# EXHIBIT A

## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO.:  1:14-cv-00392-WC

RAEMONICA CARNEY,
    Plaintiff,

v.

CITY OF DOTHAN,
    Defendant.

DEPOSITION TESTIMONY OF:
RAEMONICA CARNEY CLOYD
October 8, 2014

Job #157200

## Page 2

S T I P U L A T I O N S

1  
2    IT IS STIPULATED AND AGREED
3  by and between the parties through their
4  respective counsel that the deposition of
5  RAEMONICA CARNEY CLOYD may be taken
6  before Lane C. Butler, a Court Reporter
7  and Notary Public for the State at Large,
8  at the law offices of Jeffery W. Bennitt
9  & Associates, 121 Edenton Street,
10  Birmingham, Alabama, on the 8th day of
11  October, 2014, commencing at
12  approximately 9:30 a.m.
13    IT IS FURTHER STIPULATED
14  AND AGREED that the signature to and the
15  reading of the deposition by the witness
16  is waived, the deposition to have the
17  same force and effect as if full
18  compliance had been had with all laws and
19  rules of Court relating to the taking of
20  the depositions.
21    IT IS FURTHER STIPULATED
22  AND AGREED that it shall not be necessary
23  for any objections to be made by counsel

## Page 3

1  to any questions except as to form or
2  leading questions and that counsel for
3  the parties may make objections and
4  assign grounds at the time of trial or at
5  the time said deposition is offered in
6  evidence, or prior thereto.
7    In accordance with Rule 5(d)
8  of the Federal Rules of Civil Procedure,
9  I, Lane C. Butler, am hereby delivering
10  to Stephanie H. Mays, Esq., the original
11  transcript of the oral testimony taken
12  the 8th day of October, 2014.
13    Please be advised that this is
14  the same and not retained by the Court
15  Reporter, nor filed with the Court.
16  
17  
18  
19  
20  
21  
22  
23  

## Page 4

A P P E A R A N C E S

1  
2  
3  FOR THE PLAINTIFF:
4  
5  Jeffery W. Bennitt, Esq.
6  Terrell McCants, Esq.
7  JEFFERY W. BENNITT & ASSOCIATES
8  121 Edenton Street,
9  Birmingham, Alabama  35242
10  
11  
12  FOR THE DEFENDANT:
13  
14  Stephanie H. Mays, Esq.
15  Tiffany Rainbolt, Esq.
16  MAYNARD, COOPER & GALE
17  2400 Regions/Harbert Plaza
18  1901 Sixth Avenue North
19  Birmingham, Alabama  35203
20  
21  
22  ALSO PRESENT:
23  Delvick McKay    Job #157200

1 (Pages 1 to 4)

Page 5

```
 1            I N D E X
 2
 3   EXAMINATION BY:        PAGE NO.
 4   Ms. Mays               8
 5
 6
 7
 8
 9          E X H I B I T S
10
11   FOR THE DEFENDANT:
12   1 - Objections to defendant's    24
13       interrogatories
14   2 - SJIS search printout        43
15   3 - Job application          57
16   4 - Notice of termination        63
17   5 - Job application          67
18   6 - Charge of discrimination    125
19   7 - Charge of discrimination    130
20   8 - Charge of discrimination    134
21   9 - Personnel Board Order
22       No. 13-01            197
23   10- Court orders            200
```

Page 7

```
 1       signatures
 2   30- Dothan Police Department    285
 3       General Order 100-41
 4   31- Dothan Police Department    285
 5       General Order 100-50
 6   32- Photograph          285
 7   33- Consent decree, order, and    292
 8       joint petition to modify
 9       consent decree
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 6

```
 1   11- Facebook pages          202
 2   12- Facebook pages          217
 3   13- Dorner manifesto         222
 4   14- Memorandum, 2/15/13       223
 5   15- Letter, 2/15/13         224
 6   16- Garrity notice, 2/18/13     250
 7   17- Memorandum, 2/21/13       252
 8   18- E-mail, 2/19/13         253
 9   19- Memorandum, 3/20/13       255
10   20- Memorandum, 3/20/13       256
11   21- Letter, 2/26/13         257
12   22- Disciplinary action report   261
13       form
14   23- Affidavit            269
15   24- Employment documents      272
16   25- Personnel rules and       276
17       regulations
18   26- City of Dothan Civil       277
19       Service Act
20   27- Dothan Police Department    278
21       General Order 100-52
22   28- Memorandum, 6/23/10       282
23   29- Summary of electronic      283
```

Page 8

```
 1        I, Lane C. Butler, a Court
 2   Reporter and Notary Public, State of
 3   Alabama at Large, acting as Notary,
 4   certify that on this date, pursuant to
 5   the Federal Rules of Civil Procedure and
 6   the foregoing stipulation of counsel,
 7   there came before me at the law offices
 8   of Jeffery W. Bennitt & Associates, 121
 9   Edenton Street, Birmingham, Alabama,
10   commencing at approximately 9:00 a.m., on
11   the 8th day of October, 2014, RAEMONICA
12   CARNEY CLOYD, witness in the above cause,
13   for oral examination, whereupon the
14   following proceedings were had:
15
16        RAEMONICA CARNEY CLOYD,
17       being first duly sworn,
18   was examined and testified as follows:
19
20   EXAMINATION BY MS. MAYS:
21     Q.  Ms. Carney, my name is Stephanie
22   Mays.  I am an attorney representing the
23   City of Dothan in this matter.  I have
```

Freedom Court Reporting                    877-373-3660

Page 9

1  with me Tiffany Rainbolt and Delvick
2  McKay, personnel board director for the
3  City of Dothan.
4      Have you ever given a deposition
5  before?
6      A.  Yes, I have.
7      Q.  In what matter have you given a
8  deposition before?
9      A.  Criminal cases.
10     Q.  Related to your work at the City
11  of Dothan?
12     A.  Related to my work for the City
13  of Dothan and prior work with different
14  departments.
15     Q.  And what is this that you placed
16  here in the middle of the table?
17     A.  That is an audio recorder.
18     Q.  Are you recording the
19  deposition?
20     A.  Yes, I am.
21     Q.  Is there a reason that you're
22  recording the deposition?
23     A.  No.

Page 10

1      MS. MAYS:  Can we go off the
2  record?
3      (Discussion held off the record.)
4      Q.  (By Ms. Mays)  You understand
5  that your recording is not the official
6  transcript and is not the official record
7  in this case?
8      A.  Yes, ma'am.
9      Q.  How many times have you been
10  deposed?
11     A.  I don't recall.
12     Q.  Do you recall about how many?
13     A.  I -- I don't.  I don't recall.
14     Q.  More than ten?
15     A.  Well, I've been in law
16  enforcement for a long time, so I
17  don't -- I don't really recall.
18     Q.  Sure.  You think it's more than
19  fifty?
20     A.  I don't recall.
21     Q.  Don't have any idea?
22     A.  No.  I don't recall.
23     Q.  I want to go over a couple of

Page 11

1  rules before we get into our questioning,
2  just to help the flow of the deposition
3  today.  I'm going to ask that you please
4  respond verbally.  If I ask a question,
5  don't say "huh-uh" or "uh-huh."
6  Sometimes things may get casual, but it's
7  hard for the court reporter to record
8  "huh-uhs" and "uh-huhs."  Let's not talk
9  over each other.  The court reporter is
10  taking down everything that we say, and
11  she can't take down two people talking at
12  one time.  So I'll ask that you let me
13  finish my questions, and I'll let you
14  finish your answers before we start
15  talking.
16      If at any time you need a break,
17  you just let me know and we'll take a
18  break.  If there's a question that I
19  posed, I'll ask that you answer the
20  question before we take a break.
21      If you answer a question that
22  I've asked, I'm going to assume that you
23  understand the question.  If I ask a

Page 12

1  question that you don't understand, feel
2  free to ask me to repeat the question.
3  Okay?
4      A.  Okay.
5      Q.  The court reporter swore you in
6  just a few minutes ago.  Do you
7  understand that you're testifying under
8  penalty of perjury?
9      A.  Yes.
10     Q.  Are you on any medications today
11  that might impair your ability to
12  understand or answer my questions?
13     A.  No.
14     Q.  Is there any reason that you
15  can't testify fully and accurately?
16     A.  No.
17     Q.  Please state and spell your name
18  for the record.
19     A.  RaeMonica, R-A-E-M-O-N-I-C-A,
20  Cloyd, C-L-O-Y-D.
21     Q.  Have you ever gone by any other
22  names?
23     A.  Yes.

Page 13

```
 1      Q.  And what are those?
 2      A.  Carney, C-A-R-N-E-Y.  Caldwell,
 3  C-A-L-D-W-E-L-L.  Pullin, P-U-L-L-I-N.
 4      Q.  Are either of these three your
 5  maiden name?
 6      A.  Yes.
 7      Q.  Which one of those is your
 8  maiden name?
 9      A.  Pullin.
10      Q.  Caldwell, is that a married
11  name?
12      A.  Yes.
13      Q.  What was your husband's name?
14      A.  Which husband?
15      Q.  Mr. Caldwell.
16      A.  Oh.  Marcus.
17      Q.  And when were you married to
18  Marcus Caldwell?
19      A.  I don't recall the exact date
20  that we got married.
21      Q.  Do you recall a time frame?  Was
22  it the '80s, '90s?
23      A.  It was in '91.
```

Page 14

```
 1      Q.  And how long were you married to
 2  Mr. Caldwell?
 3      A.  One month shy of three years.
 4      Q.  How did that marriage end?
 5      A.  Divorce.
 6      Q.  Where does Mr. Caldwell
 7  currently reside?
 8      A.  I don't know specifically.  I
 9  don't -- I've never been to his home.
10      Q.  Is he in Alabama?
11      A.  Not to my knowledge.
12      Q.  What's Mr. Carney's first name?
13      A.  Roderick.
14      Q.  And when were you married to
15  Roderick?
16      A.  2002.
17      Q.  And how long were you married to
18  Mr. Roderick?
19      A.  We were married six years.
20      Q.  And how did that relationship
21  end?
22      A.  Divorce.
23      Q.  And do you know where Mr.
```

Page 15

```
 1  Roderick Carney resides?
 2      A.  Yes.
 3      Q.  Where does he reside?
 4      A.  In Tallahassee, Florida.
 5      Q.  Are you currently married?
 6      A.  Yes.
 7      Q.  To whom?
 8      A.  Kenneth Cloyd.
 9      Q.  And how long have you been
10  married to Mr. Cloyd?
11      A.  We married February of this
12  year.
13      Q.  And where does Mr. Cloyd reside?
14      A.  Louisville, Kentucky.
15      Q.  What was the basis of your
16  divorce from Mr. Caldwell?
17          MR. McCANTS:  Object to the
18  form.  But you can answer.
19      A.  Irreconcilable differences.
20      Q.  And what about from Mr. Carney?
21          MR. McCANTS:  Object to the
22  form.  Go ahead.
23      A.  Irreconcilable differences.
```

Page 16

```
 1      Q.  For either of those
 2  relationships, were the irreconcilable
 3  differences related to any domestic
 4  relations issues?
 5          MR. McCANTS:  Object to the
 6  form.
 7      A.  What do you mean, "domestic
 8  relations"?
 9      Q.  Domestic violence?  Was domestic
10  violence involved in either of those
11  relationships?
12      A.  No.
13      Q.  What is your current address?
14      A.  [REDACTED]
15      [REDACTED] You want the ZIP
16  code?
17      Q.  Yes, please.
18      A.  40229.
19      Q.  Do you have any children?
20      A.  Yes.
21      Q.  How many children?
22      A.  Three.
23      Q.  And what are their names and
```

4 (Pages 13 to 16)

Page 17

1   ages?
2      A.  Brandon deMarcus Caldwell, 22.
3   Bradley Michael Caldwell, he's 21.  And
4   [REDACTED] 13.
5      Q.  What did you do to prepare for
6   your deposition today?
7      A.  Nothing.
8      Q.  Did you review any documents?
9      A.  No.
10     Q.  Did you talk with anyone about
11  your deposition testimony?
12     A.  My counsel.
13     Q.  Other than your counsel?
14     A.  No.
15     Q.  Are you currently being treated
16  by any mental health professionals?
17     A.  No.
18     Q.  Have you been treated by any
19  mental health professionals in the last
20  ten years?
21     A.  No.  As in what?
22     Q.  As in a psychiatrist, counselor,
23  or therapist.

Page 18

1      A.  For personal or professional?
2   What are you speaking of?
3      Q.  For either.
4      A.  No.
5      Q.  For any reason.  So just so the
6   record's clear, have you been treated by
7   any mental health professional in the
8   last ten years for any reason, whether
9   personal or professional?
10     A.  No.
11     Q.  Have you ever been prescribed
12  any medications for mental health
13  conditions?
14     A.  No.
15     Q.  Have you ever been diagnosed
16  with any psychological conditions?
17     A.  No.
18     Q.  Any reason to believe that you
19  suffer from any psychological or
20  emotional conditions?
21     A.  No.
22     Q.  Did you review any documents to
23  prepare for your deposition?

Page 19

1      A.  No.
2      Q.  Other than the tape recording
3   that your lawyer provided to us that you
4   provided to him this morning, did you
5   bring any other documents to your
6   deposition?
7      A.  No.
8      Q.  Do you have any other documents
9   or recordings or evidence to support your
10  positions or your claims in this case
11  that you haven't already provided to your
12  lawyer?
13     A.  No.
14     Q.  You provided us this morning
15  with a tape recording of a conversation
16  between you and Major Parrish.  Is that
17  right?
18     A.  Yes.
19     Q.  Do you have tape recordings of
20  any conversations with any other City of
21  Dothan employees?
22     A.  Yes.
23     Q.  Are any of those recordings

Page 20

1   related to your claims in this case?
2      A.  That's something my attorney
3   would have to make the call on.
4      Q.  Have you provided those
5   recordings to your attorney?
6      A.  Some, yes.
7      Q.  How many recordings do you have?
8      A.  Several.
9      Q.  More than five?
10     A.  Yes.
11     Q.  More than ten?
12     A.  Yes.
13     Q.  More than twenty?
14     A.  Yes.
15     Q.  More than thirty?
16     A.  Yes.
17     Q.  How many would you estimate that
18  you have?
19     A.  I really don't -- I can't really
20  estimate how many.  The recordings I have
21  go over a span of years.
22     Q.  Over what span of years do the
23  recordings go?

Page 21

1     A.  Since my employment with the
2   City of Dothan in 1999.
3     Q.  Have you turned over all of
4   those recordings --
5     A.  No.
6     Q.  -- to your attorneys?  I'm going
7   to ask that you do that.
8       MS. MAYS:  And will you review
9   them and produce to us any of them that
10   are relevant, related to her claims in
11   this case?
12       MR. McCANTS:  We will.
13     Q.  (By Ms. Mays) Are you a party to
14   the conversations that you recorded on
15   these recordings that you have that date
16   back to 1999?
17     A.  Yes.
18     Q.  Who do you have recorded on
19   these tape recordings?
20     A.  That, I would have to listen to
21   each recording and provide you a more
22   accurate answer.  I -- I couldn't tell
23   you exactly who on each recording.  After

Page 22

1   listening to it, I could probably give
2   you an answer at that point in time.
3     Q.  Do you have any knowledge of
4   anybody who's on any recording?
5     A.  Yes.
6     Q.  Tell me those names.
7     A.  Major Parrish, Lieutenant
8   Baxley, Darryl Mathews, Lieutenant Etris.
9   Right now, that's all I can pinpoint.
10     Q.  So you have over thirty
11   recordings, and you can recall recording
12   conversations dating back to 1999 with
13   Major Parrish, Lieutenant Baxley, Darryl
14   Mathews, and Lieutenant Etris.  Is that
15   right?
16     A.  No.  I have recordings that date
17   back to approximately 1999, but I cannot
18   say that each of those recordings contain
19   those individuals on each recording, no.
20     Q.  But those are the only
21   individuals that you can recall you have
22   recorded during that time frame, that you
23   can recall right now?

Page 23

1     A.  Currently, yes.
2     Q.  Is there any reason why you
3   haven't provided these recordings to your
4   attorneys?
5     A.  No.
6     Q.  Do you have any journals or
7   diaries related to your claims in this
8   case?
9     A.  No.
10     Q.  Do you have any voice mails or
11   text messages related to your claims in
12   this case?
13     A.  No.  At least, not that I can
14   recall.
15     Q.  All right.  Ms. Carney, I've
16   handed you what I've marked as
17   Defendant's Exhibit 1.  These are
18   plaintiff's objections to defendant's
19   interrogatories and requests for
20   production of documents in the first two
21   pages -- first three pages, I'm sorry.
22   And then the third page begins plaintiff
23   responses to defendant's first

Page 24

1   interrogatories and request for
2   production of documents.  Do you see
3   that?
4   (Defendant's Exhibit 1 was marked for
5   identification and is attached.)
6     A.  The fourth page.
7     Q.  I'm sorry, the fourth page
8   begins the responses.
9     A.  Yes.
10     Q.  Did you receive the City of
11   Dothan's request for inter- -- request
12   for interrogatories and request for
13   production of documents?
14     A.  Yes.
15     Q.  Have you reviewed the responses
16   to these requests?
17     A.  Yes.
18     Q.  And did you provide your lawyers
19   with the responses to these requests?
20     A.  Yes.
21     Q.  If you flip over to page 20.
22     A.  This document isn't numbered.
23     Q.  The top of the page is going to

Page 25

```
 1   have "Responses To Request For
 2   Production."
 3            MR. McCANTS:  Okay, yeah.  It
 4   starts numbering on page 20.
 5            MS. MAYS:  This is how it was
 6   provided to me.
 7       Q.   (By Ms. Mays) Are you with me?
 8       A.   Yes.
 9       Q.   Number 2 asks you to provide
10   "All documents and things from any source
11   which in any way relate to or support the
12   allegations contained in the Complaint."
13            Did I read that correctly?
14       A.   Yes.
15       Q.   And have you provided your
16   lawyers with all documents and things
17   from any source which in any way relate
18   to or support the allegations contained
19   in the complaint?
20       A.   I've provided my attorney with
21   the information that she deemed pertinent
22   to the case.  Yes.
23       Q.   Did you provide your attorney
```

Page 26

```
 1   with all documents and things from any
 2   source which in any way relate to or
 3   support the allegations contained in the
 4   complaint?
 5       A.   I provided my attorney with
 6   those things that felt were pertinent
 7   to our case.
 8       Q.   If you'll turn over to the page
 9   Bates -- that's page number 22.
10   Requests, "All personal diaries, notes,
11   desk calendars, memoranda, audio tapes,
12   video tapes, emails, text messages,
13   social media comments/posts, blog
14   comments/posts, computerized documents or
15   documents assembled or compiled by you
16   (in your possession or to which you have
17   access) from the beginning of your
18   employment with Defendant to the present
19   reflecting any remarks or statements made
20   by anyone concerning:  any employment
21   contract, agreement, arrangement or
22   understanding between you and Defendant;
23   the terms and conditions under which you
```

Page 27

```
 1   performed your services; encounters,
 2   meetings, or conversations with present
 3   or past employees, officials, agents, or
 4   attorneys of Defendant; any reprimands
 5   suspensions, or disciplines, disciplines"
 6   -- "disciplinary actions against you in
 7   connection with employment; any
 8   complaints of alleged discrimination,
 9   First Amendment violations, and/or
10   hostile work environment, and/or job
11   performance, including, but not limited
12   to performance reviews, test results, and
13   examination scores."  And it continues:
14   "job titles, duties and assignments;
15   training; social media posts related to
16   your claims in this case; and the
17   termination of your employment."
18            Did that read that correctly?
19       A.   Yes.
20       Q.   Have you provided your lawyer
21   with diaries, notes, calendars,
22   memoranda, audio tapes, videotapes,
23   e-mails, text messages, social media
```

Page 28

```
 1   posts, et cetera, related to your claims
 2   in this case?
 3       A.   Well, my attorney has provided a
 4   response to that.
 5       Q.   What I'm asking is, what have
 6   you provided to your attorney, not what
 7   your attorney has provided to me, but
 8   have you provided those responsive
 9   documents to your attorney?
10       A.   My attorney's response to that
11   is that the "Plaintiff," being me,
12   "objects to this request to the extent
13   that it seeks information protected by
14   the attorney-client privilege, the
15   attorney work-product privilege, or any
16   other privilege of" -- "or protection
17   applicable under the governing law.
18   Plaintiff objects that it is overly broad
19   in scope, unduly burdensome, vague,
20   and/or seeks information that is not
21   reasonably calculated to lead to the
22   discovery of admissible evidence.
23   Plaintiff objects to the extent that it
```

Page 29

1  requests information that is equally
2  available to the Defendant and/or
3  information that is a matter of public
4  record.  Plaintiff objects to the extent
5  that it seeks facts known or opinions
6  held by non-witness experts.  Plaintiff
7  objects to the extent that it exceeds the
8  number of requests allowed by the Federal
9  Rules of Civil Procedure and the
10  applicable Rules or Orders of the Court.
11  Subject to and without waiving these
12  objections, plaintiff, states as
13  follows."
14        States that all documents of any
15  kind --
16     Q.  That's going on to the next
17  request.
18     A.  Okay.
19     Q.  And your lawyer and I can talk
20  about the objections.  What I'm asking
21  about are the responses.
22        Do you have recordings with
23  employees, current or former employees of

Page 30

1  the City of Dothan that were made without
2  the knowledge of those employees?
3     A.  Can you -- you've asked kind of
4  a twofold question.  First part is do I
5  have any recordings of former or current
6  employees of the City of Dothan.
7     Q.  Well, I know the answer to that
8  is yes because we talked about that
9  earlier; right?
10     A.  That's correct.
11     Q.  The recording that you produced
12  to us this morning, a conversation with
13  Major Parrish, was he aware that you were
14  recording that conversation?
15     A.  I don't know that.
16     Q.  Did you inform him that you were
17  recording the conversation?
18     A.  No, I did not.
19     Q.  You mentioned that you have at
20  least one recording of interactions or
21  conversations with Lieutenant Baxley.  Is
22  that right?
23     A.  Yes.

Page 31

1     Q.  Was Lieutenant Baxley aware that
2  you were recording that conversation with
3  him?
4     A.  I don't know.
5     Q.  Did you inform him that you
6  were?
7     A.  No, I did not.
8     Q.  Did you inform Darryl Mathews
9  that you were recording any conversations
10  with him?
11     A.  No, I did not.
12     Q.  Did you inform Lieutenant Etris
13  that you were recording any conversations
14  with him?
15     A.  No, I did not.
16     Q.  Go to the page that has number
17  19.  It's not the page number, but it's
18  Question No. 19.
19     A.  Okay.
20     Q.  That question asks whether you
21  have any personal diaries, journals,
22  e-mail accounts, social networking sites.
23  In response to that request --

Page 32

1        MR. McCANTS:  We got the wrong
2  number 19.
3        MS. MAYS:  Okay.
4        MR. McCANTS:  Which one?  What
5  page?  I don't have a page.  Because this
6  one, our 19 is about expert witnesses.
7        MS. MAYS:  Turn about 15 pages
8  from the front.
9        MR. McCANTS:  Oh, we're in the
10  request for production.
11        MS. MAYS:  We're in the
12  interrogatories.
13        MR. McCANTS:  Okay.  All right.
14     Q.  (By Ms. Mays) And you respond to
15  this request on the next page that you
16  have Facebook, Twitter, MySpace,
17  LinkedIn, and a personal Yahoo e-mail
18  address.  Is that right?
19     A.  That's correct.
20     Q.  And do you in fact have those
21  accounts and social networking sites?
22     A.  Yes.
23     Q.  And this question is limited to

Page 33

1  MySpace, LinkedIn, and Twitter and your
2  Yahoo e-mail account.  Are there any
3  statements on these sites or in these
4  accounts that are related to your claims
5  in this case?
6      A.  In relation to which ones?
7      Q.  Twitter, MySpace, LinkedIn, and
8  your personal Yahoo e-mail address.
9      A.  I can't recall at this time.
10     Q.  Do you still have a MySpace
11 account?
12     A.  Yes.
13     Q.  Did you have a MySpace account
14 at the time that you were most recently
15 employed at the City of Dothan?
16     A.  Yes.
17     Q.  Do you have a LinkedIn --
18 currently have a LinkedIn account?
19     A.  Yes.
20     Q.  And did you have it at the time
21 that you were employed most recently at
22 the City of Dothan?
23     A.  Yes.

Page 34

1      Q.  Do you currently have a Twitter
2  account?
3      A.  No.
4      Q.  Did you have a Twitter account
5  at the time you were most recently
6  employed at the City of Dothan?
7      A.  Okay.  Let me correct that.
8  Yes, I do.  I get Twitter and Instagram
9  mixed up.  I don't have an Instagram.  I
10 do have a Twitter, and I still have the
11 Twitter account.
12     Q.  Did you have it at the time that
13 you were most recently employed?
14     A.  Yes.
15     Q.  Same questions for your Yahoo
16 e-mail account.  Do you currently have a
17 Yahoo e-mail account?
18     A.  Yes.
19     Q.  And did you have a Yahoo e-mail
20 account when you were most recently
21 employed with the City of Dothan?
22     A.  Yes.
23     Q.  Have you gone back to these

Page 35

1  accounts -- MySpace, LinkedIn, Twitter,
2  and your Yahoo e-mail account -- to see
3  if you have any documentation or
4  information in those accounts related to
5  this case?
6      A.  I have the accounts, but I have
7  not specifically searched for any
8  particular information that I may have
9  put on those accounts in regards to
10 anything regarding the City.  So I have
11 not searched per se for any -- each of --
12 each of those accounts that way, no.
13     Q.  I'm going to ask that you do
14 that and that you provide any information
15 that you find related to your employment
16 at the City of Dothan to your attorneys.
17     MS. MAYS:  I'm going to ask that
18 you provide that to us.
19     MR. McCANTS:  We will.
20     Q.  Have you ever been sued before?
21     A.  Yes.
22     Q.  Who have you been sued by?
23     A.  I don't recall.

Page 36

1      Q.  Have you been sued more than
2  once?
3      A.  I guess, can I get you to kind
4  of clarify what you mean by "sued"?
5      Q.  Sure.  Have you ever been a
6  defendant in a lawsuit?
7      A.  Yes, I have been.
8      Q.  And can you tell me -- what can
9  you tell me about that matter or those
10 matters?
11     A.  Well, I can't really tell you
12 anything about either without being
13 specific to that particular case.  So I
14 -- I really can't answer your question.
15     Q.  Okay.  How many times have you
16 been a defendant in a lawsuit?
17     A.  I -- I can't recall.  Not -- not
18 just right off the top of my head.  I
19 don't -- I don't know.
20     Q.  Do you recall whether it's more
21 than once?
22     MR. McCANTS:  You've speaking of
23 a named defendant, like not suing the

Page 37

1    City for her actions or anything like
2    that?
3        MS. MAYS:  Yes.
4        MR. McCANTS:  A named defendant,
5    where your name was actually on the
6    lawsuit.
7        A.  I was -- well, I really can't
8    recall right this moment.  If maybe we
9    take a break, I can kind of recollect so
10   I can give you a more accurate answer.  I
11   don't want to just throw something out
12   there.
13       Q.  Is there anything that would
14   help you recall?
15       A.  Sure.  If you had something in
16   particular.
17       Q.  Have you ever been sued -- have
18   you ever sued anyone?
19       A.  Yes.
20       Q.  Can you recall who you've sued?
21       A.  Yes.
22       Q.  And who have you sued?
23       A.  Travis Faulk.

Page 38

1        THE COURT REPORTER:  F-A-L-K?
2        THE WITNESS:  F-A-U-L-K.
3        Q.  Anyone else?
4        A.  This current proceeding, I
5    guess, would be a lawsuit where I'm the
6    plaintiff.  To my knowledge, that's all I
7    can think of.
8        Q.  When did you sue Travis Faulk
9    and for what reason?
10       MR. McCANTS:  Object to the
11   form.  But you can answer.
12       A.  That was a lawsuit regarding
13   construction of a home.  He was the
14   builder.
15       Q.  And when was that proceeding?
16       A.  On or around 2008 time frame.
17       Q.  And what was the outcome?
18       A.  Well, the matter was resolved.
19       Q.  Was there a hearing or a trial?
20       A.  There was.
21       Q.  And did the Court enter an
22   order?
23       A.  Yes.

Page 39

1        Q.  Was that order in your favor?
2        A.  I guess it depends on how you
3    look at it.
4        Q.  What was the -- what did the
5    Court order in that case?
6        A.  The Court ordered for my spouse
7    at the time and I to pay a sum of monies
8    to the builder for the work that he had
9    performed up to the point of the lawsuit,
10   which was the purpose of the lawsuit.
11       Q.  What court was that case brought
12   in?
13       A.  Circuit court in Houston County.
14       Q.  Is that Carney v., is it Dinah,
15   D-I-N-A-H, Construction?
16       A.  Dinah Construction, yes.
17       Q.  Dinah.
18       In August of 2014, were you
19   involved in a matter in Jefferson County
20   Circuit Court in Louisville, Kentucky?
21       A.  Yes.
22       Q.  What was that matter regarding?
23       A.  A dispute, domestic dispute.

Page 40

1        Q.  Who was involved in that
2    domestic dispute?
3        A.  My current spouse and myself.
4        Q.  And what were the circumstances
5    of that dispute?
6        MR. McCANTS:  Object to the
7    form.
8        A.  Just a dispute.
9        Q.  Was it a physical altercation or
10   verbal altercation?
11       MR. McCANTS:  Object to the
12   form.
13       A.  It was just a disagreement
14   between my husband and I.
15       Q.  I understand.  Was it -- what
16   was the purpose of the Court proceeding?
17       A.  That's not a matter that I
18   brought before the Court.  I wasn't the
19   petitioner in that case, so I don't know
20   the reason for it.
21       Q.  Who was the petitioner in that
22   case?
23       A.  My spouse.

Page 41

1    Q.  Was there a hearing or a Court
2  proceeding?
3    A.  There was a hearing.
4    Q.  And what took place at that
5  hearing?  Let me back up.  Did you attend
6  the hearing?
7    A.  I did.
8    Q.  And what took place at that
9  hear?
10   A.  The petitioner requested the
11 Court to dismiss the case.
12   Q.  Do you know what he was claiming
13 in the case or what he was requesting in
14 the case?
15     MR. McCANTS:  Object to the
16 form.
17   Q.  I'm asking if you know.
18   A.  Yes, I do.
19   Q.  And what was he requesting?
20   A.  Personal items to be returned to
21 him.
22   Q.  Were those personal items that
23 he was claiming that he possessed?

Page 42

1    A.  Yes.
2    Q.  And the outcome of that case was
3  there was a hearing, and at the hearing,
4  your current spouse, Mr. Cloyd, asked
5  that the Court dismiss the case?
6    A.  That's correct.
7    Q.  And the Court in fact dismissed
8  the case?
9    A.  Yes.
10   Q.  Okay.  Were you ever involved in
11 a lawsuit with Flowers Hospital?
12   A.  Repeat your question?
13   Q.  Were you ever involved in a
14 lawsuit involving Flowers Hospital, or
15 any litigation involving Flowers
16 Hospital?
17   A.  Not a lawsuit, at least not to
18 what I determine a lawsuit to be.  There
19 was a relationship between Flowers
20 Hospital and myself.
21   Q.  What was the relationship
22 between you and Flowers Hospital?
23   A.  Patient.  They provided

Page 43

1  services.
2    Q.  Do you recall that Flowers
3  Hospital filed a motion in Houston County
4  District Court here in Alabama asking to
5  garnish your wages to pay a sum certain
6  that you had owed to them?
7    A.  Yes.  I actually don't recall if
8  there was a garnishment.  But there was a
9  debt that was owed to Flowers Hospital
10 that I had to pay.
11   Q.  Okay.  Show you what I've marked
12 as Defendant's Exhibit 2.  There are nine
13 matters listed here related to RaeMonica
14 Carney.  My question for you is whether
15 these nine matters relate to you.
16 (Defendant's Exhibit 2 was marked for
17 identification and is attached.)
18   A.  I see my name listed on here
19 nine times.
20   Q.  Do you recall whether these
21 Alacourt court cases, court filings are
22 related to you?
23   A.  Well, just based on this

Page 44

1  document, like I stated, my name is
2  listed on here.  I don't know without
3  looking at each individual case.
4    Q.  But sitting here today, do you
5  have any reason to dispute that these
6  cases are related to you?
7    A.  No, not at this time.
8    Q.  Okay.  Have you ever filed for
9  bankruptcy?
10   A.  Yes, I have.
11   Q.  And was that between 1996 and
12 1999 in the Middle District of Georgia?
13 That's what you said in your
14 interrogatory responses.
15   A.  I was fixing to say --
16   Q.  That's why I'm asking.
17   A.  -- I don't recall exact dates,
18 but yes, I did have bankruptcy filings in
19 the Middle District of Georgia.
20   Q.  And has that bankruptcy been
21 discharged?
22   A.  Yes.
23   Q.  And did you file a second

Page 45

1  bankruptcy around 2000 or 2001?
2      A.  Yes.
3      Q.  And that has that bankruptcy
4  also been discharged?
5      A.  I'm agreeing with the
6  "discharge."  I don't -- I know there's
7  two different terminologies used for
8  bankruptcies, discharged and dismissed.
9  But both are -- are exposed of -- or
10  disposed of, yes.
11      Q.  They are no longer open cases?
12      A.  That's correct.
13      Q.  Not ongoing?
14      A.  That's correct.
15      Q.  Any other bankruptcy filings?
16      A.  No.
17      Q.  Other than the EEOC charges that
18  you filed against the City of Dothan,
19  have you ever filed any other EEOC
20  charges?
21      A.  No.
22      Q.  Have you filed any other
23  administrative claims?

Page 46

1      A.  What do you mean?
2      Q.  Any claims with any other
3  governmental agency.
4      A.  For -- for what in particular?
5      Q.  For anything.
6      A.  That I couldn't say.  I don't
7  know.
8      Q.  You don't know one way or the
9  other whether you filed any claims with
10  an administrative agency?
11      A.  No.
12      Q.  Okay.
13      A.  I can't say one way or the
14  other.
15      Q.  Other than this lawsuit, do you
16  have any other ongoing litigation at this
17  time?
18      A.  You know, no, I don't think so.
19      Q.  Do you have any ongoing
20  administrative claims at this time?
21      A.  None that I'm aware of.
22  (Discussion held off the record.)
23      Q.  (By Ms. Mays) Did you receive --

Page 47

1  have you received unemployment benefits
2  since December of 2013?
3      A.  For who?  For what?
4      Q.  For any reason.
5      A.  Yes.
6      Q.  Did you receive any as a result
7  of the ending of your employment with
8  City of Dothan?
9      A.  Are you asking me in relation to
10  the last question you just asked?
11      Q.  Yes.
12      A.  Or are you asking me something
13  different?
14      Q.  I'm asking you about
15  unemployment benefits.  Have you received
16  any since your employment ended at the
17  City of Dothan?
18      A.  Yes.
19      Q.  And do you recall how much
20  you've received?
21      A.  No, I don't have a total amount.
22      Q.  Are you still currently
23  receiving unemployment benefits?

Page 48

1      A.  No.
2      Q.  Do you know when those benefits
3  ended?
4      A.  On or around July 22nd.
5      Q.  Of this year?
6      A.  Yes, of this year.
7      Q.  Why did those benefits end?
8      A.  I don't know.
9      Q.  Have you ever been arrested?
10      A.  Yes.
11      Q.  What were you arrested for?
12      A.  Harassing communications.
13      Q.  When was that?
14      A.  The early '90s.
15      Q.  Were you charged with harassing
16  communications?
17      A.  Well, I was arrested for
18  harassing communications, so.
19      Q.  How long were you in jail?
20      A.  I wasn't.  I was just processed
21  in and released.
22      Q.  Okay.  Who were you accused of
23  harassing?

2c4fb98a563851ef

Page 49

```
 1        A.  Marcus Caldwell.
 2        Q.  After you were released, was
 3   there a court date or hearing?
 4        A.  Yes.
 5        Q.  And what happened at that
 6   hearing?
 7        A.  The judge dismissed the case.
 8        Q.  How was Mr. Caldwell claiming
 9   that you had engaged in harassing
10   communications?
11           MR. McCANTS:  Object to the
12   form.
13        A.  By telephoning him.
14        Q.  Any other ways?
15        A.  No.
16        Q.  You said the case was dismissed.
17   Was that after a hearing, or was that at
18   Mr. Caldwell's request?
19        A.  That was at the hearing.  That
20   was the judge's decision.
21        Q.  Based on the evidence that was
22   presented at the hearing?
23        A.  Yes.
```

Page 50

```
 1        Q.  Have you been arrested any other
 2   times?
 3        A.  No.
 4        Q.  Have you ever been charged with
 5   a crime other than harassing
 6   communications at this time?  Have you
 7   ever been charged with a crime other than
 8   this incidence when you were charged with
 9   harassment, harassing communications?
10        A.  Aside from traffic violations,
11   no.
12        Q.  Ever been convicted of a crime?
13        A.  Aside from traffic violations,
14   no.
15        Q.  How many traffic violations do
16   you have, Ms. Carney?  Or Ms. Cloyd, I'm
17   sorry.
18        A.  I don't recall exactly how many.
19        Q.  Some speeding tickets here and
20   there?
21        A.  Yes.
22        Q.  What's your educational
23   background?
```

Page 51

```
 1        A.  High school diploma, associate's
 2   degree.
 3        Q.  What's your associate's degree
 4   in?
 5        A.  Criminal justice administration.
 6        Q.  And where did you get that
 7   degree?
 8        A.  Columbia Southern University.
 9        Q.  Do you have any other licenses
10   or certificates?
11        A.  Yes.
12        Q.  And in what do you have a
13   license?
14        A.  A real estate license.
15        Q.  Any other license?
16        A.  No.
17        Q.  When did you get your real
18   estate license?
19        A.  First license?  On or around
20   2002.
21        Q.  When did you get your
22   associate's degree?
23        A.  On or around 2010.
```

Page 52

```
 1        Q.  Where did you work prior to
 2   working for the City of Dothan?
 3        A.  Milledgeville Police Department,
 4   in Milledgeville, Georgia.
 5        Q.  And what was your position
 6   there?
 7        A.  Police officer.
 8        Q.  And where did you work after
 9   working at Milledgeville?
10        A.  Dothan.
11        Q.  Where did you work prior to
12   working at Milledgeville?
13        A.  Athens-Clarke County Police
14   Department.
15        Q.  What was your position there?
16        A.  Police officer.
17        Q.  And where did you work prior to
18   working at Athens as a police officer?
19        A.  I was working in the military.
20        Q.  And what was your position in
21   the military?
22        A.  Intelligence analyst.
23        Q.  Are you still currently in the
```

13 (Pages 49 to 52)

Page 53

```
 1    military?
 2       A.  Yes.
 3       Q.  And what is your position?
 4       A.  Instructor.
 5       Q.  What is your rank?
 6       A.  That's a good question.  E5
 7    sergeant.  I just, I answered that
 8    question that way because I was placed on
 9    a promotion list, but I have not received
10    the orders to be promoted.  I don't have
11    them in hand, so technically, I'm still
12    an E5 sergeant.
13       Q.  And if you're granted the
14    promotion, what will you be promoted to?
15       A.  E6, staff sergeant.
16       Q.  And you said that you're an
17    instructor.  What do you instruct?
18       A.  Actually, nothing.  Actually,
19    nothing.  I have not been to the
20    instructor course that's required, so I
21    don't instruct anything.  But that's the
22    position that I'm in.
23       Q.  Do you have plans to attend the
```

Page 54

```
 1    instructor course?
 2       A.  That's up to the military.
 3       Q.  And you are in the U.S. Army?
 4       A.  Yes.
 5       Q.  Is that correct?
 6       A.  Reserves.
 7       Q.  Were you ever disciplined or
 8    counseled when you were employed with the
 9    Milledgeville Police Department?
10       A.  I don't recall.
11       Q.  Could have been, just don't
12    recall one way or the other?
13       A.  I don't recall.
14    (Discussion held off the record.)
15       Q.  (By Ms. Mays) All right.  Now,
16    you were terminated from the Athens
17    Police Department?
18       A.  Say it again.
19       Q.  Am I right that your employment
20    was terminated from the Athens Police
21    Department?
22       A.  Yes.
23       Q.  Tell me the circumstances of
```

Page 55

```
 1    that termination.
 2       A.  I was terminated.  I don't know
 3    what to tell you.
 4       Q.  What reason were you provided
 5    for your termination?
 6       A.  If I recall correctly, I was
 7    terminated while still on probation, so
 8    they don't have to give you a reason.
 9       Q.  Were you provided with a reason?
10       A.  Not by Athens-Clarke County
11    Police Department, no.
12       Q.  Were you provided with a reason
13    by anybody?
14       A.  The Department of Labor.
15       Q.  And what did the Department of
16    Labor tell you was the reason for your
17    termination?
18       A.  What I recall is that I failed
19    to assist an officer in making an arrest.
20       Q.  And how did you get that
21    information from the Department of Labor?
22       A.  During the investigation or
23    hearing for -- when I applied for
```

Page 56

```
 1    unemployment benefits.
 2       Q.  Were you granted unemployment
 3    benefits?
 4       A.  Yes.
 5       Q.  At that time?
 6       A.  Yes.
 7       Q.  Did you file a grievance or
 8    contest your termination from the Athens
 9    Police Department?
10       A.  File a grievance with whom?
11       Q.  With anybody.
12       A.  No.
13       Q.  Are you currently employed?
14       A.  Yes.
15       Q.  Where are you currently
16    employed?
17       A.  With Keller Williams Realty.
18       Q.  Is that in Louisville, Kentucky?
19       A.  Yes.
20       Q.  As a real estate agent?
21       A.  Yes.
22       Q.  Any other employment?
23       A.  No.  Well, military still.
```

14 (Pages 53 to 56)

Page 57

1    Q.  Let's talk about your employment
2  with the City of Dothan.
3    A.  Can we take a break first?
4    Q.  Sure.
5       (Break taken.)
6    Q.  (By Ms. Mays) All right.  Ms.
7  Carney, when did you first start working
8  at the City of Dothan as a police
9  officer?
10   A.  On or around June of '99.
11   Q.  I am showing you what I've
12 marked as Defendant's Exhibit 3.  Is this
13 your application for employment that was
14 completed in February of 1999?
15 (Defendant's Exhibit 3 was marked for
16 identification and is attached.)
17   A.  I actually don't recall the
18 application itself, but.
19   Q.  Do you have any reason to
20 dispute that this is the application that
21 you completed and submitted to the City
22 of Dothan?
23      (Witness reviews document.)

Page 58

1    A.  This appears to be the
2  application.  At least, it contains
3  information that I recognize as being my
4  information.
5    Q.  If you look at the page that's
6  Bates-labeled -- when I say
7  "Bates-labeled," we're looking at these
8  numbers in the bottom right-hand corner.
9  It's 000007.
10   A.  Okay.
11   Q.  Is that your signature?
12      (Witness reviews document.)
13   A.  Yes, that appears to be my
14 signature.
15   Q.  If you turn to the page that's
16 Bates-labeled 11, is that also your
17 signature?
18   A.  Yes, it appears to be my
19 signature.
20   Q.  And starting with the page
21 that's Bates-labeled 12, is that a copy
22 of your resumé at the time?
23      (Witness reviews document.)

Page 59

1    A.  Yes, it appears to be.
2    Q.  It's my understanding that there
3  are different divisions within the police
4  department at the City of Dothan.  Is
5  that correct?
6    A.  Yes.
7    Q.  Do you recall what division you
8  were initially assigned to when you began
9  working there in 1999?
10   A.  That I don't know.
11   Q.  Our records indicate that you
12 were assigned to the patrol division.
13 Does that sound right?
14   A.  Again, I'd have to say I don't
15 know.  I just have to say I don't know.
16   Q.  Sure.  Any reason to dispute
17 that you were assigned to the patrol
18 division when you were originally hired?
19   A.  Well, based on the work that I
20 was actually performing, I was not in the
21 patrol.  I was not working patrol.
22   Q.  What work were you performing
23 when you first began working at the City

Page 60

1  of Dothan in June of 1999?
2    A.  I worked undercover.
3    Q.  And would that be a different
4  division?
5    A.  That would have fallen under the
6  narcotics division.
7    Q.  How long were you working
8  undercover in the narcotics division?
9    A.  I don't recall how long.
10   Q.  Do you recall who made the
11 decision to hire you?
12   A.  No, I don't recall.
13   Q.  From 1999 to 2004, did you spend
14 that entire time frame working in the
15 narcotic division?
16   A.  No.
17   Q.  Tell me what other divisions you
18 worked in.
19   A.  Patrol and narcotics.  The
20 narcotics division beginning out, and
21 then I was -- I was moved into the patrol
22 division, or assigned a patrol vehicle
23 and -- to a patrol shift.

Page 61

1    Q.   Do you recall about how long you
2    were in the narcotics division?
3        A.   No, I don't.
4        Q.   Do you recall about how long you
5    were assigned to the patrol division?
6        A.   Until I left the department in
7    2004.
8        Q.   What were your assignments or
9    duties when you worked in the narcotics
10   division?
11       A.   It's kind of a hard question to
12   answer.  I worked as an undercover police
13   officer with confidential informants, in
14   the capacity to make drug arrests.  Drug
15   cases, should I say.
16       Q.   What were your duties when you
17   worked in the patrol division?
18       A.   It's really various duties.  So
19   without, you know, having a complete
20   description of those duties, I may name
21   some and leave some off, so I would have
22   to say it's various duties.
23       Q.   Tell me some of those duties.

Page 62

1    What were your -- I mean, what were your
2    primary duties?
3        A.   To answer police dispatch calls
4    for service.
5        Q.   Who were you reporting to during
6    that time frame?
7        A.   Whoever the supervisor was of
8    that shift that I was on.
9        Q.   So from 1999 to 2004, you would
10   work on different shifts?
11       A.   We were assigned to a particular
12   shift, but you're subject to being
13   reassigned to different shifts.
14       Q.   What shift did you typically
15   work on?
16       A.   I don't recall.  I mean, I went
17   from nights to days.
18       Q.   Did you resign from your
19   employment with the City of Dothan at
20   some point?
21       A.   Yes.
22       Q.   When was that?
23       A.   On or around February 2004.

Page 63

1    Q.   And what led you to resign?
2        A.   My spouse's employment.
3        Q.   And who was your spouse at that
4    time?
5        A.   Roderick Carney.
6        Q.   And where was he employed?
7        A.   United States Air Force.
8        Q.   And why did his employment, or
9    how did his employment lead to your
10   resignation?
11       A.   He was stationed at Luke Air
12   Force Base in Arizona.
13       Q.   And did you resign so you could
14   move to Arizona?
15       A.   Yes.
16       Q.   Showing you what I've marked as
17   Defendant's Exhibit 4.  Do you recognize
18   these documents?
19   (Defendant's Exhibit 4 was marked for
20   identification and is attached.)
21       (Witness reviews document.)
22       A.   Yes.
23       Q.   What are they?

Page 64

1    A.   The top document I don't recall
2    ever seeing.  The second page of this
3    document is my letter of resignation
4    written on a -- what's called a PD 12
5    form for the police department notifying
6    of my resignation.
7        Q.   So on the second page of this
8    exhibit, you write:  "I am submitting
9    this letter of resignation to notify the
10   department of my intent to leave.  The
11   resignation will be effective February
12   21, 2004.  My last work day will be
13   February 20, 2004.  Lt. Martin has
14   authorized me to exhaust my accrued
15   holiday time."
16       Did I read that correctly?
17       A.   Yes.
18       Q.   And is that the letter of
19   resignation that you submitted in January
20   of 2004?
21       A.   On or about, yes.
22       Q.   And in the first page of this
23   exhibit, is that the notice of

16 (Pages 61 to 64)

Page 65

1   termination indicating that you have
2   resigned and that you provided at least
3   one week's notice prior to resigning?
4       A.  Yes.
5       Q.  And you in fact resigned in good
6   standing with the City of Dothan.  Is
7   that right?
8       A.  Yes.
9       Q.  Were you employed in Arizona or
10  after you left the City?
11      A.  I was self-employed.
12      Q.  And what -- how -- what type of
13  business were you self-employed in?
14      A.  Mary Kay cosmetics.
15      Q.  And what time frame were you
16  employed with Mary Kay?
17      A.  I don't recall when I started
18  that particular position with Mary Kay,
19  but it was -- it was after my employment
20  with the City.  I mean, it was -- I was
21  actually employed in that during the time
22  that I had -- or after I had resigned
23  from the City of Dothan.

Page 66

1       Q.  So after you resigned from the
2   City of Dothan in February of 2004, you
3   began working for Mary Kay as a sales
4   representative?  Is that what you were
5   doing?  What was your title when you
6   worked -- when you were self-employed?
7       A.  I'm trying to think of the
8   title.  It's like independent sales
9   associate.
10      Q.  And how long were you an
11  independent sales associate?
12      A.  I kind of did it off and on, and
13  I don't recall.
14      Q.  Were you an independent sales
15  associate at any point while you were
16  also employed at the City of Dothan?
17      A.  You mean before the resignation?
18      Q.  Yes.  Before February 21st,
19  2004, the effective date of the
20  resignation.
21      A.  I don't -- I don't recall the
22  date in which I actually started the Mary
23  Kay.  It's possible.

Page 67

1       Q.  At some point, did you submit an
2   application to be rehired at the City?
3       A.  Yes.
4       Q.  When was that?
5       A.  I don't recall the exact date,
6   but it was within one year of me leaving
7   the department.
8       Q.  And what were the circumstances
9   that were bringing you back to the City
10  of Dothan?
11      A.  My personal choice.
12      Q.  Was your husband also moving
13  back to Dothan?
14      A.  At some point.
15      Q.  When you -- did you submit an
16  application to be rehired?
17      A.  I don't recall.
18      Q.  I'll show you what I've marked
19  as Defendant's Exhibit 5.  Tell me, is
20  this your application that you submitted
21  to be rehired?
22  (Defendant's Exhibit 5 was marked for
23  identification and is attached.)

Page 68

1       (Witness reviews document.)
2       A.  Yes, it appears to be.
3       Q.  If you'll look on the page
4   that's Bates-labeled 71.  Is that your
5   signature?
6       (Witness reviews document.)
7       A.  Yes, it appears to be.
8       Q.  Look at the page that's
9   Bates-labeled 75.  Is that your
10  signature?
11      A.  Yes, it appears to be.
12      Q.  Then beginning with the page
13  that's Bates-labeled 76 through 80, is
14  that a copy of your resumé?
15      A.  Yes, it appears to be.
16      Q.  After you submitted this
17  application, were you in fact rehired by
18  the City of Dothan?
19      A.  Yes.
20      Q.  And when were you rehired?
21      A.  On or around May 2005.
22      Q.  Our records indicate that you
23  were rehired May 11th, 2005.  Do you have

Page 69

1   any reason to dispute that?
2      A.  No, I don't.  Not that I can
3   think of at the time -- at this time.
4      Q.  Do you know why there was about
5   a two-, three-month period between the
6   time that you submitted your application
7   and the time that you were hired?
8      A.  Are you asking me if I know why
9   the City took that length of time?
10     Q.  Is it your understanding that
11  the City was under a hiring freeze at the
12  time you submitted your application to be
13  rehired?
14     A.  No.
15     Q.  Okay.  You were in fact rehired
16  in May of 2005.  What division were you
17  assigned to at that time?
18     A.  As I recall, patrol.
19     Q.  And when you were rehired, were
20  you rehired at the same rate of pay that
21  you had left at in February of 2004?
22     A.  I -- I don't know the -- I -- I
23  don't know specifically.  I mean, I would

Page 70

1   have to look at figures to find that out.
2      Q.  Do you have any reason to
3   dispute that you were hired back at the
4   same rate of pay that you were being paid
5   when you left in February of 2004?
6      A.  Would I have any reason to
7   dispute that?
8      Q.  Do you have any reason to
9   dispute that?
10     A.  Well, again, without being able
11  to look at figures, I can't really say.
12     Q.  How long were you assigned to
13  the patrol division?
14     A.  From which time frame?
15     Q.  From May 2005 when you were
16  initially rehired.
17     A.  I don't know.
18     Q.  Do you recall what your rank was
19  when you were rehired in 2005?
20     A.  Officer.
21     Q.  After being assigned to the
22  patrol division, were you subsequently
23  assigned to the juvenile investigations

Page 71

1   division?
2      A.  Say that again?
3      Q.  Were you subsequently --
4   subsequently assigned to the juvenile
5   investigations division?
6      A.  After my rehire?
7      Q.  Yes.
8      A.  Yes.
9      Q.  And what were your duties there?
10     A.  School resource officer.
11     Q.  Were you the school resource
12  officer at one school or multiple
13  schools?
14     A.  Multiple.
15     Q.  How many?
16     A.  I can't really answer that as
17  far as saying a specific number.
18        THE WITNESS:  Is it okay to
19  explain?
20        MR. McCANTS:  Well, yeah,
21  explain.
22     A.  Okay.  We -- we were assigned as
23  primary to certain schools, whether it be

Page 72

1   a middle school, an elementary school, or
2   a high school.  And then you also had --
3   so if you were assigned, for instance, a
4   middle school, you also had an elementary
5   school.  But that doesn't mean you don't
6   respond to the other schools.  So we
7   could, you know, go to any of the schools
8   if necessary.
9        So that's why I said it's kind
10  of hard to answer your question to say,
11  you know, I was assigned to one school.
12  That wasn't the case.
13     Q.  How many school resource
14  officers were there?
15     A.  I don't recall the exact number.
16     Q.  But more than one?
17     A.  Yes.
18     Q.  You weren't the only school
19  resource officer.  So there were certain
20  schools where you were the primary
21  officer for that school, and -- but you
22  would respond if you were needed at other
23  schools?

Page 73

1     A.  Correct.
2     Q.  Similarly, there were other
3  officers who were primarily assigned to
4  schools, and they would respond to the
5  schools that you were assigned to if you
6  were unable to?
7     A.  Yes.
8     Q.  What were your duties and
9  responsibilities as a school resource
10  officer?
11     A.  They were various.  And, you
12  know, to give you a whole list of those,
13  I couldn't do that just right off the top
14  of my head.
15     Q.  Tell me your primary
16  responsibilities.
17     A.  The safety of the school.
18     Q.  And how did you go about
19  ensuring the safety of the school?
20     A.  Well, that kind of entails quite
21  a few things.  One, my presence being at
22  the school.  You know, that's kind of a
23  loaded question, you know, to try to

Page 74

1  explain all that.
2     Q.  And I'll tell you, I'm not
3  trying to trick you.  I'm just trying to
4  get a sense of what you did, because I've
5  never been a school resource officer.  So
6  I want to hear about, when you were
7  present at the school, what did you do?
8  Did you walk around?  Did you do
9  presentations in the classrooms?  Did you
10  take the kids treats?  Give me a general
11  idea of the duties and responsibilities
12  and what you did as a school resource
13  officer?
14     A.  The things you named, yes, with
15  exception of giving the kids treats.
16  That didn't happen on a regular basis.
17  But yes, walked the school, walked around
18  the school, patrolled the campus of the
19  school, did presentations in the
20  classrooms, attended football games or
21  different events for whatever school,
22  handled any disruptions that occurred on
23  the campus or that involved a student

Page 75

1  from whatever school I was at at the
2  time.  Just to give you an example.
3     Q.  Were you responsible for
4  developing relationships with the school
5  administrators?
6     A.  Yes.
7     Q.  Were you responsible for
8  developing relationships with the
9  students and parents at the schools?
10     A.  Yes.
11     Q.  You said that you were assigned
12  to be the primary resource officer for
13  multiple schools.  At any given time,
14  were you assigned to five or more
15  schools?
16     A.  In what capacity?
17     Q.  As a school resource officer.
18     A.  You mean as a primary?
19     Q.  As the primary.
20     A.  No.  We were assigned two
21  schools.  Again, whether that be a high
22  school and an elementary or a high school
23  and a middle school or the alternative

Page 76

1  school.  They were kind of divided
2  amongst the school resource officers.
3     Q.  Do you know how many schools
4  there are total or about how many there
5  are total?
6     A.  In Dothan?  No, not right off
7  the top of my head.
8     Q.  Sure.  In any given week, how
9  many different schools might you visit as
10  a school resource officer?
11     A.  Oh, God.  That depends.  I can't
12  even give you an answer to that.  It just
13  depends on the circumstances for whatever
14  school.
15     Q.  So you could go to a school on
16  Monday and stay at that school the entire
17  day, or you could visit four or five
18  different schools on a Monday, depending
19  on the circumstances or what was
20  happening in that day?
21     A.  Well, yes and no.  Yes, we have
22  to visit -- you know, we have one primary
23  school or two primary schools.  You have

19 (Pages 73 to 76)

Page 77

1    to make visits to both schools if you
2    have two schools assigned.  But in
3    addition to that, if something occurs at
4    one of the other schools, you're the
5    backup for that school, you have to go to
6    that school as well.  So you leave your
7    primary assignments to go and assist with
8    whatever is going on at another school.
9    It's possible you could visit several
10   schools in one day.  It just depends on
11   what's going on, how many officers are
12   actually working that day, what the need
13   is.
14       Q.   Would you spend the majority of
15   your week at a school?
16       A.   Again, it just depends.
17       Q.   But as a school resource
18   officer, you were assigned primary
19   schools and you said you had backup
20   responsibilities at other schools.  Does
21   that mean that you wouldn't be at the
22   police department for the most part.  You
23   would be --

Page 78

1        A.   Not necessarily.
2        Q.   You would not necessarily be at
3    the police department, or you would not
4    necessarily be in a school?
5        A.   It just depends on where you're
6    needed.  If you had to go to the police
7    department, you have to go to the police
8    department.  You're not restricted from
9    going to the police department, should I
10   say.
11       Q.   Sure.  But you're primarily --
12   primary role at that time was to be the
13   school resource officer, to ensure the
14   safety of the school, the kids, to
15   interact with the students,
16   administrators, parents?
17       A.   That's -- that's the position of
18   the school resource officer, but I'm also
19   a police officer.  So aside from the
20   school resource officer, you still have
21   the duties to answer calls if necessary
22   that were close to the school if you had
23   to respond for something that was close

Page 79

1    to the school.  It doesn't -- it doesn't
2    preclude you, or exclude you from your
3    other responsibilities as a police
4    officer.  So it's kind of an
5    all-inclusive type of position.  You're a
6    school resource officer, yes, but you're
7    still a police officer.  So there
8    isn't -- there isn't a because you wear
9    this hat, you don't do this anymore.
10       Q.   Did you enjoy being a school
11   resource officer?
12       A.   Yes.
13       Q.   How did you get that position or
14   that assignment?
15       A.   If I recall correctly, when
16   positions come available for school
17   resource officer, you submit a request to
18   be considered for the position.  So if I
19   recall correctly, I submitted a request
20   to be considered for school resource
21   officer position.
22       Q.   Do you recall who makes the
23   selection for that position?

Page 80

1        A.   I don't know who makes the final
2    decision on who gets those positions.
3        Q.   Who did you submit your request
4    to?
5        A.   Whomever we were instructed to
6    submit the request to.
7        Q.   Do you recall who that was?
8        A.   I don't.
9        Q.   Do you know how long you were in
10   this role as school resource officer?
11       A.   Approximately two, three years.
12       Q.   Did you think you were good at
13   it?
14       A.   Based on my evaluations, I
15   would -- and being in the position, and I
16   wasn't removed from it.  I don't -- I
17   don't know.
18       Q.   I was just asking you your
19   thoughts.  Did you think you were good at
20   what you did as a school resource
21   officer, not what another person had
22   evaluated your performance as.
23       A.   Yes.

Page 81

1    Q.  You said you weren't removed
2  from the role, but you were only in it
3  for two to three years.  What did you do
4  after that?  What was your assignment?
5    A.  Well, I wasn't removed from the
6  position.  I had additional
7  responsibilities that were given to me.
8    Q.  And what were those additional
9  responsibilities?
10   A.  Community Watch coordinator,
11 Crime Stoppers liaison/coordinator,
12 recruiting team member.
13   Q.  Were you given these three
14 assignments, the Community Watch
15 coordinator, Crime Stoppers
16 liaison/coordinator, and recruiting team
17 member, at the same time?
18   A.  Like were they all assigned to
19 me at the exact -- no.
20   Q.  When were you assigned to be the
21 Community Watch coordinator?
22   A.  If I recall correctly, on or
23 around the latter part of 2011.

Page 82

1    Q.  Can you give me a general idea
2  of what your primary duties and
3  responsibilities were as Community Watch
4  coordinator?
5    A.  No.  It was pretty detailed what
6  those responsibilities were.
7    Q.  If you were at a dinner party
8  and you were the community watch
9  coordinator and somebody came up and
10 said, "What do you do for a living," what
11 would you say?
12   A.  Now?
13   Q.  At that time.
14   A.  At that time?
15   Q.  When you were the Community
16 Watch coordinator.
17   A.  Just as the Community Watch
18 coordinator, I'm responsible for
19 implementing a Community Watch program
20 within different parts of the community
21 to the citizens to assist them with crime
22 watch in their neighborhoods and to train
23 them on how to identify suspicious

Page 83

1  activity within their neighborhoods, how
2  to report that activity to law
3  enforcement.
4    And then I also trained other
5  officers on the Community Watch program
6  and how they are to apply that
7  information to the community, or supply
8  that information to the community and
9  getting the community more involved with
10 seeking the information from the
11 department and the training that we were
12 offering for citizens.
13   In addition to that -- it's a
14 lot.  My role was to interact with other
15 agencies that were a part of the City so
16 that if we could share the ideas to make
17 it -- that same idea wave, say, just not
18 in the city, but also in the county.
19 Work with the County, Houston County
20 Sheriff's Department with their program
21 so that we kind of follow the same
22 protocols, basically.
23   Q.  What was your role in the

Page 84

1  community?  Did you attend community
2  meetings?  How did you -- I'll rephrase
3  my question.
4    How did you implement the
5  Community Watch program?  You said that
6  that was one of the first things you did,
7  was implementing the Community Watch
8  program.  How did you go about
9  implementing that program?
10   A.  Well, it started within the
11 department first and creating what was
12 not in the department for a Community
13 Watch program.  There was no Community
14 Watch program.  There were attempts at
15 getting a Community Watch program
16 established for the department.  And what
17 I was given was a manual, and that was
18 it.  So I had to take the manual and do
19 research, first off, to figure out how to
20 even create the program, or work the
21 program based on the national level of
22 the Community Watch program and create
23 something for our department

21 (Pages 81 to 84)

Page 85

1  individually.
2       And after establishing the
3  policy for the Community Watch program
4  that applied to all the officers in the
5  department, then I had to create the
6  training program to train the officers
7  that worked under the Community Watch
8  program and then to establish a training
9  program for the community, for the
10  citizens.
11       And then, of course, after
12  establishing that and getting people
13  trained, as far as the officers go, then
14  we set meetings up with the community.
15  And I had to evaluate the officers and
16  their performance of communicating what
17  we -- what training we had put together
18  so that they effectively put out the
19  correct information to the community when
20  they -- when we conducted those meetings.
21  And making sure I got feedback from the
22  community members that attended those
23  classes.  I had to, you know, create

Page 86

1  documents of that nature to get that
2  feedback so I could report that
3  information to the chief of police.
4       So it was a very detailed
5  position.  So there's training on -- in
6  house and, you know, being -- using what
7  we've trained in house and applying it
8  outside the department to the community.
9  The program itself was quite extensive.
10  There are several parts of the program I
11  never even attempted.  It was just
12  getting it started.  And -- and trying to
13  build the numbers of active Community
14  Watch groups that were formed within the
15  city.
16       Q.  Did you attend any of the
17  meetings in the community --
18       A.  Yes.
19       Q.   -- where community members were
20  being trained?
21       A.  Yes.
22       Q.  Did you conduct any of that
23  training?

Page 87

1       A.  Yes.
2       Q.  Did you attend most of those
3  meetings?  You attended a lot of them
4  because you were over the program.
5       A.  Yes.
6       Q.  So, would you say that this was
7  a position that made you highly visible
8  in the community?
9       A.  Yes.
10       Q.  You were highly involved in the
11  community?
12       A.  Yes.
13       Q.  People knew you, and you knew
14  people in the community?
15       A.  Yes.
16       Q.  From being the school resource
17  officer to Community Watch coordinator,
18  you were a representative of the police
19  department in the community that people
20  recognized?
21       A.  Yes.
22       Q.  Was that a position that you
23  enjoyed?

Page 88

1       A.  Yes.
2       Q.  Something you were good at?
3       A.  Are you asking my personal
4  opinion?
5       Q.  Did you think you were good at
6  it?
7       A.  Yes.
8       Q.  How were you selected for the
9  Community Watch coordinator position?
10       A.  I don't know.
11       Q.  Was that a position that you --
12  when I say "position," I mean assignment.
13  Was that an assignment that you applied
14  for?
15       A.  No.
16       Q.  Or requested?
17       A.  No.
18       Q.  How were you notified that you
19  would serve in that capacity?
20       A.  I was called to report to the
21  chief's office.
22       Q.  Who the chief at the time?
23       A.  Chief Greg Benton.

22 (Pages 85 to 88)

Page 89

1     Q.   And what did Chief Benton say
2  when you reported to his office?
3     A.   He stated that he wanted to get
4  the Community Watch program in place for
5  the department, and it was his passion
6  that he get this program going in the
7  department, and the officer that he felt
8  could do that effectively was me.  And
9  then he asked me would I consider taking
10 that position, and I told him, if he
11 would give me a couple of days to think
12 about it, I'd let him know.  And after
13 thinking about it a couple of days, I
14 told him I would do my best at it.
15    Q.   Did he tell you that he thought
16 you would be the best person for this
17 position?
18    A.   Yes.
19    Q.   Did he tell you why he thought
20 you were the best person for the
21 position?
22    A.   If I recall correctly, the
23 conversation was that he thought I had a

Page 90

1  good personality, was good with the
2  public, and could, you know, get the
3  public on board for supporting the
4  program.  And that was basically based
5  off of I guess his interaction or his
6  observations of me.
7     Q.   Do you agree with that
8  assessment?
9     A.   Yes.
10    Q.   Were there other officers who
11 were also asked to be involved with the
12 program?
13    A.   By whom?
14    Q.   By you or Chief Benton.  You
15 were the coordinator.  Were there other
16 officers who also participated in the
17 program in some way?
18    A.   Yes.
19    Q.   Who were those officers?
20    A.   Initially, Officer Rebecca
21 Jewell, Officer Tywon Truitt, Officer
22 David Schwab, S-C-H-W-A-B, Officer Jim
23 Metheny, Officer Peter Nunez.  Actually,

Page 91

1  it was Corporal Peter Nunez.  How many is
2  that?
3     Q.   I have five.
4     A.   Initially, I believe those were
5  the five officers that I started the
6  program with.
7     Q.   And how did they come to
8  participate in the program?
9     A.   Honestly, I don't know.
10    Q.   Did you ask them to help you
11 with the program?
12    A.   No.
13    Q.   Did somebody tell you these five
14 people are available to help you with the
15 program?
16    A.   Yes.
17    Q.   Who told you that?
18    A.   I don't remember if it was Chief
19 Benton who specifically said those
20 particular persons or if Captain David
21 Jay was the person who told me.  Between
22 the two of them, I think, is -- one of
23 the two of them.

Page 92

1     Q.   What role did Rebecca Jewell
2  play in this program?
3     A.   Under the program, they all had
4  the title of district coordinator.
5     Q.   And what did district
6  coordinators do?
7     A.   They were responsible for the
8  district they were assigned.
9     Q.   So they would provide the
10 training, coordinate the meetings?
11    A.   And have the meetings, yes.
12    Q.   You mentioned earlier that you
13 trained officers as part of this program.
14 What officers did you train as part of
15 this program?
16    A.   Those five.
17    Q.   And what training did you
18 provide to them?
19    A.   Well, I say those five.  Those
20 five were a part of the team to begin
21 with.  Officer Jewell left the program in
22 the startup portion of it.  Basically, in
23 my first involvement in getting

Page 93

1    everything started, she decided it wasn't
2    something she wanted to do, so she asked
3    to get out of it.  So as far as training
4    her goes, there wasn't much training
5    provided to Officer Jewell.
6           The other officers, however,
7    received training as far as the
8    PowerPoint presentations that I created.
9    They had to learn those PowerPoint
10   presentations so that they could actually
11   give those PowerPoint presentations in my
12   absence.  I can't be everywhere all the
13   time, so it was their responsibility to
14   be able to impart the exact same
15   information at each meeting.
16          Did I answer your question as
17   far as what officers I trained?
18          There was a request to train all
19   of the officers at the department, but I
20   did not get to actually accomplish that.
21      Q.   You mentioned that you were also
22   the Crime Stoppers liaison?
23      A.   Yes.

Page 94

1       Q.   When did you receive that
2    assignment?
3       A.   Sometime in 2012.
4       Q.   And if you were at a dinner
5    party and -- while you were serving as
6    the Crime Stoppers liaison and somebody
7    asked you what you did, what would you
8    say?
9       A.   Well, when dealing with Crime
10   Stoppers, my role was to basically be the
11   person who handled issues of Crime
12   Stoppers as it dealt with the different
13   agencies that were tied to the Crime
14   Stoppers program, like Houston County
15   Sheriff's Department, the other police
16   departments that fall under the district
17   attorney's purview, the chamber of
18   commerce.  So I acted as liaison for our
19   department, Dothan Police Department,
20   with our Crime Stoppers program.  But it
21   was, I guess, a network between our
22   department and the other departments and
23   the chamber of commerce.

Page 95

1           And initially, the -- the Crime
2    Stoppers program was already in place, so
3    it wasn't something I had to implement
4    per se, as I did with the Community Watch
5    program.  So it was more of a -- let me
6    just say this.  When -- when I was
7    approached about Crime Stoppers, it came
8    from outside the department, not within
9    the department.  So there was a request
10   from the chamber of commerce for them to
11   partner with me because of the work I had
12   done with the Community Watch program and
13   being visible in the media.  The Crime
14   Stoppers program wanted the same
15   visibility, so they wanted to work with
16   me, or have me work with them on getting
17   that for Crime Stoppers.  That's what led
18   to me getting that title, or that
19   position under the Crime Stoppers
20   program.
21          And part of what I did under the
22   program was implement a text-a-tip
23   program, which, of course, allowed us

Page 96

1    media time, you know, to promote getting
2    the text-a-tip program for the
3    community's benefit to report crimes to
4    the police department.  So my
5    responsibility over that was to monitor
6    that program itself because I had to, you
7    know, sell it to the powers that be who
8    make the decision on whether or not to
9    purchase the program for the department.
10   That's the chamber of commerce, the DA,
11   police chief, or whomever had funding to
12   support that program.  So in monitoring
13   what took place, the activities of that
14   text-a-tip program, I had to provide
15   reports about the benefit of it, if it
16   benefitted the department in any way.  If
17   not, it was something they would no
18   longer pay for.  So if there was no
19   benefit added, they wouldn't keep it.  If
20   it was, they would consider paying for
21   another, you know, subscription for the
22   program.
23          And again, it -- it supported

Page 97

1    several different agencies, not just
2    Dothan Police Department.  So anytime
3    there was feedback given, it was done
4    mainly with the chamber of commerce.  So
5    those meetings were held with the chamber
6    of commerce because they have a major
7    part in the program.
8        Q.  Was the Crime Stoppers liaison a
9    position that was created for you, or was
10   that an existing position in 2012?
11       A.  I don't know.
12       Q.  Do you know of anybody else who
13   had previously served in that capacity
14   before you in 2012?
15       A.  No.
16       Q.  So that you were asked, or
17   approached about this role from the
18   chamber of commerce in part due to how
19   visible you were in the media.  Is that
20   right?
21       A.  With the Community Watch
22   program.
23       Q.  So you were visible in the media

Page 98

1    through the Community Watch program?
2        A.  Yes.
3        Q.  And the work that you were doing
4    in that program?
5        A.  Yes.
6        Q.  And when you say "visible in the
7    media," what do you mean by that?
8        A.  News media would come in and
9    tape or air, you know, portions of our
10   meetings, the Community Watch meetings as
11   they were taking place.
12       Q.  So the local television stations
13   would attend some of the community
14   meetings when you were doing a training
15   for the Community Watch program?
16       A.  Yes.
17       Q.  And they would air portions of
18   that?
19       A.  Yes.
20       Q.  Of those tapings?
21       A.  Yes.
22       Q.  And so you would be on TV?
23       A.  Yes.

Page 99

1        Q.  Was the Crime Stoppers liaison
2    position a position that you enjoyed?
3        A.  Yes.
4        Q.  Was it another position that put
5    you out in the community?
6        A.  Not so much.  I guess initially
7    with the implementation of the text-a-tip
8    program, yes.
9        Q.  So, with the test-a-tip program,
10   that was something that helped to create
11   some visibility for the Crime Stoppers
12   program overall?
13       A.  Yes.
14       Q.  And that was something you said
15   where the media also highlighted the
16   activities that were taking place as
17   related to the test-a-tip program?
18       A.  Yes.
19       Q.  So, were there TV news reports
20   about the test-a-tip program?
21       A.  Yes.
22       Q.  And were you interviewed as a
23   part of those news reports about that

Page 100

1    program?
2        A.  Yes.
3        Q.  Do you know how -- how often you
4    were interviewed?
5        A.  No, I don't.
6        Q.  You were well known in the
7    community.  Is that fair to say?
8        A.  Yes.
9        Q.  How long were you the Crime
10   Stoppers liaison?
11       A.  I don't recall the date.  I
12   guess up until around the time when I was
13   written up for social media violation of
14   policy, policy violation.
15       Q.  So from 2012 till about
16   February, March of 2013?
17       A.  If that's the time frame when I
18   was written up for the social media
19   policy, yes.
20       Q.  Okay.  You said that you were
21   also given the assignment of recruiting
22   team member?  Is that right?
23       A.  Yes.

25 (Pages 97 to 100)

Page 101

```
 1      Q.  When were you given that
 2  assignment?
 3      A.  I don't recall.
 4      Q.  Were you a recruiting team
 5  member while you were a Crime Stoppers
 6  liaison?
 7      A.  Yes.
 8      Q.  Because you were a team member,
 9  I assumed there were other members.  How
10  many other recruiting team members were
11  there?
12      A.  We had the sergeant, and I think
13  there were a total of four or five of us.
14      Q.  Was that a role that you
15  enjoyed?
16      A.  Yes.
17      Q.  Another role that allowed you to
18  interact with people?
19      A.  Yes.
20      Q.  Was part of your responsibility
21  to attend job fairs?
22      A.  Yes.
23      Q.  To go to universities to try to
```

Page 102

```
 1  recruit candidates to apply for jobs with
 2  the City?
 3      A.  Yes.
 4      Q.  Do you recall the names of the
 5  four to five other team members?
 6      A.  Well, Sergeant Rachel David was
 7  the supervisor.  Officer Darren Moody.
 8  Now Sergeant Maurice Eggleston.
 9      Okay.  There was one other
10  officer, I can't call his name right now.
11  He was a newer officer at the time.  Oh,
12  goodness.  This is going to beat the
13  devil out of me.  And there's two more I
14  can't think of the names, two male
15  officers.
16      Q.  The new officer at the time, are
17  you including him as one of the two male
18  officers?
19      A.  Yes.
20      MS. MAYS:  Y'all good?  Y'all
21  want to take a break?
22      THE WITNESS:  I could use a
23  break.
```

Page 103

```
 1      (Break taken.)
 2      Q.  (By Ms. Mays) Tell me what the
 3  level of ranks are for the Dothan Police
 4  officers.
 5      A.  Okay.  You mean for an officer
 6  to go from starting out low-level police
 7  officer on up to the highest rank you can
 8  obtain?
 9      Q.  Yes.
10      A.  You start out police officer.
11  At least, to my knowledge and all I've
12  seen.
13      Q.  Okay.
14      A.  From police officer to corporal,
15  corporal to sergeant, sergeant to
16  lieutenant, lieutenant to captain, and
17  captain to major.
18      Q.  And then major to chief?
19      A.  No.  The chief is not a --
20      Q.  Chief is --
21      A.  -- ranked position, no.
22      Q.  Separate.  Okay.  In 2011, you
23  were promoted to corporal.  Is that
```

Page 104

```
 1  right?
 2      A.  Yes.
 3      Q.  And is that the highest rank
 4  that you achieved while you worked for
 5  the City?
 6      A.  Yes.  You said May of 2011, or
 7  did you say 2011?
 8      Q.  I believe I said September 2011.
 9      A.  Oh.  Yes.
10      Q.  Would you agree with me that in
11  law enforcement there's a heightened need
12  for order?
13      A.  Would I agree that there's a
14  heightened need for order?  No.
15      Q.  Do you agree there's a need for
16  order?
17      A.  Yes.
18      Q.  Do you agree there's a need for
19  loyalty?
20      A.  Yes.
21      Q.  And good morale?
22      A.  Yes.
23      Q.  Would you agree that those
```

Page 105

1    factors -- order, loyalty, good morale --
2    are critical to the success of a police
3    department?
4        A.  No.
5        Q.   Why are those factors not
6    critical to the success of a police
7    department?
8        A.  I don't think they're critical.
9    They're necessary.  They, if in place,
10   would, I guess, would provide a better
11   working environment for the department,
12   if they were all followed or in place.
13       Q.   Because police officers,
14   regardless of your rank, you work closely
15   with your fellow officers?
16       A.  To a certain degree.
17       Q.   You mentioned that your
18   assignments as a Community Watch
19   coordinator and the Crime Stoppers
20   liaison made you a very visible person in
21   the community.  Is that right?
22       A.  No.  I said my position as the
23   Community Watch coordinator, school

Page 106

1    resource officer.
2        Q.   You're right.  Those positions
3    made you visible in the community?
4        A.  Yes.
5        Q.   And one of your goals as an
6    officer who was visible in the community
7    was to inspire confidence and represent
8    as your position as a police officer.
9        A.  Say that again.
10       Q.   One of your goals was to inspire
11   confidence and respect for your position
12   as a police officer.
13       A.  That wasn't asked of me.
14       Q.   That wasn't asked of you, but
15   was that one of your goals?
16       A.  And repeat the question.
17       Q.   Even if it wasn't asked of you?
18   To inspire confidence and respect for the
19   position of police officer.
20       A.  Yes.
21       Q.   Among members of the community.
22   Was that a goal of yours?  Did you want
23   the community members that you were

Page 107

1    interacting with to have confidence in
2    you as a police officer?
3        A.  Yes.
4        Q.   Did you want them to trust you?
5        A.  Yes.
6        Q.   Did you want them to respect
7    you?
8        A.  Yes.
9        Q.   And you personally wanted to
10   maintain a good reputation in the
11   community?
12       A.  Yes.
13       Q.   And your reputation was
14   important to you regardless of whether
15   you were on duty or off duty?
16       A.  Yes.
17       Q.   Are you familiar with the law
18   enforcement code of ethics?
19       A.  Yes.
20       Q.   I'm going to read you a
21   statement, and you tell me if you recall
22   whether this is a part of that code of
23   ethics.

Page 108

1        "I will keep my private life
2    unsullied as an example to all and will
3    behave in a manner that does not bring
4    discredit to me or my agency."
5        A.  I don't recall.
6        Q.   Okay.  Do you hold that to be
7    true for yourself personally?
8        A.  You would have to repeat it for
9    me to make sure I copy all of it.
10       Q.   Sure.  It states, "I will keep
11   my private life unsullied" -- or "pure"
12   is another way to say that -- "as an
13   example to all and will behave in a
14   manner that does not bring discredit to
15   me or my agency."
16            Is that something you were doing
17   as an officer for the City of Dothan?
18       A.  You just said in my personal
19   life.
20       Q.   It's the law enforcement code of
21   ethics, and it states, "I will keep my
22   private life" --
23       A.  I'm saying you -- you asked the

27 (Pages 105 to 108)

Page 109

1  question just a second ago, you said
2  would that be my personal goal in my
3  personal life.  And I answered your
4  question before saying I didn't recall
5  whether or not that was a part of the
6  code of the ethics, or code of ethics for
7  police officers.  So your question now
8  is, is it my personal goal?
9      Q.  Is it your personal goal to keep
10  your private life unsullied as an example
11  to all and behave in a manner that
12  doesn't bring discredit to you, or the
13  agency when you were a police officer?
14      A.  Which one?  You're asking both.
15      Q.  I'll break it up.  When you were
16  an officer for the City of Dothan -- and
17  when I use the term "officer," I mean
18  regardless of your rank at any given
19  time -- was it one of your goals to set
20  an example in your behavior in a way that
21  didn't bring discredit to the agency?
22      A.  Yes.
23      Q.  Would you agree with me that

Page 110

1  it's important for police officers to
2  have a good reputation in the community?
3      A.  Yes.
4      Q.  And why do you think that's
5  important?
6      A.  Because we expect the community
7  to respect us and trust us.
8      Q.  Would you describe yourself as
9  outgoing?
10      A.  Yes.
11      Q.  Would you describe yourself as
12  being well spoken?
13      A.  Yes.
14      Q.  Someone who enjoys being engaged
15  in the community?
16      A.  Repeat the question.
17      Q.  Do you enjoy being involved in
18  the community?
19      A.  Yes, I enjoy being involved in
20  the community.
21      Q.  And as an officer for the City
22  of Dothan, you had a lot of contact with
23  community members?

Page 111

1      A.  At times.
2      Q.  Particularly when you were the
3  school resource officer, you had a lot of
4  community contact?
5      A.  It's kind of hard to answer that
6  question.  I mean, you can't -- people
7  don't see school resource officer, they
8  see police officer.  That's just a role
9  you have, is a school resource officer.
10  That might be the job that you're doing.
11  So it's kind of hard to say a school
12  resource officer.  I can't answer that to
13  that extent.
14      Q.  Well, earlier you said you were
15  in a more visible role and more involved
16  in the community when you were a --
17      A.  You -- you asked me --
18      Q.  -- school resource officer
19  and --
20      A.  -- as far as.
21      Q.  I asked earlier that we not talk
22  over each other.  I'm just trying to
23  verify that you had a lot of contact with

Page 112

1  members of the community, and you wanted
2  to limit that time frame, and so I was
3  trying to figure out what that time frame
4  was.
5          When did you consider yourself
6  to have a lot of contact with the
7  community?
8      A.  During the time that I was
9  working the Community Watch program, that
10  entailed the most community contact.
11      Q.  And tell me what time frame were
12  you coordinating the Community Watch
13  program.
14      A.  What time frame?
15      Q.  What years.
16      A.  From, if I recall correctly, I
17  think 2011 until February or March 2013.
18      Q.  Would you agree with me that
19  even when you're not actively
20  participating in military duties, you're
21  still a sergeant in the military?
22      A.  Say that again?
23      Q.  Even when you're not actively

Page 113

1  participating in military duties, you
2  remain a sergeant in the military.
3      A.  Yes.
4      Q.  Similarly, even when you're not
5  actively engaged in police work, you're
6  still a police officer, if you're a
7  police officer?
8      A.  If I'm a police officer, yes.
9      Q.  Would you agree with me that as
10 a police officer, you are a
11 representative of the department whether
12 or not you are on duty?
13     A.  To some degree.
14     Q.  If you observed illegal activity
15 while you were off duty, would you
16 respond?
17     A.  It depends.
18     Q.  In what situations would you
19 respond?
20     A.  There are policy -- or a policy
21 in place that dictates the manner in
22 which you can respond.  So you would have
23 to follow the policy regarding whatever

Page 114

1  the incident might be.
2      Q.  What policy dictates whether you
3  could respond to illegal activity when
4  you're off duty?
5      A.  I don't recall the exact policy
6  number.  But in essence, if you're not
7  equipped to respond to a robbery in
8  progress that you might be witnessing,
9  meaning you don't have your badge, you
10 don't have your gun, you don't have your
11 radio, you don't have a bulletproof vest
12 on, you don't have the equipment
13 necessary to involve yourself in that
14 crime, you don't.  You just be a witness.
15     Q.  Were there ever times when you
16 were an officer that you responded to
17 activity when you were off duty?
18     A.  Yes.
19     Q.  On what occasions did you
20 respond to activity when you were off
21 duty?
22     A.  Again, that's a question that
23 doesn't have just a simple response.  You

Page 115

1  can be off duty and have your uniform on
2  and see something, you have to respond,
3  but I'm off duty.
4      Q.  Tell me an instance when you
5  were off duty and you saw something and
6  you had to respond.
7      A.  Again, there isn't -- it depends
8  on the circumstances.  I mean, I can't
9  just tell you a particular time, you
10 know, just right off the top of my head,
11 I can't.
12     Q.  Was there ever an instance where
13 you used your personal vehicle to make a
14 traffic stop when someone had cut you off
15 in traffic?
16     A.  I used my personal vehicle to
17 make a traffic stop?  No.
18     Q.  Was there ever an incident where
19 you were off duty and driving a City of
20 Dothan vehicle and made a traffic stop
21 when you were off duty?
22     A.  To answer that question, it's
23 not possible for me to say yes, I've done

Page 116

1  that.  Because when you act as a police
2  officer, you're a police officer, you're
3  not off duty.  You have to notify
4  dispatch that you're acting as a police
5  officer whether you're, you know, on the
6  clock or not on the clock.
7      Q.  So whether you're on the clock
8  or not, you're a police officer?
9      A.  Correct.
10     Q.  Do you think as a police officer
11 it's important to have the trust of your
12 coworkers?
13     A.  Yes.
14     Q.  Are there times as a police
15 officer when you are placed in harm's way
16 and it's important to know that your
17 coworkers have your back in those
18 situations?
19     A.  Yes.
20     Q.  Would you agree with me that
21 there are some things people do outside
22 of work that can affect their reputation?
23     A.  Yes.

Page 117

1      Q.   Would you agree with me that
2   your patrol vehicle belonged to the City
3   of Dothan?
4      A.   Yes.
5      Q.   That wasn't your personal
6   property?
7      A.   No, it was not my personal
8   property.
9      Q.   Could you use the City of
10  Dothan's vehicle to drive in a drag race
11  competition?
12     A.   Not that I'm aware of.
13     Q.   Why couldn't you do that?
14     A.   As far as I know, it wasn't
15  something we were allowed to do, I guess,
16  without prior approval.
17     Q.   Are drag races illegal?
18     A.   I guess it depends on what
19  circumstance a drag race is taking place.
20  If it's, you know, an event sponsored,
21  you know, for the purpose of charity or
22  something, I don't know, might be
23  something new the City might get into.

Page 118

1      Q.   And you caused damage to the
2   City's vehicle, you could be subject to
3   discipline; is that right?
4      A.   Yes.
5      Q.   Would you agree with me that
6   managers and supervisors sometimes make
7   decisions that subordinates don't agree
8   with?
9      A.   Yes.
10     Q.   That doesn't make the decision
11  wrong, it just means that the subordinate
12  doesn't agree.  Is that right?
13     A.   Yes.
14     Q.   Was paid leave earned through
15  service hours?  So for example, the
16  longer you've been employed at the City,
17  the more hours of paid leave you were
18  allowed to accrue?
19     A.   That's not my view -- I really
20  couldn't tell you.
21     Q.   So you don't know one way or the
22  other?
23     A.   Not without referring to the

Page 119

1   manual on how leave was approved.
2      Q.   Okay.  Did you ever take any
3   paid leave while you were employed with
4   the City?
5      A.   What kind of paid leave are you
6   referring to?
7      Q.   Any type of paid leave.
8      A.   As in like holiday paid leave,
9   vacation, sick leave?
10     Q.   Did you take any leave, any paid
11  leave?
12     A.   Yes, I've taken leave before.
13     Q.   Did you take any paid leave?
14     A.   Well, it would be paid if I had
15  the time accrued.
16     Q.   Are you alleging as part of your
17  claims in this case that there were
18  individuals who were credited with more
19  paid leave time than you were?
20     A.   Yes.
21     Q.   Tell me about that claim.
22     A.   What about it?
23     Q.   What are you claiming -- who are

Page 120

1   you claiming received more -- was
2   credited with more paid leave than you?
3      A.   Well, I can't provide you
4   specific names at this present time.
5      Q.   Well, what's your basis for
6   making that allegation?
7      A.   Well, as you stated, that there
8   were persons who received more leave time
9   than I did.
10     Q.   Who were those persons?
11     A.   Again, I -- I can't name them
12  right off the top of my head.
13     MR. BENNITT:  Could we take a
14  break?  I'd like to look -- read the
15  complaint.  I haven't even seen the
16  complaint.
17     MS. MAYS:  Can I ask her a
18  couple more questions?
19     MR. BENNITT:  You can ask her
20  the entire episode, but I want to go back
21  and read the complaint, because I'm lost.
22     MS. MAYS:  Okay.
23     Q.   (By Ms. Mays) Today is my

Page 121

1    opportunity to ask you questions about
2    this case.
3        MR. BENNITT:  Okay.  Go ahead
4    and fire away.  I'm going to go back in
5    here and see if I can't find the
6    complaint.
7        Q.  You just testified that one of
8    your claims is there were people who were
9    credited with more paid leave time than
10   you.
11       A.  Uh-huh.
12       Q.  I need to know who those people
13   are.
14       A.  Okay.  Again, I can't tell you
15   right now right off the top of my head.
16       Q.  What evidence do you have that
17   there were people who were paid -- were
18   credited with more paid leave time than
19   you?
20       A.  Well, there's documentation that
21   would have to be provided by the City in
22   order for me to provide that
23   documentation or evidence to you.  And I

Page 122

1    don't know if my attorney at this present
2    time has requested that documentation or
3    if it's been provided by the City.
4        Q.  What leads you to believe that
5    there are individuals who were credited
6    with more paid leave time than you?
7        A.  Well, during my employment with
8    the City --
9        MR. BENNITT:  Okay.  All right.
10   I'm up to snuff.  This is right here
11   where you said it, or we said it.  She's
12   got a simple question:  Who are they?
13       THE WITNESS:  And I explained to
14   her that I don't know if Sonya has
15   requested the documentation from the City
16   for us to show who those officers are, so
17   I can't --
18       MR. BENNITT:  So your answer is,
19   "I don't know."
20       THE WITNESS:  Exactly.
21       MR. BENNITT:  Okay.
22       Q.  (By Ms. Mays) My question now
23   is, what leads you to believe that there

Page 123

1    were people, individuals who were
2    credited with more paid time than you?
3        A.  Again --
4        MR. BENNITT:  If you don't know,
5    you don't know.
6        A.  I don't know.
7        Q.  Well, why did you make that
8    assertion in your complaint if you don't
9    know?
10       A.  That, again, will be determined
11   once we are provided with the information
12   that -- again, my attorney would have to
13   state whether or not she has requested
14   the information from the City or not.  I
15   don't know if she's requested it.
16       Q.  What was your basis for making
17   that claim?
18       A.  My employment period with the
19   City.
20       Q.  And what during your employment
21   period led you to believe that there were
22   individuals who were credited with more
23   paid time than you?

Page 124

1        A.  The number of years that I've
2    been at the City and the time that I have
3    accrued versus the time that several
4    other officers have accrued that were
5    different.
6        Q.  Who were those several other
7    officers?
8        A.  Again, I don't know.
9        Q.  Who do you think they were?
10       A.  I -- I don't know.
11       Q.  Any idea?
12       A.  No.
13       Q.  You filed an EEOC charge in
14   September of 2006 against the City of
15   Dothan alleging race discrimination, sex
16   discrimination, and retaliation.  Is that
17   right?
18       MR. BENNITT:  Can she see it?
19       Q.  Do you recall filing an EEOC
20   charge in September of 2006 against the
21   City of Dothan?
22       A.  Well, if that's what was stated.
23       MR. BENNITT:  No, no, no.

Page 125

1      A.  -- in my interrogatories --
2         MR. BENNITT:  She asked you a
3    question.  Do you recall?
4      A.  No, I don't recall.
5         MR. BENNITT:  Just answer the
6    question.  Sometimes when it gets late in
7    the afternoon, we meander.
8      Q.  I'm showing you what I've marked
9    as Defendant's Exhibit 6.  Do you
10   recognize this as the EEOC charge that
11   you filed in September of 2006 against
12   the City of Dothan?
13   (Defendant's Exhibit 6 was marked for
14   identification and is attached.)
15     A.  Yes.
16     Q.   And in this charge, did you make
17   allegations of race discrimination, sex
18   discrimination, and retaliation?
19     A.  Yes.
20     Q.   And your allegations involved
21   not being allowed to take the corporal
22   exam.  Is that right?
23        (Witness reviews document.)

Page 126

1      A.  That was one part of it.
2         MR. BENNITT:  The answer is,
3    "Yes."
4      A.  Yes.
5      Q.  Is that a yes?  And then another
6    portion of your charge involved
7    allegations that female officers were not
8    being acknowledged when they called out
9    on the radio.  Is that correct?
10     A.  Yes.
11     Q.  If you'll turn to page 2 of this
12   exhibit, did the EEOC issue a dismissal
13   and notice of right to sue dated August
14   1st, 2007?
15        (Witness reviews document.)
16     A.  The EEOC, their determination
17   states:  "Based upon its investigation,
18   the EEOC is unable to conclude that the
19   information obtained establishes
20   violations of the statutes.  This is not
21   certified that the respondent is in
22   compliance with the statutes.  No finding
23   is made as to any other issues that might

Page 127

1    be construed as having been raised by
2    this charge."
3      Q.  Okay.  On August the 1st, 2007,
4    did the EEOC issue this dismissal and
5    notice of right to sue where they checked
6    the box beside the statement that you
7    just read?
8      A.  Yes.
9      Q.  If you'll look a little further
10   down on the page with me, there's a
11   section that's entitled "Notice Of Suit
12   Rights."  Do you see that?
13     A.  Yes.
14     Q.  In the first paragraph down at
15   the third line is the sentence that
16   reads, "Your lawsuit must be filed within
17   90 days from your receipt of this Notice;
18   otherwise, your right to sue based on
19   this charge will be lost."
20        Did I read that correctly?
21     A.  Yes.
22     Q.  Would you agree with me that
23   more than ninety days have passed since

Page 128

1    you received this dismissal and notice of
2    right to sue?
3      A.  Yes.
4      Q.  And you did not file a lawsuit
5    based on this charge?
6      A.  No.
7      Q.  And do you agree with me that
8    your claims in this lawsuit don't involve
9    the allegations that were made in this
10   2006 charge?
11        (Witness reviews document.)
12        MR. BENNITT:  Do you understand
13   the question?
14     A.  Can we have a moment?
15     Q.  I'd like to get an answer to my
16   question first.
17        MR. BENNITT:  You really, either
18   you know that this is what you filed suit
19   about or you don't.
20     A.  And your question again, please?
21     Q.  I'm asking you, do you agree
22   with me that your claims in this lawsuit,
23   the suit that we're here about today,

Page 129

```
 1    doesn't involve the allegations that
 2    remained in this 2006 EEOC charge?
 3       A.  The claims in this charge from
 4    two thousand --
 5          MR. BENNITT:  That's called
 6    Defendant's Exhibit No. 6.
 7       A.  -- Defendant's Exhibit No. 6 are
 8    not in relation to the suit that is
 9    pending.
10       Q.  So you're agreeing with me that
11    the allegations in this charge aren't
12    related to the suit that we are here
13    about today?
14       A.  Correct.
15          MR. BENNITT:  Y'all just keep
16    right on going.  Because I may have --
17    I'm -- I'm a fill-in.
18          Excuse me, sir.
19       A.  I still need to take a break.
20       Q.  Okay.  You can take a break
21    right now.
22          (Break taken.)
23       Q.  (By Ms. Mays) I'm showing you
```

Page 130

```
 1    what I've marked as Defendant's Exhibit
 2    7.  Do you recognize this as the EEOC
 3    charge that you filed against the City of
 4    Dothan Police Department in August of
 5    2009?
 6    (Defendant's Exhibit 7 was marked for
 7    identification and is attached.)
 8       A.  Yes.
 9       Q.  And your allegations in this
10    charge were based on race discrimination
11    and sex discrimination?  Is that right?
12       A.  Yes.
13       Q.  Your allegations involved being
14    harassed and intimidated in the
15    performance of your job and being
16    subjected to a hostile work environment
17    by the police chief and the City
18    attorney.  Is that right?
19       A.  Yes.
20       Q.  And did you also make an
21    allegation about the patrol car that you
22    had been assigned?
23          (Witness reviews document.)
```

Page 131

```
 1       A.  I don't know.
 2       Q.  If we turn to the second page of
 3    this exhibit, it's Bates number 719, did
 4    the EEOC issue a dismissal and notice of
 5    right to sue dated October the 7th, 2010,
 6    regarding this charge?
 7       A.  Yes.
 8       Q.  And similarly, in the middle
 9    section of this charge, it reads:  "Based
10    upon its investigation, the EEOC is
11    unable to conclude that the information
12    contained establishes violation of
13    statutes.  This does not certify that the
14    respondent is in compliance with
15    statutes.  No finding is made as to any
16    other issues that might be construed as
17    having been raised in this charge."
18          Did I read that correctly?
19       A.  Yes.
20       Q.  And is that the box that the
21    EEOC checked in its dismissal and notice
22    of rights?
23       A.  Yes.
```

Page 132

```
 1       Q.  If you'll look down at the
 2    bottom part of the page with me, under
 3    the "Notice Of Suit Rights" section, does
 4    it read, "Your lawsuit must be filed" --
 5    I'm sorry, I'm going to back up.  Before
 6    that sentence.
 7          "This will be the only notice of
 8    dismissal and of your right to sue that
 9    we will send you.  You may file a lawsuit
10    against the respondent under federal law
11    based on this charge in federal or state
12    court.  Your lawsuit must be filed within
13    90 days of your receipt of this notice;
14    or your right to sue based on this charge
15    will be lost."
16          Did I read that correctly?
17       A.  Yes.
18       Q.  And would you agree with me that
19    you had notice that you had ninety days
20    to file a Title VII lawsuit based on this
21    charge?
22       A.  Yes.
23       Q.  And that ninety days have passed
```

Page 133

1    since you received this charge?
2        A.  Since I received this notice.
3        Q.  Received this -- sorry.  Since
4    you received this notice and dismissal?
5        A.  Yes.
6        Q.  And you did not file a lawsuit
7    based on this charge.  Is that right?
8        A.  I don't know.
9        Q.  You don't know whether you based
10   a lawsuit -- filed a lawsuit based on
11   this charge?
12       A.  No, I don't.
13       Q.  Did you file a lawsuit within
14   ninety days based on this charge?
15       A.  No.
16       Q.  Would you agree that your claims
17   in this lawsuit don't involve the
18   allegations that were made in this 2009
19   charge?
20       A.  I don't know.
21       Q.  Would you agree that based on
22   the language that we read here regarding
23   your lawsuit must be filed within ninety

Page 134

1    days of receipt of this notice, that any
2    allegations in this lawsuit would be
3    untimely?
4        A.  I don't know.
5        Q.  You don't know if ninety days
6    have passed since you received the
7    notice?
8        A.  I do know that.
9        Q.  Okay.  Show you what I've marked
10   as Defendant's Exhibit 8.  Do you
11   recognize this as the EEOC charge that
12   you filed against the City of Dothan
13   Police Department on April the 19th,
14   2013?
15   (Defendant's Exhibit 8 was marked for
16   identification and is attached.)
17       A.  Yes.
18       Q.  If you'll turn over to the
19   second page of this exhibit, do you
20   recognize this as the dismissal and
21   notice of right to sue that the EEOC
22   issued on February 19th, 2014?
23       A.  Yes.

Page 135

1        Q.  Have you filed any other EEOC
2    charges against the City of Dothan?
3        A.  None that I recall at this time.
4        Q.  Have you filed any amendments to
5    any of the three EEOC charges that we've
6    marked as Defendant's 6, 7, and 8?
7        A.  That's something you would have
8    to ask my attorney.
9        Q.  Did you ever personally complete
10   any amendments to any of these charges?
11       A.  Well, I have legal counsel.
12   That's what my counsel is for.
13       Q.  If you'll look at the bottom of
14   Exhibit 8 for me, the bottom left-hand
15   corner, do you see a place that has your
16   signature?
17       A.  Yes.
18       Q.  And it says, "I declare under
19   penalty of perjury that the foregoing is
20   true and correct"?
21       A.  Yes.
22       Q.  And you signed that EEOC charge
23   declaring that?

Page 136

1        A.  Yes.
2        Q.  The statements contained in the
3    charge were true and correct.  Is that
4    correct?
5        A.  Yes.
6        Q.  And if you look at Exhibits 6
7    and 7, you similarly signed acknowledging
8    that same statement?
9        A.  Yes.
10       Q.  Do you recall having signed any
11   other charges?
12       A.  Not at this time.
13       Q.  Do you recall having signed any
14   amendments to any of these charges,
15   "these" being Exhibits 6, 7, and 8?
16       A.  I don't recall.
17       Q.  Did you know how to submit a
18   complaint or reports of harassment or
19   discrimination internally?
20       A.  Internally with?
21       Q.  All my questions are related to
22   your employment with the City of Dothan.
23   So internally at the City.

Page 137

```
 1      A.  Yes.
 2      Q.  And how could you submit
 3   complaints or reports of harassment and
 4   discrimination?
 5      A.  Depends on who it was against.
 6      Q.  Okay.  Tell me how you could
 7   submit reports of harassment or
 8   discrimination against your superior
 9   officers.
10      A.  It could be reported to the
11   chief of police or to -- and/or the EEOC
12   officer.  That's it, as far as I know.
13      Q.  Under what circumstances could
14   you submit a grievance?
15      A.  I take that back.  Also the
16   personnel director.
17      Q.  And would that be submitting a
18   grievance to the personnel director?
19      A.  Well, yes.
20      Q.  Did the City of Dothan have an
21   EEO officer the entire time that you were
22   employed there?
23      A.  I don't know.
```

Page 138

```
 1      Q.  Was there an EEO officer during
 2   your most recent employment at the City?
 3      A.  Yes.
 4      Q.  Who was that?
 5      A.  Darryl Mathews.
 6      Q.  What is Darryl's race?
 7      A.  I don't know.
 8      Q.  Have you ever met Darryl?
 9      A.  Yes.
10      Q.  Have you ever talked to him?
11      A.  Yes.
12         MR. BENNITT:  I swear I'm just
13   going to close the door.
14      Q.  Did you have a good relationship
15   with him?
16      A.  I don't know.
17      Q.  Did you think Darryl was honest,
18   or do you think that Darryl was honest?
19      A.  In reference to?
20      Q.  In general.
21      A.  I don't know.
22      Q.  Do you know him to be dishonest?
23      A.  I don't know him that way,
```

Page 139

```
 1   period.
 2      Q.  Do you have any reason to
 3   believe that he's not honest?
 4      A.  Yes.
 5      Q.  What are those reasons?
 6      A.  Well, right now, I don't -- from
 7   personal conversation that I've had with
 8   him.
 9      Q.  What was that con- -- were those
10   personal conversations about?
11      A.  Regarding my complaint that I
12   filed.
13      Q.  And what did he say that led you
14   to believe that he's not honest?
15      A.  Well, it was his determination
16   of his findings from the investigation he
17   conducted, I didn't agree with them.
18      Q.  Do you think that disagreeing
19   with a person's finding and finding that
20   person dishonest are the same thing?
21      A.  I think that his -- his
22   application was wrong.
23         MR. BENNITT:  Just answer the
```

Page 140

```
 1   question.  Just say "yes" or "no."
 2      A.  No.
 3      Q.  So it's not the same thing to be
 4   dishonest as to disagree with a person.
 5   You can disagree with somebody but not
 6   think they're a liar.
 7      A.  Yes.
 8      Q.  Right?  When you made reports to
 9   Mr. Mathews, did you think he took your
10   reports seriously?
11      A.  No.
12      Q.  Why don't you think he took your
13   reports seriously?
14      A.  I just don't.
15      Q.  What is your basis for not
16   believing that he took your reports
17   seriously?
18      A.  His findings.
19      Q.  So because you disagree with his
20   findings, you don't believe that he took
21   your report seriously.  Is that your
22   testimony?
23      A.  Yes.
```

Page 141

1    Q.  Did you ever submit a report or
2  complaint to the personnel board
3  director?
4    A.  Yes.
5    Q.  Was Delvick McKay the personnel
6  board director that you submitted that
7  report or those reports of complaint to?
8    A.  Yes.
9    Q.  What is Delvick's race?
10    A.  I don't know.
11    Q.  If I told you that he's
12  African-American, would you have any
13  reason to dispute that?
14    A.  No.
15    Q.  Do you think Delvick is an
16  honest person?
17    A.  I don't know.
18    Q.  Any reason to believe that he's
19  not?
20    A.  I don't know.
21    Q.  Do you think he took your
22  reports seriously?
23    A.  No.

Page 142

1    Q.  Why not?
2    A.  I just don't.
3    Q.  Is that because you disagree
4  with his findings?
5    A.  Possibly.
6    Q.  Any other reasons?
7    A.  I don't know.
8    Q.  You understand that today is my
9  opportunity to get your testimony about
10  your allegations in your complaint.  To
11  the extent you have any information
12  related to the questions that I'm asking,
13  I ask that you give me that information
14  today.  Okay?
15    A.  Okay.
16    Q.  Are you alleging as part of this
17  lawsuit that Dothan discriminated against
18  you on the basis of your race?
19    A.  Yes.
20    Q.  And what is your basis for that
21  claim?
22    A.  Exhibit 8 has it listed.
23    Q.  In your own words, tell me what

Page 143

1  the basis of your race discrimination
2  claim is.
3    (Witness reviews document.)
4    A.  That based on my race, I was not
5  treated fairly.
6    MR. BENNITT:  Do you know what
7  the word "basis" means?  B-A-S-I-S?
8    THE WITNESS:  Uh-huh.
9    MR. BENNITT:  What does it mean?
10    THE WITNESS:  The reason for or
11  behind.
12    MR. BENNITT:  Right.  She asked
13  you for the reasons why you filed the
14  claim.
15    (Witness reviews document.)
16    A.  As a black female in the
17  department, or African-American female in
18  the department, I was not given the same
19  positions as other races within the
20  department.
21    Q.  What positions were people of
22  other races given that you were not?
23    A.  Investigative positions, hostage

Page 144

1  negotiation positions, different --
2  different positions within the
3  department, traffic position.  There's
4  many to name.
5    Q.  I want to know all of them.
6    A.  There's many to name.
7    MR. BENNITT:  I'm sorry, but you
8  have to answer the question.  It's
9  either, "Here they are," or "I don't
10  know."
11    A.  I named being in traffic or
12  investigative positions, juvenile
13  investigations, criminal investigations,
14  hostage negotiations.
15    MR. BENNITT:  I think you're
16  giving generalized lists.  I think she's
17  asking for who did you compete against,
18  what was the date the position was given
19  to somebody else, how did you apply.
20    A.  Is that what you're asking?
21    Q.  I haven't gotten to those
22  questions yet, but I'm going to ask you
23  those things.

36 (Pages 141 to 144)

1     A.  Okay.
2     Q.  I want to know what you're
3  claiming in this lawsuit.  And if you're
4  claiming that there was a position in a
5  certain department or a certain division
6  that you should have gotten or received
7  but didn't because you were a black
8  female, we're going to talk about that.
9     A.  That's what I just gave you.
10     Q.  And so this list of positions,
11  investigative positions, hostage
12  negotiation, traffic positions, juvenile
13  investigations, criminal investigations,
14  those are positions that you allege that
15  individuals who were not black females,
16  who were not you received that you should
17  have?
18     A.  Yes.
19     Q.  Okay.  What were the
20  investigative positions that you believe
21  you should have received?
22     A.  That's what it is,
23  investigations.

1        MR. BENNITT:  She wants to know
2  the date.
3     A.  You're not a detective.  It's --
4        MR. BENNITT:  She wants to know
5  the date --
6     A.  You're in investigations.
7        MR. BENNITT:  -- who got the
8  position, who did you complete against,
9  who did you apply, did you file an
10  application.  That's what she's asking
11  for each of the specific episode, not a
12  blanket.  Does that make sense?
13        THE WITNESS:  Yes.
14        MR. BENNITT:  Can you answer
15  that question or not?
16        THE WITNESS:  But she didn't ask
17  me that exactly.  I'm answering what she
18  asked me.
19     Q.  (By Ms. Mays) I'm going to ask
20  you all those questions about each one of
21  these positions.  And so we can -- you
22  tell me as much as you can about why you
23  believe that you should have gotten

1  investigative position.
2     A.  Okay.  And again, there were
3  other officers, white male officers.  You
4  want names?
5     Q.  I do.
6     A.  I mean, I -- I can't give you
7  all their names because I don't have a
8  list to go by, first off, so that I can
9  tell you specifically this officer, this
10  officer, this officer.
11     Q.  I want all the names you're
12  basing your claims off of.  There is some
13  reason you made this allegation.
14     A.  Uh-huh.
15     Q.  I want to know why.
16     A.  I'm saying I don't have it in
17  front of me so that I can name those
18  persons' names off to you.  I don't have
19  that in front of me.
20     Q.  Well, today's my day to ask you.
21     A.  I understand that.
22     Q.  And so I need you to name who
23  got investigative positions that you were

1  qualified for.
2     A.  I can get you that information.
3  I just don't that right here in front of
4  me to give that to you.
5        MR. BENNITT:  Okay.  Let me try
6  to help here.  Because I'm a newbie.
7        MS. MAYS:  Can we go off the
8  record?
9        (Break taken.)
10     Q.  (By Ms. Mays) So before we took
11  a break, I had asked you about the
12  investigative positions that you thought
13  that you should have received.  Do you
14  recall that?
15     A.  Yes.
16     Q.  Who received the investigative
17  positions that you thought you should
18  have received?
19     A.  I don't know.
20     Q.  What is the investigative
21  position?
22     A.  I don't know the City's
23  definition for it, so.

Page 149

1    Q.  What did you think it was?
2    A.  An investigative position.
3    Q.  What did you think the
4  responsibilities included?
5    A.  Investigating crimes.
6    Q.  During what time period or time
7  frame did you think you should have
8  gotten a position that you didn't get?
9    A.  Between 1999 and 2013.
10   Q.  That's the duration of your
11 employment.  You thought you should have
12 gotten an investigative position every
13 year from 1999 to 2013?
14   A.  That's not what you asked me.
15   Q.  Was there a year or a date or a
16 certain position that came available?
17   A.  It was between my employment
18 period.
19   Q.  During your first stint of
20 employment --
21   A.  First and second.
22   Q.  -- or the second stint?
23   A.  First and second.

Page 150

1    Q.  How many investigative positions
2  became available that you thought you
3  should have gotten?
4    A.  I don't know.
5    Q.  More than one?
6    A.  I don't know.
7    Q.  What do you know about these
8  investigative positions that you thought
9  you should have received?
10   A.  That they were available and I
11 wasn't -- I didn't receive one.
12   Q.  Did you apply?
13   A.  Yes.
14   Q.  Do you know who received them?
15   A.  I don't.
16   Q.  Do you know who made the
17 decision --
18   A.  I don't.
19   Q.  -- regarding who received the
20 position?
21   A.  I don't.
22   Q.  Do you know the qualifications
23 of the people who received the positions?

Page 151

1    A.  No.
2    Q.  Do you know how your
3  qualifications compared to the
4  qualifications of the people who received
5  the position?
6    A.  I don't know.
7    Q.  Is there anything else you can
8  tell me about these investigative
9  positions?
10   A.  No.
11   Q.  Hostage negotiation, is that a
12 position?
13   A.  Yes.
14   Q.  Who received the hostage
15 negotiation position that you thought you
16 should have received?
17   A.  I don't know.
18   Q.  During what time frame was a
19 hostage negotiation position available?
20   A.  During my second employment.
21   Q.  And that began in what year?
22   A.  2005.
23   Q.  Was it toward the beginning of

Page 152

1  your employment that this position was
2  available?
3    A.  I -- I don't know.
4    Q.  How many times was a hostage
5  negotiation position available?
6    A.  I don't recall.
7    Q.  Was it more than one?
8    A.  I don't recall.
9    Q.  Did you apply for the position?
10   A.  I did.
11   Q.  How many times did you apply for
12 the position?
13   A.  I don't -- I don't recall.
14   Q.  Do you know who received the
15 position?
16   A.  I don't.
17   Q.  Do you know who made the
18 decision --
19   A.  I don't.
20   Q.  -- regarding who received the
21 position?
22   A.  I don't know.
23   Q.  Do you know the qualifications

Page 153

1    of the person who was hired into the
2    position?
3        A.  I don't.
4        Q.  Do you know the gender of the
5    person who was hired?
6        A.  I don't know at this time.
7        Q.  Do you know the race?
8        A.  I don't know at this time.
9        Q.  For the investigative positions,
10   do you know the race or gender of the
11   persons who were hired into those
12   positions?
13       A.  I don't know at this time.
14       Q.  If you don't know the race or
15   the gender of the people who were hired
16   into the positions, how can you allege
17   that you weren't provided the position or
18   granted the position because of your race
19   and gender?
20       A.  I don't know.
21       Q.  Traffic positions, who was hired
22   into the traffic positions that you
23   thought you should have been hired into?

Page 155

1    during that time frame that you thought
2    you should have received a traffic
3    position?
4        A.  No.
5        Q.  Do you know how many traffic
6    positions were posted?
7        A.  I don't know.  I don't recall.
8        Q.  Anything else you can tell me
9    about the traffic positions that you
10   think you should have received?
11       A.  No.
12       Q.  Juvenile investigations, is that
13   another position that you thought that
14   you should have received?
15       A.  Yes.
16       Q.  Who received the juvenile
17   investigations positions that you thought
18   you should have received?
19       A.  I don't recall.
20       Q.  Do you recall the race of the
21   person?
22       A.  I don't.
23       Q.  Or persons who received the

Page 154

1        A.  I don't know.
2        Q.  Do you know the race of the
3    people who were hired?
4        A.  I don't know at this time.
5        Q.  Do you know who made the hiring
6    decision?
7        A.  I don't know at this time, no.
8        Q.  Do you know the qualifications
9    of the people who were hired?
10       A.  I don't know.
11       Q.  Did you apply for a traffic
12   position?
13       A.  I don't recall.
14       Q.  Did you expect to get a position
15   that you did not apply for?
16       A.  I mean, that was possible.
17       Q.  During what time frame did you
18   expect to receive a traffic position or
19   do you think that you should -- during
20   what time frame do you think you should
21   have received a traffic position?
22       A.  Between 2005 and 2013.
23       Q.  Is there a year in particular

Page 156

1    positions that you thought you should
2    have received?
3        A.  I don't recall.
4        Q.  Do you recall the gender?
5        A.  I don't recall.
6        Q.  Do you recall who made the
7    hiring decision?
8        A.  I don't recall, no.
9        Q.  Do you know the qualifications
10   of the people who were hired?
11       A.  I don't.
12       Q.  Did you submit an application?
13       A.  Yes.
14       Q.  How many times did you apply?
15       A.  I don't recall.
16       Q.  When did you apply?
17       A.  Between -- well, during both my
18   employment periods.
19       Q.  Can you tell me anything else
20   about your allegations that you should
21   have received a juvenile investigation
22   position?
23       A.  Not at this time.

39 (Pages 153 to 156)

Page 157

1      Q.  Can you tell me anything else
2  about your basis for alleging that you
3  should have received the position?
4      A.  Not at this time.
5      Q.  Did you review your complaint
6  before it was filed?
7      A.  Which complaint?
8      Q.  The complaint that's the basis
9  of this lawsuit.
10     A.  Yes.
11     Q.  And at that time, did you have a
12  basis for alleging that you should have
13  received these positions?
14     A.  Yes.
15     Q.  And at this time, do you have a
16  basis for alleging that you should have
17  received those positions?
18     A.  No.
19     Q.  So, what happened between the
20  time that you filed the complaint and
21  now?
22     A.  Nothing.
23     Q.  What information did you have at

Page 158

1  the time that you filed the complaint
2  that provided you with a basis for making
3  these allegations that you don't have
4  here today?
5      A.  Well, nothing's changed.  I
6  mean, the complaint details it.
7      Q.  So you had the same information
8  at the time you filed the complaint that
9  you do right now?
10     A.  Yes.
11     Q.  Okay.  So the information that
12  you don't know today, you didn't know
13  when you filed your complaint.  Is that
14  right?
15     A.  No.
16     Q.  That's not right?
17     A.  No.  I just said I don't recall.
18     Q.  So the information you don't
19  recall right now, you didn't recall when
20  you filed your complaint?
21     A.  No.  That's not what I'm saying.
22     Q.  What are you saying?
23     A.  Right now, I don't recall.

Page 159

1      Q.  Okay.  Did you have documents or
2  information at the time that the
3  complaint was filed that helped you to
4  recall this information?
5      A.  Yes.
6      Q.  Do you still have access to
7  those documents and information that you
8  had when you filed the complaint?
9      A.  Yes.
10     Q.  Have you provided those
11  documents and that information to your
12  counsel?
13     A.  Yes.
14        MS. MAYS:  Jeffrey, do we know
15  if that's been produced in this case?
16        MR. BENNITT:  I don't know
17  what's been produced and what hasn't.
18  Has anything been produced?
19        MS. MAYS:  Yes, there have been
20  documents produced.  I don't recall any
21  documents related to these positions.
22        MR. BENNITT:  You want to get
23  Sonya on the phone?  She's at the house.

Page 160

1         MS. MAYS:  I'm going to keep
2  trucking through.
3         MR. BENNITT:  I haven't seen the
4  list of documents that exist in this
5  case.  But I think that, you know, she's
6  testified there are document, you need to
7  know what they are.
8         MS. MAYS:  I do need to know
9  what they are.
10        MR. BENNITT:  Do you know what
11  the names of these documents are?  Do you
12  know what they look like?  Can you
13  describe them?
14        THE WITNESS:  No.  I don't know
15  what documents she's referring to.
16        MR. BENNITT:  She's not
17  referring to any documents.  You said
18  that there are documents.  So if you can
19  describe them, what they look like, then
20  that would be nice.
21        Okay.  Let's just tab this right
22  here.  Okay?
23        MS. MAYS:  Okay.

1          MR. BENNITT:  To come back to.
2     Because I don't know what they are.  I've
3     never seen any documents, and I can't.
4          Q.  (By Ms. Mays) What are the
5     documents that would help you to recall
6     information about these positions?
7          A.  The job postings or
8     announcements, job announcements.
9          Q.  Anything else?
10         A.  I guess the list of officers who
11    were selected for those positions.
12         Q.  Are you testifying that you have
13    that information?
14         A.  No.  I'm testifying that that
15    information is available.
16         Q.  Criminal investigations, did you
17    apply for any criminal investigations
18    positions?
19         A.  Yes.
20         Q.  How many times?
21         A.  I don't recall.
22         Q.  Do you recall when you applied?
23         A.  I don't recall the exact dates.

1          Q.  Do you recall a time frame?
2          A.  During my last employment
3     period.
4          Q.  Do you know whether it was
5     closer to the beginning of that
6     employment period or closer to the end?
7          A.  I don't.  Because there have
8     been multiple.
9          Q.  Do you know who was hired into
10    those positions?
11         A.  Not at this time.
12         Q.  Do you know whether they were
13    male or female?
14         A.  Both.
15         Q.  Do you know their races?
16         A.  Caucasian.
17         Q.  Do you know the names of any of
18    these individuals?
19         A.  I don't recall at this time.
20         Q.  Do you know who made the hiring
21    decision?
22         A.  I don't.
23         Q.  Do you know the qualifications

1     of any of these individuals?
2          A.  I don't.
3          Q.  Let's look at your EEOC charge.
4     The third sentence in "The Particulars
5     Are," "In addition to my duties as a
6     police officer, I am a Community Watch
7     Coordinator, Crime Stoppers Coordinator,
8     and a recruiting team member."
9          We talked about your service in
10    those assignments.  Is that correct?
11         A.  Yes.
12         Q.  The next sentence reads,
13    "Despite having been assigned these
14    additional duties, I have not been
15    promoted, nor have I received any
16    additional compensation."
17         Am I right that, when serving in
18    the roles of Community Watch coordinator,
19    Crime Stoppers coordinator, and
20    recruiting team member, you were an
21    officer?  Your rank was officer during
22    those time frames?
23         A.  During the time frames of what?

1          Q.  When you served as Community
2     Watch coordinator, were you an officer?
3          A.  Yes.
4          Q.  And when you served as the Crime
5     Stoppers coordinator, were you an
6     officer?
7          A.  Yes.
8          Q.  And when you were serving as
9     recruiting team member, were you also
10    serving in the rank of an officer?
11         A.  Yes.
12         Q.  So you had not been promoted to
13    another rank, you had just been given the
14    assignments to serve in the capacity of
15    Community Watch coordinator, Crime
16    Stoppers coordinator --
17         A.  For --
18         Q.  -- and recruiting team member.
19    Is that right?
20         A.  For Community Watch coordinator
21    and the Crime Stoppers position, when I
22    started the Community Watch coordinator
23    position, I was just an officer.  And I

Page 165

```
1    don't recall the time frame for when I
2    was given the Crime Stoppers coordinator
3    position, if that came after the
4    promotion to corporal.  But when I
5    started that position as Community Watch
6    coordinator, I was an officer.  And I
7    don't recall if I was a member of the
8    recruiting team before the promotion.
9        Q.   These three assignments, the
10   Community Watch coordinator, Crime
11   Stoppers coordinator, and recruiting team
12   member, those aren't rank advancements?
13       A.   No.
14       Q.   Those aren't promotions in and
15   of themselves?
16       A.   No.
17       Q.   Do you know of any individuals
18   who have served in any of those three
19   capacities who received additional
20   compensation?
21       A.   I don't know.
22       Q.   "Throughout" -- the next
23   sentence reads, "Throughout my
```

Page 166

```
1    employment, White male employees with
2    less experience have been promoted at a
3    faster rate than I have."
4        Did I read that correctly?
5        A.   Yes.
6        Q.   What white male employees with
7    less experience have been promoted at a
8    faster rate than you?
9        A.   I don't know at this time what
10   the names are.
11       Q.   How do you know that white male
12   employees with less experience have been
13   promoted at a faster rate than you?
14       A.   Because some were hired after
15   me.
16       Q.   Who were those white males with
17   less experience who were hired after you?
18       A.   Right now, I don't recall the
19   names.
20       Q.   Can you describe them?
21       A.   Other than being white males?
22   No, not.
23       Q.   When were they hired?
```

Page 167

```
1        A.   Some were hired after me.  Some
2    were hired at the same time I was hired.
3        Q.   Well, if they were hired at the
4    same type as you, they would have the
5    same experience as you; right?
6        A.   No, not necessarily.
7        Q.   Why would they not have the same
8    experience with you, if they were hired
9    at the same time?
10       A.   I had prior law enforcement
11   experience.  I don't know if they had
12   prior law enforcement experience.  To my
13   knowledge, they did not.
14       Q.   Were you allowed to attribute
15   your prior law enforcement experience to
16   promotions at the City?
17       A.   I don't recall at this time.
18       Q.   The City had policies in place
19   with regard to each of the rank
20   advancement opportunities that outlined
21   the number of continuous years in service
22   an officer had to be before being allowed
23   to be promoted to those positions.  Is
```

Page 168

```
1    that right?
2        A.   I don't recall.
3        Q.   Okay.  What promotions did the
4    white male employees with less experience
5    receive?
6        A.   What promotions?
7        Q.   What jobs were they promoted
8    into?
9        A.   They don't get promoted into
10   jobs.
11       Q.   The statement says that,
12   "Throughout my employment, white male
13   employees with less experience have been
14   promoted at a faster rate than I have."
15       What have they been promoted to?
16       A.   Different ranks.
17       Q.   What ranks did these white male
18   employees get promoted to?
19       A.   Corporal, sergeant.
20       Q.   During what time frame?
21       A.   During my employment period from
22   2005 to 2013.
23       Q.   What year?
```

1      A.  I don't recall exactly what
2   year.
3      Q.   Is there anything else that you
4   can tell me about the white male
5   employees with less experience who have
6   been promoted at a faster rate than you
7   have?
8      A.  No, not at this time.
9      Q.   Do you have any documents or
10  information that would help you to recall
11  information about these white male
12  employees with less experience?
13     A.  Not at this time.
14     Q.   Have you at any time had any
15  documents or information regarding this
16  statement?
17     A.  I don't recall documents, but
18  information.
19     Q.   What information have you had?
20     A.   Knowledge of who's being
21  promoted that was -- during my time of
22  working at the department.
23     Q.   And as we sit here today, you

1   don't have that knowledge?
2      A.  I don't have specific dates and
3   times and names.
4      Q.  What do you have?
5      A.  I just don't have it right now.
6      Q.   Again, you understand today is
7   my opportunity to ask you questions about
8   what you are alleging --
9      A.  Uh-huh.
10     Q.   -- in this lawsuit.  And I've
11  asked you repeatedly about the white male
12  employees with less experience who have
13  been promoted at a faster rate than you.
14  Can you tell me any information that
15  provides you with a basis for that
16  allegation?
17     A.  No, not at this time.
18     Q.  The next sentence reads that,
19  "White male employees with less
20  experience are paid more than I am."  Who
21  are the white male employees who are paid
22  more than you?
23     A.  I don't recall.

1      MR. BENNITT:  Is that a claim?
2   Is there a pay claim in this lawsuit?
3      MS. MAYS:  I'm reading through
4   her --
5      MR. BENNITT:  -- charge?
6      MS. MAYS:  -- EEOC charge, which
7   she says is the basis for her race
8   discrimination claim.
9      Q.   (By Ms. Mays) Do you have any
10  evidence to support that white males with
11  less experience were paid more than you?
12     A.  Not at this time.
13     Q.  Why do you believe that?
14     A.  Because there were white male
15  employees who were promoted over me that,
16  again, had less experience than I had.
17     Q.  In order to be promoted to a
18  different rank, were officers required to
19  take promotional exams?
20     A.  Yes.
21     Q.  And whether a person was
22  promoted was related to the score that
23  they got on that validated promotional

1   exam.  Isn't that right?
2      A.  A portion of it.
3      Q.  So that's right?
4      A.  A portion of it.  It wasn't.
5      Q.  That it was a portion of their
6   score that determined whether they --
7      A.  That wasn't the only thing.
8      Q.  It wasn't the only -- I'm not
9   saying it was the only factor.  But the
10  validated test score was a consideration,
11  or one of the factors that was considered
12  in whether a person could be promoted to
13  a higher rank.  Is that right?
14     A.  Yes.
15     Q.  Do you know the test scores for
16  any of these white male employees who
17  were promoted?
18     A.  I do not know.
19     Q.  Do you know how your test scores
20  compared to theirs?
21     A.  I don't know.
22     Q.  The next sentence in the charge
23  reads, "Furthermore, I have been

Page 173

1  subjected to harassment from White male
2  employees, but management is turning the
3  other cheek."
4      Did I read that correctly?
5      A.  Yes.
6      Q.  What harassment are you alleging
7  you have been subjected to from white
8  male employees?
9      A.  As is stated, "The harassment
10  began when I began speaking up for the
11  rights of minorities who I believed the
12  department was targeting and treating
13  differently."
14      Q.  That's what the next sentence
15  says; right?
16      A.  Yes.
17      Q.  What I'm asking you is what
18  harassment were you subjected to.
19      A.  Officers not having
20  conversations with me, conversations that
21  were ongoing were ended when I
22  approached, evaluations being lowered,
23  not being considered for positions that

Page 174

1  became available.
2      Q.  Are there any other ways that
3  you believe you were subjected to
4  harassment from white male employees?
5      A.  Those were ones I can recall
6  right now.
7      Q.  What white male employees are
8  you alleging subjected you to harassment?
9      A.  I don't recall right now.
10      Q.  When are you alleging that you
11  were subjected to harassment?
12      A.  Between '05 and 2013.
13      Q.  Who stopped having conversations
14  when you approached?
15      A.  Multiple officers.
16      Q.  Who?
17      A.  I don't recall by name.
18      Q.  Do you know why they stopped
19  having conversations when you approached?
20      A.  Yeah.  I approached.  I mean.
21      Q.  Do you know what they were
22  talking about when you approached?
23      A.  I don't recall at this present

Page 175

1  time exactly what the conversations were.
2      Q.  Could they have --
3      A.  Some I may have walked in on and
4  heard and just dispersed.
5      Q.  So you don't know what they were
6  talking about when you approached, you
7  just know that they stopped talking when
8  you approached?
9      A.  Uh-huh.
10      Q.  Could they have completed their
11  conversation by the time you approached?
12      A.  It's possible.
13      Q.  How many times were officers
14  talking and they ended their
15  conversations when you approached?
16      A.  I don't recall exactly how many.
17      Q.  Was it more than five?
18      A.  I don't recall.  I mean.  I
19  would say numerous.
20      Q.  And how do you define
21  "numerous"?
22      A.  Many, numerous, multiple.  I
23  don't have an exact number for you.

Page 176

1      Q.  Can you provide me with a range?
2      A.  Well, it lasted several months,
3  so I couldn't tell you.  I didn't count
4  them.
5      Q.  What months did it take place?
6      A.  Off and on between 2007 and
7  2013.
8      Q.  Do you know whether these
9  officers stopped talking when other
10  people approached?
11      A.  Not that I was a witness to.
12      Q.  But you don't know one way or
13  the other whether they did?
14      A.  I don't.
15      Q.  Did you report to the EEO
16  officer that the officers stopped talking
17  when you approached?
18      A.  Not that I recall.
19      Q.  Did you report to personnel
20  board or file a grievance?
21      A.  Not that I recall.
22      Q.  Did you report to anyone?
23      A.  Yes.

1    Q.  Who did you report to?
2    A.  Captain Keith Gray.
3    Q.  When did you report to Captain
4  Keith Gray?
5    A.  More than likely, right after
6  the incidents occurred.
7    Q.  And what did you report to
8  Captain Gray?
9    A.  What I observed.
10   Q.  Did you make the report in
11  writing?
12   A.  None that I recall putting in
13  writing.  Just by conversation.
14   Q.  And tell me what you told
15  Captain Gray.
16   A.  Exactly what I witnessed.  I was
17  approaching, the officers were speaking
18  and having conversation, laughing, what
19  have you, and I walk up, everybody stops
20  and walks away.
21   Q.  And how did Captain Gray
22  respond?
23   A.  It was up to me what I wanted to

1  do.  If I wanted to file a grievance or
2  just let it go, it was up to me.
3    Q.  And you chose not to file a
4  grievance.  Is that right?
5    A.  Not at the time.
6    Q.  You didn't file a grievance at
7  the time.
8    A.  No.
9    Q.  Is that right?  Who was not
10  having conversations with you?
11   A.  I don't recall who was not
12  having conversations with me.  It was a
13  matter of conversations were taking place
14  and I would walk up, conversations would
15  stop and look up, you know, see me
16  coming, and disperse.  That -- that
17  happened with just regular officers and
18  supervisors.
19   Q.  Can you tell me the names of any
20  of those regular officers?
21   A.  No, not right off.
22   Q.  Can you tell me the names of any
23  of those supervisors?

1    A.  Not right offhand, no.
2    Q.  Have you told me everything
3  about officers ending conversations when
4  you approached or not having
5  conversations with you?
6    A.  That I can recall, yes.
7    Q.  What postings were you not
8  considered for?
9    A.  What what?
10   Q.  You said that you were not
11  considered for certain postings or
12  positions.  What positions or postings
13  were you not considered for?
14   A.  I don't recall saying anything
15  about postings.
16   Q.  Were you not considered for
17  certain positions?
18   A.  Those are the ones you've
19  already gone over.
20   Q.  That's what we talked about
21  earlier, the five positions that we
22  talked about --
23   A.  Yes.

1    Q.  -- previously?  What evaluations
2  were lowered?
3    A.  We have yearly evaluations, so
4  the yearly evaluations we receive.
5    Q.  Did you ever receive an
6  evaluation that was less than
7  satisfactory during your second stint of
8  employment with the City?
9    A.  Not that I recall.
10   Q.  So from 2005 forward, all of
11  your evaluations were at least
12  satisfactory.  Is that right?
13   A.  Yes.  That I recall.
14   Q.  The charge states, "The
15  harassment began when I began speaking up
16  for the rights of minorities who I
17  believed the department was targeting and
18  treating differently."
19       Did I read that correctly?
20   A.  Yes.
21   Q.  What are you referring to when
22  you mention the rights of minorities who
23  you believed the department was targeting

Page 181

1    and treating differently?
2        A.  What do you mean, what do I
3    mean?
4        Q.  What were you speaking up about?
5        (Witness reviews document.)
6        A.  One person that comes to mind
7    would be Officer Sylvia Summers.
8        Q.  Why does Officer Sylvia Summers
9    come to mind?
10       A.  She was terminated by the
11   department.
12       Q.  And why was she terminated?
13       A.  I don't know the exact reason.
14       Q.  Why does she come to mind when
15   we read the sentence about you speaking
16   up about the rights of minorities?
17       A.  I think that she was treated
18   differently and targeted unfairly.  It
19   wasn't -- the same discipline wasn't
20   administered to other officers being of
21   the opposite race and sex.  They weren't
22   given the same type of disciplinary
23   action that she received for the same

Page 182

1    infraction.  And it could have been a
2    worse infraction, they received less
3    punishment or different.
4        Q.  What is Ms. Summers' race?
5        A.  She, to my knowledge, is an
6    African-American.
7        Q.  What conduct or behavior had she
8    engaged in that resulted in her
9    discipline?
10       A.  To my knowledge, it involved
11   turning in citations to the magistrate's
12   office in a timely fashion.
13       Q.  Is it your understanding that
14   she was not turning them in in a timely
15   fashion?
16       A.  Yes.
17       Q.  What other officers were not
18   turning in citations in a timely fashion
19   but received a different level of
20   discipline than Ms. Summers?
21       A.  Corporal Tim Miller.
22       Q.  Anyone else?
23       A.  Not that I can recall right now.

Page 183

1        Q.  What is Tim Miller's race?
2        A.  To my knowledge, a white male.
3        Q.  Are you saying that you spoke to
4    someone at the department on Officer
5    Summers' behalf?
6        A.  No.
7        Q.  What minorities were you
8    speaking up for?
9        A.  What do you mean?
10       Q.  I'm asking what you meant.  The
11   statement says, "The harassment began
12   when I began speaking up for the rights
13   of minorities who I believed the
14   department was targeting and treating
15   differently."
16       A.  Uh-huh.
17       Q.  What minorities were you
18   speaking up for?
19       A.  We'd have a conversation in --
20   in briefing or in conversation with
21   another officer that's getting back to
22   the supervisors or whomever, that's when
23   the treatment started.

Page 184

1        Q.  What conversation --
2        A.  The harassment towards me began.
3        Q.  What conversations were you
4    having about the treatment of minorities?
5        A.  Again, just like I said, about
6    Officer Summers and how she was treated.
7        Q.  Who were you having that
8    conversation with?
9        A.  I don't recall exactly.
10       Q.  Do you know whether any of the
11   officers who you allege subjected you to
12   harassment were privy to the
13   conversations that you were having about
14   the mistreatment of minorities?
15       A.  I don't -- I don't recall.
16       Q.  Have you told me all the
17   evidence that you have about being
18   subjected to harassment from white male
19   employees?
20       A.  What I can recall at this time.
21       Q.  Your charge reads:
22   "Additionally, the department is
23   undermining my position by limiting my

Page 185

1    access to certain departmental computer
2    applications.  Several White male
3    co-workers complained about my having
4    access to TipSoft, a web-based
5    application that shows tips coming in
6    from the public.  I used that application
7    in the past to help solve crimes.  I
8    believe the department is limiting my
9    access so that I cannot assist in solving
10   those crimes and so that other white male
11   employees can take the credit."
12          Did I read that correctly?
13       A.  Yes.
14       Q.  What white male coworkers
15   complained about you having access to
16   TipSoft software?
17       A.  Lieutenant Will Benny.
18       Q.  And do you know specifically
19   what he complained about?
20       A.  No.
21       Q.  How do you know he complained?
22       (Witness reviews document.)
23       A.  I don't know that I can answer

Page 186

1    that.
2        Q.  Well, do you know that he
3    complained?
4        A.  I know that he sent me an e-mail
5    in reference to my access being removed.
6        Q.  He sent you an e-mail informing
7    you that your access had been removed?
8        A.  Yes.
9        Q.  He didn't send you an e-mail
10   telling you that he had complained about
11   you having access to it?
12       A.  No.
13       Q.  No, he didn't send you an e-mail
14   complaining about your access?
15       A.  No.
16       Q.  Okay.  I still don't think I've
17   asked a good question, and that's my bad.
18          Did Lieutenant Will Benny send
19   you an e-mail complaining about you
20   having access to TipSoft software?
21       A.  No.
22       Q.  Who complained about you having
23   access to the TipSoft software?

Page 187

1        A.  I don't know.
2        Q.  Do you know whether people
3    complained about you having access to the
4    software?
5        A.  I don't.
6        Q.  So when you declare here under
7    penalty of perjury that several white
8    male coworkers complained about you
9    having access, it's not true, is it?  You
10   don't know whether white males
11   complained?
12       A.  No, I'm not going to say it's
13   not true.
14       Q.  But you don't know whether
15   several white males complained about you
16   having access to the software, do you?
17   You don't know one way or the other?
18       A.  I don't know.
19       Q.  What white male employees did
20   you believe were getting credit for
21   solving crimes using the TipSoft
22   software?
23       A.  I can't name all of the officers

Page 188

1    that are in investigations or that were
2    in investigations during the time that I
3    was there and this program was
4    implemented.  But it would be the ones
5    that were working investigations during
6    that time frame.
7        Q.  Can you name any of them?
8        A.  No, not right now.
9        Q.  You state, "I have also noticed
10   that on recent required tests, some of my
11   answers have been counted wrong, even
12   though they were clearly correct."
13          What tests are you referring to?
14       A.  The ethics test.
15       Q.  Which ethics test?
16       A.  One that was given by the
17   department.
18       Q.  In what year?
19       A.  I don't recall.  I don't recall
20   if it was 2012 or 2013, but it was just
21   prior to -- it was prior to my
22   termination.
23       Q.  Do you recall what the questions

47 (Pages 185 to 188)

Page 189

```
1    were?
2        A.  It was the early part of 2013,
3    if I recall correctly.
4        Q.  Do you recall what the questions
5    were?
6        A.  It was one.  I don't recall it
7    verbatim.
8        Q.  What was the subject of the
9    question?
10       A.  It dealt with the ethics
11   training that we had to review and then
12   answer questions on.  So I don't remember
13   the exact question.
14       Q.  How do you know that it was
15   counted wrong even though it was correct?
16       A.  Because I received the results
17   of the test and compared the result where
18   it was marked wrong with the training.
19       Q.  Did you report this error to
20   anyone?
21       A.  Yes.
22       Q.  Who did you report it to?
23       A.  The chief.
```

Page 190

```
1        Q.  And who was the chief at the
2    time?
3        A.  That's via a report that I wrote
4    that was sent up the chain.
5        Q.  Is that Chief Benton?
6        A.  Yes.
7        Q.  And did you receive a response?
8        A.  No.
9        Q.  Is the ethics exam pass/fail?
10       A.  Well, you're scored, so no.
11   You, I guess, have to score a certain
12   percentage on the test.
13       Q.  And did you score the minimum
14   percentage that you were required to
15   score?
16       A.  As I recall, that was the only
17   question that I missed on the test.
18       Q.  Were you penalized in any way
19   for missing that one question on the
20   test?
21       A.  It was a lowered score.
22       Q.  Other than receiving a lowered
23   score that was still a passing score,
```

Page 191

```
1    were you penalized in any other way?
2        A.  No.
3        Q.  You state that:  "In a recent
4    firearms test, several of my shots were
5    not counted as having hit the mark, and I
6    received the score in the 80's.  I
7    pointed out to my White superior officer
8    the proof where I had only missed a
9    couple of shots.  He gave me credit for
10   some, but not all of the shots made.
11   This the concerns me, because the results
12   of these tests can be used to affect both
13   my current position and my chances for
14   future advancement."
15           Did I read that correctly?
16       A.  Yes.
17       Q.  In what year did you take this
18   firearms test?
19       A.  I don't recall.
20       Q.  Who was your superior officer
21   that you refer to when you state --
22       A.  Lieutenant Scott Heath.
23       Q.  Say that again?
```

Page 192

```
1        A.  Lieutenant Scott Heath,
2    H-E-A-T-H.
3        Q.  How often are you required to
4    take the firearms test?
5        A.  Annually.  And then if, I guess,
6    deemed necessary by the department.
7        Q.  Is there a minimum score that
8    you have to achieve?
9        A.  Yes.
10       Q.  What is the minimum?
11       A.  If I recall correctly, 70
12   percent.  Don't quote me on this, but to
13   my recollection, I believe the score was
14   70 percent.
15       Q.  So a score in the 80s would have
16   been passing?
17       A.  Yes.
18       Q.  And if the minimum score was a
19   70 percent, a score in 80 percent was
20   well beyond passing?
21       A.  Yes.
22       Q.  How could these results affect
23   your current position?
```

1     A.  Because those, those scores are
2  also part of our evaluation.  Those
3  scores are used if you want to be
4  considered for, for instance, SWAT team
5  or SRT team.
6     Q.  Were you interested in being
7  considered for the SWAT team or the SRT
8  team?
9     A.  Was I?  I was.
10     Q.  What score were you required to
11  have to be considered for the SWAT team?
12     A.  I don't recall.
13     Q.  What score were you required to
14  have to be part of the SRT team?
15     A.  I don't recall.
16     Q.  Was there some judgment that had
17  to be used to determine whether you had
18  hit the mark in the firearms test?
19     A.  No.  What do you mean, "some
20  judgment"?
21     Q.  Because it's not like
22  basketball, you either shoot it and it
23  goes in or it doesn't.

1     A.  Well.
2     Q.  Were you shooting at a target
3  and you were either in a range or you
4  weren't?
5     A.  Yes.
6     Q.  And there were some judgments
7  that had to be made about whether the
8  shots were within the target range?
9     A.  Yes, there was some judgment
10  based on where the shots landed on the
11  target.  Or if multiple shots went
12  through the same target or same hole.
13     Q.  You state that your superior
14  officer gave you some credit, but not all
15  of the shots -- not for all of the shots
16  made.
17     A.  Correct.
18     Q.  After you were given some
19  credit, did that increase your score to
20  the 80s, or was your score already in the
21  80s before --
22     A.  I -- I don't recall.
23     Q.  -- you received that additional

1  credit?
2     You state that:  "I was recently
3  suspended for an alleged breach of the
4  department's social media policy for
5  posting my views online about a
6  newsworthy event.  Several of my White
7  co-workers complained to management that
8  my comments were racist (they clearly
9  were not), simply because they didn't
10  agree with my views.  The department
11  suspended me without pay pending a
12  hearing before the personnel board.
13  Nothing that I posted would disparage or
14  otherwise place the department in a
15  negative light.  One of the White
16  co-workers even called me a racist on my
17  Facebook page."
18     Did I read that correctly?
19     A.  Yes.
20     Q.  After filing this EEOC charge,
21  was there in fact a hearing held before
22  the personnel board?
23     A.  Yes.

1     Q.  And did the personnel board
2  decide to uphold your suspension?
3     A.  Yes.
4     Q.  And did you appeal the personnel
5  board's ruling to the Houston County
6  Circuit Court?
7     A.  Yes.
8     Q.  And did the Houston County
9  Circuit Court also issue an order
10  upholding your suspension, upholding the
11  opinion of the personnel board?
12     A.  No.
13     Q.  The Houston County Circuit Court
14  did not enter an order --
15     A.  No.
16     Q.  -- to that effect?  What did the
17  Houston County Circuit Court order?
18     A.  That they could not make a
19  decision.  They didn't -- that it wasn't
20  within their, I guess, authority to rule
21  on matters involving First Amendment
22  rights.  At least, that's my
23  understanding of the order or ruling.

Page 197

```
1        MR. BENNITT:  I'm going to have
2   to take a break with this stuff.  I'm
3   sorry.  Five minutes.
4        MS. MAYS:  Okay.  We can take a
5   break.
6        MR. BENNITT:  Thank you.
7           (Break taken.)
8      Q.  (By Ms. Mays) Ms. Carney, I'm
9   showing you what I've marked as
10  Defendant's Exhibit 9.  Do you recognize
11  this as Personnel Board Order No. 13-10
12  regarding the appeal of your suspension
13  in March of 2013?
14  (Defendant's Exhibit 9 was marked for
15  identification and is attached.)
16     A.  Wait.  What did you say?  It's
17  13-01 on my --
18     Q.  Did I read the number
19  incorrectly?
20     A.  You said 13-10.
21     Q.  I'm sorry.  Do you recognize
22  this as Personnel Board Order 13-01
23  regarding the appeal of your suspension
```

Page 198

```
1   in March of 2013?
2      A.  Yes.
3      Q.  If you'll turn to the last page
4   of this exhibit, you see it states
5   "Personnel Board Finding"?
6      A.  Yes.
7      Q.  "We find substantial evidence to
8   uphold the decision of the department
9   head in disciplinary action against you
10  for having a Major Category Offense, Sec.
11  3-42(13), Final Written Warning."
12     A.  Yes.
13     Q.  If you'll go back to the second
14  page, in the middle of the page, it
15  states that, "on March 28th, 2013, Police
16  Chief Gregory Benton issued Personnel
17  Form #155, Decision of Determination
18  Hearing, and Ms. Carney received this
19  written decision on March 28th, 2013."
20  And it says, "This decision reads."  I
21  won't read it all, but I'll start at the
22  second paragraph.
23        "It is my decision to suspend
```

Page 199

```
1   you for a period of ten working days.
2   You will also be required to complete any
3   training designated by the EEO Officer of
4   the City of Dothan.  The office of the
5   Chief of Police shall be notified of your
6   completion of this training.
7        "After the completion of the ten
8   days of suspension, you will be
9   reassigned to the Front Desk of the
10  Police Department Lobby.  You will report
11  to the Bureau Commander, Captain Keith
12  Gray."
13        Did I read that correctly?
14     A.  Yes.
15     Q.  And was that in fact the
16  discipline that you received?
17     A.  Part of the discipline.
18     Q.  Okay.  I'm going to show you
19  what I have marked as Defendant's Exhibit
20  10.  Do you recognize this as the August
21  6, 2013, order of the Houston County
22  Circuit Court regarding your appeal of
23  the decision of the personnel board?
```

Page 200

```
1   (Defendant's Exhibit 10 was marked for
2   identification and is attached.)
3         (Witness reviews document.)
4      Q.  And this exhibit is two pages,
5   so we're just looking over at the first
6   page.
7      A.  To answer your question, you're
8   referring to the first page only?
9      Q.  Yes.
10     A.  Yes.
11     Q.  And does the August 6, 2013,
12  order say, beginning in the second
13  paragraph, "Pursuant to Section 33 of the
14  said Act" -- that's referring to the
15  Dothan Civil Service Act -- "this Court
16  finds that the issue on appeal" -- "on
17  this appeal is whether there is
18  substantial evidence to support the
19  findings of the Dothan Personnel Board."
20        Did I read that correctly?
21     A.  Yes.
22     Q.  And then the second page of this
23  exhibit is another order of Houston
```

Page 201

1    County Circuit Court dated January 14th,
2    2014.  Is that right?
3        A.  Yes.
4        Q.  And that order reads in relevant
5    part that:  "This Court has reviewed the
6    record made in this case at the hearing
7    conducted before the City of Dothan
8    Personnel Board.  The Court has
9    considered the arguments and briefs of
10   the parties as to their respective
11   positions.  Upon consideration of the
12   record, arguments, and briefs, the Court
13   find that there was substantial evidence
14   presented to the Personnel Board to
15   support the Board's decision.  Therefore,
16   the decision of the board which is dated
17   June 20th, 2013, is hereby affirmed."
18       Did I read that correctly?
19       A.  Yes.  With the exception you
20   left out the word "also" in that first
21   paragraph you read.  The second sentence
22   says, "The Court has also considered the
23   arguments and briefs of the parties as to

Page 202

1    their respective positions."
2        Q.  Okay.  With the addition of the
3    word "also," did I read that correctly?
4        A.  Yes.
5        Q.  Okay.  Is that in fact the order
6    that the Houston County Circuit Court
7    issued on January 14th, 2014?
8        A.  Yes.
9            There is an additional part
10   that's not mentioned, the second part of
11   the order.  Do you mind if I record that
12   as well?
13       Q.  We have that in the record.
14   That is going to be an exhibit to your
15   deposition, the entire document.
16           Showing you what I've marked as
17   Defendant's Exhibit 11.  Do you recognize
18   this exhibit as printouts from Facebook
19   that you have produced to us in this
20   case?
21   (Defendant's Exhibit 11 was marked for
22   identification and is attached.)
23       A.  Yes.

Page 203

1        Q.  Who printed these records?
2        A.  I don't know who printed yours.
3        Q.  Who printed the ones that were
4    produced to us?
5        A.  Who provided them?  I provided
6    them.
7        Q.  You provided these to your
8    lawyer?  The date in the bottom
9    right-hand corner is dated September
10   22nd, 2014.  Was that the date that you
11   captured these images from the Facebook
12   pages that they were printed from?
13       A.  Yes.
14       Q.  And on September 22nd, 2014, had
15   you updated your Facebook profile so that
16   your name appears as Rae, R-A-E, Cy, C-Y?
17       A.  Did I do that on September 22nd?
18       Q.  No.  At that time had it been
19   updated?  Not did you -- my question
20   isn't did you update it on that day so
21   that that was what your name reflected.
22   But as of that date, was your name,
23   profile name showing as Rae Cy?

Page 204

1        A.  Yes.
2        Q.  So that the comments or posts
3    that are reflected in this exhibit posted
4    by Rae Cy, those are in fact comments or
5    posts that you posted?
6        A.  Yes.  Assuming that was the
7    question you were asking.
8        Q.  Yes, that was the question.
9            And do the dates and times that
10   are listed in this exhibit accurately
11   reflect the dates on which you posted the
12   comments?
13       A.  Yes.
14       MR. BENNITT:  Have you had a
15   chance to go through these?
16       THE WITNESS:  Yes.
17       Q.  For example, on the document
18   that's Bates-labeled Carney 58, on
19   February 13th, 2013, did you post:  "'We
20   did not intentionally burn the cabin.'
21   Well, did you intentionally call for a
22   fire truck to put out the unintentional
23   burning cabin?  I never saw any footage

Page 205

1  of water being applied to the burning
2  cabin.  If they felt someone, whether it
3  was Chris or not, was inside, don't they
4  have a lawful duty to preserve the life
5  of others, including criminals....ijs"?
6      A.  Yes.
7      Q.  On page 59, the page that's
8  Bates-labeled 59, on February 13th, 2013,
9  at 7:41 p.m. did you post: "Did law
10  enforcement burn Barker Ranch where
11  Charles Manson and his followers lay
12  after killing so many people that the
13  true count is still not known... NO!!!
14  Instead he and his band of murderers are
15  still sitting in jail being fed by
16  taxpayers dollars.... ONE MAN who stands
17  for justice is, if you believe the news
18  story, burned to charred remains by a
19  group of what are supposed to be
20  enforcers of the law and protectors or
21  life but in my opinion are no more than
22  vigilantes with a badge and gun!!!  Not
23  my brothers in law enforcement."

Page 206

1      A.  What date and time did you say
2  that was?
3      Q.  February 13th, 2013, at 7:41
4  p.m.
5      A.  No.  That's at 7:55 p.m.
6      Q.  So the time and date are beneath
7  the posting.  Is that right?  Is that
8  what you're saying?
9      A.  Yes.  Except for on the first
10  posting.
11      Q.  So if it's in the feed where
12  other people are responding --
13      A.  -- it comes after the post.
14      Q.  -- the date and time comes after
15  the posting.
16      A.  Uh-huh.
17      Q.  But if it's --
18      A.  The first post --
19      Q.  -- your initial post, okay, then
20  it's before that initial post, the date
21  and time comes before it.  Is that right?
22      A.  Correct.
23      Q.  Who is Carla Maze?

Page 207

1      A.  A childhood friend of mine.
2      Q.  What is her race?
3      A.  I don't know.
4      Q.  On February 13th, 2013, at 6:19
5  a.m., did you post, "Labeling someone a
6  cop killer" --
7      A.  I'm sorry.  What page are you
8  on?
9      Q.  Bates label 65.  February 13th,
10  2013, at 8:19 a.m.  I think I was
11  misreading that before.
12      Did you post: "Labeling someone
13  a cop killer doesn't automatically give
14  other law enforcement the right to burn a
15  man to death without due process afforded
16  to all citizens in the United States
17  Constitution!!!  There were no reports
18  that he came out shooting only that he
19  threw out a smoke grenade.  Every time we
20  encounter any person posing a threat, we
21  as law enforcement have to be able to use
22  more than just deadly force to resolve
23  tense and oftentimes unpredictable

Page 208

1  situations.  It is my opinion that this
2  tragic situation turned into a lynching
3  for those accused before he was afforded
4  his constitutional due process rights."
5      A.  "For the accused."
6      Q.  "For the accused."  Did you post
7  that statement?
8      A.  Yes.
9      Q.  On February 13th, 2013, at 9:30
10  a.m., did part of your post read:
11  "Christopher Dorner said in his manifesto
12  that no other deaths would occur if those
13  people whom he mentioned in it would
14  simply tell the truth which would clear
15  his name... instead they continued to
16  make matters worse by vilifying a man
17  whose morals, ethics, and integrity were
18  probably beyond reproach and
19  unquestionable.  He stood for the rights
20  of others and then himself"?
21      Is that a part of your post on
22  February 13th, 2013, around 9:30?
23      A.  Where did you start that at,

1   again?  Could you reread that?
2     Q.  "Christopher Dorner said in his
3   manifesto that no other deaths would
4   occur if those people who he mentioned in
5   it would simply tell the truth which
6   would clear his name."
7     A.  You're not reading the first
8   part of that post.
9     Q.  No.  I was asking whether that
10  was a part of the post that you made on
11  that day.  I wasn't reading all the posts
12  that you made that day.  Was that a part
13  of the comments that you posted on that
14  day?
15    A.  Yes.
16    Q.  And you reference his manifesto
17  in that post.  Is that right?
18    A.  Yes.
19    Q.  Had you read his manifesto?
20    A.  I don't recall if at that
21  particular time I had or not.
22    Q.  How did you know what he had
23  said in his manifesto?

1     A.  I don't know.
2     Q.  Have you read his manifesto?
3     A.  I don't know.
4     Q.  Did you also post on February
5   13th, 2013, "This man is very
6   intelligent"?
7     A.  I stated, "The man is very
8   intelligent."
9     Q.  Did you also post on February
10  13th, "Sometimes the hardest lessons in
11  life are learned thru death"?
12    A.  Where are you referring to with
13  that?
14    Q.  February 13th, 2013, at 9:47
15  a.m.
16    A.  Yes.
17    Q.  February 13th, 2013, at 10:59
18  a.m., did you post:  "it was his way of
19  getting justice for the injustices that
20  he and others suffered at the hands of
21  those people.  Justice for the
22  injustices"?
23    A.  Yes.  That's part of the post.

1     Q.  On the page that is
2   Bates-labeled 59, did you post:  "CNN is
3   playing the audio from the shoot out
4   allegedly between btwn Christopher Dorner
5   and San Bernardino officers...sounds like
6   several hundreds of rounds being fired
7   and none from a semiautomatic weapon.
8   One man can only fire a maximum of two
9   handguns at one time which would equate
10  to roughly 30 rounds with no magazine
11  exchanges (hard to do that with both
12  hands holding guns)...and the fire was
13  set from outside the cabin not inside the
14  cabin...I'm not surprised!!!  Does this
15  not sound like slavery times when mobs
16  would burn blacks just because...."?
17    A.  Yes.
18    Q.  Looking at the page that's
19  Bates-labeled 81, who is Mike Woodside?
20    A.  Well, at the time, he was a
21  police officer with the City of Dothan.
22    Q.  Are you and Mike Woodside
23  Facebook friends?

1     A.  I have to say we're not at the
2   present time.  We were.
3     Q.  Did you capture this print
4   screen of his Facebook page that's
5   Bates-labeled 81?
6     A.  Yes.
7     Q.  And how does this page relate to
8   your claims in this case?
9     A.  I don't know.
10    MR. BENNITT:  What claims?  I'm
11  sorry.  I'm going to object to that's --
12  which claim are you talking about?
13    MS. MAYS:  How does it relate to
14  any of her claims in this case?
15    MR. BENNITT:  Do you understand
16  the question?
17    THE WITNESS:  Uh-huh.
18    MR. BENNITT:  What is -- what is
19  your understanding?
20    THE WITNESS:  Well, I don't know
21  exactly.
22    A.  I guess, clarify why you're
23  asking.  I mean.

Page 213

1     Q.   I'm asking why you produced this
2   document.  Most of the documents that you
3   provided me from Facebook are printouts
4   from your Facebook page.
5     A.   Uh-huh.
6     Q.   There are some documents from
7   the pages of other individuals and --
8        MR. BENNITT:  Are you listening
9   to her question?
10       THE WITNESS:  Uh-huh.
11    Q.   My question to you is, why did
12   you produce those documents?  I want to
13   know that.
14    A.   Well, Officer Mike Woodside, if
15   you look on your Bates -- how do you say
16   it?
17    Q.   Bates label.  Bates number.
18    A.   Bates label number 82 is a
19   continuation from 81 of postings that
20   were made by Officer Mike Woodside.  And
21   on that page it captures a picture of the
22   current president of the United States
23   with a half-burned face and a caption

Page 214

1   that he wrote, "Click 'LIKE' if Obama is
2   a 'two faced' liar and a hypocrite."  And
3   this was submitted in my personnel board
4   hearing to show --
5        MR. BENNITT:  You don't know why
6   it was submitted.  Just tell her --
7        THE WITNESS:  It was submitted.
8        MR. BENNITT:  Answer the
9   question.
10    A.   That's the reason why this is
11   submitted to you.
12    Q.   Did you ever report to anybody
13   at the City of Dothan that this picture
14   of Obama and his comments were on
15   Facebook?
16    A.   Yes.
17    Q.   Who did you report it to?
18    A.   The personnel board.
19    Q.   And what was your report to the
20   personnel board?
21    A.   The chief of police, personnel
22   board, the personnel director, everyone
23   that was present.

Page 215

1     Q.   At the personnel board hearing?
2     A.   Yes.
3     Q.   Had you reported this posting or
4   these comments before then?
5     A.   No.
6     Q.   When did you first see this
7   posting by Mike Woodside?
8     A.   I don't recall the date.
9        MR. BENNITT:  Yes, you do.  She
10   asked you for the judgment of the date.
11   She didn't ask you what century.  Just
12   give your best judgment of the date you
13   saw it.
14    A.   April 5th, 2013, is -- as it's
15   captured on this page where it was
16   printed off.
17        MR. BENNITT:  That was April
18   15th what?
19        THE WITNESS:  April 5th, 2013.
20    Q.   Who was David Jay?
21        MR. BENNITT:  Bates stamp?
22    A.   At the time -- oh.
23    Q.   I'm looking at the document

Page 216

1   that's Bates-stamped 83.
2     A.   He was captain for the police
3   department, but I think he just recently
4   retired.
5     Q.   And is this Facebook printout
6   another document that you submitted at
7   the personnel board hearing?
8     A.   Yes.
9     Q.   And it was also printed, it
10   looks like, on April the 5th, 2013?
11    A.   Yes.
12    Q.   Is that the first time that you
13   saw this posting from David Jay?
14    A.   I don't recall when I first saw
15   the posting, but I captured it on April
16   5th, 2013.
17    Q.   Who is Will Benny?
18    A.   Lieutenant for the police
19   department.
20    Q.   And the documents Bates-labeled
21   84 through 87 are documents that you
22   captured from his Facebook page on April
23   the 5th, 2013, as well?

Page 217

1      A.  Yes.
2      Q.  And do you recall whether that
3  was the first time you saw those
4  postings?
5      A.  I don't.  On or around that time
6  frame.
7      Q.  Show you what I've
8  Bates-labeled -- not Bates-labeled --
9  labeled as Exhibit 12.  These are
10  Facebook posts that were included in the
11  City of Dothan's investigation regarding
12  your Facebook posts.  And also, beginning
13  with document Bates-labeled 785,
14  WiregrassLive postings.  What is
15  WiregrassLive?
16  (Defendant's Exhibit 12 was marked for
17  identification and is attached.)
18      A.  A social site.
19      Q.  Is it a site that anyone can
20  access?
21      A.  Yes.
22      Q.  Is it similar to Facebook in
23  that you have to be a member?

Page 218

1      A.  Yes, they do require a
2  membership.
3      Q.  How do you become a member of
4  WiregrassLive, if you know?
5      A.  Basically, you fill out their
6  application online and provide a user
7  name and password that you want for your
8  account.
9      Q.  Who is Emily Hays?
10      A.  I don't know.
11      Q.  Is she an officer of the Dothan
12  Police Department?
13      A.  Not that I'm aware of.  You said
14  785?
15      Q.  Yes.  Beginning with document
16  Bates-labeled 785 in the bottom
17  right-hand corner.
18      Do you know how the police
19  department became aware of your Facebook
20  posts regarding the Christopher Dorner
21  situation?
22      A.  I don't know.  Some of these, I
23  can't make out what pages.

Page 219

1      Q.  Have you seen those
2  WiregrassLive postings before today?
3      A.  Which ones?
4      Q.  Any of the ones that begin with
5  the documents Bates-labeled 785, 785
6  through 795.
7      A.  Yes, I've seen some of them.
8      Q.  Which ones have you seen?
9      (Witness reviews document.)
10      MR. BENNITT:  What was the
11  question, please, ma'am?
12      MS. MAYS:  I was asking her to
13  identify any of the WiregrassLive posts
14  that she had seen before.
15      A.  I recall seeing all of them.
16      Q.  Okay.
17      MR. BENNITT:  What -- what Bates
18  stamp number?
19      THE WITNESS:  I can't read the
20  Bates stamp numbers at the bottom of
21  the --
22      MS. MAYS:  It was Bates stamp
23  number 785.

Page 220

1      MR. BENNITT:  It's Defendant's
2  -- it's Defendant's Exhibit 12?
3      THE WITNESS:  It starts with
4  785, 786, 787, and after that, I can't
5  make out what the numbers are.
6      Q.  (By Ms. Mays) I think they're in
7  chronological order.
8      A.  I see 784.  What appears to be
9  785.
10      Q.  These posts that are on
11  WiregrassLive site --
12      A.  Six pages of these, I can't make
13  out what the Bates stamp is.
14      Q.  Okay.
15      A.  In between the numbers I've
16  identified.
17      Q.  Okay.  The posts that you have
18  seen on the WiregrassLive site, are those
19  posts made by officers of the City of
20  Dothan Police Department?
21      A.  I don't know.
22      Q.  Do you recognize any of the
23  names or the screen names as officers of

Page 221

```
1    the Dothan Police Department?
2        (Witness reviews document.)
3        A.   No, none that I can see in these
4    documents.
5        Q.   Okay.  Do you recognize any of
6    those names as members of the community
7    in Dothan?
8        A.   No one that I know.
9        Q.   Okay.  The other documents that
10   are in Exhibit 12, are those print-offs
11   from your Facebook page?
12       A.   Bates stamp 1011, 1012.  What
13   appears to be Bates stamp 766, 767, 768.
14   Let me go back and check that.  Yeah.
15   771.
16       (Witness reviews document.)
17       A.   770.  773, 774.
18       (Witness reviews document.)
19       A.   624, 625, 626, 970 appear to be
20   printouts from my Facebook page.
21       Q.   So the Bates numbers that you
22   just called out from Exhibit 12?
23       A.   Yes.
```

Page 222

```
1        Q.   Those are printouts from your
2    Facebook page and accurately reflect
3    posts that you made on your Facebook
4    page?
5        A.   As best I can tell.
6        Q.   Okay.  Let me show you what I've
7    marked as Defendant's Exhibit 13.  Does
8    this refresh your recollection as to
9    whether you've seen a manifesto written
10   by Christopher Dorner?
11   (Defendant's Exhibit 13 was marked for
12   identification and is attached.)
13       (Witness reviews document.)
14       A.   I don't recall that this is the
15   exact same one that I saw.
16       Q.   Do you know whether he wrote
17   more than one?
18       A.   I don't.  I don't know.
19       Q.   But you did read and see one of
20   his manifestos, or read and see his
21   manifesto at some point?
22       A.   I read and saw something that
23   was labeled as his manifesto.
```

Page 223

```
1        Q.   Okay.
2        A.   I don't know that it was his.
3        Q.   In the manifesto that you read,
4    did he state, "When the truth comes out,
5    the killing stops"?
6        A.   I don't recall.
7        Q.   Do you recall him stating:  "No
8    one grows up and wants to be a cop
9    killer.  It was against everything I ever
10   was"?
11       A.   I don't recall.
12       Q.   Do you recall him writing
13   messages to Kevin Hart, Chris Rock, Jerry
14   Seinfeld, Dave Chappelle, Bill Cosby?
15       A.   I don't recall.
16       Q.   Show you what I've marked as
17   Defendant's Exhibit 14.  Do you recognize
18   this as the memo that Sergeant Donny
19   Smith issued to you on February 15th,
20   2013, advising you that a complaint
21   against you had been filed in the
22   Internal Affairs Division?
23   (Defendant's Exhibit 14 was marked for
```

Page 224

```
1    identification and is attached.)
2        A.   I don't -- I -- I don't recall
3    if this is the exact same document.
4        Q.   Do you think you got a different
5    document?
6        A.   I don't know.
7        MR. BENNITT:  Does this appear
8    to be the document that you got?
9        THE WITNESS:  It appears to be.
10       Q.   Did you receive notice from
11   Donny Smith that an internal affairs
12   complaint had been filed against you?
13       A.   Yes.
14       Q.   Show you what I'm marking as
15   Defendant's Exhibit 15.  That same day,
16   did you submit to Chief Benton this
17   letter dated February 15th, 2013, in
18   which you allege that you have been
19   subjected to sexual and racial
20   discrimination?
21   (Defendant's Exhibit 15 was marked for
22   identification and is attached.)
23       (Witness reviews document.)
```

56 (Pages 221 to 224)

Page 225

1     A.  This appears to be that
2  document.
3     Q.  Who are the two high-ranking
4  officers that you --
5     A.  The first page of it.
6     Q.  Did I give you multiple pages?
7     A.  Yes.
8     Q.  My apologies.
9        MS. MAYS:  Can we just take that
10  off?  This exhibit should be one page,
11  Jeff.
12        MR. BENNITT:  Oh, okay.
13     Q.  (By Ms. Mays) Take those off.
14  My apologies.  You can keep them, but
15  it's not part of the exhibit.
16        Who are the two high-ranking
17  officers that you refer to in this
18  letter?
19     A.  I don't recall.
20        MR. BENNITT:  You wrote the
21  letter.
22        THE WITNESS:  Uh-huh.
23        MR. BENNITT:  You wrote the

Page 226

1  letter.
2     Q.  But you don't recall who the
3  officers were that you were referring to
4  in this letter?
5        MR. BENNITT:  Think hard.
6        (Witness reviews document.)
7        MR. BENNITT:  Do you see where
8  she's referring to?  Is that going to
9  help you ring a bell?  Do you need a
10  highlighter?  Here.  Let's see if I can
11  find it.  Here it is.  Here you are,
12  ma'am.  Maybe that will help.
13        THE WITNESS:  Okay.  I see that.
14        MR. BENNITT:  Okay.  Thank you.
15        (Witness reviews document.)
16        MR. BENNITT:  The law requires
17  that you tell her who these men are, or
18  well, people.
19        (Witness reviews document.)
20     A.  One of the officers was Major
21  Steve Parrish.
22     Q.  (By Ms. Mays) Who was the other
23  officer?

Page 227

1     A.  I don't recall at this time who
2  the other officer high-ranking officer
3  was.
4        MR. BENNITT:  Do you know what
5  they looked like?  What did they look
6  like?
7     Q.  So you write a letter to Chief
8  Benton saying that two high-ranking
9  officers had been intimidating, creating
10  a hostile and offensive work environment
11  for you from 1995 and then again since
12  2005, but you don't recall who they are.
13  Is that right?  Is that your testimony?
14     A.  No.  My letter state that is
15  during my employment --
16        MR. BENNITT:  She wants -- you
17  have to.  The law says you've got to tell
18  her.
19        THE WITNESS:  Yes, I understand
20  that.
21        MR. BENNITT:  What are their
22  names?
23     A.  During my employment from 1999

Page 228

1  to '05, I've had to address sexual and
2  racial discrimination issues within the
3  ranks of the department.  The two
4  officers that I was referring to, I'm not
5  saying, or was not saying that those two
6  officers between those time frames were
7  persons responsible for that.
8     Q.  What you're telling him is that
9  there are two people, two high-ranking
10  officers who are responsible for creating
11  an intimidating hostile and offensive
12  work environment.  Is that right?  That's
13  what you're telling him?
14     A.  That's correct.
15     Q.  And wouldn't you say that those
16  are some very serious allegations?
17     A.  Yes.
18     Q.  So you're telling me, as you sit
19  here today, you don't know who was
20  creating an intimidating hostile and
21  offensive work environment for you?
22     A.  One of the persons I named was
23  Major Steve Parrish.

Page 229

1    Q.   And who was the other person?
2    A.   The second person, I believe,
3  that time that I was complaining against
4  was Lieutenant Will Benny.
5    Q.   Did you ever disclose those two
6  names to Chief Benton?
7    A.   I don't recall if I did.
8    Q.   How did you expect him to
9  investigate your allegations without
10  knowing the names of the two individuals
11  who were allegedly creating this hostile
12  work environment?
13    A.   As I recall, he never even
14  questioned me on this.
15    Q.   Tell me each and every way that
16  Major Steve Parrish created an
17  intimidating hostile and offensive work
18  environment for you.
19      MR. BENNITT:  Does she have a
20  claim here for race harassment and gender
21  harassment?
22      MS. MAYS:  I'm trying to learn
23  what her claims are today.

Page 230

1    Q.   (By Ms. Mays) Do you have a
2  claim for race harassment and gender
3  harassment?
4    A.   I have a claim for that, yes,
5  for sex -- race discrimination,
6  harassment, First Amendment rights
7  violations, and retaliation are what my
8  claims are.
9      MR. BENNITT:  Can we go off the
10  record for a second?
11      MS. MAYS:  Sure.
12      (Discussion held off the record.)
13    Q.   (By Ms. Mays) Are you alleging
14  as part of this lawsuit that you were
15  sexually and racially discriminated
16  against by Major Steve Parrish and
17  Lieutenant Will Benny?
18    A.   Yes.
19    Q.   Is that something you alleged in
20  your April 2013 EEOC charge?
21    A.   I don't have it before me.
22    Q.   You can look back at it.  I
23  think it's still in your stack.

Page 231

1    A.   I don't know that it's on the
2  charge sheet.
3      MR. BENNITT:  It would be
4  located right down here where that last
5  sentence.  Right there, beginning with
6  that word there.
7    A.   On my -- on the charge sheet it
8  states that, "I believe that I am being
9  harassed and discriminated against on the
10  basis of my race, Black, and my sex,
11  female, in violation of Title VII of the
12  Civil Rights Act of 1964, as amended."
13      MR. BENNITT:  I thought it
14  was -- I'm sorry.  Go ahead.
15    Q.   Tell me each and every way that
16  Major Steve Parrish created an
17  intimidating, hostile, and offensive work
18  environment for you?
19    A.   Well, Major Parrish is a
20  decision-maker in the department.
21      MR. BENNITT:  Can we go off the
22  record?  I got to call Sonya and see.  I
23  don't see it.  I'm going to call Sonya

Page 232

1  and find out if it's in here.  Do you
2  mind?
3      MS. MAYS:  I don't mind you
4  calling Sonya.
5      MR. BENNITT:  Thank you.
6      (Break taken.)
7    Q.   (By Ms. Mays) Tell me each and
8  every way Major Steve Parrish created an
9  intimidating, hostile, and offensive work
10  environment for you.
11    A.   Well, at this time, I don't -- I
12  don't know.  I can't just rattle them all
13  off.
14    Q.   Do you know any?  Any instances
15  where he created an intimidating,
16  hostile, and offensive work environment
17  for you?
18    A.   On the morning that -- you
19  listened to the conversation, prior to
20  the deposition starting.
21    Q.   You're alleging that the
22  recording that you provided to us this
23  morning that we listened to on your

Page 233

1  laptop was an example of Major Parrish
2  creating an intimidating hostile and
3  offensive work environment for you?
4      A.  Yes.
5      Q.  And how was that hostile work
6  environment?
7      A.  Subsequently led to my
8  termination from the department.
9      Q.  How was that conversation in and
10 of itself a hostile work environment?
11     A.  It infringed upon my First
12 Amendment rights to freedom of speech.
13     Q.  The conversation that Major
14 Parrish had with you that morning, you're
15 alleging that that infringed on your
16 First Amendment rights?
17     A.  Yes.
18     Q.  Okay.  Do you still have that
19 recording on your computer?
20     A.  Yes.
21     Q.  Can we listen to that?
22         What date did you have this
23 conversation with Major Parrish?

Page 234

1      A.  My computer's moving slow.
2  February 14th, 2013.  On or around that
3  date at 9:38 a.m.
4      Q.  The recording is about nine
5  minutes long.  The conversation with
6  Major Parrish starts a little before the
7  four-minute mark, so if we want to go --
8  fast-forward --
9          MR. BENNITT:  Yes, ma'am.
10     Q.  -- to about 3:50.  If we need to
11 back it up, we can.
12     A.  I'm starting it at about 3:47.
13     Q.  Okay.  You can rewind it back.
14         (Audio recording played.)
15         "OFFICER CARNEY:  Good morning,
16 sir.
17         "MALE VOICE:  How are you?
18         "OFFICER CARNEY:  You been Mardi
19 Gras-ing it up?  How was it?"
20     Q.  (By Ms. Mays) Is that you
21 talking to Major Parrish?
22     A.  No.  It's Captain Gray.
23         (Audio recording played.)

Page 235

1          "MALE VOICE:  What time y'all
2  got to be there?
3          "OFFICER CARNEY:  It starts at
4  9:00, so setup is between 8:30 -- Mark --
5  no, the one here in Troy.  I mean in
6  Dothan, Troy here in Dothan, yes."
7      Q.  (By Ms. Mays) Will you pause it?
8  Who are you having a conversation with
9  there?
10     A.  Major Parrish, Steve Parrish.
11     Q.  So at this time you're in Major
12 Parrish's office?
13     A.  Yes.
14     Q.  And had he called you to come to
15 his office?
16     A.  He did not call me, but he had
17 the secretary, the chief's secretary call
18 me.
19     Q.  So on the morning of February
20 the 14th, the chief's secretary called
21 and asked you to report to Major
22 Parrish's office?
23     A.  Yes.

Page 236

1      Q.  And you did so?
2      A.  Yes.
3      Q.  And who else was present when
4  you reported to Major Parrish's office?
5      A.  Lieutenant Baxley, Benny Baxley.
6      Q.  Was Lieutenant Baxley present
7  for the duration of this conversation
8  that we're about to hear?
9      A.  Yes.
10     Q.  Okay.
11         (Audio recording played.)
12         "OFFICER CARNEY:  No.  Just me
13 and Officer Marquette.
14         "MAJOR PARRISH:  Okay.
15         "OFFICER CARNEY:  But he's --
16 he's -- he was on his way up there behind
17 me, so, I mean, being set up.
18         "MAJOR PARRISH:  Oh, I won't
19 take but a minute of your time.  I want
20 to be -- I'm just going to tell you
21 something, and I want you to mull it
22 over.  And I just want to -- I don't -- I
23 understand that you're posting some

Page 237

1   things on Facebook. Okay? Now, in my
2   opinion, you have every right under the
3   freedom of speech to post whatever you
4   want. I don't have a Facebook, but I
5   have been hearing nothing but remarks
6   about this -- this guy in California and
7   this manifesto and -- and posts that
8   you're making that are having a -- that
9   are having, frankly, some officers in
10  this department scratching their heads.
11  Okay? I don't know anything about that
12  guy other than he killed some police
13  officers. If -- if you know, whatever
14  your political view of that is, is your
15  business. But I just want to ask you a
16  question. Do you have any idea how much
17  pressure that puts on this hallway from
18  the rank and file when you post stuff
19  like that? Do you consider that?
20      "OFFICER CARNEY: Yes, sir, I
21  do.
22      "MAJOR PARRISH: Did you care?
23      "OFFICER CARNEY: Yes, sir,

Page 238

1   absolutely.
2       "MAJOR PARRISH: Okay. Well,
3   like I said, you can do what you want,
4   RaeMonica. I know you're familiar with
5   the personnel rules. Just bear in mind
6   that you can't do anything that has a
7   negative reflection on this agency. So I
8   haven't read all this stuff, I'm not
9   going to. I just wanted you to come in
10  and tell you how I feel about it. Like I
11  said, I don't know this guy, I don't know
12  what his -- his position was. All I know
13  is that they say he killed police
14  officers. You're a police officer.
15  You're in a high-profile -- -profile
16  position, you're recruiting to this
17  agency. And I just want you to think
18  about that.
19      "OFFICER CARNEY: Uh-huh.
20      "MAJOR PARRISH: And what you do
21  is up to you. But I just -- if you
22  could -- if you could help us out and
23  be -- and understand that every time you

Page 239

1   post, something it fuels -- it fuels some
2   people's fire. But I understand it's on
3   WiregrassLive, I don't read
4   WiregrassLive. I don't read --
5       "OFFICER CARNEY: I don't read
6   WiregrassLive, either.
7       "MAJOR PARRISH: I don't read
8   that. I don't have a Facebook. And --
9   and -- and I have all the respect in the
10  world for you as an officer and as a
11  human being, and you have every right to
12  do what you want to do. But just please
13  understand the position that it puts us
14  in when everybody's saying, 'I can't
15  believe y'all are putting up with that.'
16  Well, you have a right to say what you
17  want to say and feel how you feel to
18  feel. But just understand we've got you
19  in a -- in a position that is a -- a very
20  high-profile position. And it's an
21  important position. And we're being -- I
22  mean, we have no intentions of taking you
23  out of it, but I'm saying, you need to

Page 240

1   just consider those things when you --
2   when you -- when you post things about
3   people who kill police officers. And
4   that's all I wanted to say. And I'm
5   sorry I took -- took time from your.
6       "OFFICER CARNEY: No, sir, I
7   don't -- I don't mind that at all. I
8   mean, you're -- you're expressing, you
9   know, the concern from the department,
10  and I totally appreciate that.
11      "MAJOR PARRISH: From that view.
12  And -- and if you want to say anything
13  regarding that or anything. But you know
14  me, and we've always gotten along fine, I
15  respect you. And, but you also know that
16  I'm a person that would tell you what I
17  feel, and I know that you're the same
18  way.
19      "OFFICER CARNEY: Yes, sir.
20      "MAJOR PARRISH: So if you
21  want to -- if you want to tell me
22  anything related to this, you can. I'm
23  not asking you to cease and desist or --

Page 241

1   or do anything or threatening you in any
2   way.  You understand that?
3          "OFFICER CARNEY:  Yes, sir.
4          "MAJOR PARRISH:  I'm just -- I'm
5   just telling you the position that we're
6   in.
7          "OFFICER CARNEY:  Yes, sir.
8          "MAJOR PARRISH:  And I ask that
9   you just consider that.
10         "OFFICER CARNEY:  I -- I do.  I
11  consider that every day, in everything I
12  do.  My position with the police
13  department, my position as a sergeant in
14  the Army.  So I'm not willing to throw
15  away all my years of experience in either
16  location based on Facebook or any other
17  social media.
18         "MAJOR PARRISH:  Right.  Right.
19         "OFFICER CARNEY:  So I'm not
20  going to jeopardize my career for
21  anybody.
22         "MAJOR PARRISH:  Right.
23         "OFFICER CARNEY:  But I do feel

Page 242

1   I'm entitled to my personal opinion.
2          "MAJOR PARRISH:  Absolutely.
3          "OFFICER CARNEY:  Regardless of
4   what anybody else thinks about it.
5          "MAJOR PARRISH:  That's right.
6          "OFFICER CARNEY:  So I don't
7   attack other people for their personal
8   opinions.
9          "MAJOR PARRISH:  Like I said, I
10  haven't read that stuff.
11         "OFFICER CARNEY:  We have to
12  agree to disagree.  I -- I'm not
13  supporting one way or the other the
14  actions that that gentleman took.  It's
15  not my place to, the way I see it.
16         "MAJOR PARRISH:  Well,
17  regardless of the stance, just remember
18  that when you tie yourself in to a social
19  media and you're identified on your site
20  as a police officer, that, you know,
21  there comes with that certain things that
22  you have to bear in mind, and how your
23  actions or whatever reflect on this

Page 243

1   agency is one of those things you have to
2   consider.
3          "OFFICER CARNEY:  Uh-huh.
4          "MAJOR PARRISH:  Okay.  Thank
5   you for your time.
6          "OFFICER CARNEY:  You're
7   welcome.
8          "MAJOR PARRISH:  Good-bye.
9   Thank you.
10         "OFFICER CARNEY:  No problem."
11         (End of audio recording.)
12     Q.  (By Ms. Mays) Was that the
13  complete conversation?
14     A.  Uh-huh.
15     Q.  Did Major Parrish or Lieutenant
16  Baxley know that you were recording that
17  conversation?
18     A.  Not to my knowledge.
19     Q.  Did you ask them for permission
20  to record the conversation?
21     A.  No.
22     Q.  Did you tell Major Parrish that
23  you totally appreciated him having that

Page 244

1   conversation with you?
2      A.  Yes.
3      Q.  Did you appreciate him having
4   that conversation with you?
5      A.  Yes.
6      Q.  Did he state as part of that
7   conversation that you can't do anything
8   that has a negative reflection on this
9   agency?
10     A.  As I recall, yes.
11     Q.  Did he say that he hadn't read
12  the Facebook or the WiregrassLive posts?
13     A.  Yes.
14     Q.  Did he say as part of that
15  conversation that he had all the respect
16  in the world for you?
17     A.  Yes.
18     Q.  At the time that you were making
19  the posts about Christopher Dorner in
20  February 2013, were you identified on
21  your Facebook page as an officer for the
22  City of Dothan?
23     A.  I don't recall exactly what it

Page 245

1    stated.
2        Q.  Do you know whether people who
3    were not your friends could view your
4    Facebook page?
5        A.  People who were not my friends
6    could, like, go to the page.  I don't
7    know what all they could see of my page.
8        Q.  But it's possible that people
9    who weren't your friends could see your
10   postings on your wall on Facebook?
11       A.  I'm not certain.
12       Q.  You just don't know one way or
13   the other?
14       A.  I'm not certain.
15       Q.  Do you think that people could
16   view your page who weren't your friend?
17       A.  Again, it depends like what's on
18   the settings and how you set your
19   Facebook page up.
20       Q.  At that time did you have your
21   settings such that only your friends
22   could view your wall?
23       A.  I don't recall.

Page 246

1        Q.  Since February 2013, have you
2    changed your Facebook settings?
3        A.  I've updated information.  I
4    don't know if I've changed -- I don't
5    recall changing any of the settings.
6        Q.  Do you know whether Major
7    Parrish is a lawyer?
8        A.  I don't.
9        Q.  Did you have any other
10   conversations with Major Parrish
11   regarding your Facebook posts?
12       A.  No, not that I recall.
13       Q.  Any other examples of him
14   creating an intimidating, hostile, or
15   offensive work environment for you?
16       A.  Not that I can recall at this
17   time.
18       Q.  Tell me all the ways that
19   Lieutenant Will Benny created an
20   intimidating, hostile, and offensive work
21   environment for you.
22       A.  The position that I held over
23   the Crime Stoppers program was given to

Page 247

1    him, and that is what he reflected in the
2    e-mail he sent to me.
3        Q.  Are you saying that he sent you
4    an e-mail letting you know that he was
5    going to be over the Crime Stoppers
6    program?
7        A.  Yes.
8        Q.  And that e-mail letting you know
9    that he was taking over the Crime
10   Stoppers program was harassing to you?
11       A.  Yes.
12       Q.  In what way?
13       A.  It was harassing in that he was
14   the person in charge of investigations,
15   criminal investigations division.  And by
16   him being a lieutenant and me being an
17   officer, that was a responsibility that
18   someone of his rank would have been in
19   command of.  And for me to be of less
20   rank than him was like a slap in his
21   face, that I was working a program that
22   he should have been over, or was over and
23   it was given to me.

Page 248

1        Q.  Do you have a copy --
2        A.  So when it was taken away from
3    him and given to me and when he had the
4    opportunity to take it back, I felt like
5    it was harassing because he had an
6    opportunity to tell me face-to-face that
7    I was no longer going to have the
8    permissions or have the position of
9    coordinator over the program, and
10   instead, when I came in, I was told by
11   the secretary that I no longer had the
12   permissions when I questioned why I
13   didn't have access.  And the secretary
14   being Brandi Barnes.
15       Q.  Do you have a copy of the e-mail
16   that Lieutenant Benny sent to me?
17       A.  I can try to gain access to it.
18       Q.  Do you recall what the e-mail
19   said?
20       A.  That he appreciated the work I
21   did with getting the text-to-tip program,
22   but I was no longer -- it was going to be
23   I guess reassigned or based on the

Page 249

1    distribution or needs of the program.
2        Q.  Who made the decision to
3    reassign Lieutenant Benny to the Crime
4    Stoppers program?
5        A.  I don't know.
6        Q.  He didn't make that decision
7    himself, did he?
8        A.  I don't know.
9        Q.  Had Brandi Barnes already told
10   you that you were going to be reassigned
11   from the Crime Stoppers program to
12   another program?
13       A.  No.
14       Q.  The first notice that you had
15   that you were not going to be over the
16   Crime Stoppers program came from this
17   e-mail from Will Benny?
18       A.  Yes.
19       Q.  Any other examples of
20   intimidating, hostile, offensive comments
21   or behavior from Lieutenant Will Benny?
22       A.  His postings also on Facebook.
23       Q.  And have we looked at those?

Page 250

1        A.  They're in your exhibit.
2        Q.  Any other ways?
3        A.  Not that I can think of.
4        Q.  And again, you never told Chief
5    Benton the names of these individuals or
6    the details that you just provided to me.
7    Is that --
8        A.  No.
9        Q.  -- correct?  It's correct that
10   you never provided him that information?
11       A.  That's correct.  I did not
12   provide him with the names of
13   individuals.
14       Q.  Or the details that you just
15   provided to me?
16       A.  No.
17       Q.  Show you what I've marked as
18   Defendant's Exhibit 16.  Do you recognize
19   this document?
20   (Defendant's Exhibit 16 was marked for
21   identification and is attached.)
22       A.  Yes.
23       Q.  What is this?

Page 251

1        A.  Dothan Police Department
2    Internal Affairs Division Garrity notice.
3        Q.  And is this a notice that you
4    signed on the date that you were
5    interviewed by internal affairs
6    investigating officer Donny Smith?
7        A.  Yes.  But he was not the only
8    person, or only investigator that
9    questioned me.
10       Q.  Who else was present for that
11   interview?
12       A.  Sergeant Doug Magill.
13       Q.  And was the purpose of that
14   interview to ask you questions about the
15   Facebook posts, to investigate the
16   internal affairs complaint that they had
17   received from Chief Benton?
18       A.  Yes.
19       Q.  And is that in fact what they
20   asked you about on February 18th, 2013?
21       A.  Yes.
22       Q.  Did I say February 8th?  I meant
23   February 18th, 2013.

Page 252

1        Where did you meet Officer Smith
2    and Sergeant Magill for this interview?
3        A.  For this interview?  In Sergeant
4    Smith's office.  I believe it was his
5    office at the time.
6        Q.  Did you get the impression that
7    they were taking this interview seriously
8    and taking the investigation seriously?
9        A.  Yes.
10       Q.  I'll show you what I've marked
11   as Defendant's Exhibit 17.  Did you
12   receive a copy of this memo -- looks like
13   the same thing -- from Darryl Mathews on
14   February 21st advising you that various
15   Dothan Police officers have registered a
16   complaint regarding several public posts
17   you made on your Facebook page?
18   (Defendant's Exhibit 17 was marked for
19   identification and is attached.)
20       A.  Yes.
21       Q.  Did you know that seventeen
22   officers submitted reports, complaints
23   regarding your Facebook posts?

Page 253

1    A.  No.
2    Q.  Show you what we've marked as
3  Defendant's Exhibit 18.  Do you recognize
4  this as e-mail correspondence between you
5  and Delvick McKay, personnel board
6  director?
7  (Defendant's Exhibit 18 was marked for
8  identification and is attached.)
9      (Witness reviews document.)
10    A.  Yes.
11    Q.  February 19th, 2013, you
12  reported to Mr. McKay that you felt in
13  imminent danger.  Is that right?
14    A.  Are you asking me is that what I
15  reported to him in this e-mail?
16    Q.  Yes.  Is that what you reported?
17  Start on the page that's Bates 589.
18    A.  This is.
19    Q.  The last page of the exhibit?
20    A.  Is this out of order?  Because.
21    Q.  The first e-mail, it's going to
22  be on the last page of the exhibit.
23    A.  Tuesday February 19, 2013, at

Page 254

1  12:54 p.m.
2    Q.  Yes.
3    A.  Yes.  The basis of the e-mail
4  does state that.
5    Q.  And why did you feel that you
6  were in danger?
7    A.  As stated, I advised that I feel
8  that those officers were in collusion
9  with former police officers of the
10  department and that their intention was
11  to label me a racist in the eyes of the
12  public.
13    Q.  And did Mr. McKay respond that
14  if you felt that you had received
15  personal threats for your personal safety
16  from employees, supervisors, or the
17  public, report them to the proper
18  authorities?
19      (Witness reviews document.)
20    A.  Well, his response was, "If
21  there is any specific reports of threats
22  being made to you by a supervisor or
23  employees related to this matter, I need

Page 255

1  to know them as well as the Chief."
2    Q.  Had you received any specific
3  threats?
4    A.  At the time of the e-mail, as I
5  can recall, no.
6    Q.  Show you what I've marked as
7  Defendant's Exhibit 19.  Is this a memo
8  that you received on March 20th from
9  Darryl Mathews, who is the EEO training
10  officer, regarding his findings and
11  recommendations from the complaints
12  registered against you by various Dothan
13  Police officers?
14  (Defendant's Exhibit 19 was marked for
15  identification and is attached.)
16    A.  Yes.
17    Q.  And did he conclude as part of
18  his findings that your public posts on
19  Facebook had racial content?
20    A.  Yes.
21    Q.  And did he conclude that your
22  conduct was unbecoming of a Dothan Police
23  officer and merited a corrective action?

Page 256

1    A.  Yes.
2    Q.  And he recommended that you
3  attend race sensitivity sessions, that
4  you attend leadership, professional
5  conduct, and accountability in verbal and
6  written communications sessions and that
7  he monitor those sessions.  Is that
8  right?
9    A.  Yes.
10    Q.  Did you ever attend race
11  sensitivity sessions?
12    A.  No.
13    Q.  Did you ever attend the Bradford
14  Services on leadership, professional
15  conduct, and accountability in written
16  and verbal communication?
17    A.  No.
18    Q.  Show you what I've marked as
19  Defendant's Exhibit 20.  Did you receive
20  this memo dated March 20th, 2013, from
21  Darryl Mathews, the EEO training officer,
22  regarding his findings about your EEO
23  complaint that you had submitted dated

1  February 26?
2  (Defendant's Exhibit 20 was marked for
3  identification and is attached.)
4    A.  You said do I recognize this
5  exhibit?
6    Q.  Uh-huh.
7    A.  Yes.
8    Q.  I think I haven't marked that
9  yet, so I'll mark Exhibit 21.  Looks like
10  two copies of the same grievance, just
11  have different dates in the top
12  right-hand corner -- or top left-hand
13  corner.  Is this a grievance that you
14  submitted to Darryl Mathews, the EEO
15  officer on February 26th, 2013?
16  (Defendant's Exhibit 21 was marked for
17  identification and is attached.)
18    A.  Yes.  It appears to be, yes.
19    Q.  And do you allege in the
20  grievance that Major Steve Parrish,
21  Captain David, Lieutenant Will Benny,
22  Sergeant Donny Smith, and Sergeant Donny
23  Magill had intentionally conspired race

1  discrimination, harassment, coercion and
2  intimidation and threatened violence
3  against you?
4    A.  Yes.
5    Q.  Did you also allege that retired
6  police sergeant Jimmy Holley, ex-officer
7  Richard Odom, and Emily Hays had
8  conspired against you?
9    A.  Yes.
10    Q.  And we won't read the whole
11  thing.  But did you also make
12  allegations, or report that you had been
13  removed -- your access to the TipSoft
14  software had been removed?  Still on
15  Exhibit 21 that last paragraph on the
16  first page.
17    (Witness reviews document.)
18    A.  What was your question again?
19    Q.  My question was, did you also
20  include in this -- this formal grievance
21  that you submitted to Darryl Mathews a
22  report that you no longer had access to
23  the TipSoft software?

1    A.  I no longer had admin access
2  rights, administrative access rights.
3    Q.  Is that something you reported
4  in this February 26th --
5    A.  Yes.
6    Q.  You also reported that your
7  office location had been moved to
8  Wiregrass Park.  Is that correct?
9    A.  Yes.
10    Q.  You informed him about your
11  meeting with Major Parrish on February
12  the 14th?
13    A.  Yes.
14    Q.  Did you have any conversations
15  with Mr. Mathews about this February 26th
16  report?
17    A.  Other than when I handed it to
18  him?
19    Q.  Did you have a conversation with
20  him when you handed it to him?
21    A.  Yes, I did have a conversation
22  when I handed it to him.
23    Q.  And what did you say?

1    A.  That it detailed my complaint.
2    Q.  And how did he respond?
3    A.  He would take a look at it and
4  investigate it.
5    Q.  And did he in fact do that?
6    A.  I don't know.
7    Q.  If you look at Exhibit 20, is
8  that not his response to your EEO
9  complaint?
10    A.  That is his response.
11    Q.  Okay.  And did he provide you
12  with that response on March the 20th,
13  2013?
14    A.  Yes.
15    Q.  So while the investigation into
16  your Facebook posts are taking place,
17  Darryl Mathews are also conducting an
18  investigation into the EEO allegations
19  that you had alleged.  Is that right?
20    A.  I don't know if the
21  investigation was still ongoing.
22    Q.  You don't know if which
23  investigation was still ongoing?

1     A.  The investigation into my
2  Facebook posts.
3     Q.  Okay.  I'm showing you what I've
4  marked as Defendant's Exhibit 22.  Do you
5  see that the first page of this exhibit,
6  which is Bates-labeled 674, those first
7  two pages, 674 and 675, that those are
8  the City of Dothan employee disciplinary
9  action report form?
10  (Defendant's Exhibit 22 was marked for
11  identification and is attached.)
12     A.  Yes.
13     Q.  Signed by Gregory Benton.  And
14  who was your supervisor at the time?
15     A.  Captain David Jay.
16     Q.  Signed also by Captain David
17  Jay, and it also contains your signature.
18  Do you see that down at the bottom?
19     A.  Yes.
20     Q.  And does this document provide
21  you with notice that you've received a
22  final written warning for violation of a
23  major category, personnel rule Section

1  3-42?  Do you see that at the top of the
2  page?
3     A.  Section 3-42(13).
4     Q.  Okay.
5     A.  First offense.  Yes.
6     Q.  The page Bates-labeled 676
7  provides you with notice of decision of
8  determination hearing.  Do you see that
9  document?
10     A.  Yes.
11     Q.  And did you also sign and date
12  that document?
13     A.  Yes.
14     Q.  And the decision was to suspend
15  you for a period of ten working days and
16  to complete training designated by the
17  EEO officer.  After the completion of the
18  ten days, you'll be reassigned to front
19  desk duty of the police department lobby.
20  Do you see that?
21     A.  Yes.
22     Q.  And is that in fact the
23  discipline that was issued?

1     A.  A part of it.
2     Q.  Okay.  We turn the page to the
3  page that's Bates-labeled 678, is this
4  the "Formal Grievance And Appeal
5  Procedure Form" that you submitted?
6     (Witness reviews document.)
7     A.  Yes.
8     Q.  And the next page beginning with
9  Bates number 685, is that the response
10  that you received from personnel board
11  director Delvick McKay?
12     A.  Yes.
13     Q.  What is the Sons of Confederate
14  Veterans?
15     A.  I don't know.  I'm not a member
16  of that.
17     Q.  Do you know anything about the
18  organization?
19     A.  Well, I'm not a member of it, so
20  I don't know.
21     Q.  Do you know the purpose of the
22  organization?
23     A.  No, I don't.

1     MS. MAYS:  Can we take five?
2     MR. BENNITT:  Yes, ma'am.
3     (Break taken.)
4     Q.  (By Ms. Mays) Ms. Carney, would
5  you agree that the terms, or the words
6  "slavery" and "lynchings" are racially
7  charged words?
8     A.  No.
9     Q.  Would you agree that there are
10  implicit racial undertones when you use
11  those two words?
12     A.  No.
13     Q.  Would you agree that "slavery"
14  is most often used in reference to a
15  period in our country's history when
16  African-Americans were enslaved?
17     A.  Repeat your question?
18     (Requested portion read.)
19     A.  Yes.
20     Q.  And most often used, that term,
21  "slavery," is most often used in
22  reference to a period in our history
23  prior to the Civil War?

Page 265

1      A.  I don't know.
2      Q.  Look back for a minute at what
3  we labeled as Defendant's Exhibit 11.
4  And I want to ask you about the documents
5  that are Bates-labeled 81 through 87.
6  These are Facebook posts by Mike
7  Woodside, David Jay, and Will Benny.  Is
8  that right?
9      (Witness reviews document.)
10     A.  Yes.
11     Q.  And you said that you have not
12 seen these posts before April the 5th,
13 2013.  Is that right?
14     A.  I said I couldn't recall.
15     Q.  Couldn't recall having seen
16 them, but you knew that you hadn't
17 reported any of them to anybody at the
18 City of Dothan prior to that date.  Is
19 that right?
20     A.  No.  It was reported during the
21 hearing, the personnel board hearing.
22     Q.  How was it reported during the
23 personnel board hearing?

Page 266

1      A.  It was presented as evidence.
2      Q.  These Facebook pages were
3  presented as evidence at the personnel
4  board hearing regarding your suspension.
5  Is that what you're saying?
6      A.  Regarding the social media
7  personnel board hearing.
8      Q.  Okay.  But prior to that time,
9  you hadn't made any reports to the EEO
10 officer or to the personnel board
11 director or to anybody at the City
12 regarding these Facebook posts.  Is that
13 right?
14     A.  No.
15     Q.  That's not right?
16     A.  No.  No, I had not.
17     Q.  Okay.  Do you know whether
18 anyone else had made any reports
19 regarding these Facebook posts that are
20 Bates-labeled 81 to 85?
21     A.  No, I do not.
22     Q.  There's no one at the City of
23 Dothan whose job it is to review the

Page 267

1  officers' Facebook pages, is it?
2      A.  You mean on a regular basis?
3      Q.  Correct.
4      A.  I don't know.
5      Q.  Do you think that's something
6  you'd know if that was somebody's job
7  assignment?
8      A.  Not necessarily.
9      Q.  Did you know before today that
10 seventeen officers had submitted
11 complains about your Facebook posts
12 related to Christopher Dorner?
13     A.  I did not.
14     Q.  Do you know whether seventeen
15 officers submitted complaints regarding
16 the posts made by Mike Woodside, David
17 Jay, and Will Benny?
18     A.  Do I know if those seventeen
19 officers did what?
20     Q.  Had submitted complaints
21 regarding their Facebook posts?
22     A.  Officer Mike Woodside --
23        MR. BENNITT:  I'm going to

Page 268

1  object to the form.  I don't think I
2  quite understand.  I'm sorry.
3      Q.  Do you know whether any other
4  officers have made complaints about the
5  Facebook posts that you were reviewing
6  here that are Bates-labeled 81 to 87?
7         MR. BENNITT:  I'm sorry again.
8  Do you mean, does she know if they made
9  complaints to --
10        MS. MAYS:  Does she know whether
11 anybody has made complaints about these
12 Facebook posts.
13        MR. BENNITT:  To her boss?
14        MS. MAYS:  To anybody at the
15 City of Dothan.
16        MR. BENNITT:  To just the
17 secretary or anybody that they happen to
18 see?
19        MS. MAYS:  To the EEO officer,
20 to the personnel board, or to any member
21 of management.
22     A.  I don't know.
23     Q.  (By Ms. Mays) Okay.

67 (Pages 265 to 268)

Page 269

1    MR. BENNITT: I'm sorry, I don't
2  mean to interrupt. Please forgive me.
3    Q. I'm showing you what we've
4  marked as Defendant's Exhibit 23. Can
5  you tell me what this is, Ms. Carney? I
6  keep calling you Ms. Carney because it's
7  in the complaint. It's Cloyd.
8  (Defendant's Exhibit 23 was marked for
9  identification and is attached.)
10   (Discussion held off the record.)
11    MR. BENNITT: Okay. This is her
12  affidavit.
13    Q. (By Ms. Mays) Can you tell me
14  what this is, Ms. Carney? Ms. Cloyd. My
15  documents are Bates-labeled Carney, so
16  it's throwing me off.
17    A. This is labeled as an affidavit.
18    Q. Is it in fact an affidavit that
19  you presented at the personnel board
20  hearing?
21    MR. BENNITT: Here, let me help
22  you.
23    THE WITNESS: Well.

Page 270

1    MR. BENNITT: I'm sorry. Let me
2  show you the last page. Is that your
3  signature?
4    THE WITNESS: Uh-huh.
5    MR. BENNITT: Okay.
6    Q. (By Ms. Mays) This is your
7  signature on --
8    A. I don't recall if this was
9  submitted to the personnel board hearing.
10    Q. Okay. For what purpose did you
11  draft this affidavit?
12    A. It was sent to the chief of
13  police.
14    Q. Okay. But you did in fact draft
15  and send it to him?
16    A. Yes. But I don't recall it
17  being in this form.
18    MR. BENNITT: Well, just take
19  your time.
20    A. I don't know who -- I don't
21  know -- I don't recall drafting it in
22  this particular form.
23    MR. BENNITT: Just take your

Page 271

1  time and read it. Read the whole thing
2  before you say anything.
3    (Witness reviews document.)
4    Q. What I'm interested in knowing
5  is did you draft it and is it your
6  signature.
7    MR. BENNITT: She wants to
8  authenticate this as a real document.
9    A. Do you have the original stamped
10  copy of this?
11    Q. This was produced to us, and we
12  received it electronically, so this, what
13  you have, is a print-off.
14    MR. BENNITT: This is a
15  print-off from Mrs. Edwards.
16    THE WITNESS: Okay.
17    A. Yes, it appears to be a document
18  that I produced.
19    Q. Did you draft the statements
20  that are contained in this affidavit,
21  this-ten page affidavit that's been
22  labeled as Exhibit 23?
23    A. Yes.

Page 272

1    MR. BENNITT: Twenty-four, you
2  say?
3    MS. MAYS: Twenty-three.
4    MR. BENNITT: Thank you.
5    Q. All right. I'm showing you what
6  I've marked as Defendant's Exhibit 24.
7  The first page of this exhibit is
8  Bates-labeled page 96. Do you recognize
9  this as an acknowledgment that you
10  received the City of Dothan employee
11  handbook that includes the personnel
12  rules and regulations and the Civil
13  Service Act, among other policies?
14  (Defendant's Exhibit 24 was marked for
15  identification and is attached.)
16    A. Yes.
17    Q. The next page in this exhibit is
18  Bates-labeled 97. Do you recognize this
19  as your acknowledgment of receipt of the
20  computer policies and procedures?
21    A. Yes.
22    Q. Next page is a Bates label
23  that's hard to read. But do you

Page 273

1  recognize this as your certificate of
2  completion of preventing employment
3  discrimination training in June of 2009?
4      A.  Yes.
5      Q.  There are three more pages.
6  They are Bates-labeled 729 to 731.  Do
7  you recognize those as the statement of
8  the EEO policy for the City of Dothan?
9      A.  The Bates number 729 is dated
10  January 2nd, 2007.  And Bates number 730
11  is dated October the 5th, 2009.  And 731
12  is dated May 8th, 2012.  Each titled
13  "Statement Of EEO Policy."
14      Q.  If you'll notice in the bottom
15  of each of those policies, they are
16  signed by the mayor, the personnel board
17  director, and the EEO officer at the
18  time.
19      A.  Yes.
20      Q.  Is that correct?
21      A.  Yes.
22      Q.  And it's my understanding that
23  this policy is redistributed whenever a

Page 274

1  person changes positions.  So for
2  example, you'll see on the first EEO
3  policy, Bates 79, the personnel director
4  was Kai Davis, and the next one in
5  October of 2009, the personnel director
6  was Delvick McKay.  So whenever there's a
7  change or turnover in that position, that
8  this policy is reissued.  Do you have any
9  reason to dispute that?
10      A.  You mean for the positions that
11  are annotated on this document?
12      Q.  Yes.
13      A.  The mayor's position, personnel
14  director, or EEO officer's position, when
15  there is a change in those positions,
16  this document is reissued.
17      Q.  That's what I mean, yes.
18      A.  Yes.
19      Q.  And have you seen this document
20  posted on the department bulletin board?
21      A.  I can't say one way or the other
22  if I have or have not.
23      Q.  Do you have any reason to

Page 275

1  dispute that it's posted on the
2  department bulletin board?
3      A.  I don't know at this point in
4  time.
5      MR. BENNITT:  Well, can you
6  explain that answer?
7      A.  There are things that are posted
8  on the board that -- or things that are
9  supposed to be posted on the board, such
10  as this document, that may be covered by
11  other documents, get taken off, thrown
12  down, fall off, get lost.  And how
13  quickly it's replaced, I don't know, if
14  it's replaced.  So I don't know if this
15  document is posted, as in all the time if
16  you walk up to the board, it's going to
17  be there.  I can't attest to that.  So I
18  don't know if I've -- I don't recall
19  seeing the document being posted on the
20  board.
21      Q.  But you're familiar with the
22  statement of EEO policy?
23      A.  Yes.

Page 276

1      MR. BENNITT:  Do we need to
2  authenticate this policy that you're
3  fixing to identify?
4      MS. MAYS:  I need her to
5  acknowledge that she is aware of the
6  policy.
7      MR. BENNITT:  Can we do that?
8  This is the policy.
9      Q.  Showing you what's been labeled
10  as Exhibit 25.  I represent to you that
11  these are excerpts of the personnel board
12  rules and regulations, Sections 1 through
13  5, 7, and portions of Sections 9 through
14  11.
15  (Defendant's Exhibit 25 was marked for
16  identification and is attached.)
17      MR. BENNITT:  And these were
18  given by y'all to us from requests for
19  production.
20      MS. MAYS:  Yes.
21      Q.  Did you have access to these
22  rules and regulations throughout the
23  duration of your employment --

Page 277

1     A.  Yes.
2     Q.  -- with the City?
3     (Discussion held off the record.)
4     Q.  (By Ms. Mays) Showing you what's
5  been marked as Exhibit 26.
6  (Defendant's Exhibit 26 was marked for
7  identification and is attached.)
8     A.  Now, I can't say that these are
9  the exact ones that were in existence
10  during my term of employment, because
11  they are subject to being updated,
12  Exhibit -- in Defendant's Exhibit 25.
13     Q.  Okay.
14        MR. BENNITT:  This will be --
15  address it as Defendant's 26.
16     A.  Yes, ma'am.  Defendant's Exhibit
17  26.
18        MR. BENNITT:  And just she wants
19  to know can you authenticate that, what
20  is it.
21     A.  What is Defendant's Exhibit 26?
22  The City of Dothan Civil Service Act.
23     Q.  And are you familiar with the

Page 278

1  City of Dothan Civil Service Act?  And I
2  represent to you that is only excerpts of
3  the act.
4     A.  Yes.
5     Q.  You are familiar with it?
6     A.  I am familiar.
7     Q.  And were you -- did you know
8  that it was in place during the duration
9  of your employment, and did you have
10  access to it?
11     A.  Yes and yes.
12     (Discussion held off the record.)
13     Q.  (By Ms. Mays) All right.  Show
14  you what's been marked as Exhibit 27.  Do
15  you recognize this as a social media
16  policy that was in place during your
17  employment at the City of Dothan?
18  (Defendant's Exhibit 27 was marked for
19  identification and is attached.)
20     A.  I do not, because I cannot
21  distinguish the dates that this was put
22  in place.
23        MR. BENNITT:  Do you have any

Page 279

1  reason to dispute that this is the social
2  media policy for that time period?
3        THE WITNESS:  Well, yes, because
4  it could change at any time.
5     Q.  Okay.
6        MR. BENNITT:  How many social
7  media policies do y'all have altogether?
8  If there's a change, surely, it's a very
9  small change.
10        MS. MAYS:  I don't know the
11  answer to that question.
12        MR. BENNITT:  Would you do us a
13  favor, please, ma'am?  Read this policy,
14  and if it looks about right, see if it
15  looks about right.
16     Q.  (By Ms. Mays) Were you aware
17  that during your employment at the City
18  of Dothan that it was a policy of the
19  City that department personnel are free
20  to express themselves as private citizens
21  on social media sites to the degree that
22  their speech does not impair working
23  relationships for this department for

Page 280

1  which loyalty and confidentiality are
2  important, impede the performance of
3  duties, impair discipline and harmony
4  among coworkers, or negatively affect the
5  public perception of the department?
6        MR. BENNITT:  Well, I'm going to
7  is have to object to the form because I
8  don't know that she can comprehend all
9  those words at one time.  There's a lot
10  of them.
11     Q.  Sure.  Let's look on the page
12  that's Bates-labeled 726.  Were you aware
13  that in February of 2013 and throughout
14  your employment at the City of Dothan
15  that it was the policy of the City --
16        MR. BENNITT:  Which one?  Okay.
17     A.  This falls under --
18        MR. BENNITT:  No, no.
19     Q.  That's reflected in Paragraph
20  V(A)(1).
21     A.  Again, I'm referring to, or
22  you're referring to --
23        MR. BENNITT:  Right here.

Page 281

1    A.  -- this document that I can't
2  identify whether or not this document is
3  the same document that was in place.
4    Q.  Regardless of whether this
5  document was in place, are you aware that
6  that was the policy that was --
7    A.  I can't say that.  Because if
8  the policy was different during my time
9  of employment with the City of Dothan --
10    MR. BENNITT:  Can I talk to my
11  client?  Just go off the record for a
12  second?
13    (Discussion held off the record.)
14    MR. BENNITT:  My client would
15  like to say something about the policy,
16  Exhibit 27.
17    A.  I can't say that this is the
18  exact same policy that was in place, but
19  I am aware of one that is similar to what
20  is stated in this document.
21    Q.  Okay.  I'm showing you what's
22  marked as Defendant's Exhibit 28.  It's a
23  memo that was issued on June 23rd, 2010,

Page 282

1  to all employees and to department heads
2  regarding social networking sites.  Were
3  you an employee of the City of Dothan in
4  June of 2010?
5  (Defendant's Exhibit 28 was marked for
6  identification and is attached.)
7    A.  Yes.
8    Q.  Do you recall receiving this
9  memo?
10    (Witness reviews document.)
11    A.  I recall receiving something to
12  this effect.  I don't recall if this is
13  exact -- exactly the same information,
14  but.
15    Q.  All right.  Let me show you what
16  I've marked as Defendant's Exhibit 29.
17  If you'll look at the top of this
18  exhibit, the very first line, it has your
19  username, your first and last name, and
20  under "Subject," the first one, it says,
21  "Use of Social Networking Sites," and
22  "Rev Date," which I believe is received
23  date, June 23rd, 2010, which is the date

Page 283

1  of this memo that's labeled Exhibit 28.
2  (Defendant's Exhibit 29 was marked for
3  identification and is attached.)
4    MR. BENNITT:  This is 29, you
5  say?
6    MS. MAYS:  Yes.
7    MR. BENNITT:  Thank you.
8    Q.  (By Ms. Mays) It's a summary of
9  your --
10    A.  Revision date?  I don't know if
11  that's the received date.
12    Q.  Did you have to submit an
13  electronic signature whenever you
14  received revisions or updates to
15  policies?
16    A.  When we review the policies.
17    Q.  So when you reviewed policies,
18  you had to electronically acknowledge
19  that you had reviewed those policies?
20    A.  Yes.
21    Q.  And do you recognize this
22  document as a summary of your electronic
23  signature acknowledging that you have

Page 284

1  reviewed the various policies that are
2  listed under the "Subject" heading?
3    A.  Well, this would be the first
4  time I'm seeing this.
5    MR. BENNITT:  Are you trying to
6  authenticate a past policy?  We will
7  agree that that policy is --
8    MS. MAYS:  Sure.
9    MR. BENNITT:  -- authentic.
10    MS. MAYS:  I'm asking her if
11  this is her electronic signature that she
12  has received and reviewed the policies
13  that are in this summary that is labeled
14  Defendant's Exhibit 29.
15    MR. BENNITT:  Is there really
16  any dispute that Defendant's No. 27 is
17  anything but authentic?
18    MS. MAYS:  Defendant's Exhibit
19  29 relates to more than just Defendant's
20  Exhibit 27.  It's a summary of various
21  policies.
22    MR. BENNITT:  Okay.  Admitted.
23    Q.  Show you what's been marked

Page 285

1 Defendant's Exhibit 30.  Was this the
2 code of ethics policy that was in place
3 when you were employed with the City?
4 (Defendant's Exhibit 30 was marked for
5 identification and is attached.)
6      MR. BENNITT:  Do you agree that
7 that's what it is?
8   A.  I'll agree it looks similar to
9 the code of ethics policy that the
10 department had.
11   Q.  And no reason to dispute that
12 it's anything but that; right?
13   A.  No, not at this time.
14   Q.  The code of -- what I've marked
15 as Defendant's 31, is that the code of
16 conduct that was in place during your
17 employment?
18 (Defendant's Exhibit 31 was marked for
19 identification and is attached.)
20   A.  It appears to be similar.
21   Q.  What is this photograph of that
22 we have marked as Exhibit 32?
23 (Defendant's Exhibit 32 was marked for

Page 287

1 in this photograph?
2   A.  In the very front holding the
3 document in front of the flag is Steve
4 Parrish, Major Parrish of Dothan Police
5 Department.  And holding on to the right
6 side of the flag, holding the right
7 corner of the flag would be Dwayne Harry,
8 former lieutenant of the police
9 department.  Then I guess with the back
10 row behind Dwayne Harry starting to the
11 very far right-hand side of the photo,
12 Sergeant Scott Smith of Dothan Police
13 Department.  Standing next to him with
14 the black baseball cap in the very back,
15 Gary --
16      MR. BENNITT:  Where's the real
17 photograph?
18      MS. MAYS:  Y'all gave this to
19 us.  I don't know.
20   A.  Sergeant Gary Coleman, he's
21 retired.  Standing between Sergeant
22 Coleman and Lieutenant Herring is Sheriff
23 Andy -- or former sheriff Andy Hughes.

Page 286

1 identification and is attached.)
2   A.  It appears to be a photograph of
3 several persons, males.
4      MR. BENNITT:  Are those police
5 officers?
6      THE WITNESS:  Some whom are
7 police officers, or were police officers.
8   Q.  Who are the police officers in
9 this photograph?
10   A.  Starting from my left?
11   Q.  Okay.
12   A.  Would be, the first person,
13 Clark Rice.  And this picture is really
14 distorted.  Standing next to him on the
15 back row, I don't recognize who that
16 person is.  And standing on the back row
17 again next to that person, Sergeant Hamm,
18 former Sergeant Hamm.
19      MR. BENNITT:  Which police
20 department?
21      THE WITNESS:  Dothan Police
22 Department.
23   Q.  Any other Dothan police officers

Page 288

1 And the other two individuals, I can't
2 quite make out from this photo who they
3 are.
4   Q.  Where did you get this
5 photograph?
6   A.  I don't know where this
7 particular photograph came from.
8   Q.  Have you seen it before today?
9   A.  Yes.
10   Q.  When have you seen it before
11 today?
12      MR. BENNITT:  She doesn't mean
13 in your lawyer's office.
14   A.  I was given a copy of the
15 photograph by a former police sergeant, a
16 retired police sergeant.
17   Q.  Who was that?
18   A.  Sergeant Donald Harding.
19   Q.  And why did Sergeant Harding
20 give you a copy of this photograph?
21   A.  I think that's a question you
22 have to ask him.
23   Q.  Did he say anything when he gave

1  you the copy of the photograph?
2      A.  He said, "Use it to burn their
3  asses."
4      Q.  Do you know what he meant by
5  that?
6          MR. BENNITT:  If you can read
7  his thoughts, you can answer.
8      A.  I don't know.
9      Q.  What did you take that to mean?
10     A.  For the discrimination that I
11 was facing at the department.
12     Q.  When did he give you this
13 photograph?
14     A.  In 2004 before I left the
15 department.
16     Q.  Did you find this photograph
17 offensive?
18     A.  Yes.
19     Q.  Did you report that to anyone?
20 Did you report this photograph, having
21 seen and received this photograph to
22 anyone?
23     A.  No.  I left the department.

1      Q.  What department was that?
2      A.  The police department, Dothan
3  Police Department.  I moved.
4      Q.  But the reason you left wasn't
5  related to this photograph?
6      A.  No.  No.
7      Q.  So you've had a copy of this
8  photograph since 2004?
9      A.  Yes.
10     Q.  Do you have the original?
11     A.  I have a copy of what was given
12 to me.  I don't know if that's an
13 original.
14     Q.  Do you have a color copy?
15     A.  What I have is what I scanned
16 into my computer.  I don't have a hard
17 copy, or the copy that was given to me.
18 I don't -- if I have it, I don't know
19 where it is, let me put it that way.
20     Q.  So Sergeant Harding gave you a
21 hard copy, you scanned it into the
22 computer, and now all you have is your
23 electronically saved copy.  Is that

1  right?
2      A.  Correct.
3      Q.  Okay.  Do you know who else has
4  a copy of this photograph?
5      A.  I do not.
6      Q.  Do you know if any other
7  officers, other than the officers who are
8  in the photograph, have a copy of the
9  photograph or have seen the photograph?
10     A.  Yes.
11     Q.  Who do you know who has seen
12 this photograph?
13     A.  Captain Keith Gray.
14     Q.  Anyone else?
15     A.  Officer Sylvia Summers.
16     Q.  Anyone else?
17     A.  None that I know personally that
18 I can say yes, I know they saw it.  I
19 don't know.
20     Q.  Do you know whether anyone has
21 reported that they have been offended by
22 this photograph to the EEO office or to
23 the personnel board?

1      A.  I don't know.
2      Q.  Show you what I've marked as
3  Defendant's Exhibit 33.  Do you recognize
4  this as the consent decree that was
5  entered with regard to the City of
6  Dothan?
7  (Defendant's Exhibit 33 was marked for
8  identification and is attached.)
9      A.  Yes.
10     Q.  Are you alleging as part of your
11 lawsuit that the City of Dothan violated
12 its consent decree obligations with
13 regard to you?
14     A.  Yes.
15     Q.  In what way?
16     A.  As it's detailed in the consent
17 decree.
18     Q.  Okay.  Let's look at --
19         MR. BENNITT:  Do you need to get
20 home?
21         THE WITNESS:  I do.
22         MS. MAYS:  Okay.  I need to know
23 how -- this can be -- depending on how

Page 293

1  she answers my questions.  I just want to
2  know how she's alleging that the City of
3  Dothan discriminated against her or
4  violated her rights with regard to the
5  consent decree.
6       MR. BENNITT:  Go ahead, please,
7  ma'am.
8    A.  For the consent decree
9  specifically states that the City is
10  prohibited from discriminating against
11  black persons on the basis of race in the
12  City's recruiting, hiring, promoting,
13  assigning, and testing practices.
14    Q.  Is there a specific provision
15  that you allege that the City violated
16  with regard to you?
17       (Witness reviews document.)
18    A.  Yes.  In regards to promotions.
19    Q.  What paragraph are you looking
20  at?
21    A.  It is stated on the front page.
22    Q.  Anything else?
23    A.  Recruiting, assigning, testing.

Page 294

1  That's everything that's named in the
2  decree.
3    Q.  Why do you think you were
4  terminated?
5    A.  I think I was terminated based
6  on a lie.
7    Q.  What lie?
8    A.  The lie that was told by the
9  supervisors that I guess initiated the
10  complaint for my termination.
11    Q.  What was the lie that was told?
12    A.  That I was grossly
13  insubordinate.
14    Q.  Do you know of any other police
15  officer who has used a police vehicle to
16  block someone in at their personal
17  residence?
18    A.  Not -- no, not that I'm aware
19  of.
20    Q.  Do you know of any other police
21  officer who has used a police vehicle to
22  block someone at their personal residence
23  and refused to move it after being

Page 295

1  repeatedly ordered to do so?
2    A.  Not that I'm aware of.
3       MS. MAYS:  If Jeff doesn't have
4  any objections, we can adjourn the
5  deposition for today, to reconvene at
6  later date.
7       MR. BENNITT:  Correct.  No
8  objections.  And I thank you very much
9  for your accommodations.
10
11       END OF DEPOSITION
12       (6:45 p.m.)
13
14
15
16
17
18
19
20
21
22
23

1       C E R T I F I C A T E
2  STATE OF ALABAMA   )
3  COUNTY OF JEFFERSON )
4       I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that the
7  content herein was produced in transcript
8  form by computer aid under my
9  supervision, and that the foregoing
10  represents, to the best of my ability, a
11  true and correct transcript of the
12  proceedings occurring on said date at
13  said time.
14       I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of said
18  case.
19       /s/ Lane C. Butler
20       LANE C. BUTLER, RPR, CRR, CCR
21       CCR# 418 -- Expires 9/30/15
22       Commissioner, State of Alabama
23       My Commission Expires:  2/11/17

74 (Pages 293 to 296)

**A**

**ability** 12:11
296:10
**able** 70:10 93:14
207:21
**absence** 93:12
**absolutely** 238:1
242:2
**access** 26:17 159:6
185:1,4,9,15
186:5,7,11,14,20
186:23 187:3,9,16
217:20 248:13,17
258:13,22 259:1,2
276:21 278:10
**accommodations**
295:9
**accomplish** 93:20
**account** 33:2,11,13
33:18 34:2,4,11
34:16,17,20 35:2
218:8
**accountability**
256:5,15
**accounts** 31:22
32:21 33:4 35:1,4
35:6,9,12
**accrue** 118:18
**accrued** 64:14
119:15 124:3,4
**accurate** 21:22
37:10
**accurately** 12:15
204:10 222:2
**accused** 48:22
208:3,5,6
**achieve** 192:8
**achieved** 104:4
**acknowledge** 276:5
283:18
**acknowledged**
126:8
**acknowledging**
136:7 283:23
**acknowledgment**
272:9,19
**act** 6:19 116:1

200:14,15 231:12
272:13 277:22
278:1,3
**acted** 94:18
**acting** 8:3 116:4
**action** 1:6 6:12
181:23 198:9
255:23 261:9
296:16
**actions** 27:6 37:1
242:14,23
**active** 86:13
**actively** 112:19,23
113:5
**activities** 96:13
99:16
**activity** 83:1,2
113:14 114:3,17
114:20
**added** 96:19
**addition** 77:3 83:13
163:5 202:2
**additional** 81:6,8
163:14,16 165:19
194:23 202:9
**additionally** 184:22
**address** 16:13
32:18 33:8 228:1
277:15
**adjourn** 295:4
**admin** 259:1
**administered**
181:20
**administration**
51:5
**administrative**
45:23 46:10,20
259:2
**administrators**
75:5 78:16
**admissible** 28:22
**admitted** 284:22
**advancement**
167:20 191:14
**advancements**
165:12
**advised** 3:13 254:7
**advising** 223:20

252:14
**affairs** 223:22
224:11 251:2,5,16
**affect** 116:22
191:12 192:22
280:4
**affidavit** 6:14
269:12,17,18
270:11 271:20,21
**affirmed** 201:17
**afforded** 207:15
208:3
**africanamerican**
141:12 143:17
182:6
**africanamericans**
264:16
**afternoon** 125:7
**agencies** 83:15
94:13 97:1
**agency** 46:3,10
108:4,15 109:13
109:21 238:7,17
243:1 244:9
**agent** 56:20
**agents** 27:3
**ages** 17:1
**ago** 12:6 109:1
**agree** 90:7 104:10
104:13,15,18,23
109:23 112:18
113:9 116:20
117:1 118:5,7,12
127:22 128:7,21
132:18 133:16,21
139:17 195:10
242:12 264:5,9,13
284:7 285:6,8
**agreed** 2:2,14,22
**agreeing** 45:5
129:10
**agreement** 26:21
**ahead** 15:22 121:3
231:14 293:6
**aid** 296:8
**air** 63:7,11 98:9,17
**alabama** 1:2 2:10
4:9,19 8:3,9 14:10

43:4 296:2,22
**alacourt** 43:21
**allegation** 120:6
130:21 147:13
170:16
**allegations** 25:12
25:18 26:3 125:17
125:20 126:7
128:9 129:1,11
130:9,13 133:18
134:2 142:10
156:20 158:3
228:16 229:9
258:12 260:18
**allege** 145:14
153:16 184:11
224:18 257:19
258:5 293:15
**alleged** 27:8 195:3
230:19 260:19
**allegedly** 211:4
229:11
**alleging** 119:16
124:15 142:16
157:2,12,16 170:8
173:6 174:8,10
230:13 232:21
233:15 292:10
293:2
**allinclusive** 79:5
**allowed** 29:8 95:23
101:17 117:15
118:18 125:21
167:14,22
**altercation** 40:9,10
**alternative** 75:23
**altogether** 279:7
**amended** 231:12
**amendment** 27:9
196:21 230:6
233:12,16
**amendments** 135:4
135:10 136:14
**amount** 47:21
**analyst** 52:22
**andy** 287:23,23
**annotated** 274:11
**announcements**

161:8,8
**annually** 192:5
**answer** 11:19,21
12:12 15:18 21:22
22:2 30:7 36:14
37:10 38:11 61:12
62:3 71:16 72:10
76:12 78:21 93:16
111:5,12 115:22
122:18 125:5
126:2 128:15
139:23 144:8
146:14 185:23
189:12 200:7
214:8 275:6
279:11 289:7
**answered** 53:7
109:3
**answering** 146:17
**answers** 11:14
188:11 293:1
**anybody** 22:4
55:13 56:11 97:12
214:12 241:21
242:4 265:17
266:11 268:11,14
268:17
**anymore** 79:9
**anytime** 97:2
**anywise** 296:17
**apologies** 225:8,14
**appeal** 196:4
197:12,23 199:22
200:16,17 263:4
**appear** 221:19
224:7
**appears** 58:1,13,18
59:1 68:2,7,11,15
203:16 220:8
221:13 224:9
225:1 257:18
271:17 285:20
286:2
**applicable** 28:17
29:10
**application** 5:15,17
57:13,18,20 58:2
67:2,16,20 68:17

69:6,12 139:22
146:10 156:12
185:5,6 218:6
**applications** 185:2
**applied** 55:23 85:4
88:13 161:22
205:1
**apply** 83:6 102:1
144:19 146:9
150:12 152:9,11
154:11,15 156:14
156:16 161:17
**applying** 86:7
**appreciate** 240:10
244:3
**appreciated** 243:23
248:20
**approached** 95:7
97:17 173:22
174:14,19,20,22
175:6,8,11,15
176:10,17 179:4
**approaching**
177:17
**approval** 117:16
**approved** 119:1
**approximately**
2:12 8:10 22:17
80:11
**april** 134:13 215:14
215:17,19 216:10
216:15,22 230:20
265:12
**arent** 129:11
165:12,14
**arguments** 201:9
201:12,23
**arizona** 63:12,14
65:9
**army** 54:3 241:14
**arrangement** 26:21
**arrest** 55:19
**arrested** 48:9,11,17
50:1
**arrests** 61:14
**aside** 50:10,13
78:19
**asked** 11:22 30:3

42:4 47:10 89:9
90:11 93:2 94:7
97:16 106:13,14
106:17 108:23
111:17,21 125:2
143:12 146:18
148:11 149:14
170:11 186:17
215:10 235:21
251:20
**asking** 28:5 29:20
41:17 43:4 44:16
47:9,12,14 69:8
80:18 88:3 109:14
128:21 142:12
144:17,20 146:10
173:17 183:10
204:7 209:9
212:23 213:1
219:12 240:23
253:14 284:10
**asks** 25:9 31:20
**assembled** 26:15
**assertion** 123:8
**asses** 289:3
**assessment** 90:8
**assign** 3:4
**assigned** 59:8,12,17
60:22 61:5 62:11
69:17 70:12,21,23
71:4,22 72:3,11
73:3,5 75:11,14
75:20 77:2,18
81:18,20 92:8
130:22 163:13
**assigning** 293:13
293:23
**assignment** 79:14
81:4 88:12,13
94:2 100:21 101:2
267:7
**assignments** 27:14
61:8 77:7 81:14
105:18 163:10
164:14 165:9
**assist** 55:19 77:7
82:21 185:9
**associate** 66:9,11

66:15
**associates** 2:9 4:7
8:8 51:1,3,22
**assume** 11:22
**assumed** 101:9
**assuming** 204:6
**athens** 52:18 54:16
54:20 56:8
**athensclarke** 52:13
55:10
**attached** 24:5
43:17 57:16 63:20
67:23 125:14
130:7 134:16
197:15 200:2
202:22 217:17
222:12 224:1,22
250:21 252:19
253:8 255:15
257:3,17 261:11
269:9 272:15
276:16 277:7
278:19 282:6
283:3 285:5,19
286:1 292:8
**attack** 242:7
**attempted** 86:11
**attempts** 84:14
**attend** 41:5 53:23
84:1 86:16 87:2
98:13 101:21
256:3,4,10,13
**attended** 74:20
85:22 87:3
**attest** 275:17
**attorney** 8:22 20:2
20:5 25:20,23
26:5 28:3,6,7,9,15
122:1 123:12
130:18 135:8
**attorneyclient**
28:14
**attorneys** 21:6 23:4
27:4 28:10 35:16
94:17
**attribute** 167:14
**audio** 9:17 26:11
27:22 211:3

234:14,23 236:11
243:11
**august** 39:18
126:13 127:3
130:4 199:20
200:11
**authentic** 284:9,17
**authenticate** 271:8
276:2 277:19
284:6
**authorities** 254:18
**authority** 196:20
**authorized** 64:14
**automatically**
207:13
**available** 29:2
79:16 91:14
149:16 150:2,10
151:19 152:2,5
161:15 174:1
**avenue** 4:18
**aware** 30:13 31:1
46:21 117:12
218:13,19 276:5
279:16 280:12
281:5,19 294:18
295:2

**B**

**b** 5:9
**back** 21:16 22:12
22:17 34:23 41:5
67:9,13 70:3
116:17 120:20
121:4 132:5
137:15 161:1
183:21 198:13
221:14 230:22
234:11,13 248:4
265:2 286:15,16
287:9,14
**background** 50:23
**backup** 77:5,19
**bad** 186:17
**badge** 114:9 205:22
**band** 205:14
**bankruptcies** 45:8
**bankruptcy** 44:9

44:18,20 45:1,3
45:15
**barker** 205:10
**barnes** 248:14
249:9
**base** 63:12
**baseball** 287:14
**based** 43:23 49:21
59:19 80:14 84:21
90:4 126:17
127:18 128:5
130:10 131:9
132:11,14,20
133:7,9,10,14,21
143:4 194:10
241:16 248:23
294:5
**basically** 83:22
90:4 92:22 94:10
218:5
**basing** 147:12
**basis** 15:15 74:16
120:5 123:16
140:15 142:18,20
143:1,7,7 157:2,8
157:12,16 158:2
170:15 171:7
231:10 254:3
267:2 293:11
**basketball** 193:22
**bates** 26:9 131:3
207:9 213:15,17
213:17,18 215:21
219:17,20,22
220:13 221:12,13
221:21 253:17
263:9 272:22
273:9,10 274:3
**bateslabeled** 58:6,7
58:16,21 68:4,9
68:13 204:18
205:8 211:2,19
212:5 216:20
217:8,8,13 218:16
219:5 261:6 262:6
263:3 265:5
266:20 268:6
269:15 272:8,18

273:6 280:12
**batesstamped**
216:1
**baxley** 22:8,13
30:21 31:1 236:5
236:5,6 243:16
**bear** 238:5 242:22
**beat** 102:12
**began** 59:8,23 66:3
151:21 173:10,10
180:15,15 183:11
183:12 184:2
**beginning** 26:17
60:20 68:12
151:23 162:5
200:12 217:12
218:15 231:5
263:8
**begins** 23:22 24:8
**behalf** 183:5
**behave** 108:3,13
109:11
**behavior** 109:20
182:7 249:21
**believe** 18:18 91:4
104:8 122:4,23
123:21 139:3,14
140:20 141:18
145:20 146:23
171:13 174:3
185:8 187:20
192:13 205:17
229:2 231:8
239:15 252:4
282:22
**believed** 173:11
180:17,23 183:13
**believing** 140:16
**bell** 226:9
**belonged** 117:2
**beneath** 206:6
**benefit** 96:3,15,19
**benefits** 47:1,15,23
48:2,7 56:1,3
**benefitted** 96:16
**bennitt** 2:8 4:5,7
8:8 120:13,19
121:3 122:9,18,21

123:4 124:18,23
125:2,5 126:2
128:12,17 129:5
129:15 138:12
139:23 143:6,9,12
144:7,15 146:1,4
146:7,14 148:5
159:16,22 160:3
160:10,16 161:1
171:1,5 197:1,6
204:14 212:10,15
212:18 213:8
214:5,8 215:9,17
215:21 219:10,17
220:1 224:7
225:12,20,23
226:5,7,14,16
227:4,16,21
229:19 230:9
231:3,13,21 232:5
234:9 264:2
267:23 268:7,13
268:16 269:1,11
269:21 270:1,5,18
270:23 271:7,14
272:1,4 275:5
276:1,7,17 277:14
277:18 278:23
279:6,12 280:6,16
280:18,23 281:10
281:14 283:4,7
284:5,9,15,22
285:6 286:4,19
287:16 288:12
289:6 292:19
293:6 295:7
**benny** 185:17
186:18 216:17
229:4 230:17
236:5 246:19
248:16 249:3,17
249:21 257:21
265:7 267:17
**benton** 88:23 89:1
90:14 91:19 190:5
198:16 224:16
227:8 229:6 250:5
251:17 261:13

**bernardino** 211:5
**best** 89:14,16,20
215:12 222:5
296:10
**better** 105:10
**beyond** 192:20
208:18
**bill** 223:14
**birmingham** 2:10
4:9,19 8:9
**black** 143:16 145:7
145:15 231:10
287:14 293:11
**blacks** 211:16
**blanket** 146:12
**block** 294:16,22
**blog** 26:13
**board** 5:21 9:2 90:3
141:2,6 176:20
195:12,22 196:1
196:11 197:11,22
198:5 199:23
200:19 201:8,14
201:16 214:3,18
214:20,22 215:1
216:7 253:5
263:10 265:21,23
266:4,7,10 268:20
269:19 270:9
273:16 274:20
275:2,8,9,16,20
276:11 291:23
**boards** 196:5
201:15
**boss** 268:13
**bottom** 58:8 132:2
135:13,14 203:8
218:16 219:20
261:18 273:14
**box** 127:6 131:20
**bradford** 256:13
**bradley** 17:3
**brandi** 248:14
249:9
**brandon** 17:2
**breach** 195:3
**break** 11:16,18,20
37:9 57:3,5

102:21,23 103:1
109:15 120:14
129:19,20,22
148:9,11 197:2,5
197:7 232:6 264:3
**briefing** 183:20
**briefs** 201:9,12,23
**bring** 19:5 108:3,14
109:12,21
**bringing** 67:9
**broad** 28:18
**brothers** 205:23
**brought** 39:11
40:18
**btwn** 211:4
**build** 86:13
**builder** 38:14 39:8
**bulletin** 274:20
275:2
**bulletproof** 114:11
**burdensome** 28:19
**bureau** 199:11
**burn** 204:20 205:10
207:14 211:16
289:2
**burned** 205:18
**burning** 204:23
205:1
**business** 65:13
237:15
**butler** 2:6 3:9 8:1
296:19,20

---

**C**

**c** 2:6 3:9 4:1 8:1
296:1,1,19,20
**cabin** 204:20,23
205:2 211:13,14
**calculated** 28:21
**caldwell** 13:2,3,10
13:15,18 14:2,6
15:16 17:2,3 49:1
49:8
**caldwells** 49:18
**calendars** 26:11
27:21
**california** 237:6
**call** 20:3 102:10

204:21 231:22,23
235:16,17
**called** 64:4 88:20
126:8 129:5
195:16 221:22
235:14,20
**calling** 232:4 269:6
**calls** 62:3 78:21
**campus** 74:18,23
**candidates** 102:1
**cant** 11:11 12:15
20:19 33:9 36:11
36:14,17 37:7
46:13 70:11 71:16
76:11 93:12
102:10,14 111:6
111:12 115:8,11
120:3,11 121:5,14
122:17 147:6
161:3 187:23
218:23 219:19
220:4,12 232:12
238:6 239:14
244:7 274:21
275:17 277:8
281:1,7,17 288:1
**cap** 287:14
**capacities** 165:19
**capacity** 61:14
75:16 88:19 97:13
164:14
**captain** 91:20
103:16,17 177:2,3
177:8,15,21
199:11 216:2
234:22 257:21
261:15,16 291:13
**caption** 213:23
**capture** 212:3
**captured** 203:11
215:15 216:15,22
**captures** 213:21
**car** 130:21
**care** 237:22
**career** 241:20
**carla** 206:23
**carney** 1:8,18 2:5
8:12,16,21 13:2,2

15:1,20 17:4
23:15 39:14 43:14
50:16 57:7 63:5
197:8 198:18
204:18 234:15,18
235:3 236:12,15
237:20,23 238:19
239:5 240:6,19
241:3,7,10,19,23
242:3,6,11 243:3
243:6,10 264:4
269:5,6,14,15
**carneys** 14:12
**case** 10:7 19:10
20:1 21:11 23:8
23:12 25:22 26:7
27:16 28:2 33:5
35:5 36:13 39:5
39:11 40:19,22
41:11,13,14 42:2
42:5,8 44:3 49:7
49:16 72:12
119:17 121:2
159:15 160:5
201:6 202:20
212:8,14 296:18
**cases** 9:9 43:21
44:6 45:11 61:15
**casual** 11:6
**category** 198:10
261:23
**caucasian** 162:16
**cause** 8:12
**caused** 118:1
**ccr** 296:20,21
**cease** 240:23
**century** 215:11
**certain** 43:5 71:23
72:19 105:16
145:5,5 149:16
179:11,17 185:1
190:11 242:21
245:11,14
**certificate** 273:1
**certificates** 51:10
**certified** 126:21
**certify** 8:4 131:13
296:4,14

**cetera** 28:1
**chain** 190:4
**chamber** 94:17,23
95:10 96:10 97:4
97:5,18
**chance** 204:15
**chances** 191:13
**change** 274:7,15
279:4,8,9
**changed** 158:5
246:2,4
**changes** 274:1
**changing** 246:5
**chappelle** 223:14
**charge** 5:18,19,20
124:13,20 125:10
125:16 126:6
127:2,19 128:5,10
129:2,3,11 130:3
130:10 131:6,9,17
132:11,14,21
133:1,7,11,14,19
134:11 135:22
136:3 163:3 171:5
171:6 172:22
180:14 184:21
195:20 230:20
231:2,7 247:14
**charged** 48:15 50:4
50:7,8 264:7
**charges** 45:17,20
135:2,5,10 136:11
136:14
**charity** 117:21
**charles** 205:11
**charred** 205:18
**check** 221:14
**checked** 127:5
131:21
**cheek** 173:3
**chief** 86:3 88:22,23
89:1 90:14 91:18
96:11 103:18,19
103:20 130:17
137:11 189:23
190:1,5 198:16
199:5 214:21
224:16 227:7

229:6 250:4
251:17 255:1
270:12
**chiefs** 88:21 235:17
235:20
**childhood** 207:1
**children** 16:19,21
**choice** 67:11
**chose** 178:3
**chris** 205:3 223:13
**christopher** 208:11
209:2 211:4
218:20 222:10
244:19 267:12
**chronological**
220:7
**circuit** 39:13,20
196:6,9,13,17
199:22 201:1
202:6
**circumstance**
117:19
**circumstances** 40:4
54:23 67:8 76:13
76:19 115:8
137:13
**citations** 182:11,18
**citizens** 82:21
83:12 85:10
207:16 279:20
**city** 1:13 6:18 8:23
9:3,10,12 19:20
21:2 24:10 30:1,6
33:15,22 34:6,21
35:10,16 37:1
45:18 47:8,17
52:2 57:2,8,21
59:4,23 62:19
65:6,10,20,23
66:2,16 67:2,9
68:18 69:9,11
83:15,18 86:15
102:2 104:5
108:17 109:16
110:21 115:19
117:2,9,23 118:16
119:4 121:21
122:3,8,15 123:14

123:19 124:2,14
124:21 125:12
130:3,17 134:12
135:2 136:22,23
137:20 138:2
167:16,18 180:8
199:4 201:7
211:21 214:13
217:11 220:19
244:22 261:8
265:18 266:11,22
268:15 272:10
273:8 277:2,22
278:1,17 279:17
279:19 280:14,15
281:9 282:3 285:3
292:5,11 293:2,9
293:15
**citys** 118:2 148:22
293:12
**civil** 1:6 3:8 6:18
8:5 29:9 200:15
231:12 264:23
272:12 277:22
278:1
**claim** 119:21
123:17 142:21
143:2,14 171:1,2
171:8 212:12
229:20 230:2,4
**claiming** 41:12,23
49:8 119:23 120:1
145:3,4
**claims** 19:10 20:1
21:10 23:7,11
27:16 28:1 33:4
45:23 46:2,9,20
119:17 121:8
128:8,22 129:3
133:16 147:12
212:8,10,14
229:23 230:8
**clarify** 36:4 212:22
**clark** 286:13
**classes** 85:23
**classrooms** 74:9,20
**clear** 18:6 208:14
209:6

**clearly** 188:12
195:8
**click** 214:1
**client** 281:11,14
**clock** 116:6,6,7
**close** 78:22,23
138:13
**closely** 105:14
**closer** 162:5,6
**cloyd** 1:18 2:5 8:12
8:16 12:20,20
15:8,10,13 42:4
50:16 269:7,14
**cnn** 211:2
**code** 16:16 107:18
107:22 108:20
109:6,6 285:2,9
285:14,15
**coercion** 258:1
**coleman** 287:20,22
**collusion** 254:8
**color** 290:14
**columbia** 51:8
**come** 79:16 91:7
98:8 161:1 181:9
181:14 235:14
238:9
**comes** 181:6 206:13
206:14,21 223:4
242:21
**coming** 178:16
185:5
**command** 247:19
**commander** 199:11
**commencing** 2:11
8:10
**comments** 26:13,14
195:8 204:2,4,12
209:13 214:14
215:4 249:20
**commerce** 94:18,23
95:10 96:10 97:4
97:6,18
**commission** 296:23
**commissioner**
296:22
**communicating**
85:16

communication
256:16
communications
48:12,16,18 49:10
50:6,9 256:6
community 81:10
81:14,21 82:3,8
82:15,17,19,20
83:5,7,8,9 84:1,1
84:5,7,12,13,15
84:22 85:3,7,9,14
85:19,22 86:8,13
86:17,19 87:8,11
87:14,17,19 88:9
89:4 95:4,12
97:21 98:1,10,13
98:15 99:5 100:7
105:18,21,23
106:3,6,21,23
107:11 110:2,6,15
110:18,20,23
111:4,16 112:1,7
112:9,10,12 163:6
163:18 164:1,15
164:20,22 165:5
165:10 221:6
communitys 96:3
compared 151:3
172:20 189:17
compensation
163:16 165:20
compete 144:17
competition 117:11
compiled 26:15
complained 185:3
185:15,19,21
186:3,10,22 187:3
187:8,11,15 195:7
complaining
186:14,19 229:3
complains 267:11
complaint 25:12,19
26:4 120:15,16,21
121:6 123:8
136:18 139:11
141:2,7 142:10
157:5,7,8,20
158:1,6,8,13,20

159:3,8 223:20
224:12 251:16
252:16 256:23
260:1,9 269:7
294:10
complaints 27:8
137:3 252:22
255:11 267:15,20
268:4,9,11
complete 61:19
135:9 146:8 199:2
243:13 262:16
completed 57:14,21
175:10
completion 199:6,7
262:17 273:2
compliance 2:18
126:22 131:14
comprehend 280:8
computer 185:1
233:19 272:20
290:16,22 296:8
computerized
26:14
computers 234:1
con 139:9
concern 240:9
concerning 26:20
concerns 191:11
conclude 126:18
131:11 255:17,21
conditions 18:13,16
18:20 26:23
conduct 86:22
182:7 255:22
256:5,15 285:16
conducted 85:20
139:17 201:7
conducting 260:17
confederate 263:13
confidence 106:7
106:11,18 107:1
confidential 61:13
confidentiality
280:1
connection 27:7
consent 7:7,9 292:4
292:12,16 293:5,8

consider 89:9 96:20
112:5 237:19
240:1 241:9,11
243:2
consideration
172:10 201:11
considered 79:18
79:20 172:11
173:23 179:8,11
179:13,16 193:4,7
193:11 201:9,22
conspired 257:23
258:8
constitution 207:17
constitutional
208:4
construction 38:13
39:15,16
construed 127:1
131:16
contact 110:22
111:4,23 112:6,10
contain 22:18
contained 25:12,18
26:3 131:12 136:2
271:20
contains 58:2
261:17
content 255:19
296:7
contest 56:8
continuation
213:19
continued 208:15
continues 27:13
continuous 167:21
contract 26:21
conversation 19:15
30:12,14,17 31:2
89:23 139:7
175:11 177:13,18
183:19,20 184:1,8
232:19 233:9,13
233:23 234:5
235:8 236:7
243:13,17,20
244:1,4,7,15
259:19,21

conversations
19:20 21:14 22:12
27:2 30:21 31:9
31:13 139:10
173:20,20 174:13
174:19 175:1,15
178:10,12,13,14
179:3,5 184:3,13
246:10 259:14
convicted 50:12
cooper 4:16
coordinate 92:10
coordinating
112:12
coordinator 81:10
81:11,15,16,21
82:4,9,16,18
87:17 88:9 90:15
92:4 105:19,23
163:7,7,18,19
164:2,5,15,16,20
164:22 165:2,6,10
165:11 248:9
coordinators 92:6
cop 207:6,13 223:8
copies 257:10
copy 58:21 68:14
108:9 248:1,15
252:12 271:10
288:14,20 289:1
290:7,11,14,17,17
290:21,23 291:4,8
corner 58:8 135:15
203:9 218:17
257:12,13 287:7
corporal 91:1
103:14,15,23
125:21 165:4
168:19 182:21
correct 30:10 32:19
34:7 42:6 45:12
45:14 54:5 59:5
73:1 85:19 116:9
126:9 129:14
135:20 136:3,4
163:10 188:12
189:15 194:17
206:22 228:14

250:9,9,11 259:8
267:3 273:20
291:2 295:7
296:11
corrective 255:23
correctly 25:13
27:18 55:6 64:16
79:15,19 81:22
89:22 112:16
127:20 131:18
132:16 166:4
173:4 180:19
185:12 189:3
191:15 192:11
195:18 199:13
200:20 201:18
202:3
correspondence
253:4
cosby 223:14
cosmetics 65:14
couldnt 21:22 46:6
73:13 117:13
118:20 176:3
265:14,15
counsel 2:4,23 3:2
8:6 17:12,13
135:11,12 159:12
296:15
counseled 54:8
counselor 17:22
count 176:3 205:13
counted 188:11
189:15 191:5
countrys 264:15
county 39:13,19
43:3 52:13 55:10
83:18,19,19 94:14
196:5,8,13,17
199:21 201:1
202:6 296:3
couple 10:23 89:11
89:13 120:18
191:9
course 53:20 54:1
85:11 95:23
court 1:1 2:6,19
3:14,15 5:23 8:1

11:7,9 12:5 16:14
29:10 38:1,21
39:5,6,11,13,20
40:16,18 41:1,11
42:5,7 43:4,21,21
49:3 132:12 196:6
196:9,13,17
199:22 200:15
201:1,5,8,12,22
202:6
**covered** 275:10
**coworkers** 116:12
116:17 185:3,14
187:8 195:7,16
280:4
**create** 84:20,22
85:5,23 99:10
**created** 93:8 97:9
229:16 231:16
232:8,15 246:19
**creating** 84:11
227:9 228:10,20
229:11 233:2
246:14
**credit** 185:11
187:20 191:9
194:14,19 195:1
**credited** 119:18
120:2 121:9,18
122:5 123:2,22
**crime** 50:5,7,12
81:11,15 82:21
93:22 94:6,9,11
94:13,20 95:1,7
95:13,17,19 97:8
99:1,11 100:9
101:5 105:19
114:14 163:7,19
164:4,15,21 165:2
165:10 246:23
247:5,9 249:3,11
249:16
**crimes** 96:3 149:5
185:7,10 187:21
**criminal** 9:9 51:5
144:13 145:13
161:16,17 247:15
**criminals** 205:5

**critical** 105:2,6,8
**crr** 296:20
**current** 16:13
29:23 30:5 38:4
40:3 42:4 191:13
192:23 213:22
**currently** 14:7 15:5
17:15 23:1 33:18
34:1,16 47:22
52:23 56:13,15
**cut** 115:14
**cy** 203:16,16,23
204:4

---

**D**

**d** 3:7 5:1
**da** 96:10
**damage** 118:1
**danger** 253:13
254:6
**darren** 102:7
**darryl** 22:8,13 31:8
138:5,8,17,18
252:13 255:9
256:21 257:14
258:21 260:17
**darryls** 138:6
**date** 8:4 13:19
21:15 22:16 49:3
66:19,22 67:5
100:11 144:18
146:2,5 149:15
203:8,10,22 206:1
206:6,14,20 215:8
215:10,12 233:22
234:3 251:4
262:11 265:18
282:22,23,23
283:10,11 295:6
296:12
**dated** 126:13 131:5
201:1,16 203:9
224:17 256:20,23
273:9,11,12
**dates** 44:17 161:23
170:2 204:9,11
257:11 278:21
**dating** 22:12

**dave** 223:14
**david** 90:22 91:20
102:6 215:20
216:13 257:21
261:15,16 265:7
267:16
**davis** 274:4
**day** 2:10 3:12 8:11
64:12 76:17,20
77:10,12 147:20
203:20 209:11,12
209:14 224:15
241:11
**days** 62:17 89:11
89:13 127:17,23
132:13,19,23
133:14 134:1,5
199:1,8 262:15,18
**deadly** 207:22
**dealing** 94:9
**dealt** 94:12 189:10
**death** 207:15
210:11
**deaths** 208:12
209:3
**debt** 43:9
**december** 47:2
**decide** 196:2
**decided** 93:1
**decision** 49:20
60:11 80:2 96:8
118:10 150:17
152:18 154:6
156:7 162:21
196:19 198:8,17
198:19,20,23
199:23 201:15,16
249:2,6 262:7,14
**decisionmaker**
231:20
**decisions** 118:7
**declare** 135:18
187:6
**declaring** 135:23
**decree** 7:7,9 292:4
292:12,17 293:5,8
294:2
**deemed** 25:21

192:6
**defendant** 1:14
4:12 5:11 26:18
26:22 27:4 29:2
36:6,16,23 37:4
**defendants** 5:12
23:17,18,23 24:4
43:12,16 57:12,15
63:17,19 67:19,22
125:9,13 129:6,7
130:1,6 134:10,15
135:6 197:10,14
199:19 200:1
202:17,21 217:16
220:1,2 222:7,11
223:17,23 224:15
224:21 250:18,20
252:11,18 253:3,7
255:7,14 256:19
257:2,16 261:4,10
265:3 269:4,8
272:6,14 276:15
277:6,12,15,16,21
278:18 281:22
282:5,16 283:2
284:14,16,18,19
285:1,4,15,18,23
292:3,7
**define** 175:20
**definition** 148:23
**degree** 51:2,3,7,22
105:16 113:13
279:21
**delivering** 3:9
**delvick** 4:23 9:1
141:5,15 253:5
263:11 274:6
**delvicks** 141:9
**demarcus** 17:2
**department** 6:20
7:2,4 52:3,14 54:9
54:17,21 55:11,14
55:15,21 56:9
59:4 61:6 64:5,10
67:7 77:22 78:3,7
78:8,9 83:11,20
84:11,12,16,23
85:5 86:8 87:19

89:5,7 93:19
94:15,19,19,22
95:8,9 96:4,9,16
97:2 105:3,7,11
113:11 130:4
134:13 143:17,18
143:20 144:3
145:5 169:22
173:12 180:17,23
181:11 183:4,14
184:22 185:8
188:17 192:6
195:10,14 198:8
199:10 216:3,19
218:12,19 220:20
221:1 228:3
231:20 233:8
237:10 240:9
241:13 251:1
254:10 262:19
274:20 275:2
279:19,23 280:5
282:1 285:10
286:20,22 287:5,9
287:13 289:11,15
289:23 290:1,2,3
**departmental**
185:1
**departments** 9:14
94:16,22 195:4
**depending** 76:18
292:23
**depends** 39:2 76:11
76:13 77:10,16
78:5 113:17 115:7
117:18 137:5
245:17
**deposed** 10:10
**deposition** 1:17 2:4
2:15,16 3:5 9:4,8
9:19,22 11:2 17:6
17:11 18:23 19:6
202:15 232:20
295:5,11
**depositions** 2:20
**describe** 110:8,11
160:13,19 166:20
**description** 61:20

**designated** 199:3
262:16
**desist** 240:23
**desk** 26:11 199:9
262:19
**despite** 163:13
**detailed** 82:5 86:4
260:1 292:16
**details** 158:6 250:6
250:14
**detective** 146:3
**determination**
126:16 139:15
198:17 262:8
**determine** 42:18
193:17
**determined** 123:10
172:6
**developing** 75:4,8
**devil** 102:13
**diagnosed** 18:15
**diaries** 23:7 26:10
27:21 31:21
**dictates** 113:21
114:2
**didnt** 74:16 109:4
109:21 139:17
145:7 146:16
149:8 150:11
158:12,19 176:3
178:6 186:9,13
195:9 196:19
215:11 248:13
249:6
**differences** 15:19
15:23 16:3
**different** 9:13 45:7
47:13 59:3 60:3
62:10,13 74:21
76:9,18 82:20
94:12 97:1 124:5
144:1,2 168:16
171:18 182:3,19
224:4 257:11
281:8
**differently** 173:13
180:18 181:1,18
183:15

**dinah** 39:14,15,16
39:17
**dinner** 82:7 94:4
**diploma** 51:1
**director** 9:2 137:16
137:18 141:3,6
214:22 253:6
263:11 266:11
273:17 274:3,5,14
**disagree** 140:4,5,19
142:3 242:12
**disagreeing** 139:18
**disagreement**
40:13
**discharge** 45:6
**discharged** 44:21
45:4,8
**disciplinary** 6:12
27:6 181:22 198:9
261:8
**discipline** 118:3
181:19 182:9,20
199:16,17 262:23
280:3
**disciplined** 54:7
**disciplines** 27:5,5
**disclose** 229:5
**discovery** 28:22
**discredit** 108:4,14
109:12,21
**discriminated**
142:17 230:15
231:9 293:3
**discriminating**
293:10
**discrimination**
5:18,19,20 27:8
124:15,16 125:17
125:18 130:10,11
136:19 137:4,8
143:1 171:8
224:20 228:2
230:5 258:1 273:3
289:10
**discussion** 10:3
46:22 54:14
230:12 269:10
277:3 278:12

281:13
**dishonest** 138:22
139:20 140:4
**dismiss** 41:11 42:5
**dismissal** 126:12
127:4 128:1 131:4
131:21 132:8
133:4 134:20
**dismissed** 42:7 45:8
49:7,16
**disparage** 195:13
**dispatch** 62:3 116:4
**disperse** 178:16
**dispersed** 175:4
**disposed** 45:10
**dispute** 39:23,23
40:2,5,8 44:5
57:20 59:16 69:1
70:3,7,9 141:13
274:9 275:1 279:1
284:16 285:11
**disruptions** 74:22
**distinguish** 278:21
**distorted** 286:14
**distribution** 249:1
**district** 1:1,2 43:4
44:12,19 92:4,5,8
94:16
**divided** 76:1
**division** 1:3 59:7,12
59:18 60:4,6,8,15
60:20,22 61:2,5
61:10,17 69:16
70:13,22 71:1,5
145:5 223:22
247:15 251:2
**divisions** 59:3
60:17
**divorce** 14:5,22
15:16
**document** 24:22
44:1 57:23 58:12
58:23 63:21 64:1
64:3 68:1,6
125:23 126:15
128:11 130:23
143:3,15 160:6
181:5 185:22

200:3 202:15
204:17 213:2
215:23 216:6
217:13 218:15
219:9 221:2,16,18
222:13 224:3,5,8
224:23 225:2
226:6,15,19
250:19 253:9
254:19 258:17
261:20 262:9,12
263:6 265:9 271:3
271:8,17 274:11
274:16,19 275:10
275:15,19 281:1,2
281:3,5,20 282:10
283:22 287:3
293:17
**documentation**
35:3 121:20,23
122:2,15
**documents** 6:15
17:8 18:22 19:5,8
23:20 24:2,13
25:10,16 26:1,14
26:15 28:9 29:14
63:18 86:1 159:1
159:7,11,20,21
160:4,11,15,17,18
161:3,5 169:9,15
169:17 213:2,6,12
216:20,21 219:5
221:4,9 265:4
269:15 275:11
**doesnt** 72:5 79:1,1
109:12 114:23
118:10,12 129:1
193:23 207:13
288:12 295:3
**doing** 66:5 98:3,14
108:16 111:10
**dollars** 205:16
**domestic** 16:3,7,9,9
39:23 40:2
**donald** 288:18
**donny** 223:18
224:11 251:6
257:22,22

**dont** 10:11,13,13
10:17,17,20,21,22
11:5 12:1 13:19
14:8,9 20:19
30:15 31:4 32:5
34:9 35:23 36:19
36:19 37:11 40:19
43:7 44:2,17 45:6
46:6,8,18 47:21
48:8 50:18 53:10
53:21 54:10,11,13
55:2,8 57:17
59:10,14,15 60:9
60:12 61:3 62:16
64:1 65:17 66:13
66:21,21 67:5,17
69:2,22,23 70:17
72:5,15 79:9 80:1
80:8,16,17 88:10
91:9,18 97:11
100:5,11 101:3
105:8 108:5 111:7
114:5,9,10,10,11
114:12,14 117:22
118:7,21 122:1,14
122:19 123:4,5,6
123:8,15 124:8,10
125:4 128:8,19
131:1 133:8,9,12
133:17,20 134:4,5
136:16 137:23
138:7,16,21,23
139:6 140:12,14
140:20 141:10,17
141:20 142:2,7
144:9 147:7,16,18
148:3,19,22 150:4
150:6,15,18,21
151:6,17 152:3,6
152:8,13,13,16,19
152:22 153:3,6,8
153:13,14,20
154:1,4,7,10,13
155:7,7,19,22
156:3,5,8,11,15
158:3,12,17,18,23
159:16,20 160:14
161:2,21,23 162:7

162:19,22 163:2
165:1,7,21 166:9
166:18 167:11,17
168:2,9 169:1,17
170:1,2,5,23
172:21 174:9,17
174:23 175:5,16
175:18,23 176:12
176:14 178:11
179:14 181:13
184:9,15,15
185:23 186:16
187:1,5,10,14,17
187:18 188:19,19
189:6,12 191:19
192:12 193:12,15
194:22 203:2
205:3 207:3
209:20 210:1,3
212:9,20 214:5
215:8 216:14
217:5 218:10,22
220:21 222:14,18
222:18 223:2,6,11
223:15 224:2,2,6
225:19 226:2
227:1,12 228:19
229:7 230:21
231:1,23 232:3,11
232:12 236:22
237:4,11 238:11
238:11 239:3,4,5
239:7,8 240:7,7
242:6 244:23
245:6,12,23 246:4
246:4,8 249:5,8
260:6,20,22
263:15,20,23
265:1 267:4 268:1
268:22 269:1
270:8,16,20,20,21
275:3,13,14,18,18
279:10 280:8
282:12 283:10
286:15 287:19
288:6 289:8
290:12,16,18,18
291:19 292:1

**door** 138:13
**dorner** 6:3 208:11
209:2 211:4
218:20 222:10
244:19 267:12
**dothan** 1:13 6:18
6:20 7:2,4 8:23
9:3,11,13 19:21
21:2 30:1,6 33:15
33:22 34:6,21
35:16 45:18 47:8
47:17 52:2,10
57:2,8,22 59:4
60:1 62:19 65:6
65:23 66:2,16
67:10,13 68:18
76:6 94:19 97:2
103:3 108:17
109:16 110:22
115:20 117:3
124:15,21 125:12
130:4 134:12
135:2 136:22
137:20 142:17
199:4 200:15,19
201:7 211:21
214:13 218:11
220:20 221:1,7
235:6,6 244:22
251:1 252:15
255:12,22 261:8
265:18 266:23
268:15 272:10
273:8 277:22
278:1,17 279:18
280:14 281:9
282:3 286:21,23
287:4,12 290:2
292:6,11 293:3
**dothans** 24:11
117:10 217:11
**doug** 251:12
**draft** 270:11,14
271:5,19
**drafting** 270:21
**drag** 117:10,17,19
**drive** 117:10
**driving** 115:19

**drug** 61:14,14
**due** 97:18 207:15
208:4
**duly** 8:17
**duration** 149:10
236:7 276:23
278:8
**duties** 27:14 61:9
61:16,18,20,22,23
62:2 71:9 73:8
74:11 78:21 82:2
112:20 113:1
163:5,14 280:3
**duty** 107:15,15
113:12,15 114:4
114:17,21 115:1,3
115:5,19,21 116:3
205:4 262:19
**dwayne** 287:7,10

**E**
**e** 4:1,1 5:1,9 296:1
296:1
**e5** 53:6,12
**e6** 53:15
**earlier** 30:9 92:12
111:14,21 179:21
**early** 48:14 189:2
**earned** 118:14
**edenton** 2:9 4:8 8:9
**educational** 50:22
**edwards** 271:15
**eeo** 137:21 138:1
176:15 199:3
255:9 256:21,22
257:14 260:8,18
262:17 266:9
268:19 273:8,13
273:17 274:2,14
275:22 291:22
**eeoc** 45:17,19
124:13,19 125:10
126:12,16,18
127:4 129:2 130:2
131:4,10,21
134:11,21 135:1,5
135:22 137:11
163:3 171:6

195:20 230:20
**effect** 2:17 196:16
282:12
**effective** 64:11
66:19
**effectively** 85:18
89:8
**eggleston** 102:8
**either** 13:4 16:1,10
18:3 36:12 128:17
144:9 193:22
194:3 239:6
241:15
**electronic** 6:23
283:13,22 284:11
**electronically**
271:12 283:18
290:23
**elementary** 72:1,4
75:22
**email** 6:8 31:22
32:17 33:2,8
34:16,17,19 35:2
186:4,6,9,13,19
247:2,4,8 248:15
248:18 249:17
253:4,15,21 254:3
255:4
**emails** 26:12 27:23
**emily** 218:9 258:7
**emotional** 18:20
**employed** 33:15,21
34:6,13,21 54:8
56:13,16 63:6
65:9,16,21 66:16
118:16 119:3
137:22 285:3
**employee** 261:8
272:10 282:3
**employees** 19:21
27:3 29:23,23
30:2,6 166:1,6,12
168:4,13,18 169:5
169:12 170:12,19
170:21 171:15
172:16 173:2,8
174:4,7 184:19
185:11 187:19

254:16,23 282:1
**employment** 6:15
21:1 26:18,20
27:7,17 35:15
47:7,16 54:19
56:22 57:1,13
62:19 63:2,8,9
65:19 122:7
123:18,20 136:22
138:2 149:11,17
149:20 151:20
152:1 156:18
162:2,6 166:1
168:12,21 180:8
227:15,23 273:2
276:23 277:10
278:9,17 279:17
280:14 281:9
285:17
**encounter** 207:20
**encounters** 27:1
**ended** 47:16 48:3
173:21 175:14
**enforcement** 10:16
83:3 104:11
107:18 108:20
167:10,12,15
205:10,23 207:14
207:21
**enforcers** 205:20
**engaged** 49:9
110:14 113:5
182:8
**enjoy** 79:10 110:17
110:19
**enjoyed** 87:23 99:2
101:15
**enjoys** 110:14
**enslaved** 264:16
**ensure** 78:13
**ensuring** 73:19
**entailed** 112:10
**entails** 73:20
**enter** 38:21 196:14
**entered** 292:5
**entire** 60:14 76:16
120:20 137:21
202:15

entitled 127:11
242:1
environment 27:10
105:11 130:16
227:10 228:12,21
229:12,18 231:18
232:10,16 233:3,6
233:10 246:15,21
episode 120:20
146:11
equally 29:1
equate 211:9
equipment 114:12
equipped 114:7
error 189:19
esq 3:10 4:5,6,14
4:15
essence 114:6
establish 85:8
established 84:16
establishes 126:19
131:12
establishing 85:2
85:12
estate 51:14,18
56:20
estimate 20:17,20
et 28:1
ethics 107:18,23
108:21 109:6,6
188:14,15 189:10
190:9 208:17
285:2,9
etris 22:8,14 31:12
evaluate 85:15
evaluated 80:22
evaluation 180:6
193:2
evaluations 80:14
173:22 180:1,3,4
180:11
event 117:20 195:6
events 74:21
everybody 177:19
everybodys 239:14
evidence 3:6 19:9
28:22 49:21
121:16,23 171:10

184:17 198:7
200:18 201:13
266:1,3
exact 13:19 44:17
67:5 72:15 81:19
93:14 114:5
161:23 175:23
181:13 189:13
222:15 224:3
277:9 281:18
282:13
exactly 21:23 50:18
122:20 146:17
169:1 175:1,16
177:16 184:9
212:21 244:23
282:13
exam 125:22 172:1
190:9
examination 5:3
8:13,20 27:13
examined 8:18
example 75:2 108:2
108:13 109:10,20
118:15 204:17
233:1 274:2
examples 246:13
249:19
exams 171:19
exceeds 29:7
exception 74:15
201:19
excerpts 276:11
278:2
exchanges 211:11
exclude 79:2
excuse 129:18
exhaust 64:14
exhibit 23:17 24:4
43:12,16 57:12,15
63:17,19 64:8,23
67:19,22 125:9,13
126:12 129:6,7
130:1,6 131:3
134:10,15,19
135:14 142:22
197:10,14 198:4
199:19 200:1,4,23

202:14,17,18,21
204:3,10 217:9,16
220:2 221:10,22
222:7,11 223:17
223:23 224:15,21
225:10,15 250:1
250:18,20 252:11
252:18 253:3,7,19
253:22 255:7,14
256:19 257:2,5,9
257:16 258:15
260:7 261:4,5,10
265:3 269:4,8
271:22 272:6,7,14
272:17 276:10,15
277:5,6,12,12,16
277:21 278:14,18
281:16,22 282:5
282:16,18 283:1,2
284:14,18,20
285:1,4,18,22,23
292:3,7
exhibits 136:6,15
exist 160:4
existence 277:9
existing 97:10
exofficer 258:6
expect 110:6
154:14,18 229:8
experience 166:2,7
166:12,17 167:5,8
167:11,12,15
168:4,13 169:5,12
170:12,20 171:11
171:16 241:15
expert 32:6
experts 29:6
expires 296:21,23
explain 71:19,21
74:1 275:6
explained 122:13
exposed 45:9
express 279:20
expressing 240:8
extensive 86:9
extent 28:12,23
29:4,7 111:13
142:11

eyes 254:11

─────────
F
─────────
f 296:1
face 213:23 247:21
facebook 6:1,2
32:16 195:17
202:18 203:11,15
211:23 212:4
213:3,4 214:15
216:5,22 217:10
217:12,22 218:19
221:11,20 222:2,3
237:1,4 239:8
241:16 244:12,21
245:4,10,19 246:2
246:11 249:22
251:15 252:17,23
255:19 260:16
261:2 265:6 266:2
266:12,19 267:1
267:11,21 268:5
268:12
faced 214:2
facetoface 248:6
facing 289:11
fact 32:20 42:7
65:5 68:17 69:15
195:21 199:15
202:5 204:4
251:19 260:5
262:22 269:18
270:14
factor 172:9
factors 105:1,5
172:11
facts 29:5
fail 190:9
failed 55:18
fair 100:7
fairly 143:5
fairs 101:21
falk 38:1
fall 94:16 275:12
fallen 60:5
falls 280:17
familiar 107:17
238:4 275:21

277:23 278:5,6
far 71:17 85:13
93:3,7,17 111:20
117:14 137:12
287:11
fashion 182:12,15
182:18
faster 166:3,8,13
168:14 169:6
170:13
fastforward 234:8
faulk 37:23 38:2,8
favor 39:1 279:13
february 15:11
57:14 62:23 64:11
64:13 66:2,18
69:21 70:5 100:16
112:17 134:22
204:19 205:8
206:3 207:4,9
208:9,22 210:4,9
210:14,17 223:19
224:17 234:2
235:19 244:20
246:1 251:20,22
251:23 252:14
253:11,23 257:1
257:15 259:4,11
259:15 280:13
fed 205:15
federal 3:8 8:5 29:8
132:10,11
feed 206:11
feedback 85:21
86:2 97:3
feel 12:1 238:10
239:17,17,18
240:17 241:23
254:5,7
fellow 105:15
felt 26:6 89:7 205:2
248:4 253:12
254:14
female 126:7
143:16,17 145:8
162:13 231:11
females 145:15
fifty 10:19

**figure** 84:19 112:3
**figures** 70:1,11
**file** 44:23 56:7,10
  128:4 132:9,20
  133:6,13 146:9
  176:20 178:1,3,6
  237:18
**filed** 3:15 43:3 44:8
  45:18,19,22 46:9
  124:13 125:11
  127:16 128:18
  130:3 132:4,12
  133:10,23 134:12
  135:1,4 139:12
  143:13 157:6,20
  158:1,8,13,20
  159:3,8 223:21
  224:12
**filing** 124:19
  195:20
**filings** 43:21 44:18
  45:15
**fill** 218:5
**fillin** 129:17
**final** 80:1 198:11
  261:22
**find** 35:15 70:1
  121:5 198:7
  201:13 226:11
  232:1 289:16
**finding** 126:22
  131:15 139:19,19
  198:5
**findings** 139:16
  140:18,20 142:4
  200:19 255:10,18
  256:22
**finds** 200:16
**fine** 240:14
**finish** 11:13,14
**fire** 121:4 204:22
  211:8,12 239:2
**firearms** 191:4,18
  192:4 193:18
**fired** 211:6
**first** 8:17 14:12
  23:20,21,23 27:9
  30:4 51:19 57:3,7

59:23 64:22 84:6
  84:11,19 92:23
  127:14 128:16
  147:8 149:19,21
  149:23 196:21
  200:5,8 201:20
  206:9,18 209:7
  215:6 216:12,14
  217:3 225:5 230:6
  233:11,16 249:14
  253:21 258:16
  261:5,6 262:5
  272:7 274:2
  282:18,19,20
  284:3 286:12
**five** 20:9 75:14
  76:17 91:3,5,13
  92:16,19,20
  101:13 102:5
  175:17 179:21
  197:3 264:1
**fixing** 44:15 276:3
**flag** 287:3,6,7
**flip** 24:21
**florida** 15:4
**flow** 11:2
**flowers** 42:11,14,15
  42:19,22 43:2,9
**follow** 83:21
  113:23
**followed** 105:12
**followers** 205:11
**following** 8:14
**follows** 8:18 29:13
**footage** 204:23
**football** 74:20
**force** 2:17 63:7,12
  207:22
**foregoing** 8:6
  135:19 296:5,9
**forgive** 269:2
**form** 3:1 6:13
  15:18,22 16:6
  38:11 40:7,12
  41:16 49:12 64:5
  198:17 261:9
  263:5 268:1
  270:17,22 280:7

296:8
**formal** 258:20
  263:4
**formed** 86:14
**former** 29:23 30:5
  254:9 286:18
  287:8,23 288:15
**forward** 180:10
**four** 76:17 101:13
  102:5
**fourminute** 234:7
**fourth** 24:6,7
**frame** 13:21 22:22
  38:16 60:14 62:6
  65:15 70:14
  100:17 112:2,3,11
  112:14 149:7
  151:18 154:17,20
  155:1 162:1 165:1
  168:20 188:6
  217:6
**frames** 163:22,23
  228:6
**frankly** 237:9
**free** 12:2 279:19
**freedom** 233:12
  237:3
**freeze** 69:11
**friend** 207:1 245:16
**friends** 211:23
  245:3,5,9,21
**front** 32:8 147:17
  147:19 148:3
  199:9 262:18
  287:2,3 293:21
**fuels** 239:1,1
**full** 2:17
**fully** 12:15
**funding** 96:11
**further** 2:13,21
  127:9 296:14
**furthermore**
  172:23
**future** 191:14

---
**G**
---
**gain** 248:17
**gale** 4:16

**games** 74:20
**garnish** 43:5
**garnishment** 43:8
**garrity** 6:6 251:2
**gary** 287:15,20
**gender** 153:4,10,15
  153:19 156:4
  229:20 230:2
**general** 6:21 7:3,5
  74:10 82:1 138:20
**generalized** 144:16
**gentleman** 242:14
**georgia** 44:12,19
  52:4
**getting** 83:9 84:15
  85:12 86:12 92:23
  95:16,18 96:1
  183:21 187:20
  210:19 248:21
**give** 22:1 37:10
  55:8 73:12 74:10
  75:2 76:12 82:1
  89:11 93:11
  142:13 147:6
  148:4 207:13
  215:12 225:6
  288:20 289:12
**given** 9:4,7 75:13
  76:8 81:7,13
  84:17 97:3 100:21
  101:1 109:18
  143:18,22 144:18
  164:13 165:2
  181:22 188:16
  194:18 246:23
  247:23 248:3
  276:18 288:14
  290:11,17
**giving** 74:15 144:16
**go** 10:1,23 15:22
  20:21,23 31:16
  72:7 73:18 76:15
  77:5,7 78:6,7 84:8
  85:13 101:23
  103:6 120:20
  121:3,4 147:8
  148:7 178:2
  198:13 204:15

221:14 230:9
  231:14,21 234:7
  245:6 281:11
  293:6
**goal** 106:22 109:2,8
  109:9
**goals** 106:5,10,15
  109:19
**god** 76:11
**goes** 93:4 193:23
**going** 11:3,22 21:6
  24:23 29:16 35:13
  35:17 77:8,11
  78:9 89:6 102:12
  107:20 121:4
  129:16 132:5
  138:13 144:22
  145:8 146:19
  160:1 187:12
  197:1 199:18
  202:14 212:11
  226:8 231:23
  236:20 238:9
  241:20 247:5
  248:7,22 249:10
  249:15 253:21
  267:23 275:16
  280:6
**good** 53:6 65:5
  80:12,19 88:2,5
  90:1,1 102:20
  104:21 105:1
  107:10 110:2
  138:14 186:17
  234:15
**goodbye** 243:8
**goodness** 102:12
**gotten** 144:21
  145:6 146:23
  149:8,12 150:3
  240:14
**governing** 28:17
**governmental** 46:3
**granted** 53:13 56:2
  153:18
**grasing** 234:19
**gray** 177:2,4,8,15
  177:21 199:12

234:22 291:13
**greg** 88:23
**gregory** 198:16
261:13
**grenade** 207:19
**grievance** 56:7,10
137:14,18 176:20
178:1,4,6 257:10
257:13,20 258:20
263:4
**grossly** 294:12
**grounds** 3:4
**group** 205:19
**groups** 86:14
**grows** 223:8
**guess** 36:3 38:5
39:2 90:5 94:21
99:6 100:12
105:10 117:15,18
161:10 190:11
192:5 196:20
212:22 248:23
287:9 294:9
**gun** 114:10 205:22
**guns** 211:12
**guy** 237:6,12
238:11

**H**

**h** 3:10 4:14 5:9
265:16 266:9
**hadnt** 244:11
**halfburned** 213:23
**hallway** 237:17
**hamm** 286:17,18
**hand** 53:11
**handbook** 272:11
**handed** 23:16
259:17,20,22
**handguns** 211:9
**handled** 74:22
94:11
**hands** 210:20
211:12
**happen** 74:16
268:17
**happened** 49:5
157:19 178:17

**happening** 76:20
**harassed** 130:14
231:9
**harassing** 48:12,15
48:18,23 49:9
50:5,9 247:10,13
248:5
**harassment** 50:9
136:18 137:3,7
173:1,6,9,18
174:4,8,11 180:15
183:11 184:2,12
184:18 229:20,21
230:2,3,6 258:1
**harbert** 4:17
**hard** 11:7 61:11
72:10 111:5,11
211:11 226:5
272:23 290:16,21
**hardest** 210:10
**harding** 288:18,19
290:20
**harmony** 280:3
**harms** 116:15
**harry** 287:7,10
**hart** 223:13
**hasnt** 159:17
**hat** 79:9
**havent** 19:11 23:3
120:15 144:21
160:3 238:8
242:10 257:8
**hays** 218:9 258:7
**head** 36:18 73:14
76:7 115:10
120:12 121:15
198:9
**heading** 284:2
**heads** 237:10 282:1
**health** 17:16,19
18:7,12
**hear** 41:9 74:6
236:8
**heard** 175:4
**hearing** 38:19 41:1
41:3,5,6 42:3,3
49:3,6,17,19,22
55:23 195:12,21

198:18 201:6
214:4 215:1 216:7
237:5 262:8
265:21,21,23
266:4,7 269:20
270:9
**heath** 191:22 192:1
192:2
**heightened** 104:11
104:14
**held** 10:3 29:6
46:22 54:14 97:5
195:21 230:12
246:22 269:10
277:3 278:12
281:13
**help** 11:2 37:14
91:10,14 148:6
161:5 169:10
185:7 226:9,12
238:22 269:21
**helped** 99:10 159:3
**herring** 287:22
**hes** 17:3 139:3,14
141:11,18 236:15
236:16 287:20
**high** 51:1 72:2
75:21,22
**higher** 172:13
**highest** 103:7 104:3
**highlighted** 99:15
**highlighter** 226:10
**highly** 87:7,10
**highprofile** 238:15
239:20
**highranking** 225:3
225:16 227:2,8
228:9
**hire** 60:11
**hired** 59:18 69:7
70:3 153:1,5,11
153:15,21,23
154:3,9 156:10
162:9 166:14,17
166:23 167:1,2,2
167:3,8
**hiring** 69:11 154:5
156:7 162:20

293:12
**history** 264:15,22
**hit** 191:5 193:18
**hold** 108:6
**holding** 211:12
287:2,5,6
**hole** 194:12
**holiday** 64:15
119:8
**holley** 258:6
**home** 14:9 38:13
292:20
**honest** 138:17,18
139:3,14 141:16
**honestly** 91:9
**hospital** 42:11,14
42:16,20,22 43:3
43:9
**hostage** 143:23
144:14 145:11
151:11,14,19
152:4
**hostile** 27:10
130:16 227:10
228:11,20 229:11
229:17 231:17
232:9,16 233:2,5
233:10 246:14,20
249:20
**hours** 118:15,17
**house** 86:6,7
159:23
**houston** 39:13 43:3
83:19 94:14 196:5
196:8,13,17
199:21 200:23
202:6
**hughes** 287:23
**huhuh** 11:5
**huhuhs** 11:8
**human** 239:11
**hundreds** 211:6
**husband** 13:14
40:14 67:12
**husbands** 13:13
**hypocrite** 214:2

**I**

**id** 59:14 89:12
120:14 128:15
**idea** 10:21 74:11
82:1 83:17 124:11
237:16
**ideas** 83:16
**identification** 24:5
43:17 57:16 63:20
67:23 125:14
130:7 134:16
197:15 200:2
202:22 217:17
222:12 224:1,22
250:21 252:19
253:8 255:15
257:3,17 261:11
269:9 272:15
276:16 277:7
278:19 282:6
283:3 285:5,19
286:1 292:8
**identified** 220:16
242:19 244:20
**identify** 82:23
219:13 276:3
281:2
**ijs** 205:5
**ill** 11:12,13,19
67:18 74:2 84:2
109:15 198:21
252:10 257:9
285:8
**illegal** 113:14 114:3
117:17
**im** 11:3,22 21:6
23:21 24:7 28:5
29:20 35:13,17
38:5 41:17 44:16
45:5 46:21 47:14
50:16 53:11,22
66:7 74:2,3 78:18
82:18 107:20
108:23 111:22
113:8 115:3
117:12 120:21
121:4 122:10
125:8 128:21
129:17,17,23

132:5,5 138:12
142:12 144:7,22
146:17,19 147:16
148:6 158:21
160:1 161:14
171:3 172:8
173:17 183:10
187:12 197:1,2,8
197:21 199:18
207:7 211:14
212:10,11 213:1
215:23 218:13
224:14 228:4
229:22 231:14,23
234:12 236:20
238:8 239:23
240:4,16,22 241:4
241:4,14,19 242:1
242:12 245:11,14
261:3 263:15,19
267:23 268:2,7
269:1,3 270:1
271:4 272:5 280:6
280:21 281:21
284:4,10 294:18
295:2
**images** 203:11
**imminent** 253:13
**impair** 12:11
279:22 280:3
**impart** 93:14
**impede** 280:2
**implement** 84:4
95:3,22
**implementation**
99:7
**implemented** 188:4
**implementing**
82:19 84:7,9
**implicit** 264:10
**important** 107:14
110:1,5 116:11,16
239:21 280:2
**impression** 252:6
**incidence** 50:8
**incident** 114:1
115:18
**incidents** 177:6

**include** 258:20
**included** 149:4
217:10
**includes** 272:11
**including** 27:11
102:17 205:5
**incorrectly** 197:19
**increase** 194:19
**independent** 66:8
66:11,14
**indicate** 59:11
68:22
**indicating** 65:1
**individual** 44:3
**individually** 85:1
**individuals** 22:19
22:21 119:18
122:5 123:1,22
145:15 162:18
163:1 165:17
213:7 229:10
250:5,13 288:1
**inform** 30:16 31:5
31:8,12
**informants** 61:13
**information** 25:21
28:13,20 29:1,3
35:4,8,14 55:21
58:3,4 83:7,8,10
85:19 86:3 93:15
123:11,14 126:19
131:11 142:11,13
148:2 157:23
158:7,11,18 159:2
159:4,7,11 161:6
161:13,15 169:10
169:11,15,18,19
170:14 246:3
250:10 282:13
**informed** 259:10
**informing** 186:6
**infraction** 182:1,2
**infringed** 233:11
233:15
**initial** 206:19,20
**initially** 59:8 70:16
90:20 91:4 95:1
99:6

**initiated** 294:9
**injustices** 210:19
210:22
**inside** 205:3 211:13
**inspire** 106:7,10,18
**instagram** 34:8,9
**instance** 72:3 115:4
115:12 193:4
**instances** 232:14
**instruct** 53:17,21
**instructed** 80:5
**instructor** 53:4,17
53:20 54:1
**insubordinate**
294:13
**integrity** 208:17
**intelligence** 52:22
**intelligent** 210:6,8
**intent** 64:10
**intention** 254:10
**intentionally**
204:20,21 257:23
**intentions** 239:22
**inter** 24:11
**interact** 78:15
83:14 101:18
**interacting** 107:1
**interaction** 90:5
**interactions** 30:20
**interested** 193:6
271:4 296:17
**internal** 223:22
224:11 251:2,5,16
**internally** 136:19
136:20,23
**interrogatories**
5:13 23:19 24:1
24:12 32:12 125:1
**interrogatory**
44:14
**interrupt** 269:2
**interview** 251:11
251:14 252:2,3,7
**interviewed** 99:22
100:4 251:5
**intimidated** 130:14
**intimidating** 227:9
228:11,20 229:17

231:17 232:9,15
233:2 246:14,20
249:20
**intimidation** 258:2
**investigate** 229:9
251:15 260:4
**investigating** 149:5
251:6
**investigation** 55:22
126:17 131:10
139:16 156:21
217:11 252:8
260:15,18,21,23
261:1
**investigations**
70:23 71:5 144:13
144:13 145:13,13
145:23 146:6
155:12,17 161:16
161:17 188:1,2,5
247:14,15
**investigative**
143:23 144:12
145:11,20 147:1
147:23 148:12,16
148:20 149:2,12
150:1,8 151:8
153:9
**investigator** 251:8
**involve** 114:13
128:8 129:1
133:17
**involved** 16:10
39:19 40:1 42:10
42:13 74:23 83:9
87:10 90:11
110:17,19 111:15
125:20 126:6
130:13 182:10
**involvement** 92:23
**involving** 42:14,15
196:21
**irreconcilable**
15:19,23 16:2
**isnt** 24:22 79:8,8
115:7 172:1
203:20
**issue** 126:12 127:4

131:4 196:9
200:16
**issued** 134:22
198:16 202:7
223:19 262:23
281:23
**issues** 16:4 94:11
126:23 131:16
228:2
**items** 41:20,22
**ive** 10:15 11:22
14:9 23:15,16
25:20 43:11 57:11
63:16 67:18 74:4
103:11 115:23
119:12 124:1
125:8 130:1 134:9
139:7 161:2
170:10 186:16
197:9 202:16
217:7 219:7
220:15 222:6
223:16 228:1
246:3,4 250:17
252:10 255:6
256:18 261:3
272:6 275:18
282:16 285:14
292:2

---

**J**

**jail** 48:19 205:15
**jamari** 17:4
**january** 64:19
201:1 202:7
273:10
**jay** 91:21 215:20
216:13 261:15,17
265:7 267:17
**jeff** 225:11 295:3
**jefferson** 39:19
296:3
**jeffery** 2:8 4:5,7 8:8
**jeffrey** 159:14
**jeopardize** 241:20
**jerry** 223:13
**jewell** 90:21 92:1
92:21 93:5

**jim** 90:22
**jimmy** 258:6
**job** 1:23 4:23 5:15
5:17 27:10,14
101:21 111:10
130:15 161:7,8
266:23 267:6
**jobs** 102:1 168:7,10
**joint** 7:8
**journals** 23:6 31:21
**judge** 49:7
**judges** 49:20
**judgment** 193:16
193:20 194:9
215:10,12
**judgments** 194:6
**july** 48:4
**june** 57:10 60:1
201:17 273:3
281:23 282:4,23
**justice** 51:5 205:17
210:19,21
**juvenile** 70:23 71:4
144:12 145:12
155:12,16 156:21

**K**

**kai** 274:4
**kay** 65:14,16,18
66:3,23
**keep** 96:19 108:1
108:10,21 109:9
129:15 160:1
225:14 269:6
**keith** 177:2,4
199:11 291:13
**keller** 56:17
**kenneth** 15:8
**kentucky** 15:14
16:15 39:20 56:18
**kevin** 223:13
**kids** 74:10,15 78:14
**kill** 240:3
**killed** 237:12
238:13
**killer** 207:6,13
223:9
**killing** 205:12

223:5
**kin** 296:15
**kind** 29:15 30:3
36:3 37:9 61:11
66:12 72:9 73:20
73:22 76:1 79:4
83:21 111:5,11
119:5
**knew** 87:13,13
265:16
**know** 11:17 14:8,23
30:7,15 31:4
36:19 40:19 41:12
41:17 44:2 45:6
46:7,8,18 48:2,8
55:2 59:10,15,15
61:19 69:4,8,22
69:23 70:17 72:7
72:11 73:12,22,23
76:3,22 80:1,9,17
85:23 86:6 88:10
89:12 90:2 91:9
96:1,7,21 97:11
97:12 98:9 100:3
115:10 116:5,16
117:14,20,21,22
118:21 121:12
122:1,14,19 123:4
123:5,6,9,15
124:8,10 128:18
131:1 133:8,9,20
134:4,5,8 136:17
137:12,23 138:7
138:16,21,22,23
141:10,17,20
142:7 143:6 144:5
144:10 145:2
146:1,4 147:15
148:19,22 150:4,6
150:7,14,16,22
151:2,6,17 152:3
152:14,17,22,23
153:4,6,7,8,10,13
153:14,20 154:1,2
154:4,5,7,8,10
155:5,7 156:9
158:12,12 159:14
159:16 160:5,7,8

160:10,12,14
161:2 162:4,9,12
162:15,17,20,23
165:17,21 166:9
166:11 167:11
172:15,18,19,21
174:18,21 175:5,7
176:8,12 178:15
181:13 184:10
185:18,21,23
186:2,4 187:1,2
187:10,14,17,18
189:14 203:2
207:3 209:22
210:1,3 212:9,20
213:13 214:5
218:4,10,18,22
220:21 221:8
222:16,18 223:2
224:6 227:4
228:19 231:1
232:12,14 237:11
237:13 238:4,11
238:11,12 240:9
240:13,15,17
242:20 243:16
245:2,7,12 246:4
246:6 247:4,8
249:5,8 252:21
255:1 260:6,20,22
263:15,17,20,21
265:1 266:17
267:4,6,9,14,18
268:3,8,10,22
270:20,21 275:3
275:13,14,18
277:19 278:7
279:10 280:8
283:10 287:19
288:6 289:4,8
290:12,18 291:3,6
291:11,17,18,19
291:20 292:1,22
293:2 294:14,20
**knowing** 229:10
271:4
**knowledge** 14:11
22:3 30:2 38:6

103:11 167:13
169:20 170:1
182:5,10 183:2
243:18
**known** 29:5 100:6
205:13

**L**

**l** 2:1
**label** 207:9 213:17
213:18 254:11
272:22
**labeled** 217:9
222:23 265:3
269:17 271:22
276:9 283:1
284:13
**labeling** 207:5,12
**labor** 55:14,16,21
**landed** 194:10
**lane** 2:6 3:9 8:1
296:19,20
**language** 133:22
**laptop** 233:1
**large** 2:7 8:3
**lasted** 176:2
**late** 125:6
**laughing** 177:18
**law** 2:8 8:7 10:15
28:17 83:2 104:11
107:17 108:20
132:10 167:10,12
167:15 205:9,20
205:23 207:14,21
226:16 227:17
**lawful** 205:4
**laws** 2:18
**lawsuit** 36:6,16
37:6 38:5,12 39:9
39:10 42:11,14,17
42:18 46:15
127:16 128:4,8,22
132:4,9,12,20
133:6,10,10,13,17
133:23 134:2
142:17 145:3
157:9 170:10
171:2 230:14

292:11
**lawyer** 19:3,12
27:20 29:19 203:8
246:7
**lawyers** 24:18
25:16 288:13
**lay** 205:11
**lead** 28:21 63:9
**leadership** 256:4
256:14
**leading** 3:2
**leads** 122:4,23
**learn** 93:9 229:22
**learned** 210:11
**leave** 61:21 64:10
77:6 118:14,17
119:1,3,5,7,8,9,10
119:11,12,13,19
120:2,8 121:9,18
122:6
**leaving** 67:6
**led** 63:1 95:17
123:21 139:13
233:7
**left** 61:6 65:10
69:21 70:5 92:21
201:20 286:10
289:14,23 290:4
**lefthand** 135:14
257:12
**legal** 135:11
**length** 69:9
**lessons** 210:10
**letter** 6:5,11 64:3,9
64:18 224:17
225:18,21 226:1,4
227:7,14
**letting** 247:4,8
**level** 84:21 103:3
182:19
**liaison** 81:11,16
93:22 94:6,18
97:8 99:1 100:10
101:6 105:20
**liar** 140:6 214:2
**license** 51:13,14,15
51:18,19
**licenses** 51:9

**lie** 294:6,7,8,11
**lieutenant** 22:7,8
  22:13,14 30:21
  31:1,12 103:16,16
  185:17 186:18
  191:22 192:1
  216:18 229:4
  230:17 236:5,6
  243:15 246:19
  247:16 248:16
  249:3,21 257:21
  287:8,22
**life** 108:1,11,19,22
  109:3,10 205:4,21
  210:11
**light** 195:15
**limit** 112:2
**limited** 27:11 32:23
**limiting** 184:23
  185:8
**line** 127:15 282:18
**linkedin** 32:17 33:1
  33:7,17,18 35:1
**list** 53:9 73:12
  145:10 147:8
  160:4 161:10
**listed** 43:13,18 44:2
  142:22 204:10
  284:2
**listen** 21:20 233:21
**listened** 232:19,23
**listening** 22:1 213:8
**lists** 144:16
**litigation** 42:15
  46:16
**little** 127:9 234:6
**living** 82:10
**loaded** 73:23
**lobby** 199:10
  262:19
**local** 98:12
**located** 231:4
**location** 241:16
  259:7
**long** 10:16 14:1,17
  15:9 48:19 60:7,9
  61:1,4 66:10
  70:12 80:9 100:9

234:5
**longer** 45:11 96:18
  118:16 248:7,11
  248:22 258:22
  259:1
**look** 39:3 58:5 68:3
  68:8 70:1,11
  120:14 127:9
  132:1 135:13
  136:6 160:12,19
  163:3 178:15
  213:15 227:5
  230:22 260:3,7
  265:2 280:11
  282:17 292:18
**looked** 227:5
  249:23
**looking** 44:3 58:7
  200:5 211:18
  215:23 293:19
**looks** 216:10
  252:12 257:9
  279:14,15 285:8
**lost** 120:21 127:19
  132:15 275:12
**lot** 83:14 87:3
  110:22 111:3,23
  112:6 280:9
**louisville** 15:14
  16:15 39:20 56:18
**lowered** 173:22
  180:2 190:21,22
**lowlevel** 103:6
**loyalty** 104:19
  105:1 280:1
**lt** 64:13
**luke** 63:11
**lynching** 208:2
**lynchings** 264:6

---

**M**

**m** 2:12 8:10 205:9
  206:4,5 207:5,10
  208:10 210:15,18
  234:3 254:1
  295:12
**maam** 10:8 219:11
  226:12 234:9

264:2 277:16
  279:13 293:7
**magazine** 211:10
**magill** 251:12
  252:2 257:23
**magistrates** 182:11
**maiden** 13:5,8
**mails** 23:10
**maintain** 107:10
**major** 19:16 22:7
  22:13 30:13 97:6
  103:17,18 198:10
  226:20 228:23
  229:16 230:16
  231:16,19 232:8
  233:1,13,23 234:6
  234:21 235:10,11
  235:21 236:4,14
  236:18 237:22
  238:2,20 239:7
  240:11,20 241:4,8
  241:18,22 242:2,5
  242:9,16 243:4,8
  243:15,22 246:6
  246:10 257:20
  259:11 261:23
  287:4
**majority** 77:14
**making** 55:19
  85:21 120:6
  123:16 158:2
  237:8 244:18
**male** 102:14,17
  147:3 162:13
  166:1,6,11 168:4
  168:12,17 169:4
  169:11 170:11,19
  170:21 171:14
  172:16 173:1,8
  174:4,7 183:2
  184:18 185:2,10
  185:14 187:8,19
  234:17 235:1
**males** 166:16,21
  171:10 187:10,15
  286:3
**man** 205:16 207:15
  208:16 210:5,7

211:8
**management** 173:2
  195:7 268:21
**managers** 118:6
**manifesto** 6:3
  208:11 209:3,16
  209:19,23 210:2
  222:9,21,23 223:3
  237:7
**manifestos** 222:20
**manner** 108:3,14
  109:11 113:21
**manson** 205:11
**manual** 84:17,18
  119:1
**march** 100:16
  112:17 197:13
  198:1,15,19 255:8
  256:20 260:12
**marcus** 13:16,18
  49:1
**mardi** 234:18
**mark** 191:5 193:18
  234:7 235:4 257:9
**marked** 23:16 24:4
  43:11,16 57:12,15
  63:16,19 67:18,22
  125:8,13 130:1,6
  134:9,15 135:6
  189:18 197:9,14
  199:19 200:1
  202:16,21 217:16
  222:7,11 223:16
  223:23 224:21
  250:17,20 252:10
  252:18 253:2,7
  255:6,14 256:18
  257:2,8,16 261:4
  261:10 269:4,8
  272:6,14 276:15
  277:5,6 278:14,18
  281:22 282:5,16
  283:2 284:23
  285:4,14,18,22,23
  292:2,7
**marking** 224:14
**marquette** 236:13
**marriage** 14:4

**married** 13:10,17
  13:20 14:1,14,17
  14:19 15:5,10,11
**martin** 64:13
**mary** 65:14,16,18
  66:3,22
**mathews** 22:8,14
  31:8 138:5 140:9
  252:13 255:9
  256:21 257:14
  258:21 259:15
  260:17
**matter** 8:23 9:7
  29:3 36:9 38:18
  39:19,22 40:17
  178:13 254:23
**matters** 36:10
  43:13,15 196:21
  208:16
**maurice** 102:8
**maximum** 211:8
**maynard** 4:16
**mayor** 273:16
**mayors** 274:13
**mays** 3:10 4:14 5:4
  8:20,22 10:1,4
  21:8,13 25:5,7
  32:3,7,11,14
  35:17 37:3 46:23
  54:15 57:6 102:20
  103:2 120:17,22
  120:23 122:22
  129:23 146:19
  148:7,10 159:14
  159:19 160:1,8,23
  161:4 171:3,6,9
  197:4,8 212:13
  219:12,22 220:6
  225:9,13 226:2
  229:22 230:1,11
  230:13 232:3,7
  234:20 235:7
  243:12 264:1,4
  268:10,14,19,23
  269:13 270:6
  272:3 276:4,20
  277:4 278:13
  279:10,16 283:6,8

284:8,10,18
287:18 292:22
295:3
**maze** 206:23
**mccants** 4:6 15:17
15:21 16:5 21:12
25:3 32:1,4,9,13
35:19 36:22 37:4
38:10 40:6,11
41:15 49:11 71:20
**mckay** 4:23 9:2
141:5 253:5,12
254:13 263:11
274:6
**mean** 16:7 36:4
46:1 62:1,16
65:20 66:17 69:23
72:5 75:18 77:21
88:12 98:7 103:5
109:17 111:6
115:8 143:9 147:6
154:16 158:6
174:20 175:18
181:2,3 183:9
193:19 212:23
235:5 236:17
239:22 240:8
267:2 268:8 269:2
274:10,17 288:12
289:9
**meander** 125:7
**meaning** 114:9
**means** 118:11
143:7 296:6
**meant** 183:10
251:22 289:4
**media** 26:13 27:15
27:23 95:13 96:1
97:19,23 98:7,8
99:15 100:13,18
195:4 241:17
242:19 266:6
278:15 279:2,7,21
**medications** 12:10
18:12
**meet** 252:1
**meeting** 93:15
259:11

**meetings** 27:2 84:2
85:14,20 86:17
87:3 92:10,11
97:5 98:10,10,14
**member** 81:12,17
100:22 101:5,8
163:8,20 164:9,18
165:7,12 217:23
218:3 263:15,19
268:20
**members** 85:22
86:19 101:9,10
102:5 106:21,23
110:23 112:1
221:6
**membership** 218:2
**memo** 223:18
252:12 255:7
256:20 281:23
282:9 283:1
**memoranda** 26:11
27:22
**memorandum** 6:4
6:7,9,10,22
**men** 226:17
**mental** 17:16,19
18:7,12
**mention** 180:22
**mentioned** 30:19
92:12 93:21
105:17 202:10
208:13 209:4
**merited** 255:23
**messages** 23:11
26:12 27:23
223:13
**met** 138:8
**metheny** 90:23
**michael** 17:3
**middle** 1:2 9:16
44:12,19 72:1,4
75:23 131:8
198:14
**mike** 211:19,22
213:14,20 215:7
265:6 267:16,22
**military** 52:19,21
53:1 54:2 56:23

112:20,21 113:1,2
**milledgeville** 52:3,4
52:9,12 54:9
**miller** 182:21
**millers** 183:1
**mind** 181:6,9,14
202:11 232:2,3
238:5 240:7
242:22
**mine** 207:1
**minimum** 190:13
192:7,10,18
**minorities** 173:11
180:16,22 181:16
183:7,13,17 184:4
184:14
**minute** 236:19
265:2
**minutes** 12:6 197:3
234:5
**misreading** 207:11
**missed** 190:17
191:8
**missing** 190:19
**mistreatment**
184:14
**mixed** 34:9
**mobs** 211:15
**modify** 7:8
**moment** 37:8
128:14
**monday** 76:16,18
**monies** 39:7
**monitor** 96:5 256:7
**monitoring** 96:12
**month** 14:3
**months** 176:2,5
**moody** 102:7
**morale** 104:21
105:1
**morals** 208:17
**morning** 19:4,14
30:12 232:18,23
233:14 234:15
235:19
**motion** 43:3
**move** 63:14 294:23
**moved** 60:21 259:7

290:3
**moving** 67:12
234:1
**mull** 236:21
**multiple** 71:12,14
75:13 162:8
174:15 175:22
194:11 225:6
**murderers** 205:14
**myspace** 32:16
33:1,7,10,13 35:1

───────────

## N

**n** 2:1 4:1 5:1
**name** 8:21 12:17
13:5,8,11,13
14:12 37:5 43:18
44:1 61:20 102:10
120:11 144:4,6
147:17,22 174:17
187:23 188:7
203:16,21,22,23
208:15 209:6
218:7 282:19
**named** 36:23 37:4
74:14 144:11
228:22 294:1
**names** 12:22 16:23
22:6 102:4,14
120:4 147:4,7,11
147:18 160:11
162:17 166:10,19
170:3 178:19,22
220:23,23 221:6
227:22 229:6,10
250:5,12
**nancy** 16:14
**narcotic** 60:15
**narcotics** 60:6,8,19
60:20 61:2,9
**national** 84:21
**nature** 86:1
**necessarily** 78:1,2
78:4 167:6 267:8
**necessary** 2:22 72:8
78:21 105:9
114:13 192:6
**need** 11:16 77:12

104:11,14,15,18
121:12 129:19
147:22 160:6,8
226:9 234:10
239:23 254:23
276:1,4 292:19,22
**needed** 72:22 78:6
**needs** 249:1
**negative** 195:15
238:7 244:8
**negatively** 280:4
**negotiation** 144:1
145:12 151:11,15
151:19 152:5
**negotiations**
144:14
**neighborhoods**
82:22 83:1
**neither** 296:15
**network** 94:21
**networking** 31:22
32:21 282:2,21
**never** 14:9 74:5
86:11 161:3
204:23 229:13
250:4,10
**new** 102:16 117:23
**newbie** 148:6
**newer** 102:11
**news** 98:8 99:19,23
205:17
**newsworthy** 195:6
**nice** 160:20
**nights** 62:17
**nine** 43:12,15,19
234:4
**ninety** 127:23
132:19,23 133:14
133:23 134:5
**nonwitness** 29:6
**north** 4:18
**notary** 2:7 8:2,3
**notes** 26:10 27:21
**nothings** 158:5
**notice** 5:16 6:6
64:23 65:3 126:13
127:5,11,17 128:1
131:4,21 132:3,7

132:13,19 133:2,4
134:1,7,21 224:10
249:14 251:2,3
261:21 262:7
273:14
**noticed** 188:9
**notified** 88:18
199:5
**notify** 64:9 116:3
**notifying** 64:5
**number** 25:9 26:9
29:8 31:16,17
32:2 71:17 72:15
114:6 124:1 131:3
167:21 175:23
197:18 213:17,18
219:18,23 263:9
273:9,10
**numbered** 24:22
**numbering** 25:4
**numbers** 58:8
86:13 219:20
220:5,15 221:21
**numerous** 175:19
175:21,22
**nunez** 90:23 91:1

---
**O**
---

**o** 2:1
**obama** 214:1,14
**object** 15:17,21
16:5 38:10 40:6
40:11 41:15 49:11
212:11 268:1
280:7
**objections** 2:23 3:3
5:12 23:18 29:12
29:20 295:4,8
**objects** 28:12,18,23
29:4,7
**obligations** 292:12
**observations** 90:6
**observed** 113:14
177:9
**obtain** 103:8
**obtained** 126:19
**occasions** 114:19
**occur** 208:12 209:4

**occurred** 74:22
177:6
**occurring** 296:12
**occurs** 77:3
**october** 1:19 2:11
3:12 8:11 131:5
273:11 274:5
**odom** 258:7
**offended** 291:21
**offense** 198:10
262:5
**offensive** 227:10
228:11,21 229:17
231:17 232:9,16
233:3 246:15,20
249:20 289:17
**offered** 3:5
**offering** 83:12
**offhand** 179:1
**office** 88:21 89:2
182:12 199:4
235:12,15,22
236:4 252:4,5
259:7 288:13
291:22
**officer** 52:7,16,18
55:19 57:9 61:13
70:20 71:10,12
72:19,21 73:10
74:5,13 75:12,17
76:10 77:18 78:13
78:18,19,20 79:4
79:6,7,11,17,21
80:10,21 87:17
89:7 90:20,21,21
90:22,23 92:21
93:5 102:7,10,11
102:16 103:5,7,10
103:14 106:1,6,8
106:12,19 107:2
108:17 109:13,16
109:17 110:21
111:3,7,8,9,12,18
113:6,7,8,10
114:16 116:2,2,5
116:8,10,15
137:12,21 138:1
147:9,10,10 163:6

163:21,21 164:2,6
164:10,23 165:6
167:22 176:16
181:7,8 183:4,21
184:6 191:7,20
194:14 199:3
211:21 213:14,20
218:11 226:23
227:2,2 234:15,18
235:3 236:12,13
236:15 237:20,23
238:14,19 239:5
239:10 240:6,19
241:3,7,10,19,23
242:3,6,11,20
243:3,6,10 244:21
247:17 251:6
252:1 255:10,23
256:21 257:15
262:17 266:10
267:22 268:19
273:17 291:15
294:15,21
**officers** 72:14 73:3
76:2 77:11 83:5
85:4,6,13,15
90:10,16,19 91:5
92:13,14 93:6,17
93:19 102:15,18
103:4 105:13,15
109:7 110:1
122:16 124:4,7
126:7 137:9 147:3
147:3 161:10
171:18 173:19
174:15 175:13
176:9,16 177:17
178:17,20 179:3
181:20 182:17
184:11 187:23
211:5 220:19,23
225:4,17 226:3,20
227:9 228:4,6,10
237:9,13 238:14
240:3 252:15,22
254:8,9 255:13
267:1,10,15,19
268:4 274:14

286:5,7,7,8,23
291:7,7
**offices** 2:8 8:7
**official** 10:5,6
**officials** 27:3
**oftentimes** 207:23
**oh** 13:16 32:9 76:11
102:11 104:9
215:22 225:12
236:18
**okay** 12:3,4 25:3
29:18 31:19 32:3
32:13 34:7 36:15
42:10 43:11 44:8
46:12 48:22 58:10
69:15 71:18,22
100:20 102:9
103:5,13,22 108:6
119:2 120:22
121:3,14 122:9,21
127:3 129:20
134:9 137:6
142:14,15 145:1
145:19 147:2
148:5 158:11
159:1 160:21,22
160:23 168:3
186:16 197:4
199:18 202:2,5
206:19 219:16
220:14,17 221:5,9
222:6 223:1
225:12 226:13,14
233:18 234:13
236:10,14 237:1
237:11 238:2
243:4 260:11
261:3 262:4 263:2
266:8,17 268:23
269:11 270:5,10
270:14 271:16
277:13 279:5
280:16 281:21
284:22 286:11
291:3 292:18,22
**once** 36:2,21
123:11
**ones** 33:6 174:5

179:18 188:4
203:3 219:3,4,8
277:9
**ongoing** 45:13
46:16,19 173:21
260:21,23
**online** 195:5 218:6
**open** 45:11
**opinion** 88:4
196:11 205:21
208:1 237:2 242:1
**opinions** 29:5
242:8
**opportunities**
167:20
**opportunity** 121:1
142:9 170:7 248:4
248:6
**opposite** 181:21
**oral** 3:11 8:13
**order** 5:21 6:21 7:3
7:5,7 38:22 39:1,5
104:12,14,16
105:1 121:22
171:17 196:9,14
196:17,23 197:11
197:22 199:21
200:12,23 201:4
202:5,11 220:7
253:20
**ordered** 39:6 295:1
**orders** 5:23 29:10
53:10
**organization**
263:18,22
**original** 3:10 271:9
290:10,13
**originally** 59:18
**outcome** 38:17 42:2
**outgoing** 110:9
**outlined** 167:20
**outside** 86:8 95:8
116:21 211:13
**overall** 99:12
**overly** 28:18
**owed** 43:6,9

---
**P**
---

**p** 2:1 4:1,1 205:9
206:4,5 254:1
295:12
**page** 5:3 23:22 24:6
24:7,21,23 25:4
26:8,9 31:16,17
32:5,5,15 58:5,15
58:20 64:2,7,22
68:3,8,12 126:11
127:10 131:2
132:2 134:19
195:17 198:3,14
198:14 200:6,8,22
205:7,7 207:7
211:1,18 212:4,7
213:4,21 215:15
216:22 221:11,20
222:2,4 225:5,10
244:21 245:4,6,7
245:16,19 252:17
253:17,19,22
258:16 261:5
262:2,6 263:2,3,8
270:2 271:21
272:7,8,17,22
280:11 293:21
**pages** 6:1,2 23:21
23:21 32:7 200:4
203:12 213:7
218:23 220:12
225:6 261:7 266:2
267:1 273:5
**paid** 70:4 118:14
118:17 119:3,5,7
119:8,10,13,14,19
120:2 121:9,17,18
122:6 123:2,23
170:20,21 171:11
**paragraph** 127:14
198:22 200:13
201:21 258:15
280:19 293:19
**parents** 75:9 78:16
**park** 259:8
**parrish** 19:16 22:7
22:13 30:13
226:21 228:23
229:16 230:16

231:16,19 232:8
233:1,14,23 234:6
234:21 235:10,10
236:14,18 237:22
238:2,20 239:7
240:11,20 241:4,8
241:18,22 242:2,5
242:9,16 243:4,8
243:15,22 246:7
246:10 257:20
259:11 287:4,4
**parrishs** 235:12,22
236:4
**part** 30:4 77:22
81:23 83:15 92:13
92:14,20 95:21
97:7,18 99:23
101:20 107:22
109:5 119:16
126:1 132:2
142:16 189:2
193:2,14 199:17
201:5 202:9,10
208:10,21 209:8
209:10,12 210:23
225:15 230:14
244:6,14 255:17
263:1 292:10
**participate** 91:8
**participated** 90:16
**participating**
112:20 113:1
**particular** 35:8
36:13 37:16 46:4
62:1 65:18 91:20
115:9 154:23
209:21 270:22
288:7
**particularly** 111:2
**particulars** 163:4
**parties** 2:3 3:3
201:10,23 296:16
**partner** 95:11
**parts** 82:20 86:10
**party** 21:13 82:7
94:5
**pass** 190:9
**passed** 127:23

132:23 134:6
**passing** 190:23
192:16,20
**passion** 89:5
**password** 218:7
**patient** 42:23
**patrol** 59:12,17,21
59:21 60:19,21,22
60:23 61:5,17
69:18 70:13,22
117:2 130:21
**patrolled** 74:18
**pause** 235:7
**pay** 39:7 43:5,10
69:20 70:4 96:18
171:2 195:11
**paying** 96:20
**pd** 64:4
**penalized** 190:18
191:1
**penalty** 12:8
135:19 187:7
**pending** 129:9
195:11
**people** 11:11 85:12
87:13,14,19 91:14
101:18 111:6
116:21 121:8,12
121:17 123:1
143:21 150:23
151:4 153:15
154:3,9 156:10
176:10 187:2
205:12 206:12
208:13 209:4
210:21 226:18
228:9 240:3 242:7
245:2,5,8,15
**peoples** 239:2
**percent** 192:12,14
192:19,19
**percentage** 190:12
190:14
**perception** 280:5
**performance** 27:11
27:12 80:22 85:16
130:15 280:2
**performed** 27:1

39:9
**performing** 59:20
59:22
**period** 69:5 123:18
123:21 139:1
149:6,18 162:3,6
168:21 199:1
262:15 264:15,22
279:2
**periods** 156:18
**perjury** 12:8
135:19 187:7
**permission** 243:19
**permissions** 248:8
248:12
**person** 80:21 89:16
89:20 91:21 94:11
105:20 139:20
140:4 141:16
153:1,5 155:21
171:21 172:12
181:6 207:20
229:1,2 240:16
247:14 251:8
274:1 286:12,16
286:17
**personal** 18:1,9
26:10 31:21 32:17
33:8 41:20,22
67:11 88:3 108:18
109:2,3,8,9
115:13,16 117:5,7
139:7,10 242:1,7
254:15,15 294:16
294:22
**personality** 90:1
**personally** 107:9
108:7 135:9
291:17
**personnel** 5:21
6:16 9:2 137:16
137:18 141:2,5
176:19 195:12,22
196:1,4,11 197:11
197:22 198:5,16
199:23 200:19
201:8,14 214:3,18
214:20,21,22

215:1 216:7 238:5
253:5 261:23
263:10 265:21,23
266:3,7,10 268:20
269:19 270:9
272:11 273:16
274:3,5,13 276:11
279:19 291:23
**persons** 91:20
120:8,10 139:19
147:18 153:11
155:23 228:7,22
286:3 293:11
**pertinent** 25:21
26:6
**peter** 90:23 91:1
**petition** 7:8
**petitioner** 40:19,21
41:10
**phone** 159:23
**photo** 287:11 288:2
**photograph** 7:6
285:21 286:2,9
287:1,17 288:5,7
288:15,20 289:1
289:13,16,20,21
290:5,8 291:4,8,9
291:9,12,22
**physical** 40:9
**picture** 213:21
214:13 286:13
**pinpoint** 22:9
**place** 41:4,8 89:4
95:2 96:13 98:11
99:16 105:9,12
113:21 117:19
135:15 167:18
176:5 178:13
195:14 242:15
260:16 278:8,16
278:22 281:3,5,18
285:2,16
**placed** 9:15 53:8
116:15
**plaintiff** 1:9 4:3
23:22 28:11,18,23
29:4,6,12 38:6
**plaintiffs** 23:18

**plans** 53:23
**play** 92:2
**played** 234:14,23
236:11
**playing** 211:3
**plaza** 4:17
**please** 3:13 11:3
12:17 16:17
128:20 219:11
239:12 269:2
279:13 293:6
**point** 22:2 39:9
62:20 66:15 67:1
67:14 222:21
275:3
**pointed** 191:7
**police** 6:20 7:2,4
52:3,7,13,16,18
54:9,17,20 55:11
56:9 57:8 59:3
61:12 62:3 64:5
77:22 78:3,6,7,9
78:19 79:3,7 86:3
87:18 94:15,19
96:4,11 97:2
103:3,6,10,14
105:2,6,13 106:8
106:12,19 107:2
109:7,13 110:1
111:8 113:5,6,7,8
113:10 116:1,2,4
116:8,10,14 130:4
130:17 134:13
137:11 163:6
198:15 199:5,10
211:21 214:21
216:2,18 218:12
218:18 220:20
221:1 237:12
238:13,14 240:3
241:12 242:20
251:1 252:15
254:9 255:13,22
258:6 262:19
270:13 286:4,7,7
286:8,19,21,23
287:4,8,12 288:15
288:16 290:2,3

294:14,15,20,21
**policies** 167:18
272:13,20 273:15
279:7 283:15,16
283:17,19 284:1
284:12,21
**policy** 85:3 100:14
100:14,19 113:20
113:20,23 114:2,5
195:4 273:8,13,23
274:3,8 275:22
276:2,6,8 278:16
279:2,3,18
280:15 281:6,8,15
281:18 284:6,7
285:2,9
**political** 237:14
**portion** 92:22
126:6 172:2,4,5
264:18
**portions** 98:9,17
276:13
**posed** 11:19
**posing** 207:20
**position** 52:5,15,20
53:3,22 65:18
78:17 79:5,13,18
79:21,23 80:15
81:6 86:5 87:7,22
88:9,11,12 89:10
89:17,21 95:19
97:9,10 99:2,2,4
103:21 105:22
106:8,11,19 144:3
144:18 145:4
146:8 147:1
148:21 149:2,8,12
149:16 150:20
151:5,12,15,19
152:1,5,9,12,15
152:21 153:2,17
153:18 154:12,14
154:18,21 155:3
155:13 156:22
157:3 164:21,23
165:3,5 184:23
191:13 192:23
238:12,16 239:13

239:19,20,21
241:5,12,13
246:22 248:8
274:7,13,14
**positions** 19:10
79:16 80:2 106:2
143:19,21,23
144:1,2,12 145:10
145:11,12,14,20
146:21 147:23
148:12,17 150:1,8
150:23 151:9
153:9,12,16,21,22
155:6,9,17 156:1
157:13,17 159:21
161:6,11,18
162:10 167:23
173:23 179:12,12
179:17,21 201:11
202:1 274:1,10,15
**possessed** 41:23
**possession** 26:16
**possible** 66:23 77:9
115:23 154:16
175:12 245:8
**possibly** 142:5
**post** 204:19 205:9
206:13,18,19,20
207:5,12 208:6,10
208:21 209:8,10
209:17 210:4,9,18
210:23 211:2
237:3,18 239:1
240:2
**posted** 155:6
195:13 204:3,5,11
209:13 274:20
275:1,7,9,15,19
**posting** 195:5 206:7
206:10,15 215:3,7
216:13,15 236:23
**postings** 161:7
179:7,11,12,15
213:19 217:4,14
219:2 245:10
249:22
**posts** 26:13,14
27:15 28:1 204:2

204:5 209:11
217:10,12 218:20
219:13 220:10,17
220:19 222:3
237:7 244:12,19
246:11 251:15
252:16,23 255:18
260:16 261:2
265:6,12 266:12
266:19 267:11,16
267:21 268:5,12
**powerpoint** 93:8,9
93:11
**powers** 96:7
**practices** 293:13
**preclude** 79:2
**prepare** 17:5 18:23
**prescribed** 18:11
**presence** 73:21
**present** 4:22 26:18
27:2 74:7 120:4
122:1 174:23
212:2 214:23
236:3,6 251:10
**presentations** 74:9
74:19 93:8,10,11
**presented** 49:22
201:14 266:1,3
269:19
**preserve** 205:4
**president** 213:22
**pressure** 237:17
**pretty** 82:5
**preventing** 273:2
**previously** 97:13
180:1
**primarily** 73:3
78:11
**primary** 62:2 71:23
72:20 73:15 75:12
75:18,19 76:22,23
77:7,18 78:12
82:2
**print** 212:3
**printed** 203:1,2,3
203:12 215:16
216:9
**printoff** 271:13,15

**printoffs** 221:10
**printout** 5:14 216:5
**printouts** 202:18
213:3 221:20
222:1
**prior** 3:6 9:13 52:1
52:11,17 65:3
117:16 167:10,12
167:15 188:21,21
232:19 264:23
265:18 266:8
**private** 108:1,11,22
109:10 279:20
**privilege** 28:14,15
28:16
**privy** 184:12
**probably** 22:1
208:18
**probation** 55:7
**problem** 243:10
**procedure** 3:8 8:5
29:9 263:5
**procedures** 272:20
**proceeding** 38:4,15
40:16 41:2 296:5
**proceedings** 8:14
296:12
**process** 207:15
208:4
**processed** 48:20
**produce** 21:9
213:12
**produced** 30:11
159:15,17,18,20
202:19 203:4
213:1 271:11,18
296:7
**production** 23:20
24:2,13 25:2
32:10 276:16
**professional** 18:1,7
18:9 256:4,14
**professionals** 17:16
17:19
**profile** 203:15,23
238:15
**program** 82:19
83:5,20 84:5,8,9

84:13,14,15,20,21
84:22 85:3,6,8,9
86:9,10 87:4 89:4
89:6 90:4,12,17
91:6,8,11,15 92:2
92:3,13,15,21
94:14,20 95:2,5
95:12,14,20,22,23
96:2,6,9,12,14,22
97:7,22 98:1,4,15
99:8,9,12,17,20
100:1 112:9,13
188:3 246:23
247:6,10,21 248:9
248:21 249:1,4,11
249:12,16
**progress** 114:8
**prohibited** 293:10
**promote** 96:1
**promoted** 53:10,14
  103:23 163:15
  164:12 166:2,7,13
  167:23 168:7,9,14
  168:15,18 169:6
  169:21 170:13
  171:15,17,22
  172:12,17
**promoting** 293:12
**promotion** 53:9,14
  165:4,8
**promotional**
  171:19,23
**promotions** 165:14
  167:16 168:3,6
  293:18
**proof** 191:8
**proper** 254:17
**property** 117:6,8
**protected** 28:13
**protection** 28:16
**protectors** 205:20
**protocols** 83:22
**provide** 21:21
  24:18 25:9,23
  35:14,18 92:9,18
  96:14 105:10
  120:3 121:22
  176:1 218:6

250:12 260:11
261:20
**provided** 19:3,4,11
  19:14 20:4 23:3
  25:6,15,20 26:5
  27:20 28:3,6,7,8
  42:23 55:4,9,12
  65:2 93:5 121:21
  122:3 123:11
  153:17 158:2
  159:10 203:5,5,7
  213:3 232:22
  250:6,10,15
**provides** 170:15
  262:7
**provision** 293:14
**psychiatrist** 17:22
**psychological**
  18:16,19
**public** 2:7 8:2 29:3
  90:2,3 185:6
  252:16 254:12,17
  255:18 280:5
**pullin** 13:3,3,9
**punishment** 182:3
**purchase** 96:9
**pure** 108:11
**purpose** 39:10
  40:16 117:21
  251:13 263:21
  270:10
**pursuant** 8:4
  200:13
**purview** 94:17
**put** 35:9 85:17,18
  99:4 204:22
  278:21 290:19
**puts** 237:17 239:13
**putting** 177:12
  239:15

---

**Q**

**qualifications**
  150:22 151:3,4
  152:23 154:8
  156:9 162:23
**qualified** 148:1
**question** 11:4,18,20

11:21,23 12:1,2
30:4 31:18,20
32:23 36:14 42:12
43:14 47:10 53:6
53:8 61:11 72:10
73:23 84:3 93:16
106:16 109:1,4,7
110:16 111:6
114:22 115:22
122:12,22 125:3,6
128:13,16,20
140:1 144:8
146:15 186:17
189:9,13 190:17
190:19 200:7,8
203:19 204:7,8
212:16 213:9,11
214:9 219:11
237:16 258:18,19
264:17 279:11
288:21
**questioned** 229:14
  248:12 251:9
**questioning** 11:1
**questions** 3:1,2
  11:13 12:12 34:15
  120:18 121:1
  136:21 142:12
  144:22 146:20
  170:7 188:23
  189:4,12 251:14
  293:1
**quickly** 275:13
**quite** 73:20 86:9
  268:2 288:2
**quote** 192:12

---

**R**

**r** 4:1 296:1
**race** 117:10,19
  124:15 125:17
  130:10 138:6
  141:9 142:18
  143:1,4 153:7,10
  153:14,18 154:2
  155:20 171:7
  181:21 182:4
  183:1 207:2

229:20 230:2,5
231:10 256:3,10
257:23 293:11
**races** 117:17
  143:19,22 162:15
**rachel** 102:6
**racial** 224:19 228:2
  255:19 264:10
**racially** 230:15
  264:6
**racist** 195:8,16
  254:11
**radio** 114:11 126:9
**rae** 203:16,16,23
  204:4
**raemonica** 1:8,18
  2:5 8:11,16 12:19
  12:19 43:13 238:4
**rainbolt** 4:15 9:1
**raised** 127:1 131:17
**ranch** 205:10
**range** 176:1 194:3
  194:8
**rank** 53:5 70:18
  103:7 104:3
  105:14 109:18
  163:21 164:10,13
  165:12 167:19
  171:18 172:13
  237:18 247:18,20
**ranked** 103:21
**ranks** 103:3 168:16
  168:17 228:3
**rate** 69:20 70:4
  166:3,8,13 168:14
  169:6 170:13
**rattle** 232:12
**read** 25:13 27:18
  64:16 107:20
  120:14,21 127:7
  127:20 131:18
  132:4,16 133:22
  166:4 173:4
  180:19 181:15
  185:12 191:15
  195:18 197:18
  198:21 199:13
  200:20 201:18,21

202:3 208:10
209:19 210:2
219:19 222:19,20
222:22 223:3
238:8 239:3,4,5,7
242:10 244:11
258:10 264:18
271:1,1 272:23
279:13 289:6
**reading** 2:15 171:3
  209:7,11
**reads** 127:16 131:9
  163:12 165:23
  170:18 172:23
  184:21 198:20
  201:4
**real** 51:14,17 56:20
  271:8 287:16
**really** 10:17 20:19
  20:19 36:11,14
  37:7 61:18 70:11
  71:16 118:19
  128:17 284:15
  286:13
**realty** 56:17
**reason** 9:21 12:14
  18:5,8,18 23:2
  38:9 40:20 44:5
  47:4 55:4,8,9,12
  55:16 57:19 59:16
  69:1 70:2,6,8
  139:2 141:13,18
  143:10 147:13
  181:13 214:10
  274:9,23 279:1
  285:11 290:4
**reasonably** 28:21
**reasons** 139:5
  142:6 143:13
**reassign** 249:3
**reassigned** 62:13
  199:9 248:23
  249:10 262:18
**rebecca** 90:20 92:1
**recall** 10:11,12,13
  10:17,20,22 13:19
  13:21 22:11,21,23
  23:14 33:9 35:23

36:17,20 37:8,14
37:20 43:2,7,20
44:17 47:19 50:18
54:10,12,13 55:6
55:18 57:17 59:7
60:9,10,12 61:1,4
62:16 64:1 65:17
66:13,21 67:5,17
69:18 70:18 72:15
79:15,19,22 80:7
81:22 89:22
100:11 101:3
102:4 107:21
108:5 109:4
112:16 114:5
124:19 125:3,4
135:3 136:10,13
136:16 148:14
152:6,8,13 154:13
155:7,19,20 156:3
156:4,5,6,8,15
158:17,19,19,23
159:4,20 161:5,21
161:22,23 162:1
162:19 165:1,7
166:18 167:17
168:2 169:1,10,17
170:23 174:5,9,17
174:23 175:16,18
176:18,21 177:12
178:11 179:6,14
180:9,13 182:23
184:9,15,20
188:19,19,23
189:3,4,6 190:16
191:19 192:11
193:12,15 194:22
209:20 215:8
216:14 217:2
219:15 222:14
223:6,7,11,12,15
224:2 225:19
226:2 227:1,12
229:7,13 244:10
244:23 245:23
246:5,12,16
248:18 255:5
265:14,15 270:8

270:16,21 275:18
282:8,11,12
**receipt** 127:17
132:13 134:1
272:19
**receive** 24:10 46:23
47:6 94:1 150:11
154:18 168:5
180:4,5 190:7
224:10 252:12
256:19
**received** 47:1,15,20
53:9 93:7 120:1,8
128:1 133:1,2,3,4
134:6 145:6,16,21
148:13,16,18
150:9,14,19,23
151:4,14,16
152:14,20 154:21
155:2,10,14,16,18
155:23 156:2,21
157:3,13,17
163:15 165:19
181:23 182:2,19
189:16 191:6
194:23 198:18
199:16 251:17
254:14 255:2,8
261:21 263:10
271:12 272:10
282:22 283:11,14
284:12 289:21
**receiving** 47:23
190:22 282:8,11
**recognize** 58:3
63:17 125:10
130:2 134:11,20
197:10,21 199:20
202:17 220:22
221:5 223:17
250:18 253:3
257:4 272:8,18
273:1,7 278:15
283:21 286:15
292:3
**recognized** 87:20
**recollect** 37:9
**recollection** 192:13

222:8
**recommendations**
255:11
**recommended**
256:2
**reconvene** 295:5
**record** 10:2,3,6
11:7 12:18 29:4
46:22 54:14 148:8
201:6,12 202:11
202:13 230:10,12
231:22 243:20
269:10 277:3
278:12 281:11,13
**recorded** 21:14,18
22:22
**recorder** 9:17
**recording** 9:18,22
10:5 19:2,15
21:21,23 22:4,11
22:19 30:11,14,17
30:20 31:2,9,13
232:22 233:19
234:4,14,23
236:11 243:11,16
**recordings** 19:9,19
19:23 20:5,7,20
20:23 21:4,15,19
22:11,16,18 23:3
29:22 30:5
**records** 18:6 59:11
68:22 203:1
**recruit** 102:1
**recruiting** 81:12,16
100:21 101:4,10
163:8,20 164:9,18
165:8,11 238:16
293:12,23
**redistributed**
273:23
**refer** 191:21 225:17
**reference** 138:19
186:5 209:16
264:14,22
**referring** 118:23
119:6 160:15,17
180:21 188:13
200:8,14 210:12

226:3,8 228:4
280:21,22
**reflect** 204:11
222:2 242:23
**reflected** 203:21
204:3 247:1
280:19
**reflecting** 26:19
**reflection** 238:7
244:8
**refresh** 222:8
**refused** 294:23
**regard** 167:19
292:5,13 293:4,16
**regarding** 35:10
38:12 39:22
113:23 131:6
133:22 139:11
150:19 152:20
169:15 197:12,23
199:22 217:11
218:20 240:13
246:11 252:16,23
255:10 256:22
266:4,6,12,19
267:15,21 282:2
**regardless** 105:14
107:14 109:18
242:3,17 281:4
**regards** 35:9
293:18
**regions** 4:17
**registered** 252:15
255:12
**regular** 74:16
178:17,20 267:2
**regulations** 6:17
272:12 276:12,22
**rehire** 71:6
**rehired** 67:2,16,21
68:17,20,23 69:13
69:15,19,20 70:16
70:19
**reissued** 274:8,16
**relate** 25:11,17
26:2 43:15 212:7
212:13
**related** 9:10,12

16:3 20:1 21:10
23:7,11 27:15
28:1 33:4 35:4,15
43:13,22 44:6
99:17 129:12
136:21 142:12
159:21 171:22
240:22 254:23
267:12 290:5
**relates** 284:19
**relating** 2:19
**relation** 33:6 47:9
129:8
**relations** 16:4,8
**relationship** 14:20
42:19,21 138:14
**relationships** 16:2
16:11 75:4,8
279:23
**released** 48:21 49:2
**relevant** 21:10
201:4
**remain** 113:2
**remained** 129:2
**remains** 205:18
**remarks** 26:19
237:5
**remember** 91:18
189:12 242:17
**removed** 80:16
81:1,5 186:5,7
258:13,14
**repeat** 12:2 42:12
106:16 108:8
110:16 264:17
**repeatedly** 170:11
295:1
**rephrase** 84:2
**replaced** 275:13,14
**report** 6:12 83:2
86:2 88:20 96:3
140:21 141:1,7
176:15,19,22
177:1,3,7,10
189:19,22 190:3
199:10 214:12,17
214:19 235:21
254:17 258:12,22

259:16 261:9
289:19,20
**reported** 89:2
137:10 215:3
236:4 253:12,15
253:16 259:3,6
265:17,20,22
291:21
**reporter** 2:6 3:15
8:2 11:7,9 12:5
38:1
**reporting** 62:5
**reports** 96:15 99:19
99:23 136:18
137:3,7 140:8,10
140:13,16 141:7
141:22 207:17
252:22 254:21
266:9,18
**represent** 106:7
276:10 278:2
**representative** 66:4
87:18 113:11
**representing** 8:22
**represents** 296:10
**reprimands** 27:4
**reproach** 208:18
**reputation** 107:10
107:13 110:2
116:22
**request** 24:1,11,11
24:12 25:1 28:12
29:17 31:23 32:10
32:15 49:18 79:17
79:19 80:3,6
93:18 95:9
**requested** 41:10
88:16 122:2,15
123:13,15 264:18
**requesting** 41:13
41:19
**requests** 23:19
24:16,19 26:10
29:1,8 276:18
**require** 218:1
**required** 53:20
171:18 188:10
190:14 192:3

193:10,13 199:2
**requires** 226:16
**reread** 209:1
**research** 84:19
**reserves** 54:6
**reside** 14:7 15:3,13
**residence** 294:17
294:22
**resides** 15:1
**resign** 62:18 63:1
63:13
**resignation** 63:10
64:3,6,9,11,19
66:17,20
**resigned** 65:2,5,22
66:1
**resigning** 65:3
**resolve** 207:22
**resolved** 38:18
**resource** 71:10,11
72:13,19 73:9
74:5,12 75:12,17
76:2,10 77:17
78:13,18,20 79:6
79:11,17,20 80:10
80:20 87:16 106:1
111:3,7,9,12,18
**respect** 106:11,18
107:6 110:7 239:9
240:15 244:15
**respective** 2:4
201:10 202:1
**respond** 11:4 32:14
72:6,22 73:4
78:23 113:16,19
113:22 114:3,7,20
115:2,6 177:22
254:13 260:2
**responded** 114:16
**respondent** 126:21
131:14 132:10
**responding** 206:12
**response** 28:4,10
31:23 114:23
190:7 254:20
260:8,10,12 263:9
**responses** 23:23
24:8,15,19 25:1

29:21 44:14
**responsibilities**
73:9,16 74:11
77:20 79:3 81:7,9
82:3,6 149:4
**responsibility**
93:13 96:5 101:20
247:17
**responsible** 75:3,7
82:18 92:7 228:7
228:10
**responsive** 28:8
**restricted** 78:8
**result** 47:6 189:17
296:17
**resulted** 182:8
**results** 27:12
189:16 191:11
192:22
**resumé** 58:22 68:14
**retained** 3:14
**retaliation** 124:16
125:18 230:7
**retired** 216:4 258:5
287:21 288:16
**returned** 41:20
**rev** 282:22
**review** 17:8 18:22
21:8 157:5 189:11
266:23 283:16
**reviewed** 24:15
201:5 283:17,19
284:1,12
**reviewing** 268:5
**reviews** 27:12
57:23 58:12,23
63:21 68:1,6
125:23 126:15
128:11 130:23
143:3,15 181:5
185:22 200:3
219:9 221:2,16,18
222:13 224:23
226:6,15,19 253:9
254:19 258:17
263:6 265:9 271:3
282:10 293:17
**revision** 283:10

**revisions** 283:14
**rewind** 234:13
**rice** 286:13
**richard** 258:7
**right** 19:17 22:9,15
22:23 23:15 30:9
30:22 32:13,18
36:18 37:8 54:15
54:19 57:6 59:13
65:7 73:13 76:6
97:20 100:22
102:10 104:1
105:21 106:2
115:10 118:3,12
120:12 121:15,15
122:9,10 124:17
125:22 126:13
127:5,18 128:2
129:16,21 130:11
130:18 131:5
132:8,14 133:7
134:21 139:6
140:8 143:12
148:3 158:9,14,16
158:19,23 160:21
163:17 164:19
166:18 167:5
168:1 170:5 172:1
172:3,13 173:15
174:6,9 177:5
178:4,9,21 179:1
180:12 182:23
188:8 201:2 206:7
206:21 207:14
209:17 227:13
228:12 231:4,5
237:2 239:11,16
241:18,18,22
242:5 253:13
256:8 260:19
265:8,13,19
266:13,15 272:5
278:13 279:14,15
280:23 282:15
285:12 287:5,6
291:1
**righthand** 58:8
203:9 218:17

257:12 287:11
**rights** 127:12
131:22 132:3
173:11 180:16,22
181:16 183:12
196:22 208:4,19
230:6 231:12
233:12,16 259:2,2
293:4
**ring** 226:9
**robbery** 114:7
**rock** 223:13
**roderick** 14:13,15
14:18 15:1 17:4
63:5
**role** 78:12 80:10
81:2 83:14,23
92:1 94:10 97:17
101:14,17 111:8
111:15
**roles** 163:18
**roughly** 211:10
**rounds** 211:6,10
**row** 286:15,16
287:10
**rpr** 296:20
**rule** 3:7 196:20
261:23
**rules** 2:19 3:8 6:16
8:5 11:1 29:9,10
238:5 272:12
276:12,22
**ruling** 196:5,23

───────────
**S**
**s** 2:1,1 4:1 5:9 54:3
296:19
**safety** 73:17,19
78:14 254:15
**sales** 66:3,8,11,14
**san** 211:5
**satisfactory** 180:7
180:12
**saved** 290:23
**saw** 114:5 204:23
215:13 216:13,14
217:3 222:15,22
291:18

**saying** 71:17
    108:23 109:4
    147:16 158:21,22
    172:9 179:14
    183:3 206:8 227:8
    228:5,5 239:14,23
    247:3 266:5
**says** 135:18 168:11
    171:7 173:15
    183:11 198:20
    201:22 227:17
    282:20
**scanned** 290:15,21
**school** 51:1 71:10
    71:11,12 72:1,1,2
    72:4,5,11,13,18
    72:21 73:9,17,19
    73:22 74:5,7,12
    74:17,18,19,21
    75:1,4,17,22,22
    75:23 76:1,2,10
    76:14,15,16,23
    77:5,6,8,15,17
    78:4,13,14,18,20
    78:22 79:1,6,10
    79:16,20 80:10,20
    87:16 105:23
    111:3,7,9,11,18
**schools** 171:13,23
    72:6,7,20,23 73:4
    73:5 75:9,13,15
    75:21 76:3,9,18
    76:23 77:1,2,4,10
    77:19,20
**schwab** 90:22,22
**scope** 28:19
**score** 171:22 172:6
    172:10 190:11,13
    190:15,21,23,23
    191:6 192:7,13,15
    192:18,19 193:10
    193:13 194:19,20
**scored** 190:10
**scores** 27:13 172:15
    172:19 193:1,3
**scott** 191:22 192:1
    287:12
**scratching** 237:10

**screen** 212:4
    220:23
**se** 35:11 95:4
**search** 5:14
**searched** 35:7,11
**sec** 198:10
**second** 44:23 64:2
    64:7 109:1 131:2
    134:19 149:21,22
    149:23 151:20
    180:7 198:13,22
    200:12,22 201:21
    202:10 229:2
    230:10 281:12
**secretary** 235:17
    235:17,20 248:11
    248:13 268:17
**section** 127:11
    131:9 132:3
    200:13 261:23
    262:3
**sections** 276:12,13
**see** 24:2 35:2 43:18
    111:7,8 115:2
    121:5 124:18
    127:12 135:15
    178:15 198:4
    215:6 220:8 221:3
    222:19,20 226:7
    226:10,13 231:22
    231:23 242:15
    245:7,9 261:5,18
    262:1,8,20 268:18
    274:2 279:14
**seeing** 64:2 219:15
    275:19 284:4
**seeking** 83:10
**seeks** 28:13,20 29:5
**seen** 103:12 120:15
    160:3 161:3 219:1
    219:7,8,14 220:18
    222:9 265:12,15
    274:19 288:8,10
    289:21 291:9,11
**seinfeld** 223:14
**selected** 88:8
    161:11
**selection** 79:23

**selfemployed** 65:11
    65:13 66:6
**sell** 96:7
**semiautomatic**
    211:7
**send** 132:9 186:9
    186:13,18 270:15
**sense** 74:4 146:12
**sensitivity** 256:3,11
**sent** 186:4,6 190:4
    247:2,3 248:16
    270:12
**sentence** 127:15
    132:6 163:4,12
    165:23 170:18
    172:22 173:14
    181:15 201:21
    231:5
**separate** 103:22
**september** 104:8
    124:14,20 125:11
    203:9,14,17
**sergeant** 53:7,12,15
    101:12 102:6,8
    103:15,15 112:21
    113:2 168:19
    223:18 241:13
    251:12 252:2,3
    257:22,22 258:6
    286:17,18 287:12
    287:20,21 288:15
    288:16,18,19
    290:20
**serious** 228:16
**seriously** 140:10,13
    140:17,21 141:22
    252:7,8
**serve** 88:19 164:14
**served** 97:13 164:1
    164:4 165:18
**service** 6:19 62:4
    118:15 163:9
    167:21 200:15
    272:13 277:22
    278:1
**services** 27:1 43:1
    256:14
**serving** 94:5 163:17

    164:8,10
**sessions** 256:3,6,7
    256:11
**set** 85:14 109:19
    211:13 236:17
    245:18
**settings** 245:18,21
    246:2,5
**setup** 235:4
**seventeen** 252:21
    267:10,14,18
**sex** 124:15 125:17
    130:11 181:21
    230:5 231:10
**sexual** 224:19
    228:1
**sexually** 230:15
**share** 83:16
**sheet** 231:2,7
**sheriff** 287:22,23
**sheriffs** 83:20
    94:15
**shes** 122:11 123:15
    144:16 146:10
    159:23 160:5,15
    160:16 226:8
    293:2
**shift** 60:23 62:8,12
    62:14
**shifts** 62:10,13
**shoot** 193:22 211:3
**shooting** 194:2
    207:18
**shots** 191:4,9,10
    194:8,10,11,15,15
**show** 43:11 67:18
    122:16 134:9
    199:18 214:4
    217:7 222:6
    223:16 224:14
    250:17 252:10
    253:2 255:6
    256:18 270:2
    278:13 282:15
    284:23 292:2
**showing** 57:11
    63:16 125:8
    129:23 197:9

**202:16 203:23**
    261:3 269:3 272:5
    276:9 277:4
    281:21
**shows** 185:5
**shy** 14:3
**sick** 119:9
**side** 287:6,11
**sign** 262:11
**signature** 2:14
    58:11,14,17,19
    68:5,10 135:16
    261:17 270:3,7
    271:6 283:13,23
    284:11
**signatures** 7:1
**signed** 135:22
    136:7,10,13 251:4
    261:13,16 273:16
**similar** 217:22
    281:19 285:8,20
**similarly** 73:2
    113:4 131:8 136:7
**simple** 114:23
    122:12
**simply** 195:9
    208:14 209:5
**sir** 129:18 234:16
    237:20,23 240:6
    240:19 241:3,7
**sit** 169:23 228:18
**site** 217:18,19
    220:11,18 242:19
**sites** 31:22 32:21
    33:3 279:21 282:2
    282:21
**sitting** 44:4 205:15
**situation** 208:2
    218:21
**situations** 113:18
    116:18 208:1
**six** 14:19 220:12
**sixth** 4:18
**sjis** 5:14
**slap** 247:20
**slavery** 211:15
    264:6,13,21
**slow** 234:1

small 279:9
smith 223:19
  224:11 251:6
  252:1 257:22
  287:12
smiths 252:4
smoke 207:19
snuff 122:10
social 26:13 27:15
  27:23 31:22 32:21
  100:13,18 195:4
  217:18 241:17
  242:18 266:6
  278:15 279:1,6,21
  282:2,21
software 185:16
  186:20,23 187:4
  187:16,22 258:14
  258:23
solve 185:7
solving 185:9
  187:21
somebody 82:9
  91:13 94:6 140:5
  144:19
somebodys 267:6
sons 263:13
sonya 122:14
  159:23 231:22,23
  232:4
sorry 23:21 24:7
  50:17 132:5 133:3
  144:7 197:3,21
  207:7 212:11
  231:14 240:5
  268:2,7 269:1
  270:1
sound 59:13 211:15
sounds 211:5
source 25:10,17
  26:2
southern 1:3 51:8
span 20:21,22
speaking 18:2
  36:22 173:10
  177:17 180:15
  181:4,15 183:8,12
  183:18

specific 36:13
  71:17 120:4
  146:11 170:2
  254:21 255:2
  293:14
specifically 14:8
  35:7 69:23 91:19
  147:9 185:18
  293:9
speech 233:12
  237:3 279:22
speeding 50:19
spell 12:17
spend 60:13 77:14
spoke 183:3
spoken 110:12
sponsored 117:20
spouse 39:6 40:3,23
  42:4 63:3
spouses 63:2
srt 193:5,7,14
stack 230:23
staff 53:15
stamp 215:21
  219:18,20,22
  220:13 221:12,13
stamped 271:9
stance 242:17
standing 65:6
  286:14,16 287:13
  287:21
stands 205:16
start 11:14 57:7
  103:10 198:21
  208:23 253:17
started 65:17 66:22
  84:10 86:12 91:5
  93:1 164:22 165:5
  183:23
starting 58:20
  103:6 232:20
  234:12 286:10
  287:10
starts 25:4 220:3
  234:6 235:3
startup 92:22
state 2:7 8:2 12:17
  123:13 132:11

188:9 191:3,21
  194:13 195:2
  223:4 227:14
  244:6 254:4 296:2
  296:22
stated 44:1 89:3
  120:7 124:22
  173:9 210:7 245:1
  254:7 281:20
  293:21
statement 107:21
  127:6 136:8
  168:11 169:16
  183:11 208:7
  273:7,13 275:22
statements 26:19
  33:3 136:2 271:19
states 1:1 29:12,14
  63:7 108:10,21
  126:17 180:14
  198:4,15 207:16
  213:22 231:8
  293:9
stating 223:7
stationed 63:11
stations 98:12
statutes 126:20,22
  131:13,15
stay 76:16
stenographic 296:6
stephanie 3:10 4:14
  8:21
steve 226:21 228:23
  229:16 230:16
  231:16 232:8
  235:10 257:20
  287:3
stint 149:19,22
  180:7
stipulated 2:2,13
  2:21
stipulation 8:6
stone 16:14
stood 208:19
stop 115:14,17,20
  178:15
stopped 174:13,18
  175:7 176:9,16

stoppers 81:11,15
  93:22 94:6,10,12
  94:14,20 95:2,7
  95:14,17,19 97:8
  99:1,11 100:10
  101:5 105:19
  163:7,19 164:5,16
  164:21 165:2,11
  246:23 247:5,10
  249:4,11,16
stops 177:19 223:5
story 205:18
street 2:9 4:8 8:9
student 74:23
students 75:9 78:15
stuff 197:2 237:18
  238:8 242:10
subject 29:11 62:12
  118:2 189:8
  277:11 282:20
  284:2
subjected 130:16
  173:1,7,18 174:3
  174:8,11 184:11
  184:18 224:19
submit 67:1,15
  79:17 80:3,6
  136:17 137:2,7,14
  141:1 156:12
  224:16 283:12
submitted 57:21
  64:19 67:20 68:16
  69:6,12 79:19
  141:6 214:3,6,7
  214:11 216:6
  252:22 256:23
  257:14 258:21
  263:5 267:10,15
  267:20 270:9
submitting 64:8
  137:17
subordinate 118:11
subordinates 118:7
subscription 96:21
subsequently 70:22
  71:3,4 233:7
substantial 198:7
  200:18 201:13

success 105:2,6
sue 38:8 126:13
  127:5,18 128:2
  131:5 132:8,14
  134:21
sued 35:20,22 36:1
  36:4 37:17,18,20
  37:22
suffer 18:19
suffered 210:20
suing 36:23
suit 127:11 128:18
  128:23 129:8,12
  132:3
sum 39:7 43:5
summary 6:23
  283:8,22 284:13
  284:20
summers 181:7,8
  182:4,20 183:5
  184:6 291:15
superior 137:8
  191:7,20 194:13
supervision 296:9
supervisor 62:7
  102:7 254:22
  261:14
supervisors 118:6
  178:18,23 183:22
  254:16 294:9
supply 83:7
support 19:9 25:11
  25:18 26:3 96:12
  171:10 200:18
  201:15
supported 96:23
supporting 90:3
  242:13
supposed 205:19
  275:9
sure 10:18 36:5
  37:15 57:4 59:16
  76:8 78:11 85:21
  108:9,10 230:11
  280:11 284:8
surely 279:8
surprised 211:14
suspend 198:23

262:14
**suspended** 195:3
  195:11
**suspension** 196:2
  196:10 197:12,23
  199:8 266:4
**suspensions** 27:5
**suspicious** 82:23
**swat** 193:4,7,11
**swear** 138:12
**swore** 12:5
**sworn** 8:17
**sylvia** 181:7,8
  291:15

**T**

**t** 2:1,1 5:9 296:1,1
**tab** 160:21
**table** 9:16
**take** 11:11,17,20
  37:9 57:3 74:10
  84:18 102:21
  119:2,10,13
  120:13 125:21
  129:19,20 137:15
  171:19 176:5
  185:11 191:17
  192:4 197:2,4
  225:9,13 236:19
  248:4 260:3 264:1
  270:18,23 289:9
**taken** 2:5 3:11 57:5
  103:1 119:12
  129:22 148:9
  197:7 232:6 248:2
  264:3 275:11
  296:5
**talk** 11:8 17:10
  29:19 57:1 111:21
  145:8 281:10
**talked** 30:8 138:10
  163:9 179:20,22
**talking** 11:11,15
  174:22 175:6,7,14
  176:9,16 212:12
  234:21
**tallahassee** 15:4
**tape** 19:2,15,19

21:19 98:9
**tapes** 26:11,12
  27:22
**tapings** 98:20
**target** 194:2,8,11
  194:12
**targeted** 181:18
**targeting** 173:12
  180:17,23 183:14
**taxpayers** 205:16
**team** 81:12,16
  92:20 100:22
  101:4,8,10 102:5
  163:8,20 164:9,18
  165:8,11 193:4,5
  193:7,8,11,14
**technically** 53:11
**telephoning** 49:13
**television** 98:12
**tell** 21:22 22:6 36:8
  36:9,11 54:23
  55:3,16 60:17
  61:23 67:19 73:15
  74:2 89:15,19
  91:13 103:2
  107:21 112:11
  115:4,9 118:20
  119:21 121:14
  137:6 142:23
  146:22 147:9
  151:8 155:8
  156:19 157:1
  169:4 170:14
  176:3 177:14
  178:19,22 208:14
  209:5 214:6 222:5
  226:17 227:17
  229:15 231:15
  232:7 236:20
  238:10 240:16,21
  243:22 246:18
  248:6 269:5,13
**telling** 186:10
  228:8,13,18 241:5
**ten** 10:14 17:20
  18:8 20:11 199:1
  199:7 262:15,18
**tense** 207:23

**term** 109:17 264:20
  277:10
**terminated** 54:16
  54:20 55:2,7
  181:10,12 294:4,5
**termination** 5:16
  27:17 55:1,5,17
  56:8 65:1 188:22
  233:8 294:10
**terminologies** 45:7
**terms** 26:23 264:5
**terrell** 4:6
**test** 27:12 172:10
  172:15,19 188:14
  188:15 189:17
  190:12,17,20
  191:4,18 192:4
  193:18
**testatip** 99:9,17,20
**testified** 8:18 121:7
  160:6
**testify** 12:15
**testifying** 12:7
  161:12,14
**testimony** 1:17
  3:11 17:11 140:22
  142:9 227:13
**testing** 293:13,23
**tests** 188:10,13
  191:12
**text** 23:11 26:12
  27:23
**textatip** 95:22 96:2
  96:14 99:7
**texttotip** 248:21
**thank** 197:6 226:14
  232:5 243:4,9
  272:4 283:7 295:8
**thats** 20:2 22:9
  26:9 29:16 30:10
  32:19 38:6 40:17
  42:6 44:13,16
  45:12,14 53:6,20
  53:21 54:2 58:5
  58:15,21 68:4,8
  68:13 72:9 73:22
  78:17,17 95:17
  96:10 100:17

110:4 111:8
  114:22 118:19
  124:22 127:11
  129:5 135:7,12
  137:12 145:9,22
  146:10 149:10,14
  157:8 158:16,21
  159:15 172:3
  173:14 179:20
  183:21,22 186:17
  190:3 196:22
  200:14 202:10
  204:18 205:7
  206:5 210:23
  211:18 212:4,11
  214:10 216:1
  228:12,14 240:4
  242:5 250:11
  253:17 263:3
  266:15 267:5
  271:21 272:23
  274:17 280:12,19
  283:1,11 285:7
  288:21 290:12
  294:1,1
**theirs** 172:20
**therapist** 17:23
**theres** 11:18 45:6
  86:5 102:13
  104:11,13,15,18
  121:20 127:10
  144:3,6 266:22
  274:6 279:8 280:9
**thereto** 3:6
**theyre** 105:8,9
  140:6 220:6 250:1
**thing** 139:20 140:3
  172:7 252:13
  258:11 271:1
**things** 11:6 25:10
  25:16 26:1,6
  73:21 74:14 84:6
  116:21 144:23
  237:1 240:1,2
  242:21 243:1
  275:7,8
**think** 10:18 38:7
  46:18 66:7 69:3

80:12,19 88:5
  89:11 91:22
  101:12 102:14
  105:8 110:4
  112:17 116:10
  124:9 138:17,18
  139:18,21 140:6,9
  140:12 141:15,21
  144:15,16 149:1,3
  149:7 154:19,20
  155:10 160:5
  181:17 186:16
  207:10 216:3
  220:6 224:4 226:5
  230:23 238:17
  245:15 250:3
  257:8 267:5 268:1
  288:21 294:3,5
**thinking** 89:13
**thinks** 242:4
**third** 23:22 127:15
  163:4
**thirty** 20:15 22:10
**thisten** 271:21
**thought** 89:15,19
  89:23 148:12,17
  149:11 150:2,8
  151:15 153:23
  155:1,13,17 156:1
  231:13
**thoughts** 80:19
  289:7
**thousand** 129:4
**threat** 207:20
**threatened** 258:2
**threatening** 241:1
**threats** 254:15,21
  255:3
**three** 13:4 14:3
  16:22 23:21 80:11
  81:3,13 135:5
  165:9,18 273:5
**threemonth** 69:5
**threw** 207:19
**throw** 37:11 241:14
**throwing** 269:16
**thrown** 275:11
**tickets** 50:19

**tie** 242:18
**tied** 94:13
**tiffany** 4:15 9:1
**till** 100:15
**tim** 182:21 183:1
**time** 3:4,5 10:16
  11:12,16 13:21
  22:2,22 33:9,14
  33:20 34:5,12
  38:16 39:7 44:7
  46:17,20 50:6
  56:5 58:22 60:14
  62:6 63:4 64:15
  65:15,21 69:3,3,6
  69:7,9,12,17
  70:14 75:2,13
  78:12 81:17 82:13
  82:14 88:22 93:13
  96:1 100:12,17
  102:11,16 109:19
  112:2,3,8,11,14
  115:9 119:15,19
  120:4,8 121:9,18
  122:2,6 123:2,23
  124:2,3 135:3
  136:12 137:21
  149:6,6 151:18
  153:6,8,13 154:4
  154:7,17,20 155:1
  156:23 157:4,11
  157:15,20 158:1,8
  159:2 162:1,11,19
  163:22,23 165:1
  166:9 167:2,9,17
  168:20 169:8,13
  169:14,21 170:17
  171:12 175:1,11
  178:5,7 184:20
  188:2,6 190:2
  203:18 206:1,6,14
  206:21 207:19
  209:21 211:9,20
  212:2 215:22
  216:12 217:3,5
  227:1 228:6 229:3
  232:11 235:1,11
  236:19 238:23
  240:5 243:5

244:18 245:20
246:17 252:5
255:4 261:14
266:8 270:19
271:1 273:18
275:4,15 279:2,4
280:9 281:8 284:4
285:13 296:13
**timely** 182:12,14,18
**times** 10:9 36:15
  43:19 50:2 111:1
  114:15 116:14
  152:4,11 156:14
  161:20 170:3
  175:13 204:9
  211:15
**tips** 185:5
**tipsoft** 185:4,16
  186:20,23 187:21
  258:13,23
**title** 66:5,8 92:4
  95:18 132:20
  231:11
**titled** 273:12
**titles** 27:14
**today** 11:3 12:10
  17:6 44:4 120:23
  128:23 129:13
  142:8,14 158:4,12
  169:23 170:6
  219:2 228:19
  229:23 267:9
**todays** 147:20
**told** 89:10,14 91:17
  91:21 141:11
  177:14 179:2
  184:16 248:10
  249:9 250:4 294:8
  294:11
**top** 24:23 36:18
  64:1 73:13 76:7
  115:10 120:12
  121:15 257:11,12
  262:1 282:17
**total** 47:21 76:4,5
  101:13
**totally** 240:10

243:23
**traffic** 50:10,13,15
  115:14,15,17,20
  144:3,11 145:12
  153:21,22 154:11
  154:18,21 155:2,5
  155:9
**tragic** 208:2
**train** 82:22 85:6
  92:14 93:18
**trained** 83:4 85:13
  86:7,20 92:13
  93:17
**training** 27:15
  83:11 85:6,8,17
  86:5,23 92:10,17
  93:3,4,7 98:14
  189:11,18 199:3,6
  255:9 256:21
  262:16 273:3
**transcript** 3:11
  10:6 296:7,11
**travis** 37:23 38:8
**treated** 17:15,18
  18:6 143:5 181:17
  184:6
**treating** 173:12
  180:18 181:1
  183:14
**treatment** 183:23
  184:4
**treats** 74:10,15
**trial** 3:4 38:19
**trick** 74:3
**troy** 235:5,6
**truck** 204:22
**trucking** 160:2
**true** 108:7 135:20
  136:3 187:9,13
  205:13 296:11
**truitt** 90:21
**trust** 107:4 110:7
  116:11
**truth** 208:14 209:5
  223:4
**try** 73:23 101:23
  148:5 248:17
**trying** 66:7 74:3,3

86:12 111:22
112:3 229:22
284:5
**tuesday** 253:23
**turn** 26:8 32:7
  58:15 126:11
  131:2 134:18
  198:3 263:2
**turned** 21:3 208:2
**turning** 173:2
  182:11,14,18
**turnover** 274:7
**tv** 98:22 99:19
**twenty** 20:13
**twentyfour** 272:1
**twentythree** 272:3
**twitter** 32:16 33:1
  33:7 34:1,4,8,10
  34:11 35:1
**two** 11:11 23:20
  45:7 69:5 75:20
  76:23 77:2 80:11
  81:3 91:22,23
  102:13,14,17
  129:4 200:4 211:8
  214:2 225:3,16
  227:8 228:3,5,9,9
  229:5,10 257:10
  261:7 264:11
  288:1
**twofold** 30:4
**type** 65:12 79:5
  119:7 167:4
  181:22
**typically** 62:14
**tywon** 90:21

---

**U**

**u** 2:1 54:3
**uhhuh** 11:5 121:11
  143:8 147:14
  170:9 175:9
  183:16 206:16
  212:17 213:5,10
  225:22 238:19
  243:3,14 257:6
  270:4
**uhhuhs** 11:8

**unable** 73:6 126:18
  131:11
**unbecoming**
  255:22
**undercover** 60:2,8
  61:12
**undermining**
  184:23
**understand** 10:4
  11:23 12:1,7,12
  40:15 128:12
  142:8 147:21
  170:6 212:15
  227:19 236:23
  238:23 239:2,13
  239:18 241:2
  268:2
**understanding**
  26:22 59:2 69:10
  182:13 196:23
  212:19 273:22
**undertones** 264:10
**unduly** 28:19
**unemployment**
  47:1,15,23 56:1,2
**unfairly** 181:18
**uniform** 115:1
**unintentional**
  204:22
**united** 1:1 63:7
  207:16 213:22
**universities** 101:23
**university** 51:8
**unpredictable**
  207:23
**unquestionable**
  208:19
**unsullied** 108:2,11
  109:10
**untimely** 134:3
**update** 203:20
**updated** 203:15,19
  246:3 277:11
**updates** 283:14
**uphold** 196:2 198:8
**upholding** 196:10
  196:10
**use** 102:22 109:17

117:9 207:21 264:10 282:21 289:2
**user** 218:6
**username** 282:19

**V**

**v** 1:11 39:14 280:20
**vacation** 119:9
**vague** 28:19
**validated** 171:23 172:10
**various** 61:18,22 73:11 252:14 255:12 284:1,20
**vehicle** 60:22 115:13,16,20 117:2,10 118:2 294:15,21
**verbal** 40:10 256:5 256:16
**verbally** 11:4
**verbatim** 189:7
**verify** 111:23
**versus** 124:3
**vest** 114:11
**veterans** 263:14
**video** 26:12
**videotapes** 27:22
**view** 118:19 237:14 240:11 245:3,16 245:22
**views** 195:5,10
**vigilantes** 205:22
**vii** 132:20 231:11
**vilifying** 208:16
**violated** 292:11 293:4,15
**violation** 100:13,14 131:12 231:11 261:22
**violations** 27:9 50:10,13,15 126:20 230:7
**violence** 16:9,10 258:2
**visibility** 95:15 99:11

**visible** 87:7 95:13 97:19,23 98:6 105:20 106:3,6 111:15
**visit** 76:9,17,22 77:9
**visits** 77:1
**voice** 23:10 234:17 235:1

**W**

**w** 2:8 4:5,7 8:8
**wages** 43:5
**wait** 197:16
**waived** 2:16
**waiving** 29:11
**walk** 74:8 177:19 178:14 275:16
**walked** 74:17,17 175:3
**walks** 177:20
**wall** 245:10,22
**want** 10:23 16:15 37:11 74:6 102:21 106:22 107:4,6 120:20 144:5 145:2 147:4,11,15 159:22 193:3 213:12 218:7 234:7 236:19,21 236:22 237:4,15 238:3,17 239:12 239:17 240:12,21 240:21 265:4 293:1
**wanted** 89:3 93:2 95:14,15 107:9 112:1 177:23 178:1 238:9 240:4
**wants** 146:1,4 223:8 227:16 271:7 277:18
**war** 264:23
**warning** 198:11 261:22
**wasnt** 40:18 48:20 72:12 80:16 81:5 93:1,4 95:3

106:13,14,17 117:5,14 150:11 172:4,7,8 181:19 181:19 196:19 209:11 290:4
**watch** 81:10,14,21 82:3,8,16,17,19 82:22 83:5 84:5,7 84:13,14,15,22 85:3,7 86:14 87:17 88:9 89:4 95:4,12 97:21 98:1,10,15 105:18 105:23 112:9,12 163:6,18 164:2,15 164:20,22 165:5 165:10
**water** 205:1
**way** 25:11,17 26:2 35:12 46:8,13 53:8 54:12 90:17 96:16 108:12 109:20 116:15 118:21 138:23 176:12 187:17 190:18 191:1 210:18 229:15 231:15 232:8 236:16 240:18 241:2 242:13,15 245:12 247:12 274:21 290:19 292:15
**ways** 49:14 174:2 246:18 250:2
**weapon** 211:7
**wear** 79:8
**webbased** 185:4
**wed** 183:19
**week** 76:8 77:15
**weeks** 65:3
**welcome** 243:7
**went** 62:16 194:11
**weve** 86:7 135:5 239:18 240:14 253:2 269:3
**whats** 14:12 50:22 51:3 64:4 77:11

120:5 159:17 245:17 276:9 277:4 278:14 281:21 284:23
**wheres** 287:16
**white** 147:3 166:1,6 166:11,16,21 168:4,12,17 169:4 169:11 170:11,19 170:21 171:10,14 172:16 173:1,7 174:4,7 183:2 184:18 185:2,10 185:14 187:7,10 187:15,19 191:7 195:6,15
**whos** 22:4 169:20
**williams** 56:17
**willing** 241:14
**wiregrass** 259:8
**wiregrassline** 217:14,15 218:4 219:2,13 220:11 220:18 239:3,4,6 244:12
**witness** 2:15 8:12 38:2 57:23 58:12 58:23 63:21 68:1 68:6 71:18 102:22 114:14 122:13,20 125:23 126:15 128:11 130:23 143:3,8,10,15 146:13,16 160:14 176:11 181:5 185:22 200:3 204:16 212:17,20 213:10 214:7 215:19 219:9,19 220:3 221:2,16,18 222:13 224:9,23 225:22 226:6,13 226:15,19 227:19 253:9 254:19 258:17 263:6 265:9 269:23 270:4 271:3,16 279:3 282:10

286:6,21 292:21 293:17
**witnessed** 177:16
**witnesses** 32:6
**witnessing** 114:8
**wont** 198:21 236:18 258:10
**woodside** 211:19 211:22 213:14,20 215:7 265:7 267:16,22
**word** 143:7 201:20 202:3 231:6
**words** 142:23 264:5 264:7,11 280:9
**work** 9:10,12,13 27:10 39:8 52:1,8 52:11,17 59:19,22 62:10,15 64:12 83:17,19 84:20 95:11,15,16 98:3 105:14 113:5 116:22 130:16 227:10 228:12,21 229:12,17 231:17 232:9,16 233:3,5 233:10 246:15,20 248:20
**worked** 60:2,18 61:9,12,17 66:6 85:7 104:4
**working** 52:2,9,12 52:18,19 57:7 59:9,21,23 60:7 60:14 66:3 77:12 105:11 112:9 169:22 188:5 199:1 247:21 262:15 279:22
**workproduct** 28:15
**world** 239:10 244:16
**worse** 182:2 208:16
**wouldnt** 77:21 96:19 228:15
**write** 64:8 227:7
**writing** 177:11,13 223:12

**written** 64:4 100:13
100:18 198:11,19
222:9 256:6,15
261:22
**wrong** 32:1 118:11
139:22 188:11
189:15,18
**wrote** 190:3 214:1
222:16 225:20,23

---

**X**

**x** 5:1,9

---

**Y**

**yahoo** 32:17 33:2,8
34:15,17,19 35:2
**yall** 102:20,20
129:15 235:1
239:15 276:18
279:7 287:18
**yeah** 25:3 71:20
174:20 221:14
**year** 15:12 48:5,6
67:6 149:13,15
151:21 154:23
168:23 169:2
188:18 191:17
**yearly** 180:3,4
**years** 14:3,19 17:20
18:8 20:21,22
80:11 81:3 112:15
124:1 167:21
241:15
**youd** 267:6
**youll** 26:8 68:3
126:11 127:9
132:1 134:18
135:13 198:3,13
262:18 273:14
274:2 282:17
**youre** 9:21 12:7
53:13,16 62:12
77:4 78:5,8,11
79:5,6 106:2
109:14 111:10
112:19,20,23
113:4,5,6 114:4,6
116:2,2,4,5,7,8

129:10 144:15,20
145:2,3 146:3,6
147:11 190:10
200:7 206:8 209:7
212:22 228:8,13
228:18 232:21
233:14 235:11
236:23 237:8
238:4,14,15,16
240:8,8,17 242:19
243:6 266:5
275:21 276:2
280:22
**youve** 30:3 36:22
37:20 47:20
118:16 179:18
222:9 227:17
261:21 290:7

---

**Z**

**zip** 16:15

---

**0**

**00** 8:10 235:4
**000007** 58:9
**05** 174:12 228:1

---

**1**

**1** 1:6 5:12 23:17
24:4 276:12
280:20
**10** 5:23 6:22 199:20
200:1 210:17
**10041** 7:3
**10050** 7:5
**10052** 6:21
**1011** 221:12
**1012** 221:12
**11** 6:1 58:16 202:17
202:21 265:3
276:14 296:23
**11508** 16:14
**11th** 68:23
**12** 6:2 58:21 64:4
217:9,16 220:2
221:10,22 254:1
**121** 2:9 4:8 8:8
**125** 5:18

**13** 6:3,4,5,6,7,8,9
6:10,11 17:4
198:11 222:7,11
262:3
**130** 5:19
**1301** 5:22 197:17
197:22
**1310** 197:11,20
**134** 5:20
**13th** 204:19 205:8
206:3 207:4,9
208:9,22 210:5,10
210:14,17
**14** 6:4 223:17,23
**14cv00392wc** 1:6
**14th** 201:1 202:7
234:2 235:20
259:12
**15** 6:4,5,5 32:7
224:15,21 296:21
**155** 198:17
**157200** 1:23 4:23
**15th** 215:18 223:19
224:17
**16** 6:6 250:18,20
**17** 6:7 252:11,18
296:23
**18** 6:6,8 253:3,7
**18th** 251:20,23
**19** 6:8,9 31:17,18
32:2,6 207:4,10
253:23 255:7,14
**1901** 4:18
**1964** 231:12
**197** 5:22
**1995** 227:11
**1996** 44:11
**1999** 21:2,16 22:12
22:17 44:12 57:14
59:9 60:1,13 62:9
149:9,13 227:23
**19th** 134:13,22
253:11
**1st** 126:14 127:3

---

**2**

**2** 5:14 6:4,5,6,7,8
6:11 25:9 43:12

43:16 126:11
296:23
**20** 6:9,10,10 24:21
25:4 64:13 256:19
257:2 260:7
**200** 5:23
**2000** 45:1
**2001** 45:1
**2002** 14:16 51:20
**2004** 60:13 61:7
62:9,23 64:12,13
64:20 66:2,19
69:21 70:5 289:14
290:8
**2005** 68:21,23
69:16 70:15,19
151:22 154:22
168:22 180:10
227:12
**2006** 124:14,20
125:11 128:10
129:2
**2007** 126:14 127:3
176:6 273:10
**2008** 38:16
**2009** 130:5 133:18
273:3,11 274:5
**2010** 51:23 131:5
281:23 282:4,23
**2011** 81:23 103:22
104:6,7,8 112:17
**2012** 94:3 97:10,14
100:15 188:20
273:12
**2013** 47:2 100:16
112:17 134:14
149:9,13 154:22
168:22 174:12
176:7 188:20
189:2 197:13
198:1,15,19
199:21 200:11
201:17 204:19
205:8 206:3 207:4
207:10 208:9,22
210:5,14,17
215:14,19 216:10
216:16,23 223:20

224:17 230:20
234:2 244:20
246:1 251:20,23
253:11,23 256:20
257:15 260:13
265:13 280:13
**2014** 1:19 2:11 3:12
8:11 39:18 134:22
201:2 202:7
203:10,14
**202** 6:1
**20th** 201:17 255:8
256:20 260:12
**21** 6:7,11 17:3
64:12 257:9,16
258:15
**217** 6:2
**21st** 66:18 252:14
**22** 6:12 17:2 26:9
261:4,10
**222** 6:3
**223** 6:4
**224** 6:5
**22nd** 48:4 203:10
203:14,17
**23** 6:14,22 269:4,8
271:22
**23rd** 281:23 282:23
**24** 5:12 6:15 272:6
272:14
**2400** 4:17
**25** 6:16 276:10,15
277:12
**250** 6:6
**252** 6:7
**253** 6:8
**255** 6:9
**256** 6:10
**257** 6:11
**26** 6:11,18 257:1
277:5,6,15,17,21
**261** 6:12
**269** 6:14
**26th** 257:15 259:4
259:15
**27** 6:20 278:14,18
281:16 284:16,20
**272** 6:15

**276** 6:16
**277** 6:18
**278** 6:20
**28** 6:22 281:22
  282:5 283:1
**282** 6:22
**283** 6:23
**285** 7:2,4,6
**28th** 198:15,19
**29** 6:23 282:16
  283:2,4 284:14,19
**292** 7:7
**2nd** 273:10

---

**3**

**3** 5:15 6:9,10 57:12
  57:15 234:10,12
**30** 2:12 7:2 208:9
  208:22 211:10
  235:4 285:1,4
  296:21
**31** 7:4 285:15,18
**32** 7:6 285:22,23
**33** 7:7 200:13 292:3
  292:7
**342** 198:11 262:1,3
**35203** 4:19
**35242** 4:9
**38** 234:3

---

**4**

**4** 5:16 63:17,19
**40229** 16:18
**41** 205:9 206:3
**418** 296:21
**43** 5:14
**45** 295:12
**47** 210:14 234:12

---

**5**

**5** 3:7 5:17 67:19,22
  276:13
**50** 234:10
**54** 254:1
**55** 206:5
**57** 5:15
**58** 204:18
**589** 253:17

**59** 205:7,8 210:17
  211:2
**5th** 215:14,19
  216:10,16,23
  265:12 273:11

---

**6**

**6** 5:18 6:22 125:9
  125:13 129:6,7
  135:6 136:6,15
  199:21 200:11
  207:4 295:12
**624** 221:19
**625** 221:19
**626** 221:19
**63** 5:16
**65** 207:9
**67** 5:17
**674** 261:6,7
**675** 261:7
**676** 262:6
**678** 263:3
**685** 263:9

---

**7**

**7** 5:19 130:2,6
  135:6 136:7,15
  205:9 206:3,5
  276:13
**70** 192:11,14,19
**71** 68:4
**719** 131:3
**726** 280:12
**729** 273:6,9
**730** 273:10
**731** 273:6,11
**75** 68:9
**76** 68:13
**766** 221:13
**767** 221:13
**768** 221:13
**770** 221:17
**771** 221:15
**773** 221:17
**774** 221:17
**784** 220:8
**785** 217:13 218:14
  218:16 219:5,5,23

  220:4,9
**786** 220:4
**787** 220:4
**79** 274:3
**795** 219:6
**7th** 131:5

---

**8**

**8** 1:19 5:4,20
  134:10,15 135:6
  135:14 136:15
  142:22 207:10
  235:4
**80** 68:13 192:19
**80s** 13:22 191:6
  192:15 194:20,21
**81** 211:19 212:5
  213:19 265:5
  266:20 268:6
**82** 213:18
**83** 216:1
**84** 216:21
**85** 266:20
**87** 216:21 265:5
  268:6
**8th** 2:10 3:12 8:11
  251:22 273:12

---

**9**

**9** 2:12 5:21 8:10
  197:10,14 208:9
  208:22 210:14
  234:3 235:4
  276:13 296:21
**90** 127:17 132:13
**90s** 13:22 48:14
**91** 13:23
**96** 272:8
**97** 272:18
**970** 221:19
**99** 57:10

Page 296

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION
CIVIL ACTION NUMBER
1:14-CV-00392-MHT-SRW

RAEMONICA CARNEY,
            PLAINTIFF,
VS.
CITY OF DOTHAN,
            DEFENDANT.

VOLUME TWO
CONTINUATION OF THE DEPOSITION OF
RAEMONICA CARNEY CLOYD
FRIDAY, MAY 1, 2015

Page 297

1       S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and between
3   the parties through their respective counsel,
4   that the continuation of the deposition of
5   RAEMONICA CARNEY CLOYD, may be taken before Donna
6   Winters, Commissioner and Notary Public, State of
7   Alabama at Large, at the law offices of Maynard,
8   Cooper & Gale, 2400 Regions/Harbert Plaza, 1901
9   Sixth Avenue North, Birmingham, Alabama 35203, on
10  the 1st day of May, 2015 commencing at 9:40 a.m.
11  CONTINUATION OF THE DEPOSITION OF: RAEMONICA
12  CARNEY CLOYD
13
14
15
16
17
18
19
20
21
22
23

Page 298

1       IT IS FURTHER STIPULATED AND AGREED that
2   the signature to and the reading of the
3   deposition by the witness is waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws and
6   rules of Court relating to the taking of
7   depositions.
8       IT IS FURTHER STIPULATED AND AGREED that it
9   shall not be necessary for any objections to be
10  made by counsel as to any questions, except as to
11  form or leading questions, and that counsel for
12  the parties may make objections and assign
13  grounds at the time of the trial, or at the time
14  said deposition is offered in evidence or prior
15  thereto.
16      IT IS FURTHER STIPULATED AND AGREED that
17  notice of filing of this deposition by the
18  Commissioner is waived.
19      In accordance with Rule 5(d) of Alabama Rules
20  of Civil Procedure, as amended, effective May 15,
21  1988, I, Donna Winters, am hereby delivering to
22  Stephanie H. Mays, Esquire, the original
23  transcript of the oral testimony taken on the 1st

Page 299

1   day of May, 2015, along with exhibits.
2       Please be advised that this is the same and
3   not retained by the Court Reporter, nor filed
4   with the Court.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1 (Pages 296 to 299)

E X H I B I T S

EXHIBIT PG DESCRIPTION
DX-34 333 Photograph
DX-35 352 RaeMonica Carney's Audio Transcription
12/09/2013
DX-36 372 3-4-13 Letter
DX-37 376 Dothan Police Department Internal
Affairs Division Garrity Notice
DX-38 378 12-9-13 Memorandum
DX-39 380 Notice of Determination Hearing and
Possible Disciplinary Action
DX-40 381 Sworn Statement of RaeMonica Carney
DX-41 382 Decision of Determination Hearing
DX-42 383 Termination Appeal of Corporal
RaeMonica Carney, Police Department
DX-43 389 Defendant's Second Interrogatories to
Plaintiff
DX-44 415 Order
DX-45 462 11-30-12 e-mail re: Crime Stoppers

I N D E X

EXAMINATION BY: PAGE NUMBER
Ms. Mays        302 - 484

A P P E A R A N C E S:

MAYNARD, COOPER & GALE, by Ms. Stephanie H.
Mays and Ms. Tiffany P. Rainbolt, 2400
Regions/Harbert Plaza, 1901 Sixth Avenue North,
Birmingham, Alabama 35203, appearing for the
Defendant.

I, Donna Winters, a Court Reporter of
Birmingham, Alabama, acting as Commissioner, and
a Notary Public for the State of Alabama at
Large, certify that on this date, as provided by
Rule 30 of the Alabama Rules of Civil Procedure,
and the foregoing stipulation of counsel, there
came before me, RAEMONICA CARNEY CLOYD, witness
in the above cause, for oral examination,
whereupon the following proceedings were had:

RAEMONICA CARNEY CLOYD,
having been first duly sworn, was examined
and testified as follows:

CONTINUED EXAMINATION BY MS. MAYS:
Q.   Ms. Cloyd, my name is Stephanie Mays.  We
are here to continue your deposition.  I know
that during the first part of your deposition you
had an audio recorder on.  Are you
audio-recording this part of your deposition as
well?
A.   Yes, I would like to.
Q.   That's fine.  I just want for the record to
note that Donna, our court reporter here, is
taking the official record.
A.   Yes.
Q.   I'll remind you of the rules that we talked
about last time.  I'll ask that you verbally
answer me and that you don't answer with "uh-huh"
or "huh-uh," that you answer out loud to the
questions I ask.  I'll ask that we don't
interrupt or talk over each other because that's
hard for Donna to take down.  If at any time you

need to take a break, let me know and we'll take
one.  I will ask that if I have a question
pending that you answer that question before we
take a break.  If you don't understand a
question, I'll ask that you let me know that.  If
you answer it, I'll assume that you understand.
Are you okay with those rules?
A.   Yes.
Q.   And you understand that you're testifying
under oath today; is that right?
A.   Yes.
Q.   Is there any reason why you can't testify
fully and accurately?
A.   No.
Q.   Have you spoken with anybody about your
deposition?
A.   No.
Q.   Are you currently employed?
A.   Yes.
Q.   And who are you currently employed with?
A.   The U.S. Army.
Q.   Anyone else?
A.   No.

1    Q.    What is the highest rank that you achieved
2    when you were employed at the Dothan Police
3    Department?
4    A.    Police corporal.
5    Q.    And am I right that a lieutenant is a
6    higher rank than a corporal?
7    A.    Yes.
8    Q.    And that a sergeant is also a higher rank
9    than a corporal?
10   A.    Yes.
11   Q.    And so is major?
12   A.    Yes.
13   Q.    If a higher ranking officer gives you a
14   lawful order, generally speaking, are you
15   expected to follow that order?
16   A.    Yes.
17   Q.    Am I right that your patrol car, when you
18   worked for the City of Dothan, was the property
19   of the City of Dothan?
20   A.    Yes.
21   Q.    And that you couldn't use that patrol car
22   for any purpose that you wanted to; is that
23   right?

1    A.    No.
2    Q.    Okay.  My question is, could you use the
3    City of Dothan's police patrol car for any reason
4    that you wanted to?
5    A.    That is not a "yes" or "no" response.  You
6    would have to get -- you could use the vehicle,
7    but you had to get permission if you were --
8    there are certain circumstances where you may
9    have had to get permission to use the vehicle for
10   personal use.
11   Q.    And what are those circumstances where you
12   would have to get permission to use the vehicle
13   for personal use?
14   A.    If you were transporting a family member or
15   person outside of the police department in the
16   vehicle, you would have to obtain permission to
17   do so.  However, there were some officers who do
18   not have personal vehicles, who utilized their
19   patrol vehicle as their personal vehicle; but
20   again, that was something that went through their
21   chain of command.
22   Q.    So the officers who used their patrol
23   vehicle as a personal vehicle had permission

1    through their chain of command to do that?
2    A.    Correct.
3    Q.    Are there any other instances where you
4    would have to get permission to use the patrol
5    vehicle for personal use?
6    A.    I mean, right offhand, I can't just name
7    off, you know, many different things that you
8    would get permission for; but generally, if it
9    was while you're on duty, you would get
10   permission to do something as far as putting
11   someone in the vehicle to transport them.  Even
12   while on duty you could handle personal matters,
13   so you use the vehicle, you know, during the
14   course of your schedule; but that doesn't
15   necessarily mean you couldn't handle personal
16   business while in that vehicle.
17   Q.    What was the reason that the City provided
18   for your termination?
19   A.    That, I would have to read off the document
20   that the City completed as far as describing what
21   reasons they gave for my termination.  I can't
22   just tell you right offhand.
23   Q.    Just from your recollection, you don't

1    recall.  Can you tell me what you recall about
2    the reason that they told you that you were
3    terminated?
4    A.    Well, it was in conjunction with this being
5    a second incident while I was under a major
6    violation, and it was in reference to -- I didn't
7    bring my paperwork in.  Gross insubordination.
8    Q.    Are you looking at something on your
9    personal laptop?
10   A.    Yes, I am.
11   Q.    What are you looking at?
12   A.    The decision of the determination hearing.
13   Q.    How do you define gross insubordination?
14   A.    I would define gross insubordination as
15   being something so egregious, an act so egregious
16   to the point that it would be -- would rise to a
17   terminable offense.
18   Q.    Are you reading from something on your
19   laptop?
20   A.    No.
21   Q.    You mentioned that your termination was
22   related to you being previously disciplined for a
23   major violation.  Was that major violation

1    related to the Facebook incident that we talked
2    about during your first deposition?
3    A.   Yes.
4    Q.   And the second incident, what did that
5    second incident involve?
6    A.   It involved a supervisor requesting for me
7    to hand over the keys to my patrol vehicle while
8    I was in an off-duty status at my personal
9    residence during a domestic incident.
10   Q.   Who was that supervisor?
11   A.   Lieutenant Long.
12   Q.   What is Lieutenant Long's first name?
13   A.   Scott.
14   Q.   And during that incident, did Lieutenant
15   Scott Long, in fact, request that you hand over
16   your keys to the patrol vehicle?
17   A.   Yes, he did.
18   Q.   And did you refuse to hand over the keys?
19   A.   No, I did not.
20   Q.   Did he ask you multiple times to hand over
21   the keys to the patrol vehicle?
22   A.   Yes, he did.
23   Q.   So you did not hand over the keys to him

1    the first time that he asked for them?
2    A.   I couldn't hand over the keys to him.  They
3    were inside the vehicle.
4    Q.   And tell me how that prevented you from
5    handing over the keys to him.
6    A.   I didn't have the keys in my hand, so I
7    couldn't hand him something that wasn't in my
8    possession.
9    Q.   And did you explain to him at that time
10   that you didn't have the keys in your hand?
11   A.   No.  I turned to go in the vehicle to get
12   the keys out of it.
13   Q.   How did it happen that he requested that
14   you give him the keys multiple times?
15   A.   That's a question you would have to ask
16   him.
17   Q.   How many times did he ask you to hand him
18   the keys?
19   A.   I don't recall exactly how many.
20   Q.   But more than once?  Are you looking for a
21   particular document?
22   A.   I'm looking to see how many times
23   Lieutenant Long asked me to give him the set of

1    keys.
2    Q.   And what are you looking at to determine
3    how many times he asked you to give him the keys?
4    What document are you reviewing to help you
5    determine how many times Lieutenant Long
6    requested that you hand over your keys?  Ms.
7    Cloyd, can you hear my question?
8    A.   Yes, I can.
9    Q.   What document are you reviewing?
10   A.   I'm reviewing the transcript of the audio
11   recording that I made the night that the domestic
12   incident occurred at my residence while I was off
13   duty.
14   Q.   And can I see that audio recording, the
15   transcript of the audio recording that you're
16   viewing?
17   A.   Can you see it?
18   Q.   Yes.
19   A.   You mean physically right this moment?
20   Q.   Yes.
21   A.   Yes (witness indicating).
22   Q.   Is that an audio recording that has been
23   produced in this case?

1    A.   Yes, I believe it has been.
2    Q.   Has the transcript that you made of that
3    audio recording been produced in this case?
4    A.   That, I'm not sure of.  I provided it to my
5    attorney, Sonya Edwards.
6    Q.   You are no longer represented by
7    Ms. Edwards; is that right?
8    A.   That's correct.
9    Q.   How much more of the transcript -- let me
10   ask this question.  How many pages is the
11   transcript?
12   A.   It is a total of 21 pages.
13   Q.   And you have been reviewing it for quite
14   some time now.  Is there -- do you want to go off
15   the record so you can have time to complete
16   reviewing it?
17   A.   If I may.
18        MS. MAYS:  Let's go off the record.
19        (Off-the-record.)
20   A.   Okay, I'm ready.
21   Q.   How many times did Lieutenant Long ask you
22   to hand over the keys to the patrol car?
23   A.   A total of eight times.

1    Q.   And that total of eight times is based on a
2    transcript of an audio recording that you made on
3    the night of that incident; is that correct?
4    A.   Yes.
5    Q.   I'm going to ask that you provide us with a
6    copy of that transcript.
7    A.   No problem.
8    Q.   I would also ask that you provide us with a
9    copy of that audio recording to the extent it
10   hasn't already been produced.
11   A.   Okay.  Are you saying that you don't have a
12   copy of this recording?
13   Q.   I'm not sure.  But to the extent that we
14   don't, I want to confirm and make sure that we
15   get one before we leave here today.
16   A.   Okay.  Because this is a recording that my
17   counsel had; so if it was not turned over to you,
18   it wasn't due to me not providing it.  It may
19   have just been something that she forgot she had
20   and didn't turn over, so I have no problem with
21   providing a copy to you.
22   Q.   In or around December of 2013, were you
23   engaged to your now husband, Kenneth Cloud?

1    A.   Yes.  It's Cloyd.
2    Q.   For the record, it's Cloyd, right?
3    A.   Correct.
4    Q.   And it's C-L-O-Y-D.
5    A.   Can I ask a question?  I'm not sure if we
6    need to be on record or off the record.
7    Regarding the time frame for this deposition, how
8    many hours does it sit for?
9    Q.   We are on the record for six hours.
10   A.   Okay.  And were the recordings -- excuse
11   me, the deposition, is it in reference to the
12   recordings?  Was it specified specifically to
13   address the recordings that you all requested of
14   the Court from me?
15   Q.   So the Court entered an order allowing the
16   defendant six additional hours to complete your
17   deposition; and during that six hours, we can
18   complete your deposition, and we can ask you
19   about the audio recordings.
20   A.   Okay.
21   Q.   In December of 2013, was your fiance --
22   A.   Wait just one moment.  I want to make sure
23   that -- my understanding was that it was to

1    question me in regards to the recordings and the
2    social media posts, the posts that were made
3    during the last deposition.  Am I incorrect in
4    that?
5    Q.   Yes.
6    A.   So you're saying that it was in reference
7    to --
8    Q.   The Court entered an order allowing us six
9    additional hours to complete your deposition; and
10   during that time, we can complete your
11   deposition, and in addition we can ask about the
12   documents and information that we received as a
13   result of the Motion to Compel.
14   A.   I'm sorry I didn't ask that beforehand.  I
15   meant to.
16   Q.   December 2013, was your fiance visiting
17   from out of town?
18   A.   Yes.
19   Q.   And had he been staying at your house
20   during that visit?
21   A.   Yes.
22   Q.   On the night of December 8th, going into
23   the early morning hours of December 9th, did you

1    take your fiance to the emergency room?
2    A.   Yes.
3    Q.   Tell me about that night, beginning from
4    the time you drove him to the emergency room to
5    the point where you left the emergency room.
6    A.   What do you mean, tell you about the night?
7    Q.   Tell me what transpired that night.
8    A.   From the moment I transported him to the
9    emergency room?
10   Q.   Yes.
11   A.   Well, I transported him to the emergency
12   room to receive medical treatment for, I think it
13   was determined to be the flu or something of that
14   nature; and during his wait to be seen by a
15   physician at the ER, I requested to use his cell
16   phone because my cell phone battery was dying or
17   had died, and I didn't have a charger to recharge
18   my phone to continue to use it.  While using his
19   phone, with his permission, I was researching the
20   strains of the flu that the, I guess, nurse or
21   one of the attendants that came in to treat him
22   had advised they would be testing him for.  And
23   during the time that I was researching on the

1      Internet the three strains of the flu, there was
2      a message that came through his phone from a
3      social media app called Tagged, which is a
4      networking, social networking or dating, however
5      you wish to associate it.  He received a message
6      from a female or the name Sherry.  And when I saw
7      the message, I asked him to explain the message
8      from what appeared to be a female by the name of
9      Sherry messaging him the comment "Hey Boo."  And
10     Kenneth immediately got upset and sat up from the
11     table that he was laying on and began to use
12     profane language towards me in a loud voice; and
13     at that time when he responded in that manner, I
14     asked him to calm down, to have a seat back on
15     the table he was sitting on, the bed, rather, he
16     was sitting on, due to the fact that there were
17     two other patients, one on each side of him -- he
18     was in the middle, but we were separated by
19     curtains -- so that it wouldn't draw any
20     unnecessary attention to he and I in his -- with
21     his loud response and profane use of language
22     towards me.  My request of him to calm down and
23     continue to be treated initially went ignored.

1      He didn't want to calm down, if you want to say,
2      and he continued with his aggressive behavior,
3      standing directly in front of me literally
4      nose-to-nose, and I again just tried to get him
5      to calm down.  Not getting upset or angry with
6      his response, I just maintained a calm demeanor
7      and eventually convinced him to remain there at
8      the hospital so that he could be treated due to
9      his illness, and the fact that it was progressing
10     so quickly.  So he sat back down on the table.  I
11     advised him we could continue our conversation
12     after he was treated and we left the emergency
13     room.  So he went on, he was treated.  When the
14     physician came in to see him, I exited the room
15     and allowed the physician and he to discuss his
16     illness.  So I went and sat and waited in my
17     vehicle until he came out and then joined me in
18     my vehicle in the parking lot.
19     Q.    Is Tagged commonly known as a dating
20     website?
21     A.    I guess that depends on who you ask.
22     Q.    Would you consider it a dating website?
23     A.    Social networking/dating/people meeting

1      people.
2      Q.    The message that was received from Sherry,
3      was that an e-mail or a text message?
4      A.    It was a message sent through the Tagged
5      page, and it came through his phone as an alert
6      on his phone.  So when the message -- if he was
7      signed in to that application, when the message
8      came through, you could see the message as it
9      came through.  I can't say it was a text message,
10     but more of an alert that, "Hey, you just got
11     this message from this person" type of deal.
12     Q.    So is it similar to Facebook, when you've
13     got a Facebook message and you've got the
14     Facebook application downloaded on your phone, it
15     will show you you've got a message on Facebook,
16     and you can click on it and see what that message
17     is?
18     A.    Actually, it shows you the message from the
19     person, so it's not like an indicator that you
20     have mail waiting.  It shows you what the message
21     is when you have the application open and you're
22     actively signed in to it.  You can be signed out
23     of Facebook or this application and just get a

1      notice with a number, you know, for however many
2      messages you've received when you're not signed
3      in to it.  But this time he was signed in to it,
4      so whoever sent him a message, it would show that
5      actual message from whomever it was being sent
6      from.
7      Q.    You said that while you were at the
8      emergency room, Mr. Cloyd used profane language.
9      What specifically did he say?  Are you looking at
10     something in particular on your laptop?
11     A.    I was trying to see if I could locate the
12     statement that I wrote, and if it was actually
13     detailed in my written account of what occurred
14     that evening.
15     Q.    What statement did you write regarding that
16     evening?
17     A.    It was just basically a detailed statement
18     of what occurred either prior to or during the
19     incident once the police arrived at the house.
20     I'm not certain if I actually wrote a statement
21     that detailed that or if I only wrote what
22     occurred.
23     Q.    Is that a statement that you provided to

Page 320

1  someone at the City of Dothan?
2  A.   That's what I'm trying to see.
3       MS. MAYS:  Let's go off the record while
4  she's looking for the document.
5       (Off-the-record.)
6  A.   Right now I'm not finding a document that
7  details that specific part of our conversation,
8  but I will make a note to research and see if I
9  have written it somewhere and provide you with a
10 copy of that, aside from the interview that took
11 place with the investigators after the fact,
12 during the time that they were making a decision
13 as to whether or not I had violated any of the
14 policies.  I think that would have been the only
15 other time where there was conversation where I
16 would have gone through the steps or events that
17 led up to my termination and that investigation
18 of my termination.
19 Q.   What is your recollection, as you sit here
20 today, of the language that Mr. Cloyd used?
21 A.   Initially his response, as I recall, he
22 jumped up from the table and said, "I knew you
23 were going to do that S-H-I-T," and then he began

Page 321

1  to say "F this, I'm leaving, give me my phone
2  back."  And I was like, "What are you talking
3  about?" in my response to him.  And his response
4  was, "I knew you were going to do that F-ing shit
5  again"; and, again, I attempted to calm him down
6  and diffuse the matter by saying, "Everything is
7  fine.  You know, it's something we can talk about
8  later.  You don't need to leave.  Just have a
9  seat."  And, again, he finally sat down and
10 waited for treatment.
11 Q.   Did you use any curse words or profane
12 language during your interactions with him that
13 night?
14 A.   That night?
15 Q.   Well, during this exchange while you were
16 at the hospital.
17 A.   No, not during that exchange.
18 Q.   He did receive treatment?
19 A.   Yes, he did.
20 Q.   And after he had received treatment and was
21 released, you both got back into your car; is
22 that right?
23 A.   That's correct.

Page 322

1  Q.   And you were driving and he was in the
2  passenger's seat?
3  A.   Yes.
4  Q.   At some point before you got back, the two
5  of you got back to your house, you made Mr. Cloyd
6  get out of the car.  Is that right?
7  A.   You say at some point?  Yes.
8  Q.   How far were you from your home when he got
9  out of the car, or when you made him get out of
10 the car?
11 A.   When I asked him to get out, approximately
12 two miles.
13 Q.   And did you ask him to get out of the car
14 at a particular location?
15 A.   Yes.
16 Q.   Where was that?
17 A.   In the parking lot of Northview Christian
18 Church.
19 Q.   Tell me what happened after you asked him
20 to get out of your car at the parking lot of the
21 church.
22 A.   He didn't do anything when I asked him the
23 first time.  He just sat in the car and looked at

Page 323

1  me.
2  Q.   And then after he sat in the car and looked
3  at you, what happened?
4  A.   He eventually started talking and, as I saw
5  it, his way of trying to justify or give reasons
6  to maintain keeping contact with his female
7  friends on that social site or other social
8  sites.  So I advised him that from my
9  perspective, if you've asked me to marry you and
10 I have accepted your proposal, then that means to
11 me that you are no longer interested in dating
12 other people, and I in turn am saying the same to
13 you, that I am no longer interested in dating
14 other people or maintaining relationships that
15 would lead to, say, a sexual encounter or dating
16 relationship with other persons, and I would, you
17 know, of course, focus my attention to him only,
18 and I expected the same of him.  And I asked him
19 specifically what he was going to do in terms of
20 either maintaining those relationships or
21 eliminating those relationships for the benefit
22 of being in an engagement to me, with the
23 expectation of marriage.  And his response was he

Page 324

1    was not going to get rid of his friends, and I
2    told him that was not acceptable to me.  And I
3    asked him specifically, "I want to understand
4    your position," is what I asked him.  "So are you
5    telling me that because you want to maintain
6    these relationships, that you don't want to be in
7    a relationship with me?"  And he said, "No."  And
8    I said, "Let me understand you clearly.  So
9    you're saying you don't want to be engaged to
10   me?"  He said, "No."  And I said, "You don't want
11   to marry me?"  He said, "No."  I said, "I need
12   you to get out of my car."  Again, he sat there
13   for a second or two and then reached to grab his
14   seat belt to release the seat belt, so I thought
15   that he -- he did release the seat belt but
16   continued to sit in the car; so by him not
17   exiting the vehicle, I again reiterated or
18   stated, at least at this particular time, because
19   that was twice I had asked him to exit my
20   vehicle.  The third time I stated to him that I
21   would contact the police department if he was not
22   going to get out of my vehicle; and when I stated
23   that, that's when he actually got out of the

Page 325

1    vehicle.
2    Q.   And after he got out of the vehicle, what
3    did you do?
4    A.   He began to walk off, and I started my car
5    up and proceeded to drive past him.
6    Q.   And did you, in fact, drive past him to
7    your house?
8    A.   I started -- he walked off and I kind of
9    sat in the parking lot for a moment; and he was
10   still in the parking lot, he had not exited the
11   parking lot from where we were parked.  So he
12   walked away from the car, you know, a good
13   distance, and then I pulled up with the passenger
14   window down and advised him to please not come
15   back to my house.  And I said, "As far as your
16   vehicle and your things," I said, "I will call a
17   wrecker to come get your vehicle, and I will
18   bring you your things to the parking lot of the
19   church," if that's where he was, or wherever he
20   might have been.  I don't know, wherever he
21   decided to walk to or what have you.
22   Q.   Is it fair to say at this point after he
23   had gotten the Tagged message, he said he didn't

Page 326

1    want to be engaged, didn't want to be married,
2    that you were very upset with him?
3    A.   Yes, I was.
4    Q.   So after you told him that you would bring
5    him his things and you would have a tow company
6    to tow his vehicle somewhere, what did you do?
7    A.   I drove off.  I drove off, and instead of
8    going directly to my home, I went to my mother's
9    home which was, say, approximately three blocks
10   from the church -- she lives in the general
11   vicinity of Northview Christian Church -- and sat
12   in her yard thinking about what all was said
13   between he and I, giving myself some time to
14   reflect on what was stated between, you know, him
15   and myself while we were discussing the matter.
16   And I was trying to see, too, if he -- he had my
17   mother's phone number, so I wanted to see if he
18   was going to try to contact her to come and pick
19   him up, and I just waited in the car, in the
20   parking lot.  I never even went to knock on my
21   mother's door or indicate to her that I was
22   sitting in the parking lot.  I just sat there and
23   just waited for, I don't know, maybe five, six

Page 327

1    minutes or so, maybe longer.  I don't recall
2    exactly how much time transpired.
3    Q.   So is there a parking lot at your mom's
4    house?
5    A.   In her yard.  There's a duplex, basically.
6    She lives in a house behind a duplex, and they
7    share the same parking area or land space.
8    Q.   What did you do when you left your mother's
9    house?
10   A.   I went back to Northview Christian Church,
11   or the vicinity thereof, and at the time when I
12   drove -- when I drove down the street to turn to
13   go back to the church, I saw Kenneth at the
14   intersection walking.  He had made it up to the
15   intersection.
16   Q.   And did you say anything to him at that
17   time?
18   A.   I pulled into the center lane of the
19   roadway and rolled my driver's side window down.
20   Of course, he was across on the side of the road,
21   so there was a whole lane of traffic, opposite
22   lane of traffic between he and I, and I engaged
23   him in conversation, and I asked him to explain

8 (Pages 324 to 327)

1   to me what it is that I had done wrong, why he
2   was choosing that course of action, and if he
3   understood my position.  He informed me that I
4   hadn't done anything wrong, and I asked him if he
5   wanted the drink I had purchased for him, he
6   said, "No."  His attitude to me at that point was
7   still somewhat hostile, so I did not ask him to
8   get back into the vehicle, because I kind of felt
9   it would just be more of the same, say, lack of
10  understanding or him being sympathetic to my
11  feelings regarding the issue.  So when he refused
12  to accept the drink, I drove off and continued to
13  let him walk along the side of the road, and I
14  went to my residence.
15  Q.   And what did you do when you arrived at
16  your residence?
17  A.   I gathered his belongings in however much
18  time it took me to gather up his belongings, and
19  then I drove back to -- I was driving back to the
20  last location where I saw him or had that
21  conversation with him, and he was no longer at
22  that location.  He had actually made it a lot
23  closer to my home.  So when I saw him walking, I

1   just made a U-turn and came back, drove past him
2   and in front of him and pulled off on the side of
3   the road to give him his personal belongings,
4   which was, you know, in a suitcase.
5   Q.   Were his personal belongings already packed
6   at your house, or did you pack those belongings
7   for him?
8   A.   For the most part.
9   Q.   For the most part, they were already
10  packed?
11  A.   Yes.
12  Q.   And what were his personal belongings?
13  A.   Clothing items.
14  Q.   So you made a U-turn, pulled over on the
15  side of the road, and did you get out and give
16  him the suitcase?  What happened next?
17  A.   I got out, I put the suitcase out by the
18  road, and his overnight bag, shaving kit that I
19  placed on top of the bag as well, with a pair of
20  his shoes and a suit that I didn't fold up and
21  put in the suitcase because it was hanging, so I
22  just laid it across the suitcase and placed the
23  shoes on top of that.  And he walked up and got

1   his things.  He didn't say anything, I didn't say
2   anything.  I got back in the car, and I'm trying
3   to think if I said -- I don't think I said
4   anything.  There wasn't any exchange at that
5   point.  So I got back in my car and went back
6   home.  But because of the way he was walking
7   towards my home, I did, you know, make notice of
8   the fact that, okay, he is still walking back
9   to -- towards my home or to get to my home; but
10  that doesn't mean, you know, right away that,
11  yes, he was coming back, but that was my
12  suspicion.
13  Q.   So after you dropped off his suitcase, what
14  did you do?
15  A.   I went back to my home.
16  Q.   And what did you do when you got back to
17  your house?
18  A.   I actually had made in my mind that I was
19  going to just go on and park and wait for -- call
20  for a wrecker en route, for a wrecker to come and
21  get the vehicle; however, I didn't get an answer
22  for the wrecker company that I called.  So I
23  pulled my car, my personal car, into my garage

1   and decided to go inside and get the keys to my
2   patrol car to move my patrol car onto the
3   driveway so that I would be prepared to go to
4   work that morning, you know, the following
5   morning, which it was already after midnight so
6   it would have been that same day.
7   Q.   So at this time when you got back to your
8   house, you said you pulled your personal car into
9   the garage, it was already well after midnight,
10  into the wee hours of the morning?
11  A.   Correct.
12  Q.   And where had your patrol car been parked
13  prior to you moving it into the driveway?
14  A.   It was parked -- excuse me -- on the grass
15  area next to the driveway, but normally it's
16  parked on the driveway.  But when Kenneth got
17  sick at church, my mother and I -- she came and
18  picked him up.  I called her, she came and picked
19  him up, his car was actually parked at the
20  church.  I was in my patrol car working for the
21  church, so neither his car nor my car was at my
22  home at that particular time during the morning
23  service.  So when he got sick, I called my mom to

Page 332

1    come pick him up, so she came and picked him up
2    and took him to my home and dropped him off.  And
3    then when I got off from work, she came back and
4    picked me up to take me to get his vehicle from
5    the church.  So I brought his vehicle back to my
6    house and I parked it -- I actually had parked my
7    patrol car on the grassy area next to the
8    driveway so that I could just pull his car onto
9    the driveway, because it was a double -- double
10   space car garage or driveway.  You could park two
11   cars side-by-side on the driveway.  So where I
12   normally parked my patrol car is where I parked
13   his vehicle, and I pulled my patrol car onto the
14   grass next to that.  Of course, the other side of
15   the driveway is for my personal vehicle to get in
16   and out, from inside the garage outside.  So that
17   vehicle, my patrol car, was parked on the grassy
18   area next to the driveway.
19   Q.   How far is the grassy area next to the
20   driveway from the driveway?
21   A.   It's right there.  There's no break between
22   them.  It's the paved driveway and then the
23   grass.

Page 333

1    Q.   I'm not an artist, but I'm going to try to
2    draw us an exhibit.  Let's mark this instead.
3        (Whereupon, Defendant's Exhibit Number 34
4    was marked for identification, a copy of which is
5    attached to the original of the transcript.)
6    Q.   I'll show you what I'm going to mark as
7    Exhibit 34 to your deposition.  And I'm not
8    representing this is to scale, because it looks
9    like the police car is fairly large.  In this
10   Exhibit 34, does this appear to be a picture of
11   your house?
12   A.   A picture of the home that I lived in at
13   the time?
14   Q.   Yes, in December of 2013.
15   A.   Yes.
16   Q.   And this picture has what looks like a
17   double garage; is that right?
18   A.   Yes.
19   Q.   And to the right of that garage, there is a
20   car, and there's an arrow that's pointed saying
21   "Kenneth Cloyd's car."  Is that where Kenneth's
22   car was parked that morning before you moved your
23   police car?

Page 334

1    A.   You said to the right of the house?
2    Q.   I'm sorry.  Yes, to the right of the house
3    and also on the right side of the garage.
4    A.   No.  The car is parked in front of the
5    garage.  I mean, we're looking at the front of
6    the home, and the garage is facing or on the
7    front side of the house.
8    Q.   Sure.  Maybe I didn't describe it very
9    well.  Looking at this photograph, there's a
10   garage on the right side of the home; is that
11   correct?
12   A.   Yes.
13   Q.   And to the right of the garage is a grassy
14   area; is that correct?
15   A.   Correct.
16   Q.   In front of the garage but on the right
17   side of that garage, this photograph shows
18   Kenneth Cloyd's car parked.  Is that correct?
19   A.   Yes.
20   Q.   And is that close to where Mr. Cloyd's car
21   was parked when you arrived at your home on
22   December 9, 2013?
23   A.   That is where I parked his vehicle.

Page 335

1    Q.   That's where you parked his vehicle.  And
2    you told me when you arrived in your personal
3    vehicle, that you pulled your personal vehicle
4    into the garage.  Is that correct?
5    A.   Correct.
6    Q.   So did you park in the left side of the
7    garage?
8    A.   Correct.
9    Q.   And then after you parked in the left side
10   of the garage, the patrol car that was parked, in
11   this photograph it would be to the right on the
12   grass, you moved the patrol car behind Kenneth
13   Cloyd's car.  Is that correct?
14   A.   Correct.
15   Q.   Was there space available for you to pull
16   the patrol car beside Mr. Cloyd's car?
17   A.   You mean to the right of his car?
18   Q.   In this photograph it would be to the left
19   of his car, so behind your personal vehicle?
20   A.   Yes, there was space; however, I would have
21   blocked my car in.
22   Q.   What car were you going to drive to work
23   the next day?

Page 336

1    A.   My patrol car.
2    Q.   And were you planning to leave again that
3    night in your personal vehicle?
4    A.   I did leave again that night in my personal
5    vehicle.
6    Q.   After you had moved the patrol car?
7    A.   Yes, but I didn't block my car in.  That is
8    what I was explaining.
9    Q.   So tell me how you moved your patrol car
10   behind Mr. Cloyd's car without blocking in your
11   personal vehicle.
12   A.   As depicted on this picture, it's not
13   quite -- the patrol car is not quite in the exact
14   same location where I moved the vehicle from the
15   grassy area to the right of Kenneth's car.  I
16   pulled it behind the vehicle as it was parallel
17   to the roadway, but not blocking the left
18   driveway; so the nose of the patrol car was
19   basically kind of flush with Kenneth's vehicle
20   without being past his vehicle, meaning it would
21   have blocked the left driveway.  So in essence,
22   if you backed up the patrol car, if you backed it
23   up, the front end of the patrol car stopped about

Page 337

1    here (witness indicating), but it was still on
2    the driveway without being in the roadway.  And I
3    stopped the vehicle short so that I could get
4    back into my personal vehicle, and I did so to
5    see if Kenneth was still coming to my home from
6    the time I dropped off his personal belongings to
7    him.
8    Q.   So if we take what we've marked as
9    Defendant's Exhibit 34, you say the nose of the
10   vehicle was where I've drawn this straight line?
11   A.   Not past it, correct.
12   Q.   And that's nose of the patrol car?
13   A.   Yes, the bumper, the front guard of the
14   patrol car would have been here (witness
15   indicating), not exceeding, you know, his vehicle
16   in the driveway; because had it been in excess or
17   beyond where his vehicle was parked, it would
18   have blocked the entry point of the left side of
19   the driveway, entry or exit point of the left
20   side of the driveway, meaning I would not have
21   been able to remove my personal car because it
22   would have been impeded by the patrol car.
23   Q.   So after you moved the patrol car behind

Page 338

1    Mr. Cloyd's car, your testimony is that you got
2    back in your personal vehicle that had been
3    parked in the garage?
4    A.   That's correct.
5    Q.   And what did you do once you got in your
6    personal vehicle?
7    A.   I drove back to the corner of State Avenue
8    and Ross Clark Circle where the fire department
9    is located.
10   Q.   And what did you do when you got there?
11   A.   When I drove up to the stop sign and looked
12   to my left, I saw Mr. Cloyd approaching that
13   intersection.
14   Q.   And did you and Mr. Cloyd have an exchange
15   when you saw him at that time?
16   A.   When I saw him, I actually backed up and
17   parked my vehicle in the -- there's a recycle bin
18   in kind of a gravel driveway.  There's a, for
19   lack of a better word, utilities, electrical,
20   power -- I don't know how you describe those
21   things.  But it's a fenced-in power source, if
22   you will, that is located right at that -- where
23   the lot is, where the recycle bin and driveway --

Page 339

1    on a grassy area behind the fire department.  So
2    I pulled in there, parked my vehicle and got out,
3    and walked down to the stop sign; and as I
4    approached the stop sign, Mr. Cloyd approached it
5    at the same time.  I engaged him in conversation
6    again, asking him to please not come to my house,
7    to just keep walking, go to a hotel, you know, or
8    call a cab or get a ride to a hotel, rather than
9    come to my home.  I didn't want to argue with my
10   son being at the house.  And he walked past me,
11   did not say anything and turned onto State Avenue
12   towards my home.  So when he did not say anything
13   to me and ignored me, I continued walking behind
14   him and I told him, "Please, again, don't come to
15   my house, or you're going to make me call the
16   police.  I've already called for a wrecker to
17   come get your vehicle," and he didn't say
18   anything.  I got back in my car and I drove off
19   again and went back to my house, which we were,
20   without knowing the exact distance, say, a
21   quarter-mile, maybe, from where we were to my
22   home, walking distance.  I drove back to the
23   house, backed my car into the driveway, again on

Page 340

1    the phone trying to contact the same wrecker
2    company because they had not called back.
3    Usually they'll call you back once they see
4    they've missed a call.  So no one had called, I
5    called back again and parked my vehicle, shut --
6    went to shut the garage door down.  I shut the
7    garage door or hit the button to shut the garage
8    door to keep my animals inside the garage, to
9    keep them from running out as I was going back
10   out to move my patrol car to park it.  So I
11   started up the staircase and the door was still
12   coming down, and I went into the house.  Of
13   course, there's no exit doors from the garage to
14   come back outside to where the cars were parked,
15   so I had to go through the home in order to come
16   back outside.  So I went through the house to
17   come back outside, I mean literally got out of
18   the car, walked through the house, came to the
19   front door.  When I got to the front door,
20   Mr. Cloyd was on the property and in his vehicle,
21   attempting to move his vehicle back and forth
22   with the patrol car parked behind it.
23      Q.   At any point before Mr. Cloyd got to your

Page 341

1    house, did you have the keys to his vehicle?
2       A.   No.
3       Q.   So when you saw him trying to move his
4    personal vehicle, what did you do?
5       A.   I walked out to the driveway and I didn't,
6    like, walk up to the door, but I just started
7    yelling once I hit, like, where the driveway --
8    where the basketball goal is located, when I got
9    about to that location, I was yelling to him to
10   stop before he struck the patrol car.  And when
11   he finally -- or when I finally got his attention
12   and he was looking at me, I again, you know,
13   said, "Stop before you hit the patrol car, or
14   you're going to have more problems than just an
15   argument with me if you strike that patrol car
16   that belongs to the City."  And I -- when he
17   stopped the vehicle's movement, I went to get in
18   the patrol car to move the patrol car from behind
19   his vehicle.  And at that point he started
20   backing the vehicle up before I could move the
21   vehicle, and I hit the horn inside the patrol car
22   to get his attention again, to make him stop
23   moving, because us moving at the same time could

Page 342

1    cause an accident.  When I blew the horn, and I
2    didn't move the vehicle because I was afraid it
3    would create an unintentional accident, he -- I
4    was watching the taillights of his car to see if
5    he was in park -- if he went from reverse,
6    because he was in reverse, to park.  You know,
7    you could see the brake lights be applied.  So
8    when I saw him apply the brake lights and the
9    reverse lights went off, I was still watching the
10   car and he jumped out of the car.  I was watching
11   the tail end of the car.  He jumped out of the
12   car and walked around in front of the patrol car;
13   and about the time he got in front of the patrol
14   car was when I realized he had exited the
15   vehicle.  So he came around to the driver's door
16   and opened the driver's door of my patrol car and
17   grabbed me by the arm and tried to snatch me out
18   of the vehicle.
19      Q.   At any time up to this point had you called
20   the police?
21      A.   No.
22      Q.   Do you know whether Mr. Cloyd called the
23   police that night?

Page 343

1       A.   Yes.
2       Q.   What is your understanding of what he
3    reported when he called the police that night?
4       A.   Well, what I heard him state was that he
5    was giving the dispatcher the location, my
6    address; and he stated that he needed assistance
7    getting his vehicle from my driveway, I believe
8    is the conversation I heard him having with the
9    dispatcher.  This was after he had attempted to
10   pull me from the vehicle.
11      Q.   At no point prior to him calling the
12   dispatcher did you move the patrol car from
13   behind his personal vehicle; is that right?
14      A.   I didn't, no.
15      Q.   That was a bad question on my part.
16      A.   I was interrupted in the process of moving
17   the patrol car by him physically walking around
18   and then grabbing me and trying to pull me out of
19   the vehicle when I had the vehicle in drive.
20      Q.   So at the point that he called the
21   dispatcher, the patrol car remained parked behind
22   his car; is that correct?
23      A.   Yes.

Page 344

1    Q.   After he called the dispatcher, did an
2    officer arrive on the scene?
3    A.   Eventually, yes.
4    Q.   And who arrived?
5    A.   Officer Schulmerich, Lacy.
6    Q.   And tell me what happened after Officer
7    Lacy Schulmerich arrived.  And we spell that
8    S-C-H-U-L-M-E-R-I-C-H.
9    A.   When Officer Schulmerich arrived, Mr. Cloyd
10   was still standing on my property, and she --
11   they had an exchange where she started to
12   question him about what occurred, or his reason
13   for calling the police department.  I didn't hear
14   their conversation, but that is -- I saw them
15   engage in conversation, should I just say it that
16   way?
17   Q.   And at some point did other officers arrive
18   on the scene?
19   A.   Yes.
20   Q.   And who were those other officers?
21   A.   I can't name exactly in what order each of
22   them arrived; but to name those who were present
23   aside from Officer Schulmerich, Officer Taiwan

Page 345

1    Truitt; there were two officers whom I was not
2    familiar with, as in worked with, so I didn't
3    know them to say them by name, you know, upon
4    sight, but I have given their names.
5    Q.   Did Lieutenant Scott Long arrive at the
6    scene that night?
7    A.   Yes, Lieutenant Long and also Sergeant
8    Derek Wieczorek.  I can't think of the --
9    Q.   Officer McClendon?
10   A.   McClendon is one, yes, and then another
11   officer.
12   Q.   Officer Brady?
13   A.   Brady, yes.
14   Q.   After Lieutenant Scott arrived at the
15   scene, did he instruct you multiple times to move
16   your car?
17   A.   At some point, yes.
18   Q.   And when I say "your car," I mean the
19   patrol vehicle.
20   A.   Yes.
21   Q.   And did you, in fact, refuse to move the
22   car?
23   A.   No.

Page 346

1    Q.   Well, why did he have to give you multiple
2    instructions to move it if you -- scratch that.
3    I can't talk.  Why did he have to ask you
4    multiple times to move it?
5    A.   When he asked initially, I didn't have the
6    understanding of what vehicle he was asking for
7    the keys to.  I didn't know if he was asking me
8    for the keys to Mr. Cloyd's vehicle or to the
9    patrol vehicle.
10   Q.   I'm asking about him saying to you move the
11   patrol vehicle.  Did he ask you or instruct you
12   at any time to move the patrol car?
13   A.   No.
14   Q.   At some point during that night, did you
15   speak with Major Parrish by phone?
16   A.   Yes.
17   Q.   And how did it come about that you spoke to
18   Major Parrish by phone?
19   A.   I requested through Lieutenant Long to
20   contact the major, and he said no.  He refused.
21   And when he refused, I advised him that I would
22   call dispatch and make a request through
23   dispatch, and he advised me that he would tell

Page 347

1    dispatch to disregard my request.  And I called
2    dispatch anyway and requested to speak with
3    either the major or the police chief, and I don't
4    recall who the dispatcher was that answered the
5    call at the time; but I was advised to hold on
6    and they would patch the call through, and I was
7    put through to Major Parrish.
8    Q.   And tell me about the conversation that you
9    had with Major Parrish.  I just want your
10   recollection of that conversation.  Are you
11   looking for a particular document?
12   A.   I'm looking through the same document, the
13   transcript of the audio recording that I made
14   that evening.
15   Q.   How long is the audio recording that you
16   made that evening?
17   A.   As I have it recorded here on the document,
18   I'm going to say it appears to be approximately
19   51 minutes 27 seconds; however, that was the
20   amount of time from when I started recording
21   after Officer Schulmerich arrived up until the
22   point where the police leave.  And this may be
23   the reason why you were not provided the audio

1    recording, because it also captured conversation
2    between me and my then attorney, Ms. Edwards.
3    There's a portion on there that captures our
4    conversation from, as I have it documented here,
5    51 minutes 27 seconds to 58 minutes 3 seconds, so
6    the last portion of that recording is between she
7    and I, with me speaking with her on speakerphone
8    for the audio recording to actually capture that
9    conversation as well.
10   Q.   We won't be asking you about or for any
11   documents or information regarding anything that
12   you talked to with your counsel; but to the
13   extent there's audio recordings or transcripts or
14   other documents and information that don't
15   include conversations with your counsel, we want
16   you to produce that to us.
17   A.   Okay.  There is conversation prior to that
18   time, when the police were still present, where I
19   had contacted Ms. Edwards to inform her that the
20   police were on my property.  So there is
21   conversation in that 51 minutes 27 seconds of
22   police contact time where she was also a part of
23   that.  I can't tell you right now where that time

1    frame picks up, so, again, I don't know if she
2    excluded providing you a copy of this recording
3    because there was conversation where I was
4    seeking legal counsel, and she was my counsel at
5    the time, to deal with that incident.
6    Q.   The transcript that you have on your
7    computer of the audio recording, is it a
8    transcript where you specifically have typed
9    quotations and exactly what people have said?
10   A.   Yes.
11        MS. MAYS:  Let's go off the record.
12        (Off-the-record.)
13        MS. MAYS:  Let me just say this.  What we
14   discussed when we were off the record is, I asked
15   Mrs. Cloyd if she would be willing to provide us
16   with a copy of the transcript that she is looking
17   at, because we're not singing from the same sheet
18   of music; she has a transcript, we do not.  We've
19   asked that she redact that transcript to exclude
20   from the portion that she's giving to us the
21   conversations that she had with her counsel at
22   that time, and she has agreed to do that.
23        THE WITNESS:  Yes, I have.

1        MS. MAYS:  So we're going to go off the
2    record while we get a copy of the redacted
3    transcript that she made of the audio recording
4    that night.
5        THE WITNESS:  I just wanted to ensure that
6    if I'm copying this document to this device, and
7    then it's going to be placed in someone else's
8    computer, I don't want it downloaded prior to me
9    redacting those portions of the statement that
10   include, you know, conversation between my
11   attorney and myself.
12        MS. MAYS:  You can walk with me to my
13   office and watch me print it, and we'll delete it
14   from the flash drive.  I'll give you the hard
15   copy, and you can redact it that way.
16        THE WITNESS:  Okay.
17        MS. MAYS:  Are you agreeable to that?
18        THE WITNESS:  Yes.
19        (Whereupon, at this time a short break was
20   taken.)
21   A.   In regards to the audio recording, it still
22   maintains or has the conversation between my
23   attorney and I, it's just not recorded in writing

1    in this transcript that I prepared.  So I just
2    want to make you aware of the fact that the
3    recording does have the actual recording of our
4    voices in conversation on it, but this document
5    does not, with the exception of that one
6    statement that I redacted.
7    Q.   So the 21 or so pages that you're going to
8    provide to us is a full transcript of what
9    transpired from the time that you began your
10   audio recording, except that the transcript does
11   not include conversation on the audio recording
12   between you and your counsel?
13   A.   Correct.  In the recording, or the
14   transcript that I provide you of the recording,
15   do you want the recording time up to that point
16   where my conversation begins with my attorney?
17   Q.   Do you have a way to provide us with the
18   audio recording that does not include your
19   conversation with counsel?
20   A.   I will have to see if I can maybe get
21   someone who is more proficient at getting a copy
22   from what is provided, and then exclude those
23   sections so that I don't mess it up in my

1  attempt.
2      (Off-the-record.)
3  Q.   Back on the record.
4      (Whereupon, Defendant's Exhibit Number 35
5  was marked for identification, a copy of which is
6  attached to the original of the transcript.)
7  Q.   Ms. Cloyd, I am going to show you what I
8  have marked as Defendant's Exhibit 35.  Is this a
9  true and accurate copy of the transcript you've
10 provided to us today?  It appears to be entitled
11 RaeMonica Carney's Audio Transcription 12-09-2013
12 at the top.
13 A.   Yes.
14 Q.   And is this a document that you personally
15 transcribed?
16 A.   Yes.
17 Q.   And you transcribed this based on an audio
18 recording that you recorded on the morning of
19 December 9, 2013?
20 A.   Yes.
21 Q.   If we turn about 16 pages into this
22 document.
23 A.   Okay, starting where?  Starting where?

1  Q.   At about 16 pages into the document.
2  A.   (Witness complies.)  Okay.
3  Q.   On that page, do you see where you've
4  transcribed a conversation that you had between
5  you and Major Steve Parrish?
6  A.   Yes.
7  Q.   And about a third of the way, less than a
8  third of the way down the page, does he say to
9  you, quote, "Exactly when you -- when you got in
10 the car and -- and was going to activate your
11 equipment and talked about, uh, what he could and
12 couldn't do, you became -- you went from being a
13 victim to trying to become a police officer,
14 okay, so I don't know anything about the
15 particulars of what's going on there; but if
16 Lieutenant Long is telling you what you need to
17 do because you acted as a police officer, then
18 you allow him to do it.  It's best to give that
19 guy his car and take it off that car.  He's
20 acting as a supervisor."  Did I read that
21 correctly?
22 A.   Yes.
23 Q.   And is that, in fact, what Major Parrish

1  told you that night?
2  A.   Yes.
3  Q.   And did you respond, "Yes, sir, I gave
4  Lieutenant Long the keys and he moved the car"?
5  A.   "He moved the patrol car," yes.
6  Q.   And did Major Parrish then respond, "I'm
7  talking about the other car, too.  This whole
8  thing is a police matter, so if he -- if in -- if
9  in his judgment, he is a lieutenant, he wants to
10 resolve this by doing something, then since --
11 since you're acting in some regards in part of
12 this as a police officer."  Did I read that
13 correctly?
14 A.   Yes.
15 Q.   So here was Major Parrish talking about
16 moving Mr. Cloyd's personal vehicle?
17 A.   Yes.
18 Q.   And at this point had you refused to allow
19 Lieutenant Long to move Mr. Cloyd's personal
20 vehicle from your property?
21 A.   Yes.
22 Q.   Had you, in fact, stood behind Mr. Cloyd's
23 vehicle when one of the officers tried to move it

1  from the property?
2  A.   No.  I'm not sure I understand what you
3  mean, "stood behind."
4  Q.   Did you in any way position yourself behind
5  Mr. Cloyd's vehicle so that the officers could
6  not move it?
7  A.   If I may, position myself behind, what do
8  you mean by "position myself behind"?
9  Q.   Were you ever at any point behind
10 Mr. Cloyd's car when one of the officers was
11 trying to move it?
12 A.   We all were behind the car.
13 Q.   Were you ever behind the car when one of
14 the officers was trying to move it from your
15 driveway?
16 A.   Yes.
17 Q.   And were you asked multiple times to move
18 away from behind the car so that the car could be
19 moved without hitting you?
20 A.   Yes.
21 Q.   And who asked you to move from behind the
22 car multiple times?
23 A.   Several officers.  I would have to go

1   through the transcript in order to identify which
2   of the officers asked me to move. However, I was
3   on my property, and when our conversation -- or
4   the investigation was going on, we were all
5   standing on my driveway behind the vehicle.
6   Q.  When the officer -- who moved Mr. Cloyd's
7   vehicle from your property?
8   A.  Sergeant Wieczorek.
9   Q.  Sergeant Wieczorek. And that's spelled
10   W-I-E-C-S-O-R-E-K.
11   A.  I think it's C-Z.
12   Q.  C-Z, okay. W-I-E-C-Z-O-R-E-K. When
13   Officer Wieczorek --
14   A.  Sergeant.
15   Q.  I'm sorry, when Sergeant Wieczorek was
16   attempting to move Mr. Cloyd's car from your
17   property, was anyone else standing behind the
18   vehicle at that time other than you?
19   A.  Yes.
20   Q.  Who else was standing behind the vehicle at
21   that time?
22   A.  Officer Truitt.
23   Q.  Anyone else?

1   A.  I don't want to make an incorrect
2   statement; but if I recall correctly, I believe
3   Officer Schulmerich or -- I want to say Officer
4   Schulmerich may have been standing in the
5   vicinity or behind the vehicle. Lieutenant Long
6   at one point -- again, there were several of us
7   standing behind the vehicle during the exchange
8   of the officers trying to get me to allow them to
9   come onto the property to move Mr. Cloyd's
10   vehicle, at which time or prior to that time, I
11   had requested the officers to leave my property.
12   I had already instructed them that no one was
13   going to be moving the vehicle with the exception
14   of the tow driver.
15   Q.  At any point during this incident, were
16   Officers Truitt, Schulmerich, and Long instructed
17   multiple times to move from behind the vehicle?
18   A.  Were they instructed to move?
19   Q.  Yes.
20   A.  No.
21   Q.  Who made the decision to terminate your
22   employment?
23   A.  You mean whose name is on the document?

1   Q.  To your knowledge, who made the decision to
2   terminate your employment?
3   A.  Well, I don't know if that decision was a
4   single person's decision or if it was a joint
5   decision of the administrative staff.
6   Q.  Why do you believe you were terminated?
7   A.  I believe that this was an act of
8   retaliation for my Federal EEOC Complaint that
9   had already been filed against the department.
10   Q.  And who do you claim was retaliating
11   against you?
12   A.  To answer your question -- to go back to
13   your previous question, let me continue with my
14   answer. I also believe that this was an act on
15   Major Parrish's part for my termination to take
16   place because of his involvement with an
17   organization, Sons of Confederate Veterans, that
18   I view as being a racist organization and, again,
19   retaliation for the EEOC complaint and also my
20   complaint that I was being discriminated against
21   that was filed with the EEOC officer, Darryl
22   Mathews, and the personnel director, Delvick
23   McKay.

1   Q.  Is it your testimony that Darryl Mathews
2   retaliated against you in this case?
3   A.  Yes.
4   Q.  In what way?
5   A.  By not rendering an investigation in a fair
6   manner when my complaint was made known to him,
7   and in guidelines with the consent decree that
8   the City of Dothan -- the federal consent decree
9   that the City of Dothan is currently under, or in
10   guidelines with EEO regulations regarding
11   investigations of complaints of discrimination.
12   Q.  What had you reported to Darryl Mathews?
13   Do we need to go off the record while you look at
14   documents?
15   A.  Yes.
16   (Whereupon, at this time a short break was
17   taken.)
18   A.  Can you please repeat your question?
19   (Whereupon, at this time the designated
20   portion of the testimony was read back by the
21   court reporter.)
22   A.  What I reported to Darryl Mathews, the EEO
23   officer for the City of Dothan, by way of a

Page 360

1   written notice of formal grievance, was that
2   there was intentional conspired racial
3   discrimination, harassment, coercion, and
4   intimidation and threats of violence against me
5   by police department employees; Major Steve
6   Parrish, Captain David Jay, Lieutenant Will
7   Benny, Sergeant Donny Smith, and Sergeant Doug
8   Magill.
9   Q.   Was that a written grievance that you
10  submitted on February 26, 2013?
11  A.   Yes.
12  Q.   Any other reports to Darryl Mathews?
13  A.   I'm sorry?
14  Q.   Any other reports to Mr. Mathews?
15  A.   Are you asking any reports in regards to
16  what exactly?
17  Q.   It's my understanding that your testimony
18  is that Darryl Mathews retaliated against you by
19  not rendering an investigation into the complaint
20  that you made, so I want to know what those
21  complaints are.  So are those the complaints that
22  you outlined in that February 26th grievance that
23  you just mentioned?

Page 361

1   A.   I indicated that he didn't render a fair
2   investigation into the complaint that I made;
3   and, yes, it was in reference to the allegations
4   I made in that document.
5   Q.   What was unfair about the investigation
6   that he rendered?
7   A.   First, what was unfair was that Mr.
8   Mathews, I do not believe, took my complaint
9   seriously.  Two, I don't believe that he applied
10  the consent decree, the federal consent decree
11  that the City of Dothan is under, to his
12  investigation of the complaint that I made to
13  him.  Three, I do not believe that Mr. Mathews
14  fairly investigated my complaint, because when he
15  rendered his findings to me, he made a statement
16  regarding another investigation on a different
17  employee for the City of Dothan who utilized
18  verbiage that he attempted to compare to the
19  investigation he was doing on my case.  And as I
20  told him, the two situations were totally
21  different.  And fourth, he could not justify how
22  he came to his conclusion by way of stating per
23  EEO guidelines or any particular laws.  He didn't

Page 362

1   reference any type of material or sources that he
2   used in making his determination to identify what
3   he considered to be racially motivated,
4   statements that he attributed to my comments of
5   my Facebook posts.  Also, he did not identify to
6   me the persons with whom he advised had filed
7   complaints against me that he revealed during his
8   investigation of my complaint.  He indicated
9   there were two persons, and by the end of -- or
10  during the course of the investigation against
11  me, it went from two persons to I believe a total
12  of 13 by the time we went to the personnel board
13  hearing.  So I don't believe that he conducted a
14  fair investigation of my complaint based on the
15  information I provided him in my complaint.  In
16  his questioning of me of my complaint, he did not
17  explore each of those areas in which I identified
18  in my complaint that I felt I was being
19  discriminated against by the members I advised I
20  was being discriminated against by.
21  Q.   Have you completed your answer?
22  A.   I was going to say, for now that is a
23  portion of the reasons as to why I don't believe

Page 363

1   he conducted a fair investigation.
2   Q.   And you understand that now, today, is the
3   time that I get to ask you these questions?
4   A.   Yes.
5   Q.   Is there anything that would help you to
6   know now any additional reasons?
7   A.   Aside from my reasons already mentioned
8   from his investigation during that time.  Since
9   then, I know that Mr. Mathews has been under
10  depositions in the federal lawsuit that Captain
11  Keith Gray has against the City of Dothan, and he
12  made statements in those depositions that he has
13  never followed the consent decree in his position
14  as the EEO officer in making determinations on
15  complaints of discrimination, because he
16  didn't -- he felt that the consent decree was
17  unsubstantiated.  And for that reason, in
18  addition to what I've already mentioned, I also
19  believe that plays a major part in him not
20  conducting a fair investigation into my
21  complaint.
22  Q.   When you were employed with the City of
23  Dothan, did you ever make any complaints to

1    Darryl Mathews about how the consent decree was
2    being implemented?
3    A.   Over the course of 14 years, I'm not quite
4    certain when Mr. Mathews became the EEO officer
5    in the official capacity.  I know that he came
6    in, went out, or was assigned and then reassigned
7    and was reassigned again back to that position.
8    There could have been conversation, maybe not in
9    a formal writing or formal complaint.
10   Q.   Do you recall any report that you made to
11   Darryl Mathews when he was the EEO officer about
12   compliance with the consent decree?
13   A.   Again, over the course of a 14-year period,
14   I don't know the exact time frames for when he
15   was in the actual capacity as the EEO officer,
16   where he and I, you know, may have had
17   conversation, not necessarily a written report to
18   him.  There could have been a verbal conversation
19   which, as I understand, can also lead to an
20   investigation if a complaint is made or a concern
21   is noted about discrimination in regards to the
22   federal consent decree.
23   Q.   Sitting here today, do you recall a

1    specific conversation that you had with Darryl
2    Mathews regarding that topic?  That's my
3    question.  Sitting here today.  Not could there
4    have been, but sitting here today, do you recall
5    a specific conversation with Darryl Mathews
6    regarding the federal consent decree?
7    A.   Right off the top of my head, I can't say
8    that I recall a specific conversation that he and
9    I had regarding the consent decree and its
10   application.
11   Q.   That answers my question.  My next question
12   is, you mentioned testimony that Darryl Mathews
13   has given in another lawsuit regarding Keith
14   Gray.  Have you seen Mr. Mathews' deposition
15   testimony in that case?  Are you looking at
16   something to try to determine whether you've seen
17   the testimony in that case?
18   A.   I am.
19   Q.   And what is it that you're looking for?
20   A.   I'm just trying to see if I have -- what it
21   is I actually have, whether it's transcript of
22   his actual conversation or if it's record to the
23   Court regarding deposition that was had with him.

1    Q.   And where would you have gotten those
2    documents?
3    A.   From the court website.
4    Q.   So you logged onto the court website in
5    Keith Gray's case?
6    A.   Yes.
7    Q.   And got documents that have been submitted
8    in that case?
9    A.   Yes.
10   Q.   And what court website was that?  Do you
11   recall?
12   A.   I do.  I just can't call it right off the
13   top of my head, and I don't have -- I'm sorry,
14   I'm speaking low.  I do, but I can't call it
15   right off the top of my head, but it's to access
16   court records for federal court cases, for the
17   U.S. district of middle, whatever, however
18   it's -- United States District Court, Middle
19   District of Alabama, Southern Division.
20   Q.   Do you recall or do you know whether Darryl
21   Mathews participated in a decision to terminate
22   your employment?
23   A.   I have reason to believe that Mr. Mathews

1    had conversations with other persons indicating
2    that he made recommendations as to what
3    punishment I was to receive.
4    Q.   What recommendations have you heard that
5    Mr. Mathews made regarding punishments that you
6    were to receive?
7    A.   One individual indicated that Mr. Mathews
8    stated that he informed the police chief, or the
9    major, not to keep me in the position of the duty
10   desk officer for an extended period of time,
11   because it would be wrong, and he advised me
12   personally that he was recommending that I attend
13   cultural diversity training as a part of his
14   recommendation from his findings in the
15   investigation.
16   Q.   Who told you that he had made a
17   recommendation about the duty desk assignment?
18   A.   Captain Keith Gray.
19   Q.   What evidence do you have that Darryl
20   Mathews didn't take your February 2013 report
21   seriously?
22   A.   From my conversation with him, again,
23   where he informed me of another employee's

Page 368

1  investigation that he headed, where that employee
2  used the N-word, as he explained it to me, and
3  how he determined that to be discriminative and a
4  violation, and he compared that investigation to
5  mine and stated that he felt that my comments
6  were racially motivated.  And again, I inquired
7  what he determined racially motivated meant, "How
8  do you define racially motivated?"  He could not
9  provide me an answer.
10 Q.   Who was the employee who had used the
11 N-word?
12 A.   The IT director, Tim Stewart.
13 Q.   Do you know at what time frame that
14 incident occurred?
15 A.   I don't, no.
16 Q.   What evidence do you have that he -- "he,"
17 being Darryl Mathews -- didn't apply the consent
18 decree?
19 A.   I'm sorry.  Say that again.
20 Q.   What evidence do you have that Darryl
21 Mathews did not apply the consent decree to your
22 investigation, or to investigate the issues that
23 you reported in February of 2013?

Page 369

1  A.   Are you asking what physical evidence?
2  Q.   I'm asking what evidence you have to
3  support that allegation that you've made.
4  A.   Aside from the reasons I gave you before?
5  Q.   So your testimony is that you've told me
6  those reasons?
7  A.   Yes.
8  Q.   What areas in your February 2013 complaint
9  are you alleging Darryl Mathews did not explore?
10 A.   The entire complaint.
11 Q.   So it's your testimony that he didn't
12 investigate your complaint at all?
13 A.   I don't think he did a fair investigation
14 of my complaint.
15 Q.   One of the things that you said that you're
16 claiming that he didn't do was that he did not
17 explore each area of the complaint.  My question
18 to you is, which area are you alleging that he
19 didn't explore?
20 A.   Each of them.  That's what I said a few
21 moments ago, he didn't explore where I advised
22 that there was intentional conspired racial
23 discrimination against me.

Page 370

1  Q.   What did Mr. Mathews not do that you think
2  that he should have done?
3  A.   I just want to make sure -- I was trying to
4  make eye contact with you so you understood as
5  I've stated in the complaint.
6  Q.   No, I understand that your testimony is
7  that he didn't address any of the areas in your
8  complaint.  And I've got a copy of your
9  complaint, it's attached to your deposition as
10 Exhibit 21, so I have that.  My question to you
11 is, what did he fail to do that you think he
12 should have done to address your complaint?
13 A.   I don't think that he addressed each
14 specific allegation in his -- even in his
15 conversation with me, to ask me about what
16 happened.  Aside from what I wrote, his
17 questioning of me did not include any of those
18 areas that I mentioned in my complaint.
19 Q.   In what way are you alleging that Delvick
20 McKay retaliated against you?
21 A.   One, because when I first made my complaint
22 to him and he called me into his office -- let me
23 take that back.  In a conversation with Mr.

Page 371

1  McKay, I won't say that it was when he called me
2  into his office, but in conversation with him --
3  and I believe it was at the time that I made the
4  complaint and gave him a copy of my complaint, he
5  stated to me that -- he asked me -- as a matter
6  of fact, we were in his office, and you have that
7  recording available to you, I recorded that
8  conversation -- he indicated to me that -- he
9  asked had I been put on notice about the
10 investigation of my social media comments, and I
11 advised him that I had been put on notice about
12 that, and his comment to me was that my complaint
13 of discrimination, harassment, intimidation, and
14 coercion would not trump that investigation.  So
15 by him making that statement to me just right
16 off -- you know, right out of the gate of me
17 handing him a document of my formal complaint to
18 say, "These are my concerns that I'm being
19 discriminated against," and his first reply
20 being, "This isn't going to trump the
21 investigation that's already ongoing," and my
22 response to him was, "Well, I wouldn't think it
23 would.  It's just this is my complaint to you.  I

1    expect that it would be investigated as any other
2    complaint would, regardless of whatever
3    additional complaints might be ongoing."
4    Q.   Any other evidence to support the
5    allegation that Delvick McKay retaliated against
6    you?
7    A.   Other than the fact that his finding stated
8    that he didn't see where I had any grounds for a
9    complaint, no.
10       (Whereupon, Defendant's Exhibit Number 36
11   was marked for identification, a copy of which is
12   attached to the original of the transcript.)
13   Q.   I'll show you what I'm marking as
14   Defendant's Exhibit 36.  Do you recognize this
15   document?
16   A.   Yes, ma'am, I recognize it.
17   Q.   And is this document the March 4, 2013
18   response that Delvick McKay provided to you
19   regarding your February 2013 grievance?
20   A.   Yes.
21   Q.   At what point during your employment with
22   the City of Dothan did you learn that Steve
23   Parrish was a member of the Sons of Confederate

1    Veterans?
2    A.   In 2004.
3    Q.   Do you know whether he is currently a
4    member of that organization?
5    A.   No, I do not.
6    Q.   In 2004, did you make a report or complain
7    to anyone regarding Major Parrish's membership in
8    that organization?
9    A.   No, because I left the department when I
10   was notified.  I was in the process of leaving
11   the department.
12   Q.   And when did you return to the department?
13   A.   A year later.
14   Q.   So in 2005?
15   A.   I returned to the department, yes.
16   Q.   So when you returned to the department in
17   2005, do you know whether Steve Parrish was still
18   a member of the Sons of Confederate Veterans at
19   that time?
20   A.   Yes.
21   Q.   Was he a member?
22   A.   He was.
23   Q.   And did you make a report to anyone

1    regarding his membership in that organization at
2    that time?
3    A.   No.
4    Q.   Have you ever made any reports or
5    complaints regarding Steve Parrish's membership
6    in the Sons of Confederate Veterans?
7    A.   Yes.
8    Q.   Who did you make a complaint or report to?
9    A.   That report or complaint was made during
10   the personnel board hearings for the social media
11   violations.
12   Q.   So when you say that complaint or report
13   was made during the personnel board hearing, you
14   provided testimony during that hearing regarding
15   Major Parrish's membership in the organization;
16   is that right?
17   A.   Yes.
18   Q.   You never made a complaint or report to
19   Delvick McKay; is that right?
20   A.   No.
21   Q.   And you never made a complaint or report to
22   Darryl Mathews?
23   A.   No.  To my understanding, it was already

1    known by the City of Dothan department heads,
2    personnel director, city manager, mayor, for
3    several years.
4    Q.   After your employment with the City was
5    terminated, do you know who replaced you?  I'm
6    asking if you know.
7    A.   Replaced me in what terms?
8    Q.   Replaced you as in filled your position.
9    A.   For the Community Watch Program
10   coordinator?  For Crime Stoppers coordinator?
11   For what exactly?
12   Q.   What assignments did you have at the time
13   that your job with the City was terminated?
14   A.   At the time when I was terminated, I had
15   been reassigned to the duty desk officer
16   position.
17   Q.   Do you know who became the duty desk
18   officer after you were terminated?
19   A.   I cannot say with certainty who was
20   assigned to that, no.  I know that the position
21   was being staffed by multiple officers.
22   Q.   It was being staffed by multiple officers
23   after your employment was terminated?

1    A.   Prior to as well when, of course, I was out
2  or assigned to something different, the patrol
3  officers were called on to fill that position for
4  certain time frames.
5    Q.   At the time your employment was terminated,
6  you were in the rank of corporal; is that right?
7    A.   Yes.
8    Q.   Do you know who, if anybody, was next
9  promoted to the position of corporal?
10    A.   Yes.
11    Q.   Who was that?
12    A.   Officer Truitt.
13    Q.   Is that Taiwan Truitt?
14    A.   Yes.
15    Q.   Is Taiwan Truitt a black male?
16    A.   Yes.
17       (Whereupon, Defendant's Exhibit Number 37
18  was marked for identification, a copy of which is
19  attached to the original of the transcript.)
20    Q.   I'll show you what I'm marking as
21  Defendant's --
22    A.   I believe there were others as well.
23    Q.   Who were the other officers who were

1  promoted, if you know?
2    A.   I don't know right offhand, without being
3  able to review some information to try to get
4  that information.  I don't know the names right
5  offhand.
6    Q.   But one of those officers who was promoted
7  was Officer Taiwan Truitt; is that right?
8    A.   Yes.
9    Q.   I'm going to show you what I've marked as
10  Defendant's Exhibit 37.
11    A.   Officer Miller, Kevin Miller, who is also a
12  black male.
13    Q.   Kevin Miller?
14    A.   Yes.
15    Q.   And I'll keep going with my questions.  If
16  you think of anybody during the time that we're
17  here, just let me know.
18    A.   Okay.
19    Q.   I'm showing you what I have marked as
20  Defendant's Exhibit 37.  Do you recognize that
21  document?
22    A.   Yes.
23    Q.   And what is that?

1    A.   Dothan Police Department Internal Affairs
2  Division Garrity Notice.
3    Q.   And did you receive a Garrity Notice on
4  December 9, 2013?
5    A.   Yes.
6    Q.   And were you interviewed that morning by
7  Internal Affairs investigators regarding the
8  incident that had occurred at your house in the
9  wee hours of that same morning?
10    A.   Yes.
11       (Whereupon, Defendant's Exhibit Number 38
12  was marked for identification, a copy of which is
13  attached to the original of the transcript.)
14    Q.   I'm going to show you what I've marked as
15  Defendant's Exhibit 38, and tell me if you
16  recognize that document.
17    A.   In all honesty, no, I don't remember this
18  document; however, I do recognize my signature on
19  it.  But I don't remember receiving this
20  document.
21    Q.   On December 9, 2013, were you placed on
22  paid administrative leave pending the outcome of
23  the investigation regarding the incident that had

1  occurred that morning?
2    A.   Yes.
3    Q.   And was Chief Benton the individual who
4  made that decision to place you on paid
5  administrative leave?
6    A.   According to this document, yes.
7    Q.   Do you have any information or evidence
8  that he was not the person who made that
9  decision?
10    A.   Well, it's possible that Major Parrish
11  could have been acting on the Chief's behalf.
12    Q.   What do you mean, it's possible that Major
13  Parrish could have acted on the Chief's behalf?
14    A.   Meaning in the Chief's absence that Major
15  Parrish would act on his accord.
16    Q.   But our document Exhibit 38 reflects that
17  Chief Benton signed that document; is that right?
18    A.   It has his signature on it.  I don't know
19  that he signed it.
20    Q.   Were you provided a Notice of Determination
21  Hearing, an opportunity to present evidence at a
22  determination hearing?
23    A.   Yes.

Page 380

1    Q.   And at that determination hearing, did you
2    provide an affidavit, a sworn affidavit by
3    Kenneth Cloyd and also a sworn affidavit drafted
4    by you as well?
5    A.   I'm sorry.  Repeat your question.
6    Q.   Sure.  At the determination hearing, did
7    you submit as evidence a sworn affidavit of
8    Kenneth Cloyd and a sworn affidavit by yourself?
9    A.   At the determination hearing?  No.  At the
10   determination hearing, there was only the formal
11   process of me being notified of the Chief's
12   decision.
13       (Whereupon, Defendant's Exhibit Number 39
14   was marked for identification, a copy of which is
15   attached to the original of the transcript.)
16   Q.   Let me show you what I'm going to mark as
17   Defendant's Exhibit 39.  Do you recognize the
18   first two pages of that exhibit as the Notice of
19   Determination Hearing?
20   A.   Yes.
21   Q.   Then beginning with the page that's
22   Bates-labeled in the bottom right-hand corner as
23   701 through 703, do you recognize that as a

Page 381

1    transcript of the determination hearing?
2    A.   Yes.
3    Q.   And on the page that's Bates-labeled 703,
4    toward the middle of the page, there's a
5    statement by you that says, "I have two
6    statements; a statement by myself, a sworn
7    statement from myself and a sworn statement from
8    Mr. Kenneth Cloyd, who was the other party
9    involved in the domestic incident at my home on
10   that evening or that morning"?
11   A.   Yes.
12   Q.   Did I read that correctly?
13   A.   You did.
14   Q.   And did you, in fact, submit sworn
15   statements by you and Mr. Cloyd at the
16   determination hearing?
17   A.   Yes, I did.
18       (Whereupon, Defendant's Exhibit Number 40
19   was marked for identification, a copy of which is
20   attached to the original of the transcript.)
21   Q.   I'll show you what I've marked as
22   Defendant's Exhibit 40.  Are those the sworn
23   statements that you submitted during that

Page 382

1    determination hearing?
2    A.   Yes.
3    Q.   And after that determination hearing, were
4    you issued a decision of the determination
5    hearing?
6    A.   After that hearing?  Yes, I was issued a
7    decision.
8        (Whereupon, Defendant's Exhibit Number 41
9    was marked for identification, a copy of which is
10   attached to the original of the transcript.)
11   Q.   And I'll show you what I've marked as
12   Defendant's Exhibit 41 and ask you if that is the
13   Decision of Determination Hearing?
14   A.   Yes.
15   Q.   And that document indicates that it was the
16   decision of Chief Benton to terminate your
17   employment for gross insubordination; is that
18   correct?
19   A.   Yes.
20   Q.   And did you appeal that decision to
21   terminate your employment to the personnel board?
22   A.   Yes.
23   Q.   And was there a hearing before the

Page 383

1    personnel board?
2    A.   Yes.
3    Q.   And as part of that hearing, did you give
4    sworn testimony?
5    A.   Yes.
6    Q.   And were you represented by counsel at that
7    hearing?
8    A.   Yes.
9        (Whereupon, Defendant's Exhibit Number 42
10   was marked for identification, a copy of which is
11   attached to the original of the transcript.)
12   Q.   Let me show you what I've marked as
13   Defendant's Exhibit 42.  My question is, do you
14   recognize that as the personnel board's decision
15   upholding the termination of your employment?
16   A.   Yes.
17   Q.   Who is Carla Mays?
18   A.   She is a friend of mine from childhood.
19   Q.   How long have you known Ms. Mays?
20   A.   All my life pretty much.
21   Q.   How did you meet her?
22   A.   As children.
23   Q.   Did y'all attend the same school?

Page 384

1    A.   Our family knew each other.  We lived in
2    the same neighborhood, we attended the same
3    schools.
4    Q.   What is her race?
5    A.   To my knowledge, African-American.
6    Q.   In one of the audio recordings that you've
7    produced in this case where you indicated to us
8    through your interrogatory responses that you
9    were talking to John White, as I understand it
10   you were having a conversation with Mr. White
11   about taking a trip to Auburn, and he responded
12   that "Nobody knows you've been to Auburn, and you
13   should keep it that way."  Do you recall that
14   trip to Auburn?
15   A.   I was having a conversation with who?
16   Q.   John White, is what our records indicate
17   based on the interrogatory responses that we
18   received.  Do you know why you would have been
19   having a conversation with Mr. Wright about a
20   trip to Auburn?
21   A.   And you're advising that was a recording
22   that I provided to you?  Right now, no, I don't
23   recall the conversation about going to Auburn.

Page 385

1    If given the opportunity to listen to that
2    recording and refresh my memory, I may be able
3    to.
4    Q.   Does that trip to Auburn relate in any way
5    to your claims in this case?
6    A.   I can't answer that.
7    Q.   But sitting here today, do you know whether
8    that trip --
9    A.   I can't answer that right now.  I mean,
10   without being able to listen to the recording to
11   refresh my memory on our conversation, I can't
12   advise you of that.
13   Q.   Have you listened to the recordings that
14   you've produced to us in this case?
15   A.   Yes, I have, but not to the extent of
16   refreshing my memory to the conversations that
17   were being -- that were taking place during those
18   recordings.
19   Q.   Who is Katrina Lewis?
20   A.   She is a police officer, black female
21   police officer with the City of Dothan.
22   Q.   Do you know whether Katrina Lewis has ever
23   been a subject of Internal Affairs or an EEO

Page 386

1    investigation?
2    A.   No.
3    Q.   She has not been, or you don't know?
4    A.   No, I don't know.
5    Q.   When were you assigned to the control room?
6    A.   During the time that I had -- let me
7    clarify.  The control room, you're referring to
8    the jail, Dothan city jail's control room for
9    inmates, where inmates are housed?
10   Q.   Is that the control room that you were
11   assigned to?
12   A.   Yes.
13   Q.   When were you assigned to that control
14   room?
15   A.   During a recovery period when I injured my
16   thumb.
17   Q.   When was that time frame?  Do you want to
18   go off the record while you look for a document
19   to respond?
20   A.   Yes, please.
21       (Off-the-record.)
22   A.   And I don't remember the exact day, but it
23   was around the time of Labor Day, which Labor Day

Page 387

1    was August 2, 2013.  At least on my calendar.  I
2    thought it was in September.  I was like why does
3    my calendar say August?
4        MS. RAINBOLT:  Labor Day is usually, like,
5    September 1st or 2nd.
6    A.   It's probably September.  I don't know why
7    this calendar is showing that.
8    Q.   Were you assigned to the control room as a
9    light-duty assignment because of your injury to
10   your thumb?
11   A.   I was told by Lieutenant Etress that I was
12   assigned there because they didn't have any other
13   place to put us, or me; but he made reference to
14   several other employees who were unable to work
15   their normal duties for whatever their reasons
16   were.  But I was placed in the control room.
17   Q.   Due to your thumb injury, did your doctor
18   require you to have a light-duty assignment?
19   A.   Yes.
20   Q.   How long were you required to have a
21   light-duty assignment?
22   A.   If I recall, I believe the light-duty
23   restriction lasted between four and six weeks.

1    Q.   How long were you assigned to the control
2    room?
3    A.   Again, I don't recall the exact day that I
4    was first placed in the control room.
5    Q.   Do you recall about how long you were in
6    the control room?
7    A.   I remained in the control room until I know
8    that I was released, or I no longer had the
9    restriction, rather, for light-duty.  Again, that
10   went from four to six weeks long.
11   Q.   Did Keith Gray at one point tell you that
12   he was being investigated by the FBI?
13   A.   Yes.
14   Q.   Did you at any point provide information to
15   the media regarding Keith Gray's employment with
16   the City of Dothan?
17   A.   Say that again.
18   Q.   Did you at any point provide information to
19   the media regarding information about Keith
20   Gray's employment with the City of Dothan?  Do
21   you need to go off the record while you look for
22   something?
23   A.   Yes.

1        (Off-the-record.)
2    A.   Can we go back on the record?
3    Q.   Okay.
4    A.   Are you asking as an employee of the City
5    of Dothan or as a private citizen?
6    Q.   I'm asking in either capacity.
7    A.   Not that I recall.
8    Q.   You don't recall contacting the media and
9    providing the media with any information
10   regarding Keith Gray?
11   A.   No.
12       (Whereupon, Defendant's Exhibit Number 43
13   was marked for identification, a copy of which is
14   attached to the original of the transcript.)
15   Q.   I'll show you what I've marked as
16   Defendant's Exhibit 43.  Do you recognize this
17   exhibit as Defendant's second interrogatories to
18   you and your response to the same?
19   A.   Yes.
20   Q.   If you'll look at the last page of this
21   exhibit, it's a chart where you identify 37 audio
22   recordings that have been produced to the
23   defendant in this case.  Is that right?

1    A.   Yes.
2    Q.   And there are two audio recordings that you
3    had indicated that were unknown, and it's my
4    understanding that there were some numbers
5    transposed in the chart that we have provided to
6    you to give us information about those audio
7    recordings.  Is that right?
8    A.   Yes.
9    Q.   And have you since been able to identify
10   those audio recordings?
11   A.   No.  I was in transition with the military
12   back to our original location, so I did not have
13   an opportunity to review.  I believe Ms. Tiffany
14   Rainbolt -- is that you?
15       MS. RAINBOLT:  Yes, that's me.
16       THE WITNESS:  I believe you sent me an
17   e-mail, maybe, identifying them?
18       MS. RAINBOLT:  I did.  I did.
19   A.   But I didn't have the capability to go back
20   and look, to give you a response to those.  I can
21   answer the locations based on the information I
22   already provided in this document, but I did not
23   have a chance to go back and look at the

1    recordings based on the numbers that were
2    corrected.
3    Q.   So other than those two, which are on this
4    chart, numbers 25 and 36, you've provided us with
5    information, the information that we've requested
6    regarding those audio recordings.  Is that right?
7    A.   Yes.
8    Q.   I believe there's one other exception,
9    number 6, you're missing the location?
10   A.   Uh-huh.
11   Q.   Do you recall what location, where that
12   took place?
13   A.   Yes.  In the parking lot of the police
14   department and then inside the police department.
15   Q.   So other than numbers 25 and 36, this is a
16   true and accurate copy of the responses that you
17   gave us to the interrogatories that we served?
18   A.   Yes.
19   Q.   Two other questions.  Number 33 on the
20   response, under the date it says that it was
21   December 2, 1987.  Do you know if that date is
22   right?
23   A.   That obviously is an error.

1    Q.   And also on number 34, the date is
2    November 1, 1989.
3    A.   It's possible that -- no, I take that back.
4    That is correct.  December 16, 2013 for number
5    37.
6    Q.   I'm looking at number 33 where the date
7    is --
8    A.   Oh, wow, yes, that would be incorrect.
9    Q.   Talking about Defendant's Exhibit Number
10   43.  So the date on number 33 is incorrect; is
11   that right?
12   A.   Yes.
13   Q.   So December 2, 1987 is not the correct
14   date?
15   A.   That is not.
16   Q.   And on number 34, the date of November 1,
17   1989, that's also incorrect; is that right?
18   A.   Yes.
19   Q.   I'm not going to mark this, but I'm going
20   to show you a copy of the Complaint that was
21   filed in this case.  Would you look with me on
22   page 10?
23   A.   I do need to refer back.  Again, what page

1    are you on?
2    Q.   Page 10.
3    A.   Okay.
4    Q.   Looking at paragraph 79, it states,
5    "Defendant promoted white officers with less
6    seniority and experience at a faster rate than
7    Carney."  You talked about this allegation during
8    the first part of your deposition.  Have you told
9    me all the evidence that you have to support this
10   allegation?
11   A.   No.
12   Q.   What evidence do you have to support this
13   allegation?
14   A.   If there was not already a request from the
15   City to produce records of officers employed with
16   the City during the same time frame that I had
17   been employed with the City, by my previous
18   counsel, so that we could identify those officers
19   by record, from the City's records to reflect
20   that there are white officers that were promoted
21   faster than I was, there should have been.  And
22   without having that documentation, per se, in
23   hand or an opportunity to review, I would like to

1    state that answering that right now would be
2    premature.
3    Q.   What does it mean that "Defendant promoted
4    officers at a faster rate"?
5    A.   Meaning there were officers when
6    promotions, of course, became available, I may
7    have had more experience or longer time at the
8    department over those officers who had less time
9    or experience with the department or outside the
10   department in law enforcement who were promoted
11   faster than I was promoted within the department.
12   Q.   What promotions have you applied for in the
13   department?
14   A.   I applied for promotion in -- give me a
15   moment.  May 18, 2006, and then I don't recall
16   the date right off of my head, but it would have
17   been, I want to say, May time frame 2011 when I
18   applied the second time for police corporal and
19   was actually promoted during that promotion
20   period, in September.  September 9th, I believe,
21   was the promotion date, 2011.
22   Q.   So the promotions that you applied for were
23   May 18, 2006.  What position did you apply for?

1    A.   Police corporal.
2    Q.   And then again May of 2011, you applied for
3    police corporal; is that correct?
4    A.   Correct.
5    Q.   Was there a validated test to be promoted,
6    that you had to take to be promoted to corporal?
7    A.   You mean either time?
8    Q.   In 2006 was there a validated test?
9    A.   There was.
10   Q.   Did you take that test?
11   A.   No.
12   Q.   And why did you not take that test?
13   A.   I was determined to be ineligible by the
14   then personnel director, Kay Davis.
15   Q.   And why were you ineligible?  Let me ask it
16   this way.  Was that related to the amount of time
17   that you had been back at the Dothan Police
18   Department?
19   A.   According to Ms. Davis, her response was an
20   employee serving an initial probationary working
21   test period shall not be eligible for promotional
22   and/or in-house vacancies in the classified
23   service until satisfactorily completing this

Page 396

1    initial probationary working test period.
2    Q.    Do you know who was promoted to corporal in
3    May 2006?
4    A.    Not right off the top of my head, no.
5    Q.    Do you know of any individuals who have
6    been allowed to take the validated test for the
7    position of corporal who were still in the
8    initial probationary working test period?
9    A.    Can I get you to clarify something? I'm
10   answering your questions with the use of the word
11   "validated test." I'm not quite certain what you
12   mean by "validated test." There was a test that
13   was given. I don't know what the validating
14   process was for the City of Dothan or if there
15   was a validating process for the City of Dothan,
16   but there was a test that the persons who were
17   applying would have to take in order to be
18   determined for promotion.
19   Q.    And that test was one of the factors that
20   determined whether a person would be promoted; is
21   that correct?
22   A.    It played a factor, yes, to my
23   understanding.

Page 397

1    Q.    My next question is, do you know of any
2    individuals who were allowed to take those tests,
3    those promotional exams, who were in their
4    initial probationary working test period?
5    A.    As I recall, there was some question to the
6    May 18, 2006 police corporal promotion. There
7    was some question as to certain officers, I don't
8    recall who the officers were, being that it was
9    so long ago, that were called into question
10   regarding their probationary status or length of
11   time as was required under the promotion, their
12   length of time with the department or as a police
13   officer. There was a question about that, and
14   that, I believe, was addressed during that time
15   frame. I don't want to seem I'm evading your
16   question, but I do believe that there was some
17   discussion or question or concern regarding
18   certain officers who were allowed to take the
19   exam, who may or may not have been either off of
20   probation, the initial probationary period, or
21   who didn't meet the time in service requirement.
22   Q.    You don't know who those officers are or
23   were?

Page 398

1    A.    Again, it was in 2006. Without actually
2    having -- being provided a copy of the roster for
3    those officers who were being -- who applied to
4    take the corporal exam, I wouldn't be able to
5    give you a definite answer that a certain officer
6    was identified.
7    Q.    Do you know who made the hiring decision
8    with regard to who was promoted to corporal in
9    May of 2006?
10   A.    Well, again, it would be my assumption to
11   say that the police chief would be, whomever that
12   was at that particular time, would have made that
13   decision solely or in concert with his other
14   staff members as to who was chosen to be police
15   corporal.
16   Q.    Do you know who the police chief was in May
17   of 2006?
18   A.    That would have been Chief John Powell.
19   Q.    Did you make a report or complaint about
20   not being allowed to take the test in 2006?
21   A.    Yes, I did.
22   Q.    And what was the outcome of that report or
23   complaint?

Page 399

1    A.    I was determined to be ineligible to test
2    for corporal.
3    Q.    And who determined you to be ineligible?
4    A.    Kay Davis.
5    Q.    In May of 2011, it's my understanding from
6    your testimony that that was the second time that
7    you applied for corporal. Is that right?
8    A.    Yes.
9    Q.    And at that time you were promoted. Is
10   that right?
11   A.    Correct.
12   Q.    And do you have any complaints about that
13   promotion process?
14   A.    Yes.
15   Q.    Tell me what your complaint is related to
16   the May 2011 promotion process.
17   A.    My complaint is, there was study material
18   that was supposed to be available to officers to
19   study for the test, then there was a change in
20   how things were being done. Let me say, prior to
21   this particular testing, there had been study
22   materials provided by the Personnel Department
23   for officers to study to help them in the

1    promotion process, you know, better themselves to
2    take that test.  The City switched to doing the
3    assessment center type testing where they brought
4    in outside persons from different departments to
5    staff that assessment center.  My complaint is
6    that there was not adequate training to prepare
7    officers for the promotion or the position of
8    police corporal by the -- whatever section you
9    were assigned to, if it was patrol, traffic,
10   investigations, whatever section you were
11   assigned to, there was not adequate training by
12   the supervisors towards the officers who had
13   expressed an interest in testing for police
14   corporal.  That did not take place prior to the
15   assessment center as a group or on an individual
16   level.
17   Q.   So just in general, supervisors weren't
18   preparing individuals who were officers at the
19   time to fulfill their duties or fulfill a role
20   once they were promoted to corporal; is that what
21   you're saying?
22   A.   They were not -- it was not equal.  There
23   may have been some supervisors who trained

1    certain ones, but it wasn't done throughout the
2    department.  So there may have been one or two
3    who were hand-picked and they were trained or
4    told, "This is what you're going to have to do to
5    be corporal."  They were filling the rolls every
6    day when they came to shift, but it wasn't done
7    equally.  Every officer wasn't being trained that
8    way.  There were select ones who were being
9    chosen to fulfill that role of being a police
10   corporal, say, in the absence of a corporal that
11   might have been out sick or on leave, but not
12   every single officer on the shift was being
13   treated that way.  And I say the African-American
14   officers were not treated that way, at least the
15   ones that I worked with and saw on a regular
16   basis when I worked patrol.  I wasn't trained
17   that way, I was never mentored.  I never saw any
18   of my African-American co-workers being mentored
19   or trained or given any kind of guidance to
20   study -- you know, get particular study
21   materials.  The only supervisor in the department
22   who actually suggested any kind of training
23   materials and actually sat with officers, not

1    just African-Americans but any officer who wanted
2    the help, was Captain Keith Gray.
3    Q.   In addition to the African-American
4    officers who you saw who were not getting
5    mentored, were there also white officers who were
6    not getting the mentoring that you're mentioning?
7    A.   Aside from the ones who were eligible, the
8    other officers that I saw received some sort of
9    guidance or was placed in a position where they
10   were given more responsibility.
11   Q.   So it's your testimony that all the white
12   officers were given more responsibility and were
13   given training to train them to become corporals?
14   A.   Yes.
15   Q.   Who provided all the white officers with
16   this training?
17   A.   It depends on whose shift they were a part
18   of.  I didn't see everyone; but the ones that I
19   actually had working relationships with, I can
20   speak of.
21   Q.   Who are you claiming should have provided
22   you with that training?
23   A.   The sergeants.  The corporals that were

1    already corporals, the sergeants, the
2    lieutenants, the captains.
3    Q.   And during this time frame we're talking
4    about, May of 2011, who were those folks?  Who
5    were the sergeants?
6    A.   I can't name all the sergeants in the
7    department.  I mean, I would have to ask for a
8    list from the City of Dothan to identify all of
9    the sergeants, lieutenants, corporals, captains,
10   majors, and police chiefs during that time.
11   Q.   So everyone who was at a rank above you
12   during that time frame had a responsibility --
13   A.   Yes.
14   Q.   Let me finish my question.
15   A.   Oh, I'm sorry.
16   Q.   It's your testimony that everyone who was
17   at a higher rank than you, regardless of what
18   shift they worked on, regardless of what division
19   they worked in, had a responsibility to train you
20   to become a corporal?
21   A.   Yes.
22   Q.   And in May of 2011, it's your testimony
23   that you were --

Page 404

1  A.  Let me say yes, yes to those who had a
2  direct role over me, absolutely.  Those who may
3  not have been in my direct chain of command,
4  regardless, should have been able to provide
5  information if asked or if they saw the need.
6  Q.  Were there any individuals in particular
7  who you requested information from or requested
8  training from who didn't provide it to you?
9  A.  The supervisors that I worked with -- at
10  least when I worked with Lieutenant Woodham,
11  Sergeant Donald Hardin and -- I'm trying to think
12  of who the other sergeant was on the shift.
13  Aside from working with them, they were the
14  supervisors I had under that control or under
15  their command, with Lieutenant Woodham being the
16  senior officer over us.  Under his command, he
17  was the only supervisor -- not including the
18  training division, because that's what they're
19  supposed to do is set up training for us to
20  attend, that's everybody.  But just on the level
21  of being in patrol and having them as my direct
22  chain of command, Lieutenant Woodham made sure
23  that we studied the PGOs.  We actually gave

Page 405

1  briefings.  Every morning we had to give a
2  briefing on a PGO, which is procedure general
3  orders.  That's the guidance from the department,
4  what we're supposed to do when we're answering
5  calls, how we're supposed to respond as law
6  enforcement officers.  Aside from under his
7  command, I've not had any supervisor provide that
8  kind of training on a regular basis, or at all,
9  really.
10  Q.  Is it your testimony that white officers
11  were getting this training on a regular basis?
12  A.  I can't speak for what I didn't see on
13  other shifts.  But that was not the only -- they
14  were not the only supervisors that I worked
15  under.
16  Q.  On the shifts that you worked, is it your
17  testimony that all the white officers were
18  getting training to become corporal prior to
19  2011?
20  A.  Prior to 2011?
21  Q.  Prior to May 2011.
22  A.  There were some white officers who were
23  being given more training or specific training

Page 406

1  that African-Americans were not given.  So if we
2  requested a particular class or course, we
3  weren't always given or granted permission to
4  attend those particular courses, and the white
5  officers --
6  Q.  Can you give me any specific examples?
7  A.  -- that requested those training courses
8  were.
9  Q.  Can you give me specific examples of any
10  courses or training that you requested that you
11  were denied or black officers weren't provided?
12  A.  I requested to be a member of -- I
13  requested to be a school resource officer, I
14  requested to be -- which requires training.  As a
15  school resource officer, you have to go to a
16  course.  That was denied.  Then I requested to be
17  on the hostage negotiation team, which, of
18  course, would require specialized training.  I
19  was informed I was chosen, then removed from the
20  position before being officially notified, so I
21  don't actually know.  The way I saw it, I was not
22  chosen because I was not officially notified that
23  I had been chosen for the team.  I requested to

Page 407

1  be a criminal investigator, which requires
2  additional training as well.  Then there were
3  training classes that were not actually being
4  publicized.  They were only being provided to,
5  again, other officers -- not the African-American
6  officers were being provided with the
7  availability of certain classes.  It wasn't being
8  published.  And the way I saw it, it was to keep
9  African-Americans from asking to attend
10  particular courses.
11  Q.  Did anybody ever say that that was the
12  reason?
13  A.  When it was identified that those courses
14  were not being published, there was no effort
15  made to begin publishing the information.  There
16  was a statement that they would look into being
17  able to create a list of classes or some sort of,
18  I think, a website or something where you could
19  look the information up.  But I never got the
20  information, it was never posted on the board
21  where you could find the information.  So it was
22  addressed but really not a solution made for the
23  problem.

Page 408

1  Q.  What training courses were not being
2  publicized?
3  A.  There were a number of training courses
4  that I had no clue were even available.  To tell
5  you right offhand what those were, I can't just
6  give you, you know, specific courses in
7  particular.
8  Q.  Do you know whether any black officers
9  participated in those training courses that were
10  not publicized?
11  A.  Well, if the knowledge wasn't there that
12  they were available, how can you apply for it?
13  You can't even apply for something that you don't
14  know is available.
15  Q.  How did you find out that they were
16  available?
17  A.  Through other officers saying that they had
18  attended these particular courses.
19  Q.  And what were those particular courses?
20  A.  Again, I can't -- I mean, it's been several
21  years of different training courses.
22  Q.  So sitting here today, you can't provide me
23  an example of one particular course?

Page 409

1  A.  The FBI Academy, that's a course that I
2  know Captain Gray, I think, requested to go to.
3  Q.  Did you ever request to go to the FBI
4  Academy?
5  A.  No.  I think you have to be at a certain
6  rank and position within the department before
7  you can actually apply for that or be considered
8  to go to that.
9  Q.  Other than the trainings that you've
10  mentioned to me today, are there any other
11  particular trainings or courses that you didn't
12  know about or were not publicized?
13  A.  Again, during those time frames, there may
14  have been certain courses that were available.
15  You know, the training improves through the
16  years, so the courses may not be the exact same;
17  they may have evolved, gotten better.  So, again,
18  I can't just give you a name of a particular
19  training course.
20  Q.  Do you know whether any black officers have
21  been on the criminal investigation team?
22  A.  Have any African-Americans been on the
23  criminal investigations?

Page 410

1  Q.  Yes.
2  A.  Yes.
3  Q.  Have any African-American officers been on
4  the hostage negotiation team?
5  A.  Yes.
6  Q.  And have you, in fact, served as a school
7  resource officer?
8  A.  I have.
9  Q.  So did you receive the training that was
10  required to serve as a school resource officer
11  before you served in that role?
12  A.  I was assigned to the position and later
13  went to the course, one of the courses, not both
14  of the courses.
15  Q.  What were both of the courses?
16  A.  There's a basic school resource officer
17  course, and then there's an advanced.
18  Q.  Which one did you attend?
19  A.  The basic.
20  Q.  And why did you not attend the advanced
21  course?
22  A.  I was not -- my supervision did not
23  schedule me to attend the course.  There was also

Page 411

1  conferences for school resource officers to
2  attend.  I was never sent to any of those
3  conferences either.
4  Q.  Did you request to attend advanced
5  training?
6  A.  Yes.  It was my understanding we all would
7  be, at some point, sent to both courses.  It was
8  pretty much a requirement.
9  Q.  How long were you a school resource
10  officer?
11  A.  I don't recall the exact date I was
12  assigned.
13  Q.  I'm not asking for a particular date.  Were
14  you a school resource officer for a couple of
15  months?
16  A.  It was over a couple of years, two to three
17  years.
18  Q.  And who are you claiming denied you the
19  opportunity to go to advanced training?
20  A.  Well, I can't say who denied it.  I can say
21  that it was a request that was put in.
22  Q.  Who did you put the request in to?
23  A.  The supervisor.

Page 412

```
1    Q.   Who was that?
2    A.   My supervisor at the time was Sergeant
3    Benny Baxley.  Of course, she's not sergeant now.
4    Q.   Did you ever file any complaints or make
5    any reports about not attending advanced school
6    resource officer training?
7    A.   No.  Well, I take that back.  Yes, I did.
8    Q.   And who did you report that to?
9    A.   Sergeant Brad Cain through a document that
10   the department identified, I believe, as a
11   survey, that I was informed had to be completed
12   by all officers; however, when I questioned
13   Officer Driskell, if he had been given the
14   document, he said he didn't know anything about
15   it, hadn't heard of it.  So I don't know if it
16   was something specific for me to fill out, but I
17   did make that complaint that there were
18   particular trainings -- as a matter of fact, hold
19   on one second and I will attempt to locate that.
20   The document I was referring to that I made
21   notice to the department regarding the training
22   or lack of training opportunities, or information
23   regarding training, was done on a Dothan Police
```

Page 413

```
1    Department Career Counseling form, something I
2    had never seen in my tenure with the department
3    from my first employment --
4    Q.   What date was that form completed?
5    A.   -- during my first employment period or my
6    second employment period with the City.
7    Q.   What date was that form completed by you?
8    A.   Can we go back on the record?  On or around
9    July 2, 2013 is when I was provided the document
10   to fill out.
11   Q.   What are you looking at to provide you with
12   that date?
13   A.   E-mails to my attorney.  Former attorney,
14   excuse me, Ms. Edwards.
15   Q.   And after you completed that form, who did
16   you submit it to?
17   A.   Sergeant Brad Cain.
18   Q.   And is that a form that we've produced in
19   this case or has been produced in this case?
20   A.   That, I don't know.
21   Q.   Can I see the form that you submitted?
22   A.   (Witness complies.)
23   Q.   After you submitted this form to Sergeant
```

Page 414

```
1    Brad Cain, did you have any follow-up discussions
2    with him regarding this form?
3    A.   No.
4    Q.   Did you have any follow-up discussions with
5    anyone regarding information you provided in this
6    form?
7    A.   No.  Can we take a break?
8    Q.   Sure.
9        (Whereupon, at this time a short break was
10   taken.)
11       THE WITNESS:  Can we start with my noting
12   for the record that I stand in objection to the
13   manner in which the timing is being kept in
14   regards to the depositions and how the breaks are
15   being conducted during the depositions.
16       MS. MAYS:  I hear your objection, and I'll
17   state for the record that we just talked with the
18   clerk of court and discussed Ms. Cloyd's
19   objections to the timekeeping.  I have been
20   keeping time for the amount of time that we've
21   been on the record and have asked that the court
22   reporter go off the record when there have been
23   extended pauses to review documents or to answer
```

Page 415

```
1    questions, and I believe that is what Ms. Cloyd
2    is stating an objection to.  Am I right about
3    that?
4        THE WITNESS:  Yes, that is what I'm
5    stating; however, there have not been any pauses,
6    elongated pauses to respond to any of your
7    questions.  I have agreed to go off the record
8    when searching for a document in order to respond
9    and granted you that time frame so that it
10   wouldn't count during your deposition time.  My
11   complaint is in regards to me thinking of a
12   response and you saying, in my lack of providing
13   an immediate response, that the time is being
14   stopped until I actually respond.  That is where
15   I have a problem with the manner in which time is
16   being kept.
17       MS. MAYS:  And we disagree about that.
18       THE WITNESS:  Yes.  Let's move on.
19       (Whereupon, at this time the designated
20   portion of the testimony was read back by the
21   court reporter.)
22       (Whereupon, Defendant's Exhibit Number 44
23   was marked for identification, a copy of which is
```

Page 416

1 attached to the original of the transcript.)
2 Q. Ms. Cloyd, I'm going to show you what I've
3 marked as Defendant's Exhibit 44. Do you
4 recognize this as the Order, the Court's Order on
5 the Defendant's Motion Regarding Plaintiff's
6 Audio Recordings and Renewed Motion for
7 Additional Time to Depose Plaintiff?
8 A. That was a long question.
9 Q. Do you recognize this Order? I'm simply
10 providing it for your reference.
11 A. Yes, I recognize the document as being
12 that.
13 Q. And I just wanted to point out that in
14 paragraph 6 on page 2, it states, "The defendant
15 is granted leave to reopen plaintiff's deposition
16 for the purpose of completing the original
17 deposition and to inquire about the audio
18 recordings and social media discovery."
19 A. Yes.
20 Q. Now if you'll refer back to the copy of the
21 Complaint that I provided to you, on page 10,
22 paragraph 80, it states, "Defendant offered white
23 officers preferential work assignments over

Page 417

1 Carney." My question is, what white officers
2 were offered preferential work assignments over
3 you?
4 A. The officers, or at least some -- I'm sure
5 I won't be able to name all of them, but I will
6 at least name those I can come off the top of my
7 head with -- would include the officers who
8 attended the field training course to be a field
9 training officer for new officers that were
10 brought in to the department. I know that
11 Glover, Sergeant Glover -- he's now a sergeant,
12 or maybe lieutenant -- was one of the officers
13 who was in that course, who was actually -- after
14 completing the course, everyone with the
15 exception of me who attended that course, and I
16 was the only black officer, or African-American
17 officer, that attended that particular training
18 course, were put in the role as a field training
19 officer and identified as a field training
20 officer in their records, but I was not. And
21 there was approximately fifteen to twenty of us
22 that attended that course. And if I recall
23 correctly, I was the only female that attended

Page 418

1 that course, and actually Glover and I were
2 selected by -- I was told -- should I say I was
3 selected by Sergeant Donald Hardin to be one of
4 the officers off of our shift to attend the field
5 training officer course, but I can't give you a
6 list of names of the officers that were in there,
7 but there was several.
8 Q. Any other officers who received
9 preferential work assignments over you?
10 A. Yes. Officer Ruddock; Officer Evans, Joey
11 Evans.
12 Q. Would you like to go off the record while
13 you search for documents?
14 A. Well, I'm actually simultaneously thinking
15 at the same time.
16 Q. What is Officer Ruddock's first name?
17 A. Scott.
18 Q. Have you thought of anyone else in addition
19 to Officer Ruddock, Officer Joey Evans, and the
20 officers who participated in the field training
21 course?
22 A. Let me refer back to this. Lynn Watkins;
23 Brandy Bowen; Shane Ash; Chris Barberree; Derek

Page 419

1 Wieczorek; Keith Cook; Ronald Hall; Robert Cole;
2 Jared Bladen, B-L-A-D-E-N; Joe Cochran; Adam
3 Davis; Philip Rice.
4 Q. Billup or Philip?
5 A. Philip. Sean Morgan; Glen Ketchum;
6 Jonathan Godwin; Jeremy Kendrick; Tom Davis.
7 Q. Are there any others?
8 A. Not that I can think of.
9 Q. Are you reading those -- I didn't mean to
10 interrupt you. Were you finished with your
11 answer?
12 A. Arthur Schaefer.
13 Q. Are you referring to a particular document?
14 A. I'm using a roll call sheet that has
15 officers' names listed on it.
16 Q. Can I see that?
17 A. Uh-huh. Is it large enough for you to see
18 it?
19 Q. Before you leave here today, can I get a
20 copy of that document?
21 A. Uh-huh.
22 Q. Is that a "yes"?
23 A. Yes. I'm sorry.

Page 420

1  Q.   Have you completed your answer?
2  A.   Tripp Phares; Sammie Hancock; Adam
3  Blackwell; Jerry Moore; Jason Arnette; David
4  Vieira, V-I-E-I-R-A; Warren Aplin.  And during
5  the sergeant exam, I believe there were -- just
6  strike that.
7  Q.   So have you provided me your complete
8  answer?
9  A.   I'm sorry?
10 Q.   Have you provided me your complete answer?
11 A.   Well, I won't say complete, because in the
12 course of the deposition, I may think of someone
13 else.  I don't want to limit myself or limit the
14 answer, should I say, restrict it to saying these
15 are all and there are no others.
16 Q.   Well, these are the ones that you can think
17 of sitting right here today and reviewing the roll
18 call sheets you're looking at in front of you on
19 your laptop; is that right?
20 A.   Yes.
21 Q.   What is Sergeant Glover's race?
22 A.   White male.
23 Q.   What is Scott Ruddock's race?

Page 421

1  A.   White male.
2  Q.   What is his rank?
3  A.   Officer.
4  Q.   Joey Evans, what is his race?
5  A.   White male.
6  Q.   What is his rank?
7  A.   To my knowledge, last was corporal.
8  Q.   What is Lynn Watkins' race?
9  A.   White male.  I'm sorry I'm saying "male."
10 Q.   What is his rank?
11 A.   He is a sergeant.
12 Q.   What is Brandy Bowen's race?
13 A.   Caucasian.
14 Q.   And what is Brandy's gender?
15 A.   Female.
16 Q.   And what is her rank?
17 A.   She's no longer employed with the
18 department.
19 Q.   What was the highest rank that she
20 achieved, to your knowledge?
21 A.   Officer.
22 Q.   Shane Nash, what is his race?
23 A.   Shane Ash.

Page 422

1  Q.   Ash, what is Shane Ash's race?
2  A.   Caucasian.
3  Q.   What was his or what is his rank?
4  A.   Officer, last I knew.
5  Q.   Chris Barberree, what is his race?
6  A.   Caucasian.
7  Q.   What was his highest rank?
8  A.   Corporal, to my knowledge.
9  Q.   Derek, what was Derek's last name?
10 A.   Wieczorek.
11 Q.   Wieczorek, what is his race?
12 A.   Caucasian.
13 Q.   And what was the highest rank he achieved?
14 A.   Sergeant.
15 Q.   What is Keith Cook's race?
16 A.   Caucasian.
17 Q.   And what was his highest rank?
18 A.   Officer.
19 Q.   Ronald Hall, what is his race?
20 A.   Caucasian.
21 Q.   What's the highest rank he achieved?
22 A.   Officer.
23 Q.   Robert Cole's race?

Page 423

1  A.   Caucasian.
2  Q.   And what is the highest rank he achieved?
3  A.   Officer.
4  Q.   What is Jared Bladen's race?
5  A.   I'm sorry, Caucasian.
6  Q.   And what is the highest rank Jared
7  achieved; do you know?
8  A.   Corporal.
9  Q.   And Jared is a male?
10 A.   Yes.
11 Q.   Joe Cochran, is that a while male?
12 A.   Yes.
13 Q.   And what is the highest rank he achieved?
14 A.   Officer, but he's no longer employed.
15 Q.   What is Adam Davis's race?
16 A.   Caucasian.
17 Q.   And what is the highest rank he achieved?
18 A.   Officer.
19 Q.   Philip Rice, what is his race?
20 A.   Caucasian.
21 Q.   What is the highest rank Philip achieved?
22 A.   Sergeant.
23 Q.   Philip is a male?

Page 424

```
 1   A.   Yes.
 2   Q.   Sean Morgan, is that a male?
 3   A.   Yes.
 4   Q.   What is Sean's race?
 5   A.   Caucasian.
 6   Q.   And what is the highest rank Sean achieved?
 7   A.   Officer.
 8   Q.   Glen Ketchum, is that a male?
 9   A.   Yes.
10   Q.   And what is the highest rank Glen achieved?
11   A.   Officer.
12   Q.   And what is his race?
13   A.   Caucasian.
14   Q.   What is Jonathan Goodwin's race?
15   A.   Caucasian.
16   Q.   He's a male?
17   A.   Yes.
18   Q.   And what is the highest rank he achieved?
19   A.   It's Godwin, not Goodwin, and rank is
20   corporal.
21   Q.   What is Jeremy Kendrick's race?
22   A.   Caucasian.
23   Q.   Is he a male?
```

Page 425

```
 1   A.   Yes.
 2   Q.   And what is the highest rank he achieved?
 3   A.   To my knowledge, corporal.
 4   Q.   What is Tom Davis's race?
 5   A.   Caucasian.
 6   Q.   And what's the highest rank Tom achieved?
 7   A.   Officer.
 8   Q.   What is Arthur Schaefer's race?
 9   A.   Caucasian.
10   Q.   Is he a male?
11   A.   Yes.
12   Q.   Highest rank achieved?
13   A.   Corporal.
14   Q.   Sammie Hancock, is that a male or a female?
15   A.   Male.
16   Q.   And what is his race?
17   A.   Caucasian.
18   Q.   And what was the highest rank achieved?
19   A.   Corporal.
20   Q.   Adam Blackwell, is that a male?
21   A.   Yes.
22   Q.   And what is his race?
23   A.   Caucasian.
```

Page 426

```
 1   Q.   And what's the highest rank he achieved?
 2   A.   Officer.
 3   Q.   Jerry Moore, what is his race?
 4   A.   Caucasian.
 5   Q.   And what's the highest rank he achieved?
 6   A.   Excuse me.  Officer.
 7   Q.   Jason Arnette, is that a male?
 8   A.   Yes.
 9   Q.   What's his race?
10   A.   Caucasian.
11   Q.   What's the highest rank he achieved?
12   A.   Officer.
13   Q.   David Vieira, what's his race?
14   A.   Caucasian.
15   Q.   What's the highest rank he achieved?
16   A.   Corporal.
17   Q.   Warren Atkin, is that a male?
18   A.   Again, these are, to my knowledge, on the
19   ranks.  That was the last of my knowledge, the
20   position they were.  And who is that?
21   Q.   Warren Atkin, is that a male?
22   A.   Aplin?
23   Q.   I wrote down Atkin.  Did I write that down
```

Page 427

```
 1   wrong?
 2   A.   Warren Aplin, A-P-L-I-N.
 3   Q.   A-P-L-I-N.  Is that a male?
 4   A.   Yes.
 5   Q.   What is his race?
 6   A.   Caucasian.
 7   Q.   And what was the highest rank he achieved,
 8   to your knowledge?
 9   A.   Corporal.
10   Q.   So it's your allegation all these
11   individuals received preferential work
12   assignments over you; is that correct?
13   A.   Yes.
14   Q.   Were any of these preferential work
15   assignments that you're alleging prior to 2013?
16   A.   Yes.
17   Q.   Were any of them prior to 2012?
18   A.   Yes.
19   Q.   I want to talk about just the ones that
20   were after -- that were during or after 2012,
21   okay?
22   A.   That would be a little difficult to
23   distinguish.
```

Page 428

1    Q.   Well, we'll walk through. Scott Ruddock,
2    what assignments did he -- what preferential work
3    assignments did Scott achieve or receive?
4    A.   Again, I can't give you that answer without
5    having documentation from the City that shows
6    when the officers were assigned to certain
7    positions, so I can't honestly answer your
8    question and give you that information, because I
9    can't tell you when someone was assigned to a
10   particular position.
11   Q.   My question right now is, what is the
12   preferential work assignment that you're alleging
13   that Scott received over you.
14   A.   But you're asking also between 2012 and
15   2013. I cannot advise you of when they received
16   those particular positions. I can advise you
17   that during that time frame, yes, they were in
18   that position, but I can't say when they actually
19   were given that position. I don't have that
20   information.
21   Q.   Putting aside the 2012 to 2013 time frame,
22   can you tell me what preferential work
23   assignments you're alleging in this case that

Page 429

1    Scott Ruddock received over you?
2    A.   School resource officer. He was
3    assigned -- when I first requested to be a school
4    resource officer, he requested it at the same
5    time. He was chosen over me, so he was in the
6    position longer than I was. I wasn't selected
7    until maybe a couple years later.
8    Q.   When were you selected to be a school
9    resource officer?
10   A.   Again, that's a question you asked and I
11   answered previously. I don't recall the exact
12   date.
13   Q.   Do you know who decided, who made the
14   decision that Scott would be a school resource
15   officer?
16   A.   No. I can only tell you who I remember
17   being in the interview process.
18   Q.   And who do you remember being in the
19   interview process?
20   A.   Sergeant Wombles was, I believe, the
21   supervisor over school resource officers during
22   the time that -- during that time frame when
23   Scott and I both applied to be school resource

Page 430

1    officers, so we did an interview through him. I
2    don't recall who the other person was that was in
3    the room, but Sergeant Wombles is the one who
4    conducted the interview. And to my
5    understanding, that would be the person who would
6    make that decision as to who they chose to be a
7    school resource officer.
8    Q.   Did you make any complaint or report about
9    not being selected as a school resource officer
10   at that time?
11   A.   Not at that time, no. I didn't complain.
12   It was mentioned to me that Officer Ruddock
13   needed the position based on his familial status,
14   problems he was having at home; and in light of
15   that information, I believe that he was chosen
16   over me because of his personal situation at
17   home.
18   Q.   So the answer to my question is, no, you
19   didn't complain at that time. Is that right?
20   A.   No, I did not complain.
21   Q.   Joey Evans, what assignment are you
22   alleging that Joey Evans received over you?
23   A.   Promotion.

Page 431

1    Q.   Promotion to what?
2    A.   To corporal.
3    Q.   At what time?
4    A.   Well, he was promoted before I was
5    promoted, several years before I was promoted.
6    Q.   At the time that Joey Evans was promoted,
7    did you apply?
8    A.   Yes, I did.
9    Q.   And did you have to take a test in order to
10   be promoted?
11   A.   I was deemed ineligible.
12   Q.   And that was in 2006?
13   A.   Yes.
14   Q.   What preferential work assignments did Lynn
15   Watkins receive over you?
16   A.   Promotion to corporal, promotion to
17   sergeant, assignment to investigations.
18   Q.   When was Watkins promoted to corporal?
19   A.   If my memory also serves me correctly, I
20   also believe that he was field training officer.
21   I'm sorry, what was your question?
22   Q.   My question was, when was Lynn Watkins
23   promoted to corporal?

1   A.   Again, you're asking me something I can't
2   provide without documentation from the City.
3   Q.   Was he promoted to corporal before you were
4   promoted to corporal?
5   A.   Yes.
6   Q.   And you were promoted to corporal in 2011;
7   is that right?
8   A.   Yes.
9   Q.   And when was Lynn Watkins promoted to
10  sergeant?
11  A.   I can't answer that.
12  Q.   At the time that Lynn Watkins was promoted
13  to sergeant, had you applied?
14  A.   I can't -- you cannot apply for a
15  sergeant's position without being a corporal.
16  Q.   And you were, in fact, a corporal when you
17  were employed at the City of Dothan, right?
18  A.   I may not have been a corporal at the time
19  when he was promoted to sergeant and tested for
20  sergeant.
21  Q.   So sitting here today, you don't have a
22  time frame?  You don't know when he was promoted
23  to sergeant.  That's the answer to the question,

1   right?
2   A.   That's correct.
3   Q.   You said that he was assigned to
4   investigations.  Do you know when he was assigned
5   to investigations?
6   A.   No, I don't.
7   Q.   Do you know who assigned him to
8   investigations?  Is there an application process
9   to be assigned to investigations?
10  A.   You submit a PD-12, basically your desire
11  to join a different division; and it goes through
12  the chain of command, your supervisors, and then
13  up to the administrative staff, or the division
14  which you want to go to also, you know, reviews
15  that document or your request.  It's my
16  understanding whoever is in charge of that
17  division and, of course, the command staff, if
18  they agree that you're a candidate or good
19  candidate or somebody they want to fill that
20  position, then you're chosen for that position.
21  Q.   Do you know whether you applied at the same
22  time to be in the investigations division?
23  A.   At the same time that --

1   Q.   That Lynn Watkins applied.
2   A.   I can't say that.  I don't know when he
3   applied.
4   Q.   Do you know when Lynn Watkins became a
5   field training officer?
6   A.   No, I don't.
7   Q.   Are field training officers all officers
8   who are at the rank of officer?
9   A.   Not all, no.
10  Q.   So there are some field training officers
11  who are corporals or lieutenants or sergeants or
12  above?
13  A.   Yes.  However, a sergeant and a lieutenant,
14  or above, would not necessarily be conducting
15  field training as in training a new officer on
16  the street.  Usually if a person has been through
17  the field training course and they pass the
18  course, they are designated as field training
19  officers and given the assignments to train
20  people.  And, of course, it's recorded in their
21  official record that they went through the
22  course, passed the course, and served as a field
23  training officer.  As they move throughout the

1   department, they may be -- may not have the task
2   of being a field training officer.  That doesn't
3   mean they haven't been through the course and
4   passed the course to be a field training officer.
5   So they may move on but not exercise that
6   particular responsibility, if that makes sense to
7   you.
8   Q.   What preferential assignments did Brandy
9   Bowen receive over you?
10  A.   Being assigned to investigations.
11  Actually, that kind of goes back before then.
12  When Brandy was hired, we were hired at the same
13  time, and we went to the police academy together.
14  And prior to going to the academy, we were all
15  instructed that if we failed the academy and got
16  sent back to the department as a failure, we
17  would no longer have a job waiting for us; we
18  would be sent home.  And that did not happen with
19  Brandy Bowen.  She was sent back to a different
20  academy when she failed Southwest Alabama Police
21  Academy.
22  Q.   Do you know when Brandy went to
23  investigations?

Page 436

1    A.   I don't recall the exact time frame.  I'm
2  just going to say no, I don't recall.
3    Q.   Do you know who assigned her to the
4  investigations unit?
5    A.   No, I do not.
6    Q.   What preferential assignments did Shane Ash
7  receive?
8    A.   Field training officer and investigations.
9    Q.   Do you know when he became a field training
10  officer?
11    A.   No, I do not.
12    Q.   Do you know who assigned him to be a field
13  training officer?
14    A.   No, I do not.
15    Q.   Do you know when he became a member of
16  investigations?
17    A.   No.
18    Q.   Do you know who assigned him to that unit
19  or position?
20    A.   No.
21    Q.   What assignments did Chris Barberree
22  receive?
23    A.   Assignment to investigations.  Right now, I

Page 437

1  believe that was all on Barberree71.
2    Q.   Do you know when he was assigned to
3  investigations?
4    A.   No, I don't.
5    Q.   Do you know who assigned him to
6  investigations?
7    A.   No, I do not.
8    Q.   Derek, what is Derek's last name?
9    A.   Wieczorek.
10    Q.   Wieczorek, I'm having a hard time
11  pronouncing that.  What preferential assignments
12  did Derek Wieczorek receive?
13    A.   Field training officer, promotion to
14  sergeant.
15    Q.   Do you know when he was assigned to field
16  training officer, as a field training officer?
17    A.   No, I do not.
18    Q.   Do you know who made that assignment?
19    A.   No, I don't.
20    Q.   Do you know when he was promoted to
21  sergeant?
22    A.   I believe it was either May or June of
23  2013.

Page 438

1    Q.   And are you looking at some document?
2    A.   I'm reviewing my e-mails.
3    Q.   And had you applied for the position of
4  sergeant at that time?
5    A.   I did.
6    Q.   And did you take the assessment at the
7  assessment center during that time frame?
8    A.   Yes, I did.
9    Q.   And are applicants who take the assessment
10  at the assessment center all ranked?
11    A.   We did, yes.  There was a ranking.
12    Q.   Do you recall what your rank was?
13    A.   I believe 8.
14    Q.   Do you recall 8 out of how many applicants?
15    A.   I believe there were 17.
16    Q.   Do you know how many applicants were hired?
17    A.   How many were promoted?
18    Q.   I'm sorry, yes, how many were promoted, how
19  many officers were promoted to sergeant at that
20  time?
21    A.   Well, the list is good for a year or two
22  years, whatever -- I believe it was a year -- so
23  there may be promotions at different times during

Page 439

1  that year, so I don't know exactly how many were
2  promoted from that list.  But I do know that he
3  was one of the ones promoted from that list.
4    Q.   Do you know whether there were other
5  officers who were also promoted on that list
6  then?
7    A.   Yes.
8    Q.   Do you know whether there were any black
9  officers who were promoted on that list?
10    A.   Yes.
11    Q.   Were there black officers promoted on that
12  list?
13    A.   Yes.
14    Q.   And who were they?
15    A.   Maurice Eggleston.
16    Q.   Anyone else?
17    A.   No.
18    Q.   Were there any other females on that list
19  other than you, if you know?
20    A.   I think I was the only female corporal.
21    Q.   Did you say, "I think I was the only female
22  corporal"?
23    A.   I believe I was the only female corporal.

Page 440

1    Q.   What preferential assignments did Keith
2   Cook receive over you?
3    A.   Assignment to criminal investigations.
4    Q.   Do you recall the time frame?
5    A.   No.
6    Q.   Do you recall who made the assignment or
7   who assigned him to criminal investigations?
8    A.   No.
9    Q.   What preferential assignment did Ronald
10  Hall receive?
11   A.   Assignment to investigations, and then
12  there's specialty teams.  The one that he was a
13  member of is identified as RRT, which I believe
14  stands for rapid response team.
15   Q.   Do you recall the time frame that he was
16  assigned to investigations?
17   A.   No, I do not.
18   Q.   Do you recall who assigned him to
19  investigations?
20   A.   No.
21   Q.   Do you recall when he was assigned to the
22  specialty team RRT?
23   A.   No.

Page 441

1    Q.   Do you know who assigned him to that
2   specialty team?
3    A.   No.
4    Q.   Had you applied to participate in the
5   specialty team at the same time that Ronald Hall
6   had?
7    A.   I didn't know anything about it.
8    Q.   What preferential assignment did Robert
9   Cole receive?
10   A.   Assignment to CID, criminal investigations.
11   Q.   Do you recall what time frame he was
12  assigned to CID?
13   A.   I do not.
14   Q.   Do you know who assigned him to CID?
15   A.   I do not.
16   Q.   Jared Bladen?
17   A.   Assignment as a field training officer,
18  specialty team member SRT, and I don't know when
19  he was assigned.  I don't know who assigned him.
20   Q.   To either of those two assignments?
21   A.   Correct.
22   Q.   Joe Cochran, what preferential assignments
23  did he receive?

Page 442

1    A.   Assignment as a field training officer and
2   specialty team RRT.
3    Q.   Do you know who assigned him to either of
4   those assignments?
5    A.   No.
6    Q.   Do you know the time frame for either of
7   those assignments?
8    A.   No.
9    Q.   What preferential assignment did Adam Davis
10  receive?
11   A.   Assignment to the bike control, bike,
12  B-I-K-E, and assignment to RRT.
13   Q.   Do you know the timing, the time frame of
14  either of those assignments?
15   A.   No.
16   Q.   Do you know who made those assignments to
17  him?
18   A.   No.
19   Q.   What preferential assignments did Philip
20  Rice receive?
21   A.   Assignment to investigations.
22   Q.   Do you know the time frame of that
23  assignment?

Page 443

1    A.   No, I do not.
2    Q.   Do you know who made that assignment to him
3   or assigned him to investigations?
4    A.   No, I do not.
5    Q.   What preferential assignments did Sean
6   Morgan receive?
7    A.   I'm sorry for the pause.  I was thinking on
8   the previous response.  That's all regarding
9   Philip Rice.  Sean Morgan, assignment to
10  investigations, juvenile investigations.
11   Q.   Do you recall the time frame that he
12  received his assignment?
13   A.   No, I do not.
14   Q.   Do you know who assigned him to juvenile
15  investigations?
16   A.   I do not.
17   Q.   What preferential assignments did Glen
18  Kitchen receive?
19   A.   Ketchum?
20   Q.   Ketchen (sic).
21   A.   K-E-T-C-H-U-M.  Assignment to juvenile
22  investigations and a member of what's identified
23  as specialty team BED.  That's bomb and

1    explosives division.
2    Q.   Do you know the time frame of either of
3    those assignments?
4    A.   No.
5    Q.   Do you know who assigned him to either of
6    those assignments?
7    A.   No.
8    Q.   What preferential assignments did Jonathan
9    Godwin receive?
10   A.   Assignment as a field training officer and
11   to the specialty team RRT.
12   Q.   Do you know who assigned him to either of
13   those assignments?
14   A.   I do not.
15   Q.   Do you know when either of those
16   assignments were made or given to him?
17   A.   No.
18   Q.   Jeremy Kendrick, what preferential
19   assignments did he receive?
20   A.   Assignment in FTO, to the specialty teams
21   SRT and RRT.
22   Q.   Do you know when he was assigned to any of
23   those assignments?

1    A.   No.
2    Q.   Do you know who assigned him to any of
3    those assignments?
4    A.   No.
5    Q.   What preferential assignments did Tom Davis
6    receive?
7    A.   Assignment to SRT, the specialty team.
8    Q.   Do you know when he was assigned to that
9    team?
10   A.   No.
11   Q.   Do you know who assigned him to that team?
12   A.   No.
13   Q.   Arthur Schaefer, what preferential
14   assignments did he receive?
15   A.   Corporal Schaefer's promotion to corporal
16   was in dispute.
17   Q.   What do you mean, it was in dispute?
18   A.   That he was not present when the corporal's
19   exam was given.  When he took that exam, or he
20   came back, rather, to take the exam, but he was
21   promoted or allowed to take the exam after the
22   fact, meaning when the exam was actually given
23   and everyone who was present was supposed to take

1    the exam were present, he was not; and then when
2    he returned, he was allowed to take the exam and
3    get promoted.
4    Q.   And how is that a preferential assignment
5    over you?
6    A.   Because the City allowing him to take the
7    test after the fact was in conflict with my
8    reasoning for why I was being deemed ineligible
9    to be able to take the exam.
10   Q.   And how is that a conflict?
11   A.   Because the City was not abiding by their
12   own policies.  Their policy was if you weren't
13   present, you didn't take the test, you missed
14   out.  So if you came later and said, "Well, hey,
15   I was on military leave," or "on vacation," you
16   weren't allowed to come back and make the test up
17   and be considered.
18   Q.   Do you know why Arthur Schaefer was not
19   able to take the test when the initial group of
20   applicants took the test?
21   A.   I don't have firsthand knowledge of the
22   reason why.
23   Q.   What knowledge or information do you have

1    about why he was not able to take the test?
2    A.   That he was on military leave.
3    Q.   Did you ever request to take a test that
4    you were unable to take because you were on
5    military leave?
6    A.   No.
7    Q.   What preferential assignments did Tripp --
8    I'm not sure how to say his last name --
9    A.   Phares.
10   Q.   -- Phares --
11   A.   Also with Schaefer, I didn't know you were
12   going to move on to the next person, but he also
13   received preferential treatment in bike -- in the
14   specialty team, being a bike patroller.
15   Q.   Do you know when that assignment was given
16   to him?
17   A.   I do not.
18   Q.   Do you know who gave him that assignment?
19   A.   I do not.
20   Q.   Tripp Phares, what preferential assignments
21   did he receive?
22   A.   Assignment to the specialty team RRT and
23   being a field training officer.

Page 448

```
 1    Q.   Do you know when he got either of those
 2    assignments?
 3    A.   No.
 4    Q.   And do you know who gave him either of
 5    those assignments?
 6    A.   No.
 7    Q.   Sammie Hancock, what preferential
 8    assignments did he receive?
 9    A.   Assignment to SRT, RRT, and FTO.
10    Q.   Do you know when he received any of those
11    assignments?
12    A.   I do not.
13    Q.   Do you know who assigned him to any of
14    those assignments?
15    A.   I do not.
16    Q.   What preferential assignments did Adam
17    Blackwell receive?
18    A.   Position to the RRT, field training
19    officer, and bike.
20    Q.   What preferential assignments did Jerry
21    Moore receive?
22    A.   FTO and RRT.
23    Q.   Are you looking at a document that provides
```

Page 449

```
 1    you with the preferential assignments that these
 2    individuals received?
 3    A.   I'm looking at that same roll call
 4    document.
 5    Q.   What preferential assignments did Jason
 6    Arnette receive?
 7    A.   Assignment as a field training officer,
 8    FTO.
 9    Q.   What preferential assignments did David
10    Vieira receive?
11    A.   Assignment to SRT, RRT, and FTO.
12    Q.   What preferential assignments did Warren
13    Aplin receive?
14    A.   Assignment to FTO.
15    Q.   The assignments that you told me about for
16    Adam Blackwell, Jerry Moore, Jason Arnette, David
17    Vieira, and Warren Aplin, do you know when any of
18    those assignments were made?
19    A.   No.
20    Q.   Do you know who made any of those
21    assignments?
22    A.   No.
23    Q.   Earlier you mentioned that there were
```

Page 450

```
 1    officers who received preferential assignments to
 2    attend the field training course.  The list of
 3    officers that you've provided for me in addition,
 4    to say that general catch-all officers who went
 5    to the field training course, have you told me
 6    all those officers who went to the field training
 7    course?
 8    A.   No.  I told you earlier that I could not
 9    name off the ones that attended the exact same
10    field training course that I went through, you
11    know, in that same setting.  But some of those
12    officers, or probably the majority of them, were
13    not in that setting.
14    Q.   Do any of these preferential assignments
15    provide the officers in those assignments with an
16    increase in pay?
17    A.   For the positions of SRT and RRT, there
18    would be additional pay.  I can't say it would
19    be -- there would be additional pay in the event
20    they were called out to perform in those
21    specialties.
22    Q.   During your time with the Dothan Police
23    Department, did you ever receive preferential
```

Page 451

```
 1    work assignments?
 2    A.   Not that I'm aware of.
 3    Q.   At some point you were a school resource
 4    officer; is that right?
 5    A.   Yes.
 6    Q.   And is it your testimony that one of the
 7    preferential assignments that Scott Ruddock
 8    received was as a school resource officer?
 9    A.   Yes.
10    Q.   Paragraph 81 of your Complaint, you allege
11    that "Defendant offered white officers better
12    training opportunities than Carney."  Did I read
13    that correctly?
14    A.   Is that number 10?
15    Q.   On page 10 of your Complaint, paragraph 81.
16    A.   Yes.
17    Q.   Are there training opportunities, better
18    training opportunities that were offered to white
19    officers that we haven't talked about today?
20    A.   Yes.
21    Q.   What better training opportunities were
22    offered?
23    A.   I've answered that also.
```

Page 452

```
 1   Q.  That's what I was asking.  So my question
 2   is --
 3   A.  No, no.  I'm saying I answered your
 4   question previously.  You asked that question
 5   previously, and I advised you that there were a
 6   number of training opportunities that were
 7   provided to white officers that were unknown to
 8   African-American officers.  So I cannot advise
 9   you of those particular training courses without
10   having a list of them available to me during
11   those years that they were available to them.
12   Q.  So that was my question.  Have we already
13   covered the answer --
14   A.  No, we have not because I can't provide it.
15   Q.  Have you provided me the evidence that you
16   have available to you today?
17   A.  Yes.
18   Q.  Have you provided me all the evidence that
19   you have to support your allegation that
20   Defendant offered white officers better training
21   opportunities than Carney?  That's my question.
22   A.  No, I haven't.  But from the information
23   that I can provide to you, I have.
```

Page 453

```
 1   Q.  What other evidence do you have that
 2   Defendant offered white officers better training
 3   opportunities than you?  Today is my opportunity
 4   to get that evidence from you.  So I'm asking
 5   you, what evidence do you have to support the
 6   allegation that Defendant offered white officers
 7   better training opportunities than you?
 8   A.  I don't have that available today.
 9   Q.  And you understand that today is my
10   opportunity to ask you questions about your
11   allegations in this case?
12   A.  Yes, I do.
13   Q.  Paragraph 82 --
14   A.  The training that these officers -- that I
15   am stating these officers were afforded can only
16   be provided through discovery from the City
17   providing documents of the training that was
18   available to officers.  So without having that
19   discovery available to me, I cannot provide you
20   any additional evidence to support answering that
21   question.
22   Q.  On page 10, paragraph 82 of your Complaint,
23   it states, "Defendant offered white officers a
```

Page 454

```
 1   better work environment than Carney."  Did I read
 2   that correctly?
 3   A.  Yes.
 4   Q.  Have you told me all the evidence that you
 5   have to support the allegation that Defendant
 6   offered white officers a better work environment
 7   than you?
 8   A.  Yes.
 9   Q.  Paragraph 83 states, "Defendant gave white
10   officers preferential treatment with regard to
11   testing."  Did I read that correctly?
12   A.  Yes.
13   Q.  Have you told me all the evidence that you
14   have to support your allegations that Defendant
15   gave white officers preferential treatment with
16   regard to testing?
17   A.  No.
18   Q.  What additional evidence do you have to
19   support that claim?
20   A.  That Corporal Brian Goguen, G-O-G-U-E-N,
21   advised me of his knowledge that Officer or
22   Corporal -- excuse me -- Corporal Mock was being
23   groomed by members of the department to be
```

Page 455

```
 1   sergeant prior to the sergeant's exam being
 2   given.
 3   Q.  What is Corporal Mock's race?
 4   A.  White male.
 5   Q.  What is his first name?
 6   A.  Ray.
 7   Q.  Who did Brian Goguen allege was grooming
 8   Corporal Mock?
 9   A.  The members of the SWAT team or the SRT
10   team, whatever their --
11   Q.  Do you know who the members of that team
12   were at that time?
13   A.  I don't know all of the names of the
14   members, no.
15   Q.  But it's your allegation that all of the
16   members of the SWAT team or the SRT team were
17   grooming Corporal Mock to be a sergeant?
18   A.  I'm not alleging that all, no.  I'm stating
19   that Brian Goguen advised me that he witnessed
20   Officer Mock being groomed for the position of
21   sergeant.
22   Q.  How was he being groomed?
23   A.  He was being trained on how to handle
```

1    certain types of calls.  They would set up mock
2    examples or demonstrations, as you will, to train
3    him on how to supervise officers when they
4    responded to a particular incident.
5    Q.   During what time frame was Corporal Mock
6    being groomed?
7    A.   According to my conversations with Officer
8    Goguen, it had been going on for at least a
9    couple of months prior to the sergeant's exam.
10   Q.   The sergeant's exam that was administered
11   in what year?
12   A.   In 2013.
13   Q.   In 2013 was Corporal Mock promoted for
14   sergeant?
15   A.   Yes.
16   Q.   Let me back up to paragraph 81.  What have
17   we talked about today -- and when I say "today,"
18   what have we talked about during your
19   deposition -- that's a better question.  What
20   have we talked about during your deposition to
21   support your allegation why Defendant offered
22   white officers a better work environment?
23   A.   Are we going back to 81 or 82?

1    Q.   My apologies.  82.
2    A.   And your question is?
3    Q.   What have we talked about during your
4    deposition to support that allegation?
5    A.   The different position assignments
6    oftentimes offer a better work environment.  And
7    that in turn also offers better training
8    opportunities.
9    Q.   What's an example of a position assignment
10   that offers a better work environment?
11   A.   Being in investigations.  You're not in
12   patrol.
13   Q.   Is it true that there are some officers who
14   prefer to be in patrol over investigations?
15   A.   That is true.
16   Q.   So what's preferential is really dependent
17   on the individual officer?
18   A.   Well, it depends on what the officer wants
19   to be involved in.
20   Q.   So what you prefer might not be the same as
21   what another officer prefers to be involved in?
22   A.   Well, some officers don't prefer because of
23   the limitations, or inabilities, rather, to

1    attend training events that would allow them to
2    move to different positions.  So they had
3    basically been -- I guess lack of motivation
4    towards moving to other departments, because they
5    haven't been given the same opportunities for
6    training to move up to those positions.  For
7    instance, Officer Bobby Ashley, I think he's been
8    in the department almost twenty years and he's
9    still an officer.  There has not been any
10   mentoring by any supervisors in the evaluations
11   he has received over the years to help him grow
12   as an officer so that he can pass the test to get
13   corporal or pass the test to be sergeant, or
14   better his writing skills, or improve his
15   communication skills.  That is what I mean by the
16   preferential treatment goes to those who don't
17   need any assistance or are not being mentored.
18   Q.   My question to you is, what one officer
19   considers a preferential assignment, another
20   officer may not even want that assignment.  Is
21   that right?  It depends, right?
22   A.   In that aspect, yes.  But for --
23   Q.   That's all I'm asking.

1    A.   From the aspect of who's in charge of those
2    areas, who's in charge of CID, if they don't want
3    that officer, they're not going to choose them.
4    They choose the ones they want to choose, not so
5    much based on the person's education or
6    experience or what they bring to the table.  It's
7    based on who they want to work in that section.
8    Q.   Thank you for that, but that wasn't
9    responsive to my question.  Let's look at page 10
10   of your Complaint, paragraph 84.  It states that
11   "Defendant removed responsibilities from Carney
12   and assigned them to a white officer."  What
13   responsibilities were removed from you and
14   assigned to a white officer?
15   A.   Community Watch Program coordinator.
16   Q.   When were those responsibilities removed
17   from you?
18   A.   May 2013.
19   Q.   And who removed those responsibilities from
20   you?
21   A.   The command.
22   Q.   Is there someone in particular who removed
23   those responsibilities from you?

Page 460

```
 1    A.   Well, I know that I was told those
 2    responsibilities were not going to be removed
 3    from me by Major Parrish.
 4    Q.   Who told you that you no longer had those
 5    responsibilities?
 6    A.   Either between Captain David Jay or David
 7    Jay and the police chief, one or both, or one and
 8    both.
 9    Q.   And when those responsibilities were
10    removed from you, who assumed the responsibility
11    of Community Watch Program coordinator?
12    A.   Corporal Schwab.
13    Q.   What is Corporal Schwab's first name?
14    A.   David.
15    Q.   Why were those responsibilities removed
16    from you?
17    A.   As a result of the social media policy
18    violation determination.
19    Q.   So you were removed as Community Watch
20    Program coordinator as a part of your discipline
21    for the social media policy violation; is that
22    right?
23    A.   Yes, along with the Crime Stoppers
```

Page 461

```
 1    position.  That was turned back over to
 2    Lieutenant Will Benny.  School resource officer,
 3    I'm not certain who was chosen to fill that
 4    position.  What did I say, school resource
 5    officer?
 6    Q.   Yes.
 7    A.   And as a recruiting team member, I don't
 8    know who was chosen to fulfill that position.
 9    Q.   Those four positions that you just
10    mentioned, Community Watch Program coordinator,
11    Crime Stoppers, school resource officer, and
12    recruiting team member, those were all positions
13    or assignments that you were removed from as a
14    result of the social media policy violation; is
15    that right?
16    A.   Yes.
17    Q.   When you were removed from those
18    assignments, did that result in a decrease in
19    your pay?
20    A.   Yes.  I should say no, not a decrease in my
21    pay, but it did not allow me to earn extra pay in
22    association with those roles.
23    Q.   And how did you earn extra pay in
```

Page 462

```
 1    association with these roles?
 2    A.   As the Community Watch Program coordinator,
 3    there were times where I would get overtime in
 4    that position.
 5    Q.   Anything else?
 6    A.   No.
 7    Q.   Paragraph 85 of your Complaint states,
 8    "Defendant restricted Plaintiff's access to
 9    computer programs given to white officers that
10    better enabled them to perform their duties."  Is
11    that a reference to the Text-A-Tip program?
12    A.   Yes.
13    Q.   I believe you have already testified that
14    Will Benny sent you an e-mail informing you that
15    your access to that program had been removed; is
16    that correct?
17    A.   Yes.
18         (Whereupon, Defendant's Exhibit Number 45
19    was marked for identification, a copy of which is
20    attached to the original of the transcript.)
21    Q.   I'll show you what I'm marking as
22    Defendant's Exhibit 45.  My question is, is this
23    a copy of the e-mail that Lieutenant William
```

Page 463

```
 1    Benny sent to you on November 30, 2012, regarding
 2    your access to the Text-A-Tip program software?
 3    A.   Yes.
 4         (Off-the-record.)
 5    Q.   Would you look with me on page 3 of your
 6    Complaint, paragraph 10?  It states, "Carney
 7    trained a white officer who was promoted to
 8    corporal over Carney after only three years of
 9    service within the department."  Who was that
10    corporal that you're referring to?
11    A.   Sergeant Rachel David, if she's still a
12    sergeant.
13    Q.   Say that name again.
14    A.   Sergeant Rachel David, if she's still a
15    sergeant.  She may have been promoted to
16    lieutenant.
17    Q.   And in what year was Sergeant Rachel David
18    promoted to corporal?
19    A.   I don't recall.
20    Q.   What is Sergeant Rachel David's race?
21    A.   Caucasian.
22    Q.   And what is Rachel David's gender?
23    A.   Female.
```

Page 464

1  Q.   Do you know whether you had applied to be
2  promoted to corporal during the same time frame
3  that Sergeant Rachel David was promoted to
4  corporal?
5  A.   I don't recall.
6  Q.   We talked earlier about different officers
7  getting preferential work assignments.  Those
8  preferential work assignments didn't affect an
9  officer's rank; is that right?
10  A.   I'm not certain I understand your question.
11  Q.   Sure.  My question is, just because you
12  received one of these assignments that you
13  identified as preferential assignments, for
14  example, field training officer or investigations
15  division, that didn't change your rank within a
16  department?  If you were an officer, you remained
17  an officer, you were just an officer assigned as
18  a field training officer; or if you were a
19  sergeant, you remained a sergeant.  Your rank did
20  not change based on the assignment that you were
21  provided; is that right?
22  A.   That's correct.
23  Q.   And it was your rank that determined the

Page 465

1  amount of pay that you received; is that right?
2  A.   Also your years of service.
3  Q.   So your rank and your years of service
4  within a department determined your salary?
5  A.   Yes.
6  Q.   And is it true that the chief had the
7  discretion to make assignments?
8  A.   Yes.
9  Q.   Was there a time in the Dothan Police
10  Department where training was put on hold because
11  there wasn't any money in the budget to pay for
12  individuals to get training?
13  A.   Say that again, please.
14  Q.   Was there a time in the Dothan Police
15  Department where training was put on hold for
16  officers because there wasn't any money available
17  in the budget to allow officers to go get
18  training?
19  A.   That would have been information I wasn't
20  privy to.
21  Q.   You just don't know one way or the other?
22  Is that right, you just don't know one way or the
23  other?

Page 466

1  A.   That's information I wasn't privileged to.
2  Q.   In November of 2012 when William Benny sent
3  you the e-mail regarding the Text-A-Tip program,
4  it's true that you were no longer over that
5  program at that time?
6  A.   No.
7  Q.   Were you over the Text-A-Tip program?
8  A.   I'm not quite certain I understand what you
9  mean by "over the program."
10  Q.   Did you leave the program?  Did you oversee
11  the program at any time?
12  A.   I founded the actual program, the TipSoft
13  program that Text-A-Tip is a part of.  I
14  researched -- I brought the information to the
15  persons in the department or the city government
16  who would make a decision on whether or not to
17  purchase that program and implement it as a tool
18  for the Crime Stoppers program.
19  Q.   After the program was implemented, what was
20  your role with the program?
21  A.   I managed the program.
22  Q.   And what did managing the program entail?
23  A.   It entailed knowing how to use the program,

Page 467

1  setting the program up for our department and the
2  other agencies that were a part of the Crime
3  Stoppers, under the purview of the Crime Stoppers
4  program and the district attorney's purview, his
5  control.  I believe there's five agencies; the
6  sheriff's department, the police department, the
7  police agencies that fall in Houston and Henry
8  Counties were all under the Crime Stoppers
9  program.  So I had to establish access for the
10  outside departments, outside the police
11  department, to have access to the program, and
12  then the police department itself and all of the
13  officers in the department who would have access
14  to utilize the program.  I also had to, or was
15  supposed to train everyone on how to use the
16  program and market it to the public to begin
17  using the Text-A-Tip software on their phone, on
18  their computer, you know, how to use it and start
19  using it to help benefit the police department.
20  Q.   In November of 2012 when William Benny sent
21  you that e-mail, am I right that you were no
22  longer managing that program?
23  A.   When I received this e-mail, this was --

1   this e-mail came to me after I inquired as to why
2   I did not have access to the program.  So I was
3   not told prior to receiving this e-mail that I
4   would no longer have access to managing the
5   program, if that's your question.
6   Q.   At what point did you stop managing that
7   program?
8   A.   At this point when I found out that I
9   didn't have access rights to the program, those
10  rights were not restored.
11  Q.   And why were those rights removed from you?
12  A.   According to the e-mail from Lieutenant
13  Benny dated Friday, November 30, 2012, 9:36 a.m.,
14  it reads, "Thanks for your hard work on setting
15  up the TipSoft.  The admin rights have been
16  changed to fall in line with the distribution and
17  response needed for Crime Stopper tips.  You are
18  of course still the liaison for the Dothan Police
19  Department and the Chamber of Commerce for the
20  Crime Stopper program," with a signature block
21  for Lieutenant Will Benny.
22  Q.   When you were employed at the City of
23  Dothan, did you ever hear any racially derogatory

1   comments?
2   A.   I heard comments, yes.
3   Q.   Tell me what racially derogatory comments
4   you heard.
5   A.   Our shift being labeled the Soul Patrol; an
6   officer who was not from the South being referred
7   to as a Yankee.  Right now I'm tired.  I don't
8   want to give the impression that I'm not
9   answering you, but I am tired.
10  Q.   Well, I'll say this.  We are getting --
11  A.   I really have not had adequate sleep.
12  Q.   We are getting very close to the end.  Do
13  you want to take ten minutes or so and then come
14  back?
15  A.   I mean, I appreciate that.  I want to try
16  to finish this up and be done; but, again, I am
17  tired.  I have gone from two-week deployment
18  straight into driving here, so I have not had any
19  rest, and I've been on a flip-flop schedule,
20  twelve-hour shift, that went longer than
21  twelve-hour shifts on the last few nights of the
22  event, so my body is tired.  And I don't live
23  here, so I have to drive to another location.

1   Again, in all fairness to you, I want to answer
2   all the questions that you have; but I am tired,
3   and I don't want to drag this out any longer.
4   Honestly, I do not.  Let's try to push forward
5   and get through as many as I can, but I'm -- I'm
6   just telling you, my limitation has been met
7   right now.
8   Q.   I hear you, we're close to the end.  If you
9   want to take a break, I'm happy to take a break
10  for a few minutes and regroup.  Is that a
11  request, or do you want --
12  A.   Listen, I'm beyond tired.
13  Q.   I hear you.
14  A.   I'm at the pass-out level right now.  I'm
15  struggling to try to stay awake right this
16  moment.  I'm trying to answer you, and let's get
17  to the end.  That's why I don't want to break
18  anymore.  I just want to get through this.
19  Q.   Okay.  So you told me that racial comments
20  that you heard are your shift being referred to
21  as the Soul Patrol; is that right?
22  A.   Yes.
23  Q.   And what shift did you work on?

1   A.   I don't recall what number.  I worked first
2   shift and, I think, second shift.  I forget how
3   the shifts rotated, but I think it was first --
4   one shift was a night shift, but there was
5   myself; Officer Truitt; Officer Bonds; Officer
6   Summers, Sylvia Summers; Lanice Bonds; and Taiwan
7   Truitt, were all on the same shift, so there was
8   a majority of minorities on the shift where we
9   were labeled the Soul Patrol.
10  Q.   And who did you hear call your shift the
11  Soul Patrol?
12  A.   Lieutenant Will Benny and several others.
13  These were -- you know, this has been some few
14  years ago.  So, again, I'm tired and trying to
15  recall all these things.  I'm trying to give you
16  as many names as I possibly can, but I'm drained,
17  so I can't --
18  Q.   You understand you filed this lawsuit?
19  A.   Yes, I know.
20  Q.   And it's my responsibility on behalf of the
21  City of Dothan to defend this lawsuit and get as
22  much information as I can about the allegations
23  and claims that you're making in this lawsuit.  I

1    understand that you have other life situations
2    and circumstances. We all do. But today is the
3    day that we set weeks ago, court-ordered in March
4    of 2015 --
5    A.   Yes, ma'am, I'm very familiar --
6    Q.   -- that we had to complete this deposition
7    by today, and today is the last day that we get
8    to do that. So I'm taking this opportunity to
9    ask my questions about your claims in this case.
10   A.   I don't think the Court is going to want me
11   to put myself in jeopardy of creating or being a
12   hazard on the roadway when trying to get to
13   another location because I don't reside here.
14   Q.   I can't advise you in that regard. I can
15   only ask you --
16   A.   I'm advising you, for the record, that I am
17   physically tired. I am beat. I have gone from
18   working anywhere from 12 to 21 hours straight in
19   the field exercise with the military, for which
20   you have documentation and proof of. So I'm not
21   making excuses. I'm giving you the facts of what
22   I've already been through leading up to this very
23   moment, from last night as well.

1    Q.   I hear you. And you selected the date for
2    this deposition. You selected May 1st for this
3    deposition, so let's stick to the questions.
4    A.   No, I don't select this date. The Court
5    selected this date. I didn't choose this date.
6    This was set by the Court.
7    Q.   Let's stay on course with my questions so
8    that we can get done. Lieutenant Will Benny and
9    you said some other officers. Are there any
10   other officers who you can recall making a
11   comment about your shift being referred to as the
12   Soul Patrol, or referring to your shift as the
13   Soul Patrol?
14   A.   I can't right now, but I can tell you that
15   former Officer Sylvia Summers is a witness to
16   that and heard that same information.
17   Q.   And you mentioned that it was some few
18   years ago. Can you provide me with a time frame
19   that you heard these comments?
20   A.   No, I can't.
21   Q.   Who was the officer who was referred to as
22   a yankee?
23   A.   Robert Miller.

1    Q.   And who referred to him as a Yankee?
2    A.   Who didn't?
3    Q.   What is Robert Miller's race?
4    A.   Aside from African-Americans, I never heard
5    any African-Americans refer to him as Yankee. I
6    know I specifically told him if he was offended
7    by the comments, then he should go to the EO
8    officer and make a complaint about it; he should
9    tell his supervisors and make a complaint about
10   it and not just let it go.
11   Q.   What is Robert Miller's race?
12   A.   White male.
13   Q.   Did you ever report to the EEO officer that
14   Lieutenant Will Benny or other officers had
15   referred to your shift as the Soul Patrol?
16   A.   No.
17   Q.   During your employment with the City of
18   Dothan, did you ever report a violation of the
19   consent decree to the EEO officer?
20   A.   Well, aside from my federal EEOC complaint
21   itself, no.
22   Q.   How have you been damaged by the actions
23   that you describe in your Complaint?

1    A.   Well, I was terminated, and of course that
2    resulted in a loss of income since the date of
3    termination. Being able to obtain employment in
4    law enforcement has been hindered or made rather
5    difficult. It has been emotionally draining and
6    very stressful. It has caused me to have to
7    relocate and disrupt my family status. Constant
8    media coverage has also, from my point of view,
9    slandered my name and my reputation.
10   Q.   How have you been hindered from searching
11   for other employment?
12   A.   I haven't been hindered from searching for
13   other employment.
14   Q.   Is it your testimony that you've been
15   hindered from obtaining other employment?
16   A.   Yes.
17   Q.   And how have you been hindered from
18   obtaining other employment?
19   A.   With this pending litigation against the
20   City and the actual reasons for the termination,
21   or the termination itself, has hindered my
22   process in which to try to gain employment in law
23   enforcement. I have submitted several

Page 476

1   applications to different departments for which I
2   have either not received any type of response
3   from or was not selected for employment.
4   Although, I have not been told, per se, that the
5   termination from the City of Dothan is what is
6   hindering me from being hired, it hasn't helped
7   me, having been terminated and having this
8   federal lawsuit pending.
9   Q.   But none of the applications that you've
10  submitted, none of those employers have told you
11  that the reason you weren't selected was because
12  you were terminated from the City of Dothan; is
13  that right?  Is that what I hear you saying?
14  A.   Yes.
15  Q.   And when you say there's been constant
16  media coverage, what media coverage are you
17  referring to?
18  A.   Local news media coverage.  Dothan Eagle,
19  TV news reporters, WDHN, WTBY, Rickey Stokes
20  News, and their outlets.
21  Q.   But you are no longer residing in Dothan;
22  is that right?
23  A.   Correct.

Page 477

1   Q.   So when you say "local news media
2   coverage," you're talking about coverage in the
3   city of Dothan?
4   A.   Yes.  However, the Associated Press also
5   picked up those, the articles and the case itself
6   initially when I was being investigated for the
7   social media post, and then subsequent
8   termination from the gross insubordination
9   charge.  So it went worldwide.
10  Q.   What are you hoping to obtain as a result
11  of this lawsuit?
12  A.   That the City would be held accountable for
13  acts of discrimination for the consent decree
14  that it has been under for 39 years, and that
15  sanction to be rendered by the Court, of course,
16  and to be restored financially for the money or
17  income that I lost during this time frame; and if
18  the Court deemed it necessary to provide punitive
19  damages to the City, whatever that amount that
20  might be is what I would also ask for, or am
21  seeking.  Also to have the negative aspect of the
22  termination, if it's determined that I was not or
23  should not have been terminated based on the

Page 478

1   grounds that the City used, that those things be
2   reversed.  And also for the City to acknowledge
3   that through the media.
4   Q.   Do you know of any other Dothan police
5   officer who was instructed to do something eight
6   times by a superior officer who refused to follow
7   that instruction?
8   A.   Not to my knowledge.
9   Q.   Have you told me about all the complaints
10  and reports that you made regarding
11  discrimination to the City of Dothan?
12  A.   Have I told you about what, now?
13  Q.   All the complaints that you've made.
14  A.   That I've made?
15  Q.   Yes.
16  A.   No.
17  Q.   What other complaints have you made of
18  discrimination?
19  A.   Your question before was to Darryl Mathews?
20  Q.   Yes.
21  A.   That's where I limited my answer, to Darryl
22  Mathews.  I made a complaint to David Thornton
23  when he was the EEO.

Page 479

1   Q.   Okay.  To anyone else?
2   A.   As far as in a formal written complaint,
3   Darryl Mathews and David Thornton.  In verbal
4   conversation I made complaints or spoke with
5   other officers and Captain Gray.  In
6   conversations with the jail administrator, Mamie
7   McCrory; Sergeant Dan Danzy; Lieutenant David
8   Lewis, who also was a jail security supervisor;
9   Sergeant Donald Hardin.  I didn't actually make a
10  complaint to him.  He actually provided me with a
11  photo of Major Parrish, and that depicted him and
12  several other officers that are members of the
13  police department, or were members of the police
14  department, holding what appears to be the flag
15  that's flown by members of the KKK and the Sons
16  of Confederate Veterans flag, that they use,
17  which is the same organization that now Chief
18  Parrish was a member of, is a member of, or
19  whatever his affiliation was.
20  Q.   And you've already testified you don't know
21  whether he's still a member of that organization,
22  right?
23  A.   I did testify already, yes.

Page 480

1    Q.   And you've already testified, I believe,
2  that Donald Hardin gave you this photograph in
3  2004?
4    A.   Correct.
5    Q.   Anyone else that you made a complaint or
6  report to?
7    A.   Officer Jason Neal; Officer Bobby Ashley;
8  Sergeant Eggleston, Maurice Eggleston.  Again,
9  these were not necessarily written complaints but
10 in conversation.
11   Q.   Do you recall when David Thornton was EEO
12 officer?
13   A.   Prior to when Mr. Mathews was put back in
14 as the EEO.
15   Q.   And what did you complain to him about?
16   A.   I don't recall.  I don't recall the
17 specifics of that complaint.
18   Q.   Do you recall the outcome of the report?
19   A.   I don't.
20   Q.   You said that you complained to --
21   A.   I want to say it was in conjunction with
22 something else or a complaint on someone else.  I
23 believe it was a complaint involving Officer

Page 481

1  Truitt, and I was called in and then Officer
2  Summers was called in to give a statement.  I
3  don't recall the specifics of it at all.
4    Q.   So your complaint or report would have been
5  a part of the statement that you provided when
6  you were called in --
7    A.   Yes.
8    Q.   -- as a part of an investigation related to
9  something regarding --
10   A.   Yes.
11   Q.   -- Officer Truitt?
12   A.   Yes.  If I recall correctly, yes.
13   Q.   And then you said that you had complained
14 to other officers, then you proceeded to give me
15 a list of officers.  Are those the list of
16 officers that you recall that you have complained
17 to?
18   A.   I've spoken to in conversation, you know,
19 regarding discriminative acts of the department
20 and how different things were taking place where
21 blacks were -- or African-Americans were --
22 evaluations were lowered just prior to
23 promotional exams; certain people getting

Page 482

1  preferential treatment to be on certain teams; or
2  not being allowed to be brought into the criminal
3  investigations or juvenile investigations, or
4  school resource officer seemed to be the only
5  position that minorities were chosen to be a part
6  of.  Outside of that, it was very limited.  Or
7  should I say, restricted even more so.
8    Q.   When you had these conversations with the
9  other officers, was there expectation that those
10 officers would conduct an investigation?
11   A.   No, it was just conversation.  It was more
12 "What's the morale of" or "What's the opinion of
13 everyone else regarding these issues that we all
14 are experiencing?"
15      (Off-the-record.)
16   Q.   Back on the record, looking at page 9 of
17 the Complaint, paragraph 71, it states, "On or
18 about December 16, 2013, Carney amended her EEOC
19 charge to add retaliation."  Did I read that
20 correctly?
21   A.   Yes.
22   Q.   In the discovery requests that we sent to
23 you, we requested a copy, Defendant requested a

Page 483

1  copy of that EEOC charge, and one has not been
2  produced.  Do you have a copy of that amended
3  EEOC charge that was submitted on December 16,
4  2013?
5    A.   I will have to check with Ms. Edwards,
6  because she was to prepare that document for
7  submission, and I don't -- I don't recall if I
8  received a copy of what she sent.
9    Q.   But sitting here today, you don't have a
10 copy of that amended EEOC charge?
11   A.   I have one that says amended.  Yes, I do.
12 I will save it to this jump drive.
13   Q.   Do you know whether that amended EEOC
14 charge was ever submitted or provided to the
15 EEOC?
16   A.   I signed it and dated it, and it would have
17 been submitted through my counsel.
18   Q.   But sitting here today, do you know one way
19 or the other whether it was ever sent to the
20 EEOC?
21   A.   I couldn't tell you.  But you want to get a
22 copy of this, right?
23   Q.   Yes.  Have you told me about all the

Page 484

1   evidence that you have to support your claims in
2   this lawsuit?
3   A.   Based on the questions that you've asked
4   me, yes.  At least that I can recall, you know,
5   unless I indicated otherwise.
6   Q.   Today you're going to provide me with a
7   copy of a document that you have as an amended
8   EEOC charge and also a roll call sheet that you
9   referred to during your testimony today.  Is that
10  right?
11  A.   Yes, ma'am.  Let me show you on the drive,
12  the last one here is the roll call, and the first
13  one is the amended EEOC.  That's what's on her
14  drive, so it's the first one and then the last
15  document.
16  Q.   And these other things are not yours?
17  A.   Those are hers.
18      MS. MAYS:  That's all I have.
19      (Whereupon, at this time, the
20  deposition was concluded at 4:40 p.m.)
21      FURTHER DEPONENT SAITH NOT.
22
23

Page 485

1       C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY)
5
6       I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were reduced to typewriting under my supervision
10  and that the foregoing represents a true and
11  correct record of the testimony/evidence given by
12  the deponent.
13      I further certify that I am neither of
14  counsel nor of kin to any of the parties to the
15  action, nor am I in anywise interested in the
16  results of said cause.
17
18
19      /s/Donna L. Winters
20      Donna L. Winters, Commissioner
21      ACCR Certificate Number: AL-373
22      Commissioner for State of Alabama
23      Notary commission expires: 10-30-2017

48 (Pages 484 to 485)

**A**

**abiding** 446:11
**able** 337:21 377:3
385:2,10 390:9
398:4 404:4
407:17 417:5
446:9,19 447:1
475:3
**absence** 379:14
401:10
**absolutely** 404:2
**academy** 409:1,4
435:13,14,15,20
435:21
**accept** 328:12
**acceptable** 324:2
**accepted** 323:10
**access** 366:15 462:8
462:15 463:2
467:9,11,13 468:2
468:4,9
**accident** 342:1,3
**accord** 379:15
**account** 319:13
**accountable** 477:12
**accr** 485:21
**accurate** 352:9
391:16
**accurately** 303:13
**achieve** 428:3
**achieved** 304:1
421:20 422:13,21
423:2,7,13,17,21
424:6,10,18 425:2
425:6,12,18 426:1
426:5,11,15 427:7
**acknowledge** 478:2
**act** 307:15 358:7,14
379:15
**acted** 353:17
379:13
**acting** 301:16
353:20 354:11
379:11
**action** 296:4 300:11
328:2 485:15
**actions** 474:22

**activate** 353:10
**actively** 318:22
**acts** 477:13 481:19
**actual** 319:5 351:3
364:15 365:22
466:12 475:20
**adam** 419:2 420:2
423:15 425:20
442:9 448:16
449:16
**add** 482:19
**addition** 314:11
363:18 402:3
418:18 450:3
**additional** 313:16
314:9 363:6 372:3
407:2 416:7
450:18,19 453:20
454:18
**address** 313:13
343:6 370:7,12
**addressed** 370:13
397:14 407:22
**adequate** 400:6,11
469:11
**admin** 468:15
**administered**
456:10
**administrative**
358:5 378:22
379:5 433:13
**administrator**
479:6
**advanced** 410:17
410:20 411:4,19
412:5
**advise** 385:12
428:15,16 452:8
472:14
**advised** 299:2
315:22 317:11
323:8 325:14
346:21,23 347:5
362:6,19 367:11
369:21 371:11
452:5 454:21
455:19
**advising** 384:21

472:16
**affairs** 300:8 378:1
378:7 385:23
**affect** 464:8
**affidavit** 380:2,2,3
380:7,8
**affiliation** 479:19
**afforded** 453:15
**afraid** 342:2
**africanamerican**
384:5 401:13,18
402:3 407:5 410:3
417:16 452:8
**africanamericans**
402:1 406:1 407:9
409:22 474:4,5
481:21
**agencies** 467:2,5,7
**aggressive** 317:2
**ago** 369:21 397:9
471:14 472:3
473:18
**agree** 433:18
**agreeable** 350:17
**agreed** 297:2 298:1
298:8,16 349:22
415:7
**al373** 485:21
**alabama** 296:2
297:7,9 298:19
301:9,16,17,19
366:19 435:20
485:3,22
**alert** 318:5,10
**allegation** 369:3
370:14 372:5
393:7,10,13
427:10 452:19
453:6 454:5
455:15 456:21
457:4
**allegations** 361:3
453:11 454:14
471:22
**allege** 451:10 455:7
**alleging** 369:9,18
370:19 427:15
428:12,23 430:22

455:18
**allow** 353:18
354:18 357:8
458:1 461:21
465:17
**allowed** 317:15
396:6 397:2,18
398:20 445:21
446:2,16 482:2
**allowing** 313:15
314:8 446:6
**amended** 298:20
482:18 483:2,10
483:11,13 484:7
484:13
**amount** 347:20
395:16 414:20
465:1 477:19
**angry** 317:5
**animals** 340:8
**answer** 302:19,19
302:20 303:3,6
330:21 358:12,14
362:21 368:9
385:6,9 390:21
398:5 414:23
419:11 420:1,8,10
420:14 428:4,7
430:18 432:11,23
452:13 470:1,16
478:21
**answered** 347:4
429:11 451:23
452:3
**answering** 394:1
396:10 405:4
453:20 469:9
**answers** 365:11
485:8
**anybody** 303:15
376:8 377:16
407:11
**anymore** 470:18
**anyway** 347:2
**anywise** 485:15
**aplin** 420:4 426:22
427:2,2,3 449:13
449:17

**apologies** 457:1
**app** 316:3
**appeal** 300:14
382:20
**appear** 333:10
**appeared** 316:8
**appearing** 301:9
**appears** 347:18
352:10 479:14
**applicants** 438:9,14
438:16 446:20
**application** 318:7
318:14,21,23
365:10 433:8
**applications** 476:1
476:9
**applied** 342:7
361:9 394:12,14
394:18,22 395:2
398:3 399:7
429:23 432:13
433:21 434:1,3
438:3 441:4 464:1
**apply** 342:8 368:17
368:21 394:23
408:12,13 409:7
431:7 432:14
**applying** 396:17
**appreciate** 469:15
**approached** 339:4
339:4
**approaching**
338:12
**approximately**
322:11 326:9
347:18 417:21
**area** 327:7 331:15
332:7,18,19
334:14 336:15
339:1 369:17,18
**areas** 326:17 369:8
370:7,18 459:2
**argue** 339:9
**argument** 341:15
**arm** 342:17
**army** 303:21
**arnette** 420:3 426:7
449:6,16

**arrive** 344:2,17
345:5
**arrived** 319:19
328:15 334:21
335:2 344:4,7,9
344:22 345:14
347:21
**arrow** 333:20
**arthur** 419:12
425:8 445:13
446:18
**articles** 477:5
**artist** 333:1
**ash** 418:23 421:23
422:1 436:6
**ashley** 458:7 480:7
**ashs** 422:1
**aside** 320:10
344:23 363:7
369:4 370:16
402:7 404:13
405:6 428:21
474:4,20
**asked** 309:1,23
310:3 316:7,14
322:11,19,22
323:9,18 324:3,4
324:19 327:23
328:4 346:5
349:14,19 355:17
355:21 356:2
371:5,9 404:5
414:21 429:10
452:4 484:3
**asking** 339:6 346:6
346:7,10 348:10
360:15 369:1,2
375:6 389:4,6
407:9 411:13
428:14 432:1
452:1 453:4
458:23
**aspect** 458:22
459:1 477:21
**assessment** 400:3,5
400:15 438:6,7,9
438:10
**assign** 298:12

**assigned** 364:6
375:20 376:2
386:5,11,13 387:8
387:12 388:1
400:9,11 410:12
411:12 428:6,9
429:3 433:3,4,7,9
435:10 436:3,12
436:18 437:2,5,15
440:7,16,18,21
441:1,12,14,19,19
442:3 443:3,14
444:5,12,22 445:2
445:8,11 448:13
459:12,14 464:17
**assignment** 367:17
387:9,18,21
428:12 430:21
431:17 436:23
437:18 440:3,6,9
440:11 441:8,10
441:17 442:1,9,11
442:12,21,23
443:2,9,12,21
444:10,20 445:7
446:4 447:15,18
447:22 448:9
449:7,11,14 457:9
458:19,20 464:20
**assignments**
375:12 416:23
417:2 418:9
427:12,15 428:2,3
428:23 431:14
434:19 435:8
436:6,21 437:11
440:1 441:20,22
442:4,7,14,16,19
443:5,17 444:3,6
444:8,13,16,19,23
445:3,5,14 447:7
447:20 448:2,5,8
448:11,14,16,20
449:1,5,9,12,15
449:18,21 450:1
450:14,15 451:1,7
457:5 461:13,18
464:7,8,12,13

465:7
**assistance** 343:6
458:17
**associate** 316:5
**associated** 477:4
**association** 461:22
462:1
**assume** 303:6
**assumed** 460:10
**assumption** 398:10
**atkin** 426:17,21,23
**attached** 333:5
352:6 370:9
372:12 376:19
378:13 380:15
381:20 382:10
383:11 389:14
416:1 462:20
**attempt** 352:1
412:19
**attempted** 321:5
343:9 361:18
**attempting** 340:21
356:16
**attend** 367:12
383:23 404:20
406:4 407:9
410:18,20,23
411:2,4 418:4
450:2 458:1
**attendants** 315:21
**attended** 384:2
408:18 417:8,15
417:17,22,23
450:9
**attending** 412:5
**attention** 316:20
323:17 341:11,22
**attitude** 328:6
**attorney** 311:5
348:2 350:11,23
351:16 413:13,13
**attorneys** 467:4
**attributed** 362:4
**auburn** 384:11,12
384:14,20,23
385:4
**audio** 300:4 302:9

310:10,14,15,22
311:3 312:2,9
313:19 347:13,15
347:23 348:8,13
349:7 350:3,21
351:10,11,18
352:11,17 384:6
389:21 390:2,6,10
391:6 416:6,17
**audiorecording**
302:10
**august** 387:1,3
**availability** 407:7
**available** 335:15
371:7 394:6
399:18 408:4,12
408:14,16 409:14
452:10,11,16
453:8,18,19
465:16
**avenue** 297:9 301:8
338:7 339:11
**awake** 470:15
**aware** 351:2 451:2

---

**B**

**b** 300:1
**back** 316:14 317:10
321:2,21 322:4,5
325:15 327:10,13
328:8,19,19 329:1
330:2,5,5,8,11,15
330:16 331:7
332:3,5 337:4
338:2,7 339:18,19
339:22 340:2,3,5
340:9,14,16,17,21
352:3 358:12
359:20 364:7
370:23 389:2
390:12,19,23
392:3,23 395:17
412:7 413:8
415:20 416:20
418:22 435:11,16
435:19 445:20
446:16 456:16,23
461:1 469:14

480:13 482:16
**backed** 336:22,22
338:16 339:23
**backing** 341:20
**bad** 343:15
**bag** 329:18,19
**barberree** 418:23
422:5 436:21
**barberree71** 437:1
**based** 312:1 352:17
362:14 384:17
390:21 391:1
430:13 459:5,7
464:20 477:23
484:3
**basic** 410:16,19
**basically** 319:17
327:5 336:19
433:10 458:3
**basis** 401:16 405:8
405:11
**basketball** 341:8
**bateslabeled**
380:22 381:3
**battery** 315:16
**baxley** 412:3
**beat** 472:17
**bed** 316:15 443:23
**began** 316:11
320:23 325:4
351:9
**beginning** 315:3
380:21
**begins** 351:16
**behalf** 379:11,13
471:20
**behavior** 317:2
**believe** 311:1 343:7
357:2 358:6,7,14
361:8,9,13 362:11
362:13,23 363:19
366:23 371:3
376:22 387:22
390:13,16 391:8
394:20 397:14,16
412:10 415:1
420:5 429:20
430:15 431:20

437:1,22 438:13
438:15,22 439:23
440:13 462:13
467:5 480:1,23
**belongings** 328:17
328:18 329:3,5,6
329:12 337:6
**belongs** 341:16
**belt** 324:14,14,15
**benefit** 323:21
467:19
**benny** 360:7 412:3
461:2 462:14
463:1 466:2
467:20 468:13,21
471:12 473:8
474:14
**benton** 379:3,17
382:16
**best** 353:18
**better** 338:19 400:1
409:17 451:11,17
451:21 452:20
453:2,7 454:1,6
456:19,22 457:6,7
457:10 458:14
462:10
**beyond** 337:17
470:12
**bike** 442:11,11,12
447:13,14 448:19
**billup** 419:4
**bin** 338:17,23
**birmingham** 297:9
301:9,16
**black** 376:15
377:12 385:20
406:11 408:8
409:20 417:16
439:8,11
**blacks** 481:21
**blackwell** 420:3
425:20 448:17
449:16
**bladen** 419:2,2
441:16
**bladens** 423:4
**blew** 342:1

**block** 336:7 468:20
**blocked** 335:21
336:21 337:18
**blocking** 336:10,17
**blocks** 326:9
**board** 362:12
374:10,13 382:21
383:1 407:20
**boards** 383:14
**bobby** 458:7 480:7
**body** 469:22
**bomb** 443:23
**bonds** 471:5,6
**boo** 316:9
**bottom** 380:22
**bowen** 418:23
435:9,19
**bowens** 421:12
**brad** 412:9 413:17
414:1
**brady** 345:12,13
**brake** 342:7,8
**brandy** 418:23
421:12 435:8,12
435:19,22
**brandys** 421:14
**break** 303:1,4
332:21 350:19
359:16 414:7,9
470:9,9,17
**breaks** 414:14
**brian** 454:20 455:7
455:19
**briefing** 405:2
**briefings** 405:1
**bring** 307:7 325:18
326:4 459:6
**brought** 332:5
400:3 417:10
466:14 482:2
**budget** 465:11,17
**bumper** 337:13
**business** 306:16
**button** 340:7

-------C-------

**c** 301:5 485:1,1
**cab** 339:8

**cain** 412:9 413:17
414:1
**calendar** 387:1,3,7
**call** 325:16 330:19
339:8,15 340:3,4
346:22 347:5,6
366:12,14 419:14
420:18 449:3
471:10 484:8,12
**called** 316:3 330:22
331:18,23 339:16
340:2,4,5 342:19
342:22 343:3,20
344:1 347:1
370:22 371:1
376:3 397:9
450:20 481:1,2,6
**calling** 343:11
344:13
**calls** 405:5 456:1
**calm** 316:14,22
317:1,5,6 321:5
**candidate** 433:18
433:19
**cant** 303:12 306:6
306:21 318:9
344:21 345:8
346:3 348:23
365:7 366:12,14
385:6,9,11 403:6
405:12 408:5,13
408:20,22 409:18
411:20 418:5
428:4,7,9,18
432:1,11,14 434:2
450:18 452:14
471:17 472:14
473:14,20
**capability** 390:19
**capacity** 364:5,15
389:6
**captain** 360:6
363:10 367:18
402:2 409:2 460:6
479:5
**captains** 403:2,9
**capture** 348:8
**captured** 348:1

**captures** 348:3
**car** 304:17,21
305:3 311:22
321:21 322:6,9,10
322:13,20,23
323:2 324:12,16
325:4,12 326:19
330:2,5,23,23
331:2,2,8,12,19
331:20,21,21
332:7,8,10,12,13
332:17 333:9,20
333:21,22,23
334:4,18,20
335:10,12,13,16
335:16,17,19,21
335:22 336:1,6,7
336:9,10,13,15,18
336:22,23 337:12
337:14,21,22,23
338:1 339:18,23
340:10,18,22
341:10,13,15,18
341:18,21 342:4
342:10,10,11,12
342:12,14,16
343:12,17,21,22
345:16,18,22
346:12 353:10,19
353:19 354:4,5,7
355:10,12,13,18
355:18,22 356:16
**career** 413:1
**carla** 383:17
**carney** 296:7,22
297:5,12 300:12
300:15 301:21
302:1 393:7 417:1
451:12 452:21
454:1 459:11
463:6,8 482:18
**carneys** 300:4
352:11
**cars** 332:11 340:14
**case** 310:23 311:3
359:2 361:19
365:15,17 366:5,8
384:7 385:5,14

389:23 392:21
413:19,19 428:23
453:11 472:9
477:5
**cases** 366:16
**catchall** 450:4
**caucasian** 421:13
422:2,6,12,16,20
423:1,5,16,20
424:5,13,15,22
425:5,9,17,23
426:4,10,14 427:6
463:21
**cause** 301:22 342:1
485:16
**caused** 475:6
**cell** 315:15,16
**center** 327:18
400:3,5,15 438:7
438:10
**certain** 305:8
319:20 364:4
376:4 396:11
397:7,18 398:5
401:1 407:7 409:5
409:14 428:6
456:1 461:3
464:10 466:8
481:23 482:1
**certainty** 375:19
**certificate** 485:21
**certify** 301:18
485:6,13
**chain** 305:21 306:1
404:3,22 433:12
**chamber** 468:19
**chance** 390:23
**change** 399:19
464:15,20
**changed** 468:16
**charge** 433:16
459:1,2 477:9
482:19 483:1,3,10
483:14 484:8
**charger** 315:17
**chart** 389:21 390:5
391:4
**check** 483:5

**chief** 347:3 367:8
  379:3,17 382:16
  398:11,16,18
  460:7 465:6
  479:17
**chiefs** 379:11,13,14
  380:11 403:10
**childhood** 383:18
**children** 383:22
**choose** 459:3,4,4
  473:5
**choosing** 328:2
**chose** 430:6
**chosen** 398:14
  401:9 406:19,22
  406:23 429:5
  430:15 433:20
  461:3,8 482:5
**chris** 418:23 422:5
  436:21
**christian** 322:17
  326:11 327:10
**church** 322:18,21
  325:19 326:10,11
  327:10,13 331:17
  331:20,21 332:5
**cid** 441:10,12,14
  459:2
**circle** 338:8
**circumstances**
  305:8,11 472:2
**citizen** 389:5
**city** 296:10 304:18
  304:19 305:3
  306:17,20 320:1
  341:16 359:8,9,23
  361:11,17 363:11
  363:22 372:22
  375:1,2,4,13
  385:21 386:8
  388:16,20 389:4
  393:15,16,17
  396:14,15 400:2
  403:8 413:6 428:5
  432:2,17 446:6,11
  453:16 466:15
  468:22 471:21
  474:17 475:20

476:5,12 477:3,12
  477:19 478:1,2,11
**citys** 393:19
**civil** 296:4 298:20
  301:19
**claim** 358:10
  454:19
**claiming** 369:16
  402:21 411:18
**claims** 385:5
  471:23 472:9
  484:1
**clarify** 386:7 396:9
**clark** 338:8
**class** 406:2
**classes** 407:3,7,17
**classified** 395:22
**clearly** 324:8
**clerk** 414:18
**click** 318:16
**close** 334:20 469:12
  470:8
**closer** 328:23
**clothing** 329:13
**cloud** 312:23
**cloyd** 296:22 297:5
  297:12 301:21
  302:1,6 310:7
  313:1,2,4 319:8
  320:20 322:5
  338:12,14 339:4
  340:20,23 342:22
  344:9 349:15
  352:7 380:3,8
  381:8,15 415:1
  416:2
**cloyds** 333:21
  334:18,20 335:13
  335:16 336:10
  338:1 346:8
  354:16,19,22
  355:5,10 356:6,16
  357:9 414:18
**clue** 408:4
**cochran** 419:2
  423:11 441:22
**coercion** 360:3
  371:14

**cole** 419:1 441:9
**coles** 422:23
**come** 325:14,17
  326:18 330:20
  332:1 339:6,9,14
  339:17 340:14,15
  340:17 346:17
  357:9 417:6
  446:16 469:13
**coming** 330:11
  337:5 340:12
**command** 305:21
  306:1 404:3,15,16
  404:22 405:7
  433:12,17 459:21
**commencing**
  297:10
**comment** 316:9
  371:12 473:11
**comments** 362:4
  368:5 371:10
  469:1,2,3 470:19
  473:19 474:7
**commerce** 468:19
**commission** 485:23
**commissioner**
  297:6 298:18
  301:16 485:20,22
**commonly** 317:19
**communication**
  458:15
**community** 375:9
  459:15 460:11,19
  461:10 462:2
**company** 326:5
  330:22 340:2
**compare** 361:18
**compared** 368:4
**compel** 314:13
**complain** 373:6
  430:11,19,20
  480:15
**complained** 480:20
  481:13,16
**complaint** 358:8,19
  358:20 359:6
  360:19 361:2,8,12
  361:14 362:8,14

362:15,16,18
  363:21 364:9,20
  369:8,10,12,14,17
  370:5,8,9,12,18
  370:21 371:4,4,12
  371:17,23 372:2,9
  374:8,9,12,18,21
  392:20 398:19,23
  399:15,17 400:5
  412:17 415:11
  416:21 430:8
  451:10,15 453:22
  459:10 462:7
  463:6 474:8,9,20
  474:23 478:22
  479:2,10 480:5,17
  480:22,23 481:4
  482:17
**complaints** 359:11
  360:21,21 362:7
  363:15,23 372:3
  374:5 399:12
  412:4 478:9,13,17
  479:4 480:9
**complete** 311:15
  313:16,18 314:9
  314:10 420:7,10
  420:11 472:6
**completed** 306:20
  362:21 412:11
  413:4,7,15 420:1
**completing** 395:23
  416:16 417:14
**compliance** 298:5
  364:12
**complies** 353:2
  413:22
**computer** 349:7
  350:8 462:9
  467:18
**concern** 364:20
  397:17
**concerns** 371:18
**concert** 398:13
**concluded** 484:20
**conclusion** 361:22
**conduct** 482:10
**conducted** 362:13

363:1 414:15
  430:4
**conducting** 363:20
  434:14
**confederate** 358:17
  372:23 373:18
  374:6 479:16
**conferences** 411:1
  411:3
**confirm** 312:14
**conflict** 446:7,10
**conjunction** 307:4
  480:21
**consent** 359:7,8
  361:10,10 363:13
  363:16 364:1,12
  364:22 365:6,9
  368:17,21 474:19
  477:13
**consider** 317:22
**considered** 362:3
  409:7 446:17
**considers** 458:19
**conspired** 360:2
  369:22
**constant** 475:7
  476:15
**contact** 323:6
  324:21 326:18
  340:1 346:20
  348:22 370:4
**contacted** 348:19
**contacting** 389:8
**continuation**
  296:21 297:4,11
**continue** 302:7
  315:18 316:23
  317:11 358:13
**continued** 302:5
  317:2 324:16
  328:12 339:13
**control** 386:5,7,8
  386:10,13 387:8
  387:16 388:1,4,6
  388:7 404:14
  442:11 467:5
**conversation**
  317:11 320:7,15

327:23 328:21
339:5 343:8
344:14,15 347:8
347:10 348:1,4,9
348:17,21 349:3
350:10,22 351:4
351:11,16,19
353:4 356:3 364:8
364:17,18 365:1,5
365:8,22 367:22
370:15,23 371:2,8
384:10,15,19,23
385:11 479:4
480:10 481:18
482:11
**conversations**
348:15 349:21
367:1 385:16
456:7 479:6 482:8
**convinced** 317:7
**cook** 419:1 440:2
**cooks** 422:15
**cooper** 297:8 301:6
**coordinator** 375:10
375:10 459:15
460:11,20 461:10
462:2
**copy** 312:6,9,12,21
320:10 333:4
349:2,16 350:2,15
351:21 352:5,9
370:8 371:4
372:11 376:18
378:12 380:14
381:19 382:9
383:10 389:13
391:16 392:20
398:2 415:23
416:20 419:20
462:19,23 482:23
483:1,2,8,10,22
484:7
**copying** 350:6
**corner** 338:7
380:22
**corporal** 300:14
304:4,6,9 376:6,9
394:18 395:1,3,6

396:2,7 397:6
398:4,8,15 399:2
399:7 400:8,14,20
401:5,10,10
403:20 405:18
421:7 422:8 423:8
424:20 425:3,13
425:19 426:16
427:9 431:2,16,18
431:23 432:3,4,6
432:15,16,18
439:20,22,23
445:15,15 454:20
454:22,22 455:3,8
455:17 456:5,13
458:13 460:12,13
463:8,10,18 464:2
464:4
**corporals** 402:13
402:23 403:1,9
434:11 445:18
**correct** 306:2 311:8
312:3 313:3
321:23 331:11
334:11,14,15,18
335:4,5,8,13,14
337:11 338:4
343:22 351:13
382:18 392:4,13
395:3,4 396:21
399:11 427:12
433:2 441:21
462:16 464:22
476:23 480:4
485:11
**corrected** 391:2
**correctly** 353:21
354:13 357:2
381:12 417:23
431:19 451:13
454:2,11 481:12
482:20
**couldnt** 304:21
306:15 309:2,7
353:12 483:21
**counsel** 297:3
298:10,11 301:20
312:17 348:12,15

349:4,4,21 351:12
351:19 383:6
393:18 483:17
485:14
**counseling** 413:1
**count** 415:10
**counties** 467:8
**county** 485:4
**couple** 411:14,16
429:7 456:9
**course** 306:14
323:17 327:20
328:2 332:14
340:13 362:10
364:3,13 376:1
394:6 406:2,16,18
408:23 409:1,19
410:13,17,21,23
412:3 417:8,13,14
417:15,18,22
418:1,5,21 420:12
433:17 434:17,18
434:20,22,22
435:3,4 450:2,5,7
450:10 468:18
473:7 475:1
477:15
**courses** 406:4,7,10
407:10,13 408:1,3
408:6,9,18,19,21
409:11,14,16
410:13,14,15
411:7 452:9
**court** 296:1 298:6
299:3,4 301:15
302:14 313:14,15
314:8 359:21
365:23 366:3,4,10
366:16,16,18
414:18,21 415:21
472:10 473:4,6
477:15,18
**courtordered** 472:3
**courts** 416:4
**coverage** 475:8
476:16,16,18
477:2,2
**covered** 452:13

**coworkers** 401:18
**create** 342:3 407:17
**creating** 472:11
**crime** 300:19
375:10 460:23
461:11 466:18
467:2,3,8 468:17
468:20
**criminal** 407:1
409:21,23 440:3,7
441:10 482:2
**cultural** 367:13
**currently** 303:18
303:20 359:9
373:3
**curse** 321:11
**curtains** 316:19
**cz** 356:11,12

**D**

**d** 298:19 301:1
**damaged** 474:22
**damages** 477:19
**dan** 479:7
**danzy** 479:7
**darryl** 358:21
359:1,12,22
360:12,18 364:1
364:11 365:1,5,12
366:20 367:19
368:17,20 369:9
374:22 478:19,21
479:3
**date** 301:18 391:20
391:21 392:1,6,10
392:14,16 394:16
394:21 411:11,13
413:4,7,12 429:12
473:1,4,5,5 475:2
**dated** 468:13
483:16
**dating** 316:4
317:19,22,23
323:11,13,15
**david** 360:6 420:3
426:13 449:9,16
460:6,6,14 463:11
463:14,17 464:3

478:22 479:3,7
480:11
**davids** 463:20,22
**davis** 395:14,19
399:4 419:3,6
442:9 445:5
**daviss** 423:15 425:4
**day** 297:10 299:1
331:6 335:23
386:22,23,23
387:4 388:3 401:6
472:3,7
**deal** 318:11 349:5
**december** 312:22
313:21 314:16,22
314:23 333:14
334:22 352:19
378:4,21 391:21
392:4,13 482:18
483:3
**decided** 325:21
331:1 429:13
**decision** 300:13
307:12 320:12
357:21 358:1,3,4
358:5 366:21
379:4,9 380:12
382:4,7,13,16,20
383:14 398:7,13
429:14 430:6
466:16
**decrease** 461:18,20
**decree** 359:7,8
361:10,10 363:13
363:16 364:1,12
364:22 365:6,9
368:18,21 474:19
477:13
**deemed** 431:11
446:8 477:18
**defend** 471:21
**defendant** 296:11
301:10 313:16
389:23 393:5
394:3 416:14,22
451:11 452:20
453:2,6,23 454:5
454:9,14 456:21

459:11 462:8
482:23
**defendants** 300:16
333:3 337:9 352:4
352:8 372:10,14
376:17,21 377:10
377:20 378:11,15
380:13,17 381:18
381:22 382:8,12
383:9,13 389:12
389:16,17 392:9
415:22 416:3,5
462:18,22
**define** 307:13,14
368:8
**definite** 398:5
**delete** 350:13
**delivering** 298:21
**delvick** 358:22
370:19 372:5,18
374:19
**demeanor** 317:6
**demonstrations**
456:2
**denied** 406:11,16
411:18,20
**department** 300:7
300:15 304:3
305:15 324:21
338:8 339:1
344:13 358:9
360:5 373:9,11,12
373:15,16 375:1
378:1 391:14,14
394:8,9,10,11,13
395:18 397:12
399:22 401:2,21
403:7 405:3 409:6
412:10,21 413:1,2
417:10 421:18
435:1,16 450:23
454:23 458:8
463:9 464:16
465:4,10,15
466:15 467:1,6,6
467:11,12,13,19
468:19 479:13,14
481:19

**departments** 400:4
458:4 467:10
476:1
**dependent** 457:16
**depends** 317:21
402:17 457:18
458:21
**depicted** 336:12
479:11
**deployment** 469:17
**deponent** 484:21
485:12
**depose** 416:7
**deposition** 296:21
297:4,11 298:3,4
298:14,17 302:7,8
302:10 303:16
308:2 313:7,11,17
313:18 314:3,9,11
333:7 365:14,23
370:9 393:8
415:10 416:15,17
420:12 456:19,20
457:4 472:6 473:2
473:3 484:20
485:7
**depositions** 298:7
363:10,12 414:14
414:15
**derek** 345:8 418:23
422:9 437:8,12
**dereks** 422:9 437:8
**derogatory** 468:23
469:3
**describe** 334:8
338:20 474:23
**describing** 306:20
**description** 300:2
**designated** 359:19
415:19 434:18
**desire** 433:10
**desk** 367:10,17
375:15,17
**detailed** 319:13,17
319:21
**details** 320:7
**determination**
300:10,13 307:12

362:2 379:20,22
380:1,6,9,10,19
381:1,16 382:1,3
382:4,13 460:18
**determinations**
363:14
**determine** 310:2,5
365:16
**determined** 315:13
368:3,7 395:13
396:18,20 399:1,3
464:23 465:4
477:22
**device** 350:6
**didnt** 307:6 309:6
309:10 312:20
314:14 315:17
317:1 322:22
325:23 326:1
329:20 330:1,1,21
334:8 336:7 339:9
339:17 341:5
342:2 343:14
344:13 345:2
346:5,7 361:1,23
363:16 367:20
368:17 369:11,16
369:19,21 370:7
372:8 387:12
390:19 397:21
402:18 404:8
405:12 409:11
412:14 419:9
430:11,19 441:7
446:13 447:11
464:8,15 468:9
473:5 474:2 479:9
**died** 315:17
**different** 306:7
361:16,21 376:2
400:4 408:21
433:11 435:19
438:23 457:5
458:2 464:6 476:1
481:20
**difficult** 427:22
475:5
**diffuse** 321:6

**direct** 404:2,3,21
**directly** 317:3
326:8
**director** 358:22
368:12 375:2
395:14
**disagree** 415:17
**disciplinary** 300:11
**discipline** 460:20
**disciplined** 307:22
**discovery** 416:18
453:16,19 482:22
**discretion** 465:7
**discriminated**
358:20 362:19,20
371:19
**discrimination**
359:11 360:3
363:15 364:21
369:23 371:13
477:13 478:11,18
**discriminative**
368:3 481:19
**discuss** 317:15
**discussed** 349:14
414:18
**discussing** 326:15
**discussion** 397:17
**discussions** 414:1,4
**dispatch** 346:22,23
347:1,2
**dispatcher** 343:5,9
343:12,21 344:1
347:4
**dispute** 445:16,17
**disregard** 347:1
**disrupt** 475:7
**distance** 325:13
339:20,22
**distinguish** 427:23
**distribution** 488:16
**district** 296:1,2
366:17,18,19
467:4
**diversity** 367:13
**division** 296:3
300:8 366:19
378:2 403:18

404:18 433:11,13
433:17,22 444:1
464:15
**doctor** 387:17
**document** 306:19
309:21 310:4,9
320:4,6 347:11,12
347:17 350:6
351:4 352:14,22
353:1 357:23
361:4 371:17
372:15,17 377:21
378:16,18,20
379:6,16,17
382:15 386:18
390:22 412:9,14
412:20 413:9
415:8 416:11
419:13,20 433:15
438:1 448:23
449:4 483:6 484:7
484:15
**documentation**
393:22 428:5
432:2 472:20
**documented** 348:4
**documents** 314:12
348:11,14 359:14
366:2,7 414:23
418:13 453:17
**doesnt** 306:14
330:10 435:2
**doing** 354:10
361:19 400:2
**domestic** 308:9
310:11 381:9
**donald** 404:11
418:3 479:9 480:2
**donna** 297:5
298:21 301:15
302:14,23 485:19
485:20
**donny** 360:7
**dont** 302:19,21
303:4 306:23
309:19 312:11,14
321:8 324:6,9,10
325:20 326:23

327:1 330:3
338:20 339:14
347:3 348:14
349:1 350:8
351:23 353:14
357:1 358:3 361:9
362:13,23 364:14
366:13 368:15
369:13 370:13
377:2,4 378:17,19
379:18 384:22
386:3,4,22 387:6
388:3 389:8
394:15 396:13
397:7,15,22
406:21 408:13
411:11 412:15
413:20 420:13
428:19 429:11
430:2 432:21,22
433:6 434:2,6
436:1,2 437:4,19
439:1 441:18,19
446:21 453:8
455:13 457:22
458:16 459:2
461:7 463:19
464:5 465:21,22
469:7,22 470:3,17
471:1 472:10,13
473:4 479:20
480:16,16,19
481:3 483:7,7,9
**door** 326:21 340:6
340:7,8,11,19,19
341:6 342:15,16
**doors** 340:13
**dothan** 296:10
300:7 304:2,18,19
320:1 359:8,9,23
361:11,17 363:11
363:23 372:22
375:1 378:1
385:21 386:8
388:16,20 389:5
395:17 396:14,15
403:8 412:23
432:17 450:22

465:9,14 468:18
468:23 471:21
474:18 476:5,12
476:18,21 477:3
478:4,11
**dothans** 305:3
**double** 332:9,9
333:17
**doug** 360:7
**downloaded**
318:14 350:8
**drafted** 380:3
**drag** 470:3
**drained** 471:16
**draining** 475:5
**draw** 316:19 333:2
**drawn** 337:10
**drink** 328:5,12
**driskell** 412:13
**drive** 325:5,6
335:22 343:19
350:14 469:23
483:12 484:11,14
**driver** 357:14
**drivers** 327:19
342:15,16
**driveway** 331:3,13
331:15,16 332:8,9
332:10,11,15,18
332:20,20,22
336:18,21 337:2
337:16,19,20
338:18,23 339:23
341:5,7 343:7
355:15 356:5
**driving** 322:1
328:19 469:18
**dropped** 330:13
332:2 337:6
**drove** 315:4 326:7
326:7 327:12,12
328:12,19 329:1
338:7,11 339:18
339:22
**due** 312:18 316:16
317:8 387:17
**duly** 302:2
**duplex** 327:5,6

**duties** 387:15
400:19 462:10
**duty** 306:9,12
310:13 367:9,17
375:15,17
**dx34** 300:3
**dx35** 300:4
**dx36** 300:6
**dx37** 300:7
**dx38** 300:9
**dx39** 300:10
**dx40** 300:12
**dx41** 300:13
**dx42** 300:14
**dx43** 300:16
**dx44** 300:18
**dx45** 300:19
**dying** 315:16

### E

**e** 300:1 301:1,5,5
485:1,1
**eagle** 476:18
**earlier** 449:23
450:8 464:6
**early** 314:23
**earn** 461:21,23
**education** 459:5
**edwards** 311:5,7
348:2,19 413:14
483:5
**eeo** 359:10,22
361:23 363:14
364:4,11,15
385:23 474:13,19
478:23 480:11,14
**eeoc** 358:8,19,21
474:20 482:18
483:1,3,10,13,15
483:20 484:8,13
**effect** 298:4
**effective** 298:20
**effort** 407:14
**eggleston** 439:15
480:8,8
**egregious** 307:15
307:15
**eight** 311:23 312:1

478:5
**either** 319:18
323:20 347:3
389:6 395:7
397:19 411:3
437:22 441:20
442:3,6,14 444:2
444:5,12,15 448:1
448:4 460:6 476:2
**electrical** 338:19
**eligible** 395:21
402:7
**eliminating** 323:21
**elongated** 415:6
**elses** 350:7
**email** 300:19 318:3
390:17 462:14,23
466:3 467:21,23
468:1,3,12
**emails** 413:13
438:2
**emergency** 315:1,4
315:5,9,11 317:12
319:8
**emotionally** 475:5
**employed** 303:18
303:20 304:2
363:22 393:15,17
421:17 423:14
432:17 468:22
**employee** 361:17
368:1,10 389:4
395:20
**employees** 360:5
367:23 387:14
**employers** 476:10
**employment**
357:22 358:2
366:22 372:21
375:4,23 376:5
382:17,21 383:15
388:15,20 413:3,5
413:6 474:17
475:3,11,13,15,18
475:22 476:3
**en** 330:20
**enabled** 462:10
**encounter** 323:15

**enforcement**
394:10 405:6
475:4,23
**engage** 344:15
**engaged** 312:23
324:9 326:1
327:22 339:5
**engagement** 323:22
**ensure** 350:5
**entail** 466:22
**entailed** 466:23
**entered** 313:15
314:8
**entire** 369:10
**entitled** 352:10
**entry** 337:18,19
**environment** 454:1
454:6 456:22
457:6,10
**eo** 474:7
**equal** 400:22
**equally** 401:7
**equipment** 353:11
**er** 315:15
**error** 391:23
**esquire** 298:22
**essence** 336:21
**establish** 467:9
**etress** 387:11
**evading** 397:15
**evaluations** 458:10
481:22
**evans** 418:10,11,19
421:4 430:21,22
431:6
**evening** 319:14,16
347:14,16 381:10
**event** 450:19
469:22
**events** 320:16
458:1
**eventually** 317:7
323:4 344:3
**everybody** 404:20
**evidence** 298:14
367:19 368:16,20
369:1,2 372:4
379:7,21 380:7

393:9,12 452:15
452:18 453:1,4,5
453:20 454:4,13
454:18 484:1
485:11
**evolved** 409:17
**exact** 336:13
339:20 364:14
386:22 388:3
409:16 411:11
429:11 436:1
450:9
**exactly** 309:19
327:2 344:21
349:9 353:9
360:16 375:11
439:1
**exam** 397:19 398:4
420:5 445:19,19
445:20,21,22
446:1,2,9 455:1
456:9,10
**examination** 301:2
301:22 302:5
**examined** 302:2
**example** 408:23
457:9 464:14
**examples** 406:6,9
456:2
**exams** 397:3
481:23
**exceeding** 337:15
**exception** 351:5
357:13 391:8
417:15
**excess** 337:16
**exchange** 321:15
321:17 330:4
338:14 344:11
357:7
**exclude** 349:19
351:22
**excluded** 349:2
**excuse** 313:10
331:14 413:14
426:6 454:22
**excuses** 472:21
**exercise** 435:5

472:19
**exhibit** 300:2 333:2
333:3,7,10 337:9
352:4,8 370:10
372:10,14 376:17
377:10,20 378:11
378:15 379:16
380:13,17,18
381:18,22 382:8
382:12 383:9,13
389:12,16,17,21
392:9 415:22
416:3 462:18,22
**exhibits** 299:1
**exit** 324:19 337:19
340:13
**exited** 317:14
325:10 342:14
**exiting** 324:17
**expect** 372:1
**expectation** 323:23
482:9
**expected** 304:15
323:18
**experience** 393:6
394:7,9 459:6
**experiencing**
482:14
**expires** 485:23
**explain** 309:9 316:7
327:23
**explained** 368:2
**explaining** 336:8
**explore** 362:17
369:9,17,19,21
**explosives** 444:1
**expressed** 400:13
**extended** 367:10
414:23
**extent** 312:9,13
348:13 385:15
**extra** 461:21,23
**eye** 370:4

---

**F**

**f** 321:1 485:1
**facebook** 308:1
318:12,13,14,15

318:23 362:5
**facing** 334:6
**fact** 308:15 316:16
317:9 320:11
325:6 330:8
345:21 351:2
353:23 354:22
371:6 372:7
381:14 410:6
412:18 432:16
445:22 446:7
**factor** 396:22
**factors** 396:19
**facts** 472:21
**fail** 370:11
**failed** 435:15,20
**failure** 435:16
**fair** 325:22 359:5
361:1 362:14
363:1,20 369:13
**fairly** 333:9 361:14
**fairness** 470:1
**fall** 467:7 468:16
**familial** 430:13
**familiar** 345:2
472:5
**family** 305:14
384:1 475:7
**far** 306:10,20 322:8
325:15 332:19
479:2
**faster** 393:6,21
394:4,11
**fbi** 388:12 409:1,3
**february** 360:10,22
367:20 368:23
369:8 372:19
**federal** 358:8 359:8
361:10 363:10
364:22 365:6
366:16 474:20
476:8
**feelings** 328:11
**felt** 328:8 362:18
363:16 368:5
**female** 316:6,8
323:6 385:20
417:23 421:15

425:14 439:20,21
439:23 463:23
**females** 439:18
**fencedin** 338:21
**fiance** 313:21
314:16 315:1
**field** 417:8,8,18,19
418:4,20 431:20
434:5,7,10,15,17
434:18,22 435:2,4
436:8,9,12 437:13
437:15,16 441:17
442:1 444:10
447:23 448:18
449:7 450:2,5,6
450:10 464:14,18
472:19
**fifteen** 417:21
**file** 412:4
**filed** 299:3 358:9
358:21 362:6
392:21 471:18
**filing** 298:17
**fill** 376:3 412:16
413:10 433:19
461:3
**filled** 375:8
**filling** 401:5
**finally** 321:9
341:11,11
**financially** 477:16
**find** 407:21 408:15
**finding** 320:6 372:7
**findings** 361:15
367:14
**fine** 302:13 321:7
**fing** 321:4
**finish** 403:14
469:16
**finished** 419:10
**fire** 338:8 339:1
**first** 302:2,8 308:2
308:12 309:1
322:23 361:7
370:21 371:19
380:18 388:4
393:8 413:3,5
418:16 429:3

455:5 460:13
471:1,3 484:12,14
**firsthand** 446:21
**five** 326:23 467:5
**flag** 479:14,16
**flash** 350:14
**flipflop** 469:19
**flown** 479:15
**flu** 315:13,20 316:1
**flush** 336:19
**focus** 323:17
**fold** 329:20
**folks** 403:4
**follow** 304:15
478:6
**followed** 363:13
**following** 301:23
331:4
**follows** 302:3
**followup** 414:1,4
**force** 298:4
**foregoing** 301:20
485:7,10
**forget** 471:2
**forgot** 312:19
**form** 298:11 413:1
413:4,7,15,18,21
413:23 414:2,6
**formal** 360:1 364:9
364:9 371:17
380:10 479:2
**former** 413:13
473:15
**forth** 340:21
**forward** 470:4
**found** 468:8
**founded** 466:12
**four** 387:23 388:10
461:9
**fourth** 361:21
**frame** 313:7 349:1
368:13 386:17
393:16 394:17
397:15 403:3,12
415:9 428:17,21
429:22 432:22
436:1 438:7 440:4
440:15 441:11

442:6,13,22
443:11 444:2
456:5 464:2
473:18 477:17
**frames** 364:14
376:4 409:13
**friday** 296:23
468:13
**friend** 383:18
**friends** 323:7 324:1
**front** 317:3 329:2
334:4,5,7,16
336:23 337:13
340:19,19 342:12
342:13 420:18
**fto** 444:20 448:9,22
449:8,11,14
**fulfill** 400:19,19
401:9 461:8
**full** 298:5 351:8
**fully** 303:13
**further** 298:1,8,16
484:21 485:13

**G**

**gain** 475:22
**gale** 297:8 301:6
**garage** 330:23
331:9 332:10,16
333:17,19 334:3,5
334:6,10,13,16,17
335:4,7,10 338:3
340:6,7,7,8,13
**garrity** 300:8 378:2
378:3
**gate** 371:16
**gather** 328:18
**gathered** 328:17
**gender** 421:14
463:22
**general** 326:10
400:17 405:2
450:4
**generally** 304:14
306:8
**getting** 317:5 343:7
351:21 402:4,6
405:11,18 464:7

**give** 309:14,23
310:3 321:1 323:5
329:3,15 346:1
350:14 353:18
383:3 390:6,20
394:14 398:5
405:1 406:6,9
408:6 409:18
418:5 428:4,8
469:8 471:15
481:2,14
**given** 345:4 365:13
385:1 396:13
401:19 402:10,12
402:13 405:23
406:1,3 412:13
428:19 434:19
444:16 445:19,22
447:15 455:2
458:5 462:9
485:11
**gives** 304:13
**giving** 326:13 343:5
349:20 472:21
**glen** 419:5 424:8,10
443:17
**glover** 417:11,11
418:1
**glovers** 420:21
**go** 309:11 311:14
311:18 320:3
327:13 330:19
331:1,3 339:7
340:15 349:11
350:1 355:23
358:12 359:13
386:18 388:21
389:2 390:19,23
406:15 409:2,3,8
411:19 413:8
414:22 415:7
418:12 433:14
465:17 474:7,10
**goal** 341:8
**godwin** 419:6
424:19 444:9
**goes** 433:11 435:11

458:16
**goguen** 454:20,20
455:7,19 456:8
**going** 312:5 314:22
320:23 321:4
323:19 324:1,22
326:8,18 330:19
333:1,6 335:22
339:15 340:9
341:14 347:18
350:1,7 351:7
352:7 353:10,15
356:4 357:13
362:22 371:20
377:9,15 378:14
380:16 384:23
392:19,19 401:4
416:2 435:14
436:2 447:12
456:8,23 459:3
460:2 472:10
484:6
**good** 325:12 433:18
438:21
**goodwin** 424:19
**goodwins** 424:14
**gotten** 325:23
366:1 409:17
**government** 466:15
**grab** 324:13
**grabbed** 342:17
**grabbing** 343:18
**granted** 406:3
415:9 416:15
**grass** 331:14
332:14,23 335:12
**grassy** 332:7,17,19
334:13 336:15
339:1
**gravel** 338:18
**gray** 363:11 365:14
367:18 388:11
389:10 402:2
409:2 479:5
**grays** 366:5 388:15
388:20
**grievance** 360:1,9
360:22 372:19

**groomed** 454:23
455:20,22 456:6
**grooming** 455:7,17
**gross** 307:7,13,14
382:17 477:8
**grounds** 298:13
372:8 478:1
**group** 400:15
446:19
**grow** 458:11
**guard** 337:13
**guess** 315:20
317:21 458:3
**guidance** 401:19
402:9 405:3
**guidelines** 359:7,10
361:23
**guy** 353:19

**H**

**h** 298:22 300:1
301:6
**hadnt** 328:4 412:15
**hall** 419:1 422:19
440:10 441:5
**hancock** 420:2
425:14 448:7
**hand** 308:7,15,18
308:20,23 309:2,6
309:7,10,17 310:6
311:22 393:23
**handing** 309:5
371:17
**handle** 306:12,15
455:23
**handpicked** 401:3
**hanging** 329:21
**happen** 309:13
435:18
**happened** 322:19
323:3 329:16
344:6 370:16
**happy** 470:9
**harassment** 360:3
371:13
**harbert** 297:8
301:8
**hard** 302:23 350:14

437:10 468:14
**hardin** 404:11
418:3 479:9 480:2
**hasnt** 312:10 476:6
**havent** 435:3
451:19 452:22
458:5 475:12
**hazard** 472:12
**head** 365:7 366:13
366:15 394:16
396:4 417:7
**headed** 368:1
**heads** 375:1
**hear** 310:7 344:13
414:16 468:23
470:8,13 471:10
473:1 476:13
**heard** 343:4,8
367:4 412:15
469:2,4 470:20
473:16,19 474:4
**hearing** 300:10,13
307:12 362:13
374:13,14 379:21
379:22 380:1,6,9
380:10,19 381:1
381:16 382:1,3,5
382:6,13,23 383:3
383:7
**hearings** 374:10
**held** 477:12
**help** 310:4 363:5
399:23 402:2
458:11 467:19
**helped** 476:6
**henry** 467:7
**hes** 353:19 417:11
423:14 424:16
458:7,8 479:21
**hey** 316:9 318:10
446:14
**higher** 304:6,8,13
403:17
**highest** 304:1
421:19 422:7,13
422:17,21 423:2,6
423:13,17,21
424:6,10,18 425:2

425:6,12,18 426:1
426:5,11,15 427:7
**hindered** 475:4,10
  475:12,15,17,21
**hindering** 476:6
**hired** 435:12,12
  438:16 476:6
**hiring** 398:7
**hit** 340:7 341:7,13
  341:21
**hitting** 355:19
**hold** 347:5 412:18
  465:10,15
**holding** 479:14
**home** 322:8 326:8,9
  328:23 330:6,7,9
  330:9,15 331:22
  332:2 333:12
  334:6,10,21 337:5
  339:9,12,22
  340:15 381:9
  430:14,17 435:18
**honestly** 428:7
  470:4
**honesty** 378:17
**hoping** 477:10
**horn** 341:21 342:1
**hospital** 317:8
  321:16
**hostage** 406:17
  410:4
**hostile** 328:7
**hotel** 339:7,8
**hours** 313:8,9,16
  313:17 314:9,23
  331:10 378:9
  472:18
**house** 314:19
  319:19 322:5
  325:7,15 327:4,6
  327:9 329:6
  330:17 331:8
  332:6 333:11
  334:1,2,7 339:6
  339:10,15,19,23
  340:12,16,18
  341:1 378:8
**housed** 386:9

**houston** 467:7
**huhuh** 302:20
**husband** 312:23

**I**

**identification**
  333:4 352:5
  372:11 376:18
  378:12 380:14
  381:19 382:9
  383:10 389:13
  415:23 462:19
**identified** 362:17
  398:6 407:13
  412:10 417:19
  440:13 443:22
  464:13
**identify** 356:1
  362:2,5 389:21
  390:9 393:18
  403:8
**identifying** 390:17
**ignored** 316:23
  339:13
**ill** 302:17,18,21
  303:5,6 333:6
  350:14 372:13
  376:20 377:15
  381:21 382:11
  389:15 414:16
  462:21 469:10
**illness** 317:9,16
**im** 309:22 310:10
  311:4,20 312:5,13
  313:5 314:14
  319:20 320:2,6
  321:1 330:2 333:1
  333:1,6,7 334:2
  346:10 347:12,18
  350:6 354:6 355:2
  356:15 360:13
  364:3 365:20
  366:13,14 368:19
  369:2 371:18
  372:13 375:5
  376:20 377:9,19
  378:14 380:5,16
  389:6 392:6,19,19

396:9,11 397:15
  403:15 404:11
  411:13 415:4
  416:2,9 417:4
  418:14 419:14,23
  420:9 421:9,9
  423:5 431:21
  436:1 437:10
  438:2,18 443:7
  447:8 449:3 451:2
  452:3 453:4
  455:18,18 458:23
  461:3 462:21
  464:10 466:8
  469:7,8 470:5,5,9
  470:12,14,14,16
  471:14,15,16
  472:5,8,16,20,21
**immediate** 415:13
**immediately**
  316:10
**impeded** 337:22
**implement** 466:17
**implemented** 364:2
  466:19
**impression** 469:8
**improve** 458:14
**improves** 409:15
**inabilities** 457:23
**incident** 307:5
  308:1,4,5,9,14
  310:12 312:3
  319:19 349:5
  357:15 368:14
  378:8,23 381:9
  456:4
**include** 348:15
  350:10 351:11,18
  370:17 417:7
**including** 404:17
**income** 475:2
  477:17
**incorrect** 314:3
  357:1 392:8,10,17
**increase** 450:16
**indicate** 326:21
  384:16
**indicated** 361:1

362:8 367:7 371:8
  384:7 390:3 484:5
**indicates** 382:15
**indicating** 310:21
  337:1,15 367:1
**indicator** 318:19
**individual** 367:7
  379:3 400:15
  457:17
**individuals** 396:5
  397:2 400:18
  404:6 427:11
  449:2 465:12
**ineligible** 395:13,15
  399:1,3 431:11
  446:8
**inform** 348:19
**information** 314:12
  348:11,14 362:15
  377:3,4 379:7
  388:14,18,19
  389:9 390:6,21
  391:5,5 404:5,7
  407:15,19,20,21
  412:22 414:5
  428:8,20 430:15
  446:23 452:22
  465:19 466:1,14
  471:22 473:16
**informed** 328:3
  367:8,23 406:19
  412:11
**informing** 462:14
**inhouse** 395:22
**initial** 395:20 396:1
  396:8 397:4,20
  446:19
**initially** 316:23
  320:21 346:5
  477:6
**injured** 386:15
**injury** 387:9,17
**inmates** 386:9,9
**inquire** 416:17
**inquired** 368:6
  468:1
**inside** 309:3 331:1
  332:16 340:8

341:21 391:14
**instance** 458:7
**instances** 306:3
**instruct** 345:15
  346:11
**instructed** 357:12
  357:16,18 435:15
  478:5
**instruction** 478:7
**instructions** 346:2
**insubordination**
  307:7,13,14
  382:17 477:8
**intentional** 360:2
  369:22
**interactions** 321:12
**interest** 400:13
**interested** 323:11
  323:13 485:15
**internal** 300:7
  378:1,7 385:23
**internet** 316:1
**interrogatories**
  300:16 389:17
  391:17
**interrogatory**
  384:8,17
**interrupt** 302:22
  419:10
**interrupted** 343:16
**intersection** 327:14
  327:15 338:13
**interview** 320:10
  429:17,19 430:1,4
**interviewed** 378:6
**intimidation** 360:4
  371:13
**investigate** 368:22
  369:12
**investigated** 361:14
  372:1 388:12
  477:6
**investigation**
  320:17 356:4
  359:5 360:19
  361:2,5,12,16,19
  362:8,10,14 363:1
  363:8,20 364:20

367:15 368:1,4,22
369:13 371:10,14
371:21 378:23
386:1 409:21
481:8 482:10
**investigations**
359:11 400:10
409:23 431:17
433:4,5,8,9,22
435:10,23 436:4,8
436:16,23 437:3,6
440:3,7,11,16,19
441:10 442:21
443:3,10,10,15,22
457:11,14 464:14
482:3,3
**investigator** 407:1
**investigators**
320:11 378:7
**involve** 308:5
**involved** 308:6
381:9 457:19,21
**involvement**
358:16
**involving** 480:23
**isnt** 371:20
**issue** 328:11
**issued** 382:4,6
**issues** 368:22
482:13
**items** 329:13
**ive** 337:10 339:16
363:18 370:5,8
377:9 378:14
381:21 382:11
383:12 389:15
405:7 416:2
451:23 469:19
472:22 478:14
481:18

**J**

**jail** 386:8 479:6,8
**jails** 386:8
**jared** 419:2 423:4,6
423:9 441:16
**jason** 420:3 426:7
449:5,16 480:7

**jay** 360:6 460:6,7
**jefferson** 485:4
**jeopardy** 472:11
**jeremy** 419:6
424:21 444:18
**jerry** 420:3 426:3
448:20 449:16
**job** 375:13 435:17
**joe** 419:2 423:11
441:22
**joey** 418:10,19
421:4 430:21,22
431:6
**john** 384:9,16
398:18
**join** 433:11
**joined** 317:17
**joint** 358:4
**jonathan** 419:6
424:14 444:8
**judgment** 354:9
**july** 413:9
**jump** 483:12
**jumped** 320:22
342:10,11
**june** 437:22
**justify** 323:5
361:21
**juvenile** 443:10,14
443:21 482:3

**K**

**katrina** 385:19,22
**kay** 395:14 399:4
**keep** 339:7 340:8,9
367:9 377:15
384:13 407:8
**keeping** 323:6
414:20
**keith** 363:11
365:13 366:5
367:18 388:11,15
388:19 389:10
402:2 419:1
422:15 440:1
**kendrick** 419:6
444:18
**kendricks** 424:21

**kenneth** 312:23
316:10 327:13
331:16 333:21
334:18 335:12
337:5 380:3,8
381:8
**kenneths** 333:21
336:15,19
**kept** 414:13 415:16
**ketchen** 443:20
**ketchum** 419:5
424:8 443:19,21
**kevin** 377:11,13
**keys** 308:7,16,18,21
308:23 309:2,5,6
309:10,12,14,18
310:1,3,6 311:22
331:1 341:1 346:7
346:8 354:4
**kin** 485:14
**kind** 325:8 328:8
336:19 338:18
401:19,22 405:8
435:11
**kit** 329:18
**kitchen** 443:18
**kkk** 479:15
**knew** 320:22 321:4
384:1 422:4
**knock** 326:20
**know** 302:7 303:1,5
306:7,13 319:1
321:7 323:17
325:12,20 326:14
326:23 329:4
330:7,10 331:4
337:15 338:20
339:7 341:12
342:6,22 345:3,3
346:7 349:1
350:10 353:14
358:3 360:20
363:6,9 364:5,14
364:16 366:20
368:13 371:16
373:3,17 375:5,6
375:17,20 376:8
377:1,2,4,17

379:18 384:18
385:7,22 386:3,4
387:6 388:7
391:21 396:2,5,13
397:1,22 398:7,16
400:1 401:20
406:21 408:6,8,14
409:2,12,15,20
412:14,15 413:20
417:10 423:7
429:13 432:22
433:4,7,14,21
434:2,4 435:22
436:3,9,12,15,18
437:2,5,15,18,20
438:16 439:1,2,4
439:8,19 441:1,7
441:14,18,19
442:3,6,13,16,22
443:2,14 444:2,5
444:12,15,22
445:2,8,11 446:18
447:11,15,18
448:1,4,10,13
449:17,20 450:11
455:11,13 460:1
461:8 464:1
465:21,22 467:18
471:13,19 474:6
478:4 479:20
481:18 483:13,18
484:4
**knowing** 339:20
466:23
**knowledge** 358:1
384:5 408:11
421:7,20 422:8
425:3 426:18,19
427:8 446:21,23
454:21 478:8
**known** 317:19
359:6 375:1
383:19
**knows** 384:12

**L**

**l** 297:1 485:19,20
**labeled** 469:5 471:9

**labor** 386:23,23
387:4
**lack** 328:9 338:19
412:22 415:12
458:3
**lacy** 344:5,7
**laid** 329:22
**land** 327:7
**lane** 327:18,21,22
**language** 316:12,21
319:8 320:20
321:12
**lanice** 471:6
**laptop** 307:9,19
319:10 420:19
**large** 297:7 301:18
333:9 419:17
**lasted** 387:23
**law** 297:7 394:10
405:5 475:4,22
**lawful** 304:14
**laws** 298:5 361:23
**lawsuit** 363:10
365:13 471:18,21
471:23 476:8
477:11 484:2
**laying** 316:11
**lead** 323:15 364:19
**leading** 298:11
472:22
**learn** 372:22
**leave** 312:15 321:8
336:2,4 347:22
357:11 378:22
379:5 401:11
416:15 419:19
446:15 447:2,5
466:10
**leaving** 321:1
373:10
**led** 320:17
**left** 315:5 317:12
327:8 335:6,9,18
336:17,21 337:18
337:19 338:12
373:9
**legal** 349:4
**length** 397:10,12

letter 300:6
level 400:16 404:20
  470:14
lewis 385:19,22
  479:8
liaison 468:18
lieutenant 304:5
  308:11,12,14
  309:23 310:5
  311:21 345:5,7,14
  346:19 353:16
  354:4,9,19 357:5
  360:6 387:11
  404:10,15,22
  417:12 434:13
  461:2 462:23
  463:16 468:12,21
  471:12 473:8
  474:14 479:7
lieutenants 403:2,9
  434:11
life 383:20 472:1
light 430:14
lightduty 387:9,18
  387:21,22 388:9
lights 342:7,8,9
limit 420:13,13
limitation 470:6
limitations 457:23
limited 478:21
  482:6
line 337:10 468:16
list 403:8 407:17
  418:6 438:21
  439:2,3,5,9,12,18
  450:2 452:10
  481:15,15
listed 419:15
listen 385:1,10
  470:12
listened 385:13
literally 317:3
  340:17
litigation 475:19
little 427:22
live 469:22
lived 333:12 384:1
lives 326:10 327:6

local 476:18 477:1
locate 319:11
  412:19
located 338:9,22
  341:8
location 322:14
  328:20,22 336:14
  341:9 343:15
  390:12 391:9,11
  469:23 472:13
locations 390:21
logged 366:4
long 308:11,15
  309:23 310:5
  311:21 345:5,7
  346:19 347:15
  353:16 354:4,19
  357:5,16 383:19
  387:20 388:1,5,10
  397:9 411:9 416:8
longer 311:6
  323:11,13 327:1
  328:21 388:8
  394:7 421:17
  423:14 429:6
  435:17 460:4
  466:4 467:22
  468:4 469:20
  470:3 476:21
longs 308:12
look 359:13 386:18
  388:21 389:20
  390:20,23 392:21
  407:16,19 459:9
  463:5
looked 322:23
  323:2 338:11
looking 307:8,11
  309:20,22 310:2
  319:9 320:4 334:5
  334:9 341:12
  347:11,12 349:16
  365:15,19 392:6
  393:4 413:11
  420:18 438:1
  448:23 449:3
  482:16
looks 333:8,16

loss 475:2
lost 477:17
lot 317:18 322:17
  322:20 325:9,10
  325:11,18 326:20
  326:22 327:3
  328:22 338:23
  391:13
loud 302:20 316:12
  316:21
low 366:14
lowered 481:22
lynn 418:22 421:8
  431:14,22 432:9
  432:12 434:1,4

## M

m 297:10 468:13
  484:20
maam 372:16
  472:5 484:11
magill 360:8
mail 318:20
maintain 323:6
  324:5
maintained 317:6
maintaining
  323:14,20
maintains 350:22
major 304:11 307:5
  307:23,23 346:15
  346:18,20 347:3,7
  347:9 353:5,23
  354:6,15 358:15
  360:5 363:19
  367:9 373:7
  374:15 379:10,12
  379:14 460:3
  479:11
majority 450:12
  471:8
majors 403:10
making 320:12
  362:2 363:14
  371:15 471:23
  472:21 473:10
male 376:15 377:12
  420:22 421:1,5,9

  421:9 423:9,11,23
  424:2,8,16,23
  425:10,14,15,20
  426:7,17,21 427:3
  455:4 474:12
mamie 479:6
managed 466:21
manager 375:2
managing 466:22
  467:22 468:4,6
manner 316:13
  359:6 414:13
  415:15
march 372:17
  472:3
mark 333:2,6
  380:16 392:19
marked 333:4
  337:8 352:5,8
  372:11 376:18
  377:9,19 378:12
  378:14 380:14
  381:19,21 382:9
  382:11 383:10,12
  389:13,15 415:23
  416:3 462:19
market 467:16
marking 372:13
  376:20 462:21
marriage 323:23
married 326:1
marry 323:9
  324:11
material 362:1
  399:17
materials 399:22
  401:21,23
mathews 358:22
  359:1,12,22
  360:12,14,18
  361:8,13 363:9
  364:1,4,11 365:2
  365:5,12,14
  366:21,23 367:5,7
  367:20 368:17,21
  369:9 370:1
  374:22 478:19,22
  479:3 480:13

matter 321:6
  326:15 354:8
  371:5 412:18
matters 306:12
maurice 439:15
  480:8
maynard 297:7
  301:6
mayor 375:2
mays 298:22 301:3
  301:7 302:5,6
  311:18 320:3
  349:11,13 350:1
  350:12,17 383:17
  383:19 414:16
  415:17 484:18
mcclendon 345:9
  345:10
mccrory 479:7
mckay 358:23
  370:20 371:1
  372:5,18 374:19
mean 306:6,15
  310:19 315:6
  330:10 334:5
  335:17 340:17
  345:18 355:3,8
  357:23 379:12
  385:9 394:3 395:7
  396:12 403:7
  408:20 419:9
  435:3 445:17
  458:15 466:9
  469:15
meaning 336:20
  337:20 379:14
  394:5 445:22
means 323:10
meant 314:15
  368:7
media 314:2 316:3
  371:10 374:10
  388:15,19 389:8,9
  416:18 460:17,21
  461:14 475:8
  476:16,16,18
  477:1,7 478:3
medical 315:12

meet 383:21 397:21
meeting 317:23
member 305:14
372:23 373:4,18
373:21 406:12
436:15 440:13
441:18 443:22
461:7,12 479:18
479:18,21
members 362:19
398:14 454:23
455:9,11,14,16
479:12,13,15
membership 373:7
374:1,5,15
memorandum
300:9
memory 385:2,11
385:16 431:19
mentioned 307:21
360:23 363:7,18
365:12 370:18
409:10 430:12
449:23 461:10
473:17
mentioning 402:6
mentored 401:17
401:18 402:5
458:17
mentoring 402:6
458:10
mess 351:23
message 316:2,5,7
316:7 318:2,3,4,6
318:7,8,9,11,13
318:15,16,18,20
319:4,5 325:23
messages 319:2
messaging 316:9
met 470:6
middle 296:2
316:18 366:17,18
381:4
midnight 331:5,9
miles 322:12
military 390:11
446:15 447:2,5
472:19

miller 377:11,11,13
473:23
millers 474:3,11
mind 330:18
mine 368:5 383:18
minorities 471:8
482:5
minutes 327:1
347:19 348:5,5,21
469:13 470:10
missed 340:4
446:13
missing 391:9
mock 454:22 455:8
455:17,20 456:1,5
456:13
mocks 455:3
mom 331:23
moment 310:19
313:22 315:8
325:9 394:15
470:16 472:23
moments 369:21
moms 327:3
money 465:11,16
477:16
months 411:15
456:9
moore 420:3 426:3
448:21 449:16
morale 482:12
morgan 419:5
424:2 443:6,9
morning 314:23
331:4,5,10,22
333:22 352:18
378:6,9 379:11
381:10 405:1
mother 331:17
mothers 326:8,17
326:21 327:8
motion 314:13
416:5,6
motivated 362:3
368:6,7,8
motivation 458:3
move 331:2 340:10
340:21 341:3,18

341:20 342:2
343:12 345:15,21
346:2,4,10,12
354:19,23 355:6
355:11,14,17,21
356:2,16 357:9,17
357:18 415:18
434:23 435:5
447:12 458:2,6
moved 333:22
335:12 336:6,9,14
337:23 354:4,5
355:19 356:6
movement 341:17
moving 331:13
341:23,23 343:16
354:16 357:13
458:4
multiple 308:20
309:14 345:15
346:1,4 355:17,22
357:17 375:21,22
music 349:18

**N**

n 297:1 301:1,5
name 302:6 306:6
308:12 316:6,8
344:21,22 345:3
357:23 403:6
409:18 417:5,6
418:16 422:9
437:8 447:8 450:9
455:5 460:13
463:13 475:9
names 345:4 377:4
418:6 419:15
455:13 471:16
nash 421:22
nature 315:14
neal 480:7
necessarily 306:15
364:17 434:14
480:9
necessary 298:9
477:18
need 303:1 313:6
321:8 324:11

353:16 359:13
388:21 392:23
404:5 458:17
needed 343:6
430:13 468:17
negative 477:21
negotiation 406:17
410:4
neighborhood
384:2
neither 331:21
485:13
networking 316:4,4
317:23
never 326:20
363:13 374:18,21
401:17,17 407:19
407:20 411:2
413:2 474:4
new 417:9 434:15
news 476:18,19,20
477:1
night 310:11 312:3
314:22 315:3,6,7
321:13,14 336:3,4
342:23 343:3
345:6 346:14
350:4 354:1 471:4
472:23
nights 469:21
normal 387:15
normally 331:15
332:12
north 297:9 301:8
northview 322:17
326:11 327:10
nose 336:18 337:9
337:12
nosetonose 317:4
notary 297:6
301:17 485:23
note 302:14 320:8
noted 364:21
notice 298:17 300:8
300:10 319:1
330:7 360:1 371:9
371:11 378:2,3
379:20 380:18

412:21
notified 373:10
380:11 406:20,22
noting 414:11
november 392:2,16
463:1 466:2
467:20 468:13
number 296:4
301:2 319:1
326:17 333:3
352:4 372:10
376:17 378:11
380:13 381:18
382:8 383:9
389:12 391:9,19
392:1,4,6,9,10,16
408:3 415:22
451:14 452:6
462:18 471:1
485:21
numbers 390:4
391:1,4,15
nurse 315:20
nword 368:2,11

**O**

o 297:1
oath 303:10
objection 414:12
414:16 415:2
objections 298:9,12
414:19
obtain 305:16
475:3 477:10
obtaining 475:15
475:18
obviously 391:23
occurred 310:12
319:13,18,22
344:12 368:14
378:8 379:1
offduty 308:8
offended 474:6
offense 307:17
offer 457:6
offered 298:14
416:22 417:2
451:11,18,22

452:20 453:2,6,23
454:6 456:21
**offers** 457:7,10
**offhand** 306:6,22
377:2,5 408:5
**office** 350:13
370:22 371:2,6
**officer** 304:13
344:2,5,6,9,23,23
345:9,11,12
347:21 353:13,17
354:12 356:6,13
356:22 357:3,3
358:21 359:23
363:14 364:4,11
364:15 367:10
375:15,18 376:12
377:7,11 385:20
385:21 397:13
398:5 401:7,12
402:1 404:16
406:13,15 410:7
410:10,16 411:10
411:14 412:6,13
417:9,16,17,19,20
418:5,10,10,16,19
418:19 421:3,21
422:4,18,22 423:3
423:14,18 424:7
424:11 425:7
426:2,6,12 429:2
429:4,9,15 430:7
430:9,12 431:20
434:5,8,15,23
435:2,4 436:8,10
436:13 437:13,16
437:16 441:17
442:1 444:10
447:23 448:19
449:7 451:4,8
454:21 455:20
456:7 457:17,18
457:21 458:7,9,12
458:18,20 459:3
459:12,14 461:2,5
461:11 463:7
464:14,16,17,17
464:18 469:6

471:5,5,5 473:15
473:21 474:8,13
474:19 478:5,6
480:7,7,12,23
481:1,11 482:4
**officers** 305:17,22
344:17,20 345:1
354:23 355:5,10
355:14,23 356:2
357:8,11,16
375:21,22 376:3
376:23 377:6
393:5,15,18,20
394:4,5,8 397:7,8
397:18,22 398:3
399:18,23 400:7
400:12,18 401:14
401:23 402:4,5,8
402:12,15 405:6
405:10,17,22
406:5,11 407:5,6
408:8,17 409:20
410:3 411:1
412:12 416:23
417:1,4,7,9,12
418:4,6,8,20
419:15 428:6
429:21 430:1
434:7,7,10,19
438:19 439:5,9,11
450:1,3,4,6,12,15
451:11,19 452:7,8
452:20 453:2,6,14
453:15,18,23
454:6,10,15 456:3
456:22 457:13,22
462:9 464:6,9
465:16,17 467:13
473:9,10 474:14
479:5,12 481:14
481:15,16 482:9
482:10
**offices** 297:7
**official** 302:15
364:5 434:21
**officially** 406:20,22
**offtherecord**
311:19 320:5

349:12 352:2
386:21 389:1
463:4 482:15
**oftentimes** 457:6
**oh** 392:8 403:15
**okay** 303:7 305:2
311:20 312:11,16
313:10,20 330:8
348:17 350:16
352:23 353:2,14
356:12 377:18
389:3 393:3
427:21 470:19
479:1
**once** 309:20 319:19
338:5 340:3 341:7
400:20
**ones** 401:1,8,15
402:7,18 420:16
427:19 439:3
450:9 459:4
**ongoing** 371:21
372:3
**open** 318:21
**opened** 342:16
**opinion** 482:12
**opportunities**
412:22 451:12,17
451:18,21 452:6
452:21 453:3,7
457:8 458:5
**opportunity** 379:21
385:1 390:13
393:23 411:19
453:3,10 472:8
**opposite** 327:21
**oral** 298:23 301:22
**order** 300:18
304:14,15 313:15
314:8 340:15
344:21 356:1
396:17 415:8
416:4,4,9 431:9
**orders** 405:3
**organization**
358:17,18 373:4,8
374:1,15 479:17
479:21

**original** 298:22
333:5 352:6
372:12 376:19
378:13 380:15
381:20 382:10
383:11 389:14
390:12 416:1,16
462:20
**outcome** 378:22
398:22 480:18
**outlets** 476:20
**outlined** 360:22
**outside** 305:15
332:16 340:14,16
340:17 394:9
400:4 467:10,10
482:6
**overnight** 329:18
**oversee** 466:10
**overtime** 462:3

---
**P**
**p** 297:1 301:5,5,7
484:20
**pack** 329:6
**packed** 329:5,10
**page** 301:2 318:5
353:3,8 380:21
381:3,4 389:20
392:22,23 393:2
416:14,21 451:15
453:22 459:9
463:5 482:16
**pages** 311:10,12
351:7 352:21
353:1 380:18
**paid** 378:22 379:4
**pair** 329:19
**paperwork** 307:7
**paragraph** 393:4
416:14,22 451:10
451:15 453:13,22
454:9 456:16
459:10 462:7
463:6 482:17
**parallel** 336:16
**park** 330:19 332:10
335:6 340:10

342:5,6
**parked** 325:11
331:12,14,16,19
332:6,6,12,12,17
333:22 334:4,18
334:21,23 335:1,9
335:10 337:17
338:3,17 339:2
340:5,14,22
343:21
**parking** 317:18
322:17,20 325:9
325:10,11,18
326:20,22 327:3,7
391:13
**parrish** 346:15,18
347:7,9 353:5,23
354:6,15 360:6
372:23 373:17
379:10,13,15
460:3 479:11,18
**parrishs** 358:15
373:7 374:5,15
**part** 302:8,10 320:7
329:8,9 343:15
348:22 354:11
358:15 363:19
367:13 383:3
393:8 402:17
460:20 466:13
467:2 481:5,8
482:5
**participate** 441:4
**participated**
366:21 408:9
418:20
**particular** 309:21
319:10 322:14
324:18 331:22
347:11 361:23
398:12 399:21
401:20 404:6
406:2,4 407:10
408:7,18,19,23
409:11,18 411:13
412:18 417:17
419:13 428:10,16
435:6 452:9 456:4

459:22
**particulars** 353:15
**parties** 297:3
298:12 485:14
**party** 381:8
**pass** 434:17 458:12
458:13
**passed** 434:22
435:4
**passenger** 325:13
**passengers** 322:2
**passout** 470:14
**patch** 347:6
**patients** 316:17
**patrol** 304:17,21
305:3,19,22 306:4
308:7,16,21
311:22 331:2,2,12
331:20 332:7,12
332:13,17 335:10
335:12,16 336:1,6
336:9,13,18,22,23
337:12,14,22,23
340:10,22 341:10
341:13,15,18,18
341:21 342:12,13
342:16 343:12,17
343:21 345:19
346:9,11,12 354:5
376:2 400:9
401:16 404:21
457:12,14 469:5
470:21 471:9,11
473:12,13 474:15
**patroller** 447:14
**pause** 443:7
**pauses** 414:23
415:5,6
**paved** 332:22
**pay** 450:16,18,19
461:19,21,21,23
465:1,11
**pd12** 433:10
**pending** 303:3
378:22 475:19
476:8
**people** 317:23
318:1 323:12,14

349:9 434:20
481:23
**perform** 450:20
462:10
**period** 364:13
367:10 386:15
394:20 395:21
396:1,8 397:4,20
413:5,6
**permission** 305:7,9
305:12,16,23
306:4,8,10 315:19
406:3
**person** 305:15
318:11,19 379:8
396:20 430:2,5
434:16 447:12
**personal** 305:10,13
305:18,19,23
306:5,12,15 307:9
308:8 329:3,5,12
330:23 331:8
332:15 335:2,3,19
336:3,4,11 337:4
337:6,21 338:2,6
341:4 343:13
354:16,19 430:16
**personally** 352:14
367:12
**personnel** 358:22
362:12 374:10,13
375:2 382:21
383:1,14 395:14
399:22
**persons** 323:16
358:4 362:6,9,11
367:1 396:16
400:4 459:5
466:15
**perspective** 323:9
**pg** 300:2
**pgo** 405:2
**pgos** 404:23
**phares** 420:2 447:9
447:10,20
**philip** 419:3,4,5
423:19,21,23
442:19 443:9

**phone** 315:16,16,18
315:19 316:2
318:5,6,14 321:1
326:17 340:1
346:15,18 467:17
**photo** 479:11
**photograph** 300:3
334:9,17 335:11
335:18 480:2
**physical** 369:1
**physically** 310:19
343:17 472:17
**physician** 315:15
317:14,15
**pick** 326:18 332:1
**picked** 331:18,18
332:1,4 477:5
**picks** 349:1
**picture** 333:10,12
333:16 336:12
**place** 320:11
358:16 379:4
385:17 387:13
391:12 400:14
481:20
**placed** 329:19,22
350:7 378:21
387:16 388:4
402:9
**plaintiff** 296:8
300:17 416:7
**plaintiffs** 416:5,15
462:8
**planning** 336:2
**played** 396:22
**plays** 363:19
**plaza** 297:8 301:8
**please** 299:2 325:14
339:6,14 359:18
386:20 465:13
**point** 307:16 315:5
322:4,7 325:22
328:6 330:5
337:18,19 340:23
341:19 342:19
343:11,20 344:17
345:17 346:14
347:22 351:15

354:18 355:9
357:6,15 372:21
388:11,14,18
411:7 416:13
451:3 468:6,8
475:8
**pointed** 333:20
**police** 300:7,15
304:2,4 305:3,15
319:19 324:21
333:9,23 339:16
342:20,23 343:3
344:13 347:3,22
348:18,20,22
353:13,17 354:8
354:12 360:5
367:8 378:1
385:20,21 391:13
391:14 394:18
395:1,3,17 397:6
397:12 398:11,14
398:16 400:8,13
401:9 403:10
412:23 435:13,20
450:22 460:7
465:9,14 467:6,7
467:10,12,19
468:18 478:4
479:13,13
**policies** 320:14
446:12
**policy** 446:12
460:17,21 461:14
**portion** 348:3,6
349:20 359:20
362:23 415:20
**portions** 350:9
**position** 324:4
328:3 355:4,7,8
363:13 364:7
367:9 375:8,16,20
376:3,9 394:23
396:7 400:7 402:9
406:20 409:6
410:12 426:20
428:10,18,19
429:6 430:13
432:15 433:20,20

436:19 438:3
448:18 455:20
457:5,9 461:1,4,8
462:4 482:5
**positions** 428:7,16
450:17 458:2,6
461:9,12
**possession** 309:8
**possible** 300:11
379:10,12 392:3
**possibly** 471:16
**post** 477:7
**posted** 407:20
**posts** 314:2,2 362:5
**powell** 398:18
**power** 338:20,21
**prefer** 457:14,20
457:22
**preferential** 416:23
417:2 418:9
427:11,14 428:2
428:12,22 431:14
435:8 436:6
437:11 440:1,9
441:8,22 442:9,19
443:5,17 444:8,18
445:5,13 446:4
447:7,13,20 448:7
448:16,20 449:1,5
449:9,12 450:1,14
450:23 451:7
454:10,15 457:16
458:16,19 464:7,8
464:13 482:1
**prefers** 457:21
**premature** 394:2
**prepare** 400:6
483:6
**prepared** 331:3
351:1
**preparing** 400:18
**present** 344:22
348:18 379:21
445:18,23 446:1
446:13
**press** 477:4
**pretty** 383:20 411:8
**prevented** 309:4

previous 358:13
393:17 443:8
previously 307:22
429:11 452:4,5
print 350:13
prior 298:14
319:18 331:13
343:11 348:17
350:8 357:10
376:1 399:20
400:14 405:18,20
405:21 427:15,17
435:14 455:1
456:9 468:3
480:13 481:22
private 389:5
privileged 466:1
privy 465:20
probably 387:6
450:12
probation 397:20
probationary
395:20 396:1,8
397:4,10,20
problem 312:7,20
407:23 415:15
problems 341:14
430:14
procedure 298:20
301:19 405:2
proceeded 325:5
481:14
proceedings 301:23
process 343:16
373:10 380:11
396:14,15 399:13
399:16 400:1
429:17,19 433:8
475:22
produce 348:16
393:15
produced 310:23
311:3 312:10
384:7 385:14
389:22 413:18,19
483:2
profane 316:12,21
319:8 321:11

proficient 351:21
program 375:9
459:15 460:11,20
461:10 462:1,21
462:15 463:2
466:3,5,7,9,10,11
466:12,13,17,18
466:19,20,21,22
466:23 467:1,4,9
467:11,14,16,22
468:2,5,7,9,20
programs 462:9
progressing 317:9
promoted 376:9
377:1,6 393:5,20
394:3,10,11,19
395:5,6 396:2,20
398:8 399:9
400:20 431:4,5,5
431:6,10,18,23
432:3,4,6,9,12,19
432:22 437:20
438:17,18,19
439:2,3,5,9,11
445:21 446:3
456:13 463:7,15
463:18 464:2,3
promotion 394:14
394:19,21 396:18
397:6,11 399:13
399:16 400:1,7
430:23 431:1,16
431:16 437:13
445:15
promotional
395:21 397:3
481:23
promotions 394:6
394:12,22 438:23
pronouncing
437:11
proof 472:20
property 304:18
340:20 344:10
348:20 354:20
355:1 356:3,7,17
357:9,11
proposal 323:10

provide 312:5,8
320:9 349:15
351:8,14,17 368:9
380:2 388:14,18
404:4,8 405:7
408:22 413:11
432:2 450:15
452:14,23 453:19
473:18 477:18
484:6
provided 301:18
306:17 311:4
319:23 347:23
351:22 352:10
362:15 372:18
374:14 379:20
384:22 390:5,22
391:4 398:2
399:22 402:15,21
406:11 407:4,6
413:9 414:5
416:21 420:7,10
450:3 452:7,15,18
453:16 464:21
479:10 481:5
483:14
provides 448:23
providing 312:18
312:21 349:2
389:9 415:12
416:10 453:17
public 297:6
301:17 467:16
publicized 407:4
408:2,10 409:12
published 407:8,14
publishing 407:15
pull 332:8 335:15
343:10,18
pulled 325:13
327:18 329:2,14
330:23 331:8
332:13 335:3
336:16 339:2
punishment 367:3
punishments 367:5
punitive 477:18
purchase 466:17

purchased 328:5
purpose 304:22
416:16
purview 467:3,4
push 470:4
put 329:17,21
347:7 371:9,11
387:13 411:21,22
417:18 465:10,15
472:11 480:13
putting 306:10
428:21

Q
quartermile 339:21
question 303:2,3,5
305:2 309:15
310:7 311:10
313:5 314:1
343:15 344:12
358:12,13 359:18
365:3,11,11
369:17 370:10
380:5 383:13
397:1,5,7,9,13,16
397:17 403:14
416:8 417:1 428:8
428:11 429:10
430:18 431:21,22
432:23 452:1,4,4
452:12,21 453:21
456:19 457:2
458:18 459:9
462:22 464:10,11
468:5 478:19
questioned 412:12
questioning 362:16
370:17
questions 298:10
298:11 302:21
363:3 377:15
391:19 396:10
415:1,7 453:10
470:2 472:9 473:3
473:7 484:3 485:8
quickly 317:10
quite 311:13
336:13,13 364:3

396:11 466:8
quotations 349:9
quote 353:9

R
r 301:5 485:1
race 384:4 420:21
420:23 421:4,8,12
421:22 422:1,5,11
422:15,19,23
423:4,15,19 424:4
424:12,14,21
425:4,8,16,22
426:3,9,13 427:5
455:3 463:20
474:3,11
rachel 463:11,14
463:17,20,22
464:3
racial 360:2 369:22
470:19
racially 362:3
368:6,7,8 468:23
469:3
racist 358:18
raemonica 296:7
296:22 297:5,11
300:4,12,15
301:21 302:1
352:11
rainbolt 301:7
387:4 390:14,15
390:18
rank 304:1,6,8
376:6 403:11,17
409:6 421:2,6,10
421:16,19 422:3,7
422:13,17,21
423:2,6,13,17,21
424:6,10,18,19
425:2,6,12,18
426:1,5,11,15
427:7 434:8
438:12 464:9,15
464:19,23 465:3
ranked 438:10
ranking 304:13
438:11

**ranks** 426:19
**rapid** 440:14
**rate** 393:6 394:4
**ray** 455:6
**reached** 324:13
**read** 306:19 353:20
354:12 359:20
381:12 415:20
451:12 454:1,11
482:19
**reading** 298:2
307:18 419:9
**reads** 468:14
**ready** 311:20
**realized** 342:14
**really** 405:9 407:22
457:16 469:11
**reason** 303:12
305:3 306:17
307:2 344:12
347:23 363:17
366:23 407:12
446:22 476:11
**reasoning** 446:8
**reasons** 306:21
323:5 362:23
363:6,7 369:4,6
387:15 475:20
**reassigned** 364:6,7
375:15
**recall** 307:1,1
309:19 320:21
327:1 347:4 357:2
364:10,23 365:4,8
366:11,20 384:13
384:23 387:22
388:3,5 389:7,8
391:11 394:15
397:5,8 411:11
417:22 429:11
430:2 436:1,2
438:12,14 440:4,6
440:15,18,21
441:11 443:11
463:19 464:5
471:1,15 473:10
480:11,16,16,18
481:3,12,16 483:7

**receive** 315:12
321:18 367:3,6
378:3 410:9 428:3
431:15 435:9
436:7,22 437:12
440:2,10 441:9,23
442:10,20 443:6
443:18 444:9,19
445:6,14 447:21
448:8,17,21 449:6
449:10,13 450:23
**received** 314:12
316:5 318:2 319:2
321:20 384:18
402:8 418:8
427:11 428:13,15
429:1 430:22
443:12 447:13
448:10 449:2
450:1 451:8
458:11 464:12
465:1 467:23
476:2 483:8
**receiving** 378:19
468:3
**recharge** 315:17
**recognize** 372:14
372:16 377:20
378:16,18 380:17
380:23 383:14
389:16 416:4,9,11
**recollection** 306:23
320:19 347:10
**recommendation**
367:14,17
**recommendations**
367:2,4
**recommending**
367:12
**record** 302:13,15
311:15,18 313:2,6
313:6,9 320:3
349:11,14 350:2
352:3 359:13
365:22 386:18
388:21 389:2
393:19 413:8

484:4

414:12,17,21,22
415:7 418:12
434:21 472:16
482:16 485:11
**recorded** 347:17
350:23 352:18
371:7 434:20
**recorder** 302:9
**recording** 310:11
310:14,15,22
311:3 312:2,9,12
312:16 347:13,15
347:20 348:1,6,8
349:2,7 350:3,21
351:3,3,10,11,13
351:14,15,18
352:18 371:7
384:21 385:2,10
**recordings** 313:10
313:12,13,19
314:1 348:13
384:6 385:13,18
389:22 390:2,7,10
391:1,6 416:6,18
**records** 366:16
384:16 393:15,19
417:20
**recovery** 386:15
**recruiting** 461:7,12
**recycle** 338:17,23
**redact** 349:19
350:15
**redacted** 350:2
351:6
**redacting** 350:9
**reduced** 485:9
**refer** 392:23 416:20
418:22 474:5
**reference** 307:6
313:11 314:6
361:3 362:1
387:13 416:10
462:11
**referred** 469:6
470:20 473:11,21
474:1,15 484:9
**referring** 386:7
412:20 419:13

463:10 473:12
476:17
**reflect** 326:14
393:19
**reflects** 379:16
**refresh** 385:2,11
**refreshing** 385:16
**refuse** 308:18
345:21
**refused** 328:11
346:20,21 354:18
478:6
**regard** 398:8
454:10,16 472:14
**regarding** 313:7
319:15 328:11
348:11 359:10
361:16 365:2,6,9
365:13,23 367:5
372:19 373:7
374:1,5,14 378:7
378:23 388:15,19
389:10 391:6
397:10,17 412:21
412:23 414:2,5
416:5 443:8 463:1
466:3 478:10
481:9,19 482:13
**regardless** 372:2
403:17,18 404:4
**regards** 314:1
350:21 354:11
360:15 364:21
414:14 415:11
**regions** 297:8 301:8
**regroup** 470:10
**regular** 401:15
405:8,11
**regulations** 359:10
**reiterated** 324:17
**relate** 385:4
**related** 307:22
308:1 395:16
399:15 481:8
**relating** 298:6
**relationship** 323:16
324:7
**relationships**

323:14,20,21
324:6 402:19
**release** 324:14,15
**released** 321:21
388:8
**relocate** 475:7
**remain** 317:7
**remained** 343:21
388:7 464:16,19
**remember** 378:17
378:19 386:22
429:16,18
**remind** 302:17
**remove** 337:21
**removed** 406:19
459:11,13,16,19
459:22 460:2,10
460:15,19 461:13
461:17 462:15
468:11
**render** 361:1
**rendered** 361:6,15
477:15
**rendering** 359:5
360:19
**renewed** 416:6
**reopen** 416:15
**repeat** 359:18
380:5
**replaced** 375:5,7,8
**reply** 371:19
**report** 364:10,17
367:20 373:6,23
374:8,9,12,18,21
398:19,22 412:8
430:8 474:13,18
480:6,18 481:4
**reported** 343:3
359:12,22 368:23
**reporter** 299:3
301:15 302:14
359:21 414:22
415:21
**reporters** 476:19
**reports** 360:12,14
360:15 374:4
412:5 478:10
**represented** 311:6

383:6
**representing** 333:8
**represents** 485:10
**reputation** 475:9
**request** 308:15
316:22 346:22
347:1 393:14
409:3 411:4,21,22
433:15 447:3
470:11
**requested** 309:13
310:6 313:13
315:15 346:19
347:2 357:11
391:5 404:7,7
406:2,7,10,12,13
406:14,16,23
409:2 429:3,4
482:23,23
**requesting** 308:6
**requests** 482:22
**require** 387:18
406:18
**required** 387:20
397:11 410:10
**requirement**
397:21 411:8
**requires** 406:14
407:1
**research** 320:8
**researched** 466:14
**researching** 315:19
315:23
**reside** 472:13
**residence** 308:9
310:12 328:14,16
**residing** 476:21
**resolve** 354:10
**resource** 406:13,15
410:7,10,16 411:1
411:9,14 412:6
429:2,4,9,14,21
429:23 430:7,9
451:3,8 461:2,4
461:11 482:4
**respective** 297:3
**respond** 354:3,6
386:19 405:5

415:6,8,14
**responded** 316:13
384:11 456:4
**response** 305:5
316:21 317:6
320:21 321:3,3
323:23 371:22
372:18 389:18
390:20 391:20
395:19 415:12,13
440:14 443:8
468:17 476:2
**responses** 384:8,17
391:16
**responsibilities**
459:11,13,16,19
459:23 460:2,5,9
460:15
**responsibility**
402:10,12 403:12
403:19 435:6
460:10 471:20
**responsive** 459:9
**rest** 469:19
**restored** 468:10
477:16
**restrict** 420:14
**restricted** 462:8
482:7
**restriction** 387:23
388:9
**result** 314:13
460:17 461:14,18
477:10
**resulted** 475:2
**results** 485:16
**retained** 299:3
**retaliated** 359:2
360:18 370:20
372:5
**retaliating** 358:10
**retaliation** 358:8
358:19 482:19
**return** 373:12
**returned** 373:15,16
446:2
**revealed** 362:7
**reverse** 342:5,6,9

**reversed** 478:2
**reviewing** 420:17
**review** 377:3
390:13 393:23
414:23
**reviewing** 310:4,9
310:10 311:13,16
438:2
**reviews** 433:14
**rice** 419:3 423:19
442:20 443:9
**rickey** 476:19
**rid** 324:1
**ride** 339:8
**right** 303:10 304:5
304:17,23 306:6
306:22 310:19
311:7 313:2 320:6
321:22 322:6
330:10 332:21
333:17,19 334:1,2
334:3,10,13,16
335:11,17 336:15
338:22 343:13
348:23 365:7
366:12,15 371:15
371:16 374:16,19
376:6 377:2,4,7
379:17 384:22
385:9 389:23
390:7 391:6,22
392:11,17 394:1
394:16 396:4
399:7,10 408:5
415:2 420:17,19
428:11 430:19
432:7,17 433:1
436:23 451:4
458:21,21 460:22
461:15 464:9,21
465:1,22 467:21
469:7 470:7,14,15
470:21 473:14
476:13,22 479:22
482:23 484:10
**righthand** 380:22
**rights** 468:9,10,11
468:15

**rise** 307:16
**road** 327:20 328:13
329:3,15,18
**roadway** 327:19
336:17 337:2
472:12
**robert** 419:1
422:23 441:8
473:23 474:3,11
**role** 400:19 401:9
404:2 410:11
417:18 466:20
**roles** 461:22 462:1
**roll** 419:14 420:17
449:3 484:8,12
**rolled** 327:19
**rolls** 401:5
**ronald** 419:1
422:19 440:9
441:5
**room** 315:1,4,5,9
315:12 317:13,14
319:8 386:5,7,8
386:10,14 387:8
387:16 388:2,4,6
388:7 430:3
**ross** 338:8
**roster** 398:2
**rotated** 471:3
**route** 330:20
**rrt** 440:13,22 442:2
442:12 444:11,21
447:22 448:9,18
448:22 449:11
450:17
**ruddock** 418:10,19
428:1 429:1
430:12 451:7
**ruddocks** 418:16
420:23
**rule** 298:19 301:19
**rules** 298:6,19
301:19 302:17
303:7
**running** 340:9

––––––––––––––––––
**S**
––––––––––––––––––
**s** 297:1 300:1 301:5

303:21 366:17
485:19
**saith** 484:21
**salary** 465:4
**sammie** 420:2
425:14 448:7
**sanction** 477:15
**sat** 316:10 317:10
317:16 321:9
322:23 323:2
324:12 325:9
326:11,22 401:23
**satisfactorily**
395:23
**save** 483:12
**saw** 316:6 323:4
327:13 328:20,23
338:12,15,16
341:3 342:8
344:14 401:15,17
402:4,8 404:5
406:21 407:8
**saying** 312:11
314:6 321:6
323:12 324:9
333:20 346:10
400:21 408:17
415:12 420:14
421:9 452:3
476:13
**says** 381:5 391:20
483:11
**scale** 333:8
**scene** 344:2,18
345:6,15
**schaefer** 419:12
445:13 446:18
447:11
**schaefers** 425:8
445:15
**schedule** 306:14
410:23 469:19
**school** 383:23
406:13,15 410:6
410:10,16 411:1,9
411:14 412:5
429:2,3,8,14,21
429:23 430:7,9

451:3,8 461:2,4
461:11 482:4
**schools** 384:3
**schulmerich** 344:5
344:7,8,9,23
347:21 357:3,4,16
**schwab** 460:12
**schwabs** 460:13
**scott** 308:13,15
345:5,14 418:17
420:23 428:1,3,13
429:1,14,23 451:7
**scratch** 346:2
**se** 393:22 476:4
**sean** 419:5 424:2,6
443:5,9
**seans** 424:4
**search** 418:13
**searching** 415:8
475:10,12
**seat** 316:14 321:9
322:2 324:14,14
324:15
**second** 300:16
307:5 308:4,5
324:13 389:17
394:18 399:6
412:19 413:6
471:2
**seconds** 347:19
348:5,5,21
**section** 400:8,10
459:7
**sections** 351:23
**security** 479:8
**see** 309:22 310:14
310:17 317:14
318:8,16 319:11
320:2,8 326:16,17
337:5 340:3 342:4
342:7 351:20
353:3 365:20
372:8 402:18
405:12 413:21
419:16,17
**seeking** 349:4
477:21
**seen** 315:14 365:14

365:16 413:2
**select** 401:8 473:4
**selected** 418:2,3
429:6,8 430:9
473:1,2,5 476:3
476:11
**senior** 404:16
**seniority** 393:6
**sense** 435:6
**sent** 318:4 319:4,5
390:16 411:2,7
435:16,18,19
462:14 463:1
466:2 467:20
482:22 483:8,19
**separated** 316:18
**september** 387:2,5
387:6 394:20,20
**sergeant** 304:8
345:7 356:8,9,14
356:15 360:7,7
404:11,12 412:2,3
412:9 413:17,23
417:11,11 418:3
420:5,21 421:11
422:14 423:22
429:20 430:3
431:17 432:10,13
432:19,20,23
434:13 437:14,21
438:4,19 455:1,17
455:21 456:14
458:13 463:11,12
463:14,15,17,20
464:3,19,19 479:7
479:9 480:8
**sergeants** 402:23
403:1,5,6,9
432:15 434:11
455:1 456:9,10
**seriously** 361:9
367:21
**serve** 410:10
**served** 391:17
410:6,11 434:22
**serves** 431:19
**service** 331:23
395:23 397:21

463:9 465:2,3
**serving** 395:20
**set** 309:23 404:19
456:1 472:3 473:6
**setting** 450:11,13
467:1 468:14
**sexual** 323:15
**shane** 418:23
421:22,23 422:1
436:6
**share** 327:7
**shaving** 329:18
**sheet** 349:17
419:14 484:8
**sheets** 420:18
**sheriffs** 467:6
**sherry** 316:6,9
318:2
**shes** 320:4 349:20
412:3 421:17
463:11,14
**shift** 401:6,12
402:17 403:18
404:12 418:4
469:5,20 470:20
470:23 471:2,2,4
471:4,7,8,10
473:11,12 474:15
**shifts** 405:13,16
469:21 471:3
**shit** 320:23 321:4
**shoes** 329:20,23
**short** 337:3 350:19
359:16 414:9
**show** 318:15 319:4
333:6 352:7
372:13 376:20
377:9 378:14
380:16 381:21
382:11 383:12
389:15 392:20
416:2 462:21
484:11
**showing** 377:19
387:7
**shows** 318:18,20
334:17 428:5
**shut** 340:5,6,6,7

**sic** 443:20
**sick** 331:17,23
401:11
**side** 316:17 327:19
327:20 328:13
329:2,15 332:14
334:3,7,10,17
335:6,9 337:18,20
**sidebyside** 332:11
**sight** 345:4
**sign** 338:11 339:3,4
**signature** 298:2
378:18 379:18
468:20
**signed** 318:7,22,22
319:2,3 379:17,19
483:16
**similar** 318:12
**simply** 416:9
**simultaneously**
418:14
**singing** 349:17
**single** 358:4 401:12
**sir** 354:3
**sit** 313:8 320:19
324:16
**site** 323:7
**sites** 323:8
**sitting** 316:15,16
326:22 364:23
365:3,4 385:7
408:22 420:17
432:21 483:9,18
**situation** 430:16
**situations** 361:20
472:1
**six** 313:9,16,17
314:8 326:23
387:23 388:10
**sixth** 297:9 301:8
**skills** 458:14,15
**slandered** 475:9
**sleep** 469:11
**smith** 360:7
**snatch** 342:17
**social** 314:2 316:3
316:4 317:23
323:7,7 371:10

374:10 416:18
460:17,21 461:14
477:7
**software** 463:2
467:17
**solely** 398:13
**solution** 407:22
**somebody** 433:19
**somewhat** 328:7
**son** 339:10
**sons** 358:17 372:23
373:18 374:6
479:15
**sonya** 311:5
**sorry** 314:14 334:2
356:15 360:13
366:13 368:19
380:5 403:15
419:23 420:9
421:9 423:5
431:21 438:18
443:7
**sort** 402:8 407:17
**soul** 469:5 470:21
471:9,11 473:12
473:13 474:15
**source** 338:21
**sources** 362:1
**south** 469:6
**southern** 296:3
366:19
**southwest** 435:20
**space** 327:7 332:10
335:15,20
**speak** 346:15 347:2
402:20 405:12
**speakerphone**
348:7
**speaking** 304:14
348:7 366:14
**specialized** 406:18
**specialties** 450:21
**specialty** 440:12,22
441:2,5,18 442:2
443:23 444:11,20
445:7 447:14,22
**specific** 320:7
365:1,5,8 370:14

405:23 406:6,9
408:6 412:16
**specifically** 313:12
319:9 323:19
324:3 349:8 474:6
**specifics** 480:17
481:3
**specified** 313:12
**spell** 344:7
**spelled** 356:9
**spoke** 346:17 479:4
**spoken** 303:15
481:18
**srt** 441:18 444:21
445:7 448:9
449:11 450:17
455:9,16
**staff** 358:5 398:14
400:5 433:13,17
**staffed** 375:21,22
**staircase** 340:11
**stand** 414:12
**standing** 317:3
344:10 356:5,17
356:20 357:4,7
**stands** 440:14
**start** 414:11 467:18
**started** 323:4 325:4
325:8 340:11
341:6,19 344:11
347:20
**starting** 352:23,23
**state** 297:6 301:17
338:7 339:11
343:4 394:1
414:17 485:3,22
**stated** 324:18,20,22
326:14 343:6
367:8 368:5 370:5
371:5 372:7
**statement** 300:12
319:12,15,17,20
319:23 350:9
351:6 357:2
361:15 371:15
381:5,6,7,7
407:16 481:2,5
**statements** 362:4

363:12 381:6,15
381:23
**states** 296:1 366:18
393:4 416:14,22
453:23 454:9
459:10 462:7
463:6 482:17
**stating** 361:22
415:2,5 453:15
455:18
**status** 308:8 397:10
430:13 475:7
**stay** 470:15 473:7
**staying** 314:19
**stenotype** 485:8
**stephanie** 298:22
301:6 302:6
**steps** 320:16
**steve** 353:5 360:5
372:22 373:17
374:5
**stewart** 368:12
**stick** 473:3
**stipulated** 297:2
298:1,8,16
**stipulation** 301:20
**stokes** 476:19
**stood** 354:22 355:3
**stop** 338:11 339:3,4
341:10,13,22
468:6
**stopped** 336:23
337:3 341:17
415:14
**stopper** 468:17,20
**stoppers** 300:19
375:10 460:23
461:11 466:18
467:3,3,8
**straight** 337:10
469:18 472:18
**strains** 315:20
316:1
**street** 327:12
434:16
**stressful** 475:6
**strike** 341:15 420:6
**struck** 341:10

**struggling** 470:15
**studied** 404:23
**study** 399:17,19,21
399:23 401:20,20
**subject** 385:23
**submission** 483:7
**submit** 380:7
381:14 413:16
433:10
**submitted** 360:10
366:7 381:23
413:21,23 475:23
476:10 483:3,14
483:17
**subsequent** 477:7
**suggested** 401:22
**suit** 329:20
**suitcase** 329:4,16
329:17,21,22
330:13
**summers** 471:6,6
473:15 481:2
**superior** 478:6
**supervise** 456:3
**supervision** 410:22
485:9
**supervisor** 308:6
308:10 353:20
401:21 404:17
405:7 411:23
412:2 429:21
479:8
**supervisors** 400:12
400:17,23 404:9
404:14 405:14
433:12 458:10
474:9
**support** 369:3
372:4 393:9,12
452:19 453:5,20
454:5,14,19
456:21 457:4
484:1
**supposed** 399:18
404:19 405:4,5
445:23 467:15
**sure** 311:4 312:13
312:14 313:5,22

334:8 355:2 370:3
380:6 404:22
414:8 417:4 447:8
464:11
**survey** 412:11
**suspicion** 330:12
**swat** 455:9,16
**switched** 400:2
**sworn** 300:12 302:2
380:2,3,7,8 381:6
381:7,14,22 383:4
**sylvia** 471:6 473:15
**sympathetic** 328:10

**T**

**t** 297:1,1 300:1
485:1,1
**table** 316:11,15
317:10 320:22
459:6
**tagged** 316:3
317:19 318:4
325:23
**tail** 342:11
**taillights** 342:4
**taiwan** 344:23
376:13,15 377:7
471:6
**take** 302:23 303:1,1
303:4 315:1 332:4
337:8 353:19
358:15 367:20
370:23 392:3
395:6,10,12 396:6
396:17 397:2,18
398:4,20 400:2,14
412:7 414:7 431:9
438:6,9 445:20,21
445:23 446:2,6,9
446:13,19 447:1,3
447:4 469:13
470:9,9
**taken** 297:5 298:23
350:20 359:17
414:10 485:7
**talk** 302:22 321:7
346:3 427:19
**talked** 302:17

308:1 348:12
353:11 393:7
414:17 451:19
456:17,18,20
457:3 464:6
**talking** 321:2 323:4
354:7,15 384:9
392:9 403:3 477:2
**task** 435:1
**team** 406:17,23
409:21 410:4
440:14,22 441:2,5
441:18 442:2
443:23 444:11
445:7,9,11 447:14
447:22 455:9,10
455:11,16,16
461:7,12
**teams** 440:12
444:20 482:1
**tell** 306:22 307:1
309:4 315:3,6,7
322:19 336:9
344:6 346:23
347:8 348:23
378:15 388:11
399:15 408:4
428:9,22 429:16
469:3 473:14
474:9 483:21
**telling** 324:5
353:16 470:6
**ten** 469:13
**tenure** 413:2
**terminable** 307:17
**terminate** 357:21
358:2 366:21
382:16,21
**terminated** 307:3
358:6 375:5,13,14
375:18,23 376:5
475:1 476:7,12
477:23
**termination** 300:14
306:18,21 307:21
320:17,18 358:15
383:15 475:3,20
475:21 476:5

477:8,22
**terms** 323:19 375:7
**test** 395:5,8,10,12
   395:21 396:1,6,8
   396:11,12,12,16
   396:19 397:4
   398:20 399:1,19
   400:2 431:9 446:7
   446:13,16,19,20
   447:1,3 458:12,13
**tested** 432:19
**testified** 302:3
   462:13 479:20
   480:1
**testify** 303:12
   479:23
**testifying** 303:9
**testimony** 298:23
   338:1 359:1,20
   360:17 365:12,15
   365:17 369:5,11
   370:6 374:14
   383:4 399:6
   402:11 403:16,22
   405:10,17 415:20
   451:6 475:14
   484:9 485:11
**testing** 315:22
   399:21 400:3,13
   454:11,16
**tests** 397:2
**text** 318:3,9
**textatip** 462:11
   463:2 466:3,7,13
   467:17
**thank** 459:8
**thanks** 468:14
**thats** 302:13,22
   309:15 311:8
   320:2 321:23
   324:23 325:19
   333:20 335:1
   337:12 338:4
   356:9 365:2
   369:20 371:21
   380:21 381:3
   390:15 392:17
   404:18,20 405:3

409:1 429:10
432:23 433:2
443:8,23 452:1,21
456:19 458:23
464:22 466:1
468:5 470:17
478:21 479:15
484:13,18
**thereof** 327:11
**theres** 327:5 332:21
   333:20 334:9
   338:17,18 340:13
   348:3,13 381:4
   391:8 410:16,17
   440:12 467:5
   476:15
**thereto** 298:15
   485:8
**theyll** 340:3
**theyre** 404:18
   459:3
**theyve** 340:4
**thing** 354:8
**things** 306:7 325:16
   325:18 326:5
   330:1 338:21
   369:15 399:20
   471:15 478:1
   481:20 484:16
**think** 315:12
   320:14 330:3,3
   345:8 356:11
   369:13 370:1,11
   370:13 371:22
   377:16 404:11
   407:18 409:2,5
   419:8 420:12,16
   439:20,21 458:7
   471:2,3 472:10
**thinking** 326:12
   415:11 418:14
   443:7
**third** 324:20 353:7
   353:8
**thornton** 478:22
   479:3 480:11
**thought** 324:14
   387:2 418:18

**threats** 360:4
**three** 316:1 326:9
   361:13 411:16
   463:8
**thumb** 386:16
   387:10,17
**tiffany** 301:7
   390:13
**tim** 368:12
**time** 298:13,13
   302:18,23 309:1,9
   311:14,15 313:7
   314:10 315:4,23
   316:13 319:3
   320:12,15 322:23
   324:18,20 326:13
   327:2,11,17
   328:18 331:7,22
   333:13 337:6
   338:15 339:5
   341:23 342:13,19
   346:12 347:5,20
   348:18,22,23
   349:5,22 350:19
   351:9,15 356:18
   356:21 357:10,10
   359:16,19 362:12
   363:3,8 364:14
   367:10 368:13
   371:3 373:19
   374:2 375:12,14
   376:4,5 377:16
   386:6,17,23
   393:16 394:7,8,17
   394:18 395:7,16
   397:11,12,14,21
   398:12 399:6,9
   400:19 403:3,10
   403:12 409:13
   412:2 414:9,20,20
   415:9,10,13,15,19
   416:7 418:15
   428:17,21 429:5
   429:22,22 430:10
   430:11,19 431:3,6
   432:12,18,22
   433:22,23 435:13
   436:1 437:10

438:4,7,20 440:4
440:15 441:5,11
442:6,13,22
443:11 444:2
450:22 455:12
456:5 464:2 465:9
465:14 466:5,11
473:18 477:17
484:19
**timekeeping**
   414:19
**times** 308:20
   309:14,17,22
   310:3,5 311:21,23
   312:1 345:15
   346:4 355:17,22
   357:17 438:23
   462:3 478:6
**timing** 414:13
   442:13
**tips** 468:17
**tipsoft** 466:12
   468:15
**tired** 469:7,9,17,22
   470:2,12 471:14
   472:17
**today** 303:10
   312:15 320:20
   352:10 363:2
   364:23 365:3,4
   385:7 408:22
   409:10 419:19
   420:17 432:21
   451:19 452:16
   453:3,8,9 456:17
   456:17 472:2,7,7
   483:9,18 484:6,9
**told** 307:2 324:2
   326:4 335:2
   339:14 354:1
   361:20 367:16
   369:5 387:11
   393:8 401:4 418:2
   449:15 450:5,8
   454:4,13 460:1,4
   468:3 470:19
   474:6 476:4,10
   478:9,12 483:23

**tom** 419:6 425:4,6
   445:5
**tool** 466:17
**top** 329:19,23
   352:12 365:7
   366:13,15 396:4
   417:6
**topic** 365:2
**total** 311:12,23
   312:1 362:11
**totally** 361:20
**tow** 326:5,6 357:14
**town** 314:17
**traffic** 327:21,22
   400:9
**train** 402:13 403:19
   434:19 456:2
   467:15
**trained** 400:23
   401:3,7,16,19
   455:23 463:7
**training** 367:13
   400:6,11 401:22
   402:13,16,22
   404:8,18,19 405:8
   405:11,18,23,23
   406:7,10,14,18
   407:2,3 408:1,3,9
   408:21 409:15,19
   410:9 411:5,19
   412:6,21,22,23
   417:8,9,17,18,19
   418:5,20 431:20
   434:5,7,10,15,15
   434:17,18,23
   435:2,4 436:8,9
   436:13 437:13,16
   437:16 441:17
   442:1 444:10
   447:23 448:18
   449:7 450:2,5,6
   450:10 451:12,17
   451:18,21 452:6,9
   452:20 453:2,7,14
   453:17 457:7
   458:1,6 464:14,18
   465:10,12,15,18
**trainings** 409:9,11

412:18
**transcribed** 352:15
352:17 353:4
**transcript** 298:23
310:10,15 311:2,9
311:11 312:2,6
333:5 347:13
349:6,8,16,18,19
350:3 351:1,8,10
351:14 352:6,9
356:1 365:21
372:12 376:19
378:13 380:15
381:1,20 382:10
383:11 389:14
416:1 462:20
**transcription** 300:4
352:11
**transcripts** 348:13
**transition** 390:11
**transpired** 315:7
327:2 351:9
**transport** 306:11
**transported** 315:8
315:11
**transporting**
305:14
**transposed** 390:5
**treat** 315:21
**treated** 316:23
317:8,12,13
401:13,14
**treatment** 315:12
321:10,18,20
447:13 454:10,15
458:16 482:1
**trial** 298:13
**tried** 317:4 342:17
354:23
**trip** 384:11,14,20
385:4,8
**tripp** 420:2 447:7
447:20
**true** 352:9 391:16
457:13,15 465:6
466:4 485:10
**truitt** 345:1 356:22
357:16 376:12,13

376:15 377:7
471:5,7 481:1,11
**trump** 371:14,20
**try** 326:18 333:1
365:16 377:3
469:15 470:4,15
475:22
**trying** 319:11 320:2
323:5 326:16
330:2 340:1 341:3
343:18 353:13
355:11,14 357:8
365:20 370:3
404:11 470:16
471:14,15 472:12
**turn** 312:20 323:12
327:12 352:21
457:7
**turned** 309:11
312:17 339:11
461:1
**tv** 476:19
**twelvehour** 469:20
469:21
**twenty** 417:21
458:8
**twice** 324:19
**two** 296:20 316:17
322:4,12 324:13
332:10 345:1
361:9,20 362:9,11
380:18 381:5
390:2 391:3,19
401:2 411:16
438:21 441:20
**twoweek** 469:17
**type** 318:11 362:1
400:3 476:2
**typed** 349:8
**types** 456:1
**typewriting** 485:9

**U**

**u** 297:1 303:21
366:17
**uh** 353:11
**uhhuh** 302:19
391:10 419:17,21

**unable** 387:14
447:4
**understand** 303:4,6
303:9 324:3,8
355:2 363:2
364:19 370:6
384:9 453:9
464:10 466:8
471:18 472:1
**understanding**
313:23 328:10
343:2 346:6
360:17 374:23
390:4 396:23
399:5 411:6 430:5
433:16
**understood** 328:3
370:4
**unfair** 361:5,7
**unintentional**
342:3
**unit** 436:4,18
**united** 296:1
366:18
**unknown** 390:3
452:7
**unnecessary**
316:20
**unsubstantiated**
363:17
**upholding** 383:15
**upset** 316:10 317:5
326:2
**use** 304:21 305:2,6
305:9,10,12,13
306:4,5,13 315:15
315:18 316:11,21
321:11 396:10
466:23 467:15,18
479:16
**usually** 340:3 387:4
434:16
**utilities** 338:19
**utilize** 467:14
**utilized** 305:18
361:17
**uturn** 329:1,14

**V**

**vacancies** 395:22
**vacation** 446:15
**validated** 395:5,8
396:6,11,12
**validating** 396:13
396:15
**vehicle** 305:6,9,12
305:16,19,19,23
305:23 306:5,11
306:13,16 308:7
308:16,21 309:3
309:11 317:17,18
324:17,20,22
325:1,2,16,17
326:6 328:8
330:21 332:4,5,13
332:15,17 334:23
335:1,3,3,19
336:3,5,11,14,16
336:19,20 337:3,4
337:10,15,17
338:2,6,17 339:2
339:17 340:5,20
340:21 341:1,4,19
341:20,21 342:2
342:15,18 343:7
343:10,13,19,19
345:19 346:6,8,9
346:11 354:16,20
354:23 355:5
356:5,7,18,20
357:5,7,10,13,17
**vehicles** 305:18
341:17
**verbal** 364:18
479:3
**verbally** 302:18
**verbiage** 361:18
**veterans** 358:17
373:1,18 374:6
479:16
**vicinity** 326:11
327:11 357:5
**victim** 353:13
**vieira** 420:4,4
426:13 449:10,17

**view** 358:18 475:8
**viewing** 310:16
**violated** 320:13
**violation** 307:6,23
307:23 368:4
460:18,21 461:14
474:18
**violations** 374:11
**violence** 360:4
**visit** 314:20
**visiting** 314:16
**voice** 316:12
**voices** 351:4
**volume** 296:20
**vs** 296:9

**W**

**wait** 313:22 315:14
330:19
**waited** 317:16
321:10 326:19,23
**waiting** 318:20
435:17
**waived** 298:3,18
**walk** 325:4,21
328:13 341:6
350:12 428:1
**walked** 325:8,12
329:23 339:3,10
340:18 341:5
342:12
**walking** 327:14
328:23 330:6,8
339:7,13,22
343:17
**want** 302:13 311:14
312:14 313:22
317:1,1 324:3,5,6
324:9,10 326:1,1
339:9 347:9
348:15 350:8
351:2,15 357:1,3
360:20 370:3
386:17 394:17
397:15 420:13
427:19 433:14,19
458:20 459:2,4,7
469:8,13,15 470:1

470:3,9,11,17,18
472:10 480:21
483:21
**wanted** 304:22
305:4 326:17
328:5 350:5 402:1
416:13
**wants** 354:9 457:18
**warren** 420:4
426:17,21 427:2
449:12,17
**wasnt** 309:7 312:18
330:4 401:1,6,7
401:16 407:7
408:11 429:6
459:8 465:11,16
465:19 466:1
**watch** 350:13 375:9
459:15 460:11,19
461:10 462:2
**watching** 342:4,9
342:10
**watkins** 418:22
421:8 431:15,18
431:22 432:9,12
434:1,4
**way** 323:5 330:6
344:16 350:15
351:17 353:7,8
355:4 359:4,23
361:22 370:19
384:13 385:4
395:16 401:8,13
401:14,17 406:21
407:8 465:21,22
483:18
**wdhn** 476:19
**website** 317:20,22
366:3,4,10 407:18
**wee** 331:10 378:9
**weeks** 387:23
388:10 472:3
**went** 305:20 316:23
317:13,16 326:8
326:20 327:10
328:14 330:5,15
339:19 340:6,12
340:16 341:17

342:5,9 353:12
362:11,12 364:6
388:10 410:13
434:21 435:13,22
450:4,6,10 469:20
477:9
**weve** 337:8 349:18
391:5 413:18
414:20
**whats** 353:15
422:21 425:6
426:1,5,9,11,13
426:15 443:22
457:9,16 482:12
482:12 484:13
**white** 384:9,10,16
393:5,20 402:5,11
402:15 405:10,17
405:22 406:4
416:22 417:1
420:22 421:1,5,9
451:11,18 452:7
452:20 453:2,6,23
454:6,9,15 455:4
456:22 459:12,14
462:9 463:7
474:12
**whos** 459:1,2
**wiecsorek** 356:10
**wieczorek** 345:8
356:8,9,12,13,15
419:1 422:10,11
437:9,10,12
**william** 462:23
466:2 467:20
**willing** 349:15
**window** 325:14
327:19
**winters** 297:6
298:21 301:15
485:19,20
**wish** 316:5
**witness** 298:3
301:21 310:21
337:1,14 349:23
350:5,16,18 353:2
390:16 413:22
414:11 415:4,18

473:15
**witnessed** 455:19
**wombles** 429:20
430:3
**wont** 348:10 371:1
417:5 420:11
**woodham** 404:10
404:15,22
**word** 338:19
396:10
**words** 321:11
**work** 331:4 332:3
335:22 387:14
416:23 417:2
418:9 427:11,14
428:2,12,22
431:14 451:1
454:1,6 456:22
457:6,10 459:7
464:7,8 468:14
470:23
**worked** 304:18
345:2 401:15,16
403:18,19 404:9
404:10 405:14,16
471:1
**working** 331:20
395:20 396:1,8
397:4 402:19
404:13 472:18
**worldwide** 477:9
**wouldnt** 316:19
371:22 398:4
415:10
**wow** 392:8
**wrecker** 325:17
330:20,20,22
339:16 340:1
**wright** 384:19
**write** 319:15
426:23
**writing** 350:23
364:9 458:14
**written** 319:13
320:9 360:1,9
364:17 479:2
480:9
**wrong** 328:1,4

367:11 427:1
**wrote** 319:12,20,21
370:16 426:23
**wtby** 476:19

---

**X**

**x** 300:1 301:1

---

**Y**

**yall** 383:23
**yankee** 469:7
473:22 474:1,5
**yard** 326:12 327:5
**year** 373:13 438:21
438:22 439:1
456:11 463:17
**years** 364:3 375:3
408:21 409:16
411:16,17 429:7
431:5 438:22
452:11 458:8,11
463:8 465:2,3
471:14 473:18
477:14
**yelling** 341:7,9
**youll** 389:20 416:20
**youre** 303:9 306:9
310:15 314:6
318:21 319:2
324:9 339:15
341:14 351:7
354:11 365:19
369:15 384:21
386:7 391:9
400:21 401:4
402:6 420:18
427:15 428:12,14
428:23 432:1
433:18,20 457:11
463:10 471:23
477:2 484:6
**youve** 318:12,13,15
319:2 323:9 352:9
353:3 365:16
369:3,5 384:6,12
385:14 391:4
409:9 450:3
475:14 476:9

478:13 479:20
480:1 484:3

---

**Z**

---

**0**

**09** 300:5

---

**1**

**1** 296:5,23 392:2,16
**10** 392:22 393:2
416:21 451:14,15
453:22 459:9
463:6
**10302017** 485:23
**113012** 300:19
**12** 300:5 472:18
**12092013** 352:11
**12913** 300:9
**13** 362:12
**14** 364:3
**14cv00392mhtsrw**
296:5
**14year** 364:13
**15** 298:20
**16** 352:21 353:1
392:4 482:18
483:3
**17** 438:15
**18** 394:15,23 397:6
**1901** 297:8 301:8
**1987** 391:21 392:13
**1988** 298:21
**1989** 392:2,17
**1st** 297:10 298:23
387:5 473:2

---

**2**

**2** 387:1 391:21
392:13 413:9
416:14
**2004** 373:2,6 480:3
**2005** 373:14,17
**2006** 394:15,23
395:8 396:3 397:6
398:1,9,17,20
431:12
**2011** 394:17,21

395:2 399:5,16
403:4,22 405:19
405:20,21 432:6
**2012** 427:17,20
428:14,21 463:1
466:2 467:20
468:13
**2013** 300:5 312:22
313:21 314:16
333:14 334:22
352:19 360:10
367:20 368:23
369:8 372:17,19
378:4,21 387:1
392:4 413:9
427:15 428:15,21
437:23 456:12,13
459:18 482:18
483:4
**2015** 296:23 297:10
299:1 472:4
**21** 311:12 351:7
370:10 472:18
**2400** 297:8 301:7
**25** 391:4,15
**26** 360:10
**26th** 360:22
**27** 347:19 348:5,21
**2nd** 387:5

**3**

**3** 348:5 463:5
**30** 301:19 463:1
468:13
**302** 301:3
**33** 391:19 392:6,10
**333** 300:3
**34** 333:3,7,10 337:9
392:1,16
**3413** 300:6
**35** 352:4,8
**352** 300:4
**35203** 297:9 301:9
**36** 372:10,14 391:4
391:15 468:13
**37** 376:17 377:10
377:20 389:21
392:5

**372** 300:6
**376** 300:7
**378** 300:9
**38** 378:11,15
379:16
**380** 300:10
**381** 300:12
**382** 300:13
**383** 300:14
**389** 300:16
**39** 380:13,17
477:14

**4**

**4** 372:17 484:20
**40** 297:10 381:18
381:22 484:20
**41** 382:8,12
**415** 300:18
**42** 383:9,13
**43** 389:12,16
392:10
**44** 415:22 416:3
**45** 462:18,22
**462** 300:19
**484** 301:3

**5**

**5** 298:19
**51** 347:19 348:5,21
**58** 348:5

**6**

**6** 391:9 416:14

**7**

**701** 380:23
**703** 380:23 381:3
**71** 482:17
**79** 393:4

**8**

**8** 438:13,14
**80** 416:22
**81** 451:10,15
456:16,23
**82** 453:13,22
456:23 457:1
**83** 454:9

**84** 459:10
**85** 462:7
**8th** 314:22

**9**

**9** 297:10 334:22
352:19 378:4,21
468:13 482:16
**9th** 314:23 394:20

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

RAEMONICA CARNEY,     )
                             )
     **Plaintiff,**          )
                             )     **CIVIL ACTION NO:**
**vs.**                        )     **1:14-cv-000392**
                             )
**CITY OF DOTHAN,**     )
                             )
     **Defendant.**        )

## PLAINTIFF'S OBJECTIONS TO DEFENDANT'S INTERROGATORIES AND REQUEST FOR PRODUCTION

COMES NOW Plaintiff RaeMonica Carney and reserves the following objections to Defendant's Interrogatories and Request for Production:

1.    Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.    Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege, protection, or immunity applicable under the governing law.

3.    Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it is overly broad in scope, unduly

1



DEFENDANT'S EXHIBIT

Cloyd    1

burdensome, irrelevant, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.

  4.  Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it is duplicative or requests information that is equally available to Defendant.

  5.  Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it seeks facts known or opinions held by non-witness experts.

  6.  Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it seeks legal conclusions or answers to questions of law.

  7.  Plaintiff objects to each instruction, definition, interrogatory, and request for production to the extent that it seeks exceeds the number allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.

         s/ Sonya C. Edwards
         Sonya C. Edwards

EDWARDS LAW, LLC
121 Edenton Street
Birmingham, Alabama 35242
SonyaEdwardsLaw@gmail.com
Phone: (205) 408-0956
Fax: (205) 408-9236

2

s/ Jeffrey W. Bennitt
Jeffrey W. Bennitt

JEFF BENNITT & ASSOCIATES
121 Edenton Street
Birmingham, Alabama 35242
Bennittlaw@aol.com
Phone: (205) 408-7240
Fax: (205) 408-9236

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing to all counsel of record via electronic mail on this, the 15th of September, 2014 as follows:

Stephanie Mays, Esq.
Smays@maynardcooper.com

Chris Mitchell, Esq.
CMitchell@maynardcooper.com

/s/Sonya Edwards
Of Counsel

3

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

RAEMONICA CARNEY,      )
                              )

      Plaintiff,        )

                            )    CIVIL ACTION NO:

vs.                       )    1:14-cv-000392

                            )

CITY OF DOTHAN,        )

                            )

      Defendant.      )

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION

COMES NOW Plaintiff RaeMonica Carney and responds to Defendant's Interrogatories and Request for Production as follows:

### DEFINITIONS AND INSTRUCTIONS

Plaintiff objects to each instruction and definition to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

### RESPONSES TO INTERROGATORIES

1.    State your full name, date of birth, social security number, your current residence address and all residence addresses which you have had during the past 10 years (including the approximate dates during which you

have resided at each such address).

Plaintiff objects that the interrogatory is overly broad in scope, seeks irrelevant information and/or information that is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff objects to the extent that it requests information that is equally available to Defendant.  Subject to and without waiving these objections, Plaintiff responds as follows:

RaeMonica Carney Cloyd

DOB  REDACTED

SSN  REDACTED

REDACTED (March 2014 to present)

2601 Springer Street, Dothan, AL 36303 (July 2012 to March 2014)

102 Michigan Drive, Dothan, AL 36301 (May 2010-July 2012)

203 Superior Drive, Dothan, AL 36301 (May 2008-May 2010)

101 Saint Ives Court, Dothan, AL 36301 (May 2007-May 2008)

104 Breneau Drive, Dothan, AL 36303 (May 2005-May 2007)

16505 West Garfield St., Goodyear, AZ 85338 (February 2004-May 2005)

2.      Identify all persons with whom you resided during the past five years.

Plaintiff objects that the interrogatory is overly broad in scope, seeks irrelevant information and/or information that is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving these

objections, Plaintiff responds as follows:  My husband, Kenneth Cloyd, and three (3) minor children: Brandon D. Caldwell, Bradley M. Caldwell, and Roderick J. Carney.

      3.    Summarize your employment history after your employment with Defendant, including any current employment, identifying each employer and including in your answer for each job or occupation (including any self employment): the dates of employment; the position(s) held and the skills/experience/education required for each position; duties and responsibilities of each position held; rate of pay or salary; and the reason(s) for leaving each job and whether you left voluntarily.

      Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving these objections, Plaintiff responds as follows: None.

      4.    Summarize your employment history before your employment with Defendant, identifying each employer and including in your answer for each job or occupation (including any self employment): the dates of employment; the position(s) held and the skills/experience/education required for each position; duties and responsibilities of each position held; rate of pay or salary; and the reason(s) for leaving each job and whether you left voluntarily.

Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff responds as follows:

Please refer to application on file with the City of Dothan. However to the best of Plaintiff's present recollection:

Milledgeville Police Department, Police Officer (November 1996-June 1999);

Peach State Security, Security Officer (in or around August 1996-October 1996);

Ryan's Steakhouse, Hostess, Athens, GA (in or around May 1996-July 1996);

Athens Police Department, Police Officer (June 1995-March 1996);

United States Army, Specialist, Corporal, Sergeant, Staff Sergeant awaiting orders (April 1993-present).

5.     Before your employment with Defendant state whether you have ever been involuntarily terminated from a position other than with Defendant and if so, identify the other employers who involuntarily terminated you, the circumstances surrounding those terminations and the reasons given for your

termination.

Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff responds as follows:

Athens Police Department, during probation, allegedly for not assisting another officer in effectuating an arrest.

6.   As to your duties with Defendant at the time your employment was terminated provide the following: the specific title of your position and the dates you were employed in this specific position; the duties of the position; name/describe the department/location where you usually worked while holding the position; and your experience/skills/education which qualified you to hold the position.

Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff responds as follows: Corporal;

Demoted to Desk Duty in May 2013 during investigation of personal Facebook posts; worked in that position until December 2013 termination.

       7.     Describe in detail all attempts to collect disability benefits (including but not limited to social security benefits) or unemployment benefits in the last five (5) years, listing the approximate dates of any such applications, the outcome of the application and amount received.

     Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff responds as follows: Unemployment benefits were applied for and granted on or around January 2014 and continued until July 22, 2014 in the amount of $238.00 per week.

       8.     Please describe your educational background.

     Plaintiff objects that the interrogatory is overly broad in scope, unduly burdensome, vague, seeks irrelevant information, and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff responds as

follows: High School Diploma, Associate of Science Degree in Criminal Justice Administration, Real Estate License, and on-the-job education and training.

9.     If you are seeking an award of any sum or money, whether by damages or otherwise, state the full amount of money you seek and describe **in detail** the manner in which the amount was calculated. Your description should include each element of damage or component of recovery that you seek, the amount sought for each element or component, the manner in which each element or component of the calculation was determined, and identify the source of each number used in the calculation.

Plaintiff objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects to the extent that it is overly broad in scope, unduly burdensome, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it seeks legal conclusions or answers to questions of law. Subject to and without waiving these objections, Plaintiff states as follows: See Plaintiff's Initial Disclosures.

10.   Summarize each and every effort made by you to find employment since your employment with Defendant ended, including the following:

a)   list all employers you contacted regarding possible employment;

b)   list each potential employer to whom you applied for work, including the date you filled out the application;

c)   list each potential employer with whom you interviewed including the date of the interview;

d)   list each potential employer that offered you a position of employment; and

e)   list each offer of employment that you accepted; list any wages, income or compensation you received from any source after the date of your discharge from Defendant.

Plaintiff objects to this interrogatory as overly broad, unduly burdensome and/or that it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.   Subject to and without waiving these objections, Plaintiff states as follows:

Abbeville Police Department, Abbeville, AL; Hoover Police Department, Hoover, AL; Louisville Metro Police Department, Louisville, KY; Burlington Coat Factory, Louisville, KY; bebe Retail Clothing Department for Store Clerk,

Louisville, KY; Century Mortgage Company for Loan Officer, Louisville, KY; two voluntary military assignments at Fort Knox, KY; Wal-Mart, Asset Protection Manager in Training, KY; Planet Fitness, Clerk, Louisville, KY.

Interview/Application process ongoing with Louisville Metro Police Department. Current status - Requested to be considered for next police academy. Unknown next academy date. No offers of employment as of the date of these Responses.

11.     State whether you have ever been a plaintiff or defendant in any **civil or criminal** proceeding (including both past litigation and any suit which may currently be pending and including any Federal, State or local administrative proceeding) other than the instant case which you have filed against Defendant. If so, please state: the style of each such case, including the names of all parties to the case; whether you were a plaintiff or defendant in each such case; the name and city of the court where each such case was or is pending; the case number of each such case; the approximate date when each such case was filed; the nature of each such case and the relief sought by the parties; and the outcome of each such case, including a statement of whether the plaintiff or the defendant prevailed and, if the plaintiff prevailed, the damages and other relief which were awarded.

Plaintiff objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or

any other privilege or protection applicable under the governing law.  Plaintiff

objects to the extent that it is overly broad in scope, unduly burdensome, vague,

and/or seeks information that is not reasonably calculated to lead to the discovery

of admissible evidence.  Plaintiff objects to the extent that it requests information

that is equally available to Defendant or information that is a matter of public

record.  Plaintiff objects to the extent that it seeks legal conclusions or answers to

questions of law.  Subject to and without waiving these objections, Plaintiff states

as follows:

August 2014; Emergency Protection Order; Jefferson County Circuit Court;

Louisville, KY, Dismissed.

In or around 2009; Plaintiff; *Carney v. Dinah Construction, et al.*, Houston

County Circuit Court.

12.    Identify each and every person with knowledge (whether direct

or indirect) of any fact regarding this lawsuit, whether known by you, your

attorney, or anyone else who has acted on your behalf, describe what

knowledge about the lawsuit each may have and indicate whether a statement

was taken from each such witness.

Plaintiff objects to this interrogatory to the extent that it seeks information

protected by the attorney-client privilege, the attorney work-product privilege, or

any other privilege or protection applicable under the governing law. Plaintiff objects to the extent that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Subject to and without waiving these objections, Plaintiff states as follows: See Plaintiff's Initial Disclosures. Please also refer to Defendant's investigation allegedly underlying Plaintiff's termination for all presently-known written statements.

13. Identify any position for which you applied for and/or took a promotional exam for during your employment with Defendant and the approximate date on which you submitted any such application and/or took any such exam.

Plaintiff objects to the extent this interrogatory it is overly broad in scope, unduly burdensome, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff states as follows:

Criminal Investigations Division Investigator – between 2000-2004

School Resource Officer – First request made during first employment period 2000-2004

Hostage Negotiator – 2006-2008

Criminal Investigations Division/Juvenile Investigations Division – 2006-2013

School Resource Officer - Second request made during second employment period 2006-2013. Position granted on second request on or around August 2011.

Recruiting Team - 2012

Corporal's exam – 2003

Corporal's exam – 05-09/2011 – Promoted to Corporal

Sergeant's exam – 05/2013

14.    Identify each expert witness whom you intend to call as a witness at trial.   Separately  summarize each  expert's  anticipated testimony/opinions and separately provide all background facts, data, studies, survey, articles etc. on which each expert relies.

Plaintiff objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or

any other privilege or protection applicable under the governing law. Plaintiff objects to that it is overly broad, unduly burdensome, seeks irrelevant information or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it seeks legal conclusions or answers to questions of law. Subject to and without waiving these objections, Plaintiff states as follows: As of the date of this response, no expert witness has been retained.

15.    State whether or not you have ever filed a charge of discrimination or any similar employment complaint or charge with the EEOC or with any other Federal or State agency or body against any employer other than the Defendants. If so, please state: the names of all parties involved in the charge; the name of the agency with which such charge or complaint was filed; the name and city of the EEOC or other agency office where each charge or complaint was filed or is pending; the charge or case number of each such charge or complaint; the approximate date when each such charge or complaint was filed; the nature of each such charge or complaint and the relief sought; and the outcome of each such charge or complaint, including any determination made by the EEOC or other agency.

Plaintiff objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects to that it is overly broad, unduly burdensome, seeks irrelevant information or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant or a matter of public record. Plaintiff objects to the extent that it seeks legal conclusions or answers to questions of law. Subject to and without waiving these objections, Plaintiff states as follows: None.

16. Please state whether you have ever been involved in any bankruptcy proceedings and if so, provide details of when and where the bankruptcy petition was filed and the current status or outcome of that proceeding.

Plaintiff objects to that this interrogatory as overly broad in scope and as seeking irrelevant information or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it seeks legal conclusions or answers to questions of law. Subject to and without waiving these objections, Plaintiff states as follows: Two (2) filings between 1996 and 1999 filed in Middle District of Georgia. The first petition was withdrawn.

The second petition resulted in a Chapter 7 filing.   The case was dismissed in 2000/2001.

17.   Identify any communication after your discharge from Defendant between you and Defendant or any of its representatives relating to the allegations in the Complaint or any matters related to the claims in this action.

Plaintiff objects to this interrogatory as being overly broad, unduly burdensome, vague, and as seeking irrelevant information and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information equally available to Defendant.   Subject to and without waiving these objections, Plaintiff states as follows:   Plaintiff has had no material communications with Defendant or its representatives relating to the allegations in the Complaint or any matters related to Plaintiff's claims since her termination.

18.   Please identify the names and addresses of any and all medical physicians, psychiatrists, psychologists, or counselors from whom you have sought or received treatment in the last ten (10) years. Also, with regard to each physician, psychiatrist or psychologist or counselor:

       a.     List the name of each provider, where he or she practices and discuss in detail the extent of

treatment;

b.    List any and all medications they prescribed and the suggested dosage;

c.    State the frequency or number of your visits to each of these professionals.

Plaintiff objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege, protection, or immunity applicable under the governing law. Plaintiff objects to the extent that it is overly broad in scope, unduly burdensome, vague, irrelevant, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of interrogatories allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.

19.    Please identify with specificity all professional and personal diaries, journals, personal email accounts, and any accounts you have with social networking sites including, but not limited to, My Space, Facebook, Linked In, Twitter or Flicker.

Plaintiff objects to this interrogatory as overly broad in scope, unduly burdensome, vague, irrelevant, and/or seeks information that is not reasonably

calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it exceeds the number of interrogatories allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows: Facebook, Twitter, MySpace, LinkedIn, and a personal Yahoo e-mail address.

20.    Please state the full name and current address of all adult relatives, by blood or marriage, who reside in the Middle District of Alabama.

Plaintiff objects to this interrogatory as overly broad in scope, unduly burdensome, vague, irrelevant, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it exceeds the number of interrogatories allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows: To the best of Plaintiff's present knowledge and recollection, the following relatives reside in the Middle District of Alabama:

Glenda Faye Pryor, 405 Alabama Ave Apt B-1 Dothan, AL 36303;

Sharanita Shaw, 405 Alabama Ave Apt B-1 Dothan, AL 36303;

Brandon DeMarkus Caldwell & Takirra Marie Davis Caldwell, 3960 Mance Newton Road Apt A7, Midland City, AL 36350;

Ella Louise Holyfield & Horatio Holyfield, 601 Allen Road, Dothan, AL 36303;

Willie Curtis Carroll, Sr & Doretha Carroll, Dothan, AL 36301;

David Dean & Calvin Al Palmer, 2102 Stringer Street, Dothan, AL 36303;

William Carroll, Dothan, AL;

Curtis Carroll, Dothan, AL;

Trisha Carroll, Dothan, AL.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

## VERIFICATION

I do solemnly declare under the penalty of perjury that the foregoing Responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.

_____

RaeMonica Carney

I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that RAEMONICA CARNEY, whose name is signed to the foregoing Verification and who is known to me, acknowledged before me on this day, that, being fully informed of the contents of the foregoing instrument, he executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this _____ day of _____, 2014.


_____

Notary Public

My Commission Expires: _____


 (NOTARIAL SEAL)

## RESPONSES TO REQUEST FOR PRODUCTION

1.      All documents provided by Defendant to you at any time and retained by you, either in the original or by a copy.

Plaintiff objects to this request to the extent that it overly broad in scope, unduly burdensome, vague, irrelevant, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Subject to and without waiving these objections, Plaintiff states as follows:

2.      All documents and things from any source which in any way relate to or support the allegations contained in the Complaint.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects to the extent that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant and/or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by

non-witness experts.   Subject to and without waiving these objections, Plaintiff

states as follows:

3.   Each document, audio recording, video recording, text message

and photograph, and which you anticipate offering for introduction into

evidence at the trial of this case.

Plaintiff objects to this request as being vague as written.  Plaintiff objects

to the extent that it requests information that is equally available to Defendant

and/or information that is a matter of public record.  Plaintiff objects to the extent

that it seeks facts known or opinions held by non-witness experts.   Subject to and

without waiving these objections, Plaintiff states as follows:

4.   All documents of any kind evidencing, referring or relating to

expenses and/or damages you are claiming as a result of the claims asserted in

the Complaint.

Plaintiff objects to this request to the extent that it seeks information

protected by the attorney-client privilege, the attorney work-product privilege, or

any other privilege or protection applicable under the governing law.  Plaintiff

objects to the extent that it is overly broad in scope, unduly burdensome, vague,

and/or seeks information that is not reasonably calculated to lead to the discovery

of admissible evidence.  Plaintiff objects to the extent that it requests information

2c4fb98a563851ef

that is equally available to Defendant or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts.   Subject to and without waiving these objections, Plaintiff states as follows:

5.    All personal diaries, notes, desk calendars, memoranda, audio tapes, video tapes, emails, text messages, social media comments/posts, blog comments/posts, computerized documents or other documents assembled or compiled by you (in your possession or to which you have access) from the beginning of your employment with Defendant to the present reflecting any remarks or statements made by anyone concerning: (a) any employment contract, agreement, arrangement or understanding between you and Defendant; (b) the terms and conditions under which you performed services for Defendant; (c) encounters, meetings,  or conversations with past or present employees, officials, agents, or attorneys of Defendant; (d) any reprimands, suspensions,  or disciplinary actions  against  you  in  connection  with employment; (e) any complaints of alleged discrimination, First Amendment violations, and/or hostile work environment, and/or (f) job performance, including but not limited to performance reviews, test results and examination scores; (g) job titles, duties and assignments; (h) training; (i) social media posts related to your claims in this case; and (j) the termination of your employment.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant and/or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

6.      All documents of any kind evidencing, referring or relating to your discharge from Defendant.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally

available to Defendant and/or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

7.      All applications, statements, or other documents submitted in applications or pursuant to applications for benefits by you, your physician, or anyone else acting on your behalf in attempts to obtain benefits. This request includes any and all documents that discuss, refer, or relate to any attempt by you to obtain unemployment benefits, including, but not limited to, any list of potential employers prepared and/or submitted.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds

the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.   Subject to and without waiving these objections, Plaintiff states as follows:

8.   Any and all documents that discuss, refer, or relate to any wages, income, or compensation you received from any source from the date of your last day of work at Defendant.   This request includes, but is not limited to, any paycheck stubs or deposit records which evidence any wages, income or compensation since your employment ended at Defendant.

Plaintiff objects to this request as overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.   Plaintiff objects to the extent that it requests information that is equally available to Defendant.   Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.   Subject to and without waiving these objections, Plaintiff states as follows:

9.   Any and all documents that discuss, refer, or relate to any efforts by you to obtain employment during and/or after your last day of work at Defendant.

Plaintiff objects to this request as overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

10. Any and all documents utilized or relied upon to answer Defendant's interrogatories.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent it requests information that is equally available to Defendant or a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

11. Any and all documents sent to or received from the EEOC or any other government agency in the last five years; including but not limited

to the Amended EEOC Charge referenced in Paragraph 71 of your Complaint.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent it requests information that is equally available to Defendant and/or a matter of public record. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

12. Any documents relating to any positions for which you applied for and/or took an exam for during your employment with Defendant.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent it requests information that is equally available to Defendant and/or a matter of public record. Plaintiff objects to the

extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

13.    All your income tax returns, both State and Federal, with attachments, for the years 2009-2014.

Plaintiff objects that it is overly broad in scope, unduly burdensome, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

14.    Any and all written statements taken from any person concerning the matters alleged in this lawsuit.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant or information that is a matter of public record. Plaintiff

objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

15.   Any and all documents reflecting or relating to any alleged complaints relating to your claims in this lawsuit made by you during your employment with Defendant.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law. Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to the extent that it requests information that is equally available to Defendant or information that is a matter of public record. Plaintiff objects to the extent that it seeks facts known or opinions held by non-witness experts. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

16.    Copies of any statements made by you in any text message, personal e-mail account or on Facebook, MySpace, Linked In, Twitter, Flicker or any other social networking site regarding your claims in this lawsuit or your employment or discharge from Defendant, including but not limited to the February 2013 Facebook posts/comments referenced in Paragraph 107 of Plaintiff s Complaint and messages, comments and responses regarding the same.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law.  Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff objects to the extent that it requests information that is equally available to Defendant or information that is a matter of public record.  Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.  Subject to and without waiving these objections, Plaintiff states as follows:

17. Any and all documents received pursuant to a subpoena or FOIA request.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law.  Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff objects to the extent that it requests information that is equally available to Defendant and/or information that is a matter of public record.  Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court.  Subject to and without waiving these objections, Plaintiff states as follows:

18.    All documents provided to any expert witness and/or any expert consultant with whom Plaintiff and/or his attorneys have consulted in connection with any matter related to the allegations in the Complaint.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law.  Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff objects to the extent that it requests information that is equally available to Defendant and/or information that is a matter of public record.

31

Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

19.    With respect to any expert witness you intend to call in this case: (1) all documents relating in any way to such witness' qualifications as an expert; 2) a written summary of such person's opinion and intended testimony and the facts underlying such opinion or testimony and (3) documents stating whether such person has ever been retained for consultation in a lawsuit involving claims under any municipal, state or federal fair employment law.

Plaintiff objects to this request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege or protection applicable under the governing law.  Plaintiff objects that it is overly broad in scope, unduly burdensome, vague, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff objects to the extent that it requests information that is equally available to Defendant and/or information that is a matter of public record. Plaintiff objects to the extent that it exceeds the number of requests allowed by the Federal Rules of Civil Procedure and the applicable Rules or Orders of the Court. Subject to and without waiving these objections, Plaintiff states as follows:

32

As to objections,

/s/ Sonya C. Edwards
Sonya C. Edwards

EDWARDS LAW, LLC
121 Edenton Street
Birmingham, Alabama 35242
SonyaEdwardsLaw@gmail.com
(205) 408-0956 Telephone
(205) 408-9236 Facsimile

/s/ Jeffrey W. Bennitt
Jeffrey W. Bennitt

JEFFREY W. BENNITT & ASSOCIATES
121 Edenton Street
Birmingham, Alabama 35242
Bennittlaw@aol.com
(205) 408-7240 Telephone
(205) 408-9236 Facsimile

33

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing to all counsel of record via electronic mail on this the September 22, 2014 as follows:

Stephanie Mays, Esq.
smays@maynardcooper.com

Chris Mitchell, Esq.
cmitchell@maynardcooper.com

/s/Sonya Edwards
Of Counsel

# ALABAMA SJIS INDEX SEARCH

**PC**

Search Criteria: Name: carney raemonica, SSN: None, County:38, Division: ALL, DOB: None, Case Year: ALL, Filing Date: None

9 records.

| County | CaseNumber | Name | JID | Charge | Status | DOB | SEX | Race | CA date | CA code | SSN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | CV20130006300 | CARNEY RAEMONICA | HDB | APPL/CITY | DISPOSED | | | | 1/14/2014 | BENCH VERDICT | |
| 38 | SM201390104100 | CARNEY RAEMONICA | LCI | C DOTHAN AMBUL | DISPOSED | | | | 5/15/2103 | DISMISSED W/O PREJUDICE/JURIS OR PROS. | XXX-XX-X999 |
| 38 | CV20110002600 | CARNEY RAEMONICA | BEM | GRDNSHP/THELMA | DISPOSED | | | | 7/11/2012 | DISMISSED W/O PREJUDICE/JURIS OR PROS. | |
| 38 | SM201190089300 | CARNEY RAEMONICA | LCI | C SOUTHERN BON | DISPOSED | | | | 4/7/2011 | DISMISSED W/O PREJUDICE/JURIS OR PROS. | XXX-XX-X999 |
| 38 | DV20090006900 | CARNEY RAEMONICA | BHL | C THE HEADLAND | DISPOSED | | | | 2/15/2011 | DISMISSED W/O PREJUDICE/JURIS OR PROS. | XXX-XX-X999 |
| 38 | SM200990018800 | CARNEY RAEMONICA | MJS | C ENTCARE | DISPOSED | | | | 4/13/2009 | DEFAULT JUDGEMENT | XXX-XX-X999 |
| 38 | CV200700010700 | CARNEY RAEMONICA | CLL | D/DINAH CONSTR | MFICHE | | | | 3/4/2008 | BENCH VERDICT | |
| 38 | DR200800067201 | CARNEY RAEMONICA PULLIN | HDB | D RODERICK | ACTIVE | 10/15/1972 | F | | | | XXX-XX-X887 |
| 38 | DR200800067200 | CARNEY RAEMONICA PULLIN | HDB | DW/ RODERICK | DISPOSED | 10/15/1972 | F | B | 10/23/2008 | BENCH VERDICT | XXX-XX-X887 |

● **END OF THE REPORT**

© Alacourt.com    9/25/2.                                    1

DEFENDANT'S EXHIBIT

Cloyd    2

## APPLICATION FOR CITY OF DOTHAN EMPLOYMENT - PF #105

| Type, print or write plainly so that your application will be legible when reproduced (black type, black or dark blue ballpoint pen). |
|---|

## GENERAL INFORMATION

| | FOR PERSONNEL USE ONLY |
|---|---|
| | {Date(s) of changes, addition, updates, notes, etc.} |

DD214  ☑Y  ☐N  ☐N/A

*Cl 2-4*

1. What job are you applying for? Give job title and announcement number

POLICE OFFICER ANNOUNCEMENT #281-99-01

2. Social Security Number
   *(needed for employ/background investigations.)*

   **REDACTED**

3. Home Phone
   Area Code + Number

   (912 ) 414-1102

4. Work Phone
   *Area Code + Number*

   ( 912 )445-0900

5. Name and Telephone Number of Another Point of Contact
   GLORIA KING

   (912 )  452-6888

6. Driver's License Number    Expiration Date

   422901887         / 10152000

7. Driver's License State/Class/Restrictions

   GA   /   C   /   NONE

   Endorsements If Any:

8. Your Name (Last, First, Middle)

   CALDWELL, RAEMONICA

9. Is use of another name necessary to check your work record? If yes, please explain:

   NO

10. Mailing address

    No. Street:  100 NORTH LINCOLN STREET APT 4A

    City/State/Zip +4:  MILLEDGEVILLE, GEORGIA 31061-0000

    Street Address if different from Mailing Address:

11. Are you currently employed by the City of Dothan?    Yes ☐   No ☒

    If yes, give your job title and department:

12. Have you ever worked for the City ?    Yes ☐   No ☒

    If yes, list dates and department?

    a. Have you ever been dismissed from the City ?    Yes ☐   No ☒

13. Are you willing to work weekends, shifts or rotating shifts?    Yes ☒   No ☐

14. Are you related to anyone on the Board of City Commission or a Department Head?  .  Yes ☐   No ☒

    If yes, list name(s), department and *explain* relationship:

15. Have you ever been discharged from another job for cause?  Yes ☐   No ☒

    If yes, explain (Give dates, employers and details. Attach a separate sheet of paper if necessary):

16. Do you hold any political office? (The Civil Service Act of Dothan and Alabama Law prohibits City employees from holding local, City of Dothan, political office)    Yes ☐   No ☒

    If yes, title of office:

**DEFENDANT'S EXHIBIT**

*Cloyd*   3

2

CITY OF DOTHAN/CARNEY 000003
CONFIDENTIAL



**CITY OF DOTHAN PERSONNEL DEPARTMENT**
P.O. Box 2128 - DOTHAN, ALABAMA 36302-2128
24 - HOUR JOB LINE (334) 793-0309 • PHONE: (334) 793-0151 • FAX (334) 712-2567
Telecommunication Device (TDD) for the speech and/or hearing impaired (334) 792-2378

An Equal Opportunity
Employer M/F/D

### READ THE FOLLOWING INSTRUCTIONS CAREFULLY BEFORE YOU COMPLETE THIS APPLICATION

**DO NOT SUBMIT A RESUME INSTEAD OF THIS APPLICATION.** You may attach your resume to this application; however, the application must be completed. If you need additional space you may attach sheets to this application. In order to be considered for the position for which you are applying, you must submit a completed application. A sample of a completed application is posted on the Personnel Department bulletin board. NOTE: You can apply for only one position on this application. You may supplement this application with copies of certificates, diplomas, licenses, etc; however, DO NOT SEND ANY PAPERS WHICH YOU WOULD WANT RETURNED.

1. Read the job announcement. Be sure that your work experience and/or education meet the qualifications described on the position announcement.

2. Read carefully and complete each question and/or statement on the application and/or supplemental application for employment. If the question or statement does not apply to you, write "N/A".

3. Give complete name and address of each school you have attended, and complete each column for record of education.

4. NOTE: YOUR APPLICATION WILL NOT BE PROCESSED WITHOUT THE FOLLOWING INFORMATION: Give complete dates of employment to include at least the MONTH AND YEAR you started and left the place you worked; and give complete name and mailing address for all places you have worked. If you are listing volunteer work to qualify for a position, an experience block must be completed in the same manner as a paid job.

   Give your job title, the name of the person to whom you reported, and a brief reason for leaving each place you have worked or volunteered.

   DESCRIBE CLEARLY what you did at each place you have worked. Do not use abbreviations in the description of duties and responsibilities. If you do not describe your work experience, it will not be possible to determine if you meet the requirements of the position for which you are applying. We may verify your description with your former employers. If you had a major change of duties or responsibilities while you worked for the same employer, describe each major change as a separate job. This also applies to applicants listing military experience to qualify for a position. Each time you had a major change in responsibilities it should be listed separately.

   Write in each experience block your name at the time you were employed or volunteered, if it is different from the name you currently use. List your name used at that time on the first line under Description of Duties and Responsibilities.

   List, in the Personal References section, the name, mailing address (box number is required if a route is given) and telephone number of at least two (2) people {Police Officer and Fire Fighter applicants must list at least three (3) people} who know you. Do not list persons related to you or for whom you have worked in the past.

   Sign (in your usual handwriting) and date the "Applicant Certification and Agreement" form; and the "Authorization, Release and Consent" form. If left unsigned, your application will not be considered.

5. If the job announcement states a valid driver's license is required, you must present your driver's license to the receptionist at time of application for verification.

6. If hired you must present proof of identity and employment eligibility as stipulated in TITLE 8, U.S. CODE, SECTION 132A (i.e., driver's license, Social Security Card issued by the Social Security Administration).

7. The City of Dothan verifies past employment, performs background investigations, and administers employment physicals which includes drug/alcohol testing. A photo I.D., with signature, is required for employment physicals.

8. We may request that you complete a Supplemental Application form. If you list work you have done for a company on the supplemental application, and do not list the company on your employment application, you will not receive credit for this work. The same applies to education, courses completed, etc.

9. Applications for the announced position are retained for a period not to exceed two years unless re-advertised. Should it be necessary to re-advertise the position, all previous applicants should reapply. It is the applicant's responsibility to monitor the City of Dothan's 24-hour Job Line (334) 793-0309. REMINDER: You may apply for only one position on this employment application.

10. You must notify us immediately if your address or any of the telephone numbers you have listed changes. (Note: Completing a U.S. Postal Service forwarding of address form does not release you from notifying us immediately if your address changes). Your name will be removed from consideration for this position if we cannot contact you within a reasonable length of time.

11. Applicants applying for positions in the Police Department must also complete form #PF281.

12. The City of Dothan is a public employer. Employment applications, resumes, and contents thereof, are a matter of public record. (Chambers v. Birmingham News Company, 552 S. 2d 854 (Ala. 1989)

13. Please advise the Personnel Department's staffperson issuing and/or receiving your application, if you will need assistance and/or accommodation to participate in the application process. For example accommodations for a test, a job interview, or a job demonstration.

PF. 105/REV. 3-98

CITY OF DOTHAN/CARNEY 000004
CONFIDENTIAL

**City of Dothan, Alabama**
**POLICE OFFICER**
**Supplemental Application Form**

This form will be used for background investigation purposes and to determine if you meet the basic qualifications as listed on the job description (see job description inside your employment or in-house application). All information will be kept confidential. If you need additional space, you may attach additional sheets of paper to your application.

Name RAEMONICA CALDWELL                    Social Security Number REDACTED

1.   Did you graduate from high school or receive your GED?

     Yes   X                No _____

2.   List **all** residence addresses and length of time at each address since graduating from high school.

   - Residence:   2102 STRINGER STREET

                  DOTHAN, AL                    4 MONTHS

                  4 MONTHS

       Length of time at this address:   4 MONTHS

   - Residence:   206 COONE STREET

                  ENTERPRISE, AL


       Length of time at this address:   7 MONTHS

   - Residence:   WHILE ON ACTIVE DUTY

                  FT. JACKSON, SC.

                  FT. HUACHUCA, AZ

       Length of time at this address:   2 MONTHS & 3 MONTHS

   - Residence:   WHILE STATIONED AT FT.STEWART, GA

                  RT 1 BOX 7 DUNLEVIE RAOD ALLENHURST, GA

                  946 E.G. MILES PARKWAY LOT 9,HINESVILLE, GA

       Length of time at this address:   2 YEARS

   - Residence:   7 ARCH STREET ATHENS, GA

                  705 SPRING VALLEY ROAD LOT 9? ATHENS, GA (HALLMARK MOBILE

                  HOME PARK)

       Length of time at this address:   4 MONTHS & 2 YEARS 4 MONTHS

Continued on next page

**City of Dothan, Alabama**
**POLICE OFFICER**
**Supplemental Application Form**

- Residence: <u>100 NORTH LINCOLN STREET APT 4A</u>

  <u>MILLEDGEVILLE, GA 31061</u>

  <u>RIVERBEND APARTMENTS</u>

  Length of time at this address: <u>1 YEAR</u>

- Residence: _____

  _____

  _____

  Length of time at this address: _____

3. Have you ever held a driver's license from a state other than Alabama?

   Yes <u>X</u>          No _____

   If yes, list each state <u>GEORGIA</u>

   _____

   _____

4. Have you ever been arrested or issued a citation for any crime or offenses (including traffic tickets, parking, vehicle accidents whether your fault or not) or do you currently have charges pending against you?

   Yes <u>X</u>          No _____

   If yes, list all tickets, accidents and offenses.  Include dates and location of each.

   <u>FOLLOWING TOO CLOSELY - 95 HINESVILLE, GA</u>

   <u>NO PROOF INSURANCE @ 96 ATHENS, GA   (ACCIDENT INVOLVED)</u>

5. Have you ever been discharged (fired, asked to resign in lieu of being fired, or forced to resign) from another job?

   Yes <u>X</u>          No _____

RECEIVED
FEB - 3 1999

Continued on next page

CITY OF DOTHAN/CARNEY 000006
CONFIDENTIAL

**City of Dothan, Alabama**
**POLICE OFFICER**
**Supplemental Application Form**

If yes, explain.  Include employers, dates of employment and details.

ATHENS-CLARKE COUNTY POLICE DEPARTMENT

06/95 - 03/96  DATES OF EMPLOYMENT

RELEASED WHILE ON PROBATION (1 YEAR PROBATION)

I certify that the information is accurate to the best of my knowledge and belief. I understand that misrepresentation or omission of facts will be cause of cancellation of consideration for employment/promotion; or termination if employed.

_Keith Monica Caldwell_                    _FEBRUARY 1, 1999_
Signature of Applicant                    Date

CITY OF DOTHAN/CARNEY 000007
CONFIDENTIAL

# 22. WORK EXPERIENCE

**LIST MOST RECENT JOB FIRST. We will provide you with additional experience blocks if necessary. (NOTE: If you use military experience to meet the qualifications for the position you are applying for, month and year you began performing the qualifying duties, and month and year ended must be specified - not your entire tour of duty.) Applicants may also list volunteer experience that relate to the qualifications.**

1) Name and address of employer (include Zip Code)

   MILLEDGEVILLE POLICE DEPT
   125 W. MCINTOSH STREET
   MILLEDGEVILLE, GA 31061

   Dates employed (give month and Year)
   From: 11/96   To: PRESENT

   Average number of hours per week
   85.5 TWO WEEKS

   Salary or earnings
   Starting $          per
   Ending $          per

   Exact title of your job
   POLICE OFFICER

   Type of Business
   LAW ENFORCEMENT

   Your reason for leaving or wanting to leave
   LOW PAY

   Work Area Code and Phone Number
   ( 912 ) 445-0900

   Name of your immediate supervisor
   LT. MARK BELL

   Description of primary duties and responsibilities:   ANSWER DISPATCHED CALLS, AND PATROL THE CITY OF MILLEDGEVILLE
   CHECK BUSINESSES AND RESIDENCES TO ENSURE SAFETY AND SECURITY

   Other Duties:

2) Name and address of employer (include Zip Code)

   RYANS FAMILY STEAKHOUSE
   BARNETT SHOALS ROAD
   ATHENS, GA 30601

   Dates employed (give month and Year)
   From: 05/96   To: 07/96

   Average number of hours per week
   40

   Salary or earnings
   Starting $ 6.00   per HOUR
   Ending $ 6.00   per HOUR

   Exact title of your job
   HOSTESS

   Type of Business
   FAST FOOD RESTAURANT

   Your reason for leaving or wanting to leave
   INJURED IN ACCIDENT/UNABLE TO WORK

   Work Area Code and Phone Number
   (     )

   Name of your immediate supervisor

   Description of primary duties and responsibilities:   GREET AND SEAT CUSTOMERS.

   Other Duties:

3) Name and address of employer (include Zip Code)

   ATHENS-CLARKE COUNTY POLICE DEPT
   3030 LEXINGTON ROAD
   ATHENS, GA 30601

   Dates employed (give month and Year)
   From: 06/95   To: 03/96

   Average number of hours per week
   40

   Salary or earnings
   Starting $ 18,500   per YEAR
   Ending $ 22,473   per YEAR

   Exact title of your job
   POLICE OFFICER

   Type of Business
   LAW ENFORCEMENT

   Your reason for leaving or wanting to leave
   RELEASED WHILE ON PROBATION

   Work Area Code and Phone Number
   ( 706 ) 613-3330

   Name of your immediate supervisor
   LT. FLETCHER MATTOX

   Description of primary duties and responsibilities:

   Other Duties:

Please continue...

4

CITY OF DOTHAN/CARNEY 000008
CONFIDENTIAL

17. Have you reached your 18th Birthdate?   Yes ☒   No ☐     If hired, can you furnish proof of age?   Yes ☒   No ☐

## MILITARY SERVICE

18. Have you ever served in the United States Military Service?   Yes ☒   No ☐

If Yes, all police officer applicants must submit a copy of their DD FORM 214 at time of application; and/or if you are applying for other positions and you wish credit for applicable military service, you must provide, at the time of application, a complete copy of your DD FORM 214(s) for all active duty entry and ending dates. There will be no extension of this time limit.

## RECORD OF EDUCATION

19. Did you graduate from high school (If you have a GED high school equivalence answer yes)?   Yes ☒   No ☐

Name and address of school where graduated or received GED: <u>DOTHAN HIGH SCHOOL</u>

<u>1000 SOUTH OATES STREET  DOTHAN, AL</u>

20. If you did not graduate from high school, (or do not possess a GED certificate), indicate highest school grade completed: _____

Name and address of school: _____

_____

### 21. POST SECONDARY EDUCATION

| NAME OF SCHOOL/TRAINING/COURSES (CITY, STATE, ZIP CODE) | COLLEGE MAJOR/ CHIEF SUBJECTS TRAINING, COURSES, ETC. | # OF CREDITS/HOURS COMPLETED. INDICATE SEMESTER OR QUARTER | DEGREE/ CERTIFICATE RECEIVED |
|---|---|---|---|
| 1) NORTHEAST GEORGIA POLICE ACADEMY   ATHENS, GA 30605 | | | DIPLOMA |
| 2) | | | |
| 3) | | | |
| 4) | | | |

(More related courses? Attach a sheet of paper or list in question #23)

3

CITY OF DOTHAN/CARNEY 000009
CONFIDENTIAL

# WORK EXPERIENCE CONTINUED

**4) Name and address of employer (Include Zip Code)**

PEACH STATE SECURITY
ATLANTA HWY
ATHENS, GA 31061

**Dates employed (give month and Year)**
From: 08/96   To: 10/96

**Average number of hours per week**
40

**Salary or earnings**
Starting $6.00 per HOUR
Ending $6.00 per HOUR

**Exact title of your job**
SECURITY OFFICER

**Type of Business**
SECURITY

**Your reason for leaving or wanting to leave**
INJURIES PREVENTED GOOD WORK PERFORMANCE

**Work Area Code and Phone Number**
(   )

**Name of your immediate supervisor**
TROY CLAY

**Description of primary duties and responsibilities:** PATROL THE WORK SITE AND CHECK THE BUILDINGS FOR SECURITY AND MAKE SURE NO ALARMS WERE SOUNDING.  CONTACT PROPER PERSONNEL IN THE EVENT AN ALARM DID SOUND.

**Other Duties:**

---

**5) Name and address of employer (Include Zip Code)**

U.S. ARMY
124 MI BN A, COMPANY
FT. STEWART, GA

**Dates employed (give month and Year)**
From: 04/93   To: 06/95

**Average number of hours per week**
40

**Salary or earnings**
Starting $1,100 per MONTH
Ending $1,100 per MONTH

**Exact title of your job**
INTELLIGENCE ANALYST

**Type of Business**
U.S. MILITARY

**Your reason for leaving or wanting to leave**
FAMILY PROBLEMS

**Work Area Code and Phone Number**
(   )

**Name of your immediate supervisor**
CPT BRIAN CUNDIFF

**Description of primary duties and responsibilities:** COLLECT, ANALYZE, AND CONDUCT BRIEFINGS ON CLASSIFIED MATERIAL.

**Other Duties:**

---

**6) Name and address of employer (Include Zip Code)**

LOVING CARE DAYCARE
ENTERPRISE, AL

**Dates employed (give month and Year)**
From: 09/91   To: 03/93

**Average number of hours per week**
40

**Salary or earnings**
Starting $5.00 per HOUR
Ending $5.00 per HOUR

**Exact title of your job**
CHILD CARE PROVIDER

**Type of Business**
CHILD CARE

**Your reason for leaving or wanting to leave**
JOINED MILITARY

**Work Area Code and Phone Number**
(   )

**Name of your immediate supervisor**
YVONNE ALVIN

**Description of primary duties and responsibilities:** WATCH AND CARE FOR SMALL CHILDREN. AGE RANGE FROM NEWBORN TO 5 YEARS.

**Other Duties:**

---

**MORE JOBS? PLEASE ASK THE RECEPTIONIST FOR ADDITIONAL EXPERIENCE FORMS.**

CITY OF DOTHAN/CARNEY 000010
CONFIDENTIAL

23. List awards, honors, other skills, qualifications, or comments which would assist us in evaluating your application. If you use this space to continue an answer to a question please indicate the question number.

_____
_____
_____
_____
_____
_____

## 24. PERSONAL REFERENCES
### (DO NOT LIST RELATIVES OR PAST EMPLOYERS)

1) NAME AND OCCUPATION: JEROME ROBERTS   POLICE OFFICER
   AREA CODE & TELEPHONE NO. (912) 451-0721
   ADDRESS: 218 HWY 49 WEST LOT D - 14
   MILLEDGEVILLE, GA 31061

2) NAME AND OCCUPATION: WILLIE HOLSEY   POLICE OFFICER
   AREA CODE & TELEPHONE NO. (912) 452-9281
   ADDRESS: 451 NORTH GLYNN STREET
   MILLEDGEVILLE, GEORGIA 31061

3) NAME AND OCCUPATION: ESTEE ANDREWS INVESTIGATOR   DEPT. JUVENILE JUSTICE
   AREA CODE & TELEPHONE NO. 1-800-829-2251 *
   655-2251
   (770) 528-4240
   ADDRESS: ATLANTA, GEORGIA

4) NAME AND OCCUPATION: MAXINE BLACKWELL STATE SOLICITOR
   AREA CODE & TELEPHONE NO. (912) 445-4445
   ADDRESS: BALDWIN COUNTY COURTHOUSE
   MILLEDGEVILLE,GA  31061

### APPLICANT CERTIFICATION AND AGREEMENT
### Read Carefully

RECEIVED FEB - 3 1999

I hereby certify that I have read, have had read to me, or have had explained to me, the instructions pertaining to this application and that all statements made by me in this application are true and correct to the best of my knowledge and belief. I am further aware that willfully withholding information or making false statements on this application will be a basis for denial of a position prior to employment, and should such willful withholding or false statement become evident after employment, such evidence will constitute sufficient grounds for dismissal from employment with the City of Dothan. I understand all appointees serve a probationary (working test) period, during which time I must demonstrate my fitness for and ability to continue my employment with the City, and further, that any appointment offered to me will be contingent upon my passing a complete physical examination at my own expense. In addition I understand that the City of Dothan shall reserve the right to require a physical examination at City expense at any time to determine my ability to perform the work required of the position. I agree that this application and all papers in connection with it as well as results of any physical examination conducted in relation to my employment shall be confidential records of the Personnel Department subject to inspection by the Appointing Authority, as provided in the rules and regulations and to my personal inspection. I hereby release to the Personnel Department any and all information and/or records needed to determine my fitness for the position. I understand that this application for employment does not constitute an offer of employment or a contract of employment, either written or implied. I fully understand and agree to these conditions. I also understand that this application is being accepted by the City of Dothan's Personnel Department for the position listed under item number one (1) only. I further understand that this application is active, for this position, for a period not to exceed two years unless re-advertised. Should it be necessary to re-advertise the position, I must reapply (submit another application) in order to be eligible for employment consideration. I understand that as an applicant for a position with the City of Dothan, all previous and present employers are subject to be contacted. The City cannot honor an applicant's request of non-notification of past or present employers.

_Monica Caldwell_                           _February 1, 1999_
USUAL SIGNATURE OF APPLICANT          6          DATE SIGNED

CITY OF DOTHAN/CARNEY 000011
CONFIDENTIAL

**RAEMONICA CALDWELL**
**100 NORTH LINCOLN STREET APT 4A**
**MILLEDGEVILLE, GA 31061**
**(912) 414-1102**

**OBJECTIVE**

A position where exceptional skills and commitment to professional performance would be of value in the Criminal Law field with the opportunity for advancement based on performance.

**SUMMARY OF**
**QUALIFICATIONS**

Successfully completed 9 week course at the Northeast Georgia Police Academy and upon completion became a certified Peace Officer. Worked both as a Detective and Police Officer on street patrol. Successfully completed 2 years on active duty in the U.S. Army as an Intelligence Analyst. Currently serving in the U.S. Army Reserves as an Intelligence Analyst. Sharp analytic, problem solving and presentational skills. Possess ability to take on new projects and handle several priorities at once. Adaptable; learn new systems quickly and take initiative. Work well with people. Enthusiastic and committed to professional excellence.

**ADMINISTRATION**

Experienced in handling dangerous situations that involve life and death. Answered radio calls and handled different situations in a calm manner. Wrote various incident reports and traffic citations. Collected, analyzed, planned, and conducted briefings on classified data and special systems. Experienced in handling incoming and outgoing message traffic, classified information, and correspondence. Answered telephones and relayed messages to appropriate personnel. Maintained records and files. Experienced in dispatching calls on CAD through GCIC/NCIC.

**SECURITY**

Accountable for protecting and serving the publics needs and wants. Responsible for checking homes and businesses to insure their security. Accountable for the safekeeping of evidence. Accountable for accurately investigating crimes and documenting findings. Accountable for the safekeeping and destruction of Top Secret material. Possess a Top Secret Security Clearance and routinely managed classified information. Controlled entry and exit from command post, special compartments and intelligence facility. Responsible for foot patrols and identification checks.

CITY OF DOTHAN/CARNEY 000012
CONFIDENTIAL

**RAEMONICA CALDWELL**
**100 NORTH LINCOLN STREET APT 4A**
**MILLEDGEVILLE, GA 31061**
**(912) 414-1102**

| | |
|---|---|
| **DATA AUTOMATION** | Proficient with various types and models of computer systems. Operated word processing programs to include Microsoft Word, Word Perfect, Windows 95, Harvard Graphics, JDISS (Joint Deployment Intelligence Support Systems), Warrior and ASAS (All Source Analysis System) systems that included the use of an internal and external modem and a Sony CD-ROM data drive. Proficient in working copying machines and faxes. |
| **ACCOUNTABILITY** | Accountable for equipment such as uniforms, gun belt, holster, Asp Baton and holder, Ruger 9mm handgun and ammo magazines, flashlight, etc. Other equipment to include Night Vision Goggles, weapons, tools of various types, and vehicles. Responsible for performing maintenance on the equipment. Ensured all equipment remained serviceable and ready to use at all times. |
| **MOTOR TRANSPORT OPERATOR** | Licensed to operate a motor vehicle on the highways of the State of Georgia. Licensed to operate all military vehicles 5 ton and below to include 30 kilowatt generators and below. Operated military vehicles accident free in all types of weather conditions and circumstances. Assisted in proper loading and unloading of various types of equipment. Protected cargo against pilferage, shifting, and damage during transport. Performed basic radio communication procedures to include knowing the language to use to get important information out to the proper personnel. |
| **WEAPONS PROFICIENCY** | Proficient in the use of and maintenance of a Ruger 9mm, a Smith & Wesson .357 magnum, a 12 gauge shotgun, an Asp Baton, O.C. Pepper Spray, an M16A1/A2 semi and automatic weapon, an M40 Protective Mask, a Claymore Mine, and an M60 Machine Gun. Consistently qualified with the Ruger 9mm, the Smith & Wesson .357 magnum, the Asp Baton, and the M16A1/A2. Able to perform function checks assembly and disassembly procedures on all weapons assigned. |

CITY OF DOTHAN/CARNEY 000013
CONFIDENTIAL

CONFIDENTIAL
CITY OF DOTHAN/CARNEY 000014

RAEMONICA CALDWELL
100 NORTH LINCOLN STREET APT 4A
MILLEDGEVILLE, GA 31061
(912) 414-1102

**RELATED
EXPERIENCE**

POLICE OFFICER, Milledgeville Police Department, Milledgeville, Ga, 1996 – Present

DETECTIVE, Milledgeville Police Department, Milledgeville, Ga, 1998

UNDERCOVER DRUG AGENT, Ocmulgee Drug Task Force & Milledgeville Police Department, Milledgeville, Ga, 1996

SECURITY OFFICER, H.J. Russell & Company Riverbend Apartments, Milledgeville, Ga, 1998 - Present

INTELLIGENCE ANALYST, U.S. Army Reserve, Ft. Gillem , GA and Gainesville, Ga, 1995 – Present

POLICE OFFICER, Athens – Clarke County Police Department, Athens, Ga, 1995 – 1996

HOSTESS, Ryan's Family Steakhouse, Athens, Ga 1996 - 1996

SECURITY OFFICER, Peach State Security, Athens, Ga 1996 - 1996

INTELLIGENCE ANALYST, U.S. Army, Ft. Stewart, Ga, 1993 – 1995

CHILD CARE PROVIDER, Loving Care Daycare, Enterprise, Al, 1991 – 1993

SERVICE DEPARTMENT CLERK, Ray Hughes Chevrolet, Enterprise, Al, 1991- 1991

GARMENT FOLDER, Pridecraft Enterprises, Enterprise, Al, 1991-1991

CASHIER, Hardees Restaurant, Dothan, AL, 1990 – 1991

**RAEMONICA CALDWELL**
**100 NORTH LINCOLN STREET APT 4A**
**MILLEDGEVILLE, GA 31061**
**(912) 414-1102**

**EDUCATION**          **DIPLOMA**, Honors, Dothan High School, Dothan, Al, 1991

**DIPLOMA**, Basic Law Enforcement Training Course, Northeast Georgia Police Academy, Athens, Ga, 1995

**CERTIFICATE**, Basic Peace Officer, Peace Officer Standards and Training Council, State of Georgia, 1995

**CERTIFICATE**, Basic Emergency Vehicle Operation, Georgia Public Safety Training Center, Forsyth, Ga, 1996

**CERTIFICATE**, Death Investigation, Georgia Public Safety Training Center, Forsyth, Ga, 1998

**CERTIFICATE**, Advanced Traffic Law, Law Enforcement Training Center of Middle Georgia, Macon, Ga, 1998

**CERTIFICATE**, Intoxilyzer 5000, State of Georgia and Georgia Bureau of Investigations, Georgia Public Safety Training Center, Forsyth, Ga, 1997 – 1999

**CERTIFICATE**, Certificate of Appointment of Notary Public, Superior Court Baldwin County, Georgia, Milledgeville, Ga, 1998

CITY OF DOTHAN/CARNEY 000015
CONFIDENTIAL

# THE CITY OF DOTHAN
## Notice of Termination

TO  :  Personnel Director and Employee.

FROM  :  **Police** _____ Department  Date __1/30/04__

1. __Raemonica Pullin Caldwell Carney__  NAME OF EMPLOYEE

2. __100585__  SOCIAL SECURITY NUMBER

3. __6/28/1999__  DATE OF HIRE

4. __281 Police Officer__  JOB TITLE and JOB CODE

Employee Status:
( X Classified    ( ) Probationary    ( ) Unclassified    ( ) Part Time    ( ) Temp/Seasonal

5. __2/20/2004__  LAST DAY ACTUALLY WORKED

6. _____  DATE(S) and TYPE(S) OF LEAVE, if on leave prior to effective date of termination. Include any docked time.

7. __2/21/2004__  EFFECTIVE DATE OF TERMINATION (first day employee is no longer employed).

8. $ __NA__ _____to be deducted from final paycheck as reimbursement for 1984 pay period change (use Hours Type Code 40).

9. HAS FINAL CHECK BEEN WRITTEN? Y_____ N __X__

10. REASON FOR TERMINATION:

_____ *  (NT)  NO TIME: Processed for employment, Failed to report to work, No Time.

__X__  (RZ)  RESIGNED - WRITTEN NOTICE ATTACHED - PERSONNEL RULE 10.10(1) (written notice given **at least** one week [seven calendar days] prior to effective date).

_____ *  (QT)  QUIT WITHOUT WRITTEN NOTICE - PERSONNEL RULE 10.10(3) (quit without written or proper notice or no advance notice of intent to quit).

_____ *  (CR)  QUIT/COMPULSORY RESIGNATION - PERSONNEL RULE 10.10(2) (abandoned job - unauthorized absence for period of five (5) consecutive work days).

_____ *  (DM)  DISMISSED (REGULATION IV - DUE PROCESS PROCEDURE, 10.10(8).

_____  (RT)  RETIRED - PERSONNEL RULE 10.10(6) and ACT No. 543, Alabama Law.

_____  (ET)  END OF TEMPORARY OR SEASONAL EMPLOYMENT.

_____  (LO)  LAYOFF - PERSONNEL RULE 10.10(7).

_____  (DC)  DECEASED

**DEFENDANT'S EXHIBIT**

Cloyd    4

*If Type NT, QT or CR or DM, give detailed explanation of circumstances in space below:

11. Has the person returned all City property issued to him/her (supplies, tools, ID card)? Personnel Rule 10.900.

_____ YES  __X__ NO  If no, why not? __working out notice__

12. Computer Password Deleted _____ Date _____ Initial _____

_____  / 1/30/04  _____  9/2/04
Department Head's Signature    Date    Personnel Director's Signature    Date

Distribution: Original white-201 file;  yellow-Department;  pink-Employee;  goldenrod-MIS

CITY OF DOTHAN/CARNEY 000061
CONFIDENTIAL

FORMS04/PF111.FRM Rev. 9/96

Houston Printing Co., Inc. • Dothan, AL • 792-5551 • 22679

## DOTHAN POLICE DEPARTMENT

### OFFICER'S INVESTIGATION REPORT

CN # 01 - _____ - _____          SOURCE _____

TO _CHIEF JOHN WHITE_____     FROM _OFFICER RAEMONICA CARNEY_

SUBJECT _RESIGNATION_____   DATE _JAN. 28, 2004_   TIME _0600 HRS_

I AM SUBMITTING THIS LETTER OF RESIGNATION TO NOTIFY

THE DEPARTMENT OF MY INTENT TO LEAVE. THE RESIGNATION

WILL BE EFFECTIVE FEBRUARY 21, 2004. MY LAST WORK DAY

WILL BE FEBRUARY 20, 2004. LT. MARTIN HAS AUTHORIZED

ME TO EXHAUST MY ACCRUED HOLIDAY TIME.

RaeMonica Carney

669

TM

JW

USE THIS FORM REPORTING OCCURRENCES OTHER THAN CRIMES                    PD 12

CITY OF DOTHAN/CARNEY 000062
CONFIDENTIAL

## RE-HIRE

# APPLICATION FOR CITY OF DOTHAN EMPLOYMENT - PF #105

Type, print or write plainly so that your application will be legible when reproduced (black type, black or dark blue ballpoint pen).

| FOR PERSONNEL USE ONLY {Date(s) of changes, addition, updates, notes, etc.} |
|---|
| ☐ ☐ ☐ DD214 Y N N/A |

## GENERAL INFORMATION

1. What job are you applying for? Give job title and announcement number

POLICE OFFICER   281-05-R

| 2. Social Security Number *(needed for employ/background investigation)* REDACTED | 3. Home Phone Area Code + Number (623) 328-9894 |
|---|---|

*FOR PERSONNEL USE ONLY:*
EXPIRES 2-21-05

CC 2-23

| 4. Work Phone Area Code + Number ( ) | 5. Name and Telephone Number of Another Point of Contact RODERICK CARNEY (602) 763-4942 |
|---|---|

6. If the job for which you are applying requires a driver's license, please complete this information:

Driver's License Number: D03404196   State: AZ

7. Driver's License Class/Restrictions/Expiration Date: D , NONE , 10152037

Endorsements If Any:

8. Your Name (Last, First, Middle)

CARNEY, RAEMONICA

9. Is use of another name necessary to check your work record? If yes, please explain:

YES, CALDWELL, RAEMONICA

10. Mailing address

No. Street: 16505 W. GARFIELD ST.

City/State/Zip: GOODYEAR, AZ 85338

Street Address if different from Mailing Address:

11. Are you currently employed by the City of Dothan?   Yes ☐   No ☒
If yes, give your job title and department: _____

12. Have you ever worked for the City?   Yes ☒   No ☐
If yes, list dates and department: 06/99 - 02-21-04   DOTHAN POLICE DEPT.   RZ
a. Have you ever been dismissed from the City?   Yes ☐   No ☒

13. Are you willing to work weekends, shifts or rotating shifts?   Yes ☒   No ☐

14. Are you related to anyone on the Board of City Commission or a Department Head?   Yes ☐   No ☒
If yes, list name(s), department and *explain* relationship: _____

15. Have you ever been discharged from another job for cause?   Yes ☒   No ☐
If yes, explain (Give dates, employers and details. Attach a separate sheet of paper if necessary): ATHENS-CLARKE COUNTY POLICE - 03/96 - I WAS RELEASED WHILE ON PROBATION

16. Do you hold any political office? (The Civil Service Act of Dothan and Alabama Law prohibits City employees from holding local, City of Dothan, political office)   Yes ☐   No ☒
If yes, title of office: _____

2

DEFENDANT'S EXHIBIT

Cloyd   5

CITY OF DOTHAN/CARNEY_000069 CONFIDENTIAL

City of Dothan, Alabama
POLICE OFFICER
Form #PF281

1.  List your residence address(es) for the past ten (10) years, and length of time at each address:

Residence:  16505 W. GARFIELD ST.
            GOODYEAR, AZ 85338

Length of time at this residence:  1 YR

Residence:  834 HONEYSUCKLE ROAD
            DOTHAN, AL 36305

Length of time at this residence:  4 YRS

Residence:  1910 HONEYSUCKLE RD
            DOTHAN, AL 36305

Length of time at this residence:  8 MONTHS

Residence:  100 N. LINCOLN ST. A-1
            MILLEDGEVILLE, GA 31061

Length of time at this residence:  2 YRS

Residence:  _____

_____

Length of time at this residence:  _____

Residence:  _____

_____

Length of time at this residence:  _____

CITY OF DOTHAN/CARNEY 000070
CONFIDENTIAL

City of Dothan, Alabama
**POLICE OFFICER**
Form #PF281

Residence: _____

_____

_____

Length of time at this residence: _____

Residence: _____

_____

_____

Length of time at this residence: _____

Residence: _____

_____

_____

Length of time at this residence: _____

2.    Since age 18, have you been convicted of a crime or any offense other than minor traffic violations or do you currently have charges pending against you?

Yes_____       No__✓_____

If yes, explain:

I certify that the information is accurate to the best of my knowledge and belief. I understand that misrepresentation or omission of facts will be cause of cancellation of consideration for employment/promotion; or termination if employed.

_____          __21 FEBRUARY 2005__
Signature of Applicant                                      Date

CITY OF DOTHAN/CARNEY 000071
CONFIDENTIAL

17. Have you reached your 18th Birthdate?   Yes ☑   No ☐   If hired, can you furnish proof of age?   Yes ☑   No ☐

## MILITARY SERVICE

18. Have you ever served in the United States Military Service?   Yes ☑   No ☐.

If Yes, all police officer applicants must submit a copy of their DD FORM 214 at time of application: and/or if you are applying for other positions and you wish credit for applicable military service, or service connected disability, you must provide, at the time of application, a compete copy of your DD FORM 214(s) for all active duty entry and ending dates. For service connected disability you must also provide supporting documents. There will be no extension of this time limit.

## RECORD OF EDUCATION

19. Did you graduate from high school (If you have a GED high school equivalence answer yes)?   Yes ☑   No ☐

Name and address of school where graduated or received GED: DOTHAN HIGH SCHOOL
1236 S. OATES ST, DOTHAN, AL 36301

20. If you did not graduate from high school, (or do not possess a GED certificate), indicate highest school grade completed:_____
Name and address of school:_____

### 21. POST SECONDARY EDUCATION

| NAME OF SCHOOL/TRAINING/COURSES (CITY, STATE, ZIP CODE) | COLLEGE MAJOR/ CHIEF SUBJECTS TRAINING, COURSES, ETC. | # OF CREDITS/HOURS COMPLETED. INDICATE SEMESTER OR QUARTER | DEGREE/ CERTIFICATE RECEIVED |
|---|---|---|---|
| 1) ESTRELLA MOUNTAIN COMMUNITY COLLEGE AVONDALE, AZ 85323 | CRIMINAL JUSTICE | 3 | |
| 2) RIO SALADO TEMPE, AZ | CRIMINAL JUSTICE | 6 | |
| 3) SOUTH WEST ALABAMA POLICE ACAD. OZARK, AL | | | CERTIFICATE |
| 4) NORTHEAST GEORGIA POLICE ACAD. ATHENS, GA | | | CERTIFICATE |

(More related courses? Attach a sheet of paper or list in question #23)

3

CITY OF DOTHAN/CARNEY 000072
CONFIDENTIAL

## 22. WORK EXPERIENCE

LIST MOST RECENT JOB FIRST. We will provide you with additional experience blocks if necessary. (NOTE: If you use military experience to meet the qualifications for the position you are applying for, month and year you began performing the qualifying duties, and month and year ended must be specified – not your entire tour of duty.) Applicants may also list volunteer experience that relate to the qualifications.

**1) Name and address of employer (include Zip Code)**
DOTHAN POLICE DEPT.
210 N. SAINT ANDREWS ST.
DOTHAN, AL 36303

**Dates employed (give month and Year)** From: 06-99 To: 02-04

**Average number of hours per week** 80 +

**Exact title of your job** POLICE OFFICER

**Type of Business** LAW ENFORCEMENT

**Your reason for leaving or wanting to leave** U.S.A.F. RELOCATION

**Work Area Code and Phone Number** (334) 615-3000

**Name of your immediate supervisor** SGT. DONALD HARDEN

**Description of primary duties and responsibilities:** PATROL ASSIGNED AREA. RESPOND TO ASSIGNED CALLS. HANDLE EMERGENCY CALLS.

**Other Duties:**

**2) Name and address of employer (include Zip Code)**
MILLEDGEVILLE POLICE DEPT.
125 W. MCINTOSH ST.
MILLEDGEVILLE, GA 31061

**Dates employed (give month and Year)** From: 11/96 To: 06/99

**Average number of hours per week** 80 +

**Exact title of your job** POLICE OFFICER

**Type of Business** LAW ENFORCEMENT

**Your reason for leaving or wanting to leave** LOW PAY

**Work Area Code and Phone Number** (478) 414-4000

**Name of your immediate supervisor** LT. MARK BELL

**Description of primary duties and responsibilities:** PATROL ASSIGNED AREA. RESPOND TO ASSIGNED CALLS. HANDLE EMERGENCY CALLS.

**Other Duties:**

**3) Name and address of employer (include Zip Code)**
RYAN'S FAMILY STEAKHOUSE
BARNETT SHOALS RD
ATHENS, GA 30601

**Dates employed (give month and Year)** From: 05-96 To: 07-96

**Average number of hours per week** 40

**Exact title of your job** HOSTESS

**Type of Business** FAST FOOD RESTAURANT

**Your reason for leaving or wanting to leave** INJURED IN CAR ACCIDENT

**Work Area Code and Phone Number** ( )

**Name of your immediate supervisor** UNK

**Description of primary duties and responsibilities:** GREET AND SEAT CUSTOMERS

**Other Duties:**

4

Please continue....

CITY OF DOTHAN/CARNEY 000073
CONFIDENTIAL

# WORK EXPERIENCE CONTINUED

**4) Name and address of employer (Include Zip Code)**
U.S. ARMY RESERVE
FT. GILLEM, GA

Dates employed (give month and Year)
From: 09/95   To:

Average number of hours per week
40+

Exact title of your job
INTELLIGENCE ANALYST

**Type of Business**
U.S. MILITARY

Your reason for leaving or wanting to leave
FAMILY HARDSHIP

**Work Area Code and Phone Number**
(    )

Name of your immediate supervisor
MAJ. P. AHAMMER

**Description of primary duties and responsibilities:** COLLECT, ANALYZE, AND CONDUCT BRIEFINGS
ON CLASSIFIED MATERIAL.

Other Duties:

**5) Name and address of employer (Include Zip Code)**
PEACH STATE SECURITY
ATLANTA HWY
ATHENS, GA 31061

Dates employed (give month and Year)
From: 08-96   To: 10-96

Average number of hours per week
40

Exact title of your job
SECURITY OFFICER

**Type of Business**
SECURITY

Your reason for leaving or wanting to leave
INJURY FROM CAR ACCIDENT

**Work Area Code and Phone Number**
(    ) UNKNOWN

Name of your immediate supervisor
TROY CLAY

**Description of primary duties and responsibilities:** PATROL THE WORK SITE AND CHECK THE
BUILDINGS FOR SECURITY. ENSURE NO ALARMS WERE ACTIVATED.
CONTACT PROPER PERSONNEL IN THE EVENT OF AN EMERGENCY.

Other Duties:

**6) Name and address of employer (Include Zip Code)**
U.S. ARMY
124 MI BN A-COMPANY
FT. STEWART, GA

Dates employed (give month and Year)
From: 04 93   To: 06 95

Average number of hours per week
40+

Exact title of your job
INTELLIGENCE ANALYST

**Type of Business**
U.S. MILITARY

Your reason for leaving or wanting to leave
FAMILY HARDSHIP

**Work Area Code and Phone Number**
(    ) UNKNOWN

Name of your immediate supervisor
CPT. B. CUNDIFF

**Description of primary duties and responsibilities:** COLLECT, ANALYZE, AND CONDUCT BRIEFINGS
ON CLASSIFIED MATERIAL.

Other Duties:

**MORE JOBS? PLEASE ASK THE RECEPTIONIST FOR ADDITIONAL EXPERIENCE FORMS.**

5

CITY OF DOTHAN/CARNEY 000074
CONFIDENTIAL

23. List awards, honors, other skills, qualifications, or comments which would assist us in evaluating your application. If you use this space to continue an answer to a question please indicate the question number.

AWARD CITY OF DOTHAN "PATRIOT OF AMERICA" PLAQUE DOTHAN, AL
SERVED AS PTO PRESIDENT FAINE ELEMENTARY SCHOOL DOTHAN, AL
ELECTED LEADERSHIP GRADUATE PRIMARY LEADERSHIP DEVELOPMENT
COURSE, CAMP SHELBY, MS
#21 - FAULKNER STATE COMMUNITY COLLEGE MOBILE, AL CRIMINAL JUSTICE 3 CREDIT
HOURS

## 24. PERSONAL REFERENCES

### (DO NOT LIST RELATIVES OR PAST EMPLOYERS)

1) NAME AND OCCUPATION: GLENDA SULLIVAN - SELF EMPLOYED   AREA CODE & TELEPHONE NO. (623)932-3567
   ADDRESS: W. MCKINLEY STREET
   GOODYEAR, AZ 85338

2) NAME AND OCCUPATION: LAMESA DANZEY CHIROPRACTOR   AREA CODE & TELEPHONE NO. (248)231-2476
   ADDRESS: 24450 EVERGREEN RD
   SOUTHFIELD, MI 48075

3) NAME AND OCCUPATION: SENETRIX WEBB BRITT - STUDENT   AREA CODE & TELEPHONE NO. (334)445-1761
   ADDRESS: 223 WHITE AVE
   OZARK, AL 36360

4) NAME AND OCCUPATION: REV. ISAAC PITRE - MINISTER   AREA CODE & TELEPHONE NO. (602)233-2592
   ADDRESS: 1622 N. 39TH AVENUE
   PHOENIX, AZ 85009

### APPLICANT CERTIFICATION AND AGREEMENT

#### Read Carefully

I hereby certify that I have read, have had read to me, or have had explained to me, the instructions pertaining to this application and that all statements made by me in this application are true and correct to the best of my knowledge and belief. I am further aware that willfully withholding information or making false statements on this application will be basis for denial of a position prior to employment, and should such willful withholding or false statement become evident after employment, such evidence will constitute sufficient grounds for dismissal from employment with the City of Dothan. I understand all appointees serve a probationary (working test) period, during which time I must demonstrate my fitness for and ability to continue my employment with the City, and further, that any appointment offered to me will be contingent upon my passing a complete physical examination at my own expense. In addition I understand that the City of Dothan shall reserve the right to require a physical examination at City expense at any time to determine my ability to perform the work required of the position. I agree that this application and all papers in connection with it as well as results of any physical examination conducted in relation to my employment shall be confidential records of the Personnel Department subject to inspection by the Appointing Authority, as provided in the rules and regulations and to my personal inspection. I hereby release to the Personnel Department any and all information and/or records needed to determine my fitness for the position. I understand that this application for employment does not constitute an offer of employment or a contract of employment, either written or implied. I fully understand and agree to these conditions. I also understand that this application is being accepted by the City of Dothan's Personnel Department for the position listed under item number one (1) only. I further understand that this application is active, for this position, for a period not to exceed two years unless re-advertised. Should it be necessary to re-advertise the position, I must reapply (submit another application) in order to be eligible for employment consideration. I understand that as an applicant for a position with the City of Dothan, all previous and present employers are subject to be contacted. The City cannot honor an applicant's request of non-notification of past or present employers.

_____  21 FEBRUARY 2005
USUAL SIGNATURE OF APPLICANT      DATE SIGNED

6

CITY OF DOTHAN/CARNEY 000075
CONFIDENTIAL

# RAEMONICA CARNEY

16505 W. Garfield St.
Goodyear, AZ 85338
Phone: (623) 328-9894
Email: rcald669@hotmail.com

## OBJECTIVE

To join a rapidly growing organization that has the need for an exceptional Police Officer with an established track record in law enforcement.

## EDUCATION

| | |
|---|---|
| 2005 | Estrella Mountain Community College, Avondale, AZ |
| | Associate in Arts Degree, Criminal Justice, Credits: 3.0 |
| 2004 | Rio Salado Community College, Tempe, AZ |
| | Associate in Arts Degree, Criminal Justice, Credits: 6.0 |
| 2002 | ABC Institute, Dothan, AL |
| | Certificate, Alabama Real Estate 60 Hour Prelicense Course |
| 2002 | Alabama Real Estate Commission, Montgomery, AL |
| | License, Real Estate Salesperson |
| 2002 | ABC Institute, Dothan, AL |
| | Certificate, Alabama Real Estate 30 Hour Post License Course |
| 2002 | Army Community College, Ft. Leavenworth, KS |
| | Associate in Arts Degree, Military Occupational Specialty, Credits: 19.0 |
| 2000 | James H. Faulkner State Community College, Mobile, AL |
| | Associate in Arts Degree, Law Enforcement, Credits: 3.0 |
| 1999 | Southwest Alabama Police Academy, Bay Minette, AL |
| | Certificate, Basic Law Enforcement |
| 1999 | State of Alabama Peace Officers Standards and Training Commission, Montgomery, AL |
| | Certificate, Basic Law Enforcement |
| 1995 | Northeast Georgia Police Academy, Athens, GA |
| | Diploma, Basic Law Enforcement |
| 1995 | State of Georgia Peace Officer Standards and Training Council, Austell, GA |
| | Certificate, Basic Peace Officer |

## EXPERIENCE

| | |
|---|---|
| 1999-2004 | Dothan Police Department, Dothan, AL |
| | Police Officer |

- Performed duties as Field Training Officer with responsibility to train new officers on police methods, practices and procedures.
- Performed duties as Police Recruiter with the responsibility of promoting Law Enforcement as a career opportunity.
- Performed duties as Narcotics Agent in undercover capacity in order to identify drug dealers and decrease drug activity.
- Performed duties as Patrol Officer with the responsibility to enforce state, local and municipal laws.

CITY OF DOTHAN/CARNEY 000076
CONFIDENTIAL

- Experienced in analyzing situations and adopting quick, effective, and reasonable courses of action, with due regard to surrounding hazards and circumstances.
- Skilled in remembering names, faces, and details of incidents.
- Proficient in preparing clear and comprehensive reports.
- Able to think clearly and make logical decisions in stressful situations.
- Certified as Child Safety Restraint Officer with the responsibility to properly inspect and install child safety restraint systems.
- Skilled in the operation and maintenance of police patrol vehicles.
- Proficient in the use and maintenance of all assigned weapons and equipment to include, Glock 17, Ruger 9mm rifle, Capstun, M40 Protective Mask, Asp Baton, Stop Sticks, M-16 A1/A2 rifle, and M-18 Taser.

2002-2004   **Prudential Showcase Properties, Dothan, AL**
**Real Estate Salesperson**

- Assisted Buyers/Sellers with real estate transactions.
- Negotiated the successful sale or purchase of real estate.
- Responsible for marketing company properties.
- Responsible for properly documenting contracts associated with real estate transactions.
- Responsible for coordinating inspections, appraisals, and closings.
- Sponsored open houses.

1996-1999   **Milledgeville Police Department, Milledgeville, GA**
**Police Officer**

- Performed duties as Detective with responsibility to investigate cases involving child abuse, sexual assaults, property crimes, and violent crimes.
- Performed duties as Narcotics Agent in undercover capacity in order to identify drug dealers and decrease drug activity.
- Performed duties as Patrol Officer with the responsibility to enforce state, local and municipal laws.
- Experienced in analyzing situations and adopting quick, effective, and reasonable courses of action, with due regard to surrounding hazards and circumstances.
- Skilled in remembering names, faces, and details of incidents.
- Proficient in preparing clear and comprehensive reports.
- Able to think clearly and make logical decisions in stressful situations.
- Skilled in the operation and maintenance of police patrol vehicles.
- Proficient in the use and maintenance of all assigned weapons and equipment to include, Ruger 9mm handgun, Remington 12 gauge shotgun O.C. Spray, and Asp Baton.

1996-1996   **Peach State Security, Athens, GA**
**Security Officer**

- Controlled entry/exit post.
- Answered incoming calls and rerouted to appropriate sections.
- Patrolled grounds to insure security of the site and buildings.
- Able to identify and handle any emergency or hazardous situation.

CITY OF DOTHAN/CARNEY 000077
CONFIDENTIAL

1996-1996    Ryan's Family Steakhouse, Athens, GA
             Hostess

- Able to interact with customers.
- Responsible for directing customers to designated seating locations.
- Worked well with other employees and supervisors.

1995-2002    U.S. Army Reserve, Ft. Gillem, GA
             Intelligence Analyst

- Able to interpret topographical maps.
- Skilled in the identification of threat forces in the world.
- Able to describe personnel security systems, process intelligence reports, and compile data for information systems.
- Proficient in maintaining intelligence records, files, and situation maps.
- Proficient in analyzing situations and adopting quick, effective, and reasonable courses of action.
- Safeguarded classified information.
- Responsible for supervising subordinates.
- Proficient in the use and maintenance of all assigned weapons and equipment.

1995-1996    Athens-Clarke County Police Department, Athens, GA
             Police Officer

- Performed duties as Patrol Officer with the responsibility to enforce state, local and municipal laws.
- Patrolled assigned zones to prevent and discover criminal activity.
- Proficient in carrying out oral and written instructions.
- Skilled in remembering names, faces, and details of incidents.
- Proficient in preparing clear and comprehensive reports.
- Able to think clearly and make logical decisions in stressful situations.
- Skilled in the operation and maintenance of police patrol vehicles.
- Proficient in the use and maintenance of all assigned weapons and equipment to include, Smith & Wesson .357, Remington 12 gauge shotgun, O.C. Spray, and PR-34 Baton.

1993-1995    U.S. Army – Active Duty, Ft. Stewart, GA
             Intelligence Analyst

- Able to interpret topographical maps.
- Skilled in the identification of threat forces in the world.
- Able to describe personnel security systems, process intelligence reports, and compile data for information systems.
- Proficient in maintaining intelligence records, files, and situation maps.
- Proficient in analyzing situations and adopting quick, effective, and reasonable courses of action.
- Safeguarded classified information.
- Responsible for supervising subordinates.
- Proficient in the use and maintenance of all assigned weapons and equipment.

CITY OF DOTHAN/CARNEY 000078
CONFIDENTIAL

**1995-1996   Loving Care Daycare, Enterprise, AL**
**Daycare Assistant**

- Care for children newborns to 2 years of age.
- Provided safe learning environment for toddlers.
- Responsible for nutritional needs of children.

## DISTINCTIONS

- Member National Association of Realtors 2002-2004.
- Member Alabama Association of Realtors 2002-2004.
- Member Dothan Association of Realtors 2002-2004.
- Realtor eCertified Designation 2003.
- Recognized as successful African-American Professional Leader during Black History month by the staff at Montanna Street Magnet School and Highlands Elementary School, Dothan, AL in 2003.
- Recognized for patriotism and service to the City, State and National Government and awarded "Patriot of America" plaque by the Mayor, Chester Sowell, and the Dothan City Commissioners Office in 2002.
- PTO President for Faine Elementary School, Dothan, AL during fiscal school year 2001-2002.
- Elected Leadership Graduate during Primary Leadership Development Course, Camp Shelby, MS in 2000.

## REFERENCES

| | | |
|---|---|---|
| Lamesa Danzey | 24590 Lincoln Court Apt. 180 | (313) 541-2620 |
| Doctor of Chiropractic | Farmington Hills, MI 48335 | |
| | | |
| Sean Malloy | 927 Honeysuckle Rd Apt. J-133 | (334) 615-3664 |
| Police Officer | Dothan, AL 36305 | |
| | | |
| Deloris Potter | 1901 Stringer Street | (334) 794-1455 |
| Principal | Dothan, AL 36303 | |
| | | |
| Ingrid Dow Murray | P.O. Box 12964 | (520) 559-3163 |
| Child Protective Svc. | Ft. Huachuca, AZ 85670 | |

CITY OF DOTHAN/CARNEY 000079
CONFIDENTIAL

## TEN YEAR WORK HISTORY

| EMPLOYER & ADDRESS | POSITIONS HELD | SUPERVISOR | PHONE |
|---|---|---|---|
| Dothan Police Department 210 N. Saint Andrews Street Dothan, AL 36303 | Police Officer/Field Training Officer, Undercover Drug Officer, Recruiter, Child Safety Restraint Officer | Lt. T. Martin | 334-615-3000 |
| Milledgeville Police Dept. 125 W. McIntosh Street Milledgeville, GA 31061 | Police Officer, Detective, Undercover Drug Officer | Lt. Mark Bell | 478-445-0900 |
| Peach State Security Atlanta Hwy Athens, GA 30601 | Security Officer | Unknown | No Longer in Service |
| Ryan's Family Steakhouse 2020 Barnett Shoals Rd Athens, GA 30297 | Hostess | Unknown | 706-549-0186 |
| U.S. Army Reserve Ft. Gillem, GA 30297 | Intelligence Analyst | Maj. P. Ahammer | 404-469-4229 |
| Athens-Clarke County Police 3035 Lexington Road Athens, GA 30601 | Police Officer | Lt. Fletcher Maddox | 706-613-3330 |
| U.S. Army - Active Duty 649 Builtman Ave Bldg 217 Ft. Stewart, GA 31313 | Intelligence Analyst | CPT Brian Coday | 912-767-8224 |
| Loving Care Daycare 405 W. Hildreth Street Enterprise, AL 36330 | Daycare Assistant | Yvonne Alvin | 334-347-7456 |

CITY OF DOTHAN/CARNEY 000080
CONFIDENTIAL

10/05/2006 THU 16:20 FAX 334 615 3189      City of Dothan Personnel                    ☑005

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 420-2006-02516 |

|  | State or local Agency, if any |  | and EEOC |
|---|---|---|---|

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Mrs. RaeMonica Carney** | (334) 702-6437 | |

Street Address
**104 Breneau Drive, Dothan, AL 36303**                City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CITY OF DOTHAN POLICE DEPARTMENT** | **500 or More** | **(334) 615-3180** |

Street Address
**126 N St. Andrews Street, Dothan, AL 36303**                City, State and ZIP Code

SEP 2 9 2006

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address                City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest              Latest<br>03-13-2006<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was initially employed by the employer named on June 28, 1999. I had a break in service on February 21, 2004, but reapplied for employment prior to the expiration of a year. On March 13, 2006, I was informed by Chief Powell, white male, that it had been determined that I did not exercise my re-employment rights within the one year period, thus, making me ineligible to apply for and take the promotional exam for the position of Corporal. I also questioned the validity of the current Corporals' exam in that those prior promotional exams utilized by the Police Department had been compromised. On a continuing basis, female police officers are subjected to disparate treatment. Female officers calls' are not acknowledged when they call out on the radio, their safety has been jeopardized due to certain dispatchers failing to acknowledge an emergency situation when requested, the dispatchers engage in radio talk that is unprofessional toward the female officers, and when a female officer complained to a male officer, the result was usually a male chauvinistic comment like "women in a cat fight."

I believe that I have and continue to be discriminate against because of my race, black, and my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to re-employment rights which have prevented me from taking the exam to become a Corporal and other terms and conditions of employment.

I further believe that I'm being discriminated against in retaliation because of my complaints of sex discrimination.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Sept. 28, 2006   *RaeMonica Carney*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

**DEFENDANT'S EXHIBIT**

Cloyd   6

CITY OF DOTHAN/CARNEY 000715
CONFIDENTIAL

EEOC Form 161 (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: Ms. RaeMonica Carney
104 Breneau Drive
Dothan, Alabama 36303

From: **Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street South, Suite 2000**
**Birmingham, AL 35205**

[ ]  *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420 2006 02516 | Rita W. Sterling, Investigator | (205) 212-2060 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[ ]  We cannot investigate your charge because it was not filed within the time limit required by law.

[ ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]  While reasonable efforts were made to locate you, we were not able to do so.

[ ]  You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Delner Franklin-Thomas*                    8/1/07

Delner Franklin-Thomas, District Director          *(Date Mailed)*

Enclosure(s)

Carol Sue Nelson
Attorney At Law for City of Dothan
MAYNARD, COOPER & GALE
1901 6th Avenue, North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2118

CITY OF DOTHAN/CARNEY 000716
CONFIDENTIAL

INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --** **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred **more than** 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/96 to 12/1/96, you should file suit before 7/1/98 -- *not* 12/1/98 -- in order to recover unpaid wages due for July 1996. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA backpay recovery period.

ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

CITY OF DOTHAN/CARNEY 000717
CONFIDENTIAL

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 420-2009-02482 |

and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. RaeMonica Carney** | **(334) 702-6437** | REDACTED |

| Street Address | City, State and ZIP Code |
|---|---|
| **203 Superior Drive, Dothan, AL 36301** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CITY OF DOTHAN POLICE DEPT.** | **500 or More** | **(334) 615-3000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **126 N Saint Andrews Street, Dothan, AL 36303** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **05-13-2009**   Latest **06-04-2009**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a Black female. I was hired by the above employer in May 2005 as a police officer. I am presently a school resource officer. Since May 13, 2009, I have been harassed and intimidated in the performance of my job. Also, on May 14, 15, 21, 22, 2009 and June 4, 2009, I was subjected to disparate terms and conditions of employment with respect to a hostile work environment by my chief and the city attorney. White and male employees were not subjected to the treatment I received.

Numerous reasons were given for these actions.

I believe I was discriminated against because of my race, Black and my sex, female in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

x AUGUST 3, 2009   x RaeMonica Carney
Date   Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)   AUG 6 2009

DEFENDANT'S EXHIBIT

Cloyd    7

CITY OF DOTHAN/CARNEY 000718
CONFIDENTIAL

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

Raemonica Carney
203 Superior Drive
Dothan, AL 36301

From: Birmingham District Office
Ridge Park Place
1130 22nd Street
Birmingham, AL 35205

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2009-02482 | Jean L. McGinnis-Barrera, Investigator | (205) 212-2056 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]   Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Beverly B. Hinton for*

Delner Franklin-Thomas
District Director

OCT - 7 2010

(Date Mailed)

Enclosures(s)

cc:   John Powell, Police Chief
CITY OF DOTHAN
126 N Saint Andrews Street
Dothan, AL 36303

Carol Sue Nelson
Maynard, Cooper & Gale, PC
1901 6th Avenue North
2400 Regions Harbert Plaza
Birmingham, 35203-2618

CITY OF DOTHAN/CARNEY 000719
CONFIDENTIAL

Enclosure with EEOC
Form 161 (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS  --  Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than **2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION  --  Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

CITY OF DOTHAN/CARNEY 000720
CONFIDENTIAL

| Charge of Discrimination | | Agency | Charge Number |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | o ☐ FEPA<br>☐X EEOC | 420-2013-01860 |
| EEOC | | | State or local Agency, if any |

| NAME (Indicate Mr., Ms., Mrs.)<br>RaeMonica Carney | HOME TELEPHONE (area Area Code)<br>334-685-4623 | |
|---|---|---|
| STREET ADDRESS, CITY, STATE, AND ZIP CODE<br>2601 Stringer Street, Dothan, AL 36303 | | DATE OF BIRTH<br>REDACTE |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below)

| NAME<br>City of Dothan | NUMBER OF EMPLOYEES, MEMBERS<br>15+ | TELEPHONE<br>334-615-3000 |
|---|---|---|
| STREET ADDRESS      CITY, STATE, AND   ZIP CODE<br>126 North St. Andrews Street, Dothan, AL 36303 | | COUNTY<br>Houston |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| X☐ RACE   ☐COLOR   X☐SEX   ☐RELIGION   ☐ AGE<br>X☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER | X☐ CONTINUING ACTION |

### THE PARTICULARS ARE

I am a Black female.  I was hired in May 2005 as police officer.  In addition to my duties as a police officer, I am a Community Watch Coordinator, Crime Stoppers Coordinator, and a Recruiting Team Member.  Despite having been assigned these additional duties, I have not been promoted, nor have I received any additional compensation.  Throughout my employment, White male employees with less experience have been promoted at a faster rate than I have.  White male employees with less experience are paid more than I am.  Furthermore, I have been subjected to harassment from White male employees, but management is turning other cheek.  The harassment began when I began speaking up for the rights of minorities who I believed the department was targeting and treating differently.  Additionally, the department is undermining my position by limiting my access to certain departmental computer applications.  Several White male co-workers complained about my having access to TipSoft, a web-based application that shows tips coming in from the public.  I had used that application in the past to help solve crimes.  I believe that the department is limiting my access so that I cannot assist in solving those crimes and so that other White male employees can take the credit.  I have also noticed that on recent required tests, some of my answers have been counted wrong, even though they were clearly correct.  When I challenged one incorrect grading on an ethics test, my White superior officer refused to look into it or correct my grade.  In recent a firearms test, several of my shots were not counted as having hit the mark, and I received a score in the 80's.  I pointed out to my White superior the proof where I had only missed a couple of shots.  He gave me credit for some, but not all of the shots made.  This concerns me, because the results of these tests can be used to affect both my current position and my chances for future advancement.  I was recently suspended for an alleged breach of the department's social media policy for voicing my views online about a newsworthy event.  Several of my White co-workers complained to management that my comments were racist (they clearly were not), simply because they did not agree with my views.  The department suspended me without pay pending a hearing before the personnel board.  Nothing that I posted would disparage or otherwise place the department in a negative light.  One of the White co-workers even called me a racist on my Facebook page.  I have been told that I will be assigned to desk duty following my return from my suspension.  A White male will assume my former duties.  Additionally, I stand to be placed on a two-year probation in which any further disciplinary action could be used to terminate my employment  I believe that I am being harassed and discriminated against on the basis of my race, Black, and my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | Notary - (When necessary for State and Local Requirements)<br>RECEIVED<br>EEOC<br>I swear or affirm that I have read the above charge and that it is true and correct to the best of my knowledge, information, and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct<br>Date: 19 APRIL 2013<br>Charging Party (Signature) *RaeMonica Carney* | SIGNATURE OF COMPLAINANT<br>APR 20 2013 *Dawn Byrd*<br>BIRMINGHAM DISTRICT OFFICE (Day, Month, and Year) 4-19-2013 |

*Cyle Dawn Byrd*
*State of Alabama*
*County of Houston* MY COMMISSION EXPIRES 4-5-2014
CITY OF DOTHAN CARNEY 000724

**DEFENDANT'S EXHIBIT**

Cloyd     8

CONFIDENTIAL

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Raemonica Carney<br>c/o Sonya C. Edwards, Attorney<br>Edwards Law, LLC<br>121 Edenton Street<br>Birmingham, AL 35242 | From: | Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street<br>Birmingham, AL 35205 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2013-01860 | Debra Powell,<br>Investigator | (205) 212-2085 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
#### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_Shrui Greenstar /for_

**Delner Franklin-Thomas,**
**District Director**

2/19/14

*(Date Mailed)*

Enclosures(s)

cc: **THE CITY OF DOTHAN, ALABAMA**
c/o Deivick McKay, Personnel Director
Post Office Box 2128
Dothan, AL 36302



RECEIVED
FEB 21 2014
PERSONNEL DEPARTMENT

CITY OF DOTHAN/CARNEY 000722
CONFIDENTIAL

CITY OF DOTHAN        )
ALABAMA              )                    PERSONNEL BOARD ORDER NO. 13-01
HOUSTON COUNTY       )

THE PERSONNEL BOARD
City of Dothan
Dothan, Alabama

_____

SUBJECT: Suspension Appeal of Corporal RaeMonica Carney, Police Department.

_____

Pursuant to the City of Dothan Personnel Rules and Regulations III – Disciplinary Policy, RaeMonica

Carney, Police Corporal, was served with a City of Dothan Disciplinary Action Report (Personnel

Form #147) dated March 21, 2013, charging Ms. Carney with a Major Category Offense, Sec. 3-42

(13), Final Written Warning. The statement of charges reads:

> "As a Police Officer tasked with enforcing laws and adhering to conduct of integrity and
> sound decision making, on February 12, 2013; you posted on public domain (via
> Facebook) comments that detrimentally affects the public's trust and public
> expectation of you as a law enforcement officer and the City of Dothan Police
> Department as a public entity.  Your comments were of a racial nature and were
> offensive to members of the Dothan Police Department and general public.
> Furthermore, your comments on public domain related to a law enforcement tactical
> operation, where you had no direct knowledge of the facts, demonstrates your lapse in
> judgment and how this affects your role as a Dothan Police Officer; where tactical
> operations and law enforcement related activities are carried out.
>
> This is a violation of Dothan Police Department General Order 100-52, Social Media
> Section V.
>
> You are in violation of Sec. 3-42 (13) Major Offense: Misconduct, or any disgraceful
> conduct which reflects unfavorably on the City as an employer or public entity.
>
> Further violations will result in additional disciplinary actions and up to termination."

Ms. Carney was served with Personnel Form #153, Notice of Determination Hearing and Possible

Disciplinary Action, dated March 21, 2013, pursuant to the City of Dothan Personnel Rules and

Regulations IV – Due Process Procedure.



DEFENDANT'S
EXHIBIT

Cloyd     9

CARNEY-00071
Page 1 of 1

A Determination Hearing was conducted on Monday, March 25, 2013, at which time Ms. Carney was given the opportunity to respond to the charges, either orally and/or in writing. A transcript of this determination hearing was submitted into the record at the Personnel Board hearing.

On March 28, 2013, Police Chief Gregory Benton issued Personnel Form #155, Decision of Determination Hearing, and Ms. Carney received this written decision on March 28, 2013. This decision reads:

> "After reviewing all the facts and circumstances, the IA investigation and investigation by the EEO Officer of the City of Dothan, I have determined you were in violation of General Order 100-52 Social Media Section V of the Dothan Police Department and Sec. 3-42 (13) City of Dothan Personnel rules and regulations: Misconduct, or any disgraceful conduct which reflects unfavorably on the City as an employer or public entity.
>
> It is my decision to suspend you for a period of ten (10) working days. You will also be required to complete any training designated by the EEO Officer of the City of Dothan. The office of the Chief of Police shall be notified of your completion of this training.
>
> After the completion of the ten (10) days of suspension, you will be reassigned to the Front Desk position of the Police Department Lobby. You will report to Bureau Commander, Captain Keith Gray.
>
> The eighty (80) hours will be as follows: April 1 through 4 and April 8 through 11, 2013 from 0700 hours until 1700 hours. You will return to duty on April 15, 2013 at 0800 hours."

On April 5, 2013, Ms. Carney filed Personnel Form #152, City of Dothan Appeal Form, requesting an appeal to the Personnel Board of the disciplinary action taken against her.

The Personnel Board convened to hear Ms. Carney's appeal on Thursday, May 23, 2013, 1:00 p.m., in the Sakado Room, Second Floor of the Dothan Civic Center.

**PERSONNEL BOARD CONSIDERATIONS:** The Personnel Board heard testimony, examined the evidence submitted during the hearing, and upon receipt of the official hearing transcript, reviewed the transcript and evidentiary exhibits again.

**PERSONNEL BOARD FINDING:**   We find substantial evidence to uphold the decision of the department head and disciplinary action against you for having a Major Category Offense, Sec. 3-42 (13), Final Written Warning.

Signed this _20^{th}_ day of June 2013.

ATTEST:

Delvick J. McKay
Personnel Director

BARBARA SPANN, Chairperson

MARY DAVIS, Member

TIM SHIRLEY, Member

MARK SMITH, Member

EARL TYSON, Member

CARNEY-00073



IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | |
|---|---|
| CARNEY RAEMONICA,<br>Plaintiff, | )<br>)<br>) |
| V. | ) Case No.:    CV-2013-000063.00<br>) |
| CITY OF DOTHAN PERSONNEL BOARD,<br>Defendant. | )<br>)<br>) |

## ORDER

Plaintiff Raemonica Carny has appealed to the Circuit Court from an adverse decision of the Dothan Personnel Board.  This appeal is brought pursuant to Section 33 of the Dothan Civil Service Act, as amended.

Pursuant to Section 33 of the said Act, this Court finds that the issue on this appeal is whether there is substantial evidence to support the findings of the Dothan Personnel Board. *See City of Dothan v. Brackin*, 9S9 So.2d 678 (Ala. Civ. App. 2006).  The parties shall within seven (7) days submit to the Court in writing any other issues which they contend are properly before the Court on this appeal.

This case is set for final hearing on October 9, 2013, at 10:30 a.m.

DONE this 6th day of August, 2013.

/s/ HENRY D "BUTCH" BINFORD
_____
CIRCUIT JUDGE



DEFENDANT'S
EXHIBIT

Cloyd          10


ELECTRONICALLY FILED
1/14/2014 2:38 PM
38-CV-2013-000063.00
CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
CARLA H. WOODALL, CLERK

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

CARNEY RAEMONICA,             )
Plaintiff,                            )
                                   )
V.                               )   Case No.:     CV-2013-000063.00
                                 )
CITY OF DOTHAN PERSONNEL BOARD,   )
Defendant.                    )

### ORDER

This Court has reviewed the record made in this case at the hearing conducted before the City of Dothan Personnel Board. The Court has also considered the arguments and briefs of the parties as to their respective positions.

Upon consideration of the record, arguments, and briefs, the Court finds that there was substantial evidence presented to the Personnel Board to support the Board's decision. Therefore, the decision of the Board which is dated June 20, 2013, is hereby affirmed.

The Court has also considered the argument of the Plaintiff as to this Court's authority in this proceeding to consider certain constitutional issues. Upon consideration of this argument, the Court finds that such constitutional issues must be raised in a separate collateral action which would invoke the general jurisdiction of the Court. As no such collateral action is presently pending before this Court, and as this appeal does not constitute such a collateral action, this Court does not have the authority in this proceeding to consider the Plaintiff's First Amendment claims.

DONE this 14th day of January, 2014.

                                   /s/ HENRY D "BUTCH" BINFORD
                                   CIRCUIT JUDGE

FRIENDS February 2013



PLACES February 2013

Visited 1 Place

LIKES February 2013



WTVY-TV    Subs & More

+7



## Will Hold Your Hand For Only a Little While But He Will Hold Your Heart For A LifeTime If You Have A Son That Makes Your Life Worth Living By Just Being Around Him And You're Proud of your SON

## LIKE 'n Share This Picture

Like · Comment · Share

 Write a comment.

 **Rae Cy**
February 19, 2013

TIME IS RUNNING OUT LADIES AND YOUNG LADIES SO GET YOUR REGISTRATION FORM FROM YOUR SCHOOLS OR THE AL COOP OFFICE AT THE HOUSTON COUNTY FARM CENTER...COST $15

 BET RAP IT UP
Tuesday, March 26, 2013 at 6:30pm in CDT
Dothan High School
10 people went



Like · Comment · Share

Anita Smith and Mark Moneymark Newman like this.

 Write a comment.

 **Rae Cy**
February 19, 2013 · Young America, AL

GM FB...Another Blessed Day bc my God is AWESOME!!! FB I have to remind everyone that if I don't know you and you want to follow me or be my friend on this site please send me a message first and remind me how I know you. I do not accept people just because they ask or think they know me or want to use this site as a way to hook up with me. Thanks and May God Bless Us All...

Like · Comment · Share

Juanita Minor Combs and Maria Gholston like this.

 Pierre Harvey I LIKE HOW YOU HANDLE YO BUSINESS MY SISTER THIS IS HOW YOU DO IT. LOL.
February 19, 2013 at 12:34pm · Like

 Write a comment.

 **Rae Cy**
February 19, 2013

WOW!!!

 Reverend Jesse Jackson Sr.

Victims of tyranny have three options. They can adjust, they can resent but turn anger inward, or they can fight back.
http://bit.ly/Y06pPH

DEFENDANT'S EXHIBIT
Lloyd    11

Chat (52)

9/22/2014
CARNEY-00049



Like · Comment · Share

Rae   Home 11

2012

FRIENDS  February 2013

PLACES  February 2013
Visited 1 Place

LIKES  February 2013
WTVY-TV
Subs & More

+7

Anita Smith likes this

Erwin B. Jackson Good morning officer!
February 19, 2013 at 10:36am · Unlike   1

Write a comment...

Rae Cy
February 18, 2013 · Young America, AL

GM FB Friends and Family...J wanted to share the Law Enforcement Code of Ethics I swore to 17 years ago when I became a Law Enforcement Officer in Athens, GA, then again in Milledgeille, GA, and again twice in Dothan, AL.

I LOVE THIS CALLING AND THE PEOPLE I SWORE TO PROTECT ALONG WITH MY FELLOW COMRADES WHO UPHOLD THE SAME!!!

As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and the relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear of favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement.

Like  Comment  Share

Falycah Jones, Chelmek Stanford-Jackson, Mamie Small-McCory and 13 others like this.

Selethia Ra'ned Small YOU GO GIRL!It takes special people like you to do this.You are awesome!
February 18, 2013 at 10:07am · Unlike   1

Earl Mcelroy I appreciate the job u do the hard work and effort u put in to protect the community I for one applaud you for the job u do and may god bless u
February 18, 2013 at 12:19am · Unlike   2

Jane Battle Arnette I feel honored to know you and to especially have had you as a neighbor. You are a wonderful officer. Thank you for all you do.
February 19, 2013 at 1:37am · Unlike   1

Rhonda Ardis BRAVO!!!
February 19, 2013 at 7:11am  Like

Write a comment.

Rae Cy
February 17, 2013 · Dothan, AL

When actual events that occur in the present are compared to actual events that occurred in the past and is publicized, should the race, sex, personal, or professional background of the source make a difference when the facts of the events are true but deal with a highly controversial/sensitive issue?

Like  Comment  Share

Marie Drake, Greg Lucas and Sandra Edge like this.

Rae Cy I say let the facts speak for themselves all the other is irrelevant.

Chat (62)

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

February 18, 2013 at 1:18pm · Like

Rae  Home 11

Write a comment.



FRIENDS · February 2013

PLACES · February 2013

Visited 1 Place

LIKES · February 2013



WTVY-TV    Subs & More    +7

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

**Rae Cy**
February 17, 2013

WOW!!! Audio of the Officers before the cabin fire to include the LIVE Audio of Officers during the cabin fire... Confirms my previous FB observations!!!



### An Intentional Fire? Police Use of Incendiary Tear Gas Criticized in Killing of Christopher Dorner

Medical examiners in California say they have positively identified the body of former Los Angeles police officer Christopher Dorner, the man authorities say...

DEMOCRACYNOW.ORG

Like · Comment · Share

Rhonda Ardis, Marsha Magwood and Greg Lucas like this.

 Luis Escalante CNN broadcast that convo live. I couldn't believe what I was hearing.
February 17, 2013 at 10:08pm · Unlike · 1

 Rhonda Ardis OK!
February 18, 2013 at 3:52am · Like

 Rae Cy like
February 18, 2013 at 8:14am · Like

 Rae Cy I know!!! Exactly!!!
February 18, 2013 at 6:15am · Like

 Rod Carney I think that the entire ordeal was tragic and I wish things were handled differently by everyone involved. I'm a former military person and I know the standards we live by. That being said, I can't speak for Mr. Dorner's military record or standards. I... See More
February 18, 2013 at 12:23pm · Unlike · 1

 Write a comment.

 **Rae Cy**
February 17, 2013

The interview with San Francisco State University Professor Davey D. Cook....Interesting Points Made By Prof. Davey D.!!!!

### Wanted for Killing 3, Christopher Dorner's Claims of Racism, Corruption Resonate with LAPD's Critics

Chat (62)

https://www.facebook.com/

A manhunt is continuing in California for Christopher Dorner, the former Los
Angeles police officer accused of shooting three people dead in his online... 11

Like · Comment · Share

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born


Write a comment...

**FRIENDS** · February 2013



**PLACES** · February 2013

Visited 1 Place


Rae Cy
February 17, 2013

After reading this article from Professor David D. of SFSU, I see we share
similar views.


From the Use of Drones to
Enhancing Policeman's Bill of
Rights, Watch this Dorner Saga
Carefully
There are three things all of us should be concerned....
HIPHOPANDPOLITICS.WORDPRESS.COM

Like · Comment · Share

Anita Smith and Rhonda Ardis like this.


Rhonda Ardis DRONES, INVASION OF PRIVACY......WHISTLE BLOWERS ON
FORCE GETS FIRED FOR TELLING THE TRUTH, AND THE SERGEANT
PROBALLY HAD RELATIONS WITH THE ONES JUDGING HER. CORRUPTION
AT ITS BEST!
February 17, 2013 at 4:17pm · Like


Rae Cy IKR...Rhonda Ardis
February 17, 2013 at 8:55pm · Like      1


Write a comment...





**LIKES** · February 2013



WTVY-TV          Subs & More          +7


Rae Cy
February 17, 2013

Worshiping God and Praising Him while thanking Him for ALL of my
blessings!!! — at The Noc Dome Complex.

Like · Comment · Share

Chelmek Stanford-Jackson, Robert Ethridge and 2 others like this.


Write a comment...


Rae Cy
February 17, 2013 · Detroit, AL ·

On this day last year God called home my beautiful grandmother Mrs. Thelma
Carroll and today I thank God that my heart is not heavy when I think about
losing her. The other day I shared with a friend that sometimes the hardest
lessons in life are learned thru death, and one lesson I've learned thru her
death is that I am a reflection of the values and morals she taught me to live.
Thank God for her living, dying, and loving me in between.

Like · Comment · Share

Rhonda Ardis, Paula Mckenzie, Marsha Magwood and 4 others like this.

View 3 more comments


Christopher M Ward Wow already? How time is passing by....
February 17, 2013 at 11:21am · Like


Rae Cy Christopher M Ward...IKR!!!
February 17, 2013 at 11:22am · Like


Alfreda M. Rogers Remember TheMoments And Memories They Will Bring
Comfort!
February 17, 2013 at 1:30pm · Like


Rhonda Ardis AWE!
February 17, 2013 at 4:25pm · Like


Write a comment...

Chat (55)

9/22/2014
CARNEY-00052

[redacted]

Rae Home

FRIENDS · February 2013

PLACES · February 2013

Visited 1 Place

LIKES · February 2013

4
WTVY

+7

WTVY-TV Subs & More

Rae Cy
February 17, 2013 · Dothan, AL

It is better to hear the rebuke of the wise, than for a man to hear the song of fools.(Ecclesiastes 7:5)

Like · Comment · Share

Rhonda Ardis, Chelmak Stanford-Jackson, Luis Escalanté and 3 others like this.

Write a comment...

Rae Cy
February 17, 2013 · iOS

These ladies had a BLAST too!!!

Like · Comment · Share

Rhonda Ardis likes this.

Write a comment...

Rae Cy
February 17, 2013 · iOS

Tony Terry posing with my sister Sharanita Shaw after the concert last night... — at City of Dothan.

Like · Comment · Share

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

Chat (55)

Rhonda Ardis likes this.

Rae   Home

Write a comment...

Recent
2010s
2014
2013
2012
2011
2010
2000s
1900s
Edit

FRIENDS - February 2013

PLACES - February 2013

Visited 1 Place

LIKES - February 2013

WTVY-TV   Subs & More

+7

**Rae Cy**
February 17, 2013 · Dothan, AL ·

God is good and He has been good to me!!! To everyone who has posted likes to my FB posts, or shown their continued love and support for me by sharing kind words or encouraging me to keep steadfast on my journey, or just simply praying for me....I thank you from the bottom of my heart because your acts of kindness, love, and friendship mean the world to me. The Bible says God is love and to be loved is a wonderful thing, but knowing it and having it shown to you is beyond measure! So again I say THANK YOU AND I TRULY LOVE YOU TOO!!!

Like · Comment · Share

Mandia Terrians, Paul Neal, Alexis Cierra and 22 others like this.

Write a comment...

**Rae Cy**
February 16, 2013

UPLIFT: Mercy rebukes judgment & delivers us into the custody of GOD'S Grace to be loved & developed. Grace is God's solution. -Hart Ramsey

Like · Comment · Share

Anita Smith likes this.

Write a comment...

**Rae Cy**
February 16, 2013 · Dothan, AL ·

Brent Parrish, Danny Herold, Jim Holley, Richard Odom, John Riley, those who want to throw stones and hide your hands, and all of my newest FB followers who want to now see what's on my FB page so you can copy what I say here onto other social media sites like Wiregrass Live in your attempts to smear my name in the eye of the public and within the ranks of my coworkers, copy and paste my 7 values. If you're going to repeat what I say repeat all of what I say not part of what I say.

No weapon formed against me shall prosper...

Like · Comment · Share

Iaomy Own Worstenemy, Rhonda Ardis, Paula Mckenzie and 16 others like this.

Virgil K Unclev **Freedom of speech**
February 16, 2013 at 10:16pm · Unlike · 2

Jim Holley It's IRONIC that you have not mentioned anything about the WHITE MAN that was killed by the police in Midland City. And I wonder if you would feel the same about Dorner if it was your children that he had killed.
February 17, 2013 at 2:43am · Like

Rae Cy Jim Holley...Maybe if you had been following me on FB prior to last week then you would not have made that post.
February 17, 2013 at 2:47am · Like · 1

Jim Holley Would you be defending him if it had been your children?
February 17, 2013 at 2:57am · Like

Rae Cy I defend my children and everyone else's children when it's necessary.
February 17, 2013 at 3:01am · Like · 1

Rae Cy If you're not intelligent enough to understand fact from opinion it's not my duty to show you the difference.
February 17, 2013 at 3:05am · Like · 3

Jim Holley That's not what I ask. Would you be defending Dorner like you are, if he had killed your children or family. It's a simple Question.
February 17, 2013 at 3:08am · Like

Rae Cy First off it seems you have formed an assumption about my personal opinion and views so for me to respond to your assumption would say I'm in agreement with it.
February 17, 2013 at 3:12am · Like · 2

Chat (55)

9/22/2014
CARNEY-00054

 Rae Cy As I told another FB follower who made assumptions about my posts...Don't read into what I posted.   Rae   Home 11
February 17, 2013 at 3:13am · Like   1

 Jim Holley I didn't think you could answer because it would go against what you have been posting.
February 17, 2013 at 3:18am · Like

Rae Cy That's where you are mistaken. Like I said before if you had been following me on my page prior to last week then you wouldn't have to ask. After working along side me in law enforcement for at least 10 years you should already know my values and beliefs. There have been many a call that I have had your back without question.
February 17, 2013 at 3:22am · Like   1

 Rae Cy I'm still the same person I was prior to becoming a police officer and after being a police officer for the last 17 years because the values I live today were instilled in me when I was a child by my grandparents who raised me. Then those same values were just reinforced when I joined the U.S. Army 13 years ago. Law enforcement share the same values the Army teaches so it was a perfect fit for my way of living.
February 17, 2013 at 3:26am   1

 Jim Holley You still have not answered my Question.
February 17, 2013 at 3:30am · Like

Rae Cy Now Jim Holley you can interpret my answer to you however you please.
February 17, 2013 at 3:31am · Like

 Jim Holley Just remember those children have parents that are having to deal with their loss and the police officers have children that are now having to grow up without a farther because of Christopher Dorner. I sure hope they don't see your post.
February 17, 2013 at 3:47am · Like

 Rae Cy Only "Fools rush in where Angels fear to tread"...
February 17, 2013 at 3:49am · Like   2

Anita Smith RaeMonica, I've only know you for Afew years now, the guys are just jerks, we are all initial to our on points & views, never agree on same things. But no one has a right to smear a good name or person! Hold your head high, we know your a person I would be proud to call friend & my children to look for guildness !!
February 17, 2013 at 7:50am · Unlike   5

 Richard Odom · 8 mutual friends
I stated my opinion about your statement. I didn't post it anywhere else, only on your page. However, it is clear you are RACIST! Your personal "publicly announced" opinion should eliminate you from working in law enforcement. You judge those officers in California, how can you. I am sure you have never been on a SWAT deployment or probably even a search warrant. Your opinion disgust me, it literally sickens my stomach. Don't get upset when you post your opinion and people answer you with negative reactions, then start talking about freedom of speech. It's my freedom of speech to say to you "I am sickened by your statements; you makes me want to vomit. I think your attitude should get you fired from the department". I think in all this you got what you want. Your intention was to "stir a pot" and you got it. I will not post on this again. Carney,I am sure you will. Because it is in your nature to start crap. For you to be so RACIST how can you claim to be a Christian!
February 17, 2013 at 9:07am · Like

 Rae Cy Richard Odom...This coming from an ex-cop who tried to fight his coworkers after breaking the law, and who never once initiated a single hello to me when worked together for 5-6 years yet and still I always spoke to you and had your back on every call...I'm not surprised that you would have such an opinion.
February 17, 2013 at 9:47am · Like   5

 Rhonda Ardis RAE, KEEP PRAISING GOD AND SHARING YOUR VIEWS ON THINGS THAT MATTER TO OUR HEARTS. YOUR VALUES AND BELIEFS ARE RIGHT ON POINT!
February 17, 2013 at 4:48pm · Unlike   5

 Stephanie Delane Truitt Pain is pain!!! I wonder how one would feel to have their kid inform them that he had been kicked in the face by someone that had been sworn in to serve and protect. To have one of those that had taken oath to be willing to go against the "blue line", and admit that in fact that it had happened. Due to the victim having some mental issues, his abuse went unpunished. If you are kicked in the face, slapped, or experience any type of physical contact, one maybe mentally challenged, but they are still able to identify when physical harm have been inflicted. I can't imagine how those kids feel, but I'd be willing to bet that as much as they loved their parents, the father of the mentally challenged didn't love his son any less. His disability doesn't discredit his ability to realize that he had been done wrong.
February 17, 2013 at 7:28pm · Unlike   2

 Write a comment...

 Rae Cy
February 16, 2013 · Dothan, AL

Chat (55)

https://www.facebook.com/



FRIENDS February 2013

PLACES · February 2013

Visited 1 Place



LIKES February 2013



WTVY-TV        Subs & More

+7

Now I know ALL of MY family and friends and most of my coworkers DEFINITELY KNOW this value is ALL ME and should have my name next to it in every dictionary. There are evidently some "new FB followers" of mine who will soon find this out personally but in a professional way.

PERSONAL COURAGE – Face fear, danger or adversity (physical or moral). Personal courage has long been associated with our Army. With physical courage, it is a matter of enduring physical duress and at times risking personal safety. Facing moral fear or adversity may be a long, slow process of continuing forward on the right path, especially if taking those actions is not popular with others. You can build your personal courage by daily standing up for and acting upon the things that you know are honorable.

IF YA DON'T KNOW, NOW YA KNOW!!!

Like · Comment · Share

Paula McKenzie, Christina Alexander Crawford and 4 others like this.

 Write a comment.

 **Rae Cy**
February 18, 2013 · Dothan, AL

I'M NOT DONE YET!!! When people who don't live by this value in particular encounter people who do, they are threatened by the lifestyle this value affords those people to live.

INTEGRITY – Do what's right, legally and morally. Integrity is a quality you develop by adhering to moral principles. It requires that you do and say nothing that deceives others. As your integrity grows, so does the trust others place in you. The more choices you make based on integrity, the more this highly prized value will affect your relationships with family and friends, and, finally, the fundamental acceptance of yourself.

Like · Comment · Share

Holly Pullin, Ann Baxter and 2 others like this.

 Ingrid Dow Murray As my dear husband says "Integrity in non negotiable."
February 16, 2013 at 8:54pm · Unlike   1

Write a comment.

**Rae Cy**
February 18, 2013 · Dothan, AL

HONOR – Live up to Army values. The nation's highest military award is The Medal of Honor. This award goes to Soldiers who make honor a matter of daily living — Soldiers who develop the habit of being honorable, and solidify that habit with every value choice they make. Honor is a matter of carrying out, acting, and living the values of respect, duty, loyalty, selfless service, integrity and personal courage in everything you do.

Like · Comment · Share

Angela Dowkins, Luis Escalante and Anita Smith like this

Write a comment.

 **Rae Cy**
February 16, 2013

SELFLESS SERVICE – Put the welfare of the nation, the Army and your subordinates before your own. Selfless service is larger than just one person. In serving your country, you are doing your duty loyally without thought of recognition or gain. The basic building block of selfless service is the commitment of each team member to go a little further, endure a little longer, and look a little closer to see how he or she can add to the effort.

This value is EXTREMELY IMPORTANT TO ME & I know there are scores of people who know or have met me in some capacity who would agree that I live this value EVERY DAY!

Like · Comment · Share

Ann Baxter, Luis Escalante and Alfreda M. Rogers like this.

Chat (55)

Recent
2015
2014
2013
2012
2011
2010
2000s
1990s
Born

9/22/2014
CARNEY-00056

 Anita Smith I agree , you are awesome person & I r__ talking with you @ school!!!
February 16, 2013 at 8:46pm · Unlike · 1

 Christopher M Ward PUNK- a light bright who is brighter than me!
February 16, 2013 at 7:10pm · Unlike · 1

Write a comment...

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born



FRIENDS · February 2013

PLACES · February 2013

Visited · Pitpe

 Rae Cy
February 16, 2013 · Dothan, AL

FB I'm continuing to post the 7 values I live by as a Police Corporal and ARMY Sergeant:

RESPECT - Treat people as they should be treated. In the Soldier's Code, we pledge to "treat others with dignity and respect while expecting others to do the same." Respect is what allows us to appreciate the best in other people. Respect is trusting that all people have done their jobs and fulfilled their duty. And self-respect is a vital ingredient with the Army value of respect, which results from knowing you have put forth your best effort. The Army is one team and each of us has something to contribute.

Like · Comment · Share

Paula Mckenzie, Maurice Watford, Angela Dawkins and 7 others like this.

 Maurice Watford I say "hooaaahhhh"
February 16, 2013 at 9:50pm · Like

 Write a comment...



LIKES · February 2013

WTVY.TV          Subs & More

+7

 Rae Cy
February 16, 2013 · Dothan, AL

DUTY - Fulfill your obligations. Doing your duty means more than carrying out your assigned tasks. Duty means being able to accomplish tasks as part of a team. The work of the U.S. Army is a complex combination of missions, tasks and responsibilities — all in constant motion. Our work entails building one assignment onto another. You fulfill your obligations as a part of your unit every time you resist the temptation to take "shortcuts" that might undermine the integrity of the final product.

Like · Comment · Share

Lawrence Winsome Keener Sr, Angela Dawkins, Alfreda M Rogers and 8 others like this.

 Write a comment...

 Rae Cy
February 16, 2013 · Dothan, AL

Recently people have been "scratching their heads" questioning my values based on some of my recent FB posts. For ALL of my new and old FB followers let be CLEAR about the 7 MOST IMPORTANT VALUES I live by whether on or off duty as a Police Corporal and as an ARMY Sergeant:

LOYALTY - Bear true faith and allegiance to the U.S. Constitution, the Army, your unit and other Soldiers. Bearing true faith and allegiance is a matter of believing in and devoting yourself to something or someone. A loyal Soldier is one who supports the leadership and stands up for fellow Soldiers. By wearing the uniform of the U.S. Army you are expressing your loyalty. And by doing your share, you show your loyalty to your unit.

Like · Comment · Share

Roslyn King, Shametrice Barnett, Shonita Coursey Ingram and 17 others like this.

 Shawnta Davis Ward The people who question you obviously don't know you...There is a difference between being a follower and one who is strong in their convictions and values. Right is right and wrong is wrong. Many can't put their personal issues aside in order to except truth when it is spoken. I can disagree with a persons beliefs and still be a loyal friend. Many can't do this and question and ridicule the ones who can...
February 16, 2013 at 5:13pm · Unlike · 4

 Christopher M Ward O hush to both you punks!

Chat (55)

9/22/2014
CARNEY-00057

February 18, 2013 at 9:17pm · Unlike · 1          Rae  Home 11

Write a comment.



Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

FRIENDS  February 2013

PLACES  February 2013

Visited 1 Place

Volidemna

Both m

LIKES  February 2013

WTVY-TV        Subs & More

+7

**Rae Cy**
February 13, 2013

GM FB....The Constitution of the United States is the SUPREME LAW of the land: Amendment I states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Freedom of Speech...at what point does one's freedom of speech rights violate the supreme law of the land...when he/she expresses his/her opinion on social media sites, when having discussion in public places, when merely commenting on news articles publicized by national media, when it brings negative/positive attention to his/her employer, family, place of worship....Or maybe there is no point because it is after all Freedom of Speech...

Like  Comment  Share

John C. Turner, Lawrence Winscrne Keener Sr., Vince Nguyen and 2 others like this.

Write a comment.

**Rae Cy**
February 15, 2013 · Dothan, AL ·

GM FB....The Constitution of the Unite States is the SUPREME LAW of the land: Amendment I states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Freedom of Speech...at what point does one's freedom of speech rights violate the supreme law of the land...when he/she expresses his/her opinion on social media sites, when having discussion in public places, when merely commenting on news articles publicized by national media, when it brings negative/positive attention to his/her employer, family, place of worship....Or maybe there is no point because it is after all Freedom of Speech...

Like  Comment  Share

Chalmek Stanford-Jackson, Mamie Small-McCory and 2 others like this.

Mamie Draxe Sat That!!!
February 15, 2013 at 10:26am  Like

Write a comment.

**Rae Cy**
February 13, 2013 · Dothan, AL.

"We did not intentionally burn down the cabin." Well did you intentionally call for a fire truck to put out the unintentional burning cabin? I never saw any footage of water being applied to the burning cabin. If they felt someone, whether it was Chris or not, was inside don't they have a lawful duty to preserve the life of others including criminals....jjs

Like  Comment  Share

John C. Turner, Marsha Magwood, Melissa Nieves and 4 others like this.

Rae Cy CNN Live just played a sound bite from one officer to his dispatch to "Roll fire and stage"
February 13, 2013 at 7.23pm · Like

Brandon Lee Bryant I heard that too.
February 13, 2013 at 7:30pm · Like

Brandon Lee Bryant They literally let the cabin burn to the ground, no water trunks because, ' its too dangerous to go near and to put out'
February 13, 2013 at 7:31pm · Unlike    1

Chat (55)



FRIENDS · February 2013

PLACES · February 2013

Visited 1 Place

LIKES · February 2013



WTVY-TV



Subs & More

+7

 Rae Cy No it wasn't...they made the fire engine stage because they never gave the clear for rescue/fire to enter the scene Brandon Lee &  Rae    Home 11
February 13, 2013 at 7:41pm · Like   1

 Rae Cy Did law enforcement burn Barker Ranch where Charles Manson and his followers lay after killing so many people that the true count is still not known...NO!!! Instead he and his band of murderers are still sitting in jail being fed by taxpayers dollars....but ONE MAN who stands for JUSTICE is, if you believe the news story, burned to charred remains by a group of what are supposed to be enforcers of the law and protectors of life but in my opinion are no more than VIGILANTES WITH A BADGE AND GUN!!! NOT MY BROTHERS IN LAW ENFORCEMENT.
February 13, 2013 at 7:55pm · Like   3

 Shannon Ault Schwab It seems prudent to me to stage fire and rescue when the scene is unsafe for them. Seems kinda crazy to put firemen or medical personnel in harm's way in a situation like that when an armed person had already been involved in a gunfight with officers. They don't have bullet proof vests.
February 13, 2013 at 8:40pm · Like

 Rae Cy Shannon Ault Schwab why call for fire after hearing a single gun shot as they claim from inside the cabin which led them to believe that he had taken his own life as he said he was not afraid to die...
February 13, 2013 at 3:07pm · Like

 Christopher M Ward EXACTLY! How long we're they there? Isn't that protocol?
February 13, 2013 at 9:17pm · Unlike   1

 Christopher M Ward Not excusing his actions,...just saying
February 13, 2013 at 9:18pm · Unlike   1

 Jim Holley Nobody can judge what happened unless you were there.
February 14, 2013 at 12:30am · Like   3

 Rae Cy I agree Jim Holley no one can judge but everyone is entitled to his/her own opinion...
February 14, 2013 at 7:58pm · Like   1

Write a comment...

 Rae Cy
February 13, 2013 · Dothan, AL

CNN is playing the audio from the shoot out allegedly btwn Christopher Dorner and San Bernadino Officers....sounds like several hundreds of rounds being fired and none from a semiautomatic weapon....one man can only fire a maximum of two handguns at one time which would equate to roughly 30 rounds with no magazine exchanges (hard to do with both hands holding guns)...AND the fire was set from outside the cabin not inside the cabin....I'm NOT SURPRISED!!! Does this not sound like slavery times when mobs would burn blacks just because....

Like   Comment   Share

Eric George Gamble, Sandra Edge, Deborah Gordon McNair and 4 others like this.

View 33 more comments

 Rhonda Ardis I AGREE 100% WITH YOU RAEMONICA! 100% IN THE FIRST DEGREE!
February 15, 2013 at 6:37pm · Unlike   1

 Brent Perrish Who would have ever thought a Cop would take the side of a COP KILLER!!!! And all over the color of their skin!!!! WOW!!!!
February 16, 2013 at 5:38am · Unlike   4

 Danny Herold You're an ignorant racist, Carney, and a disgrace to law enforcement. I intend to file a complaint Monday morning with the Dothan Police Department and the City of Dothan regarding your insensitive and misguided rantings.
February 16, 2013 at 6:57am · Like   2

Write a comment...

 Maria Gholston
February 12, 2013

Some insight that isn't being publicized... thanks RaeMonica Carney

Recent
2015
2014
2013
2012
2011
2010
2000s
1990s
Born

Chat (55)



FRIENDS February 2013




PLACES February 2013

Visited 1 Place

LIKES February 2013

 

WTVY-TV     Subs & More

+7



Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

### Christopher Dorner Manifesto (Uncensored)

Dorner vs. LAPD (If you have trouble accessing site, the document is viewable at the end of the manifesto) From: Christopher Jordan Dorner /7648 To: America Subj: Last resort Regarding CF# 07-0042...

BOYWITHORENADE.ORG

Like  Comment  Share

Cathy Nobles likes this.

 Write a comment.

 **Rae Cy**
February 12, 2013  Dothan, AL

FB form your own opinion about Christopher Dorner after you read his manifesto at the link below. "For what shall it profit a man, if he shall gain the whole world, and lose his own soul?" (Mark 8:36-37 KJV)



### Christopher Dorner Manifesto (Uncensored)

Dorner vs. LAPD (If you have trouble accessing site, the document is viewable at the end of the manifesto) From: Christopher Jordan Dorner /7648 To: America Subj: Last resort Regarding CF# 07-0042...

BOYWITHORENADE.ORG

Like  Comment  Share

Paula Mckenzie likes this.

1 share

 Write a comment.

 **Rae Cy**
February 12, 2013  Dothan, AL

UPLIFT: GOD wants to guide you thru this day because He knows how important this season of your life is. So take time to talk things thru with Him! - Hart Ramsey

Like  Comment  Share

Alfreda M Rogers and Anita Smith like this.

 Write a comment.

 **Rae Cy** shared Natosha Thompson Harrison's photo.
February 11, 2013

Ms. Dorothy Hollis Roberts passed today at 2:17 pm before I could make it back to Dothan from drill in Montgomery. She was my other grandma whom I loved dearly. She was also friends with my grandma Thelma Carroll who I always said she looked liked. The remarkable thing in their living and passing
Chat (55)

https://www.facebook.com/

was that they were both born in January, the 19th and the 23rd and they both passed in February, the 17th and the 11th. My grandmothers celebrated their lives with the ones that loved them on earth then went home to their waiting loved ones in Heaven. Their last comments were to go home....Grandma Dorothy your little police lady will miss you but will always love you!!!

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

FRIENDS · February 2013



PLACES · February 2013

Visited 1 Place



Natosha Thompson Harrison

Rest in Peace Grandma Dorothy

Like · Comment · Share

Kelvin Lynn, Alfreda M. Rogers, Shametrice Barnett and 18 others like this.

View 4 more comments

Receda Floyd Praying for you and your family Hun .
February 12, 2013 at 4:30am · Unlike     1

Anita Smith I'm sorry for your loss,, prayers are with you and family!!
February 12, 2013 at 5:29am · Unlike     1

Alfreda M. Rogers Praying for Peace!
February 12, 2013 at 8:50am · Unlike     1

Rae Cy Thanks for everyone's comments...I must correct what I posted about her birthdate...it was January 21st not the 23rd.
February 12, 2013 at 2:13pm · Like

Write a comment...

LIKES · February 2013



WTVY-TV          Subs & More

+7

Rae Cy
February 9, 2013 · iOS

LMAO....



EverythingGhettoPictures.com     @EGhettopictures

Like · Comment · Share

Lawrence Winsome Keener Sr., Anita Smith and 2 others like this.

Celeste Fuller-Peterman Lol omg!!!lol
February 9, 2013 at 8:16pm · Like

Lawrence Winsome Keener Sr. Hah!
February 23, 2013 at 11:05pm · Like

Write a comment...

Chat (55)



Rae   Home

**Rae Cy**
February 9, 2013 · Montgomery, AL ·

All this media attention about Christopher Dorner allegedly killing two LAPD Officers but no info regarding those deaths makes me wonder if LAPD was trying to permanently silence Christopher Dorner and he took them out first...ijs

Like · Comment · Share

Kendall Coleman, Brandon Lee Bryant, Anita Smith and 2 others like this.

Maria Drake Ik,r? Makes you Wonder...
February 9, 2013 at 7:25pm · Unlike · 1

Paul John What's the inside story on him?
February 9, 2013 at 8:41pm · Like

Kendall Coleman That was my first thought when I saw the news report.... CONSPIRACY
February 9, 2013 at 10:57pm · Unlike · 2

Rae Cy Paul Motzenbecker...I wish I knew!!!
February 12, 2013 at 2:15pm · Like · 1

Maria Drake NObody gets THAT Angry without a Good Reason... Really wonder what turned him this way
February 12, 2013 at 2:20pm · Like

Rae Cy Maria Maria Drake...I'm not certain but Ray Charles can see there's more to his situation than the media knows and more than LAPD wants the public to know...
February 12, 2013 at 2:24pm · Like · 2

Paul John I read his manifesto.. if its true LAPD is one screwed up department....
February 12, 2013 at 4:21pm · Like

Rae Cy Paul Motzenbecker where did u see it...
February 12, 2013 at 4:24pm · Like

Paul John http://m.dailykos.com/.../-Christopher-Dorner-Manifesto..

### Daily Kos :: Christopher Dorner Manifesto (Uncensored)
After reading this manifesto of the accused cop killer Christopher
M.DAILYKOS.COM

February 13, 2013 at 4:35pm · Like · Remove Preview

Write a comment...

**Rae Cy**
February 9, 2013 · Montgomery, AL ·

Thankful for another Military Drill weekend.....more time towards retirement...YEAH!!!!

Like · Comment · Share

Maria Gholston, Alfreda M Rogers and 2 others like this.

Anita Smith Have a good day!!
February 9, 2013 at 7:55am · Like

Write a comment...

**Rae Cy**
February 8, 2013 · Montgomery, AL ·

At Applebee's trying to get some food for an already upset stomach...pitiful I know...smh

Like · Comment · Share

Elizabeth Smiley, Bernice Shannon and 2 others like this.

Write a comment...

**Rae Cy**
February 8, 2013 ·

Recent
2015
2014
2013
2013
2012
2011
2010
2000s
1990s
Born

FRIENDS · February 2013

PLACES · February 2013

Visited 1 Place

LIKES · February 2013

+7

WTVY-TV       Subs & More

Chat (55)

9/22/2014
CARNEY-00062

We never know what values a person truly has until they stand up, stand firm,
and fight for them!!! Like if you will stand up, stand firm, and fight for the
values you have....I WILL!!!



**Rae Cy**

When a person is pushed to the point where they begin to destroy
EVERYTHING that once was held in the HIGHEST ESTEEM and
EVERYONE who should have stood for what was RIGHT, the one
thing they were ready to give up is the only thing they feel taking
out will be the solution to restoring the name, respect, and honor
that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

Alfreda M. Rogers likes this.

 Write a comment...

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born


FRIENDS February 2013

PLACES February 2013
Visited 1 Place



**Rae Cy**
February 8, 2013 · Dothan, AL

When a person is pushed to the point where they begin to destroy
EVERYTHING that once was held in the HIGHEST ESTEEM and
EVERYONE who should have stood for what was RIGHT, the one thing they
were ready to give up is the only thing they feel taking out will be the solution
to restoring the name, respect, and honor that he was revered for: HUMAN
LIFE!!!

Like · Comment · Share

Sharon Martin, Robert Ethridge, Shametrice Barnett and 3 others like this.

1 share

 Write a comment...

 **Jabbar Andrews**
February 7, 2013

Thank you everyone for calls emails n text messages! Preciate the love...I am
on some mad drugs from this mad pain! Lol ....I think Officer RaeMonica
Carney would have to cuff me because of the high dosage they
are..Oxycodon is magical.! Lol

Like · Comment · Share

Me'Tasha K Scott, Amy Shepard Williams, Kelvin Lynn and 15 others like this.

View 2 more comments

Chawn James Hold on now! Don't get addicted!!!
February 7, 2013 at 10:08pm · Like · 1

Cynthia Ward Not MAGICAL LOL!!!!
February 7, 2013 at 10:12pm · Like · 1

Annie Bennett-Clark VERY EASY TO GET HOOKED TAKE IT SLOW AND BE
CAREFUL
February 8, 2013 at 7:00pm · Like

 Write a comment...

LIKES February 2013


WTVY-TV    Subs & More    +7

 **Rae Cy**
February 3, 2013 · iOS

Nana's Katy-bug at NCC this morning...so pretty in orange!!!

Chat (55)



March 8, 2013 at 9:06pm · Unlike   1

Rae Cy Virgil K Red Byrd....it's hard to take a self shot with the wind blowing my hair out of place...LOL
March 8, 2013 at 9:32pm · Like   1

Angela Palmer-Gibsons why did you change the color
March 8, 2013 at 9:10pm · Like

Trenesha T. Chambers Cute
March 9, 2013 at 5:25pm · Like

Write a comment...

LIKES · 2012



+44

Sadies Flea Market    Trina E. Braxton

EVENTS · 2013

Bridal Party Fitting
With 2 other guests

RaeMonica Carney's Personnel Board Hearing
With 14 other guests

BET RAP IT UP
With 9 other guests

Recent
2010s
201–
2013
2012
2011
2010
2000s
1990s
Born

Rae Cy added 6 new photos to the album iOS Photos.
February 23, 2013 · iOS



Like · Comment · Share

Paula McKenzie, Melany Bradshaw, Earl Bynum and 156 others like this.

1 share

View 39 more comments

Christopher M Ward How did it go
April 14 at 6:07pm · Like

Christopher M Ward Stoppp you killing the grass!!! Ken get her! Oh my bag. Free Labor! Carry on!
April 22 at 5:39pm · Unlike · 1

Christopher M Ward aaaaaw light skinned sap sucka
April 28 at 5:48pm · Like

Write a comment...

Rae Cy
February 13, 2013 · Dothan, AL

CNN is playing the audio from the shoot out allegedly btwn Christopher Dorner and San Bernadino Officers....sounds like several hundreds of rounds being fired and none from a semiautomatic weapon....one man can only fire a maximum of two handguns at one time which would equate to roughly 30 rounds with no magazine exchanges (hard to do with both hands holding guns)...AND the fire was set from outside the cabin not inside the cabin....I'm NOT SURPRISED!!! Does this not sound like slavery times when mobs would burn blacks just because....

Like · Comment · Share

Sfc George Gamble, Sandra Edge, Deborah Gordon McNair and 4 others like this.

Rhonda Ardis YES IT DOES!!!
February 13, 2013 at 12:16am · Like

Carl Midkiff I agree Karla. This man was very sick. I cant think of a single word in the English language that would warrant taking someones life. I can think of a few... Chat (58)





LIKES 2018



Sadies Flea          Third E Ellerton
Market

EVENTS 2013

Bridal Party Fitting
With 2 other guests

RaeMonica Carney's Personnel Board
Hearing
With 14 other guests

BET RAP IT UP
With 9 other guests

+44

Recent
2015a
2014
2013
2012
2011
2010
2009a
1990a
Born

that might get your nose broken...lol...but not killed. Sounds more like an excuse for an already troubled man. Its a tragedy on so many levels that i cant really put it in words.

February 13, 2013 at 5:01am · Like · 1

 Rae Cy Don't read into my responses to this TRAGEDY Karla C. Mays...I'm simply highlighting those things that the media don't seem to find important enough to make mention of. If the story is going to be told tell ALL OF IT NOT PART OF IT!!! The media nor LAPD were posting Chistopher Dorner's manifesto when this all began to be pushed to the public. The only thing that was said was that he allegedly killed two people with no specifics as to how or why he was the primary suspect. Then they post that he shot two LAPD Police Officers but not until last night did they mention the HORRIBLE CIVIL RIGHTS VIOLATIONS BY THE FEMALE LAPD OFFICER AND COVERUPS BY SENIOR LAPD OFFICERS AND THEIR BOARD OF RIGHTS.
INJUSTICE BY ANY NAME, WHETHER IT'S AT THE HANDS OF LAW ENFORCEMENT OR AT THE HANDS OF THE COMMON CITIZEN, IS NO JUSTICE AT ALL!!!
February 13, 2013 at 8:08am · Like · 2

 Rae Cy Labeling someone a cop killer doesn't automatically give other law enforcement the right to BURN A MAN TO DEATH WITHOUT DUE PROCESS AFFORDED TO ALL CITIZENS IN THE UNITED STATES CONSTITUTION!!! There were no reports that he came out shooting only that he threw out a smoke grenade. EVERY TIME we encounter ANY PERSON POSING A THREAT we as law enforcement have to be able to use more than just DEADLY FORCE to resolve tense and often times unpredictable situations. IT IS MY OPINION THAT THIS TRAGIC SITUATION TURNED INTO A LYNCHING FOR THE ACCUSED BEFORE HE WAS AFFORDED HIS CONSTITUTIONAL DUE PROCESS RIGHTS!!!
February 13, 2013 at 8:19am · Like · 4

 Gentry Danzay Sr. And that's why I respect you so much as a officer Cpl. Carney. Well said and so true!
February 13, 2013 at 8:57am · Unlike · 4

 Rae Cy Karla C. Mays when you have a chance rent the movie The Great Debaters. If you have seen it, watch it again because it is truly a powful movie with a powerful message!!! Christopher Dorner in his manifesto that no other deaths would occur if those people whom he mentioned in it would simply TELL THE TRUTH which would clear his name...instead they continued to make matters worse by vilifying a man whose morals, ethics, and integrity were probably beyond reproach and unquestionable. HE STOOD FOR
February 13, 2013 at 9:30am · Like · 1

 Rae Cy HE STOOD FOR THE RIGHTS OF OTHERS AND THEN HIMSELF!!!
February 13, 2013 at 9:31am · Like · 1

 Rae Cy I don't know what movie you watched but someone definitely died in it by hanging then burning and for what reason?
February 13, 2013 at 9:33am · Like · 1

 Rae Cy I never said it did...although you seem to think I have based on your responses to my posts.
February 13, 2013 at 9:35am · Like · 1

Rae Cy You seem to miss the big picture of it all CLEARLY!!!
February 13, 2013 at 9:36am · Like

 Rae Cy The man is VERY INTELLIGENT!!! and I say "is" because until its proven those are his remains inside the cabin, he may still be alive.
February 13, 2013 at 9:38am · Like · 2

 Rae Cy In order to clearly understand the position this man was pushed into you would have had to have walked in his shoes and experienced the things he experienced or in the very least experienced something very similar to what he was blowing the whistle on. I HAVE!!! Have you?
February 13, 2013 at 9:43am · Like · 5

Rae Cy I understand how you feel...Sometimes the hardest lessons in life are learned thru death.
February 13, 2013 at 9:47am · Like · 1

Rae Cy You see I think that's where people have misjudged his actions and intentions by referring to them as revenge...it was his way of getting justice for the injustices that he and others suffered at the hands of those people. JUSTICE FOR THE INJUSTICES!
February 13, 2013 at 10:59am · Like · 2

 Rae Cy In the movie the The Great Debaters one of the Wyle College Debaters in the debate against Harvard University and stated in his response to the Harvard debater's comment "Nothing that erodes the rule of law can be moral, no matter what name we give it," He replied "St. Augustine said "An unjust law is no law at all..." which means I have a right even a duty to resist with violence or civil disobedience...you should pray I choose the latter.
February 13, 2013 at 11:16am · Like · 1

Rae Cy end quote.
February 13, 2013 at 11:18am · Like

  Richard Odom · 8 mutual friends
Racism is perpetuated by racism, hence your statement! Only psychopaths write manifestos, read mein kampf!
February 13, 2013 at 10:28pm · Like · 2



Chat (56)

9/22/2014
CARNEY-00065



LIKES 2019

Sadies Flea Market   Tnna E. Brixton

EVENTS 2013

Bridal Party Fitting
With 2 other guests

RaeMonica Carney's Personnel Board Hearing
With 14 other guests

BET RAP IT UP
With 9 other guests

+44

Rae Cy I didn't label it a manifesto...LAPD did. I was simply referring to it Richard Odom. I'm not clear which statement you are referring. care to elaborate
February 15, 2013 at 10:42pm · Like

Rhonda Ardis I AGREE 100% WTH YOU RAEMONICA! 100% IN THE FIRST DEGREE!
February 15, 2013 at 8:27pm · Unlike   1

Brent Parrish Who would have ever thought a Cop would take the side of a COP KILLER!!!! And all over ther color of their skin!!!! WOW!!!!
February 10, 2013 at 9:09am · Unlike   2

Danny Harold You're an ignorant racist, Carney, and a disgrace to law enforcement. I intend to file a complaint Monday morning with the Dothan Police Department and the City of Dothan regarding your insensitive and misguided rantings.
February 13, 2013 at 8:57am · Like   2

Write a comment...

Rae Cy shared Natosha Thompson Harrison's photo.
February 11, 2013

Ms. Dorothy Hollis Roberts passed today at 2:17 pm before I could make it back to Dothan from drill in Montgomery. She was my other grandma whom I loved dearly. She was also friends with my grandma Thelma Carroll who I always said she looked liked. The remarkable thing in their living and passing was that they were both born in January, the 18th and the 23rd and they both passed in February, the 17th and the 11th. My grandmothers celebrated their lives with the ones that loved them on earth then went home to their waiting loved ones in Heaven. Their last comments were to go home....Grandma Dorothy your little police lady will miss you but will always love you!!!



Natosha Thompson Harrison

Rest in Peace Grandma Dorothy

Like · Comment · Share

Kelvin Lynn, Alfreda M. Rogers, Shemetrics Burnett and 19 others like this.

View 4 more comments

Receda Floyd Praying for you and your family Hun .
February 12, 2013 at 4:30am · Unlike   1

Anita Smith I'm sorry for your loss,, prayers are with you and family!!
February 12, 2013 at 5:26am · Unlike   1

Alfreda M. Rogers Praying for Peace!
February 12, 2013 at 8:90am · Unlike   1

Rae Cy Thanks for everyone's comments...I must correct what I posted about her birthdate...it was January 21st not the 23rd.
February 12, 2013 at 2:13pm · Like

Write a comment...

Jabbar Andrews
February 7, 2013

Thank you everyone for calls emails n text messages! Preciate the love...I am on some mad drugs from this mad pain! Lol ....I think Officer RaeMonica Carney would have to cuff me because of the high dosage they are..Oxycodon is magical.! Lol

Like · Comment · Share

McTasha K Scott, Amy Shepard Williams, Pamela Norton Jordan and 15 others like this.

Chat (58)

https://www.facebook.com/

9/22/2014
CARNEY-00066

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

Case 1:14-cv-00392-WKW-WC   Document 44-1   Filed 07/17/15   Page 272 of 319



LIKES 2015



+44

Sadies Flea Market     Trina E. Brayton

EVENTS 2013

Bridal Party Fitting
With 2 other guests

RaeMonica Carney's Personnel Board Hearing
With 14 other guests

SET RAP IT UP
With 9 other guests

Recent
2010s
2014
2013
2012
2011
2010
2000s
1990s
Born

this.

View 2 more comments

Rae Cy Luis Escalante check out my last post...AMAZING or what!!!
May 27, 2013 at 5:08pm · Like

Luis Escalante Yes indeed! You know I know that your AWESOME!! No denying the truth!! Do yo thang lady!!!
May 27, 2013 at 5:10pm · Unlike · 1

Rae Cy LMAO....you so funny Luis Escalante but I luv ya!!! in a purely platonic way of course.
May 27, 2013 at 5:11pm · Like · 1

Luis Escalante Luv you too!!! LoLi
May 27, 2013 at 5:12pm · Unlike · 1

Write a comment.

Rae Cy
May 26, 2013

FB please join me in wishing my big sister SHARANITA PULLIN SHAW a VERY HAPPY 43rd BIRTHDAY!!! I LOVE YOU FOR ETERNITY!!!



Like · Comment · Share

Altheria M Rogers, Diane Cofe, Donna Martin and 35 others like this.

View 7 more comments

Kim Lewis HAPPY BIRTHDAY
May 26, 2013 at 6:26pm · Like

Teddy Ward-Hollis Happy Birthday Strawberry
May 26, 2013 at 9:15pm · Like

Angela Palmer-Gibbons Happy BIRTHDAY Strawberry
May 26, 2013 at 8:22am · Like

Michelle Lampkin Happy Belated Birthday
May 26, 2013 at 12:30pm · Like

Write a comment..

Jemmie Watford
May 25, 2013

Be intelligent enough to Read between the lines. If you ask me a question, do not twist my answer. RaeMonica Carney, many people of intelligence would Chat (68)

not take your answer out of context. Response to being wronged will always depend on how you have been wronged, not who has wronged you. I feel your response was taken completely out of context, and pray that this is resolved with wisdom and love!

Jemmie Watford
#humanityfirst!

Like · Comment · Share

You, Danielle Sivens, Alexis Ceara and 10 others like this

 Jemmie Watford you ask me would I shot some one who had wronged me, what other reason would you shoot someone.....this is absolutely twisted... If an officer is doing wrong, threatens the life of another officer, the community, our murders innocently someone, should ... See More
May 25  2013 at 10:06am  Unlike    4

 Jemmie Watford She was not saying she would take her gun and shoot a officer that she had a gender Bender with, our one who accidentally ate her lunch from the refrigerator...
We must not be so quick to terminate, judge and persecute.
May 25  2013 at 10:10am  Unlike    4

 Kim Williams THIS IS SO SAD, I HAVE KNOWN THIS YOUNG LADY FOR SEVERAL YEARS AND SHE IS A BEUTIFUL, INTELLIGENT PERSON AND ANYONE THAT KNOW HER KNOWS THAT WHAT SHE SAID WAS TAKEN OUT OF CONTEXT, ALL I HAVE TO SAY IS WHEN GOD IS FOR YOU WHO CAN BE AGAINST YOU AND SHE... See More
May 25  2013 at 11:41am  Unlike    2

Write a comment ...

 Rae Cy
May 25  2013  Dothan, AL ·

Yesterday, Friday, my soul stirred and stirred about the things that were revealed during my appeal hearing but moments ago God brought everything full circle...Proverbs 12:22 says "The LORD detests lying lips, but He delights in people who are trustworthy" (NIV) or (KJB Cambridge Ed.) "Lying lips are an abomination to the LORD, but those who deal faithfully are His delight." There were several deliberate lies told during the hearing but I take refuge in the LORD knowing that He said, "Vengeance is mine, and recompense, for the time when their foot shall slip; for the day of their calamity is at hand, and their doom comes swiftly." (ESV) All I'm going to do is wait on the LORD.

Like · Comment · Share

Wanda Terraine, Raquel Reynoles Slaughter, Monica V Graham and 29 others like this.

View 2 more comments

 Pas Kenny Sharpton Glastgow Now if ever there was a time to stand up it is now!
This is a 1st Ammendment violation and that's we have left.
May 25, 2013 at 9:19am  Unlike    1

 Sfc George Gamble Remember to stay strong in God... He's there all of the time... The Bible also says that "Trouble may endure for a night, but joy cometh in the morning."-Psalm 30:5
You joy is on its way.. Stay strong we all love you and what u do for the unit here at Gunter, AFB.. We r on your side..
May 25  2013 at 1:43pm  Unlike    2

 Rae Cy Thank you Sfc George Gamble and the unit...Everyone's support, love and prayers mean more to me than words can express.
May 25  2013 at 1:45pm  Like    3

Write a comment ...

 Rae Cy recommends an article on Dothan Eagle.
May 23, 2013 ·

Front page of the Dothan Eagle...WOW!!! Seems someone spoke to the media about the reasons for my suspension and it sure wasn't me...

Recent
2015s
2014
2013
2012
2011
2010
2000s
1990s
Born

Sponsored  +

Designed in LA under $20
justfab.com



Beautiful Shoes IS Affordable : Your First pair for $20| Free Shipping, Free Exchanges!
Ajoi Gibbons likes this

Chat (51)

Rae   Home   2

Recent
2015s
2014
2013
2012
2011
2010
2000s
1990s
Born

## dothan

### Facebook posts at center of hearing

Issues of free speech and police loyalty will be at the forefront of a hearing Thursday involving a Dothan police officer disciplined for questionable posts on her Facebook page.

DOTHAN EAGLE

Like · Comment · Share

Eric Easley, Charity Hart and Jasmine IchooseHappiness Grubbs like this.

 Write a comment...

 Rae Cy
May 28, 2013  Dothan, AL

FB...Thanks in advance for everyone's prayers, support, and kind words during the time of my test. I say test because it is only through a test can we have a TESTimony!!! I look forward to seeing the faces of those who can come out and support me during my appeal hearing this afternoon at 1pm. In case it's hard for some to see what's truly happening let me be clear that should the Chief's decision stand it will set me up to be terminated by just making one mistake and let me tell you that those efforts are already being taken. For 12 years I have had to stand up for myself just to make it where I am today, and by the Grace of God I will be here for as long as I wish to be. I refuse to let any man dictate my future!!!

Like · Comment · Share

Jabber Andrews, NaDeva Dupree, Aaron Gartlan and 33 others like this.

View 4 more comments

Ann Baxter I wish I could say the hearings are fair and your voice will be heard but myself as well as LaVera are proof they do what they want and it is not always right no matter how dedicated you are to your job or loyal to your Dept. But on the other hand Gods... See More
May 23, 2013 at 2:26pm · Like    2

Laffont Agnew Jr. The bible says, now unto him that is able to do exceedingly, abundantly above all that we can ask or think according to tue power that worketh in us...
Give it to Him, God's gotcha and all of our prayers are with you. You've got plenty of support looks like and not just from our classmates!! I love yall
May 23, 2013 at 7:21pm · Like    3

NaDeva Dupree Pulling like hell for you Mony! I get it to God be the glory cause..... ALL POWERS I SAID ALL POWERS ARE IN HIS HOLY H   NDS! Go team you and God
May 24, 2013 at 12:24am · Like

Lakeisha Jones lady god has the last say so, never man!!
May 26, 2013 at 5:46pm · Like

 Write a comment...

 Rae Cy
May 21, 2013 · Dothan, AL

God's plan for my life inludes INCREASE!!! September 2013 I become eligible to test for Sergeant with the Police Department. Come hail or high water I claim MY BLESSINGS in the name of Jesus!!!

Like · Comment · Share

Rhonda Ardis and 42 others like this.

1 share

View 3 more comments

Rae Cy Paul Paul I tried to post earlier that I will only be eligible.. I have not been promoted yet...but my increase is not in man's hands, it's in God's plan for me.
May 21, 2013 at 5:52pm · Like    2

MOMENTS FROM THE YEAR

Got Engaged to Ken Cloyd

THE OFFICIAL ENGAGEMENT CHRISTMAS 2013

Muhammad Ali Center - AWESOME EXPERIENCE

LaToya Grubbs Stevens (Whaley) 2013 Ashworth College Graduation

The Tuskegee Airmen

Sponsored

Designed in LA under $20
justfab.com



Beautiful Shoes IS Affordable : Your First pair for $20! Free Shipping, Free Exchanges!
Apri Gibbons likes this

https://www.facebook.com/

Chat (61)



PHOTOS · 2013



FRIENDS · 2013



+104

PLACES · 2013

Visited 22 Places



Rae Cy was at Southeast Alabama Medical Center and 21 other places

See All Stories



LIKES · 2013



+44

Sadies Flea Market

Inner E. Braxton

EVENTS · 2013

Bridal Party Fitting
With 2 other guests

 Ann Baxter Yes it is sweetheart I love you girl!
May 21, 2013 at 8:20pm · Like

 Rae   Home ▾

Deborah Gordon McNair Amen already
May 21, 2013 at 6:35pm · Like

John Grubbs It's already done! !!!
Mar 21, 2013 at 10:32pm · Like

Write a comment...

Rae Cy
May 20, 2013 · Dothan, AL

GM FB...I just wanted to remind everyone that Thursday, May 23, 2013 at 1:00 pm I will be having my appeal hearing in the Sakado Room of the Dothan Civic Center and I ask that you come out to support me in my stand against being wrongly disciplined by the Dothan Police Department. I'm walking in faith knowing that no weapon formed against me shall prosper. God Bless!!!

Like · Comment · Share

Rhonda Ardis, Rhonda Johnson Easley, NaDeva Dupree and 29 others like this.

 Michelle Lampkin Amen to that sis I will be there if I have to walk. Love Ya
May 20, 2013 at 9:04am · Unlike · 1

 John Grubbs U have the highest power on your side. God!!!!!!
May 20, 2013 at 10:00am · Unlike · 1

 NaDeva Dupree Full support given! Good Luck!
May 21, 2013 at 2:27pm · Like

Write a comment...

 Rae Cy added 5 new photos to the album iOS Photos.
May 9, 2013 · iOS

HAPPY BIRTHDAY ASHTON!!! CONGRATULATIONS ON GETTING YOUR PERMIT TO OPERATE A MOTOR VEHICLE!!! Ok that's what I'm praying!!! Luv always your other mother(Luv u 2 Suzanne Smith Gartlan) — with Suzanne Smith Gartlan at The River Nile.



Like · Comment · Share

Paula Mckenzie, Earl Bynum and 155 others like this.

1 share

View 39 more comments

 Christopher M Ward How did it go
April 14 at 8:07pm · Like

 Christopher M Ward Stoppp you killing the grass!!! Ken get her! Oh my bag. Free Labor! Carry on!
April 22 at 6:39pm · Unlike · 1

Recent
2016s
2014
2013
2012
2011
2010
2000s
1990s
Born

Sponsored

Designed in LA under $20
justfab.com

Beautiful Shoes IS Affordable. Your First pair for $20! Free Shipping, Free Exchanges!
Ajci Gibbons likes this.

Chat (61)

9/22/2014
CARNEY-00070

(25) Mike Woodside



RaeMonica Carney   Home

Mike Woodside was at Dothan Civic Center and 1 other place.

See All Stories

Now

2013
March
February
January

2012

2011

2010

2009

2008

2002

1997

1980s

1973

Born

Like · Comment · Share        45   2

Mike Woodside shared Amazing and Crazy videos's video.
February 28

Funny stuff

I would hurt this guy haha
I would hurt this guy haha

Like · Comment · Share

Mike Woodside shared a link.
February 27

**Sergeant Loran "Butch" Baker**
www.cdmp.org

Sergeant Loran Baker and Detective Elizabeth Butler were shot and killed as they followed up on a sexual assault investigation at a residence in the 800 block of North Branciforte Avenue at approximately 3:30

Like · Comment · Share        1

**Paul O. Andreasen**
February 26 near Longwood, FL

Nah, the caption is wrong, it's just a baby picture of Mike Woodside LOL — with Mike Woodside.

Likes
February

Men's
Wearhouse        The Warrior
Training Group        StatGear        +10

Mike Woodside shared Todd Starnes's status.
February 28

Lindsay Lohan wants to be a motivational speaker. Well, if Obama can be president...

Like · Comment · Share        i

Mike Woodside shared a link.
February 27

**Detective Elizabeth Butler**
www.cdmp.org

Detective Elizabeth Butler and Sergeant Loran Baker were shot and killed as they followed up on a sexual assault investigation at a residence in the 800 block of North Branciforte Avenue at approximately 3:30

Like · Comment · Share        2

Mike Woodside shared True Blue Warriors's photo.
February 27

DOJ - Federal Bureau Of Prisons
United States Penitentiary - Canaan, Pennsylvania
Correctional Officer Eric Williams
End Of Watch: 02-25-13
Correctional Officer Eric Williams, 34, was killed by an inmate while he stood the line between the ...See More

Sponsored
**$5550 Grants for School**

$5550 In Grants Offered to go Back to School! See if you qualify.

Chat (46)

CARNEY-00081

(24) Mike Woodside



I challenge you in Modern Country and things
will you play SongPop with me?

Think you know music? Take my SongPop challenge
and prove it!

Like · Comment

Mike Woodside shared The Tea Party's photo.
January 15

Click "LIKE" if Obama is a "two faced" liar and a hypocrite

2006 — 2013

THE FACT THAT WE ARE HERE TODAY TO DEBATE RAISING AMERICA'S DEBT LIMIT IS A SIGN OF LEADERSHIP FAILURE. IT IS A SIGN THAT THE U.S. GOVERNMENT CANNOT PAY ITS OWN BILLS."

"TO EVEN ENTERTAIN THE IDEA OF (NOT RAISING THE DEBT CEILING), OF THE UNITED STATES OF AMERICA NOT PAYING ITS BILLS, IS IRRESPONSIBLE. IT'S ABSURD."

Like · Comment · Share                  2   1

Candace Brewer Woodside
January 10

Getting ready to get my snooze on........peace out! — with Mike Woodside at Woodside's lakefront abode.

Woodside's lakefront abode
Local Business · Dothan, Alabama

Like · Comment

Mike Woodside
January 9 via YouTube

Tripp Phares in HS

Yes, Dear: Greg defends Kim's honor.
Greg defends Kim's honor. The song is "The Glory Of Love" by Peter Cetera, the theme to "Karate Kid II"

Like · Comment                                    1

Chris Miller
January 8

Mike Woodside Will Glover Mac Eggleston Derek Wieczorek Clark Alliums Christopher Barberree Lee Nelms Jeff Hunter

Mike Woodside became friends with Chris Miller.     RaeMonica Carney   Home
January 17

Chris Miller
Lives in Dothan, Alabama
Add Friend

Like · Comment

Mike Woodside shared Gang Warfare Center's status.
January 15

We'd better wake up.

A 10-minute segment today on Glenn Beck about the size of the gang problem in the United States. The estimated numbers in totality compare in size to the 6th largest Army in the world.

Like · Comment · Share                           1   5

Mike Woodside shared The Holster Store's photo.
January 15

Like & Share -

STOP!! WE CAN'T TAKE THESE GUNS IN THERE!
BANK
NO GUNS

Like · Comment · Share                           5   2

Mike Woodside shared The Tea Party's photo.
January 8

Send a letter to Congress right NOW to tell them to keep their filthy hands off our guns! http://bit.ly/12uZU4A

Now
2013
March
February
January
2012
2011
2010
2009
2008
2002
1997
1980s
1972
Born

Sponsored
$5550 Grants for School

$5550 In Grants Offered to go Back to School! See if you qualify.

Chat (46)

https://www.facebook.com/

CARNEY-00082
4/5/2013



Search for people, places and things                                RaeMonica Carney   Home

David Jay   Timeline   2012   Highlights                    Add Friend

Now
2010s
2013
2012
2011
2010
2000s
Born

Share                                                    5        Share                          2   1


**David Jay**
July 27, 2012

Wish GWB was still the president.



Share                                    16   1


**David Jay** shared a link.
July 29, 2012

Four weeks ago my dad became the pastor at Cottonwood United
Methodist Church. On his first Sunday there were 15 in
attendance and today there were 40. If you looking for a church
home, come visit us at Cottonwood UMC. It is great hearing my
dad's sermons again and I know you will be blessed. Hope to see
you next Sunday.

**Pass It On -- The people of The
United Methodist Church**
www.youtube.com

Live the Promise of: Open Hearts. Open
Minds. Open Doors. Promotional video,
directed by Steve HJ

Share                                                   23   3


**David Jay**
July 4, 2012 via mobile

Sitting on Mexico Beach with the wife. Toes in the sand and
listening to the waves. It doent get any better than this.

Share                                                        22

**David Jay** shared Kathy Hennessy's photo.
May 28, 2012

Beautiful...



Share                                    13


**David Jay** shared Earl Blanco Jr.'s photo.
May 2, 2012

So true...



Share                                                   14   21

Sponsored

**$5550 Grants for
School**



$5550 In Grants
Offered to go Back to
School! See if you
qualify.

**David Jay** shared a link.
April 22, 2012

I often get asked why am I so into horror movies and haunted
houses. Dark Shadows is the answer. I remember running home
from school and couldn't wait for it to come on ABC. By the way
we only had three channels. Most of the facebook crowd isn't old
enough to remember such a classic.

**Dark Shadows Original Promo**
www.youtube.com

112 friends posted on David's timeline.                    Chat (47)

CARNEY-00083

4/5/2013



Search for people, places and things

Frank Bissette Sorry Chief! No disrespect!
January 27, 2012 at 7:57pm

RaeMonica Carney   Home

Will Benny Timeline   2012   Highlights

Frank Bissette I'll call him. "Jeffy "!
January 27, 2012 at 8:31pm

**Add Friend**

Now
2012
September
August
July
June
May
April
March
February
January
2011
2010
2009
Born

**Will Benny**
December 17, 2011 via mobile

20 feet up a tree trying to out smart a cloven hoofed fur bearing animal. Opposable thumbs may be over rated.

1   10

Likes
2011

Tim Dorsey   Egret Boat Company   Tropic Ocean Airways

+6

**Will Benny**
November 5, 2011 via mobile

Get your seats early, the bandwagon is almost full.

2   4

**Will Benny** updated his profile picture.
May 21, 2011

Share

2010

**Will Benny** updated his profile picture.
December 6, 2010



Likes
2010

  

Bud N' Mary's Marina   Mote Marine Laboratory &   Captain Morgan

+25


**Will Benny** updated his profile picture.
December 6, 2010

Sponsored
$5550 Grants for School

$5550 In Grants Offered to go Back to School! See if you qualify.



Search for people, places and things

RaeMonica Carney   Home

**Will Benny** · Timeline · Festival **2012**   **Highlights**
Concert Venue · Dothan, Alabama

11   3

**Will Benny**
March 22, 2012

Didn't know Big Worm played — with Lynn Watkins at Toadlick
Music Festival.

Share                                         10   6

**Will Benny**
March 7, 2012

Trampoline for free, you pick up. $50 delivered around here. No
safety net, not needed unless you are raising some sissy kid. It
does have the frame for the net if you really want a sissy kid.
Doubles as a dog shade or shelter, no additional charge.

4   13

**Will Benny** updated his profile picture.
January 7, 2012

Share

2011

Share                                         10   4

**Will Benny**
March 15, 2012

Share                                         7   6

**Will Benny**
January 26, 2012

Sometimes I laugh in Spanish and I'm all like.... ja ja ja ja

12   9

Frank Bissette, Bernardo De Faria and 9 others like this.

**Paul Coleman** ...just as long as you're not farting in Spanish,
then we're all OK.
January 26, 2012 at 11:05am          Show comments

**Dixon Cruickshank** must be your multiculturism showing thru
January 26, 2012 at 11:08am

**Lori Turner Watkins** ¿
January 26, 2012 at 11:27am

**Joe Cochran** You need to go to sleep, you have gone L~ loco`
January 26, 2012 at 11:44am

**Frank Bissette** Good one jefe!
January 26, 2012 at 1:25pm

**Sophie Coleman** Epic!!!

Now
2012
September
August
July
June
May
April
March
February
January
2011
2010
2009
Born

Sponsored

$5550 Grants for
School

$5550 In Grants
Offered to go Back to
School! See if you
qualify.

Chat (43)

CARNEY-00085
4/5/2013



Search for people, places

Houston County | Subs & More | Soy Panameño/a | ...dad de ...Monica Carney | Home

**Will Benny** Timeline 2012 Highlights

**Add Friend**

Now
2012
September
August
July
June
May
April
March
February
January
2011
2010
2009
Born

Share                                    16  3

**Will Benny**
May 10, 2012 near Panama City, FL

Alabama Tarpon

**Will Benny** was with Shelby Benny and 2 other people at Nags Head Outer Banks NC.
June 10, 2012

Share                                    13

**Will Benny**
April 25, 2012

Doin' work.

Share                                    8  5

**Will Benny**
April 16, 2012 via mobile

I have inadvertently walked in on a white trash rally. Sorry to bother you folks, I just need some milk. — at Walmart Dothan - S Oates St.

**Walmart Dothan - S Oates St**
Local Business · Dothan, Alabama

                                    10  3

**Will Benny**
March 24, 2012 via mobile

There are a lot of empty trailer parks right now. — at Toadlick Music Festival.

Share

**Will Benny**
April 14, 2012 near Dothan

When keeping it real goes wrong. — with Jared Bladen and Curtis Stephens.

Sponsored

$5550 Grants for School ·

$5550 In Grants Offered to go Back to School! See if you qualify.

Chat (43)

CARNEY-00086
4/5/2013

(26) Will Benny



**Will Benny** Timeline  2012  **Highlights**

**Will Benny**
August 1, 2012 near Beach

If all these people standing in lines across the country at Chick-Fil
-A would go to the polls on November 6th and vote it would have
a much better and long lasting impact.

24  2

**Will Benny** was at Dockside Cafe.
July 28, 2012

Share                                                                    1

**Will Benny**
August 1, 2012

If all these people standing in lines across the country at Chick-Fil
-A would go to the polls on November 6th and vote it would have
a much better and long lasting impact.

24  2

Jim Holley, Mike Woodside, Jeremy Conner and 21 others like this.

Amber Davis I tried liking this more than once. It is not possible.
However, I concur.
August 1, 2012 at 1:28pm via mobile

**Justin Vann Amen**
August 1, 2012 at 2:13pm

**Will Benny**
July 7, 2012 near Mexico Beach, FL

Dawn Patrol — with David Atwell.

Share                                                                13  2

2012

Now
2012
September
August
July
June
May
April
March
January
2011
2010
2009
Born

Places
2012

**Visited 6 Places**

**Will Benny** was at Donut Hole Bakery Cafe and
5 other places,

See All Stories

Likes
2012

Sponsored
**$5550 Grants for
School**

$5550 In Grants
Offered to go Back to
School! See if you
qualify.

Chat (43)

CARNEY-00087
4/5/2013

í - - RaeMonica Carney



Denny Smith   Home

Linda Grice Holland likes Conservative News's photo.

Waylon Scoggins Hen Emily Scoggins's status.

Shoanette Smith likes Ray Hassell's link.

Deborah Caradine added a new photo to the album PEACE :)).

The Office added a new photo.

Deborah Caradine added a new photo to the album My pics :)).

Shoanette Smith likes Dana Parrish's status.

Tami Smith Hensell likes Sandy Smith's photo.

Amy Jones Sanders likes Jill Stambridge Davis's photo.

Crystal Davis Dawson likes Tonya Locklar's photo.

Jess Danford likes Brove Parrish's status.

Tami McCord Roper Kelsey Bowen Happy Birthday!!

Frank Bissette likes Hack Lily's status.

Russell L. Jones likes Hack Lily's status.

**Timeline**   **About**   **Friends**   **Photos**   **More**

About

Studied Criminal Justice at Columbus Southern University

Lives in Dothan, Alabama

Friends





Photos

More - li

RaeMonica Carney

Happy Cinco de Hayo!!!! — at La Fonda.





The Community Store



LaToya Grubbs Stevens

Wynd R Red Eyed

Lula Escalante



RaeMonica Carney

Good Afternoon FB...Recently I was investigated for violating the Social Media policy of the Police Dept and subsequently suspended for ten (10) days without pay. In accordance with personnel rules and regulations I am entitled to appeal the findings of the investigation and have my case heard before the Personnel Board members. That hearing is open to the general public. I food for an appeal and my hearing is scheduled for Thursday, May 23, 2013 at 1:00 pm in the Salado Room of the Dothan Civic Center. I would love for all of my FB friends, family, and the general public to come and support me as I have not violated any policies. I, along with every citizen, am entitled to the same constitutional right to freedom of speech. The FB posts I made were publicized on Rickey Stokes News and made known to the followers of his news forum. Many of you who know my heart and the person I am will agree that I have done nothing more than exercise my right to freedom of speech and would never do anything to bring discredit upon myself, this city, nor my employer. As the Community Watch and Crime Stoppers Coordinator I have had the opportunity to work with many members of the community. After meeting people they never walk away as strangers, and often times become more than just

Sponsored

Fathers Reason to School
People can get $$$$ in grants to go back to school in 2013! See if you qualify.

NFLPA Rookie Premiere
Day Alabama fan? Play Eddie Lacy when he tries home for the draft.

Island Resort Getaway

13b receive the book's...

Is your church covered?

Best Night Vision Prices

DEFENDANT'S EXHIBIT

Cloyd   12

5/6/2013
CITY OF DOTHAN/CARNEY 001011
CONFIDENTIAL

RaeMonica Carney

...a non-acquaintance, many have become trusted friends. Therefore, I am asking inviting members of the community to come show their support for me and ... Bless Us At...

RaeMonica Carney
Apr 24

Jamaii's birthday was a BLAST!!! And he and a couple of them ended the night at Fun Zone... thanks to the owner for her generous birthday gift. {B [Arlen}



RaeMonica Carney shared RaeMonica Carney's photo.
April 24

HAPPY 12th BIRTHDAY to my young man Jamal Carney!!!...I am inviting all of his friends, classmates, and basketball teammates to my home this Saturday from 2pm until to help us celebrate his special day. Inbox me for the address and directi... See More

HAPPY 12th BIRTHDAY to my young man Jamal Carney!!!...I am inviting all of his friends, classmates, and basketball teammates to my home this Saturday from 2pm until to help us celebrate his special day. Inbox me for the address and directi... See More

Sponsored                    See All

Fathers Return to School
People can get $5000 grants to go back to school in 2013! See if you qualify.

HFLPA Rookie Premiere
Big Alabama fan? First. Told a Lacy when he was tremendously hot plenty for rookie in line!

2,249 people like this page.

Island Resort Getaway!
Escape Reality! Relaxation. Awaits You At Rocks Island Vacation Resort. Book Now!
135 people like this. Hotel Vacation Resort.

Is your church covered?
Insurance carrier...
FREE download Needs & Myths That Put Your Church At Risk and more to win an AL Applicant

Best Night Vision Prices
Gen III Evolution 3 Night Vision. Top of the Line, great deals!

5/6/2013
CITY OF DOTHAN/CARNEY 001012
CONFIDENTIAL

CITY OF DOTHAN/CARNEY 001013
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 001014
CONFIDENTIAL





Search for people, places and things

David Jay  Home

Sponsored
H&R Block At Home
hrblock.com
2011

H&R BLOCK
At home
2009
Get maximum refund, guaranteed. Click here to file free online.

New Cisco® CCNA Program
phoenix.edu

University of Phoenix® now offers Cisco® CCNA certification programs. Learn More.

## RaeMonica Carney

Friends    Message

Program Coordinator for Community Watch Program a...
Studied Criminal Justice at Columbia Southern University
Lives in Dothan, Alabama
Religious Views: Baptist

About

Friends 843    Photos 73    Map 331    Likes 62


3

**Post**   Photo   Gift

Write something...

Post

Activity
Recent

RaeMonica likes Facebook on iOS.
Like · Comment

RaeMonica is now friends with Tiniayah Shipman and 5 other people.

BET IT UP

RaeMonica created BET RAP IT UP.

**RaeMonica Carney**
13 hours ago near Dothan via mobile

"We did not intentionally burn down the cabin." Well did you intentionally call for a fire truck to put out the unintentional burning cabin? I never saw any footage of water being applied to the burning cabin. If they felt someone, whether it was Chris or not, was inside don't they have a lawful duty to preserve the life of others including criminals....ijs

Like · Comment · Share

6 people like this.

 **RaeMonica Carney** CNN Live just played a sound bite from one officer to his dispatch to "Roll fire and stage"
13 hours ago via mobile · Like

**Brandon Lee Bryant** I heard that too.
13 hours ago via mobile · Like

**Brandon Lee Bryant** They literally let the cabin burn to the ground, no water trunks because, ' its too dangerous to go near and to out out'
13 hours ago via mobile · Like · 1

**RaeMonica Carney** No it wasn't...they made the fire engine stage because they never gave the clear for rescue/fire to enter the scene Brandon Lee Bryant
13 hours ago · Like · 1

 **RaeMonica Carney** Did law enforcement burn Barker Ranch where Charles Manson and his followers lay after killing so many people that the true count is still not known...NO!!! Instead he and his band of murderers are still sitting in jail being fed by taxpayers dollars.....but ONE MAN who stands for JUSTICE is, if you believe the news story, burned to charred remains by a group of what are supposed to be enforcers of the law and protectors of life but in my opinion are no more than VIGILANTES WITH A BADGE AND GUN!!! NOT MY BROTHERS IN LAW ENFORCEMENT.
13 hours ago · Like · 2

Shannon Ault Schwab It seems prudent to me to stage fire and rescue

Friends    See All



Photos    See All



Sponsored
H&R Block At Home
hrblock.com

 H&R BLOCK

Your maximum refund, guaranteed. Click here to file free online.

Chat (21)



Search for people, places and things

Likes

David Jay  Home

all personnel in harm's way in a situation like that when an armed
hadRaeMonica Carneyan a Now. with officer. They don't have
bullet proof vests.
12 hours ago via mobile · Like

RaeMonica Carney Shannon Ault Schwab why call for fire after
hearing a single gun shot as they claim from inside the cabin
which led them to believe that he had taken his own life as he said
he was not afraid to die...
12 hours ago · Like

Christopher M Ward EXACTLY! How long we're they there? Isn't
that protocol?
11 hours ago via mobile · Like · 1

Christopher M Ward Not excusing his actions,,,just saying
11 hours ago via mobile · Like · 1

Jim Holley Nobody can judge what happened unless you were
there.
8 hours ago · Like · 1

RaeMonica Carney I agree Jim Holley no one can judge but
everyone is entitled to his/her own opinion...
about an hour ago via mobile · Like · 1

Write a comment...

**RaeMonica Carney**
Tuesday near Dothan via mobile

CNN is playing the audio from the shoot out allegedly btwn
Christopher Dorner and San Bernardino Officers....sounds like
several hundreds of rounds being fired and none from a
semiautomatic weapon...one man can only fire a maximum of
two handguns at one time which would equate to roughly 30
rounds with no magazine exchanges (hard to do with both hands
holding guns)...AND the fire was set from outside the cabin not
inside the cabin....I'm NOT SURPRISED!!! Does this not sound
like slavery times when mobs would burn blacks just because....

Like · Comment · Share

5 people like this.

Rhonda Ardis YES IT DOES!!!!
Tuesday at 11:16pm · Like

Karla C. Mays He was a cop killer, even if they unleashed
gunfire, he killed a Deputy a few hours before, not to mention the
3 lives he took previously... No excuse for this behavior... People are
railroaded everyday, but killing wasn't necessary... Surprised you feel
this way as a member of law enforcement...
Yesterday at 1:42am via mobile · Like · 1

Karla C. Mays Was it racism when the police killed the man in
the bonker who held Ethan? They also gave him an opportunity to
surrender??? There are race issues I am fully cognizant of, but I
don't think this isn't comparable to slavery. This man had a mental
illness and he had no conscious and would take anyone down as he
knew his time/life was running out. I respect your opinion, just
venting as well. It's sad! He could have turned himself in. Those
families will never be the same thanks to him!
Yesterday at 1:45am via mobile · Like

Carl Midkiff I agree Karla. This man was very sick. I cant think
of a single word in the English language that would warrant taking
someones life. I can think of a few that might get your nose
broken...lol...but not killed. Sounds more like an excuse for an
already troubled man. Its a tragedy on so many levels that you cant
really put it in words.
Yesterday at 4:01am · Like · 1

RaeMonica Carney Don't read into my responses to this
TRAGEDY Karla C. Mays...I'm simply highlighting those things that
the media don't seem to find important enough to make mention of.
If the story is going to be told tell ALL OF IT NOT PART OF IT!!! The
media nor LAPD were posting Chistopher Dorner's manifesto when
this all began to be pushed to the public. The only thing that was
said was that he allegedly killed two people with no specifics as to
how or why he was the primary suspect. Then they post that he shot
two LAPD Police Officers but not until last night did they mention the
HORRIBLE CIVIL RIGHTS VIOLATIONS BY THE FEMALE LAPD
OFFICER AND COVERUPS BY SENIOR LAPD OFFICERS AND THEIR
BOARD OF RIGHTS.
INJUSTICE BY ANY NAME, WHETHER IT'S AT THE HANDS OF LAW
ENFORCEMENT OR AT THE HANDS OF THE COMMON CITIZEN, IS

Waiting to
Exhale

Boardwalk
Beach Resort

Kim Smith
FOX 34/

Ezell's Catfish
of

JustFab

My Black is
Beautiful

CNN

Rickey Smiley
Official

Places

See All

10 Recent Places

Hagerstown

RaeMonica Carney was at Washington, DC
and 9 other places

See All Stories

Washington
Arlington

Maryland

bing

Likes
Recently

Likes on iOS

Facebook

Maria Gholston
Tuesday

Some insight that isn't being publicized... thanks RaeMonica
Carney

**Christopher Dorner Manifesto
(Uncensored)**
boywriterjemate.org

Dorner vs. LAPD ( If you have trouble
accessing site, this document is viewable
at the end of  the manifesto) From:

Like · Comment · Share

Cathy Robles likes this.

Write a comment...

RaeMonica Carney
Tuesday near Dothan via mobile

Now
January
2012
2011
2010
2009
2008
1999
Born

Sponsored

H&R Block At
Home
hrblock.com

H&R BLOCK

Your maximum refund,
guaranteed. Click here
to file free online.

Chat (21)

 search for people, places and things

 David Jay   Home

 RaeMonica Carney Labeling someone a cop killer doesn't automatically enforce the right to BURN A MAN TO DEATH WITHOUT DUE PROCESS AFFORDED TO ALL CITIZENS IN THE UNITED STATES CONSTITUTION!!! There were no reports that he came out shooting only that he threw out a smoke grenade. EVERY TIME we encounter ANY PERSON POSING A THREAT we as law enforcement have to be able to use more than just DEADLY FORCE to resolve tense and often times unpredictable situations. IT IS MY OPINION THAT THIS TRAGIC SITUATION TURNED INTO A LYNCHING FOR THE ACCUSED BEFORE HE WAS AFFORDED HIS CONSTITUTIONAL DUE PROCESS RIGHTS!!!
Yesterday at 7:19am via mobile · Like · 3

Gentry Danzey Sr. And that's why I respect you so much as a officer Cpl. Carney. Well said and so true!
Yesterday at 7:57am via mobile · Like · 4

 Karla C. Mays @ Rae, I can see your side and respect your opinion. If anything I could see it all being handled differently, just don't see it immediately as a racial issue. I would definitely need more information on the situation. As a former Mental Health Practitioner, I would immediately say he was a troubled man... He obviously was not in his "right mind" or else he would have sought other alternatives, there is still NO excuse for killing an innocent couple because of their relationship to another officer. I like communicating like this, we all have a right to agree to disagree. My opinion stands that it all could have been handled differently, they may should not have "lynched" him as he "lyched" other innocent people... He was on a mission to kill as many associated as he could, in his own words written in his manifesto... I know racism is alive and kicking in this world, I just don't know if his killing was racially motivated, regarding your initial posts references "slaves!"
23 hours ago via mobile · Like

 Karla C. Mays I am not a law enforcement officer and I truly respect your knowledge as one. I am sure this man was "railroaded" but again, he didn't have to take innocent lives no more than the movie theater shooter... Just saying! He wouldn't have been hunted down like a wild animal had he not been acting like one! He died a coward... If you are big and bad to kill and cause such a fuss and believe you are right, when you are done killing, walk into the closest police precinct, turn yourself in and go through the judicial process... I personally don't consider him and different than Osama Bin Laden!
23 hours ago via mobile · Edited · Like

 RaeMonica Carney Karla C. Mays when you have a chance rent the movie The Great Debaters. If you have seen it, watch it again because it is truly a poweful movie with a powerful message!!! Christopher Dorner said in his manifesto that no other deaths would occur if those people whom he mentioned in it would simply TELL. THE TRUTH which would clear his name...instead they continued to make matters worse by villifying a man whose morals, ethics, and integrity were probably beyond reproach and unquestionable. HE STOOD FOR
23 hours ago · Like

 RaeMonica Carney HE STOOD FOR THE RIGHTS OF OTHERS AND THEN HIMSELF!!!
23 hours ago · Like

 Karla C. Mays I have seen the movie... Nobody died in it????
23 hours ago via mobile · Like

RaeMonica Carney I don't know what movie you watched but someone definitely died in it by hanging then burning and for what reason?
23 hours ago · Like

 Karla C. Mays I hear you, his vigilante attitude should not make it right! The innocent people he killed had nothing to do with how he was treated! The officer's daughter should not have been gunned down. What the hell did she and her fiancé have to do with his history???
23 hours ago via mobile · Like

 RaeMonica Carney I never said it did...although you seem to think I have based on your responses to my posts.
23 hours ago · Like

 RaeMonica Carney You seem to miss the big picture of it all CLEARLY!!!
23 hours ago · Like

 Karla C. Mays Martin Luther King stood for the rights of others and himself, he never killed 1 person and he was treated worst than a wild animal on so many levels, psychologically, mentally and emotionally! Enjoy your day in beautiful Dothan, AL!
23 hours ago via mobile · Like · 1

 Karla C. Mays Wish I was home, we'd finish this conversation up over dinner!
23 hours ago via mobile · Like

UPLIFT: GOD wants to guide you thru this day because He knows how important this season of your life is. So take time to talk things thru with Him! -Hart Ramsey

Like · Comment · Share

4 people like this.

 Write a comment...

 RaeMonica Carney shared Jason Weed's photo.
February 10

I'm so sad today to learn that another great law enforcement officer (retired) from Dothan Police Dept has crossed over from this earthly world to the only place of peace - HEAVEN! May God Bless and Keep the Brackin Family and his extended family of Law Enforcement Officers

RIP 227 Brian Brackin



Like · Comment · Share   2

6 people like this.

 Write a comment...

 RaeMonica Carney
February 9 near Montgomery, AL via mobile

All this media attention about Christopher Dorner allegedly killing two LAPD Officers but no info regarding those deaths makes me wonder if LAPD was trying to permanently silence Christopher Dorner and he took them out first...ijs

Like · Comment · Share

5 people like this.

View 5 more comments

 RaeMonica Carney Marla Marla Drake...I'm not certain but Ray Charles can see there's more to his situation than the media knows and more than LAPD wants the public to know...
Tuesday at 1:34pm via mobile · Like · 2

 Paul Motzenbecker I read his manifesto... if its true LAPD is one screwed up department...
Tuesday at 3:21pm via mobile · Like

RaeMonica Carney Paul Motzenbecker where did u see it...     Chat (21)

Now
January
2012
2011
2010
2009
2008
1999
Born

Sponsored

H&R Block At Home
hrblock.com

 H&R BLOCK

Your maximum refund, guaranteed. Click here to file free online.



Search for people, places and things

Thomas Davis   Find Friends   Hom

Tuesday near Dothan via mobile

UPLIFT: GOD wants to guide you thru this day because He knows how important this season of your life is. So take time to talk things thru with Him! -Hart Ramsey

Like · Comment · Share

4 people like this.

 Write a comment...

---

RaeMonica Carney shared Natasha Thompson Harrison's photo.
February 11

Ms. Dorothy Hollis Roberts passed today at 2:17 pm before I could make it back to Dothan from drill in Montgomery. She was my other grandma whom I loved dearly. She was also friends with my grandma Thelma Carroll who I always said she looks...See More

Rest in Peace Grandma Dorothy



Like · Comment · Share

22 people like this.

View 4 more comments

Receda Floyd Praying for you and your family Hun...
Tuesday at 3:30am via mobile · Like

Anita Smith I'm sorry for your loss... prayers are with you and family!!
Tuesday at 4:26am via mobile · Like

Alfreda H. Rogers Praying for Peace!
Tuesday at 7:50am via mobile · Like

RaeMonica Carney Thanks for everyone's comments...I must correct what I posted about her birthdate...it was January 21st not the 23rd.
Tuesday at 1:13pm · Like

 Write a comment...

---

RaeMonica Carney
February 9 near Montgomery, AL via mobile

All this media attention about Christopher Dorner allegedly killing two LAPD Officers but no info regarding those deaths makes me wonder if LAPD was trying to permanently silence Christopher Dorner and he took them out first...jjs

Like · Comment · Share

5 people like this.

View 5 more comments

RaeMonica Carney Maria Maria Drake...I'm not certain but Ray Charles can see there's more to his situation than the media knows and more than LAPD wants the public to know...
Tuesday at 1:34pm via mobile · Like

Paul Hotzenbecker I read his manifesto... if its true LAPD is one screwed up department...
Tuesday at 3:21pm via mobile · Like

RaeMonica Carney Paul Hotzenbecker where did u see it...
Tuesday at 3:24pm via mobile · Like



---

RaeMonica Carney shared Jason Wendt's photo.
February 10

I'm so sad today to learn that another great law enforcement officer (retired) from Dothan Police Dept has crossed over from this earthly world to the only place of peace - HEAVEN! May God Bless and Keep the Brackin Family and his extended family of Law Enforcement Officers

RIP 277 Brian Brackin



Like · Comment · Share

6 people like this.

 Write a comment...

---

RaeMonica Carney
February 9 near Montgomery, AL via mobile

Thankful for another Military Drill weekend....more time towards retirement...YEAH!!!!

Like · Comment · Share

4 people like this.

Anita Smith Have a good day!!
February 9 at 6:55am via mobile · Like

Write a comment...

---

RaeMonica Carney
February 8 near Montgomery, AL via mobile

At Applebee's trying to get some food for an already upset stomach...pitiful I know...smh

Like · Comment · Share

---

Now
2013
2012
2011
2010
2009
2008
Born

Andy Davis likes Action Target (official)'s status.

Heather Roberts likes Wittenberg University Swimming and Diving's photo.

Joshua Robertson and Duane Traywick are now friends.

Debbie Dwight Mason commented on San Francisco VA Medical Center's photo: "I am proud to be an employee b..."

Debbie Dwight Mason likes San Francisco VA Medical Center's photo.

Debbie Dwight Mason commented on Louise Mason's photo: "Ya Gona is there"

Kevin Tyrrell likes Conservative's photo.

Holly A. Britain commented on Krystin Cornell's post on Holly A. Britain's wall: "Sounds like a plan!! Glad all..."

Kevin Tyrrell likes Who Women Sisterhood's photo.

Kevin Tyrrell likes Deneane Thomsen's photo.

Kevin Tyrrell likes Harleys For Heroes's photo.

Courtney Brantley Carter

Brandon Hark Thompson

Chris Miller

David Vieira

Elsa Pimentel

Holly A. Britain

Lee Helms

Lisa Velasquez

Matt Hubley

Nikki Collier Harrison

Sponsored          See all

Body Sculpting dailyburn.com
SUPER SUCCESS has never been this easy. 100% Free
Karlisia Cox

Carla Smith Davis

Looking for a New Home
abteksi.org
Try a Credit Union. They have great rates on all mortgage products. Fixed and adjustable!

Are You a 49ers Fan?
We've got the hottest SF 49ers gear for less. Save on team jerseys, decor and more!

141,385 people like Footag.

Free Credit Score transunion.com
TransUnion - Honesty, Experience. Relationships

I did NOT vote for Obama.
Join the community of like-minded liberty loving people.

Like · Frank Bissette likes this.

CITY OF DOTHAN/CARNEY 000771
CONFIDENTIAL



Paul Motzenbecker   Search for people, places and things   3 people like this.   Thomas Davis   Find Friends   Hom

RaeMonica Carney   Timeline   Now
(Uncaivaaired)
m.dailyksu.com
After reading this manifesto of the accused cop killer Christopher Dornes, who's...See more

Tuesday at 3:35pm via mobile · Like

Write a comment...

RaeMonica Carney
February 8 near Dothan via mobile

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

6 people like this.

Write a comment...

RaeMonica Carney shared a status.
February 8

We never know what values a person truly has until they stand up, stand firm, and fight for them!!! Like if you stand up, stand firm, and fight for the values you have....I WILL!!!!

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

2 people like this.

Write a comment...

About   Create an Ad   Create a Page   Developers   Careers   Privacy   Cookies   Terms   Help
Facebook © 2013 · English (US)

CITY OF DOTHAN/CARNEY 000770
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000772
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000773
CONFIDENTIAL



RaeMonica Carney
Wednesday at 8:16am · Like

Karla C. Hays Martin Luther King stood for the rights of others and himself, he never killed 1 person and he was treated worst than a wild animal on so many levels, psychologically, mentally and emotionally. Enjoy your day in beautiful Dothan, ALU
Wednesday at 8:36am via mobile · Like

Karla C. Hays Wish I was home, we'd finish this conversation up over dinner!
Wednesday at 8:37am via mobile · Like

RaeMonica Carney The man is VERY INTELLIGENT!!! and I say "it" because until it's proven those are his remains inside the cabin, he may still be alive.
Wednesday at 8:38am · Like · 1

Karla C. Hays I am dying to see how all of this pans out! It is very unfortunate he felt he could not speak to anyone or nobody could reach him. His rambling was truly a sign for a cry for help, he'll anyone who lists Charlie Sheen in their "manifesto" is truly sick and I like Charlie Sheen!
Wednesday at 8:42am via mobile · Like

RaeMonica Carney In order to clearly understand the position this man was pushed into you would have had to have walked in his shoes and experienced the things he experienced or in the very least experienced something very similar to what he was blowing the whistle on. I HAVE!!! Have you?
Wednesday at 8:43am · Like · 2

Karla C. Hays I have to make a little light up this terrible situation to keep from crying! I am truly an advocate for victims, and there are several victims in this situation.... My heart breaks for all...
Wednesday at 8:43am via mobile · Like

RaeMonica Carney I understand how you feel....Sometimes the hardest lessons in life are learned thru death.
Wednesday at 8:47am · Like · 1

Karla C. Hays I remember the movie now, I understand your views now....
Wednesday at 9:53am via mobile · Like

Karla C. Hays RaeMonica, yes I have walked in his shoes before, and I am now happily retired as a result. I used my situation to my advantage....
Wednesday at 9:54am via mobile · Like

RaeMonica Carney You see I think that's where people have misjudged his actions and intentions by referring to them as revenge...it was his way of getting justice for the injustices that he and others suffered at the hands of those people. JUSTICE FOR THE INJUSTICES!
Wednesday at 9:59am · Like · 1

RaeMonica Carney In the movie The The Great Debaters one of the Wyle College Debaters in the debate against Harvard University and stated in his response to the Harvard debater's comment "Nothing that erodes the rule of law can be moral, no matter what name we give it," He replied "St. Augustine said "An unjust law is no law at all..." which means I have a right even a duty to resist with violence or civil disobedience...you should pray I choose the latter.
Wednesday at 10:16am · Like · 1

RaeMonica Carney end quote.
Wednesday at 10:16am · Like

Karla C. Hays I am sad for the families who are having to bury their innocent loved ones. I will never consider him innocent in the matter for killing innocent people...
Wednesday at 10:18am via mobile · Like

Karla C. Hays Time for healing.
Wednesday at 11:06am via mobile · Like

Richard Odom Racism is perpetuated by racism, hence your statement! Only psychopaths write manifestos, read main koran?!
Wednesday at 9:28pm via mobile · Like

RaeMonica Carney I didn't label it a manifesto...LAPD did. I was simply referring to it Richard Odom. I'm not clear which statement you are referring to....care to elaborate
Wednesday at 9:33pm · Like

Write a comment...

RaeMonica Carney shared a link.
Tuesday near Dothan

FB form your own opinion about Christopher Dorner after you read his manifesto at the link below. "For what shall it profit a man, if he shall gain the whole world, and lose his own soul?" (Mark 8:36-37 KJV)

Christopher Dorner Manifesto
(Uncensored)
boywithpride.org

Places
2 Recent Places

RaeMonica Carney was at The Not Dome Complex and 1 other place.

See All Stories

Thomas Davis   Find Friends   Home

Tammy Helms and Krystin Cornell's link.

Now
2013
2012
2011
2010
2009
2008
Born

Andy Davis likes Action Target (official)'s status.

Heather Roberts likes Wittenberg University Swimming and Diving's photo.

Joshua Robertson and Duane Traywick are now friends.

Debbie Dwight Hason commented on San Francisco VA Medical Center's photo: "I am proud to be an employee o..."

Debbie Dwight Hason likes San Francisco VA Medical Center's photo.

Debbie Dwight Hason commented on Louise Hason's photo: "Ya Gina is there"

Kevin Tyrrell likes Conservative's photo.

Holly A. Britain commented on Krystin Cornell's post on Holly A. Britain's wall: "Sounds like a plant! Glad al..."

Kevin Tyrrell likes Wild Woman Sisterhood's photo.

Kevin Tyrrell likes Deneane Thomsen's photo.

Kevin Tyrrell likes Harleys For Heroes's photo.

Courtnee Brantley Carter

Brandon Mark Thompson

Chris Miller

David Vieira

Elsa Pimentel

Holly A. Britain

Lee Nelms

Lisa Velasquez

Matt Hubley

Nikki Collier Harrison

See All

Sponsored

Kids Scuffing Workouts
Body Sculpting dailyburn.com

Burning fat has never been this easy. 100% free with Erin Cox

Carle Smith Davis

Looking for a New Home
sfstcccu.org

Try a Credit Union. They have great rates on all mortgage products. Fixed and adjustable!

Are You a 49ers Fan?
We've got the hottest SF 49ers gear for less. Save on team jerseys, decor and more!

141,385 people like Nextag.

Free Credit Score
transunion.com

TransUnion - Honesty. Experience. Relationships.

I did NOT vote for Obama.
Join the community of like-minded liberty loving people.

Like · Frank Bissette likes this.

CITY OF DOTHAN/CARNEY 000774
CONFIDENTIAL

**facebook** | Search for people, places and things

**RaeMonica Carney**

CNN is playing the audio from the shoot out allegedly btwn Christopher Dorner and San Bernadino Officers...sounds like several hundreds of rounds being fired and none from a semiautomatic weapon...one man can only fire a maximum of two handguns at one time which would equate to roughly 30 rounds with no magazine exchanges (hard to do with both hands holding guns)...AND the fire was set from outside the cabin not inside the cabin...I'm NOT SURPRISED!!! Does this not sound like slavery times when mobs would burn blacks just because....

Like · Comment · Share

7 people like this.

**Rhonda Ardis** YES IT DOES!!!
Tuesday at 11:16pm · Like

**Keia C. Hays** He was a cop killer, even if they unleashed gunfire, he killed a Deputy a few hours prior, not to mention the 3 lives he took previously...he was out for blood as a member of law enforcement...
Wednesday at 1:17am via mobile · Like

**Keia C. Hays** Was it racism when the police killed the man in the border who had killed Ethan? They also gave him an opportunity to surrender??? There are race issues I am fully cognizant of, but I don't think this isn't comparable to slavery. This man had a mental illness and he had no conscious and would take anyone down he knew he was turning out. I respect your opinion, just venting as well. It's sad. He could have turned himself in. Those families will never be the same thanks to him!
Wednesday at 1:45pm via mobile · Like

**Carl Huldiff** I agree Keia. This man was very sick, I cant think of a single word in the English language that would warrant taking someones life. I can think of a few that might get your nose broken...lol...but not killed. Sounds more like an excuse for an already troubled man. Its a tragedy on so many levels that you cant really put it in words.
Wednesday at 4:01am · Like

**RaeMonica Carney** Don't read into my responses to this TRAGEDY Keia C. Hays...I'm simply highlighting those things that the media don't seem to find important enough to make mention of. If the story is going to be told tell ALL OF IT NOT PART OF IT!! The media nor LAPD were posting Christopher Dorner's manifesto when this all began to be pushed to the public. The only thing that was said was that he allegedly killed two people with no specifics as to how or why he was the primary suspect. Then they put that he shot two LAPD Police Officers but not until last night did they mention the HORRIBLE CIVIL RIGHTS VIOLATIONS BY THE FEMALE LAPD OFFICER AND COVERUPS BY SENIOR LAPD OFFICERS AND THEIR BOARD OF RIGHTS. INJUSTICE BY ANY NAME, WHETHER ITS AT THE HANDS OF LAW ENFORCEMENT OR AT THE HANDS OF THE COMMON CITIZEN, IS NO JUSTICE AT ALL!!!
Wednesday at 7:09am via mobile · Like

**RaeMonica Carney** Labeling someone a cop killer doesn't automatically give other law enforcement the right to BURN A MAN TO DEATH WITHOUT DUE PROCESS AFFORDED TO ALL CITIZENS IN THE UNITED STATES CONSTITUTION!!! There were no reports that he came out

Sponsored

Now Earn 25K Points
americanexpress.com
Earn 25K points with the Platinum Card from American Express. Learn More.

Platinum Card® from American Express

English (US) · Privacy · Terms · Cookies · More·




         

CITY OF DOTHAN/CARNEY 000775
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000776
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000777

CONFIDENTIAL



facebook    Search for people, places and things

Karla C. Mays I am dying to see how all of this pans out! It is very unfortunate he felt he could not speak to anyone or nobody could reach him. His rambling was truly a sign for a cry for help, he'd anyone who lets Charlie Sheen in their "manifesto" is truly sick and I like Charli Sheen!
Wednesday at 8:03am · Like · ☍ 1

RaeMonica Carney In order to clearly understand the position this man was pushed into you would have had to have walked in his shoes and experienced the things he experienced or in the very least experienced something very similar to what he was leaving the middle on. I HAVE!! Have you?
Wednesday at 8:43am · Like · ☍ 2

Karla C. Mays I have to make a light up this terrible situation to keep from crying I am truly an advocate for victims, and there are several victims in this situation.. My heart breaks for all...
Wednesday at 8:53am via mobile · Like

RaeMonica Carney I understand how you feel... Sometimes the hardest lessons in life are learned thru death.
Wednesday at 8:57am · Like · ☍ 1

Karla C. Mays I remember the movie too. I understand your views now...
Wednesday at 9:53am via mobile · Like

Karla C. Mays RaeMonica, yes I have walked in his shoes before, and I am now happily retired as a result. I used my situation to my advantage...
Wednesday at 9:53am via mobile · Like

RaeMonica Carney You see I think that's where people have misjudged his actions and reactions by referring to them as revenge...it was his way of getting justice for the injustices that he and others suffered at the hands of these people. JUSTICE FOR THE INJUSTICES!
Wednesday at 9:54am · Like · ☍ 1

RaeMonica Carney In the movie but The The Great Debaters one of the Wyle College Debaters in the debate argued Harvard University and stated in his response to the Harvard debater's comment "Nothing that evaded the rule of law can be moral, no matter what once we pre it," He stated "So, Augustine said "An unjust law is no law at all," which means I have a right even a duty to resist with violence or civil disobedience...you should pray I choose the latter."
Wednesday at 10:14am · Like · ☍ 1

RaeMonica Carney and quote.
Wednesday at 10:14am · Like

Karla C. Mays I am sad for the families who are having to bury that innocent loved ones. I will never consider him innocent in that matter for killing innocent people...
Wednesday at 10:15am via mobile · Like

Karla C. Mays Time for healing.
Wednesday at 11:15am via mobile · Like

Richard Odom Racism is perpetuated by racism, hence your statement! Only psychopaths write manifestos, read mean karma!!
Wednesday at 9:20pm via mobile · Like

RaeMonica Carney I didn't label it a manifesto...LMPD did. I was simply referring to it Richard Odom. I'm not clear which statement you are referring to...care to elaborate
Wednesday at 9:50pm · Like

Write a comment...

CITY OF DOTHAN CARNEY000176
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000779
CONFIDENTIAL



CARNEY 000780
CONFIDENTIAL



facebook    Search for people, places and things

**RaeMonica Carney**
Saturday at 9:16pm near Dothan, AL

Brent Parish, Danny Harold, Jim Holley, Richard Odom, John Riley, those who want to throw stones and hide your hands, and all of my newest FB followers who want to now see what's on my FB page so you can copy what I say here onto other social media sites like Wiregrass Live in your attempts to smear my name in the eye of the public and within the ranks of my coworkers, copy and paste my 7 values. If you're going to repeat what I say repeat all of what I say not part of what I say.

No weapon formed against me shall prosper...

Like · Comment · Share

18 people like this.

Like · Comment · Share

**Virgil K Red Byrd** Freedom of speech
Saturday at 9:18pm via mobile · Like · 2

**Jim Holley** It's IRONIC that you have not mentioned anything about the WHITE man that was killed by the police in Midland City. And I wonder if you would feel the same about Dorner if it was your coworker that he had killed.
Yesterday at 1:42am · Like

**RaeMonica Carney** Jim Holley...Maybe if you had been following me on FB prior to last week then you would not have made this post.
Yesterday at 1:45am via mobile · Edited · Like · 1

**Jim Holley** Would you be defending him if it had been your children?
Yesterday at 1:57am · Like

**RaeMonica Carney** I defend my children and overcome their children when it's necessary.
Yesterday at 2:00 am via mobile · Like · 1

**RaeMonica Carney** If you're not intelligent enough to understand I feel from opposin it's not my duty to show you the difference.
Yesterday at 2:05am via mobile · Like · 2

**Jim Holley** That's not what I ask. Would you be defending Dorner like you are, if he had killed your children or family. It's a simple Question.
Yesterday at 2:09am · Like

**RaeMonica Carney** First off it seems you have formed an assumption about my personal opinion and views are far for me to respond to your assumption would say I'm in agreement with it.
Yesterday at 2:12am via mobile · Edited · Like · 1

**RaeMonica Carney** As I told another FB follower who make assumptions about my posts...Don't read into what I posted.
Yesterday at 2:15am · Like · 1

**Jim Holley** I didn't think you could answer because it would go against what you have been posting.
Yesterday at 2:16am · Like

**RaeMonica Carney** That's where you are mistaken. Like I said before if you had been following me on my page prior to last week then you wouldn't have to ask. After working along side me in...
Yesterday at 2:18am · Like

Sponsored
Leigh Cameron Bryan, Kerri Armstrong-...   See All
Shave and system Darrell like Bob's.

Belly's
Like

Verizon Wireless
Dual Razr HD by Motorola. With a 1080p HD camera, it's here at first sight. http://...

Like This Page

Winter Boots on Gilt™
Save up to 60% on winter footwear. Join now & take your pick from a host of top brands!

Android Tablet ONLY $69
LIMITED TIME OFFER. Google Android Tablet ONLY $69! FREE SHIPPING! Limit one per person.

Jane Elmore HS2-4626 Lisa Hemenrick.

"Crazy Linguistics Video"
pandoranspinach.com
If you don't know Spinach and are age 45+, you'll want to see this video immediately!

Seabaum
Sail to iconic cities and hidden gems. Get set to turn about our award-winning cruises.
Like · Grace Reed likes Seabaum.

Jeff Reed likes Susan Prewitt Smith's photo.
David Sommers likes Terry Barber's photo.
Jodi Head Purnell likes Heather Bass's status.
Deborah Miller Baxley shared George's Chickenland World & friends's photo.
Jeff Reed likes Shannon Bailey's photo.
Cara Smith Lowe commented on Krystin Carnell's status: "I great I can forgive you the..."
Amy Courtney Blackstone ... Satnta Coffee's photos. "That is awesome pic...you fou..."
Cindy Poole Marshall commented on her own status:

Turn on chat to see who's available.





CITY OF DOTHAN/CARNEY000783
CONFIDENTIAL



CITY OF DOTHAN/CARNEY 000784
CONFIDENTIAL



Donsecute. LAPD. If you have trouble
Search for people, places and things

Thomas Davis   Find Friends   Hom

Tammy Helms likes Krystin Cornell's link.

Now
2013
2012
2011
2010
2009
2008
Born

Tuesday near Dothan via mobile

Andy Davis likes Action Target (official)'s status.

Heather Roberts likes Witzenburg University Swimming and Diving's photo.

Joshua Robertson and Duane Traywick are now friends.

UPLIFT: GOD wants to guide you thru this day because He knows how important this season of your life is. So take time to talk things thru with Him! -Hart Ramsey

Like · Comment · Share

4 people like this.

 Write a comment...

 RaeMonica Carney shared Natosha Thompson Harrison's photo.
February 11

Ms. Dorothy Hollis Roberts passed today at 2:17 pm before I could make it back to Dothan from drill in Montgomery. She was my other grandma whom I loved dearly. She was also friends with my grandma Thelma Carroll who I always told she looke...See more

Rest in Peace Grandma Dorothy



Like · Comment · Share

22 people like this.

View 4 more comments

Recada Floyd Praying for you and your family Hun .
Tuesday at 3:30am via mobile · Like · 1

Anita Smith I'm sorry for your loss., prayers are with you and family!!
Tuesday at 4:26am via mobile · Like · 1

Alfreda M. Rogers Praying for Peace!
Tuesday at 7:50am via mobile · Like · 1

RaeMonica Carney Thanks for everyone's comments...I must correct what I posted about her birthdate...it was January 21st not the 23rd.
Tuesday at 1:13pm · Like

Write a comment...

 RaeMonica Carney
February 9 near Montgomery, AL via mobile

All this media attention about Christopher Dorner allegedly killing two LAPD Officers but no info regarding those deaths makes me wonder if LAPD was trying to permanently silence Christopher Dorner and he took them out first...jjs

Like · Comment · Share

5 people like this.

View 5 more comments

 RaeMonica Carney Maria Maria Drake...I'm not certain but Ray Charles can see there's more to his situation than the media knows and more than LAPD wants the public to know...
Tuesday at 1:34pm via mobile · Like · 2

Paul Motzenbecker I read his manifesto.. if its true LAPD is one screwed up department....
Tuesday at 3:21pm via mobile · Like

RaeMonica Carney Paul Motzenbecker where did u see it...
Tuesday at 3:24pm via mobile · Like

RaeMonica Carney shared Jason Wood's photo.
February 10

I'm so sad today to learn that another great law enforcement officer (retired) from Dothan Police Dept has crossed over from this earthly world to the only place of peace - HEAVEN! May God Bless and Keep the Brackin Family and his extended family of Law Enforcement Officers

RIP 227 Brian Brackin



Like · Comment · Share

6 people like this.

 Write a comment...

RaeMonica Carney
February 9 near Montgomery, AL via mobile

Thankful for another Military Drill weekend....more time towards retirement...YEAH!!!!

Like · Comment · Share

4 people like this.

Anita Smith Have a good day!!
February 9 at 6:55am via mobile · Like

Write a comment...

 RaeMonica Carney
February 8 near Montgomery, AL via mobile

At Applebee's trying to get some food for an already upset stomach...pitiful I know...smh

Like · Comment · Share

Debbie Dwight Mason commented on San Francisco VA Medical Center's photo: "I am proud to be an employee o..."

Debbie Dwight Mason likes San Francisco VA Medical Center's photo.

Debbie Dwight Mason commented on Louise Mason's photo: "Yo Gma is there"

Kevin Tyrrell likes Conservative's photo.

Holly A. Britain commented on Krystin Cornell's post on Holly A. Britain's wall: "Sounds like a plan!! Glad all..."

Kevin Tyrrell likes Wild Woman Sisterhood's photo.

Kevin Tyrrell likes Deneane Thomsen's photo.

Kevin Tyrrell likes Harleys For Heroes's photo.

Courtney Brantley Carlex

Brandon Mark Thompson

Chris Miller

David Vieira

Elsa Pimentel

Holly A. Britain

Lee Helms

Lisa Velasquez

Hadi Hubley

Nikki Collier Harrison

Sponsored                                    See All

Body Sculpting Workouts
dailyburn.com

 Wick Sporting Workouts

Weight loss has never been this easy. 100% Free
Carla Smith Davis

Looking for a New Home
atatelco.org

Try a Credit Union. They have great rates on all mortgage products. Fixed and adjustable!

Are You a 49ers Fan?

We've got the hottest SF 49ers gear for less. Save on team jerseys, decor and more!

141,385 people like Nestag.

Free Credit Score
transunion.com

TransUnion - Honesty, Experience, Relationships

I did NOT vote for Obama.

 Join the community of like-minded liberty loving people.

Like · Frank Bissette likes this...

2/15/2013
CITY OF DOTHAN/CARNEY 000624
CONFIDENTIAL

Paul Motzenbecker
Search for people, places and things
3 people like this.
Thomas Davis Find Friends Home

Manifesto-Uncensored
RaeMonica Carney Timeline Now
Daily Kos :: Christopher Dorner Manifesto (Uncensored)
m.dailykos.com
After reading this manifesto of the accused cop killer Christopher Dorner, who's... See More

Tuesday at 3:35pm via mobile · Like

Write a comment...

RaeMonica Carney
February 8 near Dothan via mobile

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

6 people like this.

Write a comment...

Karla C. Mays Applebee's, yucky! : )
February 8 at 8:44pm via mobile · Like
Add Friend Follow

Write a comment...

RaeMonica Carney shared a status.
February 8

We never know what values a person truly has until they stand up, stand firm, and fight for them!!! Like if you will stand up, stand firm, and fight for the values you have....I WILL!!!!

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

2 people like this.

Write a comment...

Now
2013
2012
2011
2010
2009
2008
Born

Tammy Helms likes Krystin Cornell's link.

Andy Davis likes Action Target (official)'s status.

Heather Roberts likes Wittenberg University Swimming and Diving's photo.

Joshua Robertson and Duane Traywick are now friends.

Debbie Dwight Mason commented on San Francisco VA Medical Center's photo: "I am proud to be an employee o..."

Debbie Dwight Mason likes San Francisco VA Medical Center's photo.

Debbie Dwight Mason commented on Louise Mason's photo: "Ya Gma is there"

Kevin Tyrrell likes Conservative's photo.

Holly A. Britain commented on Krystin Cornell's post on Holly A. Britain's wall: "Sounds like a plan!! Glad all..."

Kevin Tyrrell likes Wild Woman Sisterhood's photo.

Kevin Tyrrell likes Deneane Thomsen's photo.

Kevin Tyrrell likes Harleys For Heroes's photo.

Courtney Brantley Carter
Brandon Mark Thompson
Chris Miller
David Vieira
Elsa Pimentel
Holly A. Britain
Lee Nelms
Lisa Velasquez
Matt Hubley
Nikki Collier Harrison
Rick Sporring
Rusty Wells
Whitten Cox
Karla Smith Davis

Sponsored See All
Body Sculpt Workouts
dailyburn.com
Weight loss has never been this easy. 100% Free

Looking for a New Home
alatelco.org
Try a Credit Union. They have great rates on all mortgage products. Fixed and adjustable!

Are You a 49ers Fan?
We've got the hottest SF 49ers gear for less. Save on team jerseys, decor and more!
141,385 people like Nextag.

Free Credit Score
transunion.com
TransUnion - Honesty. Experience. Relationships

I did NOT vote for Obama.
Join the community of like-minded liberty loving people.
Like · Frank Bissette likes this.

Search

About Create an Ad Create a Page Developers Careers Privacy Cookies Terms Help
Facebook © 2013 · English (US)



All this media attention about Christopher Dorner allegedly killing two LAPD Officers but no info regarding those figures makes me wonder if LAPD was trying to permanently silence Christopher Dorner and he took them out first...ljs

Like · Comment · Share

5 people like this.

View 5 more comments

RaeMonica Carney Marla Marla Drake...I'm not certain but Ray Charles can see there's more to his situation than the media knows and more than LAPD wants the public to know...
Tuesday at 1:34pm via mobile · Like · 2

Paul Motzenbecker I read his manifesto.. It's true LAPD is one screwed up department...
Tuesday at 3:21pm via mobile · Like

RaeMonica Carney Paul Motzenbecker where did u see it...
Tuesday at 3:24pm via mobile · Like

Paul Motzenbecker
http://m.dailykos.com/story/2013/02/09/1185809/-Christopher-Dorner-Manifesto-Uncensored

Daily Kos :: Christopher Dorner Manifesto (Uncensored)
m.dailykos.com
After reading this manifesto of the accused cop killer Christopher Dorner, who's...See more
Tuesday at 3:35pm via mobile · Like

Write a comment...

RaeMonica Carney
February 8 near Dothan via mobile

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

6 people like this.

Write a comment...

See More Recent Stories

February 9 near Montgomery, AL via mobile
Thomas Davis  Find Friends  Hom

Thankful for another Military Drill weekend....more time towards retirement...YEAH!!!!

Like · Comment · Share

4 people like this.

Anita Smith Have a good day!!
February 9 at 6:55am via mobile · Like

Write a comment...

RaeMonica Carney
February 8 near Montgomery, AL via mobile

At Applebee's trying to get some food for an already upset stomach...pitiful I know...smh

Like · Comment · Share

3 people like this.

Karla C. Mays Applebee's, yucky! : )
February 8 at 8:44pm via mobile · Like

Write a comment...

RaeMonica Carney shared a status.
February 8

We never know what values a person truly has until they stand up, stand firm, and fight for them!! Like if you will stand up, stand firm, and fight for the values you have....I WILL!!!

When a person is pushed to the point where they begin to destroy EVERYTHING that once was held in the HIGHEST ESTEEM and EVERYONE who should have stood for what was RIGHT, the one thing they were ready to give up is the only thing they feel taking out will be the solution to restoring the name, respect, and honor that he was revered for: HUMAN LIFE!!!

Like · Comment · Share

2 people like this.

Write a comment...

Now  2013  2012  2011  2010  2009  2008  Born

Andy Davis likes Action Target (official)'s status.

Heather Roberts likes Wittenberg University Swimming and Diving's photo.

Joshua Robertson and Duane Traywick are now friends.

Debbie Dwight Mason commented on San Francisco VA Medical Center's photo: "I am proud to be an employee o..."

Debbie Dwight Mason likes San Francisco VA Medical Center's photo.

Debbie Dwight Mason commented on Louise Mason's photo: "Ya Gma is there"

Kevin Tyrrell likes Conservative's photo.

Holly A. Britain commented on Krystin Cornell's post on Holly A. Britain's wall: "Sounds like a plan! Glad all..."

Kevin Tyrrell likes Wild Woman Sisterhood's photo.

Kevin Tyrrell likes Deneens Thomsen's photo.

Kevin Tyrrell likes Harleys For Heroes's photo.

Courtney Brantley Carter commented on her own photo: "thanks cousin Lee, he doesn't..."

Brandon Mark Thompson
Chris Miller
David Vieira
Elsa Pimentel
Jason Arnette
Jess Danford
Lee Nelms
Lisa Velasquez
Matt Hobley    See All

Sponsored
TurboTax
turbojax.intuit...
TurboTax Federal Free Edition Free to prepare, print and e-file. Start now
Shannon Cox

Zaxby's
Starla Smith Davis
You're only a click away from a boneless Wings Meal.
Holly A. Britain

Like · Jason Arnette likes this.

Earn 3.00% APY at ATCU
alatcu.org
Earn 3% Annual Percentage Yield on Castdlife Savings at Alabama Telco Credit Union. See our website for terms and disclosures.

Shocking Joint Relief
everydaylifestyles.com
Cambridge researchers have unlocked the secret to joint relief...

SF 49ers Fanatics
Like This If You Are A Niners Fanatic!

Like · Yvette Sloan likes this.

2/15/2013
CITY OF DOTHAN/CARNEY 000626
CONFIDENTIAL

KaeIMonica Carney                                                     Page 3 of 5



CITY OF DOTHAN/CARNEY 000970
CONFIDENTIAL

Case 1:14-cv-00392-WKW-WC   Document 44-1   Filed 07/17/15   Page 309 of 319

Dothan Police officer angers other officers and myself - WiregrassLive!                    Page 1 of 1

## Dothan Police officer angers other officers and myself

**Emily Hays #1**

Posted Yesterday, 10:59 PM

Something has Dothan's finest embarrassed and mad as hell today. I know a lot of police officers in Dothan, and I've heard some disturbing news today from several of them. It has to do with one that I don't know, Cpl. Raemonica Carney and her Facebook Page that's open to the public. I read her posts and I think you should too, if you haven't already. As a citizen, I'm outraged. She has been posting negative comments about the manhunt and subsequent killing of the Los Angeles ex-cop-turned-killer, Christopher Dorner. Cpl. Carney's remarks reflect negatively not only on law enforcement as a whole, but on the entire Dothan Police Department of which she is a member. She cited that she was familiar with the manifesto that the fired officer wrote and has apparently based her opinion solely upon that writing without regard to other facts in the case, which is still under investigation. She refers to the tragic ending in this case as sounding " like slavery times when mobs would burn blacks just because....". She goes on to say, referring to one of Dorner's murder victims, as being a part of "[HORRIBLE] THE RIGHTS VIOLATORS BY THE DEADLY LAW [OFFICERS ARE] WHO [IS BY ODD] SLAVE [OFFICERS ARE THEIR] BAND OUR RIGHTS, REGISTER, BY ANY NAME, WHO THERE'S AT THE HANDS [OF LAW ENF] de EMPLOY OF AT THE HANDS OF THE CRIME OF THEIR, IS DO [JUSTICE AT ALL]" Her remarks are racial, offensive, unprofessional and out of line for a law enforcement officer. At a time when she should be keeping her opinion to herself until an investigation is completed, she chose to slander dead victims and senior officers within a police department that exists 1900 miles from Dothan. She obviously has little or no respect for the very badge which she dons if she chooses to side with a suspected murderer who lives on the other side of the Country, drawing her information from pure conjecture; a paper written by a man on the edge and accepting it as gospel. Does Chief Benton condone this type of conduct from his officers? Or does the fact that Cpl. Carney has close ties to the NAACP give her the right to espouse such disgusting bias that that would embarrass every professional law enforcement officer in the United States without fear of retribution?

Emily Hays

Dothan, AL

**styrofoam boots #2**

Posted Yesterday, 10:15 PM

link?

**Always L8 #3**

Posted Yesterday, 10:33 PM

My link (http://www.facebook.com/raecarney?ref=ts&fref=ts)

**DebbieT #4**

Posted Today, 07:04 AM

CITY OF DOTHAN/CARNEY 000785 CONFIDENTIAL

Case 1:14-cv-00392-WKW-WC   Document 44-1   Filed 07/17/15   Page 310 of 319

Dothan Police officer angers other officers and myself - WiregrassLive!                    Page 1 of 3

2   3   —   List •

## Dothan Police officer angers other officers and myself

**Emily Hays #1**

Posted by February 2013 - 11:00 PM

Something has Dothan's finest embarrassed and mad as hell today. I know a lot of police officers in Dothan, and I've heard some disturbing news today from several of them. It has to do with one that I don't know, Cpl. Raemonica Carney and her Facebook Page that's open to the public. I read her posts and I think you should too, if you haven't already. As a citizen, I'm outraged. She has been posting negative comments about the manhunt and subsequent killing of the Los Angeles ex-cop-turned-killer, Christopher Dorner. Cpl. Carney's remarks reflect negatively not only on law enforcement as a whole, but on the entire Dothan Police Department of which she is a member. She cited that she was familiar with the manifesto that the fired officer wrote and has apparently based her opinion solely upon that writing without regard to other facts in the case, which is still under investigation. She refers to the tragic ending in this case as sounding " like slavery times when mobs would burn blacks just because....". She goes on to say, referring to one of Dorner's murder victims, as being a part of "IT SHOULD CIVIL RIGHTS VIOLATIONS BY THE FEMALE LAPD OFFICER AND SAYS EPIS BY SENIOR LAPD OFFICERS AND THEIR DISREGARD TO RIGHTS, REGISTRY BY ANY NAME, WHETHER ITS AT THE HANDS OF LAW ENFORCEMENT OR AT THE HANDS OF THE SAME OF CITIZENS, IS NOT JUSTIFY AT ALL." Her remarks are racial, offensive, unprofessional and out of line for a law enforcement officer. At a time when she should be keeping her opinion to herself until an investigation is completed, she chose to slander dead victims and senior officers within a police department that exists 1900 miles from Dothan. She obviously has little or no respect for the very badge which she dons if she chooses to side with a suspected murderer who lives on the other side of the Country, drawing her information from pure conjecture; a paper written by a man on the edge and accepting it as gospel. Does Chief Benton condone this type of conduct from his officers? Or does the fact that Cpl. Carney has close ties to the NAACP give her the right to espouse such disgusting bias that that would embarrass every professional law enforcement officer in the United States without fear of retribution?

Emily Hays

Dothan, AL

---

**styrofoam boots #2**

Posted by February 2013 - 11:44 PM

link?

---

**oldvet #3**

Posted by February 2013 - 11:17 PM

My link (https://www.facebook.com/#!/rsecarney)

---

**styrofoam boots #4**

Posted by February 2013 - 11:50 PM

i'm going to send her a friend request and maybe get the whole scoop, but it sounds to me like a case of someone excercising the 1st amendment, and emily hays being in shock about it.

---

**jessikat3184 #5**

Posted by February 2013 - 11:52 PM

I don't have Facebook, so I can't see what this woman said. But, that is her opinion. Although, I do agree that people need to be careful what they place on social media, I also think that the public can take it too far sometimes as to thinking we have a right to tell this woman how to feel or what opinions to have. I am in no way taking up for her opinions, but do we not have the right to free speech? It's danged if you do, and danged if you don't. You don't want someone to be able to speak freely, but when that right gets taken away, you'll be b\*\*ching then too. 😊

---

**Emily Hays #6**

Posted by February 2013 - 11:57 PM

CITY OF DOTHAN/CARNEY 000786
CONFIDENTIAL

Case 1:14-cv-00392-WKW-WC  Document 44-1  Filed 07/17/15  Page 311 of 319

Dothan Police officer angers other officers and myself - WiregrassLive!       Page 2 of 3

https://www.facebook...ecarney?fref=ts (https://www.facebook.com/raecarney?fref=ts)

---

**CodeMonkey #7**                                                                    Posted 14 February 2013 - 06:24 AM

I have less respect for those who "support" Dorner. But she does have the right to believe those things and to speak loudly about them.

IMO, Dorner was a fired employee and his actions were based on nothing more than revenge.

---

**vet #8**                                                                           Posted 14 February 2013 - 07:10 AM

I didn't see anything on her Facebook page that wasn't factual. Also, I didn't read any negative comments about Dothan police. Please enlighten me if I have failed to miss the point.

---

**Retired Special Agent #9**                                                         Posted 14 February 2013 - 07:37 AM

I guess its a good thing she did not say anything bad about John Powell or there would have been a IA investigation.

---

**Crabtrap #10**                                                                     Posted 14 February 2013 - 07:38 AM

why does the OP go on to call out chief benton.,, that's low budget,....

---

**Crabtrap #11**                                                                     Posted 14 February 2013 - 07:43 AM

 (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=3487783).
Retired Special Agent, on 14 February 2013 - 07:37 AM, said:
I guess its a good thing she did not say anything bad about John Powell or there would have been a IA investigation.

boooo,..

---

**TFSole' #12**                                                                      Posted 14 February 2013 - 08:10 AM

low budget.....lol.

---

**DanDeLion #13**                                                                    Posted 14 February 2013 - 09:09 AM

I am glad she feels free to excercise her right to free speech, even if we might not all like what she says or agree with her, remember we are supposed to be living in a free country, aside from that her comments are not exactly public, her facebook is private for people she has added as friends.

---

**Crabtrap #14**                                                                     Posted 14 February 2013 - 10:10 AM

that is not true unless that was done in the past hour,..

---

**CC Dollar #15**                                                                    Posted 14 February 2013 - 10:19 AM

and you people griping about emily posting this need to sit down and realize emily can speak her mind just as carney is speaking hers......free speech works several ways... 😊

---

**Crabtrap #16**

CITY OF DOTHAN/CARNEY 090787
CONFIDENTIAL

— 1 **2** 3 4 —

## Dothan Police officer angers other officers and myself

**Emily Hays #21**

Posted 14 February 2013 - 06:25 PM

You are all missing the point. As a police officer, she is held to higher standards. I also agree that people have their right to free speech, however to comparing this situation to "burning blacks just because" seems a little outlandish and also a tad bit racist. She is representing the people who are supposed to protect us from harm, yet she cries out that civil rights are being violating and dissing other cops who are supposed to be her brothers. I cant imagine why this is all going over your heads. I've had enough with the slavery/civil rights crap continued to be thrown around constantly. Yes that era sucked. Yes some of it still exists in this world, but the bottom line is that he killed people! Quit making everything out to be about racism. Its sooooo old. She needs to be removed as an officer. This email is not the only time she has caused an issue in the DPD. Do your homework people!! Google is a marvelous tool for information.

**dothanfrogman #22**

Posted 14 February 2013 - 06:33 PM

She has always played the race card.

**firealtor #23**

Posted 14 February 2013 - 06:41 PM

I know Mrs. Carney is entitled to her opinion. I do not see where she is coming from AT ALL!

**styrofoam boots #24**

Posted 14 February 2013 - 06:45 PM

emily, nothing is going over anybodys head, what are you doing about it other than melting on the wgl, and what do you want us to do about it? we're not your personal army, and i'm pretty sure that she can't be fired for saying what she said.

**Emily Hays #25**

Posted 14 February 2013 - 06:49 PM

I'm quite aware of that. All you have to do is Google her name, and it pulls up her past issues with DPD and a past chief. Obviously this post went right over everyone's heads and they do not see the importance of her uncalled comments as an officer of the law.

**dothanfrogman #26**

Posted 14 February 2013 - 06:51 PM

No. We see it. But they are not going to do anything.

**CodeMonkey #27**

Posted 14 February 2013 - 07:11 PM

(http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=348917)
Emily Hays, on 14 February 2013 - 06:49 PM, said:
I'm quite aware of that. All you have to do is Google her name, and it pulls up her past issues with DPD and a past chief. Obviously this post went right over everyone's heads and they do not see the importance of her uncalled comments as an officer of the law.

Did she make the post on city time or with city equipment, or did she present said opinion as that of the city? If not, then you are overreacting. If you want to set a precedent of firing racists because they are racist, then there will be a lot higher unemployment in the area.

**Crabtrap #28**

Posted 14 February 2013 - 07:52 PM

surely there aren't any racist in dothan,,,,

---

**jessikat3184 #29**

Posted 14 February 2013 - 08:24 PM

I agree with boots. In no way, shape, form, or fashion do I agree with what this woman has said, but I can't do anything about it. And just because someone is a police officer doesn't mean they all are going to have the same opinions. If we can be fired for saying or typing our opinions on our own personal time, we are diving into a dangerous slippery slope. Which is probably where we are headed as far as free speech goes. If she didn't say anything about her own department or city she works for, and was on her personal time... Then okay. I did google her like you suggested and read about her complaint in 2009, but you still cannot tell the woman or anyone else what kind of an opinion to have. Even if it is a crappy opinion.

---

**Vettman1 #30**

Posted 14 February 2013 - 11:49 PM

Wgl members won't have to do anything. I certainly hope she never needs back up. I assure you other members of the dept. will allow her plenty of time to think and reflect on her comments. This I am most certain.

---

**Crabtrap #31**

Posted 15 February 2013 - 07:12 AM

well then that would be 100 times more unprofessional than posting a stupid opinion on the Internet,,,

---

**Crabtrap #32**

Posted 15 February 2013 - 07:26 AM

you were just kidding right?,,,

---

**CC Dollar #33**

Posted 15 February 2013 - 09:27 AM

↳ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=348976)
Vettman1, on 14 February 2013 - 11:49 PM, said:
Wgl members won't have to do anything. I certainly hope she never needs back up. I assure you other members of the dept. will allow her plenty of time to think and reflect on her comments. This I am most certain.

i'd never believe any current dpd officer would not back her up if the situation were to arise....no matter what her beliefs might be.....i think our folks are a little more professional than that....

---

**Crabtrap #34**

Posted 15 February 2013 - 10:15 AM

same here,,,that could cost the city millions

---

**musikman72 #35**

Posted 15 February 2013 - 10:37 AM

Freedom of speech and opinions...we are entitled to both.

---

**CC Dollar #36**

Posted 15 February 2013 - 10:44 AM

might be... but many times there is a price to pay... just sayin...

---

**Aletheia #37**

Posted 15 February 2013 - 10:58 AM

CONFIDENTIAL

What would have happened if this officer where white and said that the only reason OJ got off was because he was black and the jury was black and then the officer lamented about the days when folks burned blacks who killed white people"?

Would the DPD have been in a position to discipline that person?

---

**Harry Potter #38**

Posted 15 February 2013 - 02:54 PM

↳ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349033) Aletheia, on 15 February 2013 - 10:58 AM, said:

What would have happened if this officer where white and said that the only reason OJ got off was because he was black and the jury was black and then the officer lamented about the days when folks burned blacks who killed white people"?

Would the DPD have been in a position to discipline that person?

They absolutely would discipline a white officer.
Some of the officers were forced to resign from the Sons of Confederate Veterans a few years ago because the black officers complained.

---

**leonidas #39**

Posted 15 February 2013 - 05:23 PM

You guys are looking at this all backwards.

The problem is whether the other officers have faith that an officer who would make statements like this will back them up when the poo hits the fan.

I will guarantee that there is not an officer in DPD or a Deputy in Houston County or any other local municipality that would not back her up because of any beliefs, stated or otherwise. Period. If it were ever so, that officer would have to face a reckoning from the collective.

---

**Vettman1 #40**

Posted 15 February 2013 - 10:24 PM

Yes I do believe they would back her up. Just not sure how quickly they may get there.

---

← 1 2 3 4 →

KENNON-SMITH/GARNEY 004780
CONFIDENTIAL

- 1 2 **3** 4 →

## Dothan Police officer angers other officers and myself

**catfish #41**

Posted 15 February 2013 - 10:33 PM

Heck one officer got in trouble because he wrote a letter to Powell on his own time. Oh he was white.

---

**catfish #42**

Posted 15 February 2013 - 10:37 PM

I only said he was white because of the race card being used. I don't care what color you are if u do something wrong you should do the time if you kill some one it doesn't matter what color the killer is murder is murder. So stop bring in the race card

---

**styrofoam boots #43**

Posted 15 February 2013 - 11:07 PM

⤳ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349177)
catfish, on 15 February 2013 - 10:33 PM, said:
Heck one officer got in trouble because he wrote a letter to Powell on his own time. Oh he was white

prove it.

---

**Crabtrap #44**

Posted 15 February 2013 - 11:43 PM

(http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349175)
Vettmant, on 15 February 2013 - 10:24 PM, said:
Yes I do believe they would back her up. Just not sure how quickly they may get there.

well earlier you assured and were most certain now you are not sure,,,which is it?,,,

---

**Anonymous #45**

Posted 16 February 2013 - 06:49 AM

⤳ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349177)
catfish, on 15 February 2013 - 10:33 PM, said:
Heck one officer got in trouble because he wrote a letter to Powell on his own time. Oh he was white

wasn't he also a member of the Confederates that went around threatening the black folks? And also the one who did various other things he got in trouble for? I wish I knew why you and your brother are so protective of him because it really makes me wonder about some things. He may have been white but he was dirty white. JMHO.

---

**JMCfan #46**

Posted 16 February 2013 - 07:25 AM

I agree with CCDollar.... dont faint........Not all the DPD may like each other but you better believe they'll back each other up in a heart beat I have heard she was racist from other officers but I don't know her and can't say that for myself. However I believe if she needed help she would be backed. Chief Benton would not put up with not backing fellow officers.

---

**housewife #47**

Posted 16 February 2013 - 07:29 AM

I sure hope you and CCS are right Girlie 😉

---

**housewife #48**

CONFIDENTIAL

Well of course she would be backed up. All of these comments posted by you and others wondering about it are based on one stupid comment by vettman1 who doesn't know what in the hell he's talking about. "Emily Hays" is the one with the problem here. Nobody else. If a police officer didn't help another officer in a dangerous situation he wouldn't be an officer for very long. Vettman1s stupid comment is based on nothing more than a fantasy in his own mind.

**Emily Hays #57**

Posted Yesterday, 07:13 AM

You people just don't get it....STILL. I never questioned her ability as a police officer. That WAS never the point of this post. If you have an employee who works for Toyota/Ford/Kia/Whatever lot and they announce that no one should come by a car from these places and they should go elsewhere...well, more than likely, when word gets back to the manager/owner of those dealerships, that person will have consequences. I DO support our first amendment rights, but do I have a **SERIOUS** problem with a Dothan Police Officer suggesting this is just like when they used to burn blacks "just because" and also throwing the words slavery and Civil Rights around over this situation. It's obvious she still has some hatred in her heart about the mistreatment of black people from that time. **You can't, as an official employed by the city, go out and announce your opinions when it comes to such sensitive matters. It reflects badly on her and not to mention the WHOLE Police Department!!!** Obviously, with most of the posts I've read in response to my original one, you are all clueless with the exception of a few who seem to "get it." This will be my last post as I refuse to try and have intelligent discussions with people who will never see the truth until they have taken off their rose-colored spectacles.

**CodeMonkey #58**

Posted Yesterday, 07:42 AM

(http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349313)
Emily Hays, on 17 February 2013 - 07:13 AM, said:
You people just don't get it....STILL. I never questioned her ability as a police officer. That WAS never the point of this post. If you have an employee who works for Toyota/Ford/Kia/Whatever lot and they announce that no one should come by a car from these places and they should go elsewhere...well, more than likely, when word gets back to the manager/owner of those dealerships, that person will have consequences. I DO support our first amendment rights, but do I have a **SERIOUS** problem with a Dothan Police Officer suggesting this is just like when they used to burn blacks "just because" and also throwing the words slavery and Civil Rights around over this situation. It's obvious she still has some hatred in her heart about the mistreatment of black people from that time. **You can't, as an official employed by the city, go out and announce your opinions when it comes to such sensitive matters. It reflects badly on her and not to mention the WHOLE Police Department!!!** Obviously, with most of the posts I've read in response to my original one, you are all clueless with the exception of a few who seem to "get it." This will be my last post as I refuse to try and have intelligent discussions with people who will never see the truth until they have taken off their rose-colored spectacles.

What exactly is the relationship between the LAPD (the folks I presume she was criticizing) and the DPD?

You sound sanctimonious, and that does nothing good for the image of the people you are attempting to "defend".

**JMCfan #59**

Posted Yesterday, 07:54 AM

I saw several post this morning all over Facebook regarding this topic and what Emily is saying. They actually are agreeing with Emily and aren't happy what was said by the officer. This my last post on thus issue due to one its none of my business and two I haven't been to officers page to read and don't care too

**Emily Hays #60**

Posted Yesterday, 07:42 AM

You never speak badly of other cops publicly before you know the facts. Even then, you STILL do not speak badly of them to the public. You make sure your statement is professional. But, **once again**, this is not the issue. She is throwing racial slurs. THAT is the issue and is an embarrassment. The End.

— 1 2 **3** 4 —

CONFIDENTIAL

First  —  2  3  4

## Dothan Police officer angers other officers and myself

**Postasaurus #61**

Posted Yesterday, 07:58 AM

→ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349317)
Emily Hays, on 17 February 2013 - 07:42 AM, said:

You never speak badly of other cops publicly before you know the facts. Even then, you STILL do not speak badly of them to the public. You make sure your statement is professional. But, once again, this is not the issue. She is throwing racial slurs. THAT is the issue and is an embarrassment. The End.

Emily I'm going to address your other post and also this one. I posted to this topic because it got off on will-she-or-will-she-not be backed up by fellow officers. Of course she will. That's a stupid assumption on anyone's part and an especially stupid post by vettman1 stating as a fact she would not. I agree that officers should not speak badly of other officers. WITH OR WITHOUT FACTS. You seem to think its ok if you have facts? And off this topic do you think its ok to talk about poisoning someone with cyanide on a facebook page whether you are joking or not? I happen to think its not ok. If you are the same Emily Hays I think you are you are way off base with some of your comments here AND other places and if you have a problem with DPD then you need to GO to DPD and voice it in person and privately the RIGHT WAY.

Other poster JMCfan you are right this is none of your business.

I hope Emily Hays will voice her complaint the RIGHT WAY and that this thread can peacefully die. my only 'beef' was the stupid comments about backing up the officer and that Emily Hays chose to voice her opinion on the internet instead of just going to DPD. I figure she wouldn't be taken seriously at DPD so that's probably why she did this. Unlike the ones that say its their last post, this really is my last because I don't really give a damn what you all talk about here since none of you even are close to knowing what you ARE talking about.

---

**Emily Hays #62**

Posted Yesterday, 08:10 AM

I have contacted the DPD and spoken with them about this and they are AWARE of all posts on Wiregrasslive. Get your facts straight. And as far as my facebook page goes, let me know when you see me talking about KKK and burning people just because. I make jokes to make people smile when they've had a bad day. And furthermore, I don't have to explain them to you or anyone else. You say you think you know me, well apparently you don't. If you did, you would know it's in my nature to post ridiculous comments every day. Good day, Sir.

→ (http://www.forums.wiregrasslive.com/index.php?app=forums&module=forums&section=findpost&pid=349319)
Postasaurus, on 17 February 2013 - 07:58 AM, said:

Emily I'm going to address your other post and also this one. I posted to this topic because it got off on will-she-or-will-she-not be backed up by fellow officers. Of course she will. That's a stupid assumption on anyone's part and an especially stupid post by vettman1 stating as a fact she would not. I agree that officers should not speak badly of other officers. WITH OR WITHOUT FACTS. You seem to think its ok if you have facts? And off this topic do you think its ok to talk about poisoning someone with cyanide on a facebook page whether you are joking or not? I happen to think its not ok. If you are the same Emily Hays I think you are you are way off base with some of your comments here AND other places and if you have a problem with DPD then you need to GO to DPD and voice it in person and privately the RIGHT WAY.

Other poster JMCfan you are right this is none of your business.

I hope Emily Hays will voice her complaint the RIGHT WAY and that this thread can peacefully die. my only 'beef' was the stupid comments about backing up the officer and that Emily Hays chose to voice her opinion on the internet instead of just going to DPD. I figure she wouldn't be taken seriously at DPD so that's probably why she did this. Unlike the ones that say its their last post, this really is my last because I don't really give a damn what you all talk about here since none of you even are close to knowing what you ARE talking about.

CONFIDENTIAL

**valleygirl #63**

The question may be, Will SHE back THEM up?

---

**Crabtrap #64**

Posted Yesterday, 09:35 AM

Facebook is stupid,,,

---

**notconcerned #65**

Posted Yesterday, 10:50 AM

WWRMD
What Would Roger Murtaugh Do

---

**Concerned Citizen #66**

Posted Yesterday, 05:02 PM

The Dorner incident reminds me of the manhunt for Robert Jay Matthews in 1984. Matthews was a member of the Order, which was a white separatist group that was involved in a spree of armored car robberies in Washington state and the assassination of Denver radio talk show host Alan Berg.

Like Dorner, Matthews wrote a manifesto. In it, Matthews vowed to hunt FBI agents, much like Dorner vowed to hunt members of the LAPD. The FBI launched one of its largetst manhunts ever.

The FBI tracked Matthews to a vacation cabin that he had taken over on Whibdey Island in the state of Washington, much like Dorner took over the vacation cabin in California.

Like Dorner, Matthews opened fire on officers when they surrounded the cabin. As with Dorner, officers fired pyrotechnics into the cabin to force Matthews out. The cabin caught fire and burned to the ground with Matthews inside.

Matthews was white. So were the Branch Davidians at Waco.

Links - http://en.wikipedia....ert_Jay_Mathews (http://en.wikipedia.org/wiki/Robert_Jay_Mathews) and
http://www.historyli...fm&file_id=7921 (http://www.historylink.org/index.cfm?DisplayPage=output.cfm&file_id=7921)

---

**Buford T. Justice #67**

Posted Yesterday, 11:41 PM

I read the post as well after it was called to my attention and it implied that the LE agency involved, burned the cabin on purpose because the murderer was black and it reminded her of the way that blacks were burned in there houses during the slavery days. There were further posts that also implied that she could see why he "went off the deep end" and made implications to his state of mind and also related it to her own life experiences. I am not sure of her meaning in the post but I can sure see why someone would think what has been implied by the OP. IMHO, at the very least, the post was in very poor taste and at the most it had racial overtones bordering on radical and unfounded accusations. If I remember right, the fire was still going when the post was made and the body hadn't even been removed and examined. Here's a conspiracy theory for ya.....Mr. Dorner thought he was wronged because of the color of his skin (true or not doesn't matter), he left a manifesto and stated he wasn't afraid to die and vowed vengeance on all that wronged him, now, what better way to get revenge than to set a fire to the cabin yourself, shoot yourself (which he did) and make it look like the LEO's set fire to the building by pumping tear gas in it...think about it.... Now......THAT'S A CONSPIRACY........lol!!!!

Mr. Dorner was an insane, stone cold killer and died a cowards death. He will and should burn in hell for eternity. There was nothing that I read in his "manifesto" that warranted anyone dying. Of course, I could be wrong...

---

**TALKIN IT UP #68**

Posted Today, 12:42 AM

Officer Carney is not Racist, I am a White Male and have known her for years and she has been nothing but nice to me.

---

**happy2be #69**

Posted Today, 12:56 AM

CITY OF DOTHAN/CARNEY 000794
CONFIDENTIAL

[quote name='Emily Hays' ]

You people just don't get it....**STILL.** I never questioned her ability as a police officer. That WAS never the point of this post. If you have an employee who works for Toyota/Ford/Kia/Whatever lot and they announce that no one should come by a car from these places and they should go elsewhere....well, more than likely, when word gets back to the manager/owner of those dealerships, that person will have consequences. I DO support our first amendment rights, but do I have a **SERIOUS** problem with a Dothan Police Officer suggesting this is just like when they used to burn blacks "just because" and also throwing the words slavery and Civil Rights around over this situation. It's obvious she still has some hatred in her heart about the mistreatment of black people from that time. **You can't, as an official employed by the city, go out and announce your opinions when it comes to such sensitive matters. It reflects badly on her and not to mention the WHOLE Police Department!!!** Obviously, with most of the posts I've read in response to my original one, you are all clueless with the exception of a few who seem to "get it." This will be my last post as I refuse to try and have intelligent discussions with people who will never see the truth until they have taken off their rose-colored spectacles.

K

First  ←  2  3 **4**

CITY OF DOTHAN/GABNEY 000782
CONFIDENTIAL