**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RAEMONICA CARNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:14-cv-392-WKW-WC** |
| **CITY OF DOTHAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>PLAINTIFF'S OPPOSITION RESPONSE AND BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Raemonica Carney submits the following Brief and Opposition Response

to Defendant City of Dothan's Motion for Summary Judgment:

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................3

II.  SUMMARY OF THE FACTS ...................................................................4

III.  SUMMARY JUDGMENT LEGAL STANDARD .......................................13

IV.  ARGUMENT ....................................................................................15

    A.  Consent Decree ........................................................................ 15

    B.  Defendant Violated Plaintiff's First Amendment Freedom of Speech Rights ........................................................................... 15

    C.  Plaintiff's Title VII Claims ......................................................... 23

        i.  Race Discrimination Claim ................................................. 23

        ii.  Retaliatory and Discriminatory Hostile Work Environment Claims ..... 30

V.  CONCLUSION ..................................................................................36

## I.  INTRODUCTION

The Defendant's Brief in Support of Its Motion for Summary Judgment

(hereinafter "Def's Brief") is a master at voicing truisms, and twisting Plaintiff's

testimony at a deposition, and then making it sound like the Defendant is entitled to

summary judgment.  This is highly misleading, to put it politely.

For example, at the top of page 6 of Def's Brief, the Defendant states:

> Plaintiff admits that officers' ranks do not
> change based on assignments given and that it
> is rank and years of service that determine an
> officer's pay.

(citing Carney Dep., 464:14-465:5).  A review of those pages shows that Ms. Mays'

question was 11 lines long before Ms. Carney answered, and actually included four

questions.

This colloquy ignores the truth that, while a preferential assignment in and of

itself does not change your rank within a department, nonetheless, a preferential

assignment does build one up for promotion, which then increases one's rank and pay.

As will be seen in the following brief and argument, there is much overlapping of

facts between those relevant to Plaintiff's First Amendment claim and facts relevant to

Plaintiff's Title VII claims.  Please note that, in Ms. Carney's second affidavit attached

hereto as Exhibit 2, Ms. Carney, in her very first paragraph, confirms that all facts

alleged in her original lawsuit Complaint (Doc. 1), filed in this case, are true and correct

to the best of her knowledge, information, and belief.  We also make special reference

to Defendant's Exhibit J (Charge of Discrimination filed with the EEOC on April 26, 2013), which is hereby also used as a reference for Plaintiff's factual averment.

## II. SUMMARY OF THE FACTS

### Facts Relevant to Plaintiff's Race Discrimination, Hostile Work Environment, and First Amendment Claims

1. Plaintiff had fourteen years of good performance at the City of Dothan Police Department. That included assuming additional responsibilities such as School Resource Officer, Community Watch Coordinator, Crime Stoppers Coordinator, and Recruiting Team Member (Doc. 1, ¶ 7; Def's Exh. J).

2. Plaintiff received no additional compensation for her increased responsibilities and no promotions, even though white male employees with less experience were promoted at a faster rate than she was, and paid more than she was (Doc. 1, ¶¶ 8-21, Def's Exh. J).

3. Plaintiff was also subjected to harassment by white male employees, but upper management turned the other cheek (Doc. 1, ¶¶ 22-23; Def's Exh J).

4. The defendant City of Dothan fostered a hostile work environment toward Ms. Carney throughout her employment with the police department (Doc. 1, ¶¶ 22-23; Def's Exh. J). That environment became increasingly hostile when Ms. Carney started voicing concerns about the rights of minority citizens she believed the department was unfairly targeting, and treating differently from white citizens (Id.).

5.     The defendant City of Dothan police department removed plaintiff's access to certain computer applications, in which plaintiff received community tips which assisted her in solving crimes (Doc. 1, ¶¶ 24-5, Def's Exhibit J).  In fact, the computer applications were part of the Crime Stoppers Program, which program Ms. Carney herself largely implemented (Id. ).

6.     On the other hand, plaintiff's white co-workers were given access to the computer applications, and accordingly were taking credit for solving crimes (Doc. 1, ¶ 2, Def's Exh. J).

7.     The Defendant City of Dothan police department treated Ms. Carney very unfairly in its employment-related exams, when compared to white employees.   (Doc. 1, ¶¶ 27-31, Def's Exh. J).  Although Ms. Carney consistently scored above average on the exams, the defendant incorrectly scored her on several occasions, resulting in lower scores than Ms. Carney actually earned (Id.).  Indeed, on one occasion Ms. Carney challenged a clearly erroneous scoring, demonstrating that her answer was correct according to the departments training manual.  However, Ms. Carney's white superior officer refused to even review the error, much less correct Ms. Carney's score (Id.).

8.     Ms. Carney also faced discrimination in a required firearms test.  The Defendant failed to score several of the shots she fired within the target zone, resulting in a reduced score (Doc. 1, ¶¶ 32-35).  Ms. Carney pointed out the incorrectly-counted shots to her white superior officer, who gave her credit for some, but not all of her

accurately fired shots (Id.). This test was a factor used to evaluate performance and determine future promotions and therefore impacted adversely on plaintiff's prospects in both matters (Id. at ¶ 36, Def's Exh. J). Ms. Carney does not know about any white police officers being scored inaccurately, and believes she would have heard about them, if they had been inaccurately scored (Id.).

9. Ms. Carney was also denied training opportunities that were afforded to white officers, including, but not limited to, advanced school resource officer training (Id. at ¶ 37).

10. In February 2013, the defendant City of Dothan falsely accused Ms. Carney of an alleged breach of Dothan's social media policy (Doc. 1, ¶ 36). Ms. Carney insists that her comments were directed to, and limited to, close personal friends. Nonetheless, Ms. Carney felt strongly that, if her Facebook postings were construed as she meant them to be, it would have had a beneficial effect on law enforcement generally, including the Dothan police department, causing it to take positive steps to ensure that the officer Dorner type of fiasco would never happen at Dothan's department (Exh 2, ¶ 26).

