STATE OF KENTUCKY

COUNTY OF HARDIN

## AFFIDAVIT

My name is RaeMonica Carney Cloyd and I do solemnly swear the following is true and correct, to the best of my knowledge, information, and belief:

1. I am a 42 year old female of African-American descent. I hereby confirm that all facts alleged in my Complaint (Doc. 1) filed in this case (1:14-cv-00392-WKW-WC) are true and correct to the best of my knowledge, information, and belief (see attached).

2. I worked for the Dothan Police Department on two separate occasions, one from June 1999 to February 2004, and after leaving for about a year, I returned in May 2005 as a police officer.

3. Overall I worked for the Dothan Police Department for fourteen years, with good performance, assuming additional responsibilities such as School Resource Officer, Community Watch Coordinator, Crime Stoppers Coordinator, and Recruiting Team Member, in addition to regular officer duties.

4. Notwithstanding, I did experience unlawful employment discrimination, based on race, sex, and retaliation, which caused me to file several EEOC charges. The first was on September 28, 2006; the second on August 3, 2009, and the third on April 19, 2013. Although the first two EEOC charges may be outside the time limits for the current litigation I am involved in, the underlying disparate treatment complained about in earlier years continued unresolved and thus helped form the foundation of the discrimination complaint. I filed my third charge on April 19, 2013, which was amended in December 16, 2013. I therefore dispute the contention in paragraph 19 (page 8) of Defendant's brief that allegations from my earlier EEOC charges are not part of this suit, as they nonetheless reflect on a continuing pattern and practice of race discrimination in the Dothan Police Department. Further, if these allegations are not relevant, then why does the Defendant's brief go to such great length to discuss my prior history with the Dothan Police Department?

5. Further, I believe the termination of my employment by the Dothan Police Department, which I experienced on December 16, 2013, was simply the ultimate outgrowth of the same facts about which I was complaining in my April 2013 EEOC charge. My termination was predicated on the violation of my First Amendment right to freedom of speech then aggravated by the Defendant's violation of my rights to privacy on my personal property for which they violated the law, then used the off-duty personal disagreement with my fiancé as the final charge to uphold terminating my employment. Neither of the charges has merit and therefore my termination was unlawful.

    5(a). To my great chagrin, the Dothan Police Department removed my access to certain computer applications whereby I received community tips that assisted me in solving crimes. Compounding my dismay, the computer applications were part of the Crime Stoppers Program,

which program I largely implemented.

5(b). On the other hand, my white co-workers were given access to the computer applications, and were thus able to take credit for solving crimes.

5(c). Likewise, the Dothan Police Department treated me very unfairly in its employment-related exams, when compared to white employees. Although I consistently scored above average on the exams, the City of Dothan incorrectly scored me on several occasions, resulting in lower scores than I actually earned. I especially remember one occasion when I challenged a clearly erroneous scoring, and demonstrated that my answer was correct according to the department's training manual. Yet, unfortunately, my white superior officer refused to review the error, or correct the score.

5(d). I also faced discrimination in a required firearms test. The Dothan Police Department failed to score several of the shots I fired within the target zone, resulting in a reduced score. I pointed out the incorrectly-counted shots to my white superior officer, who gave me credit for some, but not all, of my accurately fired shots. The test was a factor used to evaluate performance and determine future promotions, and so this failure to give me credit impacted adversely on my prospects in both matters. I never heard about any white officers or prospects being scored inaccurately. If that had happened, I'm sure I would have heard about it.

6. That is why, on December 16, 2013, I amended my afore-referenced earlier April 2013 charge to add retaliation by the City of Dothan in firing me on December 16, 2013. Indeed, the amendment is referred to in paragraph 71 of the lawsuit complaint filed with this court on May 23, 2013. I am therefore perplexed and baffled to read on page 81 of Defendant's Summary Judgement brief and in the McKay Declaration, exhibit 31, that the City of Dothan and its attorney never received my Amended charge.

