## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IVAN KEITH GRAY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **1:14-cv-00592-MHT-SRW** |
| **CITY OF DOTHAN,** | ) | |
| **Defendant.** | ) | |

## **DEFENDANT'S MOTION FOR COMPLETE SUMMARY JUDGMENT**

Defendant City of Dothan ("Defendant" or "City"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully requests that this Court enter complete summary judgment in its favor regarding Plaintiff Ivan Keith Gray's ("Plaintiff") claims. As grounds for this motion, Defendant states that based on the undisputed material evidence, and for the reasons stated herein, no genuine issue of material fact exists and Defendant is entitled to summary judgment in its favor as a matter of law.

# **TABLE OF CONTENTS**

I.   INTRODUCTION…………………………………………………1

II.  STATEMENT OF UNDISPUTED FACTS………………………2

III. LEGAL STANDARD……………………………………………..27

IV.  LEGAL ARGUMENT……………………………………………28

A.   ALL OF PLAINTIFF'S UNTIMELY CLAIMS AND
     CONSENT DECREE CLAIMS FAIL AS A MATTER OF
     LAW…………………………………..…………………………28

B.   PLAINTIFF HAS NOT AND CANNOT ESTABLISH THAT
     HIS TERMINATION WAS A VIOLATION OF THE FIRST
     AMENDMENT……………………………………………29

     1.  The *Pickering* Test……………………………………………29

     2.  FBI's Definition of Outlaws and One Percenters……………32

     3.  Plaintiff's Association With Outcast Motorcycle Club………33

     4.  Compelling Eleventh Circuit Case Law and Evidence Gathered
         During Internal Affairs Investigation…………………………35

     5.  Cases Involving Police Officers and Motorcycle Clubs……...36

C.   PLAINTIFF'S RACE DISCRIMINATION CLAIM FAILS AS
     A MATTER OF LAW……………………………………………43

     1.  Termination……………………………………………...45

     2.  Administrative Leave……………………………………51

     3.  Training…………………………………………………54

     4.  Work Environment………………………………………...56

5.  Inadequate Investigation of Complaints………………...……56

**D.    PLAINTIFF'S RETALIATORY HOSTILE WORK ENVIRONMENT CLAIM FAILS AS A MATTER OF LAW……………………………………………………..59**

1.  Plaintiff Not Subject to Harassment…………………………60

2.  No Causal Connection………………………………………..61

3.  Not Severe or Pervasive……………………………………62

**V.    CONCLUSION……………………………………………………69**

## I.    INTRODUCTION

Plaintiff's 122-paragraph Complaint (Doc. 1) is nothing more than an attempt to throw everything up and see what sticks.  As Defendant has previously outlined in its Motion for Partial Summary Judgment (Doc. 34), Count II of Plaintiff's Complaint is due to be dismissed in its entirety and the claims alleged in at least 19 of the paragraphs are due to be dismissed as untimely or for failing to state a claim.  As discussed in more detailed below, while Plaintiff was a Captain (one of the highest ranking officers) in the Dothan Police Department, he associated with outlaw motorcycle club members, attended events hosted by outlaw motorcycle clubs, proudly received a patch from an outlaw motorcycle club, and requested the blessing of Outcast and Sin City Disciples, two clubs that he knew were one percenters or in his own words, "the most volatile gang that there is out there." Plaintiff's attempt to associate with outlaws on the one hand and enforce the law on the other was a violation of City of Dothan's policies which clearly prevent Plaintiff from having it both ways.  The undisputed facts demonstrate that the City of Dothan had legitimate nondiscriminatory reasons for the employment actions it took regarding Plaintiff, including the termination of his employment, and in no way violated his First Amendments rights or subjected Plaintiff, who was employed with the City for 28-years, to a hostile work environment.  Plaintiff's termination was a product of his own choices.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

**City of Dothan Police Department**

1.      Plaintiff was hired by the City of Dothan as a Police Officer in or around February 1985. (Personnel Board Transcript "PB Transcript" 30:7-11).

2.      Key duties for all Dothan police officers include arresting those who violate the law and testifying in court against those they arrest. (Benton Declaration ¶ 10).

3.      At the time Plaintiff was employed, the City of Dothan Police Department was composed of three (3) bureaus: Patrol Bureau, Administrative Services Bureau, and Investigations Bureau.   (Deposition of Ivan Keith Gray "Gray Depo," 388:13-19).

4.      Each of the three bureaus was supervised by one of three captains within the Department. (Declaration of Gregory Benton "Benton Declaration" ¶ 9).

5.      The position of captain is the third highest ranking position in the Department and is a highly visible position entrusted with a significant amount of responsibility and discretion. (Benton Declaration ¶ 8).

6.      Plaintiff agreed that there was a need for rank and order within the Dothan Police Department. (Gray Depo, 46:10-15).

**Equal Employment Opportunity Employer**

7.      The City is an equal opportunity employer and is committed to making employment decisions, including recruiting, hiring, promoting, assigning job duties and terminating employees without regard to race or any other protected category. (Declaration of Darryl Mathews "Mathews Declaration" ¶ 3, Exhibit 1)

---

[1] The "undisputed" facts recited herein are presented for purposes of summary judgment only, and Defendant reserves the right to dispute these facts, if necessary, in later stages in this case.

**Policies and General Orders**

8.      Police officers for the City of Dothan are required to complying with the Police Department's General Orders, the Personnel Board's Rules and Regulations and policies issued by the City.  (Benton Declaration ¶ 11).

9.      Officers receive an employee handbook, containing the Rules and Regulations, and copies of the General Orders when they are hired. (Benton Declaration ¶ 11).

10.     Updates to the rules are posted on the City's network. (Benton Declaration ¶ 11).

11.     All of these polices were accessible to Plaintiff while he was employed by the City. (Gray Depo, 143:22-144:2, 159:10-16).

12.     As a supervisor, Plaintiff had to be familiar with the Department's policies because he had to apply them to employees who reported to him. (Benton Declaration ¶ 10).

13.     Plaintiff is familiar with the Police Department General Orders and Code of Ethics and reviewed these policies during his employment with the City. (PB Transcript 31:11-19; 30:18-21; Second McKay Declaration ¶11, Exhibit 5).

14.     Dothan Police Department General Order 200-42H, Mobile Data Terminals and Electronic Messaging states, in relevant part, that "Discretionary viewing, downloading, and/or transmitting materials (other than that required for police business) that involve the use of obscene language, images, jokes, sexually explicit materials or messages that are offensive or disparaging any person, group or classification of individuals is prohibited. (Benton Declaration ¶ 11, Exhibit 5).

15.     Dothan Police Department General Order 100-41, Code of Ethics states, in relevant part, that "Police officers will behave in a manner that does not bring discredit to their agencies or themselves.  A police officer's character and conduct, while off duty, must always be exemplary, thus maintaining a position of respect in the community in which he or she lives and serves.   The officer's personal behavior must be beyond reproach. (Benton Declaration ¶ 11, Exhibit 6)

16.     Dothan Police Department, General Order 100-50, Code of Conduct states, in relevant part,

II. CONDUCT UNBECOMING AN OFFICER

A.  An officer must at all times, on duty and off duty, conduct himself in a manner which does not bring discredit to himself, the Department, the City of Dothan, or law enforcement in general.

B.  Conduct unbecoming an officer/employee shall include conduct or personal association that brings the Department into disrepute; which adversely affects the morale or efficiency of the Department; has an adverse effect on the employee's job performance, or which has a tendency to destroy public respect for employees and confidence in the Department.

C.  To sustain conduct unbecoming an officer, it is not necessary that the alleged conduct be criminal in nature.  The basis for disciplinary action will be a preponderance of the evidence."

(Benton Declaration ¶ 11, Exhibit 7).

17.    Dothan Police Department, General Order 100-50, Code of Conduct also states, in relevant part

XXXII. TRUTHFULNESS

Upon the order of the Chief, the Chief's designee, or a superior officer, employees shall truthfully answer all questions specifically directed and related to the scope of employment and operations of the Department, which may be asked of them.

Any employee found to be intentionally untruthful may be subject to termination, aside from any additional improper conduct discovered."

(Benton Declaration ¶ 11, Exhibit 7).

18.    Dothan Police Department, General Order 100-50, Code of Conduct, further states that

XXXVIII.  MEMBERSHIP IN ORGANIZATIONS

A. Officers and employees of this Department shall not affiliate with, or become a member of, any organization if such affiliation or membership would in any way impede or prevent their effective duty performance, or bring the credibility and integrity of the Department into question.

B.  Officers and employees shall not affiliate with or become a member of any organization whose purpose, objective or reputation is, or has been shown to be, directed toward unlawful or illegal activities; except with permission from the Chief of Police specifically for legitimate law enforcement purposes.

(Benton Declaration ¶ 11, Exhibit 7).

19.    Dothan Police Department, General 200-30, Professional Standards, states, in relevant part

IV. INVESTIGATIVE PROCEDURES
. . .

M.  During an administrative investigation, the refusal of an employee to answer questions truthfully and without intentionally omitting details concerning the matter under investigation may result in disciplinary action to include termination.

. . .

VII. ADMINISTRATIVE LEAVE PENDING INVESTIGATION

A. When there is a question as to the employee's fitness for duty, or when failure to remove an employee from duty may have a detrimental impact upon the operations of the Department, or at the discretion of the Chief of Police, an employee may be placed on administrative leave pending the outcome of an internal or criminal investigation, or when the Chief of Police determines return to work is applicable. This action will be accompanied by the issuance of a written Notice of Administrative Leave.

…

C.  After the completion of an internal investigation wherein a conclusion of has been drawn to substantiate that the employee in question acted within the legal scope of his authority and violated no departmental policy or criminal law, the said employee shall be immediately re-instated into his previous position with no adverse action applying.

(Benton Declaration ¶ 11, Exhibit 8).

20.    The Personnel Board Rules and Regulations outline the disciplinary policy and due process procedure followed by the City of Dothan and provide that an intolerable offense for which an officer can be terminated includes conduct unbecoming of an officer.

(March 27, 2013 Declaration of Delvick McKay "Second McKay Declaration" ¶ 3, Exhibit 1).

## Plaintiff's Employment History

21.    In the City of Dothan Police Department, one becomes a corporal after being a police officer.  (Gray Depo, 44:7).

22.    Plaintiff was promoted to corporal in 1988. (Gray Depo, 384:16-385:11).

23.    Plaintiff was promoted to sergeant in 1990, to lieutenant in 2006, and to captain on or about October 24, 2010. (Gray Depo, 31:23-33:4).

24.    Chief Benton promoted Plaintiff to captain. (Benton Declaration ¶ 8).

25.    Plaintiff was the highest ranking African-American officer at the City of Dothan.  (Gray Depo, 34:15-18).

26.    Major Parrish became major of the Dothan Police Department effective July 18, 2010.  (March 17, 2015 Declaration of Delvick McKay "First McKay Declaration," ¶ 7).

27.    Major Parrish was Plaintiff's direct supervisor from Plaintiff's promotion to captain in 2010 until the end of his employment and had authority to review Plaintiff's work. (Gray Depo, 39:6-41:1).

28.     Chief Greg Benton ("Chief Benton") has been serving as police chief of the Dothan Police Department since January 2010. (Gray Depo, 313:14-17).

**Managers Have Discretion to Make Decisions**

29.     Plaintiff agreed that supervisors sometimes make decisions that subordinates do not agree with; just because the subordinate does not agree with the decision does not mean that the decision is wrong. (Gray Depo, 39:6-15).

**Performance Appraisals**

30.     On all of the performance appraisals administered by Major Parrish and approved by Chief Benton to Plaintiff, Plaintiff received the rating of "Exceptional Performer." (Benton Declaration ¶ 6, Exhibit 3).

**Performance Improvement Plan**

31.     On or about February 24, 2012, Major Parrish presented Plaintiff with a performance improvement plan. (Parrish Declaration ¶ 6, Exhibit 1, Bates 3296-3299).[2]

32.     Plaintiff recorded the meeting during which Major Parrish presented Plaintiff with a performance improvement plan. (Gray Depo, 357:3-10, Ex. 34; Parrish Declaration ¶ 6, Exhibit 2).

33.     During the meeting with Plaintiff, Major Parrish stated that he did not view Plaintiff as having "chip on [his] shoulder" and that he foresaw them returning to normalcy. (Gray Depo 360:15-361:12).

34.     During the meeting, Parrish also told Plaintiff, "We've known each other for 25, 30 years.  You know, if I didn't like you and didn't have faith in you, I wouldn't have nothing to do with you.  I mean, I'll just be honest with you.  I think – I think that you have the ability and you have the drive in you that when – when I leave out of here in a couple of years, if you're still here, you can step right in my – right in my spot.  I want to do what I can to get you ready for it, if I can do it." (Gray Depo, 363:8-364:15).

