# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IVAN "KEITH" GRAY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO:** |
| vs. | ) | **1:14-cv-00592** |
| | ) | |
| CITY OF DOTHAN, | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S PARTIAL AND COMPLETE MOTIONS FOR SUMMARY JUDGMENT</u>

Jeffrey W. Bennitt
Alabama State Bar No. ASB-0774-N51J
JEFFREY W. BENNITT & ASSOCIATES
121 Edenton Street
Birmingham, Alabama 35242
Bennittlaw@aol.com
Phone: (205) 408-7240
Fax: (205) 408-9236

Sonya C. Edwards
Alabama State Bar No. ASB-8848-S73E
EDWARDS LAW, LLC
121 Edenton Street
Birmingham, Alabama 35242
SonyaEdwardsLaw@gmail.com
Phone: (205) 408-0956
Fax: (205) 408-9236

**COUNSEL FOR PLAINITFF,
IVAN "KEITH" GRAY**

## I.    INTRODUCTION

Defendant's 100-page brief, including over 200 "undisputed" facts, belies the absence of any genuine issues of material fact in this case.  Plaintiff Ivan "Keith" Gray (hereinafter "Gray"), a black 28-year veteran of law enforcement, dedicated his life to serving the citizens of Dothan and the Dothan Police Department.  Gray's distinguished career was continuously undermined, however, by the need to over perform and over achieve in a futile attempt to gain some semblance of equality. Gray never successfully achieved that goal, due to Defendant's continual violations of this Court's Consent Decree of 1976, a decree that Defendant ignores, yet acknowledges that it is bound by.  Gray's most recent attempts to assert his rights under Title VII of the Civil Rights Act of 1964, as amended, were met with retaliation.  Three (3) weeks after Gray filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Defendant began a (4)-week, concocted witch hunt that resulted in Gray's unlawful termination.  Defendant's own witness, Willie McGuire, confirms that Defendant's investigation was based on a lie.  In addition to Defendant's discrimination, harassment, and retaliation, Defendant violated Gray's First Amendment right to freedom of association. Gray's Response will demonstrate that Gray can establish a *prima facie* case on all counts and that Defendant's alleged business reason is nothing more than a fabricated, pretextual vail that cannot mask its glaring violations of Gray's rights.

Defendant's Partial and Complete Motions for Summary Judgment are due to be denied.

Mr. Gray reserves the right to amend this response subject to any Order or additional discovery allowed by the Court pursuant to Mr. Gray's pending Motion to Compel and Motion for Sanctions (Doc. 25).

### III.   RESPONSE TO DEFENDANT'S UNDISPUTED FACTS

#### A. Partial Motion for Summary Judgment Alleged Undisputed Facts

1-4.   Admitted, except the EEOC Charge based on race is Charge Number 425-2013-00913, not 425-2013-0091.

5-7.   Admitted

8.   Admitted that Mr. Gray applied more than once for the lieutenant position.  Mr. Gray testified that, "if [he] recall[ed] correctly," he applied for the position twice, and "believed" he had applied prior to 2009.  (Def.'s Ex. A - Gray Depo., 292:22-293:1).  Denied that Mr. Gray most recently applied for the chief of police position in 2009.  Gray applied for the chief of police position in April 2015, in addition to 2009 and 2004.  (Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 318:14-20).

9.   Admitted.

10.   Admitted.

11.   Admitted that Defendant placed Gray on a performance improvement

plan ("PIP") in an attempt to demean and embarrass Gray and to disparage his character. (Def.'s Ex. A - Gray Depo., 395:1-396:8; Pl.'s Ex. A - Gray Decl.) Denied that the PIP was warranted. *Id.* This was the first PIP Gray recalls ever being placed on in his entire 28-year career. *Id.* Except as expressly admitted, denied.

12.     Admitted that Defendant began utilizing an assessment center to hire individuals for the ranks of sergeant, lieutenant, and captain in or around 2006, after Gray advised Defendant that he was considering filing a federal lawsuit based in part on discriminatory promotion practices. (Pl.'s Ex. A - Gray Decl.)

13-14.     Mr. Gray lacks sufficient information to admit or deny these allegations, and therefore denies the same.

15.     Admitted.  Gray learned through EEO Officer Darryl Mathews that Defendant investigated Stewart, found that he had used the N-word, and gave him a three-day suspension. ( Pl.'s Ex. D - Mathews Depo., 148:9-150:8)

16.     Admitted that Defendant promoted Benton over Gray for police chief in 2010 after changing the job description to make Benton's FBI National Academy training a "preferred" qualification.  Benton lacked the preferred qualification of a master's degree, which Gray possessed. (Pl.'s Ex. G - McKay Depo., 22:9-23:21)

17.     Admitted that Defendant selected Benton to attend FBI National

4

Academy and did not select Gray.  Gray has insufficient knowledge as to the exact dates Benton attended the training and therefore denies the same.

18.    Gray has insufficient knowledge to be able to admit or deny this allegation and therefore denies the same.

19.    Admitted that Defendant promoted Parrish to major in or around 2010, although Gray is unaware of the exact date.

20.    Admitted.

21.    Admitted, although Gray has insufficient knowledge of the exact dates.

22.    Admitted that Jay was lieutenant over the criminal investigations division prior to becoming police captain.  Except as expressly admitted, denied.

23.    Admitted that Defendant offered Jay training that Gray was denied. (Pl.'s Ex. A – Gray Decl.)  Gray is uncertain of the specific dates Jay received training, and therefore cannot admit nor deny the same.

24.    Admitted.

25.    Admitted, although Gray is uncertain of the date and cannot admit nor deny the same.

26.    Admitted, although Gray is aware of preferential training Defendant offered Woodham prior to 2010 that was not offered to Gray.  (Pl.'s Ex. A - Gray Decl.)

27.    Admitted that Defendant promoted Woodham to lieutenant before promoting Gray, although he is uncertain of the exact date.

28.    Admitted that Defendant assigned Woodham to the criminal investigations division.  Gray is uncertain of the exact date and therefore cannot admit nor deny the same.

29.    Admitted that Defendant selected Woodham over Gray as a member of the SWAT team.  Gray is unaware of the specific date and therefore cannot admit nor deny the same.

30.    Denied.   Gray was testifying as to training, not preferential assignments.  Additionally, Hughes left the department prior to 2010.  (Gray Depo, 320:6-9; Pl.'s Ex. A – Gray Declaration.)

31.    Admitted,   although   Defendant   gave   Gonzales   preferential assignments prior to 2010.  (Pl.'s Ex. A - Gray Decl.)

32.    Admitted, although Defendant offered Gonzales preferential training not prior to 2010.  (Pl.'s Ex. A - Gray Decl.)

33.    Admitted that Defendant promoted Herring to lieutenant before Gray, although Gray is unsure of the exact date.  (Pl.'s Ex. A - Gray Decl.)

34.    Admitted that Defendant assigned Herring to the narcotics division. Gray has insufficient knowledge as to whether Defendant assigned Herring to criminal investigations.  Gray has insufficient knowledge as to the date of either

assignment and therefore cannot admit nor deny the same.

35.    Admitted that Mathews has served in the position of EEO/Training Officer 2-3 times.  Gray has insufficient knowledge as to the date that Defendant most recently placed him into that position.

36.    Admitted.

37.    Admitted that White retired, although Gray is uncertain of the exact date.

**B.    Complete Summary Judgment – Alleged Undisputed Facts**

1.    Denied.  Defendant hired Gray as a jail security officer in February 1985.  (Def.'s Ex. A - Gray Depo., 384:2-15.)  Gray had applied for police officer, dispatcher, and jail security positions.  *Id.*  Jail security was the least prestigious position of the three.    *Id.*  Defendant placed Gray on a registry of candidates for an officer position.  (Def.'s Ex. A - Gray Depo., 339:4-341:9.)  When Gray's name was next on the registry to be promoted, Defendant abandoned the registry system. *Id.*  Gray complained, and the police chief told Gray he could do whatever he wanted to do.  *Id.*  Gray retook the civil service exam in order to be considered.  *Id.* Defendant offered Gray a police officer position later that year, which he accepted. *Id.*

2-4.    Admitted.

5.    Admitted that captain is the third highest ranking position in the

department.  Denied that Defendant gave Gray the same amount of responsibility and discretion that it gave other captains.  The term "highly visible" as used by former Police Chief Gregory Benton is too subjective of a phrase to be admitted as fact.  Gray cannot speculate as to Benton's definition of "highly visible," and therefore denies the same.

6.    Admitted.

7.    Denied.  (Def.'s Ex. A - Gray Depo., 141:4-14.)

8.    Admitted that General Orders, Personnel Board Rules and Regulations, and City policies exist.  Denied that Defendant enforces those orders, rules, and polices consistently and equally.  *Id.*

9.    Gray lacks sufficient knowledge and information to be able to admit or deny this allegation and therefore denies the same.  Objection, Benton lacks the firsthand knowledge necessary to make this assertion.

10.   Gray lacks sufficient knowledge and information to be able to admit or deny this allegation and therefore denies the same.

11.   Defendant overstates and contradicts Gray's testimony.  Gray testified on numerous occasions that he either did not recognize policies Defendant's counsel showed him during his deposition, or could not state with certainty whether he had received them during his employment.  (Def.'s Ex. A - Gray Depo., 144:3-145:18; 146:16-152:6; 159:5-13; 161:12-162:12.)  Accordingly, Gray denies

that he had access to "all" policies as alleged in this paragraph.

12.     Admitted that Gray was familiar with policies he received and those on which he was trained that related to the supervision of his subordinates.  To the extent this allegation includes policies that Defendant either failed to provide Gray or failed to provide training on, Gray denies.  *Id.*

13.     Gray cannot admit nor deny this allegation without knowing to which General Orders or Code of Ethics Defendant is referring and therefore denies the same.  *Id.*

14.     Gray objects to this allegation as irrelevant because 1) this policy was not cited as grounds for Gray's termination (Def.'s Ex. A - Gray Depo., ex. 23); and 2) Defendant spoliated evidence by failing to preserve the subject phone for independent inspection and testing (Doc. 25).  Accordingly, Gray denies.

15-18.   Denied.  Gray testified that he could not state whether General Orders 100-41 and 100-50, as quoted by Defendant in these paragraphs and as shown to Gray during his deposition, were in effect during his employment. (Def.'s Ex. A - Gray Depo., 149:14-21; 152:7-153:17.)  Importantly, Paragraph 16 of Defendant's Motion cites policies under which Gray was not terminated. General Order 100-50, Section II., paragraphs A and C were not cited in Gray's termination documentation, only paragraph B.  (Def.'s Ex. A - Gray Depo., ex. 23) Assuming *arguendo* that the remaining policies Defendant cites are correctly

quoted and were actually in effect during Gray's employment, Defendant failed to enforce them.  (*See* Pl.'s Undisputed Facts, Section IV, *infra*.)  Former Chief Benton, himself—head of the department and agent who terminated Gray—failed to abide by City policies, including the policy on Dishonesty.  (Pl.'s Ex. C - Benton Depo., 112:19-114:3; 93:14-94:6.)  Gray denies having violated these policies. (Pl.'s Ex. A - Gray Decl.)

19.     Denied.  Gray testified that he could not state whether General Order 200-30, as quoted by Defendant in these paragraphs and as shown to Gray during his deposition, were in effect during his employment.  (Def.'s Ex. A - Gray Depo., 149:14-21; 152:7-153:17.)  Gray denies having violated this policy.  (Pl.'s Ex. A - Gray Decl.)

20.     Denied that Defendant follows or applies the disciplinary policy and due process procedures outlined in the Personnel Board Rules and Regulations consistently.   (Gray Decl.)   Conduct of white comparators that is far more egregious than the conduct for which Gray has been accused has *not* been deemed conduct unbecoming an officer constituting an intolerable offense by Defendant. *Id.*

21.     Admitted that corporal is the next rank above officer.  Denied that Mr. Gray testified that "one becomes a corporal after being a police officer" in the City of Dothan, as Mr. Gray's testimony does not state this.  (Def.'s Ex. A – Gray

Depo., 31:23-33:4.)

22-24.    Admitted.

25.    Admitted that Gray was the highest ranking African-American officer within the Dothan Police Department.  Except as expressly admitted, denied.

26.    Admitted that Defendant promoted Parrish to major in or around 2010, although Gray is unaware of the exact date.

27.    Admitted.

28.    Admitted that Defendant promoted Benton to police chief in or around 2010, although Gray is unaware of the exact date.

29.    The undersigned objected to this question during Gray's deposition. All objections are reserved for trial.  Defendant's question was improper in that it was hypothetical, called for speculation, and arguably called for Gray to draw a legal conclusion.  Because Defendant nonetheless seeks to use Gray's response as evidence at summary judgment, Gray reasserts the objection.  Denied that Gray agrees with decisions made by *his* supervisors that were racially motivated and in violation of his constitutional rights.

30.    Admitted that Gray's performance appraisals accurately reflect that he was an "Exceptional Performer."  Denied that Defendant did not scrutinize and nitpick Gray's performance by other means after he made race-related complaints. (See Section IV, *infra*.)

31.   Admitted that Parrish placed Gray on a performance improvement plan shortly after he made race-related complaints.  (*See* Section IV, *infra*.)   Gray is uncertain of the exact date and therefore denies the same.

32-34.   Admitted that Gray made an audio recording of a meeting with Parrish concerning the performance improvement plan.  However, pursuant to the undersigned's objections during Gray's deposition (Def.'s Ex. A - Gray Depo., 358:3-360:5), which are hereby reasserted, Defendant's Exhibit 34 of Gray's deposition is not the actual disk that Gray produced.  Gray did not and could not authenticate Defendant's Exhibit 34 as a true and exact copy of the recording that he made.  (*Id.*)  Furthermore, the quotes alleged in paragraphs 33-34 are merely snippets taken out of context from a much longer discussion.  Indeed, Gray asked during his deposition, "Do you also show where I talked to him about racial discrimination?"  (Def.'s Ex. A - Gray Depo., 361:10-11.)  That portion of the recording was not played during Gray's deposition, nor is it cited within Defendant's brief.  Gray stands on the objections made during his deposition regarding the inadmissibility of these statements.

