# EXHIBIT
# A

## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO. 1:14-CV-00592-MHT-SRW

IVAN KEITH GRAY,
    Plaintiff,
vs.
CITY OF DOTHAN,
    Defendant.

DEPOSITION
OF
IVAN KEITH GRAY
October 16, 2014

REPORTED BY:  Teresa Turquitt Davis
    Certified Court Reporter,
    Registered Professional
    Reporter and Notary Public

## Page 2

1         STIPULATION
2         IT IS STIPULATED AND AGREED, by and
3    between the parties, through their respective
4    counsel, that the deposition of IVAN KEITH GRAY may
5    be taken before Teresa Turquitt Davis,
6    Commissioner, Certified Court Reporter, Registered
7    Professional Reporter and Notary Public;
8         That the signature to and reading of
9    the deposition by the witness is waived, the
10   deposition to have the same force and effect as if
11   full compliance had been had with all laws and
12   rules of Court relating to the taking of
13   depositions;
14        That it shall not be necessary for
15   any objections to be made by counsel to any
16   questions, except as to form or leading questions,
17   and that counsel for the parties may make
18   objections and assign grounds at the time of trial,
19   or at the time said deposition is offered in
20   evidence, or prior thereto.

## Page 3

1         A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4         Ms. Sonya C. Edwards
5         Attorney at Law
6         Edwards Law, LLC
7         121 Edenton Street
8         Birmingham, Alabama 35242
9
10   FOR THE DEFENDANT:
11        Mmes. Stephanie H. Mays
12         and Tiffany P. Rainbolt
13        Attorneys at Law
14        Maynard, Cooper & Gale, P.C.
15        2400 Regions/Harbert Plaza
16        Birmingham, Alabama 35203
17
18   OTHERS PRESENT:
19        Delvick McKay
20
21
22
23

## Page 4

1              I N D E X
              INDEX OF EXAMINATION
2    EXAMINATION BY MS. MAYS           5
              INDEX OF EXHIBITS
3    Defendant's Exhibit 1 (responses to      10
     interrogatories)
4    Defendant's Exhibit 2 (personnel action  29
     forms)
5    Defendant's Exhibit 3 (letter 7/26/12)   49
     Defendant's Exhibit 4 (letter 10/27/00)  50
6    Defendant's Exhibit 5 (transcript of      97
     recording)
7    Defendant's Exhibit 6 (statement of EEO  139
     policy)
8    Defendant's Exhibit 7 (General Order     142
     200-42H)
9    Defendant's Exhibit 8 (General Order     146
     100-41)
10   Defendant's Exhibit 9 (General Order     150
     100-50)
11   Defendant's Exhibit 10 (General Order    157
     200-30)
12   Defendant's Exhibit 11 (Personnel rules  158
     and regs)
13   Defendant's Exhibit 12 (Civil Service    159
     Act)
14   Defendant's Exhibit 13 (letter 7/21/13)  164
     Defendant's Exhibit 14 (formal          168
15   counseling 2/12)
     Defendant's Exhibit 15 (Guardian         169
16   Tracking)
     Defendant's Exhibit 16 (Chief Benton     185
17   memo)
     Defendant's Exhibit 17 (Guardian         195
18   Tracking by Major Parrish)
     Defendant's Exhibit 18 (Guardian         196
19   Tracking report)
     Defendant's Exhibit 19 (photo)      210
20   Defendant's Exhibit 20 (Parrish memo     213
     6/13)
21   Defendant's Exhibit 21 (memo)       219
     Defendant's Exhibit 22 (Garrity notice)  226
22   Defendant's Exhibit 23 (Employee         232
     Disciplinary Action Report Form)
23   Defendant's Exhibit 24 (memo D. Mathews 233

Page 5

1      I, Teresa Turquitt Davis, a Certified
2   Court Reporter and Registered Professional Reporter
3   of Birmingham, Alabama, and a Notary Public for the
4   State of Alabama at Large, acting as Commissioner,
5   certify that on this date, as provided by the
6   Federal Rules of Civil Procedure of the United
7   States District Court, and the foregoing
8   stipulation of counsel, there came before me at 121
9   Edenton Street, Birmingham, Alabama, on October 16,
10  2014, commencing at 9:05 a.m., IVAN KEITH GRAY,
11  witness in the above cause, for oral examination,
12  whereupon the following proceedings were had:
13
14          IVAN KEITH GRAY,
15  being first duly sworn, was examined and testified
16  as follows:
17
18  EXAMINATION BY MS. MAYS:
19      Q.   Good morning, Mr. Gray. My name is
20  Stephanie Mays. I'm one of the attorneys
21  representing the City of Dothan in this matter.
22      A.   Pleased to meet you.
23      Q.   I have with me Tiffany Rainbolt who

Page 6

1   is another attorney on this matter --
2       A.   Pleased to meet you.
3       Q.   -- and I believe you know Delvick
4   McKay who is the personnel --
5       A.   I do.
6       Q.   Do you have a tape recorder with you?
7       A.   I do.
8       Q.   Are you recording this deposition?
9       A.   I would hope to.
10          MS. EDWARDS: You don't really have
11  to. The court reporter is taking down all of the
12  testimony and she is recording it as well.
13      A.   Okay.
14      Q.   And to the extent that you do record
15  it, I just want to be clear for the record that her
16  transcript is the official transcript for this
17  proceeding.
18      A.   Uh-huh.
19      Q.   Have you ever given a deposition
20  before?
21      A.   I have.
22      Q.   How many times have you been deposed
23  before?

Page 7

1       A.   Once I believe, to my knowledge, that
2   I can remember right now.
3       Q.   What kind of case was that?
4       A.   It was a civil case.
5       Q.   Were you a plaintiff in that case or
6   a defendant?
7       A.   To the best of my knowledge, I was
8   just a witness.
9       Q.   Okay. Well, I'm going to go over a
10  few rules to hopefully make this deposition go
11  smoothly today. I'm going to ask you that you give
12  me verbal responses. It's hard for the court
13  reporter here to take down uh-huhs and uh-uh and
14  they look the same on the record.
15          I'm going to ask that we don't talk
16  over each other. She is here to take down
17  everything that we say, so I will ask that you let
18  me finish my question. And if you are answering a
19  question, I'm going to let you finish your answer
20  before I start another question.
21          If at any time you want to take a
22  break, just let me know. I'll ask that you answer
23  any questions that I have on the table before we

Page 8

1   take a break. If you answer a question, I'll
2   assume that you understand it. If you don't
3   understand a question that I ask, please let me
4   know that.
5           Are you okay with those rules?
6       A.   Sounds good.
7       Q.   The court reporter swore you in just
8   a minute ago. Do you understand you are testifying
9   under oath under penalty of perjury?
10      A.   I do.
11      Q.   Are you on medications today that
12  might impair your ability to understand my
13  questions?
14      A.   No.
15      Q.   Is there any reason that you can't
16  testify fully and accurately?
17      A.   No.
18      Q.   Please state and spell your name for
19  the record.
20      A.   Ivan Keith Gray, I-V-A-N K-E-I-T-H
21  G-R-A-Y.
22      Q.   Have you ever gone by any other
23  names?

| | |
|---|---|
| **Page 9** | **Page 11** |

**Page 9**

1       A.   Yes. Samuel Logan, S-A-M-U-E-L
2   L-O-G-A-N.
3       Q.   And when did you go by the name
4   Samuel Logan?
5       A.   To the best of my knowledge around
6   the year 19 — I'm not 100 percent sure of the year
7   right now. I believe it was in '91 when I was
8   working in a narcotic officer's position undercover
9   while I was employed with the Dothan Police
10   Department.
11      Q.   So Samuel Logan was your undercover
12   name?
13      A.   Correct.
14      Q.   Have you gone by any other names?
15      A.   No, ma'am, not to my knowledge.
16      Q.   What is your birth date?
17      A.   REDACTED
18      Q.   What are the last four digits of your
19   Social?
20      A.   4283.
21      Q.   Are you currently married?
22      A.   No.
23      Q.   Have you ever been married?

**Page 10**

1       A.   No.
2       Q.   What is your current address?
3       A.   1103 Meharis, M-E-H-A-R-I-S, Circle.
4   That is in Dothan, Alabama.
5       Q.   Do you have any children?
6       A.   No.
7       Q.   Are you currently being treated by
8   any mental health professionals?
9       A.   No.
10      Q.   Have you been treated by any mental
11   health professionals in the last ten years?
12      A.   Yes.
13      Q.   Who are they?
14      A.   Dr. Earl Jones. I believe it's going
15   to be the same one that is in your interrogatories.
16      Q.   Okay. And we can look at those.
17           (Whereupon, Defendant's Exhibit 1 was
18   marked for identification.)
19      Q.   I'll show you what I have marked as
20   Defendant's Exhibit 1.
21      A.   (Reviewing document.)
22      Q.   Do you recognize these as your
23   responses to our first interrogatories and request

**Page 11**

1   for production in this case?
2           MS. EDWARDS: Take a moment to look
3   through these.
4       A.   (Reviewing document.) I just came
5   through Page 6. These appear to be the responses
6   that we gave in interrogatories even though I
7   haven't gone through all the pages in its entirety.
8       Q.   Okay. Will you turn to Page 13 for
9   me?
10      A.   (Witness complies.)
11      Q.   Starting at the bottom of that page
12   on number 18, the question states, "Please identify
13   the names and addresses of any and all medical
14   physicians, psychiatrists, psychologists or
15   counselors from whom you have sought or received
16   treatment in the last ten years." Also, with
17   regard to each physician, psychiatrist or
18   psychologist or counselor, it asked you to provide
19   some additional information, do you see that?
20      A.   That is correct.
21      Q.   And in response, did you provide the
22   name Earl Jones, Ph.D., a counselor or therapist in
23   Dothan?

**Page 12**

1       A.   That is correct.
2       Q.   What is Mr. Jones treating you for?
3           MS. EDWARDS: Object to the form.
4       A.   He told me that I suffer from anxiety
5   and depression.
6       Q.   And how long has he been treating you
7   for anxiety and depression?
8       A.   I don't know the specific dates.
9       Q.   Has it been in the last five years?
10      A.   Yes.
11      Q.   Do you recall when he diagnosed you
12   with anxiety and depression?
13      A.   I do not, not at this time.
14      Q.   Is Dr. Jones' treatment of you in any
15   way related to your claims in this case?
16      A.   Yes.
17      Q.   How so?
18      A.   As a result of being discriminated
19   against racially, going through what the City of
20   Dothan has put me through with my loss of
21   employment, what he is treating me for is in direct
22   relation with that. However, I have not read
23   through all of his notes so I can't attest to

Freedom Court Reporting             877-373-3660

Page 13

```
1    everything that he has stated in his -- within his
2    diagnosis right now.
3         Q.   Had you been treated by Mr. Jones
4    prior to your termination from the City of Dothan?
5         A.   I'm not sure.
6         Q.   When is the last time that you
7    visited Dr. Jones?
8         A.   I'm not certain.
9         Q.   Has it been within the last month?
10        A.   No.
11        Q.   In the last six months?
12        A.   I'm not certain.
13        Q.   Have you been treated by him since
14   your termination?
15        A.   Yes.
16        Q.   Were you treated by him before your
17   termination?
18        A.   I'm not certain.
19        Q.   Has he prescribed you any
20   medications?
21        A.   No.
22        Q.   Has he prescribed any treatment?
23             MS. EDWARDS:  Object to the form.
```

Page 14

```
1         A.   I can't say for sure.
2         Q.   Has he recommended any forms of
3    treatment?
4              MS. EDWARDS:  Object to the form.
5    I'm just going to say you are not a medical doctor
6    so don't attempt to testify as to his medical
7    diagnosis.
8         Q.   Well, has he recommended to you any
9    forms of treatment or any ways that you can relieve
10   your anxiety and depression?
11             MS. EDWARDS:  Object to the form.
12        A.   Suggesting ways of relieving anxiety
13   and depression, yes, with continuing on my
14   medications that was prescribed, staying with my
15   religious faith, keeping and continuing that, and
16   that is all I can remember right now.
17        Q.   The medications that you mentioned,
18   those were prescribed by other doctors?
19        A.   Yes.
20        Q.   And what are those medications?
21             MS. EDWARDS:  Object to the form.
22        A.   Zoloft.
23        Q.   Are they the ones that you listed in
```

Page 15

```
1    response to this interrogatory?
2         A.   Yes.
3         Q.   Beginning on Page 15, Zoloft, Xanax
4    and Ambien?
5         A.   That is correct.
6         Q.   Okay.  Have you also sought medical
7    treatment from Dr. Robert Kreutzmann?  And that is
8    spelled K-R-E-U-T-Z-M-A-N-N.
9         A.   Yes.
10        Q.   And what is Dr. Kreutzmann treating
11   you for?
12             MS. EDWARDS:  Object to the form.
13   I'll once again advise you don't attempt to make a
14   medical -- to testify as to your medical diagnosis.
15        A.   I'm not being treated by Dr.
16   Kreutzmann.
17        Q.   Why have you visited Dr. Kreutzmann?
18        A.   Uh-huh.  He is an aviation medical
19   physician.
20        Q.   When is the last time that you saw
21   him?
22        A.   I'm not sure.
23        Q.   Is his treatment of you or your
```

Page 16

```
1    visits with him, are they in any way related to
2    your claims in this case?
3              MS. EDWARDS:  Object to the form.
4         A.   My visits, yes.
5         Q.   How so?
6         A.   I --
7              MS. EDWARDS:  Object to the form.
8         A.   I'm a licensed pilot and pilots have
9    to have a medical review and he is my physician for
10   that purpose.
11        Q.   Dr. Kenneth Tucker, you say he's your
12   primary care physician; is that right?
13             MS. EDWARDS:  Object to the form.
14        A.   Could you --
15        Q.   Is Dr. Kenneth Tucker your primary
16   care physician?
17        A.   Yes, yes.
18             MS. EDWARDS:  Object to the form.
19        Q.   Do you recall the date of your most
20   recent visit to Dr. Tucker?
21        A.   I believe it was Tuesday, but that is
22   what I remember right now is within the last one or
23   two days, but I believe it was Tuesday.
```

Freedom Court Reporting                            877-373-3660

Page 17

1     Q.   Is Dr. Tucker's treatment of you in
2 any way related to your claims in this case?
3      MS. EDWARDS: Object to the form.
4     A.   You are probably going to have to
5 rephrase that one. I'm not sure. That is my
6 primary doctor, whether I had this case or not.
7     Q.   You indicate that he is also treating
8 you for anxiety and depression; is that right?
9     A.   That is correct.
10     Q.   How long has Dr. Tucker been your
11 primary care physician?
12     A.   That, I don't know.
13     Q.   Has it been more than five years?
14     A.   I don't know.
15     Q.   What did you do to prepare for your
16 deposition today?
17      MS. EDWARDS: Object to the form, but
18 you can answer.
19     A.   I prayed and I prayed again. I
20 reviewed some of the interrogatory, I spoke with my
21 attorney and that is all I can remember right now.
22     Q.   Did you talk to anyone other than
23 your attorney?

Page 18

1      MS. EDWARDS: Object to the form.
2     A.   No.
3     Q.   If you will look at your
4 interrogatory responses that we have marked as
5 Defendant's Exhibit 1 on Page 13 again, the
6 question 17 asks you to "Identify any communication
7 after your discharge from defendant between you and
8 defendant or any of its representatives relating to
9 the allegations in the complaint or any matters
10 related to the claims in this action," did I read
11 that correctly?
12     A.   Yes.
13     Q.   And if you will skip down to your
14 response, it says, that "Plaintiff has had no
15 material communication with defendant or its
16 representative relating to the allegations in this
17 complaint or any claims in this action since his
18 termination," did I read that correctly?
19     A.   Yes.
20     Q.   What did you mean by no material
21 communication?
22      MS. EDWARDS: Object to the form.
23      MS. MAYS: What is wrong with that

Page 19

1 question?
2      MS. EDWARDS: You are asking him to
3 perhaps define a legal definition of material, but
4 you can answer.
5      MS. MAYS: I am asking him what he
6 meant by his response.
7     A.   According to the way that this is
8 written, it's asking if I have spoken with anybody
9 that is a representative of the City and that is
10 no, I haven't spoken with any -- well, I spoke to
11 Mr. McKay this morning, everyone saying hi. So he
12 would be the first representative of the City that
13 I have spoken with since this case.
14     Q.   Did you talk with anyone who is a
15 representative of the City after your termination?
16     A.   That is what I just answered.
17     Q.   So Mr. McKay is the only person that
18 you have talked to since your termination and that
19 was this morning saying hello?
20     A.   Yes.
21     Q.   Did you bring any documents with you
22 to your deposition today?
23     A.   I did.

Page 20

1     Q.   What did you bring with you?
2     A.   A binder that has various papers
3 surrounding my employment with the City.
4     Q.   What types of papers?
5      MS. EDWARDS: Object to the form.
6     Q.   What types of papers are contained in
7 this binder that you brought today?
8      MS. EDWARDS: Object to the form.
9     A.   Termination papers.
10      MS. EDWARDS: Just so we are clear,
11 these are documents that we have produced to them
12 in this lawsuit in response to these.
13     A.   Right.
14     Q.   So these are documents that you have
15 provided to your lawyer?
16     A.   Yes.
17     Q.   Have you brought any documents that
18 haven't been provided to your lawyer?
19     A.   No.
20     Q.   Do you have any tape-recordings
21 relating to your claims in this case?
22     A.   I do.
23     Q.   Have you provided those to your

## Page 21

1  lawyer?
2      A.   I have.
3      Q.   And I have a recording of a
4  conversation that you had with Darryl Mathews and
5  also a recording of a conversation that you had
6  with a Southern LINC representative. Are those the
7  two recordings that you have provided to your
8  attorney?
9      A.   Yes.
10     Q.   Are there any others that you know
11 about related to your claims in this case?
12     A.   All the recordings that I believe are
13 material to this case have been turned over to my
14 attorney.
15     Q.   Do you have any diaries or journals
16 related to your claims in this case?
17     A.   No.
18     Q.   Do you have any voice mails or text
19 messages related to your claims in this case?
20          MS. EDWARDS: Object to the form.
21     A.   No voice mails. Define text message.
22     Q.   How do you define text message?
23          MS. EDWARDS: Object to the form.

## Page 22

1      Q.   What is wrong with that question?
2          MS. EDWARDS: Let me just ask you,
3  have you given me all the voice mails, text
4  messages and e-mails that relate to your
5  termination from the City of Dothan or to your
6  claims in this lawsuit?
7      A.   I have.
8      Q.   How do you define text message?
9      A.   Texting on a phone, on a cell phone.
10 How do you define it?
11     Q.   I get to ask the questions today.
12          MS. EDWARDS: I'm afraid Ms. Mays is
13 right about that one.
14     A.   I like your attitude.
15     Q.   You have responded to interrogatory
16 number 19, it's on Page 15, that you have a Myspace
17 account, a Facebook account, a LinkedIn account and
18 Gmail e-mail accounts. Are there any statements on
19 those social networking pages that relate to your
20 claims in this case?
21          MS. EDWARDS: Object to the form.
22     A.   Could you state that question again,
23 please?

## Page 23

1      Q.   Sure. You have indicated that you
2  have several social networking web pages, Myspace,
3  Facebook, LinkedIn, and you also indicate that you
4  have a personal Yahoo e-mail account and a personal
5  Gmail account; is that right?
6      A.   That is correct.
7      Q.   Do you, in fact, have accounts with
8  all of those social networking sites and e-mail
9  accounts?
10     A.   Yes.
11     Q.   Are there any statements on any of
12 those sites or in any of your e-mail accounts that
13 are related to your claims in this case?
14          MS. EDWARDS: Object to the form.
15     A.   Yes.
16     Q.   And have you provided those to your
17 lawyer?
18          MS. EDWARDS: Object to the form.
19     A.   I have.
20     Q.   Have you ever been arrested?
21     A.   No.
22     Q.   Have you ever been charged with a
23 crime?

## Page 24

1      A.   No.
2      Q.   Well, I won't ask if you have been
3  convicted of a crime then. Where did you attain
4  your associate's degree?
5      A.   George C. Wallace Junior College,
6  Dothan, Alabama.
7      Q.   In what year, do you recall?
8      A.   Actually, I don't, but I think I
9  included it in the interrogatories.
10     Q.   I don't know. What about your
11 bachelor of science, where did you get your
12 bachelor's degree?
13     A.   Troy State University, Dothan.
14     Q.   Do you recall what year?
15     A.   No, I don't.
16     Q.   What year did you get your master's
17 of science in education?
18     A.   I don't want to speculate so I'm not
19 sure, but it's supplied in the interrogatories.
20     Q.   Okay. And where did you get that
21 degree, your master's of science in education?
22     A.   Troy State University, Dothan.
23     Q.   Are you currently employed?

Page 25

1    A.   No.
2    Q.   What are you doing for income?
3    A.   Receiving retirement benefits.
4    Q.   From where are you receiving
5  retirement benefits?
6    A.   The State of Alabama's Retirement.
7    Q.   Are those retirement benefits based
8  on your previous employment for the City of Dothan?
9    A.   Yes.
10   Q.   Have you made any efforts to find
11 employment?
12   A.   Yes.
13   Q.   What efforts have you made?
14       MS. EDWARDS:  Object to the form.
15   A.   I have joined a number of online job
16 search companies I guess you would call them.  I've
17 put in paper applications various places.  I've
18 spoken to a couple of businesses and I've gone for
19 further training in an attempt to obtain
20 employment, and that is all that I can remember
21 right now.
22   Q.   If you will look at your
23 interrogatories response on Page 7, in response to

Page 26

1  interrogatory number 10, beginning at the bottom of
2  the page is your response, it starts with a
3  Flightline of Dothan, Alabama, is that an accurate
4  response to the question regarding your efforts to
5  find employment since your termination?
6    A.   Yes.
7    Q.   How did you come to be employed?
8        MS. EDWARDS:  Excuse me, but
9  Fliteline is not the only thing listed under your
10 answer to interrogatory number ten.
11   Q.   No, and I wasn't implying that that
12 was all.  The full response, is that your full and
13 accurate response to all the efforts that you have
14 made, and it continues onto Page 8 --
15   A.   Yes.
16   Q.   -- to seek employment?
17       MS. EDWARDS:  So it was not just
18 Fliteline, correct?
19   A.   It was not just Fliteline and as I --
20 this may not be in its entirety.  As I began
21 remembering, I pass it onto my attorney.
22   Q.   Tell me how you came to be employed
23 at the City of Dothan.

Page 27

1        MS. EDWARDS:  Object to the form.
2        MS. MAYS:  What is wrong with that
3  question?
4        MS. EDWARDS:  Just how he came to be.
5    A.   I went to the Dothan Civic Center and
6  I made application through the personnel
7  department.
8    Q.   And what position did you apply for?
9    A.   Jail security officer, dispatcher,
10 police officer.
11       MS. EDWARDS:  Now are you talking
12 about when you applied?
13   A.   (Witness nods head.)
14   Q.   Did you submit a separate application
15 for each of those three positions?
16   A.   Yes.
17   Q.   And did you submit those three
18 separate applications at the same time?
19   A.   Yes, to my knowledge.
20   Q.   Do you recall what year it was when
21 you submitted those applications?
22   A.   No, I don't.
23   Q.   Were you, in fact, hired for one of

Page 28

1  those positions?
2    A.   I was.
3    Q.   What position were you hired in?
4    A.   Jail security officer.
5    Q.   Do you recall what year you were
6  hired as a jail security officer for the City of
7  Dothan?
8    A.   I believe it was in 1985.
9    Q.   And what was your next position with
10 the City?
11   A.   Police officer.
12   Q.   Do you recall what year you became a
13 police officer?
14   A.   1985 or '86.
15   Q.   Before you became a police officer,
16 did you have to undergo a background check?
17   A.   I did.
18   Q.   Do you know why the City conducted
19 that background check?
20       MS. EDWARDS:  Object to the form.
21   A.   No.
22   Q.   Were you required to provide
23 references regarding previous employment?

Freedom Court Reporting                    877-373-3660

Page 29

1    A.    Yes.
2          (Whereupon, Defendant's Exhibit 2 was
3    marked for identification.)
4    Q.    Do you know whether the City
5    conducted any background checks into your character
6    or reputation in the community?
7          MS. EDWARDS:  Object to the form.
8    A.    I do not.
9    Q.    Let me show you what I have marked as
10   Defendant's Exhibit 2.  Do you recognize these as
11   personnel action forms regarding your changes and
12   promotions and rank with the City of Dothan?
13         MS. EDWARDS:  Just take a moment to
14   look through them.
15         (Reviewing document.)
16         MS. EDWARDS:  Do you know if this is
17   all of them?
18   A.    That appears to be.
19   Q.    So if we look at the first page, it
20   shows that your hire date was February the 11th,
21   1985; is that right?
22   A.    Okay.  I would think that there would
23   need to be one more from jail security officer

Page 30

1    maybe to police officer since it was in the same
2    department, but that is just my observation.
3    Q.    So you think there might be another
4    change of status report that would go before the
5    first one on here where it would show that you went
6    from jail security officer to police officer?
7    A.    Yes.
8    Q.    Okay.  If we look on this first page
9    it has you listed as a police officer as your job
10   title; is that right?
11   A.    Yes.
12   Q.    And it shows your hire date is
13   February 11th, 1985; is that right?
14   A.    Yes.
15   Q.    Was that, in fact, your hire date?
16         MS. EDWARDS:  Object to the form.
17   Are you talking about with the City of Dothan
18   period or into the police officer position?
19   Q.    Was that your hire date into the
20   police officer position?
21   A.    I'm not certain.  If I could see the
22   other form that came before this one, I could tell
23   you with more certainty.

