# EXHIBIT A

## DECLARATION OF IVAN KEITH GRAY

1. My name is Ivan "Keith" Gray. I am over nineteen (19) years of age, of sound mind, and have firsthand knowledge of the facts herein. I swear under penalty of perjury that the following testimony is true and correct to the best of my knowledge.

2. I am a black 28-year veteran of the Dothan Police Department. I worked my way up from Jail Security Officer to my most recent rank of Captain. I have consistently earned top performance ratings throughout my employment.

3. On September 23, 2013, the City of Dothan terminated my employment. I believe the City terminated me because I am black, because I complained of discrimination and harassment, and because of my association with my motorcycle club, Bama Boyz Motorcycle Club, Inc.

4. At the time of my termination, I was the only black sworn police supervisor in the Dothan Police Department. I was only one (1) of about fifteen (15) black sworn police officers within the Dothan Police Department, which employed about one-hundred-sixty-five (165) sworn officers when fully staffed. At least two (2) of the remaining black officers have left the department since I was terminated.

5. I have been the victim of race discrimination and harassment throughout my career. I was hired as a jail security officer despite having applied for police officer, dispatcher, and jail security positions. Jail security was the least prestigious position of the three. The City placed me on a registry of candidates for an officer position. When my name was next on the registry to be promoted to officer, the City abandoned the registry system. I complained to then-Police Chief Kater Williams, who told me he could do whatever he wanted to do. I retook the civil service exam in order to be considered, and was eventually hired later that year.

6. In 1988, I filed a lawsuit in the Circuit Court of Houston County (Civil Action CV88-603) in order to obtain my promotion to Police Corporal. I was denied the opportunity to take the Corporal exam because the City alleged I did not have the minimum three years' experience as of the closing date, even though I would have had three years by the exam date. Three white officers, Jim Smith, Duane Herring, and Dorothy Johnson, were in the same situation for Sergeant and were permitted to take the exam. I was able to take the exam after the Court ruled in my favor.

7. Unfortunately, the discrimination persisted. I was denied numerous training opportunities throughout my employment that were offered to equally and lower-ranked white officers. Most of the training opportunities were not openly advertised. I would learn that other officers were selected for training, whereas I was not. I specifically requested training that was denied. I can presently recall the following courses being offered to white officers that I was denied: Jon Beeson: BIA Financial Investigative Techniques Training, How to

Development of Criminal Intelligence Unit, Heads Up in Pre-K School, 2nd National Gang Conference; <u>Hilda Bryan</u>: Interview and Interrogation; <u>Gary Coleman</u>: Title Pawn Seminar; <u>Michael Etress</u>: Basic Crime Scene Investigation; <u>Fred Fellows</u>: Investigative Video Operations; <u>Antonio Gonzalez</u> (Hispanic): Gang School; <u>David Jay</u>: Homicide Investigations, Anti-Terrorism Crisis Negotiations, Practical Hostage Negotiations, Advanced Cause and Origin/Court Techniques, Fire/Arson Investigation, Crime Scene Analysis and Offender Profiling, Statement Analysis, Advanced Hostage Negotiations, Investigative Video Operations; <u>Tommy Merritt</u>: Investigative Video Operations; <u>Ray Owens</u>: Anti-Terrorism Crisis Negotiations, Practical Hostage Negotiations, Super Glue Workshop and Blood Spatter, Introduction to Practical Crime Scene Techniques, Statement Analysis; <u>Shelby Owen</u>: Basic Crime Scene Investigation; <u>Robert Sorrells</u>: Homicide Investigations, National ROCIC Homicide Seminar, Investigative Video Operations; <u>Jim Stanley</u>: Investigative Video Operations, How to Develop an Effective Criminal Intelligence Unit, Statement Analysis; <u>Buren Wambles</u>: Statement Analysis; <u>Della Williamson</u>: Interview and Interrogation; <u>Willy Williamson</u>: BIA Financial Investigative Techniques Training; <u>Roy Woodham</u>: Homicide Investigations, Behavioral Crime Scene Analysis and Offender Profiling, Statement Analysis, Fire/Arson Investigations; <u>Wendell Wooten</u>: Covert Vehicle Installation, Technical Services/Advanced Video Operations, Super Glue Workshop and Blood Spatter, Investigative Video Operations, Nikon School of Photography.

