EXHIBIT C

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF ALABAMA
 3             SOUTHERN DIVISION
 4
 5   CIVIL ACTION NO.:  1:14-CV-00592
 6
 7   IVAN "KEITH" GRAY,
 8        Plaintiff,
 9   vs.
10   CITY OF DOTHAN,
11        Defendant.
12
13
14       S T I P U L A T I O N S
15
16       IT IS STIPULATED AND AGREED by
17   and between the parties, through their
18   respective counsel that the deposition of
19   GREGORY BENTON, may be taken before RHONDA
20   W. HEAD, CCR, Commissioner, at the law
21   offices of SHERRER JONES, P.C., 335 West
22   Main Street, Dothan, Alabama 36301, on the
23   26th day of February, 2015.
```

**Page 2**

```
 1        IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the
 3   reading of the deposition by the witness
 4   is waived, the deposition to have the same
 5   force and effect as if full compliance had
 6   with all laws and rules of Court relating
 7   to the taking of depositions.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to
11   any questions except as to form or
12   leading questions, and that counsel for
13   the parties may make objections and
14   assign grounds at the time of trial
15   or at the time said deposition is offered
16   in evidence or prior thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21
22
23
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4   SONYA C. EDWARDS, ESQUIRE
 5   EDWARDS LAW
 6   121 EDENTON STREET
 7   BIRMINGHAM, ALABAMA 35242
 8
 9   FOR THE DEFENDANT:
10   STEPHANIE MAYS, ESQUIRE
11   2400 REGIONS/HARBERT PLAZA
12   1901 6TH AVENUE NORTH
13   BIRMINGHAM, ALABAMA 35203
14
15   ALSO PRESENT:
16   DELVICK MCKAY
17
18
19
20
21
22
23
```

**Page 4**

```
 1          I N D E X
 2   EXAMINATION BY:              PAGE:
 3   MS. EDWARDS:                   7
 4
 5
 6
 7
 8
 9
10
11          E X H I B I T S
12
13        (No Exhibits Marked.)
14
15
16
17
18
19
20
21
22
23
```

Page 5

1        I, RHONDA W. HEAD, CCR, a Court
2   Reporter of Birmingham, Alabama, and
3   Notary Public for the State of Alabama at
4   Large, acting as Commissioner, certify
5   that on this date, as provided by the
6   Alabama Rules of Civil Procedure and the
7   foregoing stipulation of counsel, there
8   came before me at the law offices of
9   Sherrer Jones, P.C., 335 West Main Street,
10  Dothan, Alabama 36301, beginning at 9:30
11  a.m., GREGORY BENTON, witness in the above
12  cause, for oral examination, whereupon the
13  following proceedings were had:
14
15       GREGORY BENTON,
16  the witness, having been first duly sworn
17  by the Court Reporter, was examined and
18  testified as follows:
19
20       THE COURT REPORTER:  Usual
21  stipulations?
22       MS. EDWARDS:  Yes.
23       MS. MAYS:  Yes.

Page 6

1          EXAMINATION
2   BY MS. EDWARDS:
3        Q   Chief Benton, my name is
4   Sonya Edwards and I represent Keith Gray.
5   I'm going to ask you a series of questions
6   about this case, including your background
7   and your knowledge of the case, and if at
8   any time I ask a question that you do not
9   understand, if you could, please, just ask
10  me to rephrase it or repeat it and I'll be
11  happy to do so.
12       A   Okay.
13       Q   And if you could please
14  answer each of my questions out loud with
15  a yes or a no, and not a shaking of your
16  head, or a unh-unh or uh-huh, then Ms.
17  Head can take down your testimony more
18  accurately.
19       A   Okay.
20       Q   If we take breaks during the
21  deposition, which I anticipate we will,
22  all I ask is that you answer the question
23  that I have pending prior to our taking a

Page 7

1   break.
2        A   Okay.
3        Q   Now, can you please state
4   your full name for the record?
5        A   Gregory J. Benton.
6        Q   Do you have any nicknames or
7   others names that you go by?
8        A   Just Greg.
9        Q   What is your position with
10  the City of Dothan?
11       A   Police chief.
12       Q   Have you ever taken a
13  deposition before?
14       A   I have.
15       Q   How many times?
16       A   This is the fourth one.
17       Q   What kinds of cases have you
18  given a deposition in, just beginning with
19  the most recent one?
20       A   The last one was concerning
21  a traffic ticket and an arrest.  The other
22  two were concerning traffic accidents.
23       Q   Were these tickets -- was

Page 8

1   the ticket and the arrest case a City of
2   Dothan case?
3        A   Yes.
4        Q   Were you a witness in that
5   case?
6        A   No.
7        Q   In what capacity did you
8   give the deposition?
9        A   As the department head.
10       Q   Was this a civil case or a
11  criminal case?
12       A   This was a civil case.
13       Q   Who were the parties other
14  than -- was it an action against the City
15  of Dothan?
16       A   Correct.
17       Q   Were you sued in your
18  personal capacity?
19       A   No.
20       Q   Were you sued as the Chief
21  of Police of Dothan?
22       A   No.
23       Q   Who was the plaintiff?

---

Page 9

1      A   I do not remember the name.
2      Q   What were the circumstances
3  surrounding that case?
4      A   He claimed that there was
5  police brutality and an unlawful arrest.
6      Q   And you don't remember the
7  plaintiff's name.
8      A   No.  It was a couple of
9  years ago, so I don't remember the
10  plaintiff's name.
11      Q   Two years ago?
12      A   A couple of years ago.  I'm
13  not sure of the exact time frame.
14      Q   Was the plaintiff in that
15  case black or white or what race?
16      A   White.
17      Q   Did you testify in court in
18  that case?
19      A   I did not.
20      Q   You just gave a deposition.
21      A   Correct.
22      Q   What was the outcome of that
23  case?

---

Page 10

1      A   I am not sure at this time.
2  I don't think that it was -- I think it
3  was probably.
4          MS. MAYS:  If you don't
5  know, say you don't know.
6      A   I don't know.
7      Q   Was there a trial in this
8  case?
9      A   There was not.
10      Q   So you don't know as the
11  Chief of Police of the Dothan Police
12  Department --
13      A   I don't know if it's been
14  settled yet.
15      Q   Is it still pending?
16      A   It may be.  I haven't been
17  notified.
18      Q   What officer or officers
19  were involved in that case?
20      A   Officer Tripp Farris.
21      Q   Who else?  Who else?
22      A   That's -- that would be the
23  one.

---

Page 11

1      Q   Is he an officer or what
2  rank?
3      A   He's a corporal now.  He was
4  an officer at the time.
5      Q   So he's been promoted since
6  this incident.
7      A   Yes.
8      Q   Did you launch an internal
9  affairs investigation into this action?
10      A   Once there was a complaint,
11  yes.
12      Q   And what was the outcome of
13  your Internal Affairs investigation?
14      A   Unfounded.
15      Q   Who conducted that
16  investigation?
17      A   I believe it was Michael
18  Etress (sic).
19      Q   What is his rank?
20      A   His rank now is lieutenant.
21      Q   What was his rank then?
22      A   Sergeant.
23      Q   Was he a member of Internal

---

Page 12

1  Affairs?
2      A   Yes.
3      Q   Did you verify his
4  investigation?
5      A   I did.
6      Q   How?
7      A   I read the case file.  I
8  read the facts and circumstances, looked
9  at the video, which was included.
10      Q   Prior to this case, what
11  other case have you given a deposition in?
12      A   It was two traffic
13  accidents.
14      Q   Okay.  What was the most
15  recent?
16      A   I believe it was John
17  Givens.  Officer Givens was involved in a
18  wreck where the city was sued.
19      Q   Is that case still pending?
20      A   I believe the city settled
21  that one.
22      Q   Did it go to trial?
23      A   I do not believe it went to

---

Page 13

1  trial.
2      Q   What happened during the
3  accident?
4      A   A car pulled out in front of
5  him.  I do not -- I believe it had
6  something to do with the use of emergency
7  equipment.
8      Q   What do you mean by "use of
9  emergency equipment?"
10     A   Was not using emergency
11 equipment.
12     Q   As in what?
13     A   Lights and siren.
14     Q   Was an individual injured as
15 a result of this accident?
16     A   Yes, correct.
17     Q   How so?
18     A   I don't remember the extent
19 of the injuries.
20     Q   Is John Givens still
21 employed with the Dothan Police
22 Department?
23     A   No.

Page 14

1      Q   Was he terminated as a
2  result of this incident?
3      A   No.
4      Q   Was he terminated?
5      A   No.
6      Q   Did he resign?
7      A   No.
8      Q   Is he still working with the
9  police department?
10     A   Oh, he has since resigned,
11 yes.  He works for the Houston County
12 Sheriff's Department now.
13     Q   When did he resign?
14     A   I'm not sure of a date.
15     Q   Was it just following this
16 accident or after?
17     A   No, it was years later.
18     Q   Did you investigate Officer
19 Givens as a result of this accident?
20     A   I did not.
21     Q   Did you order Internal
22 Affairs to investigate?
23     A   I was a lieutenant at the

Page 15

1  time, and I was the squad commander and he
2  worked for me.
3      Q   What was the extent of your
4  testimony in that case?
5      A   It was ten years ago, so I
6  don't really remember it.
7      Q   How did you become involved
8  in giving a deposition in that case?
9      A   Because I was his
10 supervisor.
11     Q   And so you did not order
12 that he be investigated or recommend that
13 he be investigated as a result of this
14 accident.
15     A   I did not because accidents
16 are investigated at the scene of the
17 accident.  There's a report made --
18     Q   Who --
19     A   -- at the time.
20     Q   Who investigated the
21 accident?
22     A   I have no -- it was over ten
23 years ago.  I don't remember who

Page 16

1  investigated the accident.
2      Q   But you recall that you
3  didn't do anything specific with regard to
4  an investigation regarding him.
5      A   Correct.
6      Q   What was the other accident?
7      A   It was -- it was about
8  fifteen years ago, and I don't remember
9  the details about it.
10     Q   You gave a deposition in
11 that case.
12     A   I was just a witness.
13     Q   Did you testify in a
14 deposition?
15     A   Yes.
16     Q   Was it a traffic accident?
17     A   It was concerning a traffic
18 accident, yes.
19     Q   Were you involved in the
20 accident?
21     A   No.  I was a witness.
22     Q   In what capacity?
23     A   I saw it happen.

Page 17

1      Q   Was it an accident involving
2   an officer of the Dothan Police
3   Department?
4      A   No.
5      MS. MAYS:  If you will wait
6   until she finishes her question.
7      THE WITNESS:  Okay.
8      Q   Were you testifying on
9   behalf of the City of Dothan Police
10  Department?
11     A   No.
12     Q   Were you testifying for the
13  plaintiff or the defendant in that case?
14     A   I believe it was the
15  plaintiff.
16     Q   Were you subpoenaed?
17     A   Yes.
18     Q   Did you testify at trial?
19     A   No.
20     Q   Do you remember any of the
21  parties names?
22     A   No.
23     Q   Was the plaintiff injured in

Page 18

1   that case?
2      A   Yes.
3      Q   And how long ago was that
4   testimony given?
5      A   At least fifteen years ago.
6      Q   Other than the three cases
7   that you just told me about, have you ever
8   given a deposition in any other case?
9      A   No.
10     Q   Have you ever testified at
11  trial?
12     A   Yes.
13     Q   And explain to me, beginning
14  with the most recent, the nature of the
15  case in which you gave testimony.
16     A   Let me think.  The last
17  actual trial was just a City of Dothan
18  traffic case where a ticket was issued.
19     Q   When was that trial?
20     A   Probably seven years ago.
21  No.  Excuse me.  It would had to have been
22  before 2008, so, 2007.
23     Q   And this was involving a

Page 19

1   traffic ticket.
2      A   Yes.
3      Q   What kind of ticket?
4      A   Speeding.
5      Q   How were you involved with
6   this ticket?
7      A   I issued the citation.
8      Q   How was that case resolved?
9      A   Found guilty.
10     Q   Were you sued in your
11  personal capacity?
12     A   When?
13     Q   During that lawsuit.
14     A   I didn't know we were
15  talking about a lawsuit.  You didn't
16  specify that.
17     Q   Well, excuse me.  I'm sorry.
18  The trial.  Were you sued in your personal
19  capacity for that particular case?
20     A   No.
21     Q   Was it a criminal case or a
22  civil case?
23     A   Criminal case.  Issued a

Page 20

1   citation for speeding.
2      Q   All right.
3      MS. MAYS:  I think you said
4   found guilty.  Who was found guilty?
5      THE WITNESS:  Correct.  The
6   person who issued the ticket was found
7   guilty.
8      Q   What other cases have you
9   testified in in court?
10     A   Numerous.
11     Q   Okay.  I'd like to go
12  through them.
13     A   I can't remember every time
14  I was in court.  I mean, it had to have
15  been hundreds and hundreds of times.
16     Q   What is the most recent?
17     A   That one I just said.
18     Q   That was in 2007.
19     A   Correct.
20     Q   Have you ever been sued?
21     A   Yes.
22     Q   Okay.  Start with the most
23  recent case.

Page 21

1      A   We had a inmate in the jail
2   that contracted some kind of skin
3   disorder, and she sued the city.
4      Q   What was the skin disorder?
5      A   I don't -- her skin actually
6   started falling off, sloughing off.
7      Q   Is that case still pending?
8      A   I believe it is still
9   pending.
10      Q   So she sued the City of
11   Dothan in a civil action.
12      A   Correct.
13      Q   Were you named in this
14   lawsuit?
15      A   Yes.
16      Q   Have you been deposed in
17   this case?
18      A   No.
19      Q   What is the plaintiff's
20   name?
21      A   I do not remember.
22      Q   What have you done with
23   regard to investigating this complaint?

Page 22

1      A   I haven't done anything with
2   regard to investigating the complaint.
3      Q   What has the city done with
4   regard to investigating her allegations?
5      A   The Internal Affairs
6   division investigated that as a damage
7   claim, I believe.
8      Q   Who specifically?
9      A   I don't recall which
10   investigator did it.
11      Q   When was this lawsuit filed?
12      A   A couple of years ago, I
13   believe.
14      Q   What has Internal Affairs
15   done to investigate this?
16      MS. MAYS:  Object to the
17   form.  If you know.
18      Q   You can answer.
19      A   Investigated the damage
20   claim and made a recommendation to the
21   legal department whether the damage claim
22   should have been -- whether -- that the
23   damage claim not be paid, I believe.

Page 23

1      Q   What did they do during
2   their investigation?
3      MS. MAYS:  Object to the
4   form.
5      A   They interviewed jail
6   personnel.  They interviewed doctors and
7   medical personnel at the hospital.  They
8   interviewed the plaintiff, I guess you
9   would say, and came to the conclusion to
10   make a recommendation to the legal
11   department.
12      Q   So what were the findings of
13   the investigation?
14      A   That -- I want to say that
15   it was a condition that was not caused by
16   jail personnel or medical personnel or
17   anything that was associated with the
18   jail.
19      Q   Okay.  Other than that case,
20   in what case --
21      A   I believe that's my only
22   lawsuit.
23      Q   That's the only time that

Page 24

1   you have been sued in your personal
2   capacity.
3      A   (Witness nodding head).
4      Q   That is the only lawsuit in
5   which you have ever been involved as a
6   party.
7      A   Besides this one, yes.
8      MS. MAYS:  I don't believe
9   you're a party to this lawsuit.
10      Q   Isn't it true that you were
11   involved in a divorce?
12      A   Yes.
13      Q   And that was in court,
14   correct?
15      A   Correct.  I was the
16   plaintiff.
17      Q   You were a party in that
18   lawsuit, weren't you?
19      A   Yes.
20      Q   When was that divorce filed?
21      A   In January.
22      Q   Last January?
23      A   No, this past January.

Page 25

1    Q   So January 2015?
2    A   Yes.  No.  Back up.  I think
3  I filed the end of last year.  It could
4  have been November or December.
5    Q   Has your divorce become
6  final?
7    A   Yes.
8    Q   Was it contested?
9    A   No.
10    Q   Isn't it true that your
11  marriage ended as a result of an extra
12  marital affair?
13       MS. MAYS:  Object to the
14  form.
15    A   Yes.  Yes.
16    Q   Isn't it true that that
17  affair was with a representative of
18  Southern Link?
19       MS. MAYS:  Object to the
20  form.
21    A   Yes.
22    Q   Isn't it true that as a
23  result of this affair with this

Page 26

1  representative of Southern Link, that the
2  Dothan police department no longer manages
3  your Southern Link account for the city?
4       MS. MAYS:  Object to the
5  form.
6    A   Yes.
7    Q   To whom was that account
8  moved within the city in order to manage
9  that account?
10    A   The IT department.
11    Q   Who was the individual in
12  which you were having the affair?
13       MS. MAYS:  Object to the
14  form.
15    Q   What is the name of the
16  Southern Link representative with whom you
17  had the affair?
18       MS. MAYS:  Object to the
19  form.
20    A   Leslie Bonet.
21    Q   Out of what Southern Link
22  office did Ms. Bonet work?
23    A   Montgomery.

Page 27

1    Q   Isn't it true that that
2  office handled the Southern Link account
3  for the City of Dothan Police Department?
4       MS. MAYS:  Object to the
5  form.
6    A   Yes.
7    Q   Isn't it true that Ms. Bonet
8  worked for that office during the time in
9  which Mr. Gray was employed with the City
10  of Dothan?
11       MS. MAYS:  Object to the
12  form.
13    A   Yes.
14    Q   And isn't it true that Ms.
15  Bonet was employed at the time that Mr.
16  Gray was issued his Southern Link cell
17  phone?
18       MS. MAYS:  Object to the
19  form.
20    A   Yes.
21    Q   Other than this one civil
22  suit regarding the skin disorder and your
23  divorce, have you ever been named a party

Page 28

1  in a lawsuit?
2    A   No, not that I can remember.
3    Q   Have you ever been a witness
4  for the City of Dothan in any other
5  lawsuit as Chief of Police?
6    A   No.
7    Q   This is the only lawsuit in
8  which you have been involved in your
9  capacity as Chief of Police --
10       MS. MAYS:  Object to the
11  form.
12    Q   -- in which the City of
13  Dothan was the named defendant.
14    A   Except for the one where the
15  lady had the skin disorder.
16    Q   So you have never been a
17  witness in any other lawsuit in which the
18  City of Dothan has been named a defendant
19  other than --
20    A   What did I just say?
21    Q   I just want to make sure
22  that my question was clear.
23    A   Those are the only two.

Page 29

1    Q   Other than the traffic
2  lawsuit that you mentioned earlier, have
3  you ever been sued as an officer of the
4  Dothan Police Department?
5    A   No.
6    Q   Have you ever had any
7  complaints made against you by a
8  citizen --
9    A   Yes.
10    Q   -- during your employment
11  with the City of Dothan?
12    A   I'm sure I have.
13    Q   Tell me what the most resent
14  was.
15    A   I don't recall what the most
16  resent was.
17    Q   How many have there been?
18    A   I have no idea.
19    Q   More than ten?
20    A   I don't recall an exact
21  number.
22    Q   You have no way of
23  estimating how many complaints have been

Page 30

1  filed against you during your employment.
2  Is it numerous?
3        MS. MAYS:  Object to the
4  form.
5    A   I would have to say probably
6  around ten, is a good number.
7    Q   Describe to me what the most
8  recent complaint was against you.
9    A   I don't recall what the most
10  recent complaint was.
11        She's already asked it.
12        MS. MAYS:  If you don't
13  know, you don't know.
14        MS. EDWARDS:  Thank you for
15  your instruction, Ms. May, to your client
16  about how to answer a question.
17        MS. MAYS:  I was not
18  instructing him how to answer it --
19    Q   Have you had a citizen
20  complaint filed against you in your
21  capacity as Chief of Police?
22    A   I'm not aware of one.
23    Q   What is the most recent

Page 31

1  complaint that you remember?
2    A   I do not remember a specific
3  complaint.
4    Q   But you remember there were
5  ten.
6    A   No.  You said ten, and I
7  said that would be a good number.
8    Q   So you remember that ten
9  would be a good number.
10    A   You told me to estimate, so
11  I just tried to estimate.
12    Q   So you don't remember any
13  specifics about any of those approximately
14  ten complaints that have been filed
15  against you.
16    A   I do not remember any of the
17  specifics regarding any complaints.
18    Q   Were you investigated as a
19  result of any of those complaints?
20    A   No.
21    Q   You have never been a
22  subject of an internal affairs
23  investigation.

Page 32

1        MS. MAYS:  Object to the
2  form.
3    A   Not that I recall.
4    Q   But it's possible you have
5  been.
6        MS. MAYS:  Object to the
7  form.
8    A   I do not recall any IA
9  investigations concerning me.
10    Q   Have you ever had any
11  employee complaints against you?
12    A   Yes.
13    Q   Start with the --
14    A   Well --
15    Q   -- most recent.
16    A   I don't remember the
17  specifics, but there's been grievances
18  filed where I would -- whether it be
19  concerning disciplinary action or
20  assignment.
21    Q   Approximately how many
22  employee grievances have you had filed
23  against you?

Page 33

```
 1        A   A handful.
 2        Q   And what was the most
 3  recent?
 4        A   I don't recall what the most
 5  recent one was.  I don't believe we had
 6  any grievances filed the last year.
 7        Q   How long ago was the last
 8  one filed?
 9        A   I don't recall.
10        Q   But you recall that you had
11  approximately a handful of employee
12  grievances.
13        A   I would say there's probably
14  a handful.  I don't recall when the last
15  one was.
16        Q   Tell me what you remember
17  about any of those grievances?
18        A   Like I said, they were due
19  to disciplinary action or assignment.
20        Q   Who specifically has filed a
21  grievance against you?
22        A   I don't recall who all filed
23  grievances.
```

Page 34

```
 1        Q   Is there any reason or
 2  anything that could be affecting your
 3  memory to testify during this deposition?
 4  Are you on any medication at the moment?
 5        MS. MAYS:  Object to the
 6  form.
 7        A   No.
 8        Q   Is there anything that you
 9  can tell me, any reason that your memory
10  would be impaired in giving this
11  testimony?
12        MS. MAYS:  Object to the
13  form.
14        A   My memory is not impaired.
15        Q   So you, sitting here today
16  under oath, cannot recall any specifics
17  about any employee grievances that have
18  been filed against you.
19        A   I gave you the specifics
20  that I remember, that they were either due
21  to disciplinary action or assignment.
22        Q   What type of disciplinary
23  action have you had a grievance filed
```

Page 35

```
 1  against you regarding?
 2        A   I don't recall the specific
 3  disciplinary action.
 4        Q   Well, then, how do you
 5  recall that it was a disciplinary action?
 6        A   Because those are the only
 7  grievances that have been filed.
 8        Q   What grievances do you
 9  recall concerning job assignment?
10        A   I don't recall the specifics
11  of the job assignment grievance.
12        Q   But you just remember that
13  you have had approximately a handful of
14  employee grievances regarding disciplinary
15  action or job assignment, but you don't
16  remember who filed them or any details
17  about them whatsoever.
18        MS. MAYS:  Object to the
19  form.
20        A   I do not.  If I had my files
21  in front of me, I would be able to do so,
22  but I do not.
23        MS. MAYS:  And for the
```

Page 36

```
 1  record, Chief Benton is here to testify as
 2  a 30(b)(6) witness who is designated for
 3  certain topics as a 30(b)(6) witness
 4  today.  I'm not sure that this line of
 5  questioning falls under any one of those
 6  topics.
 7        MS. EDWARDS:  I can ask him
 8  about any topic that I want to during this
 9  30(b)(6) deposition.  Without a prior
10  protective order having been entered, then
11  I'm not limited to the topics in which I
12  can ask him questions.
13        MS. MAYS:  He is answering
14  the questions that you're asking of him.
15        Q   (BY MS. EDWARDS:)  Has
16  anyone ever complained to you about race
17  discrimination?
18        A   Not specifically about race
19  discrimination, no.
20        Q   Is it your testimony here
21  today that Keith Gray has never complained
22  to you about race discrimination?
23        A   Keith complained to me that
```

---

Page 37

1  he was being singled out and it was not
2  because -- specifically because of race.
3  It was because he thought Major Parrish
4  had something against him, didn't like
5  him.
6       Q   So it's your testimony that
7  Mr. Gray did not mention race during his
8  complaint to you.
9       A   I remember in conversation
10  with Keith that he felt like he did not
11  get the respect that he deserved because
12  he was black, and that white people didn't
13  like a black person in charge of them.
14       Q   So, in your mind, is that
15  not a complaint of race discrimination?
16       A   If that's a complaint, then,
17  yes, he complained.
18       Q   But you didn't consider it a
19  complaint of race discrimination at the
20  time.
21       A   I felt more like it was
22  someone singling out an individual was
23  what the complaint was about.

---

Page 38

1       Q   And --
2       A   Not specifically because of
3  race.
4       Q   You made that determination
5  on your own.
6       A   Yes.
7       Q   And you didn't investigate
8  to determine whether it was race
9  discrimination.
10       A   I looked at the facts and
11  circumstances that I had before me.  I am
12  not privy to conversations between both,
13  but everything that Keith said about Major
14  Parrish, when you looked at everything
15  that was done, you couldn't make a
16  determination whether that -- he was being
17  discriminated against.
18       Q   What did you do to -- what
19  did you review in making that
20  determination?
21       A   Looked at job assignments.
22  I looked at Guardian Tracking entries.  I
23  think one of Keith's complaints is that he

---

Page 39

1  did not get the recognition that the other
2  captains got in Guardian Tracking, and
3  that was just not the case.  There was
4  actually more complimentary Guardian
5  Tracking entries for Keith than the other
6  captains.
7       Q   Other than Guardian
8  Tracking, what did you review -- or did
9  you review anything to come to that
10  conclusion?
11       A   I spoke with Major Parrish.
12       Q   Anything else?
13       A   No.
14       Q   And so you personally came
15  to the conclusion that you felt that Mr.
16  Gray's complaints were unfounded.
17       MS. MAYS:  Object to the
18  form.
19       A   Yes.
20       Q   Other than that complaint,
21  has Mr. Gray ever complained to you about
22  race discrimination?
23       A   Not that I recall.

---

Page 40

1       Q   Has Mr. Gray ever complained
2  to you about race harassment?
3       A   Race harassment?  No.
4       Q   Are you aware of any other
5  complaints that Mr. Gray has filed
6  regarding or alleging race discrimination?
7       A   What time frame?
8       Q   Any time.
9       A   Yes.
10       Q   When?
11       A   I'm just -- I'm having to
12  think because, let's see.  I don't know
13  the exact dates.  I know in 2000 -- and I
14  don't know if that was due to race or not,
15  but, 2009, with the police chief's
16  application process.  2000 -- maybe 2005,
17  with the same thing.  And then in 1999,
18  maybe.
19       Q   You weren't chief of police
20  at the time of those complaints, were you?
21       A   Correct.
22       Q   Were you involved in any way
23  related to those complaints?  In other

Page 41

1   words, did those complaints involve you?
2          MS. MAYS:  Object to the
3   form.
4          A   In 1999, Keith claimed that
5   certain people got copies -- certain
6   officers got copies of the lieutenant's
7   test. I'm not sure if he was referring to
8   me or not.
9          Q   Aside from that complaint,
10  were you involved in any of his other
11  complaints for race discrimination?
12         MS. MAYS:  Object to the
13  form.
14         A   Could you explain further on
15  what you mean by that?
16         Q   Were you -- was it alleged
17  that you had discriminated against Mr.
18  Gray or had contributed to harassment in
19  any way during those complaints?
20         A   No.
21         Q   Were you ever questioned
22  during an EEO investigation related to any
23  of those previous claims?

Page 42

1          A   No.
2          Q   Have you ever been arrested?
3          A   No.
4          Q   Have you ever filed for
5   bankruptcy?
6          A   No.
7          Q   What is your level of
8   education?
9          A   Bachelor's Degree Business
10  Administration.
11         Q   You don't have a Master's
12  Degree.
13         A   No.
14         Q   Are you a member of any
15  professional groups or organizations?
16         A   Present member of Kawanis
17  International.  Past member of the Dothan
18  Exchange Club, Dothan Multi Racial Club,
19  Dothan JC's, International Association
20  Chiefs of Police, FBI National Associates.
21         Q   Any others?
22         A   Alabama Peace Officers
23  Association.

Page 43

1          Q   Any others?
2          A   That's it.
3          Q   How long have you been a
4   member of the Kawanis?
5          A   Since 2012.
6          Q   What about the Dothan
7   Exchange Club?
8          A   I was a member.  I don't
9   remember the exact dates.  It was a long
10  time ago.
11         Q   You have been a member for
12  along time you said.
13         A   No.  I'm no longer a member.
14  Those are only -- the only one that I'm
15  still currently a member of, as far as the
16  -- well, I'm a member of Kawanis.  I'm a
17  member of International Association Chiefs
18  of Police, FBINA, Alabama Peace Officers
19  Association.
20         Q   You're no longer a member of
21  the Dothan Exchange Club.
22         A   (Witness shaking head.)
23         Q   Is that a no?

Page 44

1          A   No.
2          Q   If you could, please, answer
3   out loud so she can take your testimony.
4          You're no longer a member of the
5   Dothan Multi Racial Club.
6          A   No.
7          Q   When were you a member of
8   Dothan Multi Racial Club?
9          A   2010, 2011, and I think part
10  of 2012. I'm not quite sure about that,
11  though.
12         Q   Why did you cease membership
13  in the Dothan Multi Racial Club?
14         A   I was struggling with money
15  at the time.
16         Q   Did you have to pay dues to
17  be a member?
18         A   Yes.
19         Q   How much were the dues?
20         A   I don't recall how much the
21  dues were.
22         Q   Was it a hundred, two
23  hundred, five hundred?

---

Page 45

1      A   I don't remember what the
2  dues were.
3      Q   But you remember you stopped
4  being a member because of money.
5      A   Right.  I had one kid in
6  college and another one about to start.
7      Q   When did you begin working
8  for the City of Dothan?
9      A   September 13th, 1989.
10      Q   In what position did you
11  begin your employment?
12      A   Police officer.
13      Q   When were you promoted to a
14  different rank?
15      A   1994, promoted to corporal.
16      Q   After that?
17      A   1996, promoted to sergeant.
18      Q   And after that?
19      A   1999, promoted to
20  lieutenant.
21      Q   After that?
22      A   2008, promoted to captain.
23      Q   After that?

---

Page 46

1      A   January 13th, 2010, Police
2  Chief.
3      Q   Who is your supervisor?
4      A   Who is my supervisor?
5      Q   Yes.
6      A   Mike West, City Manager.
7      Q   How long has he been your
8  supervisor?
9      A   Since January 13th, 2010.
10      Q   Who was your supervisor
11  before him?
12      A   John Powell.
13      Q   How long was he your
14  supervisor?
15      A   I'm not sure of the start
16  date -- well, back up.  From 2008 until
17  mid 2009.
18      Q   Who was your supervisor
19  between mid 2009 and January of '10?
20      A   I'm not quite sure.  It
21  could have been -- I'm not sure.  There
22  were three captains.  I don't remember
23  which one was my captain during that

---

Page 47

1  entire time.
2      Q   Who were the captains?
3      A   I believe Nick Monday, John
4  Givens.  I'm not quite sure who the other
5  captain was.  I think Draughn was promoted
6  to captain.  I'm not quite sure.
7      Q   Who?
8      A   Draughn.  Larry Draughn.
9      Q   How do you spell the last
10  name?
11      A   D-r-a-u-g-h-n.
12      Q   And in what division were
13  you at that time?
14      A   Which time?
15      Q   Between mid 2009 and January
16  '10.
17      A   I believe I was -- some of
18  that was captain over the administrative
19  services or administrative bureau and
20  patrol bureau.
21      Q   Before John Powell, who was
22  your supervisor?
23      A   That's what I couldn't

---

Page 48

1  remember when I was giving you all of
2  those names.
3      Q   Oh, okay.  My question is
4  who was your supervisor between mid 2009
5  and January 2010?
6      A   Okay.  John Powell.
7      Q   So actually John Powell was
8  your supervisor between 2008 and January
9  of 2010?
10      A   Okay.  There was an interim
11  chief between -- that would have been
12  Larry Draughn.  He was the interim chief,
13  wasn't he?
14          MS. MAYS:  You can't ask
15  questions.
16      A   I believe, yes, Larry
17  Draughn was the interim chief.
18      Q   Who was your supervisor
19  before John Powell?
20      A   That was where I was getting
21  it confused.  It would have either have
22  been John Givens, Nick Monday or Steve
23  Parrish.

---

Page 49

1     Q   How long -- so you don't
2 remember whether it was Givens, Monday or
3 Parrish.
4     A   Well, I know that Givens was
5 having some medical issues and he was out
6 considerably with colon cancer, and I
7 don't remember exactly who took over his
8 duties.
9     Q   How long was one of those
10 three individuals your supervisor before
11 John Powell became your supervisor?
12    A   You will have to rephrase
13 the question because I thought I answered
14 that.
15    Q   Okay.  Prior to -- I'm just
16 trying to understand who your supervisors
17 were prior to 2008.
18    A   I don't exactly remember
19 during that time frame which captain I
20 reported to.
21    Q   Or for how long?
22    A   What time frame are you
23 talking about?

Page 50

1     Q   Prior to 2008.
2     A   From 1999 until 2008, there
3 were several captains that I reported -- I
4 reported to.
5     Q   And you have given me the
6 name of Givens, Draughn and Parrish.
7     A   I think that Givens was my
8 captain for the majority of that.
9     Q   Have you ever been
10 disciplined?
11    A   I have had some write ups,
12 yes.
13    Q   What was your most recent
14 write up?
15    A   For a traffic accident that
16 was my fault.
17    Q   When did that occur?
18    A   Probably a month ago.
19    Q   Tell me what happened during
20 the accident.
21    A   I was turning onto East Main
22 Street from North Saint Andrews, and the
23 person that was in front of me pulled off,

Page 51

1 and I wanted to get into the other lane.
2 So I checked my blind spot to pull over,
3 and I didn't realize that the person in
4 front of me stopped.  And so I hit them
5 from behind.
6     Q   Who wrote you up for that
7 accident?
8     A   Mike West.
9     Q   What was the policy
10 violation in that write up?
11    A   It's not a policy violation.
12 It goes into a separate category.  It's
13 not a policy violation.
14        Whenever you're in an accident
15 and you're at fault, you get a certain
16 amount of points.  After you get a certain
17 amount of points, then you are given a day
18 of suspension.  After accumulation of more
19 points, you get suspended for more days.
20    Q   Were you suspended?
21    A   No.  That was my first
22 point.
23    Q   What was the citation

Page 52

1 exactly in which you were charged?
2        MS. MAYS:  Object to the
3 form.
4     Q   What was the rule violation,
5 I suppose?
6     A   I guess, careless use of
7 equipment.  The careless use of equipment.
8     Q   What was the result?  What
9 was the actual discipline that you
10 received?
11    A   You get one point on your
12 total allotted points for a year.
13    Q   Prior to that, when were you
14 disciplined?
15    A   I don't remember the last
16 time I was disciplined.
17    Q   How many times have you been
18 disciplined over the course of your career
19 with the City of Dothan?
20    A   I don't recall the specific
21 amount.  Not very many.
22    Q   Other than this traffic
23 accident, what was -- when were you

Page 53

