# EXHIBIT D

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2       MIDDLE DISTRICT OF ALABAMA
3          SOUTHERN DIVISION
4
5  CIVIL ACTION NO.: 1:14-CV-00592
6
7  IVAN "KEITH" GRAY,
8       Plaintiff,
9  vs.
10 CITY OF DOTHAN,
11      Defendant.
12
13
14    S T I P U L A T I O N S
15
16    IT IS STIPULATED AND AGREED by
17 and between the parties, through their
18 respective counsel that the deposition of
19 DARRYL MATHEWS, may be taken before RHONDA
20 W. HEAD, CCR, Commissioner, at the law
21 offices of SHERRER JONES, P.C., 335 West
22 Main Street, Dothan, Alabama 36301, on the
23 24th day of February, 2015.

Page 2

1       IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the
3  reading of the deposition by the witness
4  is waived, the deposition to have the same
5  force and effect as if full compliance had
6  with all laws and rules of Court relating
7  to the taking of depositions.
8       IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10 any objections to be made by counsel to
11 any questions except as to form or
12 leading questions, and that counsel for
13 the parties may make objections and
14 assign grounds at the time of trial
15 or at the time said deposition is offered
16 in evidence or prior thereto.
17      IT IS FURTHER STIPULATED AND
18 AGREED that the notice of filing of the
19 deposition by the Commissioner is waived.
20
21
22
23

Page 3

1       A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4  SONYA C. EDWARDS, ESQUIRE
5  EDWARDS LAW
6  121 EDENTON STREET
7  BIRMINGHAM, ALABAMA 35242
8
9  FOR THE DEFENDANT:
10 CHRIS M. MITCHELL, ESQUIRE
11 STEPHANIE MAYS, ESQUIRE
12 2400 REGIONS/HARBERT PLAZA
13 1901 6TH AVENUE NORTH
14 BIRMINGHAM, ALABAMA 35203
15
16 ALSO PRESENT:
17 DELVICK MCKAY
18
19
20
21
22
23

Page 4

1         I N D E X
2  EXAMINATION BY:            PAGE:
3  MS. EDWARDS:                  7
4  MR. MITCHELL:              185
5
6
7
8
9
10
11        E X H I B I T S
12              MARKED
13 PLAINTIFF'S EXHIBIT 1         26
14 PLAINTIFF'S EXHIBIT 2         70
15 PLAINTIFF'S EXHIBIT 3        139
16
17
18
19
20
21
22
23

---

Page 5

1    I, RHONDA W. HEAD, CCR, a Court
2  Reporter of Birmingham, Alabama, and
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify
5  that on this date, as provided by the
6  Alabama Rules of Civil Procedure and the
7  foregoing stipulation of counsel, there
8  came before me at the law offices of
9  Sherrer Jones, P.C., 335 West Main Street,
10 Dothan, Alabama 36301, beginning at 9:00
11 a.m., DARRYL MATHEWS, witness in the above
12 cause, for oral examination, whereupon the
13 following proceedings were had:
14
15       DARRYL MATHEWS,
16 the witness, having been first duly sworn
17 by the Court Reporter, was examined and
18 testified as follows:
19
20       THE COURT REPORTER:  Usual
21 stipulations?
22       MS. EDWARDS:  Yes, I guess,
23 except we reserve objections for summary

---

Page 6

1  judgment as well as trial.
2       MR. MITCHELL:  Yes.
3          EXAMINATION
4  BY MS. EDWARDS:
5       Q   Mr. Mathews, my name is
6  Sonya Edwards and I represent Keith Gray.
7  I believe we've had the opportunity to
8  meet one time before.  I appreciate you
9  being here.
10      A   Uh-huh.
11      Q   I'm going to ask you a
12 series of questions about this case, about
13 your background and your knowledge of the
14 case, and if at any time I ask you a
15 question that you do not understand, if
16 you could please just ask me to rephrase
17 and I'll be happy to reask the question
18 for you.
19      A   Okay.
20      Q   Now, if you could, please,
21 answer my questions out loud with a yes or
22 a no instead of a uh-huh or a unh-unh or a
23 shaking of your head, that way Ms. Head

---

Page 7

1  can take down your testimony more
2  accurately.
3       A   Okay.
4       Q   Now, we're going to take a
5  couple of breaks during the deposition,
6  and all I ask is that you answer any
7  question I have pending before I we take
8  that break.
9          Now, could you please state your
10 full name for the record?
11      A   Frederick,
12 F-r-e-d-e-r-i-c-k, Darryl, D-a-r-r-y-l,
13 Mathews, M-a-t-h-e-w-s.
14      Q   Do you go by any nicknames
15 or any other names?
16      A   Just Darryl.
17      Q   What is your position with
18 the City of Dothan.
19      A   My current position is EEO
20 with the City of Dothan.
21      Q   Have you ever taken a
22 deposition before?
23      A   No.

---

Page 8

1       Q   Have you ever been a party
2  to litigation?
3       A   No.
4       Q   Have you ever been arrested
5  for a crime?
6       A   No.
7       Q   Have you ever been a witness
8  to a case?
9       A   No.
10      Q   What did you do to prepare
11 for this deposition today?
12      A   I have the booklets that our
13 counsel provided to us, and I had two
14 deposition binders that I reviewed.
15      Q   And do you have those with
16 you today?
17      A   No, I do not.
18      Q   Can you tell me what sorts
19 of documents were in those binders?
20      A   Well, it was facts
21 concerning the case, information that I
22 would be addressing specifically.
23      Q   Were these on documents that

---

Page 9

1 were created and maintained by the City of
2 Dothan or were these documents that were
3 created by a third party?
4         A   The City of Dothan.
5         Q   Did you meet with your
6 counsel prior to today?  And I don't want
7 to know anything that you discussed with
8 them, but did you meet with them in person
9 or over the phone?
10        A   In person, yes.
11        Q   Was anyone else present at
12 that meeting?
13        A   The other employees as it
14 relates to the case.
15        Q   Which employees?
16        A   I can't name them by name.
17 I think Donny Smith.  The gentleman, those
18 that did the IE investigations.  I don't
19 have that information with me.
20        Q   Donny Smith.  Would it have
21 been Doug Magill?
22        A   Doug Magill, right.  I don't
23 know them that well.

Page 10

1         Q   What other employees were
2 there?
3         A   The chief of police.
4         Q   And who else?
5         A   Mr. McKay.  And there was
6 one other officer that I don't recall his
7 name.
8         Q   Is that officer a member of
9 management or what rank is that officer?
10        A   I'm not sure.
11        Q   How did that officer have
12 anything to do with your discussions?  Was
13 he part of the investigation?
14        A   Yes.
15        Q   Okay.  In what role?
16        A   With the information
17 regarding the text messages on his phone,
18 computer.
19        Q   Would that have been Tim
20 Mullins.
21        A   I'm not sure of the name.  I
22 haven't met him before.
23        Q   Other than Donny Smith, Doug

Page 11

1 Magill, Chief Benton, Delvick McKay and
2 the other individual whose name you can't
3 recall, was there anyone else who attended
4 these meetings?
5         A   No.
6         Q   Where were the meetings
7 held?
8         A   In the board room at the
9 city.
10        Q   At the city?
11        A   City Hall.
12        Q   City Hall.  So you reviewed
13 documents.  Do you remember what documents
14 specifically you reviewed?
15        A   That I would review?
16        Q   That you reviewed during
17 this meeting.
18        A   Yes.
19        Q   Okay.  What were they?
20        A   The EEO Policy, Affirmative
21 Action Plan, Consent Decree, tapings that
22 I did of Mr. Gray's investigation,
23 information a complaint that he had filed

Page 12

1 as a result of not meeting the minimum
2 qualifications for police chief.
3         Q   Do you remember when that
4 specific complaint was filed?
5         A   Pardon?
6         Q   Do you remember the date of
7 that specific complaint?
8         A   The complaint that he filed
9 with me?
10        Q   Yes.
11        A   My investigation is dated
12 September the 18th, but Mr. Gray didn't
13 officially file the complaint with me.
14            Do you want me to expound on
15 that?
16        Q   Yes, please.
17        A   Mr. Gray brought a Guardian
18 Tracking rebuttal to Mr. McKay to put in
19 his personnel file.  Mr. McKay basically
20 read the Guardian Tracking and his
21 rebuttal, and saw content in there that he
22 had the intent to file a Title 7
23 Complaint.  He immediately notified me and

Page 13

1  I ensued an investigation and notified all
2  parties.
3        Q    You said that was September
4  18th.
5        A    My report is dated September
6  18th, 2013.
7        Q    Do you mind if I see a copy
8  of that?
9            MR. MITCHELL:  Sure.
10       Q    Thank you.
11           MS. EDWARDS:  Go off the
12  record.
13           (Off the record.)
14           MS. EDWARDS:  We can go back
15  on.
16           MR. MITCHELL:  He may need
17  his documents back to testify.
18           MS. EDWARDS:  Oh, okay.
19  Certainly.  They are in the order they
20  were in when you gave them to me.
21       Q    (BY MS. EDWARDS:)  So we
22  were just discussing the documents that
23  you reviewed in preparation for your

Page 14

1  deposition today.  One of the documents
2  that you referred to was the September
3  18th, 2013 complaint made by Mr. Gray,
4  correct?
5        A    Yes.
6        Q    And you just showed me some
7  documents that related, I believe, to that
8  incident, as well as other complaints made
9  by Mr. Gray, correct?
10       A    Yes.
11       Q    Let's start with the
12  September 18th, 2013 complaint.  How was
13  that complaint made?
14       A    As I previously mentioned,
15  Mr. Gray brought a Guardian Tracking
16  rebuttal to Major Parrish, a Guardian
17  Tracking incident report, and from there,
18  Mr. McKay reviewed the document and found
19  content in it related to Mr. Gray's intent
20  to file a Title 7 Complaint.  He
21  immediately notified me and I ensued an
22  investigation and notified all parties.
23       Q    Did Mr. Gray speak to you

Page 15

1  directly about this complaint at any time?
2        A    After the fact.
3        Q    Is Guardian Tracking a
4  system used for complaints from police
5  officers?
6        A    It's my understanding that
7  it is used to track behavior and conduct
8  of officers, you know, for early warning
9  so they can address it.
10       Q    Including complaints of race
11  discrimination --
12       A    No.
13       Q    -- or harassment?
14       A    No.  No.
15       Q    Do you have a policy stating
16  that you cannot make a complaint using
17  Guardian Tracking system?
18       A    I personally don't.
19       Q    So to the extent he made the
20  complaint on Guardian Tracking, and it
21  came to the attention of Delvick McKay and
22  yourself, then it was a proper complaint.
23       A    Well, yes.  After we were

Page 16

1  put on notice, I did the investigation.
2        Q    So in other words, there is
3  nothing in the City of Dothan's policy
4  that would state that his filing the
5  complaint through Guardian Tracking would
6  be inappropriate or outside of policy.
7        A    From my understanding, the
8  Guardian Tracking is dealing with conduct
9  of police officers.
10       Q    Including discrimination.
11       A    No.
12       Q    Okay.  But you just said
13  that he made the complaint through this
14  system, and in your opinion the complaint
15  was proper because it went to the
16  attention of Delvick McKay and yourself.
17           MR. MITCHELL:  Object to the
18  form.
19       A    And I was put on notice.
20       Q    You can answer.  And you
21  were put on notice?
22       A    Yes.
23       Q    What did you do when it came

Page 17

1   to your attention that Mr. Gray had made
2   the complaint?
3       A   I notified all parties
4   involved that I would be doing an
5   investigation.  I obtained documents
6   related to the investigation from Mr.
7   Gray.  IA investigators Chief Benton,
8   Steve Parrish, David Jay and Stacy
9   Robinson.
10      Q   Now, you obtained documents
11  from, you said Chief Benton.
12      A   Keith Gray, IA
13  investigators.
14      Q   And who are they?
15      A   I think that would be Donny
16  Magill and Donny Smith.
17      Q   And who else?
18      A   Steve Parrish, David Jay and
19  Stacy Robinson.
20      Q   What documents did you
21  obtain from them?
22      A   The documents I received --
23  obtained from IA was incident reports

Page 18

1   regarding incidents at night clubs,
2   complaints filed against Mr. Gray by
3   officers involved in that complaint.
4       Q   What prompted you to request
5   documents related to complaints made
6   against Mr. Gray?
7       A   Well, when I did the
8   investigation, it was a number of night
9   club activity that he was involved in
10  while off duty, and there was subsequent
11  IA investigations of those, and some
12  involving him personally, some involving
13  other people.  And, you know, particularly
14  the -- one of the citizen that filed a
15  complaint against him, one of the officers
16  filed a complaint against him and so
17  forth.
18      Q   So let's go back just a
19  second.  You said you notified all parties
20  involved when you received notification of
21  Mr. Gray's complaint.
22      Who did you contact specifically
23  at that point in time?

Page 19

1       A   Chief Benton.  I sent a
2   letter to Steve Parrish notifying him that
3   I had a complaint against him, and that I
4   would probably need various documents
5   related to incidents he noted in his
6   Guardian Tracking.
7       Q   Who else?
8       A   That's pretty much it.
9       Q   So Chief Benton or Steve
10  Parrish contacted IA to obtain the
11  additional documents regarding the
12  complaints made against Mr. Gray.
13      A   Would you repeat that?
14      Q   You just said that you
15  obtained documents from Chief Benton from
16  Keith Gray, from internal affairs, from
17  Steve Parrish, David Jay and Stacy --
18      A   Robinson.
19      Q   -- Robinson.  And I asked
20  you who you specifically contacted when
21  you learned of Mr. Gray's complaint.  And
22  you said Chief Benton and Steve Parrish.
23      A   Correct.

Page 20

1       Q   So my question is, did you
2   or they contact IA to obtain the documents
3   related to these alleged complaints filed
4   against Mr. Gray?
5       A   Yes.
6       Q   Yes what?  You did or they
7   did?
8       A   They did.
9       Q   They did?
10      A   Right.
11      Q   Did you interview anyone as
12  a result of the complaint made by Mr.
13  Gray?
14      A   Yes.
15      Q   Who?
16      A   I interviewed Chief Benton,
17  Steve Parrish, David Jay and Stacy
18  Robinson.
19      Q   Did you interview them in
20  person?
21      A   Yes.
22      Q   What did you ask them?
23      A   In particular, which ones?

Page 21

1    Q   What did you ask Chief
2  Benton?  Let's start with him.
3       A   I informed him of Captain
4  Gray's complaint regarding his complaint
5  against Steve Parrish, all the -- the
6  various headings in my report I talked to
7  him about; and in this report, you can see
8  that he addressed it in a letter to me.
9       I can turn to that page.  Okay.
10  The following is the response to your
11  e-mail sent to me on Thursday, August the
12  8th, 2013.  That's the Chief.  I asked
13  about Captain's great lack of
14  communication with supervisor Major
15  Parrish, Captain Gray's alleged disparate
16  treatment in the reassignment of captains
17  to police bureaus, alleged allegations of
18  Captain Gray's micro-management of the
19  police bureau's patrol and administrative
20  bureau, the business necessity for the
21  administrative services lieutenant
22  position, the reassignment justification
23  used to transfer Keith Gray from patrol

Page 22

1  bureau to administrative bureau, and what
2  was used to make that determination.
3       He provide -- there was internal
4  affairs reports on incidents that happened
5  at Eton's pockets.  A police incident
6  involving Officer Markow, a copy of Gray's
7  performance improvement plan,
8  justification for Major Parrish moving
9  communication and training from under
10  Keith Gray.  And pretty much this is what
11  the Chief addressed.
12       Q   Do you mind if I look back
13  at that real quick.  So he provided this
14  to you in writing?
15       A   Yes.
16       Q   But you just said you
17  interviewed him.
18       A   Yes.  And he followed up
19  with that information.
20       Q   When you interviewed him,
21  what did you ask him?
22       A   That information there.
23       Q   So he didn't just speak to

Page 23

1  you about it in the interview.
2       A   He spoke in general, but he
3  didn't have specifics with him.
4       Q   So you questioned Chief
5  Benton.
6       A   I sent him an e-mail of
7  information I wanted from him.
8       Q   So you didn't meet with him
9  in person.
10       A   Yes, I met with him in
11  person.
12       Q   Okay.  And I guess my
13  question is:  What was discussed when you
14  met with him in person?
15       A   That information there, that
16  I needed information to support those
17  areas.
18       Q   And so then he sent this to
19  you --
20       A   Right.
21       Q   -- after the fact.
22       A   Right.
23       Q   What exactly was said during

Page 24

1  your interview with him?
2       A   Addressing that information.
3       Q   So you asked him what
4  specifically?
5       A   The content in that
6  particular document there.  And he would
7  have -- said he would have to get back
8  with me on it and give me a more detailed
9  report of the information I requested.
10       Q   So you asked him
11  specifically about Captain Gray's lack of
12  communication with Major Parrish.
13       A   (Witness nodding head).
14       Q   You asked him specifically
15  about the allegation of Captain Gray's
16  micro management.
17       A   (Witness nodding head).
18  Yes.
19       Q   The business necessity for
20  the administrative services lieutenant
21  position.
22       A   Yes.
23       Q   The reassignment

Page 25

1 justification for moving Captain Gray to
2 administrative services from the patrol
3 services bureau.
4         A   Yes.
5         Q   The internal affairs reports
6 about the alleged complaints against Mr.
7 Gray.
8         A   Yes.
9         Q   Justification for Major
10 Parrish moving communication and training
11 from Captain Gray.
12         A   Yes.
13         Q   And that was the extent of
14 your investigation with Chief Benton.
15         A   Yes.
16         Q   You didn't ask him about
17 anything else other than --
18         A   Other than this.
19         MS. EDWARDS:  I want to go
20 ahead and make an exhibit of that, if I
21 may, for the deposition.
22         If we could, just go off the
23 record for a second.

Page 26

1         (Off the record.)
2         MS. EDWARDS:  Back on the
3 record, please.
4         (Whereupon, Plaintiff's
5         Exhibit Number 1 was marked
6         for identification.)
7         MS. EDWARDS:  For the
8 record, I'm going to mark the document in
9 which I was just questioning Mr. Mathews,
10 which is marked as Plaintiff's Exhibit 1,
11 and this is the letter to Darryl from
12 Chief Benton regarding Mr. Gray's
13 complaint of September 18th, 2013.
14         MS. MAYS:  So the record is
15 clear, I don't think this complaint was
16 September 18th, 2013.  I think that's the
17 date of his report.
18         MR. MITCHELL:  That's the
19 date of the report.
20         THE WITNESS:  My report.
21         MS. EDWARDS:  I've got you.
22         Q   (BY MS. EDWARDS:)  Okay.
23 What was the date of the complaint?

Page 27

1         A   Let me just read this.  On
2 June 9th, 2013, Keith Gray entered his
3 Guardian Tracking rebuttal to supervisor
4 Steve Parrish April 8, 2013, the Guardian
5 Tracking incident report regarding
6 communication, job performance.
7         Q   So the Guardian Tracking was
8 filed on what date?
9         A   His rebuttal was June 9th,
10 2013.  Steve Parrish's Guardian Tracking
11 report was April 8th, 2013.
12         Q   When was the initial
13 complaint filed?
14         A   Okay.  The Guardian Tracking
15 was submitted to Delvick McKay on June
16 10th, 2013, and after reviewing the
17 document on June 17th, 2013, I launched an
18 investigation and notified all parties.
19         Q   So is June 10th the date
20 that Mr. Gray filed his complaint in
21 Guardian Tracking?
22         A   He gave it to Mr. McKay do
23 put in his personnel file.

Page 28

1         Q   So he gave a printout of
2 what he had previously filed in Guardian
3 Tracking?
4         A   Yes.
5         Q   When was the original
6 Guardian Tracking complaint filed?
7         A   The Guardian Tracking --
8 Major Parrish's Guardian Tracking report
9 regarding communication job, performance
10 issues with Mr. Gray was April 8th, 2013.
11         Q   And so Steve Parrish filed
12 that first.  That was the first entry into
13 Guardian Tracking or no?
14         A   That was the first.
15         Q   And then Mr. Gray filed a
16 response to Mr. Parrish's Guardian
17 Tracking on --
18         A   June 9th, 2013.
19         Q   Okay.  In which he alleged
20 race discrimination and harassment.
21         A   A number of things that were
22 contained in the document.
23         Q   But it did address race

Page 29

1  discrimination and harassment --
2       A   Yes.
3       Q   -- in that June 9th, 2013
4  complaint.
5       A   Yes.
6       Q   And then Mr. Gray gave Mr.
7  McKay a copy of that complaint on June
8  10th.
9       A   Correct.
10      Q   And then you received a copy
11 of that complaint on June 17th, or is that
12 the date that you launched your
13 investigation?  When did you actually
14 receive notice of the complaint?
15      A   I have written here:  After
16 receiving this document on June 17th,
17 2013, I launched an investigation and
18 notified all parties.
19      Q   And that's when you
20 contacted Chief Benton and Steve Parrish.
21      A   Yes.
22      Q   And you requested the
23 various documents related to complaints

Page 30

1  filed against Captain Gray.
2       A   As well as the other people
3  I mentioned to you.
4       Q   So you requested those
5  documents from the Chief, the Internal
6  Affairs, David Jay and Stacy Robinson.
7       A   Yeah, information.  Yes.
8       Q   And when you say,
9  "information," what do you mean?
10      A   Supporting the allegations
11 in his written Guardian Tracking report.
12      Q   How did you request that
13 information?
14      A   I asked the Chief and Major
15 Parrish to, you know, to provide me with
16 information from the IA reports that were
17 contained in the Guardian Tracking, and
18 they provided those documents to me.
19      Q   Who gave you the documents?
20      A   I can't remember at the
21 time.  It was more likely IA investigators
22 brought it to me.
23      Q   And so what was your -- what

Page 31

1  did you consider as you conducted this
2  investigation when you received those
3  documents?
4       And first of all, let me just go
5  back before we get into that.  Did you --
6  you said that you met in person with Chief
7  Benton.  You requested this information.
8  He did not give you detailed information
9  during that interview.  Instead he
10 followed back up with Exhibit 1.
11      MR. MITCHELL:  Object to the
12 form.
13      Q   The letter that we discussed
14 just now, correct?
15      MR. MITCHELL:  Object to the
16 form.
17      Q   You can answer.
18      A   Yes.
19      Q   Who else did you meet in
20 person with?
21      A   I met with Chief Benton,
22 Steve Parrish, David Jay and Stacy
23 Robinson.

Page 32

1       Q   Okay.  Now, a while ago I
2  thought you said that you had just
3  contacted Chief Benton and Steve Parrish.
4  But now you're saying --
5       A   I'm saying they provided --
6  I asked them to provide me information to
7  support.  I had to go through them to get
8  the information.
9       Q   I guess my question was, who
10 did you meet face-to-face with and discuss
11 this case?
12      A   Face-to-face with was Chief
13 Benton, Steve Parrish, David Jay and Stacy
14 Robinson.
15      Q   Now, when you met
16 face-to-face with Steve Parrish, what did
17 you say?  What was said?
18      A   I asked him about the
19 Guardian Tracking information.  I asked
20 him about micro-managing incidents, the
21 despair treatment assignments of Keith
22 Gray from patrol administration,
23 disciplinary actions at Eton's, the PIP

---

Page 33

1 plan he was put on. Temporary removal
2 from patrol when it was then given back.
3 His lack of -- this is information he
4 provided to me. Failure to provide
5 paperwork as it relates to polygraph
6 information. And that's the information
7 he provided to me.
8      Q   That Steve Parrish provided
9 to you.
10     A   Yes.
11     Q   So he didn't provide you
12 with any information related to Mr. Gray's
13 complaints, only the alleged complaints
14 against Mr. Gray relating to his Guardian
15 Tracking entry; is that correct?
16     A   Well, the information he was
17 providing was the Guardian Tracking.
18     Q   His Guardian Tracking?
19     A   His Guardian Tracking, and
20 Mr. Gray's rebuttal to it. He was
21 addressing all the issues in there.
22     Q   Okay. How did he address
23 the allegations of discrimination and

---

Page 34

1 harassment?
2      A   Basically in remembering,
3 that if he talked to Mr. Gray, he called
4 him into his office and brought to his
5 attention his off-duty night club
6 activities were not good, being over the
7 patrol division, and him being at these
8 incidents that happened at the night club
9 interfering with the police officers that
10 were on duty. These are the kinds of
11 things that he addressed with me. He
12 talked about his micro managing of --
13     Q   Okay. Now, let's stop
14 before we move into that, Mr. Mathews.
15         Now, as far as these night club
16 activities, what did you do to investigate
17 Steve Parrish's allegations about Mr.
18 Gray's conduct?
19     A   I got the IA reports of the
20 incidents at the various night clubs.
21     Q   From whom?
22     A   The department, basically.
23     Q   Who within the department?

---

Page 35

1      A   I don't remember exactly who
2 provided me with them. IA was in control
3 of the information.
4      Q   Did you question internal
5 affairs about these incidents?
6      A   No.
7      Q   So you just basically took
8 Steve Parrish's word.
9      A   I had the reports. I
10 reviewed the reports.
11     Q   So Steve Parrish gave you
12 Internal Affairs' reports about these
13 alleged complaints.
14     A   I can't remember that. I
15 don't think that it was Steve Parrish. It
16 was more than likely IA that provided me
17 the information since they did the
18 investigations.
19     Q   Did you document where your
20 documents in the investigation came from?
21     A   No.
22     Q   So sitting here right now,
23 you can't say for sure who gave you the

---

Page 36

1 documents related to these alleged
2 incidents.
3      A   At this time, I can't
4 recall.
5      Q   So you didn't conduct an
6 independent investigation into these
7 allegations against Mr. Gray.
8          MR. MITCHELL: Object to the
9 form.
10     A   No.
11     Q   So Mr. Parrish brought up
12 that there were some allegations about
13 off-duty conduct related to Mr. Gray. And
14 you did not independently investigate
15 that.
16         MR. MITCHELL: Object to the
17 form.
18     A   Yes. I -- from the IA
19 reports, I reviewed the incidents at the
20 particular clubs.
21     Q   But you were just reviewing
22 internal affairs' documents --
23     A   Right.

---

---

Page 37

1      Q   -- that you weren't sure
2  where they came from.
3      A   They came from Internal
4  Affairs.
5      Q   How do you know?
6      A   I have no other reason to
7  believe they didn't.
8      Q   Well, a while ago you just
9  said you didn't know where the documents
10  came from.  You said you didn't know who
11  gave you the documents.
12      A   I said I couldn't retain who
13  provided me the documents to my office.
14      Q   Okay.  So you didn't do any
15  independent investigation into those
16  documents.
17          MR. MITCHELL:  Object to the
18  form.
19      A   No.
20      Q   So the next topic was micro
21  -- allegations of micro management from
22  Steve Parrish; is that correct?
23      A   Right.

---

Page 38

1      Q   And what did you discuss
2  regarding that allegation?
3      A   Um --
4      Q   And before you answer that,
5  this allegation was made by Steve Parrish
6  against Captain Gray, correct?
7      A   What allegation?  Micro
8  management?
9      Q   Yes.
10      A   Well, yes.
11      Q   What did you discuss?
12      A   We discussed his hands-on
13  approach to police officers in the field,
14  his getting involved when he was with
15  police officers when he was at these night
16  clubs when he was off duty.  Those
17  incidents, you know, were considered that
18  he was micro-managing the officers when he
19  was off duty.  General information that I
20  had from others that I interviewed that
21  people in the patrol division felt that he
22  didn't smother them, didn't allow them to
23  do their job.

---

Page 39

1      Q   Anything else?
2      A   Not that I can remember at
3  this point.
4      Q   So you discussed with Steve
5  Parrish the off-duty incidents -- the
6  alleged off-duty incidents related to Mr.
7  Gray and the alleged micro management on
8  the part of the Mr. Gray.
9      A   His micro management of the
10  officers at those incidents.
11      Q   Was that the extent of your
12  interview with Steve Parrish?
13      A   We talked about the -- him
14  being put on a PIP plan.  We talked about
15  that he was temporarily removed from
16  patrol.  We talked about his lack of
17  providing paperwork on polygraphs.  We
18  also talked about that he felt that Mr.
19  Gray was sensitive when he was questioning
20  him about the night club incidents, that
21  he basically felt that he couldn't talk to
22  Mr. Gray without him interjecting race as
23  a basis of his discussion of these

---

Page 40

1  incidents.
2      Q   Anything else?
3      A   We talked about that he had
4  entered positive information in Guardian
5  Tracking regarding Mr. Gray.  We talked
6  about special assignments he had, that he
7  had a considerable workload with his
8  special assignments.  They was concerned
9  that if they took them away, he would
10  complain.  They just felt very uneased
11  with him, and he would allege things that
12  they felt were not true when he would be
13  questioned about things.
14      Q   Anything else?
15      A   And the incidents at the
16  various lounges.
17      Q   Anything else?
18      A   I think that's pretty much
19  it.
20      Q   Who else did you meet in
21  person with?
22      A   David Jay, Captain David
23  Jay.