11. Ms. Carney sincerely believed that former Los Angeles police officer Dorner had raised underlying issues of constitutional rights abuse by the police. However, Ms. Carney never once said that those issues justified any killings. In fact, Ms. Carney was abhorred by the killings (Exh 2, ¶ 27).

12.     Ms. Carney insists that defendant City of Dothan mischaracterized her comments about the Dorner matter for racist reasons, blew them way out of proportion of what she was stating, and wrongfully found her in violation of its social media policy, in violation of her First Amendment free speech rights (Doc 1, ¶ 41; Exh 2, ¶ 25-28; Def's Exh. J).

13.     The protest within the Dothan police department about Ms. Carney's social media comments clearly had a racist base (Def's Exh. J; Exh 2, ¶¶ 28, 33-37).  For comparison, Ms. Carney points out that, with respect to the 35 alleged comparator police officers identified by the City of Dothan in paragraphs 58-92 of Def's Brief, all but one were white.  Indeed, all were white males, except for two white females.  All these white applicants shared a white culture that was overwhelmingly Republican and anti-Obama.  On the other hand, Ms. Carney was the opposite, being Democratic and pro-Obama (Def's Brief, pp. 16-20; Exh 2, ¶ 33-37 ).

14.     To illustrate the Dothan Police Department's inconsistency, other white officers had Facebook postings that were potentially very controversial, but nothing was done to them because of their white cultural base.  One posting in particular involved Lt. Will Benny, a white male, commenting about "**common, white trailer park trash**." Yet **another controversial post by Lt. Benny was about Hispanics** (Exh 2, ¶ 34).

15.     Another Facebook illustration by white Dothan police officer Mike Woodside included a **posting of a very ugly picture of President Obama on January 15,**

**2013, calling the President a two-faced liar and hypocrite** (Exh. 2, ¶ 26). Yet, nothing was ever done by the Defendant to discipline Mr. Woodside (Id.).

16.     Another illustration involved Captain David Jay, who posted on Facebook a picture and statement that he wished George W. Bush was still president (Exh 2, ¶ 36). Captain Jay also posted a sign with a statement clearly directed at African-Americans. The sign stated "**The government is not your baby's daddy**" (Id.). Yet, nothing was ever done to discipline Captain Jay about his racially inflammatory posting (Id.).

17.     Ms. Carney says that it was never her intention to create controversy within the Dothan police department, and that the person cited by the police department for her posting, namely Emily Hayes of Wiregrass Live (another social media site similar to Facebook), was a member of white Dothan police Sgt. Adrian's motorcycle club. Ms. Hayes didn't know Ms. Carney from anyone else (Exh 2, ¶ 39). The only way Ms. Hayes could have gotten Ms. Carney's Facebook information is through someone at the police department passing it to her. Nonetheless, the Def's Brief quotes Ms. Hayes at length on pages 21-22.) (Exh 2, ¶ 39). Thus, any public reaction was stirred up by the Dothan police department itself.

18.      One of the prime movers in the Facebook complaint about Ms. Carney, namely Lt. Will Benny, a white male, was someone with a motive to get back at Ms. Carney, because Ms. Carney had filed an excessive force complaint against one of his officers (Exh. 2, ¶ 19-20, 28).

19.     Ms. Carney, in her Facebook posting on the Dorner matter, was simply trying to elevate the consciousness level of others about the kind of problems leading to L.A. police officer Dorner's manifesto and breakdown.  Ms. Carney truly believed that, if all law enforcement officers could be more sensitive about racial and ethnic differences, then the kind of incidents that happened with officer Dorner would be greatly minimized, if not eliminated altogether.  **Ms. Carney believes a real problem exists when complaints made by African-Americans to superior White officers often fall on "deaf ears."**  Ms. Carney added that this is what Dorner encountered, and what she also has encountered.  This is a simple point Ms. Carney was trying to make, along with pointing out adverse consequences when that happens (Exh 2, ¶ 42).

20.     Ms. Carney filed a complaint against a fellow white police officer for using excessive force against a handicapped black man, whose arm would not bend far enough behind his back to be handcuffed.  The officer involved punched the disabled man in the back of the head, which she thought was unconscionable, and which is why she filed the complaint (Exh 2, ¶ 43).

21.     Ms. Carney takes strong issue with the description in Def's Brief that her Facebook postings were "racially motivated," even though she acknowledges her postings raised issues of disparate treatment based on her race.  Ms. Carney did not call whites any bad names.  She believes it takes another person's far-right position on

contemporary issues, with a titled right-wing philosophy influencing the thinking of such a person, to see her Facebook posts as "racially motivating." (Exh 2, ¶ 45).

22.     Ms. Carney challenges as greatly biased the two African-Americans cited in Def's Brief, namely EEO officer Darryl Matthews and personnel director Delvick McKay. They were the ones who conducted a surface investigation of her and found that Ms. Carney violated the department's social media policy.  The bias was because Mr. Matthews got special kickbacks for referring customers to the mayor's dealership (See Exh. 1, wherein Ms. Carney specifies the circumstances of the kickbacks;  see also Exh 2, ¶ 46 ).  Mr. McKay also had a bias against Ms. Carney, even before an investigation of her social media posts.  Thus, the findings of both Mr. Matthews and Mr. McKay were considerably tainted with self-interest and unfair-mindedness, and should be jettisoned as unreliable.  (Exh 2, ¶ 46).