7. Typically, but to my great chagrin and dismay, the City of Dothan's Summary Judgment brief (hereinafter "Defendant's brief") has issued so many misstatements of fact that I am compelled to supplement my deposition by issuing this affidavit.

8(a). To begin with, the Defendant's brief states at the top of page 6:

> "Plaintiff admits that officers' ranks do not change based on assignments given and that it is rank and years of service that determine an officer's pay", allegedly quoting me at my deposition. (Carney Depo,164: 14:465:5)

8(b). Yet a review of these pages shows that Ms. Mays' question was 11 lines long, and actually included four questions. Thus, it was, and is, very unclear what question I was answering. Ms. Mays was in error to cite my answer at all. (Of course, I had no attorney present to represent me at the deposition, or to object to the form of the question).

8(c). This colloquy ignores the truth that, while a preferential assignment does not change one's rank within a department, a preferential assignment nonetheless helps build up an officer for

promotion, and that leads to an increase in rank and pay.

9. Contrary to what is attributed to me in number 5 on page 6 of Defendant's brief, I know there were many police officers who received additional compensation for services in assignments with increased responsibilities. One such was a white female police officer, Reyna Johnson. Yet I never received increased pay for any of my additional responsibilities.

10. To explain point 6 on page 6 of Defendant's brief, for a long time there were no African-Americans in either the criminal investigation division or the hostage negotiations team. One so appointed, namely black female Sylvia Summers, was terminated after appointment, and filed an EEOC charge.

11. I agree with point 8 of page 6 of the Defendant's brief that a police officer should inspire confidence and respect for her position and maintain a good reputation in the community. This I am confident I did. See the photograph and letter addressed to me and signed by students in one Girl Scout Troup that I arranged and escorted through the police department, attached as exhibit B and C. This is echoed by paragraph 23 of Defendant's brief wherein it is noted that Chief Benton saw that I was well-suited to have the community watch coordinator position and that I had a good relationship with the police.

12. I wish to add to point 10 on page 7 of Defendant's brief, where it states, "Even when Plaintiff was not actively engaged in police work she was still a police officer." I treasured my privacy, and believe my constitutional rights of freedom of speech existed when I was off duty. I also cherished my right to have personal disagreements with my fiancé, when off duty, so long as no laws were broken. The Defendant City of Dothan is deliberately misleading the court by not providing Defendant's very own police incident report taken to document the domestic incident, which clearly identified me as the victim of domestic violence committed by my fiancé. In addition, no arrest was made by any of the police officers or supervisors, identified in paragraph 140 (page 33) of Defendant's brief, even with my fiancé's admission to placing his hands on me and forcefully trying to remove me from my patrol car. This was clearly a violation of the Domestic Violence Act of the **Code of Alabama**. The Defendant also chose to take no action against my fiancé, upon his admission to backing his vehicle towards my patrol car, while I was attempting to reposition my patrol car on the driveway, just after I had just parked my personal car in my garage.

13. Adding to point 12 on page 6 of Defendant's brief, I recognize the significance of following orders of higher ranking officers. However, when those orders are not consistent with policy or law, I have a right, even a duty, to disobey unlawful commands.

14. Adding to point 14 on page 7 of Defendant's brief, I recognize that the City of Dothan, on paper, is supposed to be an equal opportunity employer. However, the City of Dothan was found not to be that in the 1976 Consent Decree. Thereafter, Dothan is still subject to that Consent Decree, which I believe was clearly violated in my case, for reasons set forth in my complaint, deposition, and this brief.

15. I am also aware that, in a deposition in the case of a former Dothan Police Captain, namely Ivan Keith Gray, City of Dothan EEO Officer Darryl Matthews said he never followed the aforesaid Consent Decree and said it was unsubstantiated. Captain Gray also made assertions that the Defendant violated the Consent Decree in discriminatory acts against him during his twenty-eight year tenure. Moreover, Captain Gray's claim was addressed in the opinion and order issued by District Judge Myron Thompson, for which I respectfully ask this court to refer to. (Doc. 68, Case 14-cv-00592).