---

[2]  According to Plaintiff, the audio recording Plaintiff produced accurately reflected the conversation that he had with Major Parrish.  (Gray Depo, 358:23-359:11).

**Supervisory Relationship Between Major Parrish and Plaintiff**

35.     During the time Major Parrish served as Plaintiff's direct supervisor, he gave Plaintiff both positive and negative feedback on many occasions. (Parrish Declaration ¶ 3).

36.     Major Parrish frequently commended Plaintiff for actions he had taken that were above and beyond expectations. (Parrish Declaration ¶ 3, Exhibit 1, Bates 3340-3351).

37.     "Guardian Tracking is a software that is used to add entries of various things dealing with an officer's duty, performance, just aspects of his job where comments can be made." (Gray Depo, 170:15-18).

38.     Guardian Tracking is not typically used to submit complaints and/or reports of alleged discrimination and/or harassment because the EEO/Training Officer, who typically investigates such allegations does not have access to Guardian Tracking entries. (Mathews Declaration ¶ 4).

39.     Major Parrish submitted more Guardian Tracking reports regarding Plaintiff than any other officer under his supervision.   (Parrish Declaration ¶ 3, Exhibit 1, Bates 3331-3335).

40.     Most of the Guardian Tracking reports regarding Plaintiff related to his positive participation in and involvement in the community and his positive job performance. (Parrish Declaration ¶ 3, Exhibit 1, Bates 3340-3351).

41.     On April 8, 2013, Parrish made a Guardian Tracking entry informing Plaintiff that a pattern of a lack of communication was developing. He stated: "as your supervisor I expect to be informed with things that relate to the operations of this Department." (Parrish Declaration ¶ 5, Exhibit 1, Bates 3272).

42.     Major Parrish had to remind Plaintiff on at least one occasion that Plaintiff needed to communicate with him when he was absent from work. (Parrish Declaration ¶ 8, Exhibit 1, Bates 3272).

43.     Plaintiff's lack of communication with his supervisor required Major Parrish to inquire about Plaintiff's whereabouts to others, including Plaintiff's secretary. (Parrish Declaration ¶ 8).

44.     Major Parrish was also responsible for guiding Plaintiff in Plaintiff's supervisory responsibilities for Plaintiff's subordinates. (Parrish Declaration ¶ 8).

45.     Due to complaints from Plaintiff's subordinates and inefficiencies in Plaintiff's Bureau, Major Parrish counseled Plaintiff on his tendency to micromanage his subordinates. (Parrish Declaration ¶ 8, Exhibit 1, Bates 3282; Declaration of Adrianne Woodruff "Woodruff Declaration" ¶ 7).

46.     On one particular occasion, on of Gray's subordinates, Officer Markow, made a mistaken arrest. Plaintiff spent so much time investigating the incident that his other responsibilities, including important paperwork, fell behind. (Parrish Declaration ¶ 8).

47.     Major Parrish counseled Plaintiff that while he agreed that Officer Markow was wrong, Plaintiff needed to deal with the situation efficiently and move on. (Parrish Declaration ¶ 8).

48.     On three different occasions, Plaintiff became involved in incidents occurring at night clubs while Plaintiff was frequenting those night clubs in his off-duty capacity. (Parrish Declaration ¶ 9, Exhibit 1, Bates 3283 & 3290).

49.     As a result of these incidents triggering inquiries within the Department, Major Parrish counseled Plaintiff that he did not think it was appropriate for Plaintiff, given his high-ranking position within the Department, to be out at night clubs into the early hours of the morning, particularly when he had to be at work at 8:00 AM the next day. (Parrish Declaration ¶ 9, Exhibit 1, Bates 3283 & 3290).

50.     Plaintiff was responsible for reviewing polygraph examinations of potential new hires within the Department and for submitting them to Chief Benton. Chief Benton sometimes asked Major Parrish about the status of delayed reports, prompting Major Parrish to remind Plaintiff that the reports were important and needed to be submitted in a timely manner. (Parrish Declaration ¶ 8).

51.     On or about June 9, 2013, Plaintiff entered a response to Major Parrish's April 8, 2013 Guardian Tracking entry.  (Parrish Declaration ¶ 5).

52.     On or about June 10, 2013, Plaintiff took his response to the office of Delvick McKay ("McKay"), the Personnel Board Director, and McKay

immediately forwarded Plaintiff's report to Darryl Mathews ("Mathews"), the EEO/Training Officer for investigation.  (Second McKay Declaration ¶ 7, Exhibit 2).

53.    On or about June 12, 2013, Major Parrish sent a memo to Chief Benton forwarding the Guardian Tracking entry made by Gray and requesting that the Chief request an investigation. (Parrish Declaration ¶ 5, Exhibit 1, Bates 3268).

54.    That same day, Chief Benton requested that Mathews conduct an investigation and that it be "investigated outside the department due to the sensitivity and nature of the complaints by Captain Gray."  (Benton Declaration ¶ 5, Exhibit 2).

55.    On or about June 17, 2013, Mathews notified Plaintiff that he was in receipt of the Guardian Tracking rebuttal and was initiating an investigation. (Mathews Declaration ¶ 7, Exhibit 4).

56.    Mathews conducted an internal investigation regarding the statements made by Plaintiff in the Guardian Tracking report.  (Mathews Declaration ¶ 8).

57.    As part of that investigation Mathews interviewed Chief Benton, Major Parrish, Captain Jay, Captain Robinson, Sergeant Donny Smith ("Sergeant Smith"), Lieutenant Etress, Officer Donald Peterson ("Officer Peterson") and Plaintiff.  (Mathews Declaration ¶ 8).

58.    On or about July 5, 2013, Major Parrish submitted a memo and supporting documentation to Mathews in which he provided responses to the allegations made by Gray in a Guardian Tracking entry. (Parrish Declaration ¶ 5, Exhibit 1).

59.    Chief Benton also submitted a memorandum to Mathews regarding Gray's June 2013 Guardian Tracking entry.    (Benton Declaration ¶ 5, Ex. 2).

60.    At the conclusion of the investigation, Mathews determined there was no evidence of discrimination and Plaintiff's allegations were unsubstantiated. (Mathews Declaration ¶ 8).

61.    On or about September 18, 2013, Mathews sent a memorandum regarding his findings to Gray. (Mathews Declaration ¶ 9, Exhibit 5).

62.     That same day, Mathews sent a more detailed report of his findings to Mike West, City Manager; and Delvick McKay, Personnel Director. (Mathews Declaration ¶10, Exhibit 6).

**Plaintiff's EEOC Charges**

63.     On March 12, 2014, the EEOC, a separate, independent administrative agency, issued a "no cause" finding with regard to both Charge Number 425-2013-00913 and Charge Number 846-2013-44447, previously filed by Plaintiff in which he alleged race discrimination and retaliation. (Doc. 1, Exhibit B)

**Plaintiff's Association with Outlaw Motorcycle Gangs**

64.     In 2008, Plaintiff founded and became the first president of Bama Boyz Motorcycle Club ("Bama Boyz"), a riding club in Dothan, Alabama. (Gray Depo, 79:23-80:18).

65.     Plaintiff was a member of Bama Boyz Motorcycle Club from 2008 until 2014. (Gray Depo, 72:11-15).

66.     In 2012, Bama Boyz opened a chapter in Anniston, Alabama. (Gray Depo, 79:20-22).

67.     When assessing candidates for membership, Bama Boyz did not inquire into or discuss whether the applicants had ever been arrested or charged with a crime. (Gray Depo, 84:8-23).

68.     No police officers other than Plaintiff were members of Bama Boyz. (Gray Depo, 88:17-18).

69.     Both Outcast Motorcycle Club ("Outcast") and Sin City Disciples Motorcycle Club are considered outlaw motorcycle clubs ("outlaws" or "OMCs"). (Gray Depo, 89:17-23).

70.     By Plaintiff's own admission, to be an outlaw motorcycle club is to have members that may have been involved in criminal activity. (Gray Depo, 90:1-11).

71.     A one percenter is someone who has a criminal record. (Gray Depo, 92:16-17).

**Plaintiff's Talk to "Prospects" - Prospective Members of Bama Boyz**

72.     At some point prior to August 25, 2013, Plaintiff gave a recorded talk to prospective members of Bama Boyz, also known as "prospects." (Gray Depo, 94:6-95:2,102:8-11; PB Transcript 82:3-6; 85:10-12; 87:2-4, 120:12-14).

73.     Plaintiff testified "It was my lecture.  No doubt about it" and admitted that he put it together.  (PB Transcript 127:18-22).

74.     The information that Plaintiff provided the prospects was "knowledge that [he] had of them independently of what research the police department or the FBI or the ATF did . . . ."  (PB Transcript 84:15 – 85:7).

75.     Plaintiff made the following comments during the talk to the Bama Boyz prospects:

- "Outlaw motorcycle clubs are one percenters." (Bates 1788).

- "An outlaw motorcycle club is a one percenter." (Bates 1788).

- "When you see someone with a patch that has one percenter on it, know that's the most volatile gang that there is out there."  (Bates 1788).

- "You give me the slightest look that you don't like me and I'm an 'OMC' your ass is gonna get slapped, whipped, jumped on by everybody or whatever.  You just don't disrespect them in any way."  (Bates 1789).

- "We do things according to OMC protocol." (Bates 1790).

- "In the state of Alabama, the dominant motorcycle clubs . . . are the one percenters." (Bates 1790).

- "The Outlaws are one percenters."  (Bates 1790).

- "Outcast, Wheels of Soul, Sin City Disciples and Mortal Souls . . . They're around this area and . . . one percenters."  (Bates 1790).

- "Since we're an outlaw state which means before you can put a vest on with designations or colors and stuff on the back, you have to have the permission of an OMC.  To be an MC, you have to have permission.  We have it." (Bates 1790).

- "We work hand-in-hand with 'em." (Bates 1790).

- "Your OMC's that you're following real close behind and you're following their direction and guidelines." (Bates 1792).

- "Every MC around here in our area is part of our association.  We have a meeting . . . every second Sunday.  . . . Any time that there's no one represented by your club at our association meetings cost your club a hundred bucks. . . . If you're not there a third time in a calendar year, boom, the whole club's colors come off for the rest of that year.  Now, the OMC can take the MC's colors at any time." (Bates 1792).

- "Going down to Panama City.  It's called Legions of Doom. We go down there any they have a clubhouse . . . .  So, they let us come to their club house and they let us write our name on the foyer going in . . . . With a bike club and you writing something on the wall in their clubhouse, that is huge. . . . We've gone to a couple of their member's funerals." (Bates 1803).

- "I had a prospect in Florida . . . that went around somewhere, smoked some weed and came back and was in our same setting and everybody smelled it." (Bates 1813).

(Declaration of Donny Smith "Smith Declaration" ¶ 14, Exhibit 5-6).[3]

76.    Plaintiff admitted that he told the prospects that outlaw motorcycle clubs are one percenters and that Bama Boyz worked hand in hand with Outcast, which is an outlaw motorcycle club.  (Gray Depo, 94:6-95:2, 249:12-250:9, Ex. 25, PB Transcript 82:3-6; 120:12-14).

**Plaintiff Requested Blessing of One-Percenter Motorcycle Clubs**

77.    Plaintiff rode motorcycles with Bama Boyz for several years before Bama Boyz received any blessings from other clubs. (Gray Depo 108:14-18, 128:23-129:4).

78.    Plaintiff defined a "blessing" as:

- "making sure that you don't have any issues with another club that may be in that particular area about existing in harmony in a specific

---

[3] This recording was also an exhibit at the Personnel Board Hearing.

locale/location" in order to ensure safety. (Gray Depo, 107:8-22; Smith Declaration ¶ 15, Exhibit 7).

- "an approval to coexist in a territory so you can avert any potential issue if they happen to be territorial" and the blessing is "basically to keep your guys safe." (PB Transcript 71:6-10; 100:15-101:4).

79.   At the time that Plaintiff requested a blessing from Big O, the state president of Outcast; Big Meat, a member of Sin City Disciples; and Catfish, national president of Easy Riders, he had been told that those clubs were outlaw motorcycle clubs. (Gray Depo, 109: 19-110:19, 114:1-7, 120:4-121:10, 165:16-22; PB Transcript 63:10-15).

80.   Plaintiff knew that outlaws had a propensity toward violence and testified that being assaulted by an outlaw motorcycle gang because they did not want you riding in their territory was a possibility.  (PB Transcript 105:13-16, 116:11-12).

81.   Failing to follow protocol in the motorcycle community could result in getting slapped, whipped, jumped on which is "why [Plaintiff] asked for a blessing."  (PB Transcript 115:15-116:3).