35.   Admitted, although the negative feedback drastically increased after Gray made race-related complaints.  (Pl.'s Ex. A - Gray Decl.)

36.   Denied as to Defendant's characterization that Parrish "frequently commended" Gray.  First, Parrish rarely, if ever, commended Gray in front of his

peers and subordinates.  (Pl.'s Ex. A - Gray Decl.)  The Guardian Tracking entries allegedly entered by Parrish were not distributed to the department at large; they were only accessible to Gray if he happened to log on to the Guardian Tracking system.  (Def.'s Ex. A - Gray Depo., 172:14-23.)  Gray testified that he did not know whether Parrish's alleged entries actually existed, whether they were a complete or accurate representation of Parrish's entries, or whether he had received them.  (Def.'s Ex. A - Gray Depo., 173:1-18.)  In fact, during Gray's personnel board hearing and appeal of his termination, Gray stated that he had never seen many of Parrish's alleged entries before that date.  (Def.'s Ex. B - Dothan Pers. Bd. Hr'ing Tr., 20:18-28:12.)

37.    Admitted.

38.    Admitted, but irrelevant.   Mathews could cite to no policies forbidding employees from making complaints of discrimination on Guardian Tracking and even admitted that Defendant had been placed on notice when Gray complained on that system.  (Pl.'s Ex. D – Mathews Depo., 15:15-16:22.)

39.    Gray lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

40.    Gray testified that he did not know whether the alleged Guardian Tracking entries actually existed, whether they were a complete or accurate representation of Parrish's entries, or whether he had received them.  (Def.'s Ex. A

- Gray Depo., 173:1-18.)  Parrish, himself, does not assert in his declaration that the Guardian Tracking entries produced represent a complete and accurate copies of the entries he made.  (Def.'s Mot. Summ. J., Ex. H.)  Gray stated during his Personnel Board hearing that he had never seen many of Parrish's alleged entries before that date.  (Def.'s Ex. B – Dothan Pers. Bd. Hr'ing Tr., 20:18-28:12.) Accordingly, Gray denies the same.

41.     Gray lacks sufficient information or knowledge to admit or deny this allegation and therefore denies the same.  (*See* Section IV, *infra*, discussing inconsistencies between Bates 3272, the alleged Guardian Tracking entry of April 8, 2012, and Parrish's e-mails to Benton the following day.)

42.     Denied.  (Pl.'s Ex. A - Gray Decl.)

43.     Denied that Parrish was "required" to inquire about Gray's whereabouts to others.  (Pl.'s Ex. A - Gray Decl.)  In fact, Parrish would inquire as to Gray's whereabouts even when he knew Gray's whereabouts, for example when Parrish had approved Gray's out-of-town travel.  *Id.*

44.     Denied to the extent Defendant avers that "guiding" includes harassment, nitpicking, and removal of Gray's authority.  (Pl.'s Ex. A - Gray Decl.)

45.     Denied.  This allegation is contradictory to Defendant's performance appraisals of Gray as an "Exceptional Performer."  Parrish's counseling of Gray

14

began shortly after Gray made race-related complaints.  (Pl.'s Ex. A - Gray Decl.)

46.    Denied and irrelevant.  Not a reason for termination.  (Def.'s Ex. A - Gray Depo., ex. 23).    Regardless, Defendant misstates the facts.    Parrish questioned Gray about <u>one</u> polygraph report he believed was delayed.  (Pl.'s Ex. A - Gray Decl.)  However, as Gray explained to Parrish (and Parrish could not refute) the delay was not on Gray's part; it was on the part of those responsible for assigning, scheduling, and administering the exam.  *Id.*  Gray was only responsible for reviewing polygraph results once the exams had been administered by other employees.  *Id.*

47.    Denied.  (Pl.'s Ex. A - Gray Decl.)  The arrest Parrish coined as "mistaken" in 46 was illegal.  *Id.*  The arrest involved two young black males who were wrongfully arrested, convicted (one entered into a plea deal), and imprisoned based on Officer Markow's illegal warrant.  *Id.*  Gray was the only member of the Dothan Police Department willing to investigate the incident.  *Id.*  Parrish discouraged Gray's investigation of the incident, told him to move on, and never held Markow (white) accountable for his actions.  *Id.*

48.    Denied and irrelevant.  Defendant did not base Gray's termination on these alleged "incidents."  (Def.'s Ex. A - Gray Depo., ex. 23).  Furthermore, Defendant fails to advise the Court that it investigated two (2) of the alleged incidents (based on unfounded complaints) and found no wrongdoing on Gray's

part.  (Pl.'s Ex. A - Gray Decl.)  The third incident involved fellow Dothan police officer Taiwan Truitt, who Gray witnessed unlawfully denying patrons entry to a restaurant and lounge.  *Id.*  The establishment by law allowed patrons aged 19 and older.  *Id.* Truitt demanded those not yet 21 to leave and attempted to block entry of others, apparently mistaking the law.  *Id.*  Gray advised Truitt that he was mistaken and asked him to stop interfering with the patrons.  *Id.*  Defendant failed to investigate the wrongdoing on Truitt's part; Parrish instead used the opportunity to "counsel" Gray (further harassment) by stating that Gray's intervention was "unnecessary." *Id.*

49.    Admitted that Parrish counseled Gray, but denied that the counseling was founded.  (*See* Pl.'s Ex. A - Gray Decl.)  The counseling was part of Gray's harassment and a feeble attempt to disparage Gray's character.  *Id.*  Gray did not "frequent" night clubs into the early hours on work nights.  *Id.*  Defendant's insinuation in its brief that Gray's off-duty life somehow affected his job performance is belied by Defendant's documentation of Gray's exceptional performance.  *Id.*

50.    Denied and irrelevant.  Not a reason for termination.  (Def.'s Ex. A - Gray Depo., ex. 23).  See response to 46.

51.    Admitted, although Defendant failed to include in the referenced exhibit (Gray's complaint) the photograph of Parrish posing behind a confederate

flag with other white members of the Dothan Police Department who were members of the Sons of Confederate Veterans.

52.    Admitted that Defendant's document purports to show that McKay forwarded Gray's complaint to Mathews on June 11, 2013.

53.    Admitted that Defendant's document purports to show that Parrish sent Benton a memorandum.  Notably, however, Parrish requests a "summary of the investigators findings at the conclusion," as if he would not be actively investigated as the offending party.  (Parrish Decl., Ex. 1, Bates 3268.)  As shown in Section IV, he wasn't.

54.    Admitted that Defendant's document purports to show that Benton requested Mathews to investigate "the entire matter" following Gray's complaint. Notably, Benton deems Gray's "accusations" (not Parrish's conduct) detrimental to the department and advises Mathews to conduct the investigation "outside the department" so as to keep it under wraps.

55.    Admitted.

56.    Denied that Mathews conducted a proper, timely investigation.  This is evidenced by Mathews' two-page summary issued over three (3) months later, utterly devoid of detailed, factual findings and his deposition testimony describing the deficient, one-sided manner in which he conducted the investigation, described in more detail in Section IV.  (Def.'s Ex. F - Mathews Decl., Ex. 5; Pl.'s Ex. D -

Mathews Depo., 16:23-46:23.)

57.    Denied that Mathews conducted proper interviews, and denied that Mathews interviewed Peterson.  (*See* Section IV; Pl.'s Ex. D - Mathews Depo., 16:23-46:23.)

58.    Admitted that parts of Exhibit 1 to Parrish's declaration purport to be a memo Parrish submitted to Mathews containing "his" supporting documentation. However, Parrish failed to include the attachment to Gray's complaint, which included the picture of Parrish with fellow Dothan police officers and Sons of Confederate Veterans behind a Confederate flag.

59.    Admitted that Exhibit 2 to Benton's declaration purports to be a memorandum Benton submitted to Mathews regarding Gray's complaint. Importantly, Benton fails to reference Gray's complaints of discrimination made to him.  (Pl.'s Ex. A – Gray Decl.)  He instead attempts to justify Defendant's treatment of Gray.

60.    Admitted that Mathews stated that Gray's complaint of discrimination was unsubstantiated following his deficient, one-sided investigation.  (See Section IV.)

61.    Admitted.

62.    Admitted that the document purports to be a memorandum that Mathews sent to West and McKay.  (*See* Section IV discussing further deficiencies

in Mathew's alleged investigation as evidenced by this memorandum.)

63.     Admitted, but irrelevant and inadmissible.

**Gray hereby OBJECTS to and DENIES Defendant's misrepresentation: "Plaintiff's Association with Outlaw Motorcycle Gangs" in this "undisputed" fact heading. The heading assumes facts not in evidence that are <u>clearly</u> in dispute in this litigation.**

64.     Admitted.

65.     Admitted.

66.     Admitted.

67.     Admitted.   It is illegal for a member of law enforcement to run criminal background checks on individuals who are not under arrest or being charged with a crime.  (Pl.'s Ex. A – Gray Decl.)

68.     Admitted.  However, white Dothan police officers were allowed to be members of other motorcycle clubs.

69.     Denied.  Defendant's allegation calls for speculation.  Gray testified over objection that he has heard the "phrase" outlaw motorcycle club and that he learned that these clubs have been "labeled" as such, but that his understanding of what it means to be labeled as an outlaw motorcycle club "may not be the correct understanding or the understanding among other members or other clubs or what have you."  (Def.'s Ex. A - Gray Depo., 89:9-90:11.)

70.    Denied.  Defendant overstates Gray's testimony.  Gray can only speak to firsthand knowledge.  Gray is not even certain whether his understanding of the phrase "outlaw motorcycle club" is correct.  See response to 69.

71.    Denied.  Defendant not only overstates Gray's testimony, but is taking it out of context:

> 15 MS. EDWARDS: If you know what a one
> 16 percenter is, tell her your understanding.
> 17 A. Right. My understanding of a one
> 18 percenter is an individual that -- I don't want to
> 19 be speculating on that.
> 20 MS. EDWARDS: No, we don't want to
> 21 speculate. Just answer what you know.
> 22 A. Well, I don't know for sure.
> 23 Q. (BY MS. MAYS:) Do you have any idea
>
> Page 92
> 1 what it means to be a one percenter?
> 2 A. That is kind of the same question. I
> 3 can speculate from -- I can speculate, but to say
> 4 this is a specific definition of who or what a one
> 5 percenter is, I don't know that for certain.

(Def.'s Ex. A - Gray Depo., 91:15-92:5.)  Defendant's line of questioning clearly called for inadmissible speculation.

72.    Admitted that at some point, Gray conducted a meeting with his motorcycle club that was recorded.  However, by Defendant's own admission, there is no recording (or transcript) of any alleged meeting that can be authenticated (Pl.'s Ex. E - Smith Depo., 190:19-191:12).  Defendant alleges that it took an audio recording from a CD found in Gray's car during its investigation of

Gray preceding his termination.  *Id.*  Defendant and Gray do not know who made the alleged recording, how it was recorded, or when; who, how, or when it was transferred to CD; the chain of custody after that; whether either the recording or CD was edited in any manner; or by whom.  (*Id.*; Def.'s Ex. A - Gray Depo., 100:19-103:19.)   Importantly, Gray does not know where or how Defendant obtained it.  (Def.'s Ex. A - Gray Depo., 102:6-7.)  Defendant knowingly relies on inadmissible evidence submitted to this Court in support of summary judgment. Except as expressly admitted, denied.

73.    Gray cannot admit this allegation, because Defendant does not state what "it" is.   Furthermore, Defendant is taking two (2) sentences of Gray's testimony out of context.  Accordingly, Gray denies.

74.    Admitted.

75.    Objection.  See response to 72.  Defendant once again knowingly relies on inadmissible, unauthenticated evidence to support this allegation.  (Pl.'s Ex. E - Smith Depo., 190:19-191:12; Def.'s Ex. A - Gray Depo., 100:19-103:19) Accordingly, Gray denies.

76.    Objection.  See response to 72.  Defendant once again knowingly relies on inadmissible, unauthenticated evidence to support this allegation.  (Pl.'s Ex. E - Smith Depo., 190:19-191:12; Def.'s Ex. A - Gray Depo., 100:19-103:19.) Furthermore, Defendant mischaracterizes Gray's testimony:

7 Q. Do you know whether Outcast is
8 considered a one percenter motorcycle club?
9 A. I don't know.

(Def.'s Ex. A - Gray Depo., 95:7-9.)

16 Q. How would you describe the
17 relationship between Bama Boyz and Outcast
18 Motorcycle Club?
19 MS. EDWARDS: Object to the form.
20 A. As far as what?
21 Q. How would you describe the
22 relationship between the Bama Boyz Motorcycle Club
23 and the Outcast Motorcycle Club at the time that
Page 136
1 you received the blessing?
2 MS. EDWARDS: Object to the form.
3 A. I don't know. They really didn't
4 know us.
5 Q. Was Bama Boyz a supporter club for
6 Outcast?
7 A. No.
8 Q. Did Outcast provide Bama Boyz with
9 some level of protection?
10 A. No.
11 Q. What was the purpose of receiving the
12 blessing?
13 A. You asked me that one time and it's
14 to make sure that we mutually could coexist without
15 any issues.

(Def.'s Ex. A - Gray Depo., 135:16-136:15.)  Accordingly, Gray denies.

**Gray hereby OBJECTS to and DENIES to Defendant's misrepresentation: "Plaintiff Requested Blessing of One-Percenter Motorcycle Clubs" in this "undisputed" fact heading.  The heading states facts directly contradicted by the evidence--facts that are <u>clearly</u> in dispute in this litigation.**

77.   Admitted.

78.     Admitted, although Defendant's cite to Smith's Declaration does not support this allegation.

79.     Denied.  This mischaracterizes and misstates Gray's testimony:

> 9 Q. Okay. Do you know whether Outcast
> 10 was considered an outlaw motorcycle club?
> 11 MS. EDWARD: Was your question did or
> 12 do?
> 13 (Record read.)
> 14 MS. EDWARDS: I'm going to object to
> 15 the form anyway.
> 16 A. I didn't know for sure.
> 17 Q. You didn't know for sure at what
> 18 time?
> 19 A. When I asked for the blessing.