Page 31

1    Q.    And when we take a break, I'll look
2    and see if we have another form.  If you will look
3    at the next page, it shows you going from a police
4    officer to a police corporal.  Were you, in fact,
5    promoted from police officer to police corporal in
6    or around January of 1990?
7    A.    I was promoted from police officer to
8    police corporal.  I can't verify that that is the
9    date.
10   Q.    Okay.  Do you have any reason to
11   dispute that it wasn't in or around January of 1990
12   when you were promoted to police corporal?
13   A.    I'm just not 100 percent certain.
14   Q.    But no reason at this time to deny
15   that it was in January of 1990?
16         MS. EDWARDS:  Object to the form.
17   A.    I'm not certain.
18   Q.    If you will look at the next page, it
19   shows you were promoted from police corporal to
20   police sergeant in or around November of 1990.  Do
21   you recall whether you were, in fact, promoted to
22   police sergeant in or around November of 1990?
23   A.    I was promoted to police sergeant and

Page 32

1    the year was 1990, but I am not certain as to the
2    date and month.
3    Q.    And if we look at the next page, were
4    you promoted from police sergeant to police
5    lieutenant in or around September 2006?
6    A.    This says August.  Where is the date
7    that is --
8    Q.    The document at the top, it has a
9    date prepared, it has August 31st, 2006.  If we
10   look down at the bottom where the signatures are
11   when the requests were made and approved, I believe
12   the dates are in September.
13         MS. EDWARDS:  I'll just note for the
14   record that the dates are somewhat unclear at the
15   bottom and you can give your best estimate.  I mean
16   if you can't remember exactly something back in
17   2006, just say so.
18   A.    Yeah, I'll say in 2006 I agree that I
19   was promoted from the rank of sergeant to
20   lieutenant.
21   Q.    And then if we look at the final
22   document that is in that Exhibit 2, does it, in
23   fact, show that you were promoted from police

8 (Pages 29 to 32)

## Page 33

1   lieutenant to police captain? At the top, it has a
2   payroll effective date of October 24th, 2010.
3         A.   I was promoted from lieutenant to
4   captain 2010, not certain of the dates.
5         Q.   And toward the bottom of that page,
6   does it show that that request for you to be
7   promoted from lieutenant to captain was made by the
8   chief at the time who was Gregory Benton,
9   B-E-N-T-O-N?
10        A.   It does.
11        Q.   And was that request approved by the
12  personnel director Delvick McKay?
13             MS. EDWARDS: Object to the form.
14        A.   That, I'm not sure. I see his name
15  here.
16        Q.   Okay. When you were last employed at
17  the police department, how many bureaus were there?
18        A.   Three.
19        Q.   And what were those three bureaus?
20        A.   Administrative, investigative and
21  patrol.
22        Q.   When you were initially promoted to
23  captain in 2010, were you assigned to the

## Page 34

1   Administrative Services Bureau?
2         A.   I was.
3         Q.   Do you recall how long you remained
4   in the Administrative Services Bureau?
5         A.   No.
6         Q.   Were you later assigned to the Patrol
7   Bureau or the patrol unit?
8         A.   Yes.
9         Q.   And then you were assigned to the
10  Administrative Services Bureau?
11        A.   Yes.
12        Q.   So you served in two of the three
13  bureaus; is that right?
14        A.   That is correct.
15        Q.   Were you the highest ranking
16  African-American in the history of the City of
17  Dothan Police Department?
18        A.   To my knowledge, I was.
19        Q.   And did you achieve that title when
20  you became the lieutenant?
21             MS. EDWARDS: Object to the form.
22        A.   No.
23        Q.   When did you obtain that title?

## Page 35

1         A.   On the promotion or when did I --
2         Q.   At what point were you the highest
3   ranking African-American in the history of the
4   Dothan Police Department?
5         A.   When I made the rank of captain.
6         Q.   Had there been previous
7   African-Americans who had served in the capacity of
8   lieutenant?
9         A.   No.
10        Q.   So you were the first
11  African-American lieutenant for the Dothan Police
12  Department?
13        A.   No.
14        Q.   Can you explain to me if there hadn't
15  been any previous African-American lieutenants, how
16  were you not the first?
17        A.   Prior to my promotion, the City
18  decided to postmortem -- post -- what is the word?
19             MS. EDWARDS: After the fact.
20        A.   Yeah, I can't think of the word right
21  now, but they promoted a sergeant that had been
22  passed onto the rank of lieutenant just prior to my
23  promotion to lieutenant. Posthumously I think is

## Page 36

1   the way you pronounce it.
2         Q.   So a police officer had passed away
3   and died and after his death he was then promoted
4   to lieutenant and that police officer was
5   African-American?
6         A.   Correct.
7         Q.   But did not serve in the rank of
8   lieutenant when he was alive; is that right?
9         A.   Correct.
10        Q.   Okay. And who was that?
11        A.   Robert Jackson.
12        Q.   Were you given several special
13  assignments when you were a police officer in
14  Dothan?
15             MS. EDWARDS: Object to the form.
16        A.   Can you be more specific about
17  special assignments?
18        Q.   Sure. Were you the helicopter
19  liaison for air operations?
20        A.   Yes.
21        Q.   Were you the coordinator for the
22  Dothan Police Department bomb squad?
23        A.   You are going to have to define

Page 37

```
 1   coordinator for me.
 2       Q.   Were you a leader on the bomb squad
 3   team for the department?
 4       A.   I was.
 5       Q.   Did you have a specific title?
 6       A.   Special operations commander.
 7       Q.   Were you a liaison for the executive
 8   dignitary protection team?
 9       A.   Yes.
10       Q.   Did you supervise employees while you
11   were employed at the police department?
12       A.   Yes.
13       Q.   As a --
14           THE WITNESS:  Can I get some water?
15       Q.   Do you need to take a break?
16           MS. MAYS:  We can take five.
17           MS. EDWARDS:  Let's just take five
18   real quick.
19           (Short break taken.)
20       Q.   (BY MS. MAYS:)  As a supervisor, did
21   you have the authority to make decisions that
22   affected employees who reported to you?
23           MS. EDWARDS:  Object to the form.  If
```

Page 38

```
 1   you ever don't understand a question, Mr. Gray, I
 2   want you to ask her to clarify.  I don't want you
 3   to guess at the question.
 4       A.   Right.  Yes, I have.
 5       Q.   Did you have the authority to request
 6   that people be transferred to different
 7   departments?
 8           MS. EDWARDS:  Object to the form.
 9   Are you asking if he had the authority to request
10   or the authority to transfer?
11       Q.   The authority to request a transfer.
12       A.   Yes.
13       Q.   Did you have authority to discipline
14   the employees who reported to you?
15       A.   Not the sole authority, no.
16       Q.   But you had authority to make
17   recommendations regarding the discipline; is that
18   right?
19       A.   Yes.
20       Q.   Did you have authority to evaluate
21   their performance?
22       A.   Yes.
23       Q.   Did you also have authority to give
```

Page 39

```
 1   them specific work assignments?
 2       A.   Yes.
 3       Q.   At some point in our lives, we have
 4   all had bosses, right?
 5       A.   Uh-huh.
 6       Q.   Would you agree with me that bosses
 7   or supervisors sometimes make decisions that
 8   subordinates don't agree with?
 9           MS. EDWARDS:  Object to the form.
10       A.   Yes.
11       Q.   It doesn't mean that their decisions
12   are wrong, it just means that the subordinates
13   don't agree with the decision; is that right?
14           MS. EDWARDS:  Object to the form.
15       A.   Yes.
16       Q.   Was there a period of time when Major
17   Parrish was your direct supervisor?
18       A.   Yes.
19       Q.   Do you recall for how long he was
20   your supervisor?
21       A.   Since my promotion in 2010.
22       Q.   And did he have the authority to
23   review your performance?
```

Page 40

```
 1           MS. EDWARDS:  I guess if you could
 2   explain what you mean by review his work
 3   performance, maybe it would help.
 4       Q.   Did he have the authority to review
 5   your work?  Did he have any input into your
 6   performance evaluations?
 7       A.   He had input into my evaluations,
 8   yes.
 9       Q.   And in order to provide input into
10   your evaluations, he had the authority to review
11   and to critique your work?
12       A.   The authority that you are talking
13   about would come from somebody above him to say
14   that he had the authority.  I'm beneath him so that
15   is why I'm stuck.  I didn't go through the process
16   to determine who gave him the authority.  So if he
17   has the authority, it would be from someone higher
18   ranked than I that can answer that question.
19           MS. EDWARDS:  All right.  She is not
20   asking whether you gave him the authority.  She's
21   just asking whether he had the authority, if I am
22   correct.
23       Q.   I am.
```

10 (Pages 37 to 40)

Page 41

1     A.   Yes.
2     Q.   And you said there was someone who
3   was higher than him.  Did Major Parrish report to
4   the chief of police?
5     A.   Yes.
6     Q.   And the chief of police from 2000 --
7   beginning in 2010 -- let me rephrase that.  The
8   chief of police in 2010 was Chief Benton?
9     A.   Correct.
10    Q.   And did Chief Benton have the
11  authority to transfer officers from one bureau to
12  another?
13    A.   Yes.
14    Q.   And he could transfer officers at his
15  discretion; is that right?
16    A.   Yes.
17    Q.   When you were transferred from one
18  bureau to another, those transfers didn't affect
19  your pay, did they?
20    A.   No.
21         MS. EDWARDS:  Excuse me one second.
22    Q.   So you were paid the same amount
23  regardless of which bureau you were over at the

Page 42

1   time?
2         MS. EDWARDS:  Excuse me, I didn't
3   hear the question.
4         MS. MAYS:  So I was asking him when
5   he was transferred from one bureau to another
6   whether he received the same pay.
7     A.   Yes.
8     Q.   And got the same benefits?
9         MS. EDWARDS:  Object to the form.
10    A.   What benefits specifically?
11    Q.   Did medical benefits, insurance
12  benefits, did any of those type benefits change
13  when you were transferred from, for example, the
14  Patrol Bureau to the Administrative Services
15  Bureau?
16         MS. EDWARDS:  Object to the form to
17  the extent --
18    A.   My medical and my insurance did not
19  change.
20    Q.   And your rank didn't change?
21    A.   Correct.
22    Q.   You remained a captain when you were
23  transferred from the patrol unit to the

Page 43

1   administrative services?
2     A.   Correct.
3     Q.   Was it standard practice for Chief
4   Bennett -- Benton, I'm sorry, to assign and
5   reassign officers to different bureaus?
6         MS. EDWARDS:  Object to the form.
7     A.   Define your standard practice.
8     Q.   Was that something that he did from
9   time to time?
10    A.   With the assistance of Major Parrish,
11  yes.
12    Q.   And when you say with the assistance
13  of Major Parrish, what do you mean?
14    A.   Major Parrish can make
15  recommendations as well for personnel transfers
16  throughout the entire department as well.  So Chief
17  Benton may not be the sole one that is making the
18  decision solely on his own.
19    Q.   Would you agree with me that in law
20  enforcement there is a need for a supervisory chain
21  of command?
22    A.   Could you kind of tell me a little
23  bit more?  When you say in law enforcement, what do

Page 44

1   you mean?
2     Q.   As a police officer there were
3   different levels of rank in the Dothan Police
4   Department; is that right?
5     A.   Yes.
6     Q.   And what were those ranks?
7     A.   You have officer, corporal, sergeant,
8   lieutenant, captain, major.
9     Q.   Did you think --
10    A.   And chief.
11    Q.   Did you think there was a need for
12  that hierarchy, those levels of rank?
13         MS. EDWARDS:  Object to the form.
14  You can answer.
15    A.   Are you talking specifically with
16  Dothan Police Department?
17    Q.   I'm talking about law enforcement in
18  general.
19    A.   I can't say there is in general.
20    Q.   You can't say there is a need for
21  order?
22    A.   That is what you asked me.
23    Q.   Do you think there is a need for

Page 45

```
1    order in law enforcement?
2              MS. EDWARDS: Object to the form.
3         A.   Define your order.
4         Q.   We just talked about the order.
5         A.   You mean order as in succession or
6    order as in -- you are asking the questions.
7              MS. EDWARDS: I guess, and correct me
8    if I am wrong, are you asking is there --
9         Q.   I'm not trying to trick you.
10             MS. EDWARDS: I don't want you to
11   speculate on anything, okay, and I don't want you
12   to answer hypotheticals. I want you to answer what
13   you know.
14        Q.   I'm not trying to ask trick
15   questions. I'm just asking whether there is a need
16   for supervisors, is there a need for ranks, that we
17   have different levels of rank you just talked
18   through them, chief is at the top of that rank,
19   then from him it's major, captain, you talked about
20   the others; is that right?
21        A.   That is correct.
22        Q.   Do you think there is a need for
23   that?
```

Page 46

```
1         A.   In a large department there is a
2    need. You can have a police department that has
3    one police officer in it so therefore you don't
4    have order, you don't have rank.
5         Q.   In Dothan, there was order and rank,
6    correct?
7         A.   I asked you if we were talking about
8    Dothan or anything and you just said in law
9    enforcement.
10        Q.   Sure. So now in Dothan, there was
11   rank and order; is that correct?
12        A.   Yes, ma'am, there was in Dothan.
13        Q.   Do you think there was a need for
14   that?
15        A.   With the size of our department, yes.
16        Q.   Do you think that in law enforcement
17   there is a need for trust?
18        A.   Yes.
19        Q.   Do you think there is a need for good
20   morale in the workforce in law enforcement?
21             MS. EDWARDS: If you don't understand
22   a question, say so. I don't want you to speculate
23   and there be another question.
```

Page 47

```
1         A.   I would like the definition of
2    morale.
3         Q.   I want you to tell me when you don't
4    understand a question. I don't want your lawyer to
5    tell you after I have asked a question whether you
6    understand it or not. I need for you to tell me
7    that if you don't understand the question, okay?
8              MS. EDWARDS: I don't want you to be
9    afraid to ask her that. That is what I am
10   suggesting.
11        A.   What is your definition of morale?
12        Q.   What is your definition of morale?
13             MS. EDWARDS: Object to the form.
14        A.   My definition of morale would be
15   where an officer feels good about his job, how he's
16   doing his job and how he's maybe perceived by a
17   supervisor or on a good note.
18        Q.   Did you think it was important when
19   you were the police captain that there was a good
20   morale in the Dothan Police Department?
21        A.   If you could control that morale,
22   yes, it's always good to have good morale if you
23   can control it.
```

Page 48

```
1         Q.   Would you agree that as a police
2    officer it's important to have a good reputation in
3    the community?
4              MS. EDWARDS: Object to the form but
5    you can answer.
6         A.   If you can control your reputation in
7    the community it would be good to be able to
8    control that, yes.
9         Q.   Did you want to have a good
10   reputation in the community?
11        A.   If I could control that, yes.
12        Q.   Did you not think you could control
13   your reputation in the community?
14             MS. EDWARDS: Object to the form.
15        A.   Not specifically.
16        Q.   Why couldn't you control that?
17        A.   To me, it's up to the interpretation
18   of the individual that sees you in whatever light
19   they see you in.
20        Q.   A large part of your reputation is
21   based on your own conduct and your own actions,
22   right?
23        A.   It could be.
```

12 (Pages 45 to 48)

Page 49

```
 1        Q.   When you were working at the City,
 2   even when you were off duty, you were still a
 3   police officer, right?
 4            MS. EDWARDS:  Object to the form.
 5        A.   I was still employed as a police
 6   officer as I was off duty, yes.
 7        Q.   So when you left the police
 8   department, you didn't then become someone who was
 9   not a police officer?
10            MS. EDWARDS:  Object to the form.
11        Q.   Is that right?
12        A.   I was still a police officer when I
13   was off duty.
14        Q.   And you have reminded your fellow
15   officers from time to time that their off-duty
16   conduct is under scrutiny?
17        A.   Yes.
18        Q.   Let me show you what I have marked as
19   Defendant's Exhibit 3.
20            (Whereupon, Defendant's Exhibit 3 was
21            marked for identification.)
22        Q.   Let me know after you have had a
23   second to review it.
```

Page 50

```
 1        A.   (Reviewing document.)
 2        Q.   Have you had a chance to review it?
 3        A.   Yes.
 4        Q.   Who is Donald Peterson?
 5        A.   He was an officer in the police
 6   academy.
 7        Q.   And is Defendant's Exhibit 3 a letter
 8   dated July 26, 2012 from you to Mr. Peterson?
 9        A.   Yes.
10        Q.   And in this letter do you say to him
11   that you would like to congratulate him on his
12   successful completion and graduation from the
13   Alabama Criminal Justice Training Center Law
14   Enforcement Academy?
15        A.   Yes.
16        Q.   And the next to the last sentence in
17   this letter, do you say to him "Be mindful that
18   your off-duty conduct is under scrutiny just as
19   well as your on-duty conduct"?
20        A.   Yes.
21        Q.   I'll show you what I have marked as
22   Defendant's Exhibit 4.
23            (Whereupon, Defendant's Exhibit 4 was
```

Page 51

```
 1        marked for identification.)
 2        A.   (Reviewing document.)
 3        Q.   Do you recognize Defendant's
 4   Exhibit 4 as a letter from John White who was the
 5   chief of police at the time that is dated October
 6   the 27th, 2000?
 7        A.   Yes.
 8        Q.   And in this letter to you in the
 9   third paragraph about halfway down, does he say,
10   "If you notice that your fellow officer is
11   developing a friendship or personal association
12   with a person of questionable character, drug
13   dealer or other individuals involved in criminal
14   behavior, advise him or her to clean up their act.
15   If the inappropriate behavior continues, then
16   report it"?
17        A.   That is what it says.
18        Q.   Do you know what he meant by that?
19            MS. EDWARDS:  Object to the form, but
20   you can answer.
21        A.   Not specifically.
22        Q.   Why did Chief White send you this
23   letter if you know?
```

Page 52

```
 1        A.   I don't know.
 2        Q.   On the second page of this letter the
 3   last paragraph, the first sentence, does he state,
 4   "More so now than anytime during my 27 years as a
 5   law enforcement officer has the public we serve
 6   been as critical and attuned to our conduct on and
 7   off the job"?
 8        A.   That is what it says.
 9        Q.   Do you know why he sent this letter?
10        A.   No.
11        Q.   Do you know whether he sent this
12   letter to any other individuals?
13        A.   I don't know.
14        Q.   When you were employed by the City of
15   Dothan Police Department, did you ever respond to
16   any illegal activity that you observed or became
17   aware of when you were off duty?
18            MS. EDWARDS:  Object to the form.
19        A.   Yes.
20        Q.   Did you do that on more than one
21   occasion?
22            MS. EDWARDS:  Object to the form.
23        A.   Can you be more specific regarding
```

13 (Pages 49 to 52)

## Page 53

1   illegal activity, me responding to illegal
2   activity?
3        Q.    Sure. So when you said that you have
4   responded to illegal activity when you were off
5   duty, what did you respond to?
6             MS. EDWARDS: Object to the form.
7        A.    I remember being off duty, just
8   getting off duty and hearing an officer call out a
9   suspicious something call and it wasn't too far
10  from where I was at. I don't remember all the
11  details. I don't remember all the details right
12  now, but I'm trying to think over a period of 28
13  and a half years specifically when that has
14  happened. So I can't remember specifically right
15  now every time I responded to whether it was
16  activity, illegal activity, I think the way you put
17  it, or I can't remember specifically right now, but
18  I do remember responding to the law enforcement
19  activity whenever I was off.
20       Q.    Would you agree with me that a police
21  officer should not knowingly associate with
22  organizations that encourages illegal activity?
23            MS. EDWARDS: Object to the form.

## Page 54

1        A.    Could you read that to me again?
2        Q.    Do you agree with me that a police
3   officer should not knowingly associate with an
4   organization that encourages illegal activity?
5             MS. EDWARDS: Object to the form.
6        A.    If that police officer has specific
7   direct knowledge of someone in an organization that
8   is conducting illegal activity, no, he shouldn't.
9        Q.    Would you agree with me that a police
10  officer should not knowingly associate with
11  organizations that bring them into conflict with
12  the law?
13            MS. EDWARDS: Object to the form.
14       A.    If the officer has specific knowledge
15  of criminal activity within an organization, that
16  officer does not need to put himself with that
17  activity.
18       Q.    Would doing so be a violation of the
19  Dothan Police Department's rules?
20            MS. EDWARDS: Object to the form.
21       A.    Right this moment, I'm not sure. You
22  would have to be specific.
23       Q.    And we will look at those in just a

## Page 55

1   minute. Would you agree with me that a police
2   officer should not knowingly associate with an
3   organization that encourages violence?
4             MS. EDWARDS: Object to the form.
5        A.    And as stated specific knowledge of
6   some specific criminal act by individuals, no, the
7   officer should not.
8        Q.    So if an officer has specific
9   knowledge that there are individuals associated
10  with an organization who have engaged in violence,
11  that officer shouldn't associate with that
12  organization?
13            MS. EDWARDS: Object to the form.
14       A.    The knowledge of what the officer has
15  is key. If the officer doesn't have knowledge, he
16  doesn't know to disassociate with a person or
17  persons that have done something illegal as you are
18  alluding to.
19       Q.    As an officer who is going to
20  associate with a particular organization, do you
21  think that an officer should ask questions about
22  the organization's tendency toward violence,
23  illegal activity?

## Page 56

1             MS. EDWARDS: Object to the form.
2        A.    That would be an independent
3   conclusion made by an individual.
4        Q.    So each individual officer has to
5   make those decisions for themselves before
6   determining whether to associate with or be
7   involved with an organization?
8             MS. EDWARDS: Object to the form.
9        A.    I'm saying anyone that associates in
10  some way with anyone or any group that is up to
11  that individual whether they are -- that is up to
12  that individual, that is their own conclusion they
13  are drawing, I guess that is up to that individual.
14       Q.    Would you say that it's up to that
15  individual to learn whether the organization would
16  bring them into conflict with the law?
17            MS. EDWARDS: Object to the form.
18       A.    I can't tell you what an individual
19  is going to think about an organization or what
20  they are going to do.
21       Q.    Would you agree with me that
22  trafficking cocaine is illegal?
23       A.    Yes.

Page 57

1    Q.   That assault is illegal?
2    A.   Yes.
3    Q.   Burglary is also illegal?
4    A.   Yes.
5    Q.   Would you agree with me that carrying
6  a concealed weapon is illegal or can be illegal?
7    A.   Not necessarily.
8    Q.   Carrying a concealed weapon can be
9  illegal?
10   A.   How can it -- well, you are asking
11 the questions.  Clarify.
12   Q.   Can carrying a concealed weapon while
13 a person is on probation be considered a violation
14 of that person's probation?
15   A.   No.
16   Q.   Is receiving stolen property illegal?
17   A.   Yes.
18   Q.   Is possessing marijuana or cocaine
19 illegal?
20   A.   In some states, not in all.
21   Q.   Is it illegal in Alabama?
22   A.   Yes.
23   Q.   Have you ever made statements to the

Page 58

1  effect of when I am off duty, I'm off duty?
2         MS. EDWARDS:  Object to the form.
3    A.   Yes.
4    Q.   When have you made statements to that
5  effect?
6    A.   I'm not sure.
7    Q.   What do you mean by that?
8    A.   What it states.
9    Q.   Do you mean that when you are off
10 duty, that you are going to turn a blind eye to
11 crime?
12   A.   No.
13   Q.   Do you mean that when you are off
14 duty, you are going to turn a blind eye to any
15 illegal activity?
16   A.   No.
17   Q.   What do you mean when you say when
18 I'm off duty, I'm off duty?
19   A.   I mean that I'm going to kind of go
20 along with what you should already have that I told
21 Internal Affairs when they asked me the same
22 question.  My interpretation of what I meant is
23 when I quote/unquote clock out for the day, if we

Page 59

1  can use those terms, and I go home and I decide to
2  cut my grass, I'm going to do it without my badge
3  on and I'm going to do it without my gun on and I'm
4  going to cut my grass.  And if someone drives by
5  with loud music or something, I'm not going to
6  follow them down the street on my lawn mower, get
7  my gun and badge and try to pull them over to write
8  them a ticket.
9         What I mean is when I am off duty, I
10 am going to try to have some peace in my home as a
11 regular citizen that doesn't enforce -- doesn't
12 have my job.
13   Q.   Have you ever made statements to the
14 effect of when I am on duty, I'm a police officer,
15 but when I am off duty, I don't care what y'all do?
16   A.   Not that I recall.
17   Q.   Who is Darryl Mathews?
18   A.   He is the EEO officer for the City,
19 is that the one you are talking about?
20   Q.   What is his race, if you know?
21   A.   I don't know.
22   Q.   Have you ever had any interactions
23 with Mr. Mathews?

Page 60

1    A.   Can you define interactions?
2    Q.   Have you ever had any conversations
3  with him?
4    A.   Yes.
5    Q.   Have you ever made any reports
6  related to your employment at the City to
7  Mr. Mathews?
8         MS. EDWARDS:  Object to the form.
9    A.   I don't understand made reports.
10   Q.   Did you ever have any conversations
11 with him about your employment at the City?
12   A.   Yes.
13   Q.   And in any of those conversations,
14 did you make any complaints about race
15 discrimination?
16   A.   Yes.
17   Q.   And did he take those reports
18 seriously?
19         MS. EDWARDS:  Object to the form.
20   A.   I don't know.
21   Q.   Do you know whether he investigated
22 your claims?
23         MS. EDWARDS:  Object to the form.

15 (Pages 57 to 60)

Page 61

1    Q.   I'm asking do you know whether he
2   investigated your claims?
3          MS. EDWARDS: Object to the form.
4          MS. MAYS: What is wrong with that
5   question?
6          MS. EDWARDS: Legal definition of
7   investigate. He's not a lawyer and whether he has
8   investigated this as a matter of law, he wouldn't
9   be able to answer that.
10    Q.   Do you know what it means to
11   investigate?
12          MS. EDWARDS: Object to the form.
13    A.   I don't know what Darryl Mathews did
14   officially.
15    Q.   Did he ever report to you his
16   findings of investigations?
17          MS. EDWARDS: Object to the form. I
18   can't recall right now a specific report that he
19   has reported back to me on.
20    Q.   Would you say that you had a good
21   working relationship with Mr. Mathews?
22          MS. EDWARDS: Object to the form.
23    A.   I can't say that.