8. I testified about denial of training and preferential assignments during my deposition, but the City's attorney asked me to limit my answers to 2010 and later. I believe the history is important, however, to show how the City used it to advance white officers at a faster pace than me over the years. Other job assignments I may not have mentioned include David Jay and Roy Woodham being assigned to the Criminal Investigations Division (CID) as Commander. There has never been a black Commander assigned to CID or the Narcotics/Vice Division. I also applied for the SWAT Team. I was denied twice and was told I would have to try out if and when those positions became available. The City selected all white males for those positions without try outs.

9. I had to pay for numerous on-the-job training opportunities out-of-pocket, even though the City had funds to pay for it. I obtained a Bachelor of Science in Criminal Justice and a Master's degree in Foundations in Education/Corrections Counseling on my own.

10. I requested to attend FBI National Academy but was never selected. Only white males were selected to attend with no prior notices to inform interested personnel. Gregory Benton, John Collier, Stanley Devane, Art Habbard, David Kirkland, Carlton Ott, Stacey Robinson, John White, and Raymond Wiehe have all been selected to attend. The City used my lack of FBI National Academy training to deny my promotion to Chief of Police, which it gave to Gregory Benton in 2009. Right before the selection, I was the most qualified candidate because I had a Master's degree, which Benton did not have. A Master's Degree was the <u>only</u> listed preferred qualification in the past for this position. I believe the City changed the qualifications to add FBI National Academy training as a preferred qualification so that it could select Benton instead of me.

11. I was denied other promotions that were given to lesser-qualified, white employees. In 2004, I met all of the qualifications listed for the Chief of Police job to include the preferred Master's level degree. Only after the position announcement closing date did City Manager Mike West verbally add an additional preferred qualification of FBI National Academy Graduate. John Powell was hired for the job and had only achieved the rank of Sergeant with an outside police department. According to the Consent Decree and Affirmative Action Plan, the City should have considered me. As soon as Powell became chief, he immediately removed me from Internal Affairs and placed me back on patrol, but left a white officer in that position.

12. The City scored the subjective portions of my Civil Service promotional exams lower than white candidates, including the interview portions. I complained about the testing, which I believed was discriminatory. Shortly after I complained, without admitting fault or otherwise addressing my complaint, the City implemented an Assessment Center. By then, however, the City's use of the old, subjective Civil Service system had allowed a number of white officers to advance at a faster rate, including Gregory Benton, Antonio Gonzalez, Steve Parrish, Raymond Wiehe, and Roy Woodham, all of whom have less education.

13. In 2006, after the Assessment Center was in place, there were three (3) available Lieutenant's positions. I placed 3rd out of all the candidates. Another officer had a tied score, which meant only 3 of the top-ranking 4 officers would be selected. I was the only black candidate. The same day the results were issued, the City placed me under a meritless Internal Affairs investigation. I know of no other white officer who committed the same alleged offense who was investigated. I believe the City was targeting me based on race, so that it could promote the 3 white officers. Internal Affairs subjected me to an intense interrogation. I had so much evidence to undermine the allegations, however, that I ultimately received one of the positions. I know of no other white officers who were subjected to the same scrutiny. I was the first and only black Police Lieutenant in the Dothan Police Department.

14. I heard the N----- word numerous times during my employment. I have personally been called the N----- word and have heard superior officers use the word. On one occasion, Lieutenant David Kirkland (white) and I were searching for a missing black juvenile. While passing a convenience store, Kirkland said, "There ain't no Niggers over there." Corporal Arthur Schaefer (white) referred to the area in which he was patrolling as the "poor black trash part of town." Another time, I was giving a coworker money for training while standing in a parking lot next to a busy street. He made the comment, "I wonder what people will think seeing a Nigger handing me a bunch of money." Lieutenant Clifford Jarrett also used the word "Nigger" while at work and was suspended for only one day. Information Technology Director Tim Stewart used the word "Nigger" while addressing a subordinate employee. Superior officers often used "code words" to refer to black officers and black citizens.