```
 1  disciplined prior to that?  I mean --
 2      A  I don't --
 3      Q  -- if you can estimate the
 4  number of years or months or a time frame.
 5      A  Yeah.
 6      Q  Was it days, months before
 7  this traffic accident in which you were
 8  disciplined?
 9          MS. MAYS:  Object to the
10  form.
11      A  Years.
12      Q  Approximately how many?
13      A  I couldn't tell you.
14      Q  So you don't recall any of
15  the details of any disciplinary action you
16  have ever received?
17      A  I have never been suspended.
18  I don't know -- just formal counselling.
19      Q  For what?
20      A  I don't recall the specifics
21  of the write ups.
22      Q  Who counseled you?
23      A  A supervisor.
```

Page 54

```
 1      Q  Who?
 2      A  Since I don't remember the
 3  specifics and I don't remember the dates,
 4  then there's absolutely no way I can tell
 5  you what supervisor it was.
 6      Q  Have you ever been counseled
 7  in your role as chief of police?
 8      A  No.
 9      Q  Have you ever been
10  disciplined in your role as chief of
11  police other than in the traffic accident
12  that you have described to me?
13      A  No.
14      Q  What rank were you when you
15  received your last disciplinary action
16  prior to becoming chief of police?
17      A  I don't recall what rank I
18  was.  I don't recall the exact date of my
19  last disciplinary action, so I have no way
20  of being able to tell you what rank I was.
21      Q  I don't need an exact date,
22  just an approximate date.
23          MS. MAYS:  Object to the
```

Page 55

```
 1  form.
 2      A  As I said, I can't give you
 3  an approximate date.
 4      Q  You don't remember any
 5  details whatsoever about any of your
 6  disciplinary actions that has occurred
 7  during your employment.
 8          MS. MAYS:  Object to the
 9  form.
10      A  No.  Like I said, it was
11  very few times I've been complained on and
12  they were a long time ago.
13          MS. EDWARDS:  Could we take
14  about a five minute break?
15          MS. MAYS:  That's fine.
16          (Short break.)
17      Q  (BY MS. EDWARDS:)  Other
18  than Keith Gray's complaint of race
19  discrimination, are you aware of any
20  another complaints that have been of race
21  discrimination or race harassment that
22  have been made against the City of Dothan?
23      A  In what time frame?
```

Page 56

```
 1      Q  Any time frame.
 2      A  I can't recall any others.
 3      Q  While you have been Chief of
 4  Police, have there been any other
 5  complaints of race discrimination made
 6  within your department?
 7      A  I don't recall any.
 8  ReaMonica Carney.
 9      Q  Any others?
10      A  That's the only two that I
11  can remember.
12      Q  Isn't it true that one of
13  your department heads was found to have
14  said the "N" word?
15      A  Oh, yes.
16          MS. MAYS:  Object to the
17  form.
18      A  Yes.
19      Q  Who was that?
20      A  That was Lieutenant Wes
21  Berry.
22      Q  Was a complaint not
23  made --
```

Page 57

1    A   Yes.
2    Q   -- as a result of that
3  comment?
4    A   Yes.
5    Q   So you don't consider that
6  as a complaint for race discrimination.
7    A   I just didn't remember it.
8    Q   What is Lieutenant Wes
9  Berry's first name?
10   A   Anthony.
11   Q   What was your involvement in
12  that complaint?
13       MS. MAYS:  Object to the
14  form.
15   A   What was my involvement?
16  Rephrase, please.
17   Q   Did you have any involvement
18  with regard to this complaint?
19   A   I was not involved in the
20  complaint, no.
21   Q   You weren't involved in any
22  disciplinary action with regard to
23  Lieutenant Wes Berry?

Page 58

1    A   Yes.
2    Q   In what way?
3    A   I was the one that set forth
4  the discipline.
5    Q   What was the discipline?
6    A   Without his file being in
7  front of me, I don't remember exactly what
8  it was.
9    Q   It was a five-day
10  suspension, wasn't it?
11       MS. MAYS:  Object to the
12  form.
13   A   I don't know.  My file on
14  Wes Berry is not here.
15   Q   You didn't suspend him, did
16  you?
17       MS. MAYS:  Object to the
18  form.
19   A   I don't know if I suspended
20  him or not because my file is not in front
21  of me.
22   Q   You didn't terminate his
23  employment, did you?

Page 59

1        MS. MAYS:  Object to the
2  form.
3    A   No.
4    Q   He's still employed with the
5  Dothan Police Department.
6    A   No.
7    Q   Did he resign?
8    A   He retired.
9    Q   How long after he said the
10  "N" word did he retire?
11   A   I don't know.  That would
12  not have just been investigated by
13  Internal Affairs, but that would have gone
14  to the EEO as well.
15   Q   But you had the final say on
16  the disciplinary action, correct?
17   A   I had the final say after
18  conferring with EEO, legal, and the
19  personnel director.
20   Q   Did you find that to be a
21  violation of the EEO policy?
22       MS. MAYS:  Object to the
23  form.

Page 60

1    A   I don't remember exactly
2  what I found.  I didn't find anything.  I
3  made the recommendation, after looking at
4  the facts and circumstances, for a
5  five-day suspension, I guess.
6        MS. MAYS:  Don't guess.
7        THE WITNESS:  Well, she's
8  saying -- okay.
9    A   Well, I don't know.  You're
10  saying I suspended him for five days.  I'm
11  saying I don't know.
12   Q   Do you know of any other
13  members of the Dothan Police Department
14  who have used the "N" word?
15   A   I do not.
16   Q   Have you ever used the "N"
17  word?
18   A   No, I have not.
19   Q   Have you ever heard anyone
20  within the City of Dothan use the "N"
21  word?
22   A   I have never personally
23  heard anybody use the "N" word.

Page 61

```
 1        Q   Have you ever known of
 2   anyone else within the City of Dothan to
 3   use the "N" word other than Lieutenant Wes
 4   Berry?
 5        A   Are you talking about within
 6   the police department or the City of
 7   Dothan?
 8        Q   Okay.  Let's start with
 9   police department.
10        A   I don't know of any other
11   instances that it's been used in the
12   police department.  I do know that there's
13   been -- I've heard of accusations in other
14   departments.
15        Q   Who?
16        A   The IT department.
17        Q   Which department?
18        A   The IT department.
19        Q   In the IT department.  Who
20   specifically?
21        A   Tim Stewart.
22        Q   Anyone else?
23        A   Carol Schumacher.
```

Page 62

```
 1        Q   Anyone else?
 2        A   No.
 3        Q   Is Carol Schumacher in the
 4   IT department?
 5        A   Yes.
 6        Q   So Tim Stewart and Carol
 7   Schumacher are in IT.
 8        A   No, just Carol Schumacher.
 9        Q   What department -- in what
10   department is Tim Stewart?
11        A   He's not in any department.
12   He retired.  And I specifically never
13   heard them say that.  That is just what I
14   have heard.
15        Q   Now, Lieutenant Wes Berry is
16   in the police department, correct?
17        A   He's retired.
18        Q   I mean, at the time that he
19   used the "N" word, he was in the police
20   department, correct?
21        A   Correct.
22        Q   Who was his supervisor, his
23   next in chain of command?
```

Page 63

```
 1        A   I do not recall who his
 2   captain was at the time.
 3        Q   When did that occur?
 4        A   If I had to -- I would say
 5   about three years ago.
 6        Q   What division did Lieutenant
 7   Wes Berry work?
 8        A   The Administrative Services
 9   Bureau.
10        Q   What was the context in
11   which he said the "N" word?
12        A   The context was that he was
13   relaying something that somebody else had
14   said.
15        Q   Who?
16        A   I don't remember.
17        Q   Someone within the police
18   department?
19        A   I don't think it was
20   somebody within the police department.
21        Q   But you don't know.
22        A   I don't recall.  I don't
23   have the file in front of me, so I can't
```

Page 64

```
 1   give you the specific information that
 2   you're asking for.
 3        Q   Was it investigated to see
 4   who else said the "N" word?
 5            MS. MAYS:  Object to the
 6   form.
 7        Q   If he was relaying that
 8   somebody said the "N" word, was that
 9   investigated?
10        A   I don't remember the exact
11   context in what it was said.  I know he
12   did not say it as if he were using the
13   word.
14        Q   Didn't another employee
15   record him saying the word?
16            MS. MAYS:  Object to the
17   form.
18        A   I don't recall if it was
19   recorded or not.
20        Q   Do you know who he said that
21   to?
22        A   I do not remember who he
23   said it to.
```

---

Page 65

1      Q    Did you supervise Tim
2  Stewart?
3      A    No.
4      Q    Who was his supervisor?
5      A    Mike West.
6      Q    The city manager?
7      A    Yes.
8      Q    What discipline, if any, did
9  Tim Stewart receive as a result of saying
10  the "N" word?
11         MS. MAYS:  Object to the
12  form.
13      A    I don't recall the exact
14  disciplinary action against Tim Stewart.
15      Q    Is IT within the police
16  department?
17      A    No.
18      Q    Is Tim Stewart still
19  employed with the City of Dothan?
20      A    He retired.
21      Q    He wasn't terminated.
22      A    No.
23      Q    What about Carol Schumacher,

---

Page 66

1  who does she report to?
2      A    Rob Meredith.
3      Q    Is she still in the IT
4  department?
5      A    Yes.
6      Q    Was she in the IT department
7  when she used the "N" word?
8      A    I have no idea.
9      Q    Tim Stewart was in IT when
10  he used the "N" word; is that correct?
11      A    Okay.  Rephrase your
12  question about Carol Schumacher.
13      Q    In what department was she
14  when she used the "N" word?
15      A    In IT.
16      Q    And what department is she
17  in now?
18      A    IT.  And I do not know if
19  she said the "N" word or not.
20      Q    What do you know about it?
21      A    I just heard that there was
22  an investigation.
23      Q    Is she still employed?

---

Page 67

1      A    Yes.
2      Q    Is the investigation
3  ongoing?
4      A    I do not know.  It's not my
5  department.
6      Q    You don't know the outcome
7  of the investigation, you just know she's
8  still employed.
9      A    Correct.
10      Q    When did she use the "N"
11  word or when did you hear that she used
12  the "N" word?
13         MS. MAYS:  Object to the
14  form.
15      A    I did not hear when she used
16  it.
17      Q    When did you hear about this
18  investigation?
19      A    A couple of weeks ago.
20      Q    When did Tim Stewart use the
21  "N" word?
22         MS. MAYS:  Object to the
23  form.

---

Page 68

1      A    I don't recall the --
2      Q    When did you learn that he
3  used the "N" word?
4      A    I don't recall how long ago
5  it was.
6      Q    Was it a few days?
7      A    No.
8      Q    A few weeks?
9      A    No.
10      Q    A few months?
11      A    No.
12      Q    A year?
13      A    No.
14      Q    Two years?
15      A    I'd have to say somewhere in
16  that neighborhood.
17      Q    Other than Lieutenant Wes
18  Berry, Tim Stewart and Carol Schumacher,
19  have you ever known of any other City of
20  Dothan employee use the "N" word?
21      A    No.
22      Q    Isn't it true that you were
23  accused of ticket fixing a few years back?

Page 69

```
1           MS. MAYS:  Object to the
2  form.
3           A   Yes.
4           Q   Explain to me what that
5  situation was.
6           A   I got a call from John
7  Powell to look into a matter where Tim
8  Stewart received a traffic ticket.  So I
9  called the traffic sergeant, which was Tim
10  Ward, and asked him to look into it and
11  report to me what he found out.
12          Tim Ward called the officer that
13  actually wrote the ticket, and the ticket
14  had not been sworn to.  The officer told
15  Tim Ward that if he would have known it
16  was, you know, Tim Stewart, he probably
17  would not write him a ticket.  And that
18  officer went and voided the ticket.
19          Q   Which officer?
20          A   I don't -- I don't recall
21  the officer.
22          Q   What was the -- did you look
23  into this?
```

Page 70

```
1           MS. MAYS:  Object to the
2  form.
3           A   Did I look into what?
4           Q   Into whether that actually
5  occurred.  Did that actually occur?
6           A   That he voided the ticket?
7           Q   Yes.
8           A   Yes, he voided the ticket.
9           Q   It was a ticket to Tim
10  Stewart.
11          A   Yes.
12          Q   The same Tim Stewart who
13  used the "N" word?
14          A   Yes.
15          Q   When did this occur?
16          A   I don't recall how long ago
17  it was.
18          Q   A few days?
19          A   Let's just say a few years.
20          Q   What was the result of this
21  incident?  Was the officer disciplined?
22          A   I don't recall if he was
23  disciplined or not.
```

Page 71

```
1           Q   He worked within the police
2  department.
3           A   Yes.
4           Q   While you were chief of
5  police.
6           A   This did not happen while I
7  was chief of police.
8           Q   What rank were you in when
9  this occurred?
10          A   I believe I was a
11  lieutenant.
12          Q   Was this officer under your
13  command?
14          A   No, he was not under my
15  command.
16          Q   Then how did it come do be
17  that you were made apart of this?
18          A   I might -- you know, I might
19  have been a captain.  So it probably was
20  -- it had to have been after 2008.  I do
21  not recall if this officer was working off
22  duty, local impact or --
23          Q   Was John Powell the chief of
```

Page 72

```
1  police at that time?
2           A   Yes.
3           Q   So how did this come to your
4  attention?
5           A   Like I said, John Powell
6  called me.
7           Q   What did he say to you when
8  he called you about this?
9           A   He wanted me to look into a
10  ticket that Tim Stewart had received and
11  get the circumstances and get back with
12  him.
13          Q   Did Internal Affairs conduct
14  an investigation?
15          A   I do not know.
16          Q   Did you request that
17  Internal Affairs conduct an investigation?
18          A   I did not.
19          Q   Is that officer still
20  employed with the City of Dothan?
21          A   Which officer?
22          Q   The officer who issued the
23  ticket.
```

Page 73

1     A   Like I said, I don't
2 remember the officer's name, so I have no
3 idea if he still works with the police
4 department or not.
5     Q   Do you recall him being
6 terminated as a result of this incident?
7          MS. MAYS:  Object to the
8 form.
9     A   No.
10     Q   Do you recall him being
11 disciplined as a result of this incident?
12     A   I do not know.
13     Q   Are you -- are you friends,
14 personal friends with any members of the
15 Dothan Personnel Board?
16     A   Personal friends?  No.
17 Nobody that I associate with is on the
18 personnel board.
19     Q   You don't have any
20 association with any members of the Dothan
21 Personnel Board?
22          MS. MAYS:  Object to the
23 form.

Page 74

1     A   Any association?  I worked
2 at Lewis Smith Supply Corporation from
3 1986 until 1989, where Mark Smith -- I
4 worked for his father.
5     Q   Who is Mark Smith?
6     A   He is one of the personnel
7 board members.
8     Q   How long has he been a
9 personnel board member?
10     A   I don't know.
11     Q   A year?
12     A   I don't know.
13     Q   Two years?
14     A   I don't know.  They rotate
15 off that board, and I could not tell you
16 how long he has been on the board.  I just
17 do not know.
18     Q   Was he on that board at the
19 time of Mr. Gray's termination?
20     A   I believe he was.
21     Q   Was he on the board at the
22 time of Mr. Gray's appeal to the personnel
23 board?

Page 75

1     A   Yes, I believe he was.
2     Q   Other than Mark Smith, do
3 you have any associations with any members
4 of the Dothan Personnel Board?
5          MS. MAYS:  Object to the
6 form.
7     A   No.
8     Q   Is Mr. Tim Shirley a member
9 of the personnel board?
10     A   Yes.
11     Q   Are you in any civic clubs
12 or organizations with Mr. Shirley?
13     A   No.
14     Q   Have you ever been?
15     A   No.
16     Q   Doesn't Mr. Shirley own
17 several Hobo Pantry stores in and around
18 the Dothan area?
19     A   Yes.
20     Q   Doesn't his business still
21 have an alarm billing account with the
22 City of Dothan that reports to the City of
23 Dothan police dispatch?

Page 76

1          MS. MAYS:  Object to the
2 form.
3     A   I don't know.
4     Q   You have no knowledge of Mr.
5 Shirley's business?
6     A   I know he owns Hobo
7 Pantry's.
8     Q   You have know -- do you have
9 any knowledge about the alarm billing
10 going through Dothan Police Department?
11     A   The alarm billings are
12 handled through our department, I just
13 don't know who all the -- has their alarms
14 come to us.
15     Q   But Hobo Pantry is through
16 the Dothan Police Department, correct?
17     A   Is it?
18     Q   I'm asking you.
19     A   I don't know.
20     Q   Whose alarm billing accounts
21 do you know of that go through the Dothan
22 police --
23     A   I don't look at the alarms

Page 77

1  billing very often.
2      Q   Aren't you ultimately in
3  charge of that function within the
4  department?
5          MS. MAYS:  Object to the
6  form.
7      A   I guess -- ultimately, yes.
8      Q   And you never review that.
9      A   Rarely.  Only when something
10 has been brought to my attention.
11     Q   Who does review it?
12     A   The -- Shawndell Willard in
13 finance.
14     Q   Who in finance?
15     A   I have no idea.
16     Q   Isn't it true that Mr.
17 Shirley's business has had delinquent
18 invoices that are -- that owe money --
19     A   I don't know.
20     Q   -- to the City?
21     A   I don't know.
22     Q   So is it your testimony that
23 you have never known of Mr. Shirley's

Page 78

1  business to have a delinquent invoice with
2  the City of Dothan?
3          MS. MAYS:  Object to the
4  form.
5      A   I did not say I did not
6  know.  I said -- yes, I said I don't know,
7  and that's my answer, I don't know.
8      Q   Have you ever known of Mr.
9  Shirley to have any delinquent invoices
10 with the City of Dothan?
11     A   I don't know.
12     Q   Did you provide information
13 to Ricky Stokes about Keith Gray's
14 Internal Affairs investigation?
15     A   No.
16     Q   Did you provide information
17 to him about his termination?
18     A   No.
19     Q   Who did?
20     A   I have no idea.
21     Q   But you know somebody within
22 the police department gave him information
23 concerning the Internal Affairs --

Page 79

1      A   I don't know where --
2          MS. MAYS:  Let her finish
3  her question.
4      A   I don't know where.
5      Q   Are you finished with your
6  question?
7      Q   Yes.  I'm just waiting for
8  you to answer.
9      A   I don't know if -- I don't
10 know if anybody in the police department
11 gave him that information.
12     Q   How else --
13     A   It could have been -- it
14 could have been Keith Gray that gave it to
15 him.
16     Q   If it wasn't Keith Gray
17 disparaging his own name in the media,
18 doesn't it make sense that it would be
19 somebody within the Dothan Police
20 Department?
21         MS. MAYS:  Object to the
22 form.  Argumentative.
23     A   I do not know if anyone in

Page 80

1  the police department gave him that
2  information.
3      Q   Did you investigate it?
4          MS. MAYS:  Object to the
5  form.
6      A   No.
7      Q   Have you ever filed any
8  complaints against Keith Gray?
9      A   Have I ever filed any
10 complaints?  No.
11     Q   Have you ever made any
12 complaints about Keith Gray during your
13 employment?
14     A   No.
15     Q   Have you ever assigned
16 Captain Gray to provide police personnel
17 statical data for you?
18     A   Do what?
19     Q   Have you ever assigned Keith
20 Gray the duty to provide you with statical
21 data for personnel?
22     A   Relating to what?
23     Q   To your police department.

Page 81

1    A   Yes.
2    Q   When?
3    A   I'm sure it's been more than
4  once.  Which time are you --
5    Q   Well, how many times do you
6  recall assigning him that duty?
7    A   I remember asking him to see
8  how many of our personnel was prior
9  military or in the guard, in the reserves
10  or in the national guard.
11    Q   Isn't it true that you also
12  had him obtain other types of personnel
13  data as far as reporting government type
14  functions --
15        MS. MAYS:  Object to the
16  form.
17    Q   -- to assist you in
18  government reporting?
19        MS. MAYS:  Object to the
20  form.
21    A   I don't know exactly what
22  you're talking about.
23    Q   Like biographical

Page 82

1  information.
2    A   Biographical information?
3    Q   Or race, number of females,
4  males, races, that type of information?
5    A   It sounds feasible.
6    Q   Have you ever appointed
7  Captain Gray to act as chief of police
8  during your absence?
9    A   Yes.
10    Q   When?
11    A   I'm not sure of the time.  I
12  know that I was out of town and I believe
13  Major Parrish was out of town, and so I
14  made Keith the acting chief while we were
15  away.
16    Q   Do you recall when that was?
17    A   It might -- I'm not
18  positive, but it might have been when we
19  went to receive our accreditation award.
20  That would have been 2012.
21    Q   Any other time before that?
22    A   No.
23    Q   So that's the only time you

Page 83

1  ever appointed him to act as chief of
2  police in your absence.
3    A   That's the only time that I
4  -- either I or the Major's in town.
5  That's the only time that I can think of
6  that we were both out of town.
7    Q   Have you ever known Keith
8  Gray to complain of retaliation?
9    A   Yes.
10    Q   When?
11    A   I believe it was in
12  September of 2013.
13    Q   Are you referring -- are you
14  referring to his complaint?
15    A   Yes.
16    Q   May I see a copy?
17    A   (Witness hands document.)
18  This says October.  No, that's not it.  It
19  might have been just race.  That one is
20  just race.  This might be it.  Yes.
21    Q   Are you referring to the
22  EEOC charge that Keith Gray filed on
23  October 4th, 2013?

Page 84

1    A   Yes.
2    Q   Other than the filing of
3  this charge, are you aware of any
4  complaints that Keith Gray has made
5  alleging retaliation?
6    A   No.
7    Q   Hasn't Mr. Gray told you
8  that he felt that he was being harassed or
9  discriminated against based on his
10  complaint to EEO within the Dothan Police
11  Department or within the City of Dothan?
12    A   When did he make that
13  complaint?
14        MS. MAYS:  Object to the
15  form.
16    A   When did he make that
17  complaint?
18    Q   Make what complaint?
19    A   The one you just stated.
20    Q   The complaint to EEO?  Are
21  you aware that he complained to -- he
22  complained about race discrimination
23  internally?

Page 85

1     A   To who?
2     Q   To EEO.
3     A   I received -- I do remember
4  receiving a document from Darryl Mathews
5  saying that there was a possibility that
6  Keith might file a Title 7 lawsuit.  I
7  believe that was in June.
8     Q   June of what year?
9     A   2013, I guess.
10    Q   The June preceding his
11 termination.
12    A   Do what?
13    Q   The June --
14    A   Yes.
15    Q   -- preceding his
16 termination.
17    A   Yes.
18    Q   Did Darryl Mathews advise
19 you that it was based on a complaint of
20 race discrimination?
21       MS. MAYS:  Object to the
22 form.
23    A   I don't remember exactly

Page 86

1  what the memo said.
2     Q   But you recall that he said
3  Title 7.
4     A   Yes.
5     Q   Do you recall Keith Gray
6  telling you that he felt he was being
7  nit-picked by Steve Parrish?
8     A   I remember a conversation
9  like that, yes.
10    Q   When was that conversation?
11    A   I'm not exactly sure.
12    Q   About what time frame was it
13 in relation to Mr. Gray's termination?
14 Was it --
15    A   When was it in relation to
16 Keith's termination?
17    Q   Yes.
18    A   It was before.
19    Q   I mean, right before or --
20    A   I want to say --
21       MS. MAYS:  Object to the
22 form.
23    A   -- maybe a few months.

Page 87

1     Q   So right about the time that
2  you became aware that -- from Darryl
3  Mathews that he had filed the EEO.
4        MS. MAYS:  Object to the
5  form.
6     A   I'm not exactly sure if
7  those coincide or not.
8     Q   Didn't Keith Gray tell you
9  that he felt he was being harassed because
10 he had filed a complaint with Darryl
11 Mathews?
12       MS. MAYS:  Object to the
13 form.
14    A   I don't remember a
15 conversation that -- between Keith and I
16 that covered harassment because of
17 anything concerning a lawsuit.
18    Q   Don't you recall Mr. Gray
19 advising you that he believed that Steve
20 Parrish was nit-picking his work.
21    A   I do remember that.
22    Q   Do you remember him advising
23 you that he felt that he was being

Page 88

1  unfairly scrutinized by Steve Parrish?
2     A   I believe I remember that
3  being part of the conversation.
4     Q   Do you remember him advising
5  you that Steve Parrish was removing his
6  authority by taking patrol -- the patrol
7  division away from him and assigning the
8  administrative bureau to him?
9     A   That was not Steve Parrish's
10 decision.
11    Q   Whose was it?
12    A   That was mine and Steve
13 Parrish's together.
14    Q   When did that -- when did
15 you make the decision to do that --
16       MS. MAYS:  Object to the
17 form.
18    Q   -- to make that change?
19    A   It would have been somewhere
20 after the first of the year, probably
21 sometime in January.
22    Q   Now, do you know when Keith
23 Gray made his complaint with Darryl

Page 89

1  Mathews?
2      A   No.
3      Q   But you were made aware of
4  it at the time, correct?
5      A   I received -- I received a
6  memo from Darryl that I was cc'd on that
7  -- the possibility of Keith filing a Title
8  7.
9      Q   Do you know whether Darryl
10  Mathews investigated Mr. Gray's complaint?
11      A   I do.  I actually sent a
12  memo over to Darryl Mathews to investigate
13  the complaint.
14      Q   So you told Darryl Mathews
15  to investigate it.
16      A   (Witness nodding head).
17      Q   Could you answer out loud?
18      A   Yes.  Sorry.
19      Q   But Darryl Mathews advised
20  you that Mr. Gray was potentially filing a
21  lawsuit, correct?
22      A   Correct.  I do not know
23  which came first.  I don't know if I sent

Page 90

1  him the memo to investigate or he sent me
2  the memo of the possibility.
3      Q   What did you do to verify
4  that Keith Gray's complaint was being
5  investigated?
6      A   By who?
7      Q   Who would investigate that
8  complaint?
9      A   The EEO.
10      Q   What did you do to verify
11  EEO's investigation of his complaint?  Did
12  you followup in any way or did you just
13  allow Darryl Mathews to conduct his
14  investigation?
15         MS. MAYS:  Object to the
16  form.
17      A   I allowed him to conduct his
18  investigation.
19      Q   Did you do anything to --
20  Scratch that.
21         What was the outcome of the
22  investigation into Mr. Gray's complaint?
23      A   That the allegations were

Page 91

1  unfounded.
2      Q   What did you do to verify
3  the accuracy of those findings?
4      A   I'm not privy to his
5  investigations.  I don't have -- I don't
6  get to see his notes.  I get to see a
7  final report.
8      Q   So in your role as chief of
9  police, is it your testimony that you have
10  no ability to verify the completeness of
11  an EEO investigation within your
12  department.
13         MS. MAYS:  Object to the
14  form.
15      A   The EEO does not report to
16  me.  The EEO reports to the city manager.
17      Q   Is it your testimony that
18  you have no involvement with EEO's
19  investigation of a member of the Dothan
20  Police Department?
21         MS. MAYS:  Object to the
22  form.
23      A   No.

Page 92

1      Q   Is there a policy that
2  prohibits you from verifying the
3  thoroughness of an EEO investigation in
4  your department?
5      A   Not that I'm aware of.
6      Q   So you made the decision
7  yourself to not verify the accuracy and
8  completeness of the EEO investigation.
9         MS. MAYS:  Object to the
10  form.
11      A   Darryl gets paid to do a job
12  and I trust that his investigations are
13  complete and thorough.  I do not supervise
14  him.
15      Q   Have you ever leased or
16  purchased a vehicle from Mayor Schmitz's
17  car dealership?
18      A   No.
19      Q   Have you ever had any
20  outside business dealings with Mayor
21  Schmitz?
22      A   No.
23      Q   Do you know of anybody who

Page 93

1  has?
2         MS. MAYS:  Object to the
3  form.
4         A   No.
5         Q   Have you had any outside
6  business dealings with any member of the
7  Dothan Personnel Board?
8         MS. MAYS:  Object to the
9  form.
10        A   No.
11        Q   Do you know of anybody who
12  has?
13        A   No.
14        Q   Have you ever played golf on
15  city time?
16        MS. MAYS:  Object to the
17  form.
18        A   Yes, on occasions where
19  there was a golf tournament that a police
20  department team was put in a tournament.
21  Sometimes there's two police department
22  teams put in, they're sponsored by someone
23  else.

Page 94

1         Q   Didn't Mike West ask you to
2  spend more time at work and less time at
3  the golf course?
4         MS. MAYS:  Object to the
5  form.
6         A   Yes.
7         Q   When?
8         A   Probably a year ago or so.
9         Q   Isn't it true that the
10  Dothan Police Department hosted a
11  fundraiser charity rides with the Bama
12  Boyz Motorcycle Club and All Throttle
13  Motorcycle Club?
14        A   Dothan Athletic League did
15  it with the Bama Boyz Riding Club.  I'm
16  not sure if they were a motorcycle club
17  then.  It was a charity ride for -- yes,
18  Dothan Athletic League.
19        Q   And didn't the police
20  department receive money as a result of
21  that charity ride?
22        A   Yes.
23        Q   Didn't the donations of that

Page 95

1  charity ride go to the United Way?
2         A   I think it went to Dothan
3  Police Athletic League.
4         Q   But didn't they then direct
5  the donations to United Way?
6         A   Who directed the donations
7  to the United Way?
8         Q   The Dothan Police Department
9  Athletic League?
10        A   I don't know if they did or
11  not.
12        Q   It was a charity ride,
13  though, correct?
14        A   Correct.
15        Q   Was it All Throttle
16  Motorcycle Club?
17        A   I don't recall.
18        Q   You remember receiving a
19  check from Bama Boyz Motorcycle Club,
20  correct?
21        A   Yes.
22        Q   Did you ever request
23  information from Southern Link regarding

Page 96

1  Keith Gray's phone?
2         A   I did not.
3         Q   Who did?
4         MS. MAYS:  Object to the
5  form.  If you know.
6         A   Internal affairs
7  investigators.
8         Q   What information did they
9  receive?
10        MS. MAYS:  Object to the
11  form.
12        A   Repeat the question.
13        Q   What information did they
14  receive from Southern Link?
15        A   I want to say the
16  information that the investigators got
17  from Southern Link was the day that the
18  phone was issued.
19        Q   Any other information?
20        A   Not that I'm aware of.
21        Q   Are you aware that Major
22  Steve Parrish is associated with Sons of
23  Confederate Veterans?

Page 97

```
 1      A   I heard that he was at one
 2  time, yes.
 3      Q   Did you investigate his
 4  affiliation with that organization?
 5      A   No.  I never received a
 6  complaint about it.
 7      Q   Other than Keith Gray, have
 8  you ever investigated any Dothan police
 9  department officers' affiliation with any
10  outside organization?
11      A   I believe that we
12  investigated Chris Watson's involvement in
13  a motorcycle club and Adrian Woodruff's
14  involvement in a motorcycle club.
15      Q   You did not initiate an
16  internal affairs investigation.
17      A   No.
18      Q   And did Internal Affairs
19  conduct an Internal Affairs investigation
20  on them, didn't they?
21      A   They did not.  They belong
22  to law enforcement clubs.
23      Q   What clubs?
```

Page 98

```
 1      A   I'm not sure.
 2      Q   Then how do you know they
 3  were law enforcement clubs?
 4      A   Because I read the report.
 5      Q   You don't know the name.
 6      A   I want to say -- I don't
 7  know what Adrian's is, but I want to say
 8  that Chris Watson's is Iron Pigs or
 9  something like that.
10      Q   Is Adrian Woodruff white?
11      A   Yes.
12      Q   Who was the other individual
13  you mentioned?
14      A   Chris Watson.
15      Q   Is he white?
16      A   Yes.
17      Q   Was Steve Parrish involved
18  in the investigation of Keith Gray?
19      A   No.
20          MS. MAYS:  Object to the
21  form.
22      A   No.
23          MS. EDWARDS:  All right.  I
```

Page 99