Page 41

```
1       Q   What was the extent of your
2   discussion with him?
3       A   When Mr. Gray alleged that
4   he was being treated differently because
5   he was black, I asked him who could
6   validate that in the department.  He told
7   me to talk to David Jay concerning that.
8   And I interviewed him as well.
9       Q   Who told you that David Jay
10  could validate it?
11      A   Keith Gray.
12      Q   Okay.  And so what was your
13  -- the extent of your discussion with
14  David Jay?
15      A   Mr. Jay felt that there was
16  no discrimination regarding Keith Gray.
17  He basically said that he didn't have a
18  problem with working for Parrish, you
19  know, in the past they had some conflicts.
20  He also mentioned that he didn't feel that
21  there was any discrimination because Mr.
22  Gray -- I mean, Mr. Parrish was a member
23  of the Sons of Confederate Soldiers.  He
```

Page 42

```
1   felt that Keith Gray saying that he
2   subscribed to the good ol' boy type of
3   environment; and he just mentioned that he
4   didn't think that was predicated on race.
5   He just liked to see his friends
6   eventually get promoted in positions.  He
7   didn't think it was race based at all.
8       Q   Okay.  He didn't think that.
9       A   Right.
10      Q   Did you conduct your own
11  internal, or, excuse me, independent
12  investigation into that?
13          MR. MITCHELL:  Object to the
14  form.
15      A   Well, that was my
16  investigation when I asked him who could I
17  talk to that could substantiate what he
18  said.
19      Q   And is David white -- excuse
20  me -- David Jay white?
21      A   Yes.
22      Q   Chief Benton is white as
23  well, correct?
```

Page 43

```
1       A   Correct.
2       Q   Is Steve Parrish white?
3       A   Correct.
4       Q   What about Stacy Robinson?
5       A   Yes.
6       Q   Did you ask David Jay how he
7   knew there was no discrimination going on
8   with regard to Captain Gray?
9       A   Well, he felt -- he told me
10  he felt that there was no race issues,
11  that Mr. Gray was not being treated
12  differently.  He also told me that, you
13  know, that he did have a rift with Steve
14  Parrish, but other than that, the -- he
15  didn't think anything was race based
16  because Mr. Parrish's affiliation with
17  this organization.
18      Q   With the Sons of Confederate
19  Veterans?
20      A   Yes.
21      Q   Did you ask anyone else
22  other than David Jay their opinion of
23  whether Captain Gray had been
```

Page 44

```
1   discriminated against?
2       A   No.  I didn't -- I didn't
3   have anybody else to ask, other than who I
4   asked him who could I talk to, since he
5   made the allegation.
6       Q   So you didn't take it upon
7   yourself to interview any other member of
8   the department in which Captain Gray
9   worked.
10      A   No.
11      Q   You just took David Jay's
12  word for it.
13      A   I took his information, his
14  testimony and -- because Keith Gray
15  referred me to him to talk to that could
16  substantiate what he said, that would
17  validate what he said about Major Parrish.
18      Q   David Jay is a member of the
19  Sons of Confederate Veterans as well,
20  isn't he?
21      A   I'm not aware of that.
22      Q   Did you ask him?
23      A   No.
```

Page 45

1    Q   So basically you allege that
2  Keith told you you could ask David Jay
3  about it, which he disputes.  But David
4  Jay is the only person that you
5  interviewed within Captain Gray's
6  department regarding Keith's allegations
7  about Parrish?
8    A   Right.
9    Q   And so you basically took
10 David Jay's word over Captain Gray's word.
11         MR. MITCHELL:  Object to the
12 form.
13    A   Mr. Gray didn't have any
14 other information to provide to me to
15 substantiate his complaint.
16    Q   What, in your mind, did he
17 need to substantiate a complaint other
18 than his word?
19    A   I think word alone, it's not
20 enough to substantiate an accusation
21 against somebody.
22    Q   What else is needed?
23    A   Incidents that show it.  In

Page 46

1  my review, I saw no incidents, no conduct
2  that would suggest that he treated him
3  differently.  And if he treated him
4  differently, Captain Jay differently, that
5  wouldn't be race based.
6    Q   I don't mean Captain Jay.
7  I'm not asking how Steve Parrish treated
8  Captain Jay.  I'm asking how he treated
9  Captain Gray.
10    A   I have no information to
11 substantiate that he was treated
12 differently, other than who he told me to
13 interview, or he asked that I interview.
14    Q   So, again, you didn't take
15 it upon yourself to interview anyone else
16 within his department?
17    A   No.
18    Q   Now, the internal affairs'
19 officers that gave you the documents
20 related to complaints against Mr. Gray at
21 your request are both white as well,
22 correct?
23    A   Yes.

Page 47

1    Q   Did you check yourself into
2  Mr. Gray's allegation that -- scratch
3  that.
4         So you basically spoke to Steve
5  Parrish, who relayed the information that
6  we just discussed regarding micro
7  management, his placing Mr. Gray on a PIP
8  plan, and the alleged off-duty incidents.
9  And then you interviewed David Jay in an
10 effort to substantiate or to -- you
11 interviewed David Jay with regard to
12 Captain Gray's allegations.
13    A   Yes.
14    Q   Was that the first time that
15 Captain Gray had complained to you?
16    A   He didn't actually complain
17 to me.  He provided the information in
18 Guardian Tracking and provided it to the
19 personnel director.  He didn't come to me
20 directly.
21    Q   Well, let me rephrase, then.
22 Was that the first time that Mr. Gray had
23 made a complaint against the City of

Page 48

1  Dothan?
2    A   Back in -- are we talking
3  about five years or --
4    Q   Any time.
5    A   Any time.  Well, he had come
6  to me alleging that he was not treated
7  fair in a, I think, a sergeant position
8  promotion.  I did a preliminary at that
9  time, and then I was promoted to
10 purchasing.  At that time I had done a
11 somewhat preliminary, saw that he did not
12 rank high enough on the register to be
13 selected.  It was a combination of
14 qualification and tests.  He scored, I
15 think a 65, if I remember correctly, on
16 the test.
17         He alleged that some people were
18 given more credit when they were not
19 dressed properly at that time.  And that's
20 as far as I had gotten before I was
21 promoted to purchasing.
22    Q   So you were in the EEO
23 officer position one time before.

Page 49

1        A   I've been in it two or three
2   times, yes.
3        Q   We'll get back to that in
4   just a second.
5        So this occurred before you were
6   transferred to purchasing.
7        A   Right.
8        Q   And Mr. Gray complained
9   about race discrimination on the basis of
10  promotion.
11       A   Yes.
12       Q   A failure to promote.
13  And this was to the sergeant position?
14       A   If I remember correctly.
15       Q   And you stated that he
16  complained to you that white officers were
17  given more consideration than him for the
18  position.
19       A   He complained to me that --
20  how would I say -- I'm trying to remember
21  back then.  That he didn't think the
22  process was fair.  He thought that people
23  that were not properly dressed were graded

Page 50

1   higher, but he provided no documentation
2   to substantiate that.
3        In reviewing some of the
4   documents prior to this deposition, I
5   pulled the sergeant status of those
6   positions and how Mr. Gray may be ranked.
7   I think he applied several times, probably
8   eight out of nineteen people, or more or
9   less.  At that time I found out that he
10  had scored 65 on his test.  So a
11  combination of the testing process and the
12  qualifications did not put him in the top
13  three.
14       Q   But didn't he complain to
15  you that he felt that the testing was
16  unfair.
17       A   Right.
18       Q   And so the 65 was the result
19  of testing that he alleged was unfair.
20       A   Well, he didn't say that.  I
21  found out he made 65.  He didn't know that
22  I found that information out.
23       Q   Well, what I'm saying is, he

Page 51

1   was -- he complained that the testing for
2   the sergeant position was unfair.
3        A   Yes.
4        Q   And that white candidates
5   were given more consideration, they were
6   give preferential consideration in the
7   testing, correct?
8        A   He alleged that, yes.
9        Q   And so that score of 65 was
10  the result of that testing that he alleged
11  was preferential.
12       A   On one of the multiple times
13  that he applied for sergeant position.
14       Q   So he was denied the
15  position to sergeant multiple times.
16       A   Because he did not score --
17  a combination of his scoring and
18  qualifications.
19       Q   But he complained that he
20  felt that the testing was preferential.
21       A   Right.
22       Q   What did you do to
23  independently investigate the scoring of

Page 52

1   those tests?
2        A   Like I said, I was able to
3   do a preliminary and I was promoted to
4   purchasing.
5        Q   What did you do exactly
6   before you went to purchasing?
7        A   I did the preliminary and
8   was starting to gather information.
9        Q   What did you gather?
10       A   That he scored 65 on the
11  test.  Allegations that he made to me that
12  he was dressed properly and others were
13  not dressed, and they get preferential
14  treatment.  No basis to substantiate that,
15  other than what he said.
16       Q   Did you look into the
17  testing itself?
18       A   All of our tests are
19  validated.
20       Q   How?
21       A   By agencies to make sure
22  there is no racial bias.
23       Q   Who?  What agency?

Page 53

1    A   The agencies that prepared
2 the test.
3    Q   But what agency is that?
4    A   Ma'am, I can't remember
5 then.  Like I said, I did the preliminary
6 and then I was moved.
7    Q   So -- but you didn't conduct
8 any independent investigation --
9    A   I didn't need to.
10   Q   -- into the actual testing.
11        MR. MITCHELL:  Object to the
12 form.
13   Q   You can answer.
14   A   Other than what I mentioned.
15   Q   Just looking at the scores
16 themselves.
17   A   Obtaining that information
18 and, you know, about Mr. Gray indicating
19 that he felt he was dressed properly and
20 they -- some of the other ones was not,
21 which is just his opinion that they were
22 treated preferential than he was.
23   Q   But because they were white.

Page 54

1    A   That was his allegation.
2    Q   And so you had his
3 allegations and you had the test score.
4    A   Yes.
5    Q   What other information did
6 you have or review prior to leaving your
7 position?
8    A   I didn't.  I didn't.  Like I
9 said, that was the only information I was
10 able to gather in that short period of
11 time.
12   Q   Were just his complaint and
13 the test scores.
14   A   Right.
15   Q   Now, you obtained his test
16 score, correct?
17   A   Right.
18   Q   Who else's test score did
19 you obtain?
20   A   I didn't look at any other
21 at that point.
22   Q   So you only looked at his
23 test.

Page 55

1    A   With the short period of
2 time that I had to see where he scored and
3 then I was moved.  I didn't get a chance
4 to complete the investigation.
5    Q   Do you not recall that this
6 was the -- for the promotion of Mr. Gray
7 to lieutenant and not sergeant?
8    A   I thought I remembered it as
9 sergeant.
10   Q   Could it have been the one
11 to lieutenant?
12   A   It could have been.  I'm not
13 sure.
14   Q   And that exam consisted of a
15 Civil Service written portion; is that
16 correct?
17   A   What are you -- explain.
18   Q   What did the test consist
19 of?
20   A   I don't have it, you know,
21 I'm not privy to see the test.
22   Q   So you don't know what the
23 test was comprised of.

Page 56

1    A   No.
2    Q   You didn't do any
3 investigation into it to determine what
4 the actual test was.
5    A   I did not have the time to
6 do a thorough investigation other than the
7 preliminary information I mentioned I
8 gathered.
9    Q   Who assumed your position?
10   A   Pardon?
11   Q   Who assumed your position
12 after you left?
13   A   Elston Jones, if I'm
14 correct.
15   Q   When did he come on board in
16 relation to Mr. Gray's complaint?
17   A   Well, I was promoted, if I'm
18 correct, in 2003 to purchasing.  So it had
19 to have been sometime after that.
20   Q   How did the investigation
21 continue after you left, into Mr. Gray's
22 complaint?
23   A   I can't answer that question

Page 57

1  because I was in purchasing.
2      Q  So you didn't speak to
3  anybody about the fact that you started a
4  preliminary investigation.
5      A  I'm pretty sure I did.  I
6  just can't remember all the details then.
7      Q  Who would you have talked to
8  about the fact that you had started an
9  investigation?
10     A  The personnel director, the
11 city manager, who I think took, at that
12 time, in on to look into it himself.
13     Q  Who was that?
14     A  That was Mike West.
15     Q  Mike West told you that he
16 was going to continue the investigation.
17     A  He asked me for documents or
18 information of what I had on the
19 particular complaint.
20     Q  What did you give him?
21     A  I gave him my letter
22 notifying -- giving notification of
23 receipt of his complaint.  I can't

Page 58

1  remember all the other details of what I
2  provided him; only what I had.
3      Q  Which, according to you,
4  was --
5      A  His scores.
6      Q  -- the key complaint and the
7  score.
8      A  Right.
9      Q  Do you know the results of
10 the investigation?
11     A  No, I do not.
12     Q  You aren't aware of any
13 corrective action that occurred as a
14 result of Mr. Gray's complaint.
15     A  If I'm not mistaken, having
16 heard that he got promoted.
17     Q  Then?
18     A  I won't say then.  At other
19 times he had taken the exam.
20     Q  But with regard to that
21 particular promotional exam, are you aware
22 of any corrective action that was taken --
23     A  No.

Page 59

1      Q  -- as a result of his
2  complaint?
3      A  No.
4      Q  Are you aware that Sergeant
5  Timmy Ward made a complaint that the
6  testing had been compromised --
7      A  No.
8      Q  -- or that answer sheets
9  were alleged to have been given to
10 specific applicants --
11     A  No.
12     Q  -- with regard to that
13 testing?
14     A  No.
15     Q  So we discussed the December
16 18th, 2013 complaint of race
17 discrimination and harassment.  And we've
18 discussed the complaint related to the
19 lieutenant position --
20     MR. MITCHELL:  Object to the
21 form.
22     Q  -- or sergeant.
23     MR. MITCHELL:  And the

Page 60

1  earlier date was the June date.
2      Q  You're right.  Thank you for
3  the correction.  That is correct, the
4  actual first Guardian Tracking complaint
5  was June.  September is stuck on the brain
6  for some reason.
7      So we discussed the June 2013
8  complaint of race discrimination and
9  harassment and we have discussed the
10 failure to promote complaint that you
11 don't recall whether it was lieutenant or
12 sergeant, but it was one of those two; is
13 that right?
14     A  Right.  Yes.
15     Q  And that complaint was made
16 when?
17     A  I can't remember the date.
18     Q  Do you have an estimated
19 time period?
20     A  I do not.
21     Q  Other than --
22     MR. MITCHELL:  He testified
23 that he was promoted to purchasing in

Page 61

1   2003, so that would be some estimate.
2       Q   How -- how long before your
3   move to purchasing was that complaint
4   made, if you can use that as a point of
5   reference?
6       A   I can't even remember.  It
7   was pretty quick.
8       Q   Other than those two
9   complaints, what other complaints has Mr.
10  Gray made against the City of Dothan?
11      A   To me or?
12      Q   To the City of Dothan.
13      A   There was a complaint that
14  he -- well, he questioned the police
15  chief's job description.
16      Q   When was this?
17      A   And at that time I was not
18  in EEO.
19      Q   You have been designated by
20  the City of Dothan as its 30(b)(6) witness
21  with regard to Mr. Gray's complaints
22  against the City, correct?
23      A   Yes.

Page 62

1       Q   On October the 29th, 2009,
2   Mr. Gray submitted a complaint letter to
3   the personnel director complaining that
4   the job description was changed, and he --
5   because of that change he did not meet the
6   minimum qualifications.
7       Q   To whom was that complaint
8   made?
9       A   This letter is from Mr.
10  Gray.  It is dated October 29th, 2009.
11      Q   And to whom did he make that
12  complaint?
13      A   To Mr. McKay.
14      Q   All right.
15      A   To Delvick McKay, personnel
16  director.
17      Q   Describe the investigation
18  into that complaint.
19      A   Can I read from this?
20      MR. MITCHELL:  You can
21  review that, yes.
22      Q   And may I ask what it is
23  that you're reviewing?

Page 63

1       A   His letter.
2       Q   Whose letter?
3       A   Mr. Gray's.
4       Q   To Mr. McKay?
5       A   Yes.
6       Q   May I see it, please?
7       A   Sure.
8       Q   And the document you're
9   referring to, Mr. Mathews, is what was
10  previously produced by the City of Dothan.
11  And it's Bates stamped as Document Number
12  000591 at the bottom.
13      A   Yes.
14      Q   And that is the complaint
15  from Mr. Gray to Delvick McKay dated
16  October 29th, 2009.
17      A   Correct.
18      Q   And this is regarding the
19  promotion to the position of chief of
20  police, correct?
21      A   Correct.
22      Q   Now, upon receiving Mr.
23  Gray's complaint, explain to me what

Page 64

1   occurred.
2       A   Okay.  As I mentioned that
3   Mr. Gray's complaint letter to Mr. McKay
4   was dated October 29th, 2009.  Mr. McKay
5   addressed his complaint in his letter to
6   him on November 3rd, 2009.  And this
7   letter is cosigned by Mr. McKay, giving
8   him -- addressing the content of his
9   particular complaint about the job
10  description.
11      Q   May I see that document,
12  please?
13      A   (Witness hands document.)
14      Q   For the record, this
15  document is Bates stamped 000595, and it
16  was previously produced by the City of
17  Dothan.  This is a letter November 3rd,
18  2009, to the address of Lieutenant Gray
19  from Delvick McKay.
20      And so that was the response.
21      A   Yes, ma'am.
22      Q   What else was performed
23  during that investigation?

Page 65

1      A   I have a letter that was
2  dated December the 1st, 2009, that Mr.
3  Gray addressed the City Commission.  I
4  have --
5      Q   May I see a copy of that,
6  please?
7      A   Continue?
8      Q   Yes.
9      A   I have a memo, a letter or
10  overview that was sent to the Mayor and
11  the City Commission from Gary Griffin,
12  dated December the 3rd, 2009, concerning
13  the police chief's application process
14  regarding Keith Gray.
15      Q   May I see that, please?
16      A   (Witness hands document.)
17      Q   So this is a letter from
18  Gary Griffin who was the former EEO
19  training officer and it's dated December
20  3rd, 2009, correct?
21      A   Correct.
22      Q   So this letter was sent
23  after Mr. McKay's letter of October 29th,

Page 66

1  2009, correct?
2      A   I think that was sent --
3      MR. MITCHELL:  I thought
4  McKay's letter was November 3, 2009.
5      A   That was sent addressing --
6      Q   Right.  November 3rd, 2009
7  was Mr. McKay's response, correct?
8      A   I think that this letter or
9  memo is a result of Mr. Gray's addressing
10  the city commission.
11      Q   Okay.  So basically you had
12  Mr. Gray's complaint on October 29th,
13  2009.  You had a response from Mr. McKay
14  on November 3rd, 2009, stating that Mr.
15  Gray's complaint was unfounded.  They had
16  found no cause on Mr. Gray's complaint
17  that had been made --
18      A   Correct.
19      Q   -- three days earlier,
20  correct?
21      A   Correct.
22      Q   So then Mr. Gray went before
23  the city commission outside of the

Page 67

1  department, correct?
2      A   Correct.
3      Q   And you have the December
4  3rd letter from Gary Griffin, the former
5  EEO also finding no cause.
6      A   Correct.
7      Q   What was done to investigate
8  Mr. Gray's complaints?
9      A   The review of the job
10  description, it was shown to Mr. Gray that
11  because the formation of the major's
12  position, which one has to have experience
13  above those that he supervised, that
14  required more experience.  And
15  subsequently, departure of Chief Powell,
16  that necessitated that job description be
17  reviewed and updated because of the advent
18  of the major's position, the police
19  chief's position should require more
20  experience.
21      Q   Why?
22      A   Because you have to have
23  more experience than those that you

Page 68

1  supervise.
2      Q   Under what rule?
3      A   I mean, that -- to qualify
4  for a position, you've got to have above
5  the experience of the people that you
6  supervise.
7      Q   So seniority is always taken
8  into consideration --
9      A   I'm not saying seniority,
10  but a person with lesser credentials
11  cannot supervise somebody lower or higher.
12      Q   We were talking about time
13  and position, not credentials.
14      MR. MITCHELL:  Object to the
15  form.
16      Q   We're talking about time --
17  we're talking about supervisory
18  experience, correct?
19      A   A combination of supervisory
20  experience and other aspects of the
21  position.
22      Q   What specifically changed in
23  the job description?

Page 69

1    A   Well, number one, the
2  formation of the major's position was
3  interjected, which required him -- that
4  person in that position to have more
5  experience than the captain's that he
6  would supervise, and subsequently, when
7  Chief Powell left, the job description was
8  reviewed and -- which hadn't been changed
9  in a couple of years, that those
10  qualifications had to be above that of the
11  major.
12    Q   Now, by qualifications that
13  would include education, correct?
14    A   Yes.
15    Q   That would include length of
16  service in the department, correct?
17    A   Correct.
18    Q   So tell me again
19  specifically how the job description
20  changed.
21    A   Okay.  The timelines that I
22  have that was provided -- can I read from
23  this?

Page 70

1    Q   May I see it?
2    A   (Witness hands document.).
3  And that's from Gary Griffin.
4    Q   Who created this?
5    A   Gary Griffin.  I know it
6  doesn't show his name, but that was in his
7  documents when I took it to -- went back
8  to EEO.
9    MS. EDWARDS:  Let's go off
10  the record.
11    (Off the record.)
12    MS. EDWARDS:  Let's take a
13  quick break.
14    (Short break.)
15    (Whereupon, Plaintiff's
16    Exhibit Number 2 was marked
17    for identification.)
18    (BY MS. EDWARDS:)  Mr.
19  Mathews, I'm going to show you what I am
20  marking as Plaintiff's Exhibit 2.
21    MR. MITCHELL:  Is this a
22  two-page document?
23    MS. EDWARDS:  These are two

Page 71

1  different documents.
2    MR. MITCHELL:  Two different
3  documents.
4    MS. EDWARDS:  That we'll
5  just keep together, and we can staple them
6  so that we can -- they relate to each
7  other.
8    MR. MITCHELL:  Okay.
9    Q   Plaintiff's Exhibit 2 are
10  letters dated -- Page 2 of that document
11  is Monday, October 29th of 2001, and this
12  is an e-mail from Keith Gray to you
13  requesting status of the complaint that
14  was filed with you concerning the
15  lieutenant's promotional examination
16  process.
17    MR. MITCHELL:  Do you recall
18  this?
19    A   The letter I have is
20  November 2nd, 2011 (sic), where I sent him
21  information concerning a lieutenant
22  position.
23    Q   Okay.  Now, this was

Page 72

1  actually November 2nd, 2001, correct?
2    A   2001, yes.
3    Q   And that's Page 1 of the
4  documents that I just gave you that I have
5  marked as Plaintiff's Exhibit 2; is that
6  correct?
7    A   Yes, I guess.
8    Q   Okay.  And so that is --
9  that is November 2nd, 2001.
10    A   Uh-huh.
11    Q   A letter to Mr. Gray from
12  you.
13    A   Uh-huh.
14    Q   And it states that you are
15  acknowledging receipt of his complaint
16  dated August 6th, 2001.
17    A   Uh-huh.
18    Q   The second page of this is
19  an e-mail from Mr. Gray to you requesting
20  the status of that complaint, correct?
21    A   Let me just read it.
22    Q   Sure, take your time.
23    A   Okay.

Page 73

1    Q   Now, earlier you testified
2  that you made a preliminary investigation
3  prior to moving to the purchasing
4  department in 2003, correct?
5    A   Correct.
6    Q   And so, between the time
7  that Mr. Gray filed his complaint on
8  August 6th, 2001, and when you moved to
9  purchasing in 2003, you had received his
10 complaint and you had obtained the test
11 results, correct?
12       MR. MITCHELL:  Object to
13 form.  That question assumes that the two
14 are connected.
15    A   Would you state your
16 question again?
17    Q   Is this the only complaint
18 that Mr. Gray made to you about a failure
19 to promote or have there been others?
20    A   That's it.
21    Q   So you were testifying
22 earlier that you did not know whether Mr.
23 Gray was complaining about the promotion

Page 74

1  to lieutenant or sergeant, correct?
2    A   I couldn't remember.
3    Q   Does this refresh your
4  recollection that it was for lieutenant?
5    A   Yes.
6    Q   So he made the complaint on
7  August 6th, 2001, correct?
8    A   Yes.
9    Q   You moved to purchasing in
10 2003, correct?
11    A   As I remember.  I don't have
12 the exact dates.  I just, just off the
13 cuff, trying to remember.
14    Q   Now, other than this
15 complaint on August 6th, 2001, concerning
16 failure to promote, and the June 2013
17 complaint regarding race discrimination
18 and harassment, those were the two
19 complaints that were made to you directly
20 in your position as EEO, correct?
21    A   Yes.
22    Q   And we began discussing the
23 failure to promote to the chief of police

Page 75

1  commission prior to the break.
2    A   Correct.
3    Q   And that was another
4  complaint that Mr. Gray made during his
5  employment for failure to promote,
6  correct?
7    A   Correct.
8    Q   And you were not the EEO
9  manager at that particular time.
10    A   No.
11    Q   That was Elston Jones,
12 correct?  Was the EEO manager Elston Jones
13 at that time or whom?
14    A   For police chief, the police
15 chief's complaint?
16    Q   Yes.  The complaint for
17 failure to promote to chief of police.
18    A   That was Gary Griffin.
19    Q   Gary Griffin.  Now, who is
20 Elston Jones took the EEO position after I
21 left and went to purchasing.
22    Q   Okay.  I've got you.  Now,
23 from the time that Mr. Gray made his

Page 76

1  complaint on October 29th, 2009, until the
2  time that Mr. McKay sent him a letter with
3  a no cause finding after his complaint on
4  November 3rd, 2009, was there any
5  investigation at that particular point in
6  time into the change in the job
7  description?
8    A   On December the 9th, 2009, I
9  have a investigative report from Gary
10 Griffin.
11    Q   Well, sir, I'm talking about
12 the letter from Mr. McKay stating that
13 there was no substantiation found for Mr.
14 Gray's complaint made on October 29th.
15 Mr. McKay sent him a reply on November
16 3rd, 2009, stating that there was no -- he
17 found no substantiation for Mr. Gray's
18 claim.
19    A   Right.
20    Q   What investigation was
21 performed during that few-day period
22 between the complaint and the letter
23 stating there was no cause?

Page 77

1       A    December 3rd, 2009, Gary
2  Griffin.
3       Q    So that was after the fact.
4       A    That was after Delvick
5  McKay's letter to Mr. Gray.
6       Q    So it wasn't until then that
7  any investigation was performed into the
8  difference in the job description.
9            MR. MITCHELL:  Object to the
10  form.
11      A    Well, it was -- Mr. McKay
12  addressed his complaint or his grievance,
13  you know, in that it was not valid,
14  substantiate that what he alleged.  But
15  that undoubtedly didn't satisfy him, so
16  Mr. Griffin got involved and did an
17  investigation, and I have a letter here
18  for December 3rd, 2009, where he reviewed
19  it as well.
20      Q    Okay.  When you say,
21  apparently that didn't satisfy him, are
22  you talking about Mr. Gray?
23      A    Right.  And then there is

Page 78

1  another investigation done by Gary Griffin
2  dated December 9th, 2009.
3       Q    So you have no knowledge of
4  any investigation that was performed
5  between October 29th and November 3rd,
6  correct?
7            MR. MITCHELL:  Object to
8  form.
9       A    I mentioned that there was
10  an investigation by -- December the 3rd,
11  2009, by Gary Griffin that he sent to the
12  commission.
13      Q    But that was after Mr.
14  McKay, the personnel director of the City
15  of Dothan, sent a response to Mr. Gray's
16  complaint saying that it was
17  unsubstantiated.
18      A    Correct.
19      Q    What precisely were the
20  changes in the job description?
21      A    Somebody has my timelines.
22            MR. MITCHELL:  The question
23  is, what changes were made in the job

Page 79

1  description?  What document do you need to
2  see to answer that question?
3            THE WITNESS:  Basically the
4  timelines and the information that Mr.
5  McKay submitted to Keith Gray.
6       Q    I'm sorry.  What document?
7       A    The letter -- first off, the
8  letter substantiated that there was no
9  cause, from Mr. McKay, and then there was
10  another -- I don't have the timelines that
11  go --
12            MR. MITCHELL:  Is that?
13      A    Okay.  On November the 3rd,
14  2009.
15      Q    May I ask what it is that
16  you're looking at?
17      A    This is Mr. McKay's letter
18  to Mr. Gray.  And I will basically read
19  it.
20      Q    May I see it, please, before
21  you do?
22      A    Yes.
23      Q    Yes.  This is, for the

Page 80

1  record, this is the November 3rd, 2009,
2  letter from -- to Mr. Gray from Delvick
3  McKay finding no cause, correct?
4       A    Yes.  This letter has the
5  content, and I read:  "After reviewing
6  your letter submitted to my office on
7  October 29th, 2009, providing a response
8  to your request, the specific reason to
9  why your application did not meet the
10  minimum requirements for the consideration
11  of police chief.  It is proper and within
12  uniform guide lines of equal employment
13  that the position of greater
14  responsibility requires greater
15  qualifications, and within equity of those
16  current positions and chain of command.
17           These are the changes.  The
18  police major position was added in 2007,
19  required the applicant to meet the minimum
20  requirements of eight years or more years
21  of progressive experience in law
22  enforcement with a minimum of four years
23  as a police captain level with a B.S.

Page 81

1  degree.  Likewise, the police chief, which
2  was advertised in 2009, required greater
3  qualifications than police major,
4  requiring that applicant to possess ten
5  years or more of professional experience
6  in law enforcement with a minimum of five
7  years of senior management experience with
8  a B.S. degree."
9      Q   That's what it changed to.
10     A   Yes.
11     Q   What had it changed from?
12     A   Three to five.
13     Q   And that change was made
14  during the application process in which
15  Mr. Gray was applying for the chief of
16  police position.
17     A   Correct.
18     Q   And that change resulted in
19  his no longer being qualified, correct?
20     A   Well, when positions are
21  vacant, that's when job descriptions are
22  reviewed, and if there is any business
23  necessity, which was created by the

Page 82

1  formation of the major's position that
2  required greater responsibility and
3  qualifications.  Subsequently, when Chief
4  Powell retired, his job -- that job
5  description changed because there is
6  greater responsibility and requirements
7  for chief police versus a major.
8      Q   But it just so happened to
9  change in a manner that disqualified Mr.
10  Gray on both of those occasions, correct?
11     A   Correct.  But, I mean, that
12  happens all the time.
13     Q   What happens all the time?
14     A   There's -- employees don't
15  meet the minimum qualification for
16  positions.
17     Q   When a job description is
18  changed.
19     A   Yeah, it's reviewed.  When
20  the position is vacant, that's when the
21  job description is reviewed to see if the
22  business necessity has changed or there
23  needs to be greater qualifications.