23.     The difficulties Ms. Carney experienced with her then-fiancée Kenneth Cloyd, on or about December 9, 2013 around midnight, involved matters of a purely private nature between her and her fiancée.  There was not even an allegation that Ms. Carney committed any physical abuse or verbal threat against her fiancée, and in fact she did not.  Ms. Carney was off-duty, and simply protecting her own personal property.  She was the sole lessee of her home, and occupied her home alone, except for her children.  Her fiancé Mr. Cloyd had no rights there.  Moreover, it was Mr. Cloyd, while Ms. Carney was in the driver's seat of her police car, who opened the car door,

and grabbed Ms. Carney by her upper arm bicep.  Instead of telling the truth about what happened, the police officers responding were influenced by a pre-existing ill-will against Ms. Carney from the social media *incident* (Exh 2, ¶ 12 and 48)

24.     Ms. Carney did not intentionally block her fiancee's car in the driveway, and her parking was only temporary.  She had parked in the driveway exit because her parking in the driveway would have blocked her ability to back her personal vehicle out of her garage.  Further, it was easy for Ms. Carney's fiancé to back his vehicle out over the grass, next to the driveway (Exh 2, ¶ 49).

25.     Ms. Carney and her fiancée had just broken up from a relationship and had mutually agreed for the fiancée not to come back to her home.  That is why Ms. Carney dropped Mr. Cloyd off at their church two miles away.  Further, it was understood that a wrecker company would remove Mr. Cloyd's car (Exh 2, ¶ 48).

26.     Later on Ms. Carney and her fiancée patched up their differences.  Only a couple months later, in February 2014, they were married.  They remain on good terms today, even though they are not currently living together (Exh 2, ¶ 49).

27.     The City of Dothan's reason given for Ms. Carney's termination, namely the difficulties she was having with her then fiancée Mr. Cloyd and her alleged insubordination to Lt. Scott Long, were instead a pretext to get rid of Ms. Carney, covering up the substantial and motivating factor for her termination, namely her social media comments.  Thus, inherent and ingrained race discrimination played a significant

underlying part in Ms. Carney's termination. Indeed, the race discrimination overlapped with, and influenced the denial of, Ms. Carney's First Amendment right to free speech. Had Ms. Carney's Facebook posting reflected an anti-Obama statement, it is reasonable to conclude that nothing would have been said by the Dothan police department, and no disciplinary actions would have been taken against her (Exh 2, ¶ 47).

28. The current Chief of Police for the City of Dothan police department, namely Chief Steven Parrish, is famous for his picture with a group of people where the Confederate battle flag is prominently exhibited. This picture helped set the tone of racism within the Dothan police department (Def's Exh. A, Carney 00080, also Def's Sub-Exh 32 to Carney Dep.).

29. Ms. Carney was informed by the City of Dothan of the existing federal consent decree shortly after she was hired in 1999. Ms. Carney mentioned the consent decree to personnel at the Dothan Police department on numerous occasions, up to and including, until just before her termination. Ms. Carney was discouraged by comments from City of Dothan EEO officers, and Dothan police supervisors, and the personnel director who said the complaint she raised reflected no violation of the consent decree (Exh. 2). The truth was that the City of Dothan engaged in a process that counteracted and contradicted the Consent Decree (see affidavit of Darrell Davis, Plaintiff's Exh. 6), and this reflects on both the Plaintiff's Consent Decree violation claim and her Title VII claims.

30.    A police colleague of Ms. Carney's, namely Ivan Keith Gray, a black male, also experienced race difficulties within the Dothan police department.  He was the subject of racial slurs and lack of equal training.  The incidents leading to both terminations (Gray's and Carney's) occurred in 2013.  Also Mr. Gray filed a lawsuit in 2014, just as Ms. Carney did.  Mr. Gray's allegations concern the same time period that Ms. Carney's allegations concern, and are therefore relevant to this Court's consideration.  Accordingly, as part of Ms. Carney's evidentiary submission in this case, ms. Carney has listed, as her Exhibit II, the entire summary judgment submission and response and the court order denying summary judgment in **Ivan Keith Gray v. City of Dothan** (Case No. 1:14-cv-00592-MHT-SRW).

## III.    SUMMARY JUDGMENT LEGAL STANDARD

A party seeking Summary Judgment always bears the initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which [it] believes demonstrate the absence of a genuine issue of material fact.  The moving party has the burden of demonstrating that no genuine issue as to any material fact exists, and that it is entitled to judgment as a matter of law. **Celotex Corporation v. Catrett**, 477 U.S. 317, 106 S.Ct. 2548 (1986), 91 L.Ed.2d. 265 (1986), citing, Fed. Rules Civ. Proc. Rule 56(c).

A fact is material if, under applicable substantive law, it might affect the outcome of the case. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is genuine if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. **Tipton v. Bergrohr GMBH-Siegen**, 965 F.2d 994, 998 (11th Cir. 1992). The Court considers the evidence and all inferences drawn therefrom, in the light most favorable to the non-moving party. **Adickes v. S.H. Kress & Co.**, 398 U.S. 144, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970*)*; **Hairston v. Gainesville Sun Publishing Co.**, 9 F.3d 913 (11th Cir. 1993).

The Court must reject any effort by a defendant to interpret the facts. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather to decide whether issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations. **Hairston v. Gainsville Sun Publishing Co.**, 9 F. 3d 913, 919 (11th Cir. 1993); **Anderson v. Liberty Lobby**, 477 U.S. 242, 206 S.Ct. 2505 (1986). **"If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc.**, 975 F.2d 1518, 1534 (11th Cir.1992) (citing **Mercantile Bank & Trust v. Fidelity & Deposit Co.**, 750 F.2d 838, 841 (11th Cir.1985) (emphasis added).

The Eleventh Circuit has said that a grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally

unsuitable where employment discrimination plaintiff has established *prima facie* case, because of elusive factual question of intentional discrimination. **Maddow v. Procter & Gamble Co., Inc.**, 107 F.3d 846, (11th Cir. 1997).  As will be seen from the following brief and argument, the Plaintiff has established a prima facie case.