16. Adding to point 15 on page 8 of Defendant's brief, the Defendant fails to advise the court that it denied me the right to use that period of employment in identifying my total number of years as displayed on my name badge, and limited that time in service to reflect my second term of service that beginning in 2005.

17. I dispute paragraph 16 on page 8 of Defendant's brief, and assert that the Defendant is deliberately misstating known facts about the terms of my work assignments in both the narcotics division and patrol divisions.

18. Adding to point 19 on page 8 of Defendant's brief, the Defendant's continued references to previous EEOC filings I made in addition to their repeated interrogatories outside of the scope of the six month window allotted under an EEOC complaint, opened the door to include my entire employment history. This was in addition to making relevant my previous motion to amending my complaint, to allow 42 U.S.C. 1981 and 42 U.S.C. 1981(a) as a basis for race and gender discrimination.

      18(a). I also insist that I provided my previous attorney a copy of my Amended EEOC Charge dated December 17, 2015, a copy of which is attached here to as Exhibit 5 of Plaintiff's Brief. As can be seen, I signed said EEOC charge under oath on December 17, 2013, and thus, had every reason to believe that said charge was filed with the EEOC by then attorney Sonya Edwards. Most of said affidavit and charge was a repeat of the previous allegations. The amended charge simply added the fact that my employment was terminated on December 16, 2013, based on unfounded allegations of gross insubordination. I added that the department's actions constituted further discrimination and harassment based on my race and sex and are in violation of retaliatory provisions of Title VII.

19. I dispute paragraph 26 on page 10 of the Defendant's brief and assert that I was assigned as the Crime Stoppers Coordinator. Major Steve Parrish re-assigned my role from coordinator to liaison upon complaint from a white male, namely Lt. Will Benny, the same officer from whom the position was taken from. Paragraphs 27, 28, and 29 on page 10 further prove my point of being the coordinator, rather than the liaison. Otherwise, there would be no need to make the change detailed in an email between Benny, Parrish, and myself. With the re-assignment to Duty Desk Officer, the position was a demotion, and least favored position, one often assigned to punish officers and limit their abilities to advancement. In fact, EEO Officer Darryl Mathews, according to Captain Gray's deposition, admitted that he, too, disagreed with placing me in the Duty Desk Officer position, because it was unfair punishment.

20. Furthermore, I dispute paragraph 29, and assert it was Major Steve Parrish, not Chief Benton, who authorized my removal in November 2012 from having access to the Tip-Soft Software within the crime stoppers program. My access was then given to a white male, namely Lt. Will Benny. In doing so, the Dothan Police Department, took away my ability to manage the program and provide a report to the Chief of Police, the Sheriff, the District Attorney, and the Chamber of Commerce Chairman.

21. Contrary to paragraphs 32-34 (page 11) of Defendant's brief, I still believe the removal of the Community Services Division in February 2013, was largely directed at me, because local white Dothan police officers didn't like visible pictures in my office of President Obama. I had gone to the second Inauguration of Obama in January 2014, and the memorabilia I brought back was offensive to my surrounding white officers and administrative staff, who frequently talked down President Obama, as they did Whitney Houston, whom they referred to as a "crack-head".

22. The effect of my removal from the Community Services Division was to deprive me of a telephone, a desk top computer, a xerox machine, a secretary, and/or access to other Dothan police officers. On the other hand, Lt. Baxley had multiple offices, one being located at the Dothan City School Board, and another located in Juvenile Investigations, where he had good access to the resources. My being so deprived made it difficult for me to do my work. It also hampered my engagement with my direct supervisor Captain David Jay, unlike Lt. Baxley. Lt. Baxley was later added into my chain of command, after removing me from Criminal Investigations.