**Plaintiff Attended Multiple Meetings & Functions with One Percenter Motorcycle Clubs**

82.   Plaintiff attended an Outcast anniversary party at an Outcast clubhouse and an Outcast coming out party. (Gray Depo: 131:2-132:23).

83.   Big O attended one of Bama Boyz' anniversary parties and Plaintiff took photographs with him.  (Gray Depo, 256:10-257:5, Gray Depo, Ex. 27-28).

84.   In one photograph, Big O's motorcycle vests has at least five (5) Rest in Peace patches that are visible in the photograph.  (Gray Depo, 257:8-20, Ex. 27).

85.   Another photograph Plaintiff is in includes a woman wearing a vest that reads, "Outcast Property of Alabama" who is squatting down backwards in front of a man.  (Gray Depo, Ex. 28).

86.   Bama Boyz hosted at least one event, an anniversary party, that Outcast members attended. (Gray Depo, 133:19-134:2).

87.     Plaintiff has also been to the Legion of Doom clubhouse.   (PB Transcript 167:18-21).

**Bama Boyz Received Rest in Peace Patch from Outcast**

88.     Members of Bama Boyz received a Rest in Peace patch from Outcast. (Gray Depo, 138:12-18).

89.     Big O, a member of Outcast, gave Plaintiff the Rest in Peace patches to give to the members of Bama Boyz who had attended the funeral of an Outcast member.  (Gray Depo, 253:13 – 256:9, Ex. 26).

90.     Plaintiff viewed receiving the patch as a sign of respect from Big O and testified, "It was an honor for [Big O] to give me a patch."  (PB Transcript 138:22-139:18; 141:1-4).

**Internal Affairs Investigation**

91.     On or about August 25, 2013, Lieutenant Will Benny ("Lieutenant Benny") informed Chief Benton that there had been a felony assault at the Outcast Motorcycle Clubhouse and that Plaintiff's name had been mentioned multiple times as being associated with the Outcast. (Benton Declaration ¶ 13).

92.     Chief Benton then contacted Sergeant Smith and Sergeant Doug Magill ("Sergeant Magill"), Internal Affairs Investigators and instructed them to conduct an investigation into the allegations.  (Benton Declaration ¶ 13; Smith Declaration ¶ 6).

93.     When Sergeants Smith and Magill began their investigation on August 25, 2013, they did not know that Plaintiff had filed an EEOC Charge against the City. (Smith Declaration ¶ 6; Declaration of Doug Magill "Magill Declaration" ¶ 4).

94.     Prior to receiving the report on August 25, 2013, Chief Benton had no prior knowledge that Plaintiff was involved and/or associated with outlaw and/or one percenter motorcycle clubs.  (Benton Declaration ¶ 13).

95.     Benton was concerned that a law enforcement officer in his department had been identified as being associated with a one percent motorcycle

gang because they are known to be engage in criminal activity. (Benton Declaration ¶ 13).

**Interviews of Motorcycle Club Members**

96.    That same day, on August 25, 2013, Sergeants Smith and Magill interviewed Kunta McGoley, Rafael Tyrues, Dominic Overton, Michael Lockett, Wendell Key, Eze Abuwali, and Willie McGuire and video recorded the interviews. (Smith Declaration ¶¶ 7-8, Exhibit 1).

97.    All but Eze Abuwali, who was from Huntsville, connected Plaintiff to Outcast, with three of them stating that they had seen Plaintiff at the Outcast clubhouse and knew that marijuana had been smoked in his presence. (Smith Declaration ¶¶ 7-8, Exhibit 1).

98.    Following the interview of the various members of motorcycle clubs, that same day, Sergeants Magill and Smith also interviewed Plaintiff, with his attorney present.  (Gray Depo, 275:17-20; 276:11-16).

99.    During that interview, Plaintiff told the investigators that he had obtained a blessing for Bama Boyz from Outcast and that "working here has nothing to do with me trying to protect the members of my club." Later in the interview, however, he contradicted himself by stating that he did not ask Outcast to protect him or his club. (Smith Declaration ¶ 11, Exhibit 4).

100.    Plaintiff also told the IA Investigators that he was aware of a place on a federal website where one could look up outlaw motorcycle clubs. (Smith Declaration ¶ 11, Exhibit 4).

101.    Following this first interview, Chief Benton placed Plaintiff on paid administrative leave, pending the outcome of the investigation.  (Gray Depo, 278:10-14).

102.    Plaintiff remained on paid leave until the termination of his employment on September 23, 2013, but was not disciplined in any way prior to his termination. (Benton Declaration ¶ 14).

103.    Placing an officer on administrative leave pending the outcome of an investigation is standard procedure within the Department and implies no presumption of guilt. (Benton Declaration ¶ 14, ¶ 11, Exhibit 8).

104.   As part of their investigation, Sergeants Smith and Magill conduct in depth research regarding outlaw motorcycle gangs.  (Smith Declaration ¶ 12).

105.   In addition, in an effort to confirm whether Plaintiff had provided any information to the motorcycle clubs regarding ongoing police investigations, the officers searched Plaintiff's police vehicle and requested a forensic analysis of his City-issued cell phone. (Smith Declaration ¶ 13).

106.   Among other things, the investigators found an audio recording labeled, "Understanding Motorcycle Clubs," in Plaintiff's car that contained a talk that Plaintiff provided to prospective members of Bama Boyz.  (Smith Declaration ¶ 14, Exhibits 5-6)

107.   On or about September 13, 2013, Sergeants Magill and Smith interviewed Plaintiff again, with Plaintiff's attorney present.  (Gray Depo, 277:17-20; 277:21-278:4).

108.   During this interview, Plaintiff told the internal affairs investigators the following:

- "One percenters are . . . people that you wanna stay away from. . . .  They just take the thing…take the motorcycle way too seriously . . . to the point where there could be some violence with them."  (Bates 744).

- Donny Smith: "An outcast is a one percenter.  Is that right?"

  Plaintiff: "That's what I understand"  (Bates 744).

- Donny Smith: "You made [a] choice to …become a motorcycle club.  Is that right?"

  Plaintiff: "Yes." (Bates 746).

- Donny Smith: "So a one percenter could have the potential for violence?"

  Plaintiff: "Yes."  (Bates 748).

- Donny Smith: "We agree that outcasts is a one percenter?"

  Plaintiff: "Yes."  (Bates 748).

- "I chose to go and see him" discussing requesting a blessing from Big O. (Bates 749).

- Big Meat "is a member of Sin City Disciples."  (Bates 755).

- Doug Magill: "Is Sin City a one percenter?"

  Plaintiff: "I don't have a clue."  (Bates 756).

- Plaintiff claimed that getting a blessing was "what you do in the biker community to keep people safe in my club."  (Bates 769).

- Plaintiff knows some of the guys in Legions of Doom and has gone to their anniversary party.  (Bates 783).

- Plaintiff is "friends" with members of Legions of Doom. (Bates 788).

- At first Plaintiff told the internal affairs investigators, "I don't know that they were an outlaw…I know they were called Outcast." (Bates 795).  After being confronted with the talk that he had with Bama Boyz prospects, he admitted that he told the prospects that Outcasts was a predominantly black motorcycle club and that they were one percenters.  (Bates 827-28).

- Plaintiff defined one percenters as "those clubs that may cause more trouble based on who the club is or what type of club they have than…those that ..that don't cause trouble."  (Bates 795).

- Plaintiff said he didn't do any of this research (Bates 811) and then later said that he had done some research.  (Bates 827).

- Doug Magill: "You've never been around any dope smoking at any of these clubs?...."

  Plaintiff: "That's right."  (Bates 813).

- Plaintiff later admitted, after being confronted with his voice on an audio recording giving a talk to Bama Boyz prospects, that while at the Legions of Doom Clubhouse one of his prospects had smoked weed.  (Bates 849-50).

- Discussing the audio recording of Plaintiff's talk to Bama Boyz prospects:

> Donny Smith: "So, right there you're saying that …I mean if you don't ….If you look at them wrong….there's violence there, right?"

> Plaintiff: "And…It's…That's exactly what I said."  (Bates 825).

- Plaintiff used the City's AS400 system to access the personal information of Major Parrish eight times during one month and admitted that it "wouldn't have to do with [his] job."  (Bates 862-63).

- Plaintiff also looked up Sergeant Magill and Officer Wiggins.  (Bates 864).

- Black Magic President of Outcast has been to Plaintiff's home on a social visit.  (Bates 873)

- Plaintiff logged into the cameras in the Dothan Police Department while he was on administrative leave.  (Bates 875, 880).

(Smith Declaration ¶ 16, Exhibit 4 & 14).

109.   Due to the complexity and the many local and federal agencies involved, it took approximately four (4) weeks to uncover all of the facts of this investigation.  Together with the Dothan Police Department, the Federal Bureau of Investigation and Alabama Beverage Control investigated the events that took place at the Outcast Motorcycle Club house on August 25, 2013.  (Smith Declaration ¶ 17).

110.   That investigation led to eight (8) second degree felony assault arrests. (Smith Declaration ¶ 5).

111.   The investigation confirmed Plaintiff's involvement and association with the Outcast motorcycle club.  (Smith Declaration ¶ 17).

112.   On or about September 16, 2013, Sergeant Smith submitted a report of the internal investigation to Chief Benton along with various documents, audio and video recordings to support internal affairs' findings. (Smith Declaration ¶ 18, Exhibit 15)

113.    Chief Benton did not conduct the investigation regarding Plaintiff's involvement in an outlaw motorcycle gang; however, the investigators kept him informed regarding their progress. (Benton Declaration ¶ 15, Smith Declaration ¶ 17).

114.   The report included the following definitions from the Federal Bureau of Investigation:

- Outlaw Motorcycle Clubs ("Outlaws" or OMGs") are "organizations whose members use their motorcycle clubs as conduits for criminal enterprises."
- One Percenters are "any group of motorcyclists who have voluntarily made a commitment to band together to abide by their organization's rules enforce by violence and who engage in activities that bring them and their club into repeated and serious conflict with society and the law. The group must be an ongoing organization, association of three (3) or more persons which have a common interest and/or activity characterized by the commission of or involvement in a pattern of criminal or delinquent conduct."
- Support clubs are "smaller gangs whose members regularly associate with or are friends of one of the national-level gangs. . . . Some members of support clubs have acquired employment with private businesses or government agencies, which enables them to provide national-level OMGs with business, government, and financial information that can be used to protect their criminal enterprises, according to open source and published law enforcement information."

(Smith Declaration ¶ 18, Exhibit 15).

115.   The report noted that Kunta McGoley, an Outcast member, told Sergeant Smith and Sergeant Magill that Bama Boyz was a local club that fell under the "guidance" of Outcast. (Smith Declaration ¶ 18, Exhibit 15).

116.   McGoley also stated that he had asked Plaintiff if the Dothan Police Department was investigating Outcast and that Plaintiff had checked and later reported that the Department was not. (Smith Declaration ¶ 18, Exhibit 15).

117.   At least two of the Outcast members interviewed by Sergeant Smith and Sergeant Magill, Wendell Key and Dominic Overton, were felons who told the Internal Affairs Investigators that they associated with Plaintiff at social functions. (Smith Declaration ¶ 18, Exhibit 15).

118.   Wendell Key told the Internal Affairs Investigators that he was a member of Bama Boyz before he joined Outcast. (Smith Declaration ¶ 18, Exhibit 15).

119.   Chief Benton relied on this report in making the decision to terminate Plaintiff's employment. (Benton Declaration ¶ 16).

**Plaintiff Received Due Process Prior to the Termination of His Employment**

120.   On or about September 20, 2013, per the instruction Chief Benton, Sergeant Donny Smith served Plaintiff a Disciplinary Action Report stating that he was being discharged an outlining the reasons for his discharge as follows violations of the following polices:

- General Order 100-50, Code of Conduct, section II, paragraph B, Conduct Unbecoming of an Officer;

- General Order 100-50, Code of Conduct, section XXXVII, paragraph A, Membership in Organizations;

- General Order 200-42H, Mobile Data Terminals and Electronic Messaging, Section I, paragraph 6, Administrative;

- General Order Code of Conduct, section XXXIII, paragraph A, Truthfulness;

- General Order 200-30, Professional Standards, section IV, paragraph M, Investigative Procedures;

- General Order 100-41, Code of Ethics, section I, paragraph I, Private Life; and

- Personnel Rules and Regulations, Section 3-43 (19), Intolerable Offence: Other, to include Conduct Unbecoming of an Officer.

(Gray Depo, 280:9-13, Ex. 23; Smith Declaration ¶ 19, Exhibit 16).