(Def.'s Ex. A - Gray Depo., 109:9-19.)

> 9 Q. At the time that you sought the
> 10 blessing from the Sin City for the Anniston Bama
> 11 Boyz, did you know whether they were an outlaw
> 12 motorcycle club?
> 13 A. The same answer. I didn't know for
> 14 sure.

(Def.'s Ex. A - Gray Depo., 110:9-14.)

> 1 Q. At the time that you sought the
> 2 blessing from Easy Riders, did you know whether
> 3 they were an outlaw motorcycle club?
> 4 A. No.
> 5 Q. Did you have any information that led
> 6 you to believe that they might be an outlaw
> 7 motorcycle club?
> 8 A. No.

(Def.'s Ex. A - Gray Depo., 111:1-8.)

80.    Denied that Gray "knew that outlaws had a propensity toward violence."  Defendant overstates Gray's testimony.

81.    Admitted, although some of the statements Defendant quoted where the words of Dothan City Attorney Len White:

> 11 Q And if you don't follow it what
> 12 did you tell them would happen?
> 13 A There is a lot of things that
> 14 has the potential of happening --
> 15 Q Your ass is going to get
> 16 slapped, whipped, jumped on by everybody.
> 17 A That's exactly right. That is a
> 18 potential. Just like I said: Territorial.
> 19 You could be subjected to that. We haven't
> 20 been subjected to that. And that's
> 21 something I teach them so they will know
> 22 the potential hazards that's out there.
> 23 That's why we asked for a blessing in this
>
> 1 area so we don't have to worry about it.
> 2 And we haven't had to worry about it.
> 3 Haven't had any problems.
> 4 I don't have to report in. I
> 5 don't have to follow their rules. I don't
> 6 have to do their -- follow their
> 7 regulations.

(Def.'s Ex. B - Dothan Pers. Bd. Hr'ing Tr., 115:11-116:7.)

**Gray hereby OBJECTS to and DENIES Defendant's misrepresentation: "Plaintiff Attended Multiple Meetings & Functions with One Percenter Motorcycle Clubs" in this "undisputed" fact heading.  The heading states facts directly contradicted by the evidence--facts that are <u>clearly</u> in dispute in this litigation.**

82.    Admitted, but irrelevant.

83.   Admitted that Big O attended one of Bama Boyz' anniversary parties. Denied that Gray "took" photos or that Defendant can in any way authenticate the alleged photos.

84-85.   Objection, irrelevant.  Defendant can in no way authenticate the alleged photos.

86.   Admitted that members of Outcast attended one Bama Boyz anniversary party.  This is the same party Defendant referenced in 83.

87.   Admitted.

88.   Admitted.  A Rest in Peace patch is a symbol of remembrance for someone who has died.  (Def.'s Ex. A - Gray Depo., 255:13-16.)  Denied to the extent Defendant asserts it was a "support" patch or other symbol of affiliation. (Def.'s Ex. A - Gray Depo., 138:1-11.)

89.   Admitted that Big O gave Gray Rest in Peace patches for attending a funeral, but denied that the funeral was for an Outcast member.  Gray testified that he did not know who the deceased was or whether that person was a member of Outcast.  (Def.'s Ex. A - Gray Depo., 254:7-8.)  The funeral was a stop-off during a multi-club charity ride.  (Pl.'s Ex. A - Gray Decl.)

90.   Admitted, but irrelevant.  See responses to 88-89.

91.   Objection.  Inadmissible hearsay.

92.   Admitted.

93.    Gray cannot admit what Smith and Magill knew personally, and therefore denies the same.   Regardless, this allegation is irrelevant, since Defendant had notice that Gray had filed an EEOC charge three (3) weeks prior to the investigation.

94.    Admitted.   Gray has never been "involved and/or associated with outlaw and/or one percenter motorcycle clubs" in any relevant or meaningful manner.

95.    Objection and denied.   This allegation assumes facts not in the record. Defendant had no evidence then and has no evidence now that Outcast is a "one percenter" motorcycle club.    In fact, Benton admitted that Defendant's investigation found no evidence that Gray or his club, Bama Boyz, had ever been involved in criminal activity.  (Pl.'s Ex. C - Benton Depo., 101:13-102:9.)

96.    Admitted.

97.    Objection and denied.   Internal Affairs interrogated these criminal suspects with guns on their hips, specifically about Gray and another black officer who had filed an EEOC charge.   Denied that these suspects "connected Plaintiff with Outcast."  Furthermore denied since they lacked firsthand knowledge of what Gray witnessed.  Gray testified that he had never witnessed marijuana smoking in his presence:

> 11 Q. Were you ever at an Outcast
> 12 Motorcycle Club when marijuana was smoked in your

13 presence?
14 A. No.
15 Q. If several members of Outcast say
16 that you were at their clubhouse when marijuana was
17 smoked in their presence, are they being untruthful
18 about that?
19 A. That is correct.

(Def.'s Ex. A - Gray Depo., 230:11-19.)  Note that at least one of these suspects

thought Gray was a "snitch" because he was in law enforcement.

98.    Admitted.   Defendant called Gray into the police department at

approximately 10:30 p.m. on a Sunday evening.  (Pl.'s Ex. A - Gray Decl.)  Gray

asked Dothan attorney, Pat Jones, to meet him at the station.  *Id*.  Internal Affairs

advised Mr. Jones that he could in no way "interfere" or object during the

interrogation.  *Id*.

99.    Objection, denied, and irrelevant.   This allegation is nonsensical.

Gray never asked Outcast to "protect" him or members of his club.  (Def.'s Ex. A -

Gray Depo., 136:8-13.)  To the contrary, he requested a blessing to ride in areas

where Outcast may be territorial in order to avoid potential conflict.  *Id*.  There is

no contradiction in these statements.

100.    Denied; taking Gray's statement out of context.  (Def.'s Ex. G, Ex. 4.)

101.    Admitted.

102.    Denied.  Gray considered being placed on leave for such a long period

a disciplinary measure.  (Pl.'s Ex. A. - Gray Decl.)

103.   Denied.  Defendant did not place Parrish on leave while he was being investigated for Gray's allegations.  (Pl.'s Ex. A. - Gray Decl.)  Gray further denies that there is not a stigma attached to being placed on administrative leave pending an internal affairs investigation, both within the department and to the outside public.  (Pl.'s Ex. A. - Gray Decl.)

104.   Denied.   Otherwise, Smith and Magill would have understood that Gray's motorcycle club, Bama Boyz, is not a gang, outlaw motorcycle club, or one percenter club.

105.   Denied.  Defendant had no evidence to support any alleged suspicions that Gray, a 28-year veteran with stellar performance, would have provided confidential internal information to anyone outside the department.  (Gray Decl.) Defendant was grasping for straws when it searched Gray's vehicle and cell phone, because it did not have enough based on Gray's initial interview or the coerced statements received from the criminal suspects.

106.   Denied.  See response to 72.

107.   Admitted.  Once again, Smith and Magill of Internal Affairs instructed attorney Pat Jones that he could not make objections or otherwise "interfere" with the interrogation, which lasted over four (4) hours.  (Ex. A – Gray Decl.)

108.   Objection.  Defendant not only takes Gray's testimony out of context, but cites to an unauthenticated, inadmissible transcript in support of these

allegations.  Accordingly, Gray denies.

109.   Denied.  Defendant made the investigation complex in an attempt to build a case against Gray.  Tellingly, neither the Federal Bureau of Investigation nor the Alabama Bureau of Investigation could find any wrongdoing on Gray's part, despite having been brought in by Defendant specifically to investigate Gray.  (Pl.'s Ex. C - Benton Depo., 178:16-186:3; Pl.'s Ex. F - Magill Depo., 63:17-67:7.)

110.   Gray has no firsthand knowledge of any arrests made and therefore cannot admit nor deny this allegation.  Gray, of course, was not arrested.  (Pl.'s Ex. C - Benton Depo., 101:4-102:9.)  Note that Defendant alleges that it took eight (8) weeks to investigate an "assault" that occurred in one evening and had nothing to do with Gray.  Gray was not even present at the scene.  *Id.*  Yet, defendant used this incident to launch an internal affairs investigation against Gray that was the longest Gray had ever seen during his 28-year career with the Dothan Police Department.  (Pl.'s Ex. A - Gray Decl.)

111.   Denied.  The extent of Gray's "involvement" was receiving a blessing to ride in Outcast's territory and attending three (3) events over a 5-year period where members of both clubs were present.  (Def.'s Ex. A - Gray Depo., 130:21-136:15.)

112.   Gray has no firsthand knowledge of what Smith gave Benton, and therefore denies the same.

113.   Denied.   Benton first denied playing a role in the investigation and then admitted to contacting personal acquaintances of his at the FBI, requesting them to investigate Gray.   (Pl.'s Ex. C - Benton Depo., 178:16-186:3.)

114.   Gray has no firsthand knowledge of what Smith gave Benton, and therefore denies the same.   Regardless, the information is irrelevant, since Bama Boyz is neither an outlaw club, a one percenter, nor a support club.   (Def.'s Ex. A - Gray Depo., 122:2-10, 136:5-7; Pl.'s Ex. A – Gray Decl.)

115-118.   Objection, hearsay.   Denied.

119.   Denied.   (*See* Section IV, *infra*.)

**DENIED THAT GRAY RECEIVED DUE PROCESS**

120.   Gray has no firsthand knowledge as to whether Benton instructed Smith to serve Gray with the Disciplinary Action Form and therefore denies the same.   Denied that the Disciplinary Action Report given to Gray reads as stated by Defendant in this paragraph.   A true and correct copy of the version given to Gray can be found in Gray's Deposition, Exhibit 23.   (*See also*, Section IV.)

121.   Admitted.

122.   Admitted that Gray attended a ten (10) minute meeting on or about September 23, 2013 in which Defendant read the alleged charges.   Defendant instructed Gray that he could not cross examine witnesses or call witnesses to testify.   Denied to the extent Defendant alleges that Gray was afforded a "hearing"

prior to his termination.  (Def.'s Ex. A - Gray Depo., Ex. 23.)

123.   Denied.   Defendant misstates Gray's complete testimony and Defendant's documentation showing the following individuals as present: Gray, Benton, Donny Smith, Doug Magill, Darryl Mathews, Pat Jones, Pam Moseley, and Dwight Baker.  (Def.'s Ex. A - Gray Depo., Ex. 23.)

124.   Admitted.  Gray once again voiced that he was the victim of a witch hunt based on discrimination, harassment, and retaliation.

125.   Admitted.  (*See* Section IV.)

126.   Admitted.

127.   Admitted.

128.   Admitted that Benton alleged the termination had nothing to do with race or retaliation, but denied that his allegations were truthful.

129.   Admitted that Benton alleged that the primary reason for Gray's termination was "association with outlaws," but denied that reason was truthful.

130.   Denied.  (*See* Section IV.)

131.   Admitted that Defendant allowed Nelms to resign, but denied that Gray was given equal treatment.  (*See* Section IV.)

132.   Admitted.

133.   Admitted, although taken out of context.  Gray was testifying about a specific incident at Pockets Lounge in which two (2) individuals assaulted Gray

when someone recognized him as a police officer.  (Def.'s Ex. A - Gray Depo., 181:14-182:13.)  This is one of the "night club" incidents that Parrish scrutinized Gray about.  Gray was off duty, picking up a carryout of food, and had not been consuming alcohol at the time that he was assaulted.  *(Id.*; Pl.'s Ex. A - Gray Decl.)

134.   Denied that Gray scrutinized fellow officers' off duty time to the point of harassment, as Defendant did with Gray.  (Pl.'s Ex. A - Gray Decl.)

135.   Admitted.  Gray does not recall which "fellow officer" of Gray's John White's letter from 2000 was referring to, if he was even referring to a specific officer or officers.  To the extent Defendant alleges Gray was the only officer who received this letter, or that the letter was somehow referring to Gray, denied.  (*See* Section IV.)

136.   Admitted.

137.   Gray lacks sufficient information to admit or deny whether Woodruff, Watson, or Truitt were members of one percenter motorcycle clubs or received blessings from them.  However, by Defendant's own admission, Taiwan Truitt was a member of All Throttle motorcycle club, which was an actual support club of Outcast and received a blessing from them:

> 12 Q So my question to you is how
> 13 you investigated Taiwan Truitt. Did you
> 14 have this off-the-side-of-the-road
> 15 conversation with Willie McGuire on the
> 16 25th?
> 17 A Yes, ma'am. When we asked

18 him about Truitt over the phone, he stated
19 that he didn't know his name, but he knew
20 he went by the name of Spoon, and he knew
21 that he rode with All Throttle, but he had
22 never seen him involved in any activity.
23 But he know he was in All Throttle. He
Page 80
1 knew All Throttle was a support club or
2 got the blessing from Outcast.
3 Q So based on that information
4 that he was, in fact, affiliated, what
5 else did you do to investigate Taiwan
6 Truitt?
7 A We interviewed him.
8 Q And so you just believed
9 Taiwan Truitt over Willie McGuire.
10 MR. MITCHELL: Object to the
11 form.
12 A Yes, ma'am.

(Pl.'s Ex. E - Smith Depo., 79:12-80:12.)

138.   Denied.  Benton admitted that Taiwan Truitt was a member of All

Throttle Motorcycle club, which also received a blessing from Outcast:

9 And you're aware that Taiwan
10 Truitt was a member of All Throttle
11 Motorcycle Club, correct?
12 A Yes.
13 Q And that his motorcycle club
14 received a blessing to ride within
15 Outcast's territory as well, correct?
16 A It is my understanding that
17 once All Throttle became involved with the
18 Outcast, that Taiwan, at that point, was
19 trying to get out of it, and he did
20 eventually get out of the club.