Page 62

1    Q.   Did you believe Mr. Mathews to be
2   honest?
3    A.   No.
4    Q.   Why not?
5    A.   Because of statements I have heard
6   that he has said and a rumor of what I have heard
7   that he has said.
8    Q.   What statements that you heard that
9   he has said that lead you to believe that he's
10   dishonest?
11    A.   He told me after he was the EEO
12   officer -- let me take that back. Let me rephrase
13   that. When Elston Jones became the EEO officer for
14   Dothan and Darryl Mathews was no longer the EEO
15   officer of Dothan, Darryl Mathews told me that he
16   had a conversation with Elston Jones and in part of
17   that conversation Darryl Mathews told Elston, I
18   have never had a successful EEOC charge to return
19   valid during my tenure as EEO officer with the
20   City. So that is the answer to that question.
21    Q.   When did this conversation between
22   Elston Jones and Mr. Mathews take place?
23    A.   I don't know when their conversation

Page 63

1   took place.
2    Q.   Do you know whether or not
3   Mr. Mathews has ever had an EEOC charge to come
4   back quote/unquote valid?
5    A.   I don't know.
6    Q.   When did Elston Jones become the EEO
7   officer?
8    A.   I don't know.
9    Q.   Who is the current EEO officer?
10    A.   I didn't finish answering that
11   question when I told you about Darryl Mathews and
12   me believing he is honest or whatever, that was
13   just part one.
14    Q.   Okay. I want to hear all the parts.
15    A.   The second one was he -- I received
16   information that Elston -- excuse me, that Darryl
17   Mathews had said to someone else that I needed to
18   be happy with the rank that I have achieved as
19   captain within the police department and I needed
20   to quit making waves, something to that effect.
21          And I asked Mr. Mathews if he said
22   that and his reply was who did I get the
23   information from and I told him I wasn't going to

Page 64

1   reveal my source and I asked him why. And he said
2   because he thinks that he has a leak in his office
3   so he never denied it. So for those reasons, there
4   may be some others that I can't remember right now,
5   I don't think that your question he was honest or
6   whatever.
7    Q.   Do you have any other reasons that
8   you believe him to be dishonest?
9    A.   Right now, no, but him openly talking
10   about other EEO people that has come to him to file
11   EEOC complaints and sharing that with me, I just
12   don't have any faith in him.
13    Q.   You said Mr. Mathews never denied
14   making a comment about you saying that you should
15   quit making waves. Did he ever admit to saying it?
16    A.   Say that again. Could you repeat
17   that?
18    Q.   You said that Darryl Mathews never
19   denied it as in he never denied saying that you
20   should be happy and quit making waves. Did he ever
21   admit saying that?
22    A.   No.
23    Q.   Who told you that Darryl Mathews said

16 (Pages 61 to 64)

Page 65

1    that you should be happy as captain and quit making
2    waves?
3        A.   I don't want to speculate right now
4    one person, but I don't want to speculate unless I
5    ask again to confirm that it was that person.
6        Q.   When did that person tell you that
7    Darryl Mathews made that statement?
8        A.   It was during a time where I had
9    applied for the chief of police position.
10       Q.   In what year?
11       A.   2009 I believe.
12       Q.   What EEO matters has Mr. Mathews
13   discussed with you?
14           MS. EDWARDS:  Object to the form.
15       A.   Can you be specific?
16       Q.   You said that he has openly discussed
17   other EEO matters with you; is that right?
18       A.   Uh-huh.
19       Q.   What were you referring to?
20       A.   I was referring to the lady that
21   filed an EEO complaint with Darryl that works I
22   believe, and don't quote me, in the wastewater
23   treatment facility.  She wanted to be removed from

Page 66

1    her immediate supervisor and placed under someone
2    else because of some type of issue, but he believed
3    that he didn't -- he didn't believe that whatever
4    her complaint was was a valid complaint, he just
5    thought that she needed to -- she wanted to move
6    from that supervisor.  But it was in the wastewater
7    treatment, I don't remember the lady's name and I
8    don't remember who her supervisor was, but I'm sure
9    he could tell you exactly what I am talking about.
10       Q.   Do you remember when you had this
11   conversation with Darryl?
12       A.   During one of the interviews that he
13   and I had in his office, his EEO office.
14       Q.   During what time frame?
15       A.   I'm not sure.
16       Q.   Do you recall what year?
17       A.   Not for certain.
18       Q.   Is that over five years ago?
19       A.   No.
20       Q.   Is it over two years ago?
21       A.   I can't say for certain.  It's in
22   that vicinity.
23       Q.   So somewhere between two and

Page 67

1    five years ago, you and Mr. Mathews had a
2    conversation with a woman who had filed an EEO
3    complaint in the wastewater treatment facility?
4            MS. EDWARDS:  Object to the form.
5        A.   I'm not 100 percent certain but
6    somewhere in that ballpark.  You want to know about
7    some others?
8        Q.   Are there other things?
9        A.   Uh-huh.
10       Q.   Yes, I want to hear it.
11       A.   He talked about Lamar Wilson which
12   was terminated from the City of Dothan and him
13   driving a Dothan police car and pulling people over
14   while driving a police car and being terminated for
15   that.
16           He has talked about RaeMonica Carney
17   and her complaint with the City of Dothan.  And I'm
18   sure there is others that I can't remember
19   specifically right now.
20       Q.   Did you bring these topics up to
21   Mr. Mathews or did he bring them up to you?
22       A.   He did.
23       Q.   And did you offer him guidance or

Page 68

1    advice about these situations?
2            MS. EDWARDS:  Object to the form.
3        A.   No.
4        Q.   Was he asking you for your advice or
5    guidance?
6        A.   No.
7        Q.   Do you recall what your position was
8    at the time he discussed with you the EEO complaint
9    by the woman in wastewater treatment?
10       A.   Could you ask me that one more time,
11   ma'am?
12       Q.   Do you recall what your position or
13   rank was at that time?
14       A.   I didn't know anything about it until
15   he brought it up so I didn't have any -- I just
16   listened.
17       Q.   No, what was your rank within the
18   department?
19       A.   Oh, I'm sorry.  I believe I was a
20   captain, but I can't say for sure, but I believe I
21   was a captain.
22       Q.   What about when he had the
23   conversation with you about Lamar Wilson, what was

Page 69

```
1       your rank at that time?
2           A.    Either captain or lieutenant.
3           Q.    Did Lamar Wilson report to you?
4           A.    No.
5           Q.    Do you know what Lamar Wilson's rank
6       was?
7           A.    He didn't have one.
8           Q.    What was his position with the City?
9           A.    Mechanic.
10          Q.    What was your position or rank when
11      Mr. Mathews had -- was it one conversation about
12      RaeMonica Carney?
13              MS. EDWARDS:  Object to the form.
14          Q.    I'll rephrase.  How many
15      conversations did Mr. Mathews have with you
16      regarding RaeMonica Carney?
17          A.    Two that I can remember right now.
18          Q.    And what was your rank or position
19      when he had those conversations with you?
20          A.    Captain.
21          Q.    And what did y'all talk about during
22      those two conversations?
23          A.    The first conversation that I recall
```

Page 70

```
1       I was -- I called him and told him that I was -- I
2       needed to speak with him in reference to some
3       issues I was having with Major Steve Parrish and he
4       told me to wait because he was in the middle of
5       doing RaeMonica Carney's EEO complaint, that was
6       the first one.
7               The other one, while we were talking
8       about my issue here, he spoke about RaeMonica being
9       put on the duty desk.  He spoke about the officers
10      filing complaints against her about what she said
11      regarding her -- the charge brought by the City on
12      her First Amendment complaint, her freedom of
13      speech.  That is all I can remember right now.
14          Q.    Prior to your first conversation with
15      Mr. Mathews where he told you that he was doing Ms.
16      Carney's EEO complaint, did you know that she had
17      an EEO complaint?
18          A.    No, I didn't know she had an EEO
19      complaint.
20          Q.    Do you know whether any of the
21      information that Mr. Mathews told you about any of
22      these EEO complaints was untrue?
23          A.    I don't know as to the truth of any
```

Page 71

```
1       of them.  He was just pretty much telling
2       everybody's business so I wasn't trying to
3       interpret whether it was true or not.
4           Q.    Are you a member of any social clubs
5       or organizations?
6               MS. EDWARDS:  Object to the form.
7           A.    I'm a member of some organizations,
8       Alabama Polygraph Association, American Polygraph
9       Association, AOPA.  I'm fixing to try to tell you
10      what that means, that slips my mind right now.  I'm
11      sure I will think of it.  Airborne Law Enforcement
12      Association.  That is all I can think of right now.
13          Q.    Are you a member of a church?
14          A.    Yes.
15          Q.    What church do you belong to?
16          A.    Northview Christian Church.
17          Q.    Do you know about how many members
18      you have?
19          A.    No, ma'am.
20          Q.    Is the membership of Northview
21      Christian predominantly African-American?
22          A.    Yes.
23          Q.    Are you a member of NAACP?
```

Page 72

```
1           A.    Yes.
2           Q.    Is that membership predominantly
3       African-American?
4           A.    I don't know.
5           Q.    Are you a member of Bama Boyz
6       Motorcycle Club?
7           A.    I was.
8           Q.    Are you currently a member of Bama
9       Boyz Motorcycle Club?
10          A.    No.
11          Q.    What period of time were you a member
12      of Bama Boyz Motorcycle Club?
13          A.    2008 to this year.
14          Q.    To 2014?
15          A.    Uh-huh.
16          Q.    Did you resign as a member of Bama
17      Boyz?
18          A.    No.
19          Q.    How did your membership in that
20      organization end?
21          A.    I closed it.
22          Q.    How did you close your membership?
23          A.    I told the board of directors that we
```

| Page 73 |
|---|

1  were — well, actually we had a meeting and we
2  decided to close the organization and that is what
3  we did.
4      Q.   So the Bama Boyz Motorcycle Club no
5  longer exists?
6      A.   That is correct.
7      Q.   Why did you decide to close the
8  organization?
9      A.   Because we felt like we were going to
10  be harassed by the Dothan Police Department.
11     Q.   Any other reasons?
12     A.   That is it.
13     Q.   Had you been harassed by the Dothan
14  Police Department?
15         MS. EDWARDS:  Object to the form.
16     A.   Could you be more specific?
17     Q.   You said that you felt that you were
18  going to be harassed by the Dothan Police
19  Department, right?
20     A.   Uh-huh.
21     Q.   Yes, is that yes?
22     A.   Yes.  I'm sorry.  You did say answer
23  verbally.

| Page 74 |
|---|

1      Q.   Why did you feel that way?
2         MS. EDWARDS:  Object to the form.
3      A.   Because of what we are here today for
4  and how I have been treated within the Dothan
5  Police Department.  If — let's just say I feel
6  like the police department was unduly surveilling
7  my club's location.  And to avoid being the victim
8  of the department trying to show us in a bad light,
9  it was better to close it.
10     Q.   Who from the Dothan Police Department
11  was surveilling your club's location?
12     A.   I don't know.
13     Q.   How do you know that it was being —
14  how do you know that it was under surveillance?
15     A.   I was told by someone that saw them
16  watching.
17     Q.   Who told you that it was under
18  surveillance?
19     A.   I don't know his name.
20     Q.   When did they tell you that it was
21  under surveillance?
22     A.   During my investigation.
23     Q.   During what investigation?

| Page 75 |
|---|

1      A.   During the investigation of me by the
2  Dothan Police Department.
3      Q.   With regard to your membership in
4  Bama Boyz?
5         MS. EDWARDS:  Object to the form.
6      A.   I was placed on administrative leave,
7  and during that time I was being told that.
8      Q.   Did they tell you how frequently the
9  club was being watched?
10     A.   No.  Their phrase was they are always
11  across the street watching the building that I'm
12  in.  And they were always across the street, the
13  police department was always across the street
14  watching the building.
15     Q.   And you don't remember who told you
16  that?
17     A.   I know who told me, I just never knew
18  his name.
19     Q.   How did you know him?
20     A.   He had a business directly beside my
21  clubhouse.
22     Q.   What was his business?
23     A.   Tire service center.

| Page 76 |
|---|

1      Q.   Do you know the name of it?
2      A.   No.
3      Q.   How did he know that they were
4  surveilling the clubhouse and not the tire center?
5         MS. EDWARDS:  Object to the form.
6      A.   I don't know.
7      Q.   Did you found Bama Boyz in 2008?
8      A.   Yes.
9      Q.   And were you president beginning in
10  2008?
11     A.   Yes.
12     Q.   Were you president from 2008 to 2014?
13     A.   No.
14     Q.   How long were you the president?
15     A.   I don't know.
16     Q.   Were you the president in August of
17  2013?
18     A.   I don't know right now.  I don't
19  know.
20     Q.   In what month of this year did y'all
21  close the membership of Bama Boyz?
22     A.   I'm not sure.  I would need to look
23  at the calendar or something.

19 (Pages 73 to 76)

Page 77

1    Q.    Is there a document that would
2  refresh your recollection about the time frame that
3  you served as president of the organization?
4    A.    Not specifically.
5    Q.    When you established Bama Boyz it was
6  established as a riding club; is that right?
7    A.    Yes.
8    Q.    What is a riding club?
9    A.    For the most part, my understanding
10  of what a riding club is is a club that is not
11  structured. They often don't have bylaws. They
12  may not have protocols. That is all I can think of
13  right now.
14    Q.    At some point did Bama Boyz go from
15  being a riding club to a motorcycle club?
16    A.    Yes.
17    Q.    And what is a motorcycle club?
18    A.    It's a club where you have the -- and
19  this isn't in its entirety because there is not a
20  written set of laws or rules or what have you. A
21  motorcycle club tends to be more organized. They
22  may or may not have bylaws. They may or may not go
23  by a set of guidelines or protocols. They may or

Page 78

1  may not have a bank account, something like that.
2    Q.    When did Bama Boyz go from being a
3  riding club to a motorcycle club?
4    A.    I don't recall.
5    Q.    Is there a document that would
6  refresh your recollection about when Bama Boyz went
7  from being a riding club to a motorcycle club?
8    A.    No.
9    Q.    Do you know about when that change
10  happened?
11    A.    No, I don't.
12    Q.    Why did Bama Boyz go from being a
13  riding club to a motorcycle club?
14    A.    To get some structure in the club, be
15  able to go out and do like community charitable
16  things, maybe some events where you can raise money
17  to turn around and share with charities and things
18  of that nature, just more structure.
19    Q.    Are riding clubs prohibited from
20  being structured?
21    A.    As I said, with my definition of, and
22  there is no book, there is no laws, there is
23  nothing out there to say that they can or cannot.

Page 79

1  That was just my understanding.
2    Q.    Are riding clubs prohibited from
3  being involved in charity events?
4    A.    I don't know.
5    Q.    When Bama Boyz was in existence, in
6  what states -- I'm assuming just Alabama -- but in
7  what states did Bama Boyz exist?
8    A.    Alabama.
9    Q.    In what cities in Alabama were there
10  Bama Boyz clubs?
11    MS. EDWARDS: Object to the form.
12    A.    Anniston and Dothan.
13    Q.    Were the Anniston and Dothan clubs
14  established at the same time?
15    A.    No.
16    Q.    Which was established first?
17    A.    Dothan.
18    Q.    And when was Dothan established?
19    A.    2008.
20    Q.    And when was Anniston established?
21    A.    I'm not certain, maybe 2012, but I am
22  not for sure.
23    Q.    When the Dothan motorcycle club --

Page 80

1  when the Dothan Bama Boyz was established, it was
2  established as a riding club and later became a
3  motorcycle club; is that right?
4    A.    Yes.
5    Q.    Is the same true for Anniston? Was
6  it established as a riding club and then later
7  became a motorcycle club?
8    A.    No.
9    Q.    Anniston was established as a
10  motorcycle club?
11    A.    Yes.
12    Q.    How did you go about founding Bama
13  Boyz?
14    MS. EDWARDS: Object to the form.
15    A.    Your definition of founding?
16    Q.    You were the founder and president in
17  2008; is that right?
18    A.    That is correct.
19    Q.    How did you go about founding the
20  organization?
21    MS. EDWARDS: Object to the form.
22  You can answer.
23    Q.    What steps did you take to create

Freedom Court Reporting                877-373-3660

Page 81

```
1    Bama Boyz as an organization?
2         A.   Thought about it, put my thoughts on
3    paper, knew some friends that had motorcycles,
4    talked about it and implemented my ideas.
5         Q.   How many members did you have when
6    you first started the organization?
7         A.   I don't know.
8         Q.   Do you know about how many you had?
9         A.   No.
10        Q.   How many did you have in 2014 when
11   you closed the membership?
12        A.   I don't know.
13        Q.   Was it more than a hundred?
14        A.   No.
15        Q.   Was it more than 50?
16        A.   No.
17        Q.   Was it more than 25?
18        A.   I don't know.
19        Q.   So less than 50 at the time that you
20   closed the membership?
21        A.   Yes.
22        Q.   Did you have written bylaws?
23        A.   Yes.
```

Page 82

```
1         Q.   What is addressed in the bylaws?
2              MS. EDWARDS:  Object to the form.
3         A.   Can you be more specific?
4         Q.   What was addressed in the bylaws?
5    What topics were covered?
6         A.   Membership, officers' duties, our
7    vests that we wear, maybe conduct.  That is all I
8    can remember right now.
9         Q.   Do you have a copy of those bylaws?
10        A.   I'm not sure.
11             MS. EDWARDS:  You don't have a copy
12   of them with you today, do you?
13        A.   No.
14        Q.   But you don't know whether or not you
15   have a copy in your possession?
16        A.   I'm not sure.
17        Q.   You could but you are just not sure
18   one way or the other?
19        A.   Right.
20        Q.   Do you know what the bylaws said
21   about membership?
22        A.   It said that you had to have a
23   certain engine size bike to be a member.  I'm not
```

Page 83

```
1    100 percent sure if it outlined the age of the
2    rider.  And to my knowledge, it speaks about having
3    a valid driver's license and insurance.  That is
4    all I can remember right now.
5         Q.   What did the bylaws say about the
6    vests?
7         A.   It said that within six months, you
8    will receive a one piece of a patch; the month
9    after that, you will receive another piece of the
10   patch; and then a month after that, you will
11   receive another piece of the patch; talked about
12   where the patches would be positioned, the position
13   of the patch on the vest.  That is all I can
14   remember right now.
15        Q.   What did the bylaws say about
16   conduct?
17             MS. EDWARDS:  Object to the form.
18        A.   If I remember correctly, I said it
19   may have something in there about conduct, that is
20   not a certainty.  I'm not 100 percent for sure.
21        Q.   Was there an application process to
22   become a member of the Bama Boyz?
23        A.   Yes.
```

Page 84

```
1         Q.   What was that process?
2         A.   The applicant had to be recommended
3    by a member.  The application had to be -- or the
4    applicant had to be discussed by the person that
5    recommended him or her.  And afterwards, the
6    potential applicant would be brought in and
7    introduced to the members and then voted on.
8         Q.   Was there ever any discussion about
9    whether potential members had ever been arrested?
10        A.   No.
11        Q.   Was there ever any discussion about
12   whether potential members had been charged with a
13   crime?
14             MS. EDWARDS:  Object to the form.
15        A.   On the application, is that what you
16   are saying?
17        Q.   Just in general.
18        A.   Ask me the question again.
19        Q.   Was there ever any discussion about
20   whether applicants to Bama Boyz' organization had
21   ever been charged with a crime?
22             MS. EDWARDS:  Object to the form.
23        A.   No.
```

21  (Pages 81 to 84)

Page 85

```
 1        Q.    Do you know whether any members of
 2   Bama Boyz had ever been charged with a crime?
 3              MS. EDWARDS:  Object to the form.
 4        A.    I know now of a member that was
 5   charged with a crime.
 6        Q.    And who was that?
 7        A.    Keith Snell.
 8        Q.    And what was Keith charged with?
 9        A.    I don't know.
10        Q.    When did you learn that Keith had
11   been charged with a crime?
12        A.    Internal Affairs, during my second
13   interview with Internal Affairs/Dothan Police
14   Department.  I believe it was the second interview.
15        Q.    Do you know of any other members of
16   Bama Boyz who had been charged with a crime?
17        A.    I know of a member now that has been
18   charged, which is yes.
19        Q.    Who is that?
20        A.    Wendell Key.
21        Q.    Do you know what Wendell was charged
22   with?
23        A.    No.
```

Page 86

```
 1        Q.    When did you learn that Wendell had
 2   been charged with a crime?
 3        A.    When his picture was in the paper
 4   from Outcast Motorcycle Club when he was arrested.
 5   He was not a member of Bama Boyz at the time.
 6        Q.    When was his picture in the paper?
 7        A.    I'm not certain.
 8        Q.    Was it during the Internal Affairs
 9   investigation?
10        A.    It could have been.  I'm not for
11   certain.
12        Q.    Are there any other members of Bama
13   Boyz who have been charged with a crime?
14        A.    No.
15        Q.    If you had known that Keith Snell and
16   Wendell Key had been charged with crimes when they
17   applied to become members of Bama Boyz, would that
18   have affected their ability to become members?
19              MS. EDWARDS:  Object to the form.
20        A.    That is a hypothetical situation, a
21   hypothetical question.
22        Q.    If you had known, would that have
23   affected their ability to become members?
```

Page 87

```
 1              MS. EDWARDS:  Object to the form.
 2        A.    It could have.
 3        Q.    In what way could that have affected
 4   their potential membership?
 5              MS. EDWARDS:  Object to the form.
 6        A.    I don't know.  It depends on -- I
 7   don't know.
 8        Q.    Were applicants asked about their
 9   criminal backgrounds?
10              MS. EDWARDS:  Object to the form.
11        A.    No.
12        Q.    Do you think that this is something
13   that would have been important to know?
14              MS. EDWARDS:  Object to the form.
15        A.    I don't know.
16        Q.    Were all of the members of Bama Boyz
17   African-American?
18        A.    No.
19              MS. EDWARDS:  Object to the form.
20        Q.    Were most of the members
21   African-American?
22              MS. EDWARDS:  Object to the form.
23        A.    It depends on the given period of
```

Page 88

```
 1   time.  From 2008 till when we closed, the
 2   membership changes, so it just depends on the --
 3        Q.    In or around August/September of
 4   2013, do you know about how many members you had
 5   during that time frame?
 6        A.    No.
 7        Q.    In the biker community, is your
 8   nickname Chopper?
 9        A.    Yes.
10        Q.    Is that because you have a license to
11   fly helicopters?
12              MS. EDWARDS:  Object to the form.
13        A.    No.
14        Q.    Why is your nickname Chopper?
15        A.    Because I like flying helicopters.
16        Q.    Because you like flying helicopters.
17   Were there any other police officers who were
18   members of Bama Boyz other than yourself?
19              MS. EDWARDS:  Object to the form.
20        A.    No.
21        Q.    Have any other police officers
22   applied for membership to Bama Boyz?
23              MS. EDWARDS:  Object to the form.
```

Page 89

1    A.    I don't know right now.
2    Q.    I asked you about the differences
3  between a riding club and a motorcycle club.  Is
4  there a difference between a motorcycle club and a
5  motorcycle gang?
6         MS. EDWARDS:  Object to the form.
7    A.    I don't know what a motorcycle gang
8  is.
9    Q.    Okay.  Do you know what an outlaw
10  motorcycle club is?
11        MS. EDWARDS:  Object to the form.
12    A.    I know the phrase "outlaw motorcycle
13  club."  I can't -- and I know that there may be
14  clubs labeled as that, but -- I know clubs labeled
15  as outlaw motorcycle clubs and I know one
16  motorcycle club called The Outlaws.
17    Q.    What clubs do you know that are
18  labeled as outlaw motorcycle clubs?
19    A.    I have learned that Legends of Doom
20  has been labeled as an outlaw motorcycle club.  I
21  know that Outcast has been labeled as an outlaw
22  motorcycle, Sin City Cycles, Hell's Angels.  That
23  is all I can think of right now.