15. My direct supervisor, Major Steve Parrish, along with several other current and former members of the Dothan Police Department, were members of the Sons of Confederate Veterans.

16. A picture of the group has been widely circulated within the Department that shows Parrish with other current and former members of the Dothan Police Department behind a confederate flag. A true and accurate the photograph is attached as Exhibit 1.

17. The members listed from left to right are Current Sgt. Clark Rice; Name Unknown; Current Cpt. Carlton "Bubba" Ott, my replacement; Ret. Sgt. Steve Hamm; Current Chief of Police (former Major) Steve Parrish; Current Cpt. David Jay; Name Unknown; Ret. Lt. Dewayne Herring, currently a Houston County Sherriff's Deputy; Andy Hughes, former Houston County Sherriff and current Director of Alabama Homeland Security; Ret. Sgt. Gary Coleman, current Officer with the Dothan Airport Police; and Current Sgt. Scott Smith.

18. I found Parrish's and the other officers' association with the Sons of Confederate Veterans and the photograph to be highly offensive. Parrish also had his office decorated with confederate décor and magazines. I complained to City Manager Mike West in year 2004, and showed him a copy of the photo. I also complained to the City of Dothan Equal Employment Officer. I verbally complained to Dothan Police Department Internal Affairs Investigators and others about both, but nothing was ever done about it. Parrish named his son after Nathan Bedford Forrest, the first Grand Wizard of the Ku Klux Klan. Forrest has also been known as the co-founder of the Ku Klux Klan.

19. The Sons of Confederate Veterans has ties to the KKK and is listed on the Southern Poverty Law's "Hate Watch" website. True and accurate copies of the website pages I viewed are attached as Exhibit 2.

20. I witnessed posts on Officer Michael Woodside's Facebook page that included a half-charred face of President Obama with derogatory comments about the President. I found the photo and posts to be racially offensive.

21. In October 2010, Parrish became my direct supervisor. Throughout the time he supervised me until my termination, Parrish subjected me to unequal treatment. Parrish scrutinized and nitpicked my performance, which he did not do with my white counterparts and lower-ranked white officers. Parrish would question my whereabouts when he knew I was either off work that day or at training he had approved. I believe he intentionally misrepresented facts both overtly and covertly in an attempt to embarrass me and defame my character due to my race. Parrish gave more deference and respect to the white officers and command staff, some of whom were members of Sons of Confederate Veterans.

22. On February 3, 2012, Sergeant Mike Etress served me with notice of an Internal Affairs investigation initiated by a complaint filed by Officer Taiwan Truitt. I responded with a rebuttal describing the incident, wherein I had addressed Truitt's conduct violating the rights of two citizens. Truitt's conduct was not investigated. Parrish used the complaint to issue an unfounded Minor 1st Offense, Formal Counseling. Immediately afterwards on February 20 2012, I was served with notice of another Internal Affairs investigation by Sergeant Donny Smith, accusing me of "interfering with" a separate Internal Affairs complaint, where I had assisted a black dispatcher trainee with filing a complaint of race discrimination. On or about February 20, 2012, I was served

with a third Internal Affairs investigation notice by Sergeant Smith allegedly arising from a complaint filed by Sergeant Adrianne Woodruff (white) after I counseled her for mismanagement of the Animal Control Division and violating the City Commission Resolution. Parrish admonished me for counseling her performance, which was my responsibility as her superior officer. This is the first and only time I have ever seen an officer placed under three (3) separate Internal Affairs investigations at one time. I felt I was being harassed and targeted because of my race.

23. I recall Parrish questioning me about one polygraph report he accused me of delaying. I reminded him that the delay was not on my part. It was on the part of those responsible for scheduling and administering the exam. I was only responsible for reviewing polygraph results once the exams had been administered by other employees.