```
 1  think now may be a good time to break for
 2  lunch.  We could meet back at a quarter
 3  after 12 or 12:30.  Let's just say 12:30.
 4          MS. MAYS:  Okay.  We'll come
 5  back when we're done and start when you're
 6  ready.
 7          (Lunch recess.)
 8  BY MS. EDWARDS:
 9      Q   Can an Internal Affairs
10  investigation be initiated by the
11  investigator alone or do you have to
12  authorize an Internal Affairs
13  investigation?
14      A   I am the one that initiates
15  -- gets the complaint and passes it on to
16  the IA investigator.
17      Q   So you have to receive a
18  complaint.
19      A   No, not necessarily.  I have
20  to be the authorization to conduct.  It
21  has to be run by me first.
22      Q   Does an internal affairs
23  investigator have a duty to investigate
```

Page 100

```
 1  all misconduct issues?
 2      A   Ones that they know about or
 3  ones that the complaints they receive.
 4      Q   Has Internal Affairs
 5  conducted an investigation into your extra
 6  marital affair with the Southern Link
 7  representative?
 8          MS. MAYS:  Object to the
 9  form.
10      A   No.
11      Q   Are you aware that adultery
12  is a misdemeanor in the state of Alabama?
13          MS. MAYS:  Object to the
14  form.
15      A   I am.
16      Q   So you admit that you have
17  broken the law.
18          MS. MAYS:  Object to the
19  form.
20      A   I had an affair.
21      Q   You admit that you broke the
22  law.
23      A   I had an affair.
```

Page 101

1    Q   It's a yes or no question.
2    A   Yes.  I'm telling you I had
3  an affair.
4    Q   You are aware that Keith
5  Gray was not in attendance at the fight
6  that occurred at the Outcast Motorcycle
7  Clubhouse on August 25th -- on or around
8  August 25th, aren't you?
9    A   Yes.
10    Q   So you're aware he was not
11  there.
12    A   Yes.
13    Q   You are aware that Keith
14  Gray was not found to have broken any laws
15  during the Internal Affairs investigation,
16  aren't you?
17    A   Yes.
18    Q   So you're aware that he did
19  not break the law.
20    A   Yes.
21    Q   You're aware that Bama Boyz
22  Motorcycle Club was not found to have
23  broken any laws, aren't you?

Page 102

1         MS. MAYS:  Object to the
2  form.
3    A   I don't know if Bama Boyz
4  Motorcycle Club has never broken any laws.
5    Q   During the course of your
6  investigation, did you have any
7  information that any members of Bama Boyz
8  Motorcycle Club had broken any laws?
9    A   No.
10    Q   You're aware that the
11  Internal Affairs investigation showed no
12  documentation that Keith Gray had been
13  dishonest.
14         MS. MAYS:  Object to the
15  form.
16    Q   Correct?
17    A   Rephrase the question.
18    Q   There is no documentation
19  within the Internal Affairs investigation
20  that Keith Gray was dishonest.
21    A   I'm not aware of that.
22    Q   You're not aware of any?
23    A   No.  I'm not aware that

Page 103

1  there's no documentation.
2    Q   What documentation are you
3  aware of that would show that?
4    A   The conclusion, the portion
5  written by Donny Smith specifically says
6  that he was untruthful.  There's the
7  document in there where the policy under
8  Code of Conduct, Truthfulness, which he
9  was charged with.
10    Q   Is that all that you relied
11  on?
12         MS. MAYS:  Object to the
13  form.  Look at it.
14    A   Looking at the entirety of
15  the investigation, I had my own
16  conclusions that he was dishonest in the
17  investigation as well as in the
18  interviews.
19    Q   So you have conclusions but
20  no documentation, correct?
21    A   The documentation is in the
22  videos.
23    Q   What videos?

Page 104

1    A   The audios.  The --
2    Q   What videos?
3    A   Of the interviews, the IA
4  interviews.
5    Q   The Internal Affairs
6  interviews?
7    A   Correct.
8    Q   What in the Internal Affairs
9  interviews led you to believe that Keith
10  Gray was dishonest?
11    A   Keith, at one point in the
12  first interview, did not know the true
13  definition of a one percenter, but he did.
14  He was asked about the clubhouse being
15  mandated by Outcast.  And he said they
16  didn't have to have a clubhouse, and they
17  actually did have to have a clubhouse.
18    Q   I'm sorry.  Let me stop you
19  on that one.  Say that last statement.
20    A   Okay.
21    Q   Repeat that last statement.
22    A   Keith lied about having to
23  have a clubhouse.

Page 105

1    Q   Who having to have a
2  clubhouse?
3    A   Bama Boyz Motorcycle Club.
4    Q   You allege that he stated
5  during an interview that Bama Boyz did not
6  have to have a clubhouse.
7    A   He was asked if they had to
8  have a clubhouse because Outcast tells
9  them. And he said no. Which, in his
10  little class that he gave, he says that
11  Outcast -- to be a motorcycle club,
12  Outcast says we have to have a clubhouse.
13  So now we have one.
14    Q   What little class are you
15  talking about?
16    A   A class that he taught to
17  his probationary member.
18    Q   Were you present at that
19  class?
20    A   No.
21    Q   Then how do you know about
22  this class?
23    A   We found the CD of the

Page 106

1  class, audio CD of the class in Keith's
2  car.
3    Q   Who made that CD?
4    A   I assume --
5      MS. MAYS:  Object to the
6  form.
7    A   -- Keith Gray.
8    Q   You assume?
9    A   It was in his car.
10    Q   You don't know he made that
11  CD, do you?
12    A   Not specifically who made
13  the CD, but it was definitely Keith Gray
14  teaching a class to his probationary
15  members.
16    Q   You -- did you --
17    A   I have no doubt. I have no
18  doubt --
19      MS. MAYS:  Just answer her
20  question.
21    A   Go ahead.
22    Q   You can go ahead.
23    A   I have no reason to doubt

Page 107

1  that that was not Keith Gray's CD which
2  was found in Keith Gray's car.
3    Q   But you don't know who made
4  that CD, do you?
5    A   Not for one hundred percent
6  sure, no.
7    Q   You don't know whether that
8  CD was ever edited, do you?
9    A   I do not.
10    Q   You don't know whether that
11  CD was ever modified in any way, do you?
12    A   I do not.
13    Q   In fact, you can't, sitting
14  here, guarantee the authenticity of that
15  CD in any way, can you?
16      MS. MAYS:  Object to the
17  form.
18    A   I don't know if I can or
19  not.
20    Q   Well, how could you if you
21  can't even tell me who created it.
22    A   I don't know that there's
23  not a way to authenticate it. There may

Page 108

1  be.
2    Q   You don't know who made it
3  though, do you?
4    A   No.
5      MS. MAYS:  Object to the
6  form.
7    Q   And you don't know if it's
8  been edited or modified.
9      MS. MAYS:  Object to the
10  form.
11    A   I do not know.
12    Q   So other than this
13  unauthenticated CD, that we don't know who
14  recorded it or whether it's ever been
15  modified, what evidence do you have or do
16  you allege that Keith Gray has been
17  dishonest?
18      MS. MAYS:  Object to the
19  form.
20    A   In the interview, Keith lied
21  about knowing who Big O was and what a
22  status was in the state of Alabama.
23    Q   What led you to believe that

Page 109

1  was a lie?
2      A  Because of his letter to his
3  motorcycle club saying that he had gone to
4  see Big O and they had been blessed.
5      Q  He never lied during this
6  investigation that he received a blessing
7  from Big O or Outcast, did he?
8          MS. MAYS:  Object to the
9  form.
10     A  No.
11     Q  So that wasn't a lie.
12     A  I did not say that it was a
13  lie that he got a blessing.  I said he
14  lied about knowing about Big O, who Big O
15  actually was and his status as the
16  president of the Alabama Chapter of
17  Outcast Motorcycle Club.
18     Q  How is it a lie if Mr. Gray
19  didn't know his exact position within the
20  Outcast Motorcycle Club?
21     A  He did know.
22     Q  What makes you think that?
23     A  Because of his letter to his

Page 110

1  Chapter, his motorcycle club.
2      Q  Does that letter state
3  specifically what Big O's position is with
4  Outcast?
5      A  The founding executive board
6  has held a series of meetings regarding
7  the possibility of starting a new chapter
8  of Bama Boyz MC in Anniston, Alabama, upon
9  receiving the blessings from Big O,
10  President of Outcast Alabama, Big Meat Sin
11  City Disciples Alabama and Catfish
12  National President of Easy Riders.
13     Q  Now, the date on that letter
14  is different from the date in which he
15  conducted his interview, isn't it?
16         MS. MAYS:  Object to the
17  form.
18     Q  That letter wasn't written
19  on the date that he had his interview with
20  internal affairs, is it?
21     A  Correct.
22     Q  Did he not say during the
23  his Internal Affairs interview that he

Page 111

1  didn't know the current possession of Big
2  O?  Was that not the question asked during
3  the Internal Affairs investigation?
4          MS. MAYS:  Object to the
5  form.
6      A  I don't remember.
7      Q  So you don't know for sure
8  whether they were asking his current
9  position or past positions or what about
10  Big O, do you?
11         MS. MAYS:  Object to the
12  form.
13     A  I don't remember.
14     Q  And you don't know, do you?
15     A  I don't remember.
16     Q  You don't know sitting here
17  today, do you?
18         MS. MAYS:  Object to the
19  form.
20     A  What's the question?
21     Q  Whether they asked him what
22  the current position with Outcast
23  Motorcycle Club is.

Page 112

1          MS. MAYS:  Object to the
2  form.
3      A  Keith new.
4      Q  Is that your assumption?
5      A  Take it as you like it.  He
6  knew.
7          MS. MAYS:  Take a break.
8          (Short break.)
9      Q  (BY MS. EDWARDS:)  Before
10  the break you were referring to a letter
11  that you've alleged Mr. Gray wrote.
12     A  Okay.
13     Q  What is the date of that
14  letter?
15     A  July 21st, 2013.
16     Q  May I see a copy of it,
17  please?
18     A  (Witness hands document.)
19     Q  Have you ever been
20  dishonest?
21         MS. MAYS:  Object to the
22  form.  In his whole life?
23     A  I'm sure there have been

Page 113

1 times I have been dishonest. I'm 52 years
2 old.
3        Q   Have you been dishonest
4 while you have been the chief of police of
5 Dothan?
6            MS. MAYS:  Object to the
7 form.
8        A   In what way?
9        Q   Just dishonest.
10       A   Not dishonest, no.
11       Q   You admitted earlier that
12 you have had an extra marital affair.
13       A   Yes, if that's what you're
14 referring to and that's dishonesty, yes.
15       Q   Do you agree that an extra
16 marital affair could be viewed as bringing
17 ill repute to the City of Dothan Police
18 Department?
19           MS. MAYS:  Object to the
20 form.
21       A   I don't know if it has been
22 or not.  It hasn't so far.
23       Q   Do you see how it could be?

Page 114

1            MS. MAYS:  Object to the
2 form.
3        A   I guess, yes.
4        Q   Have you ever known of other
5 officers within the Dothan police
6 department to be dishonest?
7        A   In what way?
8        Q   Just dishonest.
9        A   Dishonest.  I'm sure at some
10 point in their life they've been dishonest
11 too.
12       Q   While they were an officer
13 of the City of Dothan, have you ever known
14 of an officer to tell a lie --
15           MS. MAYS:  Object to the
16 form.
17       Q   -- as an officer with City
18 of Dothan.
19       A   I don't recall any specific
20 incidents where police officers lied.
21       Q   So you don't consider the
22 ticket fixing incident to be dishonest.
23           MS. MAYS:  Object to the

Page 115

1 form.
2        A   At the time of that
3 occurrence, the ticket had not been sworn
4 to and the trooper's -- the trooper's --
5 we changed our policy after that, but the
6 troopers, to this day, will void tickets.
7        It's still -- at the time it's
8 still at the discretion of the officer
9 whether that ticket be turned in.
10       Q   It was found to be wrong
11 what that officer did in voiding Tim
12 Stewart's ticket, wasn't it?
13           MS. MAYS:  Object to the
14 form.
15       A   The city attorney's opinion
16 was that --
17           MS. MAYS:  Are you about to
18 reveal attorney/client conversations?
19           THE WITNESS:  No.  No.
20           MS. MAYS:  Okay.
21       A   -- was the reason why the
22 policy was changed.
23       Q   Was because it was --

Page 116

1        A   I don't know if it was wrong
2 or not.  At the time it was an accepted
3 practice.
4        Q   So in your opinion ticket
5 fixing is an acceptable practice.
6            MS. MAYS:  Object to the
7 form to the use of the phrase "ticket
8 fixing?"
9        A   I did not say "ticket
10 fixing."  Those are your words.
11       Q   That was my question to you
12 earlier, Chief Benton, were you aware
13 of an incident involving ticket fixing.
14       A   Well, that's what it was
15 called.
16       Q   Correct.  So --
17       A   But in my opinion, I don't
18 -- I don't know if it was ticket fixing or
19 not because the ticket had not been sworn
20 to.
21       Q   In your opinion is ticket
22 fixing wrong?
23           MS. MAYS:  Object to the

Page 117

1  form.
2      A   Explain your definition of
3  ticket fixing.
4      Q   Fixing a ticket.
5      A   As in how?
6      Q   I'm asking you.
7      A   I don't know what your
8  definition of ticket fixing is.
9      Q   In the way that you answered
10 the question earlier, you admitted of
11 knowing of an officer who was involved in
12 ticket fixing, correct?
13     A   Is that the way you stated
14 it?
15     Q   It is.
16     A   Then if I answered it, I
17 misspoke because it was not considered
18 ticket fixing.
19     Q   What exactly did the officer
20 do?
21     A   He voided the ticket once he
22 found out who the person was.
23     Q   Is that not wrong in your

Page 118

1  opinion?
2      A   Yeah, there is some issues
3  there.  That is why the policy was
4  changed.
5      Q   So sitting here today under
6  oath, do you know of any employee of the
7  City of Dothan who has ever been
8  dishonest?
9          MS. MAYS:  Object to the
10 form.
11     A   I'm sure that there has been
12 some employees that have been dishonest.
13     Q   Do you know who --
14     A   I don't know of any that I
15 can recall.  I don't know what you mean by
16 "dishonest."  That is very broad.
17     Q   Well, you admitted that you
18 have been dishonest, correct?
19         MS. MAYS:  Object to the
20 form.
21     A   What's the question?
22     Q   Correct.  I said you
23 admitted just now that you've been

Page 119

1  dishonest.
2      A   I was dishonest in my
3  marriage.
4      Q   You are aware that the
5  Internal Affairs investigation did not
6  uncover any pornography on Mr. Gray's cell
7  phone in which it could be proven that Mr.
8  Gray accessed pornography.
9          MS. MAYS:  Object to the
10 form.
11     Q   In other words, the Internal
12 Affairs investigation did not prove that
13 Keith Gray accessed pornography on his
14 cell phone, did it?
15         MS. MAYS:  Object to the
16 form.
17     A   There was porn sites
18 accessed from that city phone.
19     Q   What porn sites?
20     A   Triple X Black Book, I
21 believe, dot com.
22     Q   Was that the only one?
23     A   That's the only one that I

Page 120

1  recall right now.
2      Q   But there is nothing in your
3  investigation that proved that Keith Gray
4  accessed that website on that cell phone,
5  was there?
6          MS. MAYS:  Object to the
7  form.
8      A   The information was derived
9  -- that derived from that phone says that
10 that phone accessed the porn sites, or
11 that porn site on at least two occasions,
12 and that is his city-issued cell phone.
13     Q   Where does it show that his
14 phone accessed that site on two occasions?
15     A   (Witness reading document.)
16     Q   May I see that document,
17 please?  Isn't May 8th --
18     A   Is May 8th what?
19     Q   -- of 2013, the date that
20 Keith Gray was issued his phone?
21     A   I don't recall if that was
22 the day or not.
23     Q   So you didn't verify when

Page 121

1  Mr. Gray received his phone?
2       A   It was verified by -- I did
3  not.  It was verified by Internal Affairs.
4       Q   What -- and what they gave
5  you enabled you to believe that Keith Gray
6  accessed this website?
7       A   Yes.
8       Q   What?
9       A   It was in the report.
10       Q   What report?
11       A   The IA report.
12       Q   The one from Sergeant Smith.
13       A   Yes.
14       Q   Because you didn't receive
15  one from Sergeant Magill, did you?
16       A   No.
17       Q   Now, so you don't know for
18  sure when Mr. Gray was issued his phone.
19            MS. MAYS:  Object to the
20  form.
21       A   No, I don't exactly know the
22  date.
23       Q   Then you don't know for sure

Page 122

1  that Keith Gray was the one who accessed
2  this website, do you?
3            MS. MAYS:  Object to the
4  form.
5       A   I'm not sure I understand
6  the question.
7       Q   If you don't know the date
8  that the phone was issued, then you don't
9  know that Keith Gray was the one who
10  accessed this website on this date, do
11  you?
12            MS. MAYS:  Object to the
13  form.
14       A   The IA report was -- that I
15  received said that the Triple X Black Book
16  had been accessed after he was issued the
17  phone.
18       Q   Where does it say that in
19  the report?
20       A   Maybe I was just told that.
21       Q   By whom?
22       A   Tim Mullis.
23       Q   Are you aware that Tim

Page 123

1  Mullis testified that his data does not
2  show that Keith Gray was the person who
3  accessed this website?
4            MS. MAYS:  Object to the
5  form.
6       A   Explain that.
7       Q   Are you aware that Tim
8  Mullis testified that there is nothing in
9  his records or from the testing that he
10  performed on that phone that proves that
11  Keith Gray is the one who accessed this
12  website?
13            MS. MAYS:  Object to the
14  form.
15       A   Who accessed it if it
16  weren't Keith Gray?  It's his phone.
17       Q   Is it not possible for
18  someone else to have used this cell phone?
19       A   It is possible but not
20  probable.
21       Q   How do you know if you don't
22  know the date that the phone was issued --
23       A   I --

Page 124

1       Q   You don't even know that the
2  phone was new and had never been used
3  prior to it being given to Keith Gray, do
4  you?
5            MS. MAYS:  Object to the
6  form.
7       A   IA checked that out and it
8  was a new phone.  They had just come out
9  with those phones.
10       Q   Where is that information in
11  the investigative file?
12       A   I do not know.
13       Q   It's not there, is it?
14            MS. MAYS:  Object to the
15  form.
16       A   I do not know.
17       Q   I mean, would your internal
18  affairs agent be lying if they testified
19  to me earlier that they don't know.
20            MS. MAYS:  Object to the
21  form.
22       Q   They did not investigate who
23  had the phone before Mr. Gray or whether

---

Page 125

1  it had ever been used.
2       MS. MAYS:  Object to the
3  form.
4       A   I was told after checking
5  with the Southern Link represent, Karen
6  Kelley, that the phones were new phones
7  that had not been used.  They were, as a
8  matter of fact, just received those style
9  phones, that 626 smart phone.
10      Q   This is the same office that
11 employs Leslie Bonet, the woman that you
12 were having the affair with.
13      A   Yes.
14      Q   Is Triple X Black Book dot
15 com not a dating site?
16      MS. MAYS:  Object to the
17 form.
18      A   It may be a dating site that
19 has pornographic images on it.
20      Q   How do you know that?
21      A   I'm sitting here looking at
22 a picture.
23      Q   May I see it?

---

Page 126

1       A   (Witness hands document.)
2       Q   For the record this is a
3  picture of a computer.
4       Where does this picture of this
5  computer, where did this come from?
6       A   I don't know.  It was in the
7  IA file.  I believe that was in the IA
8  file.
9       Q   Who took this picture?
10      A   I don't know.
11      Q   Whose computer is this?
12      A   I don't know.
13      Q   So you don't know for sure
14 whether this is a -- you don't know that
15 this is a porn site, do you?
16      MS. MAYS:  Object to the
17 form.
18      A   Well, it has pornographic
19 images on it.
20      Q   If this is a dating website,
21 how do you know that Keith Gray viewed
22 pornographic images?
23      MS. MAYS:  Object to the

---

Page 127

1  form.
2       A   They come from his phone.
3       Q   What did?
4       A   That he visited the sites?
5       Q   Yes.  But it doesn't say
6  that he looked at porn while he's on a
7  dating site.
8       MS. MAYS:  Object to the
9  form.
10      A   The name of the site is
11 Triple X Black Book dot com.  Those are
12 images that have been retrieved from that
13 website.
14      Q   But you don't know that he
15 viewed these images --
16      MS. MAYS:  Object to the
17 form.
18      Q   -- do you?
19      A   There's a possibility he did
20 not view that specific screen, yes.  I
21 don't even know what day that was taken.
22      Q   Is it not possible --
23      Well, first of all, do you have

---

Page 128

1  any reason to dispute that Keith Gray's
2  cell phone was issued on May 8th, 2013,
3  the date that you are showing according to
4  your report --
5       A   I don't know what date he
6  was given the phone.
7       Q   So you don't know the date
8  that he was given the phone, so you don't
9  know if this site was accessed while he
10 had possession of the phone, number one,
11 correct?
12      MS. MAYS:  Object to the
13 form.
14      A   The website was accessed
15 from his phone after he had received it.
16      Q   Well, how do you know if you
17 don't know --
18      A   I'm not a -- I'm not a
19 forensic phone person.  I don't know.  I
20 go by what people tell me.
21      Q   And your forensic phone
22 person told you there's no way to prove
23 that Keith Gray accessed this website.

---

Page 129

```
 1        MS. MAYS:  Object to the
 2   form.
 3        A    Prove as in how?  By the way
 4   your definition of proof is -- I mean, I'm
 5   not really following you.
 6        Q    No.  Nothing in the
 7   forensics examination of Keith Gray's
 8   phone could definitively show that Keith
 9   Gray accessed pornography on that cell
10   phone.
11        MS. MAYS:  Wait for the
12   question.
13        Q    Would Mr. Mullis be lying if
14   that's what he testified to?
15        MS. MAYS:  Object to the
16   form.
17        A    I don't know.
18        Q    So this is the only date
19   that you show.
20        A    That's the only -- the only
21   one in my book.
22        Q    And so a while ago you said
23   two.  So that's wrong.
```

Page 130

```
 1        A    I was told two.
 2        Q    Who told you two?
 3        A    Either Tim Mullis or Doug
 4   McGill, I don't know which one.
 5        Q    And so you don't know when
 6   the phone was issued to Keith Gray,
 7   correct?
 8        MS. MAYS:  Objection.  Asked
 9   and answered.
10        Q    Just to summarize:  You
11   don't know when the phone was issued to
12   Keith Gray, correct?
13        A    I don't know the exact day
14   he was issued the phone.
15        Q    You don't know for sure
16   whether this is a porn site or a dating
17   site or what kind of site it is, do you?
18        MS. MAYS:  Object to the
19   form.
20        A    It is a site with
21   pornographic images.
22        Q    And that you can't prove
23   that he viewed, correct?
```

Page 131

```
 1        MS. MAYS:  Object to the
 2   form.
 3        A    It was viewed by his -- it
 4   was on his phone as being viewed.
 5        Q    Is it not possible that that
 6   phone which was issued to him on that
 7   date, on May 8th, 2013, was populated with
 8   information from -- with previous
 9   information?
10        MS. MAYS:  Object to the
11   form.
12        Q    In other words, that if this
13   site, if it had ever been accessed, could
14   have been accessed prior to that date that
15   his phone was populated; is that possible?
16        A    I think in the interview
17   that I watched, is that Keith said
18   something about his Gmail being populated
19   over to his city phone.
20        So is it a possibility?  Yes.
21   However, I was told that it had been
22   looked at after that date.  It's just not
23   here.
```

Page 132

```
 1        Q    So it's not in your
 2   forensics testing of the phone.
 3        MS. MAYS:  Object to the
 4   form.
 5        A    I don't know.  I don't know
 6   if it's there or not.  I just don't see it
 7   here.
 8        MS. MAYS:  What you are
 9   saying is you don't have the whole
10   investigation file sitting here in front
11   of you.
12        MS. EDWARDS:  Oh, are you
13   testifying, Ms. Mays?
14        MS. MAYS:  I am not
15   testifying, but he's saying to you he
16   doesn't have the entire file right here in
17   front of him.  If you would like to ask
18   him questions about the investigation
19   file, show it to him and he can answer
20   your questions about it.
21        Q    My question to you is this:
22   And in deposing Tim Mullis regarding his
23   forensics testing, he could not tell
```

Page 133

1  through his testing definitively that
2  Keith Gray accessed a porn site.  Would he
3  be lying?
4       MS. MAYS:  Object to the
5  form.
6       A   What do you mean by
7  definitively?  What -- I mean --
8       Q   He said there's nothing in
9  the testing he performed on Keith Gray's
10 phone showed that Keith Gray accessed a
11 porn site --
12      A   Was it accessed from that
13 phone?
14      Q   -- by Keith Gray.
15      A   So he did access it.  So he
16 did access it.  You just said "by Keith
17 Gray."
18      Q   No.  What I'm saying is,
19 nothing in the forensic testing proves
20 that Keith Gray accessed a porn site.
21      A   But it was accessed from his
22 phone.
23      Q   That's what you believe.

Page 134

1       A   Yeah.
2       Q   And that's good enough for
3  you that Keith Gray did it when you don't
4  even know when the phone was issued to
5  him.
6       MS. MAYS:  Object to the
7  form.  Argumentative.
8       Q   That's good enough for you.
9       MS. MAYS:  Object to the
10 form.
11      A   After I looked at all the
12 facts and circumstances given to me by the
13 IA division, yes.
14      Q   Where is the phone?
15      A   I do not know.
16      Q   You don't know where the
17 phone is.
18      MS. MAYS:  Object to the
19 form.
20      A   No.
21      MS. MAYS:  Asked and
22 answered.
23      Q   You didn't preserve the

Page 135

1  phone as evidence?
2       MS. MAYS:  Object to the
3  form.
4       A   I don't know.  I never had
5  the phone.
6       Q   Your department had the
7  phone.
8       A   Yes, Internal affairs had
9  it.
10      Q   So you don't know where the
11 phone is.
12      A   I don't know where the phone
13 is.
14      MS. MAYS:  Object to the
15 form.  He's answered that question three
16 times.
17      Q   We have requested the phone
18 to be produced in this case.  We want the
19 phone produced in this case.  Will you
20 agree to produce the phone?
21      MS. MAYS:  Object to the
22 form.
23      A   I'm not going to agree

Page 136

1  because we're being -- we have counsel.  I
2  can't agree to it.  The city attorney
3  would have to agree to it, but I can't
4  agree --
5       MS. MAYS:  Sonya, we've
6  serviced discovery request, the response
7  to the discovery request.  If you want to
8  take that issue up with counsel, we can
9  take up that issue.
10      But he's answered the question
11 that you asked about the phone.  His
12 answer to the question is he doesn't know
13 were where the phone is.  He never had the
14 phone.
15      Q   You testified at the
16 personnel board hearing that you did not
17 know whether that phone was new when it
18 was issued to Keith Gray.  Do you recall
19 that?
20      MS. MAYS:  Object to the
21 form.
22      A   I didn't at the time.
23      Q   After --

Page 137

1      A   I didn't at the time.
2      Q   So at the time that you made
3  the decision to terminate his employment,
4  you did not know that.
5          MS. MAYS:  Object to the
6  form.
7      A   I did not know that, if
8  that's what I said.
9      Q   And you're aware that no
10 pornographic materials were found on Keith
11 Gray's city-issued computer as well,
12 correct?
13     A   Correct.
14     Q   In fact, when your Internal
15 Affairs department Sergeant Doug McGill,
16 unbenounced to Sergeant Smith, sent Keith
17 Gray's computer to ABI for forensics
18 testing, did you order that?
19         MS. MAYS:  Object to the
20 form.
21     A   I believe Sergeant Magill
22 advised me that it needed to be, so I did
23 authorize it.

Page 138

1      Q   And you're aware that
2  nothing came back from their investigation
3  of Keith Gray's computer.
4          MS. MAYS:  Object to the
5  form.
6      A   I don't remember whether it
7  -- to be honest, I don't remember anything
8  that they found.
9      Q   You don't remember there
10 being anything that was found.
11     A   Correct.
12         MS. MAYS:  Are you talking
13 about as it relates to porn or anything?
14     Q   Was there anything found on
15 his computer by ABI?
16     A   There were some -- a
17 software program on it, a tracking
18 software program that was on his computer.
19     Q   What kind of tracking
20 software?
21     A   GPS tracking software
22 program.
23     Q   But that's that.  Nothing

Page 139

1  that was found on his computer is
2  underlying the reason for his termination,
3  is it?
4      A   No.
5      Q   Other than this one website
6  that you allege is a porn site that Keith
7  Gray accessed, what -- is there anything
8  else that you deem in violation of that
9  policy?
10         (Requested portion of record
11         read.)
12         MS. MAYS:  Would you read
13 that question back?
14     A   No.
15         No employee shall access any file
16 or database unless they have a need and a
17 right to such information.  Personal
18 identification and access codes should not
19 be revealed to any unauthorized source or
20 person.
21     Q   What policy is that?
22     A   It's the mobile data --
23 mobile data terminals and electronic

Page 140

1  messaging.
2      Q   May I see that, please?
3          Which provision was it from this
4  policy that you just read?
5      A   Right there (indicating).
6      Q   So you read Number 8.  And
7  Number 8 is what you allege that if it was
8  proven, if it had been proven that Keith
9  Gray had accessed this website, you allege
10 that he would be in violation of Number
11 8 --
12         MS. MAYS:  Can we see it
13 back?
14     Q   -- of this policy?
15     A   Yes.
16     Q   And this is policy number
17 what?
18     A   This is General Order
19 200-42H and 1-A-8 (as read).
20     Q   Now, if other than this one
21 time alleged visit to an alleged porn
22 site, is there anything else that you
23 allege is in violation of that policy?

Page 141

```
 1      A   Besides these two, no.
 2      Q   What two?
 3      A   I just read it.  Number 8,
 4  and then the one that we've been talking
 5  about.  Discretionary viewing, downloading
 6  or transmitting materials other than that
 7  required for police business involve uses
 8  of simple language, images, jokes,
 9  sexually explicit materials, or messages
10  that are offensive or disparage any
11  person, group or classification of
12  individuals is prohibited (as read).
13      Q   What number is that?
14      A   Six.
15      Q   So is there anything other
16  than this alleged visit to this website
17  that is in violation of that policy?
18      A   I just read you the other
19  one, 8.
20      Q   No.  I'm asking actions that
21  Keith Gray took.  Is there anything other
22  than this alleged visit to this website?
23      A   No employee shall access any
```

Page 142

```
 1  file or database unless they have a need
 2  and a right to such information.
 3      Q   What I'm asking, sir, is was
 4  there anything else that you allege Keith
 5  Gray to have done -- I mean, other than
 6  this alleged one-time visit to this
 7  website the day he got his phone, is there
 8  anything else?
 9      A   He looked up --
10      MS. MAYS:  Objection to the
11  form.
12      Q   Is there anything else that
13  you allege he did in violation of those
14  policies?
15      MS. MAYS:  Object to the
16  form.
17      A   The Internal Affairs
18  investigation showed where he had visited
19  several different officers' personal
20  information without having a need to go to
21  that screen and get that information.
22      Q   But now, isn't it true that
23  he had access to that information?
```

Page 143

```
 1      A   You have a right and a need.
 2      Q   But he had --
 3      A   You have to have both.
 4      Q   But he had access to this
 5  information in his capacity as a captain
 6  of the Dothan Police Department, correct?
 7      A   Yes.
 8      Q   You had given him access to
 9  that information, correct?
10      A   Yes.
11      Q   You did not revoke his
12  access to this information during the
13  course of any investigation against him,
14  at any time prior to his being terminated,
15  did you?
16      A   Yes.  From the minute he was
17  put on admin leave -- not the minute, but
18  later on that day access to our computer
19  systems were shutdown for him.
20      Q   But obviously at the time he
21  accessed it, he had access to the
22  information, he had the ability to access
23  this information, correct?
```

Page 144