Page 83

1      Q   But you created this major
2  position at that same time that that
3  change was made, correct?
4          MR. MITCHELL:  Object to
5  form.
6      Q   The major position was
7  created during this process.
8      A   In 2007, the major position
9  was created.
10     Q   That position was never
11  posted, was it?
12     A   All positions are posted,
13  you know.  This -- generally, I post -- we
14  post all positions on our website.  We put
15  notices up in the departments.  Various
16  organizations get the job notices in the
17  community.  So there was common knowledge
18  that the position was, you know, open.
19     Q   So you have records where
20  that major position was posted?
21     A   I don't have them with me.
22     Q   Could you provide them to
23  me?  Those have not been produced in this

Page 84

1  case.
2      A   I would have to get with
3  personnel to get that information.
4      Q   I would like to see the
5  posting for the major position and the
6  applications that were received for that
7  position.
8          How was the major selected, from
9  what candidates?
10     A   Those that applied for the
11  jobs, whether they -- you know, first of
12  all, when the application was taken, you
13  had to meet the minimum to even qualify,
14  and the applications are generally
15  reviewed by the department and a selection
16  is made.  A selection memo is generally
17  sent to the EEO officer.  He reviews it to
18  make sure the content of the memo shows
19  that the selection is valid and
20  nondiscrimnatory.
21     Q   And that happened.  Did you
22  review the application process?
23     A   I wasn't there.  Gary

Page 85

1  Griffin was EEO at that time.
2       Q    So Gary Griffin would have
3  reviewed the applications received for the
4  major position to determine whether
5  they're in compliance with the EEO policy.
6       A    Yes.  Yes.
7            MS. EDWARDS:  Chris, is that
8  something that you believe that you can
9  gather for me and produce?
10           MR. MITCHELL:  I do not
11  know.  That's not part of this witnesses
12  30(b)(6) topic.  He obviously has some
13  small amount of personal knowledge on it,
14  but I don't know anything about that.
15  That's not part of his topic for the
16  30(b)(6).
17           MS. EDWARDS:  Well, I just
18  don't recall those particular documents
19  being produced, and so to the extent that
20  they exist, if we could just go on the
21  record and request them now, I would like
22  to do so.
23       Q    (BY MS. EDWARDS:)  Tell me

Page 86

1  the process for changing the job
2  descriptions.
3       A    My understanding, as I have
4  been told by personnel directors, if it's
5  a minor change, the personnel director
6  would review it based on the business
7  necessity provided by the department.  If
8  it's a more defined, major change, the
9  personnel board has to approve it.
10      Q    What is the difference
11  between a major and a minor change to a
12  job description?
13      A    That's a question that
14  personnel would have to address.
15      Q    But you know just from your
16  personal experience within the department
17  that if it was a minor change the
18  personnel director can make that change,
19  if it's a major change --
20      A    Based on the business
21  necessity provided by the department.
22      Q    But if it's a major change
23  that the -- who has to approve it?

Page 87

1       A    The personnel board.
2       Q    When the job position was
3  changed that predated Mr. Gray's complaint
4  concerning the chief of police denial of
5  promotion, who approved the change to the
6  job description?
7       A    Not having the particulars,
8  it would have been -- the department head
9  is the hiring authority, you know,
10  probably --
11           Let me go back a step.
12           In the police chief's position,
13  it's the city manager.  That's the hiring
14  authority.  And he would get with
15  personnel, and if there's any additional
16  business necessity that needs to be apart
17  of it, they would discuss it.
18      Q    So for the chief of police
19  position it wouldn't be the personnel
20  board, it would be the city manager.
21      A    He is the hiring authority
22  for the department head positions.  That's
23  a department head position.

Page 88

1       Q    And when you say, "hiring
2  authority," would he also be the one who
3  reviews and approves the change in job
4  description?
5       A    Yes, with consultation with
6  the personnel director.
7       Q    Who decided -- so are you
8  saying that the city manager made the
9  decision to change the job description for
10  chief of police?
11      A    He is the hiring authority
12  for the police chief position, and he
13  would basically consult with the personnel
14  director if he had any additional
15  requirements for the position, consult
16  with him on those particular changes and
17  the changes would be made.
18      Q    So when you investigated --
19  excuse me.  When Mr. Griffin investigated
20  Mr. Gray's complaint, what business
21  necessity did he discover necessitated
22  this change?
23      A    Well, the position required

Page 89

1  greater responsibility and qualifications
2  than that of the major.  When the major
3  position was created, it was naturally
4  that there was greater responsibilities in
5  that position that, you know, one has to
6  have the credentials above those that he
7  supervises.
8      Q    And when you say
9  "credentials," you say education.
10     A    Education.
11     Q    Length of time with the
12 department.
13     A    Yes, all of that.  Yes.
14     Q    Why was a major position
15 deemed necessary?
16     A    I can't answer that
17 question.
18     Q    Is it always the case that
19 you would have somebody -- that length of
20 time with the department would dictate
21 promotions?  Is that a major factor --
22     A    Experience --
23     Q    Let me rephrase.  That's a

Page 90

1  bad question.
2      A    We're talking about
3  experience one has to do the job.  We're
4  talking about educational qualifications,
5  and so forth.  The interview process.
6      Q    And so, I guess, I'm still
7  back to the same question.  I'm sorry.  I
8  didn't mean to interrupt you.  Go ahead.
9      A    Go ahead.
10     Q    I didn't mean to interrupt
11 you.
12     A    You're fine.
13     Q    What was the last part of
14 your answer that you just said?
15     A    I don't recall.
16     Q    So, again, I guess I'm
17 unclear.  How did it change?  It changed
18 from requiring three to five years of
19 management experience to five years of
20 management experience.
21     A    Uh-huh.
22     Q    I'm still trying to get to
23 the bottom of why was there an alleged

Page 91

1  business necessity within the department
2  for that change?
3      A    Because -- because of the
4  advent of the major's position.  Prior to
5  that the police chief's position hadn't
6  changed.
7      Q    And, I guess, that goes back
8  to why was the major position deemed
9  necessary?
10     A    I can't answer what the
11 business necessity was to create that
12 position.
13     Q    And so the investigation
14 into Mr. Gray's complaint did not address
15 whether that was a business necessity.
16     A    Would you repeat the
17 question?
18     Q    You're here to testify about
19 the investigations into Mr. Gray's
20 complaint.  You have been designated as
21 the corporate witness by the City of
22 Dothan to testify as to Mr. Gray's
23 complaint and the investigations that

Page 92

1  followed them.
2      My question to you is:  As a
3  result of the investigation of his
4  complaint about the change in the job
5  description, was the actual business
6  necessity for making that change a
7  managerial experience investigated?
8      MR. MITCHELL:  Object to
9  form.
10     A    Investigated by whom?
11     Q    By EEO.
12     A    Well, Mr. Griffin did an
13 investigation and found that his
14 allegation was unfounded.
15     Q    Based on?
16     A    That he did not meet the
17 minimum qualifications.
18     Q    But were the business
19 necessities for the change in
20 qualifications investigated?
21     A    There's no investigation of
22 the business necessity.  The department or
23 the hiring authority gets with personnel

---

**Page 93**

1  and reviews the -- when there is a
2  vacancy, to make the decision whether
3  there's a change in business necessity
4  that require more experience.  And at that
5  time the police chief position had been
6  the same for, I think, two or three years,
7  and because of the advent of the police
8  major position, the qualifications for
9  police chief had to be changed because
10  they were three years old.
11      Q    Did anybody investigate --
12  I'm going to rephrase this.
13      Did anybody investigate why this
14  change was necessitated?
15      A    That's at the discretion of
16  the hiring authority and Mr. McKay.  If he
17  brings the attention to the job
18  description, that it is -- that was, I
19  think, two or three years old and it had
20  been used to hire former chiefs, but when
21  that position of major was created, the
22  position of police chief required greater,
23  more greater responsibility than that

---

**Page 94**

1  position of the major.
2      Q    According to what authority,
3  according to what policy, what rule?
4      A    It's the qualifications for
5  the job, the minimum --
6      Q    According to what policy?
7      A    There's no policy written to
8  decide what the qualifications are.
9  That's between the appointing authority
10  who noted that the business necessity
11  should have been -- should be greater of
12  the qualifications for police chief than
13  it is for major.
14      Q    So it's based on the city
15  manager's opinion.
16      A    That particular position was
17  at the discretion of the city manager to
18  discuss the business necessity.  I'm
19  pretty sure that it was brought to his
20  attention that, because of the formation
21  of the major's position, a position
22  greater than the major had to have more
23  qualifications.

---

**Page 95**

1      Q    According to whom?
2      A    That's the hierarchy of
3  position.  You have to have greater
4  qualifications and more responsibilities
5  than the people that you supervise.
6      Q    But you're saying there is
7  no formal policy that says that within the
8  Dothan police department, that in order to
9  be over someone, you have to have more
10  managerial experience.
11      A    There's no policy.
12      Q    And so the EEO, in its
13  investigation of Mr. Gray's complaint just
14  said, well, because the city manager says
15  so, because the personnel director says
16  so, there's no written policy, but that's
17  got to be right, so no cause finding on
18  his complaint.
19          MR. MITCHELL:  Object to
20  form.
21      A    I don't think it's just that
22  simply placed that when you're looking at
23  a job description because it is vacant,

---

**Page 96**

1  that is the time that the department head
2  or the appointing authority reviews it to
3  see if there's any changes in the job
4  descriptions.  And they basically would
5  note that there may be additional business
6  necessity or requirements for the
7  position, education or experience at that
8  point.
9      Q    According to what, though?
10  You have just told me there is no formal
11  policy within the City of Dothan's police
12  department that requires someone to have
13  more managerial experience over the
14  position in which they supervise, correct?
15          MR. MITCHELL:  Object to
16  form.  That mischaracterizes his
17  testimony.
18      Q    You testified that there is
19  no formal policy that states -- there's no
20  policy.  You testified there is no policy
21  that states that someone has to have more
22  managerial experience than the person that
23  supervise, correct?

---

Page 97

1      A   I think that's standard
2  practice.
3      Q   You think.
4      A   Well, it is standard
5  practice that you have to have more
6  experience than the people you supervise.
7      Q   You can point to no policy
8  that states that, though.
9      A   No.
10     Q   Other than Mr. Gray's
11 complaint for failure to promote to
12 lieutenant, his complaint for failure to
13 be promoted to chief of police, his
14 complaint alleging race discrimination and
15 harassment in June of 2013, are you aware
16 of any other complaints made by Mr. Gray
17 during his employment?
18     A   No.
19     Q   And of those three
20 complaints, no cause was found for any of
21 those complaints.
22     A   No.
23     Q   Have you testified about

Page 98

1  everything that you're aware of relating
2  to these investigations into these
3  complaints?
4          MR. MITCHELL:  Object to
5  form.
6      A   Yes.
7      Q   Was your answer yes?
8      A   Yes.
9      Q   How long have you worked for
10 the City of Dothan?
11     A   I'm probably in my 26th
12 year.
13     Q   In what position did you
14 start?
15     A   City planner.
16     Q   How long were you in that
17 position?
18     A   If I remember correctly,
19 from '88 until 1998.
20     Q   Okay.  What position were
21 you in after that?
22     A   Well, during that time I was
23 part-time EEO, and I went full time, if I

Page 99

1  remember correctly, in 1998.
2      Q   During what period between
3  '88 and '98 were you part-time EEO?
4      A   Well, I went full time in
5  1998.  So from '95, I think, when I was
6  initially appointed to -- I can't remember
7  the date of this resolution right off.
8      Q   So between '95 and '98,
9  approximately --
10     A   Approximately.
11     Q   -- you were a part-time
12 EEO --
13     A   (Witness nodding head).
14     Q   -- while you were city
15 planner.
16     A   Yes.
17     Q   And then you became
18 full-time EEO in 1998; is that correct?
19     A   As I remember.
20     Q   And how long were you in
21 that role?
22     A   I can't -- I don't recall
23 the dates in mind, but somewhere after

Page 100

1  2000.  You know, it's in my mind 2003, but
2  it could have been before that I was
3  promoted to purchasing.
4      Q   But now you're back in EEO.
5      A   For a while I was in
6  purchasing.  I did do a whole EEO position
7  until they filled the vacancy, a whole
8  year then.  At the same time I was doing
9  purchasing.
10     Q   So you went from full-time
11 EEO to full-time purchasing, back to EEO.
12     A   In the end.
13     Q   And you keep referring to
14 this move to purchasing from the EEO
15 officer position as a promotion.  How was
16 it a promotion?
17     A   Well, it was -- I considered
18 it as a promotion because the elected
19 officials wanted to change the direction
20 with EEO and put it back part time, and I
21 was in a full-time position.  I had the
22 option of going to -- back to planning or
23 to be promoted to purchasing agent.

Page 101

1     Q   In what year was that,
2  approximately?
3     A   I can't remember -- recall
4  that.
5     Q   Was it -- let's see.  So
6  that was in 2003 that you moved to
7  purchasing.
8     A   I'm guessing that, you know,
9  somewhere around there or before.
10    Q   And that was because the
11  city manager had decided to make the EEO
12  position a part-time position.
13    A   The elected officials
14  basically wanted to change the direction
15  back to -- there's always been an issue
16  with full-time versus part-time EEO with
17  the elected officials.
18    Q   Why is that?
19    A   The workload, whether it
20  should be a full-time position or a
21  part-time.  Certain, you know,
22  commissioners at that time thought that it
23  should be part time, and there's

Page 102

1  commissioners that thought it was a full
2  time.  That's the reason it's back to full
3  time.
4     Q   Who makes the decision as to
5  whether the EEO position is full time or
6  part time?
7     A   The city commission is the
8  appointing authority for the EEO position.
9  The consent decree basically says the city
10  commission shall appoint an EEO officer.
11    Q   And so the city commissioner
12  makes that determination.
13    A   Yes.
14    Q   Whether the job is full time
15  or part time.
16    A   Yes.
17    Q   And they decided at that
18  time that that job should be part time.
19    A   Yes.
20    Q   Did you disagree with that
21  position?
22    A   No.
23    Q   Did you feel like it was a

Page 103

1  full-time job?
2     A   Yes, I did.
3     Q   Did you advise the city
4  commission of your thoughts that you
5  thought it was a full-time job?
6     A   No.
7     Q   You didn't voice that
8  opinion to anybody.
9     A   No.
10    Q   Why not?
11    A   It was at their discretion.
12    Q   How would they have known
13  without talking to you whether the
14  workload was full time or part time?
15    A   I think they just had a
16  perception.  Some -- and we're talking
17  about different mayors, we're talking
18  about different elected officials at that
19  point in time who had beliefs that the
20  position should be part time.  There are
21  some that believe it should be full time.
22  And initially, when I was part time, the
23  commission at that time wanted to be full

Page 104

1  time, and then it was brought back to part
2  time and then back to full time.
3     Q   Who wanted it to be part
4  time?
5     A   I can't remember at that
6  time.  It started off part time.
7     Q   So in response to the
8  consent decree --
9     A   It doesn't say whether it
10  should be part time or full time.
11    Q   -- -The city decided it was
12  going to be a part-time position --
13    A   Initially when it was
14  created.
15        THE COURT REPORTER:  Y'all
16  are talking over each other.
17        MR. MITCHELL:  Wait for her
18  to finish her question before you begin to
19  speak.
20        THE WITNESS:  Okay.
21    Q   (BY MS. EDWARDS:)  I'll just
22  rephrase my question.
23        After the consent decree was



Page 105

1  issued, the city through the city
2  commissioners decided that the position
3  should be part time.
4       A    When they created the
5  position, it was part time.
6       Q    And that position was
7  created as a result of the federal consent
8  decree.
9       A    Correct.
10      Q    And so it wasn't until 1998,
11  that they decided to make the position
12  full time.
13      A    Correct.
14      Q    And then in 2003, they
15  decided to make it part time again?
16      A    Somewhere around there.
17      Q    And who specifically made
18  the decision back in 2003, that the
19  position should go back to part time?
20      A    The elected officials.
21      Q    Which were?
22      A    I can't remember at that
23  time.

Page 106

1       Q    Is there anything that would
2  refresh your recollection?
3       A    Not at all.
4       Q    Just whoever were the
5  elected officials at that time.
6       A    Were at that time.
7       Q    But when you say, "elected
8  officials," you're referring to the city
9  commission?
10      A    Commission.
11      Q    So does the mayor have to --
12  does the city manager have to sign off on
13  their recommendation for this position?
14      A    He doesn't have to do that.
15      Q    Don't you report to him?
16      A    I do now.
17      Q    Who did you report to then?
18      A    When I was first appointed,
19  I had a committee of a mayor and two
20  commissioners.
21      Q    Who were they?
22      A    I think at that time was
23  Chester Sowell was may ore.

Page 107

1       Q    I'm sorry.  Could you spell
2  that?
3       A    Chester Sowell, S-o-w-e-l-l,
4  and if I remember correctly John Blanton
5  and Pat Thomas.
6       Q    Who was the mayor?
7       A    Chester Sowell.
8       Q    And the other two were
9  commissioners.
10      A    Correct.
11      Q    And so they supervised you
12  from 1998 through when?
13      A    Initially, when I was
14  appointed, I think, in '95, and -- when I
15  was first appointed, and then at that time
16  a new city manager was hired by the city,
17  Jerry Gwaltney, who basically felt that
18  the position should be full time.  And
19  they, the commission elected to bring it
20  back on a full-time basis.
21      Q    Why did he believe it should
22  be full time?
23      A    I can't tell you, you know,

Page 108

1  his reasoning, other than he knew that I
2  was in the position in a part-time basis
3  and there was no way I could survive, you
4  know, being in a part-time capacity.
5       Q    So you believe he made the
6  position full time just to benefit you.
7       A    Well, I was already in the
8  position.
9       Q    So he did it to supplement
10  your income, basically.
11      A    Well, no.  I wouldn't say it
12  supplemented my income.  When I went full
13  time, I was able to leave planning, city
14  planning.
15      Q    And so the only reason you
16  can think of was that he wanted you
17  specifically full time in the EEO
18  position.
19      A    The city manager felt that
20  the position should be full time, and I'm
21  pretty sure he convinced the commission
22  that it should be a full-time position as
23  well.

Page 109

1    Q   I guess, I'm just wondering
2  why he felt that it should be a full-time
3  position.
4    A   I was not privy to those
5  discussions.
6    Q   Did you believe it should be
7  a full-time position?
8    A   Well, we've got to
9  understand when we first created, and it
10 was sort of like pioneering the foundation
11 of the position itself, no one knew how
12 often it was going to pan out, what all
13 was going to be involved, how busy the
14 individual was.  But I looked at it as
15 that person being there, it's pretty much
16 a deterrent from, you know, violation of
17 Title 7 issues.  That person there,
18 there's visibility, is there to make sure
19 that everybody is treated fair as equal
20 employment opportunity, there is fair
21 treatment, there is due process, and so
22 forth.
23    Q   How?

Page 110

1    A   Because that person assures
2  that.
3    Q   How?
4    A   Based on the job description
5  in the consent decree, when I review
6  selection memos, I make sure tests are
7  validated.  I do recruiting, I do Title 7
8  investigations.
9    Q   Do you review every resume
10 that comes into the city?
11    A   I review every selection
12 memo.  There are times that applicants
13 come to me and provide me their resumes.
14 I would interview them and see where they
15 would fit in the organization with their
16 experience and qualifications.  As part of
17 the recruiting process, I do collect
18 resumes.
19    Q   But not every resume that
20 comes into the city.
21    A   Well, the resumes alone
22 don't come into the city.  There's
23 applications for positions that come in.

Page 111

1  You can attach that.  There's a formal
2  application process.
3    Q   Did those go through you?
4  Does every application to the city go
5  through you?
6    A   No.
7    Q   So you only see it after the
8  hiring manager makes their selection.
9    A   Right.  And I review it
10 based on the consent decree, what it says.
11    Q   Does the hiring manager
12 forward you his selection --
13    A   Yes.
14    Q   -- and you review that
15 person to determine whether this is okay
16 or is this is not.
17    A   I review the selections to
18 make sure it's valid and nondiscrimnatory.
19    Q   How do you do that?
20    A   I look at the applications.
21 I have access to the applications.  I'm
22 not privy to the interview, but I am privy
23 to the applications.  So I review what

Page 112

1  they review, the hiring authority reviews.
2    Q   So you're not privy to the
3  interview, to the interviews?
4    A   No, I'm not.
5    Q   And so what do you receive
6  with regard to a hire?
7    A   A selection memo.
8    Q   And what does that consist
9  of?
10    A   It consists of the
11 justification for the selection of that
12 particular applicant and the denial of the
13 other applicants in that particular memo.
14 We utilize the certification of three, the
15 top three people that score one, two,
16 three on the register.  And there could be
17 tied ranks and stuff, so I could get more
18 than three applicants for a particular
19 position on the selection memo.
20    Q   So you are -- you have
21 access to the person that the hiring
22 authority recommends.  The hiring
23 authority, being the hiring manager,

Page 113

1  correct?
2      A   I have access.  Would you
3  explain?
4      Q   You have access to the
5  applications --
6      A   Yes.  Yes.
7      Q   -- that were submitted.  All
8  of the applications for that position?
9      A   For every selection memo, I
10 have access to it.
11     Q   To all of the applications
12 that came in for that particular
13 selection.
14     A   No.  Yeah.  For that
15 selection, yes.
16     Q   Okay.  So if the position
17 brings in ten applications, you get to see
18 all ten applications.
19     A   No.  The applications are
20 graded either by experience or by test or
21 a combination of both.  The personnel
22 follows the rule of three, based on the
23 Civil Service Act.  And like I said, there

Page 114

1  could be tied ranks and there could be
2  more than three people.
3      Q   And so you only get to see
4  who the hiring manager designates as the
5  top three.
6      A   No.  The hiring manager does
7  not designate or certify the applicants
8  for consideration.  That's done by
9  personnel.
10     Q   And you don't have access,
11 though, to the interview portion of the
12 selection process.
13     A   I don't.
14     Q   What -- describe, other than
15 hiring -- well, first of all, why was the
16 consent decree put into place?
17     A   Well, in 1976, it was
18 alleged by African Americans in the
19 community that there was discrimination
20 practices by the City of Dothan.  They
21 went to court, and the allegation was
22 unfounded, but they entered into a consent
23 decree that basically spells out things

Page 115

1  they must do, the provisions, and so
2  forth, and the consent decree spelled out
3  a number of things.
4      Q   How do you know it was
5  unfounded?
6      A   It says it in the consent
7  decree.
8      Q   The consent decree says that
9  the finding of race discrimination was
10 unfounded.
11     A   They found -- I mean, it
12 doesn't specifically have that language in
13 it, but --
14     Okay.  The City's class action
15 was filed June 3rd, 1975, challenged
16 various employment practice and procedures
17 of the City of Dothan.  More particularly,
18 the plaintiff claimed that black person
19 was discriminated against by the City on
20 the basis of race in the city's
21 recruiting, hiring, promotion -- promoting
22 assignment and test practices.
23     On July 28th, the day of July,

Page 116

1  1975, the defendant's filed an answer
2  denying that any of the -- any of them had
3  discriminated against or were
4  discriminated against the named plaintiff
5  or any members of the class they
6  represent.  It says:  Now in resolution
7  and settlement of all pending claims and
8  allegations, and without jurisdiction of
9  merit, the parties agree to enter -- to
10 the entry of and be bounded by the
11 following order or decree.
12     Q   That didn't say they were
13 unfounded, did it?
14     A   It didn't use that language.
15     Q   But you think it was
16 unfounded.
17     A   I wasn't -- back then, I can
18 only go with what's in the content in
19 here.
20     Q   And the content in there
21 does not say that it was unfounded, does
22 it?
23             MR. MITCHELL:  Object to

Page 117

1    form.
2        A    It says --
3        MR. MITCHELL:  That's
4    argumentative.  It says what it says.
5        Q    I'm just asking you to
6    clarify your testimony, Mr. Mathews.
7        A    I'm reading what it --
8        Q    You said --
9        A    -- what it says.
10       Q    You testified a while ago
11   that you believed the consent decree that
12   was entered by a federal court stated that
13   the plaintiff's allegations alleging race
14   discrimination and harassment were
15   unfounded, did you not?
16       MR. MITCHELL:  Object to
17   form.
18       A    That was just my
19   terminology.  I read what the consent
20   decree said.
21       Q    Describe Dothan's
22   affirmative action plan.
23       A    Okay.  The Equal Opportunity

Page 118

1    Affirmative Action Plan is dated August
2    19th, '75.  It is voluntary, but not court
3    mandated.  It was updated in 2009.  It
4    gives the general purpose.  The purpose of
5    the plan, it deals with recruiting, basing
6    personal decision on employment and
7    promotion solely on individuals
8    qualifications for the position.  It talks
9    about testing.  It talks about external
10   dissemination policy as it relates to
11   information, external dissemination
12   policy, duties and responsibility of the
13   EEO officer, which is the manager of the
14   affirmative action plan.
15       Q    Which is you.
16       A    Which is me.  It talks about
17   the objectives of the plan.  Employment
18   practices, dealing with -- the Civil
19   Service Act, personnel board, personnel
20   regulations.  It's just a, you know,
21   asundery of recruiting, posting job
22   notices, and some of the agencies they
23   should be provided to.  The selection

Page 119

1    process.  It just goes on and on.
2        Q    May I see that document?
3        A    (Witness hands document.).
4        MS. EDWARDS:  Could we go
5    off the record?
6            (Off the record.)
7        MS. EDWARDS:  Back on the
8    record.
9        Q    (BY MS. EDWARDS:)  Mr.
10   Mathews, I am looking at the Equal
11   Opportunity and Affirmative Action Plan
12   for the City of Dothan.  This is dated
13   August 1975, updated December 2009.  And
14   this has been previously produced as Bates
15   Number 1697 through 1717.  Is this the
16   most recent version of the City of
17   Dothan's affirmative action plan?
18       A    Yes.
19       Q    That was revised in 2009.
20       A    Yes.
21       Q    That plan calls for you as
22   the equal employment officer to provide
23   reports, correct?

Page 120

1        A    Well, actually the personnel
2    department provides the reports, they
3    gather the data from the applications.
4        Q    So the personnel department
5    provides reports --
6        A    Provides that documentation.
7        Q    -- related to the
8    affirmative action plan.
9        A    Right.
10       Q    And those documents measure
11   the effectiveness of the affirmative
12   action plan.
13       A    It gives the fiscal data on
14   percentages of -- as it relates to hiring
15   that we -- you know, personnel that we
16   have.  It talks about the diversity, the
17   percentage of diversity or nondiversity,
18   positions, and so forth; just a number of
19   things.  And that report is done every
20   month because they have access to the
21   applications.
22       MS. EDWARDS:  I don't recall
23   having received any of those reports

Page 121

1  related to the affirmative action program.
2  Do you know whether those have been
3  produced?
4          MS. MAYS:  I don't know the
5  answer to that.  I don't know whether
6  they've been requested.
7      Q   Can you tell me whether the
8  affirmative action program, what it has
9  shown as it relates to the hiring within
10 the police department?
11     A   I think it is shown that we
12 do reach out for the diversity, trying to
13 take all the necessary steps in hiring
14 diversity within the department.
15     Q   So your own reports that are
16 prepared pursuant to this affirmative
17 action plan --
18     A   It gives us statistical
19 information.
20     Q   What does it show as far as
21 improvements to hiring minorities within
22 the Dothan police department?
23     A   It basically shows that we

Page 122

1  still have challenges, but we do and have
2  hired when we've had those opportunities.
3      Q   What does it show about
4  promotions within the Dothan police
5  department?
6      A   Well, it shows that we've
7  promoted diversity in the police
8  department, such as Mr. Gray, as an
9  example.  Other minority officers have
10 been promoted based on merit and them
11 doing well on the testing process.
12     Q   What percentage of the
13 police department are black?
14     A   I don't have that
15 information.  It varies at any given time
16 because of attrition.  I think overall the
17 minority percentage at the city fluctuate
18 between twenty-two and twenty-three
19 percent.
20     Q   What about within the police
21 department?
22     A   I don't have that data,
23 because as I say, it changes.

Page 123

1      Q   Approximately what
2  percentage of sworn police officers within
3  the police department are black?
4      A   I would really rather not
5  speculate --
6      Q   So you don't know.
7      A   -- at this point because
8  there were points that I did have the
9  information, but I do know that they make
10 the strongest effort in recruiting.
11     Q   How?
12     A   We go to job fairs.  We take
13 police officers with us, and a lot of them
14 are minorities.  We take -- one other
15 department that we have challenges in --
16 the two most visible positions that we
17 have challenges, we take the recruiting
18 fairs to recruit minorities and woman of
19 diversity, so to speak.
20     Q   So you admit you have some
21 challenges in the police department with
22 diversity.
23     A   Well, yes.  I think that's

Page 124

1  pretty much standard around the country.
2      Q   You think or you know.
3      A   I know that other cities
4  have the same challenge.
5      Q   Like who?
6      A   Well, Birmingham has the
7  same challenge.  All the cities, I think
8  that's evident by what you have seen and
9  view on TV of incidents and stuff.
10     Q   As far as what?
11     A   The issues of them not
12 having the diversity that the community
13 probably feels they should have.
14     Q   Now, what are you referring
15 to on TV that you're referencing?
16     A   Incidents regarding, such as
17 the Ferguson incident, other incidents
18 like that that have happened around the
19 country, that it's been noted that there's
20 not a significant enough diversity in the
21 departments.  And particularly with us,
22 it's not because we haven't tried.  We
23 continously reach out, very strongly in



Page 125

1  the community when it relates to police
2  and fire.
3      Q  Do you -- in your efforts
4  within the police department, are you able
5  to review -- well, you testified earlier
6  you don't review every application that
7  comes in, do you?
8      A  I don't review the
9  application.  I review those that are
10  certified through personnel for the
11  interview.  Those are the ones that are
12  being considered for selection.
13     Q  So you don't get to see the
14  overall picture.  You only get to see once
15  it's narrowed down by the hiring manager
16  to their final candidates to review,
17  correct?
18         MR. MITCHELL:  Object to
19  form.  He said the personnel department
20  does the narrowing.
21     A  Right.
22     Q  So the personal department
23  being Delvick McKay.