III.    **ARGUMENT**

    A.    **Consent Decree**

The Consent decree is attached as an exhibit to the Def's Brief.  (See Def's Exh. A). The Plaintiff and her undersigned counsel takes the position that this Consent Decree forms an underlying basis for Ms. Carney's cause of action.  At the very least, it buttresses the Plaintiff's cause of action under Title VII, 42 U.S.C. Section 2000e.

The Plaintiff's counsel does not believe it is necessary to file a separate motion under the 1976 consent decree, but if this Court views otherwise, Plaintiff is willing to do so.   However, in the spirit of judicial economy, the Plaintiff contends that this Court can consider a violation of the Consent Decree as part of this case.

In support of Plaintiff's position that the Consent Decree has been violated, she cites not only her deposition testimony and affidavit of September 24, 2015, but also cites the attached affidavit of Darrell Davis (Plaintiff's Exh. 2 and 6).

    B.    **Defendant Violated Plaintiff's First Amendment Freedom of Speech Rights**

This Court well knows the lead cases in the freedom of speech arena, going

back to the seminal U.S. Supreme Court cases of **Pickering v. Board of Ed.**, 391 U.S. 563 (1968), **Connick v. Myers**, 461 U.S. 138 (1983), and **Waters v. Churchill**, 511 U.S. 661 (1994).  Nonetheless, **Connick v. Myers** sets the standards that have been interpreted and construed in the years since.  **Connick** and its progeny set forth a four part test.

The first factor is whether the employee's speech was on a matter of public concern.  **Connick**, supra.  The second factor is the balancing of interests test.  "In determining a public employee's right of free speech, the problem is to arrive 'at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" **Pickering** at 391 U.S. 563, 568.

The third test is whether the public speech was a substantial and motivating factor in the decision to terminate.  See **Vila v. Padron**, 484 F.3d 1334, 1339 (11th Cir. 2007).

In responding to the analysis on pages 41-58 of Def's Brief, much of what the Defendant states is an argumentative point, namely that the interests of the employer outweigh the interests of the employee in this case.  Indeed, the evidence cited by the defendant, namely the Benton declaration and the McKay declaration, are very self-serving, and reflect their own biases on behalf of the City of Dothan.  The defendant argues on pages 52-53 that the decision-makers made a "determination that Plaintiff's

speech was racially motivated and impaired the efficiency of the Department in a way that violated Department policy and outweighed Plaintiff's individual interests in her First Amendment right to free speech" (Def's Brief, p. 53).

The above quote, that Ms. Carney's speech was "racially motivated," confirms the Defendant's agreement with Plaintiff's position, namely that there was a closely intertwining relationship between the race discrimination, and the violation of Ms. Carney's First Amendment rights (See Exh. 2, ¶ 20-34). Thus, it was the racial nature of Ms. Carney's Facebook postings that got her into such trouble (Id.). Had she commented on Facebook about Obama being a "two-faced liar and hypocrite," as Officer Woodside did, or had she made a Facebook posting critical of African-Americans (i.e. "the government is not your baby's daddy") as Captain David Jay did, it is reasonable to infer that nothing would have ever been done about it (Id. at ¶ 26-27).

The previously referenced authority of **Waters v. Churchill, supra.**, sets forth guidelines to follow in determining whether an employees' speech is protected. In **Waters**, 511 U.S. at 662, the U.S. Supreme Court stated that:

> If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the First Amendment requires that the manager proceed with the care that a reasonable manager would use before making an employment decision of the sort involved in the particular case. In situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular

conclusion, many different courses of action will necessarily
be reasonable, and only procedures outside the range of
what a reasonable manager would use may be condemned
as unreasonable.

Drawing on that quote, a reasonable manager in the Dothan police department,
even if he disagreed with the content of Ms. Carney's Facebook posts, should have
considered the context, and the primary audience, of Ms. Carney's speech.

Ms. Carney was primarily speaking to her close friends like Karla Mays (See Exh.
2, ¶ 30; Exh. 3). Ms. Carney did not intend for her views to be expressed for a wide
audience, Ms. Carney nonetheless believed it was a matter of public concern that
African-American employees be treated fairly in a police department. Further, Plaintiff's
point was that when the complaints of African-Americans to white superior officers fall
on "deaf ears," there is a risk of adverse consequences (Exh. 2, ¶ 31).

Speaking of Karla Mays, please read carefully what her affidavit attached as
Exhibit 3 states. As can be seen, Ms. Mays felt what Ms. Carney had to say was "actually
wise and appropriate." In fact, she did not consider it to be offensive to any police
department, and certainly not the Dothan police department. Ms. Mays said that Ms.
Carney had raised legitimate points about Dorner's whistle-blower complaints against
some of his co-workers and the need for objective review of such complaints.

Karla Mays, under oath in her affidavit, completely contradicts statements made
by Sgt. Donny Smith and Sgt. Doug Magill that, during their investigation, as reflected in
their sworn testimony at the Personnel Board, that they ever spoke with Ms. Mays. In

fact, Ms. Mays flatly denies that she ever spoke to any representative officer, investigator, or any other person with the City of Dothan about Ms. Carney's Facebook postings, and that she never called anyone at the Dothan police department about it.

In paragraph 5 of her affidavit, Ms. Mays accuses Dothan police chief Greg Benton of perjuring himself in his testimony regarding any posts made by her (Karla Mays) on the Wiregrass Live site because she (Ms. Mays) never made any posts to Wiregrass Live. In fact, Ms. Mays has never even heard of the social media site Wiregrass Live, until recently.

This affidavit from Karla Mays greatly undermines the credibility of the entire City of Dothan's presentation on its summary judgment motion. It suggests inaccuracies in its voluntary declarations and affidavits produced.

Notwithstanding Ms. Carney's concern about the underlying issues of constitutional rights abuse by police of Christopher Dorner, Ms. Carney confirmed that Dorner was not justified in his killings (Exh. 2, ¶ 22). Ms. Carney was abhorred that any police officers were killed (Id.).