23. I still insist, contrary to the Defendant's brief's allegations in paragraphs 35-39 (pages 11-12), that, in my total score, there were rounds not counted, even after a recount. The effect was to lower my score for promotional purposes, in contrast to my white fellow officers who were not sent off to a more remote location. In addition, the Defendant failed to mention that I refused to test for SWAT because the testing requirements were deliberately designed to disqualify female applicants by the training department members, one of whom was white male Carlton "Bubba" Ott, seen pictured holding the symbolic and often referred to Confederate Battle Flag, with its long-standing history of racism (See Def's Exh. A, dep. exh. 32).

24. With respect to the Sergeant's exam ( discussed in paragraphs 40-45, pages 12-13 of Defendant's brief) I should have finished 1st, or near 1st out of the 12 officers so tested, rather than 8th, had I not been the only one subjected to the improper set-up of the flip chart during the assessment. Of course, my white male counter-parts were not subjected to this improper set-up. I was the only female taking the test. I believe the improper set-up was done deliberately to trip me up. My complaint to Personnel Analyst and exam overseer, a white female, namely Nichole O'Malley Gibson, prompted no investigation by the Personnel Director Delvick McKay, EEO Officer Daryl Mathews, or Police Chief Greg Benton upon my complaint, contrary to what the Defendant indicated in paragraph 45 (page 13). The Defendant's failure to initiate an investigation into my complaint to Nichole Gibson further reflects their intent to violate the Consent Decree and continue repeated racial and gender discrimination acts towards me.

25. I strongly believe the controversy that later arose with respect to my Facebook posting on a matter of public concern, namely the Christopher Dorner case, was blown way out of proportion from reality. It was embellished, and spread around the Dothan Police Department, as a way to keep me from being promoted to Sergeant. The EEO Officer Darryl Mathews, during his investigation refused to identify those officers he claimed had filed complaints against me. In fact, Mr. Matthews changed the number of complainants during the investigation, at the personnel board hearing, and again in reports to the media and Defendant's opposing brief.

26. My Facebook postings on the Dorner matter, as with all other Facebook postings, were intended to be limited to my friends. Yet, I also felt that, had my postings been construed as I meant them to be, then a beneficial effect for law enforcement generally would have been achieved. That is, police departments, including the one in Dothan, would have taken positive steps to make certain that the ultimate fiasco of Dorner would have never happened at any other police department, including Dothan's.

27. Although I believed that Christopher Dorner had raised certain underlying issues of constitutional rights and abuse by the police, I never once said that those issues justified his alleged killings. In fact, they absolutely did not justify any killings, and I was abhorred that any policeman may have killed anyone else, except in self-defense, or in lawful defense of another.

28. One of the prime movers in the Facebook complaint about me was Major Steven Parrish, a white male, and an admitted member of the Sons of Confederate Veterans (SCV) an organization with known ties to the Ku Klux Klan. He was also Commander of the Henry Light Infantry Camp #1968 of the SCV. He was trying to create conflict among other officers and myself. He tried to create some sort of legal standing pertaining to the department rules and regulations as a way to justify removing me from the positions I held. He tried to prevent me from being promoted to Sergeant. He asserted his position within the racist organization to act out his racist viewpoints. Another prime mover in the Facebook complaint about me, namely Lt. William Benny, a white male, kept trying to get back at me because of an "excessive force" complaint that I filed against one of his officers.

29. I dispute paragraph 47 (page 14) of Defendant's brief, and again respectfully inform the court of the Defendant's misstatement of fact. The Defendant's misstatement to me not receiving an assignment from only one requested assignment via a PD12 is totally negated by Defendant's own acknowledgment of my assignment to School Resource Officer, which was initiated via a PD12. The same misstatement of fact is applied to paragraph 49 (page 14) of Defendant's brief, in that training opportunities were not made readily available to blacks, as opposed to white officers.

30. In paragraphs 51-53 of the Defendant's brief, the Defendant fails to include the laws of the State of Alabama, those for whom several of the white employees violated, including the Police Chief, a white male, namely Greg Benton, who admitted in Captain Gray's deposition to committing adultery while married. He was the standing Police Chief, and according to Defendant's brief, the sole authority in my termination of employment. Other crimes included theft of police evidence, driving under the influence, and tampering with evidence to name a few.