121.   That same day, Sergeant Smith issued Plaintiff a Notice of Determination Hearing.  (Gray Depo, 280:14-18, Ex. 23; Smith Declaration ¶ 19, Exhibit 17).

122.   Plaintiff attended the disciplinary hearing regarding his termination on or about September 23, 2013.  (Gray Depo, 280:23-281:2).

123.   Present for the disciplinary hearing were Plaintiff, Benton, Mathews, Chris Knight, Plaintiff's counsel Pat Jones, Dwight Baker (Plaintiff's brother) and someone from Internal Affairs.  (Gray Depo, 281:6-18).

## Chief Benton Offered Plaintiff the Opportunity to Resign

124.   Plaintiff provided testimony during the determination hearing.  (Gray Depo, 281:19-21, Benton Declaration ¶ 23, Exhibit 11).

125.   Prior to issuing his final decision regarding Plaintiff's termination, Benton offered Plaintiff the opportunity to resign but Plaintiff declined.  (Benton Declaration ¶ 22).

126.   Chief Benton made the decision to terminate Plaintiff's employment. (Benton Declaration ¶ 14).

127.   On or about September 23, 2013, Chief Benton met with Plaintiff (and Plaintiff's counsel) and issued Plaintiff the Decision of Determination Hearing in which Chief Benton informed him that his employment was being terminated. (Benton Declaration ¶ 23).

128.   During the meeting, Chief Benton reiterated that the termination of Plaintiff's employment had nothing to do with his race or retaliation, but was about his actions. He asserted that he believed Plaintiff had made poor decisions regarding his actions. (Benton Declaration ¶ 23, Exhibit 11).

129.   According to Chief Benton, the primary reason for the termination of Plaintiff's employment was Plaintiff's association with outlaws. (Benton Declaration ¶ 19).

130.   One other managerial official committed an intolerable offense during the time period surrounding Plaintiff's allegations—Sergeant Anthony Nelms, a white male. (Benton Declaration ¶ 24).

131.   Nelms was notified of his Determination Hearing, as was Plaintiff, but chose to resign rather than exercise his right to a hearing. (Benton Declaration ¶ 24).

**Plaintiff Knew the Importance of His Reputation**

132.   Plaintiff agreed that it is important for a police officer to have a good reputation in the community to the extent he can control his reputation and that Plaintiff himself wanted to have a good reputation in the community. (Gray Depo, 48:1-11).

133.   Plaintiff acknowledged that he is recognized as a police officer even when he is off duty. (Gray Depo, 182:5-10).

134.   Plaintiff has reminded his fellow officers from time-to-time that their off-duty conduct is under scrutiny. (Gray Depo, 49:14-17).

135.   On October 27, 2000, Plaintiff received a letter from Chief John White that said: "If you notice that your fellow officer is developing a friendship or personal association with a person of questionable character, drug dealer or other individuals involved in criminal behavior, advise him or her to clean up their act. If the inappropriate behavior continues, then report it." (Gray Depo, 51:3-16).

136.   Plaintiff agreed that if a police officer has knowledge that someone within an organization is conducting illegal activity or that the organization encourages violence, he should not knowingly associate with that organization. (Gray Depo, 54:2-55:7).

**No Comparators**

137.   Sergeant Adrianne Woodruff, Sergeant Chris Watson and Corporal Taiwann Truitt are not members of one percenter motorcycle clubs and have never received a blessing from one-percenter clubs. (Smith Declaration ¶ 20; Woodruff Declaration, ¶ 3; Declaration of Chris Watson "Watson Declaration," ¶ 5; Declaration of Taiwan Truitt "Truitt Declaration," ¶ 5).

138.   Chief Benton is not aware of any other Dothan Police Officer (other than Plaintiff) who is or has ever been associated with a one percenter or outlaw motorcycle club. (Benton Declaration ¶ 25).

**Cell Phone**

139.   A representative of Southern Linc issued a Motorola XT626 cell phone to Plaintiff in or around March 2013. (Magill Declaration ¶ 5).

140.   Plaintiff was the first person to use the phone that was issued to him in or around March 2013.  (Magill Declaration ¶ 5).

141.  Corporal Tim Mullis ("Corporal Mullis") performed a forensic analysis of Plaintiff's City-issued cell phone. (Declaration of Tim Mullis "Mullis Declaration," ¶ 4).

142.  The forensic analysis performed by Corporal Mullis captured the entire memory of the contents of the cell phone, and "physically dumped" the information gathered from the phone into a report. (Mullis Declaration, ¶ 4).

143.  On or about May 8, 2013, at least twenty-six (26) bookmarks, including a book mark to xxx.blackbook.com, a pornographic website, were added to Plaintiff's phone at nearly the exact same time - which led Corporal Mullis to believe that all of the bookmarks were transferred from another device onto the phone at the same time. (Mullis Declaration, ¶ 5, Exhibit 1).

144.  According to the report created by the forensic analysis, the xxx website had been visited three times. (Mullis Declaration, ¶ 5, Exhibit 1).

**Accessed Officers Personal Information**

145.   The Department uses the Sunguard system to maintain certain records including personal identification and contact information for officers. (Magill Declaration, ¶ 6).

146.  Plaintiff admittedly accessed several officers' personal information including their names, social security numbers, home addresses, dates of birth, etc…without the need to know or an order from the chief to do so.  (Smith Declaration, Exhibits 4 & 14).

147.   Plaintiff does not know of any other police officer who has accessed a fellow officer's personal information for nonwork related reasons.  (Gray Depo, 366:16-19).

**Plaintiff Appealed Termination to Personnel Board**

148.   On or about October 1, 2013, Plaintiff filed a notice of appeal and requested a hearing before the Personnel Board.  (Second McKay Declaration, ¶ 8).

149.   The Personnel Board members present for the hearing were Chairwoman Barbara Spann (African American), Earl Tyson (African American), Tim Shirley (Caucasian), Mary Davis (Caucasian), and Mark Smith (Caucasian). (PB Transcript 2:1-7; Second McKay Declaration, ¶ 8).

150.   On November 19, 2013, the City of Dothan Personnel Department held an administrative appeal hearing related to Plaintiff's termination.   (PB Transcript, 1:11).

151.   The Board heard sworn testimony and considered evidence pertaining to the decision to terminate Plaintiff's employment.  (PB Transcript).

152.   During the Personnel Board hearing, Plaintiff repeatedly testified that the motorcycle community can be territorial.  (PB Transcript 85:13-86:6: 89:1-11; 115:15-18).

153.   Plaintiff further described outlaw motorcycle clubs as "real serious," "labeled as hardcore," "real tough persona" and testified, "You avoid those people . . . and you stay in your own lane."  (PB Transcript 89:1-19).

154.   According to Plaintiff, one percenters are the "rough of the rough" and "you avoid them, you know."  (PB Transcript 91:20-93:4).

155.   According to Plaintiff, outlaw motorcycle clubs "try to recommend and regulate things in such a way you don't either spill over into their OMC thing . . . .  They try to guide MC's and tell them, 'listen, this is what y'all need to do. This is what y'all need to do.'  We don't do that.  This is what you do."  (PB Transcript 102:2-14).

156.   In Plaintiff's own words "that's what you do in biking.  You extend courtesies."  (PB Transcript 109:5-6).

157.   Plaintiff testified that "we didn't want to be labeled or associated *that close*."  (PB Transcript 103:23-104:2) (emphasis added).

158.   Plaintiff testified: "I did say we work hand-in-hand with Outcast.  And what I mean by hand-in-hand is, just like any other club around here, it we go to – let's say we did go to Outcast and they had a party or a dance or a charity ride or whatever, if they asked us to do something, 'can you carry these chairs?  Can you

do this?  Can you do that?'  Sure.  We're going to do it . . . ."  (PB Transcript 110:19-111:9).

**Board Voted Unanimously To Uphold Termination Decision and Plaintiff Did Not Appeal**

159.  The Personnel Board found "substantial evidence to terminate the employment of [Plaintiff]" and voted unanimously to uphold the decision to terminate Gray's employment. (Second McKay Declaration, ¶ 9, Exhibit 3).

160.  Gray did not appeal the Personnel Board's decision. (Second McKay Declaration, ¶ 10).

**Plaintiff's Replacement**

161.  Since 2006, the City of Dothan Police Department has utilized an assessment center to hire individuals for the ranks of sergeant, lieutenant, and captain.  (First McKay Declaration, ¶ 4).

162.  Carlton Ott, a Caucasian male, received the highest score on the validated promotional exam for the position of Captain following Plaintiff's termination – similar to Gray who was promoted to the position of captain after he received the highest score on the validated promotional exam. (Benton Declaration, ¶ 26).

163.  The promotional exam, along with an interview, made up the assessment center mechanism used to make promotional decisions, including the one regarding Ott. (Benton Declaration, ¶ 26).

164.  Plaintiff admits that the assessment center "wasn't a subjective testing battery." (Gray Depo, 324: 12-14).

**Plaintiff's Replacement**

165.  Since 2006, the City of Dothan Police Department has utilized an assessment center to hire individuals for the ranks of sergeant, lieutenant, and captain.  (First McKay Declaration, ¶ 4).

166.   Since 2011, the City of Dothan Police Department has utilized an assessment center to hire individuals for the rank of corporal.   (First McKay Declaration, ¶ 4).

167.   Carlton Ott, a Caucasian male, received the highest score on the validated promotional exam for the position of Captain following Plaintiff's termination – similar to Gray who was promoted to the position of captain after he received the highest score on the validated promotional exam. (Benton Declaration, ¶ 26).

168.   The promotional exam, along with an interview, made up the assessment center mechanism used to make promotional decisions, including the one regarding Ott. (Benton Declaration, ¶ 26).

169.   Plaintiff admits that the assessment center "wasn't a subjective testing battery." (Gray Depo, 324: 12-14).

## IV.   LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A plaintiff cannot defeat a properly supported motion for summary judgment without a presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings.  *See Anderson*, 477 U.S. at 248.

## V.   LEGAL ARGUMENT

### A.   ALL OF PLAINTIFF'S UNTIMELY CLAIMS AND CONSENT DECREE CLAIMS FAIL AS A MATTER OF LAW.

Defendant has previously addressed many of Plaintiffs claims in its motion for partial summary judgment. (Doc. 34).  Specifically, Defendant addressed why Count II, "Race Discrimination Violation of Consent Decree," is due to be dismissed in its entirety for failure to state a claim and why various portions of Counts I and IV were due to be dismissed as untimely.  Plaintiff's allegations in this case are an attempt to throw it all up and see what sticks.  As discussed in Defendant's motion for partial summary judgment, Plaintiff includes allegations from as early as 1985 as the basis for his lawsuit.

Defendant's motion for partial summary judgment remains pending and Plaintiff has declined to engage in meaningful dialogue regarding Plaintiff's position regarding the motion except to say that Plaintiff is planning to respond. The law is clear regarding the untimeliness of Plaintiff's claims and Plaintiff's failure to state a claim regarding the consent decree.   Defendant hereby incorporates the arguments, law and evidence submitted in support of Doc. 34.[4]

---

[4] Defendant specifically requests the opportunity to address and submit evidence regarding the merits of the claims addressed in Doc. 34 if they are not dismissed as untimely.

### B.    PLAINTIFF HAS NOT AND CANNOT ESTABLISH THAT HIS TERMINATION WAS A VIOLATION OF THE FIRST AMENDMENT.

In Count III, Plaintiff claims that Defendant violated his First Amendment right to freedom of association by terminating him based in part on his affiliation with Bama Boyz Motorcycle Club.[5] Plaintiff's claim, however, fails to meet the requirements set out by the Supreme Court in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois* and its Eleventh Circuit progeny, particularly in light of the extreme deference given to law enforcement agencies in restricting the associational privileges of its employees.

The Supreme Court has established that the "State's interests as an employer in regulating the speech of its employees differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Connick v. Myers*, 461 U.S. 138, 140 (1983). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (emphasis added).

#### 1.    The *Pickering* Test

In *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, the Supreme Court laid the foundation for what has become

---

[5] Defendant interprets this as a claim under 42 U.S.C. § 1983, which is mechanism by which a plaintiff may assert a private cause of action for redress of constitutional violations. *See Monroe v. Pape*, 365 U.S. 167 (1961).

the seminal test for determining the constitutional protections accorded to public employee speech. 391 U.S. 563 (1968). The Eleventh Circuit has expounded on this test and applied it to First Amendment associational issues as well. *See Shahar v. Bowers*, 114 F.3d 1097, 1112-1113 (11th Cir. 1997) (holding that the *Pickering* balancing test was the appropriate test for evaluating implications of an Attorney General withdrawing a job offer to an attorney based on her lesbian marriage).