(Pl.'s Ex. C - Benton Depo., 169:9-20.)

In fact, Benton never requested any officer other than Gray to be investigated for his or her association with any other organization, including Parrish's association with Sons of Confederate Veterans.  (Pl.'s Ex. C - Benton Depo., 96:21-97:17.)

139.  Admitted, although Gray is unaware of the exact model number.

140.  Denied.  Corporal Tim Mullis, Defendant's Rule 30(b)(6) witness designated to testify about the cell phone, admitted as follows:

> 2 Q Who issued Mr. Gray's phone
> 3 to him?
> 4 A I couldn't tell you that.
> 5 Q So you don't know who had
> 6 access to his phone before it came into
> 7 his possession?
> 8 A No, ma'am.
> 9 Q You don't no [sic] whether
> 10 somebody could have potentially used the
> 11 phone prior to it being placed in his
> 12 possession?
> 13 A I don't know.

(Pl.'s Ex. H - Mullis Depo., 53:2-13.)

141-144.   Defendant denied Gray the opportunity to run an independent forensics examination of the cell phone by disposing of the phone, thereby spoliating evidence.  (See Pl.'s Mot. to Compel and Mot. for Sanctions – Doc. 25.) Therefore, Gray denies.   Furthermore, Defendant mischaracterizes Mullis's testimony:

> 11 Q And, again, looking at this

12 document, you cannot tell on what date
13 that was ever accessed.
14 A It does not say what date
15 that website was accessed.
16 Q And there is no way to tell
17 that Mr. Gray accessed that website.
18 A Not that I'm aware of.

(Pl.'s Ex. H - Mullis Depo., 91:11-18.)

3 Q Okay. So once again, you
4 can't tell with certainty the actual date.
5 A I have not seen a date that
6 Triple X Black Book dot com was visited.
7 Q So you can't say for sure
8 that it was visited while it was in Mr.
9 Gray's possession.
10 A I cannot say who was holding
11 the phone.
12 Q You can't say that it --
13 whether it could have been accessed prior
14 to its being issued to him with certainty,
15 can you?
16 A I can tell you it was stored
17 on May 8th, and the e-mail we spoke about
18 earlier, said the phone was activated on
19 May 8th.
20 Q And the e-mail was showing
21 that it was activated on May 8th, and that
22 website was accessed the same day.
23 A It was stored that day.
1 Q What could cause a phone to
2 store a website?
3 A I believe Mr. Gray has
4 explained that on his phone call to
5 Southern Link activations.
6 Q What do you mean?
7 A He said that the phone was
8 populated with his information when he
9 entered his gmail account.

35

(Pl.'s Ex. H - Mullis Depo., 92:3-93.9.)

> 1 Q But you can't say one way or
> 2 the other for sure that he accessed that
> 3 website on that phone.
> 4 A I cannot say who accessed
> 5 any website on that phone.

(Pl.'s Ex. H - Mullis Depo., 94:1-5.)

145.   Admitted.

146.   Denied.  As a supervisor, Gray has had access to computer systems containing personal information since the 1990's.  (Pl.'s Ex. A - Gray Decl.)  With each increased rank, supervisors' access to such information is increased.  *Id.* Benton, himself, had given Gray assignments and authority to access information on *all* employees over the course of his employment.  *Id.*  That access was never removed until Gray's termination.

147.   Admitted.  However, Gray has since learned of approximately six (6) officers white who accessed Sungard for nonwork reasons who received verbal counseling related to a fellow officer who was involved in a domestic violence incident.  (Pl.'s Ex. A - See Gray Decl.)  *Id.*

148-152.   Admitted, but irrelevant.

153-158.   Objection, irrelevant.  Defendant is cherry picking Gray's testimony and taking it out of context in an attempt to make something out of nothing.  Gray's full testimony clearly establishes that Bama Boyz was not an

outlaw club or a one percenter, that Bama Boyz did not support outlaw clubs or one percenters, and that Gray did not associate with criminal activity or known criminals.  Furthermore, Defendant cannot attempt to use evidence gained after the fact to support Gray's unlawful termination.

159-160.    Objection, irrelevant.

161.   Admitted.

162.   Admitted that Gray scored the highest on the captain's exam and that Ott (white) replaced Gray.  Gray is without sufficient information to admit or deny the remainder of Defendant's allegation, and therefore denies.

163.   Gray is without sufficient information to admit or deny this allegation. Gray does not know if Defendant uses the same assessment center or methods for testing.

164.   Admitted that the assessment center process is less subjective than the previous civil service exam process.  Denied to the extent Defendant alleges that Gray testified that the overall promotion process is completely objective.  (Def.'s Ex. A - Gray Depo., 324:7-14.)

165.   Admitted.

166.   Admitted, although Gray is uncertain of the year.

167.   Admitted that Gray scored the highest on the captain's exam and that Ott (white) replaced Gray.  Gray is without sufficient information to admit or deny

the remainder of Defendant's allegation, and therefore denies.

168.   Gray is without sufficient information to admit or deny this allegation, and therefore denies.

169.   Admitted that the assessment center process is less subjective than the previous civil service exam process.   Denied to the extent Defendant alleges that Gray testified that the overall promotion process is completely objective.   (Def.'s Ex. A - Gray Depo., 324:7-14.)

## IV.   PLAINTIFF'S UNDISPUTED FACTS

Gray is a black 28-year veteran of the Dothan Police Department.   (Compl. ¶¶ 5-6, Doc.1; Pl.'s Ex. A - Gray Decl.)   Gray had an outstanding performance history.   (Def.'s Ex. D - Benton Decl., Ex. 3.)   Gray received the highest ranking of "exceptional performer" in his last three (3) performance reviews.   *Id.*

Defendant terminated Gray's employment on September 23, 2013.   (Compl. at ¶¶ 6-7; Pl.'s Ex. A - Gray Decl.)   At the time of his termination, Gray was the only black sworn police supervisor in the Dothan Police Department.   *Id.*   Gray was only one (1) of approximately fifteen (15) black sworn police officers within the Dothan Police Department, which, when fully employed, employed approximately one-hundred-sixty-five (165) sworn officers.   (Compl. at ¶ 8; Pl.'s Ex. A - Gray Decl.)   Two (2) of the remaining black officers have left the department since Gray's termination.   *Id.*

**TRAINING**

Gray testified extensively about training Defendant denied Gray, yet offered to similarly-situated and lower-ranked white officers.  (Compl.  at ¶¶ 37-38; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 314:14-18, 316:7-322:17, 341:13-19, 342:2-8, 368:11-14, 380:14-381:2; 398:5-22.)   Gray was forced to pay for much of the on-the-job training that he received out-of-pocket, even though City funds were available.  *Id.*  Gray obtained a Bachelor of Science in Criminal Justice and a Master's degree in Foundations in Education/Corrections Counseling on his own.  *Id.*   Gray requested, but was never selected, to attend FBI National Academy.  *Id.*  Defendant used Gray's lack of FBI National Academy training to deny Gray a promotion to Chief of Police, which it gave to Benton in 2009.  (*See* Promotions, *infra*.)

**PROMOTIONS**

Defendant denied Gray promotions that were given to lesser-qualified, white employees.  (Compl. at ¶ 9-12; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 318:2-20; 384:16-386:21.)  For two promotions, Defendant deliberately and specifically revised the requirements for the position, enabling it to select lesser-qualified white candidates over Gray.  *Id.*  For other promotions, Defendant would devise ways to avoid promoting Gray, including, but not limited to, lodging false allegations against Gray just prior to selection.  *Id.*   Defendant scored the

subjective portions of Gray's Civil Service promotional exams lower than white candidates.  *Id.*  Gray complained to then-Chief John White about the testing, which he believed was being used in a discriminatory manner.  *Id.*  Without admitting fault or otherwise advising Gray, Defendant implemented an off-site Assessment Center, which it has used since that time.  *Id.* By then, however, Defendant's use of the old Civil Service system had allowed a number of white officers to advance at a faster rate than Gray.  Gray had to consistently over perform and over achieve only to receive promotions at a slower rate than similarly-situated, lesser-qualified white candidates.  *Id.*

**RACIAL ANIMUS**

1.     Gray heard the N----- word numerous times during his employment. (Compl.  at ¶¶ 14-17; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 329:6-338:9; 381:5-9.)  Gray has personally been called the N----- word.  *Id.*  Gray heard a superior officer use the N----- word, referring to a black runaway juvenile.  *Id.* While on patrol with Gray, Lieutenant David Kirkland (white) made the statement, "There ain't no Niggers over there."  *Id.*  Corporal Arthur Schaefer (white) referred to the area in which he was patrolling as the "poor black trash part of town."  *Id.* Another time, Gray was giving a white co-worker money for training while standing in a parking lot next to a busy street.  *Id.*  The co-worker said, "I wonder what people will think seeing a Nigger handing me a bunch of money."  *Id.*

Lieutenant Clifford Jarrett used the word, "Nigger" while at work and was suspended for only one day. *Id.* Information Technology Director Tim Stewart used the word, "Nigger" in a derogatory manner while addressing his subordinate employee. *Id.* Superior officers used "code words" to refer to black officers and black citizens. *Id.* Benton admitted that three (3) individuals known to have used the N----- word were not terminated by the City. (Pl.'s Ex. C - Benton Depo., 60:19-68:21.)

Several members of the Dothan Police Department, including Major Steve Parrish ("Parrish"), Gray's direct supervisor, were members of the Sons of Confederate Veterans. (Def.'s Ex. A - Gray Depo., 202:13-213:3, Def.'s Ex. 19; Pl.'s Ex. A - Gray Decl., Ex. 1.) Defendant's Exhibit 19 to Gray's deposition and Exhibit 1 of Gray's Declaration show Parrish with approximately nine (9) current and former members of the Dothan Police Department posing behind a confederate flag. Gray identified the individuals in the photograph from left to right as follows:

> Current Sgt. Clark Rice
> (Gray does not know who this individual is)
> Current Cpt. Carlton "Bubba" Ott, Gray's replacement
> Ret. Sgt. Steve Hamm
> Current Chief of Police (former Major) Steve Parrish
> Current Cpt. David Jay
> (Gray does not know who this individual is)
> Ret. Lt. Dewayne Herring, currently a Houston County Sheriff's deputy

Andy Hughes, former Houston County Sherriff and current Director of Alabama Homeland Security

Ret. Sgt. Gary Coleman, current Officer with the Dothan Airport Police;

Current Sgt. Scott Smith

*Id.*

Gray found this photograph and these officers' and supervisors' association with the Sons of Confederate Veterans to be highly offensive, along with Parrish's office which was decorated with Confederate memorabilia. *Id.* Gray complained to no avail. *Id.* (*See* Complaints, *infra.*) His complaints were either not investigated, or not investigated in any meaningful manner. *Id.* Parrish named his son after Nathan Bedford Forrest, the first Grand Wizard of the Ku Klux Klan. *Id.* Gray also witnessed posts on Officer Michael Woodside's Facebook page, the officer that fabricated the complaint leading to his termination, that included a half-charred face of President Obama with derogatory comments about the President. Gray found this to be racially offensive, as well. *Id.*

## RACIAL DISCRIMINATION AND HARASSMENT

In October 2010, Parrish became Gray's direct supervisor. (Pl.'s Ex. A - Gray Decl.) Throughout the time that he supervised Gray, until Gray's termination, Parrish subjected Gray to unequal treatment. (Compl. at ¶¶ 30-33; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 368:15-20.) Parrish scrutinized and nitpicked Gray's performance, which he did not do with similarly-

situated and lower-ranked white officers. *Id.* Parrish also gave Gray less deference and respect than those officers, some of which were members of Sons of Confederate Veterans. *Id.*

Gray had never seen many of the Guardian Tracking posts Parrish alleges to have submitted on Gray's good performance. (Def.'s Ex. A - Gray Depo., 172:14-23; Def.'s Ex. B – Dothan Pers. Bd. Hr'ing Tr., 20:18-28:12.)  The first time Gray saw many of the posts was at the Dothan Personnel Board hearing and appeal of his termination. *Id.* Guardian Tracking posts are not broadcast to the general department. (Def.'s Ex. A - Gray Depo., 173:1-18.)  The posts must be specifically accessed by someone with authority to review them. *Id.* Parrish failed to make entries about many of Gray's significant achievements that would have become part of his overall performance record. (Pl.'s Ex A - Gray Decl.)

On February 24, 2012, Parrish placed Gray on a Performance Improvement Plan ("PIP") without justification. (Def.'s Ex. A - Gray Depo., 395:1-396:8; Pl.'s Ex. A - Gray Decl.)  This was the first PIP Gray recalls being placed on during his entire 28-year career. *Id.* Gray believes the intent of the PIP was to demean and embarrass him and to undermine his character. *Id.* In the months that followed, Parrish acted distant and indifferent toward Gray, while treating the white captains and officers in a friendly, deferential manner. *Id.* Parrish failed to communicate with Gray about job-related information pertinent to his duties. (Pl.'s Ex. A - Gray

Decl.)   Parrish continued to scrutinize Gray's performance and accuse him of micromanaging the white ranking officers.   *Id.*   Gray felt ostracized within the department.   *Id.*   Gray felt that Parrish was looking for anything he could find to sabotage his employment.   *Id.*

In or around May 2012, Gray complained to Chief Benton about the treatment.   (See Complaints, *infra*.)   Gray specifically mentioned that he believes Parrish's treatment and the PIP were based on race.   (Pl.'s Ex. A - Gray Decl.) Gray knew that his six (6)-month performance appraisal was due to be performed a month later, in June.   *Id.*   Gray expressed concern to Benton about Parrish's providing that review.   *Id.*   Benton said he would look into it, but never got back to him.   *Id.*   Defendant removed Gray from the PIP plan on May 15, 2012 around the time of Gray's complaint.   *Id.* Despite removing Gray from the PIP, Parrish continued to scrutinize and nitpick Gray's performance.   *Id.*   Parrish demanded that Gray go through him on *all* work-related matters rather than allowing him to go through Benton on some matters.   *Id.*   Parrish, at one point, had *ordered* Gray to go through Benton on some matters, which Gray found to be contradictory.   *Id.*

In or around December 2012, Gray's work environment became increasingly hostile when Gray complained about Defendant's targeting and treatment of minority citizens.   (Compl.  at ¶ 23; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 207:5-17; 403:7-405:5.)   Gray voiced concerns about another

officer's unlawful arrest of two young black males who were wrongfully arrested, convicted (one entered into a plea deal), and imprisoned based on an illegal warrant. *Id.* Parrish discouraged Gray's investigation of the incident and told him to "move on." *Id.* Defendant never held the officer (white) accountable for his actions. *Id.* Gray complained to Benton during this period. (See Complaints, *infra.*)

In January 2013, approximately a month after Gray complained about the unlawful arrests, Defendant reassigned Gray from the Field Operations Bureau to the Administrative Services Bureau, a lower status position that entailed significantly less supervisory authority over sworn police officers. (Compl. at ¶¶ 24-27; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 207:5-17, 208:3-12, 350:15-351:21).