Page 90

1    Q.    What is your understanding of what it
2  means to be labeled an outlaw motorcycle club?
3         MS. EDWARDS:  Object to the form.
4  You can answer.
5    A.    My understanding is that there are
6  members in the club that may have been involved in
7  criminal activity.  They may not be law abiding.
8  And my understanding may not be the correct
9  understanding or the understanding among other
10  members or other clubs or what have you.  That is
11  all I can think of right now.
12    Q.    Did you have that same understanding
13  of what a outlaw motorcycle club was when you
14  started Bama Boyz in 2008?
15        MS. EDWARDS:  Object to the form.
16    A.    No.
17    Q.    Do you recall what your understanding
18  was of an outlaw motorcycle club when you founded
19  Bama Boyz?
20        MS. EDWARDS:  Object to the form.
21    A.    No.
22    Q.    When did you get the understanding
23  that you have described to us as what it means to

Page 91

1  be an outlaw motorcycle club?
2         MS. EDWARDS:  Object to the form.
3    A.    Through years of riding and listening
4  to other members talk.  That is all I can think of
5  right now.
6    Q.    What is your understanding of what it
7  means to be a one percenter?
8         MS. EDWARDS:  Object to the form.
9         MS. MAYS:  What is wrong with that
10  question?
11        MS. EDWARDS:  He may not know what
12  the word "one percenter" means.
13        MS. MAYS:  That is why I asked him
14  his understanding.
15        MS. EDWARDS:  If you know what a one
16  percenter is, tell her your understanding.
17    A.    Right.  My understanding of a one
18  percenter is an individual that -- I don't want to
19  be speculating on that.
20        MS. EDWARDS:  No, we don't want to
21  speculate.  Just answer what you know.
22    A.    Well, I don't know for sure.
23    Q.    (BY MS. MAYS:)  Do you have any idea

Page 92

1  what it means to be a one percenter?
2    A.    That is kind of the same question.  I
3  can speculate from -- I can speculate, but to say
4  this is a specific definition of who or what a one
5  percenter is, I don't know that for certain.
6    Q.    Sure.  I'm not asking you for a
7  dictionary definition.  I'm asking you what your
8  understanding of what that term means.  If somebody
9  says to you that they are a one percenter, what
10  does that mean to you?
11    A.    That they -- my understanding would
12  be that they have had some type of maybe a criminal
13  record, the individual has had some type of
14  criminal record.
15    Q.    Anything else?
16    A.    To be a one percenter I think you
17  have to have a criminal record.
18    Q.    Are there one percenter motorcycle
19  clubs?
20        MS. EDWARDS:  Object to the form.
21    A.    That, I don't know.  I think the
22  individual is the one percenter.
23    Q.    Do you know any individuals who are

Page 93

```
 1    one percenters?
 2             MS. EDWARDS:  Object to the form.
 3         A.    No.
 4         Q.    Do you know whether one percenters
 5    have to commit certain types of crimes to be
 6    considered one percenters?
 7         A.    I don't know.
 8         Q.    Are there some motorcycle clubs that
 9    are more prone to violence than others?
10             MS. EDWARDS:  Object to the form.
11         A.    I don't know.
12         Q.    Do you know if there are some
13    motorcycle clubs that are more prone to engage in
14    criminal activity?
15             MS. EDWARDS:  Object to the form.
16         A.    I don't know.
17         Q.    You just don't know one way or the
18    other?
19         A.    I know about my club.  My club is not
20    a one percenter club and we are not an outlaw club,
21    so I don't go delving off into what everybody else
22    does.
23         Q.    Do you think that motorcycle clubs
```

Page 94

```
 1    whose members were comprised of one percenters
 2    would be more likely to engage in criminal
 3    activity?
 4             MS. EDWARDS:  Object to the form.
 5         A.    I don't know.
 6         Q.    What are prospects in the biker
 7    community?
 8         A.    Bike applicants.
 9         Q.    Like potential new members?
10         A.    Right.
11         Q.    Did you instruct some prospects for
12    Bama Boyz that you work hand in hand with Outcast?
13             MS. EDWARDS:  Object to the form.
14         A.    I remember that being in the
15    transcript.
16         Q.    Do you recall instructing the
17    prospects that Bama Boyz work hand in hand with
18    Outcast?
19             MS. EDWARDS:  Object to the form.
20         A.    I remember saying that.
21         Q.    Was Outcast an outlaw motorcycle
22    club?
23             MS. EDWARDS:  Object to the form.
```

Page 95

```
 1         A.    They have been considered an outlaw
 2    motorcycle club.
 3         Q.    They have been considered an outlaw
 4    motorcycle for a long time, right?
 5             MS. EDWARDS:  Object to the form.
 6         A.    I don't know.
 7         Q.    Do you know whether Outcast is
 8    considered a one percenter motorcycle club?
 9         A.    I don't know.
10         Q.    Do you know whether Sin City
11    Disciples is considered an outlaw motorcycle club?
12             MS. EDWARDS:  Object to the form.
13         A.    When you are saying considered, what
14    do you mean?
15         Q.    Do you know whether they have been
16    identified on any FBI Watch List as a outlaw or one
17    percenter motorcycle club?
18             MS. EDWARDS:  Object to the form.
19         A.    I don't know for sure.
20         Q.    Did you provide training to prospects
21    of Bama Boyz about how to stay safe?
22             MS. EDWARDS:  Object to the form.
23         A.    I don't consider it training as you
```

Page 96

```
 1    are saying.  I have talked with prospects about
 2    things I have heard that maybe I have seen or
 3    things that have just come up during the time that
 4    I have been associating with riding motorcycles.
 5         Q.    Was one of the things that you had
 6    heard that motorcycle clubs can be territorial?
 7         A.    Yes.
 8         Q.    What did you mean motorcycle clubs
 9    can be territorial?
10         A.    What I meant was any club that may
11    feel like they have certain rights to a specific
12    location or something like that may not like
13    another club coming on that locale.
14         Q.    Did you talk to your members about
15    some motorcycle clubs engaging in physical violence
16    when you come on their locale?
17         A.    Yes.  Well, let me take that back.  I
18    don't know if I said that specifically to the
19    members.  I just know that that is what is even out
20    there on TV.  I have seen it on TV as well.  So
21    that is not that I know it firsthand, but I have
22    seen it on TV.
23         Q.    Did you record one of your talks with
```

Page 97

```
 1    prospects?
 2         A.   I did.
 3         Q.   When did you record that talk?
 4         A.   I don't recall.
 5         Q.   Do you recall when that talk took
 6    place?
 7         A.   No. I'm sorry.
 8         Q.   Do you know whether you had that talk
 9    before the IA investigation began?
10         A.   Yes.
11         Q.   Did that talk, in fact, occur before
12    the IA investigation began?
13         A.   Yes.
14              (Whereupon, Defendant's Exhibit 5 was
15              marked for identification.)
16         Q.   I'm showing you what I have marked as
17    Defendant's Exhibit 5. Do you recognize this as a
18    transcript of a recording of the lecture that you
19    had with potential members of Bama Boyz?
20              MS. EDWARDS: Take a moment and look
21    through this before you answer that question.
22         Q.   Take your time.
23         A.   (Reviewing document.)
```

Page 98

```
 1              MS. EDWARDS: Want to go off the
 2    record while he reviews this?
 3              (Off-the-record discussion.)
 4         Q.   (BY MR. MAYS:) Mr. Gray, do you
 5    recognize this transcript, what is labeled here as
 6    Transcript of Recording as an exhibit that was
 7    presented during the personnel board hearing to
 8    your termination?
 9              MS. EDWARDS: I would like to object
10    to Defendant's Exhibit Number 5 to the extent it
11    constitutes hearsay. I would also like to go back
12    and object to Defendant's Exhibit Number 2 to the
13    extent that it's hearsay or incomplete records
14    regarding the personnel actions related to the
15    promotions of Mr. Gray. And also to Exhibit Number
16    4 as hearsay which is the letter dated
17    October 27th, 2000.
18              MR. MAYS: For the record, Exhibit
19    Number 2 comes directly from Mr. Gray's IA
20    personnel records, a copy of which has been
21    produced to plaintiff's counsel and she has the
22    entire file. And Exhibit Number 5 that we are
23    currently on was an exhibit admitted by plaintiff's
```

Page 99

```
 1    counsel during the personnel board hearing that
 2    occurred in I believe it was September of 2013, I
 3    may be wrong about that date, but it's clearly
 4    marked as Gray Exhibit A.
 5              MS. EDWARDS: And I object to this
 6    Defendant's Exhibit 5 to the extent it's not a copy
 7    of what plaintiff's counsel admitted during the
 8    personnel board hearing that is being referenced.
 9              MS. MAYS: Go off the record.
10              (Off-the-record discussion.)
11              MS. EDWARDS: And same objection
12    stands for Defendant's Exhibit Number 5.
13         Q.   (BY MS. MAYS:) Do you recognize
14    Defendant's Exhibit Number 5?
15         A.   I see the exhibit tab on the top. I
16    can't say this is a true and accurate copy of what
17    I said.
18         Q.   Did you —
19         A.   And I went through most of it. This
20    thing is about 10 or 12 or 14 pages. And I have
21    read, but I didn't read each word for word because
22    we would be here for a while but —
23         Q.   And we have the audio recording —
```

Page 100

```
 1         A.   Right.
 2         Q.   — of this transcript; is that
 3    correct?
 4              MS. EDWARDS: Object to the form.
 5         Q.   Do you know whether Internal Affairs
 6    investigators found an audio recording that
 7    included a talk that you provided to prospects for
 8    Bama Boyz?
 9              MS. EDWARDS: Object to the form.
10         A.   I do believe they found a audio
11    recording that was used. I don't even know if the
12    audio recording was used, but I do believe they
13    found an audio recording.
14         Q.   And had you, in fact, previously
15    recorded a talk that you had provided to prospects
16    of Bama Boyz?
17              MS. EDWARDS: Object to the form.
18         A.   Could you say that again?
19         Q.   Had you previously recorded a talk
20    that you had given to prospects of Bama Boyz?
21              MS. EDWARDS: Object to the form.
22         A.   I recorded — well, let me take that
23    back. I did not record it. I did not record an
```

Page 101

1 audio during the talks that I had with my
2 prospects.
3      Q.   Do you know whether someone else
4 recorded a talk that you gave?
5      A.   Somebody else did.
6      Q.   Do you know who recorded the
7 conversation?
8      A.   I don't recall right now.
9      Q.   Did you have a disk of this audio
10 recording in your car?
11          MS. EDWARDS:  Object to the form.
12 And what do you mean by this recording?
13      Q.   This recording that is referenced in
14 Defendant's Exhibit 5.
15          MS. EDWARDS:  I believe we have just
16 said he can't testify as to whether this is a
17 complete transcript of any recording.
18          MS. MAYS:  I didn't ask him was it
19 complete.  I asked him whether he had a disk that
20 had been located in his car by the Internal Affairs
21 investigators that contained a talk that he had
22 provided to his prospects.
23          MS. EDWARDS:  He has already answered

Page 102

1 that question, but I believe you just asked a
2 different one.
3          MS. MAYS:  Could you read that back.
4          (Record read.)
5          MS. EDWARDS:  Same objection.
6      A.   I don't know where they got the
7 recording from.  I don't know.
8      Q.   Do you deny that there was a
9 recording of a talk that you gave to prospects?
10          MS. EDWARDS:  Object to the form.
11      A.   No.
12      Q.   Okay.  Have you ever heard that
13 recording?
14          MS. EDWARDS:  Object to the form.
15      A.   Have I ever heard?
16      Q.   Have you heard that audio recording
17 of the talk that you gave to the Bama Boyz
18 prospects that was admitted during your personnel
19 board hearing?
20          MS. EDWARDS:  Object to the form.
21      A.   I have heard an audio recording of
22 the talk that I gave to the prospects.
23      Q.   And do you recall when you gave that

Page 103

1 talk that was recorded?
2      A.   No.
3      Q.   Do you recall who was present when
4 you gave that talk?
5      A.   Yes.
6      Q.   Who was present?
7      A.   Danny Timis.  I remember the face of
8 one prospect and I don't remember his name.  And
9 that is all I recall right now.
10      Q.   Do you know how many people were
11 present?
12      A.   No.
13      Q.   Do you know who transcribed this
14 recording?
15          MS. EDWARDS:  Object to the form.
16      A.   No.
17      Q.   You don't know who transcribed it, is
18 that what you said?
19      A.   No.
20      Q.   Do you recall saying during that talk
21 that outlaw motorcycle clubs are one percenters?
22          MS. EDWARDS:  Object to the form.
23      A.   If I could hear the recording, I can

Page 104

1 authenticate whether or not I said that.
2      Q.   Okay.
3          MS. MAYS:  Can we go off the record?
4          (Off-the-record discussion.)
5          (Lunch break taken.)
6      Q.   (BY MS. MAYS:)  Before we took a
7 lunch break, I was asking you some questions about
8 an audio recording and we will come back to that
9 topic.
10      A.   Okay.
11      Q.   To your knowledge, have any members
12 of the Bama Boyz ever been involved in a physical
13 altercation with any members from Outcast?
14      A.   Not to my knowledge.
15      Q.   To your knowledge, have any members
16 of Bama Boyz ever been involved in a verbal
17 altercation with members of Outcast?
18      A.   Not to my knowledge.
19      Q.   Did you request permission from
20 anyone in the police department before starting
21 Bama Boyz?
22      A.   No.
23      Q.   Have you ever sought permission from

## Page 105

1 the police department before engaging in any
2 activity outside of work?
3          MS. EDWARDS: Object to the form.
4     A.    Could you restate that?
5     Q.    Sure. Have you ever sought
6 permission from the police department before
7 joining another organization?
8          MS. EDWARDS: Object to the form.
9     A.    Joining another organization such
10 as -- I don't understand.
11    Q.    Any organization, have you ever
12 sought permission from the police department?
13    A.    I had a business called Wiregrass
14 Hypnosis and Polygraph and I received work permits
15 for that. I had a business Total Car Care and
16 Detail. I don't recall if it was even a policy
17 that we had to get permission to do that, but I'm
18 not certain right now on that.
19    Q.    When you opened your business
20 Wiregrass Hypnosis and Polygraph, did you get
21 permission from the Dothan Police Department?
22    A.    Yes.
23    Q.    And why did you have to get

## Page 106

1 permission?
2          MS. EDWARDS: Object to the form.
3     A.    At the time there was a policy
4 regarding outside employment.
5     Q.    And was that policy in place to
6 prevent you from engaging in any employment that
7 would conflict with your work for the police
8 department?
9          MS. EDWARDS: Object to the form.
10    A.    I'm not sure without reading the
11 policy again.
12    Q.    But that would make sense, the police
13 department didn't want you to engage in any work
14 that would conflict with the work that you were
15 doing for the department?
16          MS. EDWARDS: Object to the form.
17    Q.    Is that right?
18    A.    Unknown.
19    Q.    Does that make sense?
20          MS. EDWARDS: Object to the form.
21    A.    What makes sense to me and to you may
22 be two different things.
23    Q.    Did it make sense to you that the

## Page 107

1 police department wouldn't want you to engage in
2 work that would conflict with the work that you
3 were doing for the department?
4          MS. EDWARDS: Object to the form. I
5 don't want you to speculate on what you --
6     A.    I don't know.
7     Q.    You don't know whether or not that
8 makes sense. What is a blessing?
9          MS. EDWARDS: Object to the form.
10    A.    The knowledge that I have of what a
11 blessing is to make sure -- making sure that you
12 don't have any issues with another club that may be
13 in that particular area about existing in harmony
14 in a specific locale/location.
15    Q.    You say making sure you don't have
16 any issues. What types of issues?
17          MS. EDWARDS: Object to the form.
18    A.    Earlier you spoke of territorial, so
19 just trying to ensure that when I came on the scene
20 with my club there was no issues, that they didn't
21 mind us being in the same area, there was just no
22 problem. Ensuring safety, that is basically it.
23    Q.    As a member of the Dothan Police

## Page 108

1 Department could you offer safety to the members of
2 your riding club?
3          MS. EDWARDS: Object to the form.
4     A.    As a member of the Dothan Police
5 Department, could I offer safety to my club? What
6 do you mean by that?
7     Q.    Could you offer them some protection?
8          MS. EDWARDS: Object to the form.
9     A.    As a police officer?
10    Q.    As a police officer.
11    A.    As a police officer on duty offer
12 safety to people in my community, which would be if
13 they were in my community and jurisdiction, yes.
14    Q.    You rode with the Bama Boyz for
15 several years before receiving a blessing; is that
16 right?
17          MS. EDWARDS: Object to the form.
18    A.    Yes.
19    Q.    How long did you ride with the Bama
20 Boyz before receiving a blessing?
21    A.    I don't know.
22    Q.    From what motorcycle club did you
23 receive a blessing for your Dothan Bama Boyz?

Page 109

```
1        A.   Outcast.
2        Q.   Any other organization that you
3   sought a blessing from?
4        A.   No.
5        Q.   What motorcycle club did you receive
6   a blessing from for your Anniston Bama Boyz?
7        A.   Outcast, Sin City, Easy Riders.  That
8   is all I can remember right now.
9        Q.   Okay.  Do you know whether Outcast
10   was considered an outlaw motorcycle club?
11        MS. EDWARD:  Was your question did or
12   do?
13        (Record read.)
14        MS. EDWARDS:  I'm going to object to
15   the form anyway.
16        A.   I didn't know for sure.
17        Q.   You didn't know for sure at what
18   time?
19        A.   When I asked for the blessing.
20        Q.   Did you have some thought that they
21   were?
22        A.   Yes.
23        Q.   Did you have some information that
```

Page 110

```
1   led you to believe that they were an outlaw
2   motorcycle club?
3        A.   Yes, but the information wasn't
4   authenticated.  I didn't know.  I was just told.
5        Q.   Did you conduct any research to
6   confirm whether they were an outlaw motorcycle
7   club?
8        A.   No.
9        Q.   At the time that you sought the
10   blessing from the Sin City for the Anniston Bama
11   Boyz, did you know whether they were an outlaw
12   motorcycle club?
13        A.   The same answer.  I didn't know for
14   sure.
15        Q.   Did you have any information that led
16   you to believe that they were an outlaw motorcycle
17   club?
18        A.   The same answer, I was told that they
19   possibly could be.
20        Q.   Did you conduct any research to
21   determine whether they were an outlaw motorcycle
22   club?
23        A.   No.
```

Page 111

```
1        Q.   At the time that you sought the
2   blessing from Easy Riders, did you know whether
3   they were an outlaw motorcycle club?
4        A.   No.
5        Q.   Did you have any information that led
6   you to believe that they might be an outlaw
7   motorcycle club?
8        A.   No.
9        Q.   Did you conduct any research to
10   determine whether or not they were an outlaw
11   motorcycle club?
12        A.   No.
13        Q.   At the time that you sought the
14   blessing from Outcast for the Dothan Bama Boyz, did
15   you know whether there were members of Outcast who
16   were one percenters?
17        A.   Could you repeat that?
18        Q.   At the time that you sought a
19   blessing from Outcast for the Dothan Bama Boyz, do
20   you know whether --
21        A.   Okay.
22        Q.   -- there were any members of the
23   Outcast that were one percenters?
```

Page 112

```
1        MS. EDWARDS:  Object to the form.
2        A.   No.
3        Q.   Did you have any information that
4   would lead you to believe that at that time --
5        A.   No, not that I know of.
6        Q.   Is it your testimony that at that
7   time when you asked for the blessing for the Dothan
8   Bama Boyz, you didn't know whether Outcast had
9   members who were one percenters?
10        A.   That is correct, not that I know of.
11        Q.   Did you conduct any research to
12   determine whether any of the Outcast members were
13   one percenters?
14        A.   No.
15        Q.   At the time that you sought the
16   blessing from Sin City, do you know whether any of
17   its members were one percenters?
18        A.   No.
19        Q.   At the time you sought the blessing
20   from Easy Riders, did you have any knowledge that
21   any of its members were one percenters?
22        A.   No.
23        Q.   Did you conduct any research to
```

28 (Pages 109 to 112)

## Page 113

1 determine whether any members of Sin City were one
2 percenters?
3    A.   No.
4    Q.   Did you conduct any research to
5 determine whether any members of Easy Riders were
6 one percenters?
7    A.   No.
8    Q.   Prior to requesting a blessing from
9 Outcast, had you received any threats — let me
10 rephrase that. Prior to you requesting a blessing
11 on behalf of the Bama Boyz from Outcast, had Bama
12 Boyz received any threats of violence from any
13 other motorcycle clubs?
14    A.   No, not that I am aware of.
15    Q.   Was Outcast the first motorcycle club
16 that you sought a blessing from?
17    A.   Yes.
18    Q.   Do you think you should have asked
19 questions about whether Outcast was an outlaw
20 motorcycle club?
21    MS. EDWARDS: Object to the form.
22    A.   Do I think that I should have? It
23 didn't cross my mind that I needed to.

## Page 114

1    Q.   How did you go about requesting the
2 blessing from Outcast for the Dothan Bama Boyz?
3    A.   By phone call.
4    Q.   Who did you call?
5    A.   Big O.
6    Q.   Who is Big O?
7    A.   A member of Outcast Motorcycle Club.
8    Q.   Do you know when you called Big O?
9    A.   No.
10    Q.   What did you say when you called Big
11 O?
12    A.   I don't recall.
13    Q.   How did you go about asking for the
14 blessing?
15    A.   I don't recall any specific words
16 that we had during that conversation at all. I
17 just — I don't recall any words in the
18 conversation at all.
19    Q.   What can you recall about that
20 conversation?
21    A.   The only thing that I can recall is
22 that we were okay, that my club was fine.
23    Q.   Did you ask anyone else for a

## Page 115

1 blessing? Did you ask anyone else in Outcast for a
2 blessing for the Bama Boyz in Dothan?
3    A.   No.
4    Q.   Is Big O a biker nickname?
5    A.   Oh, is that his nickname?
6    Q.   Yes, is that his nickname?
7    A.   I don't know. That is just what I
8 was told he goes by, so I don't know if it's
9 nickname, if it's real name, I don't know.
10    Q.   Do you know if he goes by any other
11 names?
12    A.   I wouldn't know.
13    Q.   Do you know his real name?
14    A.   I don't know that Big O isn't his
15 real name. I don't know.
16    Q.   How did you know to call Big O and
17 ask him for the blessing?
18    A.   Someone in the local biker community
19 suggested it.
20    Q.   Who was that someone?
21    A.   I don't know.
22    Q.   Who did you contact to request a
23 blessing from Outcast for the Anniston Bama Boyz?

## Page 116

1    A.   The same person.
2    Q.   And how did you contact Big O to
3 request a blessing for Anniston?
4    A.   By phone.
5    Q.   And what do you recall about that
6 conversation?
7    A.   Can you be more specific?
8    Q.   You said that you talked to Big O by
9 phone to request a blessing for the Anniston Bama
10 Boyz?
11    A.   Right.
12    Q.   What did you say when you called Big
13 O to request that blessing?
14    A.   I told him that I was thinking about
15 starting a chapter in Anniston and were we okay.
16    Q.   And how did he respond?
17    A.   That I would need to try to get — I
18 need to try to get the same type of blessing
19 from — I'm not sure if he said some clubs in
20 Anniston, but I needed to try to get some other
21 blessings pretty much.
22    Q.   Did he say anything else?
23    A.   I think he said he had broken his

Page 117

1 arm. I think he said he had broken his arm.
2     Q.   Anything else?
3     A.   No.
4     Q.   And during that phone call, did he
5 grant you the blessing from Outcast?
6     A.   He said we were okay to start, but I
7 would have to get two other okays, I need to get
8 two other okays. Like I said, I'm not one hundred
9 percent sure if he said from Anniston or just two
10 other okays, but I remember it was just more than
11 the one.
12     Q.   When you say he gave you the okay, is
13 that the same thing as giving you the blessing?
14     A.   Yes.
15     Q.   What other blessings did he say you
16 needed to get?
17     A.   The two he mentioned — well, he
18 didn't say those specifically. He didn't say
19 specifically.
20     Q.   How did you know that you should get
21 a blessing from Sin City and Easy Riders?
22     A.   I didn't. I just called some clubs
23 in the area and Sin City was in the area. And to

Page 118

1 my knowledge that I remember right now, Easy Riders
2 I think was a large club there. And I don't recall
3 how Sin City came up.
4     Q.   How much time passed from the time
5 that you called Big O to request the blessing from
6 the Dothan Bama Boyz until the time that you called
7 to request the blessing for the Anniston club?
8     A.   I don't know.
9     Q.   Do you know whether it was a matter
10 of years?
11     A.   I don't know. I don't know.
12     MS. EDWARDS: Take time to think
13 about it. If you don't know, you don't know. But
14 if you think you can remember and you just need a
15 moment to think about it, think about it.
16     A.   I don't know. If I said it was over
17 a year or two, I don't know.
18     MS. EDWARDS: Fair enough.
19     A.   I know I did it, but I don't know how
20 long it took.
21     Q.   Had you interacted with Big O in
22 between the time that you asked for the blessing
23 for Dothan and the time that you asked for

Page 119

1 Anniston?
2     MS. EDWARDS: I want to object to the
3 form on that.
4     A.   Could you repeat the question again?
5     Q.   Had you interacted with Big O at any
6 time after you requested the blessing for Dothan
7 but before requesting it for Anniston?
8     MS. EDWARDS: Object to the form.
9     A.   Not to my knowledge right now, not to
10 my knowledge right now.
11     Q.   Who did you contact to request the
12 blessing from Sin City?
13     A.   I believe it was Big Meat, but I'm
14 not 100 percent certain.
15     Q.   Is Big Meat a nickname?
16     A.   I assume.
17     Q.   Do you know Big Meat's real name?
18     A.   No.
19     Q.   I assume Big Meat is not on his birth
20 certificate.
21     A.   I couldn't tell you.
22     Q.   And I don't expect you to know that.
23     A.   I don't know why they call him that.

Page 120

1     Q.   Do you know why Big O's nickname was
2 Big O?
3     A.   No, I don't.
4     Q.   How did you go about asking Big Meat
5 for a blessing?
6     A.   I was given his name and number by
7 someone I don't know and I called and I spoke to
8 him over the phone.
9     Q.   And what did you say in that
10 conversation?
11     A.   That I was thinking about starting a
12 motorcycle club, a chapter in Anniston and Big O
13 said that he didn't have any problem with it and
14 Big Meat said he didn't have any problem with it
15 if, in fact, that is who I did talk to because I
16 said I wasn't sure it was Big Meat, but I think it
17 was, but he said he didn't have a problem with it.
18     Q.   Do you recall when you talked to him?
19     A.   No, ma'am.
20     Q.   Who did you talk to to receive a
21 blessing from Easy Riders?
22     A.   Catfish.
23     Q.   Do you know whether that is a

30 (Pages 117 to 120)

Page 121

1  nickname?
2      A.   I don't know.
3      Q.   When did you talk to Catfish?
4      A.   I do not know.
5      Q.   How did you go about contacting
6  Catfish?
7      A.   Somebody said that he was the -- they
8  said that he was an officer in -- he was like a
9  national officer of Easy Riders, and got his number
10  and called.
11      Q.   And what did you say when you called
12  Catfish?
13      A.   That I was thinking about starting a
14  chapter in Anniston and that Big O and Big Meat
15  said they were fine with it.
16      Q.   And did you, in fact, ask for a
17  blessing?
18      A.   He said he was okay with it.
19      Q.   Did you ask him whether he was okay
20  with it?
21      A.   Yes, I'm sure I did.
22      Q.   Did you have to do anything in return
23  for receiving a blessing?