24. On February 24, 2012, Parrish placed me on a Performance Improvement Plan ("PIP") without justification. This was the first PIP I recall ever being placed on during career. I believe the true intent of the PIP was to demean me and undermine my character. I did not "frequent" night clubs into the early hours on work nights. Parrish constantly harassed me about my off-duty time. I never harassed my subordinates about their off-time, nor would I even mention it, unless there was some sort of performance issue. I believe my good performance speaks for itself.

25. After Parrish placed me on the PIP, for months, he acted distant and indifferent toward me, while treating the white captains as normal. Parrish failed to communicate with me about job-related information pertinent to my duties. He continued to scrutinize my performance and accuse me of micromanaging the white ranking officers I managed. I felt ostracized within the department. I felt like Parrish was looking for anything he could find to sabotage my employment.

26. On or around May 14, 2012, I complained to Chief Benton about the treatment. I specifically mentioned that I believe Parrish's treatment and the PIP plan were based on race. I knew that my six (6)-month performance appraisal was due to be performed a month later, in June. I expressed concern to Benton about Parrish's providing that review considering the ongoing harassment.

27. The City removed me from the PIP plan on May 15, 2012, the day after my complaint to Benton. Despite removing me from the PIP, Parrish continued to scrutinize and nitpick my performance. Parrish demanded that I go through him on *all* work-related matters rather than allowing him to go through Benton on some matters. Parrish, at one point, had *ordered* me to go through Benton on some matters, which I found to be contradictory.

28. In or around mid-January 2013, my work environment became increasingly hostile when I complained about the City's targeting and treatment of minority citizens. I voiced concerns about another officer's arrest of two young black males who were unlawfully arrested, convicted (one entered into a plea deal), and imprisoned based on an illegal warrant. Parrish discouraged me from investigating the matter and told me to "move on." The City never held the officer (white) accountable for his actions. I complained about it to Benton

29. Almost immediately after I complained about the unlawful arrests, the City reassigned me from the Field Operations Bureau to the Administrative Services Bureau, a lower status position that significantly reduced my supervisory authority.

30. In May 2013, Parrish placed Lieutenant Etress, a lower-ranked white officer between me and the staff I commanded. The City removed five (5) of my divisions and reassigned them to Parrish and Etress. I went from supervising approximately sixty (60) employees to supervising only two (2): Lieutenant Etress and the only black secretary in the police department.

31. I had little to no actual authority over Lieutenant Etress. Major Parrish continued to accuse me of "micromanaging" and warned me that he was "watching" me with regard to my supervision of Etress. Parrish had previously told me he was "watching" me with regard to my supervision of Lieutenant Mark Nelms (white) before Etress was transferred.

32. I had never seen many of the Guardian Tracking posts Parrish alleges to have submitted on my good performance. The first time I saw many of the posts was at the Dothan Personnel Board hearing and appeal of my termination. Guardian Tracking posts are not broadcast to the general department. The posts must be specifically accessed by someone with authority to review them. Parrish failed to make entries about many of my significant achievements that would have become part of my overall performance record.
Some examples include Alabama Governor Robert Bentley publically awarding certificates of recognition to the Bomb Squad under my command for the safe return of a kidnapped child held hostage and obtaining funds from the State of Alabama for training our Executive Protection Team, at no cost to the City of Dothan.

33. I complained about discrimination and harassment throughout my employment. I complained to Benton, former Chief John White, Human Resources Manager Delvick McKay, former Human Resources Manager Kai Davis, EEO Officer Darryl Matthews, former EEO Officer Elston Jones, former EEO Officer Gary Griffin, City Manager Michael West, former City Manager Jerry Gwaltney, and the City of Dothan City Commission.

34. I complained to Chief Benton about race on at least three occasions between 2012 and 2013. I complained about Parrish's association with Sons of Confederate Veterans and the offensive photo of the confederate flag. I complained of Parrish's harassment and nitpicking of my performance. I complained about Parrish's transfer of me to Administrative Services and removal of my supervisory authority. Benton told me at one point that I was "making a mountain out of a mole hill." Benton never investigated any of my complaints.

35. I complained to Darryl Mathews in late February 2013 regarding the discrimination and harassment and my transfer to Administrative Services. Mathews told me to "wait" because he was "too busy with the RaeMonica Carney investigation" to investigate my complaint. Ms. Carney (black) had also filed a complaint against the City based on race discrimination.