```
 1      A   Yes.
 2      Q   And as you testified
 3  earlier, you had, in fact, asked him to
 4  provide you with personal information on
 5  officers, correct?
 6      MS. MAYS:  Object to the
 7  form.
 8      Q   Correct?
 9      A   On occasion, yes, but, the
10  particular -- when he went and was looking
11  up whether people had military service or
12  was in the military or was in the guard,
13  that report had been completed two months
14  prior to a lot of those visits to those
15  particular officers' personal information.
16      Q   But now you said that it was
17  -- that he could have also, at other
18  times, other than just looking up military
19  service, gathered information at your
20  request in other areas, correct?
21      A   Given the investigation of
22  IA, there were several names that he --
23  several officers who he went to their
```

Page 145

1  personal information that he didn't have a
2  need to.
3       Q    Whose?
4       A    It's in the report.
5       Q    Which report?
6       A    The IA report.
7       Q    Summarizing their findings
8  of the investigation.
9       A    Yes.  And actually showing,
10 I believe, it's probably going to show the
11 dates and times that Keith went and looked
12 at the personal information.
13      Q    You believe?
14      A    No, it's in there.
15      Q    May I see it, please?
16      A    I don't have it.
17      Q    You don't have it.
18      A    No.  Don't you?
19      Q    You don't have the summary
20 of the investigation.
21      A    I do not have -- I've got
22 the summary.
23      Q    Okay.  May I see it, please?

Page 146

1       A    It's actually not in the
2  summary.
3       Q    So it's not in the summary.
4       A    It's not in the summary, no.
5  It's on the -- I don't know if this is all
6  of it.  It's not in the summary, but it is
7  in some of the exhibits, and --
8       Q    Where?
9       A    In the IA report.
10      Q    Okay.  I want to know, it's
11 important for me to understand exactly
12 what it is you're relying on to make your
13 decision to terminate a twenty-eight year
14 veteran of the Dothan Police Department.
15           MS. MAYS:  Object to the
16 form.
17      Q    I want to know whose --
18      A    It's in the --
19      Q    -- information --
20      A    It's in the fifteen hundred.
21 It's in the fifteen hundred -- I don't
22 recall.
23      Q    How many officers?

Page 147

1       A    I don't recall the number of
2  people that he got.
3       Q    Sitting here today you
4  cannot say for sure when Keith Gray
5  accessed anyone's information, can you?
6           MS. MAYS:  Object to the
7  form.  He said it's in the investigation
8  file that he reviewed prior to terminating
9  his employment.
10      Q    And sitting here today you
11 don't know, do you?
12      A    It's in the file.
13      Q    So you don't know.
14      A    It's in the file.
15      Q    You don't have personal
16 knowledge.
17           But you do not dispute that you
18 never revoked his access to that
19 information.
20           MS. MAYS:  Object to the
21 form.
22      Q    You never revoked his access
23 to that information, did you?

Page 148

1           MS. MAYS:  Object to the
2  form.
3       A    I did not.
4       Q    In other words, he did not
5  hack into your system to get this
6  information, did he?
7       A    No, he did not, but he did
8  not have a need to go there.
9       Q    In your opinion.
10           MS. MAYS:  Object to the
11 form.
12      Q    Did you ask him?
13           MS. MAYS:  Object to the
14 form.
15      A    I did not do any of the
16 interview.  I was not part of the
17 investigation.
18      Q    What did the investigation
19 uncover to you, then?
20      A    That he had been to those
21 officers' personal information without
22 having a need to do so.
23      Q    What was his reason for

Page 149

1  doing so?
2          MS. MAYS:  Object to the
3  form.
4          A   I don't know.
5          Q   And you didn't ask him, did
6  you?
7          MS. MAYS:  Object to the
8  form.
9          A   Again, I did not conduct the
10 investigation.
11         Q   Well, what did your
12 investigation tell you his reason why he
13 did it?
14         A   That there was not a need to
15 go to those.  Even interviewing, he could
16 not even give a reason why, except for the
17 -- getting the information about the
18 military service.  And that report would
19 have been completed two months prior to
20 visiting these officers' personal info.
21         Q   So you allege that that's
22 the extent of Mr. Gray's explanation about
23 his reasons for accessing that

Page 150

1  information.
2          A   No.  He said he wanted to
3  get education, phone numbers.  I'm trying
4  to think of what else.  I'm trying to look
5  up phone numbers.  Trying to look up the
6  education of Major Parrish.  Trying to get
7  a phone number for Doug McGill.  That's
8  all I can remember right now.
9          Q   But there is nothing
10 prohibiting him from doing that, was
11 there?
12         MS. MAYS:  Object to the
13 form.
14         A   A policy that says you have
15 to have a need to do so.
16         Q   What I'm saying is, you
17 never took away his access, did you?
18         A   No.
19         Q   Well, if this information is
20 so top secret, classified, why does the
21 police department not have a policy to
22 issue access on an as-needed basis?
23         MS. MAYS:  Object to the

Page 151

1  form.
2          A   There may be a need at some
3  time for you to have that information.
4          Q   In which you could --
5          A   That's why the policy says
6  you have to have a need -- a right and a
7  need.
8          Q   Well, if that's your policy,
9  then wouldn't it make more sense to issue
10 access when it's needed --
11         MS. MAYS:  Object to the
12 form.
13         Q   -- versus enabling access
14 all the time?
15         A   I don't know why, but I
16 think that would be very difficult to have
17 someone come over from IT and give access
18 for just a limited amount of time and then
19 come back over and take it away.  It just
20 doesn't make sense.  So the policy is
21 there for the reason that it is.
22         Q   It's because that
23 information is accessed quite often by

Page 152

1  officers in the police department, isn't
2  it?
3          MS. MAYS:  Object to the
4  form.
5          A   I don't know how often it's
6  accessed by officers in the police
7  department.  I don't -- there are
8  different limitations to who has that
9  information.  A captain would be one that
10 would have that access.
11         Q   Do you monitor your other
12 captains' access to that system on a daily
13 basis.
14         MS. MAYS:  Object to the
15 form.
16         A   I didn't monitor Keith
17 Gray's access on a daily basis.
18         Q   Do you monitor your other
19 captains --
20         A   No.
21         Q   -- use of that system?  Have
22 you ever monitored any other captains' use
23 of that system other than Keith Gray?

Page 153

1          MS. MAYS:  Object to the
2    form.
3          A    No, not that I'm aware of.
4          Q    Did or did you not authorize
5    Keith Gray to do tracking of Sergeant Mike
6    Sorrelli?
7          A    Yes.  I remember -- yes, it
8    was Keith.
9          Q    And using that software that
10   was found on his computer, the GPS
11   tracking software.
12         A    Yes.
13         Q    Because Sorrelli had been
14   found to have violated several
15   departmental policies, correct?
16         A    Yes.
17         Q    And you asked Keith to
18   conduct off-duty tracking, correct?
19         Q    Well, you authorized him to
20   track Mike Sorrelli, correct?
21         A    Yes.
22         Q    And you authorized placing a
23   GPS on his vehicle, didn't you?

Page 154

1          A    I didn't know what it
2    consisted of, but if it was a GPS, yes.
3    At the time I didn't know exactly how it
4    was done.
5          Q    But you -- you specifically
6    authorized tracking of him.
7          A    Yes.
8          Q    Are you -- are you aware
9    that the Internal Affairs investigation
10   determined that the extent of Keith Gray's
11   alleged association with an alleged outlaw
12   motorcycle club was receiving permission
13   or verification that he could ride in a
14   particular area and avoid friction from
15   that club?
16         MS. MAYS:  Object to the
17   form.
18         Q    Let me rephrase that.
19         First of all, Keith Gray never
20   denied requesting a blessing from Outcast
21   Motorcycle Club, correct?
22         A    No.
23         Q    He never denied that during

Page 155

1    the Internal Affairs investigation, did
2    he?
3          A    No.
4          Q    And, in fact, he told the
5    Internal Affairs investigators that his
6    reason for doing so was to avoid conflict
7    for his motorcycle club and to keep the
8    members of his club safe, correct?
9          A    Yes, he said that.
10         Q    Now, between that and
11   performing charity rides in which these
12   groups may both be present during a
13   charity run or a charity ride to raise
14   money for charity, what do you allege is
15   Mr. Gray's association with an outlaw
16   motorcycle club or an alleged one
17   percenter club?
18         A    Well, he does not deny going
19   into their clubhouse on at least three
20   occasions.  That is not all that that
21   fifteen hundred page IA investigation
22   alleges.  You're saying that is the only
23   things it allege.  It's not.

Page 156

1          Q    I'm asking you.  I'm asking
2    you.  You made the decision to terminate
3    his employment, didn't you?
4          A    Yes.
5          Q    Did anybody else make that
6    decision?
7          A    No, I did.
8          Q    And so, in understanding
9    your reasons for terminating his
10   employment based on association with a
11   motorcycle club, I want to know the
12   understanding in your mind of his
13   association with a motorcycle club.
14         A    That and Keith Gray went to
15   their events, went and -- to their
16   clubhouse and associated.
17         Q    What events?
18         A    A funeral.  They have to go,
19   according to the class that you say could
20   or could not be Keith Gray's class that he
21   taught, that there's a certain amount of
22   events that they have to go to as a
23   motorcycle club to that outlaw motorcycle

Page 157

```
 1   club's events.
 2        Q    Whose?
 3        A    The outlaw motorcycle club's
 4   events.
 5        Q    I mean, do you know the name
 6   of this alleged outlaw motorcycle club?
 7        A    Outcast.
 8        Q    Other than the funeral, what
 9   events are you aware of in which Keith
10   Gray attended with Outcast Motorcycle
11   Club?
12        A    Besides his own admission of
13   the times that he went and that funeral, I
14   don't know for sure of anymore.
15        Q    Mr. Gray never mentioned
16   that funeral during the Internal Affairs
17   investigation, did he?
18        A    I don't remember if he did
19   or he didn't.
20        Q    So at the time that you made
21   the decision to terminate him, you were
22   not aware of his attending that funeral,
23   were you?  Were you?
```

Page 158

```
 1        A    Just give me time.
 2        Q    I'm asking you at the time
 3   -- did you or did you not know at the time
 4   of his termination whether or not he went
 5   to --
 6        A    I don't know if I did or
 7   not.  If it's in this, I did.  If it's not
 8   in here, I didn't.
 9        Q    And in what you're looking
10   at is a binder that was prepared by your
11   attorneys, correct?
12        A    This is the actual interview
13   that I'm looking at between Donny Smith,
14   Doug McGill and Keith Gray.
15        Q    You didn't create that
16   binder, did you?
17        A    No.
18        Q    And your Internal Affairs
19   department didn't create that binder, did
20   they?
21        A    No.
22        Q    Your attorneys created that
23   binder, didn't they?
```

Page 159

```
 1        A    This was provided for me.
 2        Q    By your attorneys.
 3        A    And I have gone over it.
 4        Q    Your attorneys provided you
 5   with that binder, didn't they?
 6        A    Yes.  Yes, I did know.
 7        Q    Now, Keith Gray never said
 8   that Bama Boyz is apart of Outcast
 9   Motorcycle Club, did he?
10             MS. MAYS:  Object to the
11   form.
12        A    They are a subset,
13   basically, of Outcast.
14        Q    What in your investigation
15   shows that?
16        A    He said they were.
17        Q    When?
18        A    Okay.  He got the blessing
19   from the Outcast Motorcycle Club.  And it
20   was in his class, that you say may or may
21   not be Keith Gray, where -- let me find
22   it.
23             We started out as a riding club.
```

Page 160

```
 1   Now, just for definition purposes because
 2   I'm fixing to start kicking between OMC,
 3   MC and RC.  The MC is attached directly to
 4   the OMC.
 5        Q    What are you referring to
 6   there?
 7        A    This is what I just told you
 8   just like before I started reading it.
 9        Q    Where did that come from?
10   What is this document?
11             MS. MAYS:  You're referring
12   to a transcript of --
13             MS. EDWARDS:  Are you
14   testifying, Ms. Mays?
15             MS. MAYS:  I'm going to tell
16   you the Bates number --
17             MS. EDWARDS:  I would like
18   to know his understanding of the document.
19             MS. MAYS:  -- that's labeled
20   City of Dothan, Gray 00162 through 001187.
21        Q    So this is something your
22   attorneys produced.
23             MS. MAYS:  Something that's
```

Page 161

1  been produced in this case.
2       A   This is something that -- a
3  transcript was done by a transcriptionist
4  at our department.
5       Q   Somebody in your department
6  transcribed what?
7       A   The audio recording of the
8  CD.
9       Q   The unauthenticated audio
10 recording that we don't know -- excuse me
11 -- that we don't know who recorded it,
12 right?  We don't know who made the
13 recording, correct?
14          MS. MAYS:  Object to the
15 form.
16      A   So says you.
17      Q   No.  You don't know who made
18 that recording, do you?
19          MS. MAYS:  Object to the
20 form.
21      A   No.
22      Q   And again, you don't know if
23 anybody has ever edited that recording,

Page 162

1  correct?
2          MS. MAYS:  Object to the
3  form.  Asked and answered several times.
4       Q   Well, I'm just going to
5  state, you have testified you don't know
6  who made it, whether it's been edited, or
7  whether it's been modified, so.
8          MS. MAYS:  Object to the
9  form.  I don't think that was a question.
10      Q   Didn't you think that it's
11 odd that Keith Gray would feel the need to
12 ask for a blessing of a club that he's
13 apart of?
14          MS. MAYS:  Object to the
15 form.
16      Q   Why would he have to get a
17 blessing if he's part of that club?
18      A   He became apart of an
19 attachment to that club after he got his
20 blessing.
21      Q   In your opinion, correct?
22          MS. MAYS:  Object to the
23 form.

Page 163

1       A   From all the information
2  provided to me, yes.
3       Q   Again, what do you have
4  other than this unvalidated,
5  unauthenticated recording that tells you
6  that from this investigation?
7          MS. MAYS:  Object to the
8  form.
9       A   There is a lot of
10 documentation besides just this audio CD.
11      Q   Of what?
12      A   The investigation that was
13 done by the Internal Affairs division.
14      Q   Of what, though?  I mean, of
15 Bama Boyz being Outcast?
16          MS. MAYS:  Object to the
17 form.
18      A   It goes into very great
19 detail about the link between MCs and
20 OMCs.
21      Q   What does?
22      A   That investigation.  Did you
23 not read the Internal Affairs report?

Page 164

1       Q   No.  What within the
2  Internal Affairs investigation --
3       A   That whole --
4       Q   -- is what I'm trying to get
5  to.
6       A   That whole document.
7       Q   What document?
8       A   Every piece of paper in
9  there just about.  It was fifteen hundred
10 pages.
11      Q   So you allege that just
12 about every piece of paper in that fifteen
13 hundred pages of your alleged Internal
14 Affairs investigation say that Bama Boyz
15 is Outcast?
16          MS. MAYS:  Object to the
17 form.
18      Q   Is that your testimony?
19          MS. MAYS:  Object to the
20 form.
21      A   That is not my testimony.
22      Q   All right.  So you admit
23 Bama Boyz is not Outcast Motorcycle Club,

Page 165

1  correct?
2          MS. MAYS:  Object to the
3  form.
4          A    They are an attachment to
5  Outcast Motorcycle Club.
6          Q    An attachment.
7          A    Right.  They fall up under
8  the OMCs.
9          Q    What in your investigation
10  demonstrates that to you?  And what I'm
11  trying to get at here is your thought
12  process in making the decisions to
13  terminate him.  I want to know what
14  convinced you that Bama Boyz is attached
15  to Outcast Motorcycle Club.
16          MS. MAYS:  Object to the
17  form.
18          Q    Specifically.  Specifically.
19          A    Specifically.  Several
20  things.  The blessing to go in and seeking
21  out to be a motorcycle club instead of a
22  riding club.  The steps that you have to
23  go through to be a motorcycle club.  The

Page 166

1  things that you have to do that the outlaw
2  motorcycle club requires you to do.
3          Q    Like what?
4          A    Knowing --
5          Q    What does Outcast require --
6          MS. MAYS:  Let him finish
7  his answer.
8          Q    Well, may I just stop you
9  right there before you proceed.
10          What do you allege Outcast
11  Motorcycle Club requires Bama Boyz to do?
12          A    The only thing that I'm
13  aware of right now is that they have to
14  attend a certain amount of meetings with a
15  certain number of people to some of the
16  functions, and that they were instructed
17  you cannot be a club until you have a
18  clubhouse.
19          But in this whole investigation,
20  Donny Smith's hours of work, putting the
21  documents in there that shows the
22  relationships between MCs and OMCs.
23          Q    That's taken from the

Page 167

1  unverified CD, correct?
2          A    No.  It had nothing to do
3  with the CD.
4          Q    Okay.  Where else in your
5  investigation shows -- and forgive me.
6          Do you have -- do you or do you
7  not have documentation within that
8  investigative file, other than that CD
9  that is unauthenticated, and other than
10  this transcription of an unauthenticated
11  CD, that says that Bama Boyz Motorcycle
12  Club is apart of Outcast Motorcycle Club?
13          MS. MAYS:  Object to the
14  form.
15          A    I do not know that there is
16  anywhere in there that it says Bama Boyz
17  are Outcast.  It shows the correlation
18  between the two, that the Bama Boyz is a
19  motorcycle club that is attached to
20  Outcast.
21          Q    It does not say that Bama
22  Boyz is attached to Outcast anywhere in
23  that investigation, does it?

Page 168

1          MS. MAYS:  Object to the
2  form.
3          A    I don't know.  I said
4  specifically.  I don't know specifically.
5          Q    You also don't know whether
6  these meetings would be the charitable
7  events, which is the only event so far,
8  other than a funeral that you -- that you
9  know that Keith Gray has attended with
10  Outcast, correct?
11          MS. MAYS:  Object to the
12  form.
13          A    I don't know.
14          Q    And isn't it true that
15  Adrian Woodruff's motorcycle club is a
16  motorcycle club.  It is not a riding club,
17  correct?
18          MS. MAYS:  Object to the
19  form.
20          A    It's a law enforcement
21  motorcycle club.
22          Q    But it's a motorcycle club,
23  correct?



Page 169

1     A   As far as I know, yes.
2     Q   Chris Watson's club is a
3  motorcycle club as well, isn't it?
4     A   Law enforcement motorcycle
5  club.
6     Q   And not a riding club.
7     A   No.
8     Q   It's a motorcycle club.
9  And you're aware that Taiwan
10  Truitt was a member of All Throttle
11  Motorcycle Club, correct?
12     A   Yes.
13     Q   And that his motorcycle club
14  received a blessing to ride within
15  Outcast's territory as well, correct?
16     A   It is my understanding that
17  once All Throttle became involved with the
18  Outcast, that Taiwan, at that point, was
19  trying to get out of it, and he did
20  eventually get out of the club.
21     Q   Wasn't he encouraged to get
22  out of it by the Dothan Police Department?
23        MS. MAYS:  Object to the

Page 170

1  form.
2     A   I don't know.
3     Q   So it's your testimony that
4  you didn't encourage Taiwan to get out of
5  the All Throttle Motorcycle Club?
6     A   Correct.
7     Q   Do you know of anyone within
8  your department who encouraged Taiwan
9  Truitt to get out of All Throttle
10  Motorcycle Club?
11     A   No.
12     Q   Do you know whether Taiwan
13  Truitt was threatened with disciplinary
14  action unless he quit All Throttle
15  Motorcycle Club?
16     A   I don't know that.
17     Q   Was or wasn't he told --
18     A   I don't --
19     Q   -- that he would be
20  disciplined if he didn't leave All
21  Throttle Motorcycle Club?
22     A   I'm not aware of that at
23  all.

Page 171

1     Q   During your investigation of
2  Mr. Gray, did you review the Bama Boyz
3  bylaws?
4     A   No.
5     Q   Are you aware that the Bama
6  Boyz bylaws state specifically that they
7  are an independent motorcycle club?
8        MS. MAYS:  Object to the
9  form.  He just said he didn't review them.
10     A   I don't know.
11     Q   Because you didn't request
12  those, did you?
13        MS. MAYS:  Object to the
14  form.
15     Q   During the investigation,
16  you didn't request any documentation from
17  Bama Boyz Motorcycle Club, did you?
18     A   I didn't do the
19  investigation.
20     Q   And the Internal Affairs
21  investigation that you reviewed does not
22  include any documentation from Bama Boyz
23  Motorcycle Club, does it?

Page 172

1     A   I don't remember seeing any.
2        MS. MAYS:  Any bylaws?
3     A   Correct.
4     Q   Now, are you aware that in
5  order for clubs to be directly associated
6  with Outcast, they have to wear an Outcast
7  patch on their chest?  Are you aware of
8  that?
9     A   I'm not aware of that.
10     Q   And you're aware that Bama
11  Boyz Motorcycle Club did not wear Outcast
12  patches on their chests, were you?
13     A   I was not aware either way.
14     Q   That's not something
15  included in the Internal Affairs
16  investigation, is it?
17     A   I don't remember if it's in
18  there or not.
19     Q   And specifically, it's a
20  supporter patch that affiliated clubs
21  would wear, correct?
22        MS. MAYS:  Object to the
23  form.

Page 173

```
 1      A   Say the question again.
 2      Q   Are you aware that support
 3  clubs of Outcast would wear an Outcast
 4  patch?
 5          MS. MAYS:  Object to the
 6  form.
 7      Q   And that that patch is
 8  called a support patch.
 9      A   I have heard of those.  I
10  didn't know that it was required.
11      Q   Do you have any evidence or
12  any information within your Internal
13  Affairs investigation as to whether or not
14  Bama Boyz Motorcycle Club wore an Outcast
15  patch?
16      A   No.
17          MS. EDWARDS:  Could we take
18  just a five minute break?
19              (Short break.)
20      Q   (BY MS. EDWARDS:)  What is
21  the name of Adrian Woodruff's motorcycle
22  club?
23      A   I don't recall.
```

Page 174

```
 1      Q   What is the name of Chris
 2  Watson's motorcycle club?
 3      A   I believe it's the Iron
 4  Pigs.
 5      Q   How do you know that these
 6  are law enforcement motorcycle clubs,
 7  alleged law enforcement motorcycle clubs?
 8      A   IA investigators.
 9      Q   What did they do to
10  determine that?
11      A   I'm not -- I don't remember
12  exactly how they got that information.
13      Q   But they did not launch an
14  Internal Affairs investigation into them,
15  did they?
16          MS. MAYS:  Object to the
17  form.
18      A   It was part of this
19  investigation, if I'm not mistaken.
20      Q   You testified earlier, they
21  didn't launch independent --
22      A   Correct.
23      Q   -- internal affairs
```

Page 175

```
 1  investigation --
 2      A   Correct.
 3      Q   -- into their motorcycle
 4  club's associations, correct?
 5      A   Correct.
 6      Q   And, in fact, you testified
 7  earlier that they interviewed them,
 8  correct?
 9          MS. MAYS:  Object to the
10  form.
11      A   Correct.
12      Q   Do you know whether they
13  interviewed any one else?
14      A   I'm not aware.
15      Q   Now, at the time of Keith
16  Gray's termination, you didn't know that
17  their clubs were law enforcement clubs,
18  did you?
19          MS. MAYS:  Object to the
20  form.
21      A   Yes.
22      Q   How?
23      A   I was told.
```

Page 176

```
 1      Q   By whom?
 2      A   IA investigators.
 3      Q   Although they didn't conduct
 4  an Internal Affairs investigation,
 5  correct?
 6          MS. MAYS:  Object to the
 7  form.
 8      A   Correct.
 9      Q   The Dothan Police Department
10  has never investigated Iron Pigs, have
11  they?
12          MS. MAYS:  Object to the
13  form.  What time frame?
14      Q   Ever, was my question.
15          MS. MAYS:  Object to the
16  form.
17      A   Not that I'm aware of.
18      Q   Do you know what training
19  Darryl Mathews has undergone in his role
20  as EEO officer?
21      A   No.
22      Q   Did you do anything to
23  verify the accuracy or completeness of the
```

Page 177

1  Internal Affairs investigation of Keith
2  Gray?
3       A   I read the entire document.
4       Q   What do you mean "the entire
5  document?"
6       A   The three ring binder that
7  it was put in.
8       Q   By your attorneys?
9       A   No.  The one that we
10  created, the one that the department
11  created.
12      Q   And that binder was given to
13  you by your internal affairs?
14      A   Yes.
15      Q   And so did you do anything
16  to verify the accuracy and completion of
17  this investigation of Keith Gray?
18      A   The extent I did was read
19  it.
20      Q   So you didn't do anything to
21  personally verify it?
22      A   I do not conduct the
23  investigations.  I review the

Page 178

1  investigations, the facts and the
2  circumstances surrounding the
3  investigation.
4       Q   Didn't -- so are you stating
5  that you don't play any role in the
6  Internal Affairs investigation?
7           MS. MAYS:  Object to the
8  form.  Mischaracterizes his testimony.
9       A   I do not play any role in
10  the investigation except I get updates as
11  to how an investigation is going.
12      Q   So you don't take it upon
13  yourself to conduct the investigation.
14  You leave that to your internal affairs.
15      A   Correct.
16      Q   Isn't it true that you
17  contacted the FBI regarding Keith Gray?
18      A   I don't remember if I did or
19  not.
20      Q   So it's possible you could
21  have.
22      A   It is possible that I could
23  have.  I believe that the investigators,

Page 179

1  Donny and Doug asked me to make contact
2  with them because I have more of a working
3  relationship with them than they do.
4       Q   So you did play a role.
5       A   I don't know if I did or
6  not.  I mean, I could have.  It might have
7  been me that made contact on their behalf,
8  but I don't remember exactly how the
9  contact with the FBI came about.
10      Q   But you just testified that
11  you likely did it because you've got the
12  contact.
13      A   There is a good possibility
14  that I did.
15          MS. MAYS:  Object to the
16  form.  That's not what his testimony was.
17      Q   You said that --
18      A   On their behalf at their
19  request.
20      Q   Who did you contact with the
21  FBI?
22          MS. MAYS:  Object to the
23  form.

Page 180

1       A   It would have been either
2  Don VanHaus or Susan Smith.  Not Susan
3  Smith.  Susan Hanson.
4       Q   What is Don VanHaus's
5  position with the FBI?
6       A   Agent.
7       Q   Where is he located?
8       A   Dothan.
9       Q   And how do you know him?
10      A   He's a local agent.
11      Q   How long have you known him?
12      A   Probably five years.
13      Q   And how did you meet him?
14      A   Cases that have been worked
15  jointly by the police department and the
16  FBI.
17      Q   What position -- did you say
18  Susan Hanson?
19      A   Yes.
20      Q   What is her position?
21      A   Agent.
22      Q   And where is she located?
23      A   Dothan.

Page 181

1    Q    How long have you known her?
2    A    Five or six years.
3    Q    And how did you meet her?
4    A    Cases that are worked
5  jointly by the FBI and the Dothan Police
6  Department.
7    Q    Why did you contact them?
8        MS. MAYS:  Object to the
9  form.  His testimony is he didn't contact
10 them.
11       MS. EDWARDS:  Allow your
12 client to answer the question without
13 coaching him, please, ma'am.
14       MS. MAYS:  I am not coaching
15 the client.  You're asking questions that
16 are improper.
17   A    If I was -- if I was the one
18 that made contact, it was by the request
19 of Donny or Doug.
20   Q    So would your Internal
21 Affairs officers be lying if they
22 testified earlier that they did not
23 contact the FBI in this investigation?

Page 182

1    A    Then it --.
2        MS. MAYS:  Object to the
3  form.
4    A    I said it could have been
5  me.
6    Q    What did you request that
7  they do?
8    A    The tracking program on
9  Keith's computer showed a lot of entries
10 over a period of two or three years where
11 vehicles had been tracked, something had
12 been tracked.
13   Q    And what did this have to do
14 with the FBI?  What were you --
15   A    We were worried about the --
16 worried about the tracking of police
17 vehicles by Keith Gray.
18   Q    Why?
19   A    Tracking police vehicles
20 without any permission to do so.
21   Q    Why were you worried about
22 that?
23   A    Why was I worried?  Because

Page 183

1  of the clientele he was hanging around.
2    Q    Hanging around?
3    A    Yeah, visiting their
4  clubhouse.
5    Q    The propensity for violence,
6  the crime that they have a propensity to
7  commit.
8    Q    Isn't it true that you
9  believe the word of those suspects with
10 records as long as my arm over Mr. Gray?
11       MS. MAYS:  Object to the
12 form.
13   A    I took all the testimony of
14 everyone and drew my conclusions.
15   Q    So what did the FBI do for
16 you?  What did you specifically request
17 them to do?
18   A    They were able to --
19       MS. MAYS:  Object to the
20 form.
21   A    They were able to be able to
22 get the information for the last three
23 years from the company that provided the

Page 184

1  software.
2    Q    What company was that?
3    A    I do not remember the name
4  of the company.
5    Q    What was the software?
6    A    The tracking software.
7    Q    Was it GPS tracking
8  software?
9    A    Yes.
10   Q    Did they do that?
11   A    They were able to get 2011
12 and 2012, but they never got 2013.
13   Q    What did that information
14 show?
15   A    It showed that a lot of
16 vehicles had been tracked.
17   Q    How many?
18   A    That's hard to say because
19 of the -- I don't exactly remember the
20 number.
21   Q    But you had asked him to
22 track vehicles before.
23       MS. MAYS:  Object to the

Page 185

1  form.
2       A   Once.
3       Q   You do not allege that this
4  is a reason for his termination, do you?
5       A   I do not allege what?
6       Q   That his tracking --
7       A   This was not a reason for
8  his termination.
9       Q   And so you received nothing
10  in support of Keith Gray's termination
11  from either the Alabama Bureau of
12  Investigation or the Federal Bureau of
13  Investigation, correct?
14       MS. MAYS:  Object to the
15  form.
16       A   I think some of the
17  information we received was in the form --
18  no.  The answer is no.
19       Q   You received nothing from
20  ABI or --
21       A   Yes.
22       Q   -- FBI that allege supports
23  Mr. Gray's termination, did you?

Page 186

1       MS. MAYS:  Object to the
2  form.
3       A   Correct.
4       Q   How many years' experience
5  have you had as an Internal Affairs
6  investigator?
7       A   None.
8       Q   How, then, would you know if
9  the investigation was conducted properly?
10       A   Because the investigators
11  that I choose go to Internal Affairs
12  investigations, training classes, training
13  seminars.  They actually are certified as
14  Internal Affairs investigators.
15       Q   So you just take their word
16  for it that their investigation is
17  complete, correct?
18       MS. MAYS:  Object to the
19  form.  Let him finish answering the
20  question.
21       A   And they know what they're
22  doing more so than I.
23       Q   You have never received any

Page 187

1  training on conducting an Internal Affairs
2  investigation, have you?
3       A   No.
4       Q   We've discussed the reasons
5  that you allege that you have terminated
6  Mr. Gray, and I would like to recap those
7  to insure that I understand all of the
8  reasons that you terminated his
9  employment.
10       We've discussed his alleged
11  association with Outcast -- with Bama Boyz
12  Motorcycle Club by virtue of its alleged
13  association to Outcast Motorcycle Club,
14  correct?
15       MS. MAYS:  Object to the
16  form.
17       Q   Is that one of the reasons?
18       MS. MAYS:  Object to the
19  form.
20       A   Yes.
21       Q   Another reason we discussed
22  was his alleged visiting of Triple X Black
23  Book dot com on the date of May 8th, 2013,

Page 188

1  correct?
2       A   Yes.
3       Q   We discussed his alleged
4  accessing of personnel information which
5  you allege he had no need at the time.
6       A   Yes.
7       Q   But we don't know the
8  individuals nor the dates that that
9  information was accessed; is that correct?
10       MS. MAYS:  Object to the
11  form.
12       A   Yes, the dates are in the
13  Internal Affairs report.
14       Q   But is that another alleged
15  reason that you allege that he improperly
16  accessed personnel information.
17       MS. MAYS:  Object to the
18  form.
19       A   Yes.
20       Q   And you alleged that he was
21  dishonest for not knowing Big O's position
22  within the Outcast Motorcycle Club,
23  correct?

Page 189

1          MS. MAYS:  Object to the
2   form.
3          A   Can you rephrase that?
4          Q   Okay.  You alleged that
5   Keith Gray was dishonest because he --
6   because he stated that he did not know Big
7   O's position within Outcast Motorcycle
8   Club during his first interview, correct?
9          A   Yes.
10         Q   Other than these reasons
11  that I have just told you, are there any
12  other reasons that you allege serve as
13  grounds for his termination -- that you
14  allege are grounds for his termination?
15         A   What is in the IA file is
16  the reason -- the totality of the reasons
17  why Keith Gray was terminated.  Every one
18  of those that you read has some part in
19  it, yes.
20         Q   What other reasons do you
21  allege you terminated Keith Gray other
22  than these reasons I have just told you?
23         A   Those are good.

Page 190

1          Q   I mean, is that a
2   complete --
3          A   Yeah.
4          Q   -- list of the reasons why
5   he was terminated?
6          A   Yes, that, and with all the
7   information that pertains to each one of
8   those.
9          Q   Okay.  So his alleged
10  association with Bama Boyz through its
11  alleged association with Outcast
12  Motorcycle Club.  The alleged visiting of
13  Triple X Black Book dot com on May 8th,
14  2013.  His alleged accessing of personnel
15  information that you allege he accessed
16  without need, and the alleged dishonesty
17  of not knowing Big O's position within
18  Outcast Motorcycle Club.  Is that the
19  complete list of reasons?
20         MS. MAYS:  Object to the
21  form.
22         A   And all of the other
23  information that is within that document

Page 191

1   that sustains those particular charges.
2          Q   What document?
3          A   The IA document.
4          Q   That's a little vague.  I
5   need to know, other than these four
6   things, are there any -- is there any
7   other reason that you made the decision to
8   terminate Keith Gray's employment?
9          MS. MAYS:  Object to the
10  form.  Asked an answered.
11         Q   I'm not getting a clear
12  answer.
13         A   Yes.
14         Q   That's the complete list.
15         A   What you have here:  The
16  Violation of General Order 100-50, Code of
17  Conduct, Section 2, Paragraph B, Conduct
18  Unbecoming an Officer, and Section 38,
19  Paragraph A, Membership and Organizations,
20  General Order 200-51, right?  Or is that
21  40?
22         MS. MAYS:  I believe 40.
23         A   200-40, Mobile Data

Page 192

1   Terminals and Electronic Messaging,
2   Section 1, Paragraph 6, Administrative
3   General Order 100-50 Code of Conduct,
4   Section 33, Paragraph 8, Truthfulness.
5   General Order 200-30 Professional
6   Standards, Section 4, Paragraph N,
7   Investigative Procedures and General Order
8   100-41, Code of Ethics, Section 1
9   Paragraph 1, Private Life.
10         Q   Now, are you reading that
11  from his termination document?
12         A   Employee Disciplinary Action
13  Report Form.
14         Q   May I see that, please?
15         A   (Witness hand document.)
16         Q   And for the record, this has
17  been previously produced as Bates Stamped
18  Number 00515.
19         And you have just read the
20  policies that you allege that Mr. Gray
21  violated, correct?
22         A   Correct.
23         Q   Is there anything other than

Page 193

1  these four reasons that we just went over
2  that you allege is in violation of these
3  policies?
4         MS. MAYS:  Object to the
5  form.  Asked and answered.
6      A   Yes.
7      Q   What?  I mean, I hope you
8  understand, I --
9      A   I just answered your
10 question yes or no, and I answered "yes."
11     Q   Oh, you said that's the
12 complete list of what you allege Mr. Gray
13 did to be in violation of these policies.
14        MS. MAYS:  Object to the
15 form.
16     A   How many times do I have to
17 answer yes?  That and all the supporting
18 documentation.
19     Q   Supporting documentation of
20 what?
21        And I hope you understand, Chief
22 Benton, I have to understand for the
23 purposes of this deposition, what in your

Page 194

1  mind was the reason that you terminated
2  Chief Benton?
3      A   All of those reasons.
4      Q   Okay.  But I have to
5  understand what you allege was in your
6  mind at the time that you terminated his
7  employment.
8         And I need to know was there any
9  conduct that Keith Gray did other than his
10 alleged association with Outcast
11 Motorcycle Club through his association
12 with Bama Boyz, and that's, you know, I
13 understand that you've got an Internal
14 Affairs investigation that you claim, you
15 know, supports this in your mind.  And I
16 understand that that's kind of a broad
17 statement.
18        But the alleged association with
19 Outcast Motorcycle Club through Bama Boyz,
20 is that a reason?
21        MS. MAYS:  Object to the
22 form.
23     Q   Is that a reason?

Page 195

1      A   That is a reason.
2      Q   His alleged visiting of
3  Triple X Black Book dot com on May 8th
4  2013, is that a reason?
5         MS. MAYS:  Object to the
6  form.
7      A   Yes.
8      Q   His alleged accessing of
9  personal information without need, is that
10 a reason?
11        MS. MAYS:  Object to the
12 form.
13     A   Yes.
14     Q   His alleged dishonesty for
15 not knowing Big O's position within
16 Outcast, is that a reason?
17        MS. MAYS:  Object to the
18 form.
19     A   Yes.
20     Q   Is there any other conduct
21 that you allege is in violation of these
22 policies on his termination form?
23        MS. MAYS:  Asked and

Page 196

1  answered.
2      Q   And if there is, I need to
3  know what it is.
4      A   Well, I mean, it's not --
5  it's not -- it's not as simple as you want
6  to put it, Ms. Edwards.
7         The association with the club and
8  what went on in the club with Captain Gray
9  being there and knowing it was going on.
10 Testimony -- and you say eight -- the
11 eight people that I allegedly trust more
12 than I do Keith Gray, many of those said
13 that there was a lot going on that Keith
14 Gray ignored while he was a captain of the
15 Dothan Police Department.  That's all
16 included in the association with the
17 Outcast Motorcycle Club.
18     Q   Okay.  I understand that.  I
19 understand that you allege that.  Okay.
20     A   So that's -- that's the kind
21 of things that you just can't put four
22 little topics on there.
23     Q   I'm not trying to --

Page 197

1    A   And there are subtopics that
2  go with those four items that you keep
3  harping on.
4    Q   Okay.  So --
5    A   There's little things --
6  there's little intricacies that -- that
7  just what you're saying doesn't explain
8  the whole thing and that's all I'm trying
9  to say.
10    But, yes, those four things that
11  you have named are four of the things,
12  yes.
13    Q   What precisely do you allege
14  that Keith Gray did with regard to his
15  association, his alleged association with
16  Outcast Motorcycle Club through Bama Boyz
17  Motorcycle Club?  What specifically
18  underlies your decision to terminate his
19  employment regarding that association?
20    A   Knowing what the association
21  is by a lot of the documentation that was
22  in the IA file, and it's in here; that we
23  understand what outlaw motorcycle gangs

Page 198

1  are.  We understand what Outcast is.  We
2  understand that they're a one percent
3  motorcycle club.  We understand that the
4  attachment of the MC to the OMC.
5    The fact that I have a captain
6  that is visiting their clubhouse and doing
7  things with these people who are known
8  felons.
9    Q   Doing what things with what
10  people?
11    A   Partying with them.  Hanging
12  around them.  You can't do that.
13    Q   What evidence do you have in
14  this Internal Affairs investigation that
15  he was partying with members of Outcast at
16  their clubhouse on a regular basis?
17    MS. MAYS:  Object to the
18  form.  Argumentative.
19    A   He said so himself on at
20  least two occasions.
21    Q   When?
22    A   In the interview.  It's in
23  the interview.

Page 199

1    Q   Is there anything other than
2  your allegation that Keith Gray admitted
3  to -- made this admission within his
4  interview that would support your
5  statement?
6    A   I can't remember every
7  little detail about that interview.  There
8  were several things I disagreed with.  And
9  at the time, I just can't remember all of
10  them right now, but that is one of them.
11    The fact that --
12    MS. MAYS:  Do you need to
13  take time to look at the interview?
14    MS. EDWARDS:  Are you
15  coaching your witness?
16    MS. MAYS:  I'm asking him a
17  question.  He's referred to the interview
18  several times, and so if he needs to refer
19  to a document and answer the question,
20  that's perfectly acceptable.  I'm not
21  giving him an answer.
22    A   If we have four hours for me
23  to sit here and read this.

Page 200

1    Q   Well, I mean, you were to be
2  here prepared with that information anyway
3  because he's been designated as a 30(b)(6)
4  witness on this topic.
5    MS. MAYS:  He's answering
6  the questions.
7    MS. EDWARDS:  And I
8  understand.  And I want his complete and
9  accurate testimony as to the reasons,
10  these precise reasons that he terminated
11  Keith Gray's employment.
12    MS. MAYS:  And he's answered
13  that question several times.
14    MS. EDWARDS:  Well, he's
15  giving -- he's not -- he's giving vague
16  answers, a vague answer to the question as
17  to the specific reason for the
18  termination.  And, I mean, I have to
19  understand that, Chief Benton.  I've got
20  to understand the precise reasons.
21    MS. MAYS:  He's answered the
22  question several times, and told you what
23  he's relied on, and to the extent he's



Page 201

1  relying on the investigation.  If you want
2  him to go back and --
3           MS. EDWARDS:  Until I'm
4  clear in my mind, Chief Benton --
5           THE COURT REPORTER:  One at
6  a time, please.
7           MS. EDWARDS:  I'm going to
8  rephrase my question to make everybody
9  happy.
10      Q   (BY MS. EDWARDS:)  Chief
11  Benton, I want to know other than your
12  allegation that Keith Gray admitted to
13  partying on a regular basis with the
14  Outcast Motorcycle Club what -- what facts
15  are you basing your decision to terminate
16  his employment on the basis of this
17  association with a motorcycle club?
18           MS. MAYS:  Objection.
19  Totally mischaracterizes his testimony.
20      Q   And I want to know other
21  than this alleged partying.
22      A   I thought I had answered
23  this.

Page 202

1      Q   All right.  So it's the
2  alleged partying that you allege he
3  admitted to.
4      A   The association with known
5  felons.
6      Q   Okay.  But define
7  "association."  Your alleged association.
8  That's what I want to get to the bottom
9  of.
10      A   You're there.  You are
11  attending their parties.  You're attending
12  their meetings.
13      Q   How many parties did Keith
14  Gray attend with Outcast?
15      A   I know he went to their
16  clubhouse.
17      Q   How many times?
18      A   By his own admission, two
19  times.  Other people said, that were
20  interviewed said many times.
21      Q   The felons?
22           MS. MAYS:  Object to the
23  form.

Page 203

1      A   The people that we
2  interviewed.
3      Q   The people who were at the
4  police department in your custody who were
5  suspects.
6      A   Two of them were not in our
7  custody.
8      Q   Which two?
9      A   McGoley and McGuire.
10      Q   So you believe McGoley was
11  not in your custody.
12      A   He was not arrested.
13      Q   Yes.  But was he taken into
14  the station as a result of the assault
15  that had nothing to do with Keith Gray?
16      A   He was taken to be
17  interviewed, but he was never arrested.
18      Q   But he was a suspect.
19           MS. MAYS:  Object to the
20  form.
21      A   I don't know if he was a
22  suspect or not.  I do not know if he was
23  interviewed by a criminal investigator

Page 204

1  regarding the --
2      Q   So your belief is that
3  he was brought in specifically to be
4  questioned about Keith Gray and had
5  nothing to do with this assault incident.
6      A   I said I didn't now.  I said
7  that -- you're trying to put words in my
8  mouth.
9           I don't know that he was brought
10  in -- that criminal investigators talked
11  to him.  I just know that he was not
12  arrested and Internal Affairs
13  investigators talked to him.  But I do not
14  know if he was even interviewed by a
15  criminal investigator.
16      Q   Okay.  Who among these
17  suspects who were at the police station
18  being interviewed by Internal Affairs,
19  while they were wearing their firearms, of
20  those individuals, who testified that
21  Keith Gray, or who answered that Keith
22  Gray had attended the Outcast Motorcycle
23  Club Clubhouse more than twice?

Page 205