Page 126

1      A  Right.  I don't think it's a
2  situation if I asked and had reasons to
3  ask that I would not be afforded those
4  opportunities.
5      Q  But you haven't asked.
6      A  I haven't had reason to.
7      Q  But yet you admit that
8  diversity is still an issue within the
9  department.
10     A  Yes.  And with -- diversity
11  has been the issue with government all
12  around the country.
13     Q  What is the percentage of
14  blacks versus whites in Dothan, just the
15  city in general, nonemployed by Dothan?
16     A  It's -- well, the total
17  diversity, I think, is around twenty
18  percent.  If you take all other ethnics
19  group, I think it goes down to about
20  thirteen.
21     Q  I'm sorry.  What?
22     A  Thirteen percent of the
23  population.

Page 127

1      Q  Is what?
2      A  African American.
3      Q  In the city of Dothan?
4      A  Yes.
5      Q  Where are you getting that
6  static?
7      A  From -- the last I looked at
8  it, it was data provided from -- planning
9  through census data.
10     Q  A government census?
11     A  Yes.
12     Q  Where did you obtain that
13  information?
14     A  Through planning.
15     Q  From whom?
16     A  The planning department.
17     Q  The city planning
18  department?
19     A  Yes.  But overall diversity
20  is about, I think, twenty percent, the
21  last time I looked at it.
22     Q  I'm talking about the
23  residents who live, not just who work for

Page 128

1  the City of Dothan, but the overall
2  residents who live in the city of Dothan?
3      A  I think that's going to be
4  around thirteen percent.
5      Q  So, in your mind, the
6  population of Dothan, according to the
7  United States census is twelve to thirteen
8  percent black.
9      A  Yes.
10     Q  And your testimony is that
11  you received that information from the
12  city planning department for the City of
13  Dothan?
14     A  When I've inquired for that
15  information.
16     Q  When have you inquired for
17  that information?
18     A  I can't recollect when I did
19  that.
20     Q  Has it been one year, five
21  years, ten years?
22     A  I would hate to speculate.
23     Q  So you don't know, sitting

Page 129

1  here today, when you last decided to look
2  at the percentage of blacks versus whites
3  in the city of Dothan?
4      A   (Witness nodding head).
5      Q   Don't you think that it's
6  kind of important to look at that in
7  relation to the diversity within the City
8  of Dothan in hiring and retaining
9  employees?
10      A   Well, as I mentioned to you
11  that the minority reports that are
12  provided by personnel shows the percentage
13  of African American in the workforce.
14          When you're talking about
15  population, you're talking about woman,
16  children and everybody.  It's not
17  necessarily those eligible for employment.
18      Q   Sitting here today, can you
19  state whether or not the City of Dothan
20  has studied its workforce in relation to
21  the population statistics of African
22  Americans versus whites?
23      A   Say that again.

Page 130

1          MR. MITCHELL:  Is that a
2  question?
3      Q   Yes.
4          MR. MITCHELL:  Object to the
5  form, then.
6      Q   Has the City of Dothan ever
7  done a study?  Has the City of Dothan ever
8  compared the percentage of minorities in
9  its workforce versus the percentage of
10  minorities in the general population for
11  the City of Dothan?
12      A   We have the data on the
13  percentage of African Americans in the
14  workforce.  That personnel report is done
15  every month.
16      Q   Correct.
17      A   And we don't -- we just
18  don't look at population in general.
19          MS. EDWARDS:  Can we take a
20  quick break?
21          (Lunch recess.)
22      Q   (BY MS. EDWARDS:)  Mr.
23  Mathews, what equal opportunity training

Page 131

1  have you given to the Dothan Police
2  Department?
3      A   We have an online employment
4  law program that all supervisors take
5  yearly.
6      Q   You said you have an online
7  program.
8      A   Yeah, employment law program
9  that all supervisors must take each year.
10      Q   Do they have a to certify as
11  such in their personnel files?
12      A   I'm not sure of that, but I
13  know they are supposed to take it and
14  notify their department head that they
15  have taken it.
16      Q   So you don't monitor whether
17  each manager takes that.
18      A   I don't have the -- the
19  ability computer wise to see, but I think
20  personnel compiles some of that
21  information.
22      Q   But sitting here today, you,
23  personally as the EEO officer, do not know

Page 132

1  for sure whether or not these managers
2  have participated in this online training.
3      A   No.
4      Q   Who creates this online
5  course?
6      A   It's a company that we use
7  that develops the program.
8      Q   What company?
9      A   I don't have that
10  information with me today.
11      Q   Who set this up with this
12  company?
13      A   Personnel brought to it my
14  attention when I was promoted back to EEO.
15      Q   Who actually implemented it,
16  then?  Who within the police department
17  implemented this?
18          MR. MITCHELL:  I'm sorry.  I
19  couldn't hear the question.
20      Q   I'm sorry.  Who within the
21  police department implemented this
22  training?
23      A   It wasn't the police

Page 133

1  department implemented it.  It's personnel
2  gathered the information from a company
3  that provided online program, and
4  supervisors were required to take it
5  yearly.
6      Q    What have you done with
7  regard to reviewing this training?
8      A    Well, since I've been back
9  in EEO, I have developed a leadership
10  academy that's for every supervisor and
11  foreman in the city.
12      Q    Let me just stop you before
13  we move into that.
14      With regard to the online
15  training, did you review it?  Did you ever
16  review the training yourself?
17      A    I think I reviewed some of
18  the information.
19      Q    But sitting here today, you
20  can't testify that you've reviewed the
21  online training.
22      A    It was -- the reason that I
23  say that, it was implemented by another --

Page 134

1  when another person served in that
2  capacity.
3      Q    Who?
4      A    I can't recall exactly who
5  it was.
6      Q    So you can't say, sitting
7  here, that you have actually reviewed the
8  curriculum in full and --
9      A    I've seen some of the
10  questions.
11      Q    Some of them.
12      A    Right.
13      Q    But not all of them.
14      A    Well, I'm trying to remember
15  in detail.  It's just some general
16  information about employment law.
17      Q    What is the format of the
18  training?
19      A    They go on the computer and
20  take the course --
21      Q    I mean, what are the --
22      A    -- and scores.
23      Q    I'm sorry.  I didn't mean to

Page 135

1  interrupt you, sir.
2      A    They go on their computer
3  and take the course and they have to pass.
4      Q    What is the course?  What
5  does the course consist of?
6      A    If I remember correctly, it
7  has Title 7.  It talks about different
8  kinds of discrimination, and so forth.
9  It's just your basic employment law.
10      Q    Does the online training
11  incorporate anything specific to the City
12  of Dothan such as the consent decree?
13      A    No.
14      Q    Have you conducted personal
15  classroom training with the department?
16      A    I have, at the department
17  head retreat, I have talked to them about
18  employment law, and generally do at the
19  discretion of the city manager.
20      Q    At what retreat?
21      A    We have a department head
22  retreat probably -- periodically.
23      Q    When is the last time you

Page 136

1  had a retreat?
2      A    The last time we had it when
3  it was addressed, it was around when the
4  Ferguson incident, you know, happened.
5      Q    So this was after Mr. Gray
6  was terminated.  This was after Mr. Gray's
7  termination.
8      A    I'm not sure when all of
9  that was, the dates.  We have them
10  periodically.
11      Q    When before the Ferguson
12  incident was the last time that you had
13  this training?
14      A    Are you talking about the
15  employment law online course?
16      Q    Yeah.  I'm talking about any
17  classroom format training that you have
18  had with the police department on your EEO
19  policies.
20      A    Other than some individual
21  occurrences that I've taught, I don't
22  recall or remember any particular detail.
23  I basically, when I deal with selection

Page 137

1  memos, I do a lot of, you know, back and
2  forth talking to them about their
3  selections and how we have to make sure
4  the selection is valid and
5  nondiscriminatory, can't be based on race,
6  sex, religion, disability, and all of
7  that.  And I'm constantly in talks with
8  those who do the selections.
9       Q    What training, though, have
10 you conducted with the police department
11 that was specific to the department's
12 policy on race discrimination and
13 harassment?
14           MR. MITCHELL:  Object to
15 form.
16      A    I haven't.
17      Q    So you, sitting here today,
18 you can think of one retreat that occurred
19 during the Ferguson incident that included
20 the department heads.
21      A    And the -- I do mention the
22 online course as well.  My communication
23 with the internal staff supervisors on a

Page 138

1  consistent basis as it relates to
2  selection memos.
3       Q    And that's just with regard
4  to the selection of the individuals that
5  they have whittled it down to present to
6  you --
7       A    Yes.
8       Q    -- for hiring.
9       A    Yes.
10      Q    What is the EEO policy of
11 the City of Dothan?
12      A    We have the EEO -- statement
13 of EEO policy that was dated when I signed
14 it when I returned to EEO May 8th, 2012.
15 It talks about implementation of the City
16 of Dothan's policy, among other
17 appropriate actions including, recruit,
18 test, selection, hire, train more
19 personnel in all job classification with
20 regard to race, creed, colors, sex, age
21 and cat persons, and so forth.  Base
22 decisions on -- as to further insure the
23 principle of equal employment opportunity,

Page 139

1  all basic employment decisions as to the
2  future to insure the principles of equal
3  opportunity by imposing valid and
4  job-oriented requirements for promotion
5  opportunities.  And I signed this on May
6  8th, 2012, and distributed it to all the
7  departments, and it is posted.
8       Q    May I see it, please?
9       A    (Witness hands document.).
10           MS. EDWARDS:  Off the record
11 a second.
12           (Off the record.)
13           (Whereupon, Plaintiff's
14           Exhibit Number 3 was marked
15           for identification.)
16      Q    (BY MS. EDWARDS:)  Mr.
17 Mathews, you were testifying as to the
18 City of Dothan's statement of EEO policy
19 dated May 8th, 2012, correct?
20      A    Correct.
21      Q    I'm marking that as
22 Plaintiff's Exhibit 3.  Who created this
23 policy?

Page 140

1       A    I can't answer that
2  question, but the City has had a standing
3  statement of EEO policy, you know, ever
4  since the city's affirmative action plan
5  was done.  EEO officers that serve sign a
6  statement to this effect.
7       Q    So this is your -- this was
8  the policy that was in effect at the time
9  of Mr. Gray's termination.
10      A    Yes.
11      Q    This form, are the employees
12 required to sign any certification that
13 they have received this policy?
14      A    No.  It's posted on all of
15 the bulletin boards, and I personally take
16 them to the departments and make sure they
17 are posted.
18      Q    This doesn't reference the
19 consent decree, does it?
20      A    No.
21      Q    Do the bulletin boards have
22 the consent decree posted?
23      A    No.

Page 141

1      Q   Do the bulletin boards have
2  the affirmative action plan posted?
3      A   No.  It's on the computer,
4  and, I think, personnel hands out
5  handbook.
6      Q   Do you require employees to
7  access the computer to view those
8  policies?
9          MR. MITCHELL:  Object to
10 form.
11     A   I haven't.
12     Q   Is there any requirement of
13 which you're aware within the City of
14 Dothan that requires employees to view the
15 Affirmative Action Plan and the Consent
16 Decree and the Affirmative Action program
17 online?
18     A   There is no policy.
19     Q   And so there is no
20 requirement that employees sign any sort
21 of confirmation that they've received this
22 EEO policy.
23     A   Nothing employees sign.

Page 142

1  Like I said, it's posted on all bulletin
2  boards where it's -- it's visible with job
3  announcements as well.
4      Q   So it's on the bulletin
5  board with other --
6      A   Every department with
7  the documents of employment openings, and
8  so forth.
9      Q   And so you don't require
10 management to sign confirmations that
11 they've received this policy.
12     A   I don't require anybody to
13 sign that, but I gave the form and
14 informed the department heads when I went
15 and brought the document, insure that it
16 was posted.  So they had knowledge of the
17 policy.
18     Q   But you never conducted any
19 specific training on the policy.
20     A   No.
21     Q   And you never conducted any
22 specific training on the consent decree,
23 correct?

Page 143

1      A   Other than -- I have done
2  some individually when I was appointed
3  previously, and I think there was one
4  opportunity when I did do the police
5  department specifically.  I can't remember
6  all the details of the departments then
7  that I did.
8      Q   This was the first time you
9  were an EEO manager by Gwaltney.
10     A   I can't remember exactly
11 when it was, whether I was part time, full
12 time, but department heads and employees
13 are aware of these documents.
14     Q   How do you know that?
15     A   Just general information
16 that they either heard about it or I've
17 seen it.
18     Q   But you have nothing to
19 confirm that each employee is aware of it.
20     A   I don't have anything no
21 body signed, no.
22     Q   So you have no real way of
23 knowing whether every employee is aware of

Page 144

1  this consent decree or the affirmative
2  action program.
3      A   I have no way of knowing
4  that they have not or they do not have
5  knowledge.
6      Q   How many complaints of race
7  discrimination or race harassment have you
8  received while you have been the EEO
9  officer of the City of Dothan?
10     A   Well, when you say,
11 "complaints," are you talking about Title
12 7 investigations?  Can you expound,
13 because there is a difference that I would
14 have information on?
15     Q   Any employee or any member
16 -- any member or member of management, for
17 that matter, who has complained about race
18 discrimination or race harassment.
19     A   How many cases?
20     Q   Yes.
21     A   This recent one with Mr.
22 Gray.  There was a retaliation complaint a
23 couple of years ago by a Dothan utilities

Page 145

1  employee.
2       Q   Who was that employee?
3       A   I think his -- don't hold me
4  to this, but I think his name is Anthony
5  Smith.
6       Q   When was this filed?
7       A   It's been since I've been
8  back.
9       Q   Approximate year?
10      A   I came back in 2012.  It's
11 been since 2012.
12          I'm trying to think of any for
13 race discrimination and retaliation you
14 said.
15          MR. MITCHELL:  No.  The
16 question was race discrimination and
17 harassment.
18      A   And harassment.
19      Q   We'll get to retaliation in
20 a minute.
21      A   What type of harassment?
22 May I ask?
23      Q   Race.

Page 146

1       A   I would, if I can remember
2  correctly, it's just those two.
3       Q   Just Anthony Smith --
4       A   And Mr. Gray.
5       Q   -- and Mr. Gray.
6          Do you recall a complaint
7  received from a ReaMonica Carney?
8       A   That, yes.  Her -- the
9  complaint that was filed with me was by a
10 number of police officers that have
11 comments on Facebook had racial content.
12      Q   So your testimony is you
13 never investigated a complaint on her
14 behalf for race discrimination.
15      A   Well, she alleged -- there
16 was a complaint that she alleged taking an
17 assignment from her, but it was based on
18 the -- she was removed from an assignment
19 because of her Facebook comments.
20      Q   So your testimony is you've
21 never investigated a race discrimination
22 or harassment complaint that she made.
23      A   Not that I recall.

Page 147

1       Q   Do you recall investigating
2  a race discrimination or a harassment
3  complaint made by a Sylvia Summers?
4       A   I remember some content
5  about that.  I don't remember that it was
6  an actual complaint filed.
7       Q   What do you remember about
8  it?
9       A   Other than that, she was
10 complaining of sexual harassment, but I
11 don't remember that she formerly did a
12 written complaint for me to investigate.
13      Q   So it's your testimony that
14 it was not based on race.
15      A   I did not do an
16 investigation because she never really
17 filed a complaint with me.
18      Q   How did you know about any
19 complaint?
20      A   Well, she came to my office
21 alleging sexual harassment, but did not
22 file a complaint or show me -- let me know
23 that she wanted me to investigate the

Page 148

1  conduct of officers.  And if I'm not
2  mistaken, that may have been around the
3  time that I was -- I don't remember all
4  the content.
5       Q   So her word wasn't enough to
6  spark an investigation on your part.
7       A   Well, I mean, it was an
8  allegation by word but nothing official.
9       Q   Do you recall an incident in
10 which Tim Stewart, who was the head of
11 information technology used the "N" word.
12      A   Yes.
13      Q   What do you recall about
14 that incident?
15      A   I did an investigation on
16 it, his use of the "N" word.
17      Q   Can you describe that
18 investigation?
19      A   Mr. Stewart was engaged in a
20 conversation with an employee and made the
21 statement that she was using -- that
22 employee was using another employee using
23 him like a nigger.  And --

Page 149

```
 1      Q    Who did he make that comment
 2  to?
 3      A    My goodness.  I'm drawing a
 4  blank on names.  I can't think of the
 5  employee's name right now.
 6      Q    What did you do to
 7  investigate?  How did it come to your
 8  attention, first of all?
 9      A    The city manager brought it
10  to my attention.
11      Q    How did he know about it?
12      A    I can't say how he knew
13  about it, but I was just directed by him
14  to do an investigation because that was
15  the department head.  And acting as his HR
16  or EEO person, I initiated the
17  investigation.  But in that incident, Mr.
18  Stewart realized that he had said
19  something inappropriately and apologized
20  the same day to all of his employees, even
21  though they had no knowledge of his use of
22  the "N" word.  And I -- from there, I did
23  an investigation and made various
```

Page 150

```
 1  recommendations.
 2      Q    And, in fact, he was only
 3  suspended for five days, correct?
 4      A    Yes.  In addition to not
 5  getting a merit race for a year, required
 6  to take some diversity training, which we
 7  brought in a consultant, and did the
 8  training for the whole department as well.
 9      Q    Who?
10      A    They're with our -- gosh, I
11  can't even think of that -- I'm trying to
12  recall the organization that does our -- I
13  can't remember right now.
14      Q    That conversation where he
15  used the "N" word was recorded, wasn't it?
16      A    Yes.
17      Q    Who recorded it?
18      A    That's the employee I'm
19  trying to think of right now.
20      Q    Would it have been Teresa
21  Wright?
22      A    Yes.  Yes.  I just drew a
23  blank.
```

Page 151

```
 1      Q    Now, Tim Stewart is white,
 2  correct?
 3      A    Yes.
 4      Q    What race is Teresa?
 5      A    She's white.
 6      Q    What happened as a result of
 7  her recording that conversation?  Was she
 8  disciplined in any way?
 9      A    No.
10      Q    So was Mr. Stewart able to
11  retain his position of head of information
12  technology after that incident?
13      A    Yes.
14      Q    There was another incident
15  in which -- that you investigated
16  involving the "N" word, wasn't there?
17      A    No.
18      Q    Does Anthony Westbury --
19      A    No.
20      Q    -- not ring a bell with you?
21      A    Not at all.  Probably when I
22  wasn't EEO.
23      Q    So you can safely say --
```

Page 152

```
 1      A    Yes.
 2      Q    -- sitting here today that
 3  you have never investigated --
 4      A    Exactly.
 5      Q    -- anything related to him.
 6  Do you have any knowledge of --
 7      A    No.
 8      Q    -- anything related to him?
 9      A    I have no idea.
10      Q    Other than these specific
11  individuals that I've mentioned, have you
12  had any other employee complain that they
13  have heard the use of the "N" word?
14      A    No.
15      Q    Mr. Stewart is still
16  employed with the City of Dothan, isn't
17  he?
18      A    No.
19      Q    When did he quit or resign?
20      A    He retired, I guess, a
21  couple of years ago.
22      Q    And that was voluntarily.
23      A    Yes.
```

Page 153

```
 1      Q   How many lawsuits have been
 2  filed against the City of Dothan alleging
 3  race discrimination or harassment?
 4      A   I don't have that
 5  information.
 6      Q   How many are you aware of?
 7      A   When you say, "lawsuits,"
 8  you mean not just going to the EEOC,
 9  you're talking about actual lawsuits.
10      Q   Well, let's talk about both.
11  How many EEOC charges, we'll start with
12  that, are you aware of?
13      A   Mr. Gray's, and I'm trying
14  to remember.  I think it may have been
15  ReaMonica Carney.  Other than those, I
16  don't have any information that I could
17  substantiate.
18      Q   Is it possible that there
19  have been others?
20      A   Possibly and not possible,
21  because I don't know.
22      Q   How many lawsuits have been
23  filed against the City of Dothan alleging
```

Page 154

```
 1  race discrimination or harassment?
 2      A   I don't have that
 3  information, other than this one and the
 4  one that, and I'm assuming Ms. Carney is
 5  filing.
 6      Q   You don't know of any
 7  others.
 8      A   No.
 9      Q   What about retaliation?
10  Let's get back to that.  How many internal
11  complaints of retaliation have you had?
12      A   Other than Mr. Gray and
13  ReaMonica and her complaint.
14      Q   You can't think of any
15  others?
16      A   (Witness shaking head).
17      Q   Could there have been
18  others?
19      A   I couldn't answer that
20  question.
21      Q   But you just testified that
22  Anthony Smith's was retaliation.
23      A   I forgot.  Yeah.
```

Page 155

```
 1      Q   So other than Anthony Smith,
 2  Keith Gray, ReaMonica Carney, can you
 3  think of any other --
 4      A   No.
 5      Q   -- complaints of
 6  retaliation?
 7      A   No.
 8      MR. MITCHELL:  I'm sorry.
 9  Was Smith --
10      THE WITNESS:  Anthony Smith.
11      MR. MITCHELL:  Was that an
12  EEOC charge or a lawsuit?
13      THE WITNESS:  No.
14      Q   Was his an internal
15  complaint only?
16      A   Yes.
17      Q   Was he alleging anything in
18  addition to retaliation?
19      A   No.
20      Q   What was the basis of his
21  complaint?
22      A   Mr. Smith was upset about
23  his supervisors questioning him about his
```

Page 156

```
 1  whereabouts.  He got pretty belligerent in
 2  a meeting with the supervisor and the
 3  department head, and had to be subdued
 4  from hitting his supervisor.  I think the
 5  police department was called out there and
 6  he was sent home.
 7      The next day he came in to let me
 8  know that he had been -- how he had been
 9  treated and it was wrong what they were
10  doing to him, and he alleged that
11  treatment of his supervisor in the
12  determination hearing, that once I heard
13  that I was put on notice to do an
14  investigation.
15      Q   But what was he alleging?
16  I'm hearing the company side here, but I'm
17  hearing --
18      A   He was alleging that --
19      Q   I'm hearing the department
20  said, but I'm not hearing what he
21  complained about.
22      A   He complained that his
23  supervisor was treating him wrong.
```

Page 157

1      Q   On what basis?
2      A   He was nit-picking him, just
3  had it out for him.  I think a previous
4  EEO officer, maybe David Thorne had done
5  an investigation.  I don't know what all
6  that entailed.
7      Q   Who?
8      A   Pardon?
9      Q   Who did a previous
10 investigation?
11     A   David Thorne.  I think they
12 did some mediation as a result of what was
13 alleged.
14     Q   Who is David Thorne?
15     A   He was one person that
16 served as EEO.
17     Q   David Thorne was a previous
18 EEO officer.
19     A   Yes.
20     Q   And what did Mr. Thorne
21 investigate?
22     A   The same information about
23 how his supervisor was treating him.  He

Page 158

1  felt that it was harassment, you know,
2  asking him questions, but it was about his
3  whereabouts when people needed him and he
4  couldn't be found.  His supervisors
5  dislike of him.  And from my
6  understanding, they did some mediation.
7  And this, undoubtedly, continued, and as a
8  result of the incident that happened with
9  Mr. Anthony Smith and his supervisor.
10     Q   So Mr. Smith complained
11 about race to David Thornton.  Was it
12 Thorne or Thornton?
13     A   Thornton.  I don't remember
14 the details of that, of that particular
15 case.
16     Q   Is Anthony Smith black?
17     A   Yes.
18     Q   What race is his supervisor?
19     A   He's white.
20     Q   And so the second time he
21 complained to you about retaliation.  Is
22 that your testimony?
23     A   It was more of how he was

Page 159

1  being treated and he retaliated against
2  him because he was terminated.
3      Q   He was terminated?
4      A   Yes.
5      Q   So he complained to you
6  prior to being terminated.
7      A   At the hearing, the
8  determination hearing, he spoke of that on
9  tape.
10     Q   Any other complaints
11 regarding race discrimination or
12 harassment, whether formal or informal,
13 that have been made within the City of
14 Dothan other than Keith Gray, ReaMonica
15 Carney or Anthony Smith?
16     A   Not that I can recall.
17     Q   So you don't consider the
18 Sylvia Summers a complaint of race?
19     A   She did not, as I say, file
20 a complaint.  She basically came to my
21 office and saying she was being harassed
22 sexually by police officers.
23     Q   What about the "N" word

Page 160

1  incidents or incident with Mr. Stewart?
2  You don't consider that -- that came from
3  Mr. West, is that correct, the city
4  manager?
5      A   To do the investigation.
6      Q   So you didn't receive a
7  complaint from an employee on that
8  incident.
9      A   Not a written complaint, no.
10     Q   Did you receive a verbal
11 one?
12     A   I was told by the employee
13 that he had used the "N" word.  And I
14 asked her what did she have to
15 substantiate her complaint or her
16 allegation, and she said she had a tape.
17 And I said, well, if I don't have the
18 tape, it doesn't exist.  And she provided
19 me with the tape, only to find out that he
20 had apologized the same day he made the
21 statement to that particular employee.
22     Q   Now, isn't it true that you
23 were removed from your position of EEO

Page 161

1  officer originally because of performance
2  issues?
3      A    That was what a minority
4  commissioner alleged, but it was
5  unfounded.
6      Q    A minority commissioner
7  alleged that?
8      A    (Witness nodding head).
9      Q    Who?
10     A    James Reading.
11     Q    Is that spelled
12 R-e-a-d-i-n-g?
13     A    I think so.
14     Q    But it is pronounced
15 Reading.
16     A    Reading.
17     Q    You said he was a minority
18 city commissioner.
19     A    Yes.
20     Q    Meaning he's black.
21     A    Yes.
22     Q    What did he say about your
23 performance?

Page 162

1      A    Mr. Reading basically didn't
2  like the fact that he didn't have access
3  to me.  He tried to convince other
4  commissioners that the job wasn't being
5  done.  He did not like the fact when I --
6  even when I returned, that I came under
7  the city manager.  He did not like the
8  fact that I didn't recommend termination
9  of Tim Stewart; just a number of things.
10     Q    Isn't it true that there
11 were actually two black commissioners who
12 voted against your second appointment?
13     A    Yes.
14     Q    The only two minority
15 commissioners.
16     A    Exactly.  And they have
17 voted against other minorities as well.
18     Q    You were hired in --
19     Well, first of all, let me just
20 ask: How did you come about being
21 appointed the second time around back to
22 the Equal Employment Officer position?
23     MR. MITCHELL:  Object to

Page 163

1  form.  Are we talking About appointment to
2  EEO officer?
3      MS. EDWARDS:  Yes.
4      A    Back in 2012?
5      Q    Yes.  How many times have
6  you held the position?  I guess, first,
7  let me ask, because I understood from your
8  testimony that you held it twice.
9      A    I initially held it when the
10 position was formed, that was part time.
11 I went full time, I think in -- if I
12 remember correctly, as I stated in 1998.
13 And while I -- when I was promoted to
14 purchasing, I was asked to hold the
15 position until they found a replacement
16 for the position, which I did at no cost
17 to the City.  And I applied to return to
18 EEO, and I was approved.
19     Q    So you applied for a
20 demotion from purchasing.
21     A    No.  I wanted to leave
22 promotion -- I mean, purchasing, because
23 it was a dead end opportunity.  If I

Page 164

1  sought employment outside the City, it was
2  harder to get a position in purchasing,
3  which didn't pay a whole lot.  So I wanted
4  to go back to EEO.  That's the reason I
5  reapplied.
6      Q    Well, you have been calling
7  the position in purchasing a promotion.
8      A    Well, I considered it as a
9  promotion from not having a job if they
10 were going to take it back to part time.
11     Q    And so you -- did you say
12 you applied for the position the second
13 time?
14     A    Yes, this last time.
15     Q    And with whom did you apply?
16     A    I applied at that time, the
17 EEO position was under Mr. West.
18     Q    So you gave -- did you file
19 anything written with him?
20     A    I did an application.  I did
21 a resume.  I was interviewed, along with
22 others, and I was selected to come back.
23     Q    Was the job posted?

Page 165

1      A   Yes.
2      Q   Did he -- was he responsible
3  for receiving all of the applications for
4  this position?
5      A   Mr. West, yes.
6      Q   And you were hired in at
7  seventy-five thousand, three hundred and
8  seventy-nine dollars and twenty cents a
9  year; is that correct?
10     A   Hired in as to what?
11     Q   Into the EEO officer
12  position.
13     A   Back in 2012?
14     Q   Yes.
15     A   I don't remember the exact
16  salary, but it was more of a lateral move.
17     Q   From the purchasing
18  position.
19     A   Yes.
20     Q   Your salary didn't change?
21     A   No.
22     Q   So you were making
23  seventy-five thousand dollars in

Page 166

1  purchasing.
2      A   Right.
3      Q   That's exclusive of
4  benefits, correct?
5      A   No, I have benefits.
6      Q   I mean, what I'm saying is,
7  that amount does not include the amount of
8  your benefits.
9      A   I guess, no.
10     Q   You received benefits in
11  addition to receiving that salary.
12     A   Yes.
13     Q   And the seventy-five
14  thousand that you were hired in at was at
15  the very top of the range for the EEO
16  position, wasn't it?
17     A   That's what I was telling
18  you.
19     Q   Does the city furnish your
20  car?
21     A   When I returned?
22     Q   Yes.
23     A   No.