Ms. Carney also responds to page 26 of the Def's Brief, wherein the accusation is made that she was racially motivated in using her Facebook posts. However, Ms. Carney points out that she did not call whites, or any race, any bad names, and it takes another person's far-right position on contemporary issues, with a tilted philosophy influencing said person, to see Ms. Carney's posts as racially motivating (Exh. 2., ¶ 34).

The Defendant also cites to **Graziosi v. City of Greenville**, 985 F. Supp.2d 808, (N.D. Miss. 2013), wherein a police officer was terminated after making comments on a social network website criticizing the police chief.  The employee brought an action against the city and chief alleging a retaliation claim in violation of her First Amendment freedom of speech rights.  In this case, the District Court found (1) that the officer spoke pursuant to her official duties, rather than as a citizen on a matter of public concern, and (2) even if officer spoke as a citizen, chief's interest in promoting efficiency of department's services outweighed officer's interests as a citizen in commenting on matter of public concern.  Id.

The distinctions between **Graziosi** and Ms. Carney's instant case should be obvious.  First, Ms. Carney was not speaking as a police officer, but as a private citizen.  Secondly, Ms. Carney was not challenging her police chief, as did the officer in **Graziosi.**  Obviously such a challenge in **Graziosi** disrupted in the chief's interests in promoting the efficiency of his department's services.  In Ms. Carney's case, there was no evidence that the police department's services were disrupted, and indeed they were not.  All that happened was some lively conversation, giving the unhappy warriors in the Dothan police department a chance to dream up what they might catch Ms. Carney on next.  That is exactly what they did, when they used her dispute with her husband as a so-called justifiable basis for her termination.  That basis was simply a pretext to get rid of Ms. Carney, due to unhappiness about her bold Facebook postings.

The issue of whether or not the speech was a substantial and motivating factor in her termination must be examined in the light of what really caused Ms. Carney's termination.  Is what happened to Ms. Carney at home, near midnight, when off duty in the privacy of her own home, the reason for her termination? Or, was it really Ms. Carney's Facebook postings?  Note that there was never even an allegation that Ms. Carney committed any verbal abuse or made any physical threats to her fiancée.  Ms. Carney was in the driver's seat of her police car, when her fiancée opened her car door, and grabbed her by the upper arm bicep.  It is thus reasonable to infer that, but for the pre-existing ill-will by the officers, they would have sided with Ms. Carney as a fellow police officer and filed charges against her fiancée.

And what caused the pre-existing ill-will?  It is easy to conclude that it was her social media postings, from which Ms. Carney had only recently returned from serving a suspension and was still on a two year probation for said Facebook posts.

As stated in the **Graziosi** case, so relied upon by the defense:

> "Government employees are not stripped of the right to freedom of expression by virtue of their employment."

985 F. Supp.2d. at 812.  Further, Ms. Carney can meet all four tests of **Connick** and **Pickering**, in that she can show that she (1) suffered an adverse employment decision (**she was first suspended, then lost her job**).  Secondly, (2) her speech involved a matter of public concern (**the matter of a black officer's constitutional rights was, and**

**remains, a raging issue in America today**).  This was not simply a matter of some petty, personal grievance of Ms. Carney.

Thirdly, (3) **Ms. Carney's interests in speaking outweighed the governmental interest in promoting efficiency**.  As previously noted, there was virtually no disruption in the Dothan police department.  Further, both Ms. Carney's case and Captain Gray's case involved black Dothan police officers who strongly believe that race discrimination is a widespread practice in their police department.

Finally, (4) **Ms. Carney's protected speech motivated the defendant's conduct in suspending and terminating her**.  Indeed, she was still serving the suspension from her social media speech, when she was terminated for what happened at home in a private dispute with her fiancé.  Thus, there was close proximity in time between the social media matters and the Plaintiff's home dispute with her fiancé.

As the Eleventh Circuit so eloquently stated in <u>**Gowski v. Peake**</u>, 682 F.3d 1299 (2012), "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  <u>Quoting</u> <u>**Reeves v. Sanderson Plumbing Products, Inc.**</u> , 530 U.S. 133, 150 (2000).

Therefore, this Court should deny defendant's summary judgment and allow a jury to weigh the evidence and draw whatever inferences it deems legitimate from the facts presented in the case.  We believe that such a jury could well determine that Ms. Carney's termination was due to her social media posts, and the Dothan police

department's reaction thereto, based on underlying racial and political views at odds with Ms. Carney's views.

Indeed, the facts of this case are one of the most classic examples of why the First Amendment freedom of speech exists. Ms. Carney's speech in her private capacity as a citizen was on a matter of immense public concern. She was not speaking about any private grievances, although she may have inferred that the race discrimination experienced by Dorner was not far removed from the kind of race discrimination she and Captain Gray had experienced. If anything, Ms. Carney's social media posts, if received in the right spirit, could have been the foundation for bringing about better race relations within the Dothan police department, which is a public good.

### C.  Plaintiff's Title VII Claims

#### i.  Race Discrimination Claim

According to Title VII, it shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his **compensation**, terms, conditions, or privileges of employment, because of such individual's **race**, color, religion, sex, or national origin . . . **42 U.S.C.A. 2000e-2**.

When a plaintiff attempts to prove intentional discrimination, in violation of Title VII, by using circumstantial evidence, the court applies the shifting burden framework established by the Supreme Court in **<u>McDonnell Douglas Corp. v. Green</u>**, 411 U.S. 792,

93, S.Ct. 1817, 36 L.Ed.2d 668 (1973), and **Texas Dep't of Community Affairs v. Burdine**, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  See **Schoenfeld v. Babbitt**, 168 F.3d 1257, (11th Cir. 1999).  Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  **McDonnell Douglas**, 411 U.S. at 802, 93 S.Ct. at 1824; **Eskra v. Provident Life and Acc. Ins. Co.**, 125 F.3d 1406, 1411 (11th Cir.1997). If the plaintiff meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent.  **Burdine**, 450 U.S. at 254, 101 S.Ct. at 1094; **Jones v. Gerwens**, 874 F.2d 1534, 1538 (11th Cir.1989).