31. Furthermore, as noted in paragraphs 55-56 (pages 15-16) of Defendant's brief, those acts in the afore-mentioned paragraph, were not applied to these white officers alike, again displaying the disparate treatment administered towards blacks as opposed to whites.

32. Contrary to paragraph 57 (page 16) of Defendant's brief and declaration made by Mr. Benton, the Defendant fails to mention the sworn testimony of Mr. Benton given during the Personnel Board Hearing. At that point, Mr. Benton swore that he made up the gross insubordination charge against me, and could not point out the specific section of the City of Dothan Personnel rules and regulations. Mr. Benton also, under deposition in Captain Gray's case, admitted to terminating Captain Gray's employment prior to the conclusion of the internal affairs investigation. (Evidentiary Submission Exhibit B, May 23, 2013 Personnel Board hearing transcript "2013 PB Hearing,"

33. In paragraphs 58-92 of the Defendant's brief, it sets out the names of 35 alleged, or would-be, comparators, all of whom were white except for David Thornton, the EEO officer. In paragraph 93, the Defendant's brief concludes that I am unable to provide relevant details about how these alleged comparators were similarly situated to me. The fact is that all these other 34 officers were white males, except for Brandi Bowen and Rachel David, both of whom were white females. What they all had in common was a white culture overwhelmingly Republican and anti-Obama, whereas I was the opposite, Democratic and pro-Obama. Of course, despite numerous efforts to be promoted to Sergeant, I never was so promoted during my fourteen years at the Dothan police department. On the other hand, I witnessed numerous white counter-part officers with less experience than me being promoted to sergeant, including in 2013.

34. Notwithstanding, some of these other officers had Facebook postings that were potentially very controversial, but nothing was even done to them. One posting in particular involved Lt. Will Benny, a white male. He had a Facebook posting about "**I have inadvertently walked in on a white trash rally, Sorry to bother you folks, I just need some milk**" while at a local Walmart. In a second Facebook posting Lt. Benny stated, "**There are a lot of empty trailer parks right now**" while attending the Toadlick Music Festival, and even a third a third controversial posting about Hispanics.

35. In addition, Dothan police officer Mike Woodside, a white male, **posted a very ugly picture of President Obama on January 15, 2013, calling him a two-faced liar and hypocrite**. Yet, nothing was ever done to Mr. Woodside about this.

36. There was also Captain David Jay, a white male, who posted on Facebook a picture and statement that he wished George W. Bush was still president. He also had a posting of a sign with a statement clearly directed toward African- Americans, saying "**The government is not your baby's daddy**". Yet nothing was ever done by the Dothan Police Department to Captain Jay about this racially-inflammatory posting.

37. Likewise, **police chief Greg Benton had multiple Facebook postings from Glen Wood, one sharing a photo from The Tea Party about President Obama "ignoring our system of government," and a link via I will NOT vote for Obama in 2012, which was also**

**controversial, and no action was taken against him.**

38. Furthermore, a clear threat to my safety was suggested by a member on social media site, Wiregrass Live (similar to Facebook), in which Chief Greg Benton and Major Steve Parrish were also members. This was never investigated to protect my safety, or to identify the person making the threat. No attempt was made to rally the support of other law enforcement officers. Instead, a complaint originating on this same site was used as the basis for an investigation against me, when I made no posts to this site. Major Parrish even contributed comment in response to the threat.

39. The person used by the Dothan Police Department to criticize me for my Facebook posting was Emily Hayes of Wiregrass Live (another social media site similar to Facebook). Ms. Hayes is quoted at length in Defendant's brief on pages 21-22. She is a member of white female Sgt. Adrianne Woodruff's motorcycle club. Ms. Hayes didn't know me from anyone else. The only way she could have gotten my Facebook information is through someone at the Dothan Police Department passing it on to her.