Under the *Pickering* test, a court must "balance the interest of the public employee in exercising his right to free speech or association against the 'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1310 (11th Cir. 1999) (quoting *Shahar*, 114 F.3d at 1112).  In applying this test, the Eleventh Circuit has noted that "government offices could not function if every employment decision became a constitutional matter;" the First Amendment was not intended to "constitutionalize the employee grievance." *Connick*, 461 U.S. at 143, 154.

The Eleventh Circuit has identified several factors that have specific relevance to the balancing decision. "The more a public employee's transfer or discharge is necessary to the effective functioning of the office, the more the transfer or discharge becomes justifiable, and thus the more likely it is that a court will find the transfer or discharge constitutionally permissible by finding the

employer's interests to outweigh the employee's interests in the *Pickering* balance." *McCabe v. Sharrett*, 12 F. 3d 1558, 1570 (11th Cir. 1994). Even more deference is given where the government employer is a law enforcement agency because "there is a heightened need for order, loyalty, morale, and harmony, which affords a police department more latitude in responding to the associations of its officers than other government employers." *Caruso v. City of Cocoa, Fla.*, 260 F. Supp. 2d 1191, 1209 (M.D. Fla. 2003) (quoting *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000)) (emphasis added).   In fact, "[i]n the Eleventh Circuit, when the Defendant is a law enforcement agency, the employer's concerns can weigh into the *Pickering* balancing test even though there is no actual showing that those concerns would manifest themselves in the employee's individual situation since 'there is a special need to employ persons who act with good judgment and avoid potential conflicts of interest' in law enforcement agencies." *Id.* at 1206 (emphasis added) (citing *Ross*, 173 F.3d at 1311); *see also Duke v. Hamil*, 997 F. Supp. 2d 1291 (N.D. Ga. 2014) (finding that particularly where plaintiff is a high-ranking official, the defendant "did not have to wait to see if the controversy affected the discipline, mutual respect, or trust among the officers Plaintiff supervised before addressing it.").

## 2.   FBI's Definition of Outlaws and One Percenters

According to the September 16, 2013 report from Sergeant Smith to Chief Benton summarizing the results of the internal affairs investigation regarding Plaintiff's conduct— which Chief Greg Benton relied in making the decision to terminate Plaintiff's employment—the FBI defines outlaw motorcycle clubs as "organization whose members use their motorcycle clubs as conduits for criminal enterprise." (Smith Declaration ¶ 18, Exhibit 15; Benton Declaration ¶ 16). According to research conducted by Sergeant Smith and Sergeant Magill, the FBI defines "One Percenters" as "any group of motorcyclists who have voluntarily made a commitment to band together to abide by their organization's rules enforced by violence and who engage in activities that bring them and their club into repeated and serious conflict with society and the law." *Id.*  The term "support club" refers to "smaller gangs whose members regularly associate with or are friends with one of the national-level gangs." *Id.*  According to the FBI's National Gang Threat Assessment, "[s]ome members of support clubs have acquired employment with private businesses or government agencies, which enables them to provide national-level OMGs with business, government, and financial information that can be used to protect their criminal enterprises." *Id.* It is against this background that the Dothan Police Department investigators and Chief Benton

considered the evidence they collected regarding Plaintiff. (Benton Declaration ¶ 16).

### 3.   Plaintiff's Association With Outcast Motorcycle Club

During the interviews with the members of Outcast, a known outlaw club, various members identified Plaintiff as someone who had been present at various Outcast club functions and who had been present in the Outcast clubhouse when marijuana was being smoked. (Smith Declaration ¶¶ 7-8, Exhibit 1). One Outcast member, who had been identified as the president of the local club, stated that Bama Boyz was a local club that fell under the "guidance" of Outcast. *Id*. He also stated that he had asked Plaintiff if the Dothan Police Department was investigating Outcast and that Plaintiff had checked and later reported that the Department was not. *Id.* At least two of the Outcast members who claimed to have associated with Plaintiff at Outcast events were felons; one of these two was actually a member of Bama Boyz before he joined Outcast. *Id.*  After interviewing various members of Outcast, the investigators interviewed Plaintiff twice, once on August 25 and again on September 13. (Gray Depo, 275:17-20; 276:11-16, 277:17--278:4). During the course of the interviews, Plaintiff was evasive and made several conflicting statements, particularly as to whether or not he had ever asked Outcast for protection. *Id.*  During one interview, Gray claimed he did not know Big O's status in his motorcycle club.  However, just a few months prior to the

interview, Gray had written a letter in which he wrote: "The found executive board has held a series of meetings regarding the possibility of starting a new chapter of Bama Boyz MC in Anniston, Alabama, upon receiving the blessings from Big O, President of Outcast Alabama. (Benton Declaration ¶ 17, Ex. 9).   In addition, Plaintiff claimed that he did not know that Outcast was a one percenter motorcycle club but at some point prior to the internal affairs investigation, he had told prospective members of Bama Boyz that "Outcast, Wheels of Soul, Sin City Disciples and Mortal Souls . . . They're around this area and . . . one percenters." (Smith Declaration ¶ 14, Exhibits 5-6).

In addition to these facts that were undeniably relied on by the investigators and Chief Benton, Plaintiff admits several key aspects of his relationship with outlaws. By his own admission, Plaintiff is the founder of Bama Boyz, a motorcycle club that existed in Dothan, Alabama from 2008 to 2014 and also opened a chapter in Anniston, Alabama in 2012. (Gray Depo, 72:11-15, 79:20-80:18).  Plaintiff admits that he obtained "blessings" from the leaders of three other motorcycle clubs—Outcast, Sin City Disciples, and Easy Riders—and that at the time he obtained the blessings he had been told that all three clubs were outlaw motorcycle clubs. (Gray Depo, 109: 19-110:19, 114:1-7, 120:4-121:10, 165:16-22; PB Transcript 63:10-15). Plaintiff also admits to attending multiple events with outlaw motorcycle clubs at the Outcast clubhouse and elsewhere, receiving a patch

for his motorcycle vest from Outcast, and informing prospective members of Bama Boyz that the club works "hand-in-hand" with Outcast. (Gray Depo: 131:2-132:23, 138:12-18; PB Transcript 110:19-111:9).

    4.    Compelling Eleventh Circuit Case Law and Evidence Gathered During Internal Affairs Investigation

In *Ross v. Clayton County, Georgia*, the Eleventh Circuit found that a police department did not violate a former-officer's First Amendment rights in demoting him because he lived with his brother who was on probation. 173 F.3d 1305. In reaching this decision, the Eleventh Circuit noted that "[i]n the context of law enforcement, there is a special need to employ persons who act with good judgment and avoid potential conflicts of interest. Personal association with felons or active probationers could undermine appropriate objectives of a law enforcement agency." *Id*. at 1311. (emphasis added). The Court held that the defendant did not need to show actual disruption, as such a requirement would be "overly burdensome to the public employer." *Id*.

Citing *McCabe v. Sharrett*, another Eleventh Circuit decision where the Court had upheld the transfer of a police chief's secretary to a less desirable position based on her marriage to an officer under the chief's command, the *Ross* Court noted that "[t]he employer's interest in both cases is in avoiding potential conflicts of interest between loyalty to the law enforcement employer and loyalty

to someone in an off-duty, personal relationship." *Id.* (citing *McCabe*, 12 F. 3d 1558).

In this case, Defendant had evidence that Plaintiff was associating with felons and with a known criminal organization and was reportedly even passing Department information to Outcast. Even though Plaintiff denied passing any information, even just the presumptions that arise from Plaintiff's associations are sufficient under the law to justify Plaintiff's termination. Like in *Ross*, the City had an interest in avoiding any conflict of interest that might have arisen between Plaintiff's relationships with Outlaws and his duties as a police officer. The City was not required to wait to see if he chose his loyalty to the police department over his loyalty to the outlaw motorcycle club members if and when he was faced with the situation of the outlaws, coming into conflict with the law in a way that involved Plaintiff's use of the significant discretion to which he was entrusted as a Captain, one of the highest ranking officers in the Dothan Police Department.

### 5.   Cases Involving Police Officers and Motorcycle Clubs

Although the Eleventh Circuit law is clear and provides a sound basis for determining that the City did not violate Plaintiff's First Amendment rights, Defendant has not found any cases in this circuit directly relating to a police officer's involvement with a motorcycle club. Fortunately, various other circuit

and district courts have considered such cases and those cases provide a helpful, persuasive lens through which to view the Eleventh Circuit binding precedent.

In *Piscottano v. Murphy*, the Second Circuit held that the discipline of three correctional officers for their association with a motorcycle club did not violate their freedom of expressive association. 511 F.3d 247 (2d Cir. 2007). Plaintiffs, two of whom had actually been past members of the outlaws and one of whom had merely attended outlaws events and associated with outlaws members, were put on administrative leave pending investigation of their involvement with outlaws and ultimately terminated or disciplined for both their involvement with the club and evidence that they had not been completely truthful during the investigation. The parallels between *Piscottano* and this case are numerous and informative.

Although the plaintiffs in *Piscottano* denied that they were aware of any illegal activity in the outlaws or of ever associating with any felons, just as Plaintiff denies that he ever knew that he was associating with felons, the Court considered evidence from the National Drug Intelligence Center ("NDIC"), on which Department of Corrections ("DOC") investigators had relied, that "the [Outlaws Motorcycle Club] is involved in the unlawful production and distribution of [various drugs]" and that "Outlaws members also engage in other criminal activities including assault, kidnapping, weapons and explosives violations, arson, theft of motorcycles and motorcycle parts, fraud, money laundering, and

extortion." *Id.* at 254. The *Piscottano* Court also noted the investigators' evidence that the outlaws are a "self-proclaimed one-percent gang," which indicated they were part of the one percent of motorcycles on the roads that belong to "persons who [are] trouble-makers." *Id.* at 255. Sergeants Smith and Magill, the investigators in this case, uncovered similar information which was relied on by Chief Benton in the termination decision. (Benton Declaration ¶ 16).  In addition, Plaintiff admitted

- He had heard that Outcasts were one percenters, (Smith Declaration ¶ 16, Exhibit 4 & 14);

- Prior to his initial interview with IA investigators, he told Bama Boyz prospects that Outcasts were one-percenters based on his own knowledge, (Smith Declaration ¶ 14, Exhibit 5-6);

- He knew about outlaw motorcycle clubs propensity for violence and illegal activity which is why he claimed he sought a blessing, (PB Transcript 105:13-16, 116:11-12).

The DOC had a regulation, much like the City's in this case[6], that prohibited employees from "[e]ngag[ing] in conduct that constitutes, or gives rise to, the appearance of a conflict of interest," and "[e]ngag[ing] in unprofessional or illegal

---

[6] *See* Dothan Police Department, General Order 100-50, Code of Conduct Section regarding conduct unbecoming an officer and Dothan Police Department, General Order 100-50, Code of Conduct, regarding Membership in Organizations. (Benton Declaration ¶ 11, Exhibit 7).

behavior, both on and off duty, that could in any manner reflect negatively on the Department of Correction." *Id*. at 256. The officers were found to be in violation of these regulations and, as a result, two were terminated and the other was disciplined.

In its analysis, the Second Circuit rejected plaintiffs' contention that no nexus existed between their associations with the outlaws and the DOC operations, finding that "[t]he evidence sufficiently shows that DOC conducted reasonable investigations . . . and arrived at a good-faith conclusion that having correctional officers who are associated with the Outlaws is detrimental to DOC operations and reflects negatively on DOC. *Id*. at 276.  The Court cited a number of reasons why this conclusion was justified: "Plaintiffs' association with the Outlaws . . . had the potential to interfere with DOC's collaboration with other law enforcement agencies"; "DOC has an interest in avoiding even the appearance that its correctional officers have conflicts of interest"; "[a]ny acceptance of favors raises the prospect that the favors will be returned, creating the appearance of a potential conflict of interest"; and "the very fact that the officer was associated with the Outlaws could give an inmate who was a member of Hells Angels (or of any other rival club) a plausible claim that he was denied fair treatment by the officer or, in a disciplinary hearing against the inmate, a basis for challenging the testimony by the Outlaws-associated officer for bias." *Id*. at 277.