Parrish additionally placed Lieutenant Etress (white) between Gray and the staff he commanded. (Compl. at ¶¶ 26-29; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 207:5-17; 208:3-12; 350:15-351:21.) Defendant removed five (5) of Gray's divisions and reassigned them to Parrish and Etress. *Id.* Gray went from supervising approximately sixty (60) employees to supervising only two (2)— Lieutenant Etress and the only black secretary in the police department. *Id.* Gray had little to no actual authority over Lieutenant Etress. Major Parrish continued to accuse Gray of "micromanaging" and warned Gray that he was "watching" him

with regard to his supervision of Etress. *Id.* Parrish had previously told Gray he was "watching" him with regard to his supervision of Lieutenant Mark Nelms (white) before Etress was transferred.

Defendant broadcast Gray's personnel change to the entire department. *Id.* Defendant posted the change on a common-area bulletin board, which Gray had never seen Defendant do before. *Id.* Gray worked daily with the humiliation brought about by Defendant's very public removal of his supervisory authority, status, and key areas of responsibility. *Id.*

## GRAY'S COMPLAINTS OF DISCRIMINATION AND HARASSMENT

Gray complained about discrimination and harassment throughout his employment. (Compl. at ¶¶ 19; Pl.'s Ex. A - Gray Decl.; Def.'s Ex. A - Gray Depo., 288:8-21, 321:2-6; 376:7-11; 379:8-13; 385:7-14; 403:7-405:5.) Gray complained to Benton, former Chief John White, Human Resources Manager Delvick McKay, former Human Resources Manager Kai Davis, EEO Officer Darryl Matthews, former EEO Officer Elston Jones, former EEO Officer Gary Griffin, City Manager Michael West, former City Manager Jerry Gwaltney, and the City of Dothan City Commission. *Id.* Mathew's testimony evidences the delays and basic failure to adequately investigate Gray's claims. (Pl.'s Ex. D - Mathews Depo., 16:23-98:8.).

Gray complained to Chief Benton about race on at least two occasions, once

in May 2012 and the another in or around December 2012.  (Compl.  at ¶¶ 34-36;

Pl.'s Ex. A - Gray Decl.)  Gray complained to Benton about Parrish's association

with Sons of Confederate Veterans and the offensive photo of the confederate flag.

*Id.*  At one point, Benton told Gray he was "making a mountain out of a mole hill."

*Id.*  Benton never looked into Gray's complaints.  *Id.*

  In Benton's June 12, 2013 memo to EEO Officer Darryl Matthews, Benton

acted like he was hearing of Gray's complaints for the first time.  (Def.'s Ex. D -

Benton Decl., Ex. 2, Bates 000486.).  Benton refers to Gray's "accusations" (not

Defendant's conduct) as "very detrimental to our agency" and asked that "this

entire matter be investigated with due diligence."  *Id.*  Benton admitted in his

deposition that Gray had made the previous complaints:

> 15 Q (BY MS. EDWARDS:) Has
> 16 anyone ever complained to you about race
> 17 discrimination?
> 18 A Not specifically about race
> 19 discrimination, no.
> 20 Q Is it your testimony here
> 21 today that Keith Gray has never complained
> 22 to you about race discrimination?
> 23 A Keith complained to me that
> 1 he was being singled out and it was not
> 2 because -- specifically because of race.
> 3 It was because he thought Major Parrish
> 4 had something against him, didn't like
> 5 him.
> 6 Q So it's your testimony that
> 7 Mr. Gray did not mention race during his
> 8 complaint to you.
> 9 A I remember in conversation

10 with Keith that he felt like he did not
11 get the respect that he deserved because
12 he was black, and that white people didn't
13 like a black person in charge of them.
14 Q So, in your mind, is that
15 not a complaint of race discrimination?
16 A If that's a complaint, then,
17 yes, he complained.
18 Q But you didn't consider it a
19 complaint of race discrimination at the
20 time.
21 A I felt more like it was
22 someone singling out an individual was
23 what the complaint was about.
1 Q And --
2 A Not specifically because of
3 race.
4 Q You made that determination
5 on your own.
6 A Yes.
7 Q And you didn't investigate
8 to determine whether it was race
9 discrimination.
10 A I looked at the facts and
11 circumstances that I had before me. I am
12 not privy to conversations between both,
13 but everything that Keith said about Major
14 Parrish, when you looked at everything
15 that was done, you couldn't make a
16 determination whether that -- he was being
17 discriminated against.

(Pl.'s Ex. C - Benton Depo., 36:15-38:17.)

18 Q Don't you recall Mr. Gray
19 advising you that he believed that Steve
20 Parrish was nit-picking his work.
21 A I do remember that.
22 Q Do you remember him advising
23 you that he felt that he was being

Page 88
1 unfairly scrutinized by Steve Parrish?
2 A I believe I remember that
3 being part of the conversation.
4 Q Do you remember him advising
5 you that Steve Parrish was removing his
6 authority by taking patrol -- the patrol
7 division away from him and assigning the
8 administrative bureau to him?
9 A That was not Steve Parrish's
10 decision.
11 Q Whose was it?
12 A That was mine and Steve
13 Parrish's together.

(Pl.'s Ex. C - Benton Depo., 87:18-89:13).

Therefore, Benton admits that Gray complained to him about race, that he decided for himself that it was not discrimination, and did nothing to investigate or remedy the conduct. *Id.* Benton's communication to Mathews failed to give an unbiased account that included Gray's previous complaints. (Def.'s Ex. D - Benton Decl., Ex. 2, Bates 000486.) Benton's attachment to the letter attempts to defend his and Parrish's actions, including denying Gray's request to be removed from Parrish's chain of command. *Id.*

Gray made a verbal complaint to Darryl Mathews in late February/early March 2013 regarding the discrimination and harassment. (Pl.'s Ex. A - Gray Decl.) Mathews told Gray to "wait" because he was "too busy with the RaeMonica Carney investigation" to investigate Gray's complaint. (Def.'s Ex. A - Gray Depo., 69:14-70:6.) Ms. Carney (black) had also filed a complaint based on

49

race against the department.  *Id.*

After receiving no further communication from Mathews, Gray filed the June 2013 Guardian Tracking complaint in response to Parrish's entry further scrutinizing Gray.  (Pl.'s Ex. A - Gray Decl., Pl.'s Ex. D - Mathews Depo., 14:11-47:13.)  Mathews testified that, rather than launching an independent investigation, he merely requested documents from Benton, Parrish, Internal Affairs, and the two white captains, David Jay and Stacy Robinson, to back up *Defendant's* side of the story.  *Id.*

Mathews interviewed only one employee, Captain David Jay (white), to inquire about Gray's treatment.  *Id.*  Jay was Gray's counterpart that also reported to Parrish and is pictured with Parrish in the Sons of Confederate Veterans photo. (Def.'s Ex. A - Gray Depo., Def.'s Ex. 19; Gray Decl. Ex. 1).  Mathews claims that Jay told him he did not believe Parrish was discriminating against Gray, even though Parrish is associated with the Sons of Confederate Veterans.  (Pl.'s Ex. D - Mathews Depo., 41:12-46:17.)  Mathews stated that he was unaware that Jay was also a member of the group because he did not ask.  *Id.*

On September 18, 2013, Mathews issued a "no cause" finding, five (5) days prior to Gray's termination.  (Mathews' Decl., Ex. F, Ex. 3.)  The memo was issued to Mike West, Dothan City Manager, and Delvick McKay, Dothan Personnel Director.  Mathews' report states the following about his "investigation"

of Gray's complaint about the Sons of Confederate Veterans:

> Culturally speaking, some African Americans feel that Sons of Confederate Soldiers Organization's purpose is to preserve confederate history and / or the legacy of confederate soldiers, validates slavery.  African Americans disdain for the confederate flag validates their belief that those affiliated with the Sons of Confederate Soldiers believe slavery was southern economics. . .
>
> The facts are the Sons of Confederate Soldiers' organization is not a hate group according to the Southern Poverty Law Center. . . .

(Mathews' Decl., Ex. F, Ex. 3, Bates 000922.)

Contrary to Mathews' assertions, the Southern Poverty Law Center lists the Sons of Confederate Soldiers on its "Hate Watch" website.  (Pl.'s Ex. A – Gray Decl., Ex. 2.)  Mathews admitted to accepting payments from Dothan City Mayor Mike Schmitz that he alleges are for "bird dog" fees for referrals of leases to Mayor Schmitz's car dealerships.  (Pl.'s Ex. D - Mathews Depo., 168:10-185:9.)  Gray's Motion to Compel (Doc. 25) requesting production of those payment records is currently pending with the Court.

Gray filed a Charge of Discrimination with the EEOC on or about August 2, 2013 alleged race discrimination without the assistance of counsel.  (Pl.'s Ex. 1 - Gray Decl.)  Gray amended his EEOC race claims on October 4, 2013 and filed a separate charge for retaliation that same day.  *Id.*

## EEO, AFFIRMATIVE ACTION, AND CONSENT DECREE DEFICIENCIES

Mathews is Defendant's EEO/Training Manager.  (Def.'s Ex. F - Mathews Decl., ¶ 2.)  His position was created because of this Court's Consent Decree of 1975.  (Pl.'s Ex. D - Mathews Depo., 102:7-13.)  Mathews testified that he believes the Consent Decree entered by this Court, recognizing severe and pervasive race discrimination in the City of Dothan, was unfounded.  (*Id.* at 114:14-117:20.)  Mathews, therefore, does not believe in the legitimacy of the very decree he is charged with enforcing.  *Id.*  Mathews is also responsible for ensuring compliance with the City's Affirmative Action Plan.  (*Id.* at 117:21-118:14.)  Mathews admitted to grave deficiencies in the implementation and monitoring of the Affirmative Action Plan, the EEO training program, and in providing notice to employees regarding their rights under the Consent Decree and Affirmative Action Program.  (*Id.* at 117:21-130:18; 130:22-144:5.)

Gray only received one copy of the Affirmative Action Plan during his employment, in 1995.  (Pl.'s Ex. A - Gray Decl.)  Gray had to request that copy from the Personnel Department.  *Id.*  Neither the Consent Decree nor the Affirmative Action Plan were not automatically distributed or posted to employees.  *Id.*  Consistent with Mathews testimony, the Affirmative Action Plan and Consent Decree were not posted on departmental bulletin boards while Gray was employed with the City of Dothan.  *Id.*  Gray has never received any EEO Training while Mathews has been the EEO Officer.  (Def.'s Ex. A - Gray Depo., 141:4-142:9)

## INTERNAL AFFAIRS INVESTIGATION

Three (3) weeks after Gray filed his initial EEOC charge, Defendant launched the Internal Affairs investigation into Gray allegedly underlying his termination.  (Compl.  at ¶¶ 40-44; Pl.'s Ex. A - Gray Decl.)  Defendant claims that it responded to a call regarding an assault at the Outcast motorcycle clubhouse on August 25, 2013.  According to Internal Affairs Sergeants Doug Magill and Donny Smith, Defendant's Rule 30(b)(6) witnesses, Willie McGuire, a Troy firefighter, approached Officer Mike Woodside on the scene and made a complaint specifically about Gray.  (Pl.'s Ex. F - Magill Depo., 36:22- 45:7, 39:8-40:14; Pl.'s Ex. E - Smith Depo., 57:17-58:17; 65:8-15; 73:17-78:21.)   Magill testified as follows:

> 11 Q Well, how did he complain
> 12 about Keith Gray?
> 13 A He said that he didn't think
> 14 it was fitting that a high ranking officer
> 15 in the department was at an establishment
> 16 where they were smoking marijuana and
> 17 drinking beer, is what he said.

Mr. McGuire denies this.  In fact, he did not even know Gray personally.

McGuire testified as follows:

> I did not approach them to make a complaint against Keith Gray.  I did not even know Gray personally.  Some officers approached me and asked me whether any black officers had been hanging out at the clubhouse or were members of motorcycle clubs.  I had heard of Chopper, but I did not realize who it was until the police officers described him.  I

had seen him at several charity events.

I never told the Dothan Police that I witnessed Gray being around marijuana being smoked or illegal alcohol being consumed.  I never saw Gray witness or be involved in any criminal activity.

(Pl.'s Ex. B - W. McGuire Decl., ¶ 4-5.)

Sergeants Smith and Magill also allege that McGuire was not a member of Outcast.  (Pl.'s Ex. E - Smith Depo., 65:8-16; Pl.'s Ex. F - Magill Depo., 45:5-7.) McGuire testified otherwise.  (Pl.'s Ex. B - W. McGuire Decl., ¶ 2.)