Page 122

1      A.   Nothing.
2      Q.   So you didn't have to do anything in
3  return for receiving a blessing from Outcast, Sin
4  City or Easy Riders?
5      A.   That is correct.
6      Q.   Didn't have to make any promises?
7      A.   Nothing.
8      Q.   Did you have to pledge allegiance or
9  support to their organizations?
10      A.   No, nothing.
11      Q.   Were you required to attend monthly
12  president's meetings?
13      A.   No.
14      Q.   Did you ever have any meetings with
15  members from Outcast, Sin City or Easy Riders?
16          MS. EDWARDS:  Object to the form.
17      A.   Yes.
18      Q.   With which of those motorcycle clubs
19  have you had meetings?
20      A.   Outcast.
21      Q.   When have you had meetings with
22  Outcast?
23      A.   I can't remember.

Page 123

1      Q.   How many times have you met with
2  members from Outcast?
3      A.   I don't know an exact number.
4      Q.   Do you know whether it was more than
5  five?
6      A.   I don't think it was.
7      Q.   But it was more than once or twice?
8          MS. EDWARDS:  Object to the form.
9      Q.   Was it more than once?
10      A.   It was more than once.  Maybe three,
11  but I'm not for sure.
12          MS. MAYS:  We will take just a
13  minute.
14          (Brief pause.)
15      A.   I want to clarify the blessings that
16  you are asking about, that is to the best of my
17  knowledge right now, the ones I'm telling you I got
18  the blessings from.
19      Q.   You are saying that the people that
20  you requested the blessings from, that is the best
21  of your recollection, you have told me the people
22  that you requested the blessings from?
23      A.   Those people in those clubs, that is

Page 124

1  the best I remember right now.
2      Q.   But you do remember requesting a
3  blessing from those three clubs, Outcast, Sin City
4  and Easy Riders?
5      A.   I remember requesting the blessings
6  from three clubs and I believe that those were the
7  three, but I'm not saying I'm 100 percent certain
8  that it was those three.  That is just why I
9  believe it is right now.  I don't have anything to
10  kind of confirm that.  That is just what I believe
11  right now.
12      Q.   You said that you had possibly three
13  meetings with members of Outcast.  What do you meet
14  with members of the Outcast about?
15          MS. EDWARDS:  Object to the form.
16      A.   One meeting was myself and Big O and
17  that was about the blessing that we discussed
18  already.  The other meeting or two was when I think
19  some other clubs were present.  We all met together
20  but it wasn't -- I guess it wasn't a meeting, so to
21  speak, for Outcast.  It was a meeting -- multiple
22  club members.
23      Q.   What was the meeting for?

31  (Pages 121 to 124)

Freedom Court Reporting                877-373-3660

Page 125

```
 1          MS. EDWARDS: Object to the form.
 2      A.   Which meeting?
 3      Q.   You said it wasn't a meeting for
 4  Outcast. What was the meeting for?
 5          MS. EDWARDS: Object to the form.
 6      A.   The meetings that I recall were with
 7  clubs, representative of clubs, representative
 8  clubs come together to discuss maybe having a
 9  multi-club charity event. It was also to try to
10  make sure that we didn't interact on the same days
11  as far as I'm going to have a charity ride on
12  another ride and another club had to kind of split
13  their charity. We discussed different motorcycle
14  events in the community. We discussed -- I'm sure
15  there was more discussion than that and I just
16  can't remember right now. I'm just trying to --
17  that is all I can remember right now.
18      Q.   So there were one or two meetings
19  where you met with Outcast and members of other
20  motorcycle clubs to discuss charity events and that
21  y'all didn't host other events on the same day?
22          MS. EDWARDS: Object to the form.
23      A.   And other stuff that I said.
```

Page 126

```
 1      Q.   And other motorcycle events in the
 2  community?
 3          MS. EDWARDS: Object to the form.
 4      A.   Yes.
 5      Q.   You said you met with Big O. Did you
 6  meet with him in person?
 7      A.   Uh-huh.
 8      Q.   When did you meet with him in person?
 9      A.   I can't remember.
10      Q.   You said you met with him in person
11  about a blessing. Was that the blessing related to
12  Dothan or the blessing related to Anniston?
13      A.   Anniston.
14      Q.   Was there also a phone call with him
15  related to the blessing for Anniston?
16      A.   Yes.
17      Q.   What did you say when you met with
18  him in person?
19      A.   Pretty much confirming the same
20  thing.
21      Q.   Confirming the same thing you had
22  previously talked with him on the phone about?
23      A.   Right.
```

Page 127

```
 1      Q.   Does every club that requests a
 2  blessing receive it?
 3          MS. EDWARDS: Object to the form.
 4      A.   I don't know.
 5      Q.   What does it mean to have the
 6  blessing of -- what does it mean to have a blessing
 7  or to receive a blessing?
 8          MS. EDWARDS: Object to the form.
 9      A.   From --
10      Q.   What does it mean to receive a
11  blessing from Outcast?
12          MS. EDWARDS: Object to the form.
13      A.   What I know, which is, as I said,
14  isn't in any book, rule, regulations, procedure or
15  whatever, what I know to receive a blessing means
16  that you can pretty much coexist in the same areas
17  without any issues.
18      Q.   What does it mean to have a blessing
19  from Easy Riders?
20          MS. EDWARDS: Object to the form.
21      A.   My answer would be the same for any
22  blessing of any club, which is just to coexist in
23  harmony.
```

Page 128

```
 1      Q.   Was it important for you to receive a
 2  blessing from Outcast?
 3          MS. EDWARDS: Object to the form.
 4      A.   Define important.
 5      Q.   What does important mean to you?
 6      A.   You are asking me the question.
 7      Q.   I am. My question to you now is what
 8  does important mean to you?
 9          MS. EDWARDS: Object to the form.
10      A.   Important means urgent to me. Is
11  that what you mean?
12      Q.   Was it important to you to receive
13  the blessing from Outcast?
14          MS. EDWARDS: Object to the form.
15      A.   It was not urgent to me.
16      Q.   And it wasn't required for you to
17  form a motorcycle club?
18          MS. EDWARDS: Object to the form.
19      A.   We were already formed.
20      Q.   You were already formed as a
21  motorcycle club?
22      A.   Uh-huh.
23      Q.   You were already formed as a
```

| Page 129 | |
|---|---|
| 1 | motorcycle club before you received a blessing from |
| 2 | Outcast or any of the other motorcycle clubs; is |
| 3 | that right? |
| 4 | A. Right. |
| 5 | Q. Do you still own a motorcycle? |
| 6 | A. Yes. |
| 7 | Q. Do you own multiple motorcycles? |
| 8 | A. I wish. |
| 9 | Q. Do you own any other personal |
| 10 | vehicles? |
| 11 | A. Do I own something other than a |
| 12 | motorcycle? |
| 13 | Q. Yes. |
| 14 | A. Yes. |
| 15 | Q. Do you have the blessing of any |
| 16 | organization or group to use your personal |
| 17 | vehicles? |
| 18 | MS. EDWARDS: Object to the form. |
| 19 | A. The bank. |
| 20 | Q. Anybody other than the bank? |
| 21 | A. Not to my knowledge. |
| 22 | Q. Do you drive your own personal |
| 23 | vehicle without having obtained the blessing of any |

| Page 130 | |
|---|---|
| 1 | other organization; is that right? |
| 2 | A. The bank. |
| 3 | Q. Did you call the bank to ask them for |
| 4 | a blessing to coexist -- |
| 5 | A. The money. |
| 6 | Q. -- so there wouldn't be any issues? |
| 7 | A. In a sense, yes, I asked them could I |
| 8 | borrow the money so I can drive their vehicle until |
| 9 | I paid it off so I guess you could call it that. |
| 10 | Q. Did you ask Outcast to borrow any |
| 11 | money? |
| 12 | A. No. |
| 13 | Q. Have you asked any other motorcycle |
| 14 | club to borrow any money? |
| 15 | A. No. |
| 16 | Q. Have you ever seen a copy of -- let |
| 17 | me back up and ask this: Do you know whether |
| 18 | Outcast, Easy Riders or Sin City Disciples have |
| 19 | bylaws? |
| 20 | A. I don't know. |
| 21 | Q. Prior to August of 2013, had you |
| 22 | attended any events hosted by Outcast? |
| 23 | MS. EDWARDS: Object to the form. |

| Page 131 | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. What events had you attended hosted |
| 3 | by Outcast prior to August of 2013? |
| 4 | A. I believe it was an anniversary |
| 5 | party. |
| 6 | Q. Any other events hosted by Outcast |
| 7 | that you attended prior to August of 2013? |
| 8 | A. Yes. It was a -- I think they called |
| 9 | it a coming out party. |
| 10 | Q. Are those the only two? |
| 11 | A. That I remember right now. |
| 12 | Q. Do you recall when you attended the |
| 13 | anniversary party? |
| 14 | A. No. |
| 15 | Q. Where was the party? |
| 16 | A. In -- I can't answer with certainty. |
| 17 | Q. Was it at their clubhouse? |
| 18 | A. Yes. |
| 19 | Q. Was it in Dothan? |
| 20 | A. One was. |
| 21 | Q. One anniversary party was? |
| 22 | MS. EDWARDS: Object to the form. |
| 23 | A. No. |

| Page 132 | |
|---|---|
| 1 | Q. I'm only asking about the anniversary |
| 2 | party that you said you attended. You said it was |
| 3 | at their clubhouse? |
| 4 | A. Uh-huh. |
| 5 | Q. In Dothan? |
| 6 | MS. EDWARDS: Object to the form. |
| 7 | Q. It was at their clubhouse, but not in |
| 8 | Dothan? |
| 9 | MS. EDWARDS: I object to the form. |
| 10 | A. Correct. |
| 11 | Q. In what city was the clubhouse |
| 12 | located? |
| 13 | A. I'm not for certain, that is what I |
| 14 | was saying earlier. |
| 15 | Q. Was it in Alabama? |
| 16 | A. Yes. |
| 17 | Q. Okay. When did you attend the coming |
| 18 | out party? |
| 19 | A. I don't know. |
| 20 | Q. Do you know where the coming out |
| 21 | party was hosted? |
| 22 | A. Yes. |
| 23 | Q. Where? |

Page 133

1    A.   It was in Dothan.

2    Q.   What is a coming out party?

3    A.   When a motorcycle club starts a new

4 chapter, they will have what we call a coming out

5 party just to say hey, we are here.

6    Q.   Were you invited to attend the coming

7 out party?

8    MS. EDWARDS: Object to the form.

9    A.   I don't recall.

10    Q.   Do you recall how you knew about the

11 party?

12    A.   Not specifically, no.

13    Q.   Do you recall whether you were

14 invited to the anniversary party?

15    A.   No, I don't remember.

16    Q.   Do you recall how you knew about the

17 party?

18    A.   No.

19    Q.   Did Bama Boyz host events that

20 Outcast members attended?

21    MS. EDWARDS: Object to the form.

22    A.   Yes.

23    Q.   Where were those events?

Page 134

1    A.   The anniversary party, and that is

2 all that I remember right now.

3    Q.   Did Bama Boyz invite Outcast to the

4 anniversary party?

5    MS. EDWARDS: Object to the form.

6    A.   I'm not for sure right now.

7    Q.   Had you ever been to the Outcast

8 clubhouse in Dothan prior to August of 2013?

9    MS. EDWARDS: Object to the form.

10    A.   Yes.

11    Q.   For what reason?

12    A.   Their coming out party.

13    Q.   At any other time had you been to the

14 clubhouse?

15    A.   What other time?

16    Q.   At any other time prior to August of

17 2013 had you been to the Outcast clubhouse in

18 Dothan?

19    A.   Yes.

20    Q.   Do you recall how many times prior to

21 August of 2013?

22    A.   No.

23    Q.   Do you know whether it was more than

Page 135

1 five?

2    A.   As I stated earlier, I believed that

3 it was twice, to my knowledge right now, and I

4 believe I said earlier it was once to my knowledge

5 right now in Alabama and I'm not sure the exact

6 city.

7    Q.   Is that once you visited an Outcast

8 clubhouse in Alabama?

9    A.   Uh-huh.

10    Q.   And then twice you visited what, you

11 said I believe it was only twice?

12    A.   In Dothan.  And when you said less

13 than five times and I'm yeah, but that is what I

14 believe right now.  I'm not 100 percent certain.

15 It was three specific times.

16    Q.   How would you describe the

17 relationship between Bama Boyz and Outcast

18 Motorcycle Club?

19    MS. EDWARDS: Object to the form.

20    A.   As far as what?

21    Q.   How would you describe the

22 relationship between the Bama Boyz Motorcycle Club

23 and the Outcast Motorcycle Club at the time that

Page 136

1 you received the blessing?

2    MS. EDWARDS: Object to the form.

3    A.   I don't know.  They really didn't

4 know us.

5    Q.   Was Bama Boyz a supporter club for

6 Outcast?

7    A.   No.

8    Q.   Did Outcast provide Bama Boyz with

9 some level of protection?

10    A.   No.

11    Q.   What was the purpose of receiving the

12 blessing?

13    A.   You asked me that one time and it's

14 to make sure that we mutually could coexist without

15 any issues.

16    Q.   You couldn't mutually — did you

17 believe that you couldn't mutually coexist without

18 receiving their blessing?

19    MS. EDWARDS: Object to the form.

20    A.   I didn't know.

21    Q.   What does it mean to wear your

22 colors?

23    A.   To put on a vest that has your logo

Page 137

1  of your own club.
2      Q.    Under what circumstances can you be
3  stripped of your colors?
4          MS. EDWARDS:  Object to the form.
5      A.    The knowledge that I have, again
6  which is unwritten, there is no rule, no set
7  policy, I have been told that they can be taken
8  from a club that is considered to be your outlaw
9  motorcycle club.  The reasons why, I don't know
10  their reasons why.  But I have heard in the
11  motorcycle community that that can be done.
12      Q.    Did Bama Boyz have a patch?
13      A.    I don't understand what you mean.
14      Q.    What is a patch in the motorcycle
15  community?
16      A.    I don't know unless it's a patch,
17  something you sew on material.
18      Q.    Did Bama Boyz have a specific patch
19  that identified riders as Bama Boyz?
20      A.    Yes.
21      Q.    Did Outcast have a specific patch
22  that identified them as Outcast?
23      A.    Yes.

Page 138

1      Q.    Did Outcast also have patches that
2  they provided to supporter clubs that were called
3  supporter patches?
4          MS. EDWARDS:  Object to the form.
5      A.    Yes.
6      Q.    Did Bama Boyz ever receive a
7  supporter patch from Outcast?
8      A.    No.
9          MS. EDWARDS:  Object to the form.
10  You can answer.
11      A.    No.
12      Q.    Did Bama Boyz ever receive any type
13  of patch from Outcast?
14      A.    A few members in Bama Boyz received a
15  patch from Outcast.
16      Q.    And what type of patch did they
17  receive?
18      A.    It's called a Rest in Peace patch, to
19  my knowledge.
20      Q.    Do you know why they received that
21  Rest in Peace patch?
22      A.    I would be speculating so I'm going
23  to say no.

Page 139

1      Q.    Do you know whether Outcast would
2  give that patch to a motorcycle club that it had
3  not blessed?
4          MS. EDWARDS:  Object to the form.
5      A.    I don't know.
6      Q.    Are there certain circumstances when
7  a motorcycle club gives another motorcycle club a
8  patch?
9          MS. EDWARDS:  Object to the form.
10      A.    I don't know.
11      Q.    Did Bama Boyz ever give another
12  motorcycle club a patch?
13      A.    No.
14          (Whereupon, Defendant's Exhibit 6 was
15          marked for identification.)
16      Q.    I'll show you what I have marked as
17  Defendant's Exhibit 6.
18      A.    (Reviewing document.)
19      Q.    Do you recognize this as the
20  statement of EEO policy that was in effect during
21  your employment with the City of Dothan?
22          MS. EDWARDS:  I want you to review it
23  before you answer.

Page 140

1      A.    (Reviewing document.)
2          MS. EDWARDS:  I'll let you read it
3  and I'm going to run to the restroom while you --
4  could we take just a couple of minutes while he
5  looks over this?
6          (Short break taken.)
7      Q.    (BY MS. MAYS:)  Looking at Exhibit
8  Number 6 --
9      A.    Okay.
10      Q.    -- do you recognize this as the
11  statement of the EEO policy at the City of Dothan?
12      A.    I do not.  One of them, number six,
13  the first page was signed by then Mayor Pat Thomas
14  2007, and it appears to be the same thing,
15  photostat copies of all three signed by mayor -- it
16  looks like name Mayor Mike Schmitz printed up under
17  there 2009 and 2012, Mayor Schmitz, looks like
18  three separate statements of EEO policy but I can't
19  authenticate that is what I read, understand, seen.
20      Q.    Do you know -- I'm sorry, were you
21  done answering?
22      A.    Yes, ma'am.
23      Q.    Do you know whether the City of

35 (Pages 137 to 140)

Freedom Court Reporting                    877-373-3660

Page 141

```
1    Dothan had a statement of EEO policy when you were
2    employed there?
3         A.   Yes, they did.
4         Q.   And do you know whether it was the
5    City of Dothan's policy to ensure affirmative
6    action and providing equal employment opportunities
7    with regard to race, creed, religion, color, sex,
8    age, handicapped persons or national origin?
9              MS. EDWARDS:  Object to the form.
10        A.   No.  I have heard something, can't
11   testify that this is exactly what they have said,
12   but I don't think they adhered to it if that is
13   their policy of that statement that you just made.
14        Q.   Were there bulletin boards posted
15   throughout the police department?
16        A.   Yes, we have bulletin boards
17   throughout the police department.
18        Q.   And do you know whether or not the
19   statement of EEO policy was posted on the bulletin
20   board?
21        A.   I don't.
22        Q.   You don't know one way or the other?
23        A.   No.
```

Page 142

```
1         Q.   Did you ever receive any training on
2    the City's EEO policy?
3              MS. EDWARDS:  Object to the form.
4         A.   No.  But I remember an EEO Officer
5    Thornton coming in and giving some type of
6    training, but I don't remember exactly what it is,
7    I'm just saying because he was the EEO officer and
8    I remember him coming in, but I can't swear to you
9    that it was EEO training.
10        Q.   Do you remember if that is all it
11   was?
12        A.   I don't recall.
13             (Whereupon, Defendant's Exhibit 7 was
14              marked for identification.)
15        Q.   Will you look at what has been marked
16   as Defendant's Exhibit Number 7?
17        A.   Yes, ma'am.
18        Q.   Were there general orders issued by
19   the Dothan Police Department?
20             MS. EDWARDS:  Object to the form.
21        A.   Yes.
22        Q.   Is Defendant's Exhibit 7 Dothan
23   Police Department's general order related to mobile
```

Page 143

```
1    data terminals and electronic messaging?
2              MS. EDWARDS:  Object to the form.
3         A.   That is what it says on this
4    Exhibit 7.
5         Q.   Were you aware that this policy was
6    in place when you were employed with the City?
7         A.   On the front of Exhibit 7 there is a
8    dark box that has some writing on it, but some of
9    it I can't make out.  I'm not sure about that.  I
10   don't know if this is a policy that was in place
11   while I was attending.  I'm not sure of the
12   authenticity of this policy.
13             On Page 3 of 7 of the same policy at
14   number six, there are some kind of writing
15   through -- I don't know if that was supposed to be
16   redacted or not, but it's darker and it's marked
17   through, some of it, as far as legibility is
18   concerned so I have never seen anything like
19   that --
20        Q.   Did you have --
21        A.   -- in the policy.
22        Q.   Did you have access to the City's
23   general -- police department's general orders when
```

Page 144

```
1    you were employed with the City?
2         A.   I did.
3         Q.   And if this policy was in effect
4    beginning in August of 2010, as of August 2010 you
5    would have had access to this policy?
6              MS. EDWARDS:  Object to the form.
7         A.   If it were in effect at that time and
8    I have read and signed off that I read and
9    understood and saw the policy or whatever, I would.
10   But I cannot do that with this.  I just can't
11   verify that this is what I may have seen or I can't
12   verify that is something I would have seen.
13        Q.   If you look on Page 3 of 7 of this
14   exhibit, when you were employed at the City of
15   Dothan were you aware that it was the policy of the
16   City that discretionary viewing, downloading and/or
17   transmitting materials other than that required for
18   police business that involved the use of obscene
19   language, images, jokes, sexually explicit
20   materials or messages that were offensive or
21   disparage any person or group or classification of
22   individuals was prohibited?
23        A.   Again, you are reading from this form
```

Page 145

1    that I said that I cannot authenticate.
2        Q.    I'm asking you about the form. I'm
3    asking you whether you knew that viewing,
4    downloading, transmitting materials that involved
5    the use of obscene language, images, jokes,
6    sexually explicit materials or messages that were
7    offensive or disparaging to any person, group or
8    classification was prohibited by the City of
9    Dothan?
10       MS. EDWARDS:  Object to the form.
11       A.    You are referring from the same form
12   that I just said that I'm not sure if this form is
13   something that I received by the Dothan Police
14   Department, but you are reading from it.
15       Q.    Do you know whether that was a
16   policy?
17       MS. EDWARDS:  Object to the form.
18       A.    I don't know.
19       Q.    Do you know whether you were
20   prohibited from viewing sexually obscene materials
21   on your company phone?
22       A.    As it relates to this policy?
23       Q.    No, just in general. When you were

Page 146

1    an employee at the City of Dothan do you know --
2    rephrase that.
3        When you were an employee at the City
4    of Dothan, did you know that you were prohibited
5    from viewing sexually explicit materials on your
6    company-issued phone?
7        A.    Yes.
8        (Whereupon, Defendant's Exhibit 8 was
9        marked for identification.)
10       Q.    Let's look at what we have marked as
11   Defendant's Exhibit 8.
12       A.    Okay.
13       Q.    When you were employed at the City,
14   was there a Code of Ethics Policy in place?
15       A.    There was.
16       Q.    And do you recognize this as the Code
17   of Ethics that was in place at the time that you
18   were employed?
19       A.    I cannot say that this is the policy
20   that was in place when I was employed.
21       Q.    Do you have any reason to dispute
22   that this was the policy that was in place?
23       A.    I don't know that it was.

Page 147

1        Q.    Do you know one way or the other?
2        A.    No, I don't.
3        Q.    Do you know whether it was part of
4    the Code of Ethics for the City of Dothan that
5    police officers should behave in a manner that does
6    not bring discredit to their agency or themselves?
7        MS. EDWARDS:  Object to the form.
8        A.    No, I don't.
9        Q.    Do you know whether it was a policy
10   that a police officer's character and conduct while
11   off duty must be exemplary thus maintaining a
12   position of respect in the community in which he or
13   she lives and serves?
14       MS. EDWARDS:  Object to the form.
15       A.    No, I don't.
16       Q.    Are you familiar with the Law
17   Enforcement Code of Ethics?
18       MS. EDWARDS:  Object to the form.
19       Q.    And it's stated on Page 3 of this
20   exhibit.
21       A.    Okay. Which this is also contained
22   in the same Exhibit 8.
23       Q.    Yes, I'm asking you about that

Page 148

1    specific portion, section two, the Law Enforcement
2    Code of Ethics, I'm asking if you are familiar with
3    that at all?
4        A.    I cannot tell you if that is actually
5    the Law Enforcement Code of Ethics, no, I can't.
6        Q.    Okay. Regardless of whether the Law
7    Enforcement Code of Ethics is written correctly
8    here on Page 3, are you familiar with it?
9        A.    I have heard of an ethical code that
10   officers take in the police academy. I don't know
11   if this is the same code. I don't know, it has
12   IACP/DPD. I don't know IACP. I don't know if this
13   is a Code of Ethics as I have explained it would
14   have come from the police academy or whatever you
15   are calling the national -- I don't know.
16       Q.    Did you have access to the Code of
17   Ethics Policy when you were employed at the City?
18       MS. EDWARDS:  Object to the form. I
19   guess do you know which Code of Ethics she is
20   talking about? Are there more than one? If you
21   are confused -- make sure that you understand the
22   question is what I am saying.
23       A.    Let me explain why I am confused. If

Freedom Court Reporting                          877-373-3660

Page 149

1   you would tell me to leave my desk and go get the
2   Law Enforcement Code of Ethics, I would have to ask
3   around and say where are these at, or, you know, do
4   we have them, where are they at.
5          So when you say do I have access to,
6   I know we had a Code of Ethics at the Dothan Police
7   Department. If they are posted, I don't know. It
8   could have been a PG, I don't know.
9       Q.   Did you know that you were expected
10  to comply with the Code of Ethics?
11         MS. EDWARDS: Object to the form.
12      Q.   Either you know or you don't.
13         MS. EDWARDS: Which Code of Ethics?
14      Q.   The Code of Ethics that is in front
15  of you, the Dothan Police Department General Order
16  100-41 Code of Ethics, were you aware when you were
17  employed at the City that you were expected to
18  comply with this policy?
19      A.   As I stated earlier, I cannot confirm
20  that this is the Code of Ethics Policy that would
21  have been in place during my employment.
22      Q.   Do you know whether you were expected
23  to comply with any Code of Ethics when you were

Page 150

1   employed as a police officer with the City of
2   Dothan?
3       A.   As I stated earlier, I knew that we
4   had a Code of Ethics. As to this day right now
5   what I was supposed to conform to regarding the
6   Code of Ethics that was in place at that time, I am
7   not sure if this is that Code of Ethics. I cannot
8   recite to you the Code of Ethics. I would have to
9   be there, I would have to have it in front of my
10  face and sign off on it if that in fact are the
11  Code of Ethics. I do not know that this document,
12  Exhibit 8, is the Code of Ethics that was in place
13  when I was employed with the Dothan Police
14  Department.
15      Q.   Did you ever sign off that you
16  received a copy of the Code of Ethics while you
17  were employed?
18      A.   I don't recall.
19      Q.   You don't know one way or the other?
20      A.   I don't recall right now if I did or
21  didn't.
22         (Whereupon, Defendant's Exhibit 9 was
23         marked for identification.)