36. After receiving no communication from Mathews, I filed the June

2013 Guardian Tracking complaint in response to an entry Parrish made about me further scrutinizing my performance. Nothing was done to redress my treatment.

37. I filed a Charge of Discrimination with the EEOC on or about August 2, 2013 alleging race discrimination without the assistance of counsel. I filed an amended charge and a charge for retaliation on or about October 4, 2013.

38. Three (3) weeks after I filed my initial EEOC charge, Internal Affairs called me in on a Sunday evening around 10:30 P.M. and began an hour-long interrogation about my motorcycle club. Smith and Magill used interrogation tactics more in line with a criminal investigation than an Internal Affairs investigation. The information I provided them should have dissuaded any alleged concerns about my involvement with any illegal activity, which I absolutely deny.

39. The City subjected me to a second intense interrogation that lasted approximately five (5) hours. I was not provided the required notice of topics/allegations prior to the second interview, which had changed from the first, as required by department policy. Smith and Magill again used interrogation tactics more akin to interrogating a criminal suspect. I fully cooperated, but I could tell they were trying to dig up something on me and put words in my mouth. I voiced several times during the interrogations that believed I was the victim of retaliation for having filed an EEOC charge, which I had filed three (3) weeks before.

40. A "firearm dropbox" exists outside the interrogation room, specifically for the purpose of removing firearms prior to an interrogation. Sergeants Smith and Magill wore theirs during both of my interrogations in violation of departmental policy. They questioned me in a threatening manner, raising their voices and interrupting my answers when it did not suit them, for example when I tried to bring up the Consent Decree, Sons of Confederate Veterans, or that I thought their investigation was a "witch hunt." Internal Affairs investigations are supposed to be conducted in a neutral, fact-finding manner, not like a criminal investigation. Although I was represented by local counsel, we were told he could not object or otherwise interfere with their interrogation.

41. I have never seen another officer placed under a 4-week-long Internal Affairs Investigation during my entire twenty-eight (28) year career. I had worked seven (7) of those twenty-eight (28) years in Internal Affairs. In my experience, most Internal Affairs investigations last approximately a week or less. I believe the length of the investigation was to further "punish" and humiliate me for speaking up for my rights.

42. I have never known of the City to investigate an employee about their affiliation with an outside organization. The City never investigated Parrish for his involvement with Sons of Confederate Veterans, even though I made several complaints.

43. RaeMonica Carney and I are the only two black officers I knew of who had EEOC charges against the City at the time of the investigation. Ms. Carney was not a member of a motorcycle club.

44. I only received two copies of the Affirmative Action Plan during my employment, one in 1995 and the other in 2000. I had to request both copies from the Personnel Department. Neither the Consent Decree nor the Affirmative Action Plan were automatically distributed or posted to employees. I do not recall the City giving any EEO training while Mathews was the EEO Officer/Training Officer.

45. I am aware of several employees who committed Intolerable Offenses and were not terminated. Sergeant Andy Hughes (white), member of Sons of Confederate Veterans, ran for the Houston County Sherriff's office while still employed by the City.

46. Sergeant Mike Cirulli (white) committed gross insubordination when he pointed his finger in a captain's face and yelled, "You're a D--- liar."

47. Benton (white) committed the Intolerable offense of willful and deliberate damage to city property when he threw a City-issued cell phone on the floor and destroyed it.

48. Sergeant Anthony Nelms (white) pointed his service weapon at a fellow Dothan police officer during a departmental meeting. Nelms had previous Major infractions on his record for excessive speed on 2 occasions (one resulting in significant damage to a City-issued vehicle and the other when a call had been downgraded and excessive speed was no longer necessary). The City did not place him under an intense, four (4)-week-long internal affairs investigation prior to offering him the opportunity to resign, as it did me.