```
 1          MS. MAYS:  Object to the
 2  form.
 3      A   Willie McGuire.
 4      Q   How many times did he say?
 5      A   It just says he stated that
 6  he had seen Chopper on several occasions
 7  in the company of other Outcast members
 8  and that he has attended multiple Outcast
 9  functions.  He didn't know the other
10  officers.  That's stated that he had been
11  in the company of Outcast members and that
12  he had attended multiple Outcast
13  functions.
14      Q   Now, what you are reading --
15      A   It's a summary.
16      Q   -- it's a summary of
17  Sergeant Smith.
18      A   Correct.
19      Q   Okay.  It's -- that is not a
20  transcript from the actual interviews, is
21  it?
22      A   Correct.
23          MS. MAYS:  And that summary
```

Page 206

```
 1  is City of Dothan, Gray 000882 through
 2  000887.
 3      Q   And this is a summary, it's
 4  a memorandum dated September 13, 2013,
 5  correct?
 6      A   September 16th.
 7      Q   16th.  And the actual
 8  interviews of these suspects were
 9  conducted on August 25th, 2013, correct?
10      A   Yes.
11      Q   So Willie McGuire is who
12  said that.
13      A   Yes.
14      Q   Anyone else?
15      A   Yes.  Just McGoley stated
16  that he had seen Captain Gray in the
17  clubhouse while marijuana was being
18  smoked, but he had never seen him smoke
19  it.
20          He added that he had also seen
21  Captain Gray drive drunk on several
22  occasions.  He stated that Captain Gray
23  has told him in the past when he is on
```

Page 207

```
 1  duty he's a police officer, but when he
 2  was off, he did not care what the members
 3  did.
 4      Q   You never alleged that Keith
 5  Gray had driven under the influence, have
 6  you?
 7          MS. MAYS:  Object to the
 8  form.
 9      A   No.
10      Q   Now, Willie McGuire was not
11  arrested, was he?
12      A   No.
13      Q   And McGoley was not
14  arrested, was he?
15      A   No.
16      Q   Anyone else?
17      Q   Anyone else what?
18      Q   That --
19      A   Those were the two that were
20  not arrested.
21      Q   I mean, anyone else who said
22  that they saw Keith Gray hangout or party
23  at the Outcast Motorcycle Club Clubhouse
```

Page 208