Page 167

1      Q   What about a credit card for
2  expenses?
3      A   I do have a credit card for
4  expenses.  Expenses, meaning job fairs,
5  things of that sort.
6      Q   What else do you use the
7  credit card for other than job fairs?
8      A   It's pretty much job fairs,
9  pay for registration.
10     Q   Is there anything else that
11  you put on the credit card other than job
12  fair registration?
13     A   You have to get permission
14  if you use it otherwise from Mr. West.
15     Q   Have you ever done that?
16     A   I have probably talked to
17  employees off site and may have taken them
18  to lunch when they wanted to talk to me
19  about things, but very seldom did that
20  happen.
21     Q   But it has happened.
22     A   Yes, in the past.
23     Q   Approximately how often do

Page 168

1  you use your credit card for something
2  other than entrance into the job fair?
3      A   Probably not at all.  Or
4  going to training at schools as well.
5      Q   How do you travel to your
6  job fairs?
7      A   There are some job fairs
8  that I use a city vehicle.  There are some
9  that I've used my personal vehicle.
10     Q   What is your personal
11  vehicle?
12     A   Now at present?
13     Q   Yes.
14     A   A Mercedes.
15     Q   Do you lease that through
16  Mayor Schmitz's car dealership?
17     A   I lease it through Mercedes
18  Benz Corporation.
19     Q   So you're testifying you
20  don't lease that through Mr. Schmitz's
21  dealership?
22     A   Mr. Schmitz does not lease.
23  The Mercedes Benz Corporation is the

Page 169

1  leasing agent.
2      Q   Their leasing agent.
3      A   Mercedes Benz is the
4  corporation, not Mike Schmitz dealership.
5      Q   Are you testifying that you
6  didn't lease your Mercedes through Mike
7  Schmitz's dealership?
8      A   Yes.  I mean, I did.
9      Q   Tell me about your other
10 business dealings with Mr. Schmitz outside
11 of your position of EEO officer.
12     A   May I ask the question?
13     Q   I'm just asking -- if you
14 don't understand the question, I'll
15 rephrase it.
16     A   I understand the question,
17 but I do not see my personal life is of
18 issue here.
19     Q   I'm not asking about your
20 personal life.  I'm just asking about your
21 business dealings with Mayor Schmitz
22 outside of your employment.
23     A   I don't think that's

Page 170

1  relevant to this investigation.
2      Q   Well, are you refusing to
3  answer my question?
4      A   No.  I'm just only saying
5  that it is not relevant to this
6  investigation.
7      Q   It's relevant to your
8  position as an EEO manager to the City of
9  Dothan.
10     A   Would you explain how?
11     Q   No.
12         MR. MITCHELL:  Let's take a
13 break.
14         (Short break.)
15     Q   Mr. Mathews, before the
16 break I asked a question to tell me about
17 your business dealings with Mayor Schmitz
18 outside of your employment with the City
19 of Dothan.
20     A   And can I preference this by
21 say that I have purchased or leased
22 vehicles from Mr. Schmitz before he became
23 mayor, and as well as when he was mayor.

Page 171

1          From time to time I may have
2  friends, people that I know who are
3  interested in Mercedes, and if they lease
4  or purchase, I'm given a commission.
5      Q   What commission do you
6  receive?
7      A   You mean, in dollars?
8      Q   Is it based on a percentage
9  or is it based on --
10     A   It's what they want to give
11 you.  And sometimes we -- I have said, you
12 know, for this, I want this.  It just
13 depends on how much they have, can afford
14 to discount the car for the employee, or
15 whatever.  It varies.
16     Q   "They," meaning Mayor
17 Schmitz's dealership.
18     A   Yes.
19     Q   How many times have you
20 received this kickback from Mayor
21 Schmitz's dealership?
22         MR. MITCHELL:  Object to
23 form.  I object to the form.

Page 172

1      A   Commissions?
2      Q   I'll rephrase.  How many
3  times have you received a commission by
4  referring a referral to lease to Mayor
5  Schmitz's dealership?
6      A   Probably several.
7      Q   Can you be more specific?
8      A   Seven.
9      Q   Seven?
10     A   Possibly, yes.
11     Q   Could it be more?
12     A   No.
13     Q   So you're absolutely
14 positive, sitting here today under oath,
15 that you have received no more than --
16 commissions on no more than seven lease
17 referrals.
18     A   Yes.
19     Q   Now, isn't it true that you
20 have also promoted car leases to students
21 on campus that you have recruited?
22     A   That is absolutely not true.
23     Q   Isn't it true that you have

Page 173

1  attended recruitment fairs at colleges
2  with an individual who was a car broker?
3      A    That is not true.
4      Q    Who is Mr. Carl Jones?
5      A    Mr. Carl Jones is a personal
6  friend of mine who works for AIG.
7      Q    So he's in insurance.
8      A    Securities.
9      Q    Securities.
10     A    Yes.  You have taken Mr.
11 Jones with you to these college fairs,
12 haven't you?
13     A    No.
14     Q    Have you ever taken Mr.
15 Jones with you to any type of recruiting
16 event?
17     A    No.
18     Q    Have you taken anyone else
19 with you to a recruiting event?
20     A    No.
21     Q    So you have always attended
22 these recruiting events alone.
23     A    With city staff.

Page 174

1      Q    Who specifically?
2      A    Police and fire employees.
3      Q    So your testimony, sitting
4  here today, is you have never promoted
5  Mayor Schmitz's car dealership to any
6  person or persons outside -- under the
7  guise of recruitment for the City of
8  Dothan?
9          MR. MITCHELL:  Object to
10 form.
11     A    Never.
12     Q    Who have you referred to
13 Mayor Schmitz's dealership for a lease?
14     A    I'm trying to remember all
15 of them.  A personal friend of mine in
16 Montgomery.
17     Q    Who?
18     A    Kenny Thomas.  Two vehicles
19 to my cousin.
20     Q    Who is your cousin?
21     A    Cromwell Handy.
22     Q    Cromwell?
23     A    Yes.

Page 175

1      Q    Handy?
2      A    Yes.
3      Q    Who else?
4      A    Let's see.  That's three.
5  Four, Deborah Petway, is a friend of mine.
6      Q    How do you spell her last
7  name?
8      A    P-e-t-w-a-y or
9  P-e-t-t-w-a-y, one of those two.  Is that
10 five?
11     Q    I've got Kenny Thomas, two
12 for your cousin Cromwell Handy, Deborah
13 Petway.
14     A    And I think Mr. Jones has
15 done the same in that seven with some
16 people he knew.
17     Q    So did you refer Mr. Jones
18 for a lease?
19     A    No.  Mr. Jones has a
20 Mercedes.
21     Q    So he obtained his Mercedes
22 through Mayor Schmitz's dealership as
23 well?

Page 176

1      A    The one he drives now, no.
2      Q    But he has before.
3      A    I can't remember the exact.
4  I know two that were not.  I can't
5  remember all the details of the cars he's
6  had and where he got them from.
7      Q    But you know he's gotten at
8  least one through Mayor Schmitz's
9  dealership.
10     A    I think so.  I'm not sure.
11     Q    Did you refer him for that
12 lease?
13     A    No.
14     Q    Who else have you referred
15 to Mayor Schmitz's dealership?
16     A    I can't -- I don't recall
17 the others.  I don't think -- that's six.
18 I can't remember the last one.
19     Q    I'm only counting three
20 Kenny Thomas, your cousin Cromwell
21 Handy --
22     A    That was two to him.
23     Q    Then Deborah Petway or

Page 177

1  Pettway.
2      A   I can't remember the other
3  ones.
4      Q   There were others.
5      A   I think in total it's been
6  about seven.  Some that Mr. Jones brought
7  to the table, got a commission, as well as
8  some that I brought to the table.
9      Q   Did you share in the
10 commissions for the ones that Mr. Jones
11 referred to the Mayor?
12     A   Yes.
13     Q   Do you recall who he
14 referred to Mayor Schmitz's dealership?
15     A   I don't.
16     Q   How many has he referred?
17     A   Other than the one that I
18 mentioned -- actually, Mr. Thomas was --
19 first contacted him.  Mr. Jones used to be
20 a salesman with Mike Schmitz, and he left.
21     Q   When did he leave?
22     A   He's been go for a while,
23 several years.

Page 178

1      Q   How much would you estimate
2  monetarily you have received from these
3  referrals?
4      A   Probably six, seven hundred
5  dollars.
6      Q   Each?
7      A   Probably.
8      Q   Do you have any records of
9  your receipt of commissions from Mayor
10 Schmitz?
11     A   (Witness shaking head).
12     Q   How did Mayor Schmitz pay
13 you?
14     A   The dealership paid me by
15 check.
16     Q   Where does Kenny Thomas
17 reside?
18     A   Montgomery.
19     Q   And you said he is a
20 personal friend.
21     A   He is a -- he's a fraternity
22 brother of mine, but a personal friend of
23 Mr. Jones.

Page 179

1      Q   Has Mr. Thomas ever gone
2  with you on recruiting events?
3      A   No.
4      Q   Where does your -- what is
5  Mr. Thomas' address?
6      A   I don't have his address.
7      Q   Do you have his phone
8  number?
9      A   Not anymore.
10     Q   Why not?
11     A   I changed phones and just
12 haven't put some people back in there.
13     Q   So he's a good friend of
14 yours and a former frat brother, and you
15 no longer --
16     A   He's a fraternity brother
17 and an acquaintance, but not somebody I
18 deal with or see on a constant basis.
19     Q   When is the last time you
20 saw him?
21     A   When he bought the vehicle.
22     Q   Which was when?
23     A   Two or three years ago.

Page 180

1      Q   Where does he work?
2      A   At Alabama State.
3      Q   He works for Alabama State
4  University.
5      A   Yes.
6      Q   When is the last time you
7  had a recruiting event at Alabama State?
8      A   Probably last year.
9      Q   How many times have you
10 recruited at ASU?
11     A   We do that yearly.
12     Q   Where does your cousin
13 Cromwell Handy live?
14     A   Montgomery.
15     Q   What's his address?
16     A   I don't have his address.
17 He just recently moved back from Ohio.  I
18 mean, a couple of years ago.
19     Q   What is his phone number?
20     A   I have it in my other phone.
21         MS. EDWARDS:  And, I guess,
22 just to shorten this up, Chris, we're
23 going to request the contact information

Page 181

1  for these individuals.
2       MR. MITCHELL:  We're going
3  to refuse to give it to you.
4       MS. EDWARDS:  Well, we'll
5  just note the record for that.
6       We're also going to request Mayor
7  Schmitz's documentation of payments to Mr.
8  Mathews.  Can we expect that to be
9  forthcoming?  What is your answer?
10      MR. MITCHELL:  I was not
11 asked a question, so I have no answer.
12      MS. EDWARDS:  I did ask the
13 question.  I am asking --
14      MR. MITCHELL:  I heard a
15 statement made that was an interesting
16 statement, but I heard no question.
17      MS. EDWARDS:  My question
18 was:  Can we expect that to be
19 forthcoming, all documentation related to
20 payments made to Mr. Mathews.
21      MR. MITCHELL:  I'll say I
22 cannot speak to your expectations.
23      MS. EDWARDS:  Well, what I

Page 182

1  went to see is documentation of the checks
2  that have been paid by the dealership to
3  Mr. Mathews in any form, any payments
4  from --
5       MR. MITCHELL:  I understand
6  what you're saying.
7       MS. EDWARDS:  -- this
8  dealership to --
9       MR. MITCHELL:  I understand
10 what you're saying.
11      MS. EDWARDS:  And we want
12 that for a period of ten years.  Now, we
13 can discuss --
14      MR. MITCHELL:  I understand
15 what you're saying.
16      MS. EDWARDS:  Will you agree
17 that that's forthcoming?
18      MR. MITCHELL:  I'm not in a
19 position to say anything about that.
20      MS. EDWARDS:  So you're
21 telling me that you are not going to
22 voluntarily produce this information.
23      MR. MITCHELL:  I'm not in a

Page 183

1  position to say anything about that.
2       MS. EDWARDS:  What would
3  make you be in a position that you can
4  respond to that, Mr. Mitchell?
5       MR. MITCHELL:  You know, I
6  don't know.
7       MS. EDWARDS:  If you need to
8  confer with your client, that's fine, but
9  I want it on the record that we are
10 requesting this information for all
11 payments made.
12      MR. MITCHELL:  You have
13 certainly put it on the record and it is
14 there.
15      MS. EDWARDS:  And because
16 you won't agree to voluntarily produce it,
17 then we're going to move to compel this
18 information, if you're going to make that
19 necessary for us to have to do.  And it
20 sounds like I don't have an agreement that
21 you're going to voluntarily produce it.
22 Am I correct?
23      MR. MITCHELL:  I'm not in a

Page 184

1  position to make any agreement about
2  anything.
3       MS. EDWARDS:  What would
4  enable you to be in a position that you
5  can agree to that?  Do you have need to --
6       MR. MITCHELL:  I don't know.
7       MS. EDWARDS:  Is there
8  someone you can contact within the City
9  today that will enable you to answer that
10 question as to whether you will produce
11 this information to us voluntarily,
12 without necessitating our filing a Motion
13 to Compel?
14      MR. MITCHELL:  I don't know.
15      Q    (BY MS. EDWARDS:)  Outside
16 of the lease commission from referrals to
17 Mayor Schmitz's dealership, are you
18 engaged in any other sort of business
19 dealings with Mayor Schmitz outside of
20 your role as EEO officer?
21      A    No, but I don't consider
22 that as a business deal, and I have no
23 license of it as a business, just an

Page 185

1  opportunity to bring friends to the table
2  and get a commission that any other people
3  could probably get a commission for as
4  well if they brought some people.
5      Q   Any other business dealings
6  outside of those leases?
7      A   No.
8          MS. EDWARDS:  Nothing
9  further.
10         MR. MITCHELL:  Let me see.
11             EXAMINATION
12  BY MR. MITCHELL:
13     Q   I was confused about
14  department head retreats.  How often do
15  those happen?
16     A   They're at the discretion of
17  the city manager.  Most of them happen
18  every three to four months.  We just had
19  one last Thursday.
20     Q   Do you speak to EEO topics
21  at each of those?
22     A   No.  He's asked me on
23  specific occasions to do that.

Page 186

1          MR. MITCHELL:  That's all.
2          MS. EDWARDS:  That's all.
3  Okay.
4
5
6          FURTHER THE DEPONENT SAITH NOT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 187

1
2          C E R T I F I C A T E
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me
8  in stenotype, and the questions and
9  answers thereto were transcribed by means
10  of computer-aided transcription, and that
11  the foregoing represents a true and
12  correct transcript of the testimony given
13  by said witness upon said hearing.
14     I further certify that I am neither of
15  counsel, nor of any relation to the
16  parties to the action, nor am I anywise
17  interested in the result of said cause.
18
19  /s/Rhonda W. Head
20  RHONDA W. HEAD, CCR
21  CERTIFICATION NO. AL-CCR-264
22  NOTARY PUBLIC, STATE OF ALABAMA
23  MY COMMISSION EXPIRES: 03-07-2017

**A**

**a.m** 5:11
**ability** 131:19
**able** 52:2 54:10
  108:13 125:4
  151:10
**absolutely**
  172:13,22
**academy**
  133:10
**access** 111:21
  112:21 113:2
  113:4,10
  114:10 120:20
  141:7 162:2
**accurately** 7:2
**accusation**
  45:20
**acknowledging**
  72:15
**acquaintance**
  179:17
**Act** 113:23
  118:19
**acting** 5:4
  149:15
**action** 1:5
  11:21 58:13
  58:22 115:14
  117:22 118:1
  118:14 119:11
  119:17 120:8
  120:12 121:1
  121:8,17
  140:4 141:2
  141:15,16
  144:2 187:16
**actions** 32:23
  138:17
**activities** 34:6
  34:16
**activity** 18:9
**actual** 53:10
  56:4 60:4 92:5
  147:6 153:9
**added** 80:18
**addition** 150:4
  155:18 166:11

**additional**
  19:11 87:15
  88:14 96:5
**address** 15:9
  28:23 33:22
  64:18 86:14
  91:14 179:5,6
  180:15,16
**addressed** 21:8
  22:11 34:11
  64:5 65:3
  77:12 136:3
**addressing** 8:22
  24:2 33:21
  64:8 66:5,9
**administration**
  32:22
**administrative**
  21:19,21 22:1
  24:20 25:2
**admit** 123:20
  126:7
**advent** 67:17
  91:4 93:7
**advertised** 81:2
**advise** 103:3
**affairs** 19:16
  22:4 25:5 30:6
  35:5 37:4
**affairs'** 35:12
  36:22 46:18
**affiliation**
  43:16
**affirmative**
  11:20 117:22
  118:1,14
  119:11,17
  120:8,11
  121:1,8,16
  140:4 141:2
  141:15,16
  144:1
**afford** 171:13
**afforded** 126:3
**African** 114:18
  127:2 129:13
  129:21 130:13
**age** 138:20

**agencies** 52:21
  53:1 118:22
**agency** 52:23
  53:3
**agent** 100:23
  169:1,2
**ago** 32:1 37:8
  117:10 144:23
  152:21 179:23
  180:18
**agree** 116:9
  182:16 183:16
  184:5
**AGREED** 1:16
  2:2,9,18
**agreement**
  183:20 184:1
**ahead** 25:20
  90:8,9
**AIG** 173:6
**AL-CCR-264**
  187:21
**Alabama** 1:2
  1:22 3:7,14
  5:2,3,6,10
  180:2,3,7
  187:3,22
**allegation**
  24:15 38:2,5,7
  44:5 47:2 54:1
  92:14 114:21
  148:8 160:16
**allegations**
  21:17 30:10
  33:23 34:17
  36:7,12 37:21
  45:6 47:12
  52:11 54:3
  116:8 117:13
**allege** 40:11
  45:1
**alleged** 20:3
  21:15,17 25:6
  28:19 33:13
  35:13 36:1
  39:6,7 41:3
  47:8 48:17
  50:19 51:8,10

**59:9 77:14**
  90:23 114:18
  146:15,16
  156:10 157:13
  161:4,7
**alleging** 48:6
  97:14 117:13
  147:21 153:2
  153:23 155:17
  156:15,18
**allow** 38:22
**American**
  127:2 129:13
**Americans**
  114:18 129:22
  130:13
**amount** 85:13
  166:7,7
**announceme...**
  142:3
**answer** 6:21 7:6
  16:20 31:17
  38:4 53:13
  56:23 59:8
  79:2 89:16
  90:14 91:10
  98:7 116:1
  121:5 140:1
  154:19 170:3
  181:9,11
  184:9
**answers** 187:9
**Anthony** 145:4
  146:3 151:18
  154:22 155:1
  155:10 158:9
  158:16 159:15
**anybody** 44:3
  57:3 93:11,13
  103:8 142:12
**anymore** 179:9
**anywise** 187:16
**apart** 87:16
**apologized**
  149:19 160:20
**apparently**
  77:21
**applicant** 80:19

**81:4 112:12**
**applicants**
  59:10 110:12
  112:13,18
  114:7
**application**
  65:13 80:9
  81:14 84:12
  84:22 111:2,4
  125:6,9
  164:20
**applications**
  84:6,14 85:3
  110:23 111:20
  111:21,23
  113:5,8,11,17
  113:18,19
  120:3,21
  165:3
**applied** 50:7
  51:13 84:10
  163:17,19
  164:12,16
**apply** 164:15
**applying** 81:15
**appoint** 102:10
**appointed** 99:6
  106:18 107:14
  107:15 143:2
  162:21
**appointing** 94:9
  96:2 102:8
**appointment**
  162:12 163:1
**appreciate** 6:8
**approach** 38:13
**appropriate**
  138:17
**approve** 86:9
  86:23
**approved** 87:5
  163:18
**approves** 88:3
**Approximate**
  145:9
**approximately**
  99:9,10 101:2
  123:1 167:23

Darryl Matthews

**April** 27:4,11
28:10
**areas** 23:17
**argumentative**
117:4
**arrested** 8:4
**asked** 19:19
21:12 24:3,10
24:14 30:14
32:6,18,19
41:5 42:16
44:4 46:13
57:17 126:2,5
160:14 163:14
170:16 181:11
185:22
**asking** 46:7,8
117:5 158:2
169:13,19,20
181:13
**aspects** 68:20
**assign** 2:14
**assignment**
115:22 146:17
146:18
**assignments**
32:21 40:6,8
**assumed** 56:9
56:11
**assumes** 73:13
**assuming** 154:4
**assures** 110:1
**ASU** 180:10
**asundery**
118:21
**attach** 111:1
**attended** 11:3
173:1,21
**attention** 15:21
16:16 17:1
34:5 93:17
94:20 132:14
149:8,10
**attrition** 122:16
**August** 21:11
72:16 73:8
74:7,15 118:1
119:13

**authority** 87:9
87:14,21 88:2
88:11 92:23
93:16 94:2,9
96:2 102:8
112:1,22,23
**AVENUE** 3:13
**aware** 44:21
58:12,21 59:4
97:15 98:1
141:13 143:13
143:19,23
153:6,12

———————
**B**
**B** 4:11
**B.S** 80:23 81:8
**back** 13:14,17
18:18 22:12
24:7 26:2 31:5
31:10 33:2
48:2 49:3,21
70:7 87:11
90:7 91:7
100:4,11,20
100:22 101:15
102:2 104:1,2
105:18,19
107:20 116:17
119:7 132:14
133:8 137:1
145:8,10
154:10 162:21
163:4 164:4
164:10,22
165:13 179:12
180:17
**background**
6:13
**bad** 90:1
**Base** 138:21
**based** 42:7
43:15 46:5
86:6,20 92:15
94:14 110:4
111:10 113:22
122:10 137:5
146:17 147:14

171:8,9
**basic** 135:9
139:1
**basically** 12:19
34:2,22 35:7
39:21 41:17
45:1,9 47:4
66:11 79:3,18
88:13 96:4
101:14 102:9
107:17 108:10
114:23 121:23
136:23 159:20
162:1
**basing** 118:5
**basis** 39:23
49:9 52:14
107:20 108:2
115:20 138:1
155:20 157:1
179:18
**Bates** 63:11
64:15 119:14
**began** 74:22
**beginning** 5:10
**behalf** 146:14
**behavior** 15:7
**beliefs** 103:19
**believe** 6:7 14:7
37:7 85:8
103:21 107:21
108:5 109:6
**believed** 117:11
**bell** 151:20
**belligerent**
156:1
**benefit** 108:6
**benefits** 166:4,5
166:8,10
**Benton** 11:1
17:7,11 19:1,9
19:15,22
20:16 21:2
23:5 25:14
26:12 29:20
31:7,21 32:3
32:13 42:22
**Benz** 168:18,23

169:3
**bias** 52:22
**binders** 8:14,19
**Birmingham**
3:7,14 5:2
124:6
**black** 41:5
115:18 122:13
123:3 128:8
158:16 161:20
162:11
**blacks** 126:14
129:2
**blank** 149:4
150:23
**Blanton** 107:4
**board** 11:8
56:15 86:9
87:1,20
118:19 142:5
**boards** 140:15
140:21 141:1
142:2
**body** 143:21
**booklets** 8:12
**bottom** 63:12
90:23
**bought** 179:21
**bounded**
116:10
**boy** 42:2
**brain** 60:5
**break** 7:8 70:13
70:14 75:1
130:20 170:13
170:14,16
**breaks** 7:5
**bring** 107:19
185:1
**brings** 93:17
113:17
**broker** 173:2
**brother** 178:22
179:14,16
**brought** 12:17
14:15 30:22
34:4 36:11
94:19 104:1

132:13 142:15
149:9 150:7
177:6,8 185:4
**bulletin** 140:15
140:21 141:1
142:1,4
**bureau** 21:20
22:1,1 25:3
**bureau's** 21:19
**bureaus** 21:17
**business** 21:20
24:19 81:22
82:22 86:6,20
87:16 88:20
91:1,11,15
92:5,18,22
93:3 94:10,18
96:5 169:10
169:21 170:17
184:18,22,23
185:5
**busy** 109:13

———————
**C**
**C** 3:1,4 187:2,2
**called** 34:3
156:5
**calling** 164:6
**calls** 119:21
**campus** 172:21
**candidates** 51:4
84:9 125:16
**capacity** 108:4
134:2
**captain** 21:3,15
21:18 24:11
24:15 25:1,11
30:1 38:6
40:22 43:8,23
44:8 45:5,10
46:4,6,8,9
47:12,15
80:23
**captain's** 21:13
69:5
**captains** 21:16
**car** 166:20
168:16 171:14

172:20 173:2
174:5
**card** 167:1,3,7
167:11 168:1
**Carl** 173:4,5
**Carney** 146:7
153:15 154:4
155:2 159:15
**cars** 176:5
**case** 6:12,14 8:8
8:21 9:14
32:11 84:1
89:18 158:15
**cases** 144:19
**cat** 138:21
**cause** 5:12
66:16 67:5
76:3,23 79:9
80:3 95:17
97:20 187:17
**CCR** 1:20 5:1
187:20
**census** 127:9,10
128:7
**cents** 165:8
**Certain** 101:21
**certainly** 13:19
183:13
**certification**
112:14 140:12
187:21
**certified** 125:10
**certify** 5:4
114:7 131:10
187:6,14
**chain** 80:16
**challenge** 124:4
124:7
**challenged**
115:15
**challenges**
122:1 123:15
123:17,21
**chance** 55:3
**change** 62:5
76:6 81:13,18
82:9 83:3 86:5
86:8,11,17,18

86:19,22 87:5
88:3,9,22
90:17 91:2
92:4,6,19 93:3
93:14 100:19
101:14 165:20
**changed** 62:4
68:22 69:8,20
81:9,11 82:5
82:18,22 87:3
90:17 91:6
93:9 179:11
**changes** 78:20
78:23 80:17
88:16,17 96:3
122:23
**changing** 86:1
**charge** 155:12
**charges** 153:11
**check** 47:1
178:15
**checks** 182:1
**Chester** 106:23
107:3,7
**chief** 10:3 11:1
12:2 17:7,11
19:1,9,15,22
20:16 21:1,12
22:11 23:4
25:14 26:12
29:20 30:5,14
31:6,21 32:3
32:12 42:22
63:19 67:15
69:7 74:23
75:14,17
80:11 81:1,15
82:3,7 87:4,18
88:10,12 93:5
93:9,22 94:12
97:13
**chief's** 61:15
65:13 67:19
75:15 87:12
91:5
**chiefs** 93:20
**children** 129:16
**Chris** 3:10 85:7

180:22
**cities** 124:3,7
**citizen** 18:14
**city** 1:10 7:18
7:20 9:1,4
11:9,10,11,12
16:3 47:23
57:11 61:10
61:12,20,22
63:10 64:16
65:3,11 66:10
66:23 78:14
87:13,20 88:8
91:21 94:14
94:17 95:14
96:11 98:10
98:15 99:14
101:11 102:7
102:9,11
103:3 104:11
105:1,1 106:8
106:12 107:16
107:16 108:13
108:19 110:10
110:20,22
111:4 114:20
115:17,19
119:12,16
122:17 126:15
127:3,17
128:1,2,12,12
129:3,7,19
130:6,7,11
133:11 135:11
135:19 138:11
138:15 139:18
140:2 141:13
144:9 149:9
152:16 153:2
153:23 159:13
160:3 161:18
162:7 163:17
164:1 166:19
168:8 170:8
170:18 173:23
174:7 184:8
185:17
**city's** 115:14,20

140:4
**Civil** 1:5 5:6
55:15 113:23
118:18
**claim** 76:18
**claimed** 115:18
**claims** 116:7
**clarify** 117:6
**class** 115:14
116:5
**classification**
138:19
**classroom**
135:15 136:17
**clear** 26:15
**client** 183:8
**club** 18:9 34:5,8
34:15 39:20
**clubs** 18:1
34:20 36:20
38:16
**collect** 110:17
**college** 173:11
**colleges** 173:1
**colors** 138:20
**combination**
48:13 50:11
51:17 68:19
113:21
**come** 47:19
48:5 56:15
110:13,22,23
149:7 162:20
164:22
**comes** 110:10
110:20 125:7
**command**
80:16
**comment** 149:1
**comments**
146:11,19
**commission**
65:3,11 66:10
66:23 75:1
78:12 102:7
102:10 103:4
103:23 106:9
106:10 107:19

108:21 171:4
171:5 172:3
177:7 184:16
185:2,3
187:23
**commissioner**
1:20 2:19 5:4
102:11 161:4
161:6,18
**commissioners**
101:22 102:1
105:2 106:20
107:9 162:4
162:11,15
**commissions**
172:1,16
177:10 178:9
**committee**
106:19
**common** 83:17
**communicati...**
21:14 22:9
24:12 25:10
27:6 28:9
137:22
**community**
83:17 114:19
124:12 125:1
**company** 132:6
132:8,12
133:2 156:16
**compared**
130:8
**compel** 183:17
184:13
**compiles**
131:20
**complain** 40:10
47:16 50:14
152:12
**complained**
47:15 49:8,16
49:19 51:1,19
144:17 156:21
156:22 158:10
158:21 159:5
**complaining**
62:3 73:23

147:10
**complaint**
  11:23 12:4,7,8
  12:13,23 14:3
  14:12,13,20
  15:1,16,20,22
  16:5,13,14
  17:2 18:3,15
  18:16,21 19:3
  19:21 20:12
  21:4,4 26:13
  26:15,23
  27:13,20 28:6
  29:4,7,11,14
  45:15,17
  47:23 54:12
  56:16,22
  57:19,23 58:6
  58:14 59:2,5
  59:16,18 60:4
  60:8,10,15
  61:3,13 62:2,7
  62:12,18
  63:14,23 64:3
  64:5,9 66:12
  66:15,16
  71:13 72:15
  72:20 73:7,10
  73:17 74:6,15
  74:17 75:4,15
  75:16 76:1,3
  76:14,22
  77:12 78:16
  87:3 88:20
  91:14,20,23
  92:4 95:13,18
  97:11,12,14
  144:22 146:6
  146:9,13,16
  146:22 147:3
  147:6,12,17
  147:19,22
  154:13 155:15
  155:21 159:18
  159:20 160:7
  160:9,15
**complaints**
  14:8 15:4,10

18:2,5 19:12
20:3 25:6
29:23 33:13
33:13 35:13
46:20 61:9,9
61:21 67:8
74:19 97:16
97:20,21 98:3
144:6,11
154:11 155:5
159:10
**complete** 55:4
**compliance** 2:5
  85:5
**comprised**
  55:23
**compromised**
  59:6
**computer** 10:18
  131:19 134:19
  135:2 141:3,7
**computer-aid...**
  187:10
**concerned** 40:8
**concerning**
  8:21 41:7
  65:12 71:14
  71:21 74:15
  87:4
**conduct** 15:7
  16:8 34:18
  36:5,13 42:10
  46:1 53:7
  148:1
**conducted** 31:1
  135:14 137:10
  142:18,21
**Confederate**
  41:23 43:18
  44:19
**confer** 183:8
**confirm** 143:19
**confirmation**
  141:21
**confirmations**
  142:10
**conflicts** 41:19
**confused**