The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.  **Burdine**, 450 U.S. at 254-55, 101 S.Ct. at 1094-95. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination. Id. at 255-56, 101 S.Ct. at 1095-96.  The Plaintiff "now must have the opportunity to demonstrate that the proffered reason was not the **true** reason for the employment decision. . . she may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." **Texas Dep't of Community Affairs v. Burdine**, 450 U.S. 248, 255-256 (1981) (emphasis added).

A plaintiff can establish a prima facie case in a failure to promote claim by establishing that (1) she is a member of a protected class, (2) she was qualified for and

applied for a position that the employer was trying to fill, (3) she was denied the position, and (4) a non-member of the protected class was hired.  See **Combs v. Plantation Patterns**, 106 F.3d 1519, 1539 (11th Cir. 1997).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  **Williams v. Ford Motor Co.**, 14 F.3d 1305, 1308 (8th Cir.1994).

Ms. Carney has established a prima facie case by establishing that she is a member of two protected classes, namely African-American and female.  Secondly, she was qualified for and applied for promotions.  Her denial of the 2013 sergeant promotions are clearly within the statute of limitations of her April 9, 2013 EEOC charge, wherein she complains about white male employees with less experience being promoted at a faster rate than she was, as well as being paid more than she was.  All the defendant's attempt to argue is that there was a legitimate test that allowed them to promote on the basis that they did promote.

However, as set forth in paragraphs 5(a), 5(b), 5(c), and 5(d) of Plaintiff's Exhibit 2, Ms. Carney was subjected to a number of scoring deficiencies that white employees were not subjected to, which decreased her prospects for promotion.  Ms. Carney also decries in paragraph 33 of her Exh. 2 that, in the Def's Brief (paragraph 58-92), all the alleged 35 comparators were white, except for David Thornton, the EEO officer.  What

all these white comparators had in common was a white culture that was overwhelmingly Republican, where Ms. Carney was Democratic and pro-Obama.

Further proof of the defendant's racial tactics are actually found in the white police Facebook postings making fun of blacks, including President Obama, etc. (see Plaintiff's Exh. 2, ¶¶ 34-38).

As far as the next prong is concerned, Plaintiff Carney was never promoted to sergeant at the Dothan police department, despite her vigorous efforts to be so promoted (Plaintiff's Exh 2., ¶ 33). Meanwhile, non-members of the protected class have been so promoted, even in 2013 (Id.).

This is not surprising in light of the evidence set forth in the affidavit of Darnell Davis (Plaintiff's Exh. 6). As can be seen, Mr. Davis poignantly states:

> There have been several occasions I have applied for opportunities with the City of Dothan personnel department from the early 2000s up until 2013. I applied to various positions from accounting to EEOC officer. I have applied for no less than seven positions, but probably many more. I have taken accounting exams twice within this time period and been put on the hiring register twice. However, I have never been afforded an interview. I currently possess a B.A. in Marketing, B.S. in Accounting, and an M.B.A. in Finance and have years of experience in each of my degreed fields. My sentiments and experience have been that there is a lack of opportunity and/or considerations for persons of African-American descent. Objectively speaking, it appears that positions are created and announced for the minimum amount of qualified candidates to eliminate candidates who would otherwise qualify according to the Consent Decree and Affirmative Action Plan. In evaluating positions and the application processes, it appears that when positions are announced and opened for applicants, there have already been internal candidates identified to fill them simply by the criteria established for the applications. Instead of opening up candidacy to classes that would reach the widest possible

groups of applicants for positions, they are structurally and manipulatively classed for preferential treatment. These positions are classed by experience and education, for candidates that are over-qualified to perform duties to prevent equality in the application process. For example, for entry level positions, the number of years' experience and education level far exceed what is customarily required to apply for positions in other industries and governmental agencies elsewhere.

The entire process counteracts and contradicts not only the legal aspects, but also the spirit of the Consent Decree and Affirmative Action Plan. Besides the lack of foundation and support of actively seeking minorities to establish diversity, the City of Dothan has sought to operate from the most minimal vantage point of equality and diversity. It has done so in at least two ways. The first is to creatively classify positions in ways that eliminate minority applicants and/or acceptance of applications. The second way has been to hire those who only minimally meet the definition of equality and diversity, and by this I mean Caucasian women. Evidence of this can be proven by comparison of the number of Caucasian women employed to other demographic populations. This means that African-Americans, particularly males, are not considered with the frequency that Caucasians are.

It is common knowledge among the African-American population in the city of Dothan, Alabama that they are discouraged from applying for positions. Although not spoken publicly, it is known and understood that their efforts are oftentimes fruitless. To add insult to injury, it has been said publically by City officials that African Americans, and other minorities, do not apply for positions. What is known by these populations is that there is a lack of consideration for them. It has also been stated by City officials (the Mayor, Mike Schmitz; City Manager, Mike West) that there should be more minorities applying for police officer and fire positions. Little do they know, that these statements in and of themselves reveal the attitude which the City has operated from. The main question is: why do they feel that African-Americans will not be considered for other positions within the City? Does the City feel that the majority of African-Americans only qualify for these positions?

Finally, I know of no instances where the City has taken any measures to actively recruit and hire minorities. The majority of African Americans who are promoted are within the City and have been

conditioned to the prevalent inequality that exists. They are only promoted after numerous attempts and years of service. I have spoken to the current (Darryl Matthews) and former EEOC officers, and I have been informed that they attend college recruitment fairs at historically Black colleges. However, so do many other businesses and recruiters. This in no way constitutes actively recruiting African Americans. What matters are the results achieved, not the appearances. In fact, if it is true that the City attends various recruitment fairs at many historically Black colleges and does not find what it considers qualified candidates for positions, it only validates the point that it is not actively seeking to hire African Americans. And, it would be necessary to evaluate its recruitment and hiring processes of minorities. I have even been told by the Personnel Director, Delvick McKay, that the City of Dothan is a difficult place for African Americans to work due to the racial conditions that exist. He stated that those who are considered for positions must have the ability to endure the many instances of inequality and discrimination.