40. Moreover, the person most offended by my Facebook post was Major Steve Parrish because he did not agree with my reference to "slaves," which goes against his personal beliefs in support of slavery and the Confederate Battle Flag as presented in his many published writings, that include, A History of the "Irwin Invincibles" the "Henry Light Infantry" posted on a public website http://www.algw.org/henry/military/irwin_invincibles.htm. In paragraph 101 (page 25) Major Parrish expressed what the Defendant's brief refers to as the "concern from the department" making this statement the day before the internal affairs investigation was commenced against me for alleged social media policy violation, after he was advised that I was entitled to my First Amendment right to freedom of speech, and that I would not be moved from the positions I held. As acknowledged in Defendant's brief, this conversation was recorded in its entirety. However, the Defendant is picking and choosing particular points they wish the Court to consider. Carney Exhibit.

41. In my Facebook post on the Dorner matter, I was primarily speaking to close friends like Karla C. Mays, who has also issued an affidavit related to this matter. (See Exhibit E).

42. On the Facebook posting I did on the Dorner matter, I was simply trying to elevate the consciousness level of others about the kind of problem that led to Dorner's manifesto and breakdown. I truly believe that, if all law enforcement officers could be more sensitive about racial and ethnic differences, then the kind of incidents, such as what happened with Mr. Dorner, would be greatly minimized, if not eliminated altogether. The problem is that complaints made by African-Americans to white superior officers often fall on "deaf ears." This was part of what Mr. Dorner encountered. It is also what I have encountered. That was the simple point I was trying to make, along with pointing out the adverse consequences when that happens.

43. One unfortunate but related example came when I filed a complaint against a fellow white Dothan police officer, a white male named Daniel Grantham, for using excessive force against a handicapped black male whose arm would not bend far enough behind his back to be handcuffed. Mr. Grantham, after white male officer Scott Smith could not affect the arrest, then

punched the disabled man in the top and back of the head. Mr. Grantham then lifted the black male from the ground by his throat, and made a statement to the effect that this is the treatment you get when you run from law enforcement. I thought it was unconscionable, such an excessive use of force, and inconsistent with state laws and the rules and regulations of the City of Dothan. This is why I filed the complaint. Yet, I was retaliated against for filing the complaint.

44. I regret that, in her Defendant's brief, attorney Mays minimizes and twists out of context much of what I said. I'm not surprised that Internal Affairs investigator Donnie Smith is also twisting what I said, and/or embellishing the negative reaction of other Dothan police officers to my Facebook posting.

45. I note, in page 26 of the Defendant's brief, the term "racially-motivated" is used to describe my Facebook posts. Yet, I didn't call whites any bad names. It takes another person's far-right position on contemporary issues, and with that tilted philosophy influencing that person, to believe that my Facebook posts as "racially-motivated."

46. I note that Defendant's brief cites two African-Americans, namely EEO Officer Darryl Mathews, and Personnel Director Delvick McKay, as individuals who, respectively, conducted and investigated, and found that I violated the Department's social media policy. Yet, Mr. Mathews got special kickbacks from the City of Dothan's Mayor, a white male, namely Mike Schmitz's dealership for referring customers creating a conflict of interest. It was also a violation of Personnel rules and regulations. Additionally, Mr. McKay earlier indicated his bias against me, even before the investigation of my social media post, when I presented him with my complaint naming several high ranking senior officials of the police department, all of whom have been identified throughout this affidavit. Therefore, the findings of both individuals were tainted with self-interest and unfair-mindedness, and should be jettisoned as unreliable.

47. I truly believe that the City of Dothan's reason given for my termination, namely the difficulties I was having with my then fiancé Kenneth Cloyd, and my alleged insubordination to Lt. Scott Long, was a pretext to cover up a substantial and motivating factor for my termination, namely my afore-mentioned social media comments. Additionally, an element of ingrained race discrimination played a significant part in my termination, for reasons stated in my complaint, and in this affidavit. Indeed, the race discrimination and denial of my 1st Amendment right to free speech overlap. If my social media posting had reflected an anti-Obama statement, nothing more would have ever been said, and no disciplinary actions against me would have occurred. That is overwhelmingly obvious.