These reasons are equally applicable in this case. The evidence shows that Sergeants Magill and Smith conducted a thorough investigation and that Chief Benton, based on a good-faith reliance on their conclusion that Plaintiff had been inappropriately associated with outlaw motorcycle clubs and had been untruthful in the investigation, decided to terminate Plaintiff's employment. Like the DOC, the Dothan Police Department had a legitimate interest in avoiding any appearance of a conflict of interest. Plaintiff's association with members of outlaw motorcycle clubs and, in particular, his receipt of a "blessing" from those clubs, constituted a conflict of interest (or at the very least a great threat of a conflict). On the one hand, Plaintiff attempts to downplay the significance of the "blessings" and claims that they did not come with any strings attached. (Smith Declaration ¶ 16, Exhibit 4 & 14). On the other hand, Plaintiff admits that he obtained the blessings for safety and protection. (Smith Declaration ¶ 11, Exhibit 4). Furthermore, based on the audio recording of his talk to prospective Bama Boyz's members, outlaw motorcycle clubs "try to recommend and regulate things in such a way you don't either spill over into their OMC thing . . . . They try to guide MC's and tell them, 'listen, this is what y'all need to do. This is what y'all need to do.' We don't do that. This is what you do." (PB Transcript 102:2-14; Smith Declaration ¶ 14, Exhibit 5-6).

The *Piscottano* Court wisely observed that the mere acceptance of favors raises a presumption that a favor is owed in return, creating the appearance of a conflict of interest. Thus, even if the blessings Plaintiff personally requested and received were not in actuality accompanied by obligations to the various outlaw clubs giving them, just the perception that they might be creates a problem for the Department.

Finally, although Plaintiff was not in a position of overseeing inmates in a jail as were the correctional officers in *Piscottano*, his position as one of the highest ranking officers in the Dothan Police Department put him in a place of prominence and authority within the Department that created great risk that members of rival motorcycle gangs could claim that Plaintiff and/or any of his subordinate officers were biased against them in arresting them or testifying against them  in court proceedings, both very important functions in the duties of a police officer.

In *Turner v. United States Capitol Police, et al.*, the U.S. District Court for the District of Columbia addressed the First Amendment claims of a former United States Capitol Police Officer who was terminated in connection with his association with members of outlaw clubs and with convicted felons through his membership in Tribes Motorcycle Club, a "social riding club" that was *not* an outlaw motorcycle club itself. 34 F. Supp. 3d 124 (D.D.C. 2014). The Chief of the

Capitol Police based the termination decision on "plaintiff's encounter with a founding member of the Hell's Angels [an Outlaw club], plaintiff's visit to the clubhouse of a Hell's Angels chapter, plaintiff's presence and alleged interactions with the members of outlaw motorcycle clubs at certain events, photographs of plaintiff at outlaw motorcycle club clubhouses and with convicted felons, and plaintiff's alleged association with at least one white supremacist," despite plaintiff's contention that "some of these alleged incidents were mischaracterized and others never occurred at all . . . ." *Id*. at 131.

The court concluded:

> Even drawing all reasonable inferences in favor of plaintiff . . . <u>defendants have asserted an interest in the efficient operation of law enforcement activities that outweighs plaintiff's interest in his cited activities.</u> Plaintiff was not only a sworn law enforcement officer, but also a supervisor of other officers. His multiple encounters with outlaw organizations and individuals could reasonably be expected to reflect poorly on the Capital Police and to impair harmony among coworkers, and to interfere with the regular operation of the enterprise.

*Id*. at 143 (internal citations omitted) (emphasis added).

The Chief's reasoning and the court's conclusion could be applied almost verbatim to this case, minus the reference to white supremacists. Plaintiff encountered Big O, Big Meat, Catfish and other leaders of outlaw motorcycle gangs on multiple occasions; he attended and interacted with members of outlaw clubs at various events, including events at the Outcast clubhouse; he was

photographed with Outlaw members, leaders, and a woman labeled "property of Outcast," and he was photographed proudly displaying a patch issued to him by Outcast, and he associated with felons through his affiliations with both Bama Boyz and Outcast. (Gray Depo; PB Transcript). Plaintiff supervised other officers and his "encounters with outlaw organizations and individuals could reasonably be expected to reflect poorly" on the Dothan Police Department and interfere with its operations.

In sum, both the Eleventh Circuit binding authority and the persuasive cases demonstrate that the special need to employ persons who act with good judgment and avoid potential conflicts of interest in law enforcement agencies justifies the actions that Dothan Police Department took with regard to Plaintiff. The *Pickering* balancing test tilt's definitively in the Department's favor and Plaintiff is misguided in his attempt to constitutionalize this employment grievance.

### C.   PLAINTIFF'S RACE DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW.

Defendant is entitled to summary judgment on Plaintiff's race discrimination claims because no genuine issue of material fact exists to call into question the legitimate, non-discriminatory reasons that Defendant has for each of the adverse actions on which Plaintiff bases his claims. In a case such as this one where a plaintiff relies on circumstantial evidence to make his discrimination claims, courts use the *McDonnell Douglas* framework for analyzing those claims. *See Wilson v.*

*B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework a plaintiff has the burden of establishing a prima facie case of discrimination, which can be established by showing that he was a "qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Id.* Alternatively, a plaintiff can show that he was replaced by an individual outside of his protected class, rather than showing evidence of how a similarly situated employee was treated differently. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Once it has done so, the burden shifts back to the plaintiff to show that the offered reason is pretext for illegal discrimination. A plaintiff may not merely quarrel with the sufficiency of the employer's reason or recast that reason, but must meet it head on and rebut it. *Wilson*, 376 F.3d at 1087-88.

As discussed in the motion for partial summary judgment, all claims under paragraphs 71, 72, 73, 76, and 81 of Plaintiff's Complaint are untimely. Defendant will address the claims that remain under the legal framework set out above.

     1.  <u>Termination</u>

In Paragraphs 79, 80 and 83 of Plaintiff's Complaint, he sets out his termination claim. (Doc. 1, ¶¶ 79, 80, 83). Defendant does not dispute that Plaintiff is able to establish a prima facie case on this claim, given that Plaintiff was replaced by a white officer. Defendant, however, had legitimate, non-discriminatory reasons for terminating Plaintiff's employment and Plaintiff cannot establish that those reasons were pretextual.

Plaintiff's employment was terminated because he was found to have engaged in conduct unbecoming of an officer and to be in violation of Dothan Police Department Guidelines regarding mobile data terminals and electronic messaging, truthfulness, investigative procedures, and ethics in private life. (Gray Depo, 280:9-13, Ex. 23; Smith Declaration ¶ 19, Exhibit 16) Specifically, following a series of arrests at the Outcast Motorcycle Club clubhouse in Dothan, Alabama, Plaintiff was identified by club members as being involved with Outcast Motorcycle Club. (Smith Declaration ¶¶ 7-8, Exhibit 1). As a result of this accusation, the Dothan Police Department commenced an internal investigation into Plaintiff's potential association with the club. (Smith Declaration ¶ 12). Pursuant to this investigation, the Police Department confirmed that Plaintiff had been involved with multiple outlaws[7] in such a way that created a conflict of

---

[7] Plaintiff's termination notice noted that "Outlaw Motorcycle Gangs" are clubs "whose members have voluntarily made a commitment to band together to abide by their organization's rules enforced by violence and who engage in

interest for Plaintiff as a high-ranking officer in the Dothan Police Department and violated the Department regulations regarding off-duty conduct and activities. (Benton Declaration ¶ 11, Exhibit 7). The investigation also revealed that Plaintiff had misused Department equipment to access personal information of fellow officers and that Plaintiff had accessed pornographic content on his City-issued cellphone. (Mullis Declaration, ¶ 5, Exhibit 1). Finally, it was determined that Plaintiff had been untruthful with investigators during the course of the investigation. (Smith Declaration ¶ 11, Exhibit 4). All of these reasons were grounds for the termination of Plaintiff's employment and were listed on his September 20, 2013 disciplinary action form, although Chief Benton, the individual who made the termination decision, has stated that Plaintiff's association with the Outlaws was the primary reason for the termination. (Benton Declaration ¶ 19).

Plaintiff was served with his disciplinary action report form and notice of a determination hearing on September 20, 2013. (Smith Declaration ¶ 19, Exhibit 16). The determination hearing was conducted on September 23, 2013, after which Chief Benton made the final decision to terminate Plaintiff's employment. (Benton Declaration ¶ 14). It is important to note that Chief Benton offered Plaintiff the opportunity to resign instead of facing termination, which Plaintiff refused. On

---

activities that bring them and their club into repeated and serious conflict with society and the law including a pattern of criminal or delinquent conduct." (Benton Declaration ¶ 23, Exhibit 11).

October 1, 2013, Plaintiff filed a notice of appeal to the City of Dothan Personnel Board and his appeal was heard on November 19, 2013. (Second McKay Declaration, ¶ 8).  Plaintiff was represented by counsel at the Personnel Board hearing and given an opportunity to call witnesses and present evidence. (PB Transcript). After performing an independent review of the facts, the Personnel Board—which is comprised of both Caucasian and African-American members— unanimously found that substantial evidence existed to terminate Plaintiff's employment for conduct unbecoming of an officer. (Second McKay Declaration, ¶ 9, Exhibit 3).

These reasons for Plaintiff's termination are legitimate, have nothing to do with Plaintiff's race, and are supported by law. As discussed previously with regard to Plaintiff's First Amendment claim, various circuit decisions address very similar conduct and reach the conclusion that a law enforcement officer's involvement with motorcycle gangs is a justifiable reason for discharge. *Piscottano*, 511 F.3d 247; *Turner,* 34 F. Supp. 3d 124. Although those cases involve a First Amendment analysis rather than a Title VII analysis[8], if a reason for termination is sufficient to trump an employee's constitutional right to association, it is safe to say that it is sufficient to meet the legitimate and non-discriminatory standard under Title VII. *See Nix*, 738 F.2d at 1187 ("The employer may fire an

---

[8] The court in *Turner* did actually address as Title VII claim, but denied defendant's motion on that claim without prejudice to refiling on the grounds that the motion was filed early in the discovery period and various factual issues needed to be developed. 34 F. Supp. 3d at 139. That is not the case here.

employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

The Eleventh Circuit cases addressing officers terminated based on their associational conduct also speak to the legitimacy of Plaintiff's termination and the need of police departments to regulate the off-duty conduct of their officers. *See Caruso*, 260 F. Supp. 2d 1191 (also granting summary judgment to the defendant on plaintiff's claims regarding discriminatory discipline); *see also McCabe*, 12 F. 3d at 1570; *Oladeinde*, 230 F.3d 1275; *Duke*, 997 F. Supp. 2d 1291; *Ross*, 173 F.3d 1305.

In addition to the legitimacy of Defendant's reasons, other factors surrounding the termination of Plaintiff's employment indicate that it was not based on discriminatory reasons. The decision was reviewed and affirmed by an independent, racially diverse Personnel Board. *See Hampton v. City of South Miami*, No. 03-22323-CIV, 2005 WL 5993476, at *19 n. 10 (S.D. Fla. July 29, 2005) (noting that "[t]he independent review undertaken by the City Manager demonstrated that the City's stated reasons for terminating Plaintiff were not pretextual—neither pretext for race discrimination, nor as a punishment for Plaintiff's complaints about his work conditions"). Furthermore, Chief Benton, the decision-maker at issue, had previously and repeatedly made decisions with regard to Plaintiff that benefitted Plaintiff's career—promoting Plaintiff to the rank of

captain and providing him positive performance reviews. (Benton Declaration ¶ 6, Exhibit 3).

Plaintiff cannot establish that these legitimate, non-discriminatory reasons for the termination of his employment are pretextual. Investigators for the Dothan Police Department conducted a thorough, unbiased investigation and Chief Benton relied in good faith on the results of that investigation. *See Foster v. Biolife Plasma Servs.*, LP, 566 Fed. Appx. 808, 811 (11th Cir. 2014) ("A plaintiff cannot show pretext merely by showing that an employer's good faith belief that she engaged in misconduct is mistaken.") (citing *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000)).  Plaintiff claims that white officers "committed similar or worse violations than Gray" but were not charged with "conduct unbecoming an officer" or other violations, but such is not the case. (Doc. 1, ¶ 80). While other police officers may have been members of motorcycle clubs, the Dothan Police Department did not have knowledge or discover that any of them were associating with Outlaws. (Benton Declaration ¶ 25). Furthermore, none of the other officers that Plaintiff cited in his deposition as being members of motorcycle clubs were of as high a rank in the Department as Plaintiff (Gray Depo, 268:14-275:13), making them inadequate comparators in a case where the negative effects of Plaintiff's associations were in part directly related to the negative perception those associations cast on the Department, a perception that is magnified when created

by a high-ranking officer. *See Thompson v. Tyson Foods, Inc.*, 939 F. Supp. 2d 1356, 1367 ("Higher-level employees are expected to set standards for lower-level employees, and therefore it is entirely reasonable for an employer to tolerate certain misconduct from lower-level employees that it would not tolerate from higher-level employees."); *see also Piscottano*, 511 F.3d at 277 (discussing the negative perceptions created by an officer's association with Outlaws).