Defendant alleges that Outcast is a one-percenter motorcycle club. Defendant alleges that it relied on Officer Woodside's characterization of Outcast as a one-percenter club, even though 1) Defendant never spoke to Woodside to determine how he derived those findings (Pl.'s Ex. E - Smith Depo., 58:18-59:10; Pl.'s Ex. F - Magill Depo., 40:11-41:21); 2) Woodside is "self" taught and has never received any formal training on motorcycle clubs or gangs (Pl.'s Ex. E - Smith Depo., 71:21-72:22), and 3) Woodside has never worked any cases involving motorcycle clubs or gangs. *Id.*

McGuire, having firsthand knowledge as an Outcast member, testified that Outcast is not a one-percenter.  (Pl.'s Ex. B - W. McGuire Decl., ¶ 2.)  The Dothan chapter of Outcast does not exist to promote violence or crime. *Id.*  Outcast does not wear the one-percenter diamond patch. *Id.*  The Dothan Outcast chapter exists for comradery and riding purposes only. *Id.*  Based on McGuire's testimony,

Defendant fabricated the "complaint" that led to Gray's Internal Affairs investigation and his subsequent termination. *Id.*

In addition to the fabricated complaint, Defendant alleges that it interviewed seven (7) assault suspects allegedly brought in from the Outcast clubhouse, attempting to obtain information on Gray. (Def.'s Ex. G - Smith Decl., ¶¶ 7-8, Ex. 1.) Only six (6) interviews were included in Defendant's evidentiary submission. *Id.* The seventh video, purportedly of Willie McGuire, is not included. *Id.* A blank video is included in the seventh slot. *Id.*

Upon discovery of this discrepancy, the undersigned contacted counsel for Defendant to request McGuire's video. Counsel for Defendant stated that they had been mistaken, that McGuire's interview had been conducted by phone, and that no video was available. Counsel for Defendant stated that it would correct this in its Reply brief. No recording of the alleged phone conversation between Internal Affairs and Mr. McGuire has been produced in this action. No explanation was given as to why there is a blank slot on the CD where a seventh video appears to have existed. *Id.*

Regardless, the video statements from the six (6) suspects were coerced. *Id.* Smith and Magill conducted the interviews in an interrogation room wearing firearms on their sides. *Id.* This is despite the fact that the department has a "firearm dropbox" outside the interrogation room specifically for the purpose of

removing firearms prior to an interrogation. *Id.*  They advised the suspects that they did not care about the assault, that they only wanted information about police officers.  *Id.*  They told them if they cooperated, they would work with the DA on dropping or reducing charges.  *Id*.  They also asked the suspects about three (3) specific Dothan Police officers: Gray, Taiwan Truitt, and RaeMonica Carney, all of whom are black.  (*Id.*; Pl.'s Ex. A - Gray Decl.)

Defendant alleges that it did not investigate Taiwan Truitt because it took his word for it that he was not involved with Outcast.  (Pl.'s Ex. E - Smith Depo., 61:4-70:15.) Defendant's own evidence shows that All Throttle was an actual support club for Outcast, whereas Bama Boyz was not.  (Pl.'s Ex. E - Smith Depo., Ex. 2.)

On August 26, 2013, the very day after these interrogations, Smith sent the following email to the Alabama Law Enforcement Agency to obtain information about Gray and Carney:

> In reference to our earlier conversation, the names I need you to research for me is Keith Gray and ReaMonica Carney. There was an incident in Dothan in the early morning hours of August 25th, 2013 involving an outlaw motorcycle club. Several members were arrested for Assault 2nd degree involving one of their own. During the investigation, these two officer's names came up as possibly passing along sensitive information in the past to the head of the involved motorcycle club. I would like to view their activity from the last eight months if possible. Thanks in advance.

(Pl.'s Ex. E – D. Smith Depo., Ex. 3.)

Gray and Carney were the only two black officers who had filed EEOC charges against Defendant.  (Pl's Ex. A - Gray Decl.)  Ms. Carney was not even a member of a motorcycle club.  *Id.*  No officer has ever been placed under investigation by Internal Affairs for four (4) weeks during Gray's entire twenty-eight (28) year career.  *Id.*  Gray had worked seven (7) of those twenty-eight (28) years in Internal Affairs.  *Id.*  In Gray's experience, most Internal Affairs investigations last approximately a week or less.  *Id.*

Defendant subjected Gray to two (2) intense interrogations of which Defendant failed to produce the video.  (Def.'s Ex. G - Smith Decl., Exs. 4, 14.)  The first interrogation was about an hour long.  *Id.*  The second lasted approximately five (5) hours. *Id.* Gray was not provided the required notice of topics prior to the second interview, which had changed from the first.  (Pl.'s Ex. A – Gray Decl.)  Smith and Magill utilized interrogation tactics more in line with a criminal investigation than an Internal Affairs investigation.  *Id.*  Internal Affairs investigations are supposed to be conducted in a neutral, fact-finding manner.  *Id.* Gray felt as if Defendant was doing everything it could to dig up something to terminate his employment.  *Id.* Gray voiced several times during the interviews that believed he was the victim of a retaliatory witch hunt.  *Id.*

**SPOLIATED EVIDENCE: CITY-ISSUED CELL PHONE**

Counsel for Defendant admitted during the March 13, 2015 telephone hearing that Defendant failed to preserve the cell phone underlying Gray's termination.  Gray has been prejudiced by the inability to run an independent forensics analysis.  (*See* Gray's Motion to Compel and Motion for Sanctions (Doc. 25), currently pending with the Court.)

## BENTON'S EXTRAMARITAL AFFAIR WITH SOUTHERNLINC REPRESENTATIVE

Benton admitted to having an affair with a representative in the SouthernLinc office that issued Gray's phone at the time Gray's phone was issued. (Pl.'s Ex. C - Benton Depo., 25:10-27:20.)  Benton admitted that the City took away his supervision of the City's SouthernLinc account because of this conflict of interest.  *Id.*

## DEFENDANT'S OWN TESTING OF CELL PHONE INCONCLUSIVE

Corporal Mullis, Defendant's Rule 30(b)(6) witness designated to testify about Gray's phone and Defendant's testing, admitted that he does not know if Gray's phone was new or used when Gray received it.  (Pl.'s Ex. H - Mullis Depo., 49:18-53:13.)  Defendant attempts to cover up this disparity through Magill's Declaration filed with its Brief.  (See Def.'s Ex. I.)  However, Magill was not designated as Defendant's corporate witness regarding the phone.  (Pl.'s Ex. H - Mullis Depo.,  47:14-19.)    Mullis admitted that his phone was issued to him by Defendant's Radio Department, not directly from a SouthernLinc representative, as

Magill's declaration attempts to aver.   (Pl.'s Ex. H - Mullis Depo., 52:12-15.) Mullis's testified that he could not give dates of when the alleged website was accessed or if it was even accessed.   (Pl.'s Ex. H - Mullis Depo., 91:11-18; 92:7-11; 94:1-5.)   Mullis testified that he could not tell who accessed any website on Gray's phone.   *Id.*   Mullis testified that he had never investigated any other officer's cell phone, with the exception of one other black employee.   (Pl.'s Ex. H - Mullis Depo., 57:23-59:5.)

Gray did not access a pornographic website on the cell phone.   (Def.'s Ex. B, Dothan Pers. Bd. Hr'ing Tr., 230:14-231:8; Pl.'s Ex. A - Gray Decl.)

**DEFENDANT'S TESTIMONY IS IN CONFLICT REGARDING THE TESTING OF GRAY'S COMPUTER; HOWEVER, NO EVIDENCE WAS FOUND TO SUPPORT GRAY'S TERMINATION.**

Corporal Mullis testified that Internal Affairs Sergeant Magill, his superior, asked him to run checks on Gray's phone and computer on or about August 26-27, 2015, the day or so after Defendant launched the investigation.   (Def.'s Ex. B – Dothan Pers. Bd. Hr'ing Tr., 304:4-305:13; Pl.'s Ex. H - Mullis Depo., 73:6-78:22.) Mullis testified that he gave Magill FBI-issued software to use on Gray's office computer.   *Id.*  Magill denies that he used the software and that neither he nor Mullis ran checks on Gray's computer(s).   (Pl.'s Ex. F - Magill Depo., 57:1-66:22.)

Magill alleges that someone drove Gray's computer to ABI for testing, but cannot say who.  *Id.*  First, he said he did not know who drove it, then he said he

made the contact with ABI, then he alleges Mullis made the contact.  *Id.*  The testimony regarding Gray's computer testing is in conflict.  *Id.*  Defendant admits, however, that neither it nor the ABI found anything on Gray's computer to support Gray's termination.  *Id.*

## ABI / FBI DID NOT SUPPORT GRAY'S TERMINATION

Defendant had Gray investigated by the Alabama Bureau of Investigation ("ABI") and the Federal Bureau of Investigation ("FBI").  (Pl.'s Ex. C - Benton Depo., 178:4-186:3, Pl.'s Ex. F - Magill Depo., 60:18-66:21.)  Benton first testified that he played no role in the investigation, yet later admitted that he personally contacted the FBI and asked acquaintances to investigate Gray.  (Pl.'s Ex. C - Benton Depo., 178:4-186:3.)  Magill testified that Defendant sent Gray's computer to the ABI to be analyzed.  (Pl.'s Ex. F - Magill Depo., 60:18-66:21.)  Defendant nonetheless admits that it did not rely on anything from the ABI or FBI to support Gray's termination.  (Pl.'s Ex. C - Benton Depo., 185:9-186:3; Pl.'s Ex. E - Smith Depo., 182:1-183:10; Pl.'s Ex. F - Magill Depo., 60:18-66:21.)

## DEFENDANT DID NOT FORMALLY INVESTIGATE ANY OTHER OFFICER'S ASSOCIATION WITH ANOTHER ORGANIZATON

Benton never requested any officer other than Gray to be investigated for association with an organization, including white employees' associations with motorcycle clubs and Parrish's association with Sons of Confederate Veterans.  (Pl.'s Ex. C - Benton Depo., 96:21-97:17.)

## DEFENDANT'S INCONSISTENT APPLICATION OF POLICY

Defendant used its "catchall" Personnel Rule, Section 3-43(19), to terminate Gray's employment.  (Def.'s Ex. A - Gray Depo., Ex. 23.)  The Personnel Rules and Regulations set forth three (3) categories of disciplinary penalties: Minor, Major, and Intolerable.  (Def.'s Ex. C - McKay Decl., Ex. 1.)  Defendant used the "Intolerable" category to terminate Gray, because it is the only category of offenses Defendant could use to terminate an employee based on a one-time offense.  *Id.*  In looking at the policy, Gray's alleged conduct does not fit into any of the defined Intolerable offenses, which include, but are not limited to, "Membership in any organization which advocates the overthrow of the government of the United States by force or violence."  (*Id.* at Sec. 3-43(11) Bates 003996.)  Also listed is "Repeated Sexual Harassment."  *Id.*  Apparently, under Defendant's policies, one episode of sexual harassment is not enough to justify termination.  *Id.*  Using the "Other" offense under Section 3-43(19) was the only mechanism Defendant could devise to terminate Gray's 28-year employment based on a one-time offense.

Other employees have committed Intolerable offenses who have not been terminated.  (Pl.'s Ex. A - Gray Decl.)  Darryl Mathews, the EEO Manager, admitted to accepting payments from Mayor Mike Schmitz, arguably in violation of Section 3-43(12).  *Id.*  Sergeant Andy Hughes (white), member of Sons of

Confederate Veterans, ran for the Houston County Sherriff's office while still employed by the City in violation of Rule 3-43(14). *Id.* Sergeant Mike Cirulli (white) committed gross insubordination in violation of Section 3-43(18), when he pointed his finger in a captain's face and yelled, "You're a D--- liar." *Id.* Benton (white) committed the Intolerable offense of willful and deliberate damage to city property under Section 3-43(8), when he threw a City-issued cell phone on the floor and destroyed it. *Id.*

Sergeant Anthony Nelms (white), referenced by Defendant in paragraphs 130-131 of its Brief, was given preferential treatment after committing an Intolerable Offense arguably more serious than Gray's alleged offense. Nelms pointed his service weapon at a fellow Dothan police officer during a departmental meeting. (Ex. A - Gray Decl.) Additionally, Nelms had previous Major infractions on his record—excessive speed on 2 occasions (one resulting in significant damage to a City-issued vehicle (*See* Intolerable Offense Section 3-43(8)), and the other when a call had been downgraded and excessive speed was no longer unnecessary. *Id.* Defendant not only gave Nelms the opportunity to resign, but it did not place him under an intense, four (4)-week-long internal affairs investigation prior to offering him the opportunity to resign. *Id.*

Additionally, Benton threatened Gray with retribution if he refused to resign. (Ex. A - Gray Decl.) Benton stated that he would have Gray's Alabama Peace

Officer's Standards and Training Commission Diploma pulled (this is Gray's license to be a police officer in the state of Alabama), that he would have Gray's Alabama State Board Certification for Polygraph removed, and that he would not allow Gray to have his duty service weapon, which is offered to all sworn officers upon retirement.  *Id.* Gray refused to resign despite Benton's threats (*id.*), which constituted further acts of harassment and retaliation.  Defendant does not allege that it made those same threats to Nelms.

Corporal Arthur Schaefer (white) violated Sections 3-43(2)-(3) by being under the influence of alcohol while on duty.  (Pl.'s Ex. A - Gray Decl.)  Corporal Schaefer drove a City-issued vehicle to Ozark, Alabama, in uniform, to attend training related to breathalyzer tests.  *Id.*  As part of the class, Schaefer was used to demonstrate blowing into the device.  *Id.*  After the 20-30 minute drive to Ozark and a full day of class, Schaefer still registered at .05 blood-alcohol content.  *Id.* Chief Benton sent personnel from Dothan to pick up Schaefer and drive his City-issued vehicle back to the department. *Id.* Defendant did not terminate Schaefer, who is still employed by the City of Dothan.  *Id.*

Lieutenant Raymond Wiehe (white) violated Section 3-43(5) when he accessed a departmental computer system and falsified records related to his checking out of guns from the department.  *Id.*  Defendant did not terminate Wiehe's employment.  *Id.*

Sergeant Jerry Mixon (white) violated Section 3-43(15) by repeatedly sexually harassing a female subordinate (black) and was not terminated. *Id.*

Officers Andrew Sutley, Jason Adkins, and Erik Duhaime (all white) stopped during transport of a prisoner. *Id.* Sutley placed his service weapon to suspect's head while he and Adkins threatened him. *Id.* All officers misrepresented the facts on their official reports. *Id.* Sutley failed to report the seizure of marijuana. *Id.* Further, Sutley was hired by Dothan Police Department after being fired by Luverne Police Department for harassing people without cause. The City did not terminate their employment. *Id.*

Lieutenant Antonio Gonzalez was only demoted for sending sexually explicit messages over the City pager service.