Page 151

1       Q.   Look at Exhibit 9.
2       A.   Yes, ma'am.
3       Q.   Was there a central location where
4   the Dothan Police Department had the general
5   orders? For example, were they contained on the
6   intranet?
7       A.   For the most part, I had them in a
8   book.
9       Q.   Did you have the Code of Ethics in a
10  book?
11      A.   I'm not sure.
12      Q.   It's a general order, am I right or
13  wrong about that?
14         MS. EDWARDS: Object to the form.
15      A.   Say it again.
16      Q.   The Code of Ethics is a general
17  order; is that right?
18         MS. EDWARDS: Object to the form.
19      A.   Exhibit 8 says that the Dothan Police
20  Department General Order 100-41, it has Code of
21  Ethics under it.
22      Q.   And you had a book that contained the
23  general orders?

Page 152

1          MS. EDWARDS: Object to the form.
2       A.   I had a book that contained the
3   general orders at one point.
4       Q.   Do you recall when you received that
5   book?
6       A.   No, I don't.
7       Q.   Do you recognize Exhibit 9 as the
8   general order 100-50? It's entitled Code of
9   Conduct.
10         MS. EDWARDS: Object to the form.
11      A.   The copy of this that I'm holding,
12  Exhibit 9, also looks like a copy of — what are
13  you saying, that is a general order 100-50 and it
14  does have Code of Ethics on it — I mean Code of
15  Conduct, I'm sorry.
16      Q.   Do you know whether the City of
17  Dothan had a policy related to conduct unbecoming
18  an officer?
19         MS. EDWARDS: Object to the form.
20      A.   Yes.
21      Q.   If you will look at the bottom of
22  Exhibit 9, it's a section called section two,
23  Conduct Unbecoming an Officer and it states, "An

Page 153

```
1    officer must at all times, on duty and off duty,
2    conduct himself in a manner to not bring discredit
3    to his self, the City of Dothan, or law enforcement
4    in general," did I read that correctly?
5        A.   You did.
6        Q.   And was that in fact a part of the
7    policy related to conduct unbecoming an officer?
8        MS. EDWARDS: Object to the form.
9        A.   I do not know, because, as the other
10   exhibits, this has a gray box that is barely
11   legible, I can't make out everything on the front
12   of it, it is a copy. And also on Page 2 – 2 of
13   15, there is some – at B at the very top there is
14   some markings through which are dark and makes it
15   harder to read. And looking through this document,
16   I cannot say that this is something that I received
17   while employed with the Dothan Police Department.
18       Q.   When you were an officer with the
19   police department, did you know that at all times,
20   whether you were on duty or off duty, you were to
21   conduct yourself in a manner that did not bring
22   discredit to yourself, the department, the City, or
23   law enforcement in general?
```

Page 154

```
1        MS. EDWARDS: Object to the form.
2        A.   That is stated on this same exhibit
3    which is –
4        Q.   I'm asking did you know as a police
5    officer when you were an officer for the City of
6    Dothan that you were to conduct yourself in a
7    manner that did not bring discredit to yourself or
8    the department or the City or law enforcement in
9    general, whether you were on duty or off duty?
10       MS. EDWARDS: Object to the form.
11       A.   You are reading the same thing
12   Exhibit 9 that I just said that I am not sure if
13   this is exactly what was the policy with the City
14   of Dothan and I'm trying to answer that the best
15   that – this document, I do not specifically recall
16   that I have received this exact document which you
17   are reading the same thing off of the document.
18       Q.   And I'm not asking you what the
19   document says. I'm asking about your knowledge.
20   When you were employed at the City, did you know
21   that at all times whether you were on duty or off
22   duty that you were expected to conduct yourself in
23   a manner that didn't bring discredit to yourself,
```

Page 155

```
1    the department, the City or law enforcement in
2    general?
3        MS. EDWARDS: Object to the form.
4        A.   I'm going to say no based off of that
5    being the same thing on this form.
6        Q.   So you had no idea that you were
7    expected to conduct yourself in a manner that
8    didn't bring discredit to the department?
9        MS. EDWARDS: Object to the form.
10       A.   I would have my own idea but it
11   doesn't relate to reading off this form which I
12   said I'm not identifying. It's the same type of
13   form or general order that I would have received or
14   did receive at the Dothan Police Department.
15       Q.   What was your idea of how you were
16   expected to conduct yourself as a police officer
17   for the City of Dothan?
18       A.   Be law abiding, represent the City of
19   Dothan Police Department in a positive manner, do
20   my job, protect the innocent, protect property,
21   life.
22       Q.   Did you know that you were expected
23   to not be involved in any conduct or have any
```

Page 156

```
1    personal associations that brought the department
2    into disrepute?
3        MS. EDWARDS: Object to the form.
4        Q.   Is that something that you were aware
5    of when you were an officer with the City of
6    Dothan?
7        MS. EDWARDS: Object to the form.
8        A.   Not be involved in conduct what? I'm
9    sorry, I didn't get the whole thing.
10       Q.   Are you aware that you were expected
11   not to engage in conduct or have any personal
12   associations that brought the department into
13   disrepute?
14       MS. EDWARDS: Object to the form.
15       A.   I don't specifically recall that from
16   our policy that I have signed which is 100-50.
17       Q.   Did you have any knowledge of that
18   otherwise?
19       MS. EDWARDS: Object to the form.
20       Q.   Regardless of whether it was in the
21   policy, did you know that?
22       MS. EDWARDS: Object to the form.
23       A.   I can assume, but I don't want to
```

39 (Pages 153 to 156)

Page 157

```
1    assume.
2            MS. EDWARDS: No, you can't assume.
3        A.   Okay. I can't assume.
4        Q.   Either you knew or you didn't. I'm
5    not asking you to assume whether you knew. Did you
6    know or did you not?
7            MS. EDWARDS: Object to the form.
8        A.   If it's part of the policy that came
9    from Dothan Police Department which you are reading
10   off of this same exhibit, as I have said, no, I
11   can't make -- I can't say for certain that this
12   document is actually one that was given to me and
13   what you are reading is coming from the document
14   and I can't verify it.
15           (Whereupon, Defendant's Exhibit 10
16            was marked for identification.)
17       Q.   Let's look at Defendant's Exhibit 10.
18       A.   Okay.
19       Q.   Do you know whether the Dothan Police
20   Department had a general order that was labeled
21   200-30 that was labeled Professional Standards?
22       A.   They did.
23       Q.   Do you know whether or not this was
```

Page 158

```
1    that policy?
2        A.   No, I don't.
3            (Whereupon, Defendant's Exhibit 11
4             was marked for identification.)
5        Q.   Let's look at Defendant's Exhibit 11.
6    Do you know whether the City of Dothan had
7    personnel rules and regulations?
8        A.   Yes, they did.
9        Q.   Were you provided with a copy of the
10   employee handbook?
11       A.   Yes.
12       Q.   Do you know whether the personnel
13   rules and regulations contained the disciplinary
14   policy?
15           MS. EDWARDS: Object to the form.
16       A.   Could you ask it one more time?
17       Q.   Sure. Do you know whether the
18   personnel rules and regulations, the employee
19   handbook contained a disciplinary policy?
20           MS. EDWARDS: Object to the form. I
21   didn't want to interrupt. Go ahead.
22       Q.   That is fine.
23       A.   Yes, it did.
```

Page 159

```
1        Q.   Did it contain the due process
2    procedure and the grievance procedure?
3            MS. EDWARDS: Object to the form.
4        A.   Yes, it did.
5        Q.   Did you ever receive a copy of the
6    personnel rules and regulations?
7            MS. EDWARDS: Are you referring to a
8    copy of this Exhibit 11?
9        Q.   I'm asking in general.
10       A.   Okay. Within my 28 years of service,
11   I may have received a copy of the personnel rules
12   and regulations. I can't remember specifically
13   when.
14       Q.   Did you have access to those rules
15   and regulations?
16       A.   Yes.
17           MS. EDWARDS: Object to the form.
18       Q.   Did you have access to Dothan Police
19   Department's general orders?
20           MS. EDWARDS: Object to the form.
21       A.   Yes.
22           (Whereupon, Defendant's Exhibit 12
23            was marked for identification.)
```

Page 160

```
1        Q.   Let's look at Defendant's Exhibit 12.
2        A.   To finish commenting on personnel
3    rules and regulations, you have handed me
4    Exhibit 11 which also states --
5        Q.   I haven't asked any other questions
6    about Defendant's Exhibit 11.
7            MS. EDWARDS: Well, if he needs to
8    clarify some testimony that he has just given on
9    Exhibit 11 then he needs the opportunity to do so.
10       Q.   Are you clarifying testimony or are
11   you just giving a narrative?
12           MS. EDWARDS: Does it relate to a
13   question that she has asked you about Exhibit 11?
14       A.   Yes. She handed me Exhibit 11 which
15   says City of Dothan personnel rules and regulations
16   and just asked me questions about it, so just
17   before then she was asking the same questions out
18   of the other exhibits and I just want to clarify or
19   be clear that what you are asking me about
20   personnel rules and regulations and you have me
21   looking at Exhibit 11, you are asking me about one
22   and the same thing.
23       Q.   I was asking you general questions
```

40 (Pages 157 to 160)

Page 161

1    about the personnel rules and regulations.
2        A.    So Exhibit 11 doesn't exist then?
3        Q.    It does. I asked you to look at
4    Exhibit 11 and then I asked you general questions
5    about the rules.
6        A.    Okay. So that is why I answered it
7    regarding Exhibit 11, I'm thumbing through it and I
8    cannot say for certainty that everything in this
9    Exhibit 11 is as it was when I was employed and I
10   do not recognize everything in Exhibit 11 as being
11   something that I have read and been told to read.
12       Q.    Will you look at Defendant's
13   Exhibit 12, do you know whether the City of Dothan
14   had a Civil Service Act in place when you were
15   employed?
16       A.    I believe they said they did.
17       Q.    Had you ever seen the Civil Service
18   Act?
19       A.    I have seen a Civil Service Act with
20   the City of Dothan.
21       Q.    Have you ever seen the Civil Service
22   Act as it's presented to you here in Defendant's
23   Exhibit 12?

Page 162

1        A.    I cannot say that this is the Civil
2    Service Act that I have seen over my 28 years.
3        Q.    Did you ever request to see the Code
4    of Ethics?
5        A.    I don't recall.
6        Q.    Did you ever request to see the Code
7    of Conduct?
8        A.    I don't recall.
9        Q.    Did you ever request to see the
10   professional standards?
11       A.    I don't recall seeing it right now,
12   recollect seeing it right now.
13       Q.    Did you assist the City of Dothan
14   with drafting any policies?
15       A.    I did.
16       Q.    I'm sorry, I couldn't hear you.
17       A.    I did.
18       Q.    What policies did you help the City
19   draft?
20       A.    Specifically, I can't tell you. I
21   don't specifically -- specifically, I couldn't tell
22   you. I do remember one specifically. Let me
23   clarify the question. You just asked me -- could

Page 163

1    you ask me the question again.
2            (Record read.)
3        A.    The City of Dothan personnel
4    department, personnel policies, is that the
5    question?
6        Q.    Did you help the City of Dothan
7    personnel department draft any policies?
8        A.    No.
9        Q.    Did you assist the EEO office with
10   drafting any policies?
11       A.    No.
12       Q.    Did you assist the police department
13   with drafting any policies?
14       A.    Yes.
15       Q.    And what policies did you assist the
16   police department in drafting?
17       A.    The one that I specifically remember,
18   Minimum Standards of Employment, and specifically
19   that is all I can remember right now.
20       Q.    Do you know whether there were
21   others?
22       A.    I believe there were.
23       Q.    I'll show you what I have marked as

Page 164

1    Defendant's Exhibit 13.
2            (Whereupon, Defendant's Exhibit 13
3            was marked for identification.)
4        Q.    Let me know after you have had a
5    second to review it.
6        A.    (Reviewing document.)
7        Q.    Okay. Do you recognize Defendant's
8    Exhibit 19 as a letter that you sent?
9            MS. EDWARDS: Excuse me, is this 19?
10       Q.    Did I say 19? Do you recognize this
11   Defendant's Exhibit 13 as a letter that you sent to
12   All of Our Biker Family to the Bama Boyz Motorcycle
13   Club?
14           MS. EDWARDS: Object to the form.
15       A.    No.
16       Q.    Did you draft the letter that is
17   labeled as Defendant's Exhibit 13?
18       A.    Yes.
19       Q.    And did you send it to members of the
20   Bama Boyz Motorcycle Club?
21       A.    I may have sent it to a member of the
22   Bama Boyz Motorcycle Club.
23       Q.    So although it's addressed to All of

Freedom Court Reporting                    877-373-3660

Page 165

```
1     Our Biker Family, you are saying you might have
2     only sent it to one person in the organization?
3              MS. EDWARDS:  Object to the form.
4         A.   Correct.
5         Q.   And who do you believe that you sent
6     it to?
7         A.   Antwaun King Ace Clifton.
8         Q.   And Antwaun King Ace Clifton is
9     identified in this letter as the new president of
10    the Anniston chapter of Bama Boyz; is that right?
11        A.   Yes, as it states on the letter.
12        Q.   And did you send this letter in or
13    around July 21st, 2013?
14        A.   Yes.
15        Q.   And did you state in this letter that
16    upon receiving the blessings from Big O, president
17    of Outcast Alabama; Big Meat, Sin City Disciples
18    Alabama; and Catfish, national president of Easy
19    Riders MC, it is effective immediately that Antwaun
20    King Ace Clifton is the new president of Anniston
21    chapter of Bama Boyz MC?
22        A.   Yes.
23        Q.   Were you writing this letter to
```

Page 166

```
1     confirm that you had received the blessings from
2     Outcast and Sin City Disciples and Easy Riders?
3              MS. EDWARDS:  Object to the form.
4         A.   Yes.
5         Q.   In February of 2012, do you recall
6     receiving a written discipline?
7              MS. EDWARDS:  Object to the form.
8         A.   No.
9         Q.   Do you recall an incident where an
10    officer named Taiwan Truitt was at Eton's Lounge in
11    Dothan and you were also at the lounge off duty?
12        A.   Yes.
13        Q.   Tell me what happened.
14        A.   Can you be more specific?
15        Q.   Sure.  Tell me what happened when
16    Officer Truitt was at Eton's Lounge --
17             MS. EDWARDS:  Object to the form.
18        Q.   -- in or around January of 2012.
19             MS. EDWARDS:  Object to the form.
20        A.   What specifically do you want me to
21    tell you?
22        Q.   Sure.  Did you have any conversations
23    with Officer Truitt while he was at Eton's Lounge?
```

Page 167

```
1         A.   I did have a conversation with him.
2         Q.   What did you say in those
3     conversations with Officer Truitt?
4         A.   I asked him if he needed any help
5     identifying or did he need any help while he was
6     there on the premises.
7         Q.   Did you say anything else to him?
8         A.   Yes.
9         Q.   What else did you say?
10        A.   I asked him was he finished with
11    whatever investigation or whatever he was doing.
12        Q.   Did you instruct him to leave the
13    premises?
14        A.   Yes.
15        Q.   Were you off duty at the time?
16        A.   Yes.
17        Q.   Had you consumed alcohol at the time
18    that you gave him that instruction?
19             MS. EDWARDS:  Object to the form.
20        A.   Yes.
21        Q.   Did you, in fact, receive a written
22    warning as a result of that incident in February of
23    2012?
```

Page 168

```
1              MS. EDWARDS:  Object to the form.
2         A.   I did.  But I didn't agree with the
3     outcome of the investigation.
4         Q.   Let me back up.  I believe you
5     actually received a formal counseling; is that
6     right?
7         A.   I need to see.
8         Q.   I'll show you.
9              MS. MAYS:  Off the record.
10             (Whereupon, Defendant's Exhibit 14
11             was marked for identification.)
12        Q.   (BY MS. MAYS:)  All right.  I'm going
13    to show you what I have marked as Defendant's
14    Exhibit 14.  It's a two-page exhibit.  Do you
15    recognize this as the formal counseling that you
16    received in February of 2012?
17        A.   With regard to Exhibit 14, I see my
18    signature on the bottom of this but I can't say
19    this is the exact copy of the form I received.
20        Q.   Do you dispute that that is the
21    discipline that you, in fact, received as a result
22    of that incident?
23        A.   I would have to see the original and
```

Freedom Court Reporting                        877-373-3660

Page 169

1   my original signature to – yeah, I would have to
2   see the original and my original signature to say
3   that this is the – this is a discipline because
4   circle number eleven, I can't tell you off the top
5   of my head what number eleven is up there. Under
6   minor where it says first offense, eleven is
7   circled and I can't tell you what eleven is right
8   now.
9        Q.   But sitting here today, do you have
10  any reason to dispute that you received a formal
11  counseling as a result of an incident at Eton's
12  Lounge that involved Officer Truitt in February of
13  2012?
14       A.   I did.
15       Q.   You did receive the discipline, is
16  that what you are saying?
17       A.   That, yes.
18       Q.   I'm showing you what I have marked as
19  Defendant's Exhibit 15.
20            (Whereupon, Defendant's Exhibit 15
21            was marked for identification.)
22       Q.   In or around December of 2012, were
23  you over the Patrol Bureau?

Page 170

1        A.   I'm not sure.
2        Q.   Was the Patrol Bureau the largest
3   bureau in the police department?
4             MS. EDWARDS:  Would you mind if we
5   take a moment to review Defendant's Exhibit 15
6   before he testifies to it?
7             MS. MAYS:  Sure.  Take your time.
8             MS. EDWARDS:  Go off the record a
9   couple of minutes.
10            (Off-the-record discussion.)
11            (Record read.)
12       A.   Yes.
13       Q.   (BY MS. MAYS:)  What is Guardian
14  Tracking?
15       A.   Guardian Tracking is a software that
16  is used to add entries of various things dealing
17  with an officer's duty, performance, just aspects
18  of his job where comments can be made.
19       Q.   Who can make entries in the Guardian
20  Tracking?
21       A.   I'm not 100 percent sure who could
22  make entries into Guardian Tracking.
23       Q.   Could Major Parrish make entries in

Page 171

1   Guardian Tracking related to you?
2        A.   Yes.
3        Q.   And could you respond to those
4   entries that he made related to you?
5        A.   Yes.
6        Q.   Could you see entries that he entered
7   related to other people?
8             MS. EDWARDS:  Object to the form.
9        A.   I believe people in my chain of
10  command, but not everybody in the department.
11       Q.   So could you see the Guardian
12  Tracking entries related to people who reported to
13  you?
14       A.   I believe, but I'm not 100 percent
15  certain.
16       Q.   Okay.  Beginning with the second page
17  of this exhibit –
18            MS. EDWARDS:  Are we referring to
19  Defendant's Exhibit 15?
20       A.   Yes.
21       Q.   Do you recognize these documents as
22  Guardian Tracking entries --
23            MS. EDWARDS:  Object to the form.

Page 172

1        Q.   -- that Major Parrish made related to
2   you?
3             MS. EDWARDS:  Object to the form.
4        A.   This is a Guardian Tracking entry.
5   As far as the contents of if I received it and it's
6   what Major Parrish purports to have said, I don't
7   know.
8        Q.   When Major Parrish entered a Guardian
9   Tracking entry related to you, did you receive some
10  notification that an entry had been made?
11       A.   Generally, Guardian Tracking you do
12  receive entries of confirmation or you receive
13  something that someone entered an entry about you.
14       Q.   Would you get some e-mail?  How would
15  you be notified that an entry had been made about
16  you?
17       A.   You are not notified.  You just
18  periodically go check it if I remember correctly.
19       Q.   So if Major Parrish made an entry
20  related to you, you wouldn't know it unless you
21  happened to go check Guardian Tracking?
22            MS. EDWARDS:  Object to the form.
23       A.   To the best of my knowledge.

Page 173

```
1        Q.   Okay.  Do you have any reason to
2   dispute that incident reports, these Guardian
3   Tracking reports that are included in Defendant's
4   Exhibit 15 were entries that Major Parrish made?
5           MS. EDWARDS:  Object to the form.
6        A.   No, I can't authenticate any of that.
7        Q.   Have you seen any of these before
8   today?
9           MS. EDWARDS:  Object to the form.
10       Q.   And we can take it page by page if
11  you want to.
12       A.   I cannot authenticate any of this
13  stuff in Exhibit 15.  However, there's small things
14  that I have seen before but I can't say it's
15  everything in its entirety.  There are some things
16  I haven't seen before at all that to my
17  knowledge -- and contained within all these pages
18  in Number 15.
19       Q.   Do you recall whether in April 2011
20  you were asked to help develop a lesson plan on
21  leadership training?
22       A.   I'm not certain.  I'm not certain
23  that that was asked of me in April of 2011.
```

Page 174

```
1        Q.   Did you at any time help develop a
2   lesson plan on leadership training?
3        A.   I developed my own lesson plan on
4   leadership but it didn't have to do with anyone
5   else's to the best of my knowledge.
6        Q.   Did you from time to time check
7   Guardian Tracking to see whether Major Parrish had
8   made entries related to you?
9        A.   I have.
10       Q.   Did any other officer make entries
11  related to you?
12          MS. EDWARDS:  Object to the form.
13       A.   I can't be certain.
14       Q.   If you would look with me on
15  Defendant's Exhibit 15 in the bottom right-hand
16  corner the number that is Bates labeled 1097, in
17  February of 2012 did you meet with Major Parrish to
18  discuss the Performance Improvement Plan?
19       A.   I don't know.
20       Q.   Were you placed on a Performance
21  Improvement Plan in February of 2012?
22       A.   I don't know.
23       Q.   Do you know whether you were placed
```

Page 175

```
1   on a Performance Improvement Plan while you were
2   employed with the City of Dothan?
3        A.   I was.
4        Q.   If you will turn to the page that is
5   Bates labeled 0198 through 1101, do you recognize
6   that as the Performance Improvement Plan that you
7   received while you were employed at the City of
8   Dothan?
9        A.   Those pages does say Performance
10  Improvement Plan and I can't say that everything in
11  here contained is what I received.
12       Q.   Look on the page that is Bates
13  labeled 1101.  Is that your signature?
14       A.   On Page 1101, that is my signature on
15  the bottom on that page.
16       Q.   Okay.  As a part of the Performance
17  Improvement Plan that you received when you were
18  employed at the City of Dothan, were you encouraged
19  to build trust among your subordinates?
20          MS. EDWARDS:  Object to the form.
21       A.   I can't specifically remember Major
22  Parrish saying that whenever we went over my
23  Performance Improvement Plan.
```

Page 176

```
1        Q.   If you will look on the page that is
2   Bates labeled 0198, the first bullet point, it
3   says, "As we have discussed on previous occasions,
4   I would like to see you build trust among your
5   subordinates," do you see that?
6        A.   I see that.
7        Q.   Do I read that correctly?
8        A.   Yes, you read it right.
9        Q.   Is that a part of the Performance
10  Improvement Plan that you signed in February of
11  2012?
12       A.   That, I do not know.
13       Q.   You don't know whether that is
14  written on the page or whether it was part of the
15  plan?
16       A.   I don't know that it was part of the
17  plan.
18       Q.   But you do acknowledge that you
19  signed the plan in February of 2012?
20       A.   I agree that that was my signature on
21  the one sheet that we said on Bates number 1101.
22       Q.   As part of your Performance
23  Improvement Plan, did Major Parrish discuss with
```

Freedom Court Reporting                    877-373-3660

Page 177

1  you that he felt like you were handling issues that
2  could be handled by lower ranking officers?
3        A.    I recall that.
4        Q.    Did he discuss with you as part of
5  your Performance Improvement Plan that he would
6  like for you to discuss operational issues with him
7  and the chief?
8        MS. EDWARDS: Object to the form.
9        A.    Yes, I remember that.
10       Q.    Do you recall him telling you that
11 every action you take as it relates to your bureau
12 reflects on the police department?
13       A.    I don't recall him saying that.
14       Q.    Do you recall having any
15 conversations about how your off duty conduct,
16 particularly going to local bars, reflected
17 negatively on the agency?
18       MS. EDWARDS: Object to the form.
19       A.    No.
20       Q.    Do you recall any conversations about
21 you going to local bars?
22       A.    Yes.
23       Q.    Tell me what you recall about those

Page 178

1  conversations as it relates to your Performance
2  Improvement Plan.
3        A.    I can't say that. I'm going from
4  memory, not what is here because I'm not saying
5  that this is the one that I received because I
6  can't authenticate it. I'm just telling you what I
7  am thinking off memory. So for the record, I'm not
8  saying that it has to do with this plan, okay? And
9  your question was how?
10       Q.    My question was: Tell me what you
11 recall about the conversations you had with Major
12 Parrish about your off duty conduct, particularly
13 as it relates to you attending local bars.
14       MS. EDWARDS: Object to the form.
15       A.    Okay. And this is not relating to
16 the plan. The conversation that he had had with me
17 regarding going to local bars is that -- actually,
18 he didn't label it as going to local bars as you
19 just said. He just said that he didn't think that
20 a captain should be out on his own time off duty at
21 2 or 2;30 in the morning. And I told him he needed
22 to tell his 16-year-old what time to go home. And
23 he spoke about being notified about me being out on

Page 179

1  my own off duty time where there may have been some
2  officers or law enforcement that may have arrived.
3        Our conversation continued where
4  specifically we spoke about each situation, Taiwan
5  Truitt, the one that you mentioned, and I told him
6  that according to what the proprietor at the Eton's
7  told me and the doorman is that Officer Truitt was
8  harassing patrons of that establishment.
9        And I told him that, in fact, that
10 Truitt had told the patron that spoke with me that
11 there were people underage that was inside of the
12 establishment and he was going to stand outside and
13 card everyone when they exited the establishment.
14       And I went to tell Parrish that after
15 when Truitt came in, he walked around and he -- as
16 soon as he walked in, he escorted a patron outside
17 and didn't come back in -- let me take that back.
18 He escorted someone outside. And then an officer,
19 I don't know if it was Truitt, came and got the
20 doorman, went outside.
21       The doorman came back in and brought
22 the owner outside and came back in. And then they
23 came to me and said they were being harassed by a