49. Corporal Arthur Schaefer (white) committed an intolerable offense for being under the influence of alcohol while on duty. Corporal Schaefer drove a City-issued vehicle to Ozark, Alabama, in uniform, to attend training related to breathalyzer tests. As part of the class, Schaefer was used to demonstrate blowing into the device. After the 20-30 minute drive to Ozark and a full day of class, Schaefer still registered at .05 blood-alcohol content. Chief Benton sent personnel from Dothan to pick up Schaefer and drive his City-issued vehicle back to the department. The City did not terminate Schaefer, and he is still employed by the City.

50. Lieutenant Raymond Wiehe (white) accessed a departmental computer system and falsified records related to his checking out of guns from the department. The City did not terminate his employment.

51. Officers Andrew Sutley, Jason Adkins, and Erik Duhaime (all white) stopped during transport of a prisoner. Sutley placed his service weapon to suspect's head while he and Adkins threatened him. All officers misrepresented the facts on their official reports. Sutley failed to report the seizure of marijuana. Further, Sutley was hired by Dothan Police Department after being fired by Luverne Police Department for harassing people without cause. The City did not terminate their employment.

52. Lieutenant Antonio Gonzalez was not terminated for sending sexually explicit messages over the City pager service.

53. Sergeant Jerry Mixon (white) violated sexually harassed a female subordinate (black) and was not terminated.

54. I know of six (6) white officers who looked up personal records without need and were given verbal counseling. The officers looked up an incident involving a fellow officer who had been involved in a domestic incident.

55. I know of no other officer who has been terminated for a first-time offense under Section 3-43(19) for "Other" Intolerable offenses.

56. In 2008, I founded Bama Boyz Motorcycle Club, a law-abiding motorcycle club that rides as a pastime and often participates in community charitable events. The extent of my "involvement" was receiving permission for Bama Boyz to ride in other motorcycle clubs' territories without trouble and attending approximately three (3) events in which members of Outcast club were present.

57. Bama Boyz' Dothan Chapter had about a dozen (12) members at the time of my termination. Bama Boyz' Anniston Chapter had about seven (7) members.

58. Bama Boyz is not a one percenter or outlaw motorcycle gang.

59. I has never been involved in or associated with criminal activity.

60. I knew of no members of Bama Boyz who had criminal histories.

61. I never knowingly associated with any persons I knew had conducted illegal activity or had encouraged violence.

62. I could not run background checks on every person I came in contact with that rode a motorcycle. It is illegal to run background checks on individuals unless they are under suspicion for a present crime.

63. Bama Boyz sought persons of good character to become members of our club. We relied primarily on recommendations of current members when considering new recruits for membership.

64. The City hosted a charity ride for Bama Boyz. We raised money for the Dothan Police Athletic League, which I gave to Chief Benton.

65. Chief Benton threatened me with retribution if I refused to resign. He said he would have my Alabama Peace Officer's Standards and Training Commission Diploma pulled (this is my license to be a police officer in the state of Alabama), that he would have my Alabama State Board Certification for Polygraph removed, and that he would not allow me to have my duty service weapon, which is offered to all sworn officers upon retirement. I refused to resign despite Benton's threats.

66. I believe I was wrongfully terminated because I complained of discrimination and harassment. I also feel that my First Amendment Rights to Associate with Bama Boyz has been violated. I did not violate any of the policies the City cited against me.

67. I applied for the Chief of Police position in April 2015. The City gave the position to Major Steve Parrish.

Date May 11, 2015                                    Ivan Keith Gray

# GRAY DEPOSITION

# EXHIBIT 1



# GRAY DEPOSITION

# EXHIBIT 2



DONATE

Fighting Hate • Teaching Tolerance • Seeking Justice

Skip to content

Skip to search - Accesskey = s

The Hatewatch blog is managed by the staff of the *Intelligence Project* of the Southern Poverty Law Center, an Alabama-based civil rights organization.



Home » Neo-Confederate » Once Again, Racism Rears Up in the Sons of Confederate Veterans

# Once Again, Racism Rears Up in the Sons of Confederate Veterans

By Mark Potok on February 11, 2011 - 10:07 am, Posted in Neo-Confederate

Share   Like 433   +1   Email   31

For much of the last decade, the Sons of Confederate Veterans (SCV) has been roiled by an internal civil war between racial extremists and those who want to keep the Southern heritage group a kind of history and genealogy club.