```
 1  more than twice?
 2      A   The next club member
 3  interviewed was Rocky L. Tyrus (sic).  He
 4  stated the only police officer he knew was
 5  Captain Gray, and had seen him during
 6  different club functions.  He stated that
 7  approximately three months ago he saw
 8  Captain Gray in the Outcast clubhouse
 9  during a function.
10      Q   So that was one time,
11  correct?
12      A   Correct.
13      Q   So McGoley said one time and
14  Tyrus said one time, correct?
15      A   You said McGoley said one
16  time?
17      Q   Uh-huh.
18      A   It doesn't exactly say.
19  Mcgoley doesn't say how many times.
20      Q   Okay.  And Willie McGuire,
21  according to this summary done by Sergeant
22  Smith, he allegedly said several times.
23      A   Correct.
```

Page 209

1      Q   Anyone else?
2      A   The next club member
3  interviewed was Wendell Key.  He stated he
4  was a member of Bama Boyz before becoming
5  a member of Outcast.  He stated that he is
6  from Dothan.  He knows both Captain Gray
7  and Officer Truitt.  He stated that he has
8  on several occasions, at least three
9  times, seen Captain Gray at their parties
10  in the clubhouse.  He stated during these
11  parties marijuana has been smoked, but he
12  has never seen him smoke any.
13      He also stated it is a known fact
14  that they can do anything around Captain
15  Gray during these parties because he has
16  made it known that when he is off duty he
17  is a biker only.
18      Q   And who was that?
19      A   Wendell Key.
20      Q   Anyone else?  Was Wendell
21  key arrested?
22      A   Yes.
23      Q   Was Tyrus Raphael arrested?

Page 210

1      A   Yes.
2      Q   Anyone else?
3      A   No.  That's McGuire.  No.
4      Q   Now, these four individuals
5  are members of Outcast Motorcycle Club,
6  aren't they?
7      A   Yes.
8      Q   And these individuals have
9  criminal backgrounds, don't they?
10      A   I don't -- some of them do.
11  EZ Abawallie (sic) arrested for assault
12  2nd Degree.  It's aggravated assault on a
13  public official, and unlicensed sale of
14  alcoholic beverages.
15      Q   Did he testify as to how
16  many times he's allegedly seen Mr. Gray?
17      A   No.
18      Q   Did he say anything about
19  Mr. Gray?
20      A   No.
21      Q   Of the individuals that --
22  these four individuals, Willie McGuire,
23  McGoley, Tyrus and Key, do you or do you

Page 211

1  not know whether they have criminal
2  histories?
3      A   I don't know about McGoley
4  and McGuire.  I believe Wendell Key has
5  been arrested before.  Yes.  He has a
6  record.  EZ Abawallie has a record.  Two
7  that were arrested, but not interviewed
8  were Johnny Thompson and Robert Williams,
9  and they both have records.
10      Q   What about Tyrus?
11      A   It doesn't say whether he
12  has a record or not.
13      Q   But it's possible that all
14  four of these individuals have records.
15      A   It's a possibility.
16      Q   And you chose to believe
17  them over Keith Gray.
18          MS. MAYS:  Object to the
19  form.
20      Q   Correct?
21      A   After looking at all the
22  facts and circumstances surrounding the
23  situation, I did take into account what

Page 212

1  they said, yes.
2      Q   And all four of these
3  individuals were suspects to an assault
4  that had occurred at the Outcast
5  Motorcycle Clubhouse the night before.
6          MS. MAYS:  Object to the
7  form.
8      A   I don't know if McGoley or
9  McGuire was ever suspects.
10      Q   Don't you think that would
11  have been important for you to know so
12  that you could assess the reliability of
13  their interviews?
14          MS. MAYS:  Object to the
15  form.
16      A   If they were actual suspects
17  in the -- no.
18      Q   You think that's irrelevant.
19          MS. MAYS:  Object to the
20  form.
21      A   I did not do the interview.
22      Q   Okay.  Did you watch the
23  interviews of these individuals?

Page 213

1       A   I did not.
2       Q   So you did not review these
3   interviews.
4           MS. MAYS:  Object to the
5   form.  Mischaracterizes his testimony.
6       A   I did not -- you're saying I
7   did not review the interviews?
8       Q   Correct.
9       A   Yes, I saw the interviews.
10      Q   So you watched the
11  interviews of them being interrogated by
12  your Internal Affairs?
13      A   Not at the time.
14      Q   Not at what time?
15      A   At the time they were being
16  interviewed.
17      Q   When did you review these
18  videos?
19      A   At a later date.
20      Q   Before or after Mr. Gray's
21  termination?
22      A   Before.
23      Q   And so you saw on the video

Page 214

1   that they were being interrogated by
2   Internal Affairs officers specifically
3   about Keith Gray, correct?
4       A   Yes.
5       Q   Wearing firearms while
6   questioning these suspects.
7       A   I don't remember if I saw
8   firearms or not.
9       Q   Don't you think that is
10  something you would have noticed.
11          MS. MAYS:  Object to the
12  form.  He's answered the question.
13      A   I might have, I just don't
14  remember.
15      Q   Is there not a policy
16  against questioning a suspect wearing a
17  firearm?
18          MS. MAYS:  Object to the
19  form.
20      A   There is a policy concerning
21  interrogations of suspects concerning a
22  crime.  I did not know that they were
23  interrogating anyone.  It was interviews.

Page 215

1       Q   Do you seriously think these
2   suspects knew the difference?
3           MS. MAYS:  Object to the
4   form.  Calls for speculation.
5       Q   Had they not been
6   apprehended and brought to the police
7   station under the guise of they could be
8   arrested for assault.
9           MS. MAYS:  Object to the
10  form.
11      A   I don't know.
12      Q   So you don't know whether
13  they were suspects.  Are you testifying
14  that you don't -- you did not know that
15  they had been brought to the police
16  station as a result of the assault that
17  occurred the night before?
18          MS. MAYS:  Object to the
19  form.
20      A   I'm testifying I wasn't even
21  there, so I don't know.
22      Q   I'm just saying when you
23  watched the videos of the interrogations

Page 216

1   performed by your Internal Affairs
2   officers, did you not know that they were
3   being interrogated on the day following
4   this assault that allegedly occurred the
5   night before?
6       A   They weren't being
7   interrogated.  They were being interviewed
8   by IA.  I don't know if they thought they
9   were being interrogated or not.
10      Q   They were brought to the
11  police station as a result of the assault
12  that occurred at the Outcast Motorcycle
13  Club, correct?
14          MS. MAYS:  Object to the
15  form.
16      A   Correct.
17      Q   They were under suspicion
18  for assault, correct?
19          MS. MAYS:  Object to the
20  form.  If you know.
21      A   I don't really know.  I
22  don't know why each one of them was there.
23  I don't know why McGoley was there.  I

Page 217

1  don't know why McGuire was there. I don't
2  know if they were interviewed by criminal
3  investigators at all. I do know that
4  there were two arrests made, or several
5  arrests, but those two were not.
6      Q   So you knew at least some of
7  these witnesses to this Internal Affairs
8  investigation were suspects for the
9  assault for the previous evening.
10     A   Correct.
11     Q   Did your Internal Affairs
12 investigators not share that with you,
13 that they were questioning suspects who
14 were there knowing they may or may not be
15 arrested for a crime?
16     A   Rephrase the question.
17     Q   Did the internal affairs
18 investigation advise you that they
19 conducted interviews of suspects who knew
20 they may or may not be charged with a
21 crime related to the incident that
22 occurred the night before?
23         MS. MAYS: Object to the

Page 218

1  form.
2      A   I don't really know. It
3  just depends on if these people had
4  already spoken to a criminal investigator
5  or not. I would think that they had.
6      Now, I assume that there was two
7  interviews. There was one about -- for
8  the people that were arrested. There was
9  one interview by criminal investigations
10 and then another one by internal affairs.
11     Q   But you don't know that for
12 sure.
13     A   I don't know that for sure.
14 Yeah, you know what, if somebody was
15 arrested there was a criminal investigator
16 there that was questioning them. It was
17 not just IA.
18     Q   But you don't know whether
19 that would have occurred before or after
20 the Internal Affairs interview?
21     A   I don't, no.
22     Q   And it's highly possible
23 that these individuals don't know the

Page 219

1  difference between the Internal Affairs
2  officer and the regular officer, is it?
3         MS. MAYS: Object to the
4  form. Do you know what they know?
5         MS. EDWARDS: Coaching?
6      A   Honestly, I was going to say
7  I don't know. They could have been told.
8         MS. EDWARDS: Let the record
9  reflect that Ms. Mays just instructed her
10 client to only answer as to what he knows.
11     Q   Do you have anything
12 specific within your Internal Affairs
13 investigation of Keith Gray hanging out
14 with confirmed criminals, specific
15 criminals?
16     A   I believe he actually had --
17 there was an interview that Keith Gray
18 admitted that he had a none felon visiting
19 him at his house.
20     Q   Who?
21     A   I don't remember.
22     Q   But you don't know that for
23 sure.

Page 220

1      A   I'm pretty sure it's in
2  there.
3      Q   But you don't know for sure.
4      A   I don't know for sure. I
5  mean it's a fifteen hundred page document.
6      Q   Other than this, which you
7  may or may not be in this investigation,
8  do you know of any specific individuals
9  with criminal histories that you know
10 Keith Gray associated with?
11         MS. MAYS: Object to the
12 form.
13     A   I don't specifically know,
14 no.
15     Q   Do you know that Keith Gray
16 denied ever witnessing any illegal
17 activity during any of his interactions
18 with Outcast Motorcycle Club?
19     A   Yes.
20     Q   Are you aware that some of
21 the witnesses here questioned who are
22 members of the Outcast Motorcycle Club and
23 who were suspects related to the previous

Page 221

1  night's assault thought that Keith Gray
2  was a snitch?
3          MS. MAYS:  Object to the
4  form.
5      A   I don't recall that.  I
6  don't know if I read that or not.  I don't
7  remember it.
8      Q   Are you aware that -- is it
9  plausible to you that these witnesses who
10  are members of Outcast Motorcycle Club may
11  not like Keith Gray because he's a cop?
12      A   Plausible?  It could.  That
13  could be the case.
14      Q   Is it possible that these
15  individuals felt like if they gave these
16  Internal Affairs investigators what they
17  wanted that they may escape being charged
18  with a crime?
19      A   I don't know what they were
20  thinking.
21      Q   Is that plausible to you?
22      A   I have no way of knowing.  I
23  don't know their thought process.

Page 222

1      Q   But could that be?
2      A   It could be that they -- it
3  could be and it also could be that they
4  were telling the truth.
5      Q   But you don't know for sure.
6      A   I don't know for sure that
7  they would be what you said either.
8      Q   But you don't know one way
9  or the other, do you, for sure?  Do you?
10      A   I just -- I've already
11  answered you.
12      Q   So your answer is no, you
13  don't know for sure, do you?
14          MS. MAYS:  Object to the
15  form.
16      A   No.
17      Q   No, that's not your answer
18  or know that's not --
19      A   Okay.  Why don't you say the
20  question over and I'll answer it.
21      Q   You don't know for sure
22  whether they were being truthful or
23  whether they were telling those Internal

Page 223

1  Affairs investigators what they wanted to
2  hear so that they would be able to avoid
3  being charged with a crime.
4          MS. MAYS:  Object to the
5  form.
6      A   No, I don't know.
7          MS. MAYS:  Can we take a
8  break?
9          MS. EDWARDS:  I'm finishing
10  up now.
11          MS. MAYS:  Okay.  Okay.
12  Finishing up, about to finish him
13  completely?
14          MS. EDWARDS:  Yeah, I'm just
15  about through.
16          (Off the record.)
17      Q   (BY MS. EDWARDS:)  It is a
18  crime for a police officer to run a
19  background check on someone who is not a
20  suspect in a particular -- for a
21  particular offense, correct?
22          MS. MAYS:  Object to the
23  form.

Page 224

1      Q   In other words, you can't
2  run a criminal background check on just
3  anybody for any reason, correct?
4      A   Correct.
5      Q   And so, isn't it true that
6  Keith Gray wouldn't have the ability to
7  run a criminal background checks on every
8  single person who he's ever been around
9  whoever rides a motorcycle; is that
10  correct?
11          MS. MAYS:  Object to the
12  form.
13      A   Correct.
14      Q   And so, it's possible he
15  would not have prior knowledge of -- if
16  somebody who happened to ride a motorcycle
17  around him had a criminal history,
18  correct?
19          MS. MAYS:  Object to the
20  form.
21      A   It is possible.
22      Q   I mean, unless -- I mean,
23  you could see how it's possible he would

Page 225

1  not know.
2       A   If I'm in a one percent
3  motorcycle clubhouse or hanging around one
4  percent motorcycle club members, it would
5  -- me, knowing that, I would feel pretty
6  good that I would be hanging around people
7  who had a criminal background.
8       Q   But you wouldn't know for
9  sure, would you?
10          MS. MAYS:  Object to the
11  form.
12       A   No.
13       Q   Now, these four individuals
14  that you mentioned, they did not say -- I
15  mean, the extent of their testimony about
16  Keith Gray was that they saw him at the
17  clubhouse, right?  I mean, they didn't
18  say, I personally hang out with Keith Gray
19  all the time, did they?
20       A   No.
21       Q   And you realize that your
22  Internal Affairs investigator told these
23  suspects that you and the District

Page 226

1  Attorney, Doug Valeska, would agree to
2  drop charges if they could tell anything
3  on a, quote, dirty cop?
4       A   I do not remember -- I don't
5  remember that, but if it's on the video,
6  it's there.
7       Q   So with regard to Mr. Gray's
8  alleged association with Outcast
9  Motorcycle Club through Bama Boyz
10  Motorcycle Club, is there anything outside
11  of the information Sergeant Smith
12  allegedly received from these four
13  suspects that support your allegation that
14  Mr. Gray --
15          Scratch that.
16          First you said that Keith Gray
17  stated during his interview that he
18  partied all the time at the Outcast
19  Motorcycle Club.
20       A   I didn't say.
21          MS. MAYS:  She didn't ask
22  you a question.
23       Q   Well, you stated that Keith

Page 227

1  Gray admitted to partying at Outcast
2  Motorcycle Club, did you not?
3          MS. MAYS:  Object to the
4  form.
5       A   I did.  He said that on two
6  occasions.
7       Q   And so besides your
8  allegation that Keith Gray claims to have,
9  in your words, party at Outcast Motorcycle
10  Club, is there anything else other than
11  that and the funeral that we discussed
12  earlier and the charity rides, that
13  support your decision to terminate his
14  employment based on Bama Boyz's
15  association with Outcast Motorcycle Club?
16          MS. MAYS:  Object to the
17  form.  Asked and answered.
18       Q   I mean, is there anything
19  other than those things?  His admission
20  that he's hung out at the Outcast
21  Motorcycle Club on two occasions, the
22  funeral, the charity rides, and these four
23  witnesses interviews, is there anything

Page 228

1  other than that in which you are basing
2  his termination based on association with
3  Outcast Motorcycle Club?
4          MS. MAYS:  Object to the
5  form.  Asked and answered.
6       Q   I mean, are there any other
7  specific things, conduct on Mr. Gray's
8  behalf related to this alleged association
9  that support your reasons for his
10  termination, other than the allegation
11  that he hung out at the Outcast Motorcycle
12  Club.
13       A   I understand the question.
14       Q   Okay.
15       A   Are you talking about just
16  -- are we just talking about -- we're not
17  including the phone and the --
18       Q   Right.  Yeah, just for that
19  one thing.  Yeah, for just about that
20  alleged association with.
21       A   Yes.
22       Q   So that's everything.
23       A   Yes.

Page 229

1      Q   So that covers the alleged
2  association with Outcast Motorcycle Club.
3      Then we discussed the alleged
4  visiting of Triple X Black Book dot com on
5  May 8th, 2013, correct?
6      A   Yes.
7      Q   We discussed the alleged
8  accessing of personal information without
9  need, correct?
10     A   Yes.
11     Q   And we discussed the alleged
12 dishonesty of not knowing Big O's
13 association with Outcast, correct?
14     A   Yes.
15     Q   Are there any other reasons
16 other than what we have just discussed
17 that support your reason for terminating
18 Keith Gray's employment?
19         MS. MAYS:  Object to the
20 form.
21     A   No.
22         MS. EDWARDS:  That's all I
23 have.

Page 230

1      FURTHER THE DEPONENT SAITH NOT.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 231

1           C E R T I F I C A T E
2  STATE OF ALABAMA  )
3  JEFFERSON COUNTY  )
4
5      I hereby certify that the above and
6  foregoing deposition was taken down by me
7  in stenotype, and the questions and
8  answers thereto were transcribed by means
9  of computer-aided transcription, and that
10 the foregoing represents a true and
11 correct transcript of the testimony given
12 by said witness upon said hearing.
13     I further certify that I am neither of
14 counsel, nor of any relation to the
15 parties to the action, nor am I anywise
16 interested in the result of said cause.
17
18 /s/Rhonda W. Head
19 RHONDA W. HEAD, CCR
20 CERTIFICATION NO. AL-CCR-264
21 NOTARY PUBLIC, STATE OF ALABAMA
22 MY COMMISSION EXPIRES: 03-07-2017
23

Gregory Benton                                                                2/26/2015

Page 232

**A**

**a.m** 5:11
**Abawallie**
  210:11 211:6
**ABI** 137:17
  138:15 185:20
**ability** 91:10
  143:22 224:6
**able** 35:21
  54:20 183:18
  183:21,21
  184:11 223:2
**absence** 82:8
  83:2
**absolutely** 54:4
**acceptable**
  116:5 199:20
**accepted** 116:2
**access** 133:15
  133:16 139:15
  139:18 141:23
  142:23 143:4
  143:8,12,18
  143:21,22
  147:18,22
  150:17,22
  151:10,13,17
  152:10,12,17
**accessed** 119:8
  119:13,18
  120:4,10,14
  121:6 122:1
  122:10,16
  123:3,11,15
  128:9,14,23
  129:9 131:13
  131:14 133:2
  133:10,12,20
  133:21 139:7
  140:9 143:21
  147:5 151:23
  152:6 188:9
  188:16 190:15
**accessing**
  149:23 188:4
  190:14 195:8
  229:8
**accident** 13:3

13:15 14:16
14:19 15:14
15:17,21 16:1
16:6,16,18,20
17:1 50:15,20
51:7,14 52:23
53:7 54:11
**accidents** 7:22
  12:13 15:15
**account** 26:3,7
  26:9 27:2
  75:21 211:23
**accounts** 76:20
**accreditation**
  82:19
**accumulation**
  51:18
**accuracy** 91:3
  92:7 176:23
  177:16
**accurate** 200:9
**accurately** 6:18
**accusations**
  61:13
**accused** 68:23
**act** 82:7 83:1
**acting** 5:4
  82:14
**action** 1:5 8:14
  11:9 21:11
  32:19 33:19
  34:21,23 35:3
  35:5,15 53:15
  54:15,19
  57:22 59:16
  65:14 170:14
  192:12 231:15
**actions** 55:6
  141:20
**activity** 220:17
**actual** 18:17
  52:9 158:12
  205:20 206:7
  212:16
**added** 206:20
**admin** 143:17
**Administration**
  42:10

**administrative**
  47:18,19 63:8
  88:8 192:2
**admission**
  157:12 199:3
  202:18 227:19
**admit** 100:16
  100:21 164:22
**admitted**
  113:11 117:10
  118:17,23
  199:2 201:12
  202:3 219:18
  227:1
**Adrian** 97:13
  98:10 168:15
  173:21
**Adrian's** 98:7
**adultery** 100:11
**advise** 85:18
  217:18
**advised** 89:19
  137:22
**advising** 87:19
  87:22 88:4
**affair** 25:12,17
  25:23 26:12
  26:17 100:6
  100:20,23
  101:3 113:12
  113:16 125:12
**affairs** 11:9,13
  12:1 14:22
  22:5,14 31:22
  59:13 72:13
  72:17 78:14
  78:23 96:6
  97:16,18,19
  99:9,12,22
  100:4 101:15
  102:11,19
  104:5,8
  110:20,23
  111:3 119:5
  119:12 121:3
  124:18 135:8
  137:15 142:17
  154:9 155:1,5

157:16 158:18
163:13,23
164:2,14
171:20 172:15
173:13 174:14
174:23 176:4
177:1,13
178:6,14
181:21 186:5
186:11,14
187:1 188:13
194:14 198:14
204:12,18
213:12 214:2
216:1 217:7
217:11,17
218:10,20
219:1,12
221:16 223:1
225:22
**affiliated**
  172:20
**affiliation** 97:4
  97:9
**agent** 124:18
  180:6,10,21
**aggravated**
  210:12
**ago** 9:9,11,12
  15:5,23 16:8
  18:3,5,20
  22:12 33:7
  43:10 50:18
  55:12 63:5
  67:19 68:4
  70:16 94:8
  129:22 208:7
**agree** 113:15
  135:20,23
  136:2,3,4
  226:1
**AGREED** 1:16
  2:2,9,18
**ahead** 106:21
  106:22
**AL-CCR-264**
  231:20
**Alabama** 1:2

1:22 3:7,13
5:2,3,6,10
42:22 43:18
100:12 108:22
109:16 110:8
110:10,11
185:11 231:2
231:21
**alarm** 75:21
  76:9,11,20
**alarms** 76:13
  76:23
**alcoholic**
  210:14
**allegation**
  199:2 201:12
  226:13 227:8
  228:10
**allegations** 22:4
  90:23
**allege** 105:4
  108:16 139:6
  140:7,9,23
  142:4,13
  149:21 155:14
  155:23 164:11
  166:10 185:3
  185:5,22
  187:5 188:5
  188:15 189:12
  189:14,21
  190:15 192:20
  193:2,12
  194:5 195:21
  196:19 197:13
  202:2
**alleged** 41:16
  112:11 140:21
  140:21 141:16
  141:22 142:6
  154:11,11
  155:16 157:6
  164:13 174:7
  187:10,12,22
  188:3,14,20
  189:4 190:9
  190:11,12,14
  190:16 194:10

194:18 195:2
195:8,14
197:15 201:21
202:2,7 207:4
226:8 228:8
228:20 229:1
229:3,7,11
**allegedly**
196:11 208:22
210:16 216:4
226:12
**alleges** 155:22
**alleging** 40:6
84:5
**allotted** 52:12
**allow** 90:13
181:11
**allowed** 90:17
**amount** 51:16
51:17 52:21
151:18 156:21
166:14
**Andrews** 50:22
**Anniston** 110:8
**answer** 6:14,22
22:18 30:16
30:18 44:2
78:7 79:8
89:17 106:19
132:19 136:12
166:7 181:12
185:18 191:12
193:17 199:19
199:21 200:16
219:10 222:12
222:17,20
**answered** 49:13
117:9,16
130:9 134:22
135:15 136:10
162:3 191:10
193:5,9,10
196:1 200:12
200:21 201:22
204:21 214:12
222:11 227:17
228:5
**answering**

36:13 186:19
200:5
**answers** 200:16
231:8
**Anthony** 57:10
**anticipate** 6:21
**anybody** 60:23
79:10 92:23
93:11 156:5
161:23 224:3
**anymore**
157:14
**anyone's** 147:5
**anyway** 200:2
**anywise** 231:15
**apart** 71:17
159:8 162:13
162:18 167:12
**appeal** 74:22
**application**
40:16
**appointed** 82:6
83:1
**apprehended**
215:6
**approximate**
54:22 55:3
**approximately**
31:13 32:21
33:11 35:13
53:12 208:7
**area** 75:18
154:14
**areas** 144:20
**Argumentative**
79:22 134:7
198:18
**arm** 183:10
**arrest** 7:21 8:1
9:5
**arrested** 42:2
203:12,17
204:12 207:11
207:14,20
209:21,23
210:11 211:5
211:7 215:8
217:15 218:8

218:15
**arrests** 217:4,5
**as-needed**
150:22
**Aside** 41:9
**asked** 30:11
69:10 104:14
105:7 111:2
111:21 130:8
134:21 136:11
144:3 153:17
162:3 179:1
184:21 191:10
193:5 195:23
227:17 228:5
**asking** 36:14
64:2 76:18
81:7 111:8
117:6 141:20
142:3 156:1,1
158:2 181:15
199:16
**assault** 203:14
204:5 210:11
210:12 212:3
215:8,16
216:4,11,18
217:9 221:1
**assess** 212:12
**assign** 2:14
**assigned** 80:15
80:19
**assigning** 81:6
88:7
**assignment**
32:20 33:19
34:21 35:9,11
35:15
**assignments**
38:21
**assist** 81:17
**associate** 73:17
**associated**
23:17 96:22
156:16 172:5
220:10
**Associates**
42:20

**association**
42:19,23
43:17,19
73:20 74:1
154:11 155:15
156:10,13
187:11,13
190:10,11
194:10,11,18
196:7,16
197:15,15,19
197:20 201:17
202:4,7,7
226:8 227:15
228:2,8,20
229:2,13
**associations**
75:3 175:4
**assume** 106:4,8
218:6
**assumption**
112:4
**Athletic** 94:14
94:18 95:3,9
**attached** 160:3
165:14 167:19
167:22
**attachment**
162:19 165:4
165:6 198:4
**attend** 166:14
202:14
**attendance**
101:5
**attended**
157:10 168:9
204:22 205:8
205:12
**attending**
157:22 202:11
202:11
**attention** 72:4
77:10
**attorney** 136:2
226:1
**attorney's**
115:15
**attorney/client**

115:18
**attorneys**
158:11,22
159:2,4
160:22 177:8
**audio** 106:1
161:7,9
163:10
**audios** 104:1
**August** 101:7,8
206:9
**authenticate**
107:23
**authenticity**
107:14
**authority** 88:6
**authorization**
99:20
**authorize** 99:12
137:23 153:4
**authorized**
153:19,22
154:6
**AVENUE** 3:12
**avoid** 154:14
155:6 223:2
**award** 82:19
**aware** 30:22
40:4 55:19
84:3,21 87:2
89:3 92:5
96:20,21
100:11 101:4
101:10,13,18
101:21 102:10
102:21,22,23
103:3 116:12
119:4 122:23
123:7 137:9
138:1 153:3
154:8 157:9
157:22 166:13
169:9 170:22
171:5 172:4,7
172:9,10,13
173:2 175:14
176:17 220:20
221:8

**B**

**B** 4:11 191:17
**Bachelor's** 42:9
**back** 25:2 46:16
68:23 72:11
99:2,5 138:2
139:13 140:13
151:19 201:2
**background**
6:6 223:19
224:2,7 225:7
**backgrounds**
210:9
**Bama** 94:11,15
95:19 101:21
102:3,7 105:3
105:5 110:8
159:8 163:15
164:14,23
165:14 166:11
167:11,16,18
167:21 171:2
171:5,17,22
172:10 173:14
187:11 190:10
194:12,19
197:16 209:4
226:9 227:14
**bankruptcy**
42:5
**based** 84:9
85:19 156:10
227:14 228:2
**basically**
159:13
**basing** 201:15
228:1
**basis** 150:22
152:13,17
198:16 201:13
201:16
**Bates** 160:16
192:17
**becoming** 54:16
209:4
**beginning** 5:10
7:18 18:13
**behalf** 17:9

179:7,18
228:8
**belief** 204:2
**believe** 11:17
12:16,20,23
13:5 17:14
21:8 22:7,13
22:23 23:21
24:8 33:5 47:3
47:17 48:16
71:10 74:20
75:1 82:12
83:11 85:7
88:2 97:11
104:9 108:23
119:21 121:5
126:7 133:23
137:21 145:10
145:13 174:3
178:23 183:9
191:22 203:10
211:4,16
219:16
**believed** 87:19
**belong** 97:21
**Benton** 1:19
5:11,15 6:3
7:5 36:1
116:12 193:22
194:2 200:19
201:4,11
**Berry** 56:21
57:23 58:14
61:4 62:15
63:7 68:18
**Berry's** 57:9
**beverages**
210:14
**Big** 108:21
109:4,7,14,14
110:3,9,10
111:1,10
188:21 189:6
190:17 195:15
229:12
**biker** 209:17
**billing** 75:21
76:9,20 77:1

**billings** 76:11
**binder** 158:10
158:16,19,23
159:5 177:6
177:12
**biographical**
81:23 82:2
**Birmingham**
3:7,13 5:2
**black** 9:15
37:12,13
119:20 122:15
125:14 127:11
187:22 190:13
195:3 229:4
**blessed** 109:4
**blessing** 109:6
109:13 154:20
159:18 162:12
162:17,20
165:20 169:14
**blessings** 110:9
**blind** 51:2
**board** 73:15,18
73:21 74:7,9
74:15,16,18
74:21,23 75:4
75:9 93:7
110:5 136:16
**Bonet** 26:20,22
27:7,15
125:11
**book** 119:20
122:15 125:14
127:11 129:21
187:23 190:13
195:3 229:4
**bottom** 202:8
**Boyz** 94:12,15
95:19 101:21
102:3,7 105:3
105:5 110:8
159:8 163:15
164:14,23
165:14 166:11
167:11,16,18
167:22 171:2
171:6,17,22

172:11 173:14
187:11 190:10
194:12,19
197:16 209:4
226:9
**Boyz's** 227:14
**break** 7:1 55:14
55:16 99:1
101:19 112:7
112:8,10
173:18,19
223:8
**breaks** 6:20
**bringing**
113:16
**broad** 118:16
194:16
**broke** 100:21
**broken** 100:17
101:14,23
102:4,8
**brought** 77:10
204:3,9 215:6
215:15 216:10
**brutality** 9:5
**bureau** 47:19
47:20 63:9
88:8 185:11
185:12
**business** 42:9
75:20 76:5
77:17 78:1
92:20 93:6
141:7
**bylaws** 171:3,6
172:2

**C**

**C** 3:1,4 231:1,1
**call** 69:6
**called** 69:9,12
72:6,8 116:15
173:8
**Calls** 215:4
**cancer** 49:6
**capacity** 8:7,18
16:22 19:11
19:19 24:2

28:9 30:21
143:5
**captain** 45:22
46:23 47:5,6
47:18 49:19
50:8 63:2
71:19 80:16
82:7 143:5
152:9 196:8
196:14 198:5
206:16,21,22
208:5,8 209:6
209:9,14
**captains** 39:2,6
46:22 47:2
50:3 152:19
**captains'**
152:12,22
**car** 13:4 92:17
106:2,9 107:2
**care** 207:2
**career** 52:18
**careless** 52:6,7
**Carney** 56:8
**Carol** 61:23
62:3,6,8 65:23
66:12 68:18
**case** 6:6,7 8:1,2
8:5,10,11,12
9:3,15,18,23
10:8,19 12:7
12:10,11,19
15:4,8 16:11
17:13 18:1,8
18:15,18 19:8
19:19,21,22
19:23 20:23
21:7,17 23:19
23:20 39:3
135:18,19
161:1 221:13
**cases** 7:17 18:6
20:8 180:14
181:4
**category** 51:12
**Catfish** 110:11
**cause** 5:12
231:16

**caused** 23:15
**cc'd** 89:6
**CCR** 1:20 5:1
  231:19
**CD** 105:23
  106:1,3,11,13
  107:1,4,8,11
  107:15 108:13
  161:8 163:10
  167:1,3,8,11
**cease** 44:12
**cell** 27:16 119:6
  119:14 120:4
  120:12 123:18
  128:2 129:9
**certain** 36:3
  41:5,5 51:15
  51:16 156:21
  166:14,15
**CERTIFICA...**
  231:20
**certified** 186:13
**certify** 5:4
  231:5,13
**chain** 62:23
**change** 88:18
**changed** 115:5
  115:22 118:4
**chapter** 109:16
  110:1,7
**charge** 37:13
  77:3 83:22
  84:3
**charged** 52:1
  103:9 217:20
  221:17 223:3
**charges** 191:1
  226:2
**charitable**
  168:6
**charity** 94:11
  94:17,21 95:1
  95:12 155:11
  155:13,13,14
  227:12,22
**check** 95:19
  223:19 224:2
**checked** 51:2

124:7
**checking** 125:4
**checks** 224:7
**chest** 172:7
**chests** 172:12
**chief** 6:3 7:11
  8:20 10:11
  28:5,9 30:21
  36:1 40:19
  46:2 48:11,12
  48:17 54:7,10
  54:16 56:3
  71:4,7,23 82:7
  82:14 83:1
  91:8 113:4
  116:12 193:21
  194:2 200:19
  201:4,10
**chief's** 40:15
**Chiefs** 42:20
  43:17
**choose** 186:11
**Chopper** 205:6
**chose** 211:16
**Chris** 97:12
  98:8,14 169:2
  174:1
**circumstances**
  9:2 12:8 38:11
  60:4 72:11
  134:12 178:2
  211:22
**citation** 19:7
  20:1 51:23
**citizen** 29:8
  30:19
**city** 1:10 7:10
  8:1,14 12:18
  12:20 17:9
  18:17 21:3,10
  22:3 26:3,8
  27:3,9 28:4,12
  28:18 29:11
  45:8 46:6
  52:19 55:22
  60:20 61:2,6
  65:6,19 68:19
  72:20 75:22

75:22 77:20
  78:2,10 84:11
  91:16 93:15
  110:11 113:17
  114:13,17
  115:15 118:7
  119:18 131:19
  136:2 160:20
  206:1
**city-issued**
  120:12 137:11
**civic** 75:11
**civil** 1:5 5:6
  8:10,12 19:22
  21:11 27:21
**claim** 22:7,20
  22:21,23
  194:14
**claimed** 9:4
  41:4
**claims** 41:23
  227:8
**class** 105:10,14
  105:16,19,22
  106:1,1,14
  156:19,20
  159:20
**classes** 186:12
**classification**
  141:11
**classified**
  150:20
**clear** 28:22
  191:11 201:4
**client** 30:15
  181:12,15
  219:10
**clientele** 183:1
**club** 42:18,18
  43:7,21 44:5,8
  44:13 94:12
  94:13,15,16
  95:16,19
  97:13,14
  101:22 102:4
  102:8 105:3
  105:11 109:3
  109:17,20

110:1 111:23
  154:12,15,21
  155:7,8,16,17
  156:11,13,23
  157:6,11
  159:9,19,23
  162:12,17,19