185:13
**connected**
  73:14
**consent** 11:21
  102:9 104:8
  104:23 105:7
  110:5 111:10
  114:16,22
  115:2,6,8
  117:11,19
  135:12 140:19
  140:22 141:15
  142:22 144:1
**consider** 31:1
  159:17 160:2
  184:21
**considerable**
  40:7
**consideration**
  49:17 51:5,6
  68:8 80:10
  114:8
**considered**
  38:17 100:17
  125:12 164:8
**consist** 55:18
  112:8 135:5
**consisted** 55:14
**consistent**
  138:1
**consists** 112:10
**constant** 179:18
**constantly**
  137:7
**consult** 88:13
  88:15
**consultant**
  150:7
**consultation**
  88:5
**contact** 18:22
  20:2 180:23
  184:8
**contacted** 19:10
  19:20 29:20
  32:3 177:19
**contained**
  28:22 30:17

**content** 12:21
  14:19 24:5
  64:8 80:5
  84:18 116:18
  116:20 146:11
  147:4 148:4
**continously**
  124:23
**continue** 56:21
  57:16 65:7
**continued**
  158:7
**control** 35:2
**conversation**
  148:20 150:14
  151:7
**convince** 162:3
**convinced**
  108:21
**copy** 13:7 22:6
  29:7,10 65:5
**corporate**
  91:21
**corporation**
  168:18,23
  169:4
**correct** 14:4,9
  19:23 29:9
  31:14 33:15
  37:22 38:6
  42:23 43:1,3
  46:22 51:7
  54:16 55:16
  56:14,18 60:3
  61:22 63:17
  63:20,21
  65:20,21 66:1
  66:7,18,20,21
  67:1,2,6 68:18
  69:13,16,17
  72:1,6,20 73:4
  73:5,11 74:1,7
  74:10,20 75:2
  75:6,7,12 78:6
  78:18 80:3
  81:17,19
  82:10,11 83:3
  96:14,23

99:18 105:9
105:13 107:10
113:1 119:23
125:17 130:16
139:19,20
142:23 150:3
151:2 160:3
165:9 166:4
183:22 187:12
**correction** 60:3
**corrective**
  58:13,22
**correctly** 48:15
  49:14 98:18
  99:1 107:4
  135:6 146:2
  163:12
**cosigned** 64:7
**cost** 163:16
**counsel** 1:18
  2:10,12 5:7
  8:13 9:6
  187:15
**counting**
  176:19
**country** 124:1
  124:19 126:12
**COUNTY**
  187:4
**couple** 7:5 69:9
  144:23 152:21
  180:18
**course** 132:5
  134:20 135:3
  135:4,5
  136:15 137:22
**court** 1:1 2:6
  5:1,17,20
  104:15 114:21
  117:12 118:2
**cousin** 174:19
  174:20 175:12
  176:20 180:12
**create** 91:11
**created** 9:1,3
  70:4 81:23
  83:1,7,9 89:3
  93:21 104:14

105:4,7 109:9
139:22
**creates** 132:4
**credentials**
68:10,13 89:6
89:9
**credit** 48:18
167:1,3,7,11
168:1
**creed** 138:20
**crime** 8:5
**Cromwell**
174:21,22
175:12 176:20
180:13
**cuff** 74:13
**current** 7:19
80:16
**curriculum**
134:8

**D**

**D** 4:1
**D-a-r-r-y-l** 7:12
**Darryl** 1:19
5:11,15 7:12
7:16 26:11
**data** 120:3,13
122:22 127:8
127:9 130:12
**date** 5:5 12:6
26:17,19,23
27:8,19 29:12
60:1,1,17 99:7
**dated** 12:11
13:5 62:10
63:15 64:4
65:2,12,19
71:10 72:16
78:2 118:1
119:12 138:13
139:19
**dates** 74:12
99:23 136:9
**David** 17:8,18
19:17 20:17
30:6 31:22
32:13 40:22

40:22 41:7,9
41:14 42:19
42:20 43:6,22
44:11,18 45:2
45:3,10 47:9
47:11 157:4
157:11,14,17
158:11
**day** 1:23 115:23
149:20 156:7
160:20
**days** 66:19
150:3
**dead** 163:23
**deal** 136:23
179:18 184:22
**dealership**
168:16,21
169:4,7
171:17,21
172:5 174:5
174:13 175:22
176:9,15
177:14 178:14
182:2,8
184:17
**dealing** 16:8
118:18
**dealings** 169:10
169:21 170:17
184:19 185:5
**deals** 118:5
**Deborah** 175:5
175:12 176:23
**December**
59:15 65:2,12
65:19 67:3
76:8 77:1,18
78:2,10
119:13
**decide** 94:8
**decided** 88:7
101:11 102:17
104:11 105:2
105:11,15
129:1
**decision** 88:9
93:2 102:4

105:18 118:6
**decisions**
138:22 139:1
**decree** 11:21
102:9 104:8
104:23 105:8
110:5 111:10
114:16,23
115:2,7,8
116:11 117:11
117:20 135:12
140:19,22
141:16 142:22
144:1
**deemed** 89:15
91:8
**Defendant** 1:11
3:9
**defendant's**
116:1
**defined** 86:8
**degree** 81:1,8
**Delvick** 3:17
11:1 15:21
16:16 27:15
62:15 63:15
64:19 77:4
80:2 125:23
**demotion**
163:20
**denial** 87:4
112:12
**denied** 51:14
**denying** 116:2
**department**
34:22,23 41:6
44:8 45:6
46:16 67:1
69:16 73:4
84:15 86:7,16
86:21 87:8,22
87:23 89:12
89:20 91:1
92:22 95:8
96:1,12 120:2
120:4 121:10
121:14,22
122:5,8,13,21

123:3,15,21
125:4,19,22
126:9 127:16
127:18 128:12
131:2,14
132:16,21
133:1 135:15
135:16,21
136:18 137:10
137:20 142:6
142:14 143:5
143:12 149:15
150:8 156:3,5
156:19 185:14
**department's**
137:11
**departments**
83:15 124:21
139:7 140:16
143:6
**departure**
67:15
**depends** 171:13
**DEPONENT**
186:6
**deposition** 1:18
2:3,4,15,19
7:5,22 8:11,14
14:1 25:21
50:4 187:7
**depositions** 2:7
**describe** 62:17
114:14 117:21
148:17
**description**
61:15 62:4
64:10 67:10
67:16 68:23
69:7,19 76:7
77:8 78:20
79:1 82:5,17
82:21 86:12
87:6 88:4,9
92:5 93:18
95:23 110:4
**descriptions**
81:21 86:2
96:4

**designate** 114:7
**designated**
61:19 91:20
**designates**
114:4
**despair** 32:21
**detail** 134:15
136:22
**detailed** 24:8
31:8
**details** 57:6
58:1 143:6
158:14 176:5
**determination**
22:2 102:12
156:12 159:8
**determine** 56:3
85:4 111:15
**deterrent**
109:16
**developed**
133:9
**develops** 132:7
**dictate** 89:20
**difference** 77:8
86:10 144:13
**different** 71:1,2
103:17,18
135:7
**differently** 41:4
43:12 46:3,4,4
46:12
**directed** 149:13
**direction**
100:19 101:14
**directly** 15:1
47:20 74:19
**director** 47:19
57:10 62:3,16
78:14 86:5,18
88:6,14 95:15
**directors** 86:4
**disability** 137:6
**disagree** 102:20
**disciplinary**
32:23
**disciplined**
151:8

**discount** 171:14
**discover** 88:21
**discretion**
　93:15 94:17
　103:11 135:19
　185:16
**discriminated**
　44:1 115:19
　116:3,4
**discrimination**
　15:11 16:10
　28:20 29:1
　33:23 41:16
　41:21 43:7
　49:9 59:17
　60:8 74:17
　97:14 114:19
　115:9 117:14
　135:8 137:12
　144:7,18
　145:13,16
　146:14,21
　147:2 153:3
　154:1 159:11
**discuss** 32:10
　38:1,11 87:17
　94:18 182:13
**discussed** 9:7
　23:13 31:13
　38:12 39:4
　47:6 59:15,18
　60:7,9
**discussing**
　13:22 74:22
**discussion**
　39:23 41:2,13
**discussions**
　10:12 109:5
**dislike** 158:5
**disparate** 21:15
**disputes** 45:3
**disqualified**
　82:9
**dissemination**
　118:10,11
**distributed**
　139:6
**DISTRICT** 1:1

1:2
**diversity**
　120:16,17
　121:12,14
　122:7 123:19
　123:22 124:12
　124:20 126:8
　126:10,17
　127:19 129:7
　150:6
**division** 1:3
　34:7 38:21
**document**
　14:18 24:6
　26:8 27:17
　28:22 29:16
　35:19 63:8,11
　64:11,13,15
　65:16 70:2,22
　71:10 79:1,6
　119:2,3 139:9
　142:15
**documentation**
　50:1 120:6
　181:7,19
　182:1
**documents** 8:19
　8:23 9:2 11:13
　11:13 13:17
　13:22 14:1,7
　17:5,10,20,22
　18:5 19:4,11
　19:15 20:2
　29:23 30:5,18
　30:19 31:3
　35:20 36:1,22
　37:9,11,13,16
　46:19 50:4
　57:17 70:7
　71:1,3 72:4
　85:18 120:10
　142:7 143:13
**doing** 17:4
　100:8 122:11
　156:10
**dollars** 165:8
　165:23 171:7
　178:5

**Donny** 9:17,20
　10:23 17:15
　17:16
**Dothan** 1:10,22
　5:10 7:18,20
　9:2,4 48:1
　61:10,12,20
　63:10 64:17
　78:15 91:22
　95:8 98:10
　114:20 115:17
　119:12 121:22
　122:4 126:14
　126:15 127:3
　128:1,2,6,13
　129:3,8,19
　130:6,7,11
　131:1 135:12
　138:11 141:14
　144:9,23
　152:16 153:2
　153:23 159:14
　170:9,19
　174:8
**Dothan's** 16:3
　96:11 117:21
　119:17 138:16
　139:18
**Doug** 9:21,22
　10:23
**drawing** 149:3
**dressed** 48:19
　49:23 52:12
　52:13 53:19
**drew** 150:22
**drives** 176:1
**due** 109:21
**duly** 5:16
**duties** 118:12
**duty** 18:10
　34:10 38:16
　38:19

　　　　E

**E** 3:1,1 4:1,11
　187:2,2
**e-mail** 21:11
　23:6 71:12

72:19
**earlier** 60:1
　66:19 73:1,22
　125:5
**early** 15:8
**EDENTON** 3:6
**education**
　69:13 89:9,10
　96:7
**educational**
　90:4
**Edwards** 3:4,5
　4:3 5:22 6:4,6
　13:11,14,18
　13:21 25:19
　26:2,7,21,22
　70:9,12,18,23
　71:4 85:7,17
　85:23 104:21
　119:4,7,9
　120:22 130:19
　130:22 139:10
　139:16 163:3
　180:21 181:4
　181:12,17,23
　182:7,11,16
　182:20 183:2
　183:7,15
　184:3,7,15
　185:8 186:2
**EEO** 7:19
　11:20 48:22
　61:18 65:18
　67:5 70:8
　74:20 75:8,12
　75:20 84:17
　85:1,5 92:11
　95:12 98:23
　99:3,12,18
　100:4,6,11,11
　100:14,20
　101:11,16
　102:5,8,10
　108:17 118:13
　131:23 132:14
　133:9 136:18
　138:10,12,13
　138:14 139:18

140:3,5
　141:22 143:9
　144:8 149:16
　151:22 157:4
　157:16,18
　160:23 163:2
　163:18 164:4
　164:17 165:11
　166:15 169:11
　170:8 184:20
　185:20
**EEOC** 153:8,11
　155:12
**effect** 2:5 140:6
　140:8
**effectiveness**
　120:11
**effort** 47:10
　123:10
**efforts** 125:3
**eight** 50:8
　80:20
**either** 113:20
　143:16
**elected** 100:18
　101:13,17
　103:18 105:20
　106:5,7
　107:19
**eligible** 129:17
**else's** 54:18
**Elston** 56:13
　75:11,12,20
**employed**
　152:16
**employee**
　143:19,23
　144:15 145:1
　145:2 148:20
　148:22,22
　150:18 152:12
　160:7,12,21
　171:14
**employee's**
　149:5
**employees** 9:13
　9:15 10:1
　82:14 129:9

140:11 141:6 141:14,20,23 143:12 149:20 167:17 174:2
**employment** 75:5 80:12 97:17 109:20 115:16 118:6 118:17 119:22 129:17 131:3 131:8 134:16 135:9,18 136:15 138:23 139:1 142:7 162:22 164:1 169:22 170:18
**enable** 184:4,9
**enforcement** 80:22 81:6
**engaged** 148:19 184:18
**ensued** 13:1 14:21
**entailed** 157:6
**enter** 116:9
**entered** 27:2 40:4 114:22 117:12
**entrance** 168:2
**entry** 28:12 33:15 116:10
**environment** 42:3
**equal** 80:12 109:19 117:23 119:10,22 130:23 138:23 139:2 162:22
**equity** 80:15
**ESQUIRE** 3:4 3:10,11
**estimate** 61:1 178:1
**estimated** 60:18
**ethnics** 126:18
**Eton's** 22:5 32:23
**event** 173:16,19

180:7
**events** 173:22 179:2
**eventually** 42:6
**everybody** 109:19 129:16
**evidence** 2:16
**evident** 124:8
**exact** 74:12 165:15 176:3
**exactly** 23:23 35:1 52:5 134:4 143:10 152:4 162:16
**exam** 55:14 58:19,21
**examination** 4:2 5:12 6:3 71:15 185:11
**examined** 5:17
**example** 122:9
**exclusive** 166:3
**excuse** 42:11,19 88:19
**exhibit** 4:13,14 4:15 25:20 26:5,10 31:10 70:16,20 71:9 72:5 139:14 139:22
**exist** 85:20 160:18
**expect** 181:8,18
**expectations** 181:22
**expenses** 167:2 167:4,4
**experience** 67:12,14,20 67:23 68:5,18 68:20 69:5 80:21 81:5,7 86:16 89:22 90:3,19,20 92:7 93:4 95:10 96:7,13 96:22 97:6 110:16 113:20

**EXPIRES** 187:23
**explain** 55:17 63:23 113:3 170:10
**expound** 12:14 144:12
**extent** 15:19 25:13 39:11 41:1,13 85:19
**external** 118:9 118:11

---

**F**

**F** 187:2
**F-r-e-d-e-r-i-...** 7:12
**face-to-face** 32:10,12,16
**Facebook** 146:11,19
**fact** 15:2 23:21 57:3,8 77:3 150:2 162:2,5 162:8
**factor** 89:21
**facts** 8:20
**failure** 33:4 49:12 60:10 73:18 74:16 74:23 75:5,17 97:11,12
**fair** 48:7 49:22 109:19,20 167:12 168:2
**fairs** 123:12,18 167:4,7,8 168:6,7 173:1 173:11
**far** 34:15 48:20 121:20 124:10
**February** 1:23
**federal** 105:7 117:12
**feel** 41:20 102:23
**feels** 124:13
**felt** 38:21 39:18

39:21 40:10 40:12 41:15 42:1 43:9,10 50:15 51:20 53:19 107:17 108:19 109:2 158:1
**Ferguson** 124:17 136:4 136:11 137:19
**few-day** 76:21
**field** 38:13
**file** 12:13,19,22 14:20 27:23 147:22 159:19 164:18
**filed** 11:23 12:4 12:8 18:2,14 18:16 20:3 27:8,13,20 28:2,6,11,15 30:1 71:14 73:7 115:15 116:1 145:6 146:9 147:6 147:17 153:2 153:23
**files** 131:11
**filing** 2:18 16:4 154:5 184:12
**filled** 100:7
**final** 125:16
**find** 160:19
**finding** 67:5 76:3 80:3 95:17 115:9
**fine** 90:12 183:8
**finish** 104:18
**fire** 125:2 174:2
**first** 5:16 28:12 28:12,14 31:4 47:14,22 60:4 79:7 84:11 106:18 107:15 109:9 114:15 143:8 149:8 162:19 163:6

177:19
**fiscal** 120:13
**fit** 110:15
**five** 48:3 81:6 81:12 90:18 90:19 128:20 150:3 175:10
**fluctuate** 122:17
**followed** 22:18 31:10 92:1
**following** 5:13 21:10 116:11
**follows** 5:18 113:22
**force** 2:5
**foregoing** 5:7 187:7,11
**foreman** 133:11
**forgot** 154:23
**form** 2:11 16:18 31:12 31:16 36:9,17 37:18 42:14 45:12 53:12 59:21 68:15 73:13 77:10 78:8 83:5 92:9 95:20 96:16 98:5 117:1,17 125:19 130:5 137:15 140:11 141:10 142:13 163:1 171:23 171:23 174:10 182:3
**formal** 95:7 96:10,19 111:1 159:12
**format** 134:17 136:17
**formation** 67:11 69:2 82:1 94:20
**formed** 163:10
**former** 65:18 67:4 93:20 179:14

**formerly**
147:11
**forth** 18:17
90:5 109:22
115:2 120:18
135:8 137:2
138:21 142:8
**forthcoming**
181:9,19
182:17
**forward** 111:12
**found** 14:18
50:9,21,22
66:16 76:13
76:17 92:13
97:20 115:11
158:4 163:15
**foundation**
109:10
**four** 80:22
175:5 185:18
**frat** 179:14
**fraternity**
178:21 179:16
**Frederick** 7:11
**friend** 173:6
174:15 175:5
178:20,22
179:13
**friends** 42:5
171:2 185:1
**full** 2:5 7:10
98:23 99:4
102:1,2,5,14
103:14,21,23
104:2,10
105:12 107:18
107:22 108:6
108:12,17,20
134:8 143:11
163:11
**full-time** 99:18
100:10,11,21
101:16,20
103:1,5
107:20 108:22
109:2,7
**furnish** 166:19

**further** 2:1,8,17
138:22 185:9
186:6 187:14
**future** 139:2

### G

**Gary** 65:11,18
67:4 70:3,5
75:18,19 76:9
77:1 78:1,11
84:23 85:2
**gather** 52:8,9
54:10 85:9
120:3
**gathered** 56:8
133:2
**general** 23:2
38:19 118:4
126:15 130:10
130:18 134:15
143:15
**generally** 83:13
84:14,16
135:18
**gentleman** 9:17
**getting** 38:14
127:5 150:5
**give** 24:8 31:8
51:6 57:20
171:10 181:3
**given** 33:2
48:18 49:17
51:5 59:9
122:15 131:1
171:4 187:12
**gives** 118:4
120:13 121:18
**giving** 57:22
64:7
**go** 7:14 13:11
13:14 18:18
25:19,22 31:4
32:7 70:9
79:11 85:20
87:11 90:8,9
105:19 111:3
111:4 116:18
119:4 123:12

134:19 135:2
164:4 177:22
**goes** 91:7 119:1
126:19
**going** 6:11 7:4
26:8 43:7
57:16 70:19
93:12 100:22
104:12 109:12
109:13 128:3
153:8 164:10
168:4 180:23
181:2,6
182:21 183:17
183:18,21
**good** 34:6 42:2
179:13
**goodness** 149:3
**gosh** 150:10
**gotten** 48:20
176:7
**government**
126:11 127:10
**graded** 49:23
113:20
**Gray** 1:7 6:6
12:12,17 14:3
14:9,15,23
17:1,7,12 18:2
18:6 19:12,16
20:4,13 21:23
22:10 25:1,7
25:11 27:2,20
28:10,15 29:6
30:1 32:22
33:14 34:3
36:7,13 38:6
39:7,8,19,22
40:5 41:3,11
41:16,22 42:1
43:8,11,23
44:8,14 45:13
46:9,20 47:7
47:15,22 49:8
50:6 53:18
55:6 61:10
62:2,10 63:15
64:18 65:3,14

66:22 67:10
71:12 72:11
72:19 73:7,18
73:23 75:4,23
77:5,22 79:5
79:18 80:2
81:15 82:10
97:16 122:8
136:5 144:22
146:4,5
154:12 155:2
159:14
**Gray's** 11:22
14:19 18:21
19:21 21:4,15
21:18 22:6
24:11,15
26:12 33:12
33:20 34:18
45:5,10 47:2
47:12 56:16
56:21 58:14
61:21 63:3,23
64:3 66:9,12
66:15,16 67:8
76:14,17
78:15 87:3
88:20 91:14
91:19,22
95:13 97:10
136:6 140:9
153:13
**great** 21:13
**greater** 80:13
80:14 81:2
82:2,6,23 89:1
89:4 93:22,23
94:11,22 95:3
**grievance** 77:12
**Griffin** 65:11
65:18 67:4
70:3,5 75:18
75:19 76:10
77:2,16 78:1
78:11 85:1,2
88:19 92:12
**grounds** 2:14
**group** 126:19

**Guardian**
12:17,20
14:15,16 15:3
15:17,20 16:5
16:8 19:6 27:3
27:4,7,10,14
27:21 28:2,6,7
28:8,13,16
30:11,17
32:19 33:14
33:17,18,19
40:4 47:18
60:4
**guess** 5:22
23:12 32:9
72:7 90:6,16
91:7 109:1
152:20 163:6
166:9 180:21
**guessing** 101:8
**guide** 80:12
**guise** 174:7
**Gwaltney**
107:17 143:9

### H

**H** 4:11
**Hall** 11:11,12
**handbook**
141:5
**hands** 64:13
65:16 70:2
119:3 139:9
141:4
**hands-on** 38:12
**Handy** 174:21
175:1,12
176:21 180:13
**happen** 167:20
185:15,17
**happened** 22:4
34:8 82:8
84:21 124:18
136:4 151:6
158:8 167:21
**happens** 82:12
82:13
**happy** 6:17

harassed
 159:21
harassment
 15:13 28:20
 29:1 34:1
 59:17 60:9
 74:18 97:15
 117:14 137:13
 144:7,18
 145:17,18,21
 146:22 147:2
 147:10,21
 153:3 154:1
 158:1 159:12
harder 164:2
hate 128:22
head 1:20 5:1
 6:23,23 24:13
 24:17 87:8,22
 87:23 96:1
 99:13 129:4
 131:14 135:17
 135:21 148:10
 149:15 151:11
 154:16 156:3
 161:8 178:11
 185:14 187:19
 187:20
headings 21:6
heads 137:20
 142:14 143:12
hear 132:19
heard 58:16
 143:16 152:13
 156:12 181:14
 181:16
hearing 156:12
 156:16,17,19
 156:20 159:7
 159:8 187:13
held 11:7 163:6
 163:8,9
hierarchy 95:2
high 48:12
higher 50:1
 68:11
hire 93:20
 112:6 138:18

hired 107:16
 122:2 162:18
 165:6,10
 166:14
hiring 87:9,13
 87:21 88:1,11
 92:23 93:16
 111:8,11
 112:1,21,22
 112:23 114:4
 114:6,15
 115:21 120:14
 121:9,13,21
 125:15 129:8
 138:8
hitting 156:4
hold 145:3
 163:14
home 156:6
HR 149:15
hundred 165:7
 178:4

_____
I

IA 17:7,12,23
 18:11 19:10
 20:2 30:16,21
 34:19 35:2,16
 36:18
idea 152:9
identification
 26:6 70:17
 139:15
immediately
 12:23 14:21
implementati...
 138:15
implemented
 132:15,17,21
 133:1,23
important
 129:6
imposing 139:3
improvement
 22:7
improvements
 121:21
inappropriate

16:6
inappropriat...
 149:19
incident 14:8
 14:17 17:23
 22:5 27:5
 124:17 136:4
 136:12 137:19
 148:9,14
 149:17 151:12
 151:14 158:8
 160:1,8
incidents 18:1
 19:5 22:4
 32:20 34:8,20
 35:5 36:2,19
 38:17 39:5,6
 39:10,20 40:1
 40:15 45:23
 46:1 47:8
 124:9,16,17
 160:1
include 69:13
 69:15 166:7
included
 137:19
including 15:10
 16:10 138:17
income 108:10
 108:12
incorporate
 135:11
independent
 36:6 37:15
 42:11 53:8
independently
 36:14 51:23
indicating
 53:18
individual 11:2
 109:14 136:20
 173:2
individually
 143:2
individuals
 118:7 138:4
 152:11 181:1
informal

159:12
information
 8:21 9:19
 10:16 11:23
 22:19,22 23:7
 23:15,16 24:2
 24:9 30:7,9,13
 30:16 31:7,8
 32:6,8,19 33:3
 33:6,6,12,16
 35:3,17 38:19
 40:4 44:13
 45:14 46:10
 47:5,17 50:22
 52:8 53:17
 54:5,9 56:7
 57:18 71:21
 79:4 84:3
 118:11 121:19
 122:15 123:9
 127:13 128:11
 128:15,17
 131:21 132:10
 133:2,18
 134:16 143:15
 144:14 148:11
 151:11 153:5
 153:16 154:3
 157:22 180:23
 182:22 183:10
 183:18 184:11
informed 21:3
 142:14
initial 27:12
initially 99:6
 103:22 104:13
 107:13 163:9
initiated 149:16
inquired
 128:14,16
insurance
 173:7
insure 138:22
 139:2 142:15
intent 12:22
 14:19
interested
 171:3 187:17

interesting
 181:15
interfering 34:9
interjected 69:3
interjecting
 39:22
internal 19:16
 22:3 25:5 30:5
 35:4,12 36:22
 37:3 42:11
 46:18 137:23
 154:10 155:14
interrupt 90:8
 90:10 135:1
interview 20:11
 20:19 23:1
 24:1 31:9
 39:12 44:7
 46:13,13,15
 90:5 110:14
 111:22 112:3
 114:11 125:11
interviewed
 20:16 22:17
 22:20 38:20
 41:8 45:5 47:9
 47:11 164:21
interviews
 112:3
investigate
 34:16 36:14
 51:23 67:7
 93:11,13
 147:12,23
 149:7 157:21
investigated
 88:18,19 92:7
 92:10,20
 146:13,21
 151:15 152:3
investigating
 147:1
investigation
 10:13 11:22
 12:11 13:1
 14:22 16:1
 17:5,6 18:8
 25:14 27:18

29:13,17 31:2
35:20 36:6
37:15 42:12
42:16 53:8
55:4 56:3,6,20
57:4,9,16
58:10 62:17
64:23 73:2
76:5,20 77:7
77:17 78:1,4
78:10 91:13
92:3,13,21
95:13 147:16
148:6,15,18
149:14,17,23
156:14 157:5
157:10 160:5
170:1,6
**investigations**
9:18 18:11
35:18 91:19
91:23 98:2
110:8 144:12
**investigative**
76:9
**investigators**
17:7,13 30:21
**involved** 17:4
18:3,9,20
38:14 77:16
109:13
**involving** 18:12
18:12 22:6
151:16
**issue** 101:15
126:8,11
169:18
**issued** 105:1
**issues** 28:10
33:21 43:10
109:17 124:11
161:2
**IVAN** 1:7

**_____ J _____**

**James** 161:10
**Jay** 17:8,18
19:17 20:17

30:6 31:22
32:13 40:22
40:23 41:7,9
41:14,15
42:20 43:6,22
44:18 45:2,4
46:4,6,8 47:9
47:11
**Jay's** 44:11
45:10
**JEFFERSON**
187:4
**Jerry** 107:17
**job** 27:6 28:9
38:23 61:15
62:4 64:9 67:9
67:16 68:23
69:7,19 76:6
77:8 78:20,23
81:21 82:4,4
82:17,21
83:16 86:1,12
87:2,6 88:3,9
90:3 92:4
93:17 94:5
95:23 96:3
102:14,18
103:1,5 110:4
118:21 123:12
138:19 142:2
162:4 164:9
164:23 167:4
167:7,8,11
168:2,6,7
**job-oriented**
139:4
**jobs** 84:11
**John** 107:4
**Jones** 1:21 5:9
56:13 75:11
75:12,20
173:4,5,11,15
175:14,17,19
177:6,10,19
178:23
**judgment** 6:1
**July** 115:23,23
**June** 27:2,9,15

27:17,19
28:18 29:3,7
29:11,16 60:1
60:5,7 74:16
97:15 115:15
**jurisdiction**
116:8
**justification**
21:22 22:8
25:1,9 112:11

**_____ K _____**

**keep** 71:5
100:13
**Keith** 1:7 6:6
17:12 19:16
21:23 22:10
27:2 32:21
41:11,16 42:1
44:14 45:2
65:14 71:12
79:5 155:2
159:14
**Keith's** 45:6
**Kenny** 174:18
175:11 176:20
178:16
**key** 58:6
**kickback**
171:20
**kind** 129:6
**kinds** 34:10
135:8
**knew** 43:7
108:1 109:11
149:12 175:16
**know** 9:7,23
15:8 18:13
30:15 37:5,9
37:10 38:17
41:19 43:13
50:21 53:18
55:20,22 58:9
70:5 73:22
77:13 83:13
83:18 84:11
85:11,14
86:15 87:9

89:5 100:1
101:8,21
107:23 108:4
109:16 115:4
118:20 120:15
121:2,4,5
123:6,9 124:2
124:3 128:23
131:13,23
136:4 137:1
140:3 143:14
147:18,22
149:11 153:21
154:6 156:8
157:5 158:1
171:2,12
176:4,7 183:5
183:6 184:5
184:14
**knowing**
143:23 144:3
**knowledge** 6:13
78:3 83:17
85:13 142:16
144:5 149:21
152:6
**known** 103:12

**_____ L _____**

**L** 1:14
**lack** 21:13
24:11 33:3
39:16
**language**
115:12 116:14
**Large** 5:4
**lateral** 165:16
**launched** 27:17
29:12,17
**law** 1:20 3:5 5:8
80:21 81:6
131:4,8
134:16 135:9
135:18 136:15
**laws** 2:6
**lawsuit** 155:12
**lawsuits** 153:1
153:7,9,22