Plaintiff's Exhibit 6.

What is quoted above is a very powerful and damning statement of

the Dothan Police Department's lack of equal treatment for African-Americans in

both the hiring and promotion process.

Please also review pages 327-329 of Captain Gray's deposition, for which

defense counsel Stephanie Mays was present, in which Captain Gray decried the

absence of any African-Americans in the decision-making process or hierarchy for

making decisions about promotions (Plaintiff's Exh. 5)  He also said there were no

minorities involved in the test making process, and no minorities on any board.

Please note what Captain Gray stated at page 329 in answering the following

question:

Q.     What racial slurs did you hear during your employment?

**A.     Nigger.  That's the only one I recall right now.**

Plaintiff's Exh. 5.

The ultimate wrongful act against Ms. Carney, namely her termination, was the culminating adverse action against her, both on her First Amendment claim and her Race-Discrimination claim, which as previously argued, are so closely intertwined. The termination is actionable as a race-discrimination claim on a Title VII basis.  First, it grew out of the April 19, 2013 eeoc charge as an ultimate outgrowth of the earlier wrongs described.  Secondly, her amended EEOC charge of December 17, 2013, which the defendant says it did not receive, but to which Ms. Carney swore under oath (see Plaintiff's Exh. 5), clearly list her termination as a consequence of the earlier race discrimination described in her April 2013 charge.  Therefore, the termination is accurately covered.

It would be further accurately covered, if this Court grants Plaintiff's Motion for Leave to File Amended Complaint, in response to Plaintiff's Objection to Magistrates Order Denying Plaintiff's Motion for Leave (Doc. 67).

Clearly Ms. Carney's suspension and termination are amply severe to constitute adverse employment actions.

### ii. Retaliatory and Discriminatory Hostile Work Environment Claims

Ms. Carney presents sufficient facts demonstrating a retaliatory hostile work environment.  A cause of action for retaliatory hostile work environment is recognized by the Eleventh Circuit. See Gowski v. Peake, 682 F.3d 1299, 1311-1312 (11th Cir. 2012). To establish a claim of a hostile work environment, an employee must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition's of the victim's employment and create an abusive work environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  In order to establish a *prima facie* case of retaliatory hostile work environment, the plaintiff must show (1) that she engaged in protected activity; (2) after doing so, she was subjected to unwelcome harassment; (3) her protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis exists for holding her employer liable either directly or vicariously.  Swindle v. Jefferson County Com'n, 593 Fed. Appx. 919, 929 at fn. 10 (11th Cir. 2014).

In discussing the "but-for" causation standard for retaliation, Gowski provided a distinct difference when compared to a retaliatory hostile work environment claim:

> Although the Secretary is correct that the retaliation must be the "but-for" cause, we cannot agree that the same-decision defense eliminates such causation in a hostile work environment claim. As it does in every case in which the

same-decision defense applies, the jury here found that the discrete acts were motivated in part by retaliatory animus. Although that may be sufficient under the same-decision defense to preclude liability for each of the acts individually, it is not enough to eliminate liability for the hostile environment caused by the retaliatory animus when the discrete and non-discrete acts are taken collectively. To allow the same-decision defense to eliminate but-for causation in a hostile work environment claim would essentially do away with the claim. Thus, **although the same-decision defense eliminates but-for causation for each discrete action, it does not eliminate the but-for causation that matters in a retaliatory hostile work environment claim—that is, the severe and pervasive accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable.**

682 F.3d at 1313 (emphasis added).

"Whether an environment is 'hostile' or 'abusive' can only be determined by looking at **all the circumstances**." Harris, at 23 (emphasis added). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Id. It is not "a mathematically precise test." Id. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will **detract from employees' job performance**, **discourage employees from remaining on the job**, or **keep them from advancing in their careers**." Id. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their

race, gender, religion, or national origin offends Title VII's broad rule of workplace

equality.  Harris, at 23 (emphasis added).

The scope of an EEOC Charge should be liberally construed.  **Gregory v. Georgia**

**Dep't of Human Resources**, 355 F.3d 1277, 1280 (11th Cir. 2004).  "The proper inquiry is

whether the claims in a judicial complaint are like, related to, or grow out of the

allegations contained in the EEOC Charge."  Id.   It is unnecessary for a plaintiff to

exhaust administrative remedies prior to urging a retaliation claim growing out of an

earlier charge. **Gupta v. East Texas State University**, 654 F.2d 411, 414 (5th Cir. 1981).

**Gowski** analyzes facts which are comparable to Ms. Carney's retaliatory hostile

work environment claim.  In determining that the evidence was sufficient to support a

verdict in favor of plaintiffs on a retaliatory hostile work environment claim, Gowski

provided the following analysis:

> Having reviewed the testimony in this trial, and giving proper
> deference to the jury's credibility determinations, we
> conclude that the district court properly denied the motion
> for judgment as a matter of law. Although reasonable people
> could disagree about the evidence, there was enough for the
> jury to conclude that Lin, Patel, and Van Buskirk created a
> workplace filled with intimidation and ridicule that was
> sufficiently severe and pervasive to alter Gowski and
> Zachariah's working conditions. And although the discrete
> acts of retaliation played a role in the intimidation and
> ridicule, they were certainly not the only conduct that
> supported the hostile work environment claim. The evidence
> here showed that the administration intended to retaliate
> against Gowski and Zachariah because of their EEO activity
> and then created a hostile environment by spreading rumors
> about the doctors, damaging their reputations, and

disciplining them. The administration solicited ROCs on Gowski and Zachariah, instructed other employees to encourage the doctors to resign, and attempted to malign them in front of their peers and co-workers. This scheme was visible to other hospital staff in their day-to-day work in the units, as was the toll it took on Gowski and Zachariah personally.