48. One reason I see the incident with my fiancé (Mr. Cloyd) as pretextual is that the entire matter occurred while I was off-duty, and while protecting my own property. Also, there was no truth or even an allegation that I committed any physical abuse or verbal threat against Mr. Cloyd. Instead, it was Mr. Cloyd who admitted that, while I was in the driver's seat of my police car, he opened the car door, and reached in and grabbed me in my left upper arm bicep. However, instead of saying the truth about what happened, the police officers who responded were blinded by pre-existing ill will against me from the social media incident. And yet I had only recently returned from serving a suspension from the social media matter at the time of incident in my

home driveway. Indeed, I was still serving a 2 year probation from the social media incident.

49. I also want to clarify that, contrary to the appearance of the photograph reflecting I parked my police car in such a way as to intentionally block my fiancé's car from exiting my driveway, this was definitely not the case. Instead, I momentarily parked where I did because my fiancé's car was parked in the location on my driveway where I normally park my patrol car. My own personal car was parked inside the garage, which could only contain one vehicle inside. If I had parked next to my fiancé's car on the driveway, I would have blocked myself from being able to enter and exit my own personal car from the garage. It was also easy for Mr. Cloyd to exit over the grass.

48. Meanwhile, my fiancé, who was not an owner or occupant of my home, and had not been living there with me, had been dropped off at our church 2 miles away. Further, my fiancé and I had agreed for him not to come back to my home, as we had just broken up over a disagreement. I even told my fiancé that a wrecker company would remove his car. I called a wrecker company to do just that.

49. Later on my fiancé and I patched up our differences. We did this within a couple of weeks and a couple of months later, in February 2014, were married. We remain on good terms today, although we are not currently living together.

50. Although multiple acts of race discrimination were acted against me by Defendant's, the DUI murder case against white female, Tabitha Farmer, carries the strongest reminder of such acts. In conjunction to this case, a wrongful death lawsuit was filed against Defendant's by the decedent Larry Downing's wife Mary Downing. CPL Clark Rice (a white male), pictured with the Confederate Battle flag, along with two other white male officers, namely CPL Tim Miller and Officer Darren Pert, opposed my opinion to arrest Farmer for DUI and other charges and released her resulting in Farmer striking and killing Downing approximately seven minutes after her release from being detained. I was subjected to verbal harassment and witness intimidation by the City of Dothan's Attorney, white male, Freddie Lenton White and sought to have criminal charges brought against White and then Police Chief John Powell, a white male. Defendant's protected the officers responsible for Downing's death, and did nothing to protect me from White, who has a long history of being racist towards African Americans.

51. As a result of the wrongful termination, resulting from an exercise of my First Amendment rights plus related racial discrimination, I have lost significant amounts of income, suffered great mental anguish, and have had to go through the expense of hiring legal counsel to assist me in this matter.

*RaeMonica Carney Cloyd* (signature)
RaeMonica Carney Cloyd

Before me, the undersigned Notary Public, appeared RaeMonica Carney Cloyd, known to me, who, after being duly sworn, did state that the foregoing is true and correct, to the best of her

knowledge, information and belief, on this the 24th day of September 2015.

_____
Notary Public  exp. 2-6-2017



Dear Corpal Carney,

    Thank you for having us to the Police Department We had a great tour and learned a lot about our police department. Thanks for having us.

Eliza Shipman

Your Girl Scout Friends,

Merritt Young

Katie Trant

Mary Hannah

BethAnne Shiver

Emma Tyson

Erin Renojo ♡

Lydia Smith

Frances
thank you
Good luck
catch the
criminals

autumn wirt !! ♡!

Cameron Burkett
thank you ♡