Plaintiff also claims that he was replaced by a white officer. (Doc. 1, ¶ 83). While this fact alone may be sufficient to establish his prima facie case, it does not, under these circumstances, establish pretext. Plaintiff's replacement was selected through use of the City's assessment center, which Plaintiff admits "wasn't a subjective testing battery." (Gray Depo, 324: 12-14). Although the assessment center mechanism included an interview along with a test, in choosing Plaintiff's replacement the Department ultimately selected the individual with the highest test score, *just as it had done when Plaintiff himself was promoted to captain*. (Benton Declaration, ¶ 26). This selection was made without regard to race and without the discretionary input of any of the individuals who Plaintiff claims held discriminatory animus towards him. The fact that a white officer had the highest score on the test and was, therefore, promoted to fill the vacancy left by Plaintiff, has no bearing on the legitimacy of the termination of Plaintiff's employment and casts no questioning shadow of pretext over that decision. *See Nash v.*

*Consolidated City of Jacksonville, Duvall County, Fla.*, 895 Supp. 1536, 1555 (M.D. Fla. 1995) (finding that a plaintiff could not overcome defendant's legitimate, non-discriminatory reason for its adverse employment decision, despite plaintiff's desired position being given to a white male, where "[t]he City had in place a fair and objective promotional process that produced well qualified captains" and where "[a]ll persons [were] treated the same under this procedure, whites, blacks, hispanics, men, women, etc."). For these reasons, Defendant is entitled to summary judgment on Plaintiff's termination claim.

### 2. Administrative Leave

In Paragraphs 77 and 78, Plaintiff claims that he was unlawfully suspended and that white officers who committed similar offenses were not disciplined. (Doc. 1, ¶¶ 77-78). Plaintiff was not suspended; he was placed on administrative leave *with pay* on August 25, 2013, pending the investigation of the accusations that he had been associating with Outcast Motorcycle Club, and remained on paid leave until his termination on September 23, 2013. (Benton Declaration ¶ 14). Plaintiff's claim based on this administrative leave fails for multiple equally compelling reasons.

First, Plaintiff cannot establish a prima facie case on this claim because the administrative leave itself was not an adverse action.  Second, Plaintiff cannot show that a similarly situated employee outside of his protective class was treated

differently.   Finally, Plaintiff cannot show that Defendant's legitimate non-discriminatory reason for placing him on leave was pretext for discrimination.

First, Plaintiff's administrative leave was not an adverse action in and of itself because Plaintiff was paid throughout the duration of the leave and because the leave was not punitive in nature. *See Carrio v. Apollo Group*, No. 1:07-CV-1814-BBM, 2009 WL 2460983, at 15 (N.D. Ga. Aug. 7, 2009) ("Courts have consistently held that being placed on administrative leave pending an internal investigation is not an adverse employment action . . . ."); *Horne v. Russell County Com'n*, 379 F. Supp. 2d 1305, 1329 (holding that a period of paid administrative leave was an adverse employment action because evidence existed that it was "punitive in nature") (*citing Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 920 (11th Cir. 1993)).   Placing an officer on administrative leave is standard procedure for the Department when an accusation is made against the officer and an investigation is ongoing; placing Plaintiff on leave implied no presumption of his guilt and Plaintiff was not disciplined in any way until the conclusion of the internal affairs investigation, at which point he was terminated. (Benton Declaration ¶ 14, ¶ 11, Exhibit 8).

Second, even if the administrative leave is considered an adverse action (which it was not), Plaintiff cannot show a similarly situated comparator who was treated differently, which also defeats his prima facie case. As noted, it is standard

procedure for the Department to place an officer who has been accused of misconduct on paid administrative leave while the investigation of that conduct is pending. (Benton Declaration ¶ 11, Exhibit 8). Plaintiff has not cited any deviations from this procedure. Although Plaintiff's period of administrative leave may have been longer than most, the length was necessitated by the thoroughness of the Department's investigation and the Department's determination not to jump to conclusions about one of its senior officers without substantial proof, regardless of the serious accusations that had been levied against Plaintiff from outside sources from the very beginning. This seriousness with which the Department viewed this investigation is highlighted by the fact that the initial assault that led to the accusations against Plaintiff was accompanied by eight felony arrests. (Smith Declaration ¶ 5). Furthermore, to the extent that Plaintiff attempts to cite other officers who were members of motorcycle clubs and were not disciplined, Defendant has already explained why those officers are not adequate comparators in the section addressing Plaintiff's termination, above.

Finally, Defendant has a legitimate, non-discriminatory reason for placing Plaintiff on administrative leave: he was identified by members of the Outcast Motorcycle Club, a self-professed one percenter motorcycle club, as someone who frequently associated with them. Plaintiff cannot establish that this reason was pretextual, particularly given that the information prompting the investigation was

provided by sources outside the Department. *See Lowry v. Regis Salons Corp.*, No. 1:05-cv-1970-WSD, 2006 WL 2583224, at *20 (N.D. Ga. Sept. 6, 2006) ("an employee cannot demonstrate pretext merely by denying that she engaged in misconduct where the decisionmaker reasonably relied on a report from a third party") (citing *Sweeney v. Alabama Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272 (M.D. Ala. 2000)). Because Plaintiff can neither establish a prima facie case of discrimination based on his paid administrative leave or show that Defendant's reason for placing him on administrative leave was pretextual, Defendant is entitled to summary judgment on this claim.

　　　3. <u>Training</u>

　　In Paragraph 74, Plaintiff alleges that white officers were offered better training opportunities than he was offered. (Doc. 1, ¶ 74). The only examples Plaintiff has cited that are not altogether untimely are the training opportunities that Chief Benton has received since becoming chief. (Gray Depo, 318:2-13). This claim fails because Plaintiff cannot show that the alleged denial constituted an adverse action and because Benton is not a similarly situated individual so as to qualify as a comparator for Plaintiff.

　　The denial of a training opportunity is only an adverse action if the plaintiff can establish that the training opportunities were material and resulted in the loss of a tangible job benefit. *See Johnson v. Gestamp Alabama*, LLC, 946 F. Supp. 2d

1180, 1202 (N.D. Ala. 2013) (citing *Turlington v. Atlantal Gas Light Co.*, 135 F.3d 1428, 1435 n. 16 (11th Cir. 1998)); *Bullock v. Widnall*, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996) ("Although Bullock may very well have benefitted from attending [training] and it may have been insulting to have his subordinate chosen to attend, he has not demonstrated that his non-selection adversely affected the terms or conditions of his employment . . . . For instance, he has not shown that not attending the  . . . training course would affect his salary, chances of promotion, ability to perform his job, etc. Consequently, the court is unable to conclude that the denial of training was an adverse employment action.") In this case, Plaintiff can show neither. Not only has he failed to identify any specific trainings that Benton received during the relevant time frame, but he cannot show that the failure to received training opportunities offered to the chief of police affected his ability to perform his job as a captain.

Furthermore, Benton is not similarly situated to Plaintiff. They occupied different positions within the Department and were responsible for different duties. It is obvious and reasonable that Benton, as Chief of Police and head of the entire Dothan Police Department would receive certain training opportunities that would not be offered to lower level employees. Courts have noted that employees at different levels of a management hierarchy would logically receive different discipline; the same analysis applies to reach the conclusion that they would

logically be offered different training opportunities as well. *See Pastures v. Potter*, No. 408CV108, 2009 WL 4781811, at *7 (S.D. Ga. Dec. 10, 2009) (citing *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997)). As such, Plaintiff's discrimination in training claim fails.

### 4.  Work Environment

In Paragraph 75, Plaintiff claims that "Defendant offered white officers a better work environment than Gray." (Doc. 1, ¶ 75). Plaintiff has not explained how he believes he was discriminated against in this way, has not cited any specific adverse action he was subjected to, and has not provided names of any white officers who he believes were offered a better work environment within the applicable time period. As such, he has failed to meet his burden of production on two of the four elements of his prima facie case – adverse action and similarly situated comparator.  *See Wilson*, 376 F.3d at 1087. To the extent this claim overlaps with Plaintiff's hostile work environment claim, as discussed in more detail below, that claim also fails.

### 5.  Inadequate Investigation of Complaints

In Paragraph 82, Plaintiff alleges that his complaints regarding race discrimination were either inadequately investigated or not investigated at all. (Doc. 1, ¶ 82). This claim fails, first and foremost, because it is untrue. Defendant thoroughly investigated the numerous complaints it received from Plaintiff

throughout his employment and more specifically investigated the only complaint it received from Plaintiff that is timely to this action. Even if it had not, however, this claim also fails because an inadequate (or totally absent) investigation is not an adverse action.

The only complaints that Defendant received from Gray that would be timely in this case is his June 9, 2013 Guardian Tracking entry in which he made various complaints about Major Steve Parrish. (Parrish Declaration ¶ 5). Although Plaintiff did not follow proper procedure for making a complaint, he did give a copy of the Guardian Tracking entry to Personnel Director Delvick McKay, who promptly forwarded it on to EEO Officer Darryl Mathews for investigation, copying Chief Benton. (Second McKay Declaration ¶ 7, Exhibit 2). Chief Benton sent a memo to Mathews the next day requesting that "this entire matter be investigated with due diligence" and that it be "investigated outside the department due to the sensitivity and nature of the complaints by Captain Gray." (Benton Declaration ¶ 5, Exhibit 2). Mathews then notified Gray that his complaint had been received and was now the subject of an EEO Investigation. (Mathews Declaration ¶ 7, Exhibit 4). Mathews proceeded to conduct a thorough investigation, collecting documents from the parties involved and interviewing eight officers who participated in or witnessed the events alleged in the complaint. Chief Benton and Major Parrish also submitted written documentation to Mathews

which he reviewed and considered as part of his investigation. (Benton Declaration ¶ 5, Ex. 2; Parrish Declaration ¶ 5, Ex 1). On September 18, 2013, Mathews issued a memorandum to Plaintiff summarizing the findings of his investigation. (Mathews Declaration ¶ 9, Exhibit 5).

As the undisputed facts show, Plaintiff's complaint was investigated thoroughly. A conscious decision was made for the entire investigation to proceed outside the Department, a strategy that added additional objectivity and reliability to the investigation. Plaintiff was informed when the investigation started and was informed of the findings of the investigation when it ended. As such, Plaintiff has no basis for this claim. Furthermore, even if he had made a complaint that was not investigated that was timely to this action, he would be unable to meet his prima facie case because he would not be able to establish that the failure to investigate was an adverse action. *See Entrekin v. City of Panama City, Fla.*, 376 Fed. Appx. 987, 995 (11th Cir. 2010) (no adverse action when defendant failed to investigate plaintiff's sexual harassment complaint against one coworker and failed to sustain her complaint against another coworker because "the plaintiff herself must suffer an adverse employment action"); *Dorsey v. Fulton County*, No. 1:10-CV-679-TWT-ECS, 2012 WL 3871921 at * 13 (N.D. Ga. Aug. 1, 2012) ("Plaintiff's allegations of mishandling fails because Plaintiff has not shown that she suffered any materially adverse action as a result of the mishandling. Defendant's failure to

investigate Plaintiff's complaint sooner did not result in any adverse action because it did not result in any action taken against plaintiff herself." (internal quotations omitted)). Plaintiff's allegation that Defendant discriminated against him by inadequately investigating or failing to investigate his complaints is unsupported by both the facts and the law; therefore, Defendant is entitled to summary judgment on that claim.

### D.   PLAINTIFF'S RETALIATORY HOSTILE WORK ENVIRONMENT CLAIM FAILS AS A MATTER OF LAW.

Plaintiff claims that he was subjected to a retaliatory hostile work environment following various complaints that he made about discrimination within the Department. Defendant is entitled to summary judgment on this claim because Plaintiff cannot establish that many of the "harassing" acts he cites constitute harassment at all, because he cannot establish causation between his protected acts and any harassment that might have existed, and because he cannot show that the alleged harassment was severe or pervasive.

To establish a prima facie case of retaliatory hostile work environment, a plaintiff must show that: "(1) [he] engaged in protected activity; (2) after doing so, [he] was subjected to unwelcome harassment; (3) [his] protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of [his] employment; and (5) a basis exists for holding [his] employer liable either directly or vicariously." *Swindle v.*

*Jefferson County Com'n*, --- Fed. Appx. ---, 2014 WL 6678411, at *8 n. 10 (11th Cir. Nov. 26, 2014) (citing *Gowski v. Peake*, 682 F.3d 1299,1311-12 (11th Cir. 2012) (per curiam)).

### 1.   Plaintiff Not Subject to Harassment

In this case, most of the actions that Plaintiff claims contributed to his alleged hostile work environment do not constitute harassment at all. The Eleventh Circuit has recognized a statutory definition of harassment in another context as "a course of conduct directed at a specific person that— (A) causes substantial emotional distress in such person; and (B) serves no legitimate purpose." *U.S. v. Tison*, 780 F.2d 1569, 1570 (11th Cir. 1986). This is a broad, applicable definition for Title VII purposes as well.