Gray knows of six (6) white officers who looked up personal records without need and were given verbal counseling. *Id.* The officers looked up an incident involving a fellow officer who had been involved in a domestic incident. *Id..*

Gray knows of no other officer who has been terminated for a first-time offense under Section 3-43(19) for "Other" Intolerable offenses. (Pl.'s Ex. A – Gray Decl.)

## BAMA BOYZ MOTORCYCLE CLUB

Gray, like several members of the Dothan Police Department, is a member

of a motorcycle club.  (Pl.'s Ex. A – Gray Decl.)  In 2008, Gray founded Bama Boyz, a law-abiding motorcycle club that rides as a pastime and often participates in community charitable events.  *Id.*  Bama Boyz' Dothan Chapter had about a dozen (12) members at the time of his termination.  *Id.*  Bama Boyz' Anniston Chapter had about seven (7) members.  *Id.*  Bama Boyz is not a one percenter motorcycle gang.  (*Id*; Pl.'s Ex. E - Smith Depo., 149:7-150:23; Pl.'s Ex. F - Magill Depo., 46:23-48:2; Pl.'s Ex. C - Benton Depo., 223:17-225:12.)  Bama Boyz is not an outlaw club.  (Pl.'s Ex. A – Gray Decl.)  Gray has never been involved in or associated with criminal activity.  *Id.*  Gray knew of no members of Bama Boyz who had criminal histories.  *Id.*  Gray never knowingly associated with any persons he knew had conducted illegal activity or had encouraged violence.  *Id.*  Gray could not run background checks on every person he came in contact with who happened to ride a motorcycle.  (*Id*; Pl.'s Ex. C - Benton Depo., 223:17-224:13)  It is illegal to run background checks on individuals unless they are under suspicion for a present crime.  *Id.*  Bama Boyz sought persons of good character to become members its club.  *Id.*  It relied primarily on recommendations of current members when considering new recruits for membership.  *Id.*

The City of Dothan hosted a charity ride for Bama Boyz, who raised money for the Dothan Police Athletic League.  (Pl.'s Ex. C - Benton Depo., 94:9-95:21.)  Benton admitted that the City received funds from the Bama Boyz Motorcycle

Club following this event. *Id.*

## GRAY WAS NOT A MEMBER OF A ONE PERCENTER OR OUTLAW CLUB, WAS NOT INVOLVED IN CRIMINAL ACTIVITY, AND DID NOT ASSOCIATE WITH KNOWN CRIMIMALS

Defendant admitted, by and through Benton, Smith, and Magill, that its investigation revealed that Gray was not a member of a one percenter club, that he was not a member of an outlaw club, and that he was not associated with any criminal activity:

> 7 Q During your investigation,
> 8 did you research Mr. Gray's Bama Boyz Club
> 9 with regard to whether it was considered a
> 10 one percenter?
> 11 A Yes.
> 12 Q In your investigation you
> 13 discovered that Bama Boyz is not
> 14 considered a one percenter.
> 15 A That's correct.
> 16 Q It is not considered an
> 17 outlaw motorcycle club, is it?
> 18 A No, it is not.
> 19 Q You could not prove that Mr.
> 20 Gray had ever witnessed any illegal
> 21 activity of any other motorcycle club, did
> 22 you?
> 23 MR. MITCHELL: Object to the
> Page 150
> 1 form.
> 2 Q What was your answer?
> 3 A Say that again. I'm sorry.
> 4 Q Your investigation never
> 5 determined that Mr. Gray witnessed any
> 6 illegal activity, did it?
> 7 A No, ma'am.
> 8 Q Your investigation showed

66

9 that Mr. Gray had not participated in any
10 illegal activity, didn't it?
11 A That is correct.
12 Q Did you understand during
13 your investigation that the term, quote,
14 unquote, "blessing" meant that Mr. Gray
15 was requesting that his club be able to
16 ride in a particular territory without any
17 friction from another motorcycle club?
18 A Yes.
19 Q And that he was doing so to
20 avoid any potential conflicts or harm to
21 members of his motorcycle club, the Bama
22 Boyz.
23 A Yes.

(Pl.'s Ex. E - Smith Depo., 149:7-150:23.)

23 Q Now, during your
1 investigation, you ultimately found that
2 you had no evidence that Mr. Gray broke
3 any laws, correct?
4 A Criminal laws?
5 Q Yes.
6 A I mean --
7 Q He wasn't charged with
8 anything, was he?
9 A No, he wasn't.
10 Q I mean, he would have been
11 charged if he had violated the law,
12 wouldn't he?
13 A I mean, not necessarily,
14 but, no.
15 Q Did he or did he not -- did
16 you or did you not find that he broke any
17 laws?
18 A No, he did not break any
19 laws.
20 Q Did you or did you not prove
21 that he -- that the Bama Boyz Motorcycle

22 Club was involved in any crime?
23 A I mean, there was -- no, I
1 was not able to prove there was any crime,
2   no, ma'am.

(Pl.'s Ex. F -  Magill Depo., 46:23-48:2.)

Benton admitted that he was not certain that Gray associated with criminals when he terminated Gray's 28-year career. (Pl.'s Ex. C - Benton Depo., 223:17-225:12.)

## V.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  The Court must construe the record, including all pleadings, discovery, and affidavits, in the light most favorable to Gray. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).  All reasonable inferences must be drawn in Gray's favor. *Id.*

## VI.   LEGAL ARGUMENT

### A. GRAY'S CLAIMS WERE TIMELY FILED

Gray's Title VII claims include discrimination, harassment, and retaliatory hostile environment.  (Def.'s Ex. N; Compl.)  Gray's EEOC charges were timely filed with regard to the discrete acts of his termination and the transfer of his

authority and duties to a lower-ranked white officer in May 2013. (Gray Decl., ¶ 30.) All alleged acts constituting the harassment and retaliatory hostile environment were timely filed. *McCurdy v. Auburn University*, Civ. No 3:14cv226-MHT (WO) (M.D. Ala. May 4, 2015) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)). "[U]nder the 'continuing violation' doctrine, when a plaintiff alleges a hostile-work environment, the alleged violation is not any particular, discrete act of harassment, but the cumulative result of "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* (citing *Morgan*, U.S. 101 at 117). "As long as one 'act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Id.*

Defendant erroneously argues that Count I does not state a claim for harassment under Title VII. To the contrary, Gray's complaint is replete with factual allegations of harassment incorporated into this count. (Compl. ¶ 69.) Despite the header's use of the term "discrimination," the Complaint provides Defendant with more than adequate notice of a Title VII harassment claim under both Rule 8 of the Federal Rules of Civil Procedure and the precedent of this Court. *McCurdy*, Civ. No 3:14cv226-MHT (WO) ("The complaint is not a model of clarity; nevertheless, it does put the defendants on notice of a pay-discrimination theory.")

Defendant raises no arguments and cites no authority suggesting that any of

Gray's discrimination or harassment claims are time-barred under the Consent Decree, further discussed *infra*.

In the event the Court deems any of Defendant's discriminatory acts as untimely, Gray may still introduce such evidence as background evidence in support of Gray's actionable claims. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S. Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Allen v. County of Montgomery,* 788 F.2d 1485 (11th Cir.1986).

## B. DEFENDANT VIOLATED GRAY'S FIRST AMENDMENT RIGHT OF FREEDOM OF ASSOCIATION

Defendant unlawfully violated Gray's First Amendment right to associate with the Bama Boyz Motorcycle Club, a law-abiding motorcycle club that exists for riding, comradery, and charitable purposes only.   The Supreme Court recognizes that a citizen who works for the government is nonetheless a citizen with First Amendment rights. *Garcetti v. Ceballos,* 547 U.S. 410, 419, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).  ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment . . . . Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government.")  *Id.* at 417, 419.   The First Amendment limits public employers from using the employment relationship to restrict "the liberties employees enjoy in their capacities as private citizens."  *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

70

Public employees enjoy the " 'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.' " *Boy Scouts of America v. Dale*, 530 U.S. 640, 647, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)).  Public employers cannot deny an individual citizen "rights and privileges solely because of [his] association with an unpopular organization." *Healy v. James*, 408 U.S. 169, 186, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972). "[G]uilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." *Id.* (internal quotation marks omitted).

### 1.   Defendant Violated Gray's Right to Association Under the *Pickering* Test

Gray's association with the Bama Boys Motorcycle Club is entitled to Constitutional protection under the *Pickering* test.  *See Pickering v. Board of Education*, 391 U.S. 563 (1968).  The *Pickering* test balances the employee's right to engage in speech or association against the interest of the employer in "promoting the efficiency of the public services it performs." *Id.*

It should be noted that Defendant attempts to blur the lines by self-servingly interchanging the terms "motorcycle club," "outlaw motorcycle gang," and "one-percenter gang" throughout its Motion.  As described *supra*, it weakly attempts to

associate Gray with the Outcast Motorcycle Club, which is not even a one-percenter motorcycle club according to Willie McGuire, one of its members. Defendant cites two non-binding cases that can be easily distinguished from the present case.  In *Piscottano v. Murphy*, 511 F.3d 247 (2d Cir. 2007), the court upheld the termination of three (3) correctional officers who were alleged *members or prospects* of the Outlaws Motorcycle Gang, a self-proclaimed one-percenter club.  In that case, there was authenticated, documented evidence of numerous crimes committed by the local branch in which the officers were involved. Additionally, the officers in *Piscottano* guarded the jail in which fellow gang members were incarcerated.  Defendant never accused Gray of associating with the "Outlaws Motorcycle Club," and its alleged evidence of association with the much more benign Outcast club is unreliable, unauthenticated, and virtually non-existent. Defendant relies on statements made by suspects in police custody who were interrogated by Internal Affairs specifically about Gray.  Sergeants Magill and Smith advised the suspects they would seek leniency in exchange for information, making clear they were only concerned about obtaining information on leniency, Defendant has no evidence that Gray associated with known criminals or even witnessed any criminal activity during the few occasions Gray happened to be at an event where an Outcast member was present.

     In Defendant's other case, *Turner v. United States Capitol Police, et al.*, 34

F. Supp. 3d 124 (D.D.C. 2014), an officer's involvement with the self-proclaimed, one-percenter Hell's Angels had been investigated on numerous occasions for ties to illegal activity and white supremacy ties.  No evidence of that nature exists against Gray.  Defendant states it launched its investigation into Gray based on the alleged complaint from Willie McGuire, a Troy firefighter and member of the Dothan Outcast club.  However, McGuire makes clear that, not only did he not complain about Gray, Outcast is not a one-percenter gang engaged in criminal activity; it exists for riding and comradery purposes only.  McGuire did not even know who Gray was until Dothan police officers approached him and specifically described Gray to him.  Even at that, McGuire told the officers he had never seen Gray at the Outcast clubhouse, only at charity events in which both clubs happened to be present.

Defendant presents no credible evidence that Gray's association with Bama Boyz Motorcycle Club decreased the efficiency or effectiveness of Defendant under the second *Pickering* prong.  Defendant admitted, consistent with Gray's testimony, that its own investigation uncovered no evidence that Gray 1) had engaged in criminal activity, 2) had witnessed any criminal activity, or 3) had associated with known criminals.

Defendant discriminated against Gray for his association with a predominately black, law-abiding motorcycle club, whereas it did not discriminate

against white officers associated with predominately white organizations. Defendant admitted that it never conducted an Internal Affairs investigation of *any* other officer's association with an outside organization, despite knowing that other officers were associated with clubs such as the Iron Pigs Motorcycle Club, the Hamsters Motorcycle Club, and the Sons of Confederate Veterans.

Benton speciously stated that no other officer had been investigated because Defendant had never received any complaints about other officers' associations. That reason is false for two reasons.  First, Gray did complain about the white officers' association with Sons of Confederate Veterans ("SCV"), a predominately white organization with ties to the Ku Klux Klan ("KKK").  Those officers included but were not limited to Parrish, Gray's direct supervisor who engaged in Gray's harassment, and Gray's counterpart, Captain David Jay.  Gray found the officers' involvement with the SCV and photo taken with the Confederate flag to be highly offensive.  Former Chief Benton found Gray's complaint to lack merit on his own accord, without initiating any investigation.  Mathews, Defendant's EEO Officer, dismissed Gray's complaint after he alleged that Southern Poverty Law Center did not consider SCV a "hate group."  Contrary to Mathews' assertions, Southern Poverty Law has published multiple articles about the SCV on its "Hate Watch" website, referencing the SCV's association to the KKK and neo-Confederate movements.

Second, Benton's excuse is illegitimate because Defendant fabricated the "complaint" that allegedly sparked its investigation of Gray. Willie McGuire did not complain about Gray's association with Outcast, contrary to the testimony of Defendant's Internal Affairs officers and Rule 30(b)(6) witnesses. Defendant produced no credible evidence of *any* complaints made against Gray regarding his association with a motorcycle club or any other organization. In fact, Defendant, itself, sponsored charitable events involving the Bama Boyz, wherein the club raised money for the Dothan Police Athletic League.