Page 180

1  police officer. And the police officer -- they
2  told me what the police officer said he was going
3  to do, card everybody that exited because he
4  thought that there was -- the people were too
5  young, there were some people too young to be in
6  there.
7        So in telling Parrish all this, I
8  told him the detail that the -- when I went out to
9  speak -- after they came for a while patrons
10 started stacking up in this establishment not
11 leaving because the police were just standing
12 outside. The owner told me that this is harassment
13 and they were looking for me to, I guess, see what
14 was going on or what have you.
15       But basically in talking to Truitt, I
16 asked him if he needed any help, and I'm telling
17 Parrish all this, so I asked him if he needed any
18 help with anything and he said no. And I asked him
19 if there is any other investigation I can help him
20 with, if anything else was going on and he said no.
21 I asked him are you finished with your
22 investigation and he said yes. And I asked him
23 well, why are you standing out here because -- and

45 (Pages 177 to 180)

Freedom Court Reporting                           877-373-3660

Page 181

1  then I told him what the patron said that he was
2  standing out there carding -- gonna card everyone
3  that exited and they felt like it was harassment.
4  Truitt didn't say anything after I
5  told him what was alleged that he was harassing
6  them. And as he was finished with his
7  investigation, had no reason for still standing
8  there, according to what was about, I told Parrish
9  that I asked him to leave, okay, because I felt
10  that he was harassing Truitt.
11  Parrish didn't really seem to want to
12  hear my side of the story, so that was the gist of
13  his and my conversation about Eton's.
14  He then spoke about where I was off
15  duty at a lounge called Pockets Lounge and told me
16  that he had been advised by Internal Affairs that I
17  was involved in an incident at the Pockets Lounge.
18  So I told him that the incident at Pockets Lounge,
19  we discussed that and he -- it's the way that he
20  said it, it was -- well, anyway, Parrish seems that
21  if he was chastising me about being at Pockets
22  Lounge and I told him I take it personally because
23  I was off duty on my own time, no consumption of

Page 182

1  alcohol and two people were going to assault me
2  because someone pointed out that I was a police
3  officer and they -- well, one specifically, they
4  did attempt to assault me.
5  And if I remember correctly -- well,
6  I do, I told Parrish that we are -- the position
7  that law enforcement is in whenever we are off
8  duty, people recognize me as an officer, it's
9  something that is just commonly known whenever you
10  are off duty and that I obtained -- I told Judge
11  Rose Gordon about what happened and got her legal,
12  I guess, advice of what I needed to do, obtained
13  the warrant for the guys' arrest at Pockets Lounge.
14  And then Parrish brought up a third
15  incident at a third lounge and as if he is
16  chastising me for that as well and it involved a
17  patron passing counterfeit money. The owner of the
18  lounge knows I'm a law enforcement officer, told me
19  about the counterfeit money and I told him to turn
20  it over to the police. And I explained to Parrish
21  that as a result of the owner identifying $100
22  bills and $20 bills that were counterfeit, I
23  directed the owner of the establishment, if the

Page 183

1  person is still in there, pull them to the side,
2  have the security pull them to the side. He did
3  that, his security searched them, found more
4  counterfeit money on them, I told him to call the
5  police. They did so. Taiwan Truitt came, Officer
6  Peterson came. And as their security was patting
7  the guy down, they found a handgun with the serial
8  number removed.
9  So as a result, they made multiple
10  felony cases on them and that explanation, that was
11  the conversation I had with Parrish as far as me,
12  him saying I'm at night clubs or however you read
13  it.
14  Q. Were you disciplined for any actions
15  that you took while you were at Pockets Lounge?
16  A. No.
17  Q. What was the name of the bar or
18  lounge?
19  A. Legacy.
20  Q. Is that where the issue with the
21  counterfeit money arose?
22  A. I'm sorry, Legacy.
23  Q. Were you disciplined for any of the

Page 184

1  actions that you took at Legacy Lounge?
2  A. No.
3  Q. What performance were you expected to
4  improve under the Performance Improvement Plan?
5  MS. EDWARDS: Object to the form. I
6  would have to see the original of the Performance
7  Improvement Plan to be specific.
8  Q. Did Major Parrish suggest as part of
9  the Performance Improvement Plan that you should
10  work on team building?
11  A. I don't remember.
12  Q. Do you recall him suggesting that you
13  should control your self image?
14  MS. EDWARDS: I object to the form.
15  A. I don't remember.
16  Q. Do you recall whether he told you
17  that you should communicate better?
18  MS. EDWARDS: Object to the form.
19  A. I believe he did.
20  Q. And by communicate better, was he
21  telling you that you needed to communicate better
22  with him?
23  A. I'm not sure.

46 (Pages 181 to 184)

Page 185

1     Q.   If you would look at the document
2  that is Bates labeled 1102, do you recall receiving
3  a memo in May of 2012 where Major Parrish indicated
4  that you had satisfactorily completed the
5  requirements of the Performance Improvement Plan?
6     A.   I cannot be certain of this form. I
7  cannot authenticate it. I do remember a memorandum
8  of being reinstated.
9     Q.   Do you remember getting that
10 memorandum in or around May of 2012?
11    A.   I don't remember.
12    Q.   Do you remember when you were told
13 that you had completed the requirements under the
14 Performance Improvement Plan?
15    A.   I don't remember when.
16        (Whereupon, Defendant's Exhibit 16
17        was marked for identification.)
18    Q.   I'll show you what I have marked as
19 Defendant's Exhibit 16. Let me know after you have
20 had time to look at it.
21    A.   (Reviewing document.)
22    Q.   In late January of 2013, were you
23 transferred from the Patrol Services Bureau to the

Page 186

1  Administrative Bureau?
2     A.   I'm not certain.
3     Q.   Do you recognize Defendant's
4  Exhibit 16 as a memo from Chief Benton to all
5  personnel stating that the following transfers will
6  become effective January 27th, 2013, and the first
7  one listed is Captain Keith Gray from Patrol
8  Services Bureau to Administrative Bureau?
9     A.   The memo is a carbon copy of a memo
10 that comes from the chief. The transfers of the
11 first three captains I remember. I can't say those
12 are the exact dates, but I do remember those three
13 specifically.
14    Q.   Do you recall that those three
15 transfers of the captains, and those being you
16 Captain Gray, Captain David Jay and Captain Stacy
17 Robinson, occurred around the same time?
18    A.   It occurred at the same time.
19    Q.   Did Captain David Jay and Captain
20 Stacy Robinson become captains at the same time as
21 you?
22        MS. EDWARDS: Object to the form.
23    A.   I can't answer that with certainty.

Page 187

1     Q.   Do you know whether they were
2  promoted around the same time as you to captain?
3     A.   It's a possibility.
4     Q.   David Jay is a white male; is that
5  right?
6     A.   Yes.
7     Q.   And Stacy Robinson is also a white
8  male?
9     A.   Yes.
10    Q.   Do you know what other bureaus David
11 Jay had served in?
12    A.   Patrol.
13    Q.   So in addition to Investigative
14 Services, he had also served in the Patrol Services
15 Bureau?
16    A.   Yes.
17    Q.   Do you know what other bureaus Stacy
18 Robinson has served in?
19    A.   Administrative.
20    Q.   So he had served in the
21 Administrative Bureau and the Investigative
22 Services Bureau; is that right?
23    A.   Correct.

Page 188

1     Q.   Do you recall ever having
2  conversations with Major Parrish where he expressed
3  to you that it was his opinion that you were micro
4  managing your bureau?
5     A.   Yes.
6     Q.   And what bureau was he referring to
7  when you had those conversations?
8     A.   Patrol.
9     Q.   Did he tell you that he believed you
10 should delegate more work to lower ranking
11 officers?
12    A.   No.
13    Q.   Did y'all have a conversation about
14 paperwork being late to his office?
15    A.   Yes.
16    Q.   Did he tell you that he did not
17 appreciate having to learn of the three nightclub
18 incidences that we have just discussed through
19 Professional Standards and not from you?
20        MS. EDWARDS: Object to the form.
21    A.   No.
22    Q.   He didn't say anything about having
23 to learn of those incidences from Professional

| Page 189 | Page 191 |
|---|---|
| 1   Standards? | 1    A.   Because I was the senior polygraph |

**Page 189**

1  Standards?

2         MS. EDWARDS: Object to the form.

3     A.   He didn't say it like you are saying

4  it.

5     Q.   What did he say about that?

6     A.   He made the statement that he had

7  learned about it through someone other than me and

8  I believe it was Professional Services.

9     Q.   Had you told him about the three

10  nightclub incidences?

11         MS. EDWARDS: Object to the form.

12         (Off-the-record discussion.)

13         (Record read.)

14         MS. EDWARDS: Object to the form.

15     A.   I had not said anything about Legacy

16  Lounge or Pockets Lounge. I'm unsure about the

17  first one, Eton's.

18     Q.   Did you ask him why he didn't let you

19  command training and communications?

20     A.   Not that I can recall at this time.

21     Q.   Did y'all ever have any conversations

22  about why you were not commanding trainings and

23  communications?

**Page 190**

1     A.   Yes.

2     Q.   What do you recall about those

3  conversations?

4     A.   That he removed those duties from me

5  and took them unto himself because I was over that

6  bureau.

7     Q.   Training and communications was under

8  the Administrative Bureau?

9     A.   Uh-huh.

10     Q.   Did he tell you why he took those

11  duties on himself?

12     A.   I don't recall him saying that right

13  now.

14     Q.   Did you report to Major Parrish that

15  you thought you were being treated unfairly?

16     A.   Yes.

17     Q.   And did he encourage you to contact

18  Delvick McKay?

19     A.   No, not that I recall right now.

20     Q.   Did you resign from your position as

21  polygraph examiner with the police department?

22     A.   Yes.

23     Q.   And why did you resign?

**Page 191**

1     A.   Because I was the senior polygraph

2  examiner and, if I remember correctly, Parrish made

3  McGill the senior examiner and McGill didn't have

4  nearly as much time or experience as I have had at

5  polygraph so I felt he was being racist.

6         Oh, excuse me, let me clarify that.

7  I felt that Major Parrish was being racially

8  discriminatory against me because he took me as a

9  person who had more training and experience in

10  polygraph than McGill.

11     Q.   Did McGill replace you as the

12  polygraph examiner after you resigned?

13         MS. EDWARDS: Object to the form.

14     A.   I don't believe so.

15     Q.   Was he promoted to senior polygraph

16  examiner at the same time that you were a senior

17  polygraph examiner?

18     A.   McGill was placed over the polygraph

19  section so there is not a -- there is not a

20  position of senior polygraph examiner. I believe I

21  attended polygraph school in '97 and he may have in

22  2008 maybe, and those are just estimate numbers for

23  him.

**Page 192**

1     Q.   Are you saying that you reported to

2  him at some point?

3     A.   I did quality control of all

4  polygraph examiners. I was also a polygraph

5  examiner, but all the other polygraph examiners

6  came to me and received assignments from me at one

7  point. And I did the quality control of their

8  reports and sometimes exams if I need to. But

9  Parrish, there was a memo that came out and of

10  course it's going to have the chief's name on it,

11  but Parrish put him as senior polygraph -- well, he

12  was over the polygraph section. I can't think of

13  any other way to put it.

14     Q.   So after McGill was placed over the

15  polygraph section, is that when you decided to

16  resign?

17     A.   Wait a minute. I'm recalling now. I

18  remember resigning once when Ray Owens who is under

19  a different police chief, John Powell, Ray Owens

20  was placed over the polygraph section and I

21  resigned.

22         When Ray Owens and Chief Powell left,

23  I was the senior polygraph examiner and did the

Freedom Court Reporting

Page 193

1    quality control.
2            When Parrish put McGill as the head
3    of the polygraph section is when I believe to the
4    best of my knowledge right now is when I resigned.
5        Q.   Do you know when that occurred?
6        A.   No, ma'am.
7        Q.   Did you report to the EEO officer
8    that you felt that Parrish was being discriminatory
9    in that assignment?
10       A.   I don't recall whether I did or not.
11   I don't believe I did, but I can't recall whether I
12   did or not.  I don't think I did.
13       Q.   Do you recall whether you reported it
14   to anyone?
15       A.   I don't remember right now.
16       Q.   Did Major Parrish turn over direct
17   supervision of the communication center and
18   training division and the quartermaster back to
19   you?
20       A.   No.
21       Q.   So at no point during your employment
22   with the City of Dothan was that control given back
23   to you or that -- let me reask that question.

Page 194

1            At any point during your employment
2    at the City of Dothan after you were assigned to
3    the Administrative Bureau, were you given direct
4    supervision of the communications center, the
5    training division and the quartermaster?
6        A.   Yes.
7        Q.   And did Major Parrish assign you to
8    have that direct supervision over the communication
9    center, training division, quartermaster?
10       MS. EDWARDS:  I object to the form.
11       A.   I don't know.  I was in admin twice,
12   so I don't know if Major Parrish is the one that
13   assigns that division, I guess, so to speak.
14       Q.   Does Chief Benton ultimately have to
15   sign off on those assignments?
16       MS. EDWARDS:  Object to the form.
17       A.   Ultimately he does, but it doesn't
18   mean that he's the one that actually drafted the
19   policy or the procedure or what have you.  Parrish
20   could say I want to take communications and
21   training away and it will always have the chief's
22   signature on it because he's the department head,
23   but he may not have had a clue why or anything like

Page 195

1    that.
2        Q.   Were you present for the conversation
3    that Chief Benton and Major Parrish had regarding
4    transfers in the department?
5        MS. EDWARDS:  Object to the form.
6        A.   Can you be more specific?
7        Q.   Sure.  You testified that if Major
8    Parrish said he wanted to do something, that Chief
9    Benton would sign off on it.
10       MS. EDWARDS:  Object to the form.
11       Q.   I'm asking were you present when
12   Major Parrish recommended that someone be
13   transferred and Chief Benton approved it?
14       MS. EDWARDS:  Object to the form.
15       A.   I have been present during my tenure
16   working there where those types of conversations
17   have happened.
18       Q.   Were you present for all these
19   conversations?
20       MS. EDWARDS:  Object to the form.
21       A.   I don't know.
22           (Whereupon, Defendant's Exhibit 17
23           was marked for identification.)

Page 196

1        Q.   I'm going to show you what I have
2    marked as Defendant's Exhibit 17.
3        A.   (Reviewing document.)
4        Q.   Have you had a chance to review it?
5        A.   No, not yet.  (Reviewing document.)
6    Okay.
7        Q.   Do you recognize Defendant's
8    Exhibit 17 as a Guardian Tracking entry entered by
9    Major Steve Parrish regarding you?
10       MS. EDWARDS:  Object to the form.
11       A.   I can't authenticate this.  Some of
12   the contents I remember but I can't say this is a
13   specific Guardian Tracking form that I have
14   received from Parrish on 4/8 of '13.
15       Q.   Do you know whether Major Parrish
16   submitted a Guardian Tracking report about you on
17   April the 8th, 2013?
18       A.   I'm not sure.
19           (Whereupon, Defendant's Exhibit 18
20           was marked for identification.)
21       Q.   I'll show you what I have marked as
22   Defendant's Exhibit 18.
23       A.   (Reviewing document.)

49 (Pages 193 to 196)

Page 197

1    MS. EDWARDS: I'm going to go ahead
2  and note for the record that we object to all of
3  these exhibits that Mr. Gray has been unable to
4  authenticate and specifically -- well, we will just
5  leave it at that. We object to them as hearsay and
6  lacking a foundation.
7    A.    (Reviewing document.)
8    MS. EDWARDS: Do you mind if we take
9  five while he looks through these?
10   (Short break taken.)
11   Q.    (BY MS. MAYS:) Mr. Gray, have you
12  had an opportunity to review Defendant's
13  Exhibit 18?
14   A.    Yes, ma'am.
15   Q.    It looks like they may be stapled out
16  of order. It looks like the first page should be
17  page Bates labeled 475. Do you see that? So that
18  says Page 1 of 5.
19   A.    Okay.
20   Q.    And then they start in chronological
21  order, 2 of 5, do you see that?
22   A.    Yes.
23   Q.    That page is Bates labeled 475, does

Page 198

1  that appear to be the same Guardian Tracking report
2  that we have already marked as Defendant's
3  Exhibit 17?
4    A.    That does seem to be the same one.
5    MS. EDWARDS: Object to the form.
6    Q.    And beginning on Page 2 of 5, is that
7  your response to that April the 8th, 2013 entry?
8    MS. EDWARDS: Object to the form.
9    A.    I can't say it was my exact response,
10  I'm not for certain. But I know that I am not
11  saying that this particular form is authentic, this
12  Number 18. I know that I did submit a report in
13  Guardian Tracking that addressed some issues that
14  Parrish was having with me.
15   Q.    Do you have any reason to dispute
16  that Defendant's Exhibit 18 is the Guardian
17  Tracking report that you submitted?
18   MS. EDWARDS: Object to the form.
19   A.    If I could go back to my original
20  copy to make sure that it is authentic, I would do
21  that. I don't have my original copy or an original
22  copy of this and that is why.
23   Q.    Have you had an opportunity to review

Page 199

1  the comments that are made here in Defendant's
2  Exhibit 18?
3    A.    Most of them.
4    Q.    I want you to take your time and
5  review it and I want you to let me know if there is
6  anything in here that you did not enter beginning
7  on Page 2 of 5 through Page 5 of 5.
8    A.    I again would need my original copy
9  of this, and this is a carbon copy with numbers on
10  it that I didn't place on it.
11   Q.    Are there any statements that are
12  made beginning on Page 2 of 5 that you dispute
13  making?
14   A.    Again, for the record this is not my
15  original copy so I can't authenticate this is --
16  word for word this document is what I submitted.
17   Q.    Do you have an original copy?
18   A.    Not with me.
19   Q.    What reason do you have to dispute
20  that the copy that I provided to you doesn't
21  contain the information that you entered on June
22  the 9th, 2013?
23   MS. EDWARDS: Just for the record, I

Page 200

1  would like to note there are some highlighted and
2  shaded areas on this 2 of 5 showing to be the
3  first page of Defendant's Exhibit 18. We don't
4  know whether or not this was in the original or
5  not.
6    Q.    I'm not asking you about the
7  highlighting. I'm asking about the content, the
8  words that are on the page. Did you enter those
9  words?
10   A.    I believe I have answered that
11  question, but if you need me to say the same thing
12  again, I will. This is not my original. I cannot
13  be sure that everything that is on your copy, this
14  Number 18 before me today are the same thing, the
15  same words that I wrote when I submitted my
16  concerns in Guardian Tracking.
17   Q.    Did you submit concerns in Guardian
18  Tracking regarding comments made by Chief Parrish
19  about you being off work in or around April of
20  2013?
21   A.    No.
22   Q.    Did you take FMLA leave in or around
23  April of 2013?

Page 201

1      A.   I'm sorry?
2      Q.   Did you take FMLA leave in or around
3  April of 2013?
4      A.   Yes.
5      Q.   Did you get all of the leave that you
6  requested?
7      A.   Yes.
8      Q.   Did you have any accommodations or
9  restrictions related to your medical leave in April
10 of 2013?
11         MS. EDWARDS:  Object to the form.
12     A.   I had some but I can't recall what
13 they were right now.
14     Q.   Did the City accommodate those
15 restrictions?
16         MS. EDWARDS:  Object to the form.
17     A.   As I said, I can't recall all the
18 restrictions so I just can't give a blanket and say
19 yes.  I just don't remember what was on the medical
20 leave form and everything I was undergoing at the
21 time.
22     Q.   Did you report in Guardian Tracking
23 that you intended to file an EEOC charge?

Page 202

1      A.   I do remember that.
2      Q.   Do you recall entering into Guardian
3  Tracking that you had been transferred to the
4  Administrative Services Bureau and that one of the
5  reasons that you had been told that you had been
6  transferred was because Captain Robinson had health
7  issues?
8          MS. EDWARDS:  Object to the form.
9      A.   Say that again.
10         (Record read.)
11         MS. EDWARDS:  Same objection.
12     A.   Yes.
13     Q.   What is the Sons of Confederate
14 Veterans?
15         MS. EDWARDS:  Object to the form.
16     A.   It is an organization that I have
17 been told that Major Parrish and other members of
18 the Dothan Police Department are in.
19     Q.   What do you know about the
20 organization?
21     A.   My personal knowledge of them comes
22 from different areas, one is African-American
23 police officers in the Dothan Police Department

Page 203

1  have compared them with the KKK, Ku Klux Klan.  The
2  organization, they are an established organization
3  from what I have just read off of the Internet and
4  they deal with history in the civil war era and
5  they are supposed to be dependents or sons of
6  relatives of people of civil war soldiers.
7      Q.   Do you know whether they are
8  affiliated with the KKK?
9      A.   Do I know?  What is your definition
10 of "know"?  I mean, what do you mean?
11     Q.   Do you have any knowledge or
12 information that they are affiliated with KKK?
13         MS. EDWARDS:  Object to the form.
14     A.   I have read an article somewhere on
15 the Internet that relates Sons of Confederate
16 Veterans and maybe some of the members from the
17 past with the Ku Klux Klan, and I don't recall the
18 specific article.
19     Q.   When you say some members from the
20 past, does that mean that the current members are
21 not affiliated with the KKK?
22         MS. EDWARDS:  Object to the form.
23     A.   That, I don't know.

Page 204

1      Q.   So you don't know whether or not the
2  Sons of Confederate Veterans in its current state
3  is in any way affiliated with the KKK?
4          MS. EDWARDS:  Object to the form.
5      A.   What I have read is that there is a
6  Confederate general named Nathan Bedford Forrest
7  who was a Confederate general and Nathan Bedford
8  Forrest also in this article or more than one
9  article is heralded for being the founder of the Ku
10 Klux Klan.  And Steve Parrish has a son named
11 Nathan Bedford Parrish, so this is information that
12 I have read somewhere online dealing with Sons of
13 the Confederate Veterans.  And I'm pretty sure if
14 you search you will probably see the same thing.
15     Q.   When did you first learn that Steve
16 Parrish was a member of the Sons of Confederate
17 Veterans?
18     A.   I don't know.
19     Q.   You have known that for a long time?
20     A.   Yes.
21     Q.   Did you ever complain about him being
22 a member of this organization?
23         MS. EDWARDS:  Object to the form.

51  (Pages 201 to 204)

Page 205

```
 1    A.   Yes.
 2    Q.   When did you complain?
 3    A.   I can't recall specifically.
 4    Q.   Who did you complain to?
 5    A.   I believe, I'm not 100 percent sure
 6  right now, but I believe I complained to Delvick
 7  McKay and added a picture in a complaint.  I
 8  believe I have complained to Harold Mathews.  And I
 9  can't say for certainty right now, but I believe
10  there has been a few more complaints that is out
11  there.  I can't be for certain right now.
12    Q.   You say there is a few more
13  complaints out there.  You believe you made a few
14  more complaints?
15    A.   Yes.
16    Q.   What did you report to Delvick McKay?
17    A.   I remember sending him a Guardian
18  Tracking entry complaint that had a picture of some
19  Dothan police officers holding up a Confederate
20  battle jack flag as members of the Sons of
21  Confederate Veterans and I believe their chapter
22  was the Henry County chapter.  But I believe, I'm
23  not 100 percent sure, but I remember sending a
```

Page 206

```
 1  complaint across the street and either it was
 2  directed to Darryl Mathews who may have given it to
 3  Delvick or either I sent it to Delvick who may have
 4  given it Darryl, but I'm not 100 percent certain
 5  right now.  But I know I put that as a part of a
 6  complaint to the best of my knowledge.
 7    Q:   Did Delvick respond to you regarding
 8  your complaint?
 9    A.   I can't recall right now.
10    Q.   What did you report to Darryl
11  Mathews?
12    A.   That I was being harassed by Steve
13  Parrish, I felt it was racial harassment, I felt
14  like Steve Parrish had violated the consent decree,
15  that I was -- my position, my authority was being
16  removed from me by Parrish, that my -- I wasn't
17  being assigned the same bureaus as the other
18  captains.  I complained to him that I wasn't being
19  promoted.
20    I believe my complaint that I wasn't
21  being promoted the same may have gone to the
22  personnel director, but I can't recall 100 percent
23  if I told Mathews the same thing or not regarding
```

Page 207

```
 1  promotions.  But I have told several EEO officers
 2  within the City, if not all of them coming up, that
 3  I wasn't being promoted and given the equal chances
 4  for advancement.
 5    I complained to Darryl that I shared
 6  with Major Parrish some documents that came from an
 7  officer.  Actually, it was a white officer Markow
 8  that in my opinion unlawfully had arrested two
 9  African-Americans for a charge that they had not
10  committed and that they -- Officer Markhow violated
11  several policies within our general rules at the
12  time, and actually the City personnel policies and
13  manual.  And I told him that I had spoken with the
14  Judge about the two black gentlemen that was
15  arrested by the officer that I felt was unlawful
16  and I talked to the Judge and received her opinion
17  on it.
18    I complained to Darryl about Parrish
19  telling me when he thought that I needed to be home
20  as an adult when I was off duty.  I complained
21  about the incidents at Pockets Lounge.  I
22  complained about how Parrish did not give me -- he
23  appeared to give white officers more accolades in
```

Page 208

```
 1  Guardian Tracking than he did myself.
 2    I'm trying to make sure I got all the
 3  complaints with Darryl right.  I complained on how
 4  Parrish accused me of micro managing when I had not
 5  and I complained about him moving to bureaus from
 6  up under my supervision and I complained about him
 7  putting a -- Parrish creating a new position
 8  entitled Administrative Bureau Lieutenant which is
 9  Mike Etress, put him in charge of my bureau so I
10  would not or I could not command anybody pretty
11  much other than my secretary which was an
12  African-American female.  And I believe, I'm not
13  hundred percent sure on this one, I believe I told
14  him -- let me think about this and make sure.
15    I believe I complained that Parrish
16  had told me that he would be watching me as it
17  relates to my supervision over the person in that
18  position as a new Administrative Bureau lieutenant.
19  He would be watching me as far as my micro
20  management or what he labeled as my micro
21  management over this lieutenant.
22    What else did I complain to Darryl
23  about?  I can't remember specifically what it was,
```

52  (Pages 205 to 208)

Page 209

1 but I have complained to Darryl about inequality
2 prior to him being the EEO officer this last time.
3     At the moment right now, that is all
4 that I can remember at this point.
5     Q.    And I want to talk to you about all
6 of those things that you just listed. But first,
7 did you ever report anything to Darryl Mathews
8 about the Sons of Confederate Veterans?
9     A.    As I stated earlier, I'm not sure if
10 I sent my complaint straight to Darryl or if it
11 was sent to Mr. McKay. However, in a conversation
12 with Darryl Mathews, he did say that Mr. McKay
13 either passed along my complaint to him or either
14 he passed along the complaint to Mr. McKay, but I'm
15 not certain right now.
16     Q.    Do you know whether Mr. McKay has
17 access to Guardian Tracking?
18     A.    I don't know.
19     Q.    Other than making an entry in
20 Guardian Tracking in or around June of 2013, did
21 you go talk to Mr. McKay about your complaints at
22 that time?
23     MS. EDWARDS: Object to the form.