It's beginning to look like the racists won.

First came the news, originally reported on this blog last August, that the SCV was planning a Feb. 19 march down Dexter Avenue here in Montgomery, Ala., to "CELEBRATE THE BEGINNING OF THE CONFEDERACY" and ensure that it "is remembered and portrayed in the right way." What the SCV meant by "the right way" was made obvious by its website promoting the event, which insists that "the South was right!" and claims that "there is no difference between the invasion of France by Hitler and the invasion of the Southern states by Lincoln."

And now, from the Mississippi Division of the SCV, comes this new gem: The group wants the state to issue a special license plate, keyed like the Montgomery march to the 150th anniversary of the Civil War, to honor Confederate Gen. Nathan Bedford Forrest — a millionaire Memphis slave trader before the war, an apparent war criminal who presided over the massacre of surrendering black prisoners at Fort Pillow, Tenn., during it, and the first national leader of the Ku Klux Klan afterward, when the Klan's terrorist violence paved the way to a Jim Crow South.

Neo-Confederate apologists in the SCV and elsewhere claim that Forrest has been mischaracterized, that he was a good man who disbanded the Klan when it became violent. Mississippi SCV member Greg Stewart told The Associated Press that Forrest had sought "Christian redemption" and ultimately rejected the Klan. "He redeemed himself in his own time," he said. "We should respect that."

That is false. Forrest, for all the fawning attention he's received from the historical revisionists of the neo-Confederate

movement, was certainly a brilliant and highly successful cavalry general — but he was also a homicidal bully.

Before the war, according to a newspaper account at the time, he was known for personally bullwhipping slaves who were held stretched out in the air by four other slaves. Women slaves were reportedly stripped naked and whipped with a leather thong dipped in salt. Former slaves later backed up these accounts.

In 1864, Forrest demanded the surrender of 580 mostly black troops at Fort Pillow, warning them that otherwise, "I cannot be responsible for your fate," even as he stealthily and illegally improved his position during negotiations under the white flag. Then, when the Union commander refused, Forrest unleashed his men. "The slaughter was awful," an appalled Confederate sergeant later wrote his family. "I with several others tried to stop the butchery and at one time partially succeeded, but Gen. Forrest ordered them shot down like dogs, and the carnage continued." Numerous surviving Union soldiers reported hearing Confederate officers saying that Forrest had ordered them to "kill the last God damn one of them."

Forrest was known for personally executing deserters or Confederates who fled the field. As the war came to a close, he came upon a father and son near Selma, Ala., and decided they were deserters. He ordered them shot and their bodies left out for two days before burial with a sign, "Shot for desertion," hung above them. Several days later, it emerged that the pair had, in fact, been entirely innocent.

After the war, even as former Confederate Gen. Robert E. Lee was urging fellow Southerners to "promote harmony and good will" in the reborn Union, Forrest initiated hard-line resistance to Reconstruction and secretly became the Klan's first national leader. It is false that he disbanded the Klan because it became violent. In fact, Forrest disbanded the Klan — after lying to Congress about his membership — only after its work was done and it had come under severe criticism. Klan terrorism had by then already made it impossible for blacks and Republicans to vote.

Both the Montgomery march and the Mississippi license plate request are part of a whole series of events planned by the SCV to commemorate the sesquicentennial anniversary of the Civil War. None of them give so much as a nod to the horrors of slavery or to the civil rights movement that finally liberated the South a century later — and, in fact, the Montgomery neo-Confederate parade, in a particularly ugly and unmentioned irony, follows the same route as the end of the famous 1965 Selma-to-Montgomery voting rights march led by Martin Luther King Jr.