  164:23 165:5
  165:15,21,22
  165:23 166:2
  166:11,17
  167:12,12,19
  168:15,16,16
  168:21,22
  169:2,3,5,6,8
  169:11,13,20
  170:5,10,15
  170:21 171:7
  171:17,23
  172:11 173:14
  173:22 174:2
  187:12,13
  188:22 189:8
  190:12,18
  194:11,19
  196:7,8,17
  197:16,17
  198:3 201:14
  201:17 204:23
  207:23 208:2
  208:6 209:2
  210:5 216:13
  220:18,22
  221:10 225:4
  226:9,10,19
  227:2,10,15
  227:21 228:3
  228:12 229:2
**club's** 157:1,3
  175:4
**clubhouse**
  101:7 104:14
  104:16,17,23
  105:2,6,8,12
  155:19 156:16
  166:18 183:4
  198:6,16
  202:16 204:23

206:17 207:23
  208:8 209:10
  212:5 225:3
  225:17
**clubs** 75:11
  97:22,23 98:3
  172:5,20
  173:3 174:6,7
  175:17,17
**coaching**
  181:13,14
  199:15 219:5
**Code** 103:8
  191:16 192:3
  192:8
**codes** 139:18
**coincide** 87:7
**college** 45:6
**colon** 49:6
**com** 119:21
  125:15 127:11
  187:23 190:13
  195:3 229:4
**come** 39:9
  71:16 72:3
  76:14 99:4
  124:8 126:5
  127:2 151:17
  151:19 160:9
**command**
  62:23 71:13
  71:15
**commander**
  15:1
**comment** 57:3
**COMMISSI...**
  231:22
**Commissioner**
  1:20 2:19 5:4
**commit** 183:7
**company**
  183:23 184:2
  184:4 205:7
  205:11
**complain** 83:8
**complained**
  36:16,21,23
  37:17 39:21

40:1 55:11
84:21,22
**complaint**
11:10 21:23
22:2 30:8,10
30:20 31:1,3
37:8,15,16,19
37:23 39:20
41:9 55:18
56:22 57:6,12
57:18,20
83:14 84:10
84:13,17,18
84:20 85:19
87:10 88:23
89:10,13 90:4
90:8,11,22
97:6 99:15,18
**complaints**
29:7,23 31:14
31:17,19
32:11 38:23
39:16 40:5,20
40:23 41:1,11
41:19 55:20
56:5 80:8,10
80:12 84:4
100:3
**complete** 92:13
186:17 190:2
190:19 191:14
193:12 200:8
**completed**
144:13 149:19
**completely**
223:13
**completeness**
91:10 92:8
176:23
**completion**
177:16
**compliance** 2:5
**complimentary**
39:4
**computer** 126:3
126:5,11
137:11,17
138:3,15,18

139:1 143:18
153:10 182:9
**computer-aid...**
231:9
**concerning**
7:20,22 16:17
32:9,19 35:9
78:23 87:17
214:20,21
**conclusion** 23:9
39:10,15
103:4
**conclusions**
103:16,19
183:14
**condition** 23:15
**conduct** 72:13
72:17 90:13
90:17 97:19
99:20 103:8
149:9 153:18
176:3 177:22
178:13 191:17
191:17 192:3
194:9 195:20
228:7
**conducted**
11:15 100:5
110:15 186:9
206:9 217:19
**conducting**
187:1
**Confederate**
96:23
**conferring**
59:18
**confirmed**
219:14
**conflict** 155:6
**confused** 48:21
**consider** 37:18
57:5 114:21
**considerably**
49:6
**considered**
117:17
**consisted** 154:2
**contact** 179:1,7

179:9,12,20
181:7,9,18,23
**contacted**
178:17
**contested** 25:8
**context** 63:10
63:12 64:11
**contracted** 21:2
**contributed**
41:18
**conversation**
37:9 86:8,10
87:15 88:3
**conversations**
38:12 115:18
**convinced**
165:14
**cop** 221:11
226:3
**copies** 41:5,6
**copy** 83:16
112:16
**corporal** 11:3
45:15
**Corporation**
74:2
**correct** 8:16
9:21 13:16
16:5 20:5,19
21:12 24:14
24:15 40:21
59:16 62:16
62:20,21
66:10 67:9
76:16 89:4,21
89:22 95:13
95:14,20
102:16 103:20
104:7 110:21
116:16 117:12
118:18,22
128:11 130:7
130:12,23
137:12,13
138:11 143:6
143:9,23
144:5,8,20
153:15,18,20

154:21 155:8
158:11 161:13
162:1,21
165:1 167:1
168:10,17,23
169:11,15
170:6 172:3
172:21 174:22
175:2,4,5,8,11
176:5,8
178:15 185:13
186:3,17
187:14 188:1
188:9,23
189:8 192:21
192:22 205:18
205:22 206:5
206:9 208:11
208:12,14,23
211:20 213:8
214:3 216:13
216:16,18
217:10 223:21
224:3,4,10,13
224:18 229:5
229:9,13
231:11
**correlation**
167:17
**counsel** 1:18
2:10,12 5:7
136:1,8
231:14
**counseled**
53:22 54:6
**counselling**
53:18
**County** 14:11
231:3
**couple** 9:8,12
22:12 67:19
**course** 52:18
94:3 102:5
143:13
**court** 1:1 2:6
5:1,17,20 9:17
20:9,14 24:13
201:5

**covered** 87:16
**covers** 229:1
**create** 158:15
158:19
**created** 107:21
158:22 177:10
177:11
**crime** 183:6
214:22 217:15
217:21 221:18
223:3,18
**criminal** 8:11
19:21,23
203:23 204:10
204:15 210:9
211:1 217:2
218:4,9,15
220:9 224:2,7
224:17 225:7
**criminals**
219:14,15
**current** 111:1,8
111:22
**currently** 43:15
**custody** 203:4,7
203:11

---

**D**

**D** 4:1
**D-r-a-u-g-h-n**
47:11
**daily** 152:12,17
**damage** 22:6,19
22:21,23
**Darryl** 85:4,18
87:2,10 88:23
89:6,9,12,14
89:19 90:13
92:11 176:19
**data** 80:17,21
81:13 123:1
139:22,23
191:23
**database**
139:16 142:1
**date** 5:5 14:14
46:16 54:18
54:21,22 55:3

110:13,14,19
112:13 120:19
121:22 122:7
122:10 123:22
128:3,5,7
129:18 131:7
131:14,22
187:23 213:19
**dated** 206:4
**dates** 40:13
43:9 54:3
145:11 188:8
188:12
**dating** 125:15
125:18 126:20
127:7 130:16
**day** 1:23 51:17
96:17 115:6
120:22 127:21
130:13 142:7
143:18 216:3
**days** 51:19 53:6
60:10 68:6
70:18
**dealership**
92:17
**dealings** 92:20
93:6
**December** 25:4
**decision** 88:10
88:15 92:6
137:3 146:13
156:2,6
157:21 191:7
197:18 201:15
227:13
**decisions**
165:12
**deem** 139:8
**defendant** 1:11
3:9 17:13
28:13,18
**define** 202:6
**definitely**
106:13
**definition**
104:13 117:2
117:8 129:4

160:1
**definitively**
129:8 133:1,7
**Degree** 42:9,12
210:12
**delinquent**
77:17 78:1,9
**DELVICK**
3:16
**demonstrates**
165:10
**denied** 154:20
154:23 220:16
**deny** 155:18
**department** 8:9
10:12 13:22
14:9,12 17:3
17:10 22:21
23:11 26:2,10
27:3 29:4 56:6
56:13 59:5
60:13 61:6,9
61:12,16,17
61:18,19 62:4
62:9,10,11,16
62:20 63:18
63:20 65:16
66:4,6,13,16
67:5 71:2 73:4
76:10,12,16
77:4 78:22
79:10,20 80:1
80:23 84:11
91:12,20 92:4
93:20,21
94:10,20 95:8
97:9 113:18
114:6 135:6
137:15 143:6
146:14 150:21
152:1,7
158:19 161:4
161:5 169:22
170:8 176:9
177:10 180:15
181:6 196:15
203:4
**departmental**

153:15
**departments**
61:14
**depends** 218:3
**DEPONENT**
230:1
**deposed** 21:16
**deposing**
132:22
**deposition** 1:18
2:3,4,15,19
6:21 7:13,18
8:8 9:20 12:11
15:8 16:10,14
18:8 34:3 36:9
193:23 231:6
**depositions** 2:7
**derived** 120:8,9
**Describe** 30:7
**described** 54:12
**deserved** 37:11
**designated** 36:2
200:3
**detail** 163:19
199:7
**details** 16:9
35:16 53:15
55:5
**determination**
38:4,16,20
**determine** 38:8
174:10
**determined**
154:10
**difference**
215:2 219:1
**different** 45:14
110:14 142:19
152:8 208:6
**difficult** 151:16
**direct** 95:4
**directed** 95:6
**directly** 160:3
172:5
**director** 59:19
**dirty** 226:3
**disagreed** 199:8
**Disciples**

110:11
**disciplinary**
32:19 33:19
34:21,22 35:3
35:5,14 53:15
54:15,19 55:6
57:22 59:16
65:14 170:13
192:12
**discipline** 52:9
58:4,5 65:8
**disciplined**
50:10 52:14
52:16,18 53:1
53:8 54:10
70:21,23
73:11 170:20
**discovery** 136:6
136:7
**discretion**
115:8
**Discretionary**
141:5
**discriminated**
38:17 41:17
84:9
**discrimination**
36:17,19,22
37:15,19 38:9
39:22 40:6
41:11 55:19
55:21 56:5
57:6 84:22
85:20
**discussed** 187:4
187:10,21
188:3 227:11
229:3,7,11,16
**dishonest**
102:13,20
103:16 104:10
108:17 112:20
113:1,3,9,10
114:6,8,9,10
114:22 118:8
118:12,16,18
119:1,2
188:21 189:5

**dishonesty**
113:14 190:16
195:14 229:12
**disorder** 21:3,4
27:22 28:15
**disparage**
141:10
**disparaging**
79:17
**dispatch** 75:23
**dispute** 128:1
147:17
**District** 1:1,2
225:23
**division** 1:3
22:6 47:12
63:6 88:7
134:13 163:13
**divorce** 24:11
24:20 25:5
27:23
**doctors** 23:6
**document**
83:17 85:4
103:7 112:18
120:15,16
126:1 160:10
160:18 164:6
164:7 177:3,5
190:23 191:2
191:3 192:11
192:15 199:19
220:5
**documentation**
102:12,18
103:1,2,20,21
163:10 167:7
171:16,22
193:18,19
197:21
**documents**
166:21
**doing** 149:1
150:10 155:6
186:22 198:6
198:9
**Don** 180:2,4
**donations**

94:23 95:5,6
**Donny** 103:5
158:13 166:20
179:1 181:19
**dot** 119:21
125:14 127:11
187:23 190:13
195:3 229:4
**Dothan** 1:10,22
5:10 7:10 8:2
8:15,21 10:11
13:21 17:2,9
18:17 21:11
26:2 27:3,10
28:4,13,18
29:4,11 42:17
42:18,19 43:6
43:21 44:5,8
44:13 45:8
52:19 55:22
59:5 60:13,20
61:2,7 65:19
68:20 72:20
73:15,20 75:4
75:18,22,23
76:10,16,21
78:2,10 79:19
84:10,11
91:19 93:7
94:10,14,18
95:2,8 97:8
113:5,17
114:5,13,18
118:7 143:6
146:14 160:20
169:22 176:9
180:8,23
181:5 196:15
206:1 209:6
**doubt** 106:17
106:18,23
**Doug** 130:3
137:15 150:7
158:14 179:1
181:19 226:1
**downloading**
141:5
**Draughn** 47:5,8

47:8 48:12,17
50:6
**drew** 183:14
**drive** 206:21
**driven** 207:5
**drop** 226:2
**drunk** 206:21
**due** 33:18 34:20
40:14
**dues** 44:16,19
44:21 45:2
**duly** 5:16
**duties** 49:8
**duty** 71:22
80:20 81:6
99:23 207:1
209:16
_____
**E**
**E** 3:1,1 4:1,11
231:1,1
**earlier** 29:2
113:11 116:12
117:10 124:19
144:3 174:20
175:7 181:22
227:12
**East** 50:21
**Easy** 110:12
**EDENTON** 3:6
**edited** 107:8
108:8 161:23
162:6
**education** 42:8
150:3,6
**Edwards** 3:4,5
4:3 5:22 6:2,4
30:14 36:7,15
55:13,17
98:23 99:8
112:9 132:12
160:13,17
173:17,20
181:11 196:6
199:14 200:7
200:14 201:3
201:7,10
219:5,8 223:9

223:14,17
229:22
**EEO** 41:22
59:14,18,21
84:10,20 85:2
87:3 90:9
91:11,15,16
92:3,8 176:20
**EEO's** 90:11
91:18
**EEOC** 83:22
**effect** 2:5
**eight** 196:10,11
**either** 34:20
48:21 83:4
130:3 172:13
180:1 185:11
222:7
**electronic**
139:23 192:1
**emergency** 13:6
13:9,10
**employed** 13:21
27:9,15 59:4
65:19 66:23
67:8 72:20
**employee** 32:11
32:22 33:11
34:17 35:14
64:14 68:20
118:6 139:15
141:23 192:12
**employees**
118:12
**employment**
29:10 30:1
45:11 55:7
58:23 80:13
137:3 147:9
156:3,10
187:9 191:8
194:7 197:19
200:11 201:16
227:14 229:18
**employs** 125:11
**enabled** 121:5
**enabling**
151:13

**encourage**
170:4
**encouraged**
169:21 170:8
**ended** 25:11
**enforcement**
97:22 98:3
168:20 169:4
174:6,7
175:17
**entered** 36:10
**entire** 47:1
132:16 177:3
177:4
**entirety** 103:14
**entries** 38:22
39:5 182:9
**equipment** 13:7
13:9,11 52:7,7
**escape** 221:17
**ESQUIRE** 3:4
3:10
**estimate** 31:10
31:11 53:3
**estimating**
29:23
**Ethics** 192:8
**Etress** 11:18
**evening** 217:9
**event** 168:7
**events** 156:15
156:17,22
157:1,4,9
168:7
**eventually**
169:20
**everybody**
201:8
**evidence** 2:16
108:15 135:1
173:11 198:13
**exact** 9:13
29:20 40:13
43:9 54:18,21
64:10 65:13
109:19 130:13
**exactly** 49:7,18
52:1 58:7 60:1

81:21 85:23
86:11 87:6
117:19 121:21
146:11 154:3
174:12 179:8
184:19 208:18
**examination**
4:2 5:12 6:1
129:7
**examined** 5:17
**Exchange**
42:18 43:7,21
**excuse** 18:21
19:17 161:10
**executive** 110:5
**exhibits** 4:13
146:7
**experience**
186:4
**EXPIRES**
231:22
**explain** 18:13
41:14 69:4
117:2 123:6
197:7
**explanation**
149:22
**explicit** 141:9
**extent** 13:18
15:3 149:22
154:10 177:18
200:23 225:15
**extra** 25:11
100:5 113:12
113:15
**EZ** 210:11
211:6
_____
**F**
**F** 231:1
**fact** 107:13
125:8 137:14
144:3 155:4
175:6 198:5
199:11 209:13
**facts** 12:8 38:10
60:4 134:12
178:1 201:14

211:22
**fall** 165:7
**falling** 21:6
**falls** 36:5
**far** 43:15 81:13
   113:22 168:7
   169:1
**Farris** 10:20
**father** 74:4
**fault** 50:16
   51:15
**FBI** 42:20
   178:17 179:9
   179:21 180:5
   180:16 181:5
   181:23 182:14
   183:15 185:22
**FBINA** 43:18
**feasible** 82:5
**February** 1:23
**Federal** 185:12
**feel** 162:11
   225:5
**felon** 219:18
**felons** 198:8
   202:5,21
**felt** 37:10,21
   39:15 84:8
   86:6 87:9,23
   221:15
**females** 82:3
**fifteen** 16:8
   18:5 146:20
   146:21 155:21
   164:9,12
   220:5
**fight** 101:5
**file** 12:7 58:6,13
   58:20 63:23
   85:6 124:11
   126:7,8
   132:10,16,19
   139:15 142:1
   147:8,12,14
   167:8 189:15
   197:22
**filed** 22:11
   24:20 25:3

30:1,20 31:14
32:18,22 33:6
33:8,20,22
34:18,23 35:7
35:16 40:5
42:4 80:7,9
83:22 87:3,10
**files** 35:20
**filing** 2:18 84:2
   89:7,20
**final** 25:6 59:15
   59:17 91:7
**finance** 77:13
   77:14
**find** 59:20 60:2
   159:21
**findings** 23:12
   91:3 145:7
**fine** 55:15
**finish** 79:2
   166:6 186:19
   223:12
**finished** 79:5
**finishes** 17:6
**finishing** 223:9
   223:12
**firearm** 214:17
**firearms**
   204:19 214:5
   214:8
**first** 5:16 51:21
   57:9 88:20
   89:23 99:21
   104:12 127:23
   154:19 189:8
   226:16
**five** 44:23 55:14
   60:10 173:18
   180:12 181:2
**five-day** 58:9
   60:5
**fixing** 68:23
   114:22 116:5
   116:8,10,13
   116:18,22
   117:3,4,8,12
   117:18 160:2
**following** 5:13

14:15 129:5
216:3
**follows** 5:18
**followup** 90:12
**force** 2:5
**foregoing** 5:7
   231:6,10
**forensic** 128:19
   128:21 133:19
**forensics** 129:7
   132:2,23
   137:17
**forgive** 167:5
**form** 2:11
   22:17 23:4
   25:14,20 26:5
   26:14,19 27:5
   27:12,19
   28:11 30:4
   32:2,7 34:6,13
   35:19 39:18
   41:3,13 52:3
   53:10 55:1,9
   56:17 57:14
   58:12,18 59:2
   59:23 64:6,17
   65:12 67:14
   67:23 69:2
   70:2 73:8,23
   75:6 76:2 77:6
   78:4 79:22
   80:5 81:16,20
   84:15 85:22
   86:22 87:5,13
   88:17 90:16
   91:14,22
   92:10 93:3,9
   93:17 94:5
   96:5,11 98:21
   100:9,14,19
   102:2,15
   103:13 106:6
   107:17 108:6
   108:10,19
   109:9 110:17
   111:5,12,19
   112:2,22
   113:7,20

114:2,16
115:1,14
116:7 117:1
118:10,20
119:10,16
120:7 121:20
122:4,13
123:5,14
124:6,15,21
125:3,17
126:17 127:1
127:9,17
128:13 129:2
129:16 130:19
131:2,11
132:4 133:5
134:7,10,19
135:3,15,22
136:21 137:6
137:20 138:5
142:11,16
144:7 146:16
147:7,21
148:2,11,14
149:3,8
150:13 151:1
151:12 152:4
152:15 153:2
154:17 159:11
161:15,20
162:3,9,15,23
163:8,17
164:17,20
165:3,17
167:14 168:2
168:12,19
170:1 171:9
171:14 172:23
173:6 174:17
175:10,20
176:7,13,16
178:8 179:16
179:23 181:9
182:3 183:12
183:20 185:1
185:15,17
186:2,19
187:16,19

188:11,18
189:2 190:21
191:10 192:13
193:5,15
194:22 195:6
195:12,18,22
198:18 202:23
203:20 205:2
207:8 211:19
212:7,15,20
213:5 214:12
214:19 215:4
215:10,19
216:15,20
218:1 219:4
220:12 221:4
222:15 223:5
223:23 224:12
224:20 225:11
227:4,17
228:5 229:20
**formal** 53:18
**forth** 58:3
**found** 19:9 20:4
   20:4,6 56:13
   60:2 69:11
   101:14,22
   105:23 107:2
   115:10 117:22
   137:10 138:8
   138:10,14
   139:1 153:10
   153:14
**founding** 110:5
**four** 191:5
   193:1 196:21
   197:2,10,11
   199:22 210:4
   210:22 211:14
   212:2 225:13
   226:12 227:22
**fourth** 7:16
**frame** 9:13 40:7
   49:19,22 53:4
   55:23 56:1
   86:12 176:13
**friction** 154:14
**friends** 73:13

73:14,16
**front** 13:4
35:21 50:23
51:4 58:7,20
63:23 132:10
132:17
**full** 2:5 7:4
**function** 77:3
208:9
**functions** 81:14
166:16 205:9
205:13 208:6
**fundraiser**
94:11
**funeral** 156:18
157:8,13,16
157:22 168:8
227:11,22
**further** 2:1,8,17
41:14 230:1
231:13

**G**

**gangs** 197:23
**gathered**
144:19
**General** 140:18
191:16,20
192:3,5,7
**getting** 48:20
149:17 191:11
**give** 8:8 55:2
64:1 149:16
151:17 158:1
**given** 7:18
12:11 18:4,8
50:5 51:17
124:3 128:6,8
134:12 143:8
144:21 177:12
231:11
**Givens** 12:17
12:17 13:20
14:19 47:4
48:22 49:2,4
50:6,7
**giving** 15:8
34:10 48:1

199:21 200:15
200:15
**Gmail** 131:18
**go** 7:7 12:22
20:11 76:21
95:1 106:21
106:22 128:20
142:20 148:8
149:15 156:18
156:22 165:20
165:23 186:11
197:2 201:2
**goes** 51:12
163:18
**going** 6:5 76:10
135:23 145:10
155:18 160:15
162:4 178:11
196:9,13
201:7 219:6
**golf** 93:14,19
94:3
**good** 30:6 31:7
31:9 99:1
134:2,8
179:13 189:23
225:6
**government**
81:13,18
**GPS** 138:21
153:10,23
154:2 184:7
**Gray** 1:7 6:4
27:9,16 36:21
37:7 39:21
40:1,5 41:18
79:14,16 80:8
80:12,16,20
82:7 83:8,22
84:4,7 86:5
87:8,18 88:23
89:20 97:7
98:18 101:5
101:14 102:12
102:20 104:10
106:7,13
108:16 109:18
112:11 119:8

119:13 120:3
120:20 121:1
121:5,18
122:1,9 123:2
123:11,16
124:3,23
126:21 128:23
129:9 130:6
130:12 133:2
133:10,14,17
133:20 134:3
136:18 139:7
140:9 141:21
142:5 147:4
152:23 153:5
154:19 156:14
157:10,15
158:14 159:7
159:21 160:20
162:11 168:9
171:2 177:2
177:17 178:17
182:17 183:10
187:6 189:5
189:17,21
192:20 193:12
194:9 196:8
196:12,14
197:14 199:2
201:12 202:14
203:15 204:4
204:21,22
206:1,16,21
206:22 207:5
207:22 208:5
208:8 209:6,9
209:15 210:16
210:19 211:17
214:3 219:13
219:17 220:10
220:15 221:1
221:11 224:6
225:16,18
226:14,16
227:1,8
**Gray's** 39:16
55:18 74:19
74:22 78:13

86:13 89:10
90:4,22 96:1
107:1,2 119:6
128:1 129:7
133:9 137:11
137:17 138:3
149:22 152:17
154:10 155:15
156:20 175:16
185:10,23
191:8 200:11
213:20 226:7
228:7 229:18
**great** 163:18
**Greg** 7:8
**Gregory** 1:19
5:11,15 7:5
**grievance** 33:21
34:23 35:11
**grievances**
32:17,22 33:6
33:12,17,23
34:17 35:7,8
35:14
**grounds** 2:14
189:13,14
**group** 141:11
**groups** 42:15
155:12
**guarantee**
107:14
**guard** 81:9,10
144:12
**Guardian**
38:22 39:2,4,7
**guess** 23:8 52:6
60:5,6 77:7
85:9 114:3
**guilty** 19:9 20:4
20:4,7
**guise** 215:7

**H**

**H** 4:11
**hack** 148:5
**hand** 192:15
**handful** 33:1,11
33:14 35:13

**handled** 27:2
76:12
**hands** 83:17
112:18 126:1
**hang** 225:18
**hanging** 183:1
183:2 198:11
219:13 225:3
225:6
**hangout** 207:22
**Hanson** 180:3
180:18
**happen** 16:23
71:6
**happened** 13:2
50:19 224:16
**happy** 6:11
201:9
**harassed** 84:8
87:9
**harassment**
40:2,3 41:18
55:21 87:16
**hard** 184:18
**harping** 197:3
**head** 1:20 5:1
6:16,17 8:9
24:3 43:22
89:16 231:18
231:19
**heads** 56:13
**hear** 67:11,15
67:17 223:2
**heard** 60:19,23
61:13 62:13
62:14 66:21
97:1 173:9
**hearing** 136:16
231:12
**held** 110:6
**highly** 218:22
**histories** 211:2
220:9
**history** 224:17
**hit** 51:4
**Hobo** 75:17
76:6,15
**honest** 138:7

Honestly 219:6
hope 193:7,21
hospital 23:7
hosted 94:10
hours 166:20
  199:22
house 219:19
Houston 14:11
hundred 44:22
  44:23,23
  107:5 146:20
  146:21 155:21
  164:9,13
  220:5
hundreds 20:15
  20:15
hung 227:20
  228:11

**I**

IA 32:8 99:16
  104:3 121:11
  122:14 124:7
  126:7,7
  134:13 144:22
  145:6 146:9
  155:21 174:8
  176:2 189:15
  191:3 197:22
  216:8 218:17
idea 29:18 66:8
  73:3 77:15
  78:20
identification
  139:18
ignored 196:14
ill 113:17
illegal 220:16
images 125:19
  126:19,22
  127:12,15
  130:21 141:8
impact 71:22
impaired 34:10
  34:14
important
  146:11 212:11
improper

181:16
improperly
  188:15
incident 11:6
  14:2 70:21
  73:6,11
  114:22 116:13
  204:5 217:21
incidents
  114:20
include 171:22
included 12:9
  172:15 196:16
including 6:6
  228:17
independent
  171:7 174:21
indicating
  140:5
individual
  13:14 26:11
  37:22 98:12
individuals
  49:10 141:12
  188:8 204:20
  210:4,8,21,22
  211:14 212:3
  212:23 218:23
  220:8 221:15
  225:13
influence 207:5
info 149:20
information
  64:1 78:12,16
  78:22 79:11
  80:2 82:1,2,4
  95:23 96:8,13
  96:16,19
  102:7 120:8
  124:10 131:8
  131:9 139:17
  142:2,20,21
  142:23 143:5
  143:9,12,22
  143:23 144:4
  144:15,19
  145:1,12
  146:19 147:5

147:19,23
148:6,21
149:17 150:1
150:19 151:3
151:23 152:9
163:1 173:12
174:12 183:22
184:13 185:17
188:4,9,16
190:7,15,23
195:9 200:2
226:11 229:8
initiate 97:15
initiated 99:10
initiates 99:14
injured 13:14
  17:23
injuries 13:19
inmate 21:1
instances 61:11
instructed
  166:16 219:9
instructing
  30:18
instruction
  30:15
insure 187:7
interactions
  220:17
interested
  231:16
interim 48:10
  48:12,17
internal 11:8
  11:13,23
  14:21 22:5,14
  31:22 59:13
  72:13,17
  78:14,23 96:6
  97:16,18,19
  99:9,12,22
  100:4 101:15
  102:11,19
  104:5,8
  110:20,23
  111:3 119:5
  119:11 121:3
  124:17 135:8

137:14 142:17
154:9 155:1,5
157:16 158:18
163:13,23
164:2,13
171:20 172:15
173:12 174:14
174:23 176:4
177:1,13
178:6,14
181:20 186:5
186:11,14
187:1 188:13
194:13 198:14
204:12,18
213:12 214:2
216:1 217:7
217:11,17
218:10,20
219:1,12
221:16 222:23
225:22
internally
  84:23
International
  42:17,19
  43:17
interrogated
  213:11 214:1
  216:3,7,9
interrogating
  214:23
interrogations
  214:21 215:23
interview
  104:12 105:5
  108:20 110:15
  110:19,23
  131:16 148:16
  158:12 189:8
  198:22,23
  199:4,7,13,17
  212:21 218:9
  218:20 219:17
  226:17
interviewed
  23:5,6,8 175:7
  175:13 202:20

203:2,17,23
204:14,18
208:3 209:3
211:7 213:16
216:7 217:2
interviewing
  149:15
interviews
  103:18 104:3
  104:4,6,9
  205:20 206:8
  212:13,23
  213:3,7,9,11
  214:23 217:19
  218:7 227:23
intricacies
  197:6
investigate
  14:18,22
  22:15 38:7
  80:3 89:12,15
  90:1,7 97:3
  99:23 124:22
investigated
  15:12,13,16
  15:20 16:1
  22:6,19 31:18
  59:12 64:3,9
  89:10 90:5
  97:8,12
  176:10
investigating
  21:23 22:2,4
investigation
  11:9,13,16
  12:4 16:4 23:2
  23:13 31:23
  41:22 66:22
  67:2,7,18
  72:14,17
  78:14 90:11
  90:14,18,22
  91:11,19 92:3
  92:8 97:16,19
  98:18 99:10
  99:13 100:5
  101:15 102:6
  102:11,19

103:15,17
109:6 111:3
119:5,12
120:3 132:10
132:18 138:2
142:18 143:13
144:21 145:8
145:20 147:7
148:17,18
149:10,12
154:9 155:1
155:21 157:17
159:14 163:6
163:12,22
164:2,14
165:9 166:19
167:5,23
171:1,15,19
171:21 172:16
173:13 174:14
174:19 175:1
176:4 177:1
177:17 178:3
178:6,10,11
178:13 181:23
185:12,13
186:9,16
187:2 194:14
198:14 201:1
217:8,18
219:13 220:7
**investigations**
32:9 91:5
92:12 177:23
178:1 186:12
218:9
**investigative**
124:11 167:8
192:7
**investigator**
22:10 99:11
99:16,23
186:6 203:23
204:15 218:4
218:15 225:22
**investigators**
96:7,16 155:5
174:8 176:2

178:23 186:10
186:14 204:10
204:13 217:3
217:12 221:16
223:1
**invoice** 78:1
**invoices** 77:18
78:9
**involve** 41:1
141:7
**involved** 10:19
12:17 15:7
16:19 19:5
24:5,11 28:8
40:22 41:10
57:19,21
98:17 117:11
169:17
**involvement**
57:11,15,17
91:18 97:12
97:14
**involving** 17:1
18:23 116:13
**Iron** 98:8 174:3
176:10
**irrelevant**
212:18
**issue** 136:8,9
150:22 151:9
**issued** 18:18
19:7,23 20:6
27:16 72:22
96:18 120:20
121:18 122:8
122:16 123:22
128:2 130:6
130:11,14
131:6 134:4
136:18
**issues** 49:5
100:1 118:2
**items** 197:2
**IVAN** 1:7

_____
**J**
_____
**J** 7:5
**jail** 21:1 23:5

23:16,18
**January** 24:21
24:22,23 25:1
46:1,9,19
47:15 48:5,8
88:21
**JC's** 42:19
**JEFFERSON**
231:3
**job** 35:9,11,15
38:21 92:11
**John** 12:16
13:20 46:12
47:3,21 48:6,7
48:19,22
49:11 69:6
71:23 72:5
**Johnny** 211:8
**jointly** 180:15
181:5
**jokes** 141:8
**Jones** 1:21 5:9
**July** 112:15
**June** 85:7,8,10
85:13

_____
**K**
_____
**Karen** 125:5
**Kawanis** 42:16
43:4,16
**keep** 155:7
197:2
**Keith** 1:7 6:4
36:21,23
37:10 38:13
39:5 41:4
55:18 78:13
79:14,16 80:8
80:12,19
82:14 83:7,22
84:4 85:6 86:5
87:8,15 88:22
89:7 90:4 96:1
97:7 98:18
101:4,13
102:12,20
104:9,11,22
106:7,13

107:1,2
108:16,20
112:3 119:13
120:3,20
121:5 122:1,9
123:2,11,16
124:3 126:21
128:1,23
129:7,8 130:6
130:12 131:17
133:2,9,10,14
133:16,20
134:3 136:18
137:10,16
138:3 139:6
140:8 141:21
142:4 145:11
147:4 152:16
152:23 153:5
153:8,17
154:10,19
156:14,20
157:9 158:14
159:7,21
162:11 168:9
175:15 177:1
177:17 178:17
182:17 185:10
189:5,17,21
191:8 194:9
196:12,13
197:14 199:2
200:11 201:12
202:13 203:15
204:4,21,21
207:4,22
211:17 214:3
219:13,17
220:10,15
221:1,11
224:6 225:16
225:18 226:16
226:23 227:8
229:18
**Keith's** 38:23
86:16 106:1
182:9
**Kelley** 125:6

**key** 209:3,19,21
210:23 211:4
**kicking** 160:2
**kid** 45:5
**kind** 19:3 21:2
130:17 138:19
194:16 196:20
**kinds** 7:17
**knew** 112:6
208:4 215:2
217:6,19
**know** 10:5,5,6
10:10,13
19:14 22:17
30:13,13
40:12,13,14
49:4 53:18
58:13,19
59:11 60:9,11
60:12 61:10
61:12 63:21
64:11,20
66:18,20 67:4
67:6,7 69:16
71:18 72:15
73:12 74:10
74:12,14,17
76:3,6,8,13,19
76:21 77:19
77:21 78:6,6,7
78:11,21 79:1
79:4,9,10,23
81:21 82:12
88:22 89:9,22
89:23 92:23
96:5 98:2,5,7
100:2 102:3
104:12 105:21
106:10 107:3
107:7,10,18
107:22 108:2
108:7,11,13
109:19,21
111:1,7,14,16
113:21 116:1
116:18 117:7
118:6,13,14

118:15 121:17
121:21,23
122:7,9
123:21,22
124:1,12,16
124:19 125:20
126:6,10,12
126:13,14,21
127:14,21
128:5,7,9,16
128:17,19
129:17 130:4
130:5,11,13
130:15 132:5
132:5 134:4
134:15,16
135:4,10,12
136:12,17
137:4,7 146:5
146:10,17
147:11,13
149:4 151:15
152:5 154:1,3
156:11 157:5
157:14 158:3
158:6 159:6
160:18 161:10
161:11,12,17
161:22 162:5
165:13 167:15
168:3,4,5,9,13
169:1 170:2,7
170:12,16
171:10 173:10
174:5 175:12
175:16 176:18
179:5 180:9
186:8,21
188:7 189:6
191:5 194:8
194:12,15
196:3 201:11
201:20 202:15
203:21,22
204:9,11,14
205:9 211:1,3
212:8,11
214:22 215:11

215:12,14,21
216:2,8,20,21
216:22,23
217:1,2,3
218:2,11,13
218:14,18,23
219:4,4,7,22
220:3,4,8,9,13
220:15 221:6
221:19,23
222:5,6,8,13
222:18,21
223:6 225:1,8
**knowing**
108:21 109:14
117:11 166:4
188:21 190:17
195:15 196:9
197:20 217:14
221:22 225:5
229:12
**knowledge** 6:7
76:4,9 147:16
224:15
**known** 61:1
68:19 69:15
77:23 78:8
83:7 114:4,13
180:11 181:1
198:7 202:4
209:13,16
**knows** 209:6
219:10

_____
**L**
_____
**L** 1:14 208:3
**labeled** 160:19
**lady** 28:15
**lane** 51:1
**language** 141:8
**Large** 5:4
**Larry** 47:8
48:12,16
**launch** 11:8
174:13,21
**law** 1:20 3:5 5:8
97:22 98:3
100:17,22

101:19 168:20
169:4 174:6,7
175:17
**laws** 2:6 101:14
101:23 102:4
102:8
**lawsuit** 19:13
19:15 21:14
22:11 23:22
24:4,9,18 28:1
28:5,7,17 29:2
85:6 87:17
89:21
**leading** 2:12
**League** 94:14
94:18 95:3,9
**learn** 68:2
**leased** 92:15
**leave** 143:17
170:20 178:14
**led** 104:9
108:23
**legal** 22:21
23:10 59:18
**Leslie** 26:20
125:11
**let's** 40:12 61:8
70:19 99:3
**letter** 109:2,23
110:2,13,18
112:10,14
**level** 42:7
**Lewis** 74:2
**lie** 109:1,11,13
109:18 114:14
**lied** 104:22
108:20 109:5
109:14 114:20
**lieutenant**
11:20 14:23
45:20 56:20
57:8,23 61:3
62:15 63:6
68:17 71:11
**lieutenant's**
41:6
**life** 112:22
114:10 192:9

**Lights** 13:13
**limitations**
152:8
**limited** 36:11
151:18
**line** 36:4
**link** 25:18 26:1
26:3,16,21
27:2,16 95:23
96:14,17
100:6 125:5
163:19
**list** 190:4,19
191:14 193:12
**little** 105:10,14
191:4 196:22
197:5,6 199:7
**local** 71:22
180:10
**located** 180:7
180:22
**long** 18:3 33:7
43:3,9 46:7,13
49:1,9,21
55:12 59:9
68:4 70:16
74:8,16
180:11 181:1
183:10
**longer** 26:2
43:13,20 44:4
**look** 69:7,10,22
70:3 72:9
76:23 103:13
150:4,5
199:13
**looked** 12:8
38:10,14,21
38:22 127:6
131:22 134:11
142:9 145:11
**looking** 60:3
103:14 125:21
144:10,18
158:9,13
211:21
**lot** 144:14
163:9 182:9

184:15 196:13
197:21
**loud** 6:14 44:3
89:17
**lunch** 99:2,7
**lying** 124:18
129:13 133:3
181:21

_____
**M**
_____
**ma'am** 181:13
**Magill** 121:15
137:21
**Main** 1:22 5:9
50:21
**Major** 37:3
38:13 39:11
82:13 96:21
150:6
**Major's** 83:4
**majority** 50:8
**making** 38:19
165:12
**males** 82:4
**manage** 26:8
**manager** 46:6
65:6 91:16
**manages** 26:2
**mandated**
104:15
**marijuana**
206:17 209:11
**marital** 25:12
100:6 113:12
113:16
**Mark** 74:3,5
75:2
**Marked** 4:13
**marriage** 25:11
119:3
**Master's** 42:11
**materials**
137:10 141:6
141:9
**Mathews** 85:4
85:18 87:3,11
89:1,10,12,14
89:19 90:13

176:19
**matter** 69:7
125:8
**Mayor** 92:16
92:20
**Mays** 3:10 5:23
10:4 17:5 20:3
22:16 23:3
24:8 25:13,19
26:4,13,18
27:4,11,18
28:10 30:3,12
30:17 32:1,6
34:5,12 35:18
35:23 36:13
39:17 41:2,12
48:14 52:2
53:9 54:23
55:8,15 56:16
57:13 58:11
58:17 59:1,22
60:6 64:5,16
65:11 67:13
67:22 69:1
70:1 73:7,22
75:5 76:1 77:5
78:3 79:2,21
80:4 81:15,19
84:14 85:21
86:21 87:4,12
88:16 90:15
91:13,21 92:9
93:2,8,16 94:4
96:4,10 98:20
99:4 100:8,13
100:18 102:1
102:14 103:12
106:5,19
107:16 108:5
108:9,18
109:8 110:16
111:4,11,18
112:1,7,21
113:6,19
114:1,15,23
115:13,17,20
116:6,23
118:9,19

119:9,15
120:6 121:19
122:3,12
123:4,13
124:5,14,20
125:2,16
126:16,23
127:8,16
128:12 129:1
129:11,15
130:8,18
131:1,10
132:3,8,13,14
133:4 134:6,9
134:18,21
135:2,14,21
136:5,20
137:5,19
138:4,12
139:12 140:12
142:10,15
144:6 146:15
147:6,20
148:1,10,13
149:2,7
150:12,23
151:11 152:3
152:14 153:1
154:16 159:10
160:11,14,15
160:19,23
161:14,19
162:2,8,14,22
163:7,16
164:16,19
165:2,16
166:6 167:13
168:1,11,18
169:23 171:8
171:13 172:2
172:22 173:5
174:16 175:9
175:19 176:6
176:12,15
178:7 179:15
179:22 181:8
181:14 182:2
183:11,19

184:23 185:14
186:1,18
187:15,18
188:10,17
189:1 190:20
191:9,22
193:4,14
194:21 195:5
195:11,17,23
198:17 199:12
199:16 200:5
200:12,21
201:18 202:22
203:19 205:1
205:23 207:7
211:18 212:6
212:14,19
213:4 214:11
214:18 215:3
215:9,18
216:14,19
217:23 219:3
219:9 220:11
221:3 222:14
223:4,7,11,22
224:11,19
225:10 226:21
227:3,16
228:4 229:19
**MC** 110:8
160:3,3 198:4
**McGill** 130:4
137:15 150:7
158:14
**McGoley** 203:9
203:10 206:15
207:13 208:13
208:15,19
210:23 211:3
212:8 216:23
**McGuire** 203:9
205:3 206:11
207:10 208:20
210:3,22
211:4 212:9
217:1
**MCKAY** 3:16
**MCs** 163:19

166:22
**mean** 13:8
20:14 41:15
53:1 62:18
86:19 118:15
124:17 129:4
133:6,7 142:5
157:5 163:14
177:4 179:6
190:1 193:7
196:4 200:1
200:18 207:21
220:5 224:22
224:22 225:15
225:17 227:18
228:6
**means** 231:8
**Meat** 110:10
**media** 79:17
**medical** 23:7,16
49:5
**medication**
34:4
**meet** 99:2
180:13 181:3
**meetings** 110:6
166:14 168:6
202:12
**member** 11:23
42:14,16,17
43:4,8,11,13
43:15,16,17
43:20 44:4,7
44:17 45:4
74:9 75:8
91:19 93:6
105:17 169:10
208:2 209:2,4
209:5
**members** 60:13
73:14,20 74:7
75:3 102:7
106:15 155:8
198:15 205:7
205:11 207:2
210:5 220:22
221:10 225:4
**membership**

44:12 191:19
**memo** 86:1
89:6,12 90:1,2
**memorandum**
206:4
**memory** 34:3,9
34:14
**mention** 37:7
**mentioned** 29:2
98:13 157:15
225:14
**Meredith** 66:2
**messages** 141:9
**messaging**
140:1 192:1
**Michael** 11:17
**mid** 46:17,19
47:15 48:4
**MIDDLE** 1:2
**Mike** 46:6 51:8
65:5 94:1
153:5,20
**military** 81:9
144:11,12,18
149:18
**mind** 37:14
156:12 194:1
194:6,15
201:4
**mine** 88:12
**minute** 55:14
143:16,17
173:18
**mischaracter...**
178:8 201:19
213:5
**misconduct**
100:1
**misdemeanor**
100:12
**misspoke**
117:17
**mistaken**
174:19
**mobile** 139:22
139:23 191:23
**modified**
107:11 108:8

108:15 162:7
**moment** 34:4
**Monday** 47:3
48:22 49:2
**money** 44:14
45:4 77:18
94:20 155:14
**monitor** 152:11
152:16,18
**monitored**
152:22
**Montgomery**
26:23
**month** 50:18
**months** 53:4,6
68:10 86:23
144:13 149:19
208:7
**motorcycle**
94:12,13,16
95:16,19
97:13,14
101:6,22
102:4,8 105:3
105:11 109:3
109:17,20
110:1 111:23
154:12,21
155:7,16
156:11,13,23
156:23 157:3
157:6,10
159:9,19
164:23 165:5
165:15,21,23
166:2,11
167:11,12,19
168:15,16,21
168:22 169:3
169:4,8,11,13
170:5,10,15
170:21 171:7
171:17,23
172:11 173:14
173:21 174:2
174:6,7 175:3
187:12,13
188:22 189:7

190:12,18
194:11,19
196:17 197:16
197:17,23
198:3 201:14
201:17 204:22
207:23 210:5
212:5 216:12
220:18,22
221:10 224:9
224:16 225:3
225:4 226:9
226:10,19
227:2,9,15,21
228:3,11
229:2
**mouth** 204:8
**moved** 26:8
**Mullis** 122:22
123:1,8
129:13 130:3
132:22
**Multi** 42:18
44:5,8,13
**multiple** 205:8
205:12

———————
**N**
**N** 1:14 3:1 4:1
56:14 59:10
60:14,16,20
60:23 61:3
62:19 63:11
64:4,8 65:10
66:7,10,14,19
67:10,12,21
68:3,20 70:13
192:6
**name** 6:3 7:4
9:1,7,10 21:20
26:15 47:10
50:6 57:9 73:2
79:17 98:5
127:10 157:5
173:21 174:1
184:3
**named** 21:13
27:23 28:13

28:18 197:11
**names** 7:7
17:21 48:2
144:22
**national** 42:20
81:10 110:12