**leadership**
133:9
**leading** 2:12
**learned** 19:21
**lease** 168:15,17
168:20,22
169:6 171:3
172:4,16
174:13 175:18
176:12 184:16
**leased** 170:21
**leases** 172:20
185:6
**leasing** 169:1,2
**leave** 108:13
163:21 177:21
**leaving** 54:6
**left** 56:12,21
69:7 75:21
177:20
**length** 69:15
89:11,19
**lesser** 68:10
**let's** 14:11
18:18 21:2
34:13 70:9,12
101:5 153:10
154:10 170:12
175:4
**letter** 19:2 21:8
26:11 31:13
57:21 62:2,9
63:1,2 64:3,5
64:7,17 65:1,9
65:17,22,23
66:4,8 67:4
71:19 72:11
76:2,12,22
77:5,17 79:7,8
79:17 80:2,4,6
**letters** 71:10
**level** 80:23
**license** 184:23
**lieutenant**
21:21 24:20
55:7,11 59:19
60:11 64:18
71:21 74:1,4

97:12
**lieutenant's**
71:15
**life** 169:17,20
**liked** 42:5
**Likewise** 81:1
**lines** 80:12
**litigation** 8:2
**live** 127:23
128:2 180:13
**long** 61:2 98:9
98:16 99:20
**longer** 81:19
179:15
**look** 22:12
52:16 54:20
57:12 111:20
129:1,6
130:18
**looked** 54:22
109:14 127:7
127:21
**looking** 53:15
79:16 95:22
119:10
**lot** 123:13
137:1 164:3
**loud** 6:21
**lounges** 40:16
**lower** 68:11
**lunch** 130:21
167:18

_____

**M**

**M** 3:10
**M-a-t-h-e-w-s**
7:13
**ma'am** 53:4
64:21
**Magill** 9:21,22
11:1 17:16
**Main** 1:22 5:9
**maintained** 9:1
**major** 14:16
21:14 22:8
24:12 25:9
28:8 30:14
44:17 69:11

80:18 81:3
82:7 83:1,6,8
83:20 84:5,8
85:4 86:8,11
86:19,22 89:2
89:2,14,21
91:8 93:8,21
94:1,13,22
**major's** 67:11
67:18 69:2
82:1 91:4
94:21
**making** 92:6
165:22
**management**
10:9 24:16
37:21 38:8
39:7,9 47:7
81:7 90:19,20
142:10 144:16
**manager** 57:11
75:9,12 87:13
87:20 88:8
94:17 95:14
101:11 106:12
107:16 108:19
111:8,11
112:23 114:4
114:6 118:13
125:15 131:17
135:19 143:9
149:9 160:4
162:7 170:8
185:17
**manager's**
94:15
**managerial**
92:7 95:10
96:13,22
**managers**
132:1
**managing**
34:12
**mandated**
118:3
**manner** 82:9
**mark** 26:8
**marked** 4:12

26:5,10 70:16
72:5 139:14
**marking** 70:20
139:21
**Markow** 22:6
**Mathews** 1:19
5:11,15 6:5
7:13 26:9
34:14 63:9
70:19 117:6
119:10 130:23
139:17 170:15
181:8,20
182:3
**matter** 144:17
**mayor** 65:10
106:11,19
107:6 168:16
169:21 170:17
170:23,23
171:16,20
172:4 174:5
174:13 175:22
176:8,15
177:11,14
178:9,12
181:6 184:17
184:19
**mayors** 103:17
**MAYS** 3:11
26:14 121:4
**McKay** 3:17
10:5 11:1
12:18,19
14:18 15:21
16:16 27:15
27:22 29:7
62:13,15 63:4
63:15 64:3,4,7
64:19 66:13
76:2,12,15
77:11 78:14
79:5,9 80:3
93:16 125:23
**McKay's** 65:23
66:4,7 77:5
79:17
**mean** 30:9

41:22 46:6
68:3 82:11
90:8,10
115:11 134:21
134:23 148:7
153:8 163:22
166:6 169:8
171:7 180:18
**meaning**
161:20 167:4
171:16
**means** 187:9
**measure** 120:21
**mediation**
157:12 158:6
**meet** 6:8 9:5,8
23:8 31:19
32:10 40:20
62:5 80:9,19
82:15 84:13
92:16
**meeting** 9:12
11:17 12:1
156:2
**meetings** 11:4,6
**member** 10:8
41:22 44:7,18
144:15,16,16
**members** 116:5
**memo** 65:9
66:9 84:16,18
110:12 112:7
112:13,19
113:9
**memos** 110:6
137:1 138:2
**mention** 137:21
**mentioned**
14:14 30:3
41:20 42:3
53:14 56:7
64:2 78:9
129:10 152:11
177:18
**Mercedes**
168:14,17,23
169:3,6 171:3
175:20,21

**merit** 116:9
122:10 150:5
**messages** 10:17
**met** 10:22
23:10,14 31:6
31:21 32:15
**micro** 24:16
34:12 37:20
37:21 38:7
39:7,9 47:6
**micro-manag...**
21:18
**micro-manag...**
32:20 38:18
**MIDDLE** 1:2
**Mike** 57:14,15
169:4,6
177:20
**mind** 13:7
22:12 45:16
99:23 100:1
128:5
**mine** 173:6
174:15 175:5
178:22
**minimum** 12:1
62:6 80:10,19
80:22 81:6
82:15 84:13
92:17 94:5
**minor** 86:5,11
86:17
**minorities**
121:21 123:14
123:18 130:8
130:10 162:17
**minority** 122:9
122:17 129:11
161:3,6,17
162:14
**minute** 145:20
**mischaracter...**
96:16
**mistaken** 58:15
148:2
**Mitchell** 3:10
4:4 6:2 13:9
13:16 16:17

26:18 31:11
31:15 36:8,16
37:17 42:13
45:11 53:11
59:20,23
60:22 62:20
66:3 68:14
70:21 71:2,8
71:17 73:12
77:9 78:7,22
79:12 83:4
85:10 92:8
95:19 96:15
98:4 104:17
116:23 117:3
117:16 125:18
130:1,4
132:18 137:14
141:9 145:15
155:8,11
162:23 170:12
171:22 174:9
181:2,10,14
181:21 182:5
182:9,14,18
182:23 183:4
183:5,12,23
184:6,14
185:10,12
186:1
**Monday** 71:11
**monetarily**
178:2
**monitor** 131:16
**Montgomery**
174:16 178:18
180:14
**month** 120:20
130:15
**months** 185:18
**Motion** 184:12
**move** 34:14
61:3 100:14
133:13 165:16
183:17
**moved** 53:6
55:3 73:8 74:9
101:6 180:17

**moving** 22:8
25:1,10 73:3
**Mullins** 10:20
**multiple** 51:12
51:15

———————
**N**
**N** 1:14 3:1 4:1
148:11,16
149:22 150:15
151:16 152:13
159:23 160:13
**name** 6:5 7:10
9:16,16 10:7
10:21 11:2
70:6 145:4
149:5 175:7
**named** 116:4
**names** 7:15
149:4
**narrowed**
125:15
**narrowing**
125:20
**naturally** 89:3
**necessarily**
129:17
**necessary** 2:9
89:15 91:9
121:13 183:19
**necessitated**
67:16 88:21
93:14
**necessitating**
184:12
**necessities**
92:19
**necessity** 21:20
24:19 81:23
82:22 86:7,21
87:16 88:21
91:1,11,15
92:6,22 93:3
94:10,18 96:6
**need** 13:16 19:4
45:17 53:9
79:1 183:7
184:5

**needed** 23:16
45:22 158:3
**needs** 82:23
87:16
**neither** 187:14
**never** 83:10
142:18,21
146:13,21
147:16 152:3
174:4,11
**new** 107:16
**nicknames** 7:14
**nigger** 148:23
**night** 18:1,8
34:5,8,15,20
38:15 39:20
**nineteen** 50:8
**nit-picking**
157:2
**nodding** 24:13
24:17 99:13
129:4 161:8
**nondiscrimn...**
84:20 111:18
137:5
**nondiversity**
120:17
**nonemployed**
126:15
**NORTH** 3:13
**Notary** 5:3
187:22
**note** 96:5 181:5
**noted** 19:5
94:10 124:19
**notice** 2:18 16:1
16:19,21
29:14 156:13
**notices** 83:15
83:16 118:22
**notification**
18:20 57:22
**notified** 12:23
13:1 14:21,22
17:3 18:19
27:18 29:18
**notify** 131:14
**notifying** 19:2

57:22
**November** 64:6
64:17 66:4,6
66:14 71:20
72:1,9 76:4,15
78:5 79:13
80:1
**number** 18:8
26:5 28:21
63:11 69:1
70:16 115:3
119:15 120:18
139:14 146:10
162:9 179:8
180:19

———————
**O**
**O** 1:14
**oath** 172:14
**object** 16:17
31:11,15 36:8
36:16 37:17
42:13 45:11
53:11 59:20
68:14 73:12
77:9 78:7 83:4
92:8 95:19
96:15 98:4
116:23 117:16
125:18 130:4
137:14 141:9
162:23 171:22
171:23 174:9
**objections** 2:10
2:13 5:23
**objectives**
118:17
**obtain** 17:21
19:10 20:2
54:19 127:12
**obtained** 17:5
17:10,23
19:15 54:15
73:10 175:21
**Obtaining**
53:17
**obviously** 85:12
**occasions** 82:10

185:23
**occurred** 49:5
58:13 64:1
137:18
**occurrences**
136:21
**October** 62:1
62:10 63:16
64:4 65:23
66:12 71:11
76:1,14 78:5
80:7
**off-duty** 34:5
36:13 39:5,6
47:8
**offered** 2:15
**office** 34:4
37:13 80:6
147:20 159:21
**officer** 10:6,8,9
10:11 22:6
48:23 65:19
84:17 100:15
102:10 118:13
119:22 131:23
144:9 157:4
157:18 161:1
162:22 163:2
165:11 169:11
184:20
**officers** 15:5,8
16:9 18:5,15
34:9 38:13,15
38:18 39:10
46:19 49:16
122:9 123:2
123:13 140:5
146:10 148:1
159:22
**offices** 1:21 5:8
**official** 148:8
**officially** 12:13
**officials** 100:19
101:13,17
103:18 105:20
106:5,8
**Oh** 13:18
**Ohio** 180:17

okay 6:19 7:3
  10:15 11:19
  13:18 16:12
  21:9 23:12
  26:22 27:14
  28:19 32:1
  33:22 34:13
  37:14 41:12
  42:8 64:2
  66:11 69:21
  71:8,23 72:8
  72:23 75:22
  77:20 79:13
  98:20 104:20
  111:15 113:16
  115:14 117:23
  186:3
ol' 42:2
old 93:10,19
once 125:14
  156:12
ones 20:23
  53:20 125:11
  177:3,10
online 131:3,6
  132:2,4 133:3
  133:14,21
  135:10 136:15
  137:22 141:17
open 83:18
openings 142:7
opinion 16:14
  43:22 53:21
  94:15 103:8
opportunities
  122:2 126:4
  139:5
opportunity 6:7
  109:20 117:23
  119:11 130:23
  138:23 139:3
  143:4 163:23
  185:1
option 100:22
oral 5:12
order 13:19
  95:8 116:11
ore 106:23

organization
  43:17 110:15
  150:12
organizations
  83:16
original 28:5
originally 161:1
outside 16:6
  66:23 164:1
  169:10,22
  170:18 174:6
  184:15,19
  185:6
overall 122:16
  125:14 127:19
  128:1
overview 65:10

———————
**P**
P 1:14 3:1,1
P-e-t-t-w-a-y
  175:9
P-e-t-w-a-y
  175:8
P.C 1:21 5:9
page 4:2 21:9
  71:10 72:3,18
paid 178:14
  182:2
pan 109:12
paperwork
  33:5 39:17
Pardon 12:5
  56:10 157:8
Parrish 14:16
  17:8,18 19:2
  19:10,17,22
  20:17 21:5,15
  22:8 24:12
  25:10 27:4
  28:11 29:20
  30:15 31:22
  32:3,13,16
  33:8 35:11,15
  36:11 37:22
  38:5 39:5,12
  41:18,22 43:2
  43:14 44:17

45:7 46:7 47:5
Parrish's 27:10
  28:8,16 34:17
  35:8 43:16
part 10:13 39:8
  85:11,15
  90:13 100:20
  101:23 102:6
  102:15,18
  103:14,20,22
  104:1,3,6,10
  105:3,5,15,19
  110:16 143:11
  148:6 163:10
  164:10
part-time 98:23
  99:3,11
  101:12,16,21
  104:12 108:2
  108:4
participated
  132:2
particular
  20:23 24:6
  36:20 57:1
  58:21 64:9
  75:9 76:5
  85:18 88:16
  94:16 112:12
  112:13,18
  113:12 136:22
  158:14 160:21
particularly
  18:13 115:17
  124:21
particulars
  87:7
parties 1:17
  2:13 13:2
  14:22 17:3
  18:19 27:18
  29:18 116:9
  187:16
party 8:1 9:3
pass 135:3
Pat 107:5
patrol 21:19,23
  25:2 32:22

33:2 34:7
  38:21 39:16
pay 164:3 167:9
  178:12
payments 181:7
  181:20 182:3
  183:11
pending 7:7
  116:7
people 18:13
  30:2 38:21
  48:17 49:22
  50:8 68:5 95:5
  97:6 112:15
  114:2 158:3
  171:2 175:16
  179:12 185:2
  185:4
percent 122:19
  126:18,22
  127:20 128:4
  128:8
percentage
  120:17 122:12
  122:17 123:2
  126:13 129:2
  129:12 130:8
  130:9,13
  171:8
percentages
  120:14
perception
  103:16
performance
  22:7 27:6 28:9
  161:1,23
performed
  64:22 76:21
  77:7 78:4
period 54:10
  55:1 60:19
  76:21 99:2
  182:12
periodically
  135:22 136:10
permission
  167:13
person 9:8,10

20:20 23:9,11
  23:14 31:6,20
  40:21 45:4
  68:10 69:4
  96:22 109:15
  109:17 110:1
  111:15 112:21
  115:18 134:1
  149:16 157:15
  174:6
personal 85:13
  86:16 118:6
  125:22 135:14
  168:9,10
  169:17,20
  173:5 174:15
  178:20,22
personally
  15:18 18:12
  131:23 140:15
personnel
  12:19 27:23
  47:19 57:10
  62:3,15 78:14
  84:3 86:4,5,9
  86:14,18 87:1
  87:15,19 88:6
  88:13 92:23
  95:15 113:21
  114:9 118:19
  118:19 120:1
  120:4,15
  125:10,19
  129:12 130:14
  131:11,20
  132:13 133:1
  138:19 141:4
persons 138:21
  174:6
Pettway 177:1
Petway 175:5
  175:13 176:23
phone 9:9
  10:17 179:7
  180:19,20
phones 179:11
picture 125:14
pioneering

109:10
**PIP** 32:23
39:14 47:7
**place** 114:16
**placed** 95:22
**placing** 47:7
**plaintiff** 1:8 3:3
115:18 116:4
**plaintiff's** 4:13
4:14,15 26:4
26:10 70:15
70:20 71:9
72:5 117:13
139:13,22
**plan** 11:21 22:7
33:1 39:14
47:8 117:22
118:1,5,14,17
119:11,17,21
120:8,12
121:17 140:4
141:2,15
**planner** 98:15
99:15
**planning**
100:22 108:13
108:14 127:8
127:14,16,17
128:12
**PLAZA** 3:12
**please** 6:16,20
7:9 12:16 26:3
63:6 64:12
65:6,15 79:20
139:8
**pockets** 22:5
**point** 18:23
39:3 54:21
61:4 76:5 96:8
97:7 103:19
123:7
**points** 123:8
**police** 10:3 12:2
15:4 16:9
21:17,19 22:5
34:9 38:13,15
61:14 63:20
65:13 67:18

74:23 75:14
75:14,17
80:11,18,23
81:1,3,16 82:7
87:4,12,18
88:10,12 91:5
93:5,7,9,22
94:12 95:8
96:11 97:13
121:10,22
122:4,7,13,20
123:2,3,13,21
125:1,4 131:1
132:16,21,23
136:18 137:10
143:4 146:10
156:5 159:22
174:2
**policies** 136:19
141:8
**policy** 11:20
15:15 16:3,6
85:5 94:3,6,7
95:7,11,16
96:11,19,20
96:20 97:7
118:10,12
137:12 138:10
138:13,16
139:18,23
140:3,8,13
141:18,22
142:11,17,19
**polygraph** 33:5
**polygraphs**
39:17
**population**
126:23 128:6
129:15,21
130:10,18
**portion** 55:15
114:11
**position** 7:17
7:19 21:22
24:21 48:7,23
49:13,18 51:2
51:13,15 54:7
56:9,11 59:19

63:19 67:12
67:18,19 68:4
68:13,21 69:2
69:4 71:22
74:20 75:20
80:13,18
81:16 82:1,20
83:2,6,8,10,18
83:20 84:5,7
85:4 87:2,12
87:19,23
88:12,15,23
89:3,5,14 91:4
91:5,8,12 93:5
93:8,21,22
94:1,16,21,21
95:3 96:7,14
98:13,17,20
100:6,15,21
101:12,12,20
102:5,8,21
103:20 104:12
105:2,5,6,11
105:19 106:13
107:18 108:2
108:6,8,18,20
108:22 109:3
109:7,11
112:19 113:8
113:16 118:8
151:11 160:23
162:22 163:6
163:10,15,16
164:2,7,12,17
165:4,12,18
166:16 169:11
170:8 182:19
183:1,3 184:1
184:4
**positions** 42:6
50:6 80:16
81:20 82:16
83:12,14
87:22 110:23
120:18 123:16
**positive** 40:4
172:14
**possess** 81:4

**possible** 153:18
153:20
**Possibly** 153:20
172:10
**post** 83:13,14
**posted** 83:11,12
83:20 139:7
140:14,17,22
141:2 142:1
142:16 164:23
**posting** 84:5
118:21
**Powell** 67:15
69:7 82:4
**practice** 97:2,5
115:16
**practices**
114:20 115:22
118:18
**precisely** 78:19
**predated** 87:3
**predicated** 42:4
**preference**
170:20
**preferential**
51:6,11,20
52:13 53:22
**preliminary**
48:8,11 52:3,7
53:5 56:7 57:4
73:2
**preparation**
13:23
**prepare** 8:10
**prepared** 53:1
121:16
**present** 3:16
9:11 138:5
168:12
**pretty** 19:8
22:10 40:18
57:5 61:7
94:19 108:21
109:15 124:1
156:1 167:8
**previous** 157:3
157:9,17
**previously**

14:14 28:2
63:10 64:16
119:14 143:3
**principle**
138:23
**principles**
139:2
**printout** 28:1
**prior** 2:16 9:6
50:4 54:6 73:3
75:1 91:4
159:6
**privy** 55:21
109:4 111:22
111:22 112:2
**probably** 19:4
50:7 87:10
98:11 124:13
135:22 151:21
167:16 168:3
172:6 178:4,7
180:8 185:3
**problem** 41:18
**Procedure** 5:6
**procedures**
115:16
**proceedings**
5:13
**process** 49:22
50:11 65:13
71:16 81:14
83:7 84:22
86:1 90:5
109:21 110:17
111:2 114:12
119:1 122:11
**produce** 85:9
182:22 183:16
183:21 184:10
**produced** 63:10
64:16 83:23
85:19 119:14
121:3
**professional**
81:5
**program** 121:1
121:8 131:4,7
131:8 132:7

133:3 141:16
144:2
**progressive**
80:21
**promote** 49:12
60:10 73:19
74:16,23 75:5
75:17 97:11
**promoted** 42:6
48:9,21 52:3
56:17 58:16
60:23 97:13
100:3,23
122:7,10
132:14 163:13
172:20 174:4
**promoting**
115:21
**promotion** 48:8
49:10 55:6
63:19 73:23
87:5 100:15
100:16,18
115:21 118:7
139:4 163:22
164:7,9
**promotional**
58:21 71:15
**promotions**
89:21 122:4
**prompted** 18:4
**pronounced**
161:14
**proper** 15:22
16:15 80:11
**properly** 48:19
49:23 52:12
53:19
**provide** 22:3
30:15 32:6
33:4,11 45:14
83:22 110:13
119:22
**provided** 5:5
8:13 22:13
30:18 32:5
33:4,7,8 35:2
35:16 37:13

47:17,18 50:1
58:2 69:22
86:7,21
118:23 127:8
129:12 133:3
160:18
**provides** 120:2
120:5,6
**providing**
33:17 39:17
80:7
**provisions**
115:1
**Public** 5:3
187:22
**pulled** 50:5
**purchase** 171:4
**purchased**
170:21
**purchasing**
48:10,21 49:6
52:4,6 56:18
57:1 60:23
61:3 73:3,9
74:9 75:21
100:3,6,9,11
100:14,23
101:7 163:14
163:20,22
164:2,7
165:17 166:1
**purpose** 118:4
118:4
**pursuant**
121:16
**put** 12:18 16:1
16:19,21
27:23 33:1
39:14 50:12
83:14 100:20
114:16 156:13
167:11 179:12
183:13

———————
**Q**
———————
**qualification**
48:14 82:15
**qualifications**

12:2 50:12
51:18 62:6
69:10,12
80:15 81:3
82:3,23 89:1
90:4 92:17,20
93:8 94:4,8,12
94:23 95:4
110:16 118:8
**qualified** 81:19
**qualify** 68:3
84:13
**question** 6:15
6:17 7:7 20:1
23:13 32:9
35:4 56:23
73:13,16
78:22 79:2
86:13 89:17
90:1,7 91:17
92:2 104:18
104:22 130:2
132:19 140:2
145:16 154:20
169:12,14,16
170:3,16
181:11,13,16
181:17 184:10
**questioned** 23:4
40:13 61:14
**questioning**
26:9 39:19
155:23
**questions** 2:11
2:12 6:12,21
134:10 158:2
187:8
**quick** 22:13
61:7 70:13
130:20
**quit** 152:19

———————
**R**
———————
**R** 3:1 187:2
**R-e-a-d-i-n-g**
161:12
**race** 15:10
28:20,23

39:22 42:4,7
43:10,15 46:5
49:9 59:16
60:8 74:17
97:14 115:9
115:20 117:13
137:5,12
138:20 144:6
144:7,17,18
145:13,16,23
146:14,21
147:2,14
150:5 151:4
153:3 154:1
158:11,18
159:11,18
**racial** 52:22
146:11
**range** 166:15
**rank** 10:9 48:12
**ranked** 50:6
**ranks** 112:17
114:1
**reach** 121:12
124:23
**read** 12:20 27:1
62:19 69:22
72:21 79:18
80:5 117:19
**reading** 2:3
117:7 161:10
161:15,16
162:1
**real** 22:13
143:22
**realized** 149:18
**really** 123:4
147:16
**ReaMonica**
146:7 153:15
154:13 155:2
159:14
**reapplied** 164:5
**reask** 6:17
**reason** 37:6
60:6 80:8
102:2 108:15
126:6 133:22

164:4
**reasoning**
108:1
**reasons** 126:2
**reassignment**
21:16,22
24:23
**rebuttal** 12:18
12:21 14:16
27:3,9 33:20
**recall** 10:6 11:3
36:4 55:5
60:11 71:17
85:18 90:15
99:22 101:3
120:22 134:4
136:22 146:6
146:23 147:1
148:9,13
150:12 159:16
176:16 177:13
**receipt** 57:23
72:15 178:9
**receive** 29:14
112:5 160:6
160:10 171:6
**received** 17:22
18:20 29:10
31:2 73:9 84:6
85:3 120:23
128:11 140:13
141:21 142:11
144:8 146:7
166:10 171:20
172:3,15
178:2
**receiving** 29:16
63:22 165:3
166:11
**recess** 130:21
**recollect** 128:18
**recollection**
74:4 106:2
**recommend**
162:8
**recommenda...**
106:13
**recommenda...**

150:1
recommends
  112:22
record 7:10
  13:12,13
  25:23 26:1,3,8
  26:14 64:14
  70:10,11 80:1
  85:21 119:5,6
  119:8 139:10
  139:12 181:5
  183:9,13
recorded
  150:15,17
recording
  151:7
records 83:19
  178:8
recruit 123:18
  138:17
recruited
  172:21 180:10
recruiting
  110:7,17
  115:21 118:5
  118:21 123:10
  123:17 173:15
  173:19,22
  179:2 180:7
recruitment
  173:1 174:7
refer 175:17
  176:11
reference 61:5
  140:18
referencing
  124:15
referral 172:4
referrals
  172:17 178:3
  184:16
referred 14:2
  44:15 174:12
  176:14 177:11
  177:14,16
referring 63:9
  100:13 106:8
  124:14 172:4

refresh 74:3
  106:2
refuse 181:3
refusing 170:2
regard 43:8
  47:11 58:20
  59:12 61:21
  112:6 133:7
  133:14 138:3
  138:20
regarding
  10:17 18:1
  19:11 21:4
  26:12 27:5
  28:9 38:2 40:5
  41:16 45:6
  47:6 63:18
  65:14 74:17
  124:16 159:11
REGIONS/H...
  3:12
register 48:12
  112:16
registration
  167:9,12
regulations
  118:20
relate 71:6
related 14:7,19
  17:6 18:5 19:5
  20:3 29:23
  33:12 36:1,13
  39:6 46:20
  59:18 120:7
  121:1 152:5,8
  181:19
relates 9:14
  33:5 118:10
  120:14 121:9
  125:1 138:1
relating 2:6
  33:14 98:1
relation 56:16
  129:7,20
  187:15
relayed 47:5
relevant 170:1
  170:5,7

religion 137:6
remember
  11:13 12:3,6
  30:20 35:1,14
  39:2 48:15
  49:14,20 53:4
  57:6 58:1
  60:17 61:6
  74:2,11,13
  98:18 99:1,6
  99:19 101:3
  104:5 105:22
  107:4 134:14
  135:6 136:22
  143:5,10
  146:1 147:4,5
  147:7,11
  148:3 150:13
  153:14 158:13
  163:12 165:15
  174:14 176:3
  176:5,18
  177:2
remembered
  55:8
remembering
  34:2
removal 33:1
removed 39:15
  146:18 160:23
repeat 19:13
  91:16
rephrase 6:16
  47:21 89:23
  93:12 104:22
  169:15 172:2
replacement
  163:15
reply 76:15
report 13:5
  14:17 21:6,7
  24:9 26:17,19
  26:20 27:5,11
  28:8 30:11
  76:9 106:15
  106:17 120:19
  130:14
Reporter 5:2

5:17,20
  104:15
reports 17:23
  22:4 25:5
  30:16 34:19
  35:9,10,12
  36:19 119:23
  120:2,5,23
  121:15 129:11
represent 6:6
  116:6
represents
  187:11
request 18:4
  30:12 46:21
  80:8 85:21
  180:23 181:6
requested 24:9
  29:22 30:4
  31:7 121:6
requesting
  71:13 72:19
  183:10
require 67:19
  93:4 141:6
  142:9,12
required 67:14
  69:3 80:19
  81:2 82:2
  88:23 93:22
  133:4 140:12
  150:5
requirement
  141:12,20
requirements
  80:10,20 82:6
  88:15 96:6
  139:4
requires 80:14
  96:12 141:14
requiring 81:4
  90:18
reserve 5:23
reside 178:17
residents
  127:23 128:2
resign 152:19
resolution 99:7

116:6
respective 1:18
respond 183:4
response 21:10
  28:16 64:20
  66:7,13 78:15
  80:7 104:7
responsibilities
  89:4 95:4
responsibility
  80:14 82:2,6
  89:1 93:23
  118:12
responsible
  165:2
result 12:1
  20:12 50:18
  51:10 58:14
  59:1 66:9 92:3
  105:7 151:6
  157:12 158:8
  187:17
resulted 81:18
results 58:9
  73:11
resume 110:9
  110:19 164:21
resumes 110:13
  110:18,21
retain 37:12
  151:11
retaining 129:8
retaliated 159:1
retaliation
  144:22 145:13
  145:19 154:9
  154:11,22
  155:6,18
  158:21
retired 82:4
  152:20
retreat 135:17
  135:20,22
  136:1 137:18
retreats 185:14
return 163:17
returned
  138:14 162:6

review 11:15
46:1 54:6
62:21 67:9
84:22 86:6
110:5,9,11
111:9,14,17
111:23 112:1
125:5,6,8,9,16
133:15,16
reviewed 8:14
11:12,14,16
13:23 14:18
35:10 36:19
67:17 69:8
77:18 81:22
82:19,21
84:15 85:3
133:17,20
134:7
reviewing
27:16 36:21
50:3 62:23
80:5 133:7
reviews 84:17
88:3 93:1 96:2
112:1
revised 119:19
RHONDA 1:19
5:1 187:20
rift 43:13
right 9:22
20:10 23:20
23:22 35:22
36:23 37:23
42:9 45:8 49:7
50:17 51:21
54:14,17 58:8
60:2,13,14
62:14 66:6
76:19 77:23
95:17 99:7
111:9 120:9
125:21 126:1
134:12 149:5
150:13,19
166:2
ring 151:20
Robinson 17:9

17:19 19:18
19:19 20:18
30:6 31:23
32:14 43:4
role 10:15
99:21 184:20
room 11:8
rule 68:2 94:3
113:22
rules 2:6 5:6

————————
S
S 1:14,14 3:1
4:11
S-o-w-e-l-l
107:3
s/Rhonda
187:19
safely 151:23
SAITH 186:6
salary 165:16
165:20 166:11
salesman
177:20
satisfy 77:15,21
saw 12:21 46:1
48:11 179:20
saying 32:4,5
42:1 50:23
68:9 78:16
88:8 95:6
159:21 166:6
170:4 182:6
182:10,15
says 95:7,14,15
102:9 111:10
115:6,8 116:6
117:2,4,4,9
Schmitz 168:22
169:4,10,21
170:17,22
177:20 178:10
178:12 184:19
Schmitz's
168:16,20
169:7 171:17
171:21 172:5
174:5,13

175:22 176:8
176:15 177:14
181:7 184:17
schools 168:4
score 51:9,16
54:3,16,18
58:7 112:15
scored 48:14
50:10 52:10
55:2
scores 53:15
54:13 58:5
134:22
scoring 51:17
51:23
scratch 47:2
second 18:19
25:23 49:4
72:18 139:11
158:20 162:12
162:21 164:12
Securities
173:8,9
see 13:7 21:7
42:5 55:2,21
63:6 64:11
65:5,15 70:1
79:2,20 82:21
84:4 96:3
101:5 110:14
111:7 113:17
114:3 119:2
125:13,14
131:19 139:8
169:17 175:4
179:18 182:1
185:10
seen 124:8
134:9 143:17
seldom 167:19
selected 48:13
84:8 164:22
selection 84:15
84:16 110:6,11
110:6,11
111:8,12
112:7,11,19
113:9,13,15

114:12 118:23
125:12 136:23
137:4 138:2,4
138:18
selections
111:17 137:3
137:8
senior 81:7
seniority 68:7,9
sensitive 39:19
sent 19:1 21:11
23:6,18 65:10
65:22 66:2,5
71:20 76:2,15
78:11,15
84:17 156:6
September
12:12 13:3,5
14:2,12 26:13
26:16 60:5
sergeant 48:7
49:13 50:5
51:2,13,15
55:7,9 59:4,22
60:12 74:1
series 6:12
serve 140:5
served 134:1
157:16
service 55:15
69:16 113:23
118:19
services 21:21
24:20 25:2,3
set 132:11
settlement
116:7
seven 172:8,9
172:16 175:15
177:6 178:4
seventy-five
165:7,23
166:13
seventy-nine
165:8
sex 137:6
138:20
sexual 147:10

147:21
sexually 159:22
shaking 6:23
154:16 178:11
share 177:9
sheets 59:8
Sherrer 1:21
5:9
short 54:10
55:1 70:14
170:14
shorten 180:22
show 45:23
70:6,19
121:20 122:3
147:22
showed 14:6
shown 67:10
121:9,11
shows 84:18
121:23 122:6
129:12
sic 71:20
side 156:16
sign 106:12
140:5,12
141:20,23
142:10,13
signature 2:2
signed 138:13
139:5 143:21
significant
124:20
simply 95:22
sir 76:11 135:1
site 167:17
sitting 35:22
128:23 129:18
131:22 133:19
134:6 137:17
152:2 172:14
174:3
situation 126:2
six 176:17
178:4
small 85:13
Smith 9:17,20
10:23 17:16

145:5 146:3
155:1,9,10,22
158:9,10,16
159:15
**Smith's** 154:22
**smother** 38:22
**Soldiers** 41:23
**solely** 118:7
**somebody**
45:21 68:11
78:21 89:19
179:17
**somewhat**
48:11
**Sons** 41:23
43:18 44:19
**Sonya** 3:4 6:6
**sorry** 79:6 90:7
107:1 126:21
132:18,20
134:23 155:8
**sort** 109:10
141:20 167:5
184:18
**sorts** 8:18
**sought** 164:1
**sounds** 183:20
**SOUTHERN**
1:3
**Sowell** 106:23
107:3,7
**spark** 148:6
**speak** 14:23
22:23 57:2
104:19 123:19
181:22 185:20
**special** 40:6,8
**specific** 12:4,7
59:10 80:8
135:11 137:11
142:19,22
152:10 172:7
185:23
**specifically**
8:22 11:14
18:22 19:20
24:4,11,14
68:22 69:19

105:17 108:17
115:12 143:5
174:1
**specifics** 23:3
**speculate** 123:5
128:22
**spell** 107:1
175:6
**spelled** 115:2
161:11
**spells** 114:23
**spoke** 23:2 47:4
159:8
**Stacy** 17:8,19
19:17 20:17
30:6 31:22
32:13 43:4
**staff** 137:23
173:23
**stamped** 63:11
64:15
**standard** 97:1,4
124:1
**standing** 140:2
**staple** 71:5
**start** 14:11 21:2
98:14 153:11
**started** 57:3,8
104:6
**starting** 52:8
**state** 5:3 7:9
16:4 73:15
129:19 180:2
180:3,7 187:3
187:22
**stated** 49:15
117:12 163:12
**statement**
138:12 139:18
140:3,6
148:21 160:21
181:15,16
**states** 1:1 72:14
96:19,21 97:8
128:7
**static** 127:6
**stating** 15:15
66:14 76:12

76:16,23
**statistical**
121:18
**statistics**
129:21
**status** 50:5
71:13 72:20
**stenotype** 187:8
**step** 87:11
**STEPHANIE**
3:11
**Steve** 17:8,18
19:2,9,17,22
20:17 21:5
27:4,10 28:11
29:20 31:22
32:3,13,16
33:8 34:17
35:8,11,15
37:22 38:5
39:4,12 43:2
43:13 46:7
47:4
**Stewart** 148:10
148:19 149:18
151:1,10
152:15 160:1
162:9
**STIPULATED**
1:16 2:1,8,17
**stipulation** 5:7
**stipulations**
5:21
**stop** 34:13
133:12
**Street** 1:22 3:6
5:9
**strongest**
123:10
**strongly** 124:23
**stuck** 60:5
**students** 172:20
**studied** 129:20
**study** 130:7
**stuff** 112:17
124:9
**subdued** 156:3

**submitted**
27:15 62:2
79:5 80:6
113:7
**subscribed** 42:2
**subsequent**
18:10
**subsequently**
67:15 69:6
82:3
**substantiate**
42:17 44:16
45:15,17,20
46:11 47:10
50:2 52:14
77:14 153:17
160:15
**substantiated**
79:8
**substantiation**
76:13,17
**suggest** 46:2
**summary** 5:23
**Summers** 147:3
159:18
**supervise** 68:1
68:6,11 69:6
95:5 96:14,23
97:6
**supervised**
67:13 107:11
**supervises** 89:7
**supervisor**
21:14 27:3
133:10 156:2
156:4,11,23
157:23 158:9
158:18
**supervisors**
131:4,9 133:4
137:23 155:23
158:4
**supervisory**
68:17,19
**supplement**
108:9
**supplemented**
108:12

**support** 23:16
32:7
**Supporting**
30:10
**supposed**
131:13
**sure** 10:10,21
13:9 35:23
37:1 52:21
55:13 57:5
63:7 72:22
84:18 94:19
108:21 109:18
110:6 111:18
131:12 132:1
136:8 137:3
140:16 176:10
**survive** 108:3
**suspended**
150:3
**sworn** 5:16
123:2
**Sylvia** 147:3
159:18
**system** 15:4,17
16:14

---

**T**

**T** 1:14,14 4:11
187:2,2
**table** 177:7,8
185:1
**take** 7:1,4,7
44:6 46:14
70:12 72:22
121:13 123:12
123:14,17
126:18 130:19
131:4,9,13
133:4 134:20
135:3 140:15
150:6 164:10
170:12
**taken** 1:19 7:21
58:19,22 68:7
84:12 131:15
167:17 173:10
173:14,18

187:7
takes 131:17
talk 39:21 41:7
  42:17 44:4,15
  153:10 167:18
talked 21:6
  34:3,12 39:13
  39:14,16,18
  40:3,5 57:7
  135:17 167:16
talking 48:2
  68:12,16,17
  76:11 77:22
  90:2,4 103:13
  103:16,17
  104:16 127:22
  129:14,15
  136:14,16
  137:2 144:11
  153:9 163:1
talks 118:8,9,16
  120:16 135:7
  137:7 138:15
tape 159:9
  160:16,18,19
tapings 11:21
taught 136:21
technology
  148:11 151:12
tell 8:18 69:18
  85:23 107:23
  121:7 169:9
  170:16
telling 166:17
  182:21
temporarily
  39:15
Temporary
  33:1
ten 81:4 113:17
  113:18 128:21
  182:12
Teresa 150:20
  151:4
terminated
  136:6 159:2,3
  159:6
termination

136:7 140:9
  162:8
terminology
  117:19
test 48:16 50:10
  52:11 53:2
  54:3,13,15,18
  54:23 55:18
  55:21,23 56:4
  73:10 113:20
  115:22 138:18
testified 5:18
  60:22 73:1
  96:18,20
  97:23 117:10
  125:5 154:21
testify 13:17
  91:18,22
  133:20
testifying 73:21
  139:17 168:19
  169:5
testimony 7:1
  44:14 96:17
  117:6 128:10
  146:12,20
  147:13 158:22
  163:8 174:3
  187:12
testing 50:11,15
  50:19 51:1,7
  51:10,20
  52:17 53:10
  59:6,13 118:9
  122:11
tests 48:14 52:1
  52:18 110:6
text 10:17
Thank 13:10
  60:2
thereto 2:16
  187:9
things 28:21
  34:11 40:11
  40:13 114:23
  115:3 120:19
  162:9 167:5
  167:19

think 9:17
  17:15 26:15
  26:16 35:15
  40:18 42:4,7,8
  43:15 45:19
  48:7,15 49:21
  50:7 57:11
  66:2,8 93:6,19
  95:21 97:1,3
  99:5 103:15
  106:22 107:14
  108:16 116:15
  121:11 122:16
  123:23 124:2
  124:7 126:1
  126:17,19
  127:20 128:3
  129:5 131:19
  133:17 137:18
  141:4 143:3
  145:3,4,12
  149:4 150:11
  150:19 153:14
  154:14 155:3
  156:4 157:3
  157:11 161:13
  163:11 169:23
  175:14 176:10
  176:17 177:5
third 9:3
thirteen 126:20
  126:22 128:4
  128:7
Thomas 107:5
  174:18 175:11
  176:20 177:18
  178:16 179:1
Thomas' 179:5
Thorne 157:4
  157:11,14,17
  157:20 158:12
Thornton
  158:11,12,13
thorough 56:6
thought 32:2
  49:22 55:8
  66:3 101:22
  102:1 103:5

thoughts 103:4
thousand 165:7
  165:23 166:14
three 49:1
  50:13 66:19
  81:12 90:18
  93:6,10,19
  97:19 112:14
  112:15,16,18
  113:22 114:2
  114:5 165:7
  175:4 176:19
  179:23 185:18
Thursday
  21:11 185:19
tied 112:17
  114:1
Tim 10:19
  148:10 151:1
  162:9
time 2:14,15
  6:8,14 15:1
  18:23 30:21
  36:3 47:14,22
  48:4,5,9,10,19
  48:23 50:9
  54:11 55:2
  56:5 57:12
  60:19 61:17
  68:12,16
  72:22 73:6
  75:9,13,23
  76:2,6 82:12
  82:13 83:2
  85:1 89:11,20
  93:5 96:1
  98:22,23 99:4
  100:8,20
  101:22,23
  102:2,3,5,6,14
  102:15,18,18
  103:14,14,19
  103:20,21,22
  103:23 104:1
  104:2,2,4,6,6
  104:10,10
  105:3,5,12,15
  105:19,23

106:5,6,22
107:15,18,22
108:6,13,17
108:20 122:15
127:21 135:23
136:2,12
140:8 143:8
143:11,12
148:3 158:20
162:21 163:10
163:11 164:10
164:13,14,16
171:1,1
179:19 180:6
timelines 69:21
  78:21 79:4,10
times 49:2 50:7
  51:12,15
  58:19 110:12
  163:5 171:19
  172:3 180:9
Timmy 59:5
Title 12:22
  14:20 109:17
  110:7 135:7
  144:11
today 8:11,16
  9:6 14:1 129:1
  129:18 131:22
  132:10 133:19
  137:17 152:2
  172:14 174:4
  184:9
told 41:6,9 43:9
  43:12 45:2
  46:12 57:15
  86:4 96:10
  160:12
top 50:12
  112:15 114:5
  166:15
topic 37:20
  85:12,15
topics 185:20
total 126:16
  177:5
track 15:7
Tracking 12:18

12:20 14:15
14:17 15:3,17
15:20 16:5,8
19:6 27:3,5,7
27:10,14,21
28:3,6,7,8,13
28:17 30:11
30:17 32:19
33:15,17,18
33:19 40:5
47:18 60:4
**train** 138:18
**training** 22:9
25:10 65:19
130:23 132:2
132:22 133:7
133:15,16,21
134:18 135:10
135:15 136:13
136:17 137:9
142:19,22
150:6,8 168:4
**transcribed**
187:9
**transcript**
187:12
**transcription**
187:10
**transfer** 21:23
**transferred**
49:6
**travel** 168:5
**treated** 41:4
43:11 46:2,3,7
46:8,11 48:6
53:22 109:19
156:9 159:1
**treating** 156:23
157:23
**treatment**
21:16 32:21
52:14 109:21
156:11
**trial** 2:14 6:1
**tried** 124:22
162:3
**true** 40:12
160:22 162:10

172:19,22,23
173:3 187:11
**trying** 49:20
74:13 90:22
121:12 134:14
145:12 150:11
150:19 153:13
174:14
**turn** 21:9
**TV** 124:9,15
**twelve** 128:7
**twenty** 126:17
127:20 165:8
**twenty-three**
122:18
**twenty-two**
122:18
**twice** 163:8
**two** 8:13 49:1
60:12 61:8
70:23 71:2
73:13 74:18
93:6,19
106:19 107:8
112:15 123:16
146:2 162:11
162:14 174:18
175:9,11
176:4,22
179:23
**two-page** 70:22
**type** 42:2
145:21 173:15

---

**U**

**U** 1:14
**uh-huh** 6:10,22
72:10,13,17
90:21
**Um** 38:3
**unclear** 90:17
**understand**
6:15 109:9
169:14,16
182:5,9,14
**understanding**
15:6 16:7 86:3
158:6

**understood**
163:7
**undoubtedly**
77:15 158:7
**uneased** 40:10
**unfair** 50:16,19
51:2
**unfounded**
66:15 92:14
114:22 115:5
115:10 116:13
116:16,21
117:15 161:5
**unh-unh** 6:22
**uniform** 80:12
**United** 1:1
128:7
**University**
180:4
**unsubstantiat...**
78:17
**updated** 67:17
118:3 119:13
**upset** 155:22
**use** 61:4 116:14
132:6 148:16
149:21 152:13
167:6,14
168:1,8
**Usual** 5:20
**utilities** 144:23
**utilize** 112:14

---

**V**

**vacancy** 93:2
100:7
**vacant** 81:21
82:20 95:23
**valid** 77:13
84:19 111:18
137:4 139:3
**validate** 41:6
41:10 44:17
**validated** 52:19
110:7
**varies** 122:15
171:15
**various** 19:4

21:6 29:23
34:20 40:16
83:15 115:16
149:23
**vehicle** 168:8,9
168:11 179:21
**vehicles** 170:22
174:18
**verbal** 160:10
**version** 119:16
**versus** 82:7
101:16 126:14
129:2,22
130:9
**Veterans** 43:19
44:19
**view** 124:9
141:7,14
**violation**
109:16
**visibility**
109:18
**visible** 123:16
142:2
**voice** 103:7
**voluntarily**
152:22 182:22
183:16,21
184:11
**voluntary**
118:2
**voted** 162:12,17
**vs** 1:9

---

**W**

**W** 1:20 5:1
187:19,20
**Wait** 104:17
**waived** 2:4,19
**want** 9:6 12:14
25:19 171:10
171:12 182:11
183:9
**wanted** 23:7
100:19 101:14
103:23 104:3
108:16 147:23
163:21 164:3

167:18
**Ward** 59:5
**warning** 15:8
**wasn't** 77:6
84:23 105:10
116:17 132:23
148:5 150:15
151:16,22
162:4 166:16
**way** 6:23 108:3
143:22 144:3
151:8
**we'll** 49:3 71:4
145:19 153:11
181:4
**we're** 7:4 68:16
68:17 90:2,3
103:16,17
180:22 181:2
181:6 183:17
**we've** 6:7 59:17
109:8 122:2,6
**website** 83:14
**went** 16:15 52:6
66:22 70:7
75:21 98:23
99:4 100:10
108:12 114:21
142:14 163:21
182:1
**weren't** 37:1
**West** 1:21 5:9
57:14,15
160:3 164:17
165:5 167:14
**Westbury**
151:18
**whereabouts**
156:1 158:3
**white** 42:19,20
42:22 43:2
46:21 49:16
51:4 53:23
151:1,5
158:19
**whites** 126:14
129:2,22
**whittled** 138:5

Darryl Matthews

**wise** 131:19
**witness** 2:3
  5:11,16 8:7
  24:13,17
  26:20 61:20
  64:13 65:16
  70:2 79:3
  91:21 99:13
  104:20 119:3
  129:4 139:9
  154:16 155:10
  155:13 161:8
  178:11 187:13
**witnesses** 85:11
**woman** 123:18
  129:15
**wondering**
  109:1
**word** 35:8
  44:12 45:10
  45:10,18,19
  148:5,8,11,16
  149:22 150:15
  151:16 152:13
  159:23 160:13
**words** 16:2
**work** 127:23
  180:1
**worked** 44:9
  98:9
**workforce**
  129:13,20
  130:9,14
**working** 41:18
**workload** 40:7
  101:19 103:14
**works** 173:6
  180:3
**wouldn't** 46:5
  87:19 108:11
**Wright** 150:21
**writing** 22:14
**written** 29:15
  30:11 55:15
  94:7 95:16
  147:12 160:9
  164:19
**wrong** 156:9,23

---

**X**

**X** 4:1,11

---

**Y**

**Y'all** 104:15
**Yeah** 30:7
  82:19 113:14
  131:8 136:16
  154:23
**year** 98:12
  100:8 101:1
  128:20 131:9
  145:9 150:5
  165:9 180:8
**yearly** 131:5
  133:5 180:11
**years** 48:3 69:9
  80:20,20,22
  81:5,7 90:18
  90:19 93:6,10
  93:19 128:21
  128:21 144:23
  152:21 177:23
  179:23 180:18
  182:12

---

**Z**

---

**0**

**000591** 63:12
**000595** 64:15
**03-07-2017**
  187:23

---

**1**

**1** 4:13 26:5,10
  31:10 72:3
**1:14-CV-00592**
  1:5
**10th** 27:16,19
  29:8
**121** 3:6
**139** 4:15
**1697** 119:15
**1717** 119:15
**17th** 27:17
  29:11,16
**185** 4:4
**18th** 12:12 13:4

---

13:6 14:3,12
  26:13,16
  59:16
**1901** 3:13
**1975** 115:15
  116:1 119:13
**1976** 114:17
**1998** 98:19 99:1
  99:5,18
  105:10 107:12
  163:12
**19th** 118:2
**1st** 65:2

---

**2**

**2** 4:14 70:16,20
  71:9,10 72:5
**2000** 100:1
**2001** 71:11 72:1
  72:2,9,16 73:8
  74:7,15
**2003** 56:18 61:1
  73:4,9 74:10
  100:1 101:6
  105:14,18
**2007** 80:18 83:8
**2009** 62:1,10
  63:16 64:4,6
  64:18 65:2,12
  65:20 66:1,4,6
  66:13,14 76:1
  76:4,8,16 77:1
  77:18 78:2,11
  79:14 80:1,7
  81:2 118:3
  119:13,19
**2011** 71:20
**2012** 138:14
  139:6,19
  145:10,11
  163:4 165:13
**2013** 13:6 14:3
  14:12 21:12
  26:13,16 27:2
  27:4,10,11,16
  27:17 28:10
  28:18 29:3,17
  59:16 60:7

---

74:16 97:15
**2015** 1:23
**2400** 3:12
**24th** 1:23
**26** 4:13
**26th** 98:11
**28th** 115:23
**29th** 62:1,10
  63:16 64:4
  65:23 66:12
  71:11 76:1,14
  78:5 80:7
**2nd** 71:20 72:1
  72:9

---

**3**

**3** 4:15 66:4
  139:14,22
**30(b)(6)** 61:20
  85:12,16
**335** 1:21 5:9
**35203** 3:14
**35242** 3:7
**36301** 1:22 5:10
**3rd** 64:6,17
  65:12,20 66:6
  66:14 67:4
  76:4,16 77:1
  77:18 78:5,10
  79:13 80:1
  115:15

---

**4**

---

**5**

---

**6**

**65** 48:15 50:10
  50:18,21 51:9
  52:10
**6th** 3:13 72:16
  73:8 74:7,15

---

**7**

**7** 4:3 12:22
  14:20 109:17
  110:7 135:7
  144:12
**70** 4:14

---

**75** 118:2

---

**8**

**8** 27:4
**88** 98:19 99:3
**8th** 21:12 27:11
  28:10 138:14
  139:6,19

---

**9**

**9:00** 5:10
**95** 99:5,8
  107:14
**98** 99:3,8
**9th** 27:2,9
  28:18 29:3
  76:8 78:2

---

Darryl,

The following is in response to your email sent to me on Thursday, August 8, 2013:

- **Captain Grays' lack of communication with (supervision) Major Parrish**—Major Parrish has reported to me that Captain Gray resists communicating with him unless it is job related and absolutely necessary. This has gone on since Captain Gray's transfer. I have noticed Captain Gray increasingly communicating more with me and less with his supervisor by mid-year. This has caused me to have to deal more with Captain Gray from a subordinate standpoint than I really have time for and is the root of the controversy of whether or not he communicated some off time to his supervisor. Major Parrish and I have discussed this and he advised me he covered that in Captain Gray's mid-year Coaching Session and it seems to be some better. Captain Gray's resistance to communication with Major Parrish has caused instability in the Administrative hall. He is often in his office with the door closed and it radiates uneasiness among the other captains.

- **Captain Grays' alleged disparate treatment in the re-assignment of Captains' to police bureaus**—Other than what is explained below, Captain Gray has not expressed any allegations of disparate treatment to me. Assignments made in this Department are not grievable. The Personal Board has always maintained this posture. I assign officers to areas where I believe they can most benefit the Department as a whole and often time, as in this case, following a recommendation and discussion with the supervisor .

- **Allegation of Captain Grays' micro-management of Police bureau's i.e. Patrol and Administrative Bureau**—Major Parrish has reported to me on numerous occasions that Captain Gray is very "hands-on". He says that Captain Gray does not seem to have trust among his subordinates, nor does he seem to trust them. Rather than delegate authority to another supervisor, he tends to handle matters himself. Major Parrish said he has tried to communicate this to him as delicately as possible, but is met with accusations of discrimination. The incident involving disciplinary action received by Captain Gray is an example of perhaps over-managing an incident.

1. **The Business necessity for the Administrative Services Lieutenant position.**

I created the Administrative Services Lieutenant position at the request of Captain Stacy Robinson. Captain Robinson approached me in late March 2012 when he was serving as the bureau commander of Administrative Services. His desire was to stream-line his operation by placing his jail commander, Lieutenant Mark Nelms over the various divisions within his bureau. The division that was excluded at the time was the Communications Division because it was supervised by Lieutenant Woodham—an officer of equal rank with Lieutenant Nelms. I issued the memo for implementation on April 6, 2012.

2. **Re-assignment justification used to transfer Captain Gray from the Patrol Services Bureau to the Administrative Services Bureau and what was used to make that determination.**

Major Parrish first approached me about possibly changing the command staff around in the late summer of 2012. Captain Gray seemed to have a problem maintaining the flow of



PLAINTIFF'S EXHIBIT

paperwork relative to Patrol Services up the channels to my office. I do not have specific dates documented, but I recall Major Parrish and I having that conversation on numerous occasions when Captain Gray commanded Patrol. At one juncture, he was reviewing all polygraph reports administered by our examiners. They were late to the point I placed the dissemination and review of them under Lieutenant Woodham. Major Parrish also advised me that he felt Captain Gray was over-managing his bureau and morale was on the decline under his command. I told him I would consider the move as the year progressed. It was around that time that I directed the Major to discuss a Command Climate Survey for the department.

By mid-summer there had been two late-night incidences at local night clubs that Captain Gray had interaction with his subordinates. On one of those incidences, he received disciplinary action, and was temporarily relieved of his command and received a Performance Improvement Plan. Command was later reinstated. He improved for a time and began gradually reverting to previous ways of paperwork lagging in his office when it needed to be moved up the channels. Major Parrish advised me later in the year that he felt we could make our department more productive and increase morale by having Captain David Jay command Patrol Services. He also recommended that since Investigative Services was the least tasking to manage; Captain Robinson (who has health issues) would be his choice to assume those duties. In January, I issued the order to make the changes. This was largely due to Performance Management planning issues. Throughout this entire time frame, Major Parrish never advised me that Captain Gray was not capable of managing as a captain; rather he felt we could be more efficient making this adjustment.

3. **Internal Affairs reports on the incident that happen at Eton, Pockets and the place where the counterfeit money situation occurred**

   (See attached)

4. **A report of the Police incident involving Officer Markow.**
   (See attached)

5. **A copy of Captain Grays' Performance Improvement Plan**

   (See attached)

6. **Justification for Major Parrish moving Communication and Training from under Captain Gray.**

   Prior to Major Parrish and I meeting with Captain Gray and notifying him of the transfer in assignments, the Major requested that he be allowed to maintain command of Communications Division and the Training Division for a few months in order to see if Captain Gray could effectively manage what he had been given efficiently. Major Parrish said he intended to relinquish both Communications and Training once Captain Gray showed he could handle the current assignment without difficulty.

Major Parrish reported to me on January 23, 2013 that Captain Gray came to see him and they had a candid discussion about Captain Gray's management of Patrol Services.  He later advised me that he met with you at your request on February 1, 2013 and discussed some issues Captain Gray had brought to your attention.  He said you told him that Captain Gray seems to be of the opinion that he, "went from being number 3 in the command to number 5".  He is the senior captain due to time in service.  Captains are not viewed like that by any employee in the Department.  Both Major Parrish and I have served in the capacity as captain over Administrative Services and have never seen it that way.

Major Parrish contacted me in mid May and said he was ready to relinquish the Communications and Training Divisions to Captain Gray.  We discussed his efficiency and he felt it was adequate.  Major Parrish reported to me that he discussed this with Captain Gray on May 22, 2013 and explained how Captain Gray was free to set up the structure within his bureau however he wanted it.  He said Captain Gray just "snickered" and started looking around.  He said he asked Captain Gray for a plan on how he wanted to organize the bureau and he has not received that plan. (see attached memorandum)  Since that time Captain Gray has filed a complaint and requested he be removed from Major Parrish's chain of command.  I have denied that request.

There has been an issue in where leave requests are concerned.I have tried to remedy this by standardizing the process of requesting leave (see attached memo). Where this is not really a problem with the majority of the department, it has been an issue among the command staff, specifically with Captain Gray.

I hope this will suffice.

Sincerely,

Gregory J. Benton



# City of Dothan, Alabama

OFFICE OF
EQUAL
EMPLOYMENT
OPPORTUNITY

November 2, 2001

Mr. Ivan Keith Gray, Sergeant
City of Dothan Police Department
126 N. St Andrews Street
Dothan, Alabama 36302

Dear Mr. Gray

 This letter acknowledges my receipt of your complaint on August 6, 2001,
regarding the Police Lieutenant position (286-2001-P1) which was filled August 26,
2001.  As this juncture, a preliminary investigation of your complaint has been
conducted.

However, to complete the investigation and present my findings, it is requested
that you provide written information and/or evidence to support your complaint.
Please include the names of police officers and/or other personnel involved in the
Police Lieutenant promotional process that should be interviewed during my
investigation.

As the City's EEO Officer, I will conduct this investigation with complete
confidentiality but once police officers and/or other personnel are contacted,
confidentiality can not be assured.  In conclusion, it is a matter of protocol that
Department Head, Chief John White be notified of the ensuing investigation and
interviews with department personnel.  If you have any questions regarding this
letter, please contact me at the number listed below.

Sincerely, I am

Frederick D. Mathews

F. Darryl Mathews, EEO Officer

PLAINTIFF'S
EXHIBIT

2 DM

POST OFFICE BOX 2128 • DOTHAN, ALABAMA 36302 • TEL 334-712-2682 • FAX 334-793-0449

Gray, Ivan Keith

| | |
|---|---|
| **From:** | Gray, Ivan Keith |
| **Sent:** | Monday, October 29, 2001 8:47 AM |
| **To:** | Mathews, Darryl |
| **Subject:** | Complaint |

**Importance:**        High

Sir,

I am sending this e-mail in order to check the status of my complaint with you regarding the Police Lieutenant's Promotional Examination Process.  As you requsted, and at the advice of my attorney I am waiting for your investigation to conclude.  If posselbe would you let me know what progress if any you have made in this matter.

Sgt.I. Keith Gray, MS., CH.t., PDD
Internal Affairs Division
Dothan Police Department
210 N. Saint Andrews Street
Dothan, Alabama 36303
PX. (334) 671-5575
FAX (334) 793-0434
Email: IKGray@dothan.org

1



# THE CITY OF DOTHAN
## DOTHAN, ALABAMA

May 8, 2012

## STATEMENT OF EEO POLICY

It is the policy of The City of Dothan to insure affirmative action in providing equal employment opportunities without regard to race, creed, religion, color, sex, age, handicapped persons or national origin, except where age or sex is a bona fide occupational qualification.

In the implementation of this policy The City of Dothan will, among other appropriate actions:

I.   Recruit, test, select, hire, train and promote personnel in all job classifications without regard to race, creed, religion, color, sex, age, handicapped persons or national origin, except where age or sex is a bona fide occupational qualification.

II.  Base employment decisions as to further insure the principle of equal employment opportunity to all.

III. Base employment decisions as to further insure the principle of equal employment opportunity by imposing only valid and job-oriented requirements for promotional opportunities.

IV.  It is the announced policy that all personnel actions, such as compensation, fringe benefits, or promotional training, social or recreational programs will be administered without regard to race, color, sex, religion, age, creed, handicapped persons or national origin.

Periodic analysis, at least every twelve months, will be made by the Personnel Department to insure that personnel actions are in accord with the aims and stated objective of this program.

MIKE SCHMITZ, Mayor
*Board of City Commissioners*

DELVICK J. MCKAY
*Personnel Director*

DARRYL MATHEWS
*EEO Officer*

cc:   Department Bulletin Boards
      Mayor and Commissioners
      City Manager
      Department Heads
      Personnel Board



PLAINTIFF'S EXHIBIT

3   DM