And this scheme was both severe and pervasive. There was testimony that the retaliatory intent was well-known and continued over a period of years. Gowski and Zachariah were targeted with a campaign to force them to resign by limiting their privileges and their access to positions within the hospital. They were removed from committees and projects, prohibited from conducting research, reassigned to different wards, and given low proficiency ratings. Other doctors testified to the scheme, with some admitting that they were afraid to testify for fear of retaliation. And although it did not deter Gowski and Zachariah from filing complaints, several other staff members testified that they chose not to file EEO claims out of fear.

Gowski 682 F.3d at 1313-1314.

In another comparable case, Bryant v. Jones, three white managers asserted hostile work environment claims against county officials alleging that the county sought to replace the white managers with African-American managers. 575 F.3d 1281, 1288 (11th Cir. 2009). With respect to one of the white managers, the court noted the following facts supported by the record:

(1) He was excluded from meetings and was not allowed to provide input into matters for which he was responsible, while input from African-American counterparts was increased;

(2) He was not provided adequate staff support and equipment to perform his job;

(3) He was required to make an appointment to speak with his African-American boss, although his African-American counterparts were granted an open door policy to bosses office; and

(4) The boss would draft letters that the white manager was being terminated or suspended, but never submitted them to Human Resources.

Bryant, 575 F.3d at 1297-1298.  The court found that "these facts established a pattern of harassing behavior 'sufficiently severe and pervasive enough to alter the conditions of [the plaintiff's] employment.'"  Id. at 1298.

In this instance, Ms. Carney suffered similar harassing conduct over an extended period of time, which included discrete and non-discrete acts (see Plaintiff's Exh. 2, ¶¶ 5(a)-5(d), 19, 23-24).  All of these acts, to include the denial of important training opportunities, developmental work assignments, access to important computer programs, and the sabotage of Ms. Carney's tests results denied Ms. Carney the opportunity to advance her career on equal footing with other white officers.  The culmination of these acts undoubtedly marginalized Ms. Carney's career with the Dothan Police Department, and constituted a hostile work environment (Id.).

While there was a retaliatory history of promotions and opportunities being taken away from Ms. Carney, such as the Crime Stoppers Coordinator job, with its computer program that she largely implemented, the greatest act of retaliating against Ms. Carney grew out of the controversy arising from the social media matter mentioned in her April 2013 charge.  As stated in said charge, after posting her "views online about

a newsworthy event. . . several of my white co-workers complained to management that my comments were racist (they clearly were not) simply because they did not agree with my views" (Def. Exh. J; Plaintiff's Exh. 5).

A key point for Ms. Carney is that the underlying basis for her co-officers disagreements with her comments on Facebook posts, namely that they thought she was racist, betrays itself a racist basis view on the part of said co-officers. This is corroborated by the fact that numerous white officers posted Facebook rants against black misbehavior (i.e. "the government is not your baby's daddy") and anti-Obama comments. Yet, none of these officers were ever disciplined or even questioned, much less suspended or terminated (Plaintiff's Exh. 2, ¶ 34-38).

The ultimate act of retaliation against Ms. Carney occurred when she was subjected to the third degree over what should have been a private matter between her fiancé and her at home. These activities against her were pervasive, mean-spirited, and resulted in the ultimate adverse action, namely her termination. As stated in her affidavit (Plaintiff's Exh. 2, ¶¶ 48-49) , the incident with her fiancé Mr. Cloyd occurred while she was off-duty and on her own property. There was no allegation that Ms. Carney committed any physical abuse or threat against Mr. Cloyd. Yet, Ms. Carney gets clobbered by the Dothan police department.

It was Mr. Cloyd who opened her car door and reached into the driver's seat of her police car and grabbed Ms. Carney in her left upper arm bicep. Yet, instead of

seeking the truth about what happened, the responding Dothan police officers were too blinded by pre-existing ill-will towards Ms. Carney from the social media incident.  As she noted in paragraph 48 of her affidavit, Ms. Carney had just returned from serving a suspension on the social media incident, and was still serving a two year probation because of the social media matter.

Any contention from the defendant concerning a photograph of plaintiff's car blocking her fiance's case is explained by paragraph 49 of plaintiff's affidavit.  Had the rival police officers attempted to get a fair explanation from the plaintiff, rather than be continually motivated by ill-will from the social media incident, the parking matter and the entire incident should never have resulted in discipline for the plaintiff, much less her termination. Indeed, under the authority of **Gowski, supra.**, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Quoting **Reeves v. Sanderson Plumbing Products, Inc.** , 530 U.S. 133, 150 (2000).

## IV.    CONCLUSION

In light of the foregoing brief and argument, and drawing upon all the exhibits offered in the their summary judgment motion, as well as the exhibits attached to this opposition response, and given the legal standards cited earlier, the Plaintiff and the undersigned counsel urge this court to deny Defendant's Motion Summary Judgment, and allow this case to proceed to trial before a jury.

Respectfully submitted this 25th day of September, 2015

/s/Julian McPhillips
One of the Attorney's for Plaintiff

**OF COUNSEL:**

Julian L. McPhillips (ASB-3744-L74J)
McPhillips Shinbaum
516 S. Perry St.
Montgomery, AL 36104
Telephone: (334) 262-1911
Facsimile: (334) 263-2321
julianmcphillips@msg-lawfirm.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on this the 25th day of September, 2015, he forwarded a true and exact copy of the aforesaid via either email, the United States Postal Mail, properly addresses and postage prepaid, or through electronic notification of the CM/ECF system, upon the following:

/s/Julian McPhillips
OF COUNSEL