Paragraphs 120 and 121 of Plaintiff's Complaint describe Plaintiff's paid administrative leave, the investigation of his association with Outlaws, and the ultimate termination of his employment. (Doc. 1, ¶¶ 120, 121). These actions have been discussed in previous sections and Defendant has established that they were decisions made for legitimate, non-retaliatory reasons. Thus, under the definition of harassment, the actions served a legitimate purpose and cannot be considered harassment. The same analysis applies to any of the other discrete acts discussed in the previous section that Plaintiff may try to bring under the umbrella of his hostile

work environment claim—each act was based on a legitimate reason and is therefore not harassing.[9]

### 2.   No Causal Connection

Plaintiff's retaliation claims regarding his administrative leave, investigation, and ultimate termination also fail on the causation element of Plaintiff's prima facie case because the discovery of Plaintiff's misconduct severs the causal chain. *See Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) (holding that plaintiff's failure to meet the performance standards set by the employer broke the causal connection between any protected activity and adverse employment action); *see, e.g., Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 520-21 (11th Cir. 2007) (finding plaintiff's "intervening act of misconduct" as severing the causal connection between protected activity and adverse employment action that occurred five days thereafter). Furthermore, the incident that triggered the investigation and subsequent termination of Plaintiff's employment was initiated by third parties and was completely outside of Defendant's control. (Benton Declaration ¶ 13). The City could not dictate that an assault take place

---

[9] To be clear, Defendant is not arguing that these claims should be excluded from Plaintiff's retaliatory hostile work environment claim merely because they are discrete acts. The Eleventh Circuit is clear that <u>timely</u> discrete acts may be considered as part of a hostile work environment claim and has even held, in one circumstance, that acts that a defendant could not be held liable for individually could still contribute to a hostile work environment claim. *Gowski*, 682 F.3d at 1313 (emphasis added).  In that case, however, the defendant escaped liability for the individual acts on a mixed motive defense and a jury had actually found that retaliatory animus played at least some part in the decisions behind the acts. *Id*. The Eleventh Circuit has never held that acts made for legitimate, non-discriminatory and non-retaliatory reasons can be a part of a establishing a hostile work environment.

following Plaintiff's discrimination complaints or that those arrested as part of that assault would identify Plaintiff as affiliating with Outlaws.

In addition, Plaintiff cannot show that *any* of the acts he alleges to be harassing are causally connected to protected activity because temporal proximity is an insufficient indicator in this case. Defendant does not deny that Plaintiff engaged in protected activity. A look at Plaintiff's history with the Department shows that he made many complaints of discrimination or retaliation during his employment with the City, all the while, continuing to be promoted and to advance in the ranks of the Dothan Police Department. (Second McKay Declaration ¶ 12). At almost any point in his career, Plaintiff could have attempted to used temporal proximity to tie any perceived harassment or any disadvantageous employment action to a protected action. That fact demonstrates that mere temporal proximity is insufficient to establish causation in this case. Plaintiff does not and cannot explain why after properly addressing Plaintiff's complaints for 28 years, the Department would suddenly start retaliating against him.

### 3.   Not Severe or Pervasive

Even if this Court were to find that Plaintiff has made a showing of causation sufficient to satisfy his prima facie case, Plaintiff is still unable to show that any alleged harassment was severe or pervasive. Because Paragraphs 117 and 118 are untimely, the only remaining allegation making up Plaintiff's hostile work

environment claim is his allegation that "Defendant began nitpicking Gray's work." (Doc. 1, ¶ 119). Although Count IV does not specifically list the alleged racial slurs cited in Count I, Defendant will address those as well. Even assuming Plaintiff's claims are true, the "nitpicking" and four racial slurs that Plaintiff experienced are insufficient to meet the "severe or pervasive" prong of Plaintiff's prima facie case.

The "severe or pervasive" requirement includes both an objective and a subjective component; "to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] … to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (internal quotations omitted). In determining whether the alleged conduct is severe or pervasive, the Supreme Court has directed lower courts look to factors such as frequency, severity, "whether the conduct is physically threatening or humiliating, or a mere offensive utterance," and "whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

When asked how he experienced "nitpicking," Plaintiff identified four specific ways. He claimed that Major Parrish, his direct supervisor, "was asking

[Plaintiff's] secretary where [he] was," that Parrish informed Plaintiff that he was micromanaging some of his subordinates with regard to a particular investigation, that Parrish "questioned the whereabouts of a polygraph report" that Plaintiff was not responsible for, and that Parrish was critical of Plaintiff being in a "lounge-restaurant" in his off-duty capacity. (Gray Depo, 369:5-370:15, 403:13-20).

Each of these circumstances represent an example of Plaintiff's direct supervisor interacting with Plaintiff in a way that was a part of his supervisory responsibility to oversee and counsel his supervisee. Plaintiff may read in to why Parrish was inquiring about his whereabouts, but that does not change the fact that Parrish had a legitimate need and responsibility to know Plaintiff's whereabouts. Plaintiff may not have appreciated input from his supervisor about how to be a better manager or about how to behave off-duty (which, as previously established, is extremely relevant to the job of a high-ranking police officer), but giving that feedback to Plaintiff was part of Parrish's job. Furthermore, Parrish accompanied these occasional corrections and criticisms with significant praise and encouragement, as is seen in the numerous positive accolades that Parrish entered about Plaintiff over the period that Parrish supervised Plaintiff. (Parrish Declaration ¶ 3, Exhibit 1, Bates 3331-3335). Finally, Parrish may have been wrong in assuming that Plaintiff was responsible for a polygraph report, but given Plaintiff's admission that he was "the most senior person there with polygraph

examiner experience" and "pretty much quality control for polygraph," it does not seem an unreasonable mistake for Parrish to make. (Gray Depo, 370:9-12).

All of these examples are based on Plaintiff's subjective perception of Parrish's motives and do not create an "environment that a reasonable person would find hostile or abusive." *Miller*, 277 F.3d at 1276. Courts have held that "[a]lthough performance nitpicking and a cold relationship with a supervisor might cause an employee to lose some self-esteem, the federal employment laws are not a 'general civility code,' and they do not make actionable the 'ordinary tribulations of the workplace.'" *Hewlett v. Waffle House, Inc.*, No. 3:04 CV 111(CDL), 2006 WL 1582423, at *7 (M.D. Ga. June 5, 2006) (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *see also Burgin v. Burlington Coat Factory*, No. 2:11-CV-753-JHH, 2013 WL 2444038, at *17 (N.D. Ala. June 4, 2013) (where plaintiff alleged she experienced "constant nitpicking" along with verbal and physical attacks, court found that none of her allegations "come close to establishing the requirements necessary to sustain a claim for hostile work environment" and that her "hostile work environment argument [was] based on her subjective perception and speculation, rather than specific facts from which a reasonable jury could find that she was subjected to a discriminatorily hostile work environment…"); *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1218 (N.D. Ala.

2002) (holding that plaintiff failed to show severe or pervasive harassment where plaintiff alleged that his supervisor was "nitpicking" and "micro-managing" him).

The four racial slurs that Plaintiff alleges he was aware of over the course of his twenty-eight year career are also insufficient to create a severe or pervasive hostile work environment. Plaintiff cites to four incidents: two that occurred sometime between 1990 and 2006 (Gray Depo, 329:6-20, 31:23-33:4), one that occurred in 2010 (Second McKay Declaration, ¶5), and one that occurred in 2011-2012 (Gray Depo, 337:8-15). Plaintiff admits he did not actually hear the slur used in the most recent incident but was only aware that it occurred because of the Department investigation into it. (Gray Depo, 337:8-15). Although the Eleventh Circuit has refused to put an exact numerical value in the definition of "severe or pervasive," contrasting this case to the facts in other cases makes clear that Plaintiff's allegations are vastly insufficient.

> In *Freeman v. City of Riverdale*, the Eleventh Circuit held:
>
> In total, Freeman alleged approximately 11 incidents involving the use of racially derogatory language that spanned the length of his thirteen-year career, with five of those incidents involving comments made directly toward him or otherwise in his presence. These statements were too sporadic and isolated to establish discrimination so objectively severe and pervasive as to alter the terms and conditions of Freeman's employment.

330 Fed. Appx. 863, 866 (11th Cir. 2009). If 11 incidences over thirteen years were not enough, the 4 incidences over twenty-eight years in this case are nowhere

near enough to establish a hostile work environment claim. The Eleventh Circuit has held that "[o]nly when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create and abusive working environment,' is the law violated." *Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 56 (11th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 370 (1993) (finding that plaintiff did not establish severe or pervasive harassment where he saw displays of racially offensive symbols such as the rebel flag, the letters "KKK" and a noose and where he heard eight or more racial slurs over his fourteen years of employment).

Because the only evidence of alleged harassment that Plaintiff offers that even meet the definition of harassment are four examples of nitpicking by his supervisor and four examples of racial slurs over twenty-eight years, Plaintiff fails to show that he experienced a severe or pervasive hostile work environment and Defendant is entitled to summary judgment on Plaintiff's retaliatory hostile work environment claim.

Furthermore, even taking into account the various adverse actions that Plaintiff claims are part of the pattern of harassing conduct (which Defendant maintains are untimely, not harassing, or both), he *still* does not meet the severe or pervasive threshold, as is seen by examining the four factors the Supreme Court

has set out for consideration. As to frequency, Plaintiff cites two main adverse events—his reassignment to the Administrative Services Bureau and his ultimate investigation and termination—that occurred eight months apart. These two events, combined with the four racial slurs, four examples of nitpicking, and even other sporadic adverse actions do not constitute frequent harassment given that they were spread over Plaintiff's twenty-eight year career. *See Cargo v. Alabama, Bd. of Pardons and Parole Div.*, 391 Fed. Appx. 753, 755 (11th Cir. 2010) ("Five or six incidents over the course of three to four years is hardly frequent conduct.").

As to severity, this Court has held that "[h]arassing conduct is severe when it causes the employee's workplace to become permeated with discriminatory intimidation, ridicule, and insult." *Buckhanon v. Huff & Associates Const. Co., Inc.*, 506 F. Supp. 2d 958, 966-67 (M.D. Ala. 2007) (internal citations omitted). Plaintiff's administrative leave and termination cannot be said to affect his work place in this way because Plaintiff was no longer in the workplace once those events took place. The other events Plaintiff describes—a handful of sporadic racial slurs (some of which were not even heard by Plaintiff), a few examples of Plaintiff's supervisor checking in on him or correcting him, and a reassignment that occurred in conjunction with the reassignment of all the captains in the Department—simply cannot be described as intimidating, ridiculous, or insulting and certainly did not permeate Plaintiff's workplace. Neither were these events

"physically threatening or humiliating." Whatever subjective humiliation Plaintiff may allege to have felt by being counseled, disciplined, reassigned, etcetera, was not objectively reasonable given the circumstances. Finally, the conduct did not unreasonably interferes with Plaintiff's job performance, particularly given that Plaintiff continued over the years to advance through the Department ranks and, even in his final months at the Department, be told that he was in a position to continue advancing within the Department. (Gray Depo, 31:23-33:4).

As such, Plaintiff fails to establish multiple prongs of his prima facie case of retaliatory hostile work environment and Defendant is entitled to summary judgment on Plaintiff's claim.

## VI. CONCLUSION

For all the reasons stated herein and in Defendant's Motion for Partial Summary Judgment (Doc. 34), which Defendant fully incorporates herein, Plaintiff cannot show that a material issue of facts exists with regard to any of his claims and Defendant is entitled to complete summary judgment on Plaintiff's claims.

Respectfully submitted,

*/s/ Stephanie H. Mays*
Chris Mitchell, Esq.
Stephanie H. Mays, Esq.
Tiffany P. Rainbolt, Esq.
**MAYNARD, COOPER & GALE, P.C.**

1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999
cmitchell@maynardcooper.com
smays@maynardcooper.com
trainbolt@maynardcooper.com

## <u>CERTIFICATE OF SERVICE:</u>

I hereby certify that on March 27, 2015, I electronically filed the foregoing with the Clerk of Court and served a copy of the same via electronic notification to the following:

Sonya C. Edwards
Edwards Law, LLC
121 Edenton Street
Birmingham, AL 35242
sonyaedwardslaw@gmail.com
Phone: 205-408-0956
Fax: 205-408-9236

Jeffrey W. Bennitt
Edwards Law, LLC
121 Edenton Street
Birmingham, AL 35242
Bennittlaw.aol.com
Phone: 205-408-7240
Fax: 205-408-9236

*/s/ Stephanie H. Mays*