The white officers' association with SCV and its historical ties to the KKK arguably cause much more damage to Defendant's promotion of efficient public services than the allegations it levied against Gray. The Eleventh Circuit, in discussing a police officer's ties with the KKK, noted that the city's black community "would categorically distrust" the police "if a known Klan member were permitted to stay on *in any position.*" *McMullen v. Carson*, 754 F.2d 936 (11th Cir. 1985) (emphasis added). Not only did Defendant fail to investigate, discipline, or terminate white officers associated with the SCV, it promoted Major Steve Parrish, who named his son after the first Grand Wizard of the KKK, to the position of Dothan's Chief of Police.

The Second Circuit, in analyzing a police officer's racial communications regarding Jews and African-Americans, stated the following:

> The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias. . . .  If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the minority will be less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement. And the department's ability to recruit and train personnel from that community will be damaged.

*Pappas v. Giuliani*, 290 F.3d 143 at 146-147 (2d Cir. 2002) (citations omitted).

The record makes clear that Defendant discriminatorily offers First Amendment protection to white officers' associations.  The associations of Parrish, Captain David Jay, and the other white command staff associated with Sons of Confederate Veterans is arguably more disruptive to the effective operations of the Department than Gray's association with a law-abiding, predominately black motorcycle club.  Defendant's discriminatory application of the First Amendment goes to the heart of what the First Amendment seeks to protect.  Defendant cannot selectively choose which employees deserve First Amendment protection based on its own views.

Regardless of whether or not the white officers' associations would survive

First Amendment scrutiny, Gray's association survives under *Pickering*, especially where Defendant can produce no credible evidence that his association disrupted the efficiency of the department. In fact, the department sponsored and received benefit from the charitable activities of his club. Defendant's Motion for Summary Judgment on Gray's First Amendment claim is due to be denied.

## B. GRAY'S TITLE VII CLAIMS SURVIVE AS A MATTER OF LAW

The burden-shifting framework cited by Defendant in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), "is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). However, to the extent the Court is inclined to apply this framework, Gray's Title VII claims survive as a matter of law.

### 1. Gray Can Establish a Prima Facie Case of Race Discrimination

Gray must first establish that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the job; and (4) he was replaced by someone outside the protected class or was treated less favorably than a similarly situated person outside the protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677. It is undisputed that Gray is black and that Defendant terminated his employment. Gray was qualified for his job as evidenced by the favorable performance reviews

he received throughout his performance and the fact that he was not terminated based on performance.  Finally, it is undisputed that Bubba Ott (white) replaced Gray in the position of Captain.

### 2.  DEFENDANT FAILED TO ARTICULATE A LEGITIMATE BUSINESS REASON

The Supreme Court holds that "the employer must produce *admissible* evidence indicating that it *actually* based its employment decision on a reasonably specific, legitimate reason." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1093-4, 67 L. Ed. 2d 207 (1981).  The weaker the "reason," the lesser the burden for the plaintiff to overcome." *Roberts v. Houston County Bd. of Education*, 819 F. Supp. 1019 (M.D. Ala. 1993).  Here, Defendant's reason for termination is weak when it admitted the following:

Defendant had no evidence that Gray violated any laws, that he had witnessed any violations of the law, or that he was associating with known criminals.  Defendant first alleged Gray accessed a pornographic website on his City-issued cell phone the very day he received it (which Gray vehemently denies and cannot prove otherwise due to Defendant's spoliation).  Then Defendant admitted that it could not tell whether Gray had accessed the site on that phone. Defendant's Rule 30(b)(6) witnesses is also inconsistent with regard to exactly how it alleges that Gray was "untruthful," and instead shows that Gray was consistently truthful about his motorcycle club activities.  Finally, Defendant

obviously does not consider its white officers' associations with motorcycle clubs and Sons of Confederate Veterans a threat to the department's efficiency.   It instead chose to scrutinize Gray over his involvement with a law-abiding predominately black motorcycle club that exists for comradery, riding, and charitable purposes.

### 3.  GRAY CAN SHOW PRETEXT

Gray  can rebut Defendant's business reason through evidence of pretext. *Reeves. v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).  Once Gray establishes a *prima facie* case that includes evidence of pretext, he need not produce additional, independent evidence of pretext in order to rebut the proffered business reason.   *Id.* (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)).  Pretext may be established by persuading the trier of fact either that the discriminatory reason more likely motivated the decision or by showing that the employer's proffered explanation is unworthy of credence.  *Burdine*, 450 U.S. at 256.

### a.  EPISODES SHOWING PRETEXT

### 1.  FAILURE TO FOLLOW OWN POLICY

Failure to follow policy is evidence of pretext.  *Vessels v. AISS*, 408 F.3d 763 (11th Cir. 2005).  Defendant failed to discipline offers consistently under its policies, as described in Gray's undisputed facts, *supra*.  Defendant

refused to terminate numerous white officers who engaged in much more serious conduct than that of which Gray is accused. Defendant singled Gray out and accused him of violating a Major Category Intolerable Offense under the "Other" category, which is the only policy Defendant could devise in which to terminate Gray for a first time offense. Gray knows of no other officer who has ever been terminated under this policy, including those whose conduct should have been deemed intolerable as described, supra.

## 2.    DEFENDANT'S REASONS LACK "GOOD FAITH"

A good faith defense must have some element of "good faith." The testimony of Defendant's Rule 30(b)(6) witnesses is replete with inconsistencies and falsehoods. Notably, the alleged "complaint" by Willie McGuire that allegedly sparked Defendant's investigation of Gray did not exist, per McGuire's own testimony. (Pl's Ex. B.) Defendant approached McGuire (not the other way around) and described Gray to *him* asking whether he knew Gray. McGuire did not know Gray, other than having seen him at a couple of charitable events, not the Outcast clubhouse as alleged. Furthermore, Defendant coerced statements from members of Outcast who were in its custody. Defendant's own videos show that Defendant questioned them specifically about Gray, wearing firearms in violation of policy, and offered leniency in exchange for the information. Finally, Outcast, the club in which Gray is accused of associating, is not even a one-

percenter club.   According to McGuire, the Dothan Outcast club exists for comradery and riding purposes only.

### 3. DEFENDANT ALLOWED RACE-RELATED COMMENTS AND ANIMUS TO EXIST IN THE WORKPLACE

Gray heard the N----- word numerous times during his employment and has personally been called the N----- word.   Several members of the Dothan Police Department, including Major Parrish, Gray's direct supervisor, were members of the Sons of Confederate Veterans and posed in a photo with a Confederate flag that was widely circulated among the department.   Parrish named his own son after Nathan Bedford Forrest, the first Grand Wizard of the KKK.   Gray made several complaints throughout his employment that went uninvestigated.   Benton admitted that Defendant failed to terminate at least three (3) employees known to have used the N---- word.

### C. VIOLATION OF CONSENT DECREE

On February 13, 1976, this Court entered a Consent Decree to redress pervasive race discrimination in the City of Dothan.   (Doc. 1, Ex. 1)   *Wiggins v. Hollis, et al.*, No. 75-57-S (M.D. Ala. 1976). The Consent Decree incorporated the Affirmative Action Plan entered  in *Yelverton v. City of Dothan*, wherein the Court held that "there has been and still remains substantial and pervasive racial discrimination in Dothan" Yelverton, 370 F. Supp. 612, 618 (M.D. Ala. 1974).

Contrary to Defendant's assertions, the Eleventh Circuit and this Court have

expressly acknowledged the Affirmative Action Plan and Consent Decree adopted in these cases. *Williams v. City of Dothan*, 818 F.2d 755, 760-61 (11th Cir. 1987) (acknowledging Dothan's continued obligations under the Affirmative Action Plan in Yelverton); *Matthews v. City of Dothan*, No. 04-640, 2006 WL 3742237 (M.D. Ala. Dec. 18, 2006) (acknowledging the existence of the Consent Decree in *Wiggins*). The Consent Decree prohibits discrimination in, *e.g.*, promotions, assignments, testing, and the "rights and privileges given white employees."

Defendant treats its Consent Decree like it is not worth the paper it is printed on. Darryl Mathews, EEO/Training Manager for the City of Dothan, whose very job exists because of the Consent Decree, believes this Court's Order entering the Decree was "unfounded." The testimony of Mathews, Defendant's Rule 30(b)(6) witness with regard to Defendant's EEO policies, reveals the lack of EEO oversight, inadequate training, investigation procedures, and adherence to the requirements of the City's Affirmative Action Plan. It is no wonder that disparities continue to exist among minorities in City. Those disparities have been perpetuated by a lack of implementation and oversight of this Court's Order.

Gray has been a victim of this institutionalized homogeny for (28) twenty-eight years. Defendant continually denied Gray training opportunities and promotions throughout his career as he watched lesser-qualified, white candidates advance through the ranks at a faster pace. Gray has had to over perform and over

achieve, yet never reached any semblance of equality despite his best efforts. Now, in addition to calling it "unfounded," Defendant argues Gray has no cause of action.   Why, then, does the Consent Decree exist?   And why does Defendant pretend to recognize it?

This Court has held that a consent decree "has the attributes of a contract" and "'must be discerned within its four corners.'"   *Reynolds v. Alabama Dept. of Transp.*, 996 F.Supp. 1156 (M.D. Ala. 1998) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)).   This Court acknowledged that in some cases the terms are ambiguous. *Id.*   (citing *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir.1988) (quoting *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 780 (11th Cir.1982)).   "To determine whether a writing is ambiguous, the court must first assess the plain meaning of the language of the writing and determine whether there are two possible reasonable interpretations." *Id.*

Here, the Consent Decree is clear that it seeks to redress not just the named Plaintiffs but "the class they represent."   The Decree also applies to the City, Board, Commission, its successors and assigns.   The City of Dothan recognizes that the Decree is still in effect today.   The only ambiguity to decide is what relief may be afforded.   Gray cannot pretend to know what relief may be afforded, but

respectfully requests the following:

(a)   An Order holding the City of Dothan in contempt of this Court's Consent Decree;

(b)   Equitable relief enjoining Defendant, its agents, its successors, employees, and those acting in concert with Defendant from continuing to violate the Consent Decree;

(c)   Court monitoring of the City of Dothan's adherence to this Court's  Consent Decree;

(d)   Reinstatement of Plaintiff's employment and promotion to such position that Plaintiff would have attained but for Defendant's unlawful discrimination;

(e)   An Order requiring Defendant to pay lost wages and other lost employment benefits, front pay, compensatory damages, and any other monetary relief available at law;

(e)   An award of costs and reasonable attorneys' fees, plus interest;

(f)   Such other and further relief this Court deems just and proper.

## D.   RETALIATORY HOSTILE WORK ENVIRONMENT

Defendant subjected Gray to a retaliatory hostile work environment

following his complaints about the department's discriminatory treatment of minority citizens. Defendant reassigned Gray from the Field Operations Bureau to the Administrative Services Bureau, a much less prestigious bureau of the department. Defendant further subjected Gray to a retaliatory hostile work environment after he complained to Benton and Mathews, Defendant's EEO Officer. Defendant removed Gray's authority from supervising approximately sixty (60) employees to only supervising two (2) employees and gave that authority to a lesser ranked white Lieutenant. Finally, Defendant subjected Gray to a retaliatory hostile work environment following the filing of his EEOC charge alleging race discrimination on or about August 2, 2013. Defendant subjected Gray to the "witch hunt" described supra, which included two unfounded interrogations by Internal Affairs and a meritless administrative leave and investigation. Finally, Defendant unlawfully terminated Gray's employment on September 23, 2013.

The Eleventh Circuit recognizes a cause of action for retaliatory hostile environment. *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012). Contrary to Defendant's argument, "same decision" discrete acts do not preclude separate liability under this claim:

> The Secretary argues that the discrete acts in this case cannot be considered as part of the hostile environment because the retaliatory intent was not the 'but for'' cause where the jury applied the same decision defense.

> Although the Secretary is correct that the retaliation must be the 'but-for' cause, we cannot agree that the same-decision defense eliminates such causation in a hostile work environment claim. As it does in every case in which the same-decision defense applies, the jury here found that the discrete acts were motivated in part by retaliatory animus. Although that may be sufficient under the same-decision defense to preclude liability for each of the acts individually, it is not enough to eliminate liability for the hostile environment caused by the retaliatory animus.

*Id.*

A presumption of retaliation also exists under the Eleventh Circuit's short time rule. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that the burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791 (11th Cir. 2000) (same); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (11th Cir. 1999) (same). Here, Defendant began its alleged investigation of Gray underlying his termination approximately two (2) weeks following Gray's filing of his EEOC charge and terminated him less than two (2) months after the filing. Defendant also transferred Gray to a less desirable bureau almost immediately after Gray complained about the department's treatment of minority citizens. Furthermore, Defendant subjected Gray to severe and pervasive harassment following Gray's numerous complaints of discrimination and harassment that it refused to

investigate or remedy.   Defendant's Motion for Summary Judgment on Gray's Retaliatory Hostile Environment claim is due to be denied.

## VII.   CONCLUSION

The record is clear that genuine issues of material fact exist.   Gray can establish each of his *prima facie* claims, and Defendant's business reasons are not only illegitimate, but pretextual.   Defendant has abused the judicial process by belaboring this Court and the Plaintiff with two lengthy and unnecessary Motions that are due to be denied.   Gray respectfully requests the Court to deny Defendant's Partial and Complete Motions for Summary Judgment, to enter an award of attorneys' fees necessitated by the filing of this Response, and to award any such other and further relief this Court deems just and proper.

Respectfully submitted,

/s/ Sonya C. Edwards
Sonya C. Edwards
ASB-8848-S73E

EDWARDS LAW, LLC
121 Edenton Street
Birmingham, Alabama 35242
SonyaEdwardsLaw@gmail.com Phone:
(205) 408-0956
Fax: (205) 408-9236

/s/ Jeffrey W. Bennitt
Jeffrey W. Bennitt
ASB-0774-N51J

JEFFREY W. BENNITT & ASSOCIATES

121 Edenton Street
Birmingham, Alabama 35242
Bennittlaw@aol.com
Phone: (205) 408-7240
Fax: (205) 408-9236

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve such filing to all counsel of record.

So certified, this the  11th  day of  May , 2015.


/s/Sonya Edwards
Of Counsel