Page 210

1     A.    I don't recall speaking to Mr. McKay
2 about those, but I'm not sure.
3     Q.    You mentioned there was a picture or
4 a photograph or there were several people holding a
5 Confederate flag; is that right?
6     A.    Yes.
7     Q.    If you would look on Defendant's
8 Exhibit 18, the last page of that exhibit, it's a
9 very poor copy of a copy. Do you recognize that as
10 the photograph?
11     MS. EDWARDS: Object to the form.
12 It's a poor quality copy.
13     Q.    I'm going to see if I have got a
14 better copy over here. This one is a little bit
15 better. I will mark this as Defendant's
16 Exhibit 19.
17     (Whereupon, Defendant's Exhibit 19
18     was marked for identification.)
19     Q.    Is that the photograph that you were
20 referencing earlier?
21     MS. EDWARDS: Object to the form.
22 And I just like to make an objection for the record
23 just simply because it's still a very poor quality

Page 211

1 photo, but to the extent that you --
2     A.    Okay. I can't say that 100 percent
3 that this is a copy off of what I provided to them,
4 but it does appear to be a close copy, but there is
5 a difference in Exhibit 19 and --
6     Q.    And back of Exhibit 18?
7     A.    -- Exhibit 18.
8     Q.    Defendant's Exhibit 18 has -- someone
9 has written some names, it looks like, on that
10 photograph; is that right?
11     A.    Because there are names on 18 and not
12 19, yes, ma'am.
13     Q.    What did you understand was in that
14 photograph or captured in that photograph?
15     MS. EDWARDS: Object to the form.
16     A.    What do I understand to be depicted
17 in this photograph is what you are asking?
18     Q.    Yes.
19     A.    What I understand to be depicted in
20 this photograph are members of the Dothan Police
21 Department or former members of the Dothan Police
22 Department, a charter and a Confederate flag.
23     Q.    What do you mean by charter?

Page 212

1     A.    Just a charter, that is what I
2 understand there to be a charter of that
3 organization.
4     Q.    Do you know what organization that
5 was?
6     A.    It was I have been told it's Sons of
7 the Confederate Veterans where I spoke to you about
8 and said that Parrish was alleged to have been the
9 Henry County chapter president of that chapter.
10     Q.    Who told you that that was a picture
11 of the Sons of Confederate Veterans?
12     A.    I can't remember.
13     Q.    How did you get a copy of that
14 picture?
15     A.    I do not know.
16     Q.    When did you first get a copy of that
17 picture?
18     A.    Years back. I can't come close to
19 telling you.
20     Q.    Did Mr. McKay or Mr. Mathews respond
21 to your report regarding the Sons of Confederate
22 Veterans?
23     A.    To my knowledge, it was still under

53 (Pages 209 to 212)

Page 213

1    investigation when I was terminated. That is what
2    I remember right now. That is to my knowledge.
3    I'm not 100 percent certain.
4            (Whereupon, Defendant's Exhibit 20
5            was marked for identification.)
6        Q.    I'll show you what I have marked as
7    Defendant's Exhibit 20. Let me know after you have
8    had time to review it.
9        A.    (Reviewing document.)
10           MS. EDWARDS: I would like to object
11   for the record to Exhibit 20 to the extent it's an
12   incomplete copy. It references an attachment that
13   isn't attached and I'm not sure if there is more
14   than one page to this document.
15       Q.    Mr. Gray, have you had an opportunity
16   to review Defendant's Exhibit 20?
17       A.    I have.
18       Q.    Do you recall receiving a memo from
19   Major Parrish in or around June of 2013?
20       A.    I do remember receiving one. And as
21   my attorney said, I think there is more to this,
22   but I do remember this.
23       Q.    Do you recall as part of that memo

Page 214

1    that Major Parrish presented to you in June of 2014
2    that he stated that Captain Robinson had created
3    the Administration Division Lieutenant with the
4    approval of the chief of police?
5            MS. EDWARDS: Object to the form.
6        A.    I read that.
7        Q.    Do you recall him saying that to you
8    in a memo in June of 2013?
9        A.    I do.
10       Q.    Did he also state that Captain
11   Robinson had the leeway to do that as a senior
12   administrator and that you had the same leeway?
13           MS. EDWARDS: Object to the form.
14       A.    I remember that being in the memo and
15   I remember it being a lie.
16       Q.    Do you remember him stating in the
17   memo that you may keep Lieutenant Etress in his
18   current capacity or you may relinquish his duties to
19   those of only detention center as was the case
20   prior to Captain Robinson's actions?
21           MS. EDWARDS: Object to the form.
22       A.    I remember that in the memo and
23   remember that as being -- this memo that I recall

Page 215

1    that we are looking at does not reflect the truth
2    about what is contained within the memo.
3        Q.    What is untrue about this memo?
4        A.    It is untrue that I had the leeway to
5    direct the lieutenant because I'm not the one that
6    created the position for the Administrative Bureau
7    Lieutenant. And this came out only after my
8    complaint and went across the street to either
9    Delvick McKay or either the EEO officer Darryl
10   Mathews. And when I read this memo it was quite
11   funny that it appears that Major Parrish was trying
12   to cover his tracks for me complaining of that he
13   had diminished my abilities and working in my
14   position as a bureau commander, discriminating is
15   what he did and now he's trying to cover it up.
16       Q.    Did you respond to this memo in any
17   way?
18           MS. EDWARDS: Object to the form.
19       A.    I'm not 100 percent sure. I believe
20   I did but I'm not 100 percent sure.
21       Q.    At the time that you received this
22   memo, were you over the Administrative Bureau?
23           MS. EDWARDS: Object to the form.

Page 216

1        A.    I was the captain over Administrative
2    Bureau at the time, but I don't -- I was not
3    exercising that authority based upon Parrish
4    putting an Administrative Bureau Lieutenant in my
5    chain of command.
6        Q.    Parrish says in that memo that Stacy
7    Robinson had created the position that Lieutenant
8    Etress was in at that time; is that right?
9            MS. EDWARDS: Object to the form.
10       A.    That is what he says in this memo.
11       Q.    Was that position in place at the
12   time that you took over the Administrative Bureau?
13       A.    No.
14       Q.    When was that position put in effect?
15       A.    After I voiced my complaints with the
16   personnel department -- excuse me, with either
17   Delvick McKay or the EEO officer, to my knowledge
18   that I remember right now, I believe it came
19   afterwards, I'm not 100 percent certain.
20           And you asked me to point out in this
21   document what may not be correct. In paragraph two
22   of Exhibit 20, it says in the second sentence the
23   docket, excuse me -- paragraph two, the

## Page 217

1  Administrative Bureau currently encompasses three
2  primary areas, the docket detention facility,
3  records division and animal services division.
4         As administrative -- when I held this
5  position initially in 2010, it also had the
6  training division and the communication division.
7  As it sits here, those two divisions were removed.
8         Q.    Does that mean that he stated
9  something untrue in this memo?
10        A.    No, no, no, you are correct, that is
11  correct, what he stated right there is correct in
12  this memo.
13             MR. MCKAY:  Let's take five.
14             (Short break taken.)
15        Q.    (BY MS. MAYS:)  Did Chief Benton from
16  time to time send out memos to all personnel?
17        A.    I would like to clarify something in
18  the last question you just asked me in reference to
19  the memorandum on Page 20 when you said what in
20  here is not correct, I want to make sure that I
21  answer that correct.  Here in the second paragraph
22  it says, as I have discussed with you, how you
23  utilize your lieutenant is completely up to you.

## Page 218

1  That is not true.  He has not discussed that I
2  could use a lieutenant in a different position
3  other than what they were already into.  It wasn't
4  until later when I complained that he made the
5  statement as if he had already told me that I could
6  do this and he had not.
7         Q.    Did you ever attempt to use a
8  lieutenant in a manner in which he hadn't already
9  been assigned?
10             MS. EDWARDS:  Object to the form.
11        A.    No, he's the one that made --
12             MS. EDWARDS:  You can answer.
13        A.    I had never considered placing a
14  lieutenant over my bureau to pretty much in essence
15  do my job.  That idea came from Parrish when -- my
16  discussion with him, the idea came from Parrish.
17             And the way that I could document
18  that I first had knowledge that I could keep
19  Lieutenant Etress -- quote/unquote, you may keep
20  Lieutenant Etress in his current capacity or you
21  may relegate his duty to those whoever -- my first
22  knowledge of that was around the same career
23  counseling time.  This was never an option to me

## Page 219

1  from the beginning and I had never been told by
2  Major Parrish at all over any division or any
3  bureau that I have been over.
4         Q.    After you received this memo in June
5  of 2013, did you reassign Lieutenant Etress?
6             MS. EDWARDS:  I object to the form.
7         A.    I didn't do anything.
8             (Whereupon, Defendant's Exhibit 21
9             was marked for identification.)
10        Q.    Let me show you what I am marking as
11  Defendant's Exhibit 21.
12             MS. EDWARDS:  Have you finished
13  answering that question of what is incorrect in
14  that memo?
15        A.    I wasn't finished.
16        Q.    Okay.
17        A.    To complete answer to finish your
18  question, I told Parrish specifically that I was
19  going to leave everything upon hearing this and him
20  telling me for the first time, I told him I was
21  leaving everything like it was because I had a
22  complaint that already had been filed so I was not
23  going to touch anything that he had already done in

## Page 220

1  reference to this position that he created for
2  Lieutenant Etress.
3         Q.    And in telling him that you had a
4  complaint that had already been filed, what were
5  you referencing?
6         A.    I know that I said that I filed a
7  complaint with either EEO Officer Mathews or either
8  the personnel director Delvick McKay, I believe
9  that was the complaint that I was referring to.
10  That is what I believe to my knowledge right now.
11        Q.    I'll show you what I have marked as
12  Defendant's Exhibit 21.
13        A.    (Reviewing document.)  Okay.
14        Q.    Does that memo reflect that in April
15  of 2012 Chief Benton stated that effective
16  immediately Lieutenant Mark Nelms would be assigned
17  to the Administrative Services Bureau?
18             MS. EDWARDS:  Object to the form.
19        A.    That is what this memo says that you
20  have handed me here.
21        Q.    Okay.  You told me earlier that you
22  made a number of reports or reported a number of
23  things to Darryl Mathews.  Do you recall meeting

Page 221

```
 1   with him in August of 2013?
 2           MS. EDWARDS: Object to the form.
 3      A.   I met with -- I can't recall if it
 4   was in August of '13. I have met with him several
 5   times but I don't remember when specifically.
 6      Q.   You testified earlier that one of the
 7   audio recordings that you have produced in this
 8   case was a meeting that you had with Darryl
 9   Mathews; is that right?
10      A.   I testified earlier that there is an
11   audio recording that I did have with Darryl.
12      Q.   And do you recall when the
13   conversation took place?
14      A.   Right now, I don't.
15      Q.   Who was present for that
16   conversation?
17      A.   To my knowledge, it was only Darryl
18   and I.
19      Q.   Do you know whether Mr. Mathews was
20   also recorded in the conversation?
21      A.   Yes, he was.
22           MS. EDWARDS: I didn't hear the
23   question.
```

Page 222

```
 1           (Record read.)
 2           MS. EDWARDS: Object to the form.
 3   You can answer if you --
 4      A.   He was.
 5      Q.   Did he record the conversation also?
 6      A.   Oh, was that the question?
 7      Q.   That was the question.
 8      A.   I didn't hear it like that.
 9      Q.   No, my question to you is: Do you
10   know whether Mr. Mathews also recorded the
11   conversation?
12      A.   I'm not sure.
13      Q.   Does he know that you recorded the
14   conversation?
15      A.   I'm not sure if he knows that.
16      Q.   Did you make him aware that you were
17   recording the conversation?
18      A.   I don't think I did.
19      Q.   Do you recall what y'all talked about
20   during that meeting?
21           MS. EDWARDS: Object to the form.
22      A.   Not specifically right now.
23      Q.   Why did you record that conversation?
```

Page 223

```
 1      A.   Because I have a little faith in
 2   Darryl Mathews as an EEO officer of Dothan.
 3      Q.   Did you record any other
 4   conversations with Mr. Mathews?
 5      A.   Yes.
 6      Q.   But those aren't related to your
 7   claims in this case?
 8      A.   I have turned that recording over to
 9   my attorney. I just found it actually.
10      Q.   You just found it today?
11      A.   Not today. Just here recently within
12   the last --
13           MS. EDWARDS: I don't believe I have
14   received anything but one recording in this case
15   from you.
16      A.   Okay. I need to look over the method
17   of how --
18           MS. EDWARDS: Do you have another
19   recording of you meeting with Darryl Mathews other
20   than the one that we have produced in this case?
21      A.   I believe there is another one with
22   him in it.
23           MS. EDWARDS: Can you verify that and
```

Page 224

```
 1   let us know? I only know of the one.
 2      A.   Yeah, I can do that.
 3           MS. EDWARDS: Okay. If there is
 4   another recording with Darryl Mathews, you will
 5   have it if it's related to the claims of this case
 6   and responsive to your request.
 7           MS. MAYS: Thank you.
 8      Q.   When do you believe that you recorded
 9   another conversation with Darryl Mathews?
10      A.   I don't know what the date was.
11      Q.   Have you recorded any conversations
12   with any other employees at the City of Dothan
13   related to your claims in this case?
14      A.   Yes.
15      Q.   And who were those conversations
16   with?
17      A.   Steve Parrish and I think that is it
18   relating to this case.
19      Q.   Have you produced that recording of
20   the conversation with Steve Parrish to your
21   attorney?
22      A.   I guess I'm going to have to find out
23   if I did or not.
```

Page 225

1    MS. EDWARDS: We will verify if there
2    is a recording with Steve Parrish, and if it is
3    responsive to the claims of this lawsuit and
4    responsive to defendant's request, it will be
5    produced.
6    Q.    Do you recall when that conversation
7    took place?
8    A.    No, I don't, not right now.
9    Q.    Do you recall what you talked about
10   during that conversation?
11   A.    I remember telling Steve Parrish did
12   I think that I was being discriminated -- that I
13   was being discriminated against and he wasn't
14   treating me equally as he did the other white
15   captains and that I didn't feel that I had the
16   authority given the other white captains. And I
17   can't recall at the time whatever else. There may
18   have been something else but I can't remember
19   specifically what it was right now.
20   Q.    Do you recall how Major Parrish
21   responded?
22   A.    The only thing that I recall in that
23   is he avoided -- he seemed to have avoided the

Page 226

1    conversation about me being discriminated against.
2    Q.    The other recording that you have of
3    a conversation with Darryl Mathews, do you recall
4    what that conversation was about?
5    A.    Ma'am, specifically not right now, I
6    don't, I'm sorry.
7         (Whereupon, Defendant's Exhibit 22
8         was marked for identification.)
9    Q.    I'll show you what I have marked as
10   Defendant's Exhibit 22. Let me know once you have
11   had time to review it.
12   A.    (Reviewing document.)
13   MS. EDWARDS: I want it on the record
14   that we have the allotted seven hours coming up.
15   We will give you a little leeway here with this,
16   but, you know, you get seven hours under the rules
17   so that is what we agreed to.
18   MS. MAYS: We did and we are going to
19   need more than the seven hours to get through all
20   the material that we need to to cover his claims in
21   this case. Mr. Gray has four counts in his
22   complaint. He was a 28-year employee with the City
23   of Dothan. We have not gone astray in our

Page 227

1    questions today. They have all been relevant and
2    related to his claims in this case and we will be
3    happy to ask the Court for more time if we can't
4    work it out. We would love to work it out if that
5    is possible.
6    MS. EDWARDS: I don't want to keep
7    him for another hour, so, you know, if we could
8    wrap it up really quickly, I can work with you on
9    that, but I don't want to drag it out for another
10   hour.
11   MS. MAYS: I don't know that we are
12   going to be able to wrap it up in an hour, so do
13   you want to talk about that?
14   MS. EDWARDS: He's going to be
15   getting worn out which is part of the reason I like
16   to try to limit it to seven hours. It gets more
17   and more difficult as the day drags on to --
18   THE WITNESS: Are you driving home?
19   MS. EDWARDS: The stamina --
20   THE WITNESS: You are spending the
21   night, aren't you?
22   MS. MAYS: I understand that.
23   MS. EDWARDS: How long do you think

Page 228

1    that you would need?
2    MS. MAYS: Some of that depends on
3    the responsiveness, and that is not to imply that
4    he has been unresponsive at all. But I definitely
5    have more than an hour.
6    MS. EDWARDS: I can't agree to that
7    simply because it's just been a grueling seven
8    hours and, you know, it's -- he's not going to
9    maintain the clarity to answer.
10   THE WITNESS: I have had a headache
11   for about the last four or five hours.
12   MS. MAYS: Well, I'm happy to stop at
13   some point and reconvene.
14   MS. EDWARDS: Well, I mean that is
15   the thing. We agreed to seven hours per deponent
16   and we made that agreement based on the claim.
17   We haven't amended to add any more
18   claims than what we had originally when we agreed
19   to the seven hours. I just feel it's going to
20   prejudice my client to continue to put him up past
21   the rule's requirement and past what we agreed to
22   in the party planning meeting. So while I would be
23   willing to work with you for a little more time

Page 229

1    here today, I can't agree to more than an hour and,
2    you know --
3                MS. MAYS:  And we will just go
4    through today and see where we get.  And if we need
5    to file a motion or something with the Court to ask
6    for additional time, I'll be happy to do that.
7                In addition, I'll note that Mr. Gray
8    has also testified that he may have additional
9    records that are responsive to our discovery
10   requests and that we might need to ask him about as
11   well.
12               MS. EDWARDS:  And I would be willing
13   to allow you to question him on any recordings that
14   we do find that are responsive to defendant's
15   discovery request, but limited to questions
16   regarding those recordings only.
17               MS. MAYS:  I hear you.  We will keep
18   moving and see where we get today.
19       Q.     (BY MS. MAYS:)  Do you recognize
20   Defendant's Exhibit 22 as the Garrity notice that
21   you signed on August 25th, 2013?
22       A.     It is a Garrity notice and it does
23   have a signature of mine on it.

Page 230

1        Q.     Were you in fact interviewed by
2    some -- let's see, Donny Smith on August the 23rd,
3    I mean August the 25th, 2013?
4        A.     That appears to be correct.
5        Q.     Look at the second page of that
6    exhibit.  The following day were you placed or that
7    same day were you placed on paid administrative
8    leave?
9                MS. EDWARDS:  Object to the form.
10       A.     Yes.
11       Q.     Were you ever at an Outcast
12   Motorcycle Club when marijuana was smoked in your
13   presence?
14       A.     No.
15       Q.     If several members of Outcast say
16   that you were at their clubhouse when marijuana was
17   smoked in their presence, are they being untruthful
18   about that?
19       A.     That is correct.
20       Q.     Do you understand that there were
21   several agencies that were involved in the
22   investigation about the incident that occurred on
23   August the 25th, 2013 at the Outcast clubhouse in

Page 231

1    Dothan?
2                MS. EDWARDS:  Object to the form.
3        A.     I don't know.
4        Q.     Do you know whether the FBI was
5    involved in that investigation?
6                MS. EDWARDS:  Object to the form.
7        A.     I don't know.
8        Q.     Do you know whether the Alabama
9    Bureau of Investigation was involved in that
10   investigation?
11               MS. EDWARDS:  Object to the form.
12       A.     I don't know.
13       Q.     Do you know whether the Alabama
14   Beverage Control was involved in that
15   investigation?
16               MS. EDWARDS:  Object to the form.
17       A.     I don't know.
18       Q.     Is it customary to be placed on paid
19   administrative leave pending an investigation in
20   matters involving officer misconduct?
21               MS. EDWARDS:  Object to the form.
22       A.     I can't say it's customary.
23       Q.     Do you know of instances where

Page 232

1    officers' conduct is being investigated where they
2    haven't been placed on paid administrative leave?
3        A.     Yes.
4        Q.     Do you know of instances where an
5    officer's conduct is being investigated and several
6    other agencies including the Dothan Police
7    Department are involved in those investigations?
8        A.     Run that by me one more time, please.
9        Q.     Sure.  Do you know of any other
10   instances where an officer's conduct is being
11   investigated and other agencies are involved?
12               MS. EDWARDS:  I'll object to the
13   form.
14       A.     I can't answer that question, not
15   that I know of.  I can't answer that.
16       Q.     You said not that you know of, is
17   that what you said?
18       A.     I don't know of other agencies.  I
19   don't have privy of other agencies and whether or
20   not other agencies have called in to do an
21   investigation on someone, not that I can recall
22   right now.
23               (Whereupon, Defendant's Exhibit 23

58 (Pages 229 to 232)

Page 233

1         was marked for identification.)
2         Q.    I'll show you what I have marked as
3    Defendant's Exhibit 23.
4         A.    Let me clarify that last question. I
5    just thought -- read it to me one more time and
6    make sure I'm going to answer the right.
7         (Record read.)
8         A.    I just thought about one which is an
9    officer involved shooting that happened in Dothan,
10   Alabama involving Officer Darron Moody and the
11   Alabama Bureau of Investigations were called in and
12   investigated that shooting. There could be -- and
13   I'm not sure -- that is all, I'm aware of that.
14   I'm aware that has been done in the past.
15        (Reporter interruption.)
16        Q.    Did Darron Moody do the shooting in
17   that investigation?
18        A.    Yes.
19        Q.    Do you know whether he was suspended
20   while that investigation took place?
21        A.    He was.
22        (Whereupon, Defendant's Exhibit 24
23        was marked for identification.)

Page 234

1         Q.    I'll show you what I have marked as
2    Defendant's Exhibit 24.
3         MS. EDWARDS:  Do we have a 23?
4         MS. MAYS:  We do have a 23. I'm
5    skipping it for right now.
6         Q.    My question is: Did you receive a
7    memo from Darryl Mathews in or around
8    September 2013 regarding his findings related to
9    the EEO investigation?
10        A.    I answered that earlier that I was
11   not sure if I had read one. You just handed me 24,
12   Exhibit 24, and I haven't had the chance to go
13   through the first paragraph, if that is what you
14   are going to be referring to.
15        Q.    (Nods head.)
16        A.    It is?
17        Q.    I wanted you to know my question as
18   you review it. That is going to be my question:
19   Do you recall receiving this memo?
20        A.    (Reviewing document.)
21        MS. MAYS:  We are off the record
22   while he's reviewing.
23        (Off-the-record discussion.)

Page 235

1         MS. EDWARDS:  Mr. Gray is having a
2    really difficult time reading and comprehending
3    when he is looking at these exhibits, the words are
4    kind of running together, we need to just call an
5    end to the deposition at this time because we are
6    concerned about his ability to continue --
7         MS. EDWARDS:  Okay.
8         MS. EDWARDS:  -- to testify.
9         MS. MAYS:  And is it your position
10   that I still have some more time?
11        MS. EDWARDS:  We will allow you the
12   time to question him on any recordings that we
13   determine that he may have in his possession that
14   would be responsive to defendant's discovery
15   requests.
16        MS. MAYS:  So this concludes the
17   deposition for today; is that right?
18        MS. EDWARDS:  Yes.
19        MS. MAYS:  Okay. And we will be
20   asking the Court for additional time.
21        (Off-the-record discussion.)
22        MS. EDWARDS:  Okay. I'll go ahead
23   and object to 23 and 24 to the extent that Mr. Gray

Page 236

1    wasn't able to authenticate those exhibits for the
2    record.
3
4         FURTHER THE DEPONENT SAITH NOT
5
6    (The deposition was concluded at 5:54 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

```
                                        Page 237
 1              C E R T I F I C A T E
 2
 3     STATE OF ALABAMA)
 4     JEFFERSON COUNTY)
 5
 6              I hereby certify that the above and
 7     foregoing deposition was taken down by me in
 8     stenotype, and the questions and answers thereto
 9     were reduced to typewriting under my supervision,
10     and that the foregoing represents a true and
11     correct transcript of the deposition given by said
12     witness upon said hearing.
13              I further certify that I am neither
14     of counsel nor of kin to the parties to the action,
15     nor am I in anywise interested in the result of
16     said cause.
17
18
19
20
                /s/ Teresa Turquitt Davis
21     TERESA TURQUITT DAVIS, CCR, RPR
       CCR #162, Expires 09/30/15
22     Commissioner for the
       State of Alabama at Large
23     My Commission Expires:  12/03/16
```

Freedom Court Reporting                              877-373-3660