None of this is much of a surprise if you take a look at the national SCV website promoting the series of events, including the Montgomery march, that are meant to commemorate the 150th anniversary of the Civil War. There, a series of writers attempt to make the case that slavery had nothing to do with the war, another utter falsehood. In fact, as virtually all serious historians agree, the South seceded because it became obvious that Congress would not allow the extension of slavery to the new Western territories, threatening the slave lobby's dominance. The Texas Declaration of the Causes of Secession, for example, said plainly that the free states were "proclaiming the debasing doctrine of equality for all men, irrespective of race or color," and added that blacks were "rightfully held and regarded as an inferior and dependent race." Alexander Stephens, vice president of the Confederacy, said as much in his infamous 1861 "Cornerstone" speech: "Our new Government is founded on exactly the opposite idea; its foundations are laid, its cornerstone rests, upon the great truth that the negro is not equal to the white man; that slavery — subordination to the superior race — is his natural and moral condition."

But these historical facts are of no interest to the SCV. Instead, while most Americans remember the bloodiest war in American history as the nation's most trying moment, the SCV is busy promoting a Southern past that never was.

movement, was certainly a brilliant and highly successful cavalry general — but he was also a homicidal bully.

Before the war, according to a newspaper account at the time, he was known for personally bullwhipping slaves who were held stretched out in the air by four other slaves. Women slaves were reportedly stripped naked and whipped with a leather thong dipped in salt. Former slaves later backed up these accounts.

In 1864, Forrest demanded the surrender of 580 mostly black troops at Fort Pillow, warning them that otherwise, "I cannot be responsible for your fate," even as he stealthily and illegally improved his position during negotiations under the white flag. Then, when the Union commander refused, Forrest unleashed his men. "The slaughter was awful," an appalled Confederate sergeant later wrote his family. "I with several others tried to stop the butchery and at one time partially succeeded, but Gen. Forrest ordered them shot down like dogs, and the carnage continued." Numerous surviving Union soldiers reported hearing Confederate officers saying that Forrest had ordered them to "kill the last God damn one of them."

Forrest was known for personally executing deserters or Confederates who fled the field. As the war came to a close, he came upon a father and son near Selma, Ala., and decided they were deserters. He ordered them shot and their bodies left out for two days before burial with a sign, "Shot for desertion," hung above them. Several days later, it emerged that the pair had, in fact, been entirely innocent.

After the war, even as former Confederate Gen. Robert E. Lee was urging fellow Southerners to "promote harmony and good will" in the reborn Union, Forrest initiated hard-line resistance to Reconstruction and secretly became the Klan's first national leader. It is false that he disbanded the Klan because it became violent. In fact, Forrest disbanded the Klan — after lying to Congress about his membership — only after its work was done and it had come under severe criticism. Klan terrorism had by then already made it impossible for blacks and Republicans to vote.

Both the Montgomery march and the Mississippi license plate request are part of a whole series of events planned by the SCV to commemorate the sesquicentennial anniversary of the Civil War. None of them give so much as a nod to the horrors of slavery or to the civil rights movement that finally liberated the South a century later — and, in fact, the Montgomery neo-Confederate parade, in a particularly ugly and unmentioned irony, follows the same route as the end of the famous 1965 Selma-to-Montgomery voting rights march led by Martin Luther King Jr.

None of this is much of a surprise if you take a look at the national SCV website promoting the series of events, including the Montgomery march, that are meant to commemorate the 150th anniversary of the Civil War. There, a series of writers attempt to make the case that slavery had nothing to do with the war, another utter falsehood. In fact, as virtually all serious historians agree, the South seceded because it became obvious that Congress would not allow the extension of slavery to the new Western territories, threatening the slave lobby's dominance. The Texas Declaration of the Causes of Secession, for example, said plainly that the free states were "proclaiming the debasing doctrine of equality for all men, irrespective of race or color," and added that blacks were "rightfully held and regarded as an inferior and dependent race." Alexander Stephens, vice president of the Confederacy, said as much in his infamous 1861 "Cornerstone" speech: "Our new Government is founded on exactly the opposite idea; its foundations are laid, its cornerstone rests, upon the great truth that the negro is not equal to the white man; that slavery — subordination to the superior race — is his natural and moral condition."

But these historical facts are of no interest to the SCV. Instead, while most Americans remember the bloodiest war in American history as the nation's most trying moment, the SCV is busy promoting a Southern past that never was.