**nature** 18:14
**necessarily**
99:19
**necessary** 2:9
**need** 54:21
139:16 142:1
142:20 143:1
145:2 148:8
148:22 149:14
150:15 151:2
151:6,7
162:11 188:5
190:16 191:5
194:8 195:9
196:2 199:12
229:9
**needed** 137:22
151:10
**needs** 199:18
**neighborhood**
68:16
**neither** 231:13
**never** 28:16
31:21 36:21
53:17 60:22
62:12 77:8,23
97:5 102:4
109:5 124:2
135:4 136:13
147:18,22
150:17 154:19
154:23 157:15
159:7 176:10
184:12 186:23
203:17 206:18
207:4 209:12
**new** 110:7
112:3 124:2,8
125:6 136:17
**Nick** 47:3 48:22
**nicknames** 7:6
**night** 212:5

215:17 216:5
217:22
**night's** 221:1
**nit-picked** 86:7
**nit-picking**
87:20
**nodding** 24:3
89:16
**North** 3:12
50:22
**Notary** 5:3
231:21
**notes** 91:6
**notice** 2:18
**noticed** 214:10
**notified** 10:17
**November** 25:4
**number** 29:21
30:6 31:7,9
53:4 82:3
128:10 140:6
140:7,10,16
141:3,13
147:1 150:7
160:16 166:15
184:20 192:18
**numbers** 150:3
150:5
**numerous**
20:10 30:2

———————
**O**
**O** 1:14 108:21
109:4,7,14,14
110:9 111:2
111:10
**O's** 110:3
188:21 189:7
190:17 195:15
229:12
**oath** 34:16
118:6
**Object** 22:16
23:3 25:13,19
26:4,13,18
27:4,11,18
28:10 30:3
32:1,6 34:5,12

35:18 39:17
41:2,12 52:2
53:9 54:23
55:8 56:16
57:13 58:11
58:17 59:1,22
64:5,16 65:11
67:13,21 69:1
70:1 73:7,22
75:5 76:1 77:5
78:3 79:21
80:4 81:15,19
84:14 85:21
86:21 87:4,12
88:16 90:15
91:13,21 92:9
93:2,8,16 94:4
96:4,10 98:20
100:8,13,18
102:1,14
103:12 106:5
107:16 108:5
108:9,18
109:8 110:16
111:4,11,18
112:1,21
113:6,19
114:1,15,23
115:13 116:6
116:23 118:9
118:19 119:9
119:15 120:6
121:19 122:3
122:12 123:4
123:13 124:5
124:14,20
125:2,16
126:16,23
127:8,16
128:12 129:1
129:15 130:18
131:1,10
132:3 133:4
134:6,9,18
135:2,14,21
136:20 137:5
137:19 138:4
142:15 144:6

| | | | | |
|---|---|---|---|---|
| 146:15 147:6 | 130:8 142:10 | 209:7 219:2,2 | **opinion** 115:15 | 228:3,11 |
| 147:20 148:1 | 201:18 | 223:18 | 116:4,17,21 | 229:2,13 |
| 148:10,13 | **objections** 2:10 | **officer's** 73:2 | 118:1 148:9 | **Outcast's** |
| 149:2,7 | 2:13 | **officers** 10:18 | 162:21 | 169:15 |
| 150:12,23 | **obtain** 81:12 | 41:6 42:22 | **oral** 5:12 | **outcome** 9:22 |
| 151:11 152:3 | **obviously** | 43:18 114:5 | **order** 14:21 | 11:12 67:6 |
| 152:14 153:1 | 143:20 | 114:20 144:5 | 15:11 26:8 | 90:21 |
| 154:16 159:10 | **occasion** 144:9 | 144:23 146:23 | 36:10 137:18 | **outlaw** 154:11 |
| 161:14,19 | **occasions** 93:18 | 152:1,6 | 140:18 172:5 | 155:15 156:23 |
| 162:2,8,14,22 | 120:11,14 | 181:21 205:10 | 191:16,20 | 157:3,6 166:1 |
| 163:7,16 | 155:20 198:20 | 214:2 216:2 | 192:3,5,7 | 197:23 |
| 164:16,19 | 205:6 206:22 | **officers'** 97:9 | **organization** | **outside** 92:20 |
| 165:2,16 | 209:8 227:6 | 142:19 144:15 | 97:4,10 | 93:5 97:10 |
| 167:13 168:1 | 227:21 | 148:21 149:20 | **organizations** | 226:10 |
| 168:11,18 | **occur** 50:17 | **offices** 1:21 5:8 | 42:15 75:12 | **owe** 77:18 |
| 169:23 171:8 | 63:3 70:5,15 | **official** 210:13 | 191:19 | **owns** 76:6 |
| 171:13 172:22 | **occurred** 55:6 | **Oh** 14:10 48:3 | **Outcast** 101:6 | |
| 173:5 174:16 | 70:5 71:9 | 56:15 132:12 | 104:15 105:8 | **P** |
| 175:9,19 | 101:6 212:4 | 193:11 | 105:11,12 | **P** 1:14 3:1,1 |
| 176:6,12,15 | 215:17 216:4 | **okay** 6:12,19 | 109:7,17,20 | **P.C** 1:21 5:9 |
| 178:7 179:15 | 216:12 217:22 | 7:2 12:14 17:7 | 110:4,10 | **page** 4:2 155:21 |
| 179:22 181:8 | 218:19 | 20:11,22 | 111:22 154:20 | 220:5 |
| 182:2 183:11 | **occurrence** | 23:19 48:3,6 | 157:7,10 | **pages** 164:10 |
| 183:19 184:23 | 115:3 | 48:10 49:15 | 159:8,13,19 | 164:13 |
| 185:14 186:1 | **October** 83:18 | 60:8 61:8 | 163:15 164:15 | **paid** 22:23 |
| 186:18 187:15 | 83:23 | 66:11 99:4 | 164:23 165:5 | 92:11 |
| 187:18 188:10 | **odd** 162:11 | 104:20 112:12 | 165:15 166:5 | **Pantry** 75:17 |
| 188:17 189:1 | **off-duty** 153:18 | 115:20 145:23 | 166:10 167:12 | 76:15 |
| 190:20 191:9 | **offense** 223:21 | 146:10 159:18 | 167:17,20,22 | **Pantry's** 76:7 |
| 193:4,14 | **offensive** | 167:4 189:4 | 168:10 169:18 | **paper** 164:8,12 |
| 194:21 195:5 | 141:10 | 190:9 194:4 | 172:6,6,11 | **Paragraph** |
| 195:11,17 | **offered** 2:15 | 196:18,19 | 173:3,3,14 | 191:17,19 |
| 198:17 202:22 | **office** 26:22 | 197:4 202:6 | 187:11,13 | 192:2,4,6,9 |
| 203:19 205:1 | 27:2,8 125:10 | 204:16 205:19 | 188:22 189:7 | **Parrish** 37:3 |
| 207:7 211:18 | **officer** 10:18,20 | 208:20 212:22 | 190:11,18 | 38:14 39:11 |
| 212:6,14,19 | 11:1,4 12:17 | 222:19 223:11 | 194:10,19 | 48:23 49:3 |
| 213:4 214:11 | 14:18 17:2 | 223:11 228:14 | 195:16 196:17 | 50:6 82:13 |
| 214:18 215:3 | 29:3 45:12 | **old** 113:2 | 197:16 198:1 | 86:7 87:20 |
| 215:9,18 | 69:12,14,18 | **OMC** 160:2,4 | 198:15 201:14 | 88:1,5 96:22 |
| 216:14,19 | 69:19,21 | 198:4 | 202:14 204:22 | 98:17 150:6 |
| 217:23 219:3 | 70:21 71:12 | **OMCs** 163:20 | 205:7,8,11,12 | **Parrish's** 88:9 |
| 220:11 221:3 | 71:21 72:19 | 165:8 166:22 | 207:23 208:8 | 88:13 |
| 222:14 223:4 | 72:21,22 | **once** 11:10 81:4 | 209:5 210:5 | **part** 44:9 88:3 |
| 223:22 224:11 | 114:12,14,17 | 117:21 169:17 | 212:4 216:12 | 148:16 162:17 |
| 224:19 225:10 | 115:8,11 | 185:2 | 220:18,22 | 174:18 189:18 |
| 227:3,16 | 117:11,19 | **one-time** 142:6 | 221:10 226:8 | **particular** |
| 228:4 229:19 | 176:20 191:18 | **ones** 100:2,3 | 226:18 227:1 | 19:19 144:10 |
| **Objection** | 207:1 208:4 | **ongoing** 67:3 | 227:9,15,20 | 144:15 154:14 |

191:1 223:20
223:21
**partied** 226:18
**parties** 1:17
2:13 8:13
17:21 202:11
202:13 209:9
209:11,15
231:15
**party** 24:6,9,17
27:23 207:22
227:9
**partying**
198:11,15
201:13,21
202:2 227:1
**passes** 99:15
**patch** 172:7,20
173:4,7,8,15
**patches** 172:12
**patrol** 47:20
88:6,6
**pay** 44:16
**Peace** 42:22
43:18
**pending** 6:23
10:15 12:19
21:7,9
**people** 37:12
41:5 128:20
144:11 147:2
166:15 196:11
198:7,10
202:19 203:1
203:3 218:3,8
225:6
**percent** 107:5
198:2 225:2,4
**percenter**
104:13 155:17
**perfectly**
199:20
**performed**
123:10 133:9
216:1
**performing**
155:11
**period** 182:10

**permission**
154:12 182:20
**person** 20:6
37:13 50:23
51:3 117:22
123:2 128:19
128:22 139:20
141:11 224:8
**personal** 8:18
19:11,18 24:1
73:14,16
139:17 142:19
144:4,15
145:1,12
147:15 148:21
149:20 195:9
229:8
**personally**
39:14 60:22
177:21 225:18
**personnel** 23:6
23:7,16,16
59:19 73:15
73:18,21 74:6
74:9,22 75:4,9
80:16,21 81:8
81:12 93:7
136:16 188:4
188:16 190:14
**pertains** 190:7
**phone** 27:17
96:1,18 119:7
119:14,18
120:4,9,10,12
120:14,20
121:1,18
122:8,17
123:10,16,18
123:22 124:2
124:8,23
125:9 127:2
128:2,6,8,10
128:15,19,21
129:8,10
130:6,11,14
131:4,6,15,19
132:2 133:10
133:13,22

134:4,14,17
135:1,5,7,11
135:12,17,19
135:20 136:11
136:13,14,17
142:7 150:3,5
150:7 228:17
**phones** 124:9
125:6,6,9
**phrase** 116:7
**picture** 125:22
126:3,4,9
**piece** 164:8,12
**Pigs** 98:8 174:4
176:10
**placing** 153:22
**plaintiff** 1:8 3:3
8:23 9:14
17:13,15,23
23:8 24:16
**plaintiff's** 9:7
9:10 21:19
**plausible** 221:9
221:12,21
**play** 178:5,9
179:4
**played** 93:14
**PLAZA** 3:11
**please** 6:9,13
7:3 44:2 57:16
112:17 120:17
140:2 145:15
145:23 181:13
192:14 201:6
**point** 51:22
52:11 104:11
114:10 169:18
**points** 51:16,17
51:19 52:12
**police** 7:11 8:21
9:5 10:11,11
13:21 14:9
17:2,9 26:2
27:3 28:5,9
29:4 30:21
40:15,19
42:20 43:18
45:12 46:1

54:7,11,16
56:4 59:5
60:13 61:6,9
61:12 62:16
62:19 63:17
63:20 65:15
71:1,5,7 72:1
73:3 75:23
76:10,16,22
78:22 79:10
79:19 80:1,16
80:23 82:7
83:2 84:10
91:9,20 93:19
93:21 94:10
94:19 95:3,8
97:8 113:4,17
114:5,20
141:7 143:6
146:14 150:21
152:1,6
169:22 176:9
180:15 181:5
182:16,19
196:15 203:4
204:17 207:1
208:4 215:6
215:15 216:11
223:18
**policies** 142:14
153:15 192:20
193:3,13
195:22
**policy** 51:9,11
51:13 59:21
92:1 103:7
115:5,22
118:3 139:9
139:21 140:4
140:14,16,23
141:17 150:14
150:21 151:5
151:8,20
214:15,20
**populated**
131:7,15,18
**porn** 119:17,19
120:10,11

126:15 127:6
130:16 133:2
133:11,20
138:13 139:6
140:21
**pornographic**
125:19 126:18
126:22 130:21
137:10
**pornography**
119:6,8,13
129:9
**portion** 103:4
139:10
**position** 7:9
45:10 109:19
110:3 111:9
111:22 180:5
180:17,20
188:21 189:7
190:17 195:15
**positions** 111:9
**positive** 82:18
**possession**
111:1 128:10
**possibility** 85:5
89:7 90:2
110:7 127:19
131:20 179:13
211:15
**possible** 32:4
123:17,19
127:22 131:5
131:15 178:20
178:22 211:13
218:22 221:14
224:14,21,23
**potentially**
89:20
**Powell** 46:12
47:21 48:6,7
48:19 49:11
69:7 71:23
72:5
**practice** 116:3
116:5
**preceding**
85:10,15

**precise** 200:10
200:20
**precisely**
197:13
**prepared**
158:10 200:2
**present** 3:15
42:16 105:18
155:12
**preserve**
134:23
**president**
109:16 110:10
110:12
**pretty** 220:1
225:5
**previous** 41:23
131:8 217:9
220:23
**previously**
192:17
**prior** 2:16 6:23
12:10 36:9
49:15,17 50:1
52:13 53:1
54:16 81:8
124:3 131:14
143:14 144:14
147:8 149:12
224:15
**Private** 192:9
**privy** 38:12
91:4
**probable**
123:20
**probably** 10:3
18:20 30:5
33:13 50:18
69:16 71:19
88:20 94:8
145:10 180:12
**probationary**
105:17 106:14
**Procedure** 5:6
**Procedures**
192:7
**proceed** 166:9
**proceedings**

5:13
**process** 40:16
165:12 221:23
**produce** 135:20
**produced**
135:18,19
160:22 161:1
192:17
**professional**
42:15 192:5
**program**
138:17,18,22
182:8
**prohibited**
141:12
**prohibiting**
150:10
**prohibits** 92:2
**promoted** 11:5
45:13,15,17
45:19,22 47:5
**proof** 129:4
**propensity**
183:5,6
**properly** 186:9
**protective**
36:10
**prove** 119:12
128:22 129:3
130:22
**proved** 120:3
**proven** 119:7
140:8,8
**proves** 123:10
133:19
**provide** 78:12
78:16 80:16
80:20 144:4
**provided** 5:5
159:1,4 163:2
183:23
**provision** 140:3
**public** 5:3
210:13 231:21
**pull** 51:2
**pulled** 13:4
50:23
**purchased**

92:16
**purposes** 160:1
193:23
**put** 93:20,22
143:17 177:7
196:6,21
204:7
**putting** 166:20

**Q**

**quarter** 99:2
**question** 6:8,22
17:6 28:22
30:16 48:3
49:13 66:12
79:3,6 96:12
101:1 102:17
106:20 111:2
111:20 116:11
117:10 118:21
122:6 129:12
132:21 135:15
136:10,12
139:13 162:9
173:1 176:14
181:12 186:20
193:10 199:17
199:19 200:13
200:16,22
201:8 214:12
217:16 222:20
226:22 228:13
**questioned**
41:21 204:4
220:21
**questioning**
36:5 214:6,16
217:13 218:16
**questions** 2:11
2:12 6:5,14
36:12,14
48:15 132:18
132:20 181:15
**quit** 170:14
**quite** 44:10
46:20 47:4,6
151:23

**quote** 226:3

**R**

**R** 3:1 231:1
**race** 9:15 36:16
36:18,22 37:2
37:7,15,19
38:3,8 39:22
40:2,3,6,14
41:11 55:18
55:20,21 56:5
57:6 82:3
83:19,20
84:22 85:20
**races** 82:4
**Racial** 42:18
44:5,8,13
**raise** 155:13
**rank** 11:2,19,20
11:21 45:14
54:14,17,20
71:8
**Raphael** 209:23
**Rarely** 77:9
**RC** 160:3
**read** 12:7,8
98:4 139:11
139:12 140:4
140:6,19
141:3,12,18
163:23 177:3
177:18 189:18
192:19 199:23
221:6
**reading** 2:3
120:15 160:8
192:10 205:14
**ready** 99:6
**realize** 51:3
225:21
**really** 15:6
129:5 216:21
218:2
**ReaMonica**
56:8
**reason** 34:1,9
106:23 115:21
128:1 139:2

148:23 149:12
149:16 151:21
155:6 185:4,7
187:21 188:15
189:16 191:7
194:1,20,23
195:1,4,10,16
200:17 224:3
229:17
**reasons** 149:23
156:9 187:4,8
187:17 189:10
189:12,16,20
189:22 190:4
190:19 193:1
194:3 200:9
200:10,20
228:9 229:15
**recall** 16:2 22:9
29:15,20 30:9
32:3,8 33:4,9
33:10,14,22
34:16 35:2,5,9
35:10 39:23
44:20 52:20
53:14,20
54:17,18 56:2
56:7 63:1,22
64:18 65:13
68:1,4 69:20
70:16,22
71:21 73:5,10
81:6 82:16
86:2,5 87:18
95:17 114:19
118:15 120:1
120:21 136:18
146:22 147:1
173:23 221:5
**recap** 187:6
**receive** 65:9
82:19 94:20
96:9,14 99:17
100:3 121:14
**received** 52:10
53:16 54:15
69:8 72:10
85:3 89:5,5

97:5 109:6
121:1 122:15
125:8 128:15
169:14 185:9
185:17,19
186:23 226:12
**receiving** 85:4
95:18 110:9
154:12
**recess** 99:7
**recognition**
39:1
**recommend**
15:12
**recommenda...**
22:20 23:10
60:3
**record** 7:4 36:1
64:15 126:2
139:10 192:16
211:6,6,12
219:8 223:16
**recorded** 64:19
108:14 161:11
**recording**
161:7,10,13
161:18,23
163:5
**records** 123:9
183:10 211:9
211:14
**refer** 199:18
**referred** 199:17
**referring** 41:7
83:13,14,21
112:10 113:14
160:5,11
**reflect** 219:9
**regard** 16:3
21:23 22:2,4
57:18,22
197:14 226:7
**regarding** 16:4
27:22 31:17
35:1,14 40:6
95:23 110:6
132:22 178:17
197:19 204:1

**REGIONS/H...**
3:11
**regular** 198:16
201:13 219:2
**related** 40:23
41:22 217:21
220:23 228:8
**relates** 138:13
**relating** 2:6
80:22
**relation** 86:13
86:15 231:14
**relationship**
179:3
**relationships**
166:22
**relaying** 63:13
64:7
**reliability**
212:12
**relied** 103:10
200:23
**relying** 146:12
201:1
**remember** 9:1
9:6,9 13:18
15:6,23 16:8
17:20 20:13
21:21 28:2
31:1,2,4,8,12
31:16 32:16
33:16 34:20
35:12,16 37:9
43:9 45:1,3
46:22 48:1
49:2,7,18
52:15 54:2,3
55:4 56:11
57:7 58:7 60:1
63:16 64:10
64:22 73:2
81:7 85:3,23
86:8 87:14,21
87:22 88:2,4
95:18 111:6
111:13,15
138:6,7,9
150:8 153:7

157:18 172:1
172:17 174:11
178:18 179:8
184:3,19
199:6,9 214:7
214:14 219:21
221:7 226:4,5
**removing** 88:5
**repeat** 6:10
96:12 104:21
**rephrase** 6:10
49:12 57:16
66:11 102:17
154:18 189:3
201:8 217:16
**report** 15:17
66:1 69:11
91:7,15 98:4
121:9,10,11
122:14,19
128:4 144:13
145:4,5,6
146:9 149:18
163:23 188:13
192:13
**reported** 49:20
50:3,4
**Reporter** 5:2
5:17,20 201:5
**reporting** 81:13
81:18
**reports** 75:22
91:16
**represent** 6:4
125:5
**representative**
25:17 26:1,16
100:7
**represents**
231:10
**repute** 113:17
**request** 72:16
95:22 136:6,7
144:20 171:11
171:16 179:19
181:18 182:6
183:16
**requested**

135:17 139:10
**requesting**
154:20
**require** 166:5
**required** 141:7
173:10
**requires** 166:2
166:11
**resent** 29:13,16
**reserves** 81:9
**resign** 14:6,13
59:7
**resigned** 14:10
**resolved** 19:8
**respect** 37:11
**respective** 1:18
**response** 136:6
**result** 13:15
14:2,19 15:13
25:11,23
31:19 52:8
57:2 65:9
70:20 73:6,11
94:20 203:14
215:16 216:11
231:16
**retaliation** 83:8
84:5
**retire** 59:10
**retired** 59:8
62:12,17
65:20
**retrieved**
127:12
**reveal** 115:18
**revealed** 139:19
**review** 38:19
39:8,9 77:8,11
171:2,9
177:23 213:2
213:7,17
**reviewed** 147:8
171:21
**revoke** 143:11
**revoked** 147:18
147:22
**RHONDA** 1:19
5:1 231:19

**Ricky** 78:13
**ride** 94:17,21
95:1,12
154:13 155:13
169:14 224:16
**Riders** 110:12
**rides** 94:11
155:11 224:9
227:12,22
**riding** 94:15
159:23 165:22
169:16 169:6
**right** 20:2 45:5
86:19 87:1
98:23 120:1
132:16 139:17
140:5 142:2
143:1 150:8
151:6 161:12
164:22 165:7
166:9,13
191:20 199:10
202:1 225:17
228:18
**ring** 177:6
**Rob** 66:2
**Robert** 211:8
**Rocky** 208:3
**role** 54:7,10
91:8 176:19
178:5,9 179:4
**rotate** 74:14
**rule** 52:4
**rules** 2:6 5:6
**run** 99:21
155:13 223:18
224:2,7

---

**S**

**S** 1:14,14 3:1
4:11
**s/Rhonda**
231:18
**safe** 155:8
**Saint** 50:22
**SAITH** 230:1
**sale** 210:13
**saw** 16:23

207:22 208:7
213:9,23
214:7 225:16
**saying** 60:8,10
60:11 64:15
65:9 85:5
109:3 132:9
132:15 133:18
150:16 155:22
197:7 213:6
215:22
**says** 83:18
103:5 105:10
105:12 120:9
150:14 151:5
161:16 167:11
167:16 205:5
**scene** 15:16
**Schmitz** 92:21
**Schmitz's** 92:16
**Schumacher**
61:23 62:3,7,8
65:23 66:12
68:18
**Scratch** 90:20
226:15
**screen** 127:20
142:21
**scrutinized**
88:1
**secret** 150:20
**Section** 191:17
191:18 192:2
192:4,6,8
**see** 40:12 64:3
81:7 83:16
91:6,6 109:4
112:16 113:23
120:16 125:23
132:6 140:2
140:12 145:15
145:23 192:14
224:23
**seeing** 172:1
**seeking** 165:20
**seen** 205:6
206:16,18,20
208:5 209:9

209:12 210:16
**seminars**
186:13
**sense** 79:18
151:9,20
**sent** 89:11,23
90:1 137:16
**separate** 51:12
**September** 45:9
83:12 206:4,6
**sergeant** 11:22
45:17 69:9
121:12,15
137:15,16,21
153:5 205:17
208:21 226:11
**series** 6:5 110:6
**seriously** 215:1
**serve** 189:12
**service** 144:11
144:19 149:18
**serviced** 136:6
**services** 47:19
63:8
**set** 58:3
**settled** 10:14
12:20
**seven** 18:20
**sexually** 141:9
**shaking** 6:15
43:22
**share** 217:12
**Shawndell**
77:12
**Sheriff's** 14:12
**Sherrer** 1:21
5:9
**Shirley** 75:8,12
75:16 78:9
**Shirley's** 76:5
77:17,23
**Short** 55:16
112:8 173:19
**show** 103:3
120:13 123:2
129:8,19
132:19 145:10
184:14

**showed** 102:11
133:10 142:18
182:9 184:15
**showing** 128:3
145:9
**shows** 159:15
166:21 167:5
167:17
**shutdown**
143:19
**sic** 11:18 208:3
210:11
**signature** 2:2
**simple** 141:8
196:5
**Sin** 110:10
**single** 224:8
**singled** 37:1
**singling** 37:22
**sir** 142:3
**siren** 13:13
**sit** 199:23
**site** 120:11,14
125:15,18
126:15 127:7
127:10 128:9
130:16,17,17
130:20 131:13
133:2,11,20
139:6 140:22
**sites** 119:17,19
120:10 127:4
**sitting** 34:15
107:13 111:16
118:5 125:21
132:10 147:3
147:10
**situation** 69:5
211:23
**six** 141:14
181:2
**skin** 21:2,4,5
27:22 28:15
**sloughing** 21:6
**smart** 125:9
**Smith** 74:2,3,5
75:2 103:5
121:12 137:16

158:13 180:2
180:3 205:17
208:22 226:11
**Smith's** 166:20
**smoke** 206:18
209:12
**smoked** 206:18
209:11
**snitch** 221:2
**software**
138:17,18,20
138:21 153:9
153:11 184:1
184:5,6,8
**somebody**
63:13,20 64:8
78:21 79:19
161:5 218:14
224:16
**Sons** 96:22
**Sonya** 3:4 6:4
136:5
**Sorrelli** 153:6
153:13,20
**sorry** 19:17
89:18 104:18
**sounds** 82:5
**source** 139:19
**Southern** 1:3
25:18 26:1,3
26:16,21 27:2
27:16 95:23
96:14,17
100:6 125:5
**specific** 16:3
31:2 35:2
52:20 64:1
114:19 127:20
200:17 219:12
219:14 220:8
228:7
**specifically**
22:8 33:20
36:18 37:2
38:2 61:20
62:12 103:5
106:12 110:3
154:5 165:18

165:18,19
168:4,4 171:6
172:19 183:16
197:17 204:3
214:2 220:13
**specifics** 31:13
31:17 32:17
34:16,19
35:10 53:20
54:3
**specify** 19:16
**speculation**
215:4
**speeding** 19:4
20:1
**spell** 47:9
**spend** 94:2
**spoke** 39:11
**spoken** 218:4
**sponsored**
93:22
**spot** 51:2
**squad** 15:1
**Stamped**
192:17
**Standards**
192:6
**start** 20:22
32:13 45:6
46:15 61:8
99:5 160:2
**started** 21:6
159:23 160:8
**starting** 110:7
**state** 5:3 7:3
100:12 108:22
110:2 162:5
171:6 231:2
231:21
**stated** 84:19
105:4 117:13
189:6 205:5
205:10 206:15
206:22 208:4
208:6 209:3,5
209:7,10,13
226:17,23
**statement**

| | | | | |
|---|---|---|---|---|
| 104:19,21 | **sued** 8:17,20 | 111:7 112:23 | **Taiwan** 169:9 | 191:8 197:18 |
| 194:17 199:5 | 12:18 19:10 | 114:9 118:11 | 169:18 170:4 | 201:15 227:13 |
| **STATES** 1:1 | 19:18 20:20 | 121:18,23 | 170:8,12 | **terminated** |
| **statical** 80:17 | 21:3,10 24:1 | 122:5 126:13 | **take** 6:17,20 | 14:1,4 65:21 |
| 80:20 | 29:3 | 130:15 147:4 | 44:3 55:13 | 73:6 143:14 |
| **stating** 178:4 | **suit** 27:22 | 157:14 218:12 | 112:5,7 136:8 | 187:5,8 |
| **station** 203:14 | **summarize** | 218:13 219:23 | 136:9 151:19 | 189:17,21 |
| 204:17 215:7 | 130:10 | 220:1,3,4 | 173:17 178:12 | 190:5 194:1,6 |
| 215:16 216:11 | **Summarizing** | 222:5,6,9,13 | 186:15 199:13 | 200:10 |
| **status** 108:22 | 145:7 | 222:21 225:9 | 211:23 223:7 | **terminating** |
| 109:15 | **summary** | **surrounding** | **taken** 1:19 7:12 | 147:8 156:9 |
| **stenotype** 231:7 | 145:19,22 | 9:3 178:2 | 127:21 166:23 | 229:17 |
| **STEPHANIE** | 146:2,3,4,6 | 211:22 | 203:13,16 | **termination** |
| 3:10 | 205:15,16,23 | **Susan** 180:2,2,3 | 231:6 | 74:19 78:17 |
| **steps** 165:22 | 206:3 208:21 | 180:18 | **talked** 204:10 | 85:11,16 |
| **Steve** 48:22 | **supervise** 65:1 | **suspect** 203:18 | 204:13 | 86:13,16 |
| 86:7 87:19 | 92:13 | 203:22 214:16 | **talking** 19:15 | 139:2 158:4 |
| 88:1,5,9,12 | **supervisor** | 223:20 | 49:23 61:5 | 175:16 185:4 |
| 96:22 98:17 | 15:10 46:3,4,8 | **suspects** 183:9 | 81:22 105:15 | 185:8,10,23 |
| **Stewart** 61:21 | 46:10,14,18 | 203:5 204:17 | 138:12 141:4 | 189:13,14 |
| 62:6,10 65:2,9 | 47:22 48:4,8 | 206:8 212:3,9 | 228:15,16 | 192:11 195:22 |
| 65:14,18 66:9 | 48:18 49:10 | 212:16 214:6 | **taught** 105:16 | 200:18 213:21 |
| 67:20 68:18 | 49:11 53:23 | 214:21 215:2 | 156:21 | 228:2,10 |
| 69:8,16 70:10 | 54:5 62:22 | 215:13 217:8 | **teaching** 106:14 | **territory** |
| 70:12 72:10 | 65:4 | 217:13,19 | **team** 93:20 | 169:15 |
| **Stewart's** | **supervisors** | 220:23 225:23 | **teams** 93:22 | **test** 41:7 |
| 115:12 | 49:16 | 226:13 | **tell** 29:13 33:16 | **testified** 5:18 |
| **STIPULATED** | **Supply** 74:2 | **suspend** 58:15 | 34:9 50:19 | 18:10 20:9 |
| 1:16 2:1,8,17 | **support** 173:2,8 | **suspended** | 53:13 54:4,20 | 123:1,8 |
| **stipulation** 5:7 | 185:10 199:4 | 51:19,20 | 74:15 87:8 | 124:18 129:14 |
| **stipulations** | 226:13 227:13 | 53:17 58:19 | 107:21 114:14 | 136:15 144:2 |
| 5:21 | 228:9 229:17 | 60:10 | 128:20 132:23 | 162:5 174:20 |
| **Stokes** 78:13 | **supporter** | **suspension** | 149:12 160:15 | 175:6 179:10 |
| **stop** 104:18 | 172:20 | 51:18 58:10 | 226:2 | 181:22 204:20 |
| 166:8 | **supporting** | 60:5 | **telling** 86:6 | **testify** 9:17 |
| **stopped** 45:3 | 193:17,19 | **suspicion** | 101:2 222:4 | 16:13 17:18 |
| 51:4 | **supports** | 216:17 | 222:23 | 34:3 36:1 |
| **stores** 75:17 | 185:22 194:15 | **sustains** 191:1 | **tells** 105:8 | 210:15 |
| **Street** 1:22 3:6 | **suppose** 52:5 | **sworn** 5:16 | 163:5 | **testifying** 17:8 |
| 5:9 50:22 | **sure** 9:13 10:1 | 69:14 115:3 | **ten** 15:5,22 | 17:12 132:13 |
| **struggling** | 14:14 28:21 | 116:19 | 29:19 30:6 | 132:15 160:14 |
| 44:14 | 29:12 36:4 | **system** 148:5 | 31:5,6,8,14 | 215:13,20 |
| **style** 125:8 | 41:7 44:10 | 152:12,21,23 | **terminals** | **testimony** 6:17 |
| **subject** 31:22 | 46:15,20,21 | **systems** 143:19 | 139:23 192:1 | 15:4 18:4,15 |
| **subpoenaed** | 47:4,6 81:3 | | **terminate** | 34:11 36:20 |
| 17:16 | 82:11 86:11 | **T** | 58:22 137:3 | 37:6 44:3 |
| **subset** 159:12 | 87:6 94:16 | **T** 1:14,14 4:11 | 146:13 156:2 | 77:22 91:9,17 |
| **subtopics** 197:1 | 98:1 107:6 | 231:1,1 | 157:21 165:13 | 164:18,21 |

170:3 178:8
179:16 181:9
183:13 196:10
200:9 201:19
213:5 225:15
231:11
**testing** 123:9
132:2,23
133:1,9,19
137:18
**Thank** 30:14
**thereto** 2:16
231:8
**thing** 40:17
166:12 197:8
228:19
**things** 155:23
165:20 166:1
191:6 196:21
197:5,10,11
198:7,9 199:8
227:19 228:7
**think** 10:2,2
18:16 20:3
25:2 38:23
40:12 44:9
47:5 50:7
63:19 83:5
95:2 99:1
109:22 131:16
150:4 151:16
162:9,10
185:16 212:10
212:18 214:9
215:1 218:5
**thinking** 221:20
**Thompson**
211:8
**thorough** 92:13
**thoroughness**
92:3
**thought** 37:3
49:13 165:11
201:22 216:8
221:1,23
**threatened**
170:13
**three** 18:6

46:22 49:10
63:5 135:15
155:19 177:6
182:10 183:22
208:7 209:8
**Throttle** 94:12
95:15 169:10
169:17 170:5
170:9,14,21
**ticket** 7:21 8:1
18:18 19:1,3,6
20:6 68:23
69:8,13,13,17
69:18 70:6,8,9
72:10,23
114:22 115:3
115:9,12
116:4,7,9,13
116:18,19,21
117:3,4,8,12
117:18,21
**tickets** 7:23
115:6
**Tim** 61:21 62:6
62:10 65:1,9
65:14,18 66:9
67:20 68:18
69:7,9,12,15
69:16 70:9,12
72:10 75:8
115:11 122:22
122:23 123:7
130:3 132:22
**time** 2:14,15
6:8 9:13 10:1
11:4 15:1,19
20:13 23:23
27:8,15 37:20
40:7,8,20
43:10,12
44:15 47:1,13
47:14 49:19
49:22 52:16
53:4 55:12,23
56:1 62:18
63:2 72:1
74:19,22 81:4
82:11,21,23

83:3,5 86:12
87:1 89:4
93:15 94:2,2
97:2 99:1
115:2,7 116:2
136:22 137:1
137:2 140:21
143:14,20
151:3,14,18
154:3 157:20
158:1,2,3
175:15 176:13
188:5 194:6
199:9,13
201:6 208:10
208:13,14,16
213:13,14,15
225:19 226:18
**times** 7:15
20:15 52:17
55:11 81:5
113:1 135:16
144:18 145:11
157:13 162:3
193:16 199:18
200:13,22
202:17,19,20
205:4 208:19
208:22 209:9
210:16
**Title** 85:6 86:3
89:7
**today** 34:15
36:4,21
111:17 118:5
147:3,10
**told** 18:7 31:10
69:14 84:7
89:14 122:20
125:4 128:22
130:1,2
131:21 155:4
160:7 170:17
175:23 189:11
189:22 200:22
206:23 219:7
225:22
**top** 150:20

**topic** 36:8
200:4
**topics** 36:3,6,11
196:22
**total** 52:12
**totality** 189:16
**Totally** 201:19
**tournament**
93:19,20
**town** 82:12,13
83:4,6
**track** 153:20
184:22
**tracked** 182:11
182:12 184:16
**tracking** 38:22
39:2,5,8
138:17,19,21
153:5,11,18
154:6 182:8
182:16,19
184:6,7 185:6
**traffic** 7:21,22
12:12 16:16
16:17 18:18
19:1 29:1
50:15 52:22
53:7 54:11
69:8,9
**training** 176:18
186:12,12
187:1
**transcribed**
161:6 231:8
**transcript**
160:12 161:3
205:20 231:11
**transcription**
167:10 231:9
**transcription...**
161:3
**transmitting**
141:6
**trial** 2:14 10:7
12:22 13:1
17:18 18:11
18:17,19
19:18

**tried** 31:11
**Triple** 119:20
122:15 125:14
127:11 187:22
190:13 195:3
229:4
**Tripp** 10:20
**trooper's** 115:4
115:4
**troopers** 115:6
**true** 24:10
25:10,16,22
27:1,7,14
56:12 68:22
77:16 81:11
94:9 104:12
142:22 168:14
178:16 183:8
224:5 231:10
**Truitt** 169:10
170:9,13
209:7
**trust** 92:12
196:11
**truth** 222:4
**truthful** 222:22
**Truthfulness**
103:8 192:4
**trying** 49:16
150:3,4,5,6
164:4 165:11
169:19 196:23
197:8 204:7
**turned** 115:9
**turning** 50:21
**twenty-eight**
146:13
**twice** 204:23
208:1
**two** 7:22 9:11
12:12 28:23
44:22 56:10
68:14 74:13
93:21 120:11
120:14 129:23
130:1,2 141:1
141:2 144:13
149:19 167:18

182:10 198:20
202:18 203:6
203:8 207:19
211:6 217:4,5
218:6 227:5
227:21
**type** 34:22
81:13 82:4
**types** 81:12
**Tyrus** 208:3,14
209:23 210:23
211:10

_____

**U**

**U** 1:14
**uh-huh** 6:16
208:17
**ultimately** 77:2
77:7
**unauthentica...**
108:13 161:9
163:5 167:9
167:10
**unauthorized**
139:19
**Unbecoming**
191:18
**unbenounced**
137:16
**uncover** 119:6
148:19
**undergone**
176:19
**underlies**
197:18
**underlying**
139:2
**understand** 6:9
49:16 122:5
146:11 187:7
193:8,21,22
194:5,13,16
196:18,19
197:23 198:1
198:2,3 200:8
200:19,20
228:13
**understanding**

156:8,12
160:18 169:16
**unfairly** 88:1
**unfounded**
11:14 39:16
91:1
**unh-unh** 6:16
**United** 1:1 95:1
95:5,7
**unlawful** 9:5
**unlicensed**
210:13
**untruthful**
103:6
**unvalidated**
163:4
**unverified**
167:1
**updates** 178:10
**ups** 50:11 53:21
**use** 13:6,8 52:6
52:7 60:20,23
61:3 67:10,20
68:20 116:7
152:21,22
**uses** 141:7
**Usual** 5:20

_____

**V**

**vague** 191:4
200:15,16
**Valeska** 226:1
**VanHaus** 180:2
**VanHaus's**
180:4
**vehicle** 92:16
153:23
**vehicles** 182:11
182:17,19
184:16,22
**verification**
154:13
**verified** 121:2,3
**verify** 12:3 90:3
90:10 91:2,10
92:7 120:23
176:23 177:16
177:21

**verifying** 92:2
**versus** 151:13
**veteran** 146:14
**Veterans** 96:23
**video** 12:9
213:23 226:5
**videos** 103:22
103:23 104:2
213:18 215:23
**view** 127:20
**viewed** 113:16
126:21 127:15
130:23 131:3
131:4
**viewing** 141:5
**violated** 153:14
192:21
**violation** 51:10
51:11,13 54:4
59:21 139:8
140:10,23
141:17 142:13
191:16 193:2
193:13 195:21
**violence** 183:5
**virtue** 187:12
**visit** 140:21
141:16,22
142:6
**visited** 127:4
142:18
**visiting** 149:20
183:3 187:22
190:12 195:2
198:6 219:18
229:4
**visits** 144:14
**void** 115:6
**voided** 69:18
70:6,8 117:21
**voiding** 115:11
**vs** 1:9

_____

**W**

**W** 1:20 5:1
231:18,19
**wait** 17:5
129:11

**waiting** 79:7
**waived** 2:4,19
**want** 23:14
28:21 36:8
86:20 96:15
98:6,7 135:18
136:7 146:10
146:17 156:11
165:13 196:5
200:8 201:1
201:11,20
202:8
**wanted** 51:1
72:9 150:2
221:17 223:1
**Ward** 69:10,12
69:15
**wasn't** 48:13
58:10 65:21
79:16 109:11
110:18 115:12
169:21 170:17
215:20
**watch** 212:22
**watched** 131:17
213:10 215:23
**Watson** 98:14
**Watson's** 97:12
98:8 169:2
174:2
**way** 29:22
40:22 41:19
54:4,19 58:2
90:12 95:1,5,7
107:11,15,23
113:8 114:7
117:9,13
128:22 129:3
172:13 221:22
222:8
**We'll** 99:4
**we're** 99:5
136:1 228:16
**we've** 136:5
141:4 187:4
187:10
**wear** 172:6,11
172:21 173:3

**wearing** 204:19
214:5,16
**website** 120:4
121:6 122:2
122:10 123:3
123:12 126:20
127:13 128:14
128:23 139:5
140:9 141:16
141:22 142:7
**weeks** 67:19
68:8
**Wendell** 209:3
209:19,20
211:4
**went** 12:23
69:18 82:19
95:2 144:10
144:23 145:11
156:14,15
157:13 158:4
193:1 196:8
202:15
**weren't** 24:18
40:19 57:21
123:16 216:6
**Wes** 56:20 57:8
57:23 58:14
61:3 62:15
63:7 68:17
**West** 1:21 5:9
46:6 51:8 65:5
94:1
**whatsoever**
35:17 55:5
**white** 9:15,16
37:12 98:10
98:15
**Willard** 77:12
**Williams** 211:8
**Willie** 205:3
206:11 207:10
208:20 210:22
**witness** 2:3
5:11,16 8:4
16:12,21 17:7
20:5 24:3 28:3
28:17 36:2,3

Gregory Benton

43:22 60:7
83:17 89:16
112:18 115:19
120:15 126:1
192:15 199:15
200:4 231:12
**witnesses** 217:7
220:21 221:9
227:23
**witnessing**
220:16
**woman** 125:11
**Woodruff**
98:10
**Woodruff's**
97:13 168:15
173:21
**word** 56:14
59:10 60:14
60:17,21,23
61:3 62:19
63:11 64:4,8
64:13,15
65:10 66:7,10
66:14,19
67:11,12,21
68:3,20 70:13
183:9 186:15
**words** 41:1
116:10 119:11
131:12 148:4
204:7 224:1
227:9
**wore** 173:14
**work** 26:22
63:7 87:20
94:2 166:20
**worked** 15:2
27:8 71:1 74:1
74:4 180:14
181:4
**working** 14:8
45:7 71:21
179:2
**works** 14:11
73:3
**worried** 182:15
182:16,21,23

**wouldn't** 151:9
224:6 225:8
**wreck** 12:18
**write** 50:11,14
51:10 53:21
69:17
**written** 103:5
110:18
**wrong** 115:10
116:1,22
117:23 129:23
**wrote** 51:6
69:13 112:11

**X**

**X** 4:1,11 119:20
122:15 125:14
127:11 187:22
190:13 195:3
229:4

**Y**

**Yeah** 53:5
118:2 134:1
183:3 190:3
218:14 223:14
228:18,19
**year** 25:3 33:6
52:12 68:12
74:11 85:8
88:20 94:8
146:13
**years** 9:9,11,12
14:17 15:5,23
16:8 18:5,20
22:12 53:4,11
63:5 68:14,23
70:19 74:13
113:1 180:12
181:2 182:10
183:23
**years'** 186:4

**Z**

**0**

**000882** 206:1
**000887** 206:2
**001187** 160:20

**00162** 160:20
**00515** 192:18
**03-07-2017**
231:22

**1**

**1** 192:2,8,9
**1-A-8** 140:19
**1:14-CV-00592**
1:5
**10** 46:19 47:16
**100-41** 192:8
**100-50** 191:16
192:3
**12** 99:3
**12:30** 99:3,3
**121** 3:6
**13** 206:4
**13th** 45:9 46:1
46:9
**16th** 206:6,7
**1901** 3:12
**1986** 74:3
**1989** 45:9 74:3
**1994** 45:15
**1996** 45:17
**1999** 40:17 41:4
45:19 50:2

**2**

**2** 191:17
**200-30** 192:5
**200-40** 191:23
**200-42H** 140:19
**200-51** 191:20
**2000** 40:13,16
**2005** 40:16
**2007** 18:22
20:18
**2008** 18:22
45:22 46:16
48:8 49:17
50:1,2 71:20
**2009** 40:15
46:17,19
47:15 48:4
**2010** 44:9 46:1
46:9 48:5,9
**2011** 44:9

184:11
**2012** 43:5 44:10
82:20 184:12
**2013** 83:12,23
85:9 112:15
120:19 128:2
131:7 184:12
187:23 190:14
195:4 206:4,9
229:5
**2015** 1:23 25:1
**21st** 112:15
**2400** 3:11
**25th** 101:7,8
206:9
**26th** 1:23
**2nd** 210:12

**3**

**30(b)(6)** 36:2,3
36:9 200:3
**33** 192:4
**335** 1:21 5:9
**35203** 3:13
**35242** 3:7
**36301** 1:22 5:10
**38** 191:18

**4**

**4** 192:6
**40** 191:21,22
**4th** 83:23

**5**

**52** 113:1

**6**

**6** 192:2
**626** 125:9
**6TH** 3:12

**7**

**7** 4:3 85:6 86:3
89:8

**8**

**8** 140:6,7,11
141:3,19
192:4

**8th** 120:17,18
128:2 131:7
187:23 190:13
195:3 229:5

**9**

**9